**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| In re Syngenta AG MIR162 Corn Litigation | ) | MDL No. 2591 |
| | ) | Case No. 14-md-2591-JWL-JPO |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| This document relates to: | ) | |
| *Trans Coastal Supply Company, Inc. v. Syngenta* | ) | CLASS ACTION COMPLAINT |
| *AG, et al.*, 2:14-cv-02637-JWL-JPO; | ) | |
| *Winnsboro Elevator v. Syngenta Corp., et al.*, | ) | |
| 2:15-cv-02330-JWL-JPO; | ) | |
| *Rail Transfer Inc. v. Syngenta Corp. et al.*, | ) | |
| 2:15-cv-02024-JWL-JPO; | ) | |

## NON-PRODUCER PLAINTIFFS' MASTER CLASS ACTION COMPLAINT

Non-Producer Plaintiffs, Winnsboro Elevator, LLC, Rail Transfer, Incorporated, and Trans Coastal Supply Company, Inc., (collectively, the "Non-Producer Plaintiffs") on behalf of themselves and all others similarly situated, for their Non-Producer Plaintiffs' Master Class Action Complaint against Syngenta AG ("Syngenta AG"), Syngenta Crop Protection AG ("Crop Protection AG"), Syngenta Corporation ("Syngenta Corp."), Syngenta Crop Protection, LLC ("Crop Protection LLC"), Syngenta Seeds, Inc. ("Syngenta Seeds"), and Syngenta Biotechnology, Inc. ("Syngenta Biotech") (Syngenta AG, Crop Protection AG, Syngenta Corp. Crop Protection LLC, Syngenta Seeds and Syngenta Biotech are sometimes hereinafter collectively referred to as "Syngenta" or "Defendants"), allege, on personal knowledge as to themselves and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

Biotechnology holds promise to potentially improve the lives of many. But it also can cause extraordinary harm if handled irresponsibly.

Part of acting responsibly requires that biotechnology companies avoid introducing a new genetic trait into the market prematurely before it has been approved in all significant export

1

markets.  All in the industry, including Syngenta, recognize that premature commercialization can cause significant trade disruptions and enormous harm to farmers and other industry participants.  That is why they have pledged to each other and to other stakeholders, including both corn farmers and other industry participants, that they will act responsibly in introducing new bio-engineered genetic traits into the market.

In 2010, Syngenta had the opportunity to act responsibly.  Its new genetically modified corn Agrisure Viptera®, containing the MIR162 genetic trait, had just been approved for sale in the United States.  But Syngenta was aware that a large and growing export market for U.S. corn and corn products, China, had not approved MIR162.  In fact, Syngenta had only that same year sought regulatory approval in China, and the average time for regulatory approval in China is 40 months.  It had been previously warned by industry participants not to introduce another MIR genetic trait because of lack of approval in export markets, and the devastating consequences that could occur from such premature commercialization.

But Syngenta also knew that the clock was ticking on expiration of its patent for this genetic trait.  Every year that passed without commercialization meant lost monopoly profits granted by patent.

Syngenta had a decision to make.  It could wait until China approved its new genetic trait and temporarily forego its monopoly profits.  That is what it had pledged to do.  Or it could break its pledge, immediately commercialize Agrisure Viptera®, and create an enormous risk that U.S. corn farmers (also known as "Producers" as defined in the Court's March 10, 2015 Order (ECF No. 287 at 4)) and other industry participants (also known as "Non-Producers") would lose one of their large and growing export markets.

Sadly, Syngenta opted for its monopoly profits over responsibility to its stakeholders.  It commercialized Viptera® in 2010 for the 2011 crop year.

During the 2011 crop year, Syngenta was called upon again by industry participants to show responsibility and stop its overly aggressive commercialization. China's importance as a purchaser of U.S. corn and corn products was continuing to grow and it still had not approved MIR162. Syngenta's response was to *expand* sales for the 2012 and 2013 growing seasons, and capture more monopoly profits.

In November 2013, the very occurrence that had been foreseen by industry participants, including Syngenta, occurred. U.S. exports to China were found to be contaminated with MIR162, which still had not been approved by China. China therefore began rejecting shipments of corn from the U.S. Shipment of distillers dried grain with solubles (DDGS), a byproduct of corn ethanol production sold by many industry participants, were similarly rejected and became subject to a prohibitive certification process in the summer of 2014.

After rejection of U.S. corn and corn product shipments, industry participants in early 2014 demanded that Syngenta immediately halt commercialization of Agrisure Viptera®. They also demanded that Syngenta not commercialize a brand new product, Agrisure Duracade™, which also contained MIR162 and a new event, not approved by China and other export markets -- Event 5307. The industry participants pointed out that they were "gravely concerned about the serious economic harm" to those in the industry, including both corn Producers and Non-Producers, caused by the loss of the Chinese market. At that time, the National Grain and Feed Association quantified the economic harm as already ranging from $1 billion to $2.9 billion.

Syngenta doubled down. It continued to sell Agrisure Viptera®, and launched Agrisure Duracade™ for the 2014 crop year, thereby prolonging the economic harm indefinitely. Those irresponsible actions also ensured that the economic losses to farmers and others in the industry would continue to grow.

These events show corporate greed at its worst.  But there is more.  To attempt to minimize the perceived impact of its conduct, Syngenta actively misled farmers, industry participants and others about the importance of the Chinese market, the timing and substance of its application for approval in China, the timing of when China was likely to approve MIR162, its ability to "channel" Viptera® to non-Chinese markets and otherwise contain the infiltration of Viptera® into the U.S. corn supply and other issues described below.  In fact, even though it represented to the USDA and the public that "there should be no effects on the U.S. maize export market" from deregulation and that it would impose stewardship and channeling requirements to steer Viptera® corn away from export markets that had not approved it, Syngenta did not follow through in any meaningful way on this commitment.  Just the opposite.  When one company tried to channel non-Viptera® corn to the Chinese market by not accepting Viptera®, Syngenta sued to stop that company from doing so.  Syngenta was far more concerned about the impact on its business than it was about the loss of an important export market for the corn industry.

Under the basic laws of supply and demand, when there is less demand for a product, the price is lower than it otherwise would be.  China was a large and growing export market, and was predicted by the USDA to be our largest export market for corn by 2020.  China was also a large and growing market for DDGS, which are also sold by many Non-Producers.  The loss of these markets has caused enormous economic harm to U.S. corn Producers and Non-Producers, and that harm is continuing to grow.  While China finally approved MIR162 in December, 2014, it has not approved Event 5307.  U.S. corn exports to China have not yet begun to recover, and it remains to be seen whether they will ever regain the levels they would have attained but for the embargo.

Those injured by Syngenta's conduct fall into two groups:  (a) Producers (farmers and others actually involved in the production of U.S. corn) who grow corn and sell it to other market

participants; and (b) all of the other Non-Producer market participants affected by the drop in corn prices and/or the rejection of U.S. corn and corn by-products in foreign markets because of the presence of MIR162. This Non-Producer Plaintiffs' Master Class Action Complaint sets forth the claims of the Non-Producers.

Non-Producers injured by Syngenta's conduct include, but are not limited to, "country" elevators, which are local elevators that purchase or store corn; haulers and transfer companies that transport and load corn and corn by-products for export; and exporters of corn and corn by-products. All of the Non-Producers were injured by the collapse of the export market to China and suffered damages from reduced corn prices, from costs associated with lost contracts and rejected shipments of corn and corn by-products, and/or from the disruption and contraction in the export market for corn and corn by-products and the services associated with that market. With this Non-Producer Plaintiffs' Master Class Action Complaint, Non-Producer Plaintiffs seek compensation on behalf of themselves and a Class of Non-Producer participants in the corn export markets, as defined below, including sub-classes of country elevators, exporters, and transporters, from Syngenta for the damage caused by Syngenta's reckless and unlawful conduct.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this case under 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a) in that claims are asserted under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

2.     Additionally, this Court has jurisdiction over this case under 28 U.S.C. § 1332(d)(2)(A) and (C). This case is a class action, as defined by 28 U.S.C. § 1332(d)(1)(B), and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Non-Producer Plaintiffs, individually, and those similarly situated, as more particularly set forth below, include citizens of States other than Minnesota, Delaware, and North Carolina, and Defendants, as more

particularly set forth below, are citizens of Minnesota, Delaware or North Carolina, or of a foreign state, Switzerland.

3.      In the further alternative, this Court has supplemental jurisdiction over this case under 28 U.S.C. § 1367(a).

4.      Plaintiffs originally filed their actions in the Central District of Illinois, the District of Minnesota, and the Western District of Louisiana.  Venue is proper in those districts under 28 U.S.C. §1391(b)(1) and (2).  All Defendants are residents of those districts under 28 U.S.C. §§ 1391(c)(2), in that they each are entities subject to those court's personal jurisdiction.  Additionally, Defendants Syngenta AG and Crop Protection AG may be sued in any judicial district, including in this District, under 28 U.S.C. § 1391(c)(3 ).

5.      Venue is also proper in this District and in each of the Central District of Illinois, the Western District of Louisiana, and the District of Minnesota because Defendants have marketed, sold, or otherwise disseminated, and continue to market, sell, or otherwise disseminate Viptera® and Duracade™ corn in each of these Districts.

6.      Without waiving their respective rights to request that their claims be transferred back to the court in which they originally filed pursuant to 28 U.S.C. § 1407 for trial, Non-Producer Plaintiffs assert that venue is proper in this District for pre-trial multidistrict litigation proceedings under 28 U.S.C. §§ 1391 and 1407 as the action was transferred to this District as part of coordinated pre-trial multidistrict litigation proceedings.  Plaintiffs reserve their right to determine the appropriate venue for trial pursuant to this Court's March 10, 2015 Order (ECF 287) at ¶¶2 a and c.

## PARTIES

7.      Plaintiff Winnsboro Elevator, LLC ("Winnsboro") is a Louisiana limited liability company and was in the business of operating a country grain elevator at which it bought, stored and sold grain, including corn.

8.      Plaintiff Rail Transfer, Inc. ("Rail Transfer") is a Minnesota corporation with its principal place of business at 800 Grotto Street North, Saint Paul, Minnesota 55104.  It provides loading and other logistical services to exporters of corn by-products to Chinese importers.

9.      Plaintiff Trans Coastal Supply, Inc. ("Trans Coastal") is an Illinois corporation with its principal place of business at 2803 North 22nd Street, Decatur, Illinois 62526. Trans Coastal is engaged in the business of buying and exporting corn and corn products. Trans Coastal also has a branch office located in Brea, California, which assists in marketing to China, Korea and other Southeast Asian destinations.

10.      Defendant Syngenta AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.  Syngenta AG is a publicly traded company on the Swiss stock exchange. American Depository Receipts for Syngenta AG are traded on the New York Stock Exchange. Syngenta AG was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals and is the only publicly traded company among the various Syngenta entities named as defendants in this case.  Syngenta AG may be served with process under Fed. R. Civ. P. 4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters by forwarding two copies of the citation and this Class Action Complaint in English, along with two copies of the citation and Class Action Complaint translated into German to:   Appellationsgericht, Basal-Stat, Baumleingasse1, 4051 Basel, Switzerland

11.     Defendant Crop Protection AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.  Upon information and belief, Crop Protection AG is a subsidiary of Syngenta AG.  Crop Protection AG may be served with process under Fed. R. Civ. P.  4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters by forwarding two copies of the citation and this Class Action Complaint in English, along with two copies of the citation and Class Action Complaint translated into German, to:   Appellationsgericht, Basal-Stat, Baumleingasse1, 4051 Basel, Switzerland

12.     Defendant Syngenta Corp. is a Delaware corporation with a principal place of business at 3411 Silverside Road #100, Wilmington, Delaware 19810-4812.  Syngenta Corp is a subsidiary of Syngenta AG.  Syngenta Corp does not have a registered agent in the State of Kansas and may be served with process under Rule 4(h)(1)(A) and (B) by sending by registered or certified mail the citation and this Class Action Complaint to:  Cheryl Quain (or successor), Corporate Secretary, Syngenta Corporation, 3411 Silverside Road, Suite 100, Shipley Building, Wilmington, Delaware  19810, and The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware  19801.  Syngenta Corp. has agreed to accept waiver of service, pursuant to Rule 4, validly provided to Defendants' Liason Counsel as set forth in Order Relating to Consolidated Pleadings dated 3/10/15 (Dkt. #287).

13.     Defendant Crop Protection, LLC is a limited liability company organized and operating under the laws of the State of Delaware with its principal place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012.  Crop Protection LLC is a subsidiary of Syngenta Seeds.  Crop Protection LLC may be served under Rule 4(h)(1)(A), Fed. R. Civ. P., by and through its registered agent, The Corporation Company, Inc., 112 SW 7th Street, Suite 3C,

Topeka, Kansas  66603. Crop Protection, LLC has agreed to accept waiver of service, pursuant to Rule 4, validly provided to Defendants' Liason Counsel as set forth in Order Relating to Consolidated Pleadings dated 3/10/15 (Dkt. #287).

14.     Defendant Syngenta Seeds, Inc. ("Syngenta Seeds") is a Delaware corporation with a principal place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526.  Syngenta Seeds is a direct subsidiary of Syngenta Corp.  It may be served under Rule 4(h)(1)(A), Fed. R. Civ. P., by and through its registered agent, The Corporation Company, Inc., 112 SW 7th Street, Suite 3C, Topeka, Kansas  66603.  Syngenta Seeds has agreed to accept waiver of service, pursuant to Rule 4, validly provided to Defendants' Liason Counsel as set forth in Order Relating to Consolidated Pleadings dated 3/10/15 (Dkt. #287).  Syngenta Seeds has described itself in its Complaint filed in *Syngenta Seeds, Inc. v. Bunge North America, Inc*., No. 5:11-cv-04074-MWB, United States District Court, Northern District of Iowa (the "*Syngenta v. Bunge Case*"), as

> a leading agribusiness company committed to sustainable agriculture through research and technology.  Syngenta is, among other things, in the commercial seed business.  It develops, produces, and sells, through dealers and distributors or directly to growers, a wide range of agricultural products, including corn and soybean seed exhibiting useful traits that have been developed with the techniques of modern biotechnology.  The seed products are then grown and harvested as raw materials for the production of biofuels or grain for livestock feed; or are milled and processed for food products.

Among Syngenta Seeds' products which it has sold in the State of Kansas, and elsewhere, including states in which each Non-Producer Plaintiff has operations, are the Agrisure Viptera® and Agrisure Duracade™ corn seeds.  These seeds express, or contain, genetically engineered traits which confer resistance to insects.

15.     Defendant Syngenta Biotech is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at P.O. Box 12257,

3054 East Cornwallis Road, Research Triangle Park, North Carolina 27709-2257. Syngenta Biotech is a subsidiary of Syngenta Seeds and traces its operations back to CIBA-Geigy Corporation, a legacy company of Syngenta.  Syngenta Biotech may be served under Rule 4(h)(1)(A) and (B), Fed. R. Civ. P., through its registered agent, by sending by registered or certified mail the citation and this Class Action Complaint to:  Corporate Secretary, c/o Cheryl Quain (or successor), Syngenta Biotechnology, Inc., 3411 Silverside Road, Suite 110, Shipley Building, Wilmington, Delaware  19810, and The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware  19801.  Syngenta Biotech has agreed to accept waiver of service, pursuant to Rule 4, validly provided to Defendants' Liason Counsel as set forth in Order Relating to Consolidated Pleadings dated 3/10/15 (Dkt. #287).  Syngenta Biotech field tested under permits issued by or notifications to, and made application for deregulation by, the United States Department of Agriculture ("USDA") of the genetically modified corn traits MIR 162 and Event 5307.  At least 4 of the field tests of MIR 162 and 2 of the field tests of Event 5307 occurred at test sites within the State of Kansas.  MIR 162 is used in Agrisure Viptera® corn and both MIR 162 and Event 5307 are used in Agrisure Duracade™ corn.

16.     Syngenta AG wholly owns, directly or indirectly, each of Crop Protection AG, Syngenta Corp., Crop Protection LLC, Syngenta Biotech and Syngenta Seeds.

17.     Syngenta AG represents itself as a global company.  According to Syngenta's own website, Syngenta AG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the company strategy."

18.     One or more members of Syngenta AG's Board of Directors or Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of Crop Protection AG, Syngenta Corp., Crop Protection LLC, Syngenta Biotech and/or Syngenta Seeds.

19.     Furthermore, Syngenta AG's Executive Committee formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate policies requiring Syngenta subsidiaries, including those named as Defendants herein, under the general guidance of the Syngenta group control.

20.     Employees of the Syngenta group as a whole maintain reporting relationships that are not defined by legal, corporate relationships, but in fact cross those corporate lines. For example, Crop Protection AG maintains two separate product lines – Seeds and Crop Protection – that cross the Defendants' separate legal, corporate existences.

21.     The Defendant subsidiaries are subject to additional oversight that require them to seek approval for certain decisions from higher levels within the functional reporting structure – including in some instances Syngenta AG.  Appointments of senior management personnel for the Defendant subsidiaries also may require, in certain instances, approval from individuals or governing bodies that are higher than each subsidiary's respective board of directors.

22.     Also, Syngenta AG maintains a central global finance function that governs all Defendants.  Thus, the Defendant subsidiaries do not function independently but under the Syngenta AG umbrella.

23.     In addition, Syngenta entities regularly refer to themselves as "Syngenta," with no further description.

24.     Thus, the respective jurisdictional contacts of Crop Protection AG, Syngenta Corp., Crop Protection LLC, Syngenta Biotech and Syngenta Seeds in the forum state(s) are attributable to Syngenta AG because of the unusually high degree of control Syngenta AG exercises over these subsidiaries.  *See, e.g., City of Greenville v. Syngenta Crop Protection, Inc. et al.*, 830 F.Supp.2d 550 (S.D. Ill. 2011).

25.     In addition, upon information and belief, the Defendants acted in concert pursuant to agreements or other arrangements to act in a collective manner and/or as joint venturers regarding the actions and events made the subject of this Non-Producer Plaintiffs' Master Class Action Complaint.  All Defendants are therefore jointly and severally liable for the acts for which the Non-Producer Plaintiffs make complaint.

## FACTUAL ALLEGATIONS

26.     Biotechnology firms such as Syngenta develop and obtain patents on their bio-engineered products, in this instance seeds.  These products are also referred to as genetically-modified organisms, or "GMOs."  A patent gives the biotechnology firm the exclusive right to sell its bio-engineered products; however, those patents eventually expire.  Biotechnology firms have an economic incentive to "commercialize" (*i.e.* bring their products to market) as soon as possible after filing a patent application in order to maximize profitability.

27.     But premature commercialization poses a well-known and significant risk of harm to farmers and industry participants if bio-engineered commodity products are commercialized before they are approved by major importing nations.  Certain importing nations, such as China, have a "zero tolerance" policy and will reject grain and/or grain product imports from the U.S. upon detecting the presence of even trace amounts of an unapproved bio-engineered genetic trait in U.S. grain or grain product shipments.  This was well known by participants in the biotechnology industry, including Syngenta, well before, but at least by 2009.

28.     Syngenta commercialized MIR162 – and Event 5307 – despite clear risk of harm to its stakeholders, including Non-Producer Plaintiffs and the Class in this action, Syngenta's knowledge of that risk, and Syngenta's own professed commitment to responsible management.

29.     Moreover, Syngenta commercialized MIR162 by consistently misrepresenting the importance and status of China's approval and without adequate systems in place to isolate or

12

channel MIR162, virtually assuring that MIR162 would contaminate the U.S. corn supply, as set out below.

*The Industry-Recognized Stewardship Obligation*

30.     The risk in premature commercialization is well-recognized within the industry and as a result, industry participants including Syngenta have adopted "stewardship" policies.

31.     The Biotechnology Industry Organization (sometimes referred to herein as "BIO") is the world's largest biotechnology trade association, of which, on information and belief, Syngenta is or was a member.   BIO has expressly recognized that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions." Biotechnology Industry Organization, Product Launch Stewardship Policy, May 21, 2007, at Annex 1 Introduction; *see also* Biotechnology Industry Organization, Product Launch Stewardship," December 10, 2009, at Annex 1 Introduction (same);   Biotechnology Industry Organization, "Stewardship: Actions to be Taken Prior to Launching Special Traits," October 4, 2010, at Annex 1 Introduction (same); Biotechnology Industry Organization, "Product Launch Stewardship: Food and Agriculture Section,"   November 27, 2012, at Annex 1 Introduction (same).

32.     As stated in BIO's "Product Stewardship Policy" dated December 10, 2009:

> Since the commercial introduction of biotechnology-derived plant products in 1996, an increasing number of biotechnology-derived plant products intended for food or feed use are authorized for commercial production in many countries throughout the world; however, authorizations in importing countries vary depending on the timing of submissions for import authorization as well as the duration of the authorization process in each country. As a consequence of these asynchronous authorizations, low levels of recombinant-DNA plant materials that have completed full safety assessments in accordance with national and international standards in one or more countries may, on occasion, be present in

> food or feed in countries in which the authorization process of the relevant recombinant-DNA plant material has not been completed. Asynchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions.

http://www.bio.org/sites/default/files/Product_Launch_Stewardship_12_10_09.pdf.

33.     Biotechnology organizations, including CropLife International (of which Syngenta is a member) and BIO, have developed stewardship standards under which biotechnology firms refrain from commercializing their products before those products are approved by importing nations.

34.     Syngenta has, since at least 2007, represented that it is "committed to the principles of good stewardship, which are exemplified through the responsible management of [its] products across their lifecycle [including] commercialization" and its support for the Biotechnology Industry Organization Product Launch Stewardship policies. *See* Bio Product Launch Policy, Syngenta Implementation Principles (Nov. 2007) http://www.syngentabiotech.com/biopolicy.aspx.   On information and belief, Syngenta's Jeff Cox has expressly indicated Syngenta's support for this policy and pledged that "we will implement it with Syngenta."

35.     Another biotechnology industry association, Excellence Through Stewardship, advocates similar standards through its "Product Launch Stewardship Guide." http://excellencethroughstewardship.org/wp-content/uploads/Approved-Product-Launch-Stewardship-Guide-Revised-07-22-10.pdf.   Syngenta is a "founding member" of this program. www.syngentabiotech.com/biostewardship.aspx.

36.     Biotechnology industry groups are not alone in recognizing the importance of stewardship.  The National Grain and Feed Association's Policy on Agriculture Biotechnology provides:

The NGFA supports agricultural biotechnology and other scientific advancements that promote safe and abundant food and feed supply. However, the NGFA believes **biotech-enhanced traits should be commercialized only after achieving broad, deep consumer acceptance, as well as authorizations from U.S. export markets, to enable the industry to meet customer preferences and maintain access to global markets**. The NGFA advocates prudent policies to guard against the presence of unauthorized or restricted-use biotech-enhanced traits in the general commodity stream.

http://www.ngfa.org/news-policy-center/positions-priorities/ (emphasis added).

37.    The North American Export Grain Association agrees:

Biotechnology providers should be required to accept liability to compensate parties for economic damage resulting from a failure to adequately implement and enforce binding risk-management (stewardship) and supply chain management plans deemed sufficient and effective in preventing biotech events from becoming present in the general commodity stream at levels that could disrupt efficient commerce.

One of the most important of these commitments is to voluntarily restrict commercialization (marketing of seeds) under corporate stewardship plans until such time as the technology provider has obtained sufficient import authorizations from foreign governments. It is imperative that such import authorizations be in place to provide U.S. grains and oilseeds with competitive, reliable and efficient access to international markets.

The reality is that bulk grain and oilseed shipments 'may contain' a biotech-enhanced event that has been made available to producers for commercial production. Any biotechnology trait present in such shipments that lacks approval in a country of import will confront an impossible-to-achieve zero tolerance in that country. The consequences of such occurrences are dire, including impeding the ability of importing countries to provide for food security, imperiling present and future market opportunities for U.S. farmers, and unrecoverable and extensive product and shipment-rejection costs to the U.S. production and grain marketing system.

These international authorizations need to be in place at the time seed containing the event first is purchased by producers. U.S. corn producers often make their initial seed purchase decisions in the fall prior to spring planting – about the same time as international

buyers begin substantial contracting for delivery of the next year's harvest. Given that such contracts are contingent upon receiving authorizations for all biotech-enhanced events that may be present in the commodity shipment, NAEGA and NGFA believe import authorizations need to be in place at least one year prior to harvest-time deliveries from U.S. farms.

However, we recognize that technology providers may find the opportunity for economic reward attractive enough to avoid completing U.S export market approvals prior to product launch in the United States. In such cases, appropriate restraints and responsibility for risks imposed on downstream stakeholders when and after a crop biotechnology event is in production must be part of all technology providers' product stewardship commitments. Such restraint and risk responsibility is critically important when crop biotechnology is deployed under regulatory systems like the science-based U.S. coordinated regulatory framework, which does not apply an international merchantability or marketability test prior to commercialization of the genetically engineered event. Under no circumstances can or should the grain handling, processing or export industry sectors in the United States or abroad be expected to shoulder the financial risks associated with market disruptions that they have little, if any, ability to control or manage. Rather, the technology providers that do have the ability to control such exposure – and reap the economic reward of commercialization prior to authorization of their products in international markets – must be held responsible. Doing otherwise creates market risk, and undermines the ability of U.S. agriculture to contribute to global food security, as well as to U.S. economic growth and job creation.

http://naega.org/wp-content/uploads/2012/05/NGFA-NAEGA-Joint-Statement-on-Pioneer-Petition-for-APHIS-Deregulation-of-Pioneer-Hi-Bred-International-Biotech-Maize-.pdf.

38.     The Syngenta Foundation For Sustainable Agriculture states that "until a country issues a registration approval for cultivation and/or food and/or feed consumption, there is a clear responsibility and liability, even if the government scientific assessments show that there are no safety or environmental concerns," and recognizes that stewardship, among other things, "works to prevent trade disruptions."  http://www.syngentafoundation.org/index.cfm?pageID=703.

*Syngenta Recognizes Its Stewardship Obligation*

39.     Under the "Corporate Responsibility" section of its website, Syngenta acknowledges the integrated nature of the commodity market, and its responsibility to "stakeholders" affected by its business, which include Non-Producers:

> Our stakeholders are the people who can affect our business or who are affected by it. They include the following groups:
>
> Growers
> Industry
> Non-governmental organizations and international agencies
> Investors
> Employees
> Government

http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/stakeholder-engagement.aspx.

40.     Syngenta has committed to "respond to feedback from its stakeholders" and "to implement high standards of stewardship for the safe, effective and environmentally responsible use of its products."   http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/cr-policy-and-commitments.aspx.

41.     Syngenta represents that "it prioritize[s] the issues that are most relevant to     our business and most important to our stakeholders." http://www.syngenta.com/global/corporate/en/about-syngenta/corporateresponsibility/Pages/focus-areas.aspx.

42.     Syngenta also represents that it "maintain[s] the highest standards across our entire business and go[es] beyond regulatory compliance." http://www.annualreport.syngenta.com/our-business-enablers/about-our-cr-reporting/scope-and-report-structure/.

43.     In Syngenta's  "Code of Conduct," posted on its website for all stakeholders to read, Syngenta represents:

- "The trust and confidence of Syngenta's stakeholders is critical to our continuing success and will only be sustained if the company acts and is seen to act in accordance with the highest standards of ethics and integrity. To ensure we meet the standards which our stakeholders expect**,** we have produced this new Syngenta Code of Conduct . . . ."

- "We provide innovative, reliable, high-quality products **and have safeguards to protect stakeholders**."

- "The creativity of our people provides products which help growers meet the global challenges to agriculture."

- "**We will work closely with customers, contractors, users and all other stakeholders to ensure proper and responsible use of our products and understanding of the precautions that apply** . . . ."

http://www.annualreport.syngenta.com/assets/pdf/Syngenta_code-of-conduct.pdf  (emphasis added).

44.     In November, 2007, Syngenta adopted its own "Bio Product Launch Policy."  The Syngenta Bio Product Launch Policy incorporates the Biotechnology Industry Organization's Product Launch Policy, and requires Syngenta to perform a market and trade assessment to identify the key importing nations and obtain those nations' approval prior to commercializing a new bio-engineered product.   http://www.syngentabiotech.com/biopolicy.aspx.

45.     On its website, Syngenta suggests that it also complies with the stewardship standards adopted by CropLife International and Excellence Through Stewardship, telling visitors that they may learn more about "stewardship" by visiting the provided links. *See* http://www.syngentabiotech.com/BioStewardshipLinks.aspx.

18

46.     Thus, at the time it decided to commercialize Agrisure Viptera® in 2010, Syngenta had committed to not commercializing new genetically modified traits that had not been approved in key import markets.  The importance of obtaining import approval from key markets was well known and recognized within the biotechnology industry and by Syngenta. Syngenta knew that commercialization before such approval would cause major disruption and loss of key markets.

***Regulation, Testing and Deregulation of MIR162***

47.     The process of commercialization begins with obtaining approvals from U.S. agencies, including (but not limited to) deregulation from the Animal, Plant and Health Inspection Service ("APHIS") of the United States Department of Agriculture ("USDA").

48.     The regulations in 7 CFR part 340 (the "GMO Regulations") regulate, among other things, the introduction (importation, interstate movement, or release into the environment) of organisms and products altered or produced through genetic engineering that are plant pests or that there is reason to believe may be plant pests.  Such genetically engineered organisms and products are considered "regulated articles."  The GMO Regulations were promulgated under the Plant Protection Act (the "PPA"), 7 U.S.C. §7701, *et seq*., or its predecessor statutes.

49.     MIR162 is a genetically modified trait which, prior to its deregulation, was regulated by the USDA under the PPA and GMO Regulations.

50.     The GMO Regulations at 7 C.F.R. §§ 340.3 and 340.4 allow release into the environment of regulated, genetically modified traits, such as MIR162, prior to their deregulation, through field trials conducted under permits issued by, or notifications to, APHIS. Developers who field test genetically modified traits, such as Syngenta Biotech in its field testing of MIR162, are required to adhere to certain performance standards set forth in the GMO Regulations to ensure that the regulated genetically modified organism does not persist in the

environment or enter the food or feed supply.  Similarly, at the end of all field tests, developers must destroy or properly contain any viable plant material in the field and ensure that no regulated material persists in the environment beyond the duration of the trial.

51.     Between 1999 and 2007, Syngenta Biotech conducted at least 119 field trials of MIR162 corn under at least 20 permits issued by, or notifications to, APHIS under the GMO Regulations at sites in 31 states, including multiple field tests in each of the ten (10) states with the largest corn production.

52.     Syngenta is no stranger to release of regulated GM events.  In 2005, Syngenta entered into a settlement with the USDA ($375,000 fine plus a required training program) stemming from its release of still-regulated Bt10 corn, which Syngenta supplied as deregulated Bt11 corn between 2001 and 2004.  About 14,000 bags of Bt10 seeds, or enough to plant 37,000 acres, were sold from 2001 to 2004, mainly to farmers in the U.S. but also in Canada and Argentina   The Bt10 event was found in at least five Bt corn breeding lines in the U.S., and it was estimated that the seeds could have planted on 37,000 acres in the U.S., producing "an estimated 150,000 tons of corn from this area" and accounting for approximately .01% of the total U.S. corn acreage.  *See* New York Times, "U.S. Fines Swiss Company Over Sale of Altered Seed" (April 9, 2005) (http://www.nytimes.com/2005/04/09/ business/worldbusiness /09syngenta.html?_r=0http://www.nytimes.com/2005/04/09/business/worldbusiness /09syngenta.html?_r=0); PR Newswire, "Syngenta Agrees to Settlement With USDA on Unintended Bt10 Corn" (http://www.prnewswire.com/news-releases/syngenta-agrees-to-settlement-with-usda-on-unintended-bt10-corn-54220787.html).  Syngenta later paid a $1.5M fine to the EPA, which conducted an investigation confirming the distribution of unregistered Bt10 corn on "over 1000 occasions."  EPA News Release "EPA Fines Syngenta $1.5 Million for Distributing   Unregistered   Genetically   Engineered   Pesticide"   (Dec.   21,   2006)

(http://yosemite.epa.gov/opa/admpress.nsf/e987e762f557727d852570bc0042cc90/2df47c51f639

be4e8525724b0069655c!OpenDocument).

53.     The GMO Regulations in 7 C.F.R. § 340.6(a) provide that any person may submit

a petition to APHIS seeking a determination that an article should not be regulated under 7 CFR

part 340.

54.     On May 24, 2007, Syngenta filed a patent application for MIR162 in order to

secure Syngenta's exclusive right to market that corn trait pending regulatory approval by the

USDA.

55.     On or about September 10, 2007, Syngenta Biotech submitted a petition (the

"MIR162 Deregulation Petition") seeking a determination of nonregulated status (APHIS

Petition Number 07-253-01p) for corn (*Zea mays L.*) designated as transformation event

MIR162, which has been genetically engineered for insect resistance, stating that corn line

MIR162 is unlikely to pose a plant pest risk and, therefore, should not be a regulated article

under the GMO Regulations.

56.     Upon information and belief, Syngenta Biotech continued its field tests of

MIR162 under the GMO Regulations during the approximate 31-month period after filing the

MIR162 Deregulation Petition and the USDA decision deregulating MIR162 in April 2010.

57.     Syngenta Biotech stated in the MIR162 Deregulation Petition that it understood

"that a copy of the MIR162 Deregulation Petition may be made available to the public as part of

the public comment process."   MIR162 Deregulation Petition, at 3 of 268.   APHIS' notice,

published in the Federal Register on January 13, 2010 (75 Fed. Reg. 1749) (the "MIR162

Deregulation Notice"), expressly invited public comment regarding the MIR162 Deregulation

Petition and further provided instructions as to how copies of the petition and accompanying

draft environmental assessment and plant pest risk assessment could be obtained either by

21

placing a phone call or accessing them on the internet.

58.    In a preliminary observation to section IX of the MIR162 Deregulation Petition, entitled "Adverse Consequences of Introduction" (the "Adverse Consequences Discussion"), Syngenta Biotech represented that it knew "of no data or observations that indicate [that] MIR162 would adversely impact the quality of the human environment, directly, indirectly, or cumulatively.  This includes a lack of anticipated effects on . . . the economy, either within or outside the U.S."

59.    Specifically, among the matters addressed in the Adverse Consequences Discussion were "Economic Impacts" at Section IX.D.  In the introduction to that section, at pages 108-109, Syngenta Biotech stated:

> Economic considerations are not explicitly described in the factors listed in 40 CFR § 1508.27.  However, economic impacts do relate to the significance of the requested action and have been considered by some courts in reviewing NEPA [National Environmental Policy Act] compliance.

60.    The economic impacts discussed included the "Effects on the Export Market," at subsection IX.D.4, page 111, which included Syngenta Biotech's representation that "there should be no effects on the U.S. maize export markets" and advised that applications for approval of MIR162 maize were in process in a number of such export markets with "functioning regulatory systems," including China, stating:

> There should be no effects on the U.S. maize export market since Syngenta **is actively pursuing regulatory approvals** for MIR162 maize in countries with functioning regulatory systems for genetically modified organisms and that import maize from the U.S. or Canada. Regulatory filings for MIR162 maize are in process for Colombia, Japan, South Korea, Taiwan, China, the Philippines, Australia and New Zealand, South Africa, the European Union, Russia, and Switzerland.  (emphasis added).

61.    Other portions of the MIR162 Deregulation Petition made similar representations

regarding China.

62.    Syngenta Biotech also stated in subsection IX.D. of the MIR162 Deregulation Petition that stewardship agreements with growers would require channeling of MIR162 away from export markets which had not approved import of MIR162 maize, that Syngenta would undertake "a wide-ranging grower education campaign" respecting channeling, and that channeling would be effective based upon prior experiences with the specialty maize market:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (*e.g.*, grower Stewardship Guide). As noted in the context of the IRM program, these procedures are not hypothetical.

> The ability to channel particular types of maize for particular uses, such as the export market, is demonstrated by the continuing success of the specialty maize market. Use of identity preservation measures has enabled growers to maintain a wide variety of specialized maize products, including white food maize, waxy maize, hard endosperm maize, high oil maize, nutritionally enhanced maize, high extractable starch maize, non GMO maize, and organic maize (U.S. Grains Council, 2006). Channeling programs are well established for separating each of these maize varieties.  As set out above, these practices have continued successfully long after the introduction of numerous varieties of transgenic maize.

63.    Upon information and belief, the stewardship agreements to which Syngenta Biotech referred would have been between growers and Syngenta Seeds.

64.    In December 2009, based upon its review of the MIR162 Deregulation Petition, APHIS prepared a Draft Environmental Assessment which parroted what Syngenta Biotech had represented in the MIR162 Deregulation Petition:

> There should be no effects on the U.S. corn export market since Syngenta is actively pursuing regulatory approvals for the MIR162 corn in countries with functioning regulatory systems for genetically modified organisms and that import corn from the U.S.

or Canada.  Regulatory filings for the MIR162 corn are in process for . . . China.

65.     The Draft Environmental Assessment was among the documents publicly available under the MIR162 Deregulation Notice.

66.     On April 12, 2010, APHIS concluded that MIR162 corn should be deregulated. *See* Determination of Nonregulated Status for MIR162 Corn, April 12, 2010. (http://www/aphis.usda.gov/biotechnology/petitions_table_pending.shtml). *See also* Syngenta Biotechnology, Inc: Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance, 75 Fed. Reg. 20560 (April 20, 2010).

67.     Prior to making that determination, APHIS, on April 9, 2010, issued its National Environmental Policy Act Decision and Finding of No Significant Impact and, in March 2010, issued its Final Environmental Assessment. APHIS compared anticipated impact by taking no action (*i.e.*, keeping MIR162 as a regulated article) with deregulating MIR162 and concluded in the Finding of No Significant Impact that in each instance the impact upon the "Export Market" would remain "unchanged."  Similarly, in the Final Environmental Assessment dated March 2010, APHIS adopted and repeated Syngenta's representations that it did not expect any effects on the United States corn export market "by the cultivation of the MIR162 corn cultivars" and that applications to countries with functioning regulatory systems, including China, were in process.

68.     Thereafter, on April 21, 2010, Syngenta issued its press release, "Syngenta receives approval for breakthrough corn trait technology in the U.S." (April 21, 2010) (http://wwwsyngenta.com/global/corporate/en/news-releases/Pages/en-100421.aspx).  In making the announcement that MIR162 had been deregulated, Syngenta noted the plans for its imminent commercialization, stating that "[t]he trait will be combined with the Agrisure 3000GT trait stack

24

to provide corn growers with broad-spectrum, insect control and glyphosate tolerance for maximum convenience and productivity" that that "Syngenta plans to commercialize hybrids containing the Agrisure Viptera® trait for the 2011 growing season."

69.     The April 21, 2010, press release confirms that the MIR162 Deregulation Petition was a document prepared and published by Syngenta for the sole purpose of facilitating, promoting and inducing the commercial sale of its products containing MIR162 maize.  The MIR162 Deregulation Petition contained statements and representations to induce APHIS to deregulate MIR162, thereby beginning the commercialization of the product.  Further, the MIR162 Deregulation Petition was filed with full knowledge that the statements and representations therein would be published to stakeholders – including Producers and Non-Producers. The commercial nature of the statements in the MIR162 Deregulation Petition are clear: In explaining the rationale of the MIR162 Deregulation Petition, Syngenta stated therein that "[t]ransformation event MIR162 maize has been developed by Syngenta to provide growers with maize varieties that are resistant to feeding damage caused by a number of significant lepidopteran insect pests.  *This trait will be offered to growers in combination with other deregulated maize traits.*"  MIR162 Deregulation Petition at 11 (emphasis added).  The MIR162 Deregulation Petition not only espoused the sale of the product to growers, it was rife with statements and representations about the commercial benefits of Syngenta's product and expected market impact thereof. Among other indications that the MIR162 Deregulation Petition was a document in which commercial representations and statements were made are the following:

> a.     "Transformation event MIR162 has been developed by Syngenta to provide U.S. growers with maize hybrids that are resistant to feeding damage caused by a number of lepidopteran insect pests … Commercialization of this new trait has the potential to reduce conventional insecticide use in maize, increase grower profits, and

improve grain quality." (p. 13);

b. ". . . [I]t [MIR162] will be commercialized as a combined-trait hybrid with Syngenta's Bt11 maize event." (p. 96);

c. Syngenta's numerous references to and representations regarding the commercial benefits to farmers from introduction of MIR162 (*see, e.g.*, pp.5, 97, 109 [enhanced productivity], p.110 [increased competition and farmer and consumer choice]);

d. Syngenta's repeated observations that no adverse consequences should occur to the economy, either within or outside the U.S. (*see e.g.*, p. 5) and the statements regarding the lack of impact upon exports and intended channeling away from export markets which had yet to approve MIR162, as alleged above;

e. An appendix report regarding the economic implications of the introduction of MIR 162; and

f. Syngenta's acknowledgement that the MIR162 Deregulation Petition would be made available to the public as previously alleged (p.3).

70.    Contrary to Syngenta's representations that its regulatory filings were "in process" in China, Syngenta first sought regulatory approval for MIR162 from China's Ministry of Agriculture three years later in March, 2010. *See* http://www.syngenta-us.com/viptera_exports/images/MIR162-Regulatory-Timeline-9-2014.pdf.

71.    Moreover, upon information and belief, Syngenta's application included insufficient and/or incomplete information, which caused Chinese officials to raise numerous additional questions. The need for additional information resulted in the Chinese approval application going through multiple review rounds and significantly delayed the approval process.

72.    In addition, Syngenta sought approval to cultivate MIR162 in, as well as import MIR162 to China. *See* Rueters "Update 1 – Syngenta confirms it applied to cultivate GMO corn in China" (Oct. 8, 2014) (available at http://www.reuters.com/article/2014/10/08/china-gmo-syngenta-idUSL3NOS317520141008).

73.    Upon further information and belief, China has more severely restricted the right

26

to cultivate bio-engineered crops than to import them, has not previously allowed any such cultivation by a foreign firm without Chinese participation, and has taken significantly longer to approve cultivation applications than importation applications, all of which may have materially delayed import approval.

74.    Syngenta did not disclose these facts to its stakeholders, including industry participants such as Non-Producers.

75.    Syngenta commercialized Agrisure Viptera® for the 2011 growing season despite not having regulatory approval from China, a key and growing export market for U.S. corn.

76.    In a recent deposition in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB (N.D. Iowa Aug. 22, 2011), Syngenta's North American head of Corn, Charles Lee, revealed that Syngenta privately planned from the outset to commercialize Agrisure Viptera® with or without China's regulatory approval, notwithstanding the commitments it had made to stakeholders and industry participants not to commercialize genetically modified traits until approval from key export markets.

***Syngenta knew that the entire industry would be injured by contamination of the U.S. corn supply***

77.    As recognized within the industry, and by Syngenta, the harm threatened by irresponsible commercialization is very real.

78.    "There have been a number of high-profile cases involving genetically modified varieties . . . and disruption of international shipments of commodity grains such as corn, wheat, and rice." http://www.syngentafoundation.org/index.cfm?pageID=703.

79.    For example, bio-engineered corn contaminated the U.S. corn supply in 2000 and disrupted international trade, causing loss to farmers and other industry participants. *In re StarLink Corn Products Liability Litigation*, 212 F.Supp.2d 828 (N.D. Ill. 2002).

80.     In 2006, bio-engineered rice contaminated the U.S. rice supply, again disrupting trade and causing massive damages to U.S. rice farmers and other industry participants.  *See e.g In re Genetically Modified Rice Litig.,* 666 F. Supp. 2d 1004 (E.D. Mo. 2009); *Bayer CropScience LP v. Schafer*, 2011 Ark. 518, 385 S.W.3d 822, 832 (Ark. 2011).

81.     In addition to being aware of these and other well-publicized incidents at the time it commercialized MIR162, Syngenta had (and has) been continuously warned by stakeholders about the importance and need for responsible commercialization.

82.     For example, when Syngenta commercialized MIR 604 corn in 2007, the National Grain and Feed Association (of which Syngenta is a member) and the North American Export Grain Association warned against an "'ill-conceived' plan to commercialize" Syngenta's Agrisure biotechnology-enhanced corn as endangering U.S. corn and corn-product exports since it had not obtained regulatory approval for food and feed use in Japan and other U.S. export markets. Houin, "Feed and grain organizations warn growers of limited export markets," Farm World (4/25/2007). http://www.farmworldonline.com/news/ArchiveArticle.asp?newsid=4091.

83.     It was well known at least by August 2010, and certainly well before Syngenta's commercialization of MIR162 under the Agrisure Viptera® brand name and trademark, that China was an important and growing export market for US corn.  As reflected in a trade publication at the time:

> China is entering a 'new era' of corn buying.  The world's most populous country may import as much as 15 million tons of corn in 2015, according to the U.S. Grains Council. . . . Chinese imports of corn will grow from 1.7 million tons in 2010 to 5.8 million tons in 2011, and to 15 million tons in 2014-15, according to Hanver Li, Chairman of Shanghai JC, speaking to the U.S. Grains Council . . . Where will China import all this corn from?  The first place they will turn is the U.S., which is the world's largest corn exporter, accounting for 60% of global corn exports in 2009 . . . If China imports an incremental 600 million bushels of corn in 2014 from the U.S., using the USDA's baseline projections, U.S. corn ending

> stocks would be 960 million bushels.  This would put the Ending
> Stocks to Use Ratio at 6.3%, the lowest level since 1995.  2010 is a
> major turning point in the grain market.   The Chinese transition to
> becoming a net importer of corn will have a substantial implication
> on the world's corn supply.

http://www.farmlandforecast.com/2010/08/chinese-imports-to-change-grain-markets/.

84.     Syngenta knew the importance of China.

85.     Among other things, on February 9, 2011, Syngenta CEO Mack stated that
China's "import requirements alone influence global commodity prices." Syngenta 2010 Full
Year     Results,     Remarks     of     Mike     Mack     (available     at
http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/transcripts/20110209-
syngenta-fyr-script.pdf).

86.     In July, 2011, Syngenta's CEO Mack stated:   "The need to improve yield and
quality is present across all emerging markets in the region, although it's China which continues
to have the greatest impact on world markets, with increasing imports not just of soybeans but
also now of corn."   July 22, 2011 Transcript of Remarks (available at http://www.syngenta.com
/global/corporate/SiteCollectionDocuments/pdf/transcripts/H1-2011-results-transcript.pdf).

87.     In August, 2011, before the first commercially grown corn planted with the
MIR162 trait had been harvested, the National Grain and Feed Association and the North
American Export Grain Association issued a Joint Statement warning Syngenta about MIR162:

> U.S. farmers, as well as the commercial grain handling and export
> industry, depend heavily upon biotechnology providers voluntarily
> exercising corporate responsibility in the timing of product launch
> as part of their product stewardship obligation . . .The negative
> consequences of overly aggressive commercialization of biotech-
> enhanced events by technology providers are numerous, and
> include exposing exporting companies to financial losses because
> of cargo rejection, reducing access to some export markets, and
> diminishing the United States' reputation as a reliable, often-
> preferred supplier of grains, oilseeds and grain products. Premature

commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.

Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy.

http://www.naega.org/images/pdf/NGFA-NAEGA_Joint_Statement_on_Syngenta_Agrisure_

Viptera.pdf.

88.     As stated by these associations: "The grain handling and export industry have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotech-enhanced events in commodity crops receiving regulatory approvals or authorizations -- prior to commercialization -- in key export markets where foreign governments have functioning regulatory systems that approve biotech-enhanced traits. These communications regarding key export markets, identified through market and trade assessments, have been conveyed through industry trade associations and in direct communications by individual companies." *Id.*

89.     Consistent with these standards, Syngenta pulled its Agrisure Duracade™ corn product from the Canadian market for the 2014 growing season because China and the European Union had not yet approved MIR162.  *See* http://www3.syngenta.com/country/ca/ en/Syngenta-in-Canada/our-canadian-businesses/Pages/AgrisureDuaracadeandthe 2014PlantingSeason.aspx.

90.     Syngenta said in a notice to Canadian growers:  "While the vast majority of the Canadian corn crop is typically directed to domestic markets in North America, some corn may be destined for these markets." Reuters, "Syngenta halts sales of new GMO corn seed in Canada" (Mar 10, 2014). "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end-market destination requirements."  *Id.*

91.     As illustrated by the statements of its own CEO and this action, Syngenta knows that China was and is a key corn and corn product importer and that responsible management requires that its approval be obtained before commercialization of a bio-engineered corn trait.

92.     Nevertheless, Syngenta continued, and continues, to market and sell MIR162 corn, including Agrisure Viptera® and Duracade™ – each of which contain the MIR162 genetic trait – in the United States.

93.     Despite Syngenta's knowledge of the risk, it proceeded with commercialization of Agrisure Vipetera® and did so without consultation with industry stakeholders.

94.     Equally irresponsible, Syngenta sold Agrisure Viptera® without adequate systems in place to isolate and channel it away from markets, including China, from which approval was not obtained.  To make matters worse, it continued to expand sales of Agrisure Viptera® even as China was dramatically increasing imports of U.S. corn, and was projected to be the largest importer of U.S. corn by the year 2020.

95.     Compounding its irresponsibility, Syngenta then decided to commercialize Agrisure Duracade™ in 2014, even though it also contains MIR162.  Agrisure Duracade™ also contains another genetic trait, Event 5307, not approved by China or other major purchasers of U.S. corn.

*Syngenta's initial commercialization*

96.     During the 2010–2011 crop year, Syngenta Seeds sold Agrisure Viptera® to approximately 12,000 corn producers with a projected yield estimated in September 2011 of 250 million bushels. *See Syngenta v. Bunge,* 820 F. Supp.2d 953, 958 (N.D. Iowa 2011).  Agrisure Viptera® growers could be found in nearly every state such that the market for Agrisure Viptera® products was very broad across the United States.  *See id.* at 963. Syngenta projected that Agrisure Viptera® seed sales would exceed twenty percent (20%) of the United States corn

31

seed market in future years.  *See id.* at 958.

97.     Other published estimates indicate that during the 2011 crop year, Agrisure Viptera® had been planted on 1.1% of the acres in the U.S. on which corn had been grown.  *See* Paul Christensen, Chinese Approval of Syngenta Agrisure Viptera®, Seed in Context Blog: Commentary of the World of Seed.  (http://intlcorn.com/seedsiteblog/?tag=syngenta).   Other estimates for crop years 2012 and 2013 indicate that Agrisure Viptera® was grown on approximately 3% of all corn acres planted in those years.

***Transgenic Contamination***

98.     Corn, or maize, has staminate (male) and pistillate (female) flowers on the same plant and is wind pollinated.  While there is some possibility of self-fertilization, corn generally is considered an outcrossing species.  Under normal field conditions some 95% of the ovules are fertilized by pollen from other plants.  Pollen is released in large quantities. "Individual corn plants produce 4 to 5 million pollen grains. Therefore, even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination."   Thomison, "Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet.

99.     "Once released from the tassels into the air, pollen grains can travel as far as 1⁄2 mile (800 m) in 2 minutes in a wind of 15 miles per hour (27 km/h) (Nielsen 2003b)."  Kent Brittan, "Methods to Enable the Coexistence of Diverse Corn Production Systems," University of California.   Studies indicate that "cross-pollination between cornfields could be limited to 1% or less by a separation distance of 660 feet (200 m), and to 0.5% or less by a separation distance of 984 feet (300 m). However, cross-pollination frequencies could not be reduced to 0.1% consistently, even with isolation distances of 1,640 feet (500 m)."   *Id.*

100.    The Association of Official Seed Certifying Agencies (AOSCA) recognizes that "[a]lthough most corn pollen is deposited near its origin, isolation by very long distance (several miles) from any other corn is probably the only means of assuring complete confinement other than assuring complete asynchrony of flowering."  However, "[t]he matter of whom or what entity controls the area constituting a proposed isolation zone and beyond could be crucial and/or problematic to successful confinement.   AOSCA Report at 62.  Assuring "complete asynchrony of flowering" also is fraught with shortcomings.  For example, "[d]ifferences in maturity between the early and late hybrid may not be large enough to ensure that the flowering periods of each hybrid will not overlap, especially when certain climatic conditions may accelerate or delay flowering. Moreover this strategy will only work if [the farmer] control[s] the adjacent fields or can closely coordinate [his] corn planting operations with those of [his] neighbors." Thomison, "Managing 'Pollen Drift' to Minimize Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet.

101.    In addition, "[p]lanting operations to control pollen drift are only part of the process of producing an IP corn grain crop."  Thomison, "Managing 'Pollen Drift' to Minimize Contamination of Non-GMO Corn," Ohio State University Extension Fact Sheet.   Other major issues include harvesting, storage, and commingling within the production and supply chain.

102.    "Different corn breeds within an individual farm are commingled at the harvesting stage. Corn from hundreds of thousands of farms is then further commingled as it is gathered, stored and shipped through a system of local, regional and terminal grain elevators. Elevators, storage and transportation facilities are generally not equipped to test and segregate corn varieties. The commingled corn is then marketed and traded as a fungible commodity." *In re StarLink Corn Products Liability Litig.*, 212 F. Supp.2d 828, 834 (N.D. Ill. 2002).

33

103.    As a developer of genetic events, including genetically engineered corn, Syngenta knew or should have known of the high likelihood that if commercialized, MIR162 would disseminate throughout the supply chain – in fields, storage and transportation – via the numerous routes that transgenic contamination occurs.

104.    Not only did Syngenta prematurely commercialize Agrisure Viptera®, it took little to no steps to assure that MIR162 would not enter the U.S. corn supply through cross-pollination and/or commingling in fields, and took wholly inadequate steps to prevent commingling within grain elevators or otherwise within the supply chain as described below, virtually assuring that MIR162 would contaminate the U.S. corn supply in every way possible.

105.    Syngenta's representation in its MIR162 Deregulation Petition that the "ability to channel particular types of maize for particular uses such as the export market" is demonstrated by success in the "specialty maize market" is grossly misleading.  In specialty markets like organic farming, the grower receives a premium and as such, takes the onus on himself to isolate his specialty corn crop from transgenic contamination from neighboring fields (such as spacial and temporal isolation and detasseling).  *See* Thomison, "Managing Pollen Drift in Maize Seed Production," Department Horticulture and Crop Science, Ohio State University ("Growers of value added identity preserved (IP) grains need to control pollen contamination in order to optimize expression of value added traits in specialty maize and thereby obtain premiums."). The specialty seller also markets to a specialty buyer to whom he channels.  Both have incentive to take all measures necessary to avoid contamination by non-specialty corn.  The growing, marketing and distribution system of commodity corn is vastly different. A "Commodity Crop" is "a crop which in the ordinary course is grown using common agricultural practices and is commingled and not segregated for special handling or use when it enters the chain of

commerce." Biotechnology Industry Organization, "Product Launch Stewardship: Food and Agriculture Section," November 27, 2012**,** at Annex 1 Introduction n.3.

106. The difficulties with channeling are illustrated by the infamous "StarLink" contamination in 2000 that was the subject of significant litigation. *See In re StarLink Corn Products Liability Litigation*, 212 F.Supp.2d 828 (N.D. Illinois 2002). That is particularly so where, as here, millions of acres of the commodity to be channeled – MIR162 corn – were planted all across the U.S. Syngenta did not make even minimally reasonable efforts to do so.

*Syngenta's nonsensical and ineffective "stewardship" program*

107. In its 2007 MIR162 Degregulation Petition, Syngenta represented that a lack of Chinese approval would not pose a problem for U.S. farmers and industry participants because:

> Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import. Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (*e.g.*, grower Stewardship Guide) . . . [T]hese procedures are not hypothetical.

108. Unfortunately, Syngenta's "stewardship" program did indeed present "hypothetical" and ineffective procedures, which made contamination of the U.S. corn supply virtually certain.

109. In connection with its sales of Agrisure Viptera® during the 2010-2011 growing year, Syngenta Seeds required producers who purchased it to agree to a Stewardship Agreement.

110. Contrary to representations in its MIR162 Deregulation Petition, however, Syngenta did not, on information and belief, institute a "wide ranging grower education campaign" through its Stewardship Agreements, Stewardship Guides, or otherwise or certainly did not do so in a manner that would be meaningful and effective.

111.    Syngenta's 2010 "Stewardship Agreement" contained no details on Syngenta's stewardship program.  Instead, it indicated that farmers received, or may receive at some later date, a separate "Stewardship Guide" and should continue to watch for "amendments" to the Stewardship Guide.

112.    The Stewardship Agreement contemplated amendments to the Stewardship Guide by "paper," via "www.myagrisure.com, or such other website as Syngenta might designate from time to time."

113.    In other words, Syngenta's "stewardship" program for Agrisure Viptera® depended on thousands of individual farmers across the country locating and understanding a Stewardship Guide which they may well not have been provided at the time of signing the Stewardship Agreement.

114.    Moreover, at least the 2012 Insect Resistance Management Stewardship Guide includes no discussion of marketing Agrisure Viptera® in a manner that would not lead to commingling or dissemination of that trait into unapproved markets.

115.    The May 11, 2011 version of Syngenta's Stewardship Agreement states generally that the "Grower agrees to . . . channel grain produced from [Agrisure Viptera®] Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval."   The agreement also provides definitions under the heading "GROWER UNDERSTANDS," which stated: "Channeling:  Grain harvested from corn hybrids containing Agrisure Technologies . . . may not be fully approved for grain exports to Japan or the European Union.  The grain from hybrids that do not have the appropriate import approvals from Japan or the European Union must be directed to domestic use and away from import channels." This version made no reference to marketing of grain to other unapproved markets, including China.  Nor does it contain any instruction on how the grower was supposed to "channel."  To

the extent other versions of the Stewardship Agreement (or Stewardship Guide) do reference China, the concept of "channeling" by thousands of individual corn farmers under Syngenta's non-existent or, at a minimum, inadequate "stewardship" program, was certain to fail.

116.   "Channeling" can only work if all grain handlers and others in the supply chain engaged in that endeavor.  For example, BIO recognizes that a realistic assessment of conditions related to handling, distributing, processing and testing products must engage the various stakeholders.  *See* Biotechnology Industry Organization, "Product Launch Stewardship," December 10, 2009 at Introduction.

117.   Upon information and belief, Syngenta did not obtain channeling commitments from supply chain participants, took no further action to create a marketing plan or channeling mechanism or coordinate with grain handling, export and other post-harvest firms, to ensure that Agrisure Viptera® corn was not directed to markets for which regulatory approval had not been received, including China.

118.   Indeed, Syngenta sought to *stop* Non-Producers including exporters and grain elevator operators from attempting to "channel" Agrisure Viptera® away from China. Specifically, Syngenta brought a lawsuit against a grain elevator operator – Bunge North America, Inc. ("Bunge") – who refused to accept Agrisure Viptera® corn because that operator exported corn to China.

119.   On August 17, 2011, Syngenta issued a letter to Agrisure Viptera® growers expressing disappointment that Bunge and Consolidated Grain & Barge reportedly would "not be accepting grain with the Agrisure Viptera® trait." *See* http://www.syngenta-us.com/vipteraexportinfo/Aug_19_Grower_Letter.pdf.  Syngenta recommended to growers that they simply "[d]eliver[] to elevators accepting grain with the Agrisure Viptera® trait." Syngenta

made no mention that these elevators should channel the grain to markets in which that trait had been approved.

120.    Syngenta Seeds sued Bunge in the *Syngenta v. Bunge* case complaining that Bunge could not refuse to accept at its grain elevators Agrisure Vipera® corn. Bunge had posted notices at its grain elevators that it would not accept Agrisure Viptera® corn because the MIR162 trait was not then approved in China, that China had a zero tolerance policy regarding non-approved GMO events such as MIR162, and, that Bunge had significant contracts with Chinese markets which it wanted to fulfill.

121.    Syngenta Seeds filed the suit seeking an injunction to require it to accept the Agrisure Viptera® corn despite (i) its earlier representations in the MIR162 Deregulation Petition that corn grown with its MIR162 trait would be channeled away from export markets which had not yet approved of its importation, (ii) the requirement in its Stewardship Agreement with growers who had purchased Agrisure Viptera® seed requiring them to channel their harvested grain away from export markets which had not yet approved the importation of MIR162 corn and (iii) the protocols referenced above approved by the Biotechnology Industry Organization and other organizations of which Syngenta was/is a member requiring consultation with industry stakeholders and not commercializing approved traits without major market approval.

122.    At the time Syngenta first commercialized Agrisure Viptera®, China was a large and growing purchaser of U.S. corn.  At the end of the 2010 crop year in August 2010, China had already become the seventh largest importer of U.S. corn.  *See Syngenta*, 820 F. Supp.2d at 860-61. Thereafter, in the spring of 2011, Bunge had sold millions of dollars of U.S. corn for delivery to China between September 2011 and January 2012.  *Id.*

123.   The Court in the *Syngenta v. Bunge* case denied Syngenta Seeds' requested injunction on September 26, 2011.  In denying the requested injunction, the Court found that it was foreseeable that China would not approve importation of MIR162 during the 2010-2011 crop year, that during that year U.S. exports to China might be significant, and that Syngenta Seeds had caused the very harm of which it complained.  The Court refused to shift the risk to Bunge for commercializing Agrisure Viptera® prior to receipt of approval from China.  Specifically, the Court in that case concluded, *inter alia*, that:

> [a]t least to some extent, Syngenta's reputational injuries [allegedly caused by Bunge's refusal to accept Agrisure Viptera®], thought significant, [were] the result of *Syngenta's* decision to commercialize Viptera corn before obtaining import approval from significant import markets, including China, where Bunge's rejection of unapproved traits was not wholly unforeseen or unforeseeable . . . .   (*Syngenta*, 820 F. Supp.2d at 988)

124.   Further, the Court also concluded that:

> no reasonable balance of equities would impose upon Bunge the prodigious additional expense of segregating Viptera corn (or segregating non-Viptera corn earmarked for Chinese export), where Bunge did not create the situation in Viptera corn has not been yet approved for import to China.  That situation arises entirely because Syngenta decided to commercialize Viptera corn knowing that it not yet have Chinese and some other import approvals and would not have them for the 2011 crop year, and under circumstances in which Syngenta should have reasonably recognized that Chinese imports of United States corn for the 2011 crop year might well be very significant.  Syngenta accepted the risk of commercializing Viptera corn, albeit with more than the required or recommended import approvals, but without import approval from all of the reasonably likely foreign markets.  I reject Syngenta's request that I shift that risk, instead, to Bunge . . . . (*Id.* at 990)

125.   In addition, in addressing the public interest element for injunctive relief, the Court declined to shift the risk of the decision to commercialize MIR162 away from Syngenta:

> I find that the public interest strongly favors allocating the risks of a decision to introduce a new transgenic grain into the commercial

39

market on the company that decided to commercialize that grain before obtaining all import approvals . . . . (*Id.* at 992)

126.    The Court also found that in the late summer and fall of 2011, exporters other than Bunge, including Cargill and ADM, had also refused to accept Agrisure Viptera® at some of their facilities due to export market issues such as the failure of Syngenta to receive approval from the European Union. *Id.* at 962.

127.    Even if Syngenta had instituted adequate procedures to accomplish channeling, it failed to take meaningful steps to prevent pollen-mediated gene flow and commingling from GMO field to non-GMO field.

128.    Responsible stewardship procedures include, at minimum, "generally accepted best seed quality practices designed to prevent low level presence of unauthorized products and [to] minimize unintended incidental presence of products authorized in the country of production" and "[m]ak[ing] available prior to commercialization a reliable detection method or test for use by growers, processors and buyers that enables crop identity verification for intended use." *See* Biotechnology Industry Organization, "Product Launch Stewardship," December 10, 2009 Annex 1, Policy Guidance; Biotechnology Industry Organization, "Stewardship: Actions to be Taken Prior to Launching Special Traits," October 4, 2010, Annex 1 Policy Guidance; Biotechnology Industry Organization, "Product Launch Stewardship: Food and Agriculture Section" November 27, 2012, Annex 1 Policy Guidance.

129.    Neither Syngenta's Stewardship Agreement nor its Stewardship Guide required that Agrisure Viptera® growers be equipped for, or institute, the kind of practices necessary to prevent cross-pollination or commingling of Agrisure Viptera® with non-Viptera corn (such as, for example but without limitation, isolation distances, dedicated equipment, cleaning to ensure no commingling).

130. Indeed and contrary to requiring isolation, Syngenta Seeds encouraged Agrisure Viptera® growers to grow Agrisure Viptera® side-by-side with other corn to compare performance. *See Syngenta,* 820 F. Supp.2d at 958.

131. Syngenta could have required that Agrisure Viptera® growers adhere to stringent practices that would have decreased the likelihood of contamination, but did not because to do so would have drastically reduced or eliminated sales of that product.

132. Moreover, upon information and belief, in addition to the acreage upon which Agrisure Viptera® and Duracade™ have been grown from sales of those products, Syngenta has grown on land within the United States corn containing the MIR162 trait for purposes of seed increase and to develop inventories of product to sell to farmers.  This additional growth also has increased the presence of MIR162 within U.S. agriculture and risk of widespread, pervasive contamination which has caused disruption of trade in U.S corn with China.

133. In addition, Syngenta continued to downplay the importance of China and misrepresent the status of approval.

134. Syngenta affirmatively and purposefully engaged in these actions and inactions in order to sell as much Agrisure Viptera® as it could in order to increase its own profits, ignoring the tremendous risks its profit-driven strategy imposed upon U.S. corn Producers and Non-Producers.

***Syngenta's continued deception regarding China's approval of MIR162***

135. During Syngenta's first quarter 2012 earnings conference call on April 18, 2012, Syngenta's Chief Executive Officer, Michael Mack, stated that he expected China to approve Agrisure Viptera® "quite frankly with in the matter of a couple of days." http://www.morningstar.com/earnings/37715637-syngenta-ag-adrsyt-q1-2012-earnings-call-

transcript.aspx.  This was a year after Syngenta had already begun selling large quantities of Agrisure Viptera® to farmers across the country.

136.    Syngenta also distributed misleading written materials indicating that Agrisure Viptera® could be exported to China.

137.    For example, Syngenta distributed a "Request Form for Bio-Safety Certificates Issued by the Chinese Ministry of Agriculture" for Agrisure Viptera®.  In China, "Bio-Safety Authorizations" are required for the issuance of shipment-specific "Bio-Safety Certificates." However, applying for shipment-specific Bio-Safety Certificates was and is pointless because MIR162 has not been approved for importation in China.  *See* http://www.ngfa.org/2014/01/10/china-renews-bio-safety-authorizations-for-four biotechenhanced-events-but-no-approval-action-yet-on-syngentas-agrisure-viptera-mir-162-trait/

138.    Syngenta knew that its Request for Bio-Safety Certificates Forms was pointless but distributed it in an effort to mislead U.S. Producers and Non-Producers.

139.    Syngenta also distributed a "Plant with Confidence Fact Sheet," which contains deceptive statements regarding the importance of China as an export market. http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf.        For example, the "Plant with Confidence Fact Sheet" states:

> The vast majority of corn produced in the U.S. is used domestically.  There is a misconception that China imports more grain than it actually does from the U.S. China has imported, on average, a little more than half of one percent – 0.5% – of all U.S. corn produced in the past five years. . . .
>
> Since very few U.S. grain outlets actually export to China, most have no reason to restrict your right to plant the latest technologies.

http://www.syngenta-us.com/viptera_exports/images/Agrisure-Viptera-Fact-Sheet.pdf. (emphasis removed).

140.     Contrary to the Plant with Confidence Fact Sheet, the National Grain and Feed Association reports:

> The U.S. Department of Agriculture (USDA) forecasts that China will become the world's largest corn importer by 2020. China is projected to increase its corn imports to 22 million metric tons (866 million bushels) by 2023, up from 2.7 million metric tons (106 million bushels) in 2012. For 2013, USDA had projected that the United States would export 37 million metric tons (1.457 million bushels) of corn, and that China would import an estimated 7 million metric tons (276 million bushels) – virtually all of it from the United States.

http://www.ngfa.org/wp-content/uploads/NGFA-Flyer-for-Farmer-Customers-on-Potential-Market-Impacts-of-Commercializing-Biotech-Enhanced-Seeds-Not-Approved-for-Import-into-U.S.-Export-Markets.pdf.

141.     In other words, for 2013, the USDA estimated that China represented nearly 20% of the U.S. export market.

142.     Prior to China's discovery in November 2013 of MIR162 in U.S. corn shipments, China was the third largest market for U.S. corn and China's share of our market was projected to grow substantially.  China is by far the largest potential growth market for U.S. corn.

***Syngenta Continued to Expand Sales of Agrisure Viptera® Acreage Despite No Approval from China And While the Importance of the Chinese Market Continued to Increase***

143.     China continued to be a major and growing market for U.S. corn and corn products during the 2012 and 2013 crop years.  However, during that period, China still had not yet approved the import of MIR162 and various corn industry groups continued to object to Syngenta Seeds' commercialization of Agrisure Viptera®.

144.     In fact, during 2012/13, China had become the third largest export market for U.S corn.  As reported by the Iowa Corn Grower's Association, "[i]n 2012/13, China was the third largest export market for U.S. corn and up until the recent issue [the rejections beginning in

43

November 2013] [China] was on track to meet or exceed that position." China and MIR162, 2-2014, Iowa Corn Growers Association, Feb. 6, 2014 (http://www.iowacorn.org/documents/filelibrary/news/China_and_M162_FINAL_7A2080B45DA03.pdf).

145.     Nevertheless, Syngenta continued to market Agrisure Viptera® during the 2012 and 2013 crop years.  Estimates were that during this period Syngenta had increased the market share of its Agrisure Viptera® corn to well more than 2%, and, by some estimates as high as 3.5%, of the corn area grown in the U.S.  Christensen, "Viptera Could Have Been Approved for Importation Into China, But Was Not," Seed in Context Blog, April 13, 2014 (http://www.intlcorn.com/seedsiteblog/?p=1891).

146.     This increase further assured that Agrisure Viptera® could not – and would not -- be channeled away from export markets, such as China, which had not approved MIR162.

147.     Syngenta knew, or reasonably should have known, prior to its commercialization of Agrisure Viptera® that channeling in the circumstance of its clearly inadequate "stewardship" program would not work.

148.     Syngenta also knew or should have known that its own clearly inadequate "stewardship" program would not work.

149.     As such, it was inevitable that the MIR162 Viptera® corn would contaminate the U.S. corn supply.

### China's Rejection of U.S. Corn and DDGS

150.     In November 2013, China began rejecting shipments of U.S. corn which tested positive for the presence of MIR162.

151.     On December 24, 2013, the General Administration of Quality Supervision, Inspection and Quarantine of China issued a warning notification strengthening the inspection and  supervision for the import of GMO feed materials. This notification stated the

impetus was that Shanghai Chinese Inspection and Quarantine Service ("CIQ") had detected MIR162 in DDGS shipments. The December 24 notification indicated that all batches of corn and DDGS would now be tested at the Chinese ports for MIR162, and that any cargo which tested positive for MIR162 would be returned or destroyed.

152.     It was not possible to ensure a "zero" level of MIR162 in the Chinese testing (*i.e.*, a negative test of a container in the U.S. could still result in a positive test in China).

153.     The uncertainty associated with the possibility that a shipment might test positive for MIR162 when tested in China caused Chinese customers to walk away from their contracts for U.S. corn and DDGS and added a great deal of uncertainty to the market.  Not surprisingly, prices for corn and DDGS fell.

154.     Additionally, tests at Chinese ports led to increased port and storage costs (e.g., while waiting for testing to occur, or while waiting for test results, additional port and storage fees were incurred). Further, some cargo ships found to contain MIR162 corn were not rejected, but rather have been effectively seized by the CIQ, and the owners of those ships were forced to pay approximately $100 per day, per seized container in storage fees plus container detention charges from ship lines.   Beyond this, if a corn or DDGS shipment tested positive for MIR162 at a Chinese port, and if the shipment was able to leave China, exporters were faced with even heavier losses due to diversion costs.

155.     Given the increased frequency with which corn and DDGS shipments were testing positive, in July 2014, China again strengthened its policy regarding MIR162. The new policy required the U.S. to provide GMO test reports with an official stamp for each and every DDGS shipment destined to China to certify those shipments would be free of MIR162.

156.     In December, 2014, China finally approved MIR162 for importation into China. By then, however, Syngenta had already begun commercializing another unapproved bio-

engineered corn trait. U.S. corn exports to China have not yet begun to recover, and it remains to be seen whether they will ever regain the levels they would have attained but for the embargo

***Regulation, Testing and Deregulation of Event 5307***

157. Despite China's rejection of U.S. corn and DDGS because of the presence of an unapproved trait, Syngenta nonetheless pressed on with commercialization of yet another GMO corn seed product.

158. On April 22, 2011, just months after Syngenta Seeds had released Agrisure Viptera® for the 2011 crop year, Syngenta Biotech filed with APHIS a petition seeking the deregulation of another insect resistant, genetically modified trait known as Event 5307. Event 5307 was ultimately deregulated by APHIS on January 29, 2013.

159. Between 2005 and 2011, Syngenta Biotech conducted at least 101 field trials of Event 5307 corn under at least 22 notifications made to APHIS under the GMO Regulations at sites in 23 states.

160. Upon information and belief, at least some of the field trials of Event 5307 included tests of corn stacked with multiple traits, including the presence of both Event 5307 and MIR162. Further, upon information and belief, field tests conducted under the GMO Regulations of Event 5307, either singly or together with other traits, including MIR162, continued during the period after the filing of the Event 5307 Deregulation Petition and the January 29, 2013 decision to deregulate Event 5307.

161. In its deregulation petition for Event 5307, Syngenta Biotech disclosed that upon deregulation of Event 5307, Syngenta Seeds did not intend to market Event 5307 as a stand-alone product, but intended to combine it with other traits, including MIR162. It also stated that it intended to seek approval of products containing Event 5307 in countries which had functioning regulatory systems and that "Syngenta is also pursuing regulatory approvals for

46

importation of corn commodities and processed goods containing 5307 corn in key export markets for U.S. and Canadian corn" and that applications were currently planned for a number of additional countries, including China.   In the discussion of "Adverse Consequences of Introduction," Syngenta Biotech stated that an upcoming Environmental Report would discuss a range of issues related to the deregulation of Event 5307 corn, "including any potential direct, indirect or cumulative impacts on . . . the economy, either within or outside the U.S."  Petition for Determination of Nonregulated Status for Rootworm-Resistant Event 5307 Corn, April 22, 2011, at 156 (http://www.aphis.usda.gov/biotechnology/petitions_table_pending.shtml).

162.    Following approval of Event 5307, Syngenta Seeds announced that it would commercialize its Agrisure Duracade™ for the 2014 crop year containing both Event 5307 and MIR162, despite the continued failure to obtain approval from China for MIR162 and the fact that Event 5307 also had not been approved.

***Commercialization of Agrisure Duracade™ despite MIR162's continued disruption of the U.S. corn trade***

163.    In November 2013, China began rejecting shipments of U.S. corn which tested positive for the presence of MIR162.  Syngenta has, nevertheless, continued its false statements and misrepresentations, as alleged herein, including through its decision to market for the 2014 crop year Agrisure Duracade ™.

164.    The National Grain and Feed Association has detailed the disastrous results of China's rejection of U.S. corn based upon the presence of MIR162:

> This development resulted in a series of trade disruptions –
> including testing; delays in vessel discharge; and deferrals,
> diversion and rejections of cargoes – when MIR162 subsequently
> was detected in U.S shipments of corn and distillers dried grains
> with solubles (DDGS). These disruptions effectively shut U.S.
> corn farmers out of China's feed grain import market, which
> previously almost exclusively had been supplied by the United
> States.   **China subsequently has taken actions to utilize**

> **domestic, as well as international alternatives to U.S. corn. For instance, China's imports of U.S. grain sorghum have increased significantly. China also has sourced corn from Ukraine. And most recently, Brazil and Argentina each were granted approval to begin exporting corn to China. . . .**
>
> **This disruption, tied to positive detections of MIR 162 that began in November 2013, has virtually halted U.S. corn trade with China**. . . . .
>
> USDA currently is projecting Chinese corn imports will reach 22 mmt [million metric tons] by 2023, which if realized would account for nearly half of the projected growth in total world corn trade. However, **if the MIR 162-related trade disruption continues, other corn exporting nations, such as Ukraine, are capable of replacing the United States as the principal corn exporter to China**. . . .
>
> [T]he MIR 162-induced trade disruption has resulted in market price loss on unfulfilled export sales, price loss on diverted sales because of the compromised economic negotiating position of U.S. exporters, demurrage costs, and lower market prices for U.S. commodities and products. **The total loss for these sectors of the U.S. grain industry is estimated to range from $1 billion to $2.9 billion**.

http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf (emphasis added).

165.    Syngenta nevertheless moved forward with commercialization of Agrisure Duracade™ for the 2014 planting season.

166.    On January 23, 2014, the National Grain and Feed Association and the National American Export Grain Association issued another Joint Statement imploring Syngenta to stop its heedless and irresponsible commercialization:

> On Jan. 22, 2014, the National Grain and Feed Association (NGFA) and North American Export Grain Association (NAEGA) sent a letter to Syngenta asking the company to immediately halt commercialization in the United States of its Agrisure Viptera® corn and Agrisure Duracade™ corn until such time as China and certain other U.S. export markets have granted required regulatory approvals/authorizations.

48

**The NGFA and NAEGA . . . are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.**

There are numerous negative consequences incurred when the Chinese and other U.S. export markets are put at risk through commercialization of biotechnology-enhanced seeds before approvals for import into foreign markets are obtained. Such consequences may include reducing the value and demand for the U.S. farmers' products, preventing foreign consumer access to much-needed supplies, shutting off or increasing the cost of U.S. producers' access to some export markets for their crops, exposing exporting companies to financial losses because of cargo rejections and contract cancellations, and ultimately diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products in world markets. Commercialization prior to foreign regulatory approvals also has a negative impact on the overall U.S. corn and other grain value chains, and reduces significantly U.S. agriculture's contribution to global food security and economic growth.

Within the U.S. grain and oilseed handling and marketing system, each purchaser or handler makes its own determination as to whether to accept various commodity crops – including those produced from biotechnology-enhanced seeds. Such a decision likely is driven by customer preferences, infrastructure and operational limitations, regulatory regimes and contractual commitments, as well as meeting regulatory requirements in the respective markets they serve. Given the nature of the U.S. grain marketing system, these business decisions extend to the first point of sale or transfer from the producer.

As a matter of policy, NGFA and NAEGA have communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States. Individual grain handler, processor, service provider and exporter member

> companies of our Associations represent further system-wide support and advocacy for this policy.
>
> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization. We therefore seek assurances from Syngenta that it will follow suit by publicly announcing that it will suspend immediately its commercialization of Viptera and Duracade products in the United States until such time as China and other U.S. export markets have granted required regulatory approvals and authorizations.

http://www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta-Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf. (emphasis added).

167.    Syngenta spokesman, Paul Minehart, responded by stating: "Changing our marketing plan in the U.S. now **would have no effect on grain in the system** or Chinese acceptance of corn imports."   Reuters, "U.S. Groups urge Syngenta to hold back on GM corn barred by China" (Jan. 23, 2014) (http://www.reuters.com/article/2014/01/23/us-corn-syngenta-idUSL2N0KXIKG20140123) (emphasis added).

168.    This pronouncement recognizes that indeed, MIR162 has contaminated the U.S. corn supply to an extent that it cannot be undone.  This is even more true given that Syngenta continues to market and sell Agrisure Duracade™ as well as Agrisure Viptera®.

169.    In March 2014, in meetings with the National Grain and Feed Association, Syngenta advised that its introductory launch of Agrisure Duracade™ would likely extend to 250,000 to 300,000 acres in a launch zone which included portions of each of the ten (10) states which grow the largest amounts of corn.   In the same meetings, Syngenta refused to accept responsibility or liability if and when Agrisure Duracade™ becomes present in countries which had not approved it.   NGFA, Latest News, "Syngenta Provides Additional Details on Plans for 'Introductory   launch'   of   Duracade,   Biotech   Corn   in   2014"   (March   7,   2014)

50

http://www.ngfa.org/2014/2014/03/07/Syngenta-provides-additional-details-on-plans-for-

introductory-launch-of-duracade-biotech-corn-in-2014/.

170.    The National Grain and Feed Association has issued a dire forecast of the damage

Agrisure Duracade™'s premature commercialization will cause:

> For the 2014 planting season, Syngenta has introduced another trait
> called Agrisure Duracade™ 5307 (hereafter referred to as 5307)
> that currently lacks Chinese import approval, potentially
> prolonging the U.S. loss of the large, growing Chinese feed grain
> import market. . . .
>
> China is roughly one year into its semi-regular, two-year process
> of evaluating the authorization of 5307 for import in food, feed and
> for further processing. Since Chinese authorization of 5307 is not
> expected for at least another year, China is expected to continue
> enforcing a zero-tolerance policy for unapproved biotech-enhanced
> traits in 2014/15, as occurred in marketing year 2013/14 for MIR
> 162. Thus, the commercialization in the United States of 5307 is
> expected to prolong the economic impact on U.S. corn and other
> commodities that began in mid-November 2013.
>
> Similarly to 2013/14, when the United States lost access to the
> Chinese corn import market, the 2014/15 market price impact
> caused by the presence of 5307 in U.S. commodity exports is
> expected to extend beyond the corn market and potentially affect
> other commodities, such as DDGS, soybean meal and soybeans,
> because of the substitutability of corn for these commodities in
> domestic feed rations. . . .
>
> **[A]fter accounting for projected benefits and costs, the net
> economic impact of the 5307 commercial launch is estimated to
> result in a loss to the U.S. grain value chain ranging from $1.2
> billion to $3.4 billion, with a mid-point estimated net economic
> loss of $2.3 billion.**

http://www.ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact-

Analysis.pdf. (emphasis in original).

171.    In September 2014, Syngenta announced 52 new corn hybrids for the 2015

growing season.   MIR162 was in 23 new Agrisure Viptera®  products and 18 new Agrisure

Duracade™ products.  *See* "Syngenta Announces 52 New Corn Hybrids for 2015 Season," Sept.

51

17, 2014 (available at: http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015¬season-275494841.html)

172.     In December, 2014, China finally approved MIR162 for importation into China. By then, however, Syngenta already had begun commercializing yet another GMO corn seed product as discussed above.  In addition, China's December 2014 approval is not likely to lessen the impact of Syngenta's conduct anytime soon.

173.     Syngenta's acts and omissions have resulted and will continue to result in the pervasive contamination of the U.S. corn supply, including fields, grain elevators and other facilities of storage and transport, causing physical harm to Non-Producer Plaintiffs' corn, harvested corn, equipment, storage facilities, and land.

174.     The likelihood that Agrisure Viptera® would contaminate and Agrisure Duracade™ would (and will continue to) contaminate the U.S. corn supply was readily foreseeable to Syngenta, as was the harm to Producers and Non-Producers, who Syngenta describes as among its stakeholders "affected by" Syngenta's business.

175.     Syngenta had the right and ability to control the timing, size, and geographic scope of its commercialization of Agrisure Viptera® and Duracade™, as well as the extent to which adequate containment measures would be required of customers.

176.     Syngenta did not simply fail to take precautions against clearly foreseeable harm, but acted affirmatively to create it.

177.     Syngenta's conduct has directly caused and contributed to cause significant economic harm to Producers and Non-Producers in the corn industry as explained below.

***Economic Impact***

178.     The characteristics of the world corn market have important implications for understanding the market price impact of the Chinese MIR162 ban on corn and corn products from the United States. Those include:

a.     Corn is the most widely used feed grain in the world.

b.     The United States is by far the largest producer and exporter of corn.

c.     Prior to the import ban, virtually all of China's corn imports were from the United States.

d.     Prior to the import ban, China was the third largest market for U.S. corn exports.

e.     The latest U.S. Department of Agriculture (USDA) agricultural trade projections placed China as becoming the world's largest importer of corn by 2020.

f.     The MIR162 import ban virtually halted U.S. corn sales to China indefinitely.

g.     The world price of corn is established in Chicago and the loss of a key market for the U.S. puts downward pressure on the world price that reverberates to farmgate prices throughout the United States.

h.     Corn is a commodity and a relatively small change in the global volume of trade in a commodity market like corn will have a magnified price impact.

i.     An exporter's reputational loss in an agricultural commodity market due to an event like a GMO contamination can persist for many years.  Once an exporter has lost a foreign market, it is difficult to get it back.

***Global Corn Market***

179.     World corn production totaled 983.3 million metric tons (mmt) in 2013/14 (about 38.7 billion bushels). This supply was concentrated in a relatively small number of countries. The world's largest corn producers are the United States with about 36% of global production in 2013/14, China (about 22% of production), Brazil (8%), and the EU (7%).

180.    Global usage of corn has expanded by about 37% in the last decade, due to rising population and incomes, and increased urbanization with its associated changing dietary patterns. Feed usage accounts for about 58% of total global corn use, industrial use 27%, and food 11%. The pie chart below shows corn consumption by region.

**World Corn Consumption By Region**



181.    At the end of each crop year, corn inventories are carried forward in case of a short harvest. The United States and China are the largest holders of corn inventories.  At the end of 2013/14, these two countries held 70% of the 176 mmt of global stocks.

182.    Total world corn trade is about 100 to 120 mmt per year. Prior to the MIR162 ban, China was importing about 4% of global corn sales.  That amount was projected by the USDA to increase substantially by 2020, when the USDA projects that China will be the world's largest importer of corn at 16 million metric tons.



**China expected to become largest global corn importer**

Source: USDA Production, Supply and Distribution database and projections.

183.    The United States is the dominant exporter of corn. The big exporters include the U.S. (36% of world trade), Brazil (20% of exports), the Ukraine (17%), and Argentina (10%). These 4 countries alone account for over 82% of global exports.

**Table x. Major Corn Exporters: July 2013/ June 2014**

| Exporting Country | U.S. | Brazil | Ukraine | Argentina | Others | Total |
|---|---|---|---|---|---|---|
| Exports (million metric tons) | 42.8 | 23.5 | 19.9 | 12.0 | 21.8 | 120.0 |
| Exports (million bushels) | 1,685 | 925 | 783 | 472 | 858 | 4,724 |

Source: International Grains Council

184.    Just over 10 years ago China was a significant exporter of corn (as well as all grains), with exports peaking at 15.2 million metric tons in 2002/03. China flipped from being a corn exporter to a corn importer in 2009/2010.



China's net imports of grains surged during 2012-13



Note: Net imports = imports − exports. Data for calendar years.
*DDGS= Distillers Dried Grains With Solubles.
Source: USDA, Economic Research Service analysis of China customs statistics.

185.    The import side of the international trade equation is more diverse, with the major importers including the EU, Japan, Mexico, South Korea, Chinese Taipei, China and Turkey (together accounting for 55% of imports in 2013/14). This leaves 45% of the corn imports destined for a large number of small importers.

**Major Corn Importers**



Source: International Grains Council.

186.    In its annual long-term grain trade projections, the U.S. Department of Agriculture projected that China's corn imports would grow from 2.7 mmt in 2012/13 to 22 mmt in 2023/24. China is by far the largest potential growth market for U.S. corn. These projections place China as the largest corn importer in the world by 2020.

*U.S. Corn Market*

187.    Corn is the largest crop in the United States, measured either by value of production or planted acres. In the 2013/14 September-August fiscal year, U.S. corn growers produced about 13.9 billion bushels of corn, worth more than $60 billion. Corn is used for livestock (primarily cattle, hogs, and chickens) feed (37% of 2013/14 crop), food, alcohol and industrial usage (46% of the 2013/14 crop) and exports (14% of the 2013/14 crop).   U.S.

Department of Agriculture, Economic Research Service, Feedgrains Yearbook, Table 4. http://www.ers.usda.gov/data-products/feed-grains-database.aspx#.VEJk-SiwRzo.

188.    Corn production in the United States is concentrated in the neighboring Midwestern states comprising the "corn belt," where soil and climatic conditions are highly conducive to growing corn.[1]  About 95.4 million acres were planted in corn in the United States in the September-August 2013/14 marketing year.

189.    The U.S. corn marketing system is predominantly commodity-based.  Corn grown by farmers is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms to local, regional, and/or terminal distribution centers. From there, it is often transported by exporters to foreign countries.

190.    Grain elevators are facilities at which grains are received, stored, and then distributed for direct use, process manufacturing, or export. They can be classified as either "country" or "terminal" elevators, with terminal elevators further categorized as inland or export types. Operations other than storage, such as cleaning, drying, and blending, often are performed at elevators.

191.    "Country elevators" are a linchpin of the U.S. commodity grain handling and marketing system. Country elevators are generally smaller elevators that receive grain by truck directly from local farms during the harvest season. In addition to providing grain storage and drying services to such farmers, country elevators buy individual loads of grain from local farmers for cash. A county elevator then will sell the grain it has purchased and stored in volume

---

[1] There are alternative definitions of exactly which states make up the "corn belt." The top ten producing states are Iowa, Illinois, Nebraska, Minnesota, Indiana, South Dakota, Wisconsin, Kansas, Ohio and Missouri.

to regional/terminal grain elevators/distribution centers for further movement in the commodity corn supply chain.

192.     Grain elevators thus play a crucial role in agriculture. According to the U.S. Department of Agriculture, there were 8,783 off-farm storage facilities in the United States as of January 2014. Iowa had the highest number of facilities with 900; Illinois came in second with 850 facilities. *See* USDA National Agricultural Statistics Service (Grain Stocks January 2014).

193.     Farmers can sell their grain directly to country elevators for a cash price. By selling their grain to country elevators, farmers who choose to sell to country elevators are able to obtain the cash flow necessary to continue their operations, and the country elevators are able to obtain grain in volume for further sale down the commodity corn supply chain

194.     Corn prices throughout the United States are tied to the Chicago Board of Trade Futures (CBOT) price through the "basis" (defined as the futures price minus the local cash price). The U.S. corn market is spatially integrated and informationally efficient.  Basis levels for spatially separated markets are also closely linked.  Events like trade disruptions that affect the CBOT corn prices directly affect the price that U.S. corn farmers receive for their corn.

195.     Country grain elevators test and grade corn for weight, moisture content, and foreign materials. Country grain elevators are not equipped to test and segregate corn for genetic traits due to the costs associated with such a time-consuming process. Many country elevators are not equipped to test for the MIR162 trait in corn.

196.     The terminal grain elevator receives grain via rail or truck from the country grain elevator. Terminal grain elevators have the capacity to hold several million bushels of grain. After receiving the grain from country elevators, terminal operators sell large shipments to manufacturers or continue to store the grain for later sale to domestic and foreign buyers.

197.    In addition to country elevators and terminal elevators, a third type of grain elevator is the processing elevator. Rather than grain storage, the processing elevator provides agribusiness with crop collection locations at which high volumes of crops can be collected and processed in a cost-effective manner. These elevators process the grain into a finished product for either human or livestock consumption.

198.    Some corn is sold for manufacture into corn ethanol. Ethanol manufacture results in a corn by-product known as dried distillers grain with solubles ("DDGS"). DDGS from the ethanol industry is commonly sold as a high protein livestock feed. In the US, DDGS is packaged and traded as a commodity product.

199.    Corn and processed grain from terminal elevators, and DDGS from ethanol plants, are transported by truck, trail, and/or ship to their final destination. Exporters may load the products themselves, or may contract with others for hauling and/or loading/transfer services. Corn and DDGS bound for China are typically loaded into shipping containers and shipped by rail either to the West Coast where the containers are loaded onto ships, or transported to New Orleans, and loaded onto ships there. Large exporters may deal in entire vessels loaded with corn and DDGS, while smaller exporters ship containers of these products on container ships that may carry containers of other products, or from other exporters, as well.

200.    Once the corn or DDGS arrives in China, it must be cleared for import into that country before the counter-party who has purchased the product may take delivery.

201.    Thus, the commodity supply chain for corn and DDGS bound for China may involve country elevators, processing elevators, terminal elevators, truckers and other haulers, loaders and transport companies, and exporters who ship the product to China.

202.    Elevators both own and store corn for sale further down the supply chain. Similarly, exporters may purchase and sell corn and DDGS, or may export these products under

60

a variety of consignment arrangements, and incurred injury due to the loss of the Chinese export market under either arrangement.

***China's Corn Market***

203.    China has emerged as a large player in the global market for agricultural products. As of 2012 it was the fourth largest exporter and second largest importer of agricultural products in the world, according to World Trade Organization trade statistics. Its import growth has been driven by a shift in its domestic production mix, and changing consumer diets with rising incomes and urbanization. The changing diets have especially driven strong demand growth for meat (mainly pork and chicken), which requires a large supply of feed grains including corn and DDGS, a byproduct of corn ethanol production, and soybeans.

204.    China is the now largest foreign market for U.S. agricultural products. The U.S. Department of Agriculture (USDA, Outlook for U.S. Agricultural Trade, AES-83, August 28, 2014) reports that U.S. agricultural exports to China have almost doubled in the last five years, totaling $28 billion in fiscal Oct. 2013-Sept. 2014.

205.    Prior to the U.S. corn import ban, the top three U.S. agricultural exports to China (in order of importance) were soybeans, cotton, and corn, based on value of trade. In November 2013, China started turning back cargoes containing Syngenta's MIR162 biotech corn, that is yet unapproved for import into China.

206.    U.S. corn exports to China reached 5.146 mmt in 2011/12 (approximately 13% of U.S. exports that Sep-Aug marketing year) and were 2.39 mmt in 2012/13–still about 13% of exports (lower export volume due to the big U.S. drought).  By contrast, due to the China import ban of U.S. corn beginning in November 2013, the absolute volume of U.S. corn exports to China in 2013/14 was not much higher than the drought year, and fell to less than 6% of exports.

If the current trend that began after November 2013 continues, U.S. corn exports to China in 2014/15 and beyond will be negligible.

207.    The following graph shows the dramatic difference in accumulated U.S. exports to China after the MIR162 ban, taking into account seasonal variations in export quantities.



10/24/2014 Source: USDA/FAS/Export Sales Reporting

208.    If access to the China market continues to be denied to U.S. corn imports, the losses will be even more significant and will continue to grow. As the following quote explains, China was expected to be a very rapidly growing import market for corn.

> "China's corn imports are projected to rise steadily and reach 22 million tons by 2023/24.  China's strengthening domestic demand for corn is driven by structural change and growth in its livestock sectors, as well as by rising industrial use.  The increase in China's imports accounts for nearly half of the projected growth in world corn trade." USDA Long-Term Projections Feb. 2014, p.20.

USDA Agricultural Projections to 2023. Available at www.usda.gov/oce/commodity/projections/

209.    For fiscal year 2013/2014 China was expected to import 7 mmt of corn and 6 mmt in 2014/15.2.  Since the news of the rejected cargoes surfaced, U.S. Department of Agriculture analysts have lowered projections of China's total annual imports from 7 to 3.5 mmt in 2013/14 and from 6 to 3 mmt for 2014/15.  These projections obviously reflect the assumption that U.S. corn trade with China will begin again sometime in 2014/15.  If that does not occur, the actual imports will be far lower than the projected imports.  The damage to the U.S. corn and DDGS market and the prices received for U.S. corn and corn products likely will be long lasting.  *See* paragraph 220 below.

210.    To make up for reduced imports from the U.S., China has increased imports from the Ukraine and there are reportedly small shipments from Brazil and Argentina.  In other words, the U.S. is already beginning to lose China as an important corn export market.  If the import ban continues, it will be increasingly difficult to get it back.

### *GMOs in China*

211.    China imports more biotech soybeans than any other country. This marketing year China is expected to import 72 mmt of soybeans.  The vast majority of China's soybean imports are biotech varieties, even though biotech soybeans (and corn) are not commercially grown in China. China imports soybeans primarily from the United States, Brazil and Argentina.

212.    China has approved five-biotech crops for importation – canola, cotton, corn, soybeans, and sugar beets. Approximately 15 different corn biotech products have been approved by China, including "events" developed by Monsanto, Syngenta, Bayer, and Du Pont. The number of approved soybean products is approximately 8 and there are 6 cotton and 7 canola products. Only 1 sugar beet product has been approved. The approval process for Chinese

imports of biotech crops takes considerable time even if the original application is complete. The current time average between application and final approval is around 40 months.

213.    China started testing and rejecting cargoes of U.S. corn in November 2013 and subsequently began rejecting U.S. distiller's dried grains with solubles (DDGS)–a corn ethanol by-product–imports in June or July 2014.

214.    By mid-December, 2013, China had rejected shipments of U.S. corn totaling 545,000 metric tons.    *See* http://www.rueters.com/article/2013/12/20/china-corn-idUSL3N0JZ0EZ20131220.  China also rejected 2,000 metric tons of DDGS, a corn ethanol by-product, imports in December 2013, and continued rejecting DDGS through 2014.    *See* http://ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf.

215.    Beginning in July 2014, China's General Administration of Quality Supervision, Inspection and Quarantine announced that it would require official government certification from the point of origin that shipments of DDGS are free of MIR162. DDGS are used in livestock feed rations primarily as an energy source.  China's rejection of U.S. DDGS due to the presence of MIR162 has important – and negative – implications on the price of U.S. corn and DDGS.

***DDGS Trade***

216.    U.S. DDGS exports to China totaled 2.16 mmt in calendar year 2012 and 4.45 mmt in calendar year 2013. DDGS trade has been hit hard recently, but the extent of the impact on corn prices may not show up in the trade data yet.

**U.S. Exports of Corn and DDGS to China: 2009-2013 (calendar years)**



Source: USDA, GATS. DDG HS code 2303300000

217.    China was by far the largest market for U.S. DDGS exports, accounting for approximately 50% of all exports. The U.S. exports over 20% of annual DDGS production. http://www.extension.iastate.edu/agdm/crops/outlook/dgsbalancesheet.pdf.

218.    The loss of the large Chinese market for DDGS displaces corn in the U.S. domestic market, pushing corn prices down further.

219.    DDGS are an important source of revenue for US ethanol plants. Lower DDGS prices due to the loss of the Chinese market have negatively affected ethanol crush margins. The corn crush spread is a dollar value quoted as the difference between the combined sales values of the products (ethanol and DDGS) and the cost of corn. China's ban has lowered DDGS prices and therefore lowered the DDGS value per bushel of corn processed by the ethanol producers. This may be partially offset by a lower price of corn due to the ban. However, USDA (USDA, AMS, Bioenergy Market News Reports) figures on ethanol crush margins indicate the difference between corn price and value of co-products was $3.67 per bushel on May 2, 2014 and then fell to $2.28 per bushel on September 26, 2014. The value of DDGS per bushel of corn processed into ethanol was $2.08 on May 2nd this year, compared to only $1.02 on September 26, 2014.

About 4.7 billion bushels of corn are used for ethanol annually, so the financial loss to the ethanol industry from the MIR162 ban is significant.

220.     The impact of the loss of the Chinese market for corn and corn products to U.S. corn Producers and Non-Producers likely will be long lasting. The MIR162 incident has similarities to other international GM contamination incidents, which have had long-lasting market effects. For instance, 8 years after the 2006 Bayer Crop Science's Liberty Link contamination of the U.S. long-grain rice supply, exports to Europe have yet to recover. Prior to the 2006 marketing year the EU-27 procured approximately 25% of its rice imports from the United States. Immediately after the contamination event, the EU blocked imports of any new commercial U.S. long-grain rice imports. In fact U.S. long grain rice farmers lost one of their most important markets and they have yet to get it back despite considerable effort and expense. Recently, an official delegation from the U.S. rice industry visited countries in the EU (such as Germany and the United Kingdom) where they held discussions focused on the re-introduction of U.S. rice into this important market. After this visit, the USA Rice Federation reported that market re-entry faces significant hurdles:

> "The U.S. has a superior product and the industry has successfully addressed environmental and social concerns of this market, but it's clear we have more work to do before our German customers return to us," said Keith Glover, president and CEO of Producers Rice Mill and chairman of USA Rice's World Market Price committee." USA Rice Federation, *USA Rice Daily*, Tuesday October 14, 2014.

221.     In commodity markets like corn, a relatively small change in trade volume can have a significant impact on price. One of the prime examples of the operation of this basic law of economics occurred in 1973 when Middle Eastern Arab oil producers (Iran and Arab members of OPEC) cut off exports to the U.S. to protest American military support for Israel. Even though imports from this region accounted for only about 10% of the U.S. oil supply, petroleum prices

quadrupled in response to the export embargo and there were long lines for gasoline at filling stations.

222.    Another more recent example of inelastic demand at work is evident from the world coffee market. Brazil produces about 35% of the world's coffee and is unfortunately in the middle of a drought that is affecting both the 2014 and 2015 coffee harvests in that country. In 2014 the Brazilian coffee harvest was down about 13% and this doubled the price of coffee. World coffee production is about 150 million bags per year and as the following quote from the *Financial Times* indicates, a 10 million bag swing in Brazil's production over a two year period (about a 3.5% change in production) can mean the difference in coffee prices ranging between $3 and $1.50 per pound.

> "Brazil is the largest coffee producer in the world, accounting for about 35 per cent of all output. Industry consensus around the 2014 Brazilian harvest seems to have settled at about 48m 60kg bags, down from the previous year's 54-55m, but the 2015 forecasts have ranged widely between 40m and 53m bags. Estimates for the cumulative Brazil supply 2014 and 2015 combined, range from 92m to 102m bags, which is the difference between $3.00 and $1.50 per pound of coffee." *Financial Times*, Wednesday, Sep 17, 2014.

223.    Based on the same economic logic, the *Wall Street Journal* reasoned that the loss of the Chinese corn market to the U.S. industry over MIR162 will have an important impact on the U.S. corn price even though that market represented only about 12% of U.S. exports.

> "Exports account for only about 12% of the U.S. corn crop, but China's rapid growth gives the country an outsize influence over prices." *Wall Street Journal*, April 11, 2014, U.S. Corn Exports to China Dry Up Over GMO Concerns.

224.    In the U.S. corn market both domestic demand and supply curves are relatively inelastic, especially in the short run. Elasticity measures the degree of responsiveness in supply or demand to price changes. If both the supply and demand curves are inelastic, then for each

curve it will take a relatively large change in price to effect a change in quantity demanded or supplied. This is shown in the left panel of the diagram below where the U.S. domestic demand for corn is represented as schedule $US_D$ and the domestic supply is labeled as $US_S$. Both of these curves are inelastic as drawn. The horizontal difference between the supply ($US_S$) and demand ($US_D$) at world price ($P_{US}$) is the amount of corn exported.

225.    The right hand panel of the diagram shows the market for U.S. corn exports. The U.S. export supply curve shown to the world market is labeled as $US_{ES}$. This curve is based on the U.S. domestic supply and demand curves in the left hand panel. For any price above the point where $US_D$ and $US_S$ intersect in the left hand panel there is excess domestic corn that is supplied to the world market according to the schedule $US_{ES}$ in the right hand panel. The world demand for U.S. corn is shown by the curve $ROW_{ED}$ in the right hand panel. This includes demand from China. Following the MIR 162 ban the $ROW_{ED}$ curve shifts left as shown by the arrows in the right hand panel. An inward shift of the global demand for U.S. corn reduces exports from the U.S. The intersection of the shrunken $ROW_{ED}$ curve and $US_S$ determines the volume of trade after the MIR 162 ban. U.S. corn exports are reduced by a fixed volume due to a foreign market closing, and the U.S. price falls to $P'_{US}$. The drop in price is relatively large even if the shrinkage in exports is a small share of production, because the price must fall to clear a market in which both supply and demand are inelastic.



226.    Under the bedrock economic law of supply and demand, for an exportable good, when there is less foreign demand for a product, particularly one with a relatively inelastic demand and supply curves, the price is lower than it otherwise would be.

227.    As a result, all U.S. corn Producers and Non-Producers who priced corn after November 2013 have received a lower price for their corn than they would have received if China's imports of U.S. corn had not effectively stopped.

228.    Producers were not the only ones to suffer the impact of lost sales or sales at lower prices than they would have received if China's imports of U.S. corn had not effectively stopped. Country elevators, including Winnsboro and the country elevator members of the Class, which buy from local farmers and re-sell further down the supply chain similarly suffered losses from the drop in corn prices, as well as reduced volumes and reduced margins.  And, to the extent that exporters, including Trans Coastal and the exporter members of the Class, have purchased corn or DDGS in order to re-sell in the export market, they also suffered losses when the price of corn and DDGS fell.

229.    The impact of MIR162 contamination is not limited to the drop in the price of corn and DDGS, however.  When corn and DDGS cannot be exported to China, there is no need for the services of those who process, haul, transfer, or otherwise transport those products. Transporters for the export trade, including Rail Transfer and transporter members of the Class, have seen their businesses decimated with the evaporation of Chinese exports.

230.    Exporters, including Trans Coastal and exporter members of the Class, have also been hit hard in other ways as well.  They have suffered from rejected shipments, and cancelled or rescinded export contracts, as well as delayed payments on stalled deliveries to China.  With respect to shipments held in Chinese ports, exporters have incurred huge costs for storage, moving, late customs clearance, customs checking, import taxes and diversion fees.   Delays in payment on shipments to China further affected the credit of exporters and thus impaired their ability to divert their corn or DDGS to other markets.

231.    In addition, many companies seeking to import U.S. corn and DDGS who accepted shipments that later tested positive for MIR162 have been forced to default on contracts to purchase additional quantities of U.S. corn and DDGS because they are no longer able to obtain import permits.  They are also unable to enter into new contracts.  This has seriously affected the business of exporters, including Trans Coastal and exporter members of the Class, with whom these companies did business.

232.    These effects are likely to continue in the future, both because Chinese purchasers may not necessarily return to former U.S. suppliers even though MIR162 is now approved, also because the presence of Event 5307 in Syngenta's Duracade corn may cause contamination similar to the contamination caused by MIR162 alone.

*The Class Representatives*

233.    Plaintiff Winnsboro was in the business of operating a country grain elevator at which it bought, stored and sold grain, including corn.

234.    While Winnsboro tests the corn it purchases for weight, moisture content, and foreign material, Winnsboro (like other country grain elevators and other corn storage and transportation facilities) is not equipped to test and segregate different corn varieties for genetic traits.

235.    Winnsboro has been damaged by (a) Syngenta's release of Agrisure Viptera® and Agrisure Duricade™ corn into the U.S. corn supply, which has severely disrupted the export market of U.S. corn; (b) Syngenta's materially misleading statements relating to the approval status of MIR162 in China and the impact the lack of approval would have on the market; and (c) Syngenta's widespread contamination of the U.S. corn supply with MIR162 and Event 5307, which will continue to foreclose the U.S. export market to China in future years, decreasing demand for U.S. corn, and hurting country grain elevator operators like Winnsboro who are in the business of buying, storing and selling U.S. commodity corn.

236.    As a result of this conduct, Winnsboro has suffered damages, including but not limited to, lost sales, reduced margins and losses due to the decrease in the price of corn.

237.    Plaintiff Rail Transfer provides loading and other logistical services to exporters of DDGS to Chinese importers. Rail Transfer is capable of loading 2,000 metric tons of DDGS into containers each day. Once the 40-foot containers are loaded, they are transported by rail to the Pacific Northwest where they are then loaded on cargo ships bound for China.

238.    Rail Transfer was founded in 1995, originally loading logs into containers. Since 2001, Plaintiff started loading bulk whole grains into containers bound for export, becoming the first third-party company to provide such services in the Twin Cities metropolitan area. In 2012,

71

Plaintiff modernized its loading operations and unveiled a state of the art facility that primarily loads DDGS into cargo containers bound for China.

239.    Rail Transfer has been injured by reduced prices and closed markets for DDGS, resulting in a near-complete loss of business for the services it provides due to Syngenta's conduct described herein.

240.    Plaintiff Trans Coastal is an exporter of corn and DDGS.  The company was founded in 2007.  A substantial portion of Trans Coastal's business involves exports to China.

241.    Trans Coastal was started to fulfill a niche in the market – the purchase and shipment of grains in containers that must be returned abroad, as opposed to loading cargo vessels solely for the purpose of grain shipment.  The container export market deals in export quantities much smaller than that of the vessel export market. A typical container shipment would carry approximately twenty-five tons, whereas a vessel shipment can carry up to 50,000 tons.

242.    Trans Coastal's customers include small- and medium-sized Chinese companies who do not need the quantity of U.S. corn or DDGS delivered by a vessel shipment, as well as large Chinese companies who require smaller shipments of corn and corn products in between larger vessel shipments.  Plaintiff's specialty is consistently providing manageable quantities of grain to small, independent Chinese companies.

243.    In 2007, Trans Coastal had very few customers, shipped 470 containers, and had $3.5 million in revenue.

244.    Trans Coastal's business grew rapidly. By 2010, Trans Coastal had expanded to 150 customers, shipped 33,000 containers, and had $161 million in revenue.  By 2013, Trans Coastal had expanded to nearly fifty employees, shipped over 50,000 containers, and had $539 million in revenue.

245.    After rejections of U.S. corn and DDGS by China started in late 2013, Trans Coastal saw its growth stop. In 2014, Trans Coastal has seen its shipment of corn and DDGS into China drop dramatically.

246.    The corn and DDGS containers that Trans Coastal has shipped and continues to ship have been rejected for MIR162 contamination or are awaiting testing.

247.    For the first time since the start of the business, Trans Coastal has taken heavy losses. These losses arise from the frequent rescission of existing contracts and increased expenses that would not have been incurred if the contracts were honored. Trans Coastal's customers refuse to honor contracts because they fear that the corn and DDGS is contaminated with MIR162, which renders the cargo essentially worthless in China.

248.    Trans Coastal has also suffered damage in the form of lost opportunities. For example, Trans Coastal purchased and staffed an existing grain loading facility to increase its container loading capabilities. Syngenta's damage to the corn and DDGS export market has prevented Trans Coastal from fully utilizing this extra capacity; however, Trans Coastal still had to pay salaries and costs associated with it.

249.    Trans Coastal has also suffered non-economic losses including damage to its reputation and loss of goodwill among its customers and commercial suppliers. All of the problems arise solely due to Syngenta's premature release of corn containing the MIR162 and Event 5307 genetic traits.

## CLASS ACTION ALLEGATIONS

250.    Non-Producer Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(3), and/or 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Class of similarly situated Non-Producers.  The Class is initially defined as:

All persons and entities who, since January 1, 2013, prepared, stored, transported, loaded, exported, sold or purchased for resale, on a commercial basis, U.S. commodity corn or DDGS produced by others.

251.     Alternatively, Non-Producer Plaintiffs seek to certify three initial Subclasses as follows:

*Country Elevator Subclass*:  All U.S. country grain elevators that, since January 1, 2013, purchased commodity corn directly from farmers and then sold commodity corn down the commodity corn supply chain.

*Transporter Subclass*:  All persons and entities who, since January 1, 2013, prepared, transported or loaded U.S. commodity corn or DDGS owned by others.

*Exporter Subclass*:  All persons and entities who, since January 1, 2013, exported, were in the process of exporting, or were engaged in the business of exporting, U.S. commodity corn or DDGS on a commercial basis.

252.     Excluded from the Class and from all three subclasses are the Court and its officers, employees and relatives; Syngenta and its officers, directors, and employees; all governmental entities; Cargill, Inc., and Archer Daniels Midland Company and their respective subsidiaries and affiliates.  Also excluded from the Class and all three subclasses are all Producers.  Non-Producer Plaintiffs reserve the right to modify the class definitions and the class period based on the results of discovery and/or rulings of the Court.

253.     Non-Producer Plaintiffs assert claims against Syngenta, individually and on behalf of all Class members for violations of the law as set forth below.

254.     The requirements of Rule 23(a) are satisfied for the proposed class because the members of the proposed class are so numerous and geographically dispersed that joinder of all its members is impracticable. Although the exact number and identity of each class member is unknown at this time, there are believed to be hundreds of potential class members nationwide. Therefore, the "numerosity" requirement of Rule 23(a)(1) is met.

255.    The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to Non-Producer Plaintiffs and the other members of the proposed Class and/or Subclasses. Among those common questions of law or fact are:

a.    whether the members of the Class and Subclasses have sustained or continue to sustain damages in their business or property by reason of Syngenta's violation of the Lanham Act and Minnesota law, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

b.    whether Syngenta, through its acts or omissions, caused or contributed to cause the loss of export markets for U.S. corn and DDGS, including China;

c.    whether Syngenta knew or should have known that their acts or omissions would cause or contribute to cause the loss of export markets for U.S. corn and DDGS, including China;

d.    whether the loss of export markets for U.S. corn and DDGS, including China, resulted in a reduction in the price Non-Producers received for U.S. corn and DDGS;

e.    whether the loss of the Chinese export market for U.S. corn and DDGS resulted in lost business and increased costs for U.S. transporters and exporters;

f.    whether Syngenta is legally responsible for the loss of U.S. corn and DDGS export markets and the reduction in price received for U.S. corn and DDGS, as well as lost business and increased costs associated with the loss of the Chinese export market, under one or more of the legal theories asserted in this complaint;

g.    whether Non-Producer Plaintiffs and the members of the proposed Class and Subclasses have sustained or continue to sustain damages as a result of Syngenta's wrongful conduct;

h.    whether Non-Producer Plaintiffs and the members of the proposed Class and Subclasses are entitled to compensatory, consequential, exemplary and/or punitive damages;

i.    whether Syngenta had a duty to exercise reasonable care in its commercialization of MIR162 and/or Event 5307 corn;

j.    whether Syngenta breached its duty of care in its commercialization of MIR162 and/or Event 5307 corn; and

k.      whether Syngenta was negligent in breaching its duty of care in its commercialization of MIR162 and/or Event 5307 corn.

256.    Non-Producer Plaintiffs' claims are typical of the claims of the proposed Class they seek to represent, as described above, because their claims arise from the same course of conduct by Syngenta and are based on the same legal theories. Further, Non-Producer Plaintiffs seek the same forms of relief for themselves and the proposed Class. Therefore, the "typicality" requirement of Rule 23(a)(3) is satisfied.

257.    Because their claims are typical of the proposed class that they seek to represent, Non-Producer Plaintiffs have every incentive to pursue those claims vigorously. Non-Producer Plaintiffs have no conflicts with, or interests antagonistic to, the absent members of the Class they respectfully seek to represent relating to the claims set forth herein. Non-Producer Plaintiffs' commitment to the vigorous prosecution of this action is reflected in their retention of competent counsel experienced in litigation of this nature to represent them and the other members of the Class and Subclasses.  All Non-Producer Plaintiffs' counsel are experienced in complex and challenging litigation and satisfy the requirements of Rule 23(g) to serve as counsel for the proposed Class and subclasses.  All Non-Producer Plaintiffs' counsel will fairly and adequately represent the interests of the proposed Class and subclasses, and (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation in general; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed class. Accordingly, Non-Producer Plaintiffs satisfy the adequacy of representation requirements of Rule 23(a)(4).

258.    In addition, this action meets the requirements of Rule 23(b)(1).  This case raises questions about Syngenta's duty of care with respect to commercialization of genetically modified traits, which necessarily require class wide adjudication to prevent the risk of inconsistent rulings and incompatible standards of conduct for Defendants.  Moreover, absent a representative class action, many members of the proposed Class and subclasses would continue to suffer the harms described herein, for which they would have no remedy.  Even if separate actions could be brought by all individual Non-Producers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated Non-Producers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Syngenta.

259.    This action also meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those set forth above, exist as to the claims of all members of the proposed Class and Subclasses and predominate over questions affecting only individual Class members, and a class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit large numbers of similarly-situated persons to prosecute their respective claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.  Furthermore, while damages to members of the proposed Class and subclasses are substantial in the aggregate, the damages to any individual member of the proposed Class and subclasses may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

260.    This action is manageable as a class action. Notice may be provided to most, if not all, members of the proposed Class and subclasses by first-class mail and to all members of

the proposed Class and subclasses through alternative means, including publication and the Internet. Further, the claims set forth below based on federal law and the Minnesota statute will apply evenly to all proposed class members. Thus, the superiority and manageability requirements of Rule 23(b)(3) are satisfied.

261.     To the extent not all issues or claims, including damages, can be resolved on a class-wide basis, Non-Producer Plaintiffs hereby invoke Rule 23(c)(4) and reserve the right to seek certification of narrower and/or re-defined Classes and/or seek certification of a liability class or certification of certain issues common to the class.

## CLAIMS FOR RELIEF

### Count I - Lanham Act
### (Individually and on Behalf of all Class and Subclass Members)

262.     The Non-Producer Plaintiffs incorporate by reference Paragraphs 1-261 as though fully alleged herein.

263.     The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

a.     Civil action

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B)     in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

264.     Syngenta used and/or continues to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding MIR162, the timing of its approval by China, its impact on export markets for U.S. corn, including China, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn prices.

265.     Syngenta's representations, statements, and commentary have included:

a.     To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition, that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn, that Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and that at the time the MIR162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China.

b.     To APHIS and the public that MIR162 would be channeled away from markets which had not yet approved MIR162.

c.     To the press and to investment analysts on quarterly conference calls.

d.     Through statements in marketing materials published on the Internet such as its "Plant With Confidence" fact sheet.

e.     Through other statements indicating that MIR162 corn was or imminently would be approved for import into China when no such approval existed or was imminent.

each as more fully alleged above, are materially false statements that misrepresented, and are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of MIR162 corn, the timing of its approval by China, the impact of MIR162 corn on the export markets, including China, for U.S. corn and DDGS, the ability to channel MIR162 away from export markets which have not approved MIR162, and corn and DDGS prices.

266.    Syngenta's misleading representations of fact relating to the U.S. corn export market, and particularly in relation to China's position as a major export market, also misrepresented to, and deceived and/or continue to deceive, farmers, other consumers and Non-Producer industry participants. Syngenta's "Plant With Confidence" fact sheet has, and misrepresented, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn exported to China on an annual basis, among other facts.

267.    Syngenta's misleading representations of fact also include the statements in the MIR162 Deregulation Petition as more fully set forth above, including in paragraph 265.

268.    Additionally, Syngenta's representations misrepresented, and deceived and/or continue to deceive, farmers, other consumers and stakeholders including Non-Producers as to the approval of MIR162 corn for distribution of MIR162 corn in China, a major export market.

269.    Syngenta's MIR162 corn products were misrepresented, and caused, and/or were likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

270.    Syngenta's statements were made in commercial advertising or promotion for MIR162 corn products, including Viptera® and Duracade™.

271.    Syngenta had an economic motivation for making its statements, as Syngenta was incentivized to sell its MIR162 corn products.

272.    Syngenta's statements were likely to influence purchasing decisions by domestic corn producers.

273.    Syngenta's statements were widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

274.    Thus, Syngenta's misleading representations and statements are and/or were material.

80

275.     Syngenta's products travel or traveled in interstate commerce.

276.     Non-Producer Plaintiffs and the other Class members have and continue to be damaged by Syngenta's material misrepresentations. Non-Producer Plaintiffs and the other Class members were injured and/or continue to suffer injury to, among other things, their property and possessory rights in their equipment, as well as the negative market price impact on corn and DDGS explained above, which results in lower revenues and profits, as well as lost business and increased expenses.  Those economic injuries are likely to continue in the future.

277.     Non-Producer Plaintiffs and the other Class members' damages were proximately caused by Syngenta's misleading representations as described herein.

278.     Syngenta's representations, statements and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to the Non-Producer Plaintiffs and other Class members.

279.     Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Non-Producer Plaintiffs, individually and on behalf of the other Class members, to recover damages, the costs of this action, and, because this case is exceptional, reasonable attorneys' fees.

### Count II - Violation of Minn. Stat. §§ 325D.13 and 325F.69
### (Individually and on Behalf of all Class and Subclass Members)

280.     Non-Producer Plaintiffs incorporate by reference Paragraphs 1- 261 as though fully alleged herein.

281.     Syngenta made false or misleading statements regarding MIR162 and its impact on export markets for U.S. corn, including China, and corn prices.

282.     Syngenta's representations, statements and commentary have been largely disseminated, and included:

a.   To APHIS and the public, including stakeholders interested in the MIR162 Deregulation Petition that deregulation of MIR162 should not cause an adverse impact upon export markets for U.S. corn that Syngenta would communicate the stewardship requirements "using a wide ranging grower education program," and that at the time the MIR 162 Deregulation Petition was submitted to APHIS, regulatory filings were in progress in China.

b.   To APHIS and the public that MIR162 would be channeled away from markets which had not yet approved MIR162.

c.   To the press and to investment analysts on quarterly conference calls.

d.   Through statements in marketing materials published on the Internet such as its "Plant With Confidence" fact sheet.

e.   Through other statements indicating that MIR162 corn was or imminently would be approved for import into China when no such approval existed or was imminent.

283.   In addition, Syngenta stated in 2007 that its regulatory filings with China were "in process" when it did not actually file for approval from China until 2010.

284.   In addition to these false and misleading statements, Syngenta failed to disclose, and actively suppressed and concealed, that approval from China was not imminent or even reasonably likely to occur for (at least) the 2011 growing season and that purchase and planting of Agrisure Viptera® created at least a substantial risk of loss of the Chinese market.

285.   Syngenta also has at all times made false and misleading statements regarding the ability to channel MIR162 corn, as well as the state and effectiveness of its supposed stewardship generally and in regard to MIR162.

286.   Syngenta also failed to disclose, and actively suppressed and concealed, that there was not (and would not be) an effective system in place for isolation or channeling of Agrisure Viptera® or Duracade™.

287.   As a developer of genetically modified products (including MIR162), Syngenta has special knowledge of regulatory matters and facts pertaining to the content and status of its

82

application for foreign approvals to which other corn industry participants such as farmers and Non-Producers, including Non-Producer Plaintiffs, do not have access.

288.     Syngenta also has special knowledge regarding the systems it did and did not institute for isolation and channeling of its genetically modified products, including Agrisure Viptera® and Duracade™, which was not available to other industry participants, including Non-Producer Plaintiffs.

289.     Syngenta knew that approval from China would not be forthcoming for (at least) the 2011 growing season, and knew that systems were not in place for either isolation or effective channeling of Agrisure Viptera® and Duracade™ and that absent robust isolation practices and effective channeling, it was virtually certain that Agrisure Viptera® or Duracade™ would disseminate throughout the U.S. corn supply.

290.     Syngenta engaged in these deceptions in order to sell and increase its sales of Agrisure Viptera® and Agrisure Duracade™, despite Syngenta's further knowledge that the more acres grown with them, the more likely it would be that Agrisure Viptera® and Duracade™ would disseminate into the U.S. corn and DDGS supply and industry participants, including Non-Producers, would be harmed.

291.     Syngenta knew that farmers and other Non-Producer industry participants, like Non-Producer Plaintiffs here, are affected by its business and depend on it for responsible commercialization practices.

292.     For all these reasons, Syngenta had a duty to disclose the truth – that import approval from China (a key market) was not imminent or indeed anticipated for (at least) the 2011 growing season, that there was not an effective system in place to channel Agrisure Viptera® and Duracade™ away from China (or other foreign markets) from which Syngenta did not have approval, and that commercializing Agrisure Viptera® (and later Agrisure Duracade™)

without Chinese import approval or an effective channeling system created a substantial risk of loss of the Chinese market and/or prolonging the loss of that market.

293.    In addition, Syngenta made numerous misrepresentations to the effect that approval from China was imminent, and that Agrisure Viptera® and Duracade™ could, and would, be channeled away from markets for which approval had not been obtained.  Syngenta had a duty to prevent words communicated from misleading others.

294.    Syngenta's misrepresentations and omissions were made intentionally or recklessly.

295.    Syngenta, in connection with the sale of merchandise – Agrisure Viptera® and Duracade™ -- knowingly misrepresented, directly or indirectly, the true quality of that merchandise in violation of Minn. Stat. § 325D.13.

296.    Syngenta used or employed fraud, false pretense, false promise, misrepresentation, misleading statements or deceptive practices, with the intent that others rely thereon in connection with the sale of Agrisure Viptera® and Duracade™, in violation of Minn. Stat. § 325F.69.

297.    Syngenta's violations of Sections 325D.13 and 325F.69 proximately caused harm to Non-Producer Plaintiffs and other members of the Class.

298.    This action will serve a public benefit. Not only were Syngenta's misrepresentations made to a large segment of the public, Syngenta's conduct vitally affects a large segment of the public as well – all farmers and Non-Producers in the business of selling, storing, exporting and transporting corn and corn products,  including DDGS – who depend on the responsible stewardship practices of developers like Syngenta when commercializing GM products.   The issues surrounding what duties and liabilities such developers have for

irresponsible and intentional acts is not limited to corn but impact all developers and stakeholders in similar position.

299.    Non-Producer Plaintiffs are entitled to compensatory damages and attorneys' fees (*see* Minn. Stat. §8.31, subd. 3a).

## Count III - Trespass to Chattels/Movables
### (Individually and on Behalf of the Country Elevator and Exporter Subclass Members)

300.    Non-Producer Plaintiffs incorporate by reference Paragraphs 1-261 as though fully set forth herein.

301.    By commercializing Agrisure Viptera® and/or Agrisure Duricade™ prematurely and without adequate systems to isolate and channel it, Syngenta intentionally intermeddled with and brought Agrisure Viptera® and/or Agrisure Duricade™ into contact with non-Agrisure/Viptera®/Duracade™ corn in which Non-Producer Plaintiffs Winnsboro, Trans Coastal, and the members of the Country Elevator and Exporter Subclasses had possession and/or possessory rights.

302.    As a result of the trespass, Non-Producer Plaintiffs Winnsboro, Trans Coastal, and the members of the Country Elevator and Exporter Subclasses' chattels/movables were impaired as to condition, quality or value, and Non-Producer Plaintiffs were damaged.

303.    Non-Producer Plaintiffs Winnsboro, Trans Coastal, and the members of the Country Elevator and Exporter Subclasses are thus entitled to an award of compensatory damages and prejudgment interest and post-judgment interest.

304.    Syngenta's conduct was willful, wanton, and in reckless disregard for the rights of others, including the Non-Producer Plaintiffs Winnsboro, Trans Coastal, and the members of the Country Elevator and Exporter Subclasses.  Punitive damages are thus warranted.

**Count IV - Negligence**
**(Individually and on Behalf of all Class and Subclass Members)**

305.    Non-Producer Plaintiffs incorporate by reference Paragraphs 1-261 as though fully set forth herein.

306.    Syngenta owed a duty of at least reasonably care to its stakeholders, including Non-Producer Plaintiffs and the members of the Class in the timing, scope and terms under which it commercialized MIR162.

307.    Syngenta breached its duties by acts and omissions including but not limited to:

    a.    Prematurely commercializing Agrisure Viptera® and Duracade™ on a widespread basis without reasonable or adequate safeguards;

    b.    Instituting a careless and ineffective "stewardship" program;

    c.    Failing to enforce or effectively monitor its stewardship program;

    d.    Selling Agrisure Viptera® and/or Duracade™ to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channeling" those products;

    e.    Failing to adequately warn and instruct farmers on the dangers of contamination by MIR162 and at least the substantial risks that planting Agrisure Viptera® would lead to loss of the Chinese market;

    f.    Distributing misleading information about the importance of the Chinese market; and

    g.    Distributing misleading information regarding the timing of China's approval of Agrisure Viptera® and/or Duracade™.

308.    Syngenta's negligence is a direct and proximate cause of the injuries and damages sustained by the Non-Producer Plaintiffs and members of the Class.

309.    Non-Producer Plaintiffs and the members of the Class are thus entitled to an award of compensatory damages, prejudgment interest and post-judgment interest.

310.     Syngenta's conduct was willful, wanton and in reckless disregard for the rights of others, including the Non-Producer Plaintiffs and other members of the Class.  Moreover, Syngenta had knowledge of facts or intentionally disregarded facts that created a high probability of harm to the rights of Non-Producer Plaintiffs and other members of the Class, and deliberately proceeded to act in conscious disregard or intentional disregard of that high probability of harm; alternatively, Syngenta deliberately proceeded to act with indifference to that high probability of harm.  Syngenta's acts and omissions thus showed deliberate disregard for the rights of the Non-Producer Plaintiffs and other members of the Class.  Punitive damages are thus warranted.

## PRAYER FOR RELIEF

WHEREFORE Non-Producer Plaintiffs, on behalf of themselves and the members of the Class, pray for relief as follows:

A.     Entry of an order certifying the Class, or alternatively the Subclasses, identified herein and appointing Non-Producer Plaintiffs and their counsel to represent the Class and Subclasses;

B.     Entry of judgment awarding Non-Producer Plaintiffs and the members of the Class and/or the Subclasses: compensatory damages in an amount to be proved at trial; punitive damages in an amount to be determined at trial; prejudgment interest; and the costs of this action, including attorneys' fees; and

C.     Such other and further relief as this Court finds just and proper.

Date: March 13, 2015

/s/ Patrick J. Stueve
**Stueve Siegel Hanson LLP**
Patrick J. Stueve  #37682 MO
460 Nichols Road, Ste. 200
Kansas City, MO 64112
Tel:  816-714-7100
Fax:  816-714-7101
stueve@stuevesiegel.com

**Gray, Ritter & Graham, P.C.**
Don M. Downing, #30405 MO
Gretchen Garrison, #33963 MO
Jason D. Sapp, #58511 MO
701 Market Street, Suite 800
St. Louis, MO 63101
Tel:  314-241-5620
Fax:  314-241-4140
ddowning@grgpc.com
ggarrison@grgpc.com
jsapp@grgpc.com

**Gray, Reed & McGraw P.C.**
William B. Chaney #04108500 TX
Andrew K. York #24051554 TX
Alex Fuller 24055509 TX
1601 Elm Street, Suite 4600
Dallas, TX 75201
Tel:  214-954-4135
Fax:  214-953-1332
wchaney@grayreed.com
dyork@grayreed.com
afuller@grayreed.com

**Hare Wynn Newell & Newton**
Scott A. Powell #ASB-7523-L60S
Brian Vines#ASB-4419-R77V
2025 3rd Ave. North, Suite 800
Birmingham, AL 35203
Tel:  205- 328-5330
Fax:  205-324-2165
scott@hwnn.com
bvines@hwnn.com

**Hare Wynn Newell & Newton**
Jason Earley   #2004166 AR
2226 Cottondale Lane, Ste. 210
Little Rock, AR  72202
Tel:  501-225-5500
Fax:  501-225-5001
jason@hwnn.com

***Plaintiffs' Co-Lead Counsel***


**Simmons Hanly Conroy LLC**
Jayne Conroy
112 Madison Ave 7th Floor
New York, New York 10016
Tel:  212 784 6400
Fax:  212-213-5949
jconroy@simmonsfirm.com

**Bolen Robinson & Ellis LLP**
Christopher M. Ellis #6274872IL
202 S. Franklin St., 2nd Floor
Decatur, IL  62523
Tel:  217-429-4296
Fax:  219-329-0034
cellis@brelaw.com

**Paul McInnes LLP**
Richard M. Paul
601 Walnut, Suite 300
Kansas City, Missouri 64106
Tel:  816-984-8100
Fax: 816-984-8101
richard@paulmcinnes.com

**Lockridge Grindal Nauen PLLP**
Robert K. Shelquist #21310X
100 Washington Ave. South, Suite 2200
Minneapolis, MN  55401
Tel:  612-339-6900
Fax:  612-339-0981
rkshelquist@locklaw.com

**Seeger Weiss LLP**
Stephen A. Weiss
77 Water Street
New York, New York 10004
Tel:  212-584-0700
Fax:  212-584-0799
sweiss@seegerweiss.com

**Emerson Poynter LLP**
Scott E. Poynter
1301 Scott Street
Little Rock, AR 72202
Tel:  501-907-2555
Fax:  501-907-2556
scott@emersonpoynter.com

**Walters Bender Strohbehn & Vaughan, P.C.**
Thomas V. Bender
2500 City Center Square
1100 Main Street
Kansas City, MO 64105
Tel:  816-421-6620
Fax:  816-421-4747
tbender@wbsvlaw.com

**Wagstaff & Cartmell LLP**
Thomas P. Cartmell
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel:  816-701-1100
Fax:  816-531-2372

*Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 13, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/  Patrick J. Stueve
Co-Lead Counsel and Liaison Counsel for
Plaintiffs
