IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: SYNGENTA AG MIR 162 | ) | MDL No. 2591 |
| CORN LITIGATION | ) | |
| | ) | Case No. 14-md-2591-JWL |
| This Document Relates To All Cases | ) | |
| | ) | |
| _____ | ) | |

**<u>MEMORANDUM AND ORDER</u>**

**Table of Contents**

Summary of Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Governing Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    I.     Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    II.    Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    III.   Economic Loss Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

    IV.   FIFRA Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

    V.    Claims Based on Duracade / Event 5307 . . . . . . . . . . . . . . . . . . . .  49

    VI.   Trespass to Chattels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

         A.    Intermeddling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

         B.    Contact with Producer Plaintiffs' Corn . . . . . . . . . . . . . . . .  55

         C.    Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

         D.    Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

    VII.   Private Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

         A.    Syngenta's Participation in the Invasion . . . . . . . . . . . . . . .  58

         B.    Invasion of Plaintiffs' Land . . . . . . . . . . . . . . . . . . . . . . . . .  63

         C.    Unreasonable Invasion . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

VIII.   Tortious Interference with Business Expectancy . . . . . . . . . . . . . . . 67

      A.      Identification of Relationships . . . . . . . . . . . . . . . . . . . . . . . . 67

      B.      Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

      C.      Improper Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      D.      Termination of Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . 71

IX.    Trans Coastal's Claim for Negligent Interference . . . . . . . . . . . . . . 72

      A.      Improper Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

      B.      Duty of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

X.     Lanham Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

      A.      Standing – Fairly Traceable / Proximate Cause . . . . . . . . . . 75

      B.      Statutory Standing – Within the Zone of Interests . . . . . . . . 77

      C.      "Commercial Advertising or Promotion" . . . . . . . . . . . . . . . 81

      D.      Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . 87

XI.    Trans Coastal's Misrepresentation Claims . . . . . . . . . . . . . . . . . . . 88

      A.      Fraud Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

      B.      Negligent Misrepresentation Claims . . . . . . . . . . . . . . . . . . . 90

XII.   Minnesota Consumer Protection Claims . . . . . . . . . . . . . . . . . . . . . 92

      A.      Public Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

      B.      Purchasers as Merchants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

      C.      Application to Non-Minnesota Residents . . . . . . . . . . . . . . . 97

XIII.  Colorado Consumer Protection Claims . . . . . . . . . . . . . . . . . . . . . 103

XIV.   Illinois Consumer Protection Claims  . . . . . . . . . . . . . . . . . . . . . . .  105

     A.    Standing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105

     B.    Exemption for Authorized Actions  . . . . . . . . . . . . . . . . . . .  108

XV.   Nebraska Consumer Protection Claims  . . . . . . . . . . . . . . . . . . . . .  109

     A.    Standing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  109

     B.    Exemption for Regulated Actions  . . . . . . . . . . . . . . . . . . . .  109

XVI.   North Carolina Consumer Protection Claims  . . . . . . . . . . . . . . . .  110

     A.    Standing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  110

     B.    Effect on Consuming Public  . . . . . . . . . . . . . . . . . . . . . . . .  113

     C.    Reliance on Misrepresentations  . . . . . . . . . . . . . . . . . . . . . .  113

XVII.   North Dakota Consumer Protection Claims  . . . . . . . . . . . . . . . . . .  115

iv

## MEMORANDUM AND ORDER

### Summary of Rulings

In this multi-district litigation ("MDL"), three groups of plaintiffs—corn producers, non-producer corn sellers, and milo producers—have brought claims against various related Syngenta entities ("Syngenta"). The corn producers and non-producers have asserted claims on behalf of variously defined classes, while the milo claims are asserted on behalf of three individual plaintiffs. This matter comes before the Court on Syngenta's motion to dismiss the corn producer and non-producer complaints (Doc. # 856) and its motion to dismiss the milo producers complaint (Doc. # 929). For the reasons set forth below, the motions are **granted in part and denied in part**. The Court grants the motions with respect to the following claims, which are hereby dismissed:

all claims based on an alleged failure to warn to the extent based on a lack of warnings in materials accompanying the products (Part IV, *infra*);

for claims under all states' laws except Louisiana, the corn producer and non-producer plaintiffs' trespass to chattels claims (with leave granted to amend to allege facts to support specific damages other than under a market theory that were caused by contamination by corn grown specifically by Syngenta and, in the case of producer plaintiffs, facts to show that particular plaintiffs' own corn was contaminated in the fields or in an elevator while maintaining a possessory interest) (Part VI);

the corn producers' claims for private nuisance (with leave granted to amend to allege facts to show that particular plaintiffs' land suffered contamination and that Syngenta exercised continuing control over its products post-sale) (Part VII);

plaintiffs' Lanham Act claims to the extent based on representations in the deregulation petition, earnings conference call, and request form (with leave granted to amend to allege facts to show that the representations

1

constituted commercial advertising or promotion) (Part X);

non-producer plaintiff Trans Coastal's fraud claim based on the request form (with leave granted to amend to plead the claim with sufficient particularity) (Part XI.A);

Trans Coastal's negligent misrepresentation claims (Part XI.B);

plaintiffs' claims under the Minnesota consumer protection statutes (with leave granted to amend to allege claims on behalf of Minnesota residents under the MUTPA provision allowing for a private right of action) (Part XII);

corn producer plaintiffs' class claims for violations of Colorado's consumer protections statutes (Part XIII);

corn producer plaintiffs' claims for violations of North Carolina's consumer protection statutes to the extent based on misrepresentations (Part XVI.C); and

corn producer plaintiffs' claims for violations of North Dakota's consumer protection statutes to the extent based on representations in the deregulation petition, earnings conference call, or request form (with leave granted to amend to allege facts to show that such representations were made in connection with the sale or advertisement of Syngenta's products (Part XVII).

Plaintiffs are granted leave to file amended complaints to cure certain of these deficiencies, as set forth herein, by **October 4, 2015**.  The motions are otherwise denied.

## Background

Plaintiffs generally allege the following facts. Syngenta develops and sells genetically-modified crop seeds. Syngenta developed MIR 162 and Event 5307, genetic traits that it included in products called Viptera and Duracade, which products were intended to make the resulting corn crops more resistant to certain pests. After a period of development, Syngenta petitioned the United States Department of Agriculture (USDA) in 2007 for deregulation of Viptera, and the USDA approved the product for sale in 2010. Syngenta petitioned the USDA for deregulation of Duracade in 2011, and approval was granted for that product in 2013. Corn grown by farmers who did not purchase Syngenta's products gradually became contaminated with the MIR 162 and Event 5307 traits through cross-pollination from neighboring fields. In addition, Viptera- and Duracade-grown corn was commingled with other corn in grain elevators and other storage facilities. Eventually, Viptera corn infiltrated the general domestic corn supply.

Syngenta developed and commercialized Viptera and Duracade before those products were approved for import into China. In November 2013, China began rejecting all corn from the United States containing the MIR 162 trait. China eventually approved such corn in December 2014, but the loss of the Chinese market for that period caused prices to decrease in the United States, which in turn caused harm to plaintiffs.

Syngenta misled the public and made misrepresentations to the public and the USDA concerning the status and likelihood and imminence of Chinese approval of the

3

products and about the products' impact on export markets.  Syngenta also misled the

public and made misrepresentations concerning the ability of growers and others to avoid

infiltration of Viptera into the entire corn supply (through channeling and otherwise) and

concerning steps Syngenta pledged to take in that regard (including by implementing

stewardship practices).  Syngenta's actions actually increased the risk of contamination

and commingling of the corn.

Thousands of separate lawsuits based on these allegations have been filed against

Syngenta in federal and state courts.  An MDL was created, and all such federal court

cases have been transferred to this Court for that purpose.  This Court appointed lead and

liaison plaintiffs' counsel, who filed separate amended master complaints on behalf of

producer plaintiffs and non-producer plaintiffs, which complaints include class action

allegations, and on behalf of individual milo producers.  Most individual plaintiffs have

filed notices to conform their pleadings to the master complaints.  A substantial number

of cases have been remanded to state courts on the basis of the Court's ruling that

Syngenta's invocation of the federal common law of foreign relations in removing those

cases did not in fact create a basis for federal jurisdiction.

The producer plaintiffs are corn growers who did not use Syngenta's seeds in

growing their corn.  By their master complaint, the producer plaintiffs assert claims for

violations of the federal Lanham Act (on behalf of all producers); claims for violations

of Minnesota's consumer protection statutes (on behalf of all producers); and various

state-law claims on behalf of the named plaintiffs and state-wide classes of putative

4

plaintiffs residing in 22 different states, including (for each state) claims for negligence and some combination of claims for trespass to chattels, private nuisance, tortious interference, and statutory consumer protection violations.[1]

The four named non-producer plaintiffs (residing in Illinois, Louisiana, Minnesota, and Mississippi respectively) exported, stored, transported, or sold corn. They assert individual and class action claims for violations of the Lanham Act, violations of Minnesota's consumer protection statutes, negligence, and trespass to chattels. One of the named non-producer plaintiffs also asserts claims for fraudulent and negligent misrepresentation and a claim under California law for negligent interference with prospective economic relations.

The three individual milo plaintiffs (residing in Arkansas, Kansas, and Missouri respectively) are milo growers. They allege that the milo market in the United States is so closely tied to the corn market that they suffered the same economic damages that corn producers did. They assert claims for violations of the Lanham Act and Minnesota's consumer protection statutes. In addition, the Arkansas and Missouri milo plaintiffs assert state-law claims for negligence and for tortious interference, and the Kansas milo plaintiff asserts a claim for negligence.

Syngenta has moved to dismiss all three master complaints. The Court has

---

[1]The producer plaintiffs hail from Alabama, Arkansas, Colorado, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, North Carolina, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, and Wisconsin.

considered the parties' briefs, including sur-reply and sur-sur-reply briefs relating specifically to the application of the economic loss doctrine. The Court also heard oral argument on the motions, and it is now prepared to rule.

## Governing Standards

The Court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law is dispositive, *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *See Bell Atlantic*, 550 U.S. at 555. The Court must accept the facts alleged in the complaint as true, even if doubtful in fact, *see id.*, and view all reasonable inferences from those facts in favor of the plaintiff, *see Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Viewed as such, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 550 U.S. at 555. The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

6

**<u>Choice of Law</u>**

With respect to a particular plaintiff's state-law claims, both sides have applied the substantive law of that plaintiff's home state. The Court agrees that, under any applicable choice-of-law rule, each plaintiff's state-law claims would be governed by that plaintiff's state of residence, whether the choice-of-law analysis would look to the plaintiff's place of injury or to the state with the most significant relationship to the claim. Thus, this Court will also apply the law of the plaintiffs' home states. *See Johnson v. Continental Airlines Corp.*, 964 F.2d 1059, 1063 n.5 (10th Cir. 1992) (MDL court applies the choice-of-law rules of the states where the actions were originally filed).[2]

---

[2]Non-producer plaintiff Trans Coastal Supply, Inc. ("Trans Coastal"), a resident of Illinois, has asserted a claim for negligent interference with prospective economic relations under California law, but Syngenta has not challenged that claim on a choice-of-law basis. *See infra* Part IX. The parties do disagree about which state's law governs Trans Coastal's misrepresentation claims, and the Court has resolved that issue in addressing Syngenta's arguments for dismissal of those claims. *See infra* Part XI.B.

**Analysis**

I.    **Duty**

Syngenta first argues that plaintiffs' negligence claims should be dismissed because it did not owe a legal duty to plaintiffs as a matter of law.[3]  The parties agree that the existence of a legal duty is a required element for those claims.

The Court first defines the particular duty at issue.  Syngenta argues that any legal duty to plaintiffs must be more narrowly defined than a general duty of reasonable care. Syngenta further argues that it could not have had a duty to refrain from selling its products at all, particularly given the approval of those products by the governing regulatory agencies.  Although, as plaintiffs note, refraining from selling the products may have been one way for Syngenta to discharge its duty, the duty asserted by plaintiffs is actually broader than that.  Rather, plaintiffs seek to impose a duty of reasonable care with respect to the timing, manner, and scope of Syngenta's commercialization of its Viptera and Duracade products.  The Court concludes that such a duty is sufficiently specific to allow for its evaluation and application in this case.

In arguing that it did not owe a legal duty to plaintiffs as a matter of law,

---

[3]Syngenta has not clearly identified the claims to which it directs this argument. At the beginning of the section in its initial brief concerning the issue of duty, Syngenta states that plaintiffs' claims for negligence, nuisance, trespass to chattels, and tortious interference rest on the premise that Syngenta may be held liable for failing to control third parties.  Syngenta has not explained how the duty analysis applies to the non-negligence causes of action (which include intentional torts), however.  Thus, the Court considers this argument as applying only to plaintiffs' negligence claims.

Syngenta has not undertaken an analysis of each of the 22 applicable states' law concerning the existence of a duty. Instead, Syngenta argues generally that recognition of a duty in this case would extend the reach of negligence liability too far as a matter of policy. The parties agree that, as a legal question, the Court must determine whether recognition of a particular legal duty would extend liability too far under the common law. The Court thus turns to general statements of the law concerning the existence of a legal duty.

A leading treatise lists a number of factors that courts have identified generally as being relevant to the determination whether a legal duty exists. *See* Dan B. Dobbs, et al., *The Law of Torts* § 255 (2d ed. 2011) (hereafter "Dobbs"). Those factors include the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury suffered; whether the injury is too wholly out of proportion to the tortfeasor's culpability; the moral blame attached to the defendant's conduct; the policy of preventing future harm by deterrence; administrative factors, including the feasibility of administering a rule that imposed a duty; the relationship of the parties and the customs to which they jointly subscribe; the expectations of the parties; the magnitude of the burden of guarding against the injury; whether allowing recovery would be too likely to open the way to fraudulent claims; and whether allowing recovery would have no sensible or just stopping point. *See id.*

9

The Court concludes that such factors, considered in light of plaintiffs' allegations, weigh in favor of recognizing a duty in this case. As alleged by plaintiffs (which allegations must be accepted at this stage), plaintiffs' particular injuries were not only foreseeable, they were actually foreseen by Syngenta, with plaintiffs suffering the very harm expected to occur. That foreseen harm applied to the industry generally, and thus plaintiffs' injury is sufficiently connected to Syngenta's conduct and is not wholly out of proportion to Syngenta's culpability. Moreover, plaintiffs have alleged not only that Syngenta commercialized its products without taking sufficient steps to avoid the foreseen consequences, but that it also acted affirmatively to mislead the industry and to cover up its wrongdoing. The parties were not strangers, but rather were part of an inter-connected industry and market, with expectations on all sides that manufacturers and growers and sellers would act at least in part for the mutual benefit of all in that inter-connected web. For example, plaintiffs have alleged that Syngenta referred to corn sellers as "stakeholders" in its commercial activities. For reasons discussed below, the Court is not persuaded that recognition of a duty in this case would allow for a recovery that is too remote, or would open the door too much to fraudulent or speculative clams, or would allow for recovery without any stopping point. Nor is the Court persuaded, as discussed below, that other policy considerations preclude the recognition of a duty here.

Dobbs also explains that the use of such vague factors in determining the existence of a duty has been criticized in more recent times. *See id.* Thus, under the Third Restatement, the default rule is that everyone owes a duty of care not to create

10

unreasonable risks to others. *See id.* (citing Restatement (Third) of Torts (Liability for Physical and Emotional Harm) § 7(a) (2010)).  Under the Third Restatement, in exceptional cases a court may consider specific policy matters in determining whether a duty exists, and thus the court might exempt a party from a duty of reasonable care where such a duty would conflict with social norms, another domain of tort law, or the relationship between the parties, or the duty would engage the courts beyond their institutional competence or fail to defer appropriately to another branch of government. *See id.* (citing Restatement (Third) of Torts § 7 cmts.).  As discussed below, the Court rejects Syngenta's argument that recognition of a duty here would require the Court improperly to invade the province of the other branches of government.  Thus, also under this alternative modern approach, the Court recognizes a duty here, based on plaintiffs' allegations that Syngenta created an unreasonable risk of harm to plaintiffs by its conduct.[4]

Syngenta advances a number of policy reasons for refusing to recognize a duty in this case.  First, Syngenta argues that it had no post-sale control over third parties that used its products and that generally (under the Restatement) an actor has no duty to control a third party to prevent it from causing harm to others absent a special

---

[4]Dobbs also notes that under this approach, foreseeability is not a factor to be considered in determining whether a duty exists. *See* Dobbs, *supra*, § 255. The rejection of that factor, however, is related to a concern that a court may invade the province of the jury by concluding that no duty exists because of a lack of foreseeability. *See id.*  In this case, the fact that the injury was foreseeable and allegedly foreseen weighs in favor of recognizing a duty of care here.

relationship with the third party or with the injured party.  *See* Restatement (Second) of Torts § 315.  Syngenta further argues that courts generally hold that a manufacturer does not have a duty to control the post-sale use of its safe and non-defective product by third parties, particularly in cases involving the use of firearms, cell phones, or medications used to make methamphetamine.

The Court rejects these arguments.  Plaintiffs have not merely alleged that Syngenta breached a duty to control its customers' use of its products.  Not only have plaintiffs alleged that Syngenta failed to provide assistance (in the form of channeling and stewardship programs), without which producers and non-producers could not reasonably avoid contamination and commingling;[5] they have also alleged that Syngenta engaged in affirmative conduct that contributed to the harm.  Thus, plaintiffs' claims are not limited to accusations of nonfeasance (as Syngenta asserts).  As Dobbs puts it:

> The rule that one owes no duty to control others is a particular instance of the general rule that nonfeasance is not a tort unless there is a duty to act. Consequently, the no-duty-to-control rule has no logical application when the defendant is affirmatively negligent in creating a risk of harm to the plaintiff through the instrumentality of another or otherwise.

*See* Dobbs, *supra*, § 414.

The Court also concludes that this case does not fall into the same category as Syngenta's cases involving guns, cell phones, or meth.  As plaintiffs point out, those

---

[5]In light of such allegations, the Court certainly could not conclude as a matter of law that Syngenta could not affect the behavior of its customers, as Syngenta seems to argue.

12

cases generally have involved the clear misuse of the product.  Syngenta does have a point in arguing that any use that results in harm to another could be described as "misuse", including the failure of growers to segregate Viptera corn sufficiently to avoid contamination, and that its cases should therefore not be distinguished on that basis. Nevertheless, it is apparent that in the gun/phone/meth cases the user is more culpable in creating the risk of harm to others by using the product wrongfully than in the present case.  In this case, Syngenta's customer has used the product more innocently, as intended, as plaintiffs allege that they could not have effectively prevented the resulting widespread contamination without Syngenta's help.  Moreover, in the other cases, harm may have been foreseeable, in the sense that the manufacturer could anticipate that some small minority of users would misuse the product; here, on the other hand, Syngenta could foresee the "misuse" of the product by virtually every customer, and thus the foreseen harm was much more inevitable on a much wider scale.  Thus, the law reasonably imposes a duty on a manufacturer to exercise reasonable care not to commercialize and sell its product in a way that creates a risk of widespread harm resulting from the intended use of the product by all of its customers.

The relationship between Syngenta and plaintiffs further distinguishes this case from the cases involving guns, phones, or meth.  In those cases, the victims of the (foreseen or unforeseen) misuse of the products are virtual strangers to the manufacturers.  This case, however, as noted above, involves a risk of harm to other participants in an inter-connected market, participants whom Syngenta has appeared to

13

embrace as stakeholders, and thus who are especially vulnerable to the wrongful acts alleged by plaintiffs. The inter-connected nature of the parties' relationship is further demonstrated by Syngenta's representations that it would indeed take certain steps to protect corn sellers from the very harm that occurred.[6]

For these reasons, the Court is not persuaded that policy rationales cited by Syngenta require an exception to the default duty rule for this case. Syngenta argues that the no-duty-to-control rule addresses a concern about the general unfairness of holding a manufacturer liable for another's act. That purpose is not implicated in this case, however, as Syngenta's actions were tied much more closely to the product users' acts than in the gun/phone/meth cases.

Syngenta also points to concerns about the potential for open-ended liability. This case does not involve the possibility of an endless stream of claims by strangers further and further removed from Syngenta's conduct, however, as the inter-connected web of relationships within the market provides a natural cutoff for liability.[7] Nor does the Court agree that recognition of a duty here would create an *undue* risk of speculative

---

[6]The Court is not ruling that Syngenta voluntarily assumed a duty through such statements; in light of its conclusion that a duty exists here, the Court need not address that question. The statements are relevant, however, to show the inter-connected nature of the parties' relationship.

[7]That reach reasonably includes the milo producers, in light of the allegations that the milo market is so closely tied to the corn market that it fell within the scope of the risk of harm created by Syngenta's acts, as foreseeable to (and allegedly foreseen by) Syngenta.

or duplicative damages (that is, a risk greater than in the usual case), particularly in light of the commodities market by which damages would be measured. Nor is the Court persuaded by Syngenta's argument that this case simply involves too many steps in the causal chain, as plaintiffs have alleged acts by Syngenta creating the specific risk of contamination and a resulting disruption of the export market, which would naturally and directly cause the alleged market damages. Finally, the Court does not believe that the risk of a flood of new litigation is sufficiently great and sufficiently unfair to preclude the recognition of a legal duty here.

Syngenta also argues that it should not be subject to a legal duty with respect to the sale of its products because those products were approved for sale by regulatory agencies. Syngenta has not shown, however, that those governing bodies necessarily approved (or had the authority to approve) the commercialization of its products in an unreasonable manner. More specifically, Syngenta has not shown that the government agencies' approval extended to the area of the financial impacts in the market of any decision by Syngenta regarding commercialization of the products. Accordingly, the agencies' approval of the products (which resulted in deregulation, or an *absence* of any government regulation of Syngenta's acts post-approval) did not necessarily immunize Syngenta from any liability for wrongful acts connected to the commercialization or sale of those products.[8]

---

[8]Plaintiffs aptly analogize Syngenta's position to an argument that the receipt of
(continued...)

For that reason, the Court does not agree that, by recognizing a duty here, it would usurp the role of other branches of government that regulate or legislate aspects of Syngenta's activities. Questions about whether an export market is "key" or whether that market is subject to a functioning regulatory system are properly subject to evidence and proof. Nor has Syngenta shown that a complete change of the practice of the entire genetically-modified crop industry would result unfairly if manufacturers were held to a duty of reasonable care not to create unreasonable risks of widespread harm in the market.

Finally, Syngenta argues that in the only truly comparable case, the court concluded that no legal duty existed. *See Hoffman v. Monsanto Canada Inc.*, 2005 SK. C. LEXIS 330 (Sask. Q.B. May 11, 2005), *aff'd*, 2007 SK. C. LEXIS 194 (Sask. Ct. App. May 2, 2007). *Hoffman*, however, which was decided by a Canadian provincial trial court, did not involve circumstances that are completely identical to those here, and the Court believes that with respect to the issue of duty, which must be examined in light of the particular circumstances of the case, a different result is warranted here. Moreover, in *Hoffman*, the court applied a specific test under Canadian law that required a sufficiently proximal relationship between the parties. *See id.* ¶¶ 67-70. The court noted that the plaintiffs there had not alleged any expectations, representations, reliance, or special relationship between the parties. In the present case, however, as noted above,

---

[8](...continued)
a driver's license immunizes one from any liability for negligent driving.

plaintiffs have alleged facts showing a relationship between the parties in an inter-connected market, as well as representations by Syngenta concerning steps that it would take to protect stakeholders. The *Hoffman* court also cited as a policy consideration that the imposition of a duty not to release the substances into the environment would conflict with the governmental approval of the product, *see id.* ¶ 71; as already discussed, however, the duty asserted by plaintiffs in this case is broader than a mere duty not to sell the products, and the Court has concluded that recognition of a duty here would not usurp any regulatory agency's function. The *Hoffman* court also based its ruling on the plaintiffs' claims for purely economic damages, *see id.* ¶¶ 72-80; courts in this country, however, have addressed such issues separately, under the economic loss doctrine, as this Court has done, *see infra* Part III. For these reasons, the Court does not find *Hoffman* to be helpful here.

In summary, the Court concludes that policy considerations do not compel the conclusion that this case is sufficiently extraordinary to require an exception to the general rule that a party has a duty to exercise reasonable care not to create an unreasonable risk of harm to others. The Court cannot say as a matter of law that Syngenta did not have a legal duty to plaintiffs to exercise reasonable care in the manner, timing, and scope of its commercialization of its Viptera and Duracade products. Accordingly, the Court denies Syngenta's motions to dismiss plaintiffs' negligence claims for lack of a legal duty.

17

## II.   **Proximate Cause**

The parties agree that plaintiffs must prove proximate cause as an element of their negligence claims.  Syngenta argues (in a single section of its initial brief) that the same policy concerns compel rulings that duty and proximate cause are both absent as a matter of law.  With respect to proximate cause specifically, Syngenta argues that there simply are too many steps in the causal chain from its acts to the alleged injuries for the negligence claims to lie here.

Dobbs has summarized the law in pertinent respect as follows:

> Courts agree that scope of liability—commonly called proximate cause, including its subset of superseding cause problems—is to be determined on a case-by-case analysis, that it is a jury question in all but the most extreme cases, and that it turns on foreseeability in some form.

*See* Dobbs, *supra*, § 214.  Dobbs further notes that courts have at times disregarded those three rules to exclude liability for certain categories of injuries as a matter of law, but courts generally do so within the context of addressing the issue of duty.  *See id.*  Thus, because the Court has already addressed Syngenta's policy arguments for limiting the scope of liability in determining that a duty exists here, *see supra* Part I, there is no basis to conclude that the same policy concerns show a lack of proximate cause here.  Moreover, as Dobbs notes, the foreseeability of the harm is especially pertinent to the proximate cause analysis, and plaintiffs have alleged facts to state a plausible claim that their injuries were not only foreseeable but were actually foreseen by Syngenta.  Finally, Syngenta does not dispute that proximate cause ordinarily presents a question of fact for

18

the jury, and this is not the type of extreme case that justifies departure from that rule. Thus, the Court cannot conclude in this case that proximate cause is absent as a matter of law, and the Court therefore denies Syngenta's motions to dismiss plaintiffs' negligence claims on that basis.

### III.   Economic Loss Doctrine

Syngenta argues that any claims for economic damages for negligence, negligent misrepresentation, or private nuisance in this case are barred by the economic loss doctrine (the "ELD"), which is defined in the most general terms as a rule that prohibits a plaintiff from bringing a claim in negligence to recover solely economic damages.  In particular, Syngenta argues that the rule precludes plaintiffs' recovery of damages based on their theory that corn and milo prices dropped in the market generally as a result of Syngenta's actions.

Both sides agree that the ELD does not bar the recovery of economic damages derived from physical harm to a plaintiff or its property resulting from negligence. Plaintiffs argue that they have alleged such physical harm to their property here, including contamination of their corn and harm to their equipment and storage facilities, and that such allegations of physical harm place their claims beyond the reach of the ELD.  The Court disagrees.

First, in light of plaintiffs' market theory, under which all corn (and milo) sellers suffered injury in the form of lower prices in the market generally because of the

presence of Viptera corn in the domestic corn supply, plaintiffs have not alleged facts to support a plausible claim that *all* plaintiffs suffered contamination of their corn (in the fields or in elevators or other storage places), particularly in the absence of specific allegations to that effect. Despite plaintiffs' allegations that they generally suffered physical harm to their property, the complaints plausibly allege only that *some* plaintiffs suffered contamination, which contamination caused harm to all sellers in the market. Thus, the Court cannot assume that all plaintiffs' economic damage claims fall outside the reach of the ELD because of physical harm suffered. If application of the ELD turned on this issue, plaintiffs would be required to amend their complaints to distinguish between those plaintiffs who actually suffered contamination (or other physical harm) and those who did not.

The Court also concludes, however, that plaintiffs' allegations of physical harm do not exempt their market-theory damages from operation of the ELD because those damages are not derived from the physical harm alleged. Under plaintiffs' market theory, sellers suffered the same injury (the same lower prices) whether or not their corn was contaminated by Viptera. Therefore, the contamination of some plaintiffs' corn cannot be said to have caused the economic damages alleged. In the absence of such a nexus, any physical damage related to contamination that some plaintiffs suffered would not exempt those plaintiffs' market damages from operation of the ELD. *See, e.g.*, *Queen City Terminals, Inc. v. General Am. Transp. Corp.*, 653 N.E.2d 661, 668 (Ohio 1995) (mere coupling of property damage with economic damage does not allow for

20

recovery of economic damage in tort—economic damage must have arisen from the property damage).[9]

Plaintiffs have not pleaded plausible claims that they suffered economic damages other than in the market. For instance, particular plaintiffs have not alleged that they suffered other economic damages caused specifically by contamination. Thus, all of plaintiffs' claims for economic damages would be subject to the ELD if the Court concludes that the doctrine should otherwise be applied here.

Although the ELD is often applied in the context of a defective product or a contractual relationship between the parties, Syngenta argues that the Court should apply the "stranger" ELD ("SELD") in this case, in which plaintiffs (producers who did not purchase Viptera or Duracade from Syngenta and non-producer resellers) had no contractual or direct relationship to Syngenta, the defendant. Syngenta contends that the SELD is the majority rule that has been expressly rejected in only three or four jurisdictions (none of whose law is at issue here). *See, e.g.*, *Aguilar v. RP MRP Washington Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014) (defendants urged the court to follow the ELD adopted in a majority of decisions); *Aikens v. Debow*, 541 S.E.2d 576,

---

[9]Syngenta first made this argument that the alleged property damage didn't give rise to the market damages in its reply brief. The Court would not ordinarily consider an argument raised for the first time in a reply, but plaintiffs had the opportunity to address the argument in its ELD sur-reply or at oral argument on the motions. Despite those opportunities, plaintiffs did not address the issue, and thus they have not explained how their allegations of physical damage remove their market damages from operation of the ELD.

583, 588 (W. Va. 2000) (noting that other jurisdictions "almost without exception" have applied the ELD and declining to follow the alternative "minority" view); *see also* Dan B. Dobbs, et al., *The Law of Torts* § 646 (2d ed. 2011) (SELD is the "general" rule in stranger cases, "[a] little authority" has rejected the rule).

Plaintiffs insist that the SELD represents a minority rule that should not be adopted here, but its argument to that effect is unconvincing. In support of this argument, plaintiffs cite only the tentative draft of the Restatement (Third) of Torts: Liability for Economic Harm. Plaintiffs rely on the following comment to Section 1 of that draft: "A minority of courts have stated an 'economic loss rule' to the effect that there is generally no liability in tort for causing pure economic loss to another." *See id.* § 1 cmt. b. As Dobbs has noted, however, courts have indeed at times overstated the scope of the ELD by stating it as an absolute rule (and therefore without exceptions) or by referring to tort claims generally (instead of to negligence and strict liability claims). *See* Dobbs, *supra*, § 611. Thus, the tentative draft's comment does not indicate that the SELD as applied to negligence claims represents the minority view. To the contrary, the draft later adopts the SELD as a general provision (subject to exceptions). *See* Restatement (Third) of Torts: Liability for Economic Harm, Tent. Draft No. 2 § 7. Thus, plaintiffs have not shown that the SELD is a minority rule (i.e., one that has usually been rejected by the courts) and that the Court should decline to apply the doctrine for that reason.

At the same time, however, the Court cannot conclude that the SELD has been

as widely adopted as Syngenta suggests.  Although 22 states provide the governing law for plaintiffs' negligence claims, only in seven has a court arguably applied the ELD in a stranger case, *see infra*, and the great majority of those cases were lack-of-access or public nuisance cases (which fact distinguishes them from the present case).

As Dobbs (on whom Syngenta relies) makes clear, the doctrine is not applied absolutely and is subject to exceptions.  *See* Dobbs, *supra*, §§ 611, 645.  Syngenta relies on *Aikens* for that court's adoption of the SELD as the majority rule, but that court defined the doctrine as precluding recovery in the absence of some "special relationship" between the plaintiff and the tortfeasor.  *See Aikens*, 541 S.E.2d at 583, 589.  Syngenta argues that the "special relationship" cases that provide exceptions to the SELD invariably involve the provision of professional services, which circumstance is absent here.  Syngenta has not cited cases, however, in which courts directly considered and rejected application of the SELD despite the presence of inter-connected relationships and markets as alleged here.  Thus, even if the Court were to predict that all 22 jurisdictions would adopt the SELD, it would further predict that those jurisdictions would do so only in the right circumstances, in which the rationales for the doctrine would be furthered.[10]

---

[10]Citing *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985), Syngenta argues that the ELD should not be applied on a case-by-case basis.  *See id.* at 55-56.  As Syngenta concedes, however, and as the court recognized in *Barber*, *see id.*, the ELD provides only a general principle that is subject to many exceptions—exceptions that had to await the arrival of the appropriate cases for their
(continued...)

In this case, the Court cannot conclude with sufficient certainty that the rationales supporting the SELD would necessarily be furthered by application in this case. This is not a lack-of-access case, in which any member of the public could potentially assert a claim for economic loss, leading to remote and indeterminate liability that would be far out of proportion to the tortfeasor's culpability. *See, e.g.*, *In re Chicago Flood Litig.*, 680 N.E.2d 265, 274 (Ill. 1997). At least as alleged by plaintiffs (which allegations must be accepted at this stage), liability would not be too remote, as Syngenta actually foresaw these very economic losses (as discussed *supra* with respect to the issue of duty); the scope of liability is not completely open-ended, as plaintiffs represent discrete classes of growers and sellers, all in an inter-connected market; and such foreseen effects would not be disproportionate to Syngenta's specific wrongful conduct that caused the very injuries foreseen. *See In re StarLink Corn Prods. Liability Litig.*, 212 F. Supp. 2d 828, 842 (N.D. Ill. 2002) (explaining in similar terms why that case did not "present the unlimited speculative damage concerns common in access cases").[11] Moreover, any

---

[10](...continued)
creation. Moreover, the Court is not adopting or rejecting the SELD for any jurisdiction in this case, but is instead merely tasked with predicting what particular states' courts would do, and in that context it is appropriate for the Court to conclude that a court would apply a doctrine only when it makes sense to do so, that is, when the doctrine's purposes would be served.

[11]Syngenta would distinguish *StarLink* as a case involving contamination that made infected corn unfit for human consumption. That distinction, however, does not make less persuasive the court's consideration of the rationales in determining whether to apply the ELD.

concern that economic damages are necessarily too speculative is eased in this case by the fact that corn and milo are regularly traded commodities with readily measurable markets. *See id.* If plaintiffs' allegations are accepted as true, Syngenta is not unfairly being made an insurer for all growers; rather, plaintiffs assert claims to hold Syngenta responsible for particular actions having foreseeable and foreseen consequences.

For these reasons, unless a particular state's law essentially requires application of the SELD to bar plaintiffs' claims, the Court would predict, at this stage of the proceedings, that the relevant states would not bar these particular claims under the SELD. The Court thus briefly examines the law of the each of the 22 relevant states.

First, a few states do not apply any common-law ELD, and thus there is no basis for application of the ELD (let alone the SELD) to claims asserted by plaintiffs in those states.

In **Louisiana**, as Syngenta concedes, courts do not apply the ELD but instead engage in a duty-risk analysis on a case-by-case basis. *See 9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 234 (La. 1989) (citing *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058 (La. 1984), as having "abrogat[ed] the rule that flatly prohibited recovery for intangible economic loss produced by negligent conduct"); *Phillips v. G & H Seed Co.*, 86 So. 3d 773, 780 (La. Ct. App. 2012) (*PPG* adopted a duty-risk analysis). Thus, there is no basis for dismissal of the Louisiana plaintiffs' claims as barred by the ELD, and Louisiana law would certainly not preclude the Court's case-specific approach here.

**Minnesota**'s ELD is entirely statutory. *See* Minn. Stat. § 604.101. Because the

25

rule applies only to claims by buyers against sellers of products, it would not apply to claims asserted by the producer plaintiffs in this case, who did not buy Viptera or Duracade. (The statute's application to the claims of the Minnesota non-producer plaintiff is discussed below.) The Court rejects Syngenta's argument that a common-law ELD survives in Minnesota. The plain language of the statute disposes of that argument, as the statute expressly provides that "[t]he economic loss doctrine applies to claims only as stated in this section." *See id.*, subd. 5. Indeed, the reporter's notes to the statute states that that provision means that "(1) the statute exhaustively states the economic loss doctrine, and (2) there is no residual common law economic loss doctrine." *See id.* rep. note; *see also Ptacek v. Earthsoils, Inc.*, 844 N.W.2d 535, 538-39 (Minn. Ct. App. 2014) (rejecting argument for application of a common-law ELD after enactment of Section 604.101).[12] Thus, the Minnesota plaintiffs' claims are not barred by the ELD.

Syngenta does not dispute that courts in **Arkansas** have never adopted the ELD in any form. *See, e.g.*, *Rush v. Whirlpool Corp.*, 2008 WL 509562, at *2 (W.D. Ark. Feb. 22, 2008) (Arkansas does not adhere to the ELD); *Carvin v. Arkansas Power & Light Co.*, 1991 WL 540481, at *4-5 (W.D. Ark. Dec. 2, 1991) (Arkansas has not

---

[12]Syngenta cites to *Praktika Design & Projectos Ltda. v. Marvin Lumber and Cedar Co.*, 2007 WL 1582710 (D. Minn. May 30, 2007), in which the court applied a common law version of the ELD. *See id.* at *3. That court considered a different statute that did not contain language similar to that found in subdivision 5 of Section 604.101, however. *See id.* (considering Minn. Stat. § 604.10(b)). The Court concludes that the plain language of Section 604.101, consistent with the reporter's gloss, precludes the application of a common-law ELD in this case.

26

adhered to the ELD; predicting that Arkansas courts would not apply the ELD in a stranger case involving a bridge closure).  Syngenta cites *Bayer CropScience LP v. Schafer*, 385 S.W.3d 822 (Ark. 2011), in which the Arkansas Supreme Court confirmed that it had failed to recognize the ELD in strict liability cases, and then noted that its case (because it involved physical harm) did not present the opportunity to address the defendant's request that the ELD be extended to negligence claims.  *See id.* at 832-33. Syngenta thus argues that the Arkansas Supreme Court has not closed the door on application of the SELD.  *Bayer* does not provide any basis to predict that the court *would* adopt the SELD, however, as the court merely declined to address the question of the adoption of the ELD in a product defect case.  Moreover, as noted above, at least one federal court has declined to apply the ELD under Arkansas law in the stranger context.  *See Carvin*, 1991 WL 540481, at *4-5.  Thus, because the ELD has never been applied by Arkansas courts, the Court cannot reasonably predict that those courts would do so in any given case.

Second, in a number of other states, courts have never applied the SELD, but Syngenta urges the Court to predict that those courts would do so in this case.  Cases from those states do not provide a basis for such a prediction here, however, and with respect to some states, language from the courts suggest that the SELD would *not* be applied there.[13]

---

[13]With respect to many states, Syngenta argues that the fact that the state's law
(continued...)

In **Alabama**, courts have not applied the SELD and have applied the ELD only in the context of product liability claims.  In fact, in *Public Building Authority of City of Huntsville v. St. Paul Fire and Marine Insurance Co.*, 80 So. 3d 171 (Ala. 2010), the Alabama Supreme Court held that because a fact-intensive inquiry governs whether a duty exists, application of the ELD is unnecessary; thus, the court held that the ELD did not extend beyond the product liability context to apply to commercial construction cases under Alabama law.  *See id.* at 184-86; *see also Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 106 (Ala. 2004) (in rejecting an ELD argument, noting that the claim did not fall within the scope of the state's product liability rule); *AGF Marine Aviation Transport v. LaForce Shipyard, Inc.*, 2006 WL 2402345, at *2 (S.D. Ala. Aug. 18, 2006) (same, citing *Vesta*).  Thus, there is a basis to  predict that Alabama courts would *not* apply the ELD in this case that does not involve product liability.

**Colorado** courts have not specifically addressed application of the SELD, but the Colorado Supreme Court has indicated that the ELD does not apply to a claim based on the breach of a duty independent of any contract obligations.  *See S K Peightal Eng'rs, Ltd. v. Mid Valley Estate Solutions V, LLC*, 243 P.3d 868, 875 (Colo. 2015) (ELD does not apply to duties independent of contractual duties or to duties triggered by the

---

[13](...continued)
does not necessarily require privity of contract as a requirement for application of the ELD provides a basis to predict that the state would adopt and apply the SELD.  The Court disagrees.  The fact that a state may not require privity in the particular context of a product liability claim, for example, says nothing about whether the state would apply the ELD outside of that particular context.

existence of certain special relationships); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000) (adopting the ELD as applying to claims not based on independent tort duties). In this case, plaintiffs allege breaches of duties arising under the common law, which duties are independent of any contractual duties owed by Syngenta. Accordingly, these holdings of the Colorado Supreme Court strongly suggest that that court would reject application of the SELD to such claims not involving contractual duties.

Although **Indiana** courts have not applied the SELD, Syngenta argues that this Court should predict that they would do so in this case. Indiana courts have applied the ELD to claims involving the failure of performance of products or services. *See Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 152 (Ind. 2005). In *Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722 (Ind. 2010), the Indiana Supreme Court reviewed cases applying the ELD in that failure-of-performance context and confirmed that Indiana recognized the ELD as a "general rule" that precludes recovery in tort for economic loss. *See id.* at 730. The court stressed, however, that the rule was subject to appropriate exceptions. *See id.* at 736. In that case, in concluding that the ELD applied to construction cases, the court reasoned that such cases, like cases involving defective goods or products, are best left to contract law remedies. *See id.* at 737. Thus, the Indiana Supreme Court has applied the ELD only to product and other contract-based claims. Other Indiana courts have rejected arguments for application of the ELD beyond those product- and contract-based

29

contexts, including in stranger cases. For instance, in *KB Home Indiana Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297 (Ind. Ct. App. 2010), a stranger case involving TCE contamination by the plaintiff's neighbor, the court held that the plaintiff's negligence claim was not barred by the ELD because the plaintiff did not contract with the defendant to purchase property or a product, the plaintiff did not assert any product liability or comparable claim, and the plaintiff was not seeking to circumvent any contractual, statutory, or other limits on the nature or scope of its permissible recovery. *See id.* at 305; *see also Hoffman v. WCC Equity Partners, L.P.*, 2008 WL 5195974, at *2 (Ind. Ct. App. Dec. 11, 2008) (unpub. op.) (ELD did not bar a negligence claim in a stranger case because there was no contractual relationship between the parties and the plaintiffs were suing in tort and not in contract); *Novak v. Indiana Family and Social Services Admin.*, 2011 WL 1224813, at *7 (S.D. Ind. Mar. 30, 2011) (citing *Charlier* and *KB Homes* in holding that "the economic loss doctrine has no application to a circumstance where the Plaintiff has not purchased a service or product from the Defendant and is not seeking damages for which the allocation of risk has been predetermined in some fashion by the parties involved"); *American United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 705 (Ind. Ct. App. 2004) (ELD doctrine did not apply to a negligence claim that was not a "failure to perform" claim). Thus, there is caselaw in Indiana suggesting that Indiana courts would *not* apply the SELD in this case outside the context of a failure of performance of goods or services.

In *David v. Hett*, 270 P.3d 1102 (Kan. 2011), the **Kansas** Supreme Court declined

30

to extend the ELD beyond product liability law to apply to claims by homeowners against service contractors because the rationales for the rule as applied in the product liability context did not apply to the homeowner claims. *See id.* at 700. Subsequently, in *Rinehart v. Morton Buildings, Inc.*, 305 P.3d 622 (Kan. 2013), the supreme court stated that although its "narrow" holding in *David* established one circumstance in which the ELD did not apply, it left unanswered whether the court would apply the doctrine in other areas, which questions "must be examined as the opportunities present themselves." *See id.* at 629-30; *see also id.* at 632-33 (concluding that the ELD did not apply to negligent misrepresentation claims). Thus, although Kansas courts have not applied the ELD outside of the product liability context, the Kansas Supreme Court has left open the possibility that the reach of the ELD may not be so limited (while rejecting one possible expansion). Nevertheless, as Kansas courts have never applied the SELD, there is no basis for a prediction that they would do so in this case. Moreover, the Kansas Supreme Court appears to endorse the consideration of the ELD's purposes in considering exceptions to the doctrine on a case-by-case basis, as this Court has done in this case.

**Kentucky** courts have not applied the SELD, and although Syngenta argues that they would do so in this case, Kentucky caselaw suggests otherwise. Kentucky courts have not applied the ELD outside of the product and sales contexts. In *Giddings and Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729 (Ky. 2011), the Kentucky Supreme Court noted that its first mention of the ELD by name had been in a concurring

31

opinion by one justice, and that the majority in that case failed to mention the rule perhaps because of the absence of a contract between the litigants. *See id.* at 737-38 (citing *Presnell Constr. Mgrs., Inc. v. EH Constr., LLC*, 134 S.W.3d 575 (Ky. 2004)). Other courts in Kentucky since *Giddings* have held that Kentucky law limits the ELD's application to cases involving product claims. *See NS Transportation Brokerage Corp. v. Louisville Sealcoat Ventures, LLC*, 2015 WL 1020598, at *3, 5 (W.D. Ky. Mar. 9, 2015) (concluding that because the negligence claim did not arise from the sale of a defective product, the ELD did not apply under *Giddings*, and finding no evidence that Kentucky would expand the ELD to apply to contracts for services); *Ronald A. Chisholm, Ltd. v. American Cold Storage, Inc.*, 2013 WL 2242648, at *10-11 & n.11 (W.D. Ky. May 21, 2013) (noting that *Giddings* and federal cases "limit the rule's application to claims arising from a defective product sold in a commercial transaction") (citing cases); *Nami Resources Co., LLC v. Asher Land & Mineral, Ltd.*, __ S.W.3d __, 2015 WL 4776376, at *6 (Ky. Ct. App. Aug. 14, 2015) ("Kentucky law does not extend the economic loss rule beyond the realm of commercial product sales").  Thus, there is no basis to predict that Kentucky courts would apply the ELD in a different context in this case.

Syngenta concedes in an appendix to its opening brief that **Michigan** has "limited the rationale for the [ELD] to apply only where a party has some alternative avenue for protecting itself by contract." *See Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 864 (Mich. Ct. App. 2002) ("In order for the economic loss doctrine to bar

recovery in tort, there must be a transaction that provides an avenue by which the parties are afforded the opportunity to negotiate to protect their respective interests."); *see id.* at 866 (there is no support under Michigan law "for applying the doctrine in the absence of a transaction between the parties or others closely related to them, whereby the allocation of risks could be negotiated"). In *Quest*, the court refused to apply the ELD in a stranger context involving a ruptured water main that hurt the plaintiff's business. *See id.* at 866. The defendant in *Quest* also argued for dismissal of the negligence claim based on a public policy against "mass tort claims" by potentially thousands of plaintiffs asserting only economic damages; but the court declined to "speculate regarding the proper policy" because no class had yet been certified in the case, which therefore involved only the named plaintiffs. *See id.* Despite initially conceding Michigan's limitation on the ELD, Syngenta argues in its reply and sur-sur-reply briefs that *Quest* leaves open the possibility that the SELD could apply in a "mass tort" case like this one. Despite the *Quest* court's refusal to answer a question that was not before it, however, there is no basis to predict that Michigan courts would apply the SELD in this case, as Michigan courts have limited the doctrine to contract-based cases, and the Michigan Court of Appeals has refused to the apply the SELD on at least one occasion.

The **Mississippi** Supreme Court has never adopted the ELD, and the Mississippi Court of Appeals and federal courts have noted that the ELD has been applied under Mississippi law only in product liability cases. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999); *Lyndon Prop. Ins. Co.*

33

*v. Duke Levy & Assocs., LLC*, 475 F.3d 268, 274 (5th Cir. 2007). The Fifth Circuit and Mississippi's federal courts have consistently refused to apply the ELD in other types of cases. *See Lyndon*, 475 F.3d at 274 (declining to apply the ELD because Mississippi cases have not applied the doctrine outside the realm of product liability); *Federal Ins. Co. v. General Elec. Co.*, 2009 WL 1728696, at *8 (S.D. Miss. Dec. 3, 2009) (ELD has not been extended in Mississippi beyond product liability cases; ELD therefore did not apply in the absence of an allegation of a design defect); *Mississippi Phosphates Corp. v. Furnace & Tube Serv., Inc.*, 2008 WL 313770, at *1 (S.D. Miss. Feb. 1, 2008) (ELD did not apply because, as in *Lyndon*, the contract at issue was for the performance of services and not for the purchase of a product, and because the claims were not in the nature of product liability); *Brasscorp v. Highside Chems., Inc.*, 2007 WL 1673539, at *2 (S.D. Miss. June 7, 2007) (ELD was inapplicable, as it has been held to apply only to product liability cases). Thus, there is no basis to predict that Mississippi courts would apply the ELD in this case outside of the product liability context.

**Nebraska** courts have not applied the ELD in a stranger case. In *Lesiak v. Central Valley Ag Cooperative, Inc.*, 808 N.W.2d 67 (Neb. 2012), the Nebraska Supreme Court noted that although it had accepted the ELD in product cases, "the exact contours of the doctrine, particularly outside of the products liability context, have not been addressed," and it took the opportunity in that case to "clarify the doctrine's application and scope in Nebraska." *See id.* at 81. The court then indicated that it was "expressly limiting the doctrine's application" and taking the position espoused by the Florida

34

Supreme Court, under which the ELD applies only in the product liability context and "where the alleged breach is only of a contractual duty, and no independent tort duty exists." *See id.* at 82. Thus, the ELD does not apply where economic losses are caused by the breach of an independent tort duty separate and distinct from any contractual duty. *See id.* at 83; *see also E3 Biofuels-Mead, LLC v. Skinner Tank Co.*, 2014 WL 351971, at *4 (D. Neb. Jan. 30, 2014) (under *Lesiak*, ELD does not bar tort theories if "there exists an independent tort duty alleged to be breached that is separate and distinct from the contractual duty"). Thus, although Nebraska courts have not necessarily addressed the ELD in a stranger case, the state's highest court, in seeking to clarify the scope of the doctrine under Nebraska law, has limited the ELD to contractual cases and has held that the ELD does not apply to claims based on independent tort duties. That limitation by the Nebraska Supreme Court would preclude application of the ELD in this case.

In *Lord v. Customized Consulting Specialty, Inc.*, 643 S.E.2d 28 (N.C. Ct. App. 2007), the **North Carolina** Court of Appeals was persuaded to follow a federal court's reasoning that the ELD does not prohibit recovery in tort for all economic losses; that the doctrine has not expanded to apply outside the product liability context; and that the ELD does not overturn 25 years of caselaw in North Carolina recognizing tort claims for negligence based on breaches of the duty of care. *See id.* at 32 (refusing to apply the ELD because there was no contract between the parties) (citing *Ellis-Don Constr., Inc. v. HKS, Inc.*, 353 F. Supp. 2d 603, 606 (M.D.N.C. 2004)). Thus, although North Carolina courts have not considered the ELD in the stranger context, the reasoning of

35

these cases undermines any argument that those courts would adopt the SELD in this case outside of the product liability and contract contexts.

**North Dakota** and **Oklahoma** courts appear only to have applied the ELD to defective product claims. *See, e.g.*, *Leno v. K & L Homes, Inc.*, 803 N.W.2d 543, 550 (N.D. 2011); *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649, 653 (Okla. 1990). Thus, North Dakota and Oklahoma caselaw provides no basis to predict that courts in those states would adopt and apply the SELD. Neither has Syngenta suggested any basis for such a prediction under either state's law.

**South Dakota** courts have not applied the SELD. The South Dakota Supreme Court has applied the ELD in the context of a commercial transaction governed by the UCC, *see City of Lennox v. Mitek Indus., Inc.*, 519 N.W.2d 330, 333-34 (S.D. 1994), but that court has also refused to extend the ELD to apply to the provision of professional services, *see Kreisers Inc. v. First Dakota Title Ltd. Partnership*, 852 N.W.2d 413, 421-22 (S.D. 2014). Thus, there is no basis to predict that South Dakota courts would apply the ELD in another context outside the realm of the UCC.

Third, Syngenta points to a number of states with courts that have applied the ELD in the stranger context at least once. As discussed below, however, in none of those states have the courts described the SELD as an absolute bar to be applied in every stranger context without exception. Thus, there is no basis to conclude that these states' courts would necessarily apply the SELD in this case even if the rule's rationales would not be furthered by its application.

36

In *In re Chicago Flood Litigation*, 680 N.E.2d 265 (Ill. 1997), a lack-of-access case, the **Illinois** Supreme Court applied the ELD in a stranger context to bar negligence claims for economic losses resulting from the flooding of a tunnel. *See id.* at 274-76. The court based its ruling in part on the fact that the case did not implicate any of three exceptions to the ELD articulated in a prior case, *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982). *See Chicago Flood*, 680 N.E.2d at 275. In *Moorman* (a products case), however, the court did not purport to limit the possible exceptions to the ELD. *See Moorman*, 435 N.E.2d at 450-53. Indeed, in *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346 (Ill. 1990), the Illinois Supreme Court noted that it had distinguished *Moorman* and allowed tort actions to proceed in a variety of circumstances. *See id.* at 351-52 (citing cases). The supreme court noted that the "principle common to those decisions is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred." *See id.* at 352. In a case decided only last year, the Illinois Court of Appeals noted that Illinois courts had recognized other exceptions to the ELD than those identified in *Moorman*; cited *2314*'s recognition of the principle that the ELD does not apply if the defendant owed a tort duty to prevent the harm that occurred; refused to apply the ELD (to a claim for interference with an easement) because the considerations behind the ELD articulated in *Moorman* were not present; and distinguished *Chicago Flood* on the basis that the damage suffered by the plaintiff in its case was the same damage that the defendant had sought to inflict upon the plaintiff. *See Metropolitan*

37

*Water Reclamation Dist. of Greater Chicago v. Terra Foundation for Am. Art*, 13 N.E.3d 44, 59-61 (Ill. Ct. App. 2014).

Thus, although the Illinois Supreme Court applied the ELD in a stranger context in *Chicago Flood*, that case is distinguishable as an access case, and Illinois courts have found exceptions to the ELD in cases in which the rationales for the rule would not be furthered. Moreover, the Illinois Supreme Court has indicated that courts have not applied the ELD in some cases in which the defendant had a duty to act reasonably to avoid the very harm that occurred, and plaintiffs in this case have alleged (and this Court has now recognized) just such a duty to avoid plaintiffs' financial losses in the market. Thus, *Chicago Flood* does not require a conclusion that the Illinois Supreme Court would necessarily apply the SELD to bar plaintiffs' claims in this case even without serving the purposes of the doctrine.

With respect to **Iowa** law, Syngenta relies on *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984), in which the Iowa Supreme Court applied the ELD to bar economic losses that resulted from the closing of a bridge. *See id.* at 126-28. That case is easily distinguished from the present case, as the court in *Nebraska Innkeepers* relied exclusively on other lack-of-access cases. *See id.* The court in that case certainly did not suggest that the ELD must be applied in all stranger contexts. In a more recent case, *Van Sickle Constr. Co. v. Wachovia Commercial Mortgage, Inc.*, 783 N.W.2d 684 (Iowa 2010), the Iowa Supreme Court acknowledged that there were exceptions to the ELD, and it recognized another such exception (for

38

negligent misrepresentation claims) after determining that the purposes of the ELD would not be served by its application in that case.  *See id.* at 692-94 & n.5. Subsequently, in *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499 (Iowa 2011), the supreme court noted that it was not attempting in that case "to delineate the precise contours of the [ELD] in Iowa," but, as it did in *Van Sickle*, it considered the purposes of the doctrine in determining whether another exception to the ELD should be recognized.  *See id.* at 504.  Together, these cases suggest that, although the Iowa Supreme Court has applied the ELD in a lack-of-access case, it would likely consider the purposes of the ELD in determining whether the doctrine should be applied in a different stranger context.  Thus, Iowa law does not necessarily mandate application of the ELD to the Iowa plaintiffs' claims in this case.

In arguing that **Missouri** has applied the SELD, Syngenta cites only a case decided over 100 years ago, *Brink v. Wabash Railroad Co.*, 60 S.W. 1058 (Mo. 1901), in which the court refused to recognize an unprecedented wrongful death claim, in part because of the remoteness of the damages to the alleged tort.  *See id.* at 1060.  As one court noted in declining to follow *Brink*, much has changed in tort law since that case was decided.  *See City of St. Louis v. American Tobacco Co., Inc.*, 70 F. Supp. 2d 1008, 1013 (E.D. Mo. 1999).  Syngenta also notes that the Missouri Court of Appeals applied the ELD even in the absence of privity in *Captiva Lake Investments, LLC v. Ameristructure, Inc.*, 436 S.W.3d 619 (Mo. Ct. App. 2014), but that case did not involve parties that were truly strangers, and the court did not suggest that the ELD should be

applied without exception. *See id.* at 629. In fact, the Missouri Court of Appeals has recognized exceptions in other cases. *See, e.g.*, *Business Men's Assur. Co. of Am. v. Graham*, 891 S.W.2d 438, 454 (Mo. Ct. App. 1994) (rejecting application of the ELD to a claim relating to the provision of professional services); *B.L. Jet Sales, Inc. v. Alton Packaging Corp.*, 724 S.W.2d 669, 673 (Mo. Ct. App. 1987) (negligent misrepresentation cases are in a different category from cases in which the ELD has been applied). In *In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d 1004 (E.D. Mo. 2009), the court, in concluding that the ELD did not bar rice contamination claims in the stranger context under Missouri law, noted that "Missouri has traditionally allowed tort claims even where the only damages sought were economic," and that "Missouri courts have never read the doctrine as broadly" as urged by the defendant in that case. *See id.* at 1016-17. Thus, the Court does not believe that Missouri caselaw provides a reasonable basis to predict that Missouri courts would necessarily apply the ELD in a stranger context without consideration of whether the purposes of the rule would be served.

As Syngenta notes, **Ohio** courts have applied the ELD in the stranger context; but those cases from the Ohio Court of Appeals and Ohio federal courts involved public nuisance claims. *See Stevenson v. East Ohio Gas Co.*, 73 N.E.2d 200, 203 (Ohio Ct. App. 1946) (following Supreme Court's *Robins Dry Dock* case in concluding that plaintiff's damages in being unable to work as a result of a neighbor's gas fire that constituted a public nuisance were too remote); *RWP, Inc. v. Fabrizi Trucking & Paving*

40

*Co.*, 2006 WL 2777159, at *3 (Ohio Ct. App. Sept. 28, 2006) (unpub. op.) (rejecting argument that the ELD did not apply in public nuisance cases; plaintiffs had suffered disruption to their businesses after defendant cut certain telephone cables); *Ashtabula River Corp. Group II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 987-88 (N.D. Ohio 2008) (following *RWP* in barring public nuisance claims based on contamination of a river); *City of Cleveland v. Ameriquest Mtge. Sec., Inc.*, 621 F. Supp. 2d 513, 522 (N.D. Ohio 2009) (following *RWP* and *Ashtabula River* in applying the ELD to a public nuisance claim based on foreclosures resulting from subprime lending).

Other courts in Ohio, however, have held that the ELD does not apply to a claim based on the breach of a non-contractual duty. For instance, in *Campbell v. Krupp*, 961 N.E.2d 205 (Ohio Ct. App. 2011), the court summarized Ohio ELD law as follows:

> Thus, where a plaintiff has suffered only economic harm as a result of a defendant's breach of duty, the economic-loss rule will bar the tort claim if the duty arose only by contract. . . . In contrast, the economic-loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise from a contract.

*See id.* at 211; *accord Mulch Mfg., Inc. v. Advanced Polymer Solutions, LLC*, 947 F. Supp. 2d 841, 856-57 (S.D. Ohio 2013) (following the rule from *Campbell*); *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 766 (N.D. Ohio 2013) (following *Mulch*). In *Campbell*, the court derived its rule regarding the application of the ELD from the Ohio Supreme Court's opinion in *Corporex Development and Construction Management, Inc. v. Shook, Inc.*, 835 N.E.2d 701 (Ohio 2005), in which the supreme

41

court noted that the ELD stemmed from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law, and contract law. *See id.* at 704.

Applying the rule set forth in this latter group of cases, based on the distinction drawn by the Ohio Supreme Court, the ELD would not apply in the present case under Ohio law because plaintiffs have alleged breaches of non-contractual duties. In light of these latter cases, the cases cited by Syngenta (which did not address *Corporex* or the other cases recognizing the tort duty-contract duty distinction) are most reasonably understood as limited to public nuisance claims. Accordingly, the Court cannot conclude that Ohio courts would necessarily apply the ELD in all stranger cases without exception and without regard to whether the purposes of that rule would be served.

In arguing that **Tennessee** courts would apply the ELD here, Syngenta notes that courts in that state have applied the doctrine in two lack-of-access cases. *See United Textile Workers of Am., AFL-CIO v. Lear Siegler Seating Corp.*, 825 S.W.2d 83, 87 (Tenn. Ct. App. 1990) (following other access cases in applying the ELD to bar a claim for economic losses resulting from the closure of an industrial park because of a gas leak at the defendant's facility); *Ladd Landing, LLC v. Tennessee Valley Auth.*, 874 F. Supp. 2d 727, 729-33 (E.D. Tenn. 2012) (applying the ELD to claims relating to a coal ash spill). In other cases, however, Tennessee federal courts have concluded that Tennessee law limits the ELD to the product liability context. In *Ham v. Swift Transportation Co.*, 694 F. Supp. 2d 915 (W.D. Tenn. 2010), the court stated that the Tennessee Supreme

42

Court had never addressed "whether the [ELD] applies outside the products liability context." *See id.* at 921. The court noted the holding of *United Textile*, but it further noted that "[t]he Tennessee Court of Appeals has since implicitly restricted the [ELD] to claims involving products liability or the sale of goods, at least where the plaintiff can establish a sufficiently direct relationship between the defendant's negligent act and the plaintiff's economic loss." *See id.* at 922 (citing cases). The court then concluded that the Tennessee Supreme Court would decline to extend the ELD to cases involving the provision of services. *See id.* at 923; *see also Tan v. Wilbur Smith Assocs., Inc.*, 2011 WL 3421320, at *6-7 (E.D. Tenn. Aug. 4, 2011) (following *Ham* and its companion cases in concluding that the ELD does not extend to contracts for the provision of services under Tennessee law). The court in *Ladd Landing* reviewed and disagreed with the conclusions of the *Ham* court, *see Ladd Landing*, 874 F. Supp. 2d at 732-33, but the federal courts in Tennessee at least appear to be split concerning the proper scope of the ELD in that state and whether the Tennessee Supreme Court would recognize and apply the ELD in stranger cases outside the product liability context. Moreover, the court in *Ladd Landing* recognized that the ELD is subject to exception. *See id.* at 733 n.2. Thus, even if the Court were persuaded that the Tennessee Supreme Court would apply the ELD in a stranger context under the right circumstances (such as in lack-of-access cases like *United Textile* and *Ladd Landing*), the Court cannot predict that that court would apply the ELD without exception in all stranger cases, regardless of whether the rule's purposes were being served by its application.

43

Syngenta notes that the **Texas** Supreme Court has applied the ELD in the absence of contractual privity.  *See LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234 (Tex. 2014) (applying the ELD in a case in which the plaintiff contractor asserted negligence claims against the company that prepared plans for a construction project). Syngenta concedes, however, that the Texas Supreme Court in *LAN/STV* embraced a case-by-case approach to the ELD.  *See id.* at 245-46 ("[F]or both torts [negligence and negligent misrepresentation], whether and how to apply the economic loss rule does not lend itself to easy answers or broad pronouncements.  Rather, as we have already observed, the application of the rule depends on an analysis of its rationales in a particular situation.") (internal quotation and footnote omitted).  Thus, the Court's consideration of the pertinent rationales in deciding whether to apply the ELD in this case is consistent with the approach mandated by the Texas Supreme Court.

Syngenta asserts that the SELD has been applied under **Wisconsin** law.  In *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295 (7th Cir. 1991), which involved a claim of negligent supervision of an employee whose actions harmed the plaintiff, the Seventh Circuit stated that "there is now substantial evidence that Wisconsin would decline in all circumstances to allow a negligence suit for the recovery of only economic damages, even when there is no contractual relationship between the parties."  *See id.* at 1300 (footnote omitted).  Since the Seventh Circuit made that broad pronouncement of the rule in *Midwest Knitting*, however, Wisconsin courts have consistently defined the ELD as a doctrine that applies in the context of contractual

44

relationships.  For instance, in *Brew City Redevelopment Group, LLC v. Ferchill Group*, 724 N.W.2d 879 (Wis. 2006), the Wisconsin Supreme Court defined the ELD as a doctrine intended to prevent a party to a contract from employing tort remedies to compensate for economic losses arising from the contract.  *See id.* at 884.  The supreme court concluded that the ELD did not apply in that case because the plaintiff's claims did not depend on a contract in order to lie and because the plaintiff's tort allegations and damages were different from those underlying its contract claims.  *See id.* at 886; *see also Walker v. Ranger Ins. Co.*, 711 N.W.2d 683, 687 (Wis. Ct. App. 2006) (ELD did not bar a negligence claim because the case was not a defective product or real estate case and no contractual relationship existed between the parties); *Schuetta v. Aurora Nat'l Life Assur. Co.*, 2013 WL 6199248, at *5 (E.D. Wis. Nov. 27, 2013) (declining to apply the ELD under Wisconsin law because the case did not involve a defective product and the rationales for the ELD would not have been served by its application).[14]

Accordingly, based on this caselaw, the Court cannot say that Wisconsin courts have adopted the SELD, let alone that they would adopt the SELD in all cases without exception and without regard to a consideration of the doctrine's purposes.

--------

[14]Syngenta also cites to *Custom Underground, Inc. v. Mi-Tech Services, Inc.*, 2011 WL 5008343 (E.D. Wis. Oct. 20, 2011), in which the court applied the broad statement of the ELD from *Midwest Knitting*.  *See id.* at *4.  In *Custom Underground*, however, the court did not discuss *Brew City*, and it ultimately decided that it could not predict whether Wisconsin courts would apply the ELD in its own negligent-provision-of-services context.  *See id.*  Thus, the court's decision to apply the ELD as broadly stated in *Midwest Knitting* is not particularly helpful.

In summary, in none of these 22 states does the law provide a basis to predict that the state would apply the SELD in this case in the absence of circumstances in which application of the doctrine would further its rationales. Accordingly, the Court rejects Syngenta's argument that the SELD bars plaintiffs' claims, and it denies Syngenta's motions to dismiss to that extent.

Finally, Syngenta argues that the non-producer plaintiffs' claims would be barred, even without application of the SELD, by the more widely applied contract-based ELD. Syngenta argues that the non-producers' claims based on their purchases of corn fall within that version of the ELD, which generally precludes claims for disappointed commercial expectations with respect to products purchased. The Court thus turns to the law governing the non-producer claims.

The non-producer plaintiffs reside in Illinois, Louisiana, Minnesota, and Mississippi, and the parties have generally agreed that the law of the state of a plaintiff's residence governs its claims. Syngenta claims that Illinois law governs the claims by plaintiff Trans Coastal Supply Company, Inc., but it has not discussed the law of that state in making this argument, which the Court therefore rejects as applied to that plaintiff. Moreover, as set forth above, Syngenta concedes that Louisiana does not apply the ELD but instead engages in a duty-risk analysis. Thus, the Court will not dismiss the claims by the non-producer plaintiff from that state on the basis of the ELD.

As explained above, Minnesota's ELD is entirely statutory, and the statute bars certain "product defect tort claims" by a buyer against a seller. *See* Minn. Stat. §

46

604.101, subd. 3.  Syngenta has not shown that the Minnesota non-producer plaintiff's claims fall within that statute.  That plaintiff bought corn, but it did not buy any product sold by Syngenta, which sold seeds, and Syngenta has not cited any authority to support a theory allowing for liability under this statute if the plaintiff did not buy the particular product sold by the defendant.  In addition, plaintiffs have not alleged any sort of product defect, as Syngenta's seeds are not alleged to have failed to perform as intended.  Therefore, the Court concludes that the claims by the Minnesota non-producer plaintiff are not barred by the ELD.

With respect to Mississippi's ELD, Syngenta cites only *State Farm Mutual Automobile Insurance Co. v. Ford Motor Co.*, 736 So. 2d 384 (Miss. Ct. App. 1999).  In that case, however, the court discussed the ELD only in the context of a product defect.  *See id.* at 387.  Again, the present case does not involve such a defect, and the Court therefore concludes that the claims of the Mississippi non-producer plaintiff are not barred by the ELD.

## IV. <u>FIFRA Preemption</u>

In asserting various claims, all plaintiffs have alleged a failure to warn by Syngenta.  For instance, in various negligence claims, plaintiffs include the following among various acts and omissions by which they allege Syngenta breached duties to them:  "Failing to adequately warn and instruct farmers on the dangers of contamination by MIR 162 and at least the substantial risks that growing Viptera® would lead to loss

47

of the Chinese market[.]"  Syngenta argues that any claims by plaintiffs based on Syngenta's alleged failure to warn growers using its products are preempted by a provision in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136v(b).

In *Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005), the Supreme Court held that for a state rule or cause of action to be preempted under FIFRA, it must be (1) a requirement (not a mere inducement) for labeling or packaging (2) that is different or in addition to those under the statute.  *See id.* at 443-44.  The plaintiff in *Bates* had asserted a claim of negligence in the development, manufacture, production, and promotion of a pesticide, but the lower courts interpreted the claim as a failure-to-warn claim, based on the plaintiff's evidence and argument that an earlier label change would have prevented the harm.  *See id.* at 436. The Supreme Court held that various other causes of action in that case were not preempted, but it indicated that the negligent-failure-to-warn claim in that case could be preempted, and it remanded the case for further consideration of that issue.  *See id.* at 444-54; *see also In re StarLink Corn Prods. Liability Litig.*, 202 F. Supp. 2d 828, 837 (N.D. Ill. 2002) (holding that the plaintiffs' negligence claim was a disguised failure-to-warn claim, which was therefore preempted).

Syngenta argues that plaintiffs' failure-to-warn claims are preempted by FIFRA, although it has not discussed how those claims relate to its products' labels.  Plaintiffs do not dispute that FIFRA would preempt any claims based on a failure to warn in the products' labeling or packaging, which is defined to include "all labels and all other

48

written, printed, or graphic matter" accompanying the products or to which the labels or packaging refers, *see* 7 U.S.C. § 136(p).  Rather, plaintiffs insist that they have not brought a direct failure-to-warn claim and that they have cited such a failure by Syngenta merely as one in a list of ways in which Syngenta was negligent.  Plaintiffs also note that they have alleged that they were not purchasers of Syngenta's products and thus would not have seen any labels for those products.

Plaintiffs have alleged, as a basis for their various claims, Syngenta's failure to warn farmers of risks in growing Viptera, and that claim is reasonably interpreted to include a claim that Syngenta failed to warn purchasers of its products.  Because such warnings might ordinarily be included in materials accompanying the products, plaintiffs' complaints do appear to include a claim that seeks to impose a labeling requirement not found among FIFRA's statutory requirements.  Even though plaintiffs appear to disavow any such claim, the Court nevertheless grants the motions to dismiss, and it dismisses any claim based on an alleged failure to warn to the extent that such claim is based on a lack of warnings in materials accompanying the products.

## V.   Claims Based on Duracade / Event 5307

Syngenta seeks dismissal of all plaintiffs' claims to the extent they are related to the commercialization of the Duracade product that contained not only MIR 162 (which was also contained in Viptera) but also Event 5307.  Syngenta argues that plaintiffs have failed to state a claim because they cannot show that conduct related to Duracade

proximately caused plaintiffs' injuries.  Syngenta appears to make two arguments here.

First, Syngenta points to plaintiffs' allegations that their injuries started in November 2013 when China began rejecting corn with MIR 162 and that Syngenta subsequently began commercialization of Duracade for the 2014 crop year.  Syngenta thus appears to argue that the subsequent event cannot have caused the earlier injury. The Court rejects this argument, however, as plaintiffs clearly allege harm lasting over time, including during the time of Duracade's commercialization.

Second, Syngenta argues that plaintiffs have not specifically alleged that China rejected Duracade corn or that Duracade caused market disruption or other injury.  The Court rejects this argument as well.  The complaints allege that Syngenta commercialized Duracade while components MIR 162 and Event 5307 were not approved by China and that such commercialization prolonged the economic harm begun by acts relating to Viptera.  Thus, plaintiffs have alleged sufficient facts to give rise to a plausible claim that acts relating to Duracade proximately caused injury to plaintiffs. The Court denies the motions to dismiss these claims.

### VI.    Trespass to Chattels

Syngenta seeks dismissal of common-law claims for trespass to chattels asserted by the corn producer and non-producer plaintiffs.  In their briefs, both sides have looked to Restatement (Second) of Torts § 217(b), which provides that a "trespass to chattel may be committed by intentionally . . . using or intermeddling with a chattel in possession of

50

another." *See id.*

As a preliminary matter, plaintiffs note that this provision of the Restatement has been adopted in 21 of the 22 states under whose law plaintiffs have asserted claims. The exception is Louisiana, which does not recognize the common-law tort of trespass to chattels, but instead recognizes a statutory cause of action for damage to movables, which claim Louisiana producers have asserted here (Count XXVIII). *See MCI Communications Servs., Inc. v. Hagan*, 74 So. 3d 1148, 1154-55 (La. 2011). Syngenta has not addressed that specific claim under Louisiana law, which cannot be assumed to track the general common law of the other states. Therefore, the Court denies Syngenta's motion to dismiss that claim. The Court's remaining discussion of this cause of action relates to the claims asserted by plaintiffs under the others states' laws.

A. *Intermeddling*

This tort requires intermeddling with a chattel in the plaintiff's possession. Plaintiffs allege that Syngenta intentionally intermeddled with their corn, through contamination of the corn from Viptera or Duracade either in the fields or in elevators, by commercializing those products without adequate systems to isolate and channel them. Syngenta argues that it did not intermeddle with plaintiffs' corn because it merely sold the seed to third-party farmers, and that any intermeddling was therefore caused by those farmers who planted the Viptera or Duracade seeds (intermeddling by cross-pollination) or by those who mixed corn in the elevators or other storage or transport places (intermeddling by commingling). Plaintiffs respond that Syngenta intermeddled

51

by selling its products while knowing that the genetically-modified strains would spread to others through cross-pollination and commingling, while committing other acts that increased the likelihood of that contamination.

Plaintiffs rely on a comment to the Restatement that indicates that the intermeddling may be the direct or indirect result of the defendant's act. *See* Restatement (Second) of Torts § 217(b) cmt. d. Syngenta notes, however, that courts have held in a number of cases that there is no liability for trespass for an injury or contamination caused by a product after it has left the control of its seller. *See City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989) (applying Indiana law, seller of PCBs not liable for trespass when buyer's waste containing PCBs contaminated plaintiff's land); *Jordan v. Southern Wood Piedmont Co.*, 805 F. Supp. 1575, 1582 (S.D. Ga. 1992) (seller of chemicals not liable for trespass for contamination that occurred when the buyer released the chemicals); *Dine v. Western Exterminating Co.*, 1988 WL 25511, at *9 (D.D.C. Mar. 9, 1988) (seller of insecticide not liable for trespass for injury from when insecticide was used by another to treat a house); *City of Manchester v. National Gypsum Co.*, 637 F. Supp. 646, 656 (D.R.I. 1986) (dismissing trespass claim against seller of asbestos; seller's control ceased at sale, plaintiff brought the asbestos into the property); *Town of Hooksett Sch. Dist. v. W.R. Grace & Co.*, 617 F. Supp. 126, 133 (D.N.H. 1984) (same); *Parks Hiway Enters., LLC v. CEM Leasing, Inc.*, 995 P.2d 657, 664 (Alaska 2000) (seller of fuel not liable for trespass after purchaser leaked fuel into groundwater and thereby contaminated the

52

plaintiff's property; rejecting argument that the seller set in motion the release of the fuel); *Ward v. Northeast Tex. Farmers Co-op. Elevator*, 909 S.W.2d 143, 150-51 (Tex. Ct. App. 1995) (seller of herbicide to plaintiff's neighbors not liable for trespass after herbicide drifted onto plaintiff's property when applied by a crop duster; noting lack of authority indicating that a mere seller is acting in concert with others using the product).

Plaintiffs have not addressed such cases in their response.  Plaintiffs might argue (as they did in support of their nuisance claims) that in most of these cases, the product was wrongfully used, while in this case, Syngenta knew that contamination would occur when Viptera was used as intended.  In *Ward*, however, there is no discussion of improper application of the herbicide, and that defendant might have known that its product when applied would naturally drift to other fields, and yet the plaintiffs were not permitted to pursue a claim for trespass.  *See Ward*, 909 S.W.2d at 150-51.  Moreover, in *National Gypsum* and *W.R. Grace*, the asbestos cases, trespass claims were dismissed even though the defendant sold the product directly to the plaintiffs and thus would have known that its product would be used in their property.  *See National Gypsum*, 637 F. Supp. at 656; *W.R. Grace & Co.*, 617 F. Supp. at 133.

Plaintiffs cite only a single case, *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219 (N.D. Ill. 2005), and that case is readily distinguished.  In *Sotelo*, one defendant downloaded spyware onto the plaintiff's computer, and other defendants sent ads to the computer through the spyware.  *See id.* at 1231-32.  Two defendants argued that they did not send the ads to the plaintiff's computer and did not participate with others who did.

53

*See id.*  The court, however, did not hold that those defendants could nonetheless be liable for trespass, as plaintiffs here suggest; rather, the court held that the plaintiff there had in fact alleged that those defendants did send and participate in sending the ads.  *See id.*  Therefore, *Sotelo* is not helpful.

Thus, plaintiffs have not cited any case in which a trespass claim was allowed against a seller of a product on the basis that the seller knew that the product would end up interfering with property of non-purchasers if the seller did not cause the interference itself.  In the absence of such an example of any court having recognized such a claim, the Court concludes that plaintiffs may not state a claim for trespass here under this theory.

Plaintiffs also argue that they have alleged that Syngenta grew some Viptera itself—to conduct field tests in most of the states in which plaintiffs farm and to develop inventories—and that Syngenta caused intermeddling with their corn in that way.  As Syngenta notes, however, plaintiffs have not alleged that each plaintiff's corn was contaminated specifically by Viptera corn grown by Syngenta.  The Court concludes that it is not plausible that each plaintiff's corn was so contaminated, especially as plaintiffs have alleged that Syngenta grew corn not in all plaintiffs' states, but only in most.  Thus, the Court rules that the trespass to chattels claims are subject to dismissal, and Syngenta's motions are granted to that extent.  Plaintiffs are granted leave, however, to amend their complaints to assert claims specifically on behalf of those plaintiffs that are able to allege facts to support a plausible claim of contamination from corn grown

54

specifically by Syngenta.

### B.   *Contact with Producer Plaintiffs' Corn*

Syngenta also argues that in light of the producer plaintiffs' pleaded theory that they suffered damages when corn prices dropped in the domestic market generally, those plaintiffs cannot pursue trespass claims because they have not specifically alleged interference (through contamination) with each plaintiff's property. Indeed, Syngenta argues that absent allegations of testing of the corn, plaintiffs cannot plausibly make such a claim. Plaintiffs do not dispute that a producer must have suffered contamination of its own corn or other property in order to maintain this claim, but they note that plaintiffs have alleged generally that their corn was contaminated either in the fields or in elevators. In light of the plaintiffs' damage-to-the-market theory, however, the Court cannot conclude that plaintiffs have pleaded sufficient facts to support a plausible claim that *each* producer plaintiff suffered contamination of its own corn or property.

Syngenta further argues that corn in the elevators no longer belonged to the producer plaintiffs, having been sold to the elevator operators, and that that fact precludes a claim for trespass because such a claim requires intermeddling with the plaintiff's own property. Plaintiffs respond that such an argument is improperly fact-dependent. In the absence of allegations that some or all plaintiffs retained a possessory interest in corn that was contaminated in an elevator, however, plaintiffs have not stated a plausible claim for trespass based on such contamination, as one would normally expect growers to have given up their interest in the corn sent to elevators. Because

55

plaintiffs have alleged only contamination in the fields *or* in elevators, without stating which for each plaintiff, plaintiffs cannot maintain this claim as pleaded.

Accordingly, the Court concludes that plaintiffs have not alleged facts to support a plausible claim that each plaintiff suffered contamination of its own corn or other property, and the Court dismisses the trespass claims on this basis as well.  Producer plaintiffs are granted leave, however, to amend their complaint to allow any plaintiff to assert this claim if it can plausibly allege either that its own corn was contaminated in the field or that its corn was contaminated in an elevator while it retained a possessory interest.

*C.*     <u>Damage</u>

Finally, Syngenta argues that plaintiffs have not sufficiently alleged damage to their corn because Viptera-contaminated corn may be eaten and sold in the United States like any other corn.  As plaintiffs note, however, they have alleged an impairment to the value of their corn, which injury is sufficient under the Restatement—whether or not the corn is edible.  The fact that Viptera was approved for sale does not mean that no impairment of value could have occurred as a matter of law.  Syngenta argues that plaintiffs have only conclusorily alleged impairment, but (assuming plaintiffs' own corn was contaminated, *see supra* Part VI.B) plaintiffs have stated facts to support a plausible claim that the value of that corn was impaired because it was less marketable than before.

The Court agrees with Syngenta, however, that plaintiffs have not alleged facts

56

showing that the impairment of their corn's value was caused by the trespass (contamination). Plaintiffs' theory is that the market for *all* corn in the United States went down, and thus plaintiffs' contaminated corn was the same as everyone else's corn in terms of value. Therefore, because a producer or non-producer's corn lost value whether or not it experience contamination, any trespass by means of contamination cannot have caused a plaintiff's market injury. Accordingly, plaintiffs may not recover their alleged market-based damages under these trespass claims.

In their complaints, in alleging injury and seeking damages, plaintiffs have alleged damage generally to their land, equipment, and storage facilities, but they have not distinguished between plaintiffs whose corn experienced contamination and plaintiffs whose corn did not. Thus, plaintiffs have not plausibly alleged claims for any other damages actually incurred (from the alleged trespass or otherwise) other than under their market price theory. Accordingly, the trespass claims are subject to dismissal in their entirety. Plaintiffs are granted leave, however, to amend their complaints, to the extent that they are able, to allege facts to support plausible claims for specific damages caused by the alleged trespass other than under the market theory.

### D.   *Intent*

In light of the possibility of plaintiffs' repleading these claims, the Court will address Syngenta's additional argument that it had no intent to contaminate the corn of those who did not purchase its products. Syngenta, however, acknowledges that Restatement § 217 cmt. c allows for trespass liability if the act is done with knowledge

to a substantial certainty that intermeddling will result.  The Court rejects Syngenta's summary argument (made without reference to particular intent standards applied in each applicable state) that meeting such a standard should not suffice.  The Court concludes that plaintiffs have sufficiently alleged facts to satisfy the intent standard set forth in the Restatement.

## VII.   Private Nuisance

The corn producer plaintiffs have asserted common-law private nuisance claims. Syngenta asserts three bases for dismissal of those claims.

### A.   *Syngenta's Participation in the Invasion*

Both sides cite to the Restatement, which provides that a private nuisance is an "invasion of another's interest in the private use and enjoyment of land."  *See* Restatement (Second) of Torts § 821D.  In alleging a private nuisance, plaintiffs allege that by contaminating the United States corn supply, Syngenta substantially and unreasonably interfered with plaintiffs' quiet use and enjoyment of their land or property interests.

Syngenta argues that it did not interfere with plaintiffs' land as a matter of law because any interference (contamination) through cross-pollination or commingling was done by others (Viptera growers or those who commingled the corn).  Plaintiffs rely on Restatement Section 834, which provides as follows: "One is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when

58

he participates to a substantial extent in carrying it on." Plaintiffs thus argue that they have stated a claim by alleging Syngenta's substantial participation in the contamination.

As it does in seeking dismissal of the trespass claims, *see supra* Part VI.A, Syngenta relies on the general rule, as recognized in various cases that it cites, that a seller of a product is not liable for a private nuisance caused by the use of that product after it has left the seller's control. *See, e.g.*, *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989) (applying Indiana law, seller of PCBs not liable for nuisance when buyer's waste containing PCBs contaminated plaintiff's land; noting that the plaintiff had not found "any cases holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale"); *Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993) ("nuisance law does not afford a remedy against the manufacturer of an asbestos-containing product to an owner whose building has been contaminated by asbestos following the installation of that product in the building;" "courts have noted that liability for damage caused by a nuisance turns on whether the defendant is in control of the instrumentality alleged to constitute a nuisance, since without control a defendant cannot abate the nuisance"); *L'Henri, Inc. v. Vulcan Materials Co.*, 2010 WL 924259, at *5-6 (D.V.I. Mar. 11, 2010) (whether a manufacturer may be liable on a private nuisance claim beyond the point of sale turns on the degree of control that the manufacturer retains over the product post-sale; thus "where there is no evidence of such control, dismissal of a private nuisance claim is appropriate;" dismissing nuisance claim

59

in absence of allegations of control); *Appletree Square 1 Ltd. Partnership v. W.R. Grace & Co.*, 815 F. Supp. 1266, 1274 n.13 (D. Minn. 1993) (no nuisance under Minnesota law where the seller no longer owns or controls the product from which the nuisance arises (in that case, fireproofing containing asbestos)); *Jordan v. Southern Wood Piedmont Co.*, 805 F. Supp. 1575, 1582 (S.D. Ga. 1992) (seller of chemicals not liable for nuisance for contamination that occurred when the buyer released the chemicals); *Johnson County, Tenn. v. U.S. Gypsum Co.*, 580 F. Supp. 284, 294 (E.D. Tenn. 1984) (in Tennessee cases allowing nuisance claims, the defendant was in control of the instrumentality from which the nuisance was created; dismissing nuisance claim based on sale of asbestos-containing products); *Cloverleaf Car Co. v. Phillips Petroleum Co.*, 540 N.W.2d 297, 301 (Mich. Ct. App. 1995) (seller of gasoline cannot be liable for nuisance caused by another's leaking of the gasoline; "[b]ecause a seller in a commercial transaction relinquishes ownership and control of its products when they are sold, it lacks the legal right to abate whatever hazards its products may pose"); *Traube v. Freund*, 775 N.E.2d 212, 216 (Ill. Ct. App. 2002) ("the absence of a manufacturer's control over a product at the time the nuisance is created generally is fatal to any nuisance" claim; citing *City of Bloomington*).

Plaintiffs respond by noting that many of these cases apply the law of states that do not provide the applicable law in this case.[15] Plaintiffs have not tried to refute this

---

[15]Plaintiffs have asserted private nuisance claims on behalf of producers in Alabama, Arkansas, Kansas, Minnesota, Mississippi, Nebraska, North Carolina, North Dakota, Ohio, Tennessee, Texas, and Wisconsin.

general rule on a state-by-state basis, however, and plaintiffs have generally relied on the Restatement. Thus, these cases are persuasive in purporting to apply a general rule recognized in the common law of nuisance.

Plaintiffs have not cited any relevant authority to suggest that this general rule should not apply in the absence of the seller's continuing control over the product. Plaintiffs cite the *Rice* case, in which the court denied summary judgment on a private nuisance claim; but that case is distinguishable, as there the court found a fact question relating to the defendant's own use of its cooperators' land in testing the genetically-modified rice. *See In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1019 (E.D. Mo. 2009). In this case, plaintiffs have not alleged or argued that Syngenta's own use of land constituted the nuisance.

Plaintiffs also cite *In re StarLink Corn Products Liability Litigation*, 212 F. Supp. 2d 828 (N.D. Ill. 2002), in which the court denied the defendants' motion to dismiss a private nuisance claim based on the allegation that the defendants distributed corn seeds while knowing that they would cross-pollinate with neighboring corn crops. *See id.* at 844-47. The defendants in that case argued that they were no longer in control of the seeds after their sale to farmers. *See id.* at 845. *StarLink* is distinguishable, however, as in that case the court emphasized the fact that the USDA's limited registration of the product imposed on the manufacturer an affirmative duty to enforce farmers' compliance with certain agreements, which gave the manufacturer some measure of control over the use of the product, as well as a means to abate any nuisance from misuse. *See id.* at 847.

61

In *StarLink*, "[t]he unique obligations imposed by the limited registration arguably put [the manufacturer] in a position to control the nuisance." *See id.* That factor, according to the court, negated "many of the concerns courts have expressed about holding manufacturers liable for post-sale nuisances." *See id.* Thus, the holding of *StarLink* does not contradict the general rule that a seller may not be liable for a private nuisance caused by a product absent continuing control over the product post-sale, and the lack of any similar allegations of control distinguishes this case from *StarLink*. *See L'Henri*, 2010 WL 924259, at *6 n.6 (distinguishing *StarLink* on this basis).

Finally, Plaintiffs cite three additional cases (including cases from the mid- and late-nineteenth century) in which nuisance claims were allowed even absent the defendant's control over the instrumentality causing the nuisance, but those cases did not involve the sale of a product whose use caused the nuisance. *See Dorman v. Ames*, 12 Minn. 451 (1867); *Phillips v. Garfield Hts.*, 620 N.E.2d 86 (Ohio Ct. App. 1992); *Houston & T.C. R.R. Co.*, 33 S.W. 768 (Tex. Ct. App. 1896). Thus, those cases do not serve to refute the general rule. Similarly, plaintiffs' citation to an illustration in the comments to Section 834 of the Restatement is not particularly helpful, as that illustration does not involve the sale of a product, but rather involves the defendant's erection of a dam that causes an overflow onto the plaintiff's property after the sale of the defendant's land to a third party. *See* Restatement § 834 cmt. e illus. 2.

Plaintiffs also argue that Syngenta's cases tend to involve situations in which the purchasers misused the product, while in this case Syngenta allegedly knew that

contamination would occur from use of the product as intended.  As Syngenta notes, however, the courts' rejection of liability under this general rule has been based on the seller's lack of control over the product post-sale and not on the use or misuse of the product by the purchaser.  Moreover, this rule has been consistently applied in asbestos cases, even though that hazard exists even with the intended use of the asbestos-containing product.  *See Tioga*, 984 F.2d at 920 (courts have consistently rejected nuisance claims in asbestos cases).

Thus, plaintiffs have not identified any cases in which a manufacturer or seller was subjected to liability for a nuisance caused by use of a product in the absence of the seller's continuing control over the product post-sale, and the Court will not extend nuisance liability so far in the absence of such authority.

Plaintiffs also argue that the seller's continuing control over the purchasers and the products presents an issue of fact.  Plaintiffs, however, have not identified any allegations of fact supporting a plausible inference of such control in this case.  Thus, the private nuisance claims are subject to dismissal, and Syngenta's motion is granted to that extent.  Because the Court cannot conclude that plaintiffs would be unable to provide such allegations, the Court grants plaintiffs leave to amend the producer complaint if they can allege facts to support a plausible inference of the necessary control.

### B.    *Invasion of Plaintiffs' Land*

Syngenta also seeks dismissal of the nuisance claims for the reason that plaintiffs have not alleged that each producer plaintiff actually suffered contamination through

63

cross-pollination on its land, but instead rely on the theory that all plaintiffs' land was invaded because the U.S. corn supply was contaminated generally.

Plaintiffs argue in response that they have alleged contamination of their own crops and land. Specifically, plaintiffs cite to the following allegation:

> Syngenta's acts and omissions have resulted in the pervasive contamination of the U.S. corn supply, including fields, grain elevators and other facilities of storage and transport, causing physical harm to plaintiffs' corn, harvested corn, equipment, storage facilities, and land.

It is true that this allegation could be read to allege contamination of each plaintiff's land, but plaintiffs have also alleged that their corn came into contact with Viptera- or Duracade-grown corn "through contamination in fields and/or in grain elevators and other modes of storage and transport." The latter allegation, together with the theory articulated in the nuisance claims relying on general contamination of the U.S. corn supply—and in the absence of a specific allegation that each and every plaintiff's land suffered contamination through cross-pollination—make it implausible to infer that every plaintiff did suffer such contamination on its land. Moreover, in the absence of any specific allegations, plaintiffs have not alleged a plausible claim that each plaintiff's land was harmed or invaded other than by contamination through cross-pollination.

The issue then becomes whether actual contamination by cross-pollination onto a plaintiff's land is required for that plaintiff to assert a nuisance claim here. As noted, plaintiffs have asserted liability based on a theory that their use and enjoyment of their land was invaded because the price of corn dropped in general; thus, plaintiffs would

appear to argue that no such contamination is required for nuisance liability. Plaintiffs have not defended this theory of nuisance liability without actual contamination of the land, however. Rather, plaintiffs merely argue that they have stated a claim because they have alleged that they suffered harm to their land.

The Court rejects such a theory of nuisance liability. Plaintiffs argue and have cited cases for the proposition that physical injury to a plaintiff's land is not necessarily required. As Syngenta notes, however, in each such case, there was an actual, physical effect on the plaintiff's use of its own property (relating to light, sound, or view, for example). Plaintiffs have not provided any authority indicating that a landowner may maintain a nuisance claim without any tangible effect on its property. If such liability were permitted as plaintiffs seek, then any conduct causing fluctuation in a market for crops would give rise to a nuisance claim, even without any conduct affecting the plaintiff's land. The Court will not extend nuisance liability so far without supporting authority.

Accordingly, because plaintiffs have not alleged a plausible claim that each producer plaintiff's land was contaminated through cross-pollination, the Court dismisses the nuisance claims on that basis as well. Again, however, plaintiffs are granted leave to amend to assert a claim on behalf of those plaintiffs whose land actually suffered contamination (assuming that those plaintiffs can also allege a plausible claim of post-sale control by Syngenta, *see supra* Part VII.A).

## C.   *Unreasonable Invasion*

65

In light of the possibility of amendment, the Court addresses Syngenta's remaining argument for dismissal of the private nuisance claims. Syngenta argues that plaintiffs have not alleged an unreasonable invasion as a matter of law. *See* Restatement § 822. Syngenta argues that in light of the regulatory approval of the product, plaintiffs' corn was still marketable even after contamination. Syngenta also argues that the harm must be to the use of the land for normal purposes for a nuisance claim, *see* Restatement § 821F, and that growing Viptera-free corn would be a special use in light of the regulatory approval.

The Court rejects this basis for dismissal. Syngenta has not cited any authority indicating that the contamination alleged here interferes only with an abnormal use as a matter of law. Syngenta cites to the *Hoffman* case from a Canadian provincial trial court, but that case decided under Canadian law is not directly on point because the plaintiffs there were growing crops to be marketed as organic (that is, without genetically modified seeds). *See Hoffman v. Monsanto Canada Inc.*, 2005 SK. C. LEXIS 330 (Sask. Q.B. May 11, 2005), *aff'd*, 2007 SK. C. LEXIS 194 (Sask. Ct. App. May 2, 2007).

Unreasonableness generally presents a question of fact for the jury. *See* Restatement § 826 cmt. b; *see also id.* §§ 826-27 (listing factors to be weighed in determining reasonableness). The Court cannot say that the alleged invasion was not unreasonable as a matter of law; therefore, the Court rejects this basis for dismissal of the nuisance claims.

66

## VIII.  Tortious Interference with Business Expectancy

The corn and milo producer plaintiffs have asserted claims of tortious interference with a business expectancy on behalf of producers in various states.[16]  Plaintiffs generally allege that they "had business relationships and a reasonable expectancy of continued relationships with purchasers of corn" and that Syngenta "induced or caused a disruption of that expectancy." Syngenta seeks dismissal of those claims for various reasons, but the Court rejects each such basis for dismissal.

### A.  *Identification of Relationships*

Syngenta argues that the tortious interference claims should be dismissed because plaintiffs have only conclusorily alleged relationships with corn purchasers generally and have not identified particular third parties with whom they had business relationships or expectancies.  In its initial brief, in support of that argument, Syngenta generally cited to state-court cases or to federal cases relying on state law, in which courts generally discussed requirements for a tortious interference plaintiff to establish a concrete, non-speculative future expectancy of business.  Syngenta did not, however, rely on cases finding tortious interference allegations insufficient under federal pleading standards.

In its reply brief, after plaintiffs responded by citing tortious interference cases from the seven states at issue, Syngenta argued that the "core flaw" in plaintiffs' complaint was the use of conclusory allegations in violation of federal pleading

---

[16]Those states are Alabama, Arkansas, Indiana, Missouri, North Dakota, Oklahoma, and Tennessee.

standards, to which state substantive law was irrelevant. Even if plaintiffs were required to identify particular third parties by name in order eventually to *prove* the required expectancy under each state's substantive law (an issue on which the Court takes no position at this time), however, plaintiffs would not necessarily be required to plead such facts in their complaint, as a plaintiff is generally not required to allege all facts necessary to prove its case.

Moreover, Syngenta has not cited any federal case suggesting that pleading a tortious interference claim requires identification by name of specific third parties with whom the plaintiff had an expectancy. Indeed, in the Tenth Circuit case cited by Syngenta (which did not involve a tortious interference claim), the court stated that conclusory and formulaic recitations of elements are generally disregarded in determining whether a plausible claim has been alleged, but it also stated that the required specificity varies based on context and that Rule 8(a)'s notice pleading standard still applies. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191-92 (10th Cir. 2012). Syngenta has cited federal cases in which courts dismissed tortious interference claims as deficiently pleaded, but because this inquiry is context-dependent, the Court must look to the particular allegations in this case.

Here plaintiffs have alleged relationships and expectancies with an identifiable class of third parties, namely purchasers of corn from them. The Court concludes that such allegations are sufficient to state a claim for tortious interference that gives sufficient notice to Syngenta, particularly since the case involves a commodity that is

68

sold in a defined market.  Moreover, Syngenta has not argued that the existence of such expectancies is not plausible.  Accordingly, the Court denies this basis for dismissal argued by Syngenta.

### B.   _Intent_

Syngenta next argues that plaintiffs have failed to satisfy this tort's intent element in their pleading.  Specifically, Syngenta argues that plaintiffs have failed to allege facts to support a claim that it intended to induce corn purchasers to stop doing business with plaintiffs.  Syngenta does not dispute, however, that the intent element for this tort generally requires only that the defendant have been substantially certain that interference would occur from its conduct.

The Court concludes that plaintiffs have alleged sufficient facts to state a plausible claim with respect to this element.  One could reasonably infer from the facts alleged in the complaints that defendants knew that Viptera had not been approved in a key export market, that contamination of plaintiffs' corn would occur after commercialization of Viptera without certain safeguards, and thus that interference with plaintiffs' sales would be substantially certain to occur.

The Court also rejects Syngenta's argument that plaintiffs' claims are not plausible because it would have no motive to disrupt the market and stop sales of corn generally in the United States.  The Court agrees with plaintiffs that Syngenta could plausibly have wished to maximize its own sales of Viptera regardless of whether corn prices were depressed generally.  The Court rejects this basis for dismissal.

69

C.      *Improper Means*

Syngenta also argues that plaintiffs' tortious interference claims fail with respect to the "improper means" element.   Syngenta argues that plaintiffs' alleged misrepresentations concerning Chinese approval were not aimed at interfering with business between plaintiffs and their purchasers, and that plaintiffs' allegations of negligence, nuisance, trespass, and contamination generally fail for the reasons requiring dismissal of those claims, as argued in the motions to dismiss.

The Court rejects this argument.   First, Syngenta has not shown that the seven applicable states require independently actionable conduct for this tort.   As plaintiffs note, a few of these states apply a multi-factored approach to determine if there is the required impropriety.   The Restatement only requires "improper" interference, and it lists a number of factors that could be considered to determine whether interference was improper.   *See* Restatement §§ 766B, 767.   Thus, this inquiry is fact-intensive, and in light of plaintiffs' allegations, Syngenta has not shown that the alleged interference here could not be improper as a matter of law.

Moreover, plaintiffs have alleged conduct that would be independently actionable, and the Court has not concluded that all such claims are deficient as a matter of law.   Thus, even if independently actionable conduct were required, there would be no basis for dismissal of plaintiffs' tortious interference claims as a matter of law on this basis.

In its reply and in the part of its briefs relating to Trans Coastal's negligent interference claim, *see infra* Part IX.A, Syngenta seems to argue that any improper

70

means (not just misrepresentations) must be directed at a plaintiff's business expectancy, but it just refers back to its initial argument, and in that initial brief, as noted above, Syngenta made this argument only with respect to the alleged misrepresentations. Syngenta has not shown that there is any such requirement in this case. Syngenta cites a single case from Illinois (not one of the seven states at issue here), and in that case the court stated that under Illinois law the plaintiff must allege action by the defendant directed towards the party with whom the plaintiff expects to do business. Syngenta has not shown that such a showing is required in these seven states.

Moreover, any such requirement is effectively subsumed in the intent element, which does not require intent to interfere, but requires only knowledge with substantial certainty that interference will occur. Thus in this case, by alleging that Syngenta knew that interference would occur (through the contamination and lack of approval in China), plaintiffs have essentially alleged conduct directed ultimately at plaintiffs' third-party relationships.

The Court also rejects Syngenta's general argument, made without citation to pertinent authority, that it cannot have acted with improper means in light of the regulatory approval of Viptera. Syngenta may have been granted permission to sell the product, but that approval did not immunize Syngenta from liability for wrongful conduct in selling that product. The Court denies the motions for dismissal on this basis.

       *D.*    *Termination of Relationship*

Finally, in an almost cursory argument in its initial brief, Syngenta argues that

71

plaintiffs only conclusorily alleged a "disruption" of their expectancy of business with purchasers, and that plaintiffs thus failed adequately to allege that those relationships ended or were prevented, as required for interference. Plaintiffs argue that the relationship need not be terminated, and that it is enough for the relationship to be burdened or made more expensive. Syngenta insists that the relationship must be ended because the expectancy (of business in the future) must not be realized for there to be interference, which means there was no longer a relationship or business.

To some extent, Syngenta's argument raises only a matter of semantics. If there is an expectation of particular business—a sale at a certain price—and then the sale at that price becomes impossible, then there has been an unrealized expectation that could support a tortious interference claim—even if the plaintiff mitigates its losses by making a deal at a lower price. Syngenta has not explained why interference could not be the prevention of a sale at a particular price.

In the end, plaintiffs have alleged interference with the expectation of sales at certain market prices, and Syngenta has not cited any authority indicating that such a theory may not support a tortious interference claim. For these reasons, the Court rejects Syngenta's motions to dismiss plaintiffs' tortious interference claims.


### IX.    Trans Coastal's Claim for Negligent Interference

As part of the non-producer plaintiffs' complaint, plaintiff Trans Coastal Supply, Inc. ("Trans Coastal") asserts a claim under California law for negligent interference

72

with prospective economic relations.  Syngenta seeks dismissal of that claim on two grounds.

A.  *Improper Means*

Under California law, this tort requires a showing of an independently wrongful act.  *See, e.g.*, *Integrated Storage Consulting Servs. v. NetApp, Inc.*, 2013 WL 3974537, at *10-11 (N.D. Cal. July 31, 2013).  Syngenta argues that although Trans Coastal has alleged independently wrongful acts (in alleging various causes of action), Trans Coastal has not alleged such conduct that was directed at the third parties with whom Trans Coastal had a business expectancy.  Syngenta made the same argument with respect to plaintiffs' tortious interference claims.  *See supra* Part VIII.C.  In making this argument as a basis for dismissal of this claim, however, Syngenta has not cited any authority for such a requirement under California law, but instead has merely referred back to its tortious interference arguments, in which it cited a single case applying Illinois law.

The California Supreme Court did not impose any such "directed-at" requirement in discussing the independently-wrongful-act requirement in *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003).  That court stated that "an act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *See id.* at 954.  In this way, California law demands more than the Restatement, which requires that the interference have been improper under the various factors.  *See id.* at 954-55.  The court notes that the "most numerous" of the tortious interference cases involve disruption

73

caused by an act directed at the third person, but it does not impose any requirement that the independently wrongful act be directed at the third party. *See id.* at 957. The court also stated that the tort requires intentionally wrongful acts designed to disrupt the plaintiff's relationship, but that requirement is satisfied by the defendant's engaging in an independently wrongful act together with the requisite intent—the desire to interfere or knowledge to a substantial certainty that interference would result. *See id.* at 957-58.

In this case, Trans Coastal has alleged independently wrongful conduct by Syngenta (including negligence and misrepresentations) and Syngenta's knowledge to a substantial certainty, and such allegations are sufficient to satisfy the improper means element under California law. Because Syngenta has not shown that California law requires more, the Court rejects this basis for dismissal.

B.     *Duty of Care*

Syngenta also argues that Trans Coastal cannot satisfy this tort's requirement to plead and show a duty of care and a special relationship. For this tort under California law, rather than show intent, "the plaintiff must show that the defendant owed the plaintiff a duty of care which was breached by the defendant's negligent conduct." *See Impeva Labs, Inc. v. System Planning Corp.*, 2012 WL 3647716, at *6 (N.D. Cal. Aug. 23, 2012) (citing *J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979)). In *J'Aire*, the California Supreme Court listed the following criteria to be considered in determining whether a defendant had a special relationship with the plaintiff and thus owed a plaintiff a duty of care even if the absence of contractual privity:

74

(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of the harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

See J'Aire, 598 P.2d at 63 (citing *Biakanja v. Irving*, 320 P.2d 16 (Cal. 1958)); *see also*

*North Am. Chem. Co. v. Superior Court*, 69 Cal. Rptr. 2d 466, 479 (Cal. Ct. App. 1997)

(considering *J'Aire* criteria in the context of a negligent interference claim).

The Court cannot say as a matter of law that Syngenta did not owe a duty of care to Trans Coastal, for the same reasons set forth above with respect to the duty issue generally, including because of plaintiffs' allegation that Syngenta actually foresaw the harm to plaintiffs. *See supra* Part I. Trans Coastal has at least alleged a plausible claim based on a duty owed by Syngenta to Trans Coastal, and the Court cannot say as a matter of law that Trans Coastal cannot satisfy the *J'Aire* test that depends on weighing various factors, including the foreseeability of the harm. Syngenta has not cited any authority applying this multi-factor test under California law that would require the conclusion that there is no duty here as a matter of law. Accordingly, the Court denies Syngenta's motion to dismiss this claim.

## X.   Lanham Act Claims

### A.   *Standing – Fairly Traceable / Proximate Cause*

All plaintiffs have brought claims for violations of the false advertising provision

of the federal Lanham Act, 15 U.S.C. § 1125(a).  Syngenta argues that plaintiffs cannot

show, as a matter of law, either Article III or statutory standing.  Article III requires that

a Lanham Act plaintiff's injury be "fairly traceable" to the defendant's conduct in

violating the Act.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct.

1377, 1391 n.6 (2014).  In addition, claims under the Act are limited to plaintiffs whose

injuries are proximately caused by violations of the Act.  *See id.* at 1390.  The question

presented is "whether the harm alleged has a sufficiently close connection to the conduct

the statute prohibits" or, put differently, whether the alleged harm is "too remote" from

the unlawful conduct.  *See id.*  The Supreme Court recognized in *Lexmark* that there may

be an intervening step of consumer deception, as a plaintiff can be directly injured by a

misrepresentation even in a case in which a third party, and not the plaintiff, relied on

it.  *See id.* at 1391.  The Court ruled as follows:

> We thus hold that a plaintiff suing under § 1125(a) ordinarily must
> show economic or reputational injury flowing directly from the deception
> wrought by the defendant's advertising; and that that occurs when
> deception of consumers causes them to withhold trade from the plaintiff.
> That showing is generally not made when the deception produces injuries
> to a fellow commercial actor that in turn affect the plaintiff.  For example,
> while a competitor who is forced out of business by a defendant's false
> advertising generally will be able to sue for its losses, the same is not true
> of the competitor's landlord, its electric company, and other commercial
> parties who suffer merely as a result of the competitor's inability to meet
> its financial obligations.

*See id.* (internal quotation omitted).

Syngenta argues that these "fairly traceable" and proximate cause standards

cannot be met here as a matter of law for the same reasons that it argues that there is no

proximate cause with respect to plaintiffs' negligence claims. In fact, Syngenta argues that causation is even *more* remote and attenuated with respect to the Lanham Act claims because an extra step is required—not only must plaintiffs show that Syngenta's conduct in commercializing Viptera without proper safeguards proximately caused plaintiffs' market-based injuries, but they must also proximately link that chain at the beginning to the allegedly misleading statements (advertising) by Syngenta.

Plaintiffs have at least alleged a plausible claim that Syngenta's false and misleading statements caused sales of Viptera and Duracade, which in turn caused contamination. Accordingly, for the same reasons cited above, *see supra* Part II, including because proximate cause ordinarily presents a question of fact, the Court cannot conclude as a matter of law at this stage that plaintiffs' injuries were not fairly traceable to or proximately caused by Syngenta's conduct that is alleged to violate the Lanham Act.

### B.   *Statutory Standing – Within the Zone of Interests*

In *Lexmark*, the Supreme Court also held that a plaintiff may assert a Lanham Act claim only if its interests fall within the "zone of interests" protected by the Act. *See id.* at 1388. A typical false advertising claim implicates the Act's goal of "protecting persons engaged in commerce . . . against unfair competition." *See id.* (quoting 15 U.S.C. § 1127). Unfair competition has generally been understood "to be concerned with injuries to business reputation and present and future sales." *See id.* at 1389-90. The Court ruled:

We thus hold that to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales. A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act—a conclusion reached by every Circuit to consider the question. Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis.

*See id.* at 1390 (citations omitted). In *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014), the Supreme Court described the Lanham Act's cause of action for false advertising to be one "for competitors, not consumers." *See id.* at 2234.

In seeking dismissal of plaintiffs' Lanham Act claims, Syngenta argues that plaintiffs do not fall within the Act's zone of interests because plaintiffs' interests are not sufficiently commercial as required by *Lexmark*. In so arguing, Syngenta does not rely on any authority other than the standard set forth in *Lexmark*. Syngenta also relies on the pithy description of this requirement from *POM*; in that case, however, the zone-of-interests requirement was not at issue, and the Court referred back to *Lexmark* for that requirement. Thus, the Court considers Syngenta's argument under *Lexmark* alone.

Syngenta concedes that in *Lexmark* the Supreme Court refused to require that the plaintiff and defendant be direct competitors. *See Lexmark*, 134 S. Ct. at 1393-94. The Court stated that "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury congnizable under § 1125(a)." *See id.* at 1393. Syngenta argues that not only are plaintiffs not its competitors, they are not in any sort of competitive relationship relating

78

to Syngenta, and that plaintiffs' claims under the Act are therefore prohibited by *Lexmark*.

The Court rejects this argument. *Lexmark* does not require that a Lanham Act plaintiff be in a competitive relationship specifically with the defendant. Rather, *Lexmark* is most reasonably read as merely requiring that the plaintiff be a commercial actor, suffering commercial injuries (lost sales or reputational injury), instead of being a mere consumer who is "hoodwinked" into purchasing a disappointing product. Certainly the producer plaintiffs in this case are not consumers, as they did not purchase Syngenta's seeds or even purchase any corn containing Viptera. Plaintiffs have alleged that their sales were adversely affected (a commercial injury) as a result of Syngenta's false advertising, and plaintiffs thus fall within the zone of the Act's interests in redressing such injuries.

Therefore, at least with respect to the producer plaintiffs, Syngenta has not shown that *Lexmark* forecloses their claims under the Lanham Act. Nor has Syngenta cited any other authority suggesting that plaintiffs cannot satisfy the *Lexmark* zone-of-interests requirement. Accordingly, the Court denies this basis for dismissal of the producer plaintiffs' claims.

Syngenta also argues that the non-producer plaintiffs must be considered consumers in this analysis because they purchased Viptera-contaminated corn. Plaintiffs respond that the non-producers purchased corn (without regard to whether they contained Viptera), and thus were not consumers of Syngenta's seeds; that the non-

79

producers were injured within the market and thus fall within the zone of interests for the Act; and that any question as to whether they were competitors or consumers should be considered a fact question that cannot be resolved at this stage.

This question would appear to turn on whether the non-producers are alleging injuries as buyers of Viptera-contaminated corn (thus injured as consumers who are disappointed in the product purchased) or as sellers in the market (thus injured as commercial parties and not as consumers). The non-producers' complaint does not offer much help in the Lanham Act counts—non-producer plaintiffs allege injury to their property and injury consisting of "the negative market price impact on corn and DDGS explained above, which results in lower revenues and profits, as well as lost business and increased expenses." Thus, these plaintiffs appear to be alleging commercial injuries from affected sales, and not injuries as hoodwinked consumers.

Moreover, Syngenta has not addressed how one defines a consumer under this test, but it is true that plaintiffs did not buy the seeds that Syngenta allegedly falsely advertised. They were not injured by getting worse or different seeds than advertised; and although they were arguably injured by getting different corn than they anticipated (because it contained Viptera), they were not trying to get corn made from Syngenta's seeds (and thus were not an indirect consumer of the seeds). These plaintiffs are alleging injury as commercial actors in the marketplace and not as disappointed consumers of seeds or products from seeds. Accordingly, the Court concludes that these plaintiffs' claims also are not foreclosed by *Lexmark*'s zone-of-interests requirement.

Syngenta argues that the milo producer plaintiffs are even farther removed from the Act's zone of interests because they operate in an entirely different market. In light of the allegations that the milo market is so closely tied to the corn market, however, the Court does not agree that this distinction warrants a different result for milo plaintiffs. The Court denies Syngenta's motions to dismiss plaintiffs' Lanham Act claims for lack of standing.

C.       *"Commercial Advertising or Promotion"*

Syngenta argues that certain of plaintiffs' Lanham Act claims fail because they are not based on alleged misrepresentations "in commercial advertising or promotion." *See* 15 U.S.C. § 1125(a)(1)(B). Syngenta notes that plaintiffs have alleged claims based on misrepresentations in five instances: (1) in Syngenta's deregulation petition to the USDA; (2) in statements by Syngenta's Michael Mack in an earnings conference call; (3) in a request form for Bio-Safety Certificates; (4) in a "Plant with Confidence Fact Sheet;" and (5) in a letter by Syngenta's Chuck Lee. Syngenta argues that the complaints do not specifically identify any other underlying misrepresentations and that the assertion of any such other basis for these claims is therefore impermissibly vague. In their response, plaintiffs have not addressed this argument or referred to any additional representations as bases for the Lanham Act claims. Accordingly, plaintiffs' claims are properly considered as relying only on these five sets of statements.

Syngenta does not make any argument concerning the fact sheet. Accordingly, Syngenta's motion is denied with respect to claims based on alleged misrepresentations

81

contained therein.

The parties agree that the Tenth Circuit in *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000), set forth the applicable test for determining whether representations constitute "commercial advertising or promotion" under the statute. Under that test, the representations must be "for the purpose of influencing customers to buy defendant's good or services." *See id.* at 1273. "While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *See id.* at 1273-74.

1.      DEREGULATION PETITION

Plaintiffs allege that in 2007 Syngenta submitted a petition to the USDA seeking deregulation for its MIR 162 product, which petition included statements that deregulation should not cause an adverse impact on export markets for U.S. corn, that Syngenta would communicate stewardship requirements, and that regulatory filings were in progress in China.

Syngenta argues that the petition was submitted to the government in seeking deregulation and thus was not for the purpose of influencing customers as a matter of law. Syngenta relies on a few cases in which courts ruled that government submissions cannot constitute "commercial advertising or promotion" under the Act. *See Presby Envir., Inc. v. Advanced Drainage Sys., Inc.*, 2014 WL 4955666, at *8-9 (D.N.H. Sept.

30, 2014) ("Courts have consistently found that statements made to government regulators do not constitute commercial advertising.  And, this makes sense because statements made to regulators generally are not intended to influence consumer choice.") (citations omitted); *Caldon, Inc. v. Advanced Measurement & Analysis Group, Inc.*, 515 F. Supp. 2d 565, 578 (W.D. Pa. 2007) ("misrepresentations made only in regulatory submissions do not qualify as commercial speech under the Lanham Act").

These cases illustrate that representations intended to influence government action are not generally intended to influence customers.  The Court cannot say as a matter of law, however, that statements in government petitions could never be made for the purpose of influencing customers.  Just as plaintiffs in, say, a large multi-district class action might include statements in the complaint that are intended more for public-relations purposes than for the purpose of stating a legally cognizable claim, a government agency petitioner might direct statements in the petition more to the public than to the government.  That would be true particularly with respect to statements that are not especially germane to the petition, as plaintiffs argue occurred here with respect to statements in the petition relating to financial impacts.  Resolution of this issue could be fact-dependant and thus not appropriate at this stage.

Without more information, however, the reasonable inference is that statements in a governmental petition were made to influence the government and not to influence customers.  Plaintiffs have generally and conclusorily alleged that all of the statements underlying these claims were made in "commercial advertising or promotion" and were

83

likely to influence purchasing decisions; but because they have not pleaded any facts to support the inference that the statements in the deregulation petition were made to influence customers, plaintiffs have not stated a plausible claim to that effect. Thus, these claims as based on the petition are subject to dismissal, although plaintiffs are granted leave to amend if they are able to allege facts to support a plausible claim in this regard.

Syngenta also argues that the statements in the petition were not disseminated sufficiently to constitute commercial promotion. Plaintiffs conclusorily allege that all of the statements underlying these claims were widely distributed, and they allege that the petition was available online or by request for those who wished to review it during the public comment period. Without additional facts, however, it is not plausible to infer that statements in a regulatory petition that is available—but not necessarily affirmatively distributed to anyone—were sufficiently disseminated to constitute promotion or advertising. Thus, on this basis as well, plaintiffs' claims based on the petition are subject to dismissal, although plaintiffs are granted leave to amend to plead the necessary facts if they can.

## 2.   EARNINGS CONFERENCE CALL

As a basis for their Lanham Act claims, plaintiffs cite a statement by Michael Mack, a Syngenta executive, made during Syngenta's first quarter 2012 earnings conference call, that he expected China to approve Viptera within days. Plaintiffs provided in the complaint the internet address for a transcript of the call.

84

Syngenta argues that this call was to investors and analysts, and thus that the statement was not made to influence customers and was not sufficiently disseminated to the public. Syngenta relies on two cases in which Lanham Act claims based on statements made during conferences with investors were dismissed on this basis. *See Tercica, Inc. v. Insmed Inc.*, 2006 WL 1626930, at *17 (N.D. Cal. June 9, 2006); *Sigma Dynamics, Inc. v. E. Piphany, Inc.*, 2004 WL 2648370, at *3 (N.D. Cal. June 25, 2004). Those courts, however, did not rule that statements in such conference calls could never support a Lanham Act claim; rather, in each case, the court concluded that the plaintiff had not alleged sufficient facts to satisfy the requirements that the statements be made for the purpose of influencing customers and be sufficiently disseminated. Indeed, in *Sigma*, the court granted the plaintiff leave to amend to attempt to show that the purpose of the calls was to sell goods.

One would not ordinarily expect a quarterly earnings call to be made for the purpose of influencing customers, and as Syngenta points out, the website referenced in the complaint lists only nine analysts as the non-Syngenta participants in the call. (Plaintiffs argue that they did not allege any facts about who the participants were, but its citation to the website effectively incorporates the contents thereof.) Thus, in the absence of any allegations of fact supporting the inference that Mr. Mack's statement was for the purpose of influencing customers (and not for some purpose of educating investors and analysts, for instance), the Court concludes that plaintiffs have not stated a plausible claim based on Mr. Mack's statement. Again, however, plaintiffs may amend

85

to the extent that they are able to allege such facts.

Similarly, there is no basis for a plausible inference that Mr. Mack's statement was sufficiently disseminated to the public. Plaintiffs note that the transcript was available on the internet, but plaintiffs have not cited any authority to suggest that public *availability* may equate with *dissemination* to the public for this purpose. Plaintiffs have not pleaded that Mr. Mack's statement actually reached some significant portion of the relevant public (customers of Syngenta). Thus, the claims based on that statement are subject to dismissal on this basis as well, subject to plaintiffs' ability to amend to supply the necessary factual allegations.

### 3.   REQUEST FORM

Plaintiffs allege that Syngenta "distributed" a request form for Bio-Safety Certificates issued by the Chinese government, that Syngenta distributed that form while knowing that it was useless in the absence of Chinese approval of MIR 162, and that Syngenta did so in an effort to mislead U.S. farmers. In one count in the non-producers' complaint asserting a claim on behalf of Trans Coastal, plaintiffs allege that Syngenta "provided" the certificates to grain exporters and resellers and that Trans Coastal contacted Syngenta to request such certificates, which are needed for importation of corn into China.

Syngenta argues that any statements in this form, which was intended for use by resellers and exporters, and thus not for use by Syngenta's customers to influence sales, did not constitute commercial advertising or promotion. Plaintiffs respond that they did

86

not allege that the form was not used by customers or that it was used *only* by exporters. Even discounting the allegation contained only in the non-producers' complaint that the form was intended for resellers (without mentioning growers), however, the name of the form itself suggests that it was intended for use by exporters to China, and the producer plaintiffs alleged that its was purportedly intended to obtain Chinese approval certificates (which would implicate only exports). Thus, the complaints do not state a plausible claim that statements in the form were intended to influence Syngenta's customers to buy seed from Syngenta. Moreover, although plaintiffs allege "distribution" of the form, because the expected users of the form would comprise a different group, the complaints do not state a plausible claim that the form was sufficiently disseminated among (and not just available to) the relevant segment of the public, namely Syngenta's customers.

Accordingly, plaintiffs' Lanham Act claims are subject to dismissal to the extent they are based on statements in this form, although again plaintiffs may amend if possible to allege the necessary facts to support such claims.

### D. *Forward-Looking Statements*

Syngenta argues in a footnote in its initial brief that the statements by Messrs. Mack and Lee underlying these claims are forward-looking predictions and opinions, which are therefore not actionable under the Act. Syngenta points to forward-looking language ("expect" and "anticipate") in the statements, and also notes a disclaimer in the conference call that Chinese approval could not be handicapped definitively. As plaintiffs point out, however, they have alleged statements of Syngenta's present

expectations, which could constitute misrepresentations of fact. Although Syngenta may ultimately prevail in arguing that Messrs. Mack and Lee did not make representations of fact here, the Court cannot so conclude as a matter of law at this stage. The Court concludes that plaintiffs' allegations are sufficient in this respect, and it therefore rejects this basis for dismissal.

## XI.   **Trans Coastal's Misrepresentation Claims**

### A.   *Fraud Claims*

Syngenta seeks dismissal of fraud claims asserted by non-producer plaintiff Trans Coastal. Syngenta first argues that Trans Coastal has not satisfied Fed. R. Civ. P. 9(b)'s requirement that such claims be pleaded with particularity. The Tenth Circuit "requires a complaint alleging fraud to set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (internal quotation and citation omitted).

In its fraud count, Trans Coastal refers back generally to misrepresentations alleged in the rest of the complaint. In its brief, Trans Coastal points to three instances of misrepresentations by Syngenta: the Lee letter, the earnings conference call, and the certificate request form. With respect to the letter, Trans Coastal's complaint identifies the date of the letter, the author, the objectionable statements, and the class of recipients (resellers). With respect to the call, the complaint identifies the date, the speaker, and

the objectionable statements. The complaint does not identify the participants in the call, but the complaint references a website that does contain that information, and that citation to the transcript indicates that the statements were at least available to the public. The Court concludes that those allegations are sufficient to satisfy the Tenth Circuit's requirements for Rule 9(b) with respect to the statements in the letter and the call. Syngenta argues that Trans Coastal has not provided details about how and when it learned of those representations, but the Tenth Circuit's standard requires only particular information about the representation itself. *See Near v. Crivello*, 673 F. Supp. 2d 1265, 1285 (D. Kan. 2009) (Lungstrum, J.). A plaintiff need not plead every fact that supports its claim of fraud, *see id.*, and such facts concerning Trans Coastal's receipt of the statements are readily obtained in discovery. Trans Coastal does allege that it relied on the misrepresentations, which creates the reasonable inference that Trans Coastal did learn of the statements.

Trans Coastal's pleading is deficient with respect to the form, as the complaint fails to identify the particular misrepresentations contained therein and the date on which the form was provided to Trans Coastal (and thus on which the representations were made to Trans Coastal). Thus, Trans Coastal's fraud claim based on the form is subject to dismissal, although Trans Coastal may amend its complaint to cure those deficiencies.

Syngenta also argues that Trans Coastal failed to allege details concerning its reliance. Trans Coastal has alleged that it relied on the alleged misrepresentations, and the Tenth Circuit's standard does not require more. *See Koch*, 203 F.3d at 1236; *Mattos*

89

*v. Eli Lilly & Co.*, 2012 WL 1893551, at *7 n.7 (D. Kan. May 23, 2012) (Lungstrum, J.). Again, Syngenta is free to ask about the details of Trans Coastal's reliance in discovery.

Syngenta also argues that the statements by Messrs. Mack and Lee in the call and the letter respectively cannot support fraud claims because they are predictions about the future. As the Court ruled with respect to the Lanham Act claims, however, *see supra* Part X.D, Trans Coastal has alleged statements of present expectation, and the Court therefore cannot say as a matter of law that Trans Coastal cannot prove misrepresentations of fact contained in the call and the letter.

Finally, Syngenta seeks dismissal of Trans Coastal's claim for fraudulent omissions. Syngenta argues that it cannot be liable for failing to state a fact that Trans Coastal must already have known as a sophisticated exporter, namely that China had not yet approved MIR 162. Trans Coastal's omission claims are broader than that, however, and the Court cannot say as a matter of law that Trans Coastal already knew every fact allegedly omitted. Syngenta also argues that it lacked a duty to speak. Trans Coastal argues that Syngenta assumed a duty to speak and also owed a duty to speak to make sure that its statements were not misleading. Syngenta has not responded to those arguments in its reply brief. In light of those asserted bases for a duty to speak, the Court cannot conclude that Trans Coastal's fraudulent omission claim fails as a matter of law.

B.    *Negligent Misrepresentation Claims*

Syngenta argues that Trans Coastal's negligent misrepresentation claims suffer from the same defects that it argues with respect to the fraud claims. To the extent that

90

this Court has rejected Syngenta's arguments for dismissal of the fraud claims, it rejects those arguments here as well. Moreover, Trans Coastal's amendment of its fraud claim based on the form will cure any defect with the claim. Accordingly, the Court denies this basis for dismissal.

Syngenta also argues that these claims are precluded under the applicable Illinois law by the economic loss doctrine. To state a claim for negligent misrepresentation under Illinois law, the plaintiff must show that the defendant was in the business of supplying information for the guidance of others in their business dealings and that the defendant supplied the information for the guidance of the plaintiff's business transactions. *See Tyler v. Gibbons*, 857 N.E.2d 885, 888 (Ill. Ct. App. 2006). Syngenta argues that Trans Coastal has not pleaded any such facts.

Trans Coastal does not dispute that it has not stated a claim under Illinois law. Rather, Trans Coastal argues that Minnesota or California law might apply and that those states would not apply the economic loss doctrine here. Trans Coastal argues that under the governing most-significant-relationship test (under the choice-of-law rules of Illinois, where Trans Coastal's case was originally filed), the governing law depends on facts regarding where the misrepresentations were made and received and where Trans Coastal suffered injury, and therefore the issue should not be decided on a motion to dismiss. Syngenta does not dispute that the claim would be allowed under California or Minnesota law, but it argues that the choice-of-law issue may be decided at this time.

The parties agree that the most-significant-relationship test applies under Illinois's

choice-of-law rules.  Under Illinois law, "the law of the place of the injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *See Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996).  "When applying the most significant relationship test, a court should consider (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *See id.*  Any economic injury would have been suffered by Trans Coastal in Illinois, where it undisputedly is incorporated and has its principal place of business. *See Knaus v. Guidry*, 906 N.E.2d 644, 663 (Ill. Ct. App. 2009) (for choice-of-law analysis, economic injury is suffered where the plaintiff resides).

Trans Coastal argues that the other factors in the test cannot be weighed now, but it appears that under the test stated by the Illinois Supreme Court, the place of injury controls unless Illinois has a more significant relationship.  The complaint reveals that Trans Coastal suffered any economic injury in Illinois.  Therefore that state's law should apply, and Trans Coastal has not disputed that its claim may not proceed under Illinois law.  Therefore, the Court dismisses the negligent misrepresentation claims.

### XII.    Minnesota Consumer Protection Claims

#### A.    *Public Benefit*

All plaintiffs have asserted claims for violations of the Minnesota Unfair Trade Practices Act (MUTPA), Minn. Stat. § 325D.13, which prohibits knowing

misrepresentations of the true quality of merchandise in connection with its sale; and for violations of the Minnesota Consumer Fraud Act (MCFA), Minn. Stat. § 325F.69, which prohibits the use of any fraud, misleading statement, or deceptive practice with the intent that others rely thereon in connection with the sale of any merchandise.  Plaintiffs seek compensatory damages and attorney fees for these violations pursuant to Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, which provides a private right of action for persons injured by such violations.  The Minnesota Supreme Court has held that a plaintiff may maintain an action under the Private Attorney General Statute only if it demonstrates that its cause of action benefits the public.  *See Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000).  Syngenta argues that plaintiffs' claims under these statutes should be dismissed because those claims would not benefit the public.

Minnesota courts have not set forth a clear test for determining when a claim benefits the public for this purpose.  *See Buetow v. A.L.S. Enters., Inc.*, 888 F. Supp. 2d 956, 960 (D. Minn. 2012).  In making that determination, however, Minnesota courts have considered "the form of the deceptive practice and the type of relief sought."  *See Summit Recovery, LLC v. Credit Card Reseller, LLC*, 2010 WL 1427322, at *5 (D. Minn. Apr. 9, 2010); *see also Buetow*, 888 F. Supp. 2d at 960-62.

The court in *Buetow* summarized this consideration by Minnesota courts of the relief sought as follows:

> Although there exists no hard-and-fast rule, a public benefit typically will be found when the plaintiff seeks relief primarily aimed at altering the defendant's conduct (usually, but not always, through an injunction) rather

93

> than seeking remedies for past wrongs (typically through damages). This is because individual damages, generally speaking, merely enrich (or reimburse) the plaintiff to the defendant's detriment; they do not advance a public interest.

*See Buetow*, 888 F. Supp. 2d at 961 (citation and footnote omitted). In these counts, plaintiffs seek only damages to compensate them for past wrongs (and attorney fees). They have not sought injunctive or other forward-looking relief, and although that failure is not necessarily dispositive, *see id.* at 961 n.6, it does weigh strongly against a finding of a public benefit here.

Plaintiffs argue that they seek damages on behalf of entire classes, and they cite *In re National Arbitration Forum Trade Practices Litigation*, 704 F. Supp. 2d 832 (D. Minn. 2010), in which the court concluded that the pursuit of monetary damages for a class had a public benefit. *See id.* at 839. In that case, however, the court was addressing the question of standing when the Attorney General had already brought an action against the defendant; the court did not indicate that the pursuit of class damages always provides a public benefit. *See id.* For example, the Minnesota Court of Appeals dismissed class action claims under the MCFA on this basis in *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 183 (Minn. Ct. App. 2012). Plaintiffs here may have asserted class claims, but they seek relief only to redress past wrongs by compensating the putative plaintiffs. The Court also rejects plaintiffs' suggestion that a recovery here could help clarify duties for future manufacturers of genetically-modified seeds. *See Buetow*, 888 F. Supp. 2d at 962 (although any successful lawsuit recovering damages could have the

94

potential to cause some deterrent public benefit, such a broad application of the Private Attorney General Statute would allow any "dog bite case" to fall within the statute; thus "this type of ostensible benefit is too remote or theoretical to pass muster").

Plaintiffs note that the Minnesota Supreme Court, in finding a public benefit in *Collins v. Minnesota School of Business, Inc.*, 655 N.W.2d 320 (Minn. 2003), did not examine the type of relief sought, but instead looked at the defendant's misrepresentations. *See id.* at 329-30; *see also In re Levaquin Prods. Liability Litig.*, 752 F. Supp. 2d 1071, 1078 (D. Minn. 2010) (although federal courts in Minnesota have focused on the relief sought, the Minnesota Supreme Court in *Collins* was concerned with the degree to which the alleged misrepresentations affected the public). In *Collins*, the court stated that the district court had erred in focusing on the number of persons injured instead of appreciating the fact that the defendant had misrepresented its programs to the "public at large." *See Collins*, 655 N.W.2d at 330. In this case, however, plaintiffs have not based these statutory claims on statements by Syngenta to the public at large. Rather, plaintiff relies on alleged misstatements directed at most to a specific industry—including misstatements in a government petition, on an earnings call involving fewer than ten non-Syngenta participants, and in a form that exporters could request. Thus, this factor also weighs against a finding of a public benefit here.

For these reasons, the Court concludes that plaintiffs' claims asserted under the Private Attorney General Statute would not serve a public benefit and are therefore subject to dismissal.

Plaintiffs note that the MUTPA itself provides a private right of action providing for actual damages for any person injured by a violation of that statute.  *See* Minn. Stat. § 325D.15.  Plaintiffs did not assert their MUTPA claims under that provision, however, but instead asserted their statutory claims under the Private Attorney General Statute (likely because the latter statute allows for an award of attorney fees).  Accordingly, plaintiffs' MUTPA claims, as pleaded, are subject to dismissal.  *See Buetow*, 888 F. Supp. 2d at 960 (MUTPA's private right of action does not allow the plaintiffs to avoid dismissal for lack of a public benefit, as the plaintiffs brought their action under the Private Attorney General Statute).  Plaintiffs are granted leave, however, to amend their corn producer complaint to assert a claim under the MUTPA pursuant to that statute's private right of action on behalf of plaintiffs residing in Minnesota.  *See infra* Part XII.C (dismissing Minnesota statutory claims on behalf of non-residents on another basis).

## B.    *Purchasers as Merchants*

Because of plaintiffs' opportunity to amend to assert a claim under the MUTPA, the Court addresses Syngenta's other arguments for dismissal.  Syngenta argues that plaintiffs may not assert claims under these consumer protection statutes as a matter of law because the farmers who purchased Syngenta's products were merchants and the statutes therefore do not apply to such purchases.  The court in *Securian Financial Group, Inc. v. Wells Fargo Bank, N.A.*, 2014 WL 6911100 (D. Minn. Dec. 8, 2014), recently examined caselaw bearing on this question concerning the statutes' coverage of transactions involving merchants.  The court stated:

96

Courts examining MCFA and MUTPA claims have indeed distinguished between "merchants" and consumers. Further, in some scenarios, Minnesota courts have precluded "merchants" from bringing MCFA and MUTPA claims.

However, the Minnesota Supreme Court has not issued a blanket prohibition on merchants for all MCFA or MUTPA claims, . . . and in some cases, courts have allowed merchants to pursue those claims. . . . Instead, courts focus their analysis on whether a party can be considered a sophisticated merchant in the specific skills or goods at issue, and only those parties that are in fact deemed to be sophisticated merchants in the specific skills or goods at issue have been precluded from asserting Minnesota consumer claims.

*See id.* at *6 (citations omitted). The court further noted that under Minnesota law, "to be a sophisticated merchant, a party must have knowledge or skill particular to the practices involved in the transaction at issue," and that "[b]eing sophisticated in certain matters does not necessarily make one a sophisticated merchant in all matters." *See id.* at *7 (citing, *inter alia*, Minn. Stat. § 336.2-104(1)).

In *Securian*, the court concluded that a fact question remained for trial concerning whether the plaintiffs were sophisticated merchants, even though they would "undoubtedly have an uphill battle convincing a jury of their lack of sophistication." *See id.* Similarly here, the Court cannot say that the purchasers of Syngenta's seeds were sophisticated merchants in that area as a matter of law. Accordingly, the Court denies defendants' motion for dismissal on this basis.

C.       *Application to Non-Minnesota Residents*

Syngenta also seeks dismissal of the Minnesota statutory claims as asserted by plaintiffs who are not residents of Minnesota. Plaintiffs do not dispute that, before non-

97

residents may assert claims under a Minnesota statute, they must meet three requirements:  (1) the statute itself must apply extra-territorially; (2) such application cannot violate due process; and (3) Minnesota law must be chosen by the applicable choice-of-law rules. *See Cruz v. Lawson Software, Inc.*, 2010 WL 890038, at *3-9 (D. Minn. Jan. 5, 2010) (discussing and applying those three requirements) ; *see also In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120-21 (8th Cir. 2005) (requiring constitutional and choice-of-law analyses for application of Minnesota consumer protection statutes to non-residents).

## 1.    EXTRA-TERRITORIAL APPLICATION

In arguing that the MUTPA and the MCFA may apply in this case, plaintiffs cite *In re Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation*, 2004 WL 909741 (D. Minn. Apr. 28, 2004), in which the court stated that "the [MCFA] is intended to apply both to the conduct of foreign corporations that injures Minnesota residents and to the conduct of Minnesota companies that injures non-residents." *See id.* at *6.  The court offered no authority to support that statement, however.  Plaintiffs also cite to two cases in which the same judge allowed non-Minnesota residents to pursue claims under these statutes against Minnesota defendants, *see Maher v. Sempris, LLC*, 2014 WL 4749186 (D. Minn. Sept. 24, 2014); *Mooney v. Allianz Life Ins. Co. of N. Am.*, 244 F.R.D. 531 (D. Minn. 2007), but in those cases, the court did not analyze whether the statutes allowed for extra-territorial application.  Moreover, in *Olson v. Push, Inc.*, 2014 WL 4097040 (D. Minn. Aug. 19, 2014), that judge did address the issue,

concluding that Minnesota law imposes "a presumption against the extra-territorial application of state law." *See id.* at *2 (citing cases). The court in *Olson* further stated that a statute's silence regarding the issue is not an invitation to apply that statute as broadly and in as many states as possible. *See id.* at *3. The court thus held that, in the absence of extra-territorial language, the statute in that case had to be interpreted as governing only in-state activity. *See id.*

Plaintiffs have not pointed to any language in Minnesota's consumer protection statutes allowing for their extra-territorial application. Therefore, in accordance with the presumption against such application, the Court concludes that these statutes may be applied in this case only to conduct taking place in Minnesota.

In arguing that their Minnesota claims are based on conduct connected to Minnesota, plaintiffs cite their allegations that one defendant, Syngenta Seeds, has its headquarters in Minnesota; that Syngenta Seeds commercialized and sold Viptera and Duracade seeds; that it entered into stewardship agreements with growers; and that all of the defendants acted collectively. The Court concludes, however, that plaintiffs have not alleged facts to support a plausible claim under Minnesota's statutes based on conduct occurring in Minnesota. Plaintiffs have not specifically alleged that Syngenta Seeds engaged in any specific conduct from Minnesota on which these statutory claims are based. That defendant's stewardship agreements are not alleged to contain any misrepresentations or misleading statements in violation of these statutes. Plaintiffs have not alleged that plaintiffs residing outside of Minnesota had any contact with Syngenta

Seeds or the state.  Plaintiffs' allegation that Syngenta Seeds acted with the other defendants generally is at least undermined by their allegation that defendant Syngenta AG exercises an unusually high degree of control over its subsidiaries, including Syngenta Seeds.

Most importantly, plaintiffs have identified in their complaints five particular sources of misrepresentations and misleading statements by Syngenta, but they have not alleged that any of those statements were made in or distributed from Minnesota.  To the contrary, the complaints contain affirmative allegations indicating that at least some of those statements were made from elsewhere.

Accordingly, because plaintiffs have not alleged sufficient facts to state a plausible claim that acts in violation of the Minnesota statutes were performed in Minnesota, the statutes do not apply extra-territorially to allow these claims by non-residents, which claims are therefore subject to dismissal.

2.    DUE PROCESS

Application of the Minnesota consumer protection statutes must also satisfy due process.  *See St. Jude Med.*, 425 F.3d at 1120-21.  "For a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *See id.* at 1120 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).

Thus, for the same reasons these statutes may not apply extra-territorially in this

100

case, application of the statutes would violate due process. Without any facts to support a plausible claim that conduct occurring in Minnesota violated the statutes, the mere fact that one defendant resides in Minnesota does not provide significant contacts with the state with respect to claims by non-residents who had no contact with Minnesota. Thus, these claims by non-residents are subject to dismissal for this reason as well.

### 3.    CHOICE OF LAW

Finally, these claims are also subject to dismissal because Minnesota law would not be chosen as the applicable law governing claims by the non-residents. Non-resident plaintiffs suffered their alleged financial injury or injury to their property outside of Minnesota, in their home states, and plaintiffs do not dispute that at least some applicable states would therefore choose to apply their own laws under choice-of-law rules that require application of the law of the place of injury. *See, e.g.*, *Kreger v. General Steel Corp.*, 2010 WL 2902773, at *13 (E.D. La. July 19, 2010) (with respect to consumer protection violations, Louisiana choice-of-law rules require the application of the plaintiffs' home states, where they suffered injuries); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985) (for tort claims, Kansas applies law of state where plaintiff suffered injury); *Boudreau v. Baughman*, 368 S.E.2d 849, 854 (N.C. 1988) (under North Carolina choice-of-law rules, law of place of injury governs tort claims).[17]   Thus,

_____

[17]Plaintiffs do not dispute that Kansas and North Carolina would apply the law of the place of injury. With respect to Louisiana law, the Court does not agree with plaintiffs that *Kreger* is inapplicable here, as that court was specifically addressing

(continued...)

plaintiffs in those states could not assert claims under Minnesota's consumer protection statutes.

Plaintiffs argue that other states apply the most-significant-relationship test, which would allow for the application of Minnesota law.  As noted above, however, there are minimal contacts with Minnesota present here in the case of claims by non-resident plaintiffs.  On the other hand, each plaintiff's home state would have a significant interest in protecting its residents from consumer protection violations.  Accordingly, Minnesota would not have the most significant relationship for any of the claims brought by non-resident plaintiffs.

Plaintiffs cite a comment to the Restatement, which states that in applying the most-significant-relationship test to claims of fraud or false advertising, the place of the defendant's conduct may weigh more heavily than the place of pecuniary injury because the plaintiff's place of business may have only a slight relationship to the defendant's activities and to the plaintiff's loss of trade.  *See* Restatement (Second) of Conflict of Laws § 145 cmt. f.  In this case, however, plaintiffs' injuries are especially tied to their home states because they arise from their alleged inability to sell corn grown on land in those states.  Moreover, as already discussed, the alternative state—Minnesota—has only a minimal relationship to the violations as alleged by plaintiffs.  Thus, the Court is persuaded that Minnesota law would not be chosen to govern the non-resident plaintiffs'

---

[17](...continued)
consumer protection violations.

claims under any applicable state's choice-of-law rules.

Finally, plaintiffs argue that such considerations of the choice of law should be deferred at least until the class certification stage. The non-resident plaintiffs have not alleged plausible claims under Minnesota's consumer protection statutes, however; therefore, those claims are subject to dismissal at this time.

For all these reasons, the Court concludes that plaintiffs that are not Minnesota residents may not maintain these claims for violations of Minnesota's consumer protection statutes, and those claims are hereby dismissed.

## XIII. Colorado Consumer Protection Claims

The corn producer plaintiffs residing in Colorado assert claims for violations of the Colorado Consumer Protection Act (CCPA), Colo. Rev. Stat. § 6-1-105, which prohibits deceptive trade practices. Plaintiffs allege a right to bring that claim under Colo. Rev. Stat. § 6-1-113. The latter statute provides that a person who violates the CCPA shall be liable for certain monetary damages (the greatest of the amount of actual damages, $500, and three times actual damages in the event of bad faith) "[e]xcept in a class action." *See id.* § 6-1-113(2). Because plaintiffs seek only monetary damages, Syngenta moves for dismissal of any class claims under the CCPA.[18]

In response, plaintiffs argue that the statute precludes only class claims for

_____

[18]Plaintiffs note that Syngenta has not sought dismissal of any individual claims under the CCPA.

statutory damages, and not for actual damages, but they do not explain how the statute allows for such an interpretation. Plaintiffs cite to *Robinson v. Lynmar Racquet Club, Inc.*, 851 P.2d 274 (Colo. Ct. App. 1993), in which the court held that although a class claim for statutory damages would be barred, this statute did not preclude an action by class members for actual damages. *See id.* at 278. That case involved a prior version of Section 6-1-113, however, which allowed for certain statutory damages (the greater of treble damages and $250) "except in a class action." *See Robinson*, 851 P.2d at 278. Moreover, the court in *Robinson* specifically stated that class members could not recover the damages listed in the statute (which did not list actual damages as an option). *See id.* The present version of the statute lists actual damages as a possible recovery "[e]xcept in a class action." Plaintiffs also cite to *In re OnStar Contract Litigation*, 600 F. Supp. 2d 861 (E.D. Mich. 2009), in which the court relied on *Robinson*. *See id.* at 874. The *OnStar* court did not consider the different version of the statute at issue in *Robinson*, however, and this Court cannot agree with that court's conclusion that by the plain language of the statute, the class action prohibition applies only to statutory and treble damages. *See id.* The Court is instead persuaded by the reasoning of the court in the recent case of *Friedman v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 4036319 (D. Colo. July 1, 2015), in which the court concluded that the plain language of the present statute precludes a class action claim for actual damages and that *Robinson* does not require a different result. *See id.* at *3-5; *see also Martinez v. Nash Finch Co.*, 2013 WL 1313899, at *3 (D. Colo. Mar. 29, 2013) (only reasonable reading of the statute is

104

that the enumerated items of monetary relief, including actual damages, are not available in class actions); *Taison Communications, Inc. v. Ubiquiti Networks, Inc.*, 2014 WL 1048710, at \*10 (N.D. Cal. Mar. 14, 2014) (agreeing with interpretation from *Martinez*).

Accordingly, the Court dismisses the class claims for violations of the CCPA.

## XIV.   Illinois Consumer Protection Claims

Corn producer plaintiffs in Illinois assert claims alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 Ill. Comp. Stat. 505/1 *et seq.*  Syngenta seeks dismissal of those claims for two reasons.

### A.   *Standing*

Syngenta argues that because plaintiffs themselves, as non-purchasers from Syngenta, are not consumers, their ICFA claims fail because they have not alleged facts to show the necessary "consumer nexus."  The ICFA defines "consumer" to mean "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household."  *See* 815 Ill. Comp. Stat. 505/1(e).  By its terms, however, the ICFA does not limit its private right of action to consumers, but provides for an action by "[a]ny person" damaged by a violation.  *See* 815 Ill. Comp. Stat. 505/10a(a).  Nonetheless, Illinois courts have required non-consumer plaintiffs under the ICFA to satisfy a "consumer nexus" test.  *See Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 911-12 (N.D. Ill. 2012) (citing, *inter alia*, *Bank One Milwaukee v. Sanchez*, 783

105

N.E.2d 217, 221 (Ill. Ct. App. 2003)).  Under that test, a non-consumer has standing to

sue under the ICFA for conduct that "involves trade practices addressed to the market

generally or otherwise implicates consumer protection concerns."  *See Bank One*, 783

N.E.2d at 220 (quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*,

546 N.E.2d 33, 41 (Ill. Ct. App. 1989)), *quoted in Thrasher-Lyon*, 861 F. Supp. 2d at

911-12.  To establish an implication of consumer protection concerns, Illinois courts

have required ICFA plaintiffs to prove

> (1) that their actions were akin to a consumer's actions to establish a link
> between them and consumers; (2) how defendant's representations . . .
> concerned consumers other than themselves; (3) how defendant's
> particular breach . . . involved consumer protection concerns; and (4) how
> the requested relief would serve the interests of consumers.

*See Brody v. Finch Univ. of Health Sciences / The Chicago Med. Sch.*, 698 N.E.2d 257,

270 (Ill. Ct. App. 1998), *quoted in Thrasher-Lyon*, 861 F. Supp. 2d at 912.

Syngenta argues that the "consumers" of its products were the end-user corn

buyers because its seeds were components or inputs for the product sold by the

purchasers of its seeds.  *See Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569,

579 (7th Cir. 2004) ("[T]he business purchaser is not a consumer [under the ICFA],

because his only use of the purchased product is as an input into the making of a product

that he sells, in contrast to the individual who consumes a six-pack of beer for pleasure

or nutrition rather than incorporating the beer into a product (his beer belly is not for

sale).").  Thus, Syngenta argues that plaintiffs cannot satisfy the second prong of the test

for the "implication of consumer protection concerns" because the alleged

misrepresentations related to Viptera growers and not to the ultimate corn buyers. Similarly, Syngenta argues that consumers—the end purchasers of corn—were not harmed by the alleged misrepresentations because, under plaintiffs' theory of damages, market prices for corn *decreased*.  Finally, Syngenta argues that plaintiffs have not shown that the requested damages would serve the interests of consumers as required by the fourth prong of the test.

In applying the "consumer nexus" test, the Court must therefore determine who comprises the relevant consumer market here, growers (who use the seed purchased from Syngenta) or corn purchasers (who use the ultimate product produced by the growers). *See, e.g.*, *AGFA Corp. v. Wagner Printing Co.*, 2002 WL 1559663, at *2 (N.D. Ill. July 10, 2002) (printer was not a consumer of film, plates, and proofing used in its business under the ICFA because it did not "resell these items to customers in any form").  The parties have not cited any authority on the issue of whether a seed purchaser who grows and sells crops is a consumer in relation to the seed seller, and the Court has not located any such authority applying the ICFA.  The Illinois Supreme Court, however, has considered whether such seeds represent property transferred "to a purchaser for use or consumption and not for resale in any form" for purposes of determining whether sales of the seeds were taxable.  *See Sluis v. Nudelman*, 34 N.E.2d 391, 392 (Ill. 1941).  The supreme court held that a seed becomes something different in producing a plant, and that a seed purchaser therefore uses or consumes the seed and does not resell it.  *See id.*; *see also Rotello v. Ring Around Prods., Inc.*, 614 S.W.2d 455, 460 (Tex. Ct. App. 1981)

107

(citing and following *Sluis* in applying a Texas consumer protection statute to a sale of seed to a farmer).

In the absence of other authority, the Court concludes that the growers that purchased Syngenta's seeds were consumers of Syngenta's product under the ICFA. Thus, the Court rejects Syngenta's argument that the alleged misrepresentations did not relate to consumers.

As plaintiffs note, the "consumer nexus" test requires a showing of conduct that implicates consumer protection concerns (under the four-prong test) *or* involves trade practices addressed to the market generally. As herein concluded, the relevant consumer market was Syngenta's seed purchasers, and plaintiffs have alleged conduct addressed to Syngenta's purchasers. Therefore, the Court cannot say as a matter of law that plaintiffs cannot satisfy the "consumer nexus" test for their claims under the ICFA, and the Court denies Syngenta's motion for dismissal on this basis.

### B.    *Exemption for Authorized Actions*

By its express terms, the ICFA does not apply to conduct "specifically authorized by law administered by any regulatory body" of Illinois or the United States. *See* 815 Ill. Comp. Stat. 505/10b(1). Under this exemption, "mere compliance with applicable law does not necessarily bar [ICFA] liability;" rather, "the conduct at issue must be specifically authorized." *See Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 41 (Ill. 2005). The authorization need not be express, but it must "be specific—related to a particular thing." *See id.* at 42.

108

Syngenta argues that its conduct in selling Viptera and Duracade is exempt from ICFA liability because it was authorized to sell those products by U.S. regulatory agencies.  Plaintiffs do not base their ICFA claims on the mere fact that Syngenta sold its products, however, but rather on the manner in which Syngenta sold them.  Syngenta has provided no authority to suggest that authority to sell a product immunizes the seller from any liability under the ICFA for any conduct relating to the sale.  The Court therefore denies Syngenta's motion to dismiss these claims.

### XV.   Nebraska Consumer Protection Claims

#### A.   *Standing*

Corn producer plaintiffs in Nebraska have asserted claims under the Nebraska Consumer Protection Act (NCPA), Neb. Rev. Stat. § 59-1602, which prohibits unfair or deceptive trade practices.  Syngenta argues that plaintiffs, as non-purchasers, have no standing to bring a claim under the NCPA.  For this argument, Syngenta relies solely on *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293 (Neb. 2006).  *Kanne*, however, concerned the antitrust provisions of the NCPA, and the court was specifically addressing the issue of antitrust standing.  *See id.*  Syngenta has not cited any authority requiring that a plaintiff be a purchaser to bring a claim under the provision of the NCPA on which plaintiffs rely here.  Accordingly, the Court rejects this basis for dismissal.

#### B.   *Exemption for Regulated Actions*

By its express terms, the NCPA does not apply to "actions or transactions

109

otherwise permitted, prohibited, or regulated under laws administered by [state or federal regulatory bodies]." *See* Neb. Rev. Stat. § 59-1617(1). "[P]articular conduct is not immunized from the operation of the Consumer Protection Act merely because the actor comes within the jurisdiction of some regulatory body, the immunity arises if the conduct itself is also regulated." *See Hage v. General Serv. Bur.*, 306 F. Supp. 2d 883, 890 (D. Neb. 2003). Syngenta argues that plaintiffs' NCPA claims are barred by this exemption. For the same reasons cited above, however, *see supra* Part XIV.B, the Court cannot say as a matter of law that the specific manner in which Syngenta sold its products, as alleged here, was regulated by the agencies that authorized those products' sale, and the Court therefore denies the motion to dismiss these claims.

## XVI. **North Carolina Consumer Protection Claims**

### A. *Standing*

North Carolina corn producer plaintiffs have asserted claims for violations of the North Carolina Unfair and Deceptive Trade Practices Act (NCUTPA), N.C. Gen. Stat. § 75-1.1. Syngenta argues as a matter of law that plaintiffs do not have standing to bring these claims because they did not compete with Syngenta and were not engaged in commercial dealings with Syngenta. Syngenta relies on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999). In that case, the court stated that the NCUTPA was "not intended to apply to all wrongs in a business setting," but that "businesses are sometimes allowed to assert UTPA claims against other businesses

110

because unfair trade practices involving only businesses can affect the consumer as well." *See id.* at 519-20 (internal quotations omitted).  Nevertheless, the court further stated that "one business is permitted to assert an UTPA claim against another business only when the businesses are competitors (or potential competitors) or are engaged in commercial dealings with each other." *See id.* at 520.  Syngenta argues that plaintiffs do not satisfy this requirement stated by the court in *Food Lion*.

The Court does not agree that such a rule exists under North Carolina law, however.  The three cases cited by the *Food Lion* court do not provide authority for such a rule.  Rather, they represent instances in which a North Carolina appellate court *rejected* limits on the scope of the statute.[19]  In *Food Lion*, the court actually rejected liability because of a lack of harm to the consuming public.  *See Food Lion*, 194 F.3d at 520.[20]

_____

[19]In *Winston Realty Co., Inc. v. G.H.G., Inc.*, 331 S.E.2d 677 (N.C. 1985), the court rejected a contributory negligence defense and did not address any issue relating to standing.  *See id.* at 679-81.  In *Harrington Manufacturing Co., Inc. v. Powell Manufacturing Co., Inc.*, 248 S.E.2d 739 (N.C. Ct. App. 1978), the court rejected an argument that the NCUTPA was limited to dealings between buyers and sellers and thus could not apply to disputes between competitors.  *See id.* at 741-42.  In *Concrete Service Corp. v. Investors Group, Inc.*, 340 S.E.2d 755 (N.C. Ct. App. 1986), the court concluded (as the *Food Lion* court noted parenthetically) that the plaintiff had proved its claim under the statute that the defendant had deceived suppliers into extending credit; the court did not, however, purport to limit the scope of the statute in any way.

[20]Syngenta also cites *Syngergy Financial, L.L.C. v. Zarro*, 329 F. Supp. 2d 701 (W.D.N.C. 2004), in which the court repeated this "rule" from *Food Lion* (as cited in turn in an unpublished North Carolina Court of Appeals case).  *See id.* at 710.  The court then quoted and applied *Food Lion*'s ultimate conclusion that in the absence of a
(continued...)

The North Carolina Court of Appeals rejected this same argument in *J.M. Westfall & Co., Inc. v. Windswept View of Ashville, Inc.*, 387 S.E.2d 67 (N.C. Ct. App. 1990). In that case, the defendants argued that the plaintiff's claim under the NCUTPA failed because the parties were not in a commercial relationship. *See id.* at 68. The court noted that most unfair trade practices cases in North Carolina involved parties engaged in commerce between themselves, often as buyer and seller, but it further noted that courts in the state had "also recognized causes of action arising outside the context of a contractual relationship between the plaintiff and defendant." *See id.* The court then cited *Winston* (a lower appellate decision in the case cited for the "rule" in *Food Lion*), in which the court allowed the claim even though the parties were not in competition and were not in a buyer-seller relationship because the defendant was engaged in business activities that affected commerce. *See id.* at 68-69 (citing *Winston Realty Co., Inc. v. G.H.G., Inc.*, 320 S.E.2d 286, 290-91 (N.C. Ct. App. 1984), *aff'd*, 331 S.E.2d 677 (N.C. 1985)). The court concluded in *J.M. Westfall*:

> Accordingly, the proper inquiry is not whether a contractual relationship existed between the parties, but rather whether the defendants' allegedly deceptive acts *affected* commerce. A contractual relationship is not required in order to affect commerce.

*See id.* at 69 (citations omitted).

The Court does not agree with the premise of this basis for dismissal urged by

_____

[20](...continued)
competitive or business relationship, the alleged harm did not harm the consuming public. *See id.*

112

Syngenta, namely that North Carolina law requires a NCUTPA plaintiff to be in competition or in commercial dealings with the defendant. Plaintiffs here have based their NCUTPA claims on alleged acts by Syngenta that affected commerce. Therefore, the court denies Syngenta's motion to dismiss on this basis.

### B. *Effect on Consuming Public*

Syngenta also argues that plaintiffs' NCUTPA claims fail because the alleged conduct in violation of that statute did not harm corn buyers (who benefitted from lower prices in the market) and thus did not harm the "consuming public." Syngenta cites *Marshall v. Miller*, 276 S.E.2d 397 (N.C. 1981), for such a requirement. In that case, however, the court did not impose a separate consumer harm requirement; rather, the court rejected a good-faith defense to the statutory violation, stating that good faith was irrelevant and that "[w]hat is relevant is the effect of the actor's conduct on the consuming public." *See id.* at 403. *But see Food Lion*, 194 F.3d at 519 (noting that the NCUTPA's primary purpose is to protect the consuming public). At any rate, Syngenta has not addressed or provided authority for the issue of how the "consuming public" should be defined or how such a requirement should be applied. As noted above with respect to the Illinois statute, corn growers may be considered consumers of Syngenta's products. Thus, the Court rejects Syngenta's argument based on a lack of harm to end corn purchasers.

### C. *Reliance on Misrepresentations*

Finally, in a footnote, Syngenta argues that plaintiffs may not base these claims

113

on alleged misrepresentations by Syngenta because they have not alleged any facts showing their reliance on such misrepresentations. Plaintiffs do not dispute that they have not alleged reliance, but they argue that North Carolina law does not require such a showing.

North Carolina courts have indeed required reliance for NCUTPA claims based on misrepresentations. *See Tucker v. Boulevard At Piper Glen LLC*, 564 S.E.2d 248, 251 (N.C. Ct. App. 2002) ("Where an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show actual reliance on the alleged misrepresentation in order to establish that the alleged misrepresentation proximately caused the injury of which plaintiff complains.") (citing *Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 58 (N.C. Ct. App. 1995)). Plaintiffs have not addressed those cases in its own responsive footnote; they merely suggest that such a requirement would conflict with the holding of the North Carolina Supreme Court in *Marshall*. In *Marshall*, however, the court did not address any issue of proximate cause or reliance; rather, it concluded that because unfairness and deception were gauged by consideration of the effect of the conduct, the intent of the actor was irrelevant, and there could be no good faith defense to liability. *See id.* at 403. The court mentioned that state courts have generally ruled that the plaintiff need only show that the conduct created a likelihood of deception to prevail under those states' unfair and deceptive practices acts, and that proof of actual deception is not required under the federal FTC Act. *See id.* The court did not comment on the requirements for a claim under NCUTPA based on

114

misrepresentations, however, and as noted, courts after *Marshall* was decided have required reliance to support such claims. Accordingly, the Court will require reliance in this case.

Plaintiffs' pleading of this count does not indicate specifically whether they base their claims under the NCUTPA on alleged misrepresentations by Syngenta or solely on other conduct. To the extent they are based on misrepresentations, however, the claims are subject to dismissal for lack of any allegation of reliance, and Syngenta's motion is granted to that extent.

### XVII. North Dakota Consumer Protection Claims

Corn producer plaintiffs in North Dakota have asserted claims under N.D. Cent. Code § 51-15-02, which prohibits the use of deceptive practices "with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." Syngenta argues that these claims should be dismissed because the alleged misrepresentations referenced in this count—from the earnings call, deregulation petition, request form, and fact sheet—were not made "in connection with the sale or advertisement" of Syngenta's products.

Because the petition, conference call, and request form were not directed to Syngenta's purchasers, at least on their face, *see supra* Part X.C.1-3, the Court agrees that plaintiffs have not stated plausible claims that alleged misrepresentations contained therein were made in connection with the sale or advertisement of Syngenta's products,

115

and those claims are therefore subject to dismissal.  Plaintiffs are granted leave to amend to cure that deficiency, however, to the extent that they are able to allege the necessary facts to state plausible claims.

Syngenta argues that the fact sheet was directed to growers already using Viptera, but such a document could plausibly be considered advertising intended to induce future sales of the same product.  Therefore, the Court denies Syngenta's motion as it relates to claims based on alleged misrepresentations in that document.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motions to dismiss (Doc. ## 856, 929) are **granted in part and denied in part**, as set forth herein.  Plaintiffs are granted leave to file amended complaint to cure certain pleading deficiencies, as set forth herein, by **October 4, 2015**.

IT IS SO ORDERED.

Dated this 11th day of September, 2015, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

116