1              UNITED STATES DISTRICT COURT
                  DISTRICT OF KANSAS
2

3    In Re:

4    Syngenta AG MIR 162          Case No. 14-md-2591-JWL-JPO
     Corn Litigation
5

6                                 Kansas City, Kansas
                                  Date:  October 19, 2015
7    ........................

8

9

10                     TRANSCRIPT OF

11               STATUS CONFERENCE

12                     BEFORE

13     HONORABLE JOHN W. LUNGSTRUM, SENIOR DISTRICT JUDGE

14      HONORABLE JAMES P. O'HARA, CHIEF MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23   Court Reporter:       Kimberly R. Greiner, CSR, RMR, CRR
                           Official Court Reporter
24                         500 State Avenue
                           913-735-2314
25                         Kansas City, Kansas  66101

```
 1   APPEARANCES FOR THE PLAINTIFFS:

 2   William B. Chaney              Don M. Downing
     Gray Reed & McGraw            Gray, Ritter & Graham, P.C.
 3   1601 Elm Street               701 Market Street
     Suite 4600                    Suite 800
 4   Houston, TX 75201             St. Louis, MO 63101

 5   Patrick J. Stueve             Scott A. Powell
     Rachel Schwartz               Hare Wynn Newell & Newton
 6   Bradley T. Wilders            2025 Third Avenue
     Stueve Siegel                 Suite 800
 7     Hanson, LLP                 Birmingham, AL 35203
     460 Nichols Road
 8   Suite 200
     Kansas City, MO 64112
 9
                                   APPEARING FOR
10   APPEARING FOR CARGILL:        ARCHER DANIELS MIDLAND:

11   Erin Sindberg Porter          David F. Graham
     Greene Espel, PLLP            Sidley Austin, LLP
12   222 S. Ninth Street           One South Dearborn
     Suite 2200                    Chicago, IL 60603
13   Minneapolis, MN 55402

14
     APPEARING FOR THE DEFENDANTS:
15
     Michael D. Jones              Thomas P. Schult
16   Edwin John U                  Ryan C. Hudson
     Patrick F. Philbin            Berkowitz Oliver Williams
17   Ragan Naresh                   Shaw & Eisenbrandt, LLP
     Kirkland & Ellis             2600 Grand Boulevard
18   655 15th Street, NW           Suite 1200
     Suite 1200                    Kansas City, MO 64108
19   Washington, D.C. 20005

20

21

22

23

24

25
```

```
 1              (Court called to order.)
 2              JUDGE LUNGSTRUM:  We are here again this
 3  morning in Case No. 14-MD-2591, In Re:  Syngenta AG MIR
 4  162, Corn Litigation.  We're here for a status
 5  conference today, and this hearing is being made
 6  available for those who have chosen to call in and
 7  participate at least in hearing what is going on with,
 8  not in making any input.
 9          Now, let me ask for the appearances by counsel
10  here today beginning with counsel for the plaintiffs.
11              MR. DOWNING:  Don Downing for the
12  plaintiffs, Your Honor.
13              MR. CHANEY:  William Chaney.
14              MR. STUEVE:  Patrick Stueve, Your Honor.
15  Good morning.
16              MR. POWELL:  Scott Powell.
17              JUDGE LUNGSTRUM:  All right.  Any other
18  appearances anybody would like to make on behalf of the
19  co-lead counsel?
20              MS. PORTER:  Erin Sindberg Porter on behalf
21  of Cargill, Your Honor.
22              MR. GRAHAM:  David Graham on behalf of ADM,
23  Your Honor.
24              JUDGE LUNGSTRUM:  All right.  Very well,
25  let's turn to Syngenta then.  I want to make sure
```

1    everybody gets their opportunity.  For Syngenta?

2            MR. U:  Good morning, Your Honors.  Edwin U,

3    Kirkland & Ellis, for Syngenta.

4            MR. JONES:  Good morning, Your Honor.  Mike

5    Jones, Kirkland & Ellis, also for Syngenta.

6            MR. NARESH:  Good morning.  Ragan Naresh,

7    Kirkland & Ellis, also Syngenta.

8            MR. SCHULT:  Tom Schult, Berkowitz Oliver,

9    also for Syngenta.

10           JUDGE LUNGSTRUM:  All right.  Sorry.

11           MR. PHILBIN:  Your Honor, Patrick Philbin,

12   Kirkland & Ellis, for Syngenta.

13           JUDGE LUNGSTRUM:  All right.  I keep waiting

14   for others who might want to get on board here.  Welcome

15   to all of you here this morning.  Thank you for

16   traveling to Kansas City for those of who you came from

17   out of town to participate in this conference.

18       I noticed some of you wondered if the same judge

19   had taken the bench who you had seen last time.

20   Recently my wife and I and some friends went on safari

21   in Africa and for eight days it was inconvenient to

22   shave and I just thought what the heck, I've got an

23   investment here.  I'm going to keep this up, see if

24   these folks even recognize me when I show up in court

25   again.  But I assure you I'm the same -- underneath I'm

1  the same fellow for good or for ill who's been presiding

2  over this case.

3      And as you know, Judge O'Hara is seated to my

4  right.  And in the jury box is the special master in the

5  Minnesota MDL, Jack Van de North.  I understand that the

6  Special Master Van de North has a meeting set up with

7  counsel after this conference this morning to pursue

8  matters that are particularly related to the Minnesota

9  case but obviously also are important from a

10 coordination standpoint to the entire process.

11     I published an agenda last Friday somewhat late

12 in the day but that was sort of in keeping with the

13 filings that had been made by the parties.  I wanted to

14 try to digest them as much as I could before sending

15 that agenda out, and I hope that everybody has that.

16 That's somewhat helpful to guide our discussion here

17 this morning.

18     As I indicated in that particular agenda, I

19 wanted to begin by dealing with Syngenta's motion to

20 certify for interlocutory appeal, Document 1081.  As I

21 indicated, I did not intend to have additional argument

22 on that motion.  I considered the briefs.  I understand

23 the parties' positions.  I independently had thought

24 about that subject myself, and so I think I'm fully

25 prepared to rule.  I'm denying that motion.

1          As to the duty ruling, I certainly understand

2    that that was -- it was a decision that was not easy to

3    come to.  The court had to deal with it, explain it

4    and -- at some length in the memorandum and order.  I

5    understand why those on the short end of that particular

6    ruling think it wasn't as good a result and as good a

7    ruling as a court should have come up with.  And in a

8    perfect world it would be nice to have an appellate

9    court be able to give very quick answer to tough

10   questions that are decided early in a case, but this

11   isn't a perfect world.

12          It's very clear in my experience, and I've been

13   doing this job now for almost 24 years, that the policy

14   against piecemeal appeals is one that the Tenth Circuit

15   adheres to very strongly.  As a result, I think there's

16   a very high likelihood that no matter what this court

17   did, the circuit would say, no, it's just too early.  We

18   may be spared the effort of having to come to grips with

19   this because other motions may be granted or denied,

20   other things may happen which may get us to the point

21   where we don't have to deal with this.  And so I -- I

22   think it's very iffy whether the circuit would even want

23   to touch this.

24          Moreover, I think it's not really an appropriate

25   motion at this juncture anyway.  The issues here are, in

1    my view, so contextual that attempting to take this up

2    to the circuit on the motion to dismiss is -- is truly

3    premature.  The basic tort principles aren't in dispute,

4    the requirement of the duty and so forth.

5         The question is an application under the facts

6    that are alleged in this particular case, and we'll see

7    how that all plays out as we go along.  But I think that

8    the contextual nature of it makes it really

9    inappropriate to take up at this juncture.

10        Moreover, I believe that it would simply divert

11   resources from moving the case further towards a

12   resolution, other important issues such as class

13   certification, dispositive motions, et cetera, et cetera

14   down the road, in addition of course to a great deal of

15   discovery that needs to be taken.  And I realize that

16   there are many lawyers on both sides of the fence and

17   I'm sure you can find people to write briefs and do

18   other things like that.  Nonetheless, I think it would

19   divert attention from where I believe this case is

20   going.

21        Syngenta offers in its motion that it would not

22   wish to seek a discovery stay which would of course

23   literally delay the litigation.  But the other side of

24   that coin of course is that not having a discovery stay

25   would take away some of the benefit that an

1   interlocutory appeal might have, that is saving the

2   parties the time and money to engage in discovery during

3   that process.  So it does minimize, if the court were to

4   pursue interlocutory appeal, would minimize the benefit

5   of it.  So I -- I just, again, don't think that's where

6   we ought to be headed here.

7        Moreover, as to tortious interference, frankly,

8   there's no basis at all to even consider an

9   interlocutory appeal there.  Syngenta raised the issue

10  very cursorily and I suspect just threw it in their

11  motion here, too.  But that -- that didn't even cause

12  the court any second thought to deny that particular

13  request.

14        So the motion is denied and let's move on now to

15  the issues we need to discuss to advance this litigation

16  accordingly.  And I want to start, as I indicated in the

17  agenda, to talk about issues that are related to the

18  non-producers' second amended master complaint.  And I

19  think it's -- from the parties' status conference, it

20  was apparent that there was an agreement that November

21  19th for Syngenta to answer or otherwise respond was

22  mutually agreeable.  Is that correct, Mr. Downing, or --

23             MR. DOWNING:  Yes.

24             JUDGE LUNGSTRUM:  -- whoever -- whoever is

25  speaking for the --

1              MR. STUEVE:  Yeah, good morning, Your Honor,

2    Patrick Stueve.  Yes, that is correct.  I think the

3    court needs to be aware part of the negotiations on that

4    extension was an agreement by Syngenta to disclose their

5    intent with respect to counterclaims concerning

6    non-producers, that that disclosure would occur prior to

7    this status conference today so we would know, for

8    example, what impact that may have on the coordination

9    order.

10         And as we've been advised that with respect to

11   non-producers that they intend to assert counterclaims,

12   and what they have told us thus far is one of those

13   would include a tort counterclaim.  So we'll get in --

14   I'm prepared --

15              JUDGE LUNGSTRUM:  Well, I guess to the

16   extent that it's pertinent to the issue about November

17   19th, is there or is there not an agreement by the

18   plaintiffs to November 19th as the date for Syngenta to

19   plead?

20              MR. STUEVE:  There is, Your Honor.

21              JUDGE LUNGSTRUM:  All right.  Mr. U.

22         MR. U:  Yes, Your Honor.  So, again --

23              JUDGE LUNGSTRUM:  All I want to know about

24   is the November 19th.

25              MR. U:  Yes, it is November 19th.  The one

1  condition the plaintiffs ask for was that we indicate to

2  them by today whether or not we currently anticipated

3  counterclaims, recognizing on both sides that we get the

4  time to do our due diligence before coming to ground.

5  And so we've given them that indication that we

6  anticipate tort counterclaims, and so both sides would

7  respectfully request the November 19th date.

8             JUDGE LUNGSTRUM:  And that's great and the

9  court will so order November 19th as the date for

10  Syngenta to answer or otherwise respond to the

11  non-producers' second amended master complaint.  And to

12  the extent that the issue of counterclaims is pertinent

13  in discussing the coordination order or otherwise, of

14  course please feel free to get back into that topic as

15  appropriate.

16        Next, again, I think this should be a relatively

17  non-controversial matter of just almost clerical nature.

18  In the second amended counterclaim -- or master

19  complaint, the non-producers restated certain claims

20  that the court dismissed.  My assumption is that it

21  wasn't that the counsel failed to read the court's

22  memorandum and order, but rather to protect the record

23  for an appeal of the court's order, there would be --

24  plaintiffs didn't want there to be any issue of

25  abandonment or a waiver so therefore those claims were

1    restated.

2         Obviously now the next question is disposing of

3    those once again, and I see no reason for Syngenta to

4    have to refile motions or the court to do anything

5    further than just say that those claims that have

6    previously been dismissed are again dismissed from the

7    second amended complaint.

8         Is there any reason why that isn't what the court

9    should order?

10             MR. STUEVE:  Your Honor, your assumption is

11   correct and we're in agreement with the court.

12             JUDGE LUNGSTRUM:  All right.  So Mr. U,

13   the -- Syngenta does not need to do anything further.

14   The court's order that will be entered as a result of

15   this conference today will include a provision that

16   indicates that all claims previously dismissed are again

17   dismissed from the second amended complaint.  Is that

18   satisfactory?

19             MR. U:  Yes, Your Honor.  Yes, Your Honor.

20   And I suppose if we should meet and confer with the

21   plaintiffs as to exactly which causes of action, or in

22   some cases under the ruling theories are or are not out,

23   it may benefit both sides and the court for us to confer

24   on a list that we can even submit to Your Honor.

25             JUDGE LUNGSTRUM:  That's excellent, because

1    if there is any disagreement about what is in or out, we

2    should find that out sooner rather than later.  I think

3    that's an excellent suggestion.

4            MR. U:  Right.  And, Your Honor, just as an

5    example, the order had dismissed claims based on an

6    alleged lack of warnings and materials accompanying

7    Viptera and Duracade, including failure to warn farmers

8    of risks in growing Viptera.  That's an example of a

9    theory that may not translate to Count No. --

10           JUDGE LUNGSTRUM:  Right.

11           MR. U:  -- 2 or Count No. 4, what have you.

12   But we can work that out with the other side.

13           JUDGE LUNGSTRUM:  Is there an appropriate

14   time frame that we should ask you to do that in so that

15   we can -- I think before your response is due on

16   November 16th, you should work that out.

17           MR. U:  Certainly, Your Honor.  So if we

18   could have 10 days between the two sides because I don't

19   think it's going to impact the November 19th deadline

20   regardless.

21           JUDGE LUNGSTRUM:  All right.  Mr. Stueve,

22   does that work?

23           MR. STUEVE:  That's fine, Your Honor.

24           JUDGE LUNGSTRUM:  All right.  Then within

25   10 days I'd like the parties to meet and confer and

1    either agree upon what claims or theories are out and/or

2    presented to the court for some further processing any

3    disagreement about what claims are in or out.

4         All right.  Now, the next question I had was

5    whether there was any reason for the non-producer

6    plaintiffs to file new notices to conform or whether we

7    could simply deem those notices to conform to be

8    applicable to the second amended complaint?

9         Mr. Stueve, what do you think about that?

10             MR. STUEVE:  Your Honor, I believe that all

11   of the non-producers are named plaintiffs in the

12   consolidated --

13             JUDGE LUNGSTRUM:  What --

14             MR. STUEVE:  Is there one?

15             JUDGE LUNGSTRUM:  Yeah.

16             MR. STUEVE:  Okay.  So maybe there is one.

17             JUDGE LUNGSTRUM:  I thought there was at

18   least one but that --

19             MR. STUEVE:  But with respect to that, the

20   notice to conform itself makes clear that obviously that

21   they're conforming with the pleading that's filed and

22   that it's subject to any ruling on a motion to dismiss.

23   So we don't believe there will be a need to file a

24   second one.

25             JUDGE LUNGSTRUM:  Mr. U, is there any reason

 1   not to simply deem the notice to conform to comply to

 2   the second amended complaint?

 3            MR. U:  No reason, Your Honor.  We agree

 4   with that.

 5            JUDGE LUNGSTRUM:  All right.  Then that

 6   shall be part of the court's order as well.

 7       Now, finally, are there any other issues arising

 8   out of that second amended complaint, and I'll start

 9   with you, Mr. U, that we should talk about from a

10   management or clerical standpoint?

11            MR. U:  No, Your Honor.

12            JUDGE LUNGSTRUM:  Okay.  And, Mr. Stueve?

13            MR. STUEVE:  No, Your Honor.

14            JUDGE LUNGSTRUM:  All right.  Then let's

15   move to the producers and milo complaints.  Again, the

16   parties' status report indicated an agreement to set

17   November 5th for Syngenta to answer or otherwise

18   respond.  And, Mr. Stueve, I assume that's the parties'

19   agreement still as we are here this morning?

20            MR. STUEVE:  Yes.

21            JUDGE LUNGSTRUM:  And Mr. U?

22            MR. U:  Yes, Your Honor.

23            JUDGE LUNGSTRUM:  All right.  So that's the

24   court's order.

25       Now this -- the next subject is one that is

1    somewhat more troubling to me as a theoretical matter

2    and I don't know whether it is a practical concern but

3    theoretically it is a concern, and that is are there

4    individual plaintiffs who might wish to pursue claims

5    which the court dismissed with leave to replead in the

6    memorandum and order but which were not then repled by

7    the producers, the producers did not file a second

8    amended master complaint unlike the non-producers?  That

9    means that those claims that the court said were

10   dismissed subject to being able to be repled are now

11   dismissed.

12          The responsibility obviously of co-lead counsel

13   is to represent the interests of all I assume by filing

14   or in this case not filing another amended complaint.

15   In the face of the court's invitation to do so, that

16   that represents a considered decision by co-lead counsel

17   that there are not individual plaintiffs whom you

18   represent by virtue of being co-lead counsel who wish to

19   proceed otherwise, but I want to deal with that for the

20   record to make sure that that is, in fact, where we

21   stand.

22          MR. STUEVE:  Your Honor, Patrick Stueve.

23   Yes, that is correct.  There obviously was considered

24   judgment on our part.  We did not hear from any

25   plaintiff's counsel representing individual plaintiffs

1    that there -- they had -- at this point in time were in

2    possession of information that would allow us to amend

3    at this time.  Obviously there will be discovery and

4    there may be information that's ultimately gleaned that

5    may allow for an amendment down the road.  But at this

6    point, we were not in a position to do so.  We were not

7    aware of any plaintiff counsel.  It was not brought to

8    our attention that they're aware of any information.

9         The other point here obviously is the notice to

10   conform was filed on behalf of all individual producer

11   plaintiffs except two that just recently got transferred

12   in.  Obviously we have, I believe under scheduling order

13   No. 1, the show cause requirement there that if they

14   don't want that order to apply to them, that they need

15   to show cause.  But otherwise the other individual

16   plaintiffs filed the notices to conform which made clear

17   that they would be subject to a ruling by this court on

18   the motion to dismiss.

19              JUDGE LUNGSTRUM:  And the next point that I

20   raised there, I suppose, is should they be provided an

21   opportunity to formally -- formal notice from the court

22   that you may rescind, you may file your own amended

23   complaint?  Is there any reason to protect their

24   interests further by some sort of formal mechanism as

25   opposed to simply that you haven't heard from anybody

1   who felt sufficiently aggrieved that they wanted to move

2   forward with an attempt to amend?

3            MR. STUEVE:  Your Honor, I think a couple of

4   arguments would be made to not allow that, and I think

5   first and foremost is the whole concept with the notice

6   to conform and the idea of putting everyone on notice

7   that you will be -- your -- your complaint will be

8   subject to and governed by the court's order with

9   respect to dispositive motions for example.  I think it

10  also could create some potential delay while we wait for

11  that.

12        And if there -- if we had an indication that

13  there was a desire from individual plaintiffs through

14  their counsel to come forward with additional

15  information to allege facts that would satisfy the

16  court's issues in the dismissal order, we would -- we

17  would be pushing for some alternative process here.  But

18  we're just not in -- aware of any situation like that,

19  Your Honor.

20           JUDGE LUNGSTRUM:  All right.  I am satisfied

21  that co-lead counsel have performed due diligence with

22  regard to the interests and desires of the individual

23  plaintiffs whom they represent, that they are satisfied

24  that their professional duties have been fulfilled to

25  those individual plaintiffs, and that there are no such

1    individual plaintiffs whom they represent here in this

2    action who on their own think that there should be an

3    amendment made to set forth allegations that would

4    permit certain causes of action dismissed by the court

5    at least be repled, if not successfully, at least make

6    an attempt to.

7          So as a result then, the decision not to replead

8    means that all of those causes of actions and/or

9    theories that the court may have dismissed with regard

10   to the producer plaintiffs but which were not repled,

11   though leave was given, are now formally dismissed.

12         Now, Mr. U, is there a similar issue there, do

13   you think, with regard to needing to make sure what's in

14   and out in terms of theories?  You raise a very good

15   point about that I thought before.  Is there any reason

16   to pursue that further with regard to the producer

17   complaints?

18              MR. U:  No, Your Honor, for the same reasons

19   that Mr. Stueve articulated, I think the process is

20   appropriately served by looking to plaintiffs' lead

21   counsel.  And if someone on the plaintiffs' side objects

22   with plaintiffs' lead counsels' decisions, it's

23   incumbent upon them, I submit to --

24              JUDGE LUNGSTRUM:  I'm sorry, pardon me, my

25   question wasn't very good.  With regard to the

 1    non-producer plaintiffs, we set up a mechanism for you

 2    to meet and confer with regard to what's in and what's

 3    out of the second amended complaint.  Is there any

 4    question about what's in and what's out of the complaint

 5    concerning which the court entered its memorandum and

 6    order?

 7         I mean, it may be that there is something fuzzy

 8    there in the minds of Syngenta that you need -- do you

 9    need to respond to it or not?  Is it actually out of the

10    case?  Is there any -- any lack of certainty on

11    Syngenta's part as far as what claims now are going

12    forward by the producers?

13              MR. U:  So, Your Honor, I don't think so.  I

14    think the issue came up to our eyes as we looked at the

15    non-producer complaint.  But if we could, just so my

16    team doesn't criticize me later, to make a joke, if we

17    could have within the same 10-day period again to meet

18    and confer with the other side, that would take care of

19    it.

20              JUDGE LUNGSTRUM:  Mr. Stueve, any objection

21    to that?

22              MR. STUEVE:  No, Your Honor.

23              JUDGE LUNGSTRUM:  All right.  Very well.

24    Then that's what the court will order.

25              Now, one other point that I did not

1   enumerate in the agenda but which actually my law clerk

2   pointed out to me that I'd like to ask you about is in

3   the producers' complaints the court did not dismiss,

4   because there was no motion aimed at it, the claim for

5   damages to movables under Louisiana law, Count No. 28.

6   But in the brief that the co-lead counsel filed

7   concerning the scheduling order in which co-lead counsel

8   mentioned the remaining claims, it did not address that

9   claim.

10          Now, the question I guess I have is, is that

11  claim in or out?  Were you meaning to abandon that or

12  waive that claim by not mentioning it in that brief or

13  is it just you didn't mention it?

14              MR. STUEVE:  No, Your Honor, it's in and it

15  was an oversight on our part.  In preparing for this

16  this morning, we discovered that and appreciate the

17  court raising it.

18              JUDGE LUNGSTRUM:  All right.  Then to make

19  -- make the record clear, Count 28 remains alive and

20  well.

21          All right.  Are there any other matters we should

22  discuss with regard to the producers' complaint?

23          Mr. U, anything you can --

24              MR. U:  Your Honor, a small housekeeping

25  matter.  We have concluded that there are a handful of

1    producer plaintiffs who, by our records, have cases that

2    are active both in this proceeding and in the Minnesota

3    state court proceeding that were not remanded to that

4    court and include some plaintiffs who even filed notices

5    to conform in this MDL.  So they appear to be

6    simultaneously in two courthouses.  Again, we're happy

7    to meet and confer with the other side.  We just

8    discovered it preparing for this hearing and so we'll

9    speak with the MDL leads and, if it's appropriate, the

10   Minnesota leads as well.

11              JUDGE LUNGSTRUM:  Can anybody on the

12   plaintiffs' side enlighten me about your thinking there?

13              MR. STUEVE:  Well, this is the first we've

14   heard about it, so we're not in a position to respond.

15              MR. U:  Yeah, and absolutely, Your Honor,

16   it's not a criticism of Mr. Stueve at all.  It's just a

17   housekeeping point that we discovered that we'll work

18   out with the other side.

19              JUDGE LUNGSTRUM:  All right.  And so why

20   don't -- again, 10 -- I hate to just say 10 days because

21   who knows how you count anymore having -- federal rules

22   having kind of jumped around about that kind of thing.

23   The -- but the 29th of October is 10 days from today.

24   By the 29th of October, please report to the court on

25   that subject.

1    With regard to the non-producer and producer

2    complaint issues that I have given you the 10 days,

3    again if you would just, counsel, submit a joint report

4    saying we have no problems, that will just kind of tie

5    -- tie that down.  And then on this subject, give us a

6    report as to where things stand as well.  I appreciate

7    that.

8         All right.  Anything else, Mr. U, on that

9    subject?

10              MR. U:  No, Your Honor.

11              JUDGE LUNGSTRUM:  Mr. Stueve, on that

12   subject?

13              MR. STUEVE:  None, Your Honor.

14              JUDGE LUNGSTRUM:  Okay.  Let's -- let's pass

15   to the coordination order subject and the -- I want to

16   have the parties talk about to me -- I get the basic

17   difference that you have here, but I'd like you to

18   expand, if you would, on why it's an issue of importance

19   to your particular side so that I can more fully grasp

20   what I need to decide here.

21        Mr. U, I'm going to ask you to go first.

22   Syngenta suggests that discovery directed to individual

23   plaintiffs or on plaintiffs' individual issues should be

24   treated as having been propounded in every proceeding.

25   So, for example, if there's discovery taken in the

1   Minnesota MDL, that would be treated as applicable here

2   or vice versa.  The plaintiffs think that's

3   inappropriate for reasons set out in their briefing, and

4   I want to give you the opportunity to speak.

5           Now, I've been maybe remiss, Sharon, are the

6   folks on the phone able to hear when Mr. U speaks from

7   his table?

8               MS. SCHEURER:  I'm not sure.  In fact, I was

9   just writing you a note saying that he needs to --

10              JUDGE LUNGSTRUM:  Yeah.  Yeah, the things we

11  talked about so far I don't think anything -- if anybody

12  listening on the phone missed what Mr. U said, it's

13  probably not very consequential.  No offense to Mr. U.

14              MR. U:  None taken, Your Honor.

15              JUDGE LUNGSTRUM:  But we wrapped it up with

16  some kind of order about what's the consequence of it.

17  So I -- unless you feel like you'd like to give a, you

18  know, reprice of what you've been saying, let's move on.

19              MR. U:  Yes, Your Honor.  All right.  So in

20  terms of the coordination order, our basic point is that

21  both sides ought to share both the benefits and the

22  burdens of coordination instead of having coordination

23  be a unilateral privilege invokable by the plaintiffs

24  alone as their markups to the coordination order, the

25  exhibit to the joint motion, would set up.  And there

1   are two good examples of how that's one-sided in our

2   respectful view.

3          First, Section B(7) of the markup by the

4   plaintiffs would provide that a deposition cross noticed

5   in cross cases would not be subject to coordination if

6   an MDL plaintiff's lawyer or state court plaintiff's

7   lawyer chose not to attend.  So even though he or she

8   received notice, raised no objection as to the timing or

9   otherwise, he or she could simply choose not to attend

10  strategically in order to claim that that witness should

11  have to be redeposed again whether it's a Syngenta

12  witness or some other witness.

13         Second, the markup, as the plaintiffs would have

14  it, has no provision for Syngenta to be able to invoke

15  coordination.  It's entirely a right under their markup

16  of the plaintiffs, and that's true of any witness in the

17  case, again, risking duplication.

18         Now, the only reasoning we've heard from

19  plaintiffs' counsel thus far for that one-sidedness is a

20  concern apparently by ADM's counsel that they don't want

21  to have to send someone to depositions of, say, farmers

22  in state court cases not knowing in advance whether or

23  not that particular farmer might or might not say

24  something about ADM.  And as their brief puts it, that

25  would raise a concern about hearsay issues or

 1    admissibility.

 2         So we have a couple of points on that.  First,

 3    this is about coordination.  It's not about the

 4    admissibility of testimony, objections to the testimony

 5    or anything like that.  And the order expressly

 6    preserves those issues for a later date.  But beyond

 7    that there is a benefit to coordination, and I'll cover

 8    the farmer example and other examples.

 9         So, first, suppose that Cargill says, as part of

10    this case, that it took appropriate steps to separate

11    Viptera or non-Viptera corn, that it diligently asked

12    farmers it was buying from whether they did or didn't

13    grow Viptera.  Suppose that a farmer in a state court

14    action testifies under oath that he sold corn to Cargill

15    and/or ADM, and Cargill or ADM said nothing of the sort

16    to that person.  That is the type of testimony for which

17    the two sides would have arguments down the road about

18    relevance or admissibility and the like.

19         But one thing I think we both ought to agree on

20    on both sides is that there's no need to have that

21    person testify multiple times if we can avoid it through

22    a coordination order and that's what we're trying to

23    achieve.

24              JUDGE LUNGSTRUM:  Let me -- let me just ask

25    about that a little bit.  There are going to be numerous

1   depositions of farmer plaintiffs.  And if you're

2   representing Cargill or ADM, how do you know whether or

3   not a question might get asked to that particular farmer

4   about a sale to Cargill or ADM?  And if it's not going

5   to get asked, why would they want to be there?  And if

6   it does get asked, of course they would want to be

7   there, I would think, because they would want to be able

8   to cross examine that witness if the answer were one

9   that seemed less satisfactory to them.

10         And I -- so it does seem to put them in a

11   difficult position if they are stuck with, so to speak,

12   the answer given in a deposition that they didn't attend

13   because what's the chances of this particular farmer,

14   one out of a thousand, one out of a hundred thousand,

15   saying something that would have been benefited for them

16   to have heard?

17              MR. U:  Several points, Your Honor.  First,

18   Cargill and ADM, as part of the plaintiffs' side, want

19   the ability to have access to the discovery in all of

20   those cases.  They're not saying they want to step out

21   of coordination.  They want to have the access to it.

22   They want to be able to use it at their discretion.  But

23   what they can't do with respect is to put their toe in

24   that and yet say but when it comes time to attending

25   depositions of farmers, we don't want to participate.

1   If they want the benefits of access to that discovery,

2   then they need to decide whether to attend or not to

3   attend at their peril.

4         Second, there's a practical solution as well,

5   which is Cargill and ADM can look at their own records

6   to determine whether they did or didn't do business with

7   a particular plaintiff who's being deposed.

8         And, third, you know, in modern MDLs, there are

9   things like participating by phone, for example.  So if

10  there's a deposition that has a low odds of actually

11  raising an issue pertinent to Cargill or ADM, they could

12  avail themselves of it.

13        But the broader important point here, Your Honor,

14  is they want to be able to get access to whatever they

15  find beneficial to their side of the case from that

16  jurisdiction.  But what they can't do then is to say

17  they're going to wash their hands of it when it comes to

18  anything that might not help their case.

19              JUDGE LUNGSTRUM:  I understand your

20  argument.

21              MR. U:  And the non-parties, Your Honor, the

22  other example that hit the point home, it may be that we

23  have third-party deponents either in this proceeding or

24  in another jurisdiction, such as the National Grains

25  Council or NAEGA or the various third parties that are

1    throughout the complaints, and, again, we don't want a

2    situation, if we can avoid it through coordination, in

3    which either side has to seek multiple depositions of

4    those third parties.  And the way to protect against

5    that, again, is to have both sides -- either side able

6    to invoke coordination.

7         Whereas right now the risk is, as the plaintiffs

8    have marked up the order, if there is a third-party whom

9    the plaintiffs perceive as being favorable to Syngenta

10   in terms of what the person is predicted to say, the

11   plaintiffs can simply withhold coordination, not invoke

12   the order.  We would have no rights to invoke it.  And

13   thus in order to be able to use that testimony across

14   cases, we would have to argue for deposing those third

15   parties multiple times.

16        Last example, Cargill and ADM themselves, they're

17   also examples of parties whose testimony is likely to be

18   relevant or at least subject to arguments about

19   relevance across jurisdictions for again the very same

20   reasons like the example I just gave.  And I'm sure, if

21   Cargill or ADM was subjected to the possibility of

22   multiple depositions, they would object.  But the way to

23   avoid that is to have this be something where either

24   side can invoke the order much like in the *GM*

25   coordination order, *Compact Disc*, or the other examples

1   we've given.

2                JUDGE LUNGSTRUM:  All right.  Thank you,

3   Mr. U.  Let me hear then from co-lead counsel.

4                MR. U:  Your Honor, I did want to bookmark

5   just one point which is about the 14-hour depositions.

6   I didn't hear that as part of your question.  It's part

7   of this subject, but I can take it up at the right time.

8                JUDGE LUNGSTRUM:  Well, you know, I'm not

9   sure I really care to hear a lot about that.

10               MR. U:  Sure.  Sure.

11               JUDGE LUNGSTRUM:  All right.  Mr. Stueve.

12               MR. STUEVE:  Your Honor, I was the person

13   that was part of our team that was responsible for

14   reaching out to Cargill, ADM, and Minnesota leadership

15   over the past several weeks to work on a proposed

16   coordination order that satisfies as many of the

17   interests as we possibly can satisfy and achieve the

18   purposes of the -- of the coordination order.

19       A couple things that I want to point out, and I

20   would like to, if it's okay, give Cargill and ADM an

21   opportunity because this is an issue not only that is

22   important to us but particularly important to them as

23   well.

24       First of all, our proposal there is a presumption

25   that all Syngenta depositions and third-party

1    depositions can be used in any case.  Syngenta's paper

2    and the arguments here misstates our position with

3    respect to third parties so -- and with respect to

4    Syngenta, a plaintiff not showing up to a Syngenta

5    deposition doesn't get them out of the -- the agreement

6    that it can be used in any case.  So I want to be clear

7    on that.

8         The second point is our proposal doesn't bar

9    Syngenta from using a plaintiff's deposition in another

10   proceeding.  It simply requires them to give notice

11   ahead of time that that's their intent so if -- and if

12   -- if this is in the Minnesota state court proceeding,

13   if we have an issue with that, if Cargill and ADM has an

14   issue with that, then we're able to bring it up to the

15   court and have the court resolve it.  So it's not a

16   complete bar as suggested in their papers.  We think

17   we've come up with a reasonable compromise with respect

18   to the plaintiffs' depositions.

19        We also now are aware that they're going to be

20   bringing counterclaims not only against producers in our

21   case but we assume then against Cargill and ADM as well

22   as the 30 or so producers in the Minnesota state court.

23   We shouldn't have to go and attend depositions in the

24   state court in Minnesota with respect to a plaintiff

25   that's not a party in our case concerning counterclaims

1   unless they give us notice and there's good case that

2   they can use that testimony in our proceeding.  From an

3   efficiency standpoint, I think it's important that we

4   have that limitation there.

5        So the suggestion that this notice provision with

6   respect to plaintiffs somehow guts the purpose of this

7   coordination order I think is -- is not credible, Your

8   Honor.  There is a tremendous benefit here to Syngenta

9   with respect to how we structured this coordination

10   order.  They are going to be producing their witnesses

11   one time unless there's good cause to retake them.  All

12   of the plaintiffs' lead counsel from the four related

13   actions will be asking questions at that deposition.  In

14   addition to that, we've -- our proposal also

15   contemplates the questioning time for Syngenta.  But all

16   of that is going to be occurring in a single deposition.

17   That is a huge benefit to Syngenta rather than producing

18   these folks multiple times in multiple jurisdictions.

19   They're going to be responding to discovery requests one

20   time.  There will not be repeated discovery requests,

21   and so that is a huge benefit to Syngenta.

22        The only limitation that we were talking about

23   relates to parties that are not common in the various

24   jurisdictions and we think our proposal that we put

25   forth protects Syngenta's interests on that front,

1    protects the interests of the non-parties and the other

2    -- the other actions and from an efficiency standpoint

3    is very important.

4         With that being said, I would like -- David

5    Graham, would you like to talk for ADM?  Your Honor, is

6    that okay or --

7              JUDGE LUNGSTRUM:  Well, yes.  Obviously the

8    reason Mr. Graham was part of the leadership team, his

9    client has subsequently been remanded, but I know

10   there's an attempt to coordinate these things.  If

11   there's no objection from Syngenta's counsel, I would

12   permit Mr. Graham to be heard.  But I --

13             MR. U:  No objection, Your Honor.

14             JUDGE LUNGSTRUM:  -- I think that's the

15   appropriate thing to do.

16        All right, Mr. Graham, welcome back.

17             MR. GRAHAM:  Thank you, Your Honor.  Good to

18   be here.  And I recognized you notwithstanding.

19             JUDGE LUNGSTRUM:  Good.

20             MR. GRAHAM:  Your Honors, this is not just

21   an ADM and Cargill issue.  It's an issue involving the

22   MDL and the Minnesota proceedings and other proceedings

23   that may be filed, for all I know, down the line.  And

24   let me speak to the question you asked about from a

25   commonsense real world perspective, why is this an issue

1   and what does it really mean.

2        Let me break it down into the two primary areas

3   that I think are in dispute here.  One is what I'll call

4   written discovery requests.  And let me be clear what I

5   mean by written discovery requests.  I'm not talking

6   about document production requests or anything of that.

7   Everyone's in agreement that when the plaintiffs serve a

8   document production request, it counts for all the

9   litigation in terms of what's received, et cetera, their

10   sharing of documents.

11        I'm talking about written discovery meaning

12   interrogatories and requests for admission.  And the

13   bottom line with regard to that, Your Honor, is that if

14   you're talking about, say, one of the thousands of

15   Minnesota farmer plaintiffs that are there in the MDL

16   that's been formed in Minnesota and you have a request

17   for admission to some farmer in Minnesota, the Minnesota

18   action, the question is should that come in to the ADM

19   or Cargill action as if it were a request for admission

20   in that action, or similarly to the MDL action that's

21   before this court or any of the individual plaintiffs?

22   And the answer would be of course not.

23        You don't have interrogatories or written

24   requests for admission that come in from one proceeding

25   to another with non-parties to that proceeding.  Yet

1   that's what's being asked for here.  And make no

2   mistake, it's not a matter of receiving the requests or

3   receiving the responses, no problem with that except

4   that there's confidential information that's involved.

5   No problem with that.  That should all be shared.

6        It comes down to the question of use, and use is

7   not the same thing as receipt.  Mr. U consistently

8   confused those two terms.  It's not a matter of access

9   to or receiving information.  It's use.  And when we

10  talk about use, if you take a look at Syngenta papers,

11  they're talking about use being defined as if it were

12  served in that other proceeding, in our proceeding, as

13  if the request to admit to a harm in the Minnesota

14  proceeding was served in ours.  That's a very different

15  thing and it has profound implications for admissibility

16  contrary to what Mr. U says, which is why the

17  distinction between use and receipt is fundamental here

18  and is part of it.  So that's the written discovery.

19       You wouldn't expect to have requests for

20  admissions that are answered by some plaintiff in

21  another proceeding that's not our proceeding or the MDL

22  proceeding or answers to interrogatories be somehow

23  admissible and binding as if they were a party in our

24  proceeding.  They're not.  They're non-parties.

25       So that brings me to depositions.  And, as

1    Mr. Stueve said, there's some misinformation here and

2    there's also some policy here.  Let me start with the

3    inaccuracy.  Both in their papers and in oral argument

4    today, Syngenta has said that third-party depositions

5    are not going to be treated as if they are taken in all

6    the proceedings, that anyone can choose not to attend

7    and they wouldn't count for their purposes of that

8    proceeding.  That's flat out wrong, Your Honor.

9        If you take a look at paragraph B(9) of the

10   proposed protective order that was submitted, paragraph

11   B(9) deals with depositions taken of persons or entities

12   who are not plaintiffs or class members in either the

13   MDL proceeding or any other coordinated action, and it

14   says they shall be permitted to be used in any of the

15   actions unless there's a protective order that's

16   obtained by a party that would prevent that.  So the

17   rule is they are able to be used in any of the actions

18   if it's a third-party deposition.

19       Same thing with the Syngenta depositions in

20   paragraph B(8).  The only difference is dealing with the

21   individual plaintiff situation where you have -- because

22   we've got -- as Your Honor knows, we've got tens of

23   thousands of individual plaintiffs that are involved

24   here.  And the question is not as Mr. U said.  It's not

25   that we want access and use to -- those materials to use

1    in our proceeding.  We don't.  We don't want to have

2    anyone be able to say some deposition of a farmer that

3    was taken in the Minnesota action among the 30,000 plus

4    there is admissible either by us or by them in the

5    proceeding.  And it's not a deposition taken in our

6    action and nobody should be put to the burden of having

7    to attend the whole thing and this is not news.

8         Your Honor actually had a similar kind of

9    distinctions in the order that is cited by Syngenta

10   itself in its papers, the order in the NCUA, the

11   National Credit Union Administration Board case.  If you

12   take a look at I think it's paragraph 8 -- no, I'm

13   getting my -- I'm sorry, paragraph 10(b) that dealt with

14   the question of fact depositions, Your Honor actually

15   adopted, together with the other judges in that case, a

16   nuanced approach.  It said, "Fact depositions taken of a

17   party witness in any of the above-captioned cases will

18   be deemed to have been taken in all of the

19   above-captioned cases in which that party is a plaintiff

20   or a defendant."  So if it was of a party witness, it

21   counted for all the cases for which that party was a

22   plaintiff or defendant so you didn't have multiple

23   depositions.

24        But then you got more nuanced.  In that case, as

25   I understand it, you had the same plaintiffs across the

1    various cases but different sets of defendants.  And

2    Your Honor addressed the situation what happens if you

3    take a deposition of a defendant in one case, does it

4    count for purposes of another case?  And what you said

5    was, "The fact deposition of a party witness will be

6    deemed to have been taken in actions involving another

7    defendant group where the other defendant group is also

8    a defendant for the RMBS," the Residential Mortgage

9    Backed Security, "at issue in the fact deposition."

10         So it was only in a limited set of circumstances

11   that a non-party defendant where the variances were

12   would be required to attend that deposition that could

13   be used against them when there was a factual identity

14   in terms of what was at issue.

15         And, finally, Your Honor, in the last sentence of

16   that same paragraph you said, "Fact depositions of

17   non-party witnesses will be deemed to have taken in all

18   above-captioned actions of third parties," just the way

19   that we've done it in this proposed order, that third

20   parties are permitted to be used in all of the actions

21   but you treat the individual party witnesses according

22   to whether or not they're parties in your case when

23   you're dealing with these thousands and thousands of

24   farmers.

25         So this isn't a matter of unfairness.  It's not a

1    matter that we're seeking a rule for ourselves or for

2    anyone else here that doesn't apply to others.  We're

3    saying that when we're dealing with these thousands and

4    thousands of class members and individual plaintiffs,

5    that the depositions simply don't count unless somebody

6    -- unless we choose to attend.  There may be a

7    deposition, I suppose, that somebody would choose to

8    attend.  If somebody chooses to attend a deposition,

9    they're of course bound because they're there.  They've

10   had the opportunity, or if the matter -- if it's a

11   matter of importance, we allow an escape hatch.  We say

12   that you can go to the court -- if there's a situation

13   where it's one of these individual plaintiffs whether in

14   a coordinated action or in any of these class or mass

15   actions or even in front of this court, you can go to

16   the court and get an order ahead of time saying it will

17   count for purposes of all the actions if you show good

18   cause in connection with that.

19         So this isn't a matter of unfairness.  It's a

20   matter of having a workable burden.  And no state court

21   proceeding that I'm aware of, Your Honor, an individual

22   lawsuit between one plaintiff and one defendant where

23   you have thousands and thousands of depositions and have

24   parties of course to attend them, it shouldn't be any

25   different here and no party should be penalized by not

1   assuming an unrealistic economic burden in terms of

2   something that would essentially make this case, you

3   know, uneconomic even for a very, very large company as

4   well as impractical.

5              JUDGE LUNGSTRUM:  Thank you, Mr. Graham.

6        Judge O'Hara, would you like to ask any questions

7   of either Mr. Graham or Mr. U?

8              JUDGE O'HARA:  Well, I do have one basic

9   question.  Why is it so necessary at this point at this

10  early juncture of the case to referee these issues about

11  use?  And more specifically, or to say it differently,

12  why aren't these issues, Mr. Graham, in your view better

13  deferred on an ad hoc basis as individual cases are

14  moving to trial in terms of the admissibility of a

15  particular deposition or interrogatory response?

16             MR. GRAHAM:  It's a fair question, Your

17  Honor.  And I think that the answer is two-fold.  First,

18  because, for better or worse, we're going to start

19  depositions and the parties are going to have to make

20  decisions about whether to attend or not.  And unless

21  they know, you know, beforehand what the playing field

22  is, what the parameters are, the default is going to be

23  people are going to have to attend as a practical matter

24  because they can't take the risk that down the line

25  something's going to happen in terms of, you know, some

1    kind of a ruling that that would permit this.

2          And the other thing is that the Syngenta order as

3    proposed explicitly says that they "shall be permitted

4    to be used," "permitted to be used."  And they were

5    clear about that.  What they mean by that is that each

6    deposition, each written discovery response shall be

7    treated as if it were taken in that individual action.

8          And Your Honors know as well as I do that when a

9    party's deposition is taken in an action or it's noticed

10   in an action that I'm part of, that deposition, if I

11   don't show up, it's by -- I can't object to what

12   occurred in that deposition.  I've waived all my right

13   to object to questioning because I didn't bother to show

14   up.  If a third party is not available for trial, now

15   it's admissible against me.  So unless I know the

16   playing field ahead of time, I can't answer any of those

17   questions and I'm going to have to protect my client in

18   ways in terms of showing up as the default position.

19              JUDGE O'HARA:  Mr. Graham, do you read the

20   Syngenta proposal as granting basically an advance

21   ruling on admissibility, is that what the case is?

22              MR. GRAHAM:  I wouldn't go so far as to say

23   final admissibility, no, I wouldn't.  But I will say it

24   goes a long way towards admissibility.  Because once you

25   treat it as being as if they were parties in that

1  proceeding, that has the implications in all the

2  jurisdictions that I'm aware of in terms of party

3  discovery.

4            JUDGE LUNGSTRUM:  Let me ask Mr. U, would

5  you mind coming up to the lectern, too?

6        You can stay there, Mr. Graham.

7        How do you distinguish this difference between

8  that it's -- it's available, it can be used with

9  admissibility, how -- what is that nuance difference

10 that you see?

11           MR. U:  Your Honor --

12           JUDGE LUNGSTRUM:  Use the microphone.

13           MR. U:  So, Your Honor, the concept --

14           MR. GRAHAM:  Should we switch?

15           MR. U:  If I can speak into the microphone

16 for those on the phone.

17        So, Your Honor, the concept we're trying to get

18 to is that the discovery or deposition from one

19 proceeding will be deemed as if it was propounded and

20 taken in another proceeding but not, not to suggest that

21 it's binding on some other party that isn't a party in

22 the other.  And so when opposing counsel spoke about the

23 use about how this shouldn't "come in," those are

24 questions about admissibility.  In paragraph F --

25           JUDGE LUNGSTRUM:  Well, how -- just give me

1   an example of how you might use the particular discovery

2   without it being sought to be admitted.  How -- give me

3   an example of that.

4          MR. U:  Well, so, again, Your Honor, the

5   concept is if the deposition, let's say, of a farmer in

6   a case to which ADM is not a party ends up eliciting

7   testimony that we think speaks to ADM or is relevant to

8   ADM's case under that example, we want to be able to

9   confront with ADM and with the court any objections it

10  may have about admissibility, hearsay, relevance, any of

11  that, all of which is expressly preserved, but not to

12  have to deal with an argument about whether that

13  deposition needs to be retaken under the caption of the

14  ADM case before we get to that discussion.

15      And that's our concern with their language is

16  that it would require that exercise of needing to retake

17  it where every question would be the same but just as a

18  matter of captioning to address ADM's concern, again,

19  given what's a one-sided right.

20      And to illustrate the point, Your Honor, let me

21  make a handful of comments in response to what ADM has

22  said.  They've pointed to paragraph B(9) talking about

23  use of the third-party depositions.  But what they have

24  left out is paragraph B(1) as edited.  In paragraph

25  B(1), we had proposed that "upon entry of the order in

1    this proceeding and related actions, counsel

2    representing any party in a coordinated action can

3    receive and use the discovery."  They struck out the

4    reference to "any party" and made it the plaintiffs

5    alone and that is why we have these concerns about

6    one-sidedness.

7         When you marry that with B(7) and B(8), you see

8    that to the fore.  Paragraph B(8) of their markup says

9    the plaintiffs can use the discovery unless we get a

10   court order to stop it.  By contrast B(7) says that we

11   cannot use it unless we get a court order to permit it.

12   And that's exactly the kind of one-sidedness that

13   triggers our concerns.

14        Finally, Your Honor --

15        JUDGE LUNGSTRUM:  Judge O'Hara, do you

16   have...

17        JUDGE O'HARA:  I have a couple more

18   questions of Mr. Graham.  With respect to economics

19   involved here, refresh my memory -- and I forget whether

20   ADM or Cargill has a bigger stake.  Refresh my memory as

21   to the extent of your client's claim in this case if you

22   were to win everything.

23        MR. GRAHAM:  So I don't think it's ever been

24   stated.  I know that Cargill's claim I think -- I'll let

25   them speak to themselves -- I think it's -- on the

1    papers it's been more sizable than ADM's.  I don't think

2    ADM's has ever been stated.

3              JUDGE O'HARA:  Was it stated in tens of

4    millions?

5              MR. GRAHAM:  Yes, that's correct.  It's tens

6    of millions of dollars.  That is correct.

7              JUDGE O'HARA:  So assuming that, just for

8    the sake of discussion, that the larger bellwether

9    discovery pool proposed by Syngenta were adopted by the

10   court as opposed to the smaller one proposed by the

11   plaintiffs, what do you anticipate the cost to ADM of

12   covering depositions in this case during the pretrial

13   stage of the case?

14             MR. GRAHAM:  So Syngenta has, as I

15   understand it, indicated it intends to take literally

16   the deposition of every farmer plaintiff in these

17   various actions.  I don't actually know what the precise

18   number is, but we are talking about tens of thousands.

19   And whether it's telephonic or not, the cost ends up

20   being very, very substantial.

21             JUDGE LUNGSTRUM:  Mr. U, is that -- is that

22   correct, that --

23             MR. U:  No.

24             JUDGE LUNGSTRUM:  -- Syngenta isn't going to

25   just deal with the bellwether pool initially for

1   individual -- again --

2              MR. U:  We have not stated --

3              JUDGE LUNGSTRUM:  -- use the microphone.

4              MR. U:  Yes, Your Honor.  Your Honor, Edwin

5   U.

6              JUDGE LUNGSTRUM:  Which I need to remember

7   to do.  Sorry.

8              MR. U:  We have not stated that we seek to

9   take tens of thousands of depositions and that was my

10  concluding point in response to ADM and Cargill's

11  comments.  To the contrary, both sides' bellwether

12  proposals are far smaller.  Ours, as you will hear and

13  we've already stated in our brief, consist of the named

14  class reps, there are 52, four or five non-producers,

15  two milo plaintiffs.  And then in terms of the true

16  bellwethers, the dispute is to whether you have four per

17  side for each of the 22 states at issue or four per side

18  for just six states as the plaintiffs would have it.

19  But either way you're not talking about a thousand, much

20  less tens of thousands for either side.

21             MR. GRAHAM:  So two points, Your Honor.

22  First, even in terms of the bellwether, when you're

23  talking about 50 or 60 or whatever it is, that's far in

24  excess of anything that would -- one would remotely

25  expect in terms of an individual case where the farmers

1    aren't involved in this.

2        Two the -- I guess there are a couple of points

3    here.  One is that whether the bellwethers take place or

4    not, the bellwethers are just the beginning.  And after

5    the bellwethers, there would come others that would

6    occur.  And under the Syngenta proposal, each of those

7    others would eventually be treated the same.  So we're

8    -- bellwethers are exactly that, they're bellwethers.

9    They're the early ones.  They're not the only ones that

10   are going to occur in connection with this.

11       Second, when there was the reference just now by

12   Mr. U to paragraph B(7) of our proposal comparing it to

13   B(8) and B(9), B(7) is the one that's restricted to the

14   class members in the individual plaintiffs.

15       And, third, Your Honor, look, if there's a

16   legitimate need in one of these cases, if Syngenta knows

17   that there's going to be some individual plaintiff,

18   whether it be Cargill or ADM or some individual farmer

19   that there's going to be a meaningful examination about,

20   they can come to us.  You know, we're more than likely

21   to work it out candidly.  But they have an escape hatch

22   in terms of if there's a disagreement about it they can

23   come to this court.  We built in a protection mechanism

24   allowing them to come to this court and show good cause.

25            JUDGE LUNGSTRUM:  All right.  I think -- are

 1    you satisfied you have the information you need?

 2            JUDGE O'HARA:  I do.  Thank you, Mr. U.

 3            JUDGE LUNGSTRUM:  I am satisfied that I do

 4    as well.  Thank you.

 5            MR. GRAHAM:  Thank you.  And thank you for

 6    the opportunity to speak, Your Honor.

 7            JUDGE LUNGSTRUM:  Yes.  Thank you.

 8        The next issue -- and you may be seated,

 9    Mr. Graham.  Mr. U, you can stay up here.  Mr. Stueve,

10    whoever is going to deal with this.  I wasn't clear just

11    how -- what exactly the nature of your disagreement was

12    with regard to when the coordination orders come into

13    effect, vis a vis other coordination orders.  I -- I

14    heard -- I read you arguing about it but I wasn't -- I

15    didn't get it, so help me.

16            MR. U:  So, Your Honor, we had proposed in

17    our draft a provision that says that access in another

18    case to the MDL discovery requires entering a similar

19    form of the coordination order in that other

20    jurisdiction, again, so that parties share in the

21    benefits and burdens.  If you, as a plaintiff in some

22    other jurisdiction, want to participate in MDL

23    discovery, you should agree to these coordination

24    provisions that do things like limit duplicative

25    testimony and the like.

1    We saw that stricken from the other side.  We

2  weren't quite sure why, because in the meet and confer

3  process our sense was plaintiffs agreed with that

4  proposition but for some reason weren't willing to agree

5  to the language.

6    What we see in their brief is some notion that

7  they, the plaintiffs, should be able to reach side

8  agreements among themselves giving each other access to

9  discovery.  But, again, that's precisely the kind of

10  concern we have about one-sidedness that they could

11  enjoy the fruits of multi-forum discovery without being

12  subjected to the obligations that come with it, which is

13  why we would envision, much like in many coordination

14  orders, that it would be entered in the various

15  jurisdictions.  And the reason why both sides should

16  have an incentive to do that is because, again, they

17  want to get access to that discovery.

18    JUDGE LUNGSTRUM:  All right.  Mr. Stueve,

19  you want to come on up.  You know, and I should -- I

20  forgot to say this at the beginning, one of the people

21  listening on the phone is Judge Sipkins in Minnesota,

22  which I think you all probably know anyway, but the

23  record should reflect.  So to the extent that his case

24  is being invoked here today, he is -- he is listening.

25  I hope he's listening.  He has the opportunity at least.

1          MR. STUEVE:  Pat Stueve, Your Honor.  Two

2    issues.  One is if you look at (G), paragraph (G) on

3    page 18 and 19, we were in agreement that if someone in

4    a related action, party, wanted to participate in the

5    coordination efforts, they either could agree to it, the

6    parties could agree to that, or there could be a court

7    order.

8          What we objected to, and that language is intact

9    in both proposals, they kept adding though this "upon

10   entry of a court order" excluding the possibility that

11   the parties would agree to the coordination.  And part

12   of the process of me spending all the time I had and

13   making sure that Cargill's counsel was involved and

14   ADM's counsel was involved and the Minnesota leadership

15   was they agreed to the proposal that we put forth that

16   is before this court.  So we have agreement among the

17   leadership in the various related actions.

18          JUDGE LUNGSTRUM:  Mr. U sort of presents

19   that as somehow one-sided in that it gives the benefit

20   of access but doesn't bind the counsel in the non-MDL --

21   the non-federal MDL cases to the restriction -- whatever

22   restrictions there may be in the order.  Is that not how

23   you view it?

24          MR. STUEVE:  I don't disagree with that but

25   let's step back for a moment.  This court obviously is

1    aware we can't force a state court to -- to enter into,

2    or any other related action court, to sign on to this

3    order.  So it's -- that is going to be a decision left

4    up to them, number one.

5         Number two, there is still -- even with agreement

6    by counsel, there is still a significant benefit to

7    Syngenta because they're only producing their people one

8    time, et cetera.

9         Now, we could -- the third alternative is no

10   coordination order.

11             JUDGE LUNGSTRUM:  So Syngenta gets -- what

12   benefits does Syngenta, in your opinion, not get if for

13   some reason the Louisiana and Minnesota courts don't

14   enter a coordination order?

15             MR. STUEVE:  Well, I think they're -- you

16   know, again, if we have the agreement of the parties,

17   I'm not sure what they wouldn't benefit.  And perhaps

18   they're concerned about the use in those proceedings.

19   But if we have an agreement with the parties, I'm not

20   sure we need a court order.

21        So I think it's the -- it's the lack of

22   certainty, I guess, with respect to the scope of the

23   order.  We didn't really talk about this much because we

24   thought they were in agreement with the concept, one or

25   the other.

1          But here's -- the other piece that's really

2   important, they want to delay discovery in this case,

3   and this was the second reason why we didn't want that

4   language in there, until the state courts entered the

5   order.  And we just think that's unacceptable.  We have

6   gone -- I can tell Your Honor we've spent a ton of time

7   on this in good faith to try to put together a

8   coordination order.  But we can't force the state courts

9   to do it and we should not be delaying discovery until

10  the state courts enter the coordination order.

11          JUDGE LUNGSTRUM:  Have steps been taken in

12  Minnesota and the two Louisiana cases to obtain a

13  coordination order?

14          MR. STUEVE:  I'm not aware of any steps that

15  have been taken other than the -- you know, the first

16  and most important step is that we have Cargill's

17  counsel, who is here if you want to get a confirmation

18  from them, and ADM's counsel that our proposal they

19  agree with.  So, I mean, that's obviously a significant

20  step.

21          The same thing with respect to a Minnesota

22  leadership, we were in constant conversations with them

23  and again reviewed all these proposals before we

24  submitted it to them.  So I'm not sure what additional

25  steps.  But obviously the most important step has been

1    taken.

2              JUDGE LUNGSTRUM:  All right.  Judge O'Hara,

3    do you have questions of either counsel?

4              JUDGE O'HARA:  No.

5              MR. U:  Your Honor, may I address that last

6    point?

7              JUDGE LUNGSTRUM:  Briefly.

8              MR. U:  So, Your Honor, much like in *GM* or

9    *Compact Disc* or other cases involving coordination

10   orders, it's precisely the fact that this court can't

11   order another state court to do something that warrants

12   having those courts enter parallel orders.  That's

13   precisely why we gave the MDL plaintiffs five months to

14   get back to us with any comments on our draft

15   coordination order.  And indeed once we got their draft,

16   we convened a call that included the MDL plaintiffs'

17   counsel and invited and had the participation of the

18   others, including Minnesota leadership, so that we would

19   have what we understand to be the plaintiffs'

20   consolidated position across all the cases on the

21   coordination order.

22        And so what we envisioned there wouldn't -- there

23   shouldn't be any real delay in having the state courts

24   enter the form of the order, again, because we've

25   already had the benefit of everyone's input leading up

1    to the submissions today as the first step.

2         By contrast, if we allow, again, access to go

3    forward without having the state courts enter an order,

4    what will happen is that if a party in a state court

5    proceeding does something that we disagree with with

6    respect to compliance with the order, we're running the

7    risk that that party may say, well, it's not subject to

8    the MDL court's jurisdiction; it didn't sign on to the

9    MDL order; it's not in the MDL, and we'd be left with no

10   recourse given that the state court, by the plaintiffs'

11   proposal, will not necessarily have entered an order

12   like this, and, again, the notion that multiple forums

13   do this is routine in MDLs.

14             JUDGE LUNGSTRUM:  All right.  Thank you.

15   Stay there, Mr. U.

16             MR. U:  Yes, sir.

17             JUDGE LUNGSTRUM:  Please.

18             MR. U:  No, no, no.

19             JUDGE LUNGSTRUM:  I don't mean to order you

20   around, so to speak.

21             MR. U:  No, no, no.

22             JUDGE LUNGSTRUM:  But give me 30 seconds of

23   the 14-hour deposition.

24             MR. U:  Yes, Your Honor.  So what the

25   plaintiffs propose in their markup is to declare that

1    every Syngenta deposition should automatically have an

2    entitlement to 14 hours of the plaintiffs' choosing.

3    They described it as a presumption.  So, yes, they could

4    use less, but it's their right for every deposition of

5    Syngenta in the case.  And what's more, they have no

6    limit at all even beyond 14 hours for 30(b)(6)

7    depositions or the like.

8         By contrast what they say is that Syngenta should

9    be limited to seven hours with respect to any deposition

10   we take, including of, for example, commercial

11   plaintiffs like Cargill or ADM.

12        And so what we propose respectfully is a hybrid

13   much like has been ordered in other MDLs where instead

14   of automatically calling for all defense depositions to

15   be 14 hours, let's give each side an allotment.  We

16   propose ten as a hybrid with leave for a party to ask

17   for more if appropriate.  And indeed if the issue is

18   30(b)(6) depositions or witnesses who need translators,

19   we're happy to work with the other side on that.  But

20   it's the automatic nature of 14 hours that we have

21   trouble with.

22             JUDGE LUNGSTRUM:  Okay.  Mr. Stueve.

23             MR. STUEVE:  Judge, I think our proposal

24   speaks for itself.  We said we want a reasonable time

25   which would be in the notice.  There is a presumption of

1    14 hours.  That would apply to both sides by the way.

2    I'm not sure what Mr. U is referring to.  We weren't

3    trying to get them committed to seven hours, the -- and

4    we get the 14.

5        The practical realities of this are we are

6    working in the context of a coordination order where we

7    have the leadership of four related actions, different

8    types of plaintiffs, and we're -- they're going to be

9    taking, let's use a Syngenta witness, a single

10   deposition.  And so we don't think it's unreasonable

11   that the presumption of two days.  The *Pradaxa* case is

12   that, but we told them, you know, the starter is

13   reasonable notice in the deposition notice.  There may

14   very well be witnesses that we don't need the two days.

15       The second thing is I think the fact there are

16   now counterclaims that will likely be asserted against

17   non-producers, those also would be the subject matter of

18   the depositions now.  So I think it's further support

19   that reasonable time, presumption of 14 days is -- is

20   right -- is the appropriate balance here.

21       We have excluded three -- the 30(b)(6).  We said

22   that will be subject to negotiation.  I mean, if they

23   identify -- if we have a topic with -- we have 40

24   depositions -- 30(b)(6) topics and they identify one

25   30(b)(6) witness, obviously that could be multiple days.

```
 1        We excluded the deposition which would need an
 2   interpreter, and then excluded the third-party
 3   depositions.  Again, those would be in negotiation not
 4   only with the four lead counsel in the related actions
 5   but the -- likely the counsel representing the third
 6   parties.  So those were the three exceptions that we
 7   made only because we thought those would be appropriate
 8   for a case-by-case negotiation.
 9        JUDGE LUNGSTRUM:  All right.  Thank you.
10   Anything else that's pressing enough that you'd like to
11   take away from talking about other things?  All right.
12        JUDGE O'HARA:  Go ahead.
13        JUDGE LUNGSTRUM:  Jim, do you have anything
14   else that you'd like to talk about on the coordination?
15        JUDGE O'HARA:  No.
16        JUDGE LUNGSTRUM:  Let's talk about the joint
17   motion on the scheduling order.  And obviously there --
18   I've separated this out into two categories, one the
19   selection of bellwethers and the second just the general
20   order of events and what an appropriate trial schedule
21   would look like.
22        There is a dispute among the parties here about
23   the appropriate size of the pool for individual
24   discovery in consideration for bellwether trials, and
25   Mr. U alerted to that a minute ago and I think pretty
```

1    much set the stage for what that dispute is about.

2          And I'd like to have the parties speak to that

3    here.  And I want in that connection to have you address

4    two -- two considerations.  In thinking about the number

5    of bellwethers in this case, to what extent should we

6    also be factoring in the Minnesota case will be having

7    its own set of bellwethers which should have some

8    usefulness as a predictor, which is what a bellwether is

9    all about, to help the parties decide whether or not

10   this case -- a particular action ought to be settled,

11   really that's the -- that's the purpose, as well as the

12   Louisiana cases, which, again, I have no idea where

13   they're headed in that connection but, again, I suppose

14   they could have some impact as well if they

15   independently proceed along a track like the MDL in

16   federal court and MDL in Minnesota.

17         And, second, I recognize that there are an awful

18   lot of states involved.  But to what extent does it

19   really make a difference, why are 22 states better than

20   six states?  Is the law that much different in your view

21   in terms of what the predictive value of a result in

22   certain states might be?  Are the factual situations

23   that much different?

24         In a case that involves, actually when you --

25   when you just kind of pare it all down, involves a

1    fairly simple, straightforward theory that has an

2    economic loss ultimately as the damage approach, I don't

3    see this quite the same as if we were talking about did

4    people take the drug and for how long and how sick did

5    that make them, albeit there are differences.  Clearly

6    some folks may be differently situated from others.

7         But when you strip this case down, it does not

8    seem to me really to be analogous to mass tort cases

9    involving things like drugs where individual aspects

10   are, I think, far more likely to be different than they

11   would seem to be here.  That may reflect that I don't

12   get it.  So that's why I need people to tell me.

13        And so, Mr. U, I'll let you start since you're

14   the proponent of the larger pool theory and my questions

15   really go to do we really need the larger pool.  I'll

16   let you go first.

17             MR. U:  Yes, Your Honor.  So we would submit

18   that the way -- or a way to think about it is to

19   consider three buckets of plaintiffs, first the

20   non-producers and the milo plaintiffs.  The plaintiffs'

21   papers take no issue with the right to depose those

22   given approximately five non-producer plaintiffs and two

23   milo plaintiffs.  So let me move on.

24        The second bucket would be with respect to the

25   class representatives.  The plaintiffs elected to put

1    forward 51 or 52 and they have affirmatively in their

2    complaint sought certification with respect to both a

3    nationwide class and 22 state-by-state subclasses.  And

4    so we go to the basic proposition that because class

5    certification ought to be decided at an early stage

6    under the rules, we'd like to get the discovery relevant

7    to those issues underway and completed, including as to

8    the named class representatives themselves.

9         The problem with picking and choosing some over

10   others is that we wouldn't then have the record

11   necessary to be able to dispose one way or the other of

12   the class certification issues under the complaint as

13   framed.

14        And there's an important difference from cases

15   that the plaintiffs cited like *Motor Fuel* or *Caterpillar*

16   or *Toyota*.  *Motor Fuel*, in Your Honor's ruling,

17   Judge O'Hara, noted that both sides had agreed that

18   there would be some wisdom to looking just at Kansas

19   first.  *Caterpillar* was -- also by agreement the only

20   ruling was a "so ordered" by the court.  And *Toyota*

21   involved three states put forward where the plaintiffs

22   said that they would only seek certification of other

23   states in the alternative if down the road a nationwide

24   class was denied.

25        In this case, Your Honor, by contrast, all 22

1   states have been put forward at issue.  And tellingly,

2   the last point on this bucket, when we negotiated with

3   the plaintiffs as to the initial targeted discovery to

4   occur before the motion to dismiss ruling, the

5   plaintiffs told us they would not agree at that time to

6   discovery beyond the named class representatives but

7   they readily agree no objection to giving us discovery

8   as to the class representatives.  And you'll hear later

9   the state in which that discovery has or hasn't been

10  provided.

11       But the point is, you know, the basic notion is

12  if some named plaintiff isn't even willing to submit to

13  a deposition, perhaps that person shouldn't be a class

14  representative at all.  At a minimum we get to ask the

15  questions and take the discovery.

16       So then let me turn to the bellwethers themselves

17  which I think are properly thought of in terms of the

18  individual plaintiffs who apparently do not seek to

19  participate in the class actions.  We've proposed four

20  per side per state for the 22 states at issue.  That's

21  less than the number per side per state in *Bayer-Rice*.

22  And, if anything, this litigation is broader.  And I'd

23  submit the metric doesn't have to be in terms of this

24  number of states or that number of states but in terms

25  of what kinds of plaintiffs are at issue here.

1       We know that the case has thus far included

2   non-Viptera farmers.  We've learned from opposing

3   counsel that they also now seek to add Viptera farmers

4   who did use the product.  You've got small family

5   farmers who may contend that they knew nothing about

6   export markets.  You've got large commercial corporate

7   farms who, in some cases, are right alongside export

8   channels and know full well or keep track of what is or

9   isn't approved and the like.  So the bottom -- the fact

10  that this case --

11          JUDGE LUNGSTRUM:  Why would -- why would you

12  need four per state for each of 22 states?  Why would

13  you need 88 as compared to half that many or some other

14  number?

15          MR. U:  Right.  So, Your Honor, we looked to

16  the guidance of *Bayer-Rice*, five per side per state, and

17  we said to ourselves, look, whether you look at the

18  number of states at issue or having a broad pool, the

19  point is having a broad pool --

20          JUDGE LUNGSTRUM:  Yeah, but how many states

21  were involved in the *Rice* case?

22          MR. U:  Approximately ten, Your Honor.  And

23  that's -- and that's the broader point, which is the

24  bigger scope and size of this litigation to counsel, if

25  anything more discovery not less.

1          JUDGE LUNGSTRUM:  But I don't -- I don't get

2    that why the state -- the number of states makes it

3    different.  I still have a -- I get -- I get the fact

4    that there are differently situated plaintiffs.  I don't

5    get necessarily why the different numbers of states

6    makes a corn grower in Kansas and a corn grower in

7    Nebraska fundamentally different or whatever.  I'm just

8    picking.  I may not know my corn well enough to even

9    have a good comparison.  Judge O'Hara is a Nebraska boy,

10   so he can help me out on that, but --

11          MR. U:  Several points, Your Honor.  One,

12   the number per side per state was something we looked to

13   as a method of counting based on the guidance of *Bayer*.

14   We could have just as easily looked in the alternative

15   at the total number at issue in an effort to capture the

16   differences across plaintiffs.

17          Point two, there are going to be differences

18   across plaintiffs down the road given differences in,

19   for example, burdens on causation issues or reliance

20   elements, for example, given the states at issue.

21          And, number three, again, given the bottom line

22   here is, even setting aside the number of states, we're

23   trying to come up with a pool that is broad enough so

24   that across the plaintiffs' picks and our picks and

25   ultimately what the court accepts as the bellwether

1  discovery pool, you've got a fulsome enough group in

2  order to capture the various differences across producer

3  plaintiffs.

4      And we respectfully submit that the plaintiffs'

5  submission of four per side for six states is an

6  artificial total number separate and apart from the

7  notion of leaving states out.

8      Next point, Your Honor --

9          JUDGE LUNGSTRUM:  What if the court

10  approached it differently and said we're not going to do

11  "x" times certain number of states but --

12          MR. U:  Right.

13          JUDGE LUNGSTRUM:  -- we think 40-50, some

14  number, is appropriate --

15          MR. U:  Right.

16          JUDGE LUNGSTRUM:  -- how does that strike

17  you?

18          MR. U:  Sure.  So, Your Honor, what we

19  proposed, if you do four per side per state, that's 88

20  per side times two, so that's a total of 176.  Now, a

21  hybrid, Your Honor, would be we get discovery documents

22  from those 176 given the basic point that these are not

23  absent class members, they're named plaintiffs bringing

24  suit, and then perhaps to afford the parties some lesser

25  number of depositions.  It could be half, Your Honor.

1    You could order a total of 88 plaintiff depositions as

2    to the bellwethers, again, setting aside the class reps,

3    non-producers, and milo, and that's something we could

4    work with in an effort to hear your concerns and work

5    with the other side.  But we do think the other side's

6    proposal was unduly truncated.

7         And then lastly, Your Honor, let me turn to two

8    aspects of their proposal, the *Lexecon* waiver, because

9    it's in your agenda, and the notion of consolidated

10   bellwether trials, I can do that now or later.

11        JUDGE LUNGSTRUM:  You can go ahead now.

12        MR. U:  All right.  So, Your Honor, what the

13   plaintiffs propose then is the further step to say that

14   a plaintiff should be exempted from any discovery unless

15   both sides in that case agree to a *Lexecon* waiver.  And

16   we'd respectfully submit that really would turn the MDL

17   process upside down.  The point is to complete pretrial

18   proceedings before cases are sent back to their federal

19   courts of origin.  The plaintiffs' proposal would say

20   you get no discovery for cases that get sent back to

21   their federal courts of origin.  There are problems in

22   terms of what it would mean to the MDL process.  There

23   are problems in terms of *Lexecon* being the law and,

24   third, the pick-off problem --

25        JUDGE LUNGSTRUM:  You've teed it up.  I will

1   give you some more time if I need to, but I certainly

2   want to hear plaintiffs' point of view.

3            MR. U:  Yes.  So then finally we've noticed,

4   Your Honor, the plaintiffs' brief and order that slips

5   in a reference to consolidated bellwether trials.  If

6   you look in the detailed wording, what they submit is

7   that eventually you'd get down to two plaintiffs in a

8   given state who would be ordered consolidated for

9   purposes of conducting a single trial.  And that, we

10  submit, really is the problem and premature.  And the

11  Duke manual puts it best.  The Duke manual says on page

12  29, "A judge should view any proposal for consolidated

13  bellwether trials with skepticism."

14           And there's a reason for that, because one of the

15  ideas of the bellwether process is that you try one

16  person's case.  You see what the outcome is and people

17  can draw their own conclusions about what that means.

18  If you put two bellwethers together, then you get an

19  outcome and people are going to have trouble reading the

20  tea leaves what moved the needle between one plaintiffs'

21  distinctions or another.  So I wanted to bookmark that

22  at a minimum for down the road.

23           JUDGE LUNGSTRUM:  Thank you.  I -- that was

24  a good point and I'm glad you raised that.

25           All right.  Mr. Stueve.

1        MR. STUEVE:  Judge, we think our proposal

2   makes the -- we tried what we think is a -- is as good

3   of a proposal as you can get.  We were trying to balance

4   the interests of a representative range of cases with a

5   small enough pool so we can have efficiencies here and

6   get to class certification and get to bellwether trials.

7        You raised the question about, well, why do we

8   need to pick particular states, and you also raised the

9   question in your status conference about what

10  involvement the court should have.  We think that it

11  makes sense, and particularly in this case, that both

12  sides get to select plaintiffs from -- we use six states

13  we thought because what that ensures is that it's

14  important to us that those bellwethers include

15  plaintiffs who have all of the different claims.  As the

16  court is aware, in some states there are different

17  claims.

18        So that's why -- and we're in a unique position.

19  One of the purposes of bellwether is to instruct us with

20  respect to valuation, et cetera.  So this put us in a

21  position so, for example, we're going to -- on the six

22  states we pick one, they pick one; we pick one, they

23  pick one; we pick one, they pick one.  And then we're

24  using the class reps that are in those states.  On the

25  individual side, we get to pick four, they get to pick

1    four from those individual states.  And so we -- we have

2    producers, we have non-producers and we have class reps.

3    So we've hit all types of plaintiffs.  We will hopefully

4    have all the various types of claims.

5         They make the suggestion, well, gee, geography

6    may impact damages.  Well, I mean, we got six states

7    here.  So they can -- they get to pick three of them.

8    If they want to pick varying geographies, they get the

9    ability to do that.

10         We're also working in the context of a

11   coordination order.  We know that Judge Sipkins has

12   indicated that he would like to see this trial in the

13   first quarter of 2017.  We'd like to see the trial in

14   the first quarter of 2017.  So the number that we're

15   proposing is consistent with the number of plaintiffs

16   that are -- I believe Judge Sipkins has contemplated

17   narrowing it down to 40 bellwether discovery cases.  So

18   there's a consistency there that will allow us to

19   coordinate discovery.  If we adopt their proposal, if

20   you add it all up, it's over 230 plaintiffs'

21   depositions.  So --

22            JUDGE LUNGSTRUM:  Mr. U said they could live

23   with fewer.  You heard what he said.  What do you think

24   of that, if you took written discovery from 176 but you

25   had depositions of half of that number?

1          MR. STUEVE:  Your Honor, it's going to slow

2    everything down.  It's going to slow it down.  And the

3    whole purpose of the bellwether, let's let us focus on

4    these 40 or 45 plaintiffs.  Let's get the plaintiffs

5    produced and let's -- because we need to have that

6    happen before class certification we can get to.  That's

7    why we want to stay.  But I want to be very clear, we

8    want, just like what's going on in the Minnesota state

9    court, we want a stay of discovery with respect to all

10   the plaintiffs.  We're not barring discovery with

11   respect to those plaintiffs.  We're talking about the

12   bellwether stage one trials.

13          JUDGE LUNGSTRUM:  What about the class

14   certification side of the coin?  Mr. U's point is that

15   you've got 22 proposed state classes.  Why shouldn't

16   they be able to depose all of those purported class

17   representatives to be able to have a class certification

18   ruling?

19          MR. STUEVE:  Again, for efficiency purposes

20   it's going to be very instructive.  We pick six states.

21   We tee those motions for class certification up.

22          JUDGE LUNGSTRUM:  All right.  So you -- so

23   do I understand you to be saying that we would hold in

24   abeyance any issue of class certification other than in

25   those six states?

1              MR. STUEVE:  That's right.  And so then

2      there would -- what's nice about this -- I mean, because

3      can you imagine the briefing on 22 class certifications

4      at this point?  It would be a massive effort.  Again,

5      one of the questions the court raised, we don't want to

6      slow down the individual actions as well.  So this is a

7      compromise.

8              We -- you know, frankly what we're proposing is

9      much larger than the MDL bellwethers and we point -- we

10     cite to a number of cases that is substantially less

11     plaintiffs.

12             What I think is particularly important about our

13     proposal in the class certification is the efficiency in

14     once the court rules then any subsequent class

15     certification would be limited to new issues or new

16     facts.  So we're talking about streamlining the

17     subsequent class certification with respect to the

18     remaining 16 states.

19             So we think and we encourage the court to adopt

20     our proposal in its entirety.  We think it's consistent

21     with the -- the trends and the literature out there.  We

22     actually put more in than what you'll find out there.

23             With respect to class certification, we cite

24     several cases that had much smaller bellwether class

25     cases that are not six but one or three, that we cite a

1    couple of those.

2         So the final point, and I'll end with this, is

3    that, again, we put this proposal together in the

4    context of the fact that we're trying to coordinate with

5    the Minnesota state court as well and so we're trying to

6    address that issue.  You can't have it both ways.  If

7    you want to coordinate, then you've got -- you've got to

8    work with the interests of all of the parties in the

9    various litigation.

10        JUDGE LUNGSTRUM:  Judge O'Hara, do you have

11   any questions for counsel?

12        JUDGE O'HARA:  I did.  Mr. Stueve, one of

13   the criticisms by Syngenta of your proposed scheduling

14   order would be that fact discovery would be ongoing past

15   the proposed deadlines for disclosure of experts.

16   What's your response to that?

17        MR. STUEVE:  It's several.  First of all, as

18   this court is fully aware, there are -- I've been in

19   cases in federal court and state court that have done it

20   both ways.  There are pros and cons to waiting until the

21   end of fact discovery and then having experts.  So I've

22   worked in both.  The -- the -- one of the significant

23   reasons here is it's more efficient to do it that way.

24        We think in this case, number two, that we're

25   going to be in a position to do that.  Once the

1  plaintiffs are produced -- and that's one of the reasons

2  why we're staging the plaintiffs, you know, in the first

3  part.  And it's interesting that Syngenta's complaining

4  about that.  I haven't been in very many cases where the

5  defendant is complaining that we're putting our clients

6  up early on in the schedule, but it's for the purpose of

7  informing all -- excuse me -- all the experts both on

8  their side and our side.

9       And then we have the expert disclosures on April

10 15th.  If -- there's no question that there could be

11 subsequent fact discovery that may be relevant to either

12 side's expert report.  There could be supplementation of

13 that report.  And if either side needs to take discrete

14 additional deposition testimony with respect to that

15 supplementation, obviously that could be addressed by

16 the court.

17      If you stage it like they're staging it, there's

18 a five-six month gap between the close of fact discovery

19 which they're proposing is May 1st.  They actually want

20 a March 1st, I believe, written discovery cutoff and

21 then May 1st deposition discovery cutoff.  That really

22 slows down the process.  It's prejudicial to I think the

23 individual defendant cases.

24      But if we try to move it all the way back and not

25 have expert disclosures until after fact discovery, I

1   think the possibility of getting our cases to trial in

2   the first quarter of 2017 is going to be very, very

3   difficult.

4          JUDGE O'HARA:  Secondly, what's your

5   response to Syngenta's criticism that your order as

6   proposed would require plaintiff depositions to be taken

7   much earlier and yet give the plaintiffs' counsel

8   latitude to take Syngenta and non-party depositions

9   several months thereafter?

10          MR. STUEVE:  Well, again, I think first and

11  foremost you have to have the plaintiffs' depositions in

12  order for us to address the class certification.

13  They've made it very clear to us they're not willing to

14  respond to a motion for class certification until

15  they've deposed the plaintiffs that are in the

16  bellwether pool.

17         We've been telling -- we've been asking them for

18  quite some time, made it clear that we are ready and

19  want to produce the bellwether plaintiffs starting

20  November, December, January for the second reason which

21  is the farmers are not in the fields then, right.  And

22  so there's no reason why we can't do it then.  And so

23  that's the second reason.

24         And then the third reason is that the testimony

25  that's most relevant to our experts' class cert, their

1   experts' class cert, and then with respect to damages or

2   contributory fault, that's -- they're going to be

3   looking at the testimony of the plaintiffs.

4         The other information relevant to their experts

5   is all in their possession.  We run some risk of -- of

6   not getting all the information that we want with

7   respect to the expert disclosure on the merits but we

8   believe, based on the documents that we've seen thus

9   far, and you're probably aware we now have about 500,000

10  pages of documents, most of which we've coded and

11  reviewed, we think with 30(b)(6) depositions, which is

12  what we intend to start with, that we should be in a

13  position to disclose our merits experts on that date.

14        So there are a number of reasons why we staged it

15  that way.  But the plaintiffs' depositions are going to

16  be relevant to a significant portion of both sides'

17  expert testimony other than the information that's in

18  Syngenta's possession.

19              JUDGE O'HARA:  Thank you.

20              MR. U:  Your Honor, may I address the

21  scheduling aspects?

22              JUDGE LUNGSTRUM:  Well, actually,

23  Judge O'Hara's question got out a little bit in front

24  here because I'm -- I'm going to come to that in a

25  moment.  Is there anything further on the -- purely

1   focused on the bellwether aspect and discovery?  If

2   there is, yes.  Otherwise, I'm going to move to the next

3   step.

4              MR. U:  So, Your Honor, again, I think we

5   heard plaintiffs say that other cases have ordered

6   smaller bellwether numbers.  That's not quite true.

7   Take *Baycol*, for example, with 200 plaintiffs subjected

8   to full discovery.

9        But, again, unlike, say, a products case that

10  involves individuals who all took the same drug, this

11  case involves layers of differences both given that you

12  have individual farmers or corporate commercial farmers,

13  you have those who didn't use Viptera or Duracade, those

14  who did use Viptera or Duracade.  You have those near

15  export markets who may have been knowledgeable about

16  export markets and those who allegedly weren't, all of

17  which lends itself to a greater number than the

18  plaintiffs propose.  The plaintiffs, again, limited to

19  Kansas, Minnesota and four other states.  And whether in

20  terms of states or numbers we'd suggest a hybrid's

21  appropriate.

22             JUDGE LUNGSTRUM:  Any other concerns we

23  haven't addressed limited to the bellwether pool and

24  discovery related to the bellwether pool and class

25  certification?  I should -- I keep lumping those

1    together.

2         All right.  Let's talk about general scheduling

3    issues.  And I understand plaintiffs' interests

4    obviously in an early trial date just as a general

5    matter, but second in terms of sort of keeping pace with

6    the Minnesota litigation, but I look at the -- even the

7    plaintiffs' proposed schedule, which would dovetail to

8    that early trial date, and I raise the question is it

9    feasible to conduct the discovery even under the

10   plaintiffs' approach and get this matter ready to set

11   bellwether trials in January or February of 2017?

12        Mr. U, let me again turn to you.  Let's assume

13   for a minute that the court is sympathetic to the

14   argument of trying to get these cases to trial under the

15   kind of approach that the plaintiffs have offered.  Is

16   that feasible?

17             MR. U:  No, Your Honor.  So what we

18   respectfully think the plaintiffs wish to propose is an

19   artificial race to the courthouse.  They want to have

20   the discovery of the plaintiffs done as quickly as

21   possible without regard to whether we do or don't

22   actually get the documents that are relevant to then

23   deposing a witness and to say, judge, there's nothing to

24   see here; we're done in discovery in just three short

25   months.

1            And, again, you'll hear during I suspect the

2    latter part of this conference about how hundreds of

3    fact sheets are still outstanding, how as of last

4    Thursday or Friday we'd received 77 documents from some

5    of the plaintiffs, smaller numbers to be sure than what

6    we anticipated given the request.

7            And so with respect, we do think that plaintiffs

8    who have filed a lawsuit and who are named plaintiffs,

9    whether class reps or individual plaintiffs, ought to

10   provide discovery.  And so we have proposed a schedule

11   that's more realistic in order to get the documents and

12   then do the depositions.  It also cures the imbalance by

13   having a fact cutoff that's the same on both sides and

14   that marries with what we heard the plaintiffs say at

15   the very start of this case where they talked about how

16   there shouldn't be bifurcation; we should get all the

17   fact discovery done on fact and merits and class related

18   issues.

19           And so then what we respectfully propose is that

20   orderly process.  We have heard the plaintiffs say just

21   now that they wish to overlap fact and expert discovery.

22   They concede there might be a need for an expert to

23   revise his opinions, for there to be disputes about

24   whether an expert needs to be redeposed again.  And what

25   I'd submit is, in addition to being imbalanced, their

1   proposal is sufficiently unrealistic with respect to

2   them, that it all but guarantees we're going to have to

3   do things over later again in a way that slows things

4   down.

5        What we have submitted is a proposal that lays

6   everything out and still gets to the first bellwether

7   trial in mid-2017 just by virtue of the reality of

8   getting the steps done and trying to minimize having to

9   redo them.

10        JUDGE LUNGSTRUM:  Let me ask a question,

11   this is something that I hadn't even thought of until

12   right now, what would you estimate the length of a

13   bellwether trial to be?

14        MR. U:  Your Honor, we haven't talked about

15   that internally.  I suspect there will be more to it

16   than plaintiffs have indicated given, for example, the

17   third parties who are littered throughout the complaint,

18   given, for example, the Cargill-ADMs of the world.  So I

19   do think we're talking about trials of a couple of weeks

20   not a couple of days depending on what plaintiffs have

21   in mind.  So we've certainly not come to ground on that

22   but I think there's more complexity to it here given the

23   case.

24        JUDGE LUNGSTRUM:  Okay.  Thank you,

25   Mr. Stueve.

1            MR. U:  One last point, Your Honor, I

2    apologize.  I should note one thing.  We are going to be

3    conferring with Minnesota plaintiffs' counsel here right

4    after this hearing, and we had actually suggested at the

5    last status hearing before Judge Sipkins and Special

6    Master Van de North that if possible Special Master Van

7    de North participate to help the parties come to ground.

8         What we'll be proposing in that meet and confer

9    is a fact discovery timetable in Minnesota that tracks

10   the MDL fact discovery timetable here so that there

11   would not be an inconsistency.

12           MR. STUEVE:  Mr. U did not address the point

13   that I made earlier which is we have to get the

14   plaintiffs' depositions done because they want to be

15   able to use those depositions in response to the motion

16   for class certification.  That's why we've put it up

17   there the way we've set it up.  But here's more --

18           JUDGE LUNGSTRUM:  And is that --

19   understanding that as a reasonable approach, Mr. U still

20   says, well, we need to be sure we get the documents to

21   be able to take intelligent depositions of these people,

22   how can we do that when we're not getting the documents.

23           MR. STUEVE:  We agree that there -- the

24   documents, we've been producing them.  They would have

25   to be produced to them before they're obviously going to

1  take the deposition of a plaintiff.  So we're not in a

2  disagreement on that.

3         If you look at their schedule, they're proposing

4  a May 1st cutoff of not only the plaintiffs, they're

5  talking about all deposition discovery.  You want to

6  talk about unreasonable.  So that -- this is your --

7  back to your point, Judge O'Hara, about why we've got

8  the experts that we have, because we think it is -- with

9  third-party depositions, Syngenta depositions, a

10  coordination, we've got an August 15th cutoff for fact

11  discovery.  So I'd invite the court to look back at

12  their proposal.  They have a May 1st cutoff for all

13  depositions.  They have a March cutoff for all written

14  discovery which also makes no sense because, as this

15  court is fully aware, when you take depositions, you

16  often identify additional documents that you were not

17  aware of that you ask for.  There may be additional

18  interrogatories that you may ask.  But most importantly,

19  you want requests for admissions we want to be able to

20  do.  So that's why we have a fact discovery cutoff of

21  August 15th.  We think it is much more workable than

22  their proposal.

23         JUDGE LUNGSTRUM:  What about Mr. U's concern

24  about having to redo expert depositions or concerned

25  about supplemental reports and those kinds of things?

14-md-2591 In Re: Syngenta - Status Conference 10.19.15    80

1          MR. STUEVE:  You know, I know there's an

2   uncomfortability with that in the federal courts in

3   general and I will grant that.  I have -- I would say

4   50 percent of my cases are in courts in which allow that

5   and I can count on one hand when it's ever become an

6   issue.  I -- but, as I acknowledged earlier, there very

7   well may be some additional facts.

8          But typically what you have is an expert who's

9   given you an opinion, let's say five opinions, and

10  there's additional discovery and he may supplement that,

11  say this is -- these are additional facts that are

12  consistent with my opinion.

13         If we have a situation where an expert has -- is

14  doing something other than that, obviously that's an

15  issue that can be brought to the court's attention at

16  that point in time.

17         JUDGE LUNGSTRUM:  If they purport to change

18  their opinions --

19         MR. STUEVE:  Yes.

20         JUDGE LUNGSTRUM:  -- somehow based upon --

21         MR. STUEVE:  Exactly.

22         JUDGE LUNGSTRUM:  -- as opposed to simply

23  want to use this to bolster their opinion?

24         MR. STUEVE:  Right.  So I know it's not the

25  typical process that's followed, but again for all the

14-md-2591 In Re: Syngenta - Status Conference 10.19.15          81

1   reasons I've identified and the fact that we're trying

2   to coordinate, I would suggest that it makes more sense

3   than what they're proposing which is a March cutoff on

4   written discovery and a May 1st cutoff for all

5   depositions.

6          JUDGE LUNGSTRUM:  Let me ask you this, this

7   goes to the point I made about holding up the individual

8   actions, does the class certification process here delay

9   the resolution of those claims that seek to proceed as

10  individual actions?

11         MR. STUEVE:  No, Your Honor, and that's an

12  additional point I didn't make earlier that supports

13  having the expert disclosures both on merits and class

14  at the same time because we're allowed to then continue

15  to proceed forward on the individual actions.

16         If the class is certified, or classes are

17  certified, obviously we'll have bellwether class trials.

18  If certification is denied, we're in a position to go

19  forward with individual actions in the time frame that

20  we've outlined in our schedule.

21         JUDGE LUNGSTRUM:  All right.  Thank you.

22  Judge O'Hara?

23         JUDGE O'HARA:  Nothing further.

24         JUDGE LUNGSTRUM:  Any other concerns with

25  regard to the scheduling order that we ought to address

1   here?

2            MR. U:  Your Honor, if I may.  So if the

3   court pleases, I actually asked my team to prepare a

4   cheat sheet just comparing the dates between the two

5   sides.  I'd actually, if I could, hand it up to opposing

6   counsel and to you because I think it's instructive.

7            JUDGE LUNGSTRUM:  You may do so.

8            MR. U:  So, Your Honor, the concluding point

9   we'd make is if the concern is that our fact discovery

10  cutoff is too aggressive in ending discovery in May

11  2016, you know, the solution could well be to extend the

12  date, if that's plaintiffs' concern, but it should be

13  reciprocal on both sides.  Our concern with the

14  plaintiffs' proposal is that it's one-sided and it's

15  one-sided for a strategic purpose on their part.  They

16  want to force us to take depositions without having the

17  documents in hand and then to never have to take

18  discovery of the plaintiffs ever again for the next year

19  and a half.  And we'd submit that is a recipe for

20  unfairness that we've tried to correct while still

21  having an expedited schedule.

22            JUDGE LUNGSTRUM:  Thank you.  I don't need

23  to hear your denial that that's your desire.

24            MR. STUEVE:  Yeah.  Yeah.

25            JUDGE LUNGSTRUM:  All right.  Now, other

1    matters that ought to be addressed at this juncture?

2         Moving now beyond the scheduling order to this

3    last issue on the agenda, discovery problems, whatever,

4    now is the time to air those out and let us hear about

5    them.  Mr. U, you seem to have a concern about -- or

6    someone?

7              MR. NARESH:  Your Honor, I'd be happy --

8              JUDGE LUNGSTRUM:  -- on Syngenta's side

9    seems to have a concern.

10             MR. NARESH:  I believe Judge O'Hara had

11   asked at the last status conference for a bit more

12   detail --

13             JUDGE LUNGSTRUM:  Yeah.

14             MR. NARESH:  -- which I'd be happy to --

15             JUDGE LUNGSTRUM:  So come on up to the

16   lectern if you would please.

17             MR. NARESH:  Good morning, Your Honors,

18   Ragan Naresh.  Judge O'Hara, last time you asked about a

19   bit more detail about where the parties are and I'd be

20   happy to address that.

21             JUDGE O'HARA:  Please do.

22             MR. NARESH:  And also it relates to a couple

23   of the issues that Mr. U alluded to and I started last

24   night to prepare a summary which I thought would be

25   useful, then I saw additional things come in this

1    morning.  But I have a summary as to where we are as of

2    last night if that would be useful.  And, Your Honor,

3    two caveats on this.  One, as of last night -- as I was

4    pulling into the courthouse this morning, I saw

5    additional documents had been filed.  I have not had a

6    chance to look at those.

7         And the other is that there is a bit of a back

8    and forth with the plaintiffs and Syngenta as to the

9    number of individual plaintiffs that are left.  The

10   number seems to vacillate between 1,421, which is the

11   number the plaintiffs used in their papers on Thursday,

12   and our current count is 1,497.  I don't think it's a

13   material difference, but I've tried footnoting that as

14   appropriate where it matters.

15        And the top -- so the top row Section 1 is where

16   we are.  Your Honor will recall back in March we had

17   produced documents in response to the three buckets

18   which were regulatory documents to which there were

19   agreements in the Bunge production and that was -- you

20   know, we complied with that.  And then we got the second

21   round of this 75 RFP's.  We made our productions -- we

22   made our -- for the most part, we were done by September

23   30th.  We have supplemented those.  We indicated to the

24   plaintiffs on September 30th that we would be

25   supplementing it.  We have supplemented it twice since

1    then.

2         To date we have produced 260,000 documents and

3    some change of about a million pages of documents.  It's

4    been -- it's largely complete.  We have maybe a couple

5    thousand more documents to go.  Those are documents that

6    we received from China on Wednesday of last week.

7    There's a very complicated process to get documents from

8    China given Chinese law, but I expect that we'll be a

9    hundred percent complete by the end of this week.

10        With regard to the Syngenta side discovery, the

11   number will probably end up being about a million pages

12   even with about 262-263,000 documents that Syngenta has

13   produced by that time.

14        We have also reached out to the plaintiffs to

15   discuss the privilege log and we've reached agreement

16   with them on the form of the privilege log.  And so

17   we're getting that process started now and anticipate

18   rolling that out to them in a reasonable time.  We

19   haven't identified the exact date but we seem to be on

20   the same page on that as well.

21        We've also started receiving the documents from

22   the producers and the non-producer plaintiffs and we're

23   on the same page as the count of fact sheets received.

24   The count of fact sheets received is 680 to date.  So

25   that's 680 of either 1,421 or 1,497.  So we're still

1    missing a large number of fact sheets.

2         Some of these relate to the *Borah* plaintiffs,

3    which is an issue that we bookmarked at the hearing last

4    time in August.  And this is one of the issues that I

5    think will be useful to get the court's guidance in that

6    we have a disagreement as to when we should receive the

7    *Borah* plaintiff fact sheets.

8         Our view and I believe it was discussed at the

9    last hearing is that this issue would be ancient history

10   by the time of this hearing.  We have still don't have

11   666 or so *Borah* fact sheets.  The fact sheets are

12   obviously what we use to make bellwether determinations.

13   We can't make bellwether determinations without

14   information about the plaintiffs.  And so that is an

15   issue where, you know, it would be very helpful to get

16   the court's guidance as to when that should be complete.

17   Our view is that it should have been completed by now.

18        And then the other issue that relates to the --

19   the plaintiffs' fact sheets that Mr. U alluded to is

20   that the quality of the fact sheets.  We're often

21   receiving blank fact sheets and that's being counted as

22   a fact sheet that's being produced, and I have examples

23   I could show Your Honors if you're interested.  They're

24   marked confidential so I'm sensitive to that.

25        But in the 680 count, we have numerous -- I'd say

1   the vast majority of them are either missing some

2   information, and then a large percentage, 15-20 percent,

3   are missing most of the information, including, for

4   example, what state the plaintiff lives in, how much

5   corn they produced, if any at all, in the last five

6   years.

7          And so this relates to the idea of how can we

8   even identify the plaintiffs that we'd like to take

9   depositions of if we don't know how much corn they grow

10  or where they live, and certainly, you know, what kind

11  of documents they might have to support that.  And so

12  that is another issue that I think would be useful to

13  get the court's guidance of.

14         We have received a number of documents from them.

15  We received about 3,300 documents from the plaintiffs in

16  connection with the fact sheets.  As of Friday, we'd

17  received 77 documents on top of that.  We received about

18  4,000 documents over the weekend.  I have not reviewed

19  those documents, so I don't know what those look like.

20  They -- but we're at a total of about 7,500 documents

21  from the plaintiffs -- the producer plaintiffs to date.

22         And then with respect to the non-producers, we

23  received about 1,800 documents.  The idea was to produce

24  the bulk by September 30th.  We'd only received about 50

25  or so by then.  But at this point we'd received 1,856.

1   But there are a few issues but we're working those out

2   with the plaintiffs.  On the non-producer side, I don't

3   think there's any issues to point to on that at this

4   point.

5        Unless Your Honors have any questions, that's

6   where we are on discovery for now.

7             JUDGE O'HARA:  I think it would be helpful

8   to hear from Mr. Stueve or perhaps Mr. Powell.

9             MR. POWELL:  Yes, Your Honor.  With the

10  court's permission, I'd like to change my appointment

11  from co-lead counsel to lead cat herder.  The

12  plaintiffs' fact sheets, let me say this, in terms of

13  the fact sheets, if the court will recall, this has been

14  a two-stage approach.  And that is, you know, we had a

15  September deadline for, you know, providing and serving

16  plaintiffs' fact sheets for those cases that were in the

17  MDL as of May 27th I believe of this year.

18        If you'll fast forward then, the *Borah* case came

19  in subsequent to that date and there were 841 plaintiffs

20  contained within that one case.  The stipulation that we

21  filed with the court that, Judge O'Hara, you asked us to

22  file, said that the *Borah* case would be separate from

23  and separately negotiated from those cases that were

24  present in the MDL as of May 27th, and so we attempted

25  to do that.

1        And my proposal to Syngenta was that we would,

2   within the context of the *Borah* case itself, provide 100

3   plaintiff fact sheets on September 15 and October 15,

4   with a completion due date of the end of the year,

5   anticipating that as we get closer to the end of the

6   year the farmers come off the combines and it's a lot

7   easier for them to get their documents and their fact

8   sheets filled out to provide to Syngenta.  And I got no

9   response from that -- from that proposal.  So we have

10  done what we have -- you know, advised that our proposal

11  was.  We have provided 171 of the *Borah* fact sheets

12  since I first made that proposition 60 days ago.

13       With respect to the other issues, we have

14  produced approximately 18,000 documents with the

15  plaintiffs' fact sheets.  There are certain deficiencies

16  that candidly I will acknowledge where lawyers, their

17  own lawyers, their private lawyers who have cases in the

18  MDL, did not put in the fact sheet, you know, it may be

19  a how many acres they -- they grew.  We are working

20  diligently to cure that.

21       We recognize this court's directive last time

22  that you wanted this issue to be ancient history.  And I

23  can tell you that that direct message has been

24  communicated not only by e-mail but in conference calls.

25  And, again, as this court's aware, you know, we don't

1    have a direct attorney-client relationship with the

2    overwhelming majority of these farmers and yet we are

3    getting these things in.

4         Some of the things that are being discussed are

5    this idea that, you know, the 578's are not required

6    under the PFS's to be produced, so we're transcribing

7    those documents, those acreages to the forms themselves.

8    But we have provided and served 680 thus far.

9         I take issue with the fact that 80 percent of

10   those are defective in some fashion.  In fact, those

11   that were produced within the original tranche in

12   September are largely complete and in good shape, and in

13   those numbers approximately 390.

14        With respect to this notion that there were

15   1,400 cases and there's been 680 served, there are not

16   -- there are 1,400 individual or named plaintiffs.  But

17   what's happened is a lot of the lawyers have put Scott

18   Powell and then Scott Powell d/b/a Powell Farms.  Well,

19   it's the same entity but both of those names were in the

20   complaint.  So when we get down to doing plaintiffs'

21   fact sheets, there's only one fact sheet because there's

22   only one farm.  So while the numbers may reflect 1,461

23   plaintiffs, there are not 1,461 farms subject to the

24   obligations of the plaintiff fact sheet.  And so -- and

25   there are lots of those.

1        There are outstanding now the -- as far as I can

2   tell and based on the -- what I got last night, only the

3   *Borah* plaintiffs remaining to be completed.  Everything

4   else that was in the MDL in terms of -- as of May and

5   what was produced in September have been submitted,

6   served, and best we can tell are in -- are in good

7   shape.

8        And, as I understand it, there's another

9   conference between Syngenta and the tech people in our

10  office about some issues with respect to the *Borah* fact

11  sheets on Wednesday.

12       With respect to the request for production, it's

13  this -- Judge O'Hara, if you recall, this court ordered

14  a targeted request to the class reps and that was done.

15  With respect -- I can tell the court as of today every

16  class rep has produced documents totaling 20,000 to

17  date.  Are they complete?  Not completely.

18       But, again, let me remind the court too that our

19  agreement with Syngenta, as Syngenta agreed to

20  substantially comply and substantially complete

21  production by September 30th, I agreed on behalf of the

22  plaintiffs and the class reps to use the same standard

23  to be substantially complete by October 23rd, this

24  Friday.  So my expectation is that we will meet that

25  standard and we will meet that completion for the

1    targeted discovery that this court ordered directed to

2    the class reps.  It's over 20,000 today.  We have a few

3    more that will be completed by Friday.

4         So that's the status that, as best I can report

5    to the court, as to where we are not only on the fact

6    sheets but also on the request for production that the

7    court ordered.

8              JUDGE O'HARA:  Mr. Powell, do you disagree

9    with Syngenta's assertion that unless and until the PFS

10   and related documents are produced that it's premature

11   to select the bellwether cases?

12             MR. POWELL:  I do.  I do.

13             JUDGE O'HARA:  Why?

14             MR. POWELL:  The plaintiffs' fact sheets

15   that are in their possession that we have served cover

16   the gambit of the states and particularly -- so there

17   shouldn't be any states that are not sufficiently

18   represented by fact sheets of the plaintiffs and the

19   claimants in those states from which decisions can be

20   made as to maybe which ones may be selected for more

21   specific intense discovery.  So I do -- I do disagree

22   with that proposition.

23             JUDGE O'HARA:  And mindful this would differ

24   depending upon the size of an operation for a particular

25   farmer, approximately how many hours are involved in

14-md-2591 In Re: Syngenta - Status Conference 10.19.15    93

1   complying or filling out a PFS for a farmer?

2           MR. POWELL:  Probably eight to ten I'm going

3   to think.  But, again, though it's not the filling out

4   the form so much that is maybe at issue perhaps as it is

5   getting the documents that are required under the PFS.

6   Because a lot of these farmers have to go to third

7   parties.  They have to go to seed dealers perhaps.  They

8   have to go to an elevator perhaps.

9        And so, you know, a lot of it, you know -- and I

10  know they're doing their best to comply with the orders

11  of this court and getting their harvest in as well.  But

12  some of this is not subject only to their control when

13  they have to go to third parties, accountants perhaps,

14  you know, someone to get information for their

15  particular farm.

16       So there are multiple facets here that are

17  working.  It's not just them that have to get the

18  information.  They have to sometimes go get it and rely

19  on third parties to be diligent in getting the

20  information back to them.

21           JUDGE O'HARA:  I mean, under the imperfect

22  circumstance we have presently, what's, in your view, a

23  reasonable drop dead deadline for all of the farmers to

24  produce these PFS's and the related documentation?

25           MR. POWELL:  Including *Borah*?

1          JUDGE O'HARA:  Yes.

2          MR. POWELL:  Well, I had proposed to

3    Syngenta by the end of the year two months ago because

4    everything else had already been complete and *Borah* was

5    what was outstanding.  So I'm -- you know, that was the

6    proposal.  I have been in touch with the lawyers in

7    Texas that represent the *Borah* plaintiffs.  That was

8    their suggestion to me as to what was doable.  I heard

9    nothing to the contrary, you know, so I would suspect

10   that absent some word from them that something has

11   changed that that would be a realistic deadline still.

12         JUDGE O'HARA:  Putting aside Syngenta's lack

13   of response, do you think you could improve upon the end

14   of the year substantially?

15         MR. POWELL:  Before the end of the year?

16         JUDGE O'HARA:  Yes, sir.

17         MR. POWELL:  Judge O'Hara, I think it's

18   difficult in the sense that they're in crunch time now

19   in terms of harvest and so can we try -- can we do

20   better?  I'd like to tell you we could.  Can I promise

21   it?  I can't -- I can't do that.  Would I like to see

22   it?  Sure.  I mean, you know, I don't know what -- I

23   don't know what to say to you other than what I have

24   been -- what's been represented to me by their own

25   counsel.

1          JUDGE O'HARA:  Thank you, sir.

2          MR. NARESH:  Your Honor, may I just a couple

3    of quick --

4          JUDGE O'HARA:  Go ahead, Mr. Naresh.

5          MR. NARESH:  Judge O'Hara, first on the

6    offer with respect to the *Borah* plaintiffs at the end of

7    December, we did respond to it.  We responded via e-mail

8    and on the phone and we said that was not acceptable to

9    us, so within a day or two of that offer.  So the idea

10   that we didn't respond to it is incorrect.

11         JUDGE O'HARA:  What would you say was

12   acceptable?

13         MR. NARESH:  We said it should be ancient

14   history by the -- by today.  We basically pointed them

15   to their -- the transcript of the August 21st hearing.

16   And I couldn't -- I didn't print out that e-mail.  I

17   didn't expect that to come up but I do have that e-mail.

18         The 1,400 number is in terms of number of

19   plaintiffs, that's their number.  You know, I cite to it

20   in the footnote.  It's from their brief submitted on

21   Thursday.  It sounds like that number might be changing

22   today but 1,400 was their number and all we can do is

23   use their number at least from our perspective.

24         And the third thing I just wanted to point out

25   was it's not that it's one or two fields that are

1    missing.  And if I may, I'd like to hand up one or two

2    examples of the fact sheets.  And I'll only hand up two

3    copies if that's okay because I'm sensitive to the

4    notion that these are marked confidential although

5    they're largely free of any information, let alone

6    confidential information.

7              JUDGE LUNGSTRUM:  Without objection, you may

8    do so.

9              MR. STUEVE:  Go ahead.

10             JUDGE LUNGSTRUM:  I hear no objection.

11             MR. NARESH:  Your Honor.

12             MR. STUEVE:  Sorry to interrupt.  Can we

13   designate this portion of the record confidential?  It's

14   got farmer specific -- I haven't read through it but

15   that's the only issue.

16             JUDGE LUNGSTRUM:  Any objection?

17             MR. NARESH:  We don't have any objection.

18             JUDGE LUNGSTRUM:  Without objection, this

19   portion will be deemed confidential.  Please remind me

20   when we transition from this to open the record back up.

21             MR. NARESH:  I will do so.  And, Your Honor,

22   I stopped at the B's, but even stopping at the B's, if

23   you look at Andrew Banwart, for example, it doesn't list

24   his address or what state he is in.  And then on -- and

25   so if we were talking about state-by-state

1   determinations, you can't figure out where he is.

2        And then when you look at Part A, which is

3   essentially where you're supposed to identify what

4   documents -- how much corn farming that person has, the

5   answer is no information is available, plaintiff will

6   supplement.  And same thing for A2, no information is

7   available, plaintiff will supplement.  And then

8   essentially the same answer given for questions A3 all

9   the way to the end there's no information.  And then

10  same thing for the document request on the final page.

11       The same thing holds true on -- on B&B Farms.

12  B&B Farms gives a state but then the answers to A1 and

13  A2 are simply blank as are the answers from A3 through

14  A12.

15       And so it's not simply that a few fields are

16  missing.  For a number of these all the fields are

17  missing, at least all the relevant fields are missing.

18  And so we can't even begin to make a determination of

19  which plaintiffs are important to us for bellwether

20  selection purposes.  And then when you couple that with

21  the notion that we're expected to begin discovery of the

22  plaintiffs next month and we don't even have the basic

23  information about a large number of these, it really is

24  hard for us to reconcile and move forward.

25            JUDGE O'HARA:  Mr. Naresh, as relates to the

1    three --

2              JUDGE LUNGSTRUM:  Pardon me, I'm going to

3    interrupt for just a minute.  To the extent to which

4    we've discussed these individual fact sheets at all, I

5    see nothing in there that's a confidential nature that

6    needs to be protected because the sheets themselves are

7    not being entered into the record, it's been merely the

8    mention that there is no information provided in certain

9    places.  Therefore, I'm going to rescind my order with

10   regard to confidentiality and that is simply not

11   applicable here.  I see nothing that needs to be

12   protected from over scrutiny.

13             JUDGE O'HARA:  Mr. Naresh, are these

14   outliers or are these representative of, say, more than

15   a hundred fact sheets that are defective in your view?

16             MR. NARESH:  I'd say these are examples on

17   the far end of the spectrum.  But I will say that these

18   are not isolated examples.  I would say it is, in terms

19   of a percentage, probably about 10 percent leave almost

20   everything blank.  I would say of the 300 that I've

21   personally looked at about 80 percent of them are

22   missing at least one field.

23             JUDGE O'HARA:  Thank you.

24             JUDGE LUNGSTRUM:  Anything further that we

25   should take up at this juncture?

1           MR. CHANEY:  Your Honors --

2           JUDGE LUNGSTRUM:  Mr. Chaney.

3           MR. CHANEY:  -- just to -- William Chaney.

4    Just to highlight just a couple of points on the

5    non-producer production.  I recognized counsel said

6    there really weren't any major issues to raise.  But

7    since the non-producer production was mentioned on their

8    sheet, I do need to point out that they note a footnote

9    that Trans Coastal has indicated it will make documents

10   available for in-person inspection and that is correct.

11   There are a number of hard copy documents that are only

12   kept that way that Trans Coastal has made available.

13   But it's somewhat misleading.  The 1,856 documents

14   produced I don't think includes those that have been

15   made available for inspection.  So that number would be

16   increased.

17           And, secondly, until I saw this footnote here, I

18   was unaware of the concern regarding the Winnsboro

19   production.  I'll be speaking with their counsel about

20   that.

21           And but other than that the Trans Coastal issue,

22   I believe that all the non-producer class reps to whom

23   discovery was propounded would say that their production

24   is substantially complete.

25           JUDGE O'HARA:  Thank you.

14-md-2591 In Re: Syngenta - Status Conference 10.19.15   100

1          JUDGE LUNGSTRUM:  All right.  Anything else?
2  Should we schedule a follow-up status conference at this
3  time or would it be more appropriate to wait and see
4  where we go from here before we have a follow-up status
5  conference, particularly one that involves myself as
6  opposed to maybe more focused in the area of discovery
7  with Judge O'Hara?
8          What are your thoughts about that?  Counsel for
9  the plaintiffs?  I'm easy.  Certainly we're not going to
10 forget about this case if we don't have a status
11 conference, but I'll make myself available if you'd like
12 me to.
13         MR. STUEVE:  So I had a question actually
14 that's related to your -- your question which is we've
15 been operating under a narrowed scope of discovery and I
16 know we've got a proposed scheduling order in place.  Is
17 it -- are we permitted -- for example, we have some
18 additional requests for production ready to go.  We've
19 got our 30(b)(6) topics.  Are we allowed now after the
20 motion to dismiss has been denied to proceed forward
21 with that or do we have to come back and get additional
22 guidance from the court?  I mean, if there -- if that is
23 necessary, then we would want another conference
24 particularly with Judge O'Hara or can we proceed forward
25 with discovery in the normal course?

1          JUDGE O'HARA:  To answer your question,

2    Mr. Stueve, I believe it's the courts' intent, both

3    Judge Lungstrum and myself, to get a scheduling order

4    out yet this week.  My intent is to expressly state in

5    that order that the -- the limited -- there are

6    limitations on discovery that were in the first

7    scheduling order would be vacated and set aside.

8          But so we're clear about this, as far as I'm

9    concerned, I expect both sides to be laser focused on

10   all discovery and mindful this case will straddle the

11   amended Rule 26(b) -- or, excuse me, Rule 26(b)(1), all

12   discovery on both sides is going to be expected to be

13   proportionate.  But I would anticipate that discovery

14   will proceed a pace very quickly.

15          MR. STUEVE:  So mindful of that, I think one

16   thought would be we've got answers that are going to be

17   due on the 5th and then the 19th, that perhaps once we

18   see what those look like, whether they're motions to

19   dismiss and what the counterclaims look like, it may

20   make sense perhaps after those filings that we -- we

21   have the status conference just to determine whether

22   that impacts the schedule coordination.

23          JUDGE LUNGSTRUM:  Would you like to wait

24   until that happens and then make a proposal as opposed

25   to locking in a date today or would you rather lock in a

1    date?

2                   MR. STUEVE:  I think probably waiting would

3    make sense and then we can meet and confer with

4    Syngenta's counsel.  And if it's necessary, we can

5    propose some dates.

6                   MR. U:  We agree, Your Honor.

7                   JUDGE LUNGSTRUM:  All right.  Then let's do

8    that.  That's fine.  I would obviously do my best to be

9    available at a mutually agreed upon time.  All right.

10   Anything else that we need to do?

11        Again, let me thank you all for your appearances,

12   for your presentations.  Judge O'Hara and I say this to

13   ourselves all the time but the best reason to accept

14   cases like this is getting to work with really good

15   lawyers like all of you and it makes our jobs not only

16   easier but far more enjoyable to deal with it.  Even

17   though coming to grips with some of the issues you

18   present us aren't a walk in the park, it's -- it's great

19   to be able to work with folks like yourselves.  So thank

20   you.  We'll look forward to seeing you soon.

21        Now, let me turn to Jack Van de North.  What's

22   your --

23                   SPECIAL MASTER VAN de NORTH:  You made

24   reference to the meeting we're going to have about

25   bellwether discovery pool and other related issues.  And

 1   Sharon, the chief deputy, has made arrangements for

 2   those of you who are going to participate.  I'm hoping

 3   not everybody's going to participate.  There would be

 4   room in this room but it's in Room 569.  So maybe --

 5                MS. SCHEURER:  659.

 6                SPECIAL MASTER VAN de NORTH:  -- Sharon, you

 7   could say how they get there.

 8                JUDGE LUNGSTRUM:  659.

 9                SPECIAL MASTER VAN de NORTH:  659.  Thank

10   you, judge.

11                MS. SCHEURER:  It's just down the hall.

12   I'll unlock the door for you.

13                JUDGE LUNGSTRUM:  Somebody -- the Hudson

14   brothers know where to go.  You lead the folks, will

15   you, because they know where.

16                SPECIAL MASTER VAN de NORTH:  Thank you very

17   much.

18                JUDGE LUNGSTRUM:  All right.  With that

19   we'll be in recess.

20                (Proceedings adjourned.)

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3   STATE OF KANSAS        |

 4                          |   ss

 5   COUNTY OF WYANDOTTE    |

 6

 7        I, Kimberly R. Greiner, CSR, RMR, CRR, a

 8   Certified Shorthand Reporter for the State of Kansas and

 9   official reporter for the United States District Court,

10   do hereby certify that as such reporter I was present at

11   and reported in machine shorthand the above and

12   foregoing proceedings.

13        I further certify that a transcript of my

14   shorthand notes was prepared and that the foregoing

15   transcript, consisting of 104 pages, is a true and

16   correct transcript of my shorthand notes in said case to

17   the best of my knowledge and ability.

18     SIGNED October 21, 2015.

19

20                /s/KIMBERLY R. GREINER
                  KIMBERLY R. GREINER, CSR, RMR, CRR

21

22

23

24

25
```