IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: SYNGENTA AG MIR 162 | ) | MDL No. 2591 |
| CORN LITIGATION | ) | |
| | ) | Case No. 14-md-2591-JWL |
| This Document Relates To All Cases Except: | ) | |
| | ) | |
| *Funk v. Syngenta Seeds, Inc.,* | ) | |
|     No. 16-2220-JWL | ) | |
| *United States ex rel. Pospisil v. Syngenta AG,* | ) | |
|     No. 15-9637-JWL | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion by defendant Syngenta[1] for judgment on the pleadings on certain state-law claims asserted by plaintiffs (Doc. # 1927). In addition, in eight class actions brought by the Phipps Group of attorneys ("the Phipps cases")[2], motions to dismiss have been filed by Syngenta (Doc. # 2122); by defendant Gavilon Grain, LLC ("Gavilon Grain") (Doc. 2119); and by defendants Archer Daniels Midland Company ("ADM"), Bunge North America, Inc. ("Bunge"), Cargill, Incorporated ("Cargill"), and Louis Dreyfus Company LLC ("LDC")

---

[1]The Syngenta defendants (referred to herein as "Syngenta") include Syngenta AG; Syngenta Crop Protection AG; Syngenta Corporation; Syngenta Crop Protection, LLC; Syngenta Seeds, Inc. (now known as Syngenta Seeds, LLC); and Syngenta Biotechnology, Inc.

[2]The Phipps cases are those brought by plaintiffs Anderson (No. 16-2005), Crone, et al. (No. 16-2045), Dreibodt, et al. (No. 16-2065), Rich, et al. (No. 15-9935), Sigrist (No. 15-9921), Vermeer (No. 16-2052), VJW Farm, Inc. (No. 16-2013), and Welsh (No. 16-2006) (collectively "the Phipps plaintiffs").

(collectively "the ABCD defendants," and with Gavilon Grain, "the ABCDG defendants") (Doc. # 2125). For the reasons set forth below, the Court rules as follows. The ABCD defenants' motion to dismiss is **granted**, and the Phipps plaintiffs' claims against those defendants are hereby dismissed. Gavilon Grain's motion is **granted**, and the Phipps plaintiffs' claims against that defendant are dismissed, although those plaintiffs may cure their deficient pleading with respect to their partnership claims against Gavilon Grain by amending their complaints on or before **September 6, 2016**. Syngenta's motion to dismiss is **granted in part and denied in part**; certain claims by the Phipps plaintiffs are preempted by Grain Standards Act, the Court dismisses claims based on a theory of *res ipsa loquitur*, and the Court dismisses some failure-to-warn claims as preempted under another federal statute, but the motion is denied in *Crone* with respect to the application of the economic loss doctrine under Pennsylvania law. Syngenta's motion for judgment on the pleadings based on preemption is **granted in part and denied in part**.

## I.    Background

In hundreds of cases in this MDL, producer and non-producer plaintiffs have brought negligence and other claims against Syngenta relating to Syngenta's commercialization of genetically-modified corn seeds known as Viptera and Duracade. In the Phipps cases, the producer plaintiffs have not conformed their claims to the master class action complaints, but have brought negligence claims against Syngenta, Gavilon

Grain, and the ABCD defendants.  Syngenta asserted third-party claims against ADM and Cargill, but by Memorandum and Order of April 4, 2016, the Court dismissed those claims as preempted by the United States Grain Standards Act (GSA), 7 U.S.C. §§ 71-87k.  *See In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 1312519 (D. Kan. Apr. 4, 2016).

## II.    Claims Against the ABCD Defendants and Gavilon Grain

### A.    *Preemption*

In its prior order, the Court concluded that Syngenta's claims against ADM and Cargill were preempted by the following express preemption provision of the GSA:

> No State or subdivision thereof may require the inspection or description in accordance with any standards of kind, class, quality, condition, or other characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce, or require any license for, or impose any other restrictions upon the performance of any official inspection or weighing function under this chapter by official inspection personnel. Otherwise nothing in this chapter shall invalidate any law or other provision of any State or subdivision thereof in the absence of a conflict with this chapter.

*See* 7 U.S.C. § 87g(a).  Syngenta had conceded that one "characteristic" of corn under this provision is whether it contains MIR 162, the trait found in Viptera and Duracade, and that therefore its claims based on handling of the corn by ADM and Cargill were preempted.  *See In re Syngenta*, 2016 WL 1312519, at *2.  The Court concluded that Syngenta's claims based on the grain handlers' decision to sell or ship corn to China were also preempted because a duty not to do so would impose a requirement that the

3

corn be inspected or described as free of the genetic trait.  *See id.* at *2-3.  With the exception of certain claims added in the Phipps plaintiffs' amended complaints, which the ABCD defendants concede are not preempted (and which are addressed below), the Phipps plaintiffs' claims against the ABCDG defendants generally mirror those asserted by Syngenta against ADM and Cargill.  Thus, if applied here, the Court's previous ruling would compel the dismissal of those claims as preempted under the GSA.

The Phipps plaintiffs, however, argue that the Court's previous ruling was erroneous in various ways.  First, they argue that a requirement concerning inspection or description of the corn with respect to the presence of MIR 162 does not constitute a requirement in accordance with a "standard of kind, class, quality, condition, or other characteristics" of corn for purposes of the GSA's express preemption provision. Plaintiffs note that another provision of the GSA authorizes the Secretary of Agriculture to establish "standards of kind, class, quality, and condition" for corn, *see* 7 U.S.C. § 76(a), and they argue that the similar language in the preemption provision must therefore refer only to official standards, such as official grade designations, established by state regulatory bodies.  Although the preemption provision also refers to "standards . . . of other characteristics" of grain, plaintiffs argue that "other characteristics" should be interpreted under the canon of *ejusdem generis* to refer only to such official regulatory standards.  *See Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects

4

akin to the one with specific enumeration.").

The Court rejects this interpretation of Section 87g(a) of the GSA.  Under the ordinary meaning of the language of the statute, the presence of a genetic trait is a characteristic of corn.  The statute does not limit its application to "official" standards or to standards set by the Secretary of Agriculture or state regulatory bodies.  The fact that the Secretary is authorized to set standards of kind, class, quality and condition does not mean that those terms must refer elsewhere in the GSA to official standards that the Secretary actually sets, as that reasoning and definition would be improperly circular (the Secretary may set standards of kind, class, etc., therefore standards of kind, class, etc. must mean standards of the type set by the Secretary).  The Supreme Court has noted that the canon of *ejusdem generis* does not control when the context or the language compels a different interpretation.  *See id.*; *Ali v. Federal Bur. of Prisons*, 552 U.S. 214, 227 (2008).  Moreover, even if the canon were applied here, that would simply mean that "other characteristic" should be interpreted to mean something akin to a kind or class or quality or condition; since those terms are not limited by the statute to official standards set by regulators, neither would "other characteristic" be so limited.  The Court therefore interprets "other characteristic" to include the presence or absence of MIR 162, in accord with the plain meaning of the statute.

The Court also concludes that the reference in another prong of the preemption provision to "any official inspection or weighing function" does not support the Phipps plaintiffs' interpretation.  To the contrary, the reference to an "official inspection"

5

elsewhere in the same provision highlights the absence of the "official" modifier in the prong at issue here.

The Phipps plaintiffs rely on the provision of 7 U.S.C. § 78(a) stating that "the description of such grain by any proprietary brand name . . . shall not be deemed to be a description of grain as being of any grade," and they argue that a requirement of description of corn as Viptera-free or Duracade-free therefore would not fall within the preemption provision. The Court rejects this argument as well. Read as a whole, Section 78(a) provides that if the Secretary has imposed a standard, a person may not describe such grain other than by that official standard, although the use of the brand name does not violate that rule (as long as the name does not resemble an official grade designation). *See id.* Thus, the language quoted by plaintiffs does not mean that the use of a brand name may not be a description requirement within the scope of the preemption provision. A person may describe corn as being Viptera corn without violating the rule of Section 78(a), but any state-law requirement that the person describe the corn with reference to the presence of MIR 162 (the actual characteristic at issue here) would remain preempted.

The Phipps plaintiffs also dispute that the state-law "require[ments]" to which the preemption provision applies includes common-law tort duties. The Supreme Court has held that "[a]bsent other indication, reference to a State's 'requirements' [in a preemption provision] includes its common-law duties." *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008). The Court has rejected plaintiffs' argument that the GSA's

6

preemption provision refers only to official standards set by regulatory bodies. Therefore, there is no contrary indication, and the Court therefore interprets the reference to state requirements in the GSA preemption provision to include common-law tort duties.

The Phipps plaintiffs argue that the Court should apply a presumption against preemption. The parties acknowledge that the Supreme Court has appeared to take inconsistent positions with regard to whether such a presumption applies in the case of an express preemption provision. The Supreme Court ruled on the issue fairly definitively in recent months, however, concluding in one case that "because the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *See Puerto Rico v. Franklin Calif. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (internal quotations and citations omitted). Thus, this Court will not invoke any presumption in applying the GSA's express preemption provision.

The Phipps plaintiffs next argue that imposing a common-law duty in this case would not impose a "requirement" of inspection or description here because there are other ways by which the ABCDG defendants could comply with the duty. Plaintiffs have not identified any such way for those defendants to discharge the alleged duty, however, that would not require either inspection of the corn for the presence of the genetic trait or description of the corn with respect to the presence of the trait. Plaintiff

7

also provide a long list of cases in which grain farmers have asserted tort claims, but those citations are not helpful, as those cases did not involve claims analogous to those asserted here and did not involve the question of preemption under the GSA.

The Phipps plaintiffs argue that they have also alleged a duty with respect to the ABCDG defendants' communications.  Plaintiffs have not asserted a misrepresentation claim here based on any such communications, however, and plaintiffs' claim based on a duty to discourage or not to encourage farmers with respect to the seed they bought is addressed (and rejected) below.

The Phipps plaintiffs also point to the fact that the preemption provision applies only to a requirement of inspection or description as a condition of shipment or sale in interstate or foreign commerce, and they argue that not all of their claims fall within that limitation.  The claims identified by plaintiffs in making that argument, however, are the newly-asserted claims that the ABCD defendants concede are not preempted, and which the Court addresses (and rejects) below.

Finally, the Phipps plaintiffs note that their claims are also based on the ABCDG defendants' conduct with respect to Distiller's Dried Grains with Solubles (DDGS), which does not constitute a grain that falls within the scope of the GSA.  Plaintiffs' allegations, however, are based on the fact that the DDGS handled by the ABCDG defendants were produced with Viptera or Duracade corn,[3] and thus the alleged duties

---

[3]For instance, the Phipps plaintiffs allege that the ABCDG defendants were
(continued...)

8

with respect to the shipment or sale of DDGS would require inspection or description *of corn* with respect to the presence of MIR 162.  Plaintiffs have not offered any explanation as to how these defendants could comply with the alleged duties concerning DDGS without the inspection or description of the corn used to produce the DDGS.

Therefore, for the same reasons set forth in the Court's previous preemption ruling, the Court concludes that the Phipps plaintiffs' claims (other than the three theories of negligence addressed below in the next section) are preempted under the GSA's express preemption provision.  Those claims would impose a duty that would either require the grain handlers and exporters to inspect corn for the presence of a genetic trait or to describe corn with respect to the presence of that trait, or require them to ensure that others do so.  Accordingly, the claims are preempted, and the Court grants the ABCDG defendants' motion to dismiss those claims.[4]

### B.   *Viability of Non-Preempted Claims*

The ABCD defendants concede that three specific allegations of negligence by the Phipps plaintiffs are not preempted, but they argue that those allegations are not legally sufficient to state cognizable claims, and the ABCD defendants seek dismissal of those claims pursuant to Fed. R. Civ. P. 12(b)(6).  The Court will dismiss a cause of

---

[3](...continued)
negligent in purchasing corn from farmers without making sure that "the corn they sourced for the production of DDGS for shipment to China was Viptera-free," and in "[f]ailing to source uncontaminated corn for the production of DDGS shipped to China."

[4]In light of this conclusion, the Court need not address the ABCD defendants' arguments based on implied preemption and preemption under the Warehouse Act.

action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law is dispositive, *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *See Bell Atlantic*, 550 U.S. at 555. The Court must accept the facts alleged in the complaint as true, even if doubtful in fact, *see id.*, and view all reasonable inferences from those facts in favor of the plaintiff, *see Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Viewed as such, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 550 U.S. at 555. The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The claims at issue were added by the Phipps plaintiffs in their amended complaints filed after the Court's previous preemption ruling, seemingly in an effort to allege claims that would not be preempted. First, plaintiffs allege that the ABCDG defendants breached a duty of reasonable care by the following acts:

> Issuing and disseminating corporate policies, publications, and other communications to U.S. farmers indicating that they would accept Viptera at times when farmers were making planting decisions, thereby encouraging and inducing farmers to plant Viptera;

10

> Directing their crop consultants and corporate representatives or agents to recommend and/or not discourage farmer cultivation of Viptera and/or Duracade resulting in more expansive cultivation and contamination of the U.S. corn supply by cross-pollination and commingling;
>
> Failing to meaningfully consult and communicate promptly and transparently with industry stakeholders about the foreseeable risk of harm posed by commercialization of Viptera and Duracade prior to receiving import approval from China.

Of course, to the extent that plaintiffs are alleging a duty to act with respect to harvested corn, such a claim is preempted by the GSA as set forth above. Plaintiffs are also here alleging a duty to discourage or not to encourage American corn farmers to use Syngenta's Viptera and Duracade seeds. The ABCD defendants argue that they owe no such duty to plaintiffs (who did not use Viptera or Duracade seeds). Plaintiffs concede that they do not allege that those farmers who did use the seeds committed a tort. Thus, these defendants argue that they owed no duty to prevent third parties (farmers using the seeds) from engaging in non-tortious and non-criminal conduct that allegedly harmed plaintiffs. *Cf.* Restatement (Second) of Torts § 876(b) (one is subject to liability for giving substantial assistance or encouragement to a third party who commits a tort).

Plaintiffs argue that these defendants breached a general duty of reasonable care and caused harm that was foreseeable. Plaintiffs have not cited any authority, however, to support an argument that these defendants owed such a duty to prevent the harmful conduct by others in the absence of a special relationship with the injured party. Plaintiffs point to the Court's denial of Syngenta's original motion to dismiss the negligence claim asserted in the master MDL complaints, in which the Court relied on

the allegations that corn growers and Sygenta "were not strangers, but rather were part of an inter-connected industry and market, with expectations on all sides that manufacturers and growers and sellers would act at least in part for the mutual benefit of all in that inter-connected web." *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1189 (D. Kan. 2015).  The duty asserted here by the Phipps plaintiffs against the ABCDG defendants, however, is easily distinguished from the duty asserted against Syngenta, who is alleged to have started a harmful chain of events by commercializing these seeds.  The negligence alleged by the grain handlers occurred farther down the supply chain, after the alleged negligence by Syngenta.  The grain handlers are not alleged to have had a special relationship with all corn growers sufficient to impose a duty to discourage or to refrain from encouraging those growers with respect to the seed they chose.  Unlike recognition of the duty underlying the claims against Syngenta, recognition of such a duty in the grain handlers would create too great a risk of open-ended liability; the Court certainly did not conclude that everyone in the industry owes a duty to everyone else in the industry to prevent any possible harm from all actions.  *Cf. id.* at 1191 (rejecting Syngenta's argument based on a concern for open-ended liability).

The Phipps plaintiffs have not cited any authority to support imposition of a duty in these circumstances.  Accordingly, the Court dismisses these claims of negligence against the ABCDG defendants.

Second, the Phipps plaintiffs allege in their amended complaints that the ABCDG

defendants were negligent in "[f]ailing to timely and adequately respond to customer complaints and/or mitigate losses incurred by Chinese purchasers following the rejection of their corn and DDGS shipments in China (for instance by not re-directing contaminated shipments or providing replacement goods promptly), thereby causing Chinese purchasers to source corn and DDGS from locations other then the U.S." The Court has already concluded that any claim that the grain exporters should not have shipped or sold Viptera or Duracade corn to Chinese buyers is preempted. That ruling would also apply to any claim that these defendants should have provided non-contaminated corn to the buyers, as such a requirement would require testing or inspection or description of the corn as Viptera- or Duracade-free. Any other alleged duty to keep the Chinese buyers happy, even if not preempted, would not support a cognizable claim, for the same reasons set forth with respect to the allege duty to discourage farmers. Again, plaintiffs have not provided any authority to support a claim based on such a duty to all American corn growers with respect to acts so far down the supply chain.

Third, the Phipps plaintiffs allege that the ABCDG defendants made false representations to the Chinese buyers that their shipments were not contaminated with Viptera corn. Again, any requirement to describe the shipments as Viptera-free would preempted. Moreover, plaintiffs have not stated a claim for negligent misrepresentation, nor have plaintiffs provided authority to support a duty to the farmers not to make false representations to others. Finally, plaintiffs have not stated a plausible claim of

13

causation, as they do not allege plausibly that the buyers would have accepted the shipments (thus avoiding the alleged impact on the market) if the exporters would have correctly stated that the corn was contaminated with Viptera.

Accordingly, any non-preempted negligence claim asserted by the Phipps plaintiffs against the ABCDG defendants is not legally sufficient.  Thus, the Court dismisses all claims by the Phipps plaintiffs against the ABCD defendants and all claims against Gavilon Grain as grain handler and exporter.[5]

### C.   *Partnership Claims Against Gavilon Grain*

In addition to their claims against Gavilon Grain as a grain handler (addressed above), the Phipps plaintiffs assert negligence claims against Gavilon Grain as Syngenta's partner, as follows:

> At all times relevant hereto, Gavilon partnered with the Syngenta entities in the commercialization of Viptera and Duracade corn. Syngenta has publicly referred to Gavilon as its business "partner" in several news releases and marketing materials.  Also, in a joint letter to the North American Export Grain Association ("NAEGA") and the National Grain and Feed Association ("NGFA"), Syngenta represented that the commercialization of Duracade and the "Right to Grow" program was launched "in collaboration with" Gavilon.  The letter is personally signed and endorsed by Greg Konsor, Vice President and General Manager of Gavilon Grain, LLC. Under this partnership, Gavilon became responsible with the Syngenta entities for the launch, handling, stewardship, and channeling of Viptera and Duracade corn. Pursuant to the partnership, in addition to other responsibilities, Gavilon accepted Viptera and Duracade

---

[5]In light of this ruling, the Court does not address the ABCD defendants' arguments concerning the application of Rule 8 and personal jurisdiction; nor does it address Gavilon Grain's arguments concerning duty and the economic loss doctrine as applied to the claim against Gavilon Grain as grain handler.

grains and provided "stewardship and distribution services" related thereto. Although the Syngenta entities and Gavilon first announced their partnership formally on February 20, 2014 in relation to the "Right to Grow Program," it is the information and belief of Plaintiff that this partnership business between the Syngenta entities and Gavilon concerning the launch, handling, stewardship, and channeling of Viptera and Duracade corn existed for years prior to the formal announcement, including as early as 2011 when Viptera was first commercialized in the U.S. Further, at all times relevant hereto, Gavilon and the Syngenta entities have shared profits from this partnership business which they own, including revenues generated by the commercialization, marketing, and sale of Viptera and Duracade corn. In September of 2014, Syngenta announced that it "renewed and enhanced its program with Gavilon" and began to offer farmers a "per unit stewardship premium for each bag of Agrisure Duracade corn planted in 2015" and "consultative services through Gavilon to help them appropriately steward and market their corn[.]" Gavilon continues to directly encourage farmers to plant Duracade seed and promote the commercialization of Duracade despite the lack of import approval from China, stating that it "plan[s] to grow [its] network of accepting locations."

. . . At all times relevant hereto, Gavilon has partnered with the Syngenta entities in the commercialization of Viptera and Duracade corn . . . .

(Footnotes omitted.) Plaintiffs then allege conduct by "Syngenta", which they define to refer to the Syngenta defendants and Gavilon Grain collectively. Gavilon Grain moves to dismiss the "partnership" claims against it for failure to state a claim pursuant to Rule 12(b)(6).

First, these claims are subject to dismissal to the same extent that the Phipps plaintiffs' claims against Syngenta are subject to dismissal, as discussed below.

Second, the Court agrees that these plaintiffs' complaints do not allege sufficient facts to state a plausible claim that Syngenta and Gavilon Grain entered into a legal

partnership.   Plaintiffs allege that Gavilon Grain is a Delaware company with its principal place of business in Nebraska, but plaintiffs have not indicated which state's law should govern the claim that a partnership exists here.   The parties agree, however, that the basic elements of a legal partnership are co-ownership of a business and the sharing of profits.   *See, e.g.*, *In re KeyTronics*, 744 N.W.2d 425, 441-42 (Neb. 2008). The Phipps plaintiffs rely on their allegations that the parties referred to each other as "partners" or being in "collaboration" on particular occasions with respect to a Duracade program.   The Court agrees with Gavilon Grain, however, that because parties in business often use the word "partner" merely in the sense of working together, without intending to denote a legal partnership, the facts of these uses of the word "partner" are not sufficient to state a plausible claim that Gavilon Grain and Syngenta actually entered into a legal partnership under the law of any particular state.   *See, e.g.*, *Ely v. Perthuis*, 2013 WL 411348, at *6 (S.D.N.Y. Jan. 29, 2013) (plaintiff failed to plead adequately the existence of a legal partnership; "calling an organization a partnership does not make it one," and use of the word "partnership" "does not create a partnership unless there is an agreement to share profits and losses") (citations and internal quotations omitted); *T.G. Plastics Trading Co. Inc. v. Toray Plastics (America), Inc.*, 958 F. Supp. 2d 315, 327-28 (D.R.I. 2013) (use of "partner" or "partnership" colloquially in e-mails "does little to establish that a legal partnership existed").   In addition, the Phipps plaintiffs' conclusory allegation that Syngenta and Gavilon Grain shared profits, without any supporting facts,

is insufficient to support a plausible claim that a legal partnership existed.[6]

Third, the partnership allegations relate only to a program involving the commercialization of Duracade, and thus even if they were sufficient to support a claim that a partnership existed, they would not support a claim relating to Viptera, which Syngenta commercialized before Duracade.  Plaintiffs' conclusory allegation based on "information and belief" that the partnership also involved the commercialization of Viptera is insufficient in the absence of facts to support it.  Plaintiffs have alleged that Syngenta announced a "renewed and enhanced" program with Gavilon Grain involving Duracade, and they argue that one may reasonably infer that the program therefore existed prior to that announcement.  There are no factual allegations, however, to support a claim that the program went so far back to include the time when Viptera was commercialized (let alone that the reference to a "program" indicated the existence of a legal partnership).  Finally, even if the allegations were sufficient to support a claim of a partnership with respect to Duracade, plaintiffs have not alleged facts to support (or tried to explain) a plausible claim that acts in that partnership could have caused the alleged harm to the market, in light of the allegations that such harm had already been caused by the commercialization of Viptera.

Fourth, the Court agrees that, in referring collectively to Syngenta and Gavilon

---

[6]The Court rejects the Phipps plaintiffs' argument that their pleading bar is low and that they should be allowed to proceed to discovery to find facts to support their claim of a partnership.  Notably, none of the cases cited plaintiffs to support that argument were decided under the applicable standards from *Twombly*.

Grain throughout the complaints, the Phipps plaintiffs have not given Gavilon Grain sufficient notice of which acts by it are alleged to have been negligent. Plaintiffs are required to make clear whether they are alleging particular acts by Gavilon Grain or whether they only seek to hold Gavilon Grain vicariously liable for acts by its alleged partner.

For all of these reasons, the Court concludes that the Phipps plaintiffs have failed to state plausible claims against Gavilon Grain based on a partnership with Syngenta, and those claims are therefore subject to dismissal. It is possible, however, that these pleading deficiencies could be cured. Accordingly, if they are able to plead facts to support a plausible claim against Gavilon Grain based on a partnership with Syngenta, the Phipps plaintiffs are granted leave to amend their complaints in these eight cases, on or before September 6, 2016, to state such a claim. As discussed above, any such complaint must include facts to support the existence of a legal partnership; must include facts to support a partnership with respect to the commercialization of Viptera or allege a theory of causation in light of the claims against Syngenta involving Viptera; and must make clear whether Gavilon Grain is alleged to have committed specific negligent acts in the alleged partnership or whether plaintiffs assert only vicarious liability for acts by Syngenta.

## III.   **Claims Against Syngenta**

### A.   *Preemption*

18

Syngenta seeks judgment on certain negligence claims asserted by the master-complaint plaintiffs pursuant to Fed. R. Civ. P. 12(c), and dismissal of certain negligence claims asserted by the Phipps plaintiffs pursuant to Fed. R. Civ. P. 12(b)(6).  Syngenta argues that all negligence claims based on a duty other than a duty not to have commercialized Viptera and Duracade at all are preempted by the GSA.[7]  Syngenta argues that by those claims plaintiffs have asserted either a duty to channel or segregate Viptera and Duracade corn or a duty to ensure that others do so, and that either duty would impose a requirement that someone inspect corn for the genetic trait or describe the corn with respect to the presence or absence of that trait.  Thus, Syngenta argues that the Court's previous preemption analysis applies here as well to bar the claims against Syngenta.

Certainly, for the reasons stated in the Court's previous order and in the Court's preemption ruling herein with respect to claims against the ABCDG defendants, the GSA preempts any claim against Syngenta based on a duty to make sure that Viptera corn is kept segregated from other corn.  For instance, the master-complaint plaintiffs have alleged that responsible practice dictated that Syngenta not commercialize Viptera without effective channeling measures in place, and that one measure Syngenta could

---

[7]Syngenta states that all state-law claims (with the one exception) are preempted, but it has not explained how its arguments concerning the duties alleged by plaintiffs would also apply to the master-complaint plaintiffs' claims for tortious interference, for violations of various state consumer protection statutes, or for damage to movables under Louisiana law.  Therefore, the Court treats Syngenta's preemption argument as applying only to plaintiffs' negligence claims.

have taken was to trace its product through the supply chain. Plaintiffs have not specifically argued that such claims are not preempted, and the Court concludes that the GSA does preempt such claims.

The master-complaint plaintiffs state that they have brought three types of negligence claims.[8] First, plaintiffs have asserted that Syngenta was negligent in commercializing Viptera without approval from China. Syngenta does not argue that such claim is preempted. Second, plaintiffs argue that they have alleged various false and misleading representations by Syngenta and that such claims should not be preempted. The Court agrees with Syngenta, however, that plaintiffs by these complaints have not asserted any claim for negligent misrepresentation. Thus, there is no basis for Syngenta's liability based on false representations or omissions of fact in communications with plaintiffs.[9] Third, plaintiffs have asserted that Syngenta was negligent in commercializing Viptera without adequate safeguards. Those are the claims against Syngenta that are at issue in these motions.

As a preliminary matter, the Court addresses those duties asserted by plaintiffs in their opposition brief that Syngenta claims were not sufficiently pleaded in the

---

[8]The Phipps plaintiffs' allegations of negligence by Syngenta are largely similar to the allegations of negligence in the master complaints, and the Phipps plaintiffs have not argued that any of the duties they assert against Syngenta differ from those alleged by the master-complaint plaintiffs.

[9]Syngenta's potential statutory liability based on such statements is beyond the reach of this order. *See supra* note 7.

operative complaints.  The Court agrees with plaintiffs that they were not required, in pleading plausible claims against Syngenta, to identify every possible manner in which Syngenta might have satisfied a duty to act with reasonable care in the manner in which it commercialized Viptera.  Moreover, Syngenta's motion for judgment on the pleadings is based solely on GSA preemption.  Thus, the Court will not address any argument by Syngenta that certain negligence theories, to the extent they survive a preemption analysis, fail for lack of causation.[10]

For the same reasons set forth above, *see supra* Part II.A, the Court rejects plaintiffs' argument that a presumption against preemption should apply in considering the GSA's express preemption provision, as well as various arguments by the Phipps plaintiffs concerning the interpretation of the preemption statute.

Syngenta argues that plaintiffs' claims based on commercialization without sufficient safeguards are preempted because they would either require Syngenta to have undertaken measures to channel or segregate Viptera corn from other corn or require Syngenta to have made sure that others channeled or segregated Viptera corn.  Syngenta contends that segregation and channeling in either case would have required either inspection of the corn or description of the corn with respect to the presence or absence

---

[10]The Court also agrees with plaintiffs that they are allowed to pursue theories in the alternative.  Thus, plaintiffs might argue that, even if contamination was not practically inevitable as alleged, Syngenta was nonetheless negligent in failing to take certain actions (for instance, with respect to avoiding cross-pollination) that would have prevented plaintiff's injuries.

of MIR 162.

Plaintiffs note that Syngenta manufactured seeds and that the GSA applies only to grain, not seeds. The fact that the defendant is a seed manufacturer, however, does not preclude application of GSA preemption to claims against that defendant. The GSA preemption provision does not refer to state-law requirements imposed on any particular actor; thus, the statute preempts any claims based on a requirement of inspection or description by anyone, not just the seeming target of the state law. That interpretation, which is compelled by the plain language of the statute, is buttressed by cases in which the Supreme Court has rejected arguments that laws subject to preemption were aimed at different actors. *See American Trucking Ass'ns, Inc. v. City of Los Angeles, Calif.*, 133 S. Ct. 2096, 2104 (2013) ("We have often rejected efforts by States to avoid preemption by shifting their regulatory focus from one company to another in the same supply chain.") (citing *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371-73 (2008), and *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004)). Thus, the Court agrees that claims against Syngenta, a seed manufacturer, are nonetheless preempted if they impose a requirement of inspection or description based on the presence of MIR 162 *by anyone*.

On the other hand, the seed sold by Syngenta did not become a grain subject to the GSA until after it grew into corn. Thus, any claims based on duties that do not require anyone to have acted with respect to corn, after it has been grown by the farmers, would not be preempted under the GSA. That distinction provides the basic dividing

22

line between preempted claims and those claims that survive.

Plaintiffs point specifically to two types of measures that Syngenta could have taken to commercialize Viptera in a reasonable manner.  First, plaintiffs assert that Syngenta could have limited its sales of the product in a manner not to implicate the GSA.  For instance, a requirement to limit sales to farmers who agree not to sell the resulting corn outside their own states would not implicate the GSA's preemption provision, which applies only to requirements as conditions of sales or shipments in interstate or foreign commerce.  The Court agrees with plaintiffs that a claim based on a duty to limit sales in that manner is not preempted.

Plaintiffs also argue that they may pursue a claim based on a duty for Syngenta to limit its sales of Viptera to farmers who voluntarily promise (by contract or otherwise) to undertake channeling or segregation measures to avoid contamination of other corn. Plaintiffs argue that the GSA preemption provision does not reach such voluntary acts by the farmers.  *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005) ("An occurrence that merely motivates an optional decision does not qualify as a requirement [for purposes of a preemption provision]."); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 526 (1992) (common-law remedy for a contractual commitment voluntarily undertaken is not a requirement imposed under state law for purposes of a preemption provision).  It is true that the decision whether to agree to channeling measures may be voluntary for the farmers, but the duty asserted by plaintiffs would not be voluntary for Syngenta.  Under plaintiffs' theory of negligence, if Syngenta chose to sell its seeds at

23

all, it was *required* to sell them only to certain growers who made certain agreements, and inspection or description of corn by someone was *required*.  Thus, the Court rejects plaintiffs' argument that a duty to limit sales to purchasers who made certain promises would not impose a requirement under the preemption provision.[11]

Because a duty to limit sales would impose a requirement for purposes of the GSA, the question then becomes whether that requirement involves inspection or description of corn.  Thus, a duty to limit sales to those who agree to engage in channeling or segregation after the corn is harvested would impose such a requirement, and a claim based on that duty is therefore preempted.  A duty to limit sales to those who agree to take certain measures prior to harvesting the corn, on the other hand, would not implicate the GSA's preemption provision because no requirement concerning corn would be imposed.  Thus, for instance, any claim by plaintiffs based on a duty to limit sales to those who agree to take certain measures in planting the seeds to avoid cross-pollination would not be preempted.  Similarly, as noted above, a claim based on a duty to limit sales to those who would not sell their corn across state lines would not be preempted by virtue of the preemption provision's interstate or foreign commerce

_____

[11]*Bates* and *Cipollone*, on which plaintiffs rely, are distinguishable.  In those cases, the Supreme Court held that certain breach-of-warranty claims were not preempted because the defendant was not required to give the warranty but rather did so voluntarily; thus, the requirement to honor the warranty was not a state-law labeling requirement.  *See Bates*, 544 U.S. at 444-45; *Cipollone*, 505 U.S. at 525-26.  In this case, the GSA preempts any requirement of inspection or description, and imposition of a duty to limit sales in this manner might impose a requirement that inspection or description take place.

limitation.

Second, plaintiffs assert that Syngenta, in commercializing Viptera, could have undertaken measures to assist others in the industry to facilitate channeling.  Again, preemption of claims based on such duties turns on whether those measures relate to harvested corn or to the seeds sold by Syngenta prior to harvesting.  Thus, for example, any claim based on a duty to assist in the channeling or segregation of *corn* (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted.  A claim based on a duty to educate or assist farmers in planting their seeds to avoid cross-pollination, on the other hand, would not be preempted.

Just as plaintiffs were not required to identify every possible measure Syngenta could have taken to satisfy its duty to act reasonably in commercializing Viptera, the Court will not attempt to apply its preemption analysis to every possible measure that plaintiffs may assert.  Rather, the Court holds that plaintiffs' claims against Syngenta are preempted to the extent that they are based on duties that would require inspection or description of corn by reference to the presence or absence of MIR 162.  The Court thus grants in part and denies in part Syngenta's motions based on preemption under the GSA, and any claims that would be preempted under the Court's analysis are hereby dismissed.[12]

_____

[12]The Court rejects any argument by Syngenta that claims not preempted under the GSA's express preemption provision should be deemed impliedly preempted by that statute.  The Court concludes that Congress's intent to limit preemption in particular
(continued...)

B.   *Res Ipsa Loquitur*

In separate counts in their amended complaints, the Phipps plaintiffs have asserted claims against Syngenta for negligence and for *res ipsa loquitur*. Syngenta seeks to dismiss the latter count pursuant to Rule 12(b)(6) for failure to state a claim.

As a preliminary matter, the Phipps plaintiffs agree that *res ipsa loquitur* is a method of proof and does not provide a basis for a separate cause of action. Accordingly, the separate claim based on *res ipsa loquitur* is hereby dismissed.

Syngenta also argues that this theory is not available on these facts as alleged by the Phipps plaintiffs. The Court agrees as a matter of law that this is not the type of case in which the principle of *res ipsa loquitur* may be invoked, and it therefore dismisses any theory of negligence based on that principle.

The parties agree that this doctrine involves the same elements under any of the applicable states' laws, and they therefore argue based on the general law relating to *res ipsa loquitur*. Accordingly, the Court too relies on general statements of the law relating to this principle.

The principle of *res ipsa loquitur* (meaning "the thing speaks for itself") provides an exception to the usual requirement that specific acts of negligence must be shown.

_____

[12](...continued)
ways (applying only to state requirements for inspection or description, limited to sales or shipments in interstate or foreign commerce, applying only to grains within the scope of the GSA) is made plain in the GSA's express preemption provision, and that Congress therefore did not intend to preempt any claims asserted in this case that fall outside the scope of the express provision.

*See* Dan B. Dobbs, et al., *The Law of Torts* § 169 (2d ed. 2011).   Thus, as the

Restatement puts it:

> It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when
>
>> (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
>>
>> (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated; and
>>
>> (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

*See* Restatement (Second) of Torts § 328D(1).

In this case, plaintiffs have alleged specific acts of negligence by Syngenta.  Thus,

the principle of *res ipsa loquitur* is not appropriately applied here, as that principle is

intended to apply when a specific act of negligence cannot be shown.  In this case, even

if the jury is not sure which specific act of negligence caused the harm alleged,

Syngenta's liability would be based on specific acts.  Thus, there is no need to resort to

the inference provided by this principle.  *See* Dobbs, et al., *supra*, § 169.

In addition, the Court concludes that the event of plaintiffs' harm "is not of a kind

which ordinarily does not occur in the absence of negligence."  *See* Restatement

(Second) of Torts § 328D(1); *see also* Dobbs, et al., *supra*, § 169 (the requirements of

the principle are often explained "by saying that the injury must be of a kind which

ordinarily does not occur in the absence of negligence"); W. Page Keeton, et al., *Prosser

and Keeton on the Law of Torts* § 39 (5th ed. 1984) ("the event must be of a kind which

ordinarily does not occur in the absence of someone's negligence").  The seminal case invariably cited for the principle of *res ipsa loquitur* involved a pedestrian struck by a barrel of flour that fell from a window above; in that case, it was not known how the barrel escaped out of the window, but the event was of a kind that would not have occurred absent some negligence by someone.  *See* Dobbs, et al., *supra*, § 169.  The present case, however, is nothing like that typical case allowing an inference of negligence under the principle of *res ipsa loquitur*.  Plaintiffs allege that they were harmed by a drop in prices in the market for corn in this country.  That injury is not of a type that ordinarily does not occur in the absence of negligence, as changes in prices in a commodity market are routinely caused by any number of factors not involving negligence.  Even if the Court were to retreat one causal step from the injury, the result would be the same, as it cannot be said that a nation's rejection of shipments from another nation ordinarily is caused by negligence.  This is not the classic *res ipsa* case involving physical harm caused by a physical instrumentality, and plaintiffs have not cited any case in which the principle was applied in a case involving purely economic harm.  *See Fanok v. Carver Boat Corp., LLC*, 576 F. Supp. 2d 404, 412 n. 3 (E.D.N.Y. 2008) (noting that the parties had failed to direct the court "to any case for economic loss only applying *res ipsa loquitur*").

With respect to the remaining claims against Syngenta, the Phipps plaintiffs are free to try to show that Syngenta was negligent and that such negligence caused their injuries.  In attempting such proof, however, they are not entitled to rely on an inference

28

under the principle of *res ipsa loquitur*.  Accordingly, Syngenta's motion is granted with respect to the application of that principle in these cases.

### C.    *Pennsylvania Economic Loss Doctrine*

Syngenta also argues that any claims remaining in the *Crone* case (brought by Pennsylvania plaintiffs on behalf of a putative class of Pennsylvania residents) are barred under Pennsylvania law by the economic loss doctrine (the "ELD").[13]  In its prior order in which it rejected Syngenta's motion to dismiss the negligence claims asserted in the master complaints, the Court addressed application of the ELD under a number of states' laws, but it did not address Pennsylvania law.  *See In re Syngenta*, 131 F. Supp. 3d at 1193-1207.  It does so now.

The ELD is defined in the most general terms as a rule that prohibits a plaintiff from bringing a claim in negligence to recover solely economic damages.  *See id.* at 1193.  As it did in its previous motion to dismiss, Syngenta seeks application of the "stranger" ELD ("SELD"), which has been applied where (as here) the plaintiff and defendant had no direct or contractual relationship.  In its previous order, the Court reasoned as follows:

> As Dobbs (on whom Syngenta relies) makes clear, the doctrine is not applied absolutely and is subject to exceptions.  Syngenta relies on *Aikens* for that court's adoption of the SELD as the majority rule, but that

---

[13]In its original motion-to-dismiss ruling, the Court applied the law of the particular plaintiffs' home states, *see In re Syngenta*, 131 F. Supp. 3d at 1188, and the parties here have similarly assumed that Pennsylvania law governs the *Crone* plaintiffs' negligence claims.

court defined the doctrine as precluding recovery in the absence of some "special relationship" between the plaintiff and the tortfeasor. Syngenta argues that the "special relationship" cases that provide exceptions to the SELD invariably involve the provision of professional services, which circumstance is absent here. Syngenta has not cited cases, however, in which courts directly considered and rejected application of the SELD despite the presence of inter-connected relationships and markets as alleged here. Thus, even if the Court were to predict that all 22 jurisdictions would adopt the SELD, it would further predict that those jurisdictions would do so only in the right circumstances, in which the rationales for the doctrine would be furthered.

In this case, the Court cannot conclude with sufficient certainty that the rationales supporting the SELD would necessarily be furthered by application in this case. This is not a lack-of-access case, in which any member of the public could potentially assert a claim for economic loss, leading to remote and indeterminate liability that would be far out of proportion to the tortfeasor's culpability. At least as alleged by plaintiffs (which allegations must be accepted at this stage), liability would not be too remote, as Syngenta actually foresaw these very economic losses (as discussed *supra* with respect to the issue of duty); the scope of liability is not completely open-ended, as plaintiffs represent discrete classes of growers and sellers, all in an inter-connected market; and such foreseen effects would not be disproportionate to Syngenta's specific wrongful conduct that caused the very injuries foreseen. Moreover, any concern that economic damages are necessarily too speculative is eased in this case by the fact that corn and milo are regularly traded commodities with readily measurable markets. If plaintiffs' allegations are accepted as true, Syngenta is not unfairly being made an insurer for all growers; rather, plaintiffs assert claims to hold Syngenta responsible for particular actions having foreseeable and foreseen consequences.

For these reasons, unless a particular state's law essentially requires application of the SELD to bar plaintiffs' claims, the Court would predict, at this stage of the proceedings, that the relevant states would not bar these particular claims under the SELD.

*See id.* at 1195-96 (footnotes and citations omitted). The Court then reviewed the

applicable law from 22 different states (not including Pennsylvania), and it concluded

that "in none of these 22 states does the law provide a basis to predict that the state would apply the SELD in this case in the absence of circumstances in which application of the doctrine would further its rationales." *See id.* at 1206-07.  Thus, the Court denied Syngenta's motion to dismiss based on the SELD.  *See id.* at 1207.

Although it has not distinguished Pennsylvania law from any other state's law as previously discussed by the Court, Syngenta argues that Pennsylvania courts would apply the SELD in this case.  As before, unless Pennsylvania law essentially requires application of the SELD to bar the *Crone* plaintiffs claims, the Court predicts, at this stage of the proceedings, that Pennsylvania would not bar the claims under the SELD, based on the fact that the rationales supporting that doctrine may not be furthered in this case.

Pennsylvania courts generally trace that state's application of the ELD to an opinion by the Pennsylvania Superior Court (the state's intermediate appellate court) in *Aikens v. Baltimore & Ohio Railroad Co.*, 501 A.2d 277 (Pa. Super. Ct. 1985).  *Aikens* is properly considered a "stranger" case, as in that case the court refused to allow claims purely for economic loss by workers at a plant whose production was curtailed after a train derailment allegedly caused by the defendant's negligence.  *See id.*  Thus, unlike many of the states analyzed in the Court's prior order, Pennsylvania's courts have applied the SELD.  Although *Aikens* was decided by a lower court, the Pennsylvania Supreme Court has cited *Aikens* in noting that the ELD is well-established in Pennsylvania tort law.  *See Excavation Technologies, Inc. v. Columbia Gas Co. of Pa.*,

985 A.2d 840, 842-43 (Pa. 2009).

Syngenta argues that Pennsylvania courts apply the ELD without exception.[14] The cases, however, do not contain such an absolute statement as Syngenta suggests. Syngenta notes that in *Aikens* the court rejected the defendant's invitation to adopt the reasoning of the California Supreme Court in the *J'Aire* case "and to extend negligence liability to embrace purely economic loss." *See Aikens*, 501 A.2d at 279 (citing *J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979)). Syngenta argues that the *Aikens* court thus rejected a case-by-case approach to the application of the ELD. In *J'Aire*, however, the court considered various factors in determining that the defendant there owed a duty to the plaintiff, and it permitted a claim of negligent interference with prospective economic advantage; it did not purport to consider the ELD on a case-by-case basis. *See J'Aire*, 598 P.2d at 63-64. Nor did the *Aikens* court ascribe such intent to the California Supreme Court in declining to follow *J'Aire*. *See Aikens*, 501 A.2d at 279. Thus, although the court applied the SELD in *Aikens*, it did not state or suggest that the doctrine had to be applied in all cases without exception.

Syngenta also cites *Longenecker-Wells v. BeneCard Services, Inc.*, 2015 WL 5576753 (M.D. Pa. Sept. 22, 2015), in which the court applied the ELD despite the plaintiffs' argument that they comprised a well-defined class particularly known to the

---

[14]In response to this argument, the Phipps plaintiffs have not undertaken any analysis of Pennsylvania caselaw. Instead, and unhelpfully, they merely distinguish the allegations in the present case from the facts of *Aikens* and of another case cited by Syngenta for a list of exceptions to the ELD.

defendants, the economic damages were foreseeable, and the responsibility for the occurrence (a data breach) had not been allocated between the parties. *See id.* at * 5. In that case—which was not a stranger case—the federal court noted that a narrow exception previously recognized in Pennsylvania for negligent misrepresentation claims did not apply there (as had been ruled in other Pennsylvania cases involving data breaches), and it predicted that the Pennsylvania Supreme Court would not carve out a new exception to the ELD in that case. *See id.* at *5-7. The court did not state or suggest, however, that an exception would not be appropriate in *any* other case. Indeed, in concluding that the ELD should apply in that case, the court did consider certain polcy justifications for the doctrine (avoiding an undue burden on industrial freedom of action, creating a disproportion between the possible damages and the defendant's degree of fault). *See id.* at *6. Thus, the case does not undermine this Court's belief that the Pennsylvania Supreme Court would consider the rationales for the SELD in deciding whether to apply the doctrine in this case.

Syngenta cites *Dittman v. UPMC*, 2015 WL 4945713 (Pa. Ct. Common Pl. May 28, 2015), in which a trial court stated that Pennsylvania courts had already engaged in a balancing of factors in adopting the ELD. *See id.* at *3. Syngenta argues that this Court therefore should not consider any policy rationales in deciding whether to apply the SELD under Pennsylvania law. *Dittman* does not support that argument, however, as in that case, the factors referenced by the court were those applicable to the determination of whether a duty exists, an analysis of which is presupposed by adoption

33

of the ELD.  *See id.*  This Court is concerned with the rationales for the ELD and whether that doctrine should be applied if those rationales would not be furthered.

Syngenta notes that in *In re One Meridian Plaza Fire Litigation*, 820 F. Supp. 1460 (E.D. Pa.), *rev'd on other grounds sub nom. Federal Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270 (3d Cir. 1993), the court referred to the ELD as providing a "bright-line" rule "which allows courts to easily determine who may recover for economic loss in lieu of making difficult foreseeability determinations." *See id.* at 1473.  In making that statement, however—for which the court cited no authority—the court did not indicate or suggest that no exceptions to the ELD were permitted under Pennsylvania law.  *See id.*  Moreover, the court did consider the "underlying reasoning behind the [ELD]" in declining to recognize an exception in that case.  *See id.* at 1484.  The Court concludes that a consideration of that reasoning leads to the opposite result in this case.

Finally, in *Hemispherx Biopharma, Inc. v. Asensio*, 1999 WL 144109 (E.D. Pa. Mar. 15, 1999), the court applied the ELD despite the plaintiff's argument for an exception based on the foreseeability of the harm in that case.  *See id.* at *13.  Again, however, the court did not indicate that Pennsylvania law forecloses the possibility of an exception to the ELD in a case in which the rationales for that doctrine would not be furthered.

In fact, Pennsylvania courts *have* made exceptions and refused to apply the ELD in various circumstances.  In *Built-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005), one of the two cases in which the Pennsylvania Supreme Court

34

has addressed the ELD, the court made an exception to the ELD for claims for negligent misrepresentation under Section 552 of the Restatement. *See id.* Courts in Pennsylvania have recognized exceptions to the ELD under that state's law for professional negligence claims, *see Sherman v. John Brown Ins. Agency Inc.*, 38 F. Supp. 3d 658, 663 (W.D. Pa. 2014); in the case of special relationships, involving confidentiality, the repose of special trust, or fiduciary responsibilities, usually with a disparity of bargaining strength, *see Enslin v. Coca-Cola Co.*, 136 F. Supp. 3d 654, 672-73 (E.D. Pa. 2015); and for claims of fraud in the inducement relating to the quality of a product, *see Air Prods. and Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 337 (E.D. Pa. 2003). In *Mt. Lebanon School District v. W.R. Grace & Co.*, 607 A.2d 756 (Pa. Super. Ct. 1992), the court seemingly created an exception to the ELD based on the particular circumstances of the case, as it rejected an argument based on the ELD in allowing a public entity to sue in tort for the costs of removing asbestos from a public building. *See id.* at 763-64.

Accordingly, a review of Pennsylvania caselaw reveals that courts in that state have not foreclosed the possibility of an exception to the ELD, and Pennsylvania caselaw does not essentially require application of the SELD in these circumstances where the purposes of the doctrine would not be furthered by its application. The Court predicts, as it did with respect to the other states' highest courts, that the Pennsylvania Supreme Court would not apply the SELD in this case. Thus, the Court denies Syngenta's motion to dismiss the *Crone* plaintiffs' remaining claims on this basis.

D.      *FIFRA Preemption*

Syngenta argues that any claims by the Phipps plaintiffs based on Syngenta's alleged failure to warn growers using its products are preempted by a provision in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136v(b).  In ruling on the original motion to dismiss the master complaints, the Court granted a similar motion in part, as follows:

> Plaintiffs have alleged, as a basis for their various claims, Syngenta's failure to warn farmers of risks in growing Viptera, and that claim is reasonably interpreted to include a claim that Syngenta failed to warn purchasers of its products.  Because such warnings might ordinarily be included in materials accompanying the products, plaintiffs' complaints do appear to include a claim that seeks to impose a labeling requirement not found among FIFRA's statutory requirements.  Even though plaintiffs appear to disavow any such claim, the Court nevertheless grants the motions to dismiss, and it dismisses any claim based on an alleged failure to warn to the extent that such claim is based on a lack of warnings in materials accompanying the products.

*See In re Syngenta*, 131 F. Supp. 3d at 1208.  In the present cases as well, the Phipps plaintiffs insist that they have not asserted a claim that Syngenta negligently failed to warn in their labels or packaging.  Their complaints, however, do contain allegations that Syngenta failed to inform Viptera farmers adequately about segregation and channeling of Viptera.  Thus, the Court applies its previous ruling here as well, and it therefore dismisses any claim by the Phipps plaintiffs based on an alleged failure to warn to the extent that such claim is based on a lack of warnings in materials accompanying Syngenta's products.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Syngenta's motion for partial judgment on the pleadings (Doc. # 1927) is hereby **granted in part and denied in part**, as set forth herein, and Syngenta is granted judgment on the claims deemed preempted by the Court.

IT IS FURTHER ORDERED BY THE COURT THAT defendant Syngenta's motion to dismiss in the Phipps cases (Doc. # 2122) is hereby **granted in part and denied in part**.  The motion is granted with respect to claims based on a theory of *res ipsa loquitur* and certain other claims that are preempted, as set forth herein, and such claims are hereby dismissed.  The motion is otherwise denied.

IT IS FURTHER ORDERED THAT the ABCD defendants' motion to dismiss in the Phipps cases (Doc. # 2125) is hereby **granted**, and all claims against those parties are hereby dismissed.

IT IS FURTHER ORDERED THAT defendant Gavilon Grain's motion to dismiss in the Phipps cases (Doc. # 2119) is hereby **granted**, and the claims against that defendant are hereby dismissed; although the Phipps plaintiffs are granted leave to file amended complaints, on or before **September 6, 2016**, to cure pleading deficiencies relating to their claims against Gavilon Grain based on the existence of a partnership.

IT IS SO ORDERED.

Dated this 17th day of August, 2016, in Kansas City, Kansas.

s/ John W. Lungstrum

_____
John W. Lungstrum
United States District Judge