IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: SYNGENTA AG MIR 162 | ) | MDL No. 2591 |
| CORN LITIGATION | ) | |
| | ) | Case No. 14-md-2591-JWL |
| This Document Relates To All Cases | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the producer plaintiffs' motion for class
certification (Doc. # 2156).  The Court conducted a hearing on the motion on September
13 and 14, 2016.  After considering testimony and argument presented at the hearing and
the parties' written submissions, the Court concludes that certification of one nationwide
class and eight statewide classes is appropriate under Fed. R. Civ. P. 23.  Accordingly,
the Court **grants** the motion, and it certifies classes as set forth more fully herein.

## I.   Background

In this multi-district litigation (MDL), co-lead counsel have filed master
complaints on behalf of producers and non-producers of corn in the United States, in
which plaintiffs assert various claims against defendants (collectively "Syngenta")
relating to Syngenta's commercialization of corn seed products known as Viptera and
Duracade, containing a genetic trait known as MIR 162, without approval of MIR 162
corn by China, an export market.  Plaintiffs, who did not use Syngenta's products, allege
that Syngenta's commercialization of its products caused corn containing MIR 162 to

be commingled throughout the corn supply in the United States; that China rejected imports of all corn from the United States because of the presence of MIR 162; that such rejection caused corn prices to drop in the United States; and that plaintiffs were harmed by that market effect. Plaintiffs assert claims under the federal Lanham Act and various state-law claims.

By the present motion, producer plaintiffs seek certification of a nationwide class to pursue the Lanham Act claims; and certification of eight statewide classes (consisting of producers in Arkansas, Illinois, Iowa, Kansas, Missouri, Nebraska, Ohio, and South Dakota) to pursue negligence claims, as well as tortious interference claims in the case of the Arkansas and Missouri classes, and statutory consumer protection claims in the case of the Illinois and Nebraska classes. Plaintiffs also seek appointment of class counsel. Syngenta opposes certification of these classes. Certification is also opposed by a group of plaintiffs in eight cases in the MDL ("the Phipps plaintiffs"). Plaintiffs, Syngenta, and the Phipps plaintiffs submitted expert reports in support of their briefs on the motion. At the hearing, the Court heard testimony from plaintiffs' experts on cross-examination by Syngenta and re-direct examination by plaintiffs.[1]

## II.    Class Definition and Ascertainability

The Court begins its analysis with the class definitions proposed by plaintiffs.

---

[1]Plaintiffs chose not to cross-examine Syngenta's experts at the hearing.

The Court has noted that "[d]efining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule 23(b)(3) action." *See In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 444 (D. Kan. 2006) (Lungstrum, J.) (internal quotations omitted) (quoting *Manual for Complex Litig.* § 21.222, at 270 (4th ed. 2005)), *aff'd*, 768 F.3d 1245 (10th Cir. 2014).   "The definition must be precise, objective, and presently ascertainable." *See id.* at 445 (quoting *Manual for Complex Litig.* § 221.222, at 270).

In their class action master complaint, plaintiffs have defined the classes to consist of all corn producers in the United States (in the case of the nationwide class) or in a particular state (in the case of the statewide classes) who "priced their corn for sale after November 18, 2013," excluding Court personnel, Syngenta personnel, and government entities.   In their motion for certification, plaintiffs have further modified the class definitions by excluding producers who purchased Viptera or Duracade seeds (from Syngenta or any other source),[2] and by excluding all producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel.

---

[2]In the complaint, plaintiffs excluded from the statewide classes producers who had purchased Viptera or Duracade from Syngenta or a Syngenta-licensed dealer and who had signed a stewardship agreement with Syngenta.

Syngenta argues that membership in the classes is not sufficiently ascertainable.[3] Although the Tenth Circuit has not discussed an ascertainability requirement, most of the other circuit courts have imposed such a requirement, by which the proposed class must be readily identifiable. *See Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (citing cases). A few circuit courts have applied a stricter standard of ascertainability, by which the plaintiff must show not only that the class is defined by reference to objective criteria, but also that class members may be determined in an economical and "administratively feasible manner," such that "class members can be identified without extensive and individualized fact-finding or mini-trials." *See Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (internal quotations omitted); *see also Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (applying similar standard); *Karhu v. Vital Pharmaceuticals, Inc.*, 621 F. App'x 945, 947 (11th Cir. 2015) (applying similar standard). Other courts have criticized and rejected such a heightened standard for ascertainability. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659-72 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161 (2016); *Sandusky Wellness Center*, 821 F.3d at 996 (discussing *Carrera* and the criticism of that standard in *Mullins*, and declining to adopt a heightened standard of ascertainability);

---

[3]Plaintiffs did address the requirement of ascertainability in their opening brief (albeit in a footnote), and Syngenta had the opportunity at the hearing to respond to any argument raised by plaintiffs in their reply brief; thus, the Court rejects Syngenta's argument that the entire motion should be denied on the basis that plaintiffs' waived any argument on the issue of ascertainability.

4

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) ("We see no reason to follow *Carrera*, particularly given the strong criticism it has attracted from other courts."), *cert. denied*, 136 S. Ct. 1493 (2016).

In *Mullins*, the Seventh Circuit endorsed the "weak" version of ascertainability, under which the class definition must not be too vague, the class must not be defined by subjective criteria, and the class must not be defined in terms of success on the merits. *See Mullins*, 795 F.3d at 659-60. The court rejected the Third Circuit's stricter standard from *Carrera* that requires an administratively feasible mechanism for identifying class members, particularly to the extent that that standard does not allow for self-identification as a class member (for instance, by affidavit). *See id.* at 662. The Seventh Circuit concluded that the stricter version of ascertainability does not further any interest not already protected by Rule 23's explicit requirements, as any concern about administrative convenience is more properly addressed in the context of Rule 23(b)(3)'s requirement that a class action be superior to other methods of adjudication. *See id.* at 662-65. The Seventh Circuit also concluded that a higher standard is not necessary to prevent unfairness to absent class members, as Rule 23 requires not actual notice to all members but only the best notice practicable; that the risk of fraudulent claims is low; and that the lower standard does not deny the defendant due process. *See id.* at 665-72.[4]

_____

[4]In rejecting the due process rationale, the Seventh Circuit cited to *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014), in which the Tenth Circuit rejected a Seventh Amendment challenge to allocation on the basis that the defendant does not
(continued...)

The Court is persuaded by the thorough and well-reasoned analysis of the Seventh Circuit in *Mullins*. Thus, it declines Syngenta's invitation to apply a standard—one not adopted by the Tenth Circuit—that would preclude certification without a showing that class members may be determined in an administratively feasible manner.

The Court concludes that the proposed class definitions are properly based on objective criteria and are not impermissibly vague. Syngenta takes issue with the class definitions' requirement that the corn have been "priced" after November 18, 2013. Syngenta argues that the term "priced", without further definition, is too vague, particularly in light of the different types of possible sale contracts. The Court rejects this argument, and it concludes that the term "priced" is reasonably and properly understood to refer to the date on which the price for particular corn is agreed upon by the parties to the sale. The Court also rejects Syngenta's argument that determination of the date on which a producer priced its corn would require cumbersome individual inquiries in light of the possible types of contracts and producers' incomplete records or faulty memories (to the extent that such difficulty may bear on the superiority inquiry). As plaintiffs point out, a producer need only establish a single sale after November 18, 2013, to show membership in the class, and corn purchasers are generally required to keep records of contracts. To the extent necessary, a producer may be able to establish

---

[4](...continued)
have an interest in the method of distributing aggregate damages. *See Mullins*, 795 F.3d at 670 (citing *Urethane*, 768 F.3d at 1269).

membership in the class properly by affidavit.  The Court is not persuaded that the determination concerning whether a producer "priced" any corn after the relevant date will be particularly onerous.

Syngenta also challenges the definitions' use of the term "producer".  In their complaint, plaintiffs have defined that term as follows:

> "Producer" is defined as an owner, operator, landlord, waterlord, tenant, or sharecropper, who shares in the risk of producing corn and who is entitled to share in the corn crop available for marketing from the farm, as reflected in FSA Form 578.  A landlord who receives only a fixed cash amount for renting the land that does not vary with the size of, or pricing for, the crop is not a Producer.

Syngenta argues that a determination of who actually shares in the risk and crop for any particular farm would require an individual inquiry in light of the different possible ownership arrangements, as shown by discovery of some individual plaintiffs.  In their reply brief and at the hearing, however, plaintiffs clarified that their proposed definitions turn entirely on the identification of producers on the USDA's Farm Service Agency (FSA) Form 578.  With that clarification and modification, the Court agrees that the proposed definitions are sufficiently objective and definite with respect to the requirement that the class member be a "producer".  *See Davoll v. Webb*, 194 F.3d 1116, 1147 (10th Cir. 1999) ("If the court finds that the proposed definition is not sufficiently definite, it may modify the definition instead of dismissing the proposed action.").  Syngenta complains that discovery has revealed that some Form 578s are not accurate with respect to the actual ownership situation.  Use of the form, however, provides a

reasonably reliable and objective method of identifying corn producers in this country. Syngenta also complains that some farmers are not required to submit such forms. Again, however, reliance on the form is reasonable, and Syngenta has not explained how the failure to capture every injured party within a definition dooms class certification. Any injured party not included in the class remains free to pursue its own action against Syngenta.

Finally, Syngenta complains that the proposed classes are overbroad because they may include some producers who did not actually suffer injury. Syngenta relies on caselaw stating that if "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012). Syngenta argues that some producers may not have been injured by a drop in central market prices because of local pricing, or because they sold specialty corn, or because they benefitted by selling other crops or in feeding livestock. Those are merits-based defenses, however, and there is no basis to conclude that a "great number" of members *could not have been harmed* as alleged by plaintiffs. *See id.* ("critical" distinction is that "if a proposed class consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits"). Syngenta also notes that the exclusion of "purchasers" of Viptera and Duracade allows for the inclusion in

8

the class of non-purchaser users of those products.  Syngenta has not provided any evidence of such users, however, and there is no basis to conclude that the definitions include a "great number" of such farmers.  Indeed, under Tenth Circuit law, the possibility or even inevitability that the class will include members not injured by the defendant's conduct does not preclude class certification.  *See Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (10th Cir. 2009).[5]

In summary, plaintiffs' class definitions (as modified herein) are sufficiently definite and objective, and the Court rejects Syngenta's arguments that membership is not properly ascertainable.  Thus, the Court finds that plaintiffs have met any requirements for certification relating to class definition and ascertainability.

### III.    Rule 23(a) Requirements

"[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotation omitted).  Rule 23(a) contains the following four prerequisites:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the

---

[5]Syngenta has not argued that the class definitions are improper or that membership is not ascertainable with respect to the exclusions for Court personnel, Syngenta personnel, and certain plaintiffs in Minnesota state court, or that the purchasers of Viptera and Duracade are not readily identifiable, and the Court finds that the classes are properly defined with respect to such exclusions.

representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a). Neither Syngenta nor the Phipps plaintiffs challenge certification based on these factors,[6] and the Court finds that all of the requirements of Rule 23(a) are satisfied here.

First, plaintiff has provided statistics showing that there are thousands of corn farms in each of the eight states for which statewide classes are proposed, and even after excluding Viptera and Duracade purchasers (based on Syngenta's records) and certain Minnesota state-court plaintiffs, each class would still have thousands of members (with the exception of the Arkansas class, which would have over 600 members). Thus, in the case of each proposed class, joinder of so many members in a single suit would be impracticable, and the Court thus finds the requisite numerosity here.

Second, the Court finds that there are questions of law or fact common to the classes. For purposes of Rule 23(a)(2), even a single common question suffices. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). In this case, there are a great number of common questions of fact or law, including but not limited to the following: Syngenta's acts and knowledge in commercializing these products; Syngenta's duty of care with respect to that commercialization, and whether Syngenta breached that duty

---

[6]Syngenta's brief contains language suggesting that commonality and typicality are not satisfied here, but in each case, Syngenta's argument is based on a lack of predominance, which the Court addresses below under Rule 23(b).

(in the case of the negligence claims); Syngenta's representations and whether those representations were false or misleading (in the case of the statutory claims); whether Syngenta intentionally interfered with corn producers' business expectancies (in the case of the tortious interference claims); China's rejection of corn from the United States, and whether Syngenta's actions caused or contributed to that rejection; the importance of China as an export market; and the effect of China's rejection on the corn market in the United States.  Essentially, anything concerning Syngenta's actions and the general effects of those actions presents a common question that will be addressed and answered by common proof.

Third, all of the class members are alleged to have suffered the same injury (lower corn prices from a depressed market) resulting from the same conduct.  Thus, the Court finds that the claims of the class representatives are typical of the claims of the class.

Fourth, the Court finds that the requirement of adequacy of representation is satisfied in this case.  The class representatives' claims are typical, and they have already participated in answering discovery from Syngenta.  Syngenta has not suggested any reason why the class representatives lack sufficient incentive to prosecute fully the claims on the behalf of the classes.  Moreover, the history of this litigation has demonstrated that proposed class counsel (who are presently co-lead counsel for plaintiffs in the MDL) will diligently and ably prosecute the class claims, and Syngenta has not suggested otherwise.

11

## IV.  Rule 23(b) Requirements

Plaintiffs seek certification pursuant to Fed. R. Civ. P. 23(b)(3), which requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See id.* The Court addresses those requirements of predominance and superiority in turn.

### A.  *Predominance of Common Questions*

The Supreme Court recently explained the predominance inquiry under Rule 23(b)(3) as follows:

> The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case.  An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.  The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.  When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations and internal quotations omitted).

As noted above, all plaintiffs allege that the same conduct by Syngenta caused the

12

same injuries (lower corn prices); thus, this litigation involves a great many common questions, including all issues regarding Syngenta's conduct and the effects of that conduct.  Thus, with respect to the Lanham Act and state statutory claims, common issues include Syngenta's representations and whether they were false or misleading.  With respect to plaintiffs' negligence claims, common issues include Syngenta's duty of reasonable care, Syngenta's acts in commercializing the products and in seeking approval from China, and whether Syngenta breached its duty of care.  With respect to the tortious interference claims, common issues include Syngenta's interference with sales of corn and Syngenta's intent.  Common issues relating to causation include the effect of Syngenta's actions on the corn supply, China's rejection of United States corn and the reasons therefor, and the effect on the domestic corn market from China's rejection of corn.  Syngenta's defenses relating to its own conduct or to causation also will be the subject of class-wide proof and thus present common issues.  Moreover, plaintiffs intend to prove the fact and amount of damage through expert testimony in a class-wide manner, by estimating the per-unit effect on the domestic corn market from China's rejection of corn from the United States.  Thus, the common issues in the case are far more prevalent and important than any remaining individual issues, and the Court thus finds that common questions do predominate for purposes of certification under Rule 23(b)(3).

For their primary argument on this issue, Syngenta and the Phipps plaintiffs contend that the fact and amount of damage present individual issues that are so

important as to defeat predominance.  With respect to those elements, plaintiffs' theory is that the decreased demand resulting from China's rejection of corn lowered centralized futures prices for corn on the Chicago Board of Trade (CBOT) commodities market, and that class members suffered injury because of the corresponding decrease in the prices at which they sold their corn.  Syngenta and the Phipps plaintiffs and their experts criticize the opinions and analyses of plaintiffs' experts, and they take issue with the conclusion that changes in the CBOT prices are reflected in local prices.

The parties dispute the standard by which the Court should consider the opinions of plaintiffs' experts.  Relying on recent Supreme Court cases, Syngenta argues that plaintiffs must prove (and not merely plead or make a *prima facie* case) that the Rule 23 requirements are met, and they argue that the Court must therefore weigh the competing expert opinions (and choose a winner).  In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), a case involving a request for certification under Rule 23(b)(2), the Court addressed the standard for satisfying the Rule 23(a) requirements as follows:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.  We recognized in [*General Telephone Co. of Southwest v.*] *Falcon* that sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.  Frequently, that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.

*See id.* at 351 (citations and internal quotations omitted).  Subsequently, in *Amgen Inc.*

14

*v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013), a case involving certification under Rule 23(b)(3), the Court noted its prior call in *Wal-Mart* for a rigorous class-certification analysis. *See id.* at 1194. It further noted its statement from *Wal-Mart* that such analysis may entail some overlap with the merits of the plaintiff's claim, but the Court made clear that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *See id.* at 1195-96. One month later, in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), a Rule 23(b)(3) certification case, the Court stated that a party seeking certification must not only be prepared to prove the Rule 23(a) requirements, but "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)," and that the same analytic principles governing satisfaction of Rule 23(a) (including consideration of the merits as necessary) govern Rule 23(b). *See id.* at 1432.

This year, the Supreme Court issued its opinion in *Tyson Foods*, on which plaintiffs rely. In that case, the district court certified a class alleging that they were improperly denied pay for time spent donning and doffing their equipment at work. *See* 136 S. Ct. at 1042-43. The plaintiffs relied on an expert who averaged and estimated donning and doffing times on a class-wide basis. *See id.* at 1043. The Supreme Court refused to adopt a rule prohibiting the use of such representative evidence in class-action cases. *See id.* at 1046. The Court then noted that if each class member could have relied

on the representative evidence to establish liability in an individual action, then use of

that evidence is permissible to establish the number of hours to show class-wide liability

in a class action.  *See id.* at 1046-47.  The Court then addressed a district court's proper

consideration of such evidence:

> This is not to say that all inferences drawn from representative evidence in an FLSA case are just and reasonable.  Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked.  Petitioner, however, did not raise a challenge to respondents' experts' methodology under *Daubert*; and, as a result, there is no basis in the record to conclude it was legal error to admit that evidence.

> Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury.  Reasonable minds may differ as to whether the average time [the expert] calculated is probative as to the time actually worked by each employee.  Resolving that question, however, is the near-exclusive province of the jury.  The District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing.

*See id.* at 1048-49 (citations omitted).

Similarly, in the present case plaintiffs rely on expert opinions concerning the

general market price decrease, which plaintiffs then seek to apply to each class member's

sales of corn.  Although Syngenta challenges the reliability of those experts' opinions,

it, like the defendant in *Tyson Foods*, did not raise a *Daubert* challenge, and the Court

assumes the admissibility of those opinions at this stage.  In this action, plaintiffs could

rely on those opinions to show liability and damages in an individual class member's

suit; thus, under *Tyson Foods*, a plaintiff class may rely on those opinions to show class-

wide liability. Syngenta argues that the fact and amount of injury present individual issues because the CBOT price is not sufficiently tied to local corn prices. The Court does not weigh the class-wide evidence concerning the relationship between CBOT and local prices, however, as the persuasiveness of such evidence is for the jury at trial. The Court concludes that a reasonable juror could believe that local corn prices do reflect changes in the CBOT futures price, as opined by plaintiffs' experts. Therefore, under *Tyson Foods*, the Court cannot deny class certification on the ground argued by Syngenta. Plaintiffs are required to offer evidence to show predominance, and they have done so here.

The Court further concludes that the ultimate determination of the fact and amount of damage does not pose a risk that individual inquiries will predominate because if the jury rejects plaintiffs' theory that CBOT price changes are reflected in local prices, the case will effectively be lost, as plaintiffs will be unable to prove the fact of injury. In *Amgen*, a securities case, the plaintiffs sought to prove a class-wide case by invoking a presumption of reliance, and the Court held that the plaintiffs were not required to prove materiality (a requirement for the presumption) at the certification stage because a failure of proof on that element would doom any claim on the merits (whether asserted in an individual action or a class action). *See Amgen*, 133 S. Ct. at 1194-1203. Thus, a failure of proof on materiality did "not give rise to any prospect of individual questions overwhelming common ones," for purposes of Rule 23(b)(3)'s predominance requirement. *See id.* at 1199. Similarly, in *Tyson Foods*, the Court stated

that the defendant's attacks on the plaintiffs' expert's opinions were common to the claims, and, citing *Amgen*, noted that failure of proof on that common question would have ended the litigation and thus would not have caused individual questions to predominate. *See Tyson Foods*, 136 S. Ct. at 1036. For the same reason, Syngenta's arguments against plaintiffs' experts' opinions do not present individual issues.

Moreover, after considering the parties' submissions, the Court is persuaded that CBOT price changes are reflected in local prices. Plaintiffs' experts opined to that effect, based on standard economic studies, and those opinions are persuasive. Syngenta and the Phipps plaintiffs argue that local prices are affected by local factors (known as the "basis"), and that particular changes in those prices often do not mirror changes in the CBOT prices. As plaintiffs' experts explained, however, the fact that local prices may not decrease as much as the CBOT prices, or may even increase despite a CBOT decrease, do not mean that the CBOT change was not felt locally, as the local factors may have added to or offset that CBOT decrease.[7]

Syngenta concedes that local prices are generally expressed as a sum of the CBOT futures price and the basis (the effect of local factors). It argues, however, that reliance on that arithmetic statement to assume that CBOT changes are fully translated into the calculation of the local price represents a tautology, and that local prices are set

---

[7]Thus, as an example, if the CBOT price dropped ten cents while the local price increased five cents, that would not mean that the CBOT change did not affect the local price, which might have increased 15 cents but for the CBOT change.

based on local factors, without regard to changes in the CBOT price. It is true that one cannot merely rely on the sum to prove the point. Plaintiffs' experts have opined, however, that the CBOT price is a factor in setting local prices in this industry. That makes a great deal of sense—it would defy logic if the overall demand for corn, as reflected in the centralized exchange price for the commodity, did not bear on local prices. Indeed, Syngenta does not dispute the fundamental economic principle that decreased demand for a commodity results in lower prices.

Moreover, the data concerning the prices at which corn sales have historically taken place in the United States (the GeoGrains data), which both sides have cited, includes reference to the CBOT prices on the dates of those sales. Syngenta's experts have also conceded that local contract prices are customarily expressed in terms of the CBOT price. Those facts provide evidence that, even if pricing is not as simple as adding a local basis to the CBOT price, the CBOT price is at least factored in, or serves as the starting point from which local prices are determined, and that changes in the CBOT price would therefore be reflected in local prices.

Finally, plaintiffs have provided evidence, in the form of declarations from employees at Cargill and ADM, two large corn purchasers, that prices paid by those companies for corn are based on CBOT prices and that changes in CBOT prices are fully reflected in local prices. Syngenta points to depositions in which other employees of those companies testified that local prices depend on desired profit margins and local factors. That testimony is not inconsistent, however, as the ultimate price could be set

19

by local factors after the CBOT has provided the baseline price.[8]

Syngenta relies on *In re Genetically Modified Rice Litigation*, 251 F.R.D. 392 (E.D. Mo. 2008), in which the court denied class certification in a case involving a similar theory based on a depressed market. In the *Rice* case, the court concluded that the calculation of damages presented an individual issue, requiring "a unique inqiry into the time, place, and manner in which each plaintiff both priced and sold his rice." *See id.* at 398. In that case, however, the court relied in part on evidence that not every plaintiff had his rice priced according to the CBOT and that some producers sold rice based on a separate index not tied to the CBOT price. *See id.* In this case, plaintiffs have provided persuasive evidence that corn is generally sold in this country at prices based on the CBOT prices.

In addition, the *Rice* court was not bound by the opinion in *In re Urethane Antitrust Litigation*, 768 F.3d 1245 (10th Cir. 2014), in which the Tenth Circuit upheld the certification of a class by this Court. *Urethane* involved allegations of a price-fixing conspiracy in violation of antitrust law, and the Tenth Circuit concluded that this Court properly relied on evidence that the alleged price-fixing would have affected the entire market and thus raised baseline prices for all buyers, even if prices were individually negotiated. *See id.* at 1254-55. The Tenth Circuit concluded that this Court thus had the

---

[8]Syngenta has also argued that lower overall demand could also impact local factors, which impact would skew any direct correlation between CBOT and local price changes. Plaintiffs' expert testified persuasively, however, that decreased exports generally do not affect local factors.

discretion, for purposes of class certification, to treat impact as a common question capable of class-wide proof. *See id.* at 1255. The Tenth Circuit further noted that "[t]he presence of individualized damages issues would not change this result," as "[c]lass-wide proof is not required for all issues" for predominance under Rule 23(b)(3). *See id.* (citing *Amgen*, 133 S. Ct. at 1196). Finally, the Tenth Circuit sanctioned the plaintiffs' reliance on aggregate damages for the class. *See id.* at 1268-69.

Syngenta argues that *Urethane* should be distinguished because in that case the Tenth Circuit noted that antitrust law permits an inference of class-wide impact from price-fixing. *See id.* at 1254. It is true that a similar legal inference does not operate here; but as a factual matter, the tie between changes in the baseline price and changes in the actual prices would be even stronger in this case than in *Urethane*, as the present case involves a baseline set by a centralized commodities exchange and not a baseline set by a more informal market. Thus, the Court concludes that these issues of the fact and amount of damage are common issues that may be addressed by class-wide proof for the same reasons noted by this Court and the Tenth Circuit in *Urethane*.

Syngenta also argues that individual inquiries of all class members are required because some producers may in fact have benefitted from the ban of United States corn in China and the resulting drop in corn demand and prices, for instance from the corresponding increase in milo prices or from the lower price for feed for livestock. Plaintiffs respond that any such gains would not fall within the offsetting benefits rule, and that it would violate the collateral source doctrine to reduce damages for such gains.

The Court does not decide that legal issue now, but it is worth noting that the availability of such offsets presents a common question.  Moreover, even if offsets for higher milo prices were permitted, plaintiffs' expert testified that he could conduct a similar analysis involving milo to determine an aggregate offset on a class-wide basis.  In addition, Syngenta has not identified any class member whose gains from milo sales and livestock purchases would completely offset the damages from lower corn prices under plaintiffs' damage models, and thus it is speculative whether any class members had no injury for these reasons.  There is certainly no basis to conclude that the necessary individual inquiries would be so overwhelming as to defeat predominance, and, as noted above, Tenth Circuit law allows for certification of a class that may or will include members that have not been injured. *See Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (10th Cir. 2009).

With respect to the calculation of damages, Syngenta quotes *Comcast* in arguing that plaintiffs must provide a damages model that "establish[es] that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *See Comcast*, 133 S. Ct. at 1433.  Multiple circuit courts, however, including the Tenth Circuit, have rejected such a reading of *Comcast*, which did not create a broadly applicable rule as suggested by Syngenta. *See Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) (even after *Comcast*, "there are ways to preserve the class action model in the face of individualized damages"); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 & n.10 (3d Cir.

22

2015) (rejecting such a reading of *Comcast*, consistent with decisions of several sister circuit courts) (citing cases); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir.) (it is a misreading of *Comcast* to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement"), *cert. denied*, 135 S. Ct. 754 (2014); *see also Urethane*, 768 F.3d at 1258 (10th Cir.) (in rejecting an argument based on *Comcast*, noting that the outcome of that case turned on the plaintiffs' concession "that class certification required a method to prove class-wide damages through a common methodology"). Thus, the Court rejects the argument that a class-wide damage model is required for certification under Rule 23(b)(3).

Moreover, plaintiffs here *do* rely on a class-wide method to show damages in this case, as plaintiffs' experts have created models to determine the per-unit effect on class members' sales of corn. As already noted, the Tenth Circuit in *Urethane* sanctioned such a method of determining aggregate damages.

Syngenta and the Phipps plaintiffs offer a number of criticisms of the opinions by plaintiffs' experts, which criticisms purportedly show that plaintiffs' methodologies are not reliable. The Court concludes, however, that such criticisms (for instance, regarding the composition of data sets, the comparable products chosen, the rate of decay of the price effects, the failure to confirm results against particular time periods and locations) go to the weight of those opinions and not to their admissibility (as noted above, Syngenta did not seek to exclude any opinions under *Daubert*). The Court cannot

conclude that the experts' methodologies are so unreliable as to preclude certification. That applies also to the experts' use of September 2013 as the date marking the beginning of the price effects. Syngenta and the Phipps plaintiffs argue that the use of that date means that market participants *anticipated* the November 2013 rejections by China, even though plaintiffs' experts were unable to cite contemporary public predictions of such a rejection. The experts, however, based the use of that date on the increase in milo exports to China at that time and the historic break that occurred at that time between corn prices and milo prices. Thus the experts' opinions are not impermissibly lacking in foundation. Again, this argument concerning the September 2013 date goes to the weight of the opinions, the persuasiveness of which is for the jury. More importantly for purposes of certification, these criticisms present common questions that do not undermine a finding of predominance.[9]

Syngenta also argues that a few of its defenses, relating to damages and comparative negligence, present individual questions. As noted above, the presence of individual questions concerning damages does not necessarily defeat class certification, and the same is true for individual questions concerning defenses. *See Tyson Foods*, 136 S. Ct. at 1045 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as

---

[9]Syngenta conceded in its brief that many of its criticisms of the experts' opinions do not implicate individual issues.

damages or some affirmative defenses peculiar to some individual class members.").

With respect to its defenses, Syngenta first argues that the jury must consider whether individual class members should have hedged against possible future losses by locking in prices or should otherwise have mitigated their damages by, for example, switching to a different crop, finding different buyers, changing pricing methods, or storing more corn for future sale. Whether the class members had a duty to undertake such efforts, based on the circumstances in this case, will present a common threshold issue. Even if such a defense is then available with respect to some class members, the Court concludes that such individual issues are not so overwhelming as to defeat predominance here. That is especially true for any comparative negligence defense (which would apply only to the negligence claims), which is particularly speculative in light of the fact that any claim that producers were negligent in failing to ensure that their corn was not commingled with MIR 162 corn would be preempted, in accordance with this Court's prior rulings. The Court concludes that common questions predominate here despite any possible individual questions relating to Syngenta's defenses.

Finally, Syngenta argues that the tortious interference claims asserted by two proposed statewide classes involve additional individual issues. Specifically, Syngenta argues that each class member would be required to identify particularly the persons with whom they had business relationships that were affected. The Court is not persuaded that such identification is required under these circumstances under Arkansas or Missouri law. In a more typical tortious interference case, the plaintiff may claim that

Case 2:14-md-02591-JWL-JPO   Document 2547   Filed 09/26/16   Page 26 of 34

it lost business in general, and the plaintiff might be required to identify particular lost customers so that the claim is not too speculative concerning whether a business relationship in fact would have been formed. In this case, however, plaintiffs allege that Syngenta tortiously interfered with their relationships with persons to whom they sold corn, and that Syngenta did so by causing those sales to take place at lower prices. Thus, there no danger of speculation concerning whether business relationships would have been formed, as plaintiffs are alleging only interference with relationships that actually existed (with corn purchasers), and those purchasers represent a discrete and identifiable group for each class member. Syngenta has not explained why any individual inquiry is required under plaintiffs' theory that Syngenta intentionally interfered with all buyer-seller relationships by its actions that resulted in lower prices. Therefore, the Court concludes that common questions predominate with respect to plaintiffs' tortious interference claims.

Accordingly, the Court finds, pursuant to Rule 23(b)(3), that common questions predominate with respect to all of the classes proposed by plaintiffs.

### B.    *Superiority*

Rule 23(b)(3) also requires a finding "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). As stated in the rule, matters pertinent to the issue of superiority include the following: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *See id.* This list of relevant consideration is not exhaustive. *See Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 345 (10th Cir. 1973); Fed. R. Civ. P. 23 adv. cmtee. notes to 1966 amendments.

The Court finds that class actions would be superior to other methods of adjudication of these claims. Although both predominance and superiority must be shown under Rule 23(b)(3), the predominance of common issues in this case makes class resolution superior to litigation of individual suits by all of the class members. *See Urethane*, 237 F.R.D. at 453 (D. Kan.) (class resolution was superior because common issues predominated); 2 William B. Rubenstein, *Newberg on Class Actions* § 4:72 (5th ed. 2012) ("[C]ourts generally hold that if the predominance inquiry is met, then the manageability requirement is met as well."). In light of those common issues, the litigation of individual suits "would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *See id.* The Court does not foresee any particular difficulties in the management of class actions, and as discussed above, *see supra* Part II, ascertaining the class members in this case does not require difficult individualized inquiries.

Syngenta and the Phipps plaintiffs note that tens of thousands of plaintiffs have filed similar suits against Syngenta, which suits they argue provide evidence of a desire

by class members to control the individual litigation of their claims. Syngenta also

highlights the facts that some plaintiffs have named additional defendants and that some

plaintiffs (the Phipps plaintiffs) have opposed certification.[10] The advisory committee

notes to Rule 23 address this issue as follows:

> The interests of individuals in conducting separate lawsuits may be so
> strong as to call for denial of a class action. On the other hand, these
> interests may be theoretic rather than practical; the class may have a high
> degree of cohesion and prosecution of the action through representatives
> would be quite unobjectionable, or the amounts at stake for individuals
> may be so small that separate suits would be impracticable.

Fed. R. Civ. P. 23 adv. cmtee. notes to 1966 amendments. In this case, plaintiffs request

purely economic damages, and thus there is no emotional factor or physical injury that

might otherwise provide a reason for class members to wish to control their own cases.

Moreover, the amounts at stake per farm are small enough that separate suits may be

impracticable for many class members. The Court does not agree with Syngenta and the

Phipps plaintiffs that the number of individual lawsuits filed in various courts shows that

the stakes are not too small, as the federal and Minnesota MDLs and the coordinated

proceedings have allowed plaintiffs to pursue individual suits with little investment of

time or money; it is less certain that so many plaintiffs will desire to control their own

cases once the time for trial arrives. The Tenth Circuit has addressed the existence of

individual actions as follows:

---

[10]The Court notes, however, that the Phipps plaintiffs themselves requested
certification of class actions in their complaints, which fact undermines those plaintiffs'
arguments in opposition to class certification.

> [T]he mere existence of individual actions brought by putative class members does not necessarily defeat a claim for superiority. It is enough that class treatment is superior because it will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

*See CGC Holding Co. v. Broad and Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014) (citations and internal quotation omitted) (citing, *inter alia*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). Tens of thousands of putative class members have *not* brought individual actions, and the great efficiencies that may be achieved make class actions superior to individual actions, despite the fact that so many individual actions have been filed. In addition, any class member who does desire to control the litigation of its own claims may opt out of the class action and pursue its own suit.

Syngenta also argues that class actions would be unmanageable in light of the individual issues that must be litigated. As discussed above, however, plaintiffs intend to show the fact of injury and the amount of aggregate damages by class-wide, common proof. The Court does not believe that any remaining individual issues (which could be addressed by bifurcation) make class actions any more unmanageable than individual actions would be.[11]

Finally, the Phipps plaintiffs argue that the exclusion in the class definitions for

---

[11]As one treatise states, "given the fact that the very concerns that might make a class suit difficult to manage also infect the procedural alternatives, courts within at least seven circuits have held that there is a presumption against dismissing a class action on manageability grounds or that such dismissals are disfavored." *See* 2 *Newberg on Class Actions*, *supra*, § 4:72 & n.7 (citing cases).

the Minnesota state-court plaintiffs, which relieves some producers of the need to opt out, creates a conflict of interest and raises due process concerns. By definition, however, the excluded plaintiffs are not class members, and the Phipps plaintiffs have not explained how a conflict between putative class members and non-members is impermissible, nor have they provided any authority to support denial of certification on that basis. The Court thus rejects this argument.

Accordingly, the Court finds that the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied in this case, and the Court thus certifies the various classes as formally defined below.[12]

## V.    Definition of the Classes

By this order, the Court certifies the following classes[13] pursuant to Fed. R. Civ. P. 23(b):

(1)    Asserting claims under the Lanham Act, a nationwide class consisting of all corn

---

[12]In light of this ruling, the Court need not address plaintiffs' alternative request for certification of particular issues pursuant to Fed. R. Civ. P. 23(c)(4).

[13]Plaintiffs have proposed statewide classes that would also assert claims under the Lanham Act, but because the Court has certified a nationwide class to assert Lanham Act claims, it has not certified statewide classes to assert those claims, as those statewide class members are included within the nationwide class, and those class members' Lanham Act claims should not be litigated twice (with the possibility of inconsistent judgments). The Court thus rejects plaintiffs' suggestion that the class claims under the Lanham Act would be tried eight times, at each statewide class trial. Otherwise, the manner and venues in which these class actions may ultimately be tried remains to be addressed by the parties and the Court.

producers in the United States who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel. A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(2)     Asserting claims for negligence and for tortious interference, a statewide class consisting of all corn producers in Arkansas who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel. A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(3)     Asserting claims for negligence and for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, a statewide class consisting of all corn producers in Illinois who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel. A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(4)     Asserting claims for negligence, a statewide class consisting of all corn producers in Iowa who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel. A "producer" is a person or entity

listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(5)     Asserting claims for negligence, a statewide class consisting of all corn producers in Kansas who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel.  A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(6)     Asserting claims for negligence and for tortious interference, a statewide class consisting of all corn producers in Missouri who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel.  A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(7)     Asserting claims for negligence and for violations of the Nebraska Consumer Protection Act, a statewide class consisting of all corn producers in Nebraska who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel.  A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(8)     Asserting claims for negligence, a statewide class consisting of all corn producers in Ohio who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed,

and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel.  A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

(9)     Asserting claims for negligence, a statewide class consisting of all corn producers in South Dakota who priced any corn for sale after November 18, 2013; excluding (a) the Court and its officers, employees, and relatives, (b) defendants and their subsidiaries, officers, directors, employees, contractors, and agents, (c) government entities, (d) producers who purchased Viptera or Duracade corn seed, and (e) producers who filed suit in Minnesota state court on or before June 15, 2016, and who are represented by attorneys who executed a joint prosecution agreement with plaintiffs' co-lead counsel.  A "producer" is a person or entity listed as a producer on an FSA-578 form filed with the United States Department of Agriculture.

These classes shall be represented by the named plaintiffs proposed as representatives in plaintiffs' latest master class action complaint.

## VI.     Appointment of Class Counsel

Fed. R. Civ. P. 23(g) provides that a court certifying a class must appoint class counsel, and plaintiffs request that Don M. Downing, Patrick J. Stueve, Scott Powell, and William Chaney be so appointed.  These attorneys, who are co-lead counsel in the MDL litigation, have demonstrated their fitness to serve as class counsel throughout this litigation, and the Court has not received any objections to their appointment as class counsel.  Accordingly, the Court finds that appointment of these attorneys as class counsel is appropriate, and it hereby makes such appointment.

## VII.   <u>Notice</u>

Rule 23(c)(2)(B) provides that for classes certified under Rule 23(b)(3), the court must direct notice to the class members.  Plaintiffs have not proposed any form or manner of notice under this rule; thus, the Court defers its direction of notice to the certified classes.  Plaintiff shall submit to the Court a proposed plan for notice to the class members pursuant to Rule 23(c)(2)(B) on or before **October 17, 2016**.

IT IS THEREFORE ORDERED BY THE COURT THAT the producer plaintiffs' motion for class certification (Doc. # 2156) is hereby **granted**, and the Court certifies a nationwide class and eight statewide classes pursuant Rule 23(b)(3) as set forth herein.

IT IS SO ORDERED.

Dated this 26th day of September, 2016, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

34