# EXHIBIT 1

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
| --- | --- |
|  | : |
| In Re: Syngenta AG MIR 162 Corn Litigation | : MDL No. 2591 |
|  | : |
|  | : Case No. 14-md-2591-JWL-JPO |
|  | : |

**EXPERT REPORT OF DR. HONGJUN ZHANG (张红军), PH.D., ESQ.**

December 22, 2016

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

## TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................... 1

    A.   Qualifications ................................................................................ 1

    B.   Assignment ................................................................................... 2

    C.   Statement of Compensation .......................................................... 4

II.  SUMMARY OF OPINIONS .................................................................. 4

III. BACKGROUND REGARDING THE EXPORT AND IMPORT OF GENETICALLY MODIFIED AGRICULTURAL PRODUCTS ............................... 5

    A.   Overview of Chinese Law Governing the Export and Import of GM Agricultural Products ............................................................... 5

    B.   Overview of Relevant Government Ministries and Agencies ................. 8

    C.   Terminology .................................................................................. 9

    D.   Overview of China's Process for the Import and Export of Agricultural Products Containing GM Traits ................................. 10

IV.  OPINION 1: GENERALLY APPLICABLE LAWS GOVERNING IMPORTS OF COMMODITIES IMPOSE LEGAL REQUIREMENTS ON FOREIGN EXPORTERS. ................................................................... 15

V.   OPINION 2: GENERALLY APPLICABLE LAWS GOVERNING IMPORT OF FEED AND FEED MATERIALS IMPOSE LEGAL REQUIREMENTS ON FOREIGN EXPORTERS EXPORTING CORN AND CORN BY-PRODUCTS TO CHINA. ............................................. 17

VI.  OPINION 3: CHINESE LAWS SPECIFICALLY GOVERNING GM AGRICULTURAL PRODUCTS PROHIBIT A FOREIGN TRADER FROM EXPORTING INTO CHINA A SHIPMENT CONTAINING A GM TRAIT THAT HAS NOT BEEN APPROVED FOR IMPORT BY CHINA. ......... 18

    A.   Opinion 3.1: It is illegal for foreign exporters to export genetically modified agricultural products into China without appropriate approval from the Chinese government. ............................................. 18

    B.   Opinion 3.2: The legal obligation for foreign exporters to obtain the appropriate approval from the Chinese government for exporting

i

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

        genetically modified agricultural products into China cannot be shifted to Chinese importers. ................................................................................ 23

C.    Opinion 3.3:  The appropriate approval from the Chinese government for exporting GM agricultural products into China must be obtained before any export contract is signed.............................................................. 24

D.    Opinion 3.4: Chinese GMO laws provide clear provisions on the consequences of exporting GM agricultural products from abroad into China prior to obtaining the appropriate approval from the Chinese government. ........................................................................................ 24

E.    Opinion 3.5: An exporter of products with GMO traits that fall within the scope of Chinese GMO labeling requirements violates China's GMO labeling rules if it fails to obtain proper approval for its GMO labeling. ............. 26

**VII.  OPINION 4: PROVIDING FALSE OR MISLEADING INFORMATION ABOUT GMO TRAITS IN AGRICULTURAL PRODUCTS VIOLATES THE ANTI-FRAUD RULES IN CHINESE CONTRACT LAW ............................ 27**

**VIII. OPINION 5: A REASONABLY SOPHISTICATED EXPORTER SHOULD HAVE BEEN FAMILIAR WITH AND COMPLIED WITH THE ABOVE CHINESE GMO LAWS................................................................................. 28**

**IX.   OPINION 6:    THE FACT THAT SOME SHIPMENTS OF GM AGRICULTURAL PRODUCTS WENT THROUGH CHINESE CUSTOMS WITHOUT BEING INSPECTED OR STOPPED WOULD NOT LEGITIMIZE THE VIOLATION OF EXPORTING GM AGRICULTURAL PRODUCTS INTO CHINA WITHOUT APPROPRIATE APPROVAL FROM THE CHINESE GOVERNMENT. ............. 29**

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

## I.   INTRODUCTION

### A.   Qualifications

1.   I am a partner with the law firm of Holland & Knight LLP.  In my current position, I advise clients on Chinese regulatory compliance and government relations, addressing matters such as environmental protection, energy efficiency, chemical management and product stewardship.

2.   Prior to entering private practice, I was a Legislative Director in China's National People's Congress.  In this position, I was responsible for drafting national laws and policy documents and overseeing national and local government implementation of the laws.  In my early years in the Chinese government, I also served as Program Officer in China's former State Environmental Protection Administration (now Ministry of Environmental Protection).  During my many years in the Chinese government, I worked on legal issues with numerous other agencies in the Chinese government, including the Ministry of Agriculture, the Administration for Quality Supervision, Inspection and Quarantine, the Ministry of Industry and Information Technology, the State Food and Drug Administration, the Ministry of Health, and the National Development and Reform Commission.  I was involved in the drafting and implementation of numerous Chinese laws, including laws affecting product design, historical contamination of soil and groundwater, chemicals management, air pollution control, food and beverage hygiene, product quality, land-use, water resources, manufacturing processes, safe transport, and product design.

3.   When working at China's National People's Congress, my law drafting work involved product management, including product import and export issues.  My practice includes counseling clients on product import and export, GMO laws, biotechnology and related issues.

1

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

These projects include advising on the legal requirements under the GMO laws, analyzing whether particular biotechnologies are subject to Chinese GMO requirements, and advising clients on obtaining certain permits importing various types of products into China.

4.     I received my B.S., M.S. and Ph.D. degrees from Peking University and my LL.M. degree from Harvard Law School.  I am admitted to the bars of New York and China.  I am not admitted in the District of Columbia.  I am a native speaker of Chinese Mandarin and speak English fluently.

5.     My curriculum vitae, including my list of publications during the last ten years, is included as Exhibit A.  I have not testified in any cases during the past four years, as indicated in Exhibit B.

**B.     Assignment**

6.     I have been asked by Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection LLC, Syngenta Biotechnology, Inc., and Syngenta Seeds, LLC (formerly Syngenta Seeds, Inc.) (collectively, "Syngenta"), through counsel, to consider Chinese laws and regulations governing the sale, shipping, and import/export of foreign agricultural products containing genetically modified ("GM") traits into China's borders.  In particular, I have been asked to (a) to provide an overview of China's legal requirements regarding the export and import of GM agricultural products from abroad into China; (b) to discuss key issues associated with the implementation of these legal requirements; (c) to describe the legal duties and requirements imposed by Chinese law on the parties involved in the process of exporting and importing foreign GM agricultural products into China and the consequences of violating those laws, with a primary focus on the laws applicable from 2011 to 2014 to the export and import of feed or whole-kernel grains for processing; and (d) to explain the legal issues and

2

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

potential violations of Chinese law that would arise if a company were involved in exporting agricultural products to China that contained a GM trait that was not yet approved by the Chinese government for import into China.

7.      In formulating my opinions and this report, I have relied upon the official Mandarin text of the laws, which are included with my report.  I understand that certified English translations of some of the laws have been prepared by third-party translators and are being provided as a courtesy for purposes of the litigation.    I also understand that unofficial English translations of many of the laws are made publicly available through the USDA, Chinese government agencies such as the Ministry of Agriculture, and international organizations such as the BioSafety Clearing-House under the Cartagena Protocol on Biosafety.[1]  I have not required or relied on any of these English translations in preparing this report and formulating my opinions.  To the extent that there appears to be any conflict between my report and the English translations, my report controls.  Likewise, to the extent that there appears to be any conflict between the official Chinese sources and any English translations, the official Chinese sources control.  Just as a person not trained in American law would be ill-advised to read the United States Code without the advice of a trained lawyer familiar with the canons of statutory interpretation and conventions of legal drafting, the reader should use any English translations with appropriate care and caution.

8.      My work is ongoing, and I may update and revise my results and conclusions as I review additional data and information.  A complete list of materials I have considered to date in connection with this particular assignment is included in Exhibit C.  Parts of the preparatory

---

[1]    *See* https://bch.cbd.int/.

3

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

work for this report was performed under my direction and supervision by professionals working at Holland & Knight, LLP; all opinions and reasoning stated herein are my own.

### C.    Statement of Compensation

9.    Holland & Knight will be compensated for its work in this matter at an hourly rate of $700 for me, and for Holland & Knight professionals working on this engagement at an hourly rates ranging from $150 to $225.

## II.    SUMMARY OF OPINIONS

10.    It is a legal requirement for foreign companies to apply for the appropriate approval from the Chinese government before exporting genetically modified agricultural products into China.  Such legal obligation cannot be shifted to any other parties—including Chinese importers—or otherwise waived.  It is also a legal requirement under Chinese law that GM agricultural products must be indicated when making a Chinese customs declaration.  An exporter who provides an importer with false or incomplete information about the GM traits in a shipment or who fails to disclose the presence of a GM trait in a shipment violates Chinese anti-fraud rules in Chinese contract law.  A reasonably sophisticated exporter should have been familiar with and complied with the Chinese GM laws and other import / export laws.  The fact that a foreign exporter bringing goods from abroad into China has managed to get unapproved GM products into China in the past does not reduce or change their legal responsibilities under Chinese law.

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

III.   **BACKGROUND REGARDING THE EXPORT AND IMPORT OF GENETICALLY MODIFIED AGRICULTURAL PRODUCTS**

    A.   **Overview of Chinese Law Governing the Export and Import of GM Agricultural Products**

    11.   Chinese laws related to the export and import of genetically modified agricultural products fall into four major categories: (1) the laws that govern the import and export of commodities, (2) the laws that govern the quarantine of plants, (3) the laws that govern the import of animal feed, and (4) the laws that specifically govern agricultural GM organisms.

*The Law on Import/Export of Commodities*

    12.   The leading law that governs the import and export of commodities is the Law of the People's Republic of China on Import and Export Commodity Inspection (hereafter the "Commodities Law"), which was promulgated in 1989 and amended in 2002. Jinchukou Shangpin Jianyan Fa (进出口商品检验法) [Import and Export Commodity Inspection Law] (promulgated by the Standing Comm. Nat'l People's Cong., Feb. 21, 1989, amended Apr. 28, 2002 and June 29, 2013), http://www.npc.gov.cn/wxzl/gongbao/2013-10/22/content_1811008.htm (China).

*The Law on Entry and Exit Animal and Plant Quarantine*

    13.   The Law of the People's Republic of China on the Entry and Exit Animal and Plant Quarantine (hereafter the "Quarantine Law") entered into force in 1992 and was amended in 2009. Jinchujing Dongzhiwu Jianyi Fa (进出境动植物检疫法) [Entry and Exit Animal and Plant Quarantine Law] (promulgated by the Standing Comm. Nat'l People's Cong., Oct. 30, 1991, amended Aug. 27, 2009), http://www.shciq.gov.cn/xxgk/zcfg/fzfg/201606/t20160602_64193.shtml (China). Plant products and other quarantine objects are subject to quarantine inspection in accordance with this

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

law.  Art. 3.  "Plant products" refer to non-processed products or the processed products from plants, and include grain and feed.  Art. 46.  Therefore, quarantine inspection of corn must be conducted in accordance with this law.

### The Law on Animal Feed

14.     The Regulations on Administration of Animal Feed and Feed Additives (hereafter the "Feed Regulations") were promulgated in 1999 by the State Council.  Siliao He Siliao Tianjiaji Guanli Tiaoli (饲料和饲料添加剂管理条例) [Regulations on Administration of Animal Feed and Feed Additives] (promulgated by the St. Council, May 29, 1995, amended Nov. 29, 2001 and Oct. 26, 2011), http://www.gov.cn/gongbao/content/2011/content_2004716.htm (China). They were revised in 2011, and the new revision became effective in 2012. The Feed Regulations were formulated to strengthen the administration of feed, ensure quality of animal products, and maintain people's health. Art. 1.  "Feed" refers to products used as animal food after industrialized processing and manufacturing.  Art. 2.

15.     The Measures for the Administration of Registration for Imported Feed and Feed Additives (hereafter the "Feed Import Measures") were formulated by the Ministry of Agriculture in 2014 to strengthen the administration on import of feeds.  Jinkou Siliao He Siliao Tianjiaji Dengji Guanli Banfa (进口饲料和饲料添加剂登记管理办法) [Measures for the Administration of Registration for Imported Feed and Feed Additives] (promulgated by the Min. Agri.,    Dec.    27,    2013,    effective    July    1,    2014), http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/201403/t20140305_3805022.htm  (China).

### Laws on Agricultural GMOs

16.     The leading law that specifically governs agricultural genetically modified organisms is known as the Regulations on Administration of Agricultural Genetically Modified

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Organism Safety, which are administrative regulations issued by the State Council May 23, 2001, and amended January 8, 2011 (hereafter the "GMO Regulations"). Nongye Zhuajiyin Shengwu Anquan Guanli Tiaoli (农业转基因生物安全管理条例) [Regulations on Administration of Agricultural Genetically Modified Organism Safety] (promulgated by the St. Council, May 23, 2001, amended Jan. 8, 2011), http://www.gov.cn/gongbao/content/2011/content_1860866.htm (China).   Plants whose genomic structures have been modified by genetic engineering technologies for use in agricultural production or processing fall within the definition of agricultural genetically modified organisms covered by these regulations. Art. 3.  The activities of import and export with respect to agricultural genetically modified organisms within the territory of the People's Republic of China must conform to these regulations.  Art. 2.

17.   To facilitate the implementation of the GMO Regulations, the Ministry of Agriculture (hereafter, the "MOA") promulgated a number of ministry rules from 2002 to 2006 that govern the requirements for production, import, processing and labeling of agricultural GM organisms.  For the purposes of this report, the most relevant MOA legal measures include (1) Administrative Measures for Safety Control in the Import of Agricultural GMOs (hereafter the "Import Measures") that govern the importation process, (2) the Administrative Measures on Labeling of Agricultural GMOs (hereafter the "Labeling Measures") that govern the labeling requirements of agricultural of GMO products, and (3) the Administrative Measures on the Inspection and Quarantine of Genetically Modified Products Entering and Exiting the Territory (hereafter the "Inspection Measures") which govern the import and export control and quarantine requirements. The GMO Regulations and these ministry rules are discussed in greater detail below.

7

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

18.     The MOA further issued a number of official documents, including notices and announcements, during the same period (2002-2006) to provide practical guidance to local agricultural administrative agencies and private parties affected by the GMO Regulations and the related administrative rules, including (1) a Notification regarding the Implementation of Regulations on Administration of Agricultural Genetically Modified Organism Safety and Related Measures (Nong Ke Jiao Fa [2002] No. 1) ("Regulation Implementation Notification")[2]; and (2) an Announcement regarding the Implementation of Normal Administration of the Import of Agricultural Genetically Modified Organism (MOA No. 349) (2004) ("Import Administration Announcement")[3].

### B.     Overview of Relevant Government Ministries and Agencies

19.     In China, there are a number of ministries and agencies that are responsible for the management of agricultural products (including GM agricultural products), commodity and product import and export, product inspection and quarantine, etc.  For the purpose of this report, the most relevant government ministry and agencies are the MOA, and the General Administration of Quality Supervision, Inspection and Quarantine (hereafter, "AQSIQ").

### *The Ministry of Agriculture*

20.     The Ministry of Agriculture of the People's Republic of China is a component of the State Council in charge of agricultural development.[4]  Among other responsibilities, the MOA promulgates and implements legal measures and policies in the agricultural sector. The GMO Regulations provide that the MOA is responsible for the nationwide supervision and administration of GMO safety, and local agricultural administrative agencies at county-level and

---

[2]     See http://www.moa.gov.cn/ztzl/zjyqwgz/zcfg/201007/t20100717_1601290.htm.

[3]     See http://www.moa.gov.cn/zwllm/zcfg/nybgz/200806/t20080606_1056970.htm.

[4]     The official website of the Ministry of Agriculture at http://english.agri.gov.cn/aboutmoa/mandates/.

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

above are responsible for the supervision and administration of GMO safety in their executive jurisdiction. The MOA is in charge of reviewing applications for permits to import GMOs, and is responsible for issuing such permits.

### The General Administration of Quality Supervision, Inspection and Quarantine

21.     The General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China is an administrative organ that also falls under the State Council.[5] They have the responsibility to draft laws and regulations regarding quality supervision, inspection, and quarantine. The Quarantine Law is one of the laws that AQSIQ is responsible for implementing.  AQSIQ also performs the entry-exit inspection and quarantine of various products, including agricultural products.  Thirty-five entry-exit inspection and quarantine bureaus have been set up across China, with representation in most provinces through local CIQ offices.  CIQ personnel are in charge of issuing inspection and quarantine clearance certificates, which are subsequently used for customs clearance at national ports.

### C.     Terminology

22.     For purpose of this report, I will sometimes use the phrase "foreign exporters" or "foreign traders," which I use to refer to exporting companies located outside the territory of China—such as Cargill, Archer Daniels Midland, Louis Dreyfus, and Bunge—that export agricultural products to China.  This term also includes China-headquartered companies' overseas offices. "Chinese importers" refers to the importing domestic purchasers of those products located in the territory of China—*i.e.*, Chinese buyers of corn.  It also includes foreign companies' Chinese subsidiaries or branches.

---

[5]     See AQSIQ's official website at http://english.aqsiq.gov.cn/AboutAQSIQ/Mission/.

9

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**D.    Overview of China's Process for the Import and Export of Agricultural Products Containing GM Traits**

23.    At least three sets of approvals are required to export a GM agricultural product into China: (i) the GMO biosafety certificate for import, provided by the MOA to biotechnology companies like Syngenta after a GM event is approved for import and which is valid for five years[6]; (ii) a separate GMO biosafety certificate for import (sometimes referred to as a "trader's certificate"), which foreign exporters like Cargill and ADM must apply for and obtain from the MOA; and (iii) the Quarantine Import Permit ("QIP"), which Chinese importers are required to apply for and obtain from AQSIQ/CIQ.  Additionally, if a product containing GMOs is included in the Catalogue of GMOs requiring label management ("Label Catalogue")—as corn has been since 2003—then approval of the product's GMO label is also required.  Also, if an imported product is feed, then the foreign exporter bringing feed into China from abroad must obtain an import registration certificate of feed from the MOA.

24.    An example of (ii) (*i.e.*, the trader's certificate) can be found at CARGILL000616275, and an example of (iii) (*i.e.*, the QIP) can be found at CARGILL000616276.  Unless otherwise noted, the legal requirements and processes that follow refer only to the trader's certificate.

25.    The general process that exporter and importers must follow to import GM agricultural products into China for consumption or as raw materials for processing (including into feed) includes the following steps: (1) the foreign exporter exporting corn or corn by-products files an application with the MOA for a trader's certificate to import GMO products into China (Import Measures, Arts. 12 & 13); (2) the MOA issues a trader's certificate; (3) the

---

[6]    This certificate is required when foreign exporters apply for the trader's certificate with the MOA.  http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/kjjys/jwmyssq/201103/t20110303_1836124.htm

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

foreign exporter and the Chinese importer reach a contract for the importation of GMO products (Import Measures, Art. 18); (4) the foreign exporter or the Chinese importer applies for quarantine inspection; and (5) the Chinese importer goes through the port and customs declaration process. If additional approvals are required, such as approval for the GMO label, then the foreign exporter exporting goods from abroad to China must apply for the label by presenting the trader's certificate. *See* Import Measures, Art. 15.

26.     The MOA has issued interpretive guidance (in the form of a Q&A) underscoring the fundamental point that, until the "overseas R&D unit" (which is typically the GM event manufacturer or biotechnology company, like Syngenta) first obtains approval of the GM event for import, other entities (including foreign exporters like Cargill and ADM) cannot obtain a trader's certificate.   Specifically, Q&A #68 in the MOA's June 2011 "100 Questions And Answers Concerning Agricultural GMOs"[7] states:

| | |
|---|---|
| 68. 进口用做加工原料的转基因生物的程序是什么？<br><br>境外公司首次向中华人民共和国出口农业转基因生物用做加工原料的，境外研发单位应当向农业部申请领取农业转基因生物安全证书（进口）。 | Q: What is the procedure for importing GMOs to be used as raw materials for processing?<br><br>A: Overseas companies [境外公司] which for the first time import agricultural GMOs for purposes of using them as raw materials for processing, and the overseas R&D unit shall apply to the Ministry of Agriculture for an agricultural GMO safety certificate (import). |

27.     Additional detail on each step is as follows.

---

[7]     Available at http://www.moa.gov.cn/ztzl/zjyqwgz/zswd/201107/U020110705523604929127.doc

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

28.     *First*, the foreign exporter, such as Cargill or ADM, files an application with the MOA for importing GMO products into China, and the Chinese importer files an application with the AQSIQ for importing plant products into China.  A Chinese importer needs to apply to AQSIQ for a QIP when importer plans to import plant products to China.  The Quarantine Law, amended Aug. 27, 2009, art. 12.  A foreign exporter needs to apply to the MOA for a trader's certificate when the to-be-exported grain contains GM traits.  The GMO Regulations, amended Jan. 8, 2011, art. 33.  Even if a foreign exporter has already obtained a trader's certificate for one shipment, the foreign exporter is still required to apply to MOA to obtain a new trader's certificate for any new shipment.  If the new shipment comes from the same foreign exporter and contains the same GM event, a simplified application process is available.  *See* Import Measures, Art. 14.

29.     As a result, whenever a foreign exporter attempts to send a shipment of an agricultural product that contains GM traits to China for consumption or as raw material for processing (including into feed), the foreign exporter is responsible for securing a trader's certificate for *all* GM traits present in that shipment.  Failure to do so is a violation of Chinese law, regardless whether the foreign exporter is aware of such legal requirement.

30.     *Second*, the AQSIQ issues a QIP and the MOA issues a trader's certificate.

31.     *Third*, the foreign exporter and the Chinese importer reach a contract for the importation of GMO products.  Article 19 of the Import Measures provides that a foreign exporter shall not sign the contract before securing a trader's certificate:

| | |
|---|---|
| 第十九条 进口农业转基因生物用于生产或用作加工原料的，应当在取得农业部颁发的农业转基因生物安全证书后，方能签订合同。 | Article 19 For the import of agricultural GMOs for production or raw materials, the contract thereof may not be concluded until a safety |

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

> certificate of agricultural GMOs issued by the Ministry of Agriculture has been obtained.

Nongye Zhuanjiyin Shengwu Jinkou Anquan Guanli Banfa (农业转基因生物进口安全管理办法) [Administrative Measures for Safety Control in the Import of Agricultural GMOs] (promulgated by the Min. Agri., Jan. 5, 2002, amended July, 1, 2004) , http://www.moa.gov.cn/ztzl/zjyqwgz/zcfg/201007/t20100717_1601304.htm (China), art. 19.

32.     *Fourth*, either the Chinese importer or the foreign exporter must make a declaration for inspection and quarantine to the exit-entry inspection and quarantine agency at the port. The GMO Regulations, amended Jan. 8, 2011, art. 34. The documents presented shall include approvals from both the AQSIQ and the MOA. GMO Regulations Art. 34.

33.     *Fifth*, only after passing through the quarantine inspection can the Chinese importer start the process of going through the port and other customs declaration processes. GMO Regulations Art. 34.

34.     If the exported agricultural product containing GMO traits is on the Label Catalogue, such as corn, the foreign exporter is also responsible for applying for examination and approval of the label for agricultural GMOs after obtaining the trader's certificate. Regulation Implementation Notification, Attachment 3 Agricultural GMO Label Examination and Approval Process.

35.     I have reviewed various parties' lay understandings of the Chinese legal requirements on exporters—including Exhibit 239 to the deposition of Anthony Reed, trader's certificates produced by Cargill (CARGILL000616273 – CARGILL0006162791), and relevant excerpts of the deposition transcripts of Andrew Wong (Cargill Trader and Food Grain Manager based in Hong Kong), Richard Grabiel (former ADM Senior Director of Government Affairs),

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Brett Flickinger (ADM Vice President of Regulatory & Scientific Affairs), and Anthony Reed (ADM Senior Director of Government Affairs).  As relevant to the issues of Chinese law addressed in my report, I agree with the following points from my review of this evidence:

    a.    I agree that Chinese law requires the foreign exporter, such as Cargill and ADM to apply to MOA for a trader's certificate for each shipment of GM agricultural products to China, separate from a biotechnology company obtaining general approval for import of a GM trait.  *See* Dep. Ex. 329 at ADM-00062745; Flickinger Dep. 139:8-23.

    b.    I agree that the application process for a trader's certificate requires the foreign exporter shipping GM agricultural products to China to list all GM events that are contained in the shipment.  *See* Dep. Ex. 329 at ADM-00062745; Flickinger Dep. 139:8-23; *id.* at 140:5-19, 146:5-7; Grabiel Dep. Tr. 126:11-15; *id.* at 126:18-20.

    c.    I agree that a trader's certificate is issued by MOA for each shipment. Therefore, a separate trader's certificate must accompany each shipment. *See* Dep. Ex. 329 at ADM-00062745; Flickinger Dep. Tr. 139:3-7; Grabiel Dep. Tr. 126:18-20.

    d.    I agree that each trader's certificate explicitly states that it "is valid for once during the validity period and will be canceled after it has been verified by the entry-exit inspection and quarantine department."  *E.g.*, CARGILL000616275; CARGILL000616277; CARGILL000616279; CARGILL0006162781; CARGILL0006162783; CARGILL0006162785; CARGILL0006162787.  In other words, each trader's certificate can be used only for one shipment, and an exporter needs to obtain a separate certificate for each shipment.

36.    The trader's certificates obtained by Cargill illustrate these requirements of Chinese law.  *See* CARGILL000616275; CARGILL000616277; CARGILL000616279; CARGILL0006162781; CARGILL0006162783; CARGILL0006162785; CARGILL0006162787. These trader's certificates list the foreign trader, Cargill International S.A., as the applicant, and indicates which GM events are in each shipment, the country of origin for each shipment, the purpose of the commodity in each shipment, and the method of transportation for each shipment.

37.    I therefore disagree with the following points from my review of this evidence:

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

a.    I disagree that Chinese law does not specifically require a foreign exporter to apply for the trader's certificate. *Cf.* Reed Dep. Tr. 286:3-18. As I explain elsewhere, Article 12 of the Administrative Measures for Safety Control in the Import of Agricultural GMOs specifically requires "an overseas company" such as Cargill or ADM who wants to "export agricultural GMOs to [China] to be used as raw materials" for processing to "file an application with the [MOA] for a safety certificate of agricultural GMOs."

b.    I disagree that a foreign exporter is not required to list GM events contained in the shipment and can instead choose which GM events to disclose in the application for the trader's certificate. *Cf.* Reed Dep. Tr. 286:3-18, 286:23-25.  Both Article 14 of the Import measures and the trader's certificates themselves make clear that every GM event in the shipment must be declared to avoid rejection or destruction of the shipment.

c.    I disagree that a separate trader's certificate is not required for each shipment. *Cf.* Reed Dep. 296:23-297:2.  That mistaken understanding is inconsistent with (i) the one-time use limitation on each trader's certificate, (ii) with the simplified procedure provided by Article 14 of the Import Measures for obtaining a new trader's certificate when the shipment involves "the same customer and the same GM event," and (iii) with Article 38 of the GMO Regulations, which, as described in this report, requires a foreign exporter to comply with the law by ensuring that the GM events in a shipment conform to the GM events listed on the accompanying trader's certificate.

## IV.    OPINION 1: GENERALLY APPLICABLE LAWS GOVERNING IMPORTS OF COMMODITIES IMPOSE LEGAL REQUIREMENTS ON FOREIGN EXPORTERS.

38.    As explained above, the Commodities Law is a framework law governing all commodity imports, including imports of corn and corn by-products.

39.    The State Administration for Commodity Inspection made a "Catalog of Import and Export Commodities Subject to Compulsory Inspection." The Commodities Law, amended June 29, 2013, art. 4 (the "Compulsory Inspection Catalogue").  "Corn for production and other corns" have been included in the Compulsory Inspection Catalogue at all relevant times.

15

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

40.     The consignee or its agents shall report for inspection to the commodity inspection authorities located at the place of customs declaration, and the authorities shall inspect the listed commodities to ensure that they meet the compulsory requirements of the State technological criteria. Art. 6, 11. Customs authorities shall check and release the commodities based on customs clearance certificates issued by the commodities inspection authorities. Art. 11.

41.     Article 35 of the Commodities Law provides that in the case of import or export[8] of commodities which are adulterated or mixed with fake commodities, of spurious commodities as genuine ones, of defective commodities as quality ones, or of unqualified commodities as qualified ones, the commodity inspection authorities shall order such a party to desist from importing or exporting commodities, confiscate its unlawful gains derived therefrom and, in addition, impose on him a fine of not less than fifty percent of, but not more than three times the amount of, the value of the commodities; and if the violation constitutes a crime, he shall be investigated for criminal responsibility according to law.

42.     Based on the above legal requirements, it is a clear violation for a Chinese importer to import genetically modified products into China without indicating that said products are genetically modified on the port and custom declaration document. Additionally, the import process for agricultural GMs discussed below clearly shows that the foreign exporter bringing goods into China from abroad, not the Chinese importer, is in charge of items related to genetic engineering.

43.     Based on the above analysis, it is my opinion that the foreign exporter bringing GM agricultural products into China from abroad should, under Chinese law, inform the Chinese

---

[8]     In this context of the Commodities Law, "import" refers to the bringing of foreign goods into China, while "export" refers to the shipping of domestic Chinese goods to foreign buyers.

16

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

importer that the imported commodity contains GM products so that the Chinese importer can make the appropriate port and customs declaration.

## V. **OPINION 2**: GENERALLY APPLICABLE LAWS GOVERNING IMPORT OF FEED AND FEED MATERIALS IMPOSE LEGAL REQUIREMENTS ON FOREIGN EXPORTERS EXPORTING CORN AND CORN BY-PRODUCTS TO CHINA.

44.     The Feed Regulations and the Feed Import Measures are the laws governing the import of feed into China.

45.     Among other requirements, the Feed Measures require foreign companies exporting certain feed and feed ingredients (including distiller's grains, as explained below) to obtain an import registration certificate from the MOA before the product can be exported to China.  Article 12 of the Feed Regulations and Article 3 of the Feed Import Measures both provide that, the first time the foreign exporter plans to export feed from abroad to China, the exporter shall apply for an import registration certificate with the MOA.  Feed Regulations, amended Oct. 26, 2011, art. 12; Feed Import Measures, effective July 1, 2014, art. 3.

46.     The Catalogue of Feed and Feed Raw Materials was published on December 17, 2012 and amended on Dec. 19, 2013 by the MOA, which includes distillers dried grains (DDG), distillers dried soluble (DDS), and distillers dried grains with solubles (DDGS).[9]

47.     Under Part 1, Item 9 of the Catalogue of Feed and Feed Raw Materials issued by the MOA[10]:

九、生产或使用涉及转基因动物、植物 | The activities of producing and using GM

---

[9]     The Catalogue is available at http://www.bjny.gov.cn/nyj/231598/233057/5556287/5564242/.

[10]    饲 料 原 料 目 录 (Catalogue of Feed and Feed Raw Materials), Ministry of Agriculture. www.xmys.moa.gov.cn/slgz/201206/P020120614568242256328.doc.  See http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Feed%20Ingredient%20Catalogue%20(Final)_Beijing_China%20-%20Peoples%20Republic%20of_12-17-2012.pdf for translations.

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

| | |
|---|---|
| 、微生物的饲料原料，还应当遵守《农业转基因生物安全管理条例》的有关规定。 | animal, plant, and microbial feed ingredients shall be treated in accordance with the GMO Regulations. |

48.      In addition, Article 12 of the Import Measures provides that

| | |
|---|---|
| 第十二条 境外公司向中华人民共和国出口农业转基因生物用作加工原料的，应当向农业部申请领取农业转基因生物安全证书。 | Article 12 To export agricultural GMOs to the People's Republic of Chinas to be used as raw materials, an overseas company shall file an application with the Ministry of Agriculture for a safety certificate of agricultural GMOs. |

The Import Measures, amended July, 1, 2004, art. 12.

49.      Thus, the laws require foreign exporters exporting feed or raw materials for feed that contain GMOs to also comply with the laws governing agricultural GMOs.

## VI.   OPINION 3: CHINESE LAWS SPECIFICALLY GOVERNING GM AGRICULTURAL PRODUCTS PROHIBIT A FOREIGN TRADER FROM EXPORTING INTO CHINA A SHIPMENT CONTAINING A GM TRAIT THAT HAS NOT BEEN APPROVED FOR IMPORT BY CHINA.

### A.      Opinion 3.1: It is illegal for foreign exporters to export genetically modified agricultural products into China without appropriate approval from the Chinese government.

50.      Article 33 of the GMO Regulations and Article 12 of the Import Measures requires foreign exporters to apply for and obtain a trader's certificate before exporting agricultural GMOs to be used as raw materials for processing.  The GMO Regulations, amended Jan. 8, 2011, art. 33; The Import Measures, amended July, 1, 2004, art. 12.  Article 33 of the GMO Regulations and Article 13 of the Import Measures outline the legal responsibilities of foreign traders who export GMOs as raw materials for processing, stating that:

| | |
|---|---|
| 《农业转基因生物安全管理条例》 第三十 | Article 33 of the GMO Regulations: Any |

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

三条境外公司向中华人民共和国出口农业转基因生物用作加工原料的，应当向国务院农业行政主管部门提出申请；符合下列条件，并经安全评价合格的，由国务院农业行政主管部门颁发农业转基因生物安全证书：

（一）输出国家或者地区已经允许作为相应用途并投放市场；

（二）输出国家或者地区经过科学试验证明对人类、动植物、微生物和生态环境无害；

（三）经农业转基因生物技术检测机构检测，确认对人类、动植物、微生物和生态环境不存在危险；

（四）有相应的安全管理、防范措施。

《农业转基因生物进口安全管理办法》第十三条 境外公司提出上述申请时，应当提供下列材料：

(一)进口安全管理登记表 (见附件)；

(二)安全评价申报书（见《农业转基因生物安全评价管理办法》附录 V）；

(三)输出国家或者地区已经允许作为相应用途并投放市场的证明文件；

(四)输出国家或者地区经过科学试验证明对人类、动植物、微生物和生态环境无害

company outside the territory of China that exports to the People's Republic of China agricultural genetically modified organisms to be used as raw materials for processing shall make an application to the competent agricultural administrative department of the State Council; for those meeting the following conditions and passing the safety evaluation, the competent agricultural administrative department of the State Council shall issue a safety certificate of agricultural genetically modified organisms

(1) the exporting country or region has permitted the usage for the same purpose and the putting into market thereof;

(2) the exporting country or region has, through scientific experiment, proved that they are harmless to human beings, animals and plants, microorganisms and ecological environment;

(3) the technical inspection body of agricultural genetically modified organisms has confirmed, upon inspection, that there is no danger to human beings, animals, plants, microorganisms and ecological environment;

(4) having adopted appropriate safety administration and precautionary measures.

Article 13 of the Import Measures: The

19

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

的资料；

(五)农业部委托的技术检测机构出具的对人类、动植物、微生物和生态环境安全性的检测报告；

(六)境外公司在向中华人民共和国出口过程中拟采取的安全防范措施。

经安全评价合格后，由农业部颁发农业转基因生物安全证书。

following materials are required for the foregoing application:

1. Registration form for the safety control of import (see Appendix);

2. A declaration for safety assessment (see Appendix V to the Measures for the Administration of the Safety Assessment of Agricultural GMOs);

3. Supporting documents that it is permitted in the country or region of export to use them for corresponding purposes and to be put into market;

4. Materials proving that scientific experiments in the country or region of export have showed that no harm will result to the human being, animals, plants, microorganisms and the biological environment;

5. The test report issued by a technological institutions entrusted by the Ministry of Agriculture concerning the safety to the human beings, animals, plants, microorganisms and biological environment; and

6. The safety measures to be adopted by the overseas company in the process of exporting to the People's Republic of China.

If the application has passed the safety assessment, the Ministry of Agriculture shall issue a safety certificate of agricultural GMOs.

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

51.     Both foreign GM trait developers and foreign exporters seeking to import GMOs need to apply for separate kinds of import certificates.  Foreign GM trait developers must follow the above requirements in Article 33 of the GMO Regulations and Article 12 of the Import Measures.[11]  When a foreign exporters subsequently needs to obtain a trader's certificate, it must provide the following documents.[12]

| | |
|---|---|
| 《中华人民共和国农业部公告第 349 号》<br>三、境外贸易商申请《农业转基因生物安全证书（进口）》须提供以下材料：<br><br>1、研发商提供的《农业转基因生物安全证书（进口）》复印件<br><br>2、《农业转基因生物进口安全管理登记表（用作加工原料）》<br><br>3、拟采取的安全防范措施 | Article 3 of No. 349 Notice of the MOA:<br>Foreign exporters applying for the GMO biosafety certificate for importing purpose shall provide the following materials:<br><br>1. Copies of foreign developer's Agricultural GMOs' Biosafety Certificate (Import)<br><br>2. Registration Form of Safety Administration on Import of Agricultural GMOs (to be used as raw materials for processing)<br><br>3. Safety measures that are planned to be carried out |

52.     Based on the MOA's requirements, a foreign exporter must provide a foreign developer's Agricultural GMOs' Biosafety Certificate in its application material.  This is to say, if a foreign GM trait developer's biosafety certificate has not been approved by the MOA, a foreign exporter like Cargill or ADM cannot export the product into China

53.     Article 17 of the Import Measures further expands the foreign exporter's obligation to apply for trader's certificates for shipments with agricultural product containing GMO traits to be used as consumer goods.

---

[11]     http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/kjjys/jwyfsscsq/201103/t20110303_1836104.htm

[12]     http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/201405/t20140527_3917945.htm

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

54.     In addition, Article 19 of the Import Measures provides that:

| | |
|---|---|
| 进口农业转基因生物用于生产或用作加工原料的，应当在取得农业部颁发的农业转基因生物安全证书后，方能签订合同。 | for the import of agricultural GMOs for production or raw materials, the contract thereof may not be concluded until a safety certificate [*i.e.*, trader's certificate] of agricultural GMOs issued by the Ministry of Agriculture has been obtained. |

The Import Measures, amended July, 1, 2004, art. 19. Therefore, a foreign exporter bringing goods from abroad to China shall first secure the MOA's approval before it signs an export agreement with a Chinese importer and starts exporting genetically modified plants.

55.     It is thus illegal for foreign exporters to export genetically modified agricultural products into China without appropriate approval from the Chinese government. Indeed, without the appropriate approval from the MOA, Article 19 of the Import Measures forbids the foreign exporter from even executing a contract for the sale of agricultural products containing GMs.

56.     Article 38 of the GMO regulations clearly provides that "agricultural products with GMO traits that are imported without a safety certificate issued by the MOA and [other] relevant documents of approval, or not conforming to the certificate or the documents of approval, shall be rejected or destroyed."

57.     Unlike the background norms of U.S. law, knowledge and intent are generally not elements of the legal provisions discussed in this report. Unless otherwise indicated, the requirements on foreign exporters and consequences that are discussed in this report apply regardless whether the foreign exporter knows or does not know these requirements. The law thus does not provide a defense for foreign exporters who claim that they had no knowledge of

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

the existence of the GMO traits or that the GMO traits included in a shipment do not conform to the certificate.

58.    As a result, a foreign exporter that export GM agricultural products to China has an obligation to procure the trader's certificate for any GM events present in the shipment.  It makes no difference whether the foreign exporter knows that the GM events are present in the shipment.  If a foreign exporter exporting GM agricultural products to China fails to present the trader's certificate for a GM event that is present in the shipment, then the foreign exporter has violated Chinese law.

**B.    Opinion 3.2: The legal obligation for foreign exporters to obtain the appropriate approval from the Chinese government for exporting genetically modified agricultural products into China cannot be shifted to Chinese importers.**

59.    The importation of agricultural products with GMO traits is administered based on the following intended use of the imported goods: (1) research and experiment, (2) production, and (3) raw materials for processing and consumer goods.  Import Measures, Art. 4.  Both the GMO Regulations and the Import Measures clearly provide that for GM agricultural products imported for the purpose of (1) research and experiment or (2) production, the trader's certificate application can be submitted by either the foreign exporter bringing goods from abroad into China or the importer.  GMO Regulations, Art. 31, 32; Import Measures, Art. 5, 9.  By contrast, for imported products intended to be used for raw material processing or as consumer goods, the trader's certificate application must be submitted by the foreign exporter bringing goods from abroad into China.  GMO Regulations, Art. 33; Important Measures Art. 12.  The MOA's Regulation Implementation Notification also reflects the clear legislative distinction.

60.    The above Chinese laws clearly assign to the foreign exporter exporting products into China (not the Chinese importer bringing products into China) all legal obligations to obtain

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

the appropriate approval from the Chinese government before exporting genetically modified agricultural products into China.  Such legal obligations cannot be shifted to the Chinese importers or otherwise waived.

  **C.**  <u>**Opinion 3.3**</u>:  **The appropriate approval from the Chinese government for exporting GM agricultural products into China must be obtained before any export contract is signed.**

  61.  The Import Measures provide a clear sequence of events required for legal export of genetically modified agricultural products into China, including (1) applying for the trader's certificate for agricultural genetically modified organisms from MOA (Article 13), (2) contracting with the Chinese importer to import the approved GM agricultural products into China, (3) going through the export / import procedure using the trader's certificate for agricultural GMOs from the MOA, and (4) exporting the approved GM agricultural products to China.

  62.  This sequence provided by the Import Measures indicates clearly that the appropriate approval from the Chinese government for exporting GM agricultural products into China must be obtained before any export activities commence.  Later Chinese governmental approval does not absolve the foreign exporter bringing GM agricultural products into China of any previous violation for sending genetically modified agricultural products into China without appropriate approval from the Chinese government.

  **D.**  <u>**Opinion 3.4**</u>:  **Chinese GMO laws provide clear provisions on the consequences of exporting GM agricultural products from abroad into China prior to obtaining the appropriate approval from the Chinese government.**

  63.  Article 38 of the GMO regulations clearly provides that "agricultural products with GMO traits that are imported without a safety certificate issued by the MOA and [other]

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

relevant documents of approval, or not conforming to the certificate or the documents of approval, shall be rejected or destroyed."

64.     Article 20 of the Import Measures provides that "imported agricultural GMOs shall be returned or be destroyed in the absence of a safety certificate [*i.e.*, trader's certificate] of agricultural GMOs or relevant approval document issued by the agriculture department under the State Council, or if such GMOs are not in conformity with the certificate or approval document." The Import Measures, amended July, 1, 2004, art. 20.

65.     The Regulation of the People's Republic of China on the Implementation of Customs Administrative Punishment (the "Customs Regulations") provides certain punishment if false statements are made in the import process.  Article 15 provides that, in case the name, tariff serial number, quantity, specification, price, way of trading, place of origin, place of shipment, place of arrival, and final place of destination of the import and export goods *or other items fail to be declared as they should be* or declared falsely, punishment shall be given in accordance with the following provisions separately, and the illegal gains shall be confiscated, if it affects the state license certificate administration, a fine of 5% up to 30% the value of the goods shall be imposed. Haiguan Zingzheng Chufa Shishi Tiaoli (海关行政处罚实施条例) [Regulations on Implementation of Customs Administrative Punishment] (promulgated by the St. Council, Sep. 1, 2004, effective Nov. 1, 2004), http://www.gov.cn/zwgk/2005-05/23/content_248.htm (China) (emphasis added).  Article 16 provides that in case any consignee or consignor of any import and export goods fails to provide the true conditions of the customs declaration matters entrusted by any customs declaration enterprise, which leads to the occurrence of any of the circumstances as prescribed in Article 15 of the present Implementation Regulation, the entrusting party shall be

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

punished in accordance with the provisions of Article 15 of the present Implementation Regulation. Art. 16.

66.     The consequences provided in these regulations and rules clearly prohibit the import of genetically modified agricultural products into China without appropriate approval from the Chinese government.

**E.      Opinion 3.5: An exporter of products with GMO traits that fall within the scope of Chinese GMO labeling requirements violates China's GMO labeling rules if it fails to obtain proper approval for its GMO labeling.**

67.     It is a legal requirement under the Chinese law that certain GM agricultural products must be labeled.

68.     Article 8 of the Inspection Measures provides that if any GM products entering China are subject to labeling requirements, the inspection and quarantine officials shall check the label, and approve the entry of those products that comply with the documents of examination, certification, and approval of the GM agricultural products. Those products that are not labeled, as required, shall not be permitted to enter China until they are labeled. The GMO Inspection Measures, effective May 24, 2004, art. 8; GMO Regulations, Art. 38.

69.     Certain GM products are subject to the above labeling requirements. The Appendix of Administrative Measures on Labeling of Agricultural GMOs provides that GM corn products have been subject to such labeling requirements since 2003. Nongye Zhuanjiyin Shengwu Biaozhi Guanli Banfa (农业转基因生物标识管理办法) [Administrative Measures on Labeling of Agricultural GMOs] (promulgated by the Min. Agri., Jan. 5, 2002, amended July 1, 2004), http://www.moa.gov.cn/ztzl/zjyqwgz/zcfg/201007/t20100717_1601304.htm (China).

70.     The MOA issued instructions in its Regulation Implementation Notification, Attachment 3 Agricultural GMO Label Examination and Approval Process that the foreign

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

exporter bringing GM agricultural products to China on the Label Catalogue shall apply for examination and approval of the label to the Office of Agricultural Genetically Modified Organism Safety Administration Office.

71.    In short, the import and sale of GM agricultural products that are subject to labeling requirement, but are not labeled, is a violation of Chinese law.

**VII.    OPINION 4: PROVIDING FALSE OR MISLEADING INFORMATION ABOUT GMO TRAITS IN AGRICULTURAL PRODUCTS VIOLATES THE ANTI-FRAUD RULES IN CHINESE CONTRACT LAW**

72.    Article 6 of the Contract Law of People's Republic of China provides that the contract parties shall abide by the principle of good faith in exercising their rights and fulfilling their obligations.  Hetong Fa (合同法) [Contract Law] (promulgated by the Nat'l People's Cong., Mar. 15, 1999, effective Oct. 1, 1999), http://www.gov.cn/banshi/2005-07/11/content_13695.htm (China). Article 42 of the same law provides that a party involved in intentionally concealing important facts relating to the conclusion of a contract or providing false information shall bear liability for damages.  Art. 42.

73.    Information about which GMO traits are likely to be contained in a shipment is critically important to the Chinese importer because the importer runs the risk of significant expenses and fines if the Chinese importer is found with unapproved GMO products and because the Chinese importer requires the correct trader's certificate in order to apply for and receive the necessary approval from AQSIQ/CIQ (as explained above).

74.    For example, as discussed above, a Chinese importer found to have imported unapproved GMO traits will bear the costs of rejection unless and until it can bring a claim against the foreign exporter, which is uncertain and may involve substantial legal fees. The

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

Chinese importer may also be subject to fines for violating the GMO safety law or the customs laws.

75.     Similarly, as discussed above, Chinese law requires GMO commodities to be labeled once they enter China.  False information about the GMO traits contained within the shipment could subject the Chinese importer to liability for violating this regulation.

76.     A knowingly false statement about what GM traits are present in a shipment thus constitutes fraud against the Chinese importer.  Thus, a foreign exporter who conceals important facts from the Chinese importer relating to the contract violates the anti-fraud rules of China's contract law.

## VIII.  <u>OPINION 5</u>: A REASONABLY SOPHISTICATED EXPORTER SHOULD HAVE BEEN FAMILIAR WITH AND COMPLIED WITH THE ABOVE CHINESE GMO LAWS.

77.     The GMO Regulations were promulgated by the State Council on May 23, 2001 and went into effect on the same date.  GMO Regulations, amended Jan. 8, 2011. The Import Measures were promulgated by the MOA January 5, 2002 and went into effect March 20, 2002. Import Measures, effective July 1, 2004. Although these laws have undergone slight amendments, the legal requirements for foreign exporters wishing to export GM agricultural products into China have remained the same.

78.     Since the GMO Regulations and the Import Measures were promulgated, the MOA has administered a program through which foreign exporters can apply for the trader's certificate in order to export GM agricultural products into China.[13]   Indeed, many foreign exporters have successfully exported genetically modified agricultural products into China

---

[13]     http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/kjjys/jwmyssq/201103/t20110303_1836124.htm

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

through this program's assistance. Thus, a reasonably sophisticated foreign exporter should have been familiar with and complied with the above Chinese GMO laws.

79.     This opinion is reflected in and consistent with the evidence I have reviewed. Foreign companies exporting GM agricultural products to China routinely require their employees to follow the laws of the countries to which they export. *See, e.g.,* Wong Dep. Tr. 369:16-20.   Chinese law is clear that, to comply, a foreign exporter cannot ship a GM agricultural product to China if the exporter has not obtained a trader's certificate for all of the GM events in a particular shipment. *See, e.g.,* Wong Dep. Tr. 370:21-:373:15; Grabiel Dep. Tr. 171:13-14.

IX.     **OPINION 6: THE FACT THAT SOME SHIPMENTS OF GM AGRICULTURAL PRODUCTS WENT THROUGH CHINESE CUSTOMS WITHOUT BEING INSPECTED OR STOPPED WOULD NOT LEGITIMIZE THE VIOLATION OF EXPORTING GM AGRICULTURAL PRODUCTS INTO CHINA WITHOUT APPROPRIATE APPROVAL FROM THE CHINESE GOVERNMENT.**

80.     My opinion is clearly corroborated by the Inspection Measures promulgated by the MOA. Article  9 of the Inspection Measures provides that for imported products on the GMO Label Catalogue, including corn declared to contain GMO traits, the inspection and quarantine agencies shall conduct a GM conformity testing.  If they are declared not to contain GM traits, the inspection and quarantine agencies shall make sampling checks on the imported products.  For plant and animal products and food that are not included in the GMO Label Catalogue, the inspection and quarantine agencies may make sampling checks to test the products depending on the circumstances.

81.     Article 10 of the Inspection Measures provides that under any of the following circumstances, the inspection and quarantine agencies shall return the goods or destroy them:

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

1. The products are declared/indicated as genetically modified products, but the genetically modified ingredients do not correspond with the documents of approval upon testing; or

2. The products are declared/indicated as non-genetically modified products, but genetically modified events are detected upon testing.

82.     Relatedly, Articles 11 and 12 of the Commodities Law provide that to import commodities which are subject to inspection by the commodity inspection authorities, as provided for by this Law, the consignee or his agent shall apply for inspection to the commodity inspection authorities located at the place he makes Customs declarations.  The Customs officials shall check and release the commodities on the strength of the Documents for Customs Clearance issued by the commodity inspection authorities.  In addition, the consignee or his agent shall, in the places and within the time limit specified by the commodity inspection authorities, accept inspection of the import commodities conducted by the commodity inspection authorities. The commodity inspection authorities shall complete the inspection and issue an inspection certificate within the time limit specified uniformly by the State administration for commodity inspection.  Commodities Law, amended June 29, 2013, art. 11, 12.

83.     Article 12 of the Law of the People's Republic of China on the Entry and Exit Animal and Plant Quarantine provides that the owner or his or her agent shall apply to the port animal and plant quarantine office at the port of entry for quarantine inspection of the animals and plants, their products or other quarantine objects, before or on their entry, on the strength of documents such as the quarantine certificates issued by the exporting country or region and the trade contracts.  Quarantine Law, amended Aug. 27, 2009, art. 12.

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

84.     Per the above legal requirements, the Chinese importers must go through the port inspection and customs procedure in order to import the genetically modified agricultural products into China.

85.     The mere fact that a foreign exporter has managed to get unapproved corn into China in the past does not reduce or change their legal responsibilities under Chinese law outlined above.

DATED:  December 22, 2016

_____

Hongjun Zhang, Ph.D., Esq.

**EXHIBIT A: CV OF DR. HONGJUN ZHANG**

Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington DC 20006
Tel: (202) 457-5906, Fax: (202) 955-5564

## EDUCATION:

| | |
|---|---|
| 1999-2000 | **Harvard Law School**, Cambridge, Massachusetts, USA, Master of Laws (LL.M.). |
| 1995-1998 | **Peking University School of Law**, Beijing, China, Ph.D. in Law. |
| 1986-1989 | **Center of Environmental Sciences, Peking University**, Beijing, China, M.S. in Environmental Planning and Management. |
| 1982-1986 | **Department of Geography, Peking University**, Beijing, China, B.S. in Geography. |

## TRAINING EXPERIENCE:

| | |
|---|---|
| 1998 and 1995 | **School of Law, New York University,** New York, USA.  Comprehensive training on law drafting and the U.S. legal system. |
| 1996 | **Yale Law School and Yale School for Forestry and Environmental Studies,** New Haven, USA. Research Associate in comparative environmental law. |
| 1996 | **Center for International Environmental Law/The American University Washington College of Law,**  Visiting Scholar in international, comparative, and foreign environmental law. |
| 1995 | **School of Law, Uppsala University,** Uppsala, Sweden.  Training in environmental law methodology and European Union environmental law. |
| 1994 | **Nijenrode University,**  Nijenrode, The Netherlands.  Training program on sustainable development. |
| 1993 | **Chiang Mai University,**  Chiang Mai, Thailand.  Practical training sessions on environment and development. |

## FELLOWSHIPS:

| | |
|---|---|
| 1999/2000 | Harvard Law School Landon H. Gammon Fellowship |
| 1998 | Rockefeller Foundation Fellowship (Bellagio Center, Italy) |
| 1996 | Rockefeller Foundation Fellowship (LEAD) |
| 1995 | United Nations University Fellowship |

## PROFESSIONAL EXPERIENCE:

| | |
|---|---|
| 2004- present | **Senior Counsel (2004-2005) and Partner (2006-present)** of Holland & Knight LLP, Washington DC.  Primary responsibilities |

include advising clients on a broad range legal issues including regulatory compliance and government relation matters in China, including environmental protection, energy efficiency, chemical management, and product stewardship, conducting business and regulatory review of cross-border transactional projects in China for the US and multinational corporations, and providing business and regulatory counseling of investment projects in the US for the Chinese corporations and investors.

2000 – 2004       **Attorney at Law** of Beveridge & Diamond, P.C., Washington DC. Primary responsibilities include counseling on international environmental treaty law, treaty implementation, trade and environment, and WTO compliance, conducting research on environmental, health and safety law developments in China to support compliance counseling projects, advising clients on environmental, social, institutional and administrative issues associated with major development projects (i.e., energy generation facilities, etc.) in China, working on international environmental management projects with regard to compliance with environmental health and safety laws, including land use planning, property transfer, groundwater protection and soil contamination remediation regimes, in developing countries such as China, and counseling industry corporations, multilateral banks and government clients on legal and practical aspects of environmental, health and safety law enforcement programs in China and the application of international and domestic standards to particular industry operations in China

1993-2000       **Director** of Legislative Division of Environmental Protection and Natural Resources Conservation Committee of the National People's Congress of China.  Primary responsibilities included: drafting revisions of China's environmental protection, natural resources conservation, and health-related laws such as the Air Pollution Prevention and Control Law, the Water Pollution Prevention and Control Law and the Solid Waste Prevention and Control Law, the Noise Pollution Prevention and Control Law, the Land Administration Law, the Marine Environmental Protection Law, and the Clean Production Promotion Law.

1989-1993       **Program Officer** of Planning Department and Policy and Legal Affairs Department of the National Environmental Protection Agency (NEPA, now the State Environmental Protection Administration) of the PRC.  Participated in planning and organization of policy documents such as the Environment and Development Report of the PRC, China's Environmental Action

Plan, the Eighth-Five-Year National Environmental Protection
Plan, and the Environmental Investment Report of the PRC.

**PUBLICATIONS OVER LAST 10 YEARS:**

- H. Zhang, China & "RoHS 2" and Implications for the Electrical and Electronic Products Industry, Holland & Knight Alert, August 5, 2010
- H. Zhang, China Releases Final Version of Amended New Chemical Notification Regulations, Holland & Knight Alert, February 19, 2010
- H. Zhang, Alert to Industry: China Releases Draft of Amended New Chemical Notification Regulations, Holland & Knight Alert, June 17, 2009
- H. Zhang, China's Proposed Regulation Would Mandate Recall Procedures, Holland & Knight Alert, May 18, 2009
- H. Zhang, Domain Name Registration in China, Holland & Knight Newsletter, June 2008
- H. Zhang, Key Developments in the China Government Affairs and Regulatory Sectors, Holland & Knight Newsletter, January 2008
- H. Zhang, China's Unique Approach to Substance Restrictions Affecting the Import, Manufacture, Design and Sale of "Electronic Information Products", Holland & Knight Newsletter, Second Quarter 2006

**MEMBERSHIPS:**

- Board of Directors, The Energy Foundation
- Board of Directors, Environmental Law Institute
- Board of Directors, Institute of Industrial Productivities
- Member, New York Bar Association
- Member, American Bar Association

## EXHIBIT B: DR. ZHANG'S TESTIFYING EXPERIENCE OVER LAST 4 YEARS

Dr. Zhang does not have testifying experience over the last 4 years.

## EXHIBIT C: DOCUMENTS CONSIDERED

Jinchukou Shangpin Jianyan Fa (进出口商品检验法) [Import and Export Commodity
  Inspection Law] (promulgated by the Standing Comm. Nat'l People's Cong., Feb. 21, 1989,
  amended Apr. 28, 2002 and June 29, 2013), http://www.npc.gov.cn/wxzl/gongbao/2013-
  10/22/content_1811008.htm

Jinchujing Dongzhiwu Jianyi Fa (进出境动植物检疫法) [Entry and Exit Animal and Plant
  Quarantine Law] (promulgated by the Standing Comm. Nat'l People's Cong., Oct. 30, 1991,
  amended Aug. 27, 2009),
  http://www.shciq.gov.cn/xxgk/zcfg/fzfg/201606/t20160602_64193.shtml

Jinchujing Zhuanjiyin Chanpin Jianyan Jianyi Guanli Banfa (进出境转基因产品检验检疫管理
  办法) [Administrative Measures on the Inspection and Quarantine of Genetically Modified
  Products Entering and Exiting the Territory] (promulgated by the Min. Agri., May 24, 2004,
  effective May 24, 2004),
  http://www.aqsiq.gov.cn/xxgk_13386/jlgg_12538/zjl/2016/201602/t20160202_460414.htm
  (China).

Siliao He Siliao Tianjiaji Guanli Tiaoli (饲料和饲料添加剂管理条例) [Regulations on
  Administration of Animal Feed and Feed Additives] (promulgated by the St. Council, May
  29, 1995, amended Nov. 29, 2001 and Oct. 26, 2011),
  http://www.gov.cn/gongbao/content/2011/content_2004716.htm

Jinkou Siliao He Siliao Tianjiaji Dengji Guanli Banfa (进口饲料和饲料添加剂登记管理办法)
  [Measures for the Administration of Registration for Imported Feed and Feed Additives]
  (promulgated by the Min. Agri., Dec. 27, 2013, effective July 1, 2014),
  http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/201403/t20140305_3805022.htm

Nongye Zhuajiyin Shengwu Anquan Guanli Tiaoli (农业转基因生物安全管理条例)
  [Regulations on Administration of Agricultural Genetically Modified Organism Safety]
  (promulgated by the St. Council, May 23, 2001, amended Jan. 8, 2011),
  http://www.gov.cn/gongbao/content/2011/content_1860866.htm

Notification regarding the Implementation of Regulations on Administration of Agricultural
  Genetically Modified Organism Safety and Related Measures (Nong Ke Jiao Fa [2002] No.
  1), http://www.moa.gov.cn/ztzl/zjyqwgz/zcfg/201007/t20100717_1601290.htm.

Announcement regarding the Implementation of Normal Administration of the Import of
  Agricultural Genetically Modified Organism (MOA No. 349) (2004),
  httpwww.moa.gov.cnfwllmzxbsxzxkbszl201405t20140527_3917945.htm and
  http://www.moa.gov.cn/zwllm/zcfg/nybgz/200806/t20080606_1056970.htm

http://english.agri.gov.cn/aboutmoa/mandates/.

http://english.aqsiq.gov.cn/AboutAQSIQ/Mission/.

http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/kjjys/jwmyssq/201103/t20110303_1836124.htm

Catalogue of GMOs requiring label management ("Label Catalogue")

Q&A #68 in the MOA's June 2011 "100 Questions And Answers Concerning Agricultural GMOs" http://www.moa.gov.cn/ztzl/zjyqwgz/zswd/201107/U020110705523604929127.doc

Nongye Zhuanjiyin Shengwu Jinkou Anquan Guanli Banfa (农业转基因生物进口安全管理办法) [Administrative Measures for Safety Control in the Import of Agricultural GMOs] (promulgated by the Min. Agri., Jan. 5, 2002, amended July, 1, 2004) , http://www.moa.gov.cn/ztzl/zjyqwgz/zcfg/201007/t20100717_1601304.htm (China), art. 19.

Exhibit 239 to the deposition of Anthony Reed

Trader's certificates produced by Cargill (CARGILL000616273 – CARGILL0006162791)

Deposition of Andrew Wong (Cargill Trader and Food Grain Manager based in Hong Kong)

Deposition of Richard Grabiel (former ADM Senior Director of Government Affairs)

Deposition of Brett Flickinger (ADM Vice President of Regulatory & Scientific Affairs), and Anthony Reed (ADM Senior Director of Government Affairs).

Catalog of Import and Export Commodities Subject to Compulsory Inspection" (the "Compulsory Inspection Catalogue").

The Catalogue of Feed and Feed Raw Materials as published on December 17, 2012, http://www.bjny.gov.cn/nyj/231598/233057/5556287/5564242/.

Translation of Feed Ingredient Catalogue, http://gain.fas.usda.gov/Recent%20GAIN%20Publications/Feed%20Ingredient%20Catalogue%20%28Final%29_Beijing_China%20-%20Peoples%20Republic%20of_12-17-2012.pdf

http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/kjjys/jwyfsscsq/201103/t20110303_1836104.htm

http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/201405/t20140527_3917945.htm

Haiguan Zingzheng Chufa Shishi Tiaoli (海关行政处罚实施条例) [Regulations on Implementation of Customs Administrative Punishment] (promulgated by the St. Council, Sep. 1, 2004, effective Nov. 1, 2004), http://www.gov.cn/zwgk/2005-05/23/content_248.htm (China) (emphasis added).

Nongye Zhuanjiyin Shengwu Biaozhi Guanli Banfa (农业转基因生物标识管理办法) [Administrative Measures on Labeling of Agricultural GMOs] (promulgated by the Min. Agri., Jan. 5, 2002, amended July 1, 2004), http://www.moa.gov.cn/ztzl/zjyqwgz/zcfg/201007/t20100717_1601304.htm (China).

Hetong Fa (合同法) [Contract Law] (promulgated by the Nat'l People's Cong., Mar. 15, 1999, effective Oct. 1, 1999), http://www.gov.cn/banshi/2005-07/11/content_13695.htm (China)

http://www.moa.gov.cn/fwllm/zxbs/xzxk/bszl/kjjys/jwmyssq/201103/t20110303_1836124.htm