IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE SYNGENTA AG MIR162 CORN
LITIGATION

THIS DOCUMENT RELATES TO:

The Nationwide and Kansas Classes

No. 2:14-MD-02591-JWL-JPO

MDL No. 2591

FILED UNDER SEAL

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL
SUMMARY JUDGMENT ON SYNGENTA'S AFFIRMATIVE DEFENSES OF
ASSUMPTION OF RISK, COMPARATIVE FAULT, MITIGATION, INTERVENING /
SUPERSEDING CAUSE, AND "BUSINESS AND ECONOMIC JUSTIFICATION"

## <u>TABLE OF CONTENTS</u>

ARGUMENT ....................................................................................................................... 48

I.   SYNGENTA IS PRECLUDED FROM PURSUING WAIVED OR
     ABANDONED THEORIES OF COMPARATIVE FAULT. .................................. 48

     A.   Syngenta Did Not Disclose That Producer Plaintiffs Were at Fault
          for Failing to Create a "China channel" of Viptera-Free Corn. ...................... 49

     B.   Syngenta Did Not Disclose that Cargill and ADM Were at Fault
          for Shipping Corn to China. ............................................................................. 51

     C.   Syngenta Abandoned Comparative Fault of China. ........................................ 53

II.  KANSAS COMPARATIVE FAULT DOES NOT APPLY TO THE
     LANHAM ACT CLAIM ....................................................................................... 55

III. SYNGENTA CANNOT ASSIGN FAULT TO THE
     GOVERNMENT OF CHINA. ............................................................................... 58

     A.   Assigning Fault to China Violates the Act-of-State Doctrine. ....................... 59

     B.   Syngenta Has No Precedent for Asserting that a Government Has a Duty
          to Enact and Execute Laws for the Benefit of Citizens of a Foreign State. ..... 64

     C.   China's Alleged Intentional Conduct Cannot Be Compared Under
          Kansas Law. ..................................................................................................... 69

IV.  SYNGENTA CANNOT ASSIGN FAULT TO PRODUCER PLAINTIFFS ........... 73

     A.   The Grain Standards Act Preempts a Duty That Would Require Plaintiffs
          to Create a "China-Only" Channel of Viptera-Free Corn. .............................. 73

     B.   Syngenta Fails to Adduce Any Evidence of Causation or that Producer
          Plaintiffs Breached a Standard of Care. ........................................................... 73

V.   SYNGENTA CANNOT ASSIGN FAULT TO CARGILL AND ADM. ................. 77

     A.   Fault Requires Duty, Which Is Preempted. .................................................... 77

          1.   Immunity from suit is different than preemption of duty. ....................... 78

          2.   This Court already has ruled that the GSA preempts the duty Syngenta
               seeks to assert. ....................................................................................... 80

i

          3.  Liability is not the basis for preemption. ................................................... 81

   B.  Syngenta Otherwise Fails to Produce Evidence That It Was Foreseeable to Cargill and ADM That By Shipping U.S. Corn to China, Injury Would Result. ............................................................................................... 83

   C.  Syngenta Fails to Produce Evidence that Shipping U.S. Corn to China by Cargill and ADM Caused Producer Plaintiffs' Harm. .............................. 86

VI.  CHINA, CARGILL, AND ADM ARE NOT INTERVENING SUPERSEDING CAUSES OF PLAINTIFFS' INJURY.................................................................... 91

   A.  China Is Not a Superseding Cause of Plaintiffs' Injury................................. 92

   B.  Cargill and ADM Are Not A Superseding Cause of Plaintiffs' Injury........... 97

VII.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON SYNGENTA'S MITIGATION DEFENSE. .................................................................................... 103

VIII.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON SYNGENTA'S NEW ANTITRUST DEFENSE.................................................... 105

   A.  Syngenta's New Defense Is Insufficiently Plead and Unpreserved in the Pretrial Order. ............................................................................................. 106

   B.  Syngenta's Antitrust Defense is Substantively Meritless. ............................ 108

CONCLUSION............................................................................................................... 112

# TABLE OF AUTHORITIES

<u>Cases</u>

*Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628 (D. Md. 2006)..................... 55

*Akins ex rel. Akins v. Hamblin*, 703 P.2d 771 (Kan. 1985) .................................................... 77, 80

*Anderson v. Nat'l Carriers, Inc.*, 695 P.2d 1293 (Kan. Ct. App. 1985) ...................................... 78

*Arredondo v. Duckwall Stores, Inc.*, 610 F.2d 1107 (Kan. 1980) ............................................... 58

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ..................................................... 59

*Bank Tejarat v. Varsho-Saz*, 723 F. Supp. 516 (C.D. Cal. 1989) ............................................... 59

*Battenfeld of Am. Holding Co., Inc. v. Baird, Kurtz & Dobson*,
    60 F. Supp. 2d 1189 (D. Kan. 1999)................................................................................. 72, 74

*Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287 (Kan. 2011) .................................................. 83, 84

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)....................................... 57

*Brown v. Keill,* 580 P.2d 867 (Kan. 1978)................................................................................... 80

*Burton v. R.J. Reynolds Tobacco Co.*, 203 F.R.D. 636 (D. Kan. 2001) ...................................... 48

*Carney v. City & County of Denver*, 534 F.3d 1269 (10th Cir. 2008)......................................... 98

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) ................................................... 79, 81, 82

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996).............................................. 57

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977)............................................... 111

*Cooper v. Eberly,* 508 P.2d 943 (Kan. 1973).............................................................................. 93

*Cuiksa v. Hallmark Hall of Fame Prods., Inc.*, No. 00-1389-JAR,
    2004 WL 303553 (D. Kan. Jan. 26, 2004)............................................................................ 89

*Cupples v. State*, 861 P.2d 1360 (Kan. Ct. App. 1993) .............................................................. 93

*Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004) .............................................................. 66

*Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218 (D. Kan. 1995)....................................... 50

*Drouhard-Nordhus v. Rosenquist,* 345 P.3d 281 (Kan. 2015) ..................................................... 90

*Durflinger v. Artiles*, 673 P.2d 86 (1983) ........................................................................... passim

*Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248 (11th Cir. 2015).......... 56, 57

*FDIC v. Ashley*, 749 F. Supp. 1065 (D. Kan. 1990) ............................................................... 55, 56

*Fitzpatrick v. Allen*, 955 P.2d 141 (Kan. Ct. App. 1998).............................................................. 78

*Fluid Control Products, Inc. v. CAS Aeromotive, Inc.*,
    2010 WL 427765 (E.D. Mo. Feb. 1, 2010)............................................................................ 55

*Frazier v. Cities Serv. Oil Co.,* 157 P.2d 822 (Kan. 1945)........................................................... 93

*Full Draw Productions v. Easton Sports, Inc.*, 85 F. Supp. 2d 1001 (D. Colo. 2000) ................ 57

*Garcia v. Tyson Foods, Inc.*, No. CIV.A. 06-2198-JWL,
    2010 WL 5392660 (D. Kan. Dec. 21, 2010)........................................................................... 50

*Geophysical Servs., Inc. v. TGS-Nopec Geophysical Servs.*, No. CIV.A. 14-1368,
    2015 WL 6869733 (S.D. Tex. Nov. 9, 2015) .......................................................................... 63

*George v. Breising*, 477 P.2d 983 (1970) ..................................................................................... 91

*Godbee v. Dimick,* 213 S.W.3d 865 (Tenn. App. 2006)......................................................... 94, 97

*Goff v. Am. Sav. Ass'n of Kansas*, 561 P.2d 897 (Kan. Ct. App. 1977) ...................................... 58

*Gould v. Taco Bell,* 722 P.2d 511 (Kan. 1986)............................................................................ 69

*Gust v. Jones*, 162 F.3d 587 (10th Cir. 1998) .............................................................................. 89

*Hale v. Brown*, 197 P.3d 438 (Kan. 2008).................................................................................... 90

*Hernandez v. Creative Concepts, Inc.*, 295 F.R.D. 500 (D. Nev. 2013) .................................... 106

*Hewellette v. George*, 9 So. 885 (Miss. 1891) ............................................................................. 78

*In re Vitamin C Antitrust Litig.*, 837 F.3d 175 (2d Cir. 2016) .................................................... 60

*Isbrandtsen Co. v. Johnson*, 343 U.S. 779 (1952) ....................................................................... 55

*Jackson v. City of Kan. City*, 947 P.2d 31 (Kan. 1997) ..................................................... 105, 108

*Jones v. Hittle Serv., Inc.*, 549 P.2d 1383 (Kan. 1976)................................................................ 76

*Kansas State Bank & Tr. Co. v. Specialized Transportation Services., In*c.,
  819 P.2d 587 (Kan. 1991) ................................................................................................. 70, 71

*Kennedy v. Kansas Dept. of Soc. and Rehab., Srvs.*, 26 Kan. App. 2d 98 (1999) ...................... 78

*Kohler v. Staples the Office Superstore, LLC*, 291 F.R.D. 464 (S.D. Cal 2013) ....................... 106

*Konowaloff v. Metro. Museum of Art*, 702 F.3d 140 (2d Cir. 2012) ............................................ 62

*Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164 (10th Cir. 2009) ............................... 51

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ........................ 108, 109

*Lynn v. Taylor*, 642 P.2d 131 (Kan. Ct. App. 1982) ................................................................... 69

*M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 675 P.2d 864 (Kan. 1984) ................. 69

*Marquay v. Eno*, 662 A.2d 272 (N.H. 1995) .............................................................................. 66

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ............................................................................ 79

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*,
  954 F.2d 1279 (7th Cir. 1992) ................................................................................................ 56

*McGraw v. Sanders Co. Plumbing & Heating, Inc.*, 667 P.2d 289 (Kan. 1983) ......................... 89

*Mid-Valley Pipeline Co. v. S.J. Louis Const., Inc.*, 847 F. Supp. 2d 982 (E.D. Ky. 2012) ......... 56

*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989) .................................................. 79

*Miles v. West*, 580 P.2d 876 (Kan. 1978) ................................................................................... 78

*Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ...................................................... 57

*Mut. Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466 (2013) ......................................................... 83

*Mylan Laboratories, Inc. v. Pharm. Basics, Inc.*, 808 F. Supp. 446 (D. Md. 1992) .............. 57, 58

*National Soc. Of Prof'l Eng'rs v. U.S.*, 435 U.S. 679 (1978) ................................................... 108

*Nichols v. Kansas Political Action Comm.*, 11 P.3d 1134 (Kan. 2000) ...................................... 67

*Nkemakolam v. St. John's Military Sch.*, 994 F. Supp. 2d 1193 (D. Kan. 2014) ........................ 93

*Nocktonick v. Nocktonick*, 611 P.2d 135 (Kan. 1980) ................................................................ 78

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015) .................................................................. 79

v

*PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149 (D. Kan. 2001) ....................... passim

*Puckett v. Mt. Carmel Reg'l Med. Ctr.,* 228 P.3d 1048 (Kan. 2010).................................... passim

*Pullen v. West*, 92 P.3d 584 (Kan. 2004) .............................................................................. 66, 67

*Reynolds v. Kan. Dep't of Transp.*, 43 P.3d 799 (Kan. 2002) ..................................................... 90

*Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) ................................................................... 79, 81

*Roberts v. Printup*, 595 F.3d 1181 (10th Cir. 2010) .................................................................. 91

*San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959) ........................................ 82

*Sandifer Motors, Inc. v. City of Roeland Park*, 628 P.2d 239 (Kan. Ct. App. 1981) .................. 69

*Sharon v. Time, Inc.,* 599 F. Supp. 538 (S.D.N.Y. 1984) ........................................................... 61

*Sieben v. Sieben*, 646 P.2d 1036 (Kan. 1982)............................................................................ 69

*Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870 (10th Cir. 2006).................................................. 48

*Sims v. Williamsburg Twp.,* 141 P. 581 (Kan. 1914) .................................................................. 92

*Sink v. Sink*, 239 P.2d 933 (Kan. 1952) ..................................................................................... 78

*Siruta v. Siruta,* 348 P.3d 549 (Kan. 2015)................................................................................ 77

*Skepnek v. Roper & Twardowsky, LLC*, No. 11-CV-4102-DDC-JPO,
    2014 WL 4377706 (D. Kan. Sept. 4, 2014) ........................................................................ 50

*Spirit Aerosystems, Inc. v. SPS Techs., LLC*, No. 09-CV-1144-EFM-KGG,
    2013 WL 6196314 (D. Kan. Nov. 27, 2013) ..................................................................... 102

*Starr v. Downs,* 117 F. Appx. 64 (10th Cir. 2004) ............................................................. 98, 101

*State Farm Fire & Cas. Co. v. Bell,* 30 F. Supp. 3d 1085 (D. Kan. 2014)...................... 90, 93, 98

*Stutts v. De Dietrich Grp.*, No. 03-CV-4058 (ILG),
    2006 WL 1867060 (E.D.N.Y. June 30, 2006) ....................................................................... 65

*Swift-Eckrich, Inc. v. Advantage Sys., Inc.*, 55 F. Supp. 2d 1280 (D. Kan. 1999)............. 102, 104

*Underhill v. Hernandez*, 168 U.S. 250 (1897) ........................................................................... 63

*Unicredit Bank AG v. Bucheli*. No. 10-2436-JWL,
    2011 WL 4036466 (D. Kan. Sept., 12, 2011) ..................................................................... 106

vi

*Usinor, Beautor, Haironville, Sollac Atlantique, Sollace Lorraine v. United States*,
    342 F. Supp. 2d 1267 (Ct. Int'l Trade 2004) .......................................................... 65

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400 (1990) ................ 59, 62, 64

*Weldin v. IBP, Inc*., No. 00-4110-SAC, 2002 WL 1378215 (D. Kan. June 6, 2002) ............ 77, 78

*Wilhelm v. TLC Lawn Care, Inc.*, No. CIV.A. 07-2465-KHV,
    2008 WL 474265 (D. Kan. Feb. 19, 2008) ........................................................... 106

*Williams v. Le*, 662 S.E.2d 73 (Va. 2008)........................................................ 92, 96, 97

*Wilson v. Muckala*, 303 F.3d 1207 (10th Cir. 2002).................................................... 51

*Wilson v. Probst*, 581 P.2d 380 (Kan. 1978) ....................................................... 67, 78

*Worden v. Union Gas System, Inc.,* 324 P.2d 513 (Kan. 1958)................................... 91

*Wyshak v. City Nat'l Bank*, 607 F. 2d 824 (9th Cir.1979) ...................................... 106

Statutes

15 U.S.C. § 1 ................................................................................................ 108

15 U.S.C. § 1125(a) ........................................................................................ 57

21 U.S.C. § 360k(a) ........................................................................................ 81

7 U.S.C.A. § 87g(a) ........................................................................................ 82

K.S.A. 60-258a ............................................................................................. 69

K.S.A. § 68-419 ............................................................................................. 67

U.S. Const. art. VI, cl. 2................................................................................... 79

Rules

D. Kan. Rule 56.1(b)........................................................................................ 6

Fed. R. Evid. 106 ........................................................................................... 36

Other Authorities

57A Am.Jur.2d, Negligence § 599............................................................................ 93

Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 158 ........................ 66

vii

RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 41 (1965)............................................. 64

RESTATEMENT (SECOND) OF TORTS § 443 (1965)................................................................. 93, 94

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 907 ....................................................... 65

Syngenta's opposition reads like a ship passing Producer Plaintiffs' motion for partial summary judgment in the night. It affirmatively abandons the theories of comparative fault that it pled, including that Plaintiffs were at "fault" for "failing to mitigate" their damages, that Viptera growers shared fault, that non-producers other than Cargill and ADM were at fault, and that Cargill and ADM were at fault for failing to channel Viptera away from the Chinese export market. Summary judgment is, therefore, decidedly proper on each of these theories. What does that leave? It leaves only undeveloped and unpled finger-pointing by Syngenta as it seeks to find a theory that fits the evidence. But a square peg cannot fit into a round hole. Syngenta's arguments fit neither the facts nor the law, and its efforts to shift blame fail as a matter of law.

As an initial matter, the theories Syngenta seeks to pursue were waived or abandoned because Syngenta did not plead them pursuant to the requirements of Scheduling Order No. 2 or did not preserve them in the Pretrial Order. Syngenta acknowledges its failure with respect to its contention that the 400,000 or more Plaintiffs were at fault for failing to create a "China only" channel of Viptera-free corn, pointing to a single sentence in interrogatory responses served *five* months after its deadline to identify the nature of Plaintiffs' alleged fault. That excuse is facially deficient as Syngenta not only failed to seek leave to amend outside the deadline, but even now fails to *try* to demonstrate good cause or absence of prejudice. Syngenta's fault theory against Cargill and ADM runs up against the same problem. Although it pled fault based on a failure of *all* non-producers to channel, it disclaims that theory and now argues that Cargill and ADM were at fault for even trying to ship U.S. corn to China. In a futile attempt to show that its failure was harmless, Syngenta points to allegations in its (dismissed) Third-Party Complaint against Cargill and ADM even though it chose *not* to assert those same allegations in the operative comparative

fault disclosure. Finally, Syngenta seeks to assign fault to China despite the fact that nowhere in the Pretrial Order did it say that China caused or contributed to Plaintiff's injury. For these reasons, all of Syngenta's theories of comparative fault are procedurally barred.

Even if not procedurally barred, those theories are substantively barred for a variety of reasons. Syngenta's allegations of fault against Plaintiffs, Cargill, and ADM depend on the existence of legal duties that *cannot* exist, as they already have been found by this Court to be preempted under the Grain Standards Act ("GSA"). Syngenta seems to think that once a state-law duty has been foreclosed by preemption, it can be resurrected for purposes of allocating fault. That is nonsense. Preemption nullifies any state-law duty, period. Syngenta has no authority to suggest otherwise. Its attempt to equate preemption with immunity also demonstrates a fundamental misunderstanding of two distinct legal principles.

In addition, and consistent with the undisclosed nature of fault, Syngenta's new-found theory that Plaintiffs had a duty to create a "China only" channel of Viptera-free corn, lacks even basic evidentiary support. First, Syngenta does not even *attempt* to show causation, a basic element of comparative fault raised by Plaintiffs in their opening brief. That alone justifies summary judgment. But the deficiencies do not end there. Syngenta also fails to point to any relevant standard of care requiring some 400,000 producers to coalesce their corn sales in a way that would channel all other commodity corn *around* Viptera. Syngenta's weak characterization of China as some kind of "specialty" market crumbles on cursory inspection. As Syngenta admits, farmers growing for specialty markets serve and deliver their product to dedicated buyers – buyers *not served* through the commodity system like China. Syngenta identifies no mechanism by which Producer Plaintiffs – who do not sell corn directly to China – could

possibly have created a "China only" channel, much less a mechanism that fits within the bounds of what reasonable persons would do.

Syngenta's attempt to compare its negligence to Cargill and ADM is equally deficient. The Court already has held that any shipping-related duty Syngenta asserts is preempted by the GSA and Cargill and ADM cannot, as a matter of law, be at fault. Even were duty still in play, which it is not, Syngenta fails to point to any evidence to establish that it was foreseeable to Cargill and ADM that a decision to sell corn to China created or increased risk of market disruption. And even if Syngenta had mustered evidence of foreseeability, there is no evidence that Cargill's and ADM's attempt to sell corn to China *caused* Plaintiffs' injury. Shipped or not shipped, it was the presence of MIR162 in U.S. corn that caused loss of the China market.

Syngenta's attempt to compare its negligence with the acts of the entire Government of China fails for no less convincing reasons. Syngenta takes aim directly at China's GMO laws, contending that they violate World Trade Organization ("WTO") obligations. But Syngenta cannot point to a single case holding that a foreign government can be found by a U.S. jury "at fault" for failing to adopt laws to protect U.S. citizens. The act-of-state doctrine expressly forbids such a finding, which would be tantamount to declaring China in violation of its treaty obligations. Even if not prohibited by that doctrine, Syngenta has not and cannot demonstrate that China had a duty to act for the benefit of foreign citizens like Plaintiffs. There is no evidence that WTO agreements were intended to create such a duty. To the contrary, those agreements do not provide for adjudication in foreign courts, but through dispute resolution between foreign nations. Finally, Syngenta plainly contends that China's conduct was intentional, which Kansas law does not compare with negligence.

Syngenta's "extraordinary" defense of superseding cause also fails as a matter of law. First, China, Cargill, and ADM cannot be viewed as intervening, superseding causes at all since, without Syngenta's broad, unfettered commercialization of Viptera (resulting in wide-spread presence of Viptera in the corn supply) in the first place, there could be no injury. As to China, Syngenta wants to claim unforeseeability of a "dysfunctional" regulatory system that Syngenta affirmatively contends was known. The alleged "dysfunction" of China's regulatory system is a red herring. It is undisputed that Syngenta knew, when it sold Viptera to farmers in the fall of 2010, that the earliest it could have possibly expected approval was spring of 2012. There was no guarantee that MIR162 would be approved by China at all, much less guarantees of when it would pass safety tests. The possibility of delays was ever present – which Syngenta *confirms* by its own argument that China's approval process was dysfunctional. Unless Syngenta's "dysfunctional" defense is not being made in good faith, it is wholly irreconcilable with any assertion that Syngenta could not foresee that delays might prolong the presence of MIR162 in the U.S. commodity system while it remained unapproved in China.

Syngenta's theory for why Cargill and ADM are superseding, intervening causes is as baseless. Syngenta wants to say that Plaintiffs' damages theory depends on rejected corn shipped by those two exporters when plainly, it does not. It also wants to say it could not foresee that Cargill and ADM would decide to ship to China in 2012 supposedly "knowing" the corn contained Viptera in "violation" of Chinese law, but that is irrelevant. It is immaterial whether rejection of MIR162-infected corn was aboard ships of Cargill, ADM, or some other exporter. Syngenta introduces no evidence whatsoever that Cargill and ADM were the only exporters

(because it cannot), and makes no claim that it could not foresee that corn shipped by somebody would contain MIR162 and be rejected. And it was Syngenta who created that risk to begin with.

Syngenta also weakly defends its failure to mitigate defense (distinct from comparative fault), despite no evidence that any Plaintiff acted unreasonably, and no evidence on the amount of damage that any single or group of Plaintiffs might have avoided. Absent such evidence, Syngenta's mitigation defense fails.

Finally, Syngenta comes out of the gate with a new defense based on antitrust law. Syngenta not only failed to sufficiently plead that defense or preserve it in the Pretrial Order, but has not and cannot demonstrate its applicability.

## PLAINTIFFS' RESPONSE TO SYNGENTA'S
## STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to D. Kan. Rule 56.1(b), Plaintiffs respond to Defendants' Statement of Additional Material Facts. Plaintiffs' designation in this response of facts as undisputed or disputed is for purposes of the present summary judgment motion only. Further, Plaintiffs reserve for separate motions practice or for trial all objections to Defendants' contentions and professed evidence, including, without limitation, objections under the Federal Rules of Evidence. Each numbered Paragraph corresponds to Defendants' numbered paragraphs set forth in the Statement of Additional Material Facts. Exhibits submitted in support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment are cited as "Def. Ex." Exhibits submitted in support of Plaintiffs' Reply to Defendants' Response to the Motion for Partial Summary Judgment are cited as "Ex." and are numbered consecutively to the exhibits offered in support of the initial Motion for Partial Summary Judgment.

123.    Syngenta hereby incorporates by reference the Statement of Undisputed Material Facts in its Memorandum in Support of its Motion for Summary Judgment, and also states the following as part of its opposition to Plaintiffs' summary judgment motion.

**RESPONSE TO 123**:        Plaintiffs incorporate by reference their Responses to Defendants' Statement of Undisputed Facts and Statement of Additional Facts set forth in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

124.    In the 2010-2011 marketing year, China imported approximately 1.028 million metric tons of corn from the U.S., and the U.S. produced approximately 315.618 million metric tons of corn. China thus imported approximately 0.33% of total U.S. corn production in the 2010-2011 marketing year. *See* Ex. 123 (USDA FAS Production, Supply and Distribution Statistics, at 6).

**RESPONSE TO 124**:        Disputed. Plaintiffs reference the export statistics from the Report

of Dr. Colin Carter at Table 1. Ex. 65, Carter Rpt. at 7.

>   125.   In the 2011-2012 marketing year, China imported approximately 5.337 million
>           metric tons of corn from the U.S., and the U.S. produced approximately 312.789
>           million metric tons of corn. China thus imported approximately 1.71% of total
>           U.S. corn production in the 2011-2012 marketing year. *See* Ex. 123 (USDA FAS
>           Production, Supply and Distribution Statistics, at 6).

**RESPONSE TO 125**:        Disputed. Plaintiffs reference the export statistics from the Report

of Dr. Colin Carter at Table 1. Ex. 65, Carter Rpt. at 7.

>   126.   In the 2012-2013 marketing year, China imported approximately 2.196 million
>           metric tons of corn from the U.S., and the U.S. produced approximately 312.789
>           million metric tons of corn. China thus imported approximately 0.8% of total U.S.
>           corn production in the 2012-2013 marketing year. *See* Ex. 123 (USDA FAS
>           Production, Supply and Distribution Statistics, at 6).

**RESPONSE TO 126**:        Disputed. Plaintiffs reference the export statistics from the Report

of Dr. Colin Carter at Table 1. Ex. 65, Carter Rpt. at 7.

>   127.   MIR162 has received regulatory approvals in the United States, China, Australia,
>           New Zealand, Taiwan, Brazil, Japan, Mexico, the Philippines, Canada, Korea,
>           Argentina, Colombia, Russia, Kazakhstan, Belarus, Uruguay, the European Union
>           (applicable in Austria, Belgium, Bulgaria, Croatia, Cyprus, Czech Republic,
>           Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy,
>           Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania,
>           Slovakia, Spain, Sweden, and the United Kingdom), Malaysia, South Africa,
>           Indonesia, Paraguay, Vietnam, and Turkey. *See* Ex. 121 (SYNG_00811754); Ex.
>           122 (Center for Environmental Risk Assessment database of status of regulatory
>           approvals for MIR162).

**RESPONSE TO 127**:        Plaintiffs object to and dispute Paragraph 127, which is entirely

based upon hearsay. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D.

Kan. 2001) (Lungstrum, J.) (declining to consider hearsay evidence on summary judgment

because, "[o]f course, if evidence is not admissible at trial, neither is it admissible in an affidavit

or deposition used to support or resist the grant of summary judgment"). Paragraph 127 cites to

7

two out of court statements, which are offered for the truth of the matter asserted. One is a

document authored by Syngenta and the other is a document authored by the Center for

Environmental Risk Assessment.

128.    In 2009, MIR162 received regulatory approval in Australia, New Zealand, Taiwan, and Brazil. *See* Ex. 121 (SYNG_00811754); Ex. 122 (Center for Environmental Risk Assessment database of status of regulatory approvals for MIR162).

**RESPONSE TO 128**:    Plaintiffs object to and dispute Paragraph 128, which is entirely

based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 128 cites two out

of court statements, which are offered for the truth of the matter asserted. One is a document

authored by Syngenta (Def. Ex. 121) and the other is a document authored by the Center for

Environmental Risk Assessment (Def. Ex. 122).

129.    In 2010, MIR162 received regulatory approval in the United States, Japan, Mexico, the Philippines, Canada, Korea, Argentina, and Colombia. *See* Ex. 121 (SYNG_00811754); Ex. 122 (Center for Environmental Risk Assessment database of status of regulatory approvals for MIR162).

**RESPONSE TO 129**:    Plaintiffs object to and dispute Paragraph 129, which is entirely

based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 129 cites two out

of court statements, which are offered for the truth of the matter asserted. One is a document

authored by Syngenta (Def. Ex. 121) and the other is a document authored by the Center for

Environmental Risk Assessment (Def. Ex. 122).

130.    In 2011, MIR162 received regulatory approval in Argentina and Indonesia. *See* Ex. 121 (SYNG_00811754); Ex. 122 (Center for Environmental Risk Assessment database of status of regulatory approvals for MIR162).

**RESPONSE TO 130**:    Plaintiffs object to and dispute Paragraph 130, which is entirely

based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 130 cites two out

of court statements offered for the truth of the matter asserted. One is a document authored by Syngenta (Def. Ex. 121) and the other is a document authored by the Center for Environmental Risk Assessment (Def. Ex. 122).

> 131.   In 2012, MIR162 received regulatory approval in Colombia, Russia, Kazakhstan, Belarus, Uruguay, and the European Union (applicable in Austria, Belgium, Bulgaria, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Spain, Sweden, and the United Kingdom). *See* Ex. 121 (SYNG_00811754); Ex. 122 (Center for Environmental Risk Assessment database of status of regulatory approvals for MIR162).

**RESPONSE TO 131**:        Plaintiffs object to and dispute Paragraph 131, which is entirely based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 131 cites two out of court statements, which are offered for the truth of the matter asserted. One is a document authored by Syngenta (Def. Ex. 121) and the other is a document authored by the Center for Environmental Risk Assessment (Def. Ex. 122).

> 132.   In 2014, MIR162 received import approval in South Africa, Paraguay, and Vietnam. *See* Ex. 121 (SYNG_00811754); Ex. 122 (Center for Environmental Risk Assessment database of status of regulatory approvals for MIR162).

**RESPONSE TO 132**:        Plaintiffs object to and dispute Paragraph 132, which is entirely based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 132 cites two out of court statements, which are offered for the truth of the matter asserted. One is a document authored by Syngenta (Def. Ex. 121) and the other is a document authored by the Center for Environmental Risk Assessment (Def. Ex. 122).

> 133.   In 2015, MIR162 received import approval in Turkey. *See* Ex. 122 (Center for Environmental Risk Assessment database of status of regulatory approvals for MIR162).

**RESPONSE TO 133**:          Plaintiffs object to and dispute Paragraph 133, which is entirely

based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 133 cites the out of

court statement of the Center for Environmental Risk Assessment, which is offered for the truth

of the matter asserted.

> 134.   China's Implementation Regulations on the Safety of Import of Agricultural
> Genetically Modified Organisms includes a provision that: "The Ministry of
> Agriculture shall make a decision of approval or disapproval within 270 days after
> accepting the application and notify the applicant of the decision." Ex. 7
> (Implementation Regulations on the Safety of Import of Agricultural Genetically
> Modified Organisms, Art. 17); *see* Ex. 3 (P. Shull Expert Rep. ¶ 147). China's
> Regulations on Safety of Agricultural Genetically Modified Organisms includes a
> provision that: "The competent agricultural administrative department of the State
> Council and the exit-entry inspection and quarantine department of the State shall
> make a decision of approval or disapproval and notify the applicant within 270
> days from the date of application acceptance." Ex. 8 (Regulations on Safety of
> Agricultural Genetically Modified Organisms, Art. 36); *see* Ex. 3 (P. Shull Expert
> Rep. ¶ 147).

**RESPONSE TO 134**:          Plaintiffs dispute Paragraph 134, which, as written, suggests the

referenced regulations call for a decision on import approval within 270 days of the initial

application for a permit to import tests seeds for in-country testing. Instead, the regulations call

for a decision on import approval within 270 days of the submission of the full import approval

dossier, which includes the results of the in-country field and toxicity tests. Further, the Ministry

of Agriculture has 270 days from any subsequent application submitting the full approval dossier

responding to questions raised by the Ministry of Agriculture. Ex. 67, Latner Report ¶¶ 206, 208,

212.

     In addition, Article 36 of the Regulations on Safety of Agricultural Genetically Modified

Organisms does not refer to an application for import approval filed by a biotechnology company

like Syngenta, but rather an application for the transfer of genetically modified organisms

through Chinese borders, as discussed in Article 35. The "applicant" is the owner of the

commodity, not a biotechnology company. *See* Def. Ex. 8.

> 135.    Phillip Shull, the former U.S. Minister-Counselor of Agriculture in China and one
> of Syngenta's proffered experts, stated in his report that on July 1, 2012, Syngenta
> submitted responses to questions from China's Ministry of Agriculture ("MOA")
> and that "the MOA did not issue any formal response until on or around May 21,
> 2013." Ex. 3 (P. Shull Expert Rep. ¶ 150). Shull also states that after Syngenta
> submitted responses to questions on March 1, 2014, "the MOA did not grant final
> approval until mid-December 2014." *Id.* ¶ 151.

**RESPONSE TO 135**:        Plaintiffs do not dispute that Paragraph 135 accurately quotes

portions of Shull's expert report, but dispute and have moved to strike Shull's testimony. ECF

No. 2868. If Shull's testimony is stricken, Paragraph 135 lacks a factual basis.

> 136.    "A company cannot even submit its initial import application until it has secured
> cultivation approval elsewhere." Ex. 3 (P. Shull Expert Rep. ¶ 99). Shull states in
> his report that this precondition "is not a standard international practice." *Id.*

**RESPONSE TO 136**:        Plaintiffs do not dispute that Paragraph 136 accurately quotes

portions of Shull's expert report, but dispute and have moved to strike Shull's testimony. ECF

No. 2868. If Shull's testimony is stricken, Paragraph 136 lacks a factual basis. Plaintiffs also

object to Shull's characterization of China's import approval process as "not standard

international practice." Syngenta does not explain what it believes to be "standard international

practice" for import approval procedures, but Plaintiffs note that other nations had similar

requirements. Ex. 67, Latner Report ¶ 63 (noting Japan's requirement that a biotech company

secure cultivation approval elsewhere prior to applying for import approval).

> 137.    Referring to the requirement that cultivation approval in another country must be
> secured before an application for import approval in China can even be filed, Ed
> Porter from the USDA's Foreign Agricultural Service stated in an email to the
> U.S. Grains Council: "Our message has and will remain that this requirement is
> unacceptable because it is not science-based, it is unnecessary, and it needlessly

delays the commercialization of much-needed new events." Ex. 9 (T. Carrato Expert Report ¶ 45 n.24) (quoting T. Sleight Dep. Ex. 50, at 898).

**RESPONSE TO 137**:          Plaintiffs object to and dispute Paragraph 137 because it entirely based upon hearsay and is not reliable. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 137 references an expert report, which references emails between a staff member of the USDA and a staff member of the U.S. Grains Council.

138.   The 2012 BIO Policy states that: "A 'functioning' regulatory system is science-based, with clearly defined timelines and processes for regulatory review and decision-making, and for appropriate protection for proprietary information and data. In a 'functioning' regulatory system, the regulatory and decision-making processes must be predictable and not subject to undue political influence. The term 'predictable' includes, without limiting the definition, that the regulatory system accepts submissions in the ordinary course without preconditions related to the regulatory status in other countries, and the regulatory process for import authorization is completed routinely within 30 months or less. Since regulatory systems continue to evolve and change globally, countries' systems may become functional or dysfunctional. Over time, a country should develop a track record of systematic authorizations with consistent and predictable timelines and processes." Ex. 4 at SYNG_00684123 n.5. BIO's corporate representative stated during his deposition that the 2012 BIO Policy's definition of functioning regulatory system is "essentially the same as the definitions" in the 2007 and 2009 versions of the Policy, and that the 2012 BIO Policy's definition was an "elaboration" of the prior definitions. *See* Ex. 11 (BIO Dep. Tr. 243:17-24, 246:8-21).

**RESPONSE TO 138**:          Disputed. BIO's corporate representative also testified that when comparing the 2012 Policy with the 2009 Policy, "it's certainly different than the other one." *See* Def. Ex. 11 (BIO Dep.) at 243:22-23.

139.   BIO's corporate representative was asked during his deposition: "Can you give the jury an example of a precondition related to the regulatory status in other countries?" He responded: "One precondition could be the practice of, of requiring other countries to approve the product first." Ex. 11 (M. O'Mara Dep. Tr. 247:20-22).

**RESPONSE TO 139**:          Plaintiffs do not dispute that Paragraph 139 accurately quotes the

deposition testimony cited.

140.    A June 29, 2007 letter from the American Seed Trade Association and BIO to the
USDA states that:

> China's agricultural biotech authorization process impedes agricultural
> trade through asynchronous authorizations of agricultural
> biotechnology products. The Ministry of Agriculture has a requirement
> that a biotech product to be imported into China must be approved in
> the country of development before the authorization process in China
> can begin. There is no scientific basis for delaying the start of the
> authorization process in China solely because a product is not yet
> approved in the country of export. In addition, such a provision raises
> questions as to whether the regulation is consistent with China's
> obligations under the World Trade Organization.

Ex. 12 (6/29/2007 Letter from BIO & ASTA to U.S. Trade Representative).

**RESPONSE TO 140**:          Plaintiffs object to and dispute Paragraph 140 as hearsay. *See PAS*

*Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 140 simply quotes a letter from the ASTA and

BIO to the USDA (Def. Ex. 12), which is an out of court statement offered for the truth of the

matter asserted.

141.    Shull states in his report that "China requires toxicology doses on mice well
above the standard established by the Organization for Economic Co-operation
and Development." Ex. 3 (Shull Expert Rep. ¶ 103). Shull states in his report that
"Chinese scientists have even admitted to [me] that there is no sound technical
basis for the way they conduct these studies, and that even toxicologists on the
[Chinese National Biosafety Committee] agree there is no basis for this
requirement." *Id.*

**RESPONSE TO 141**:          Plaintiffs do not dispute that Paragraph 141 accurately quotes

portions of Shull's expert report, but dispute and have moved to strike Shull's testimony. ECF

No. 2868. If Shull's testimony is stricken, Paragraph 136 lacks a factual basis. Plaintiffs also

object to and dispute Shull's statements because they are based upon hearsay and are not reliable.

*See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Shull cites the out of court statements of unnamed

"Chinese scientists" for the truth of the matter asserted.

> 142. In a document entitled "U.S. Agricultural Commodity Exports to China: Limiting Market Access through Onerous Biotech Requirements," BIO states: "All jurisdictions accept acute oral toxicity studies according to the study design called out in OECD 425. China has a unique standard that requires a redundant study requiring many more animals and at unnecessary do[se] levels that are physically difficult or impossible to administer." Ex. 13 (M. O'Mara Dep. Ex. 26, at BIO-0007693).

**RESPONSE TO 142**:          Plaintiffs object to Paragraph 142 as entirely based upon hearsay.

*See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 142 simply quotes an out of court

statement of BIO (Def. Ex. 26) for the truth of the matter asserted.

> 143. In that same document, BIO states: "China is the only jurisdiction that requires in-country *field* trials for an *import* approval" and that "[i]n China, the process stops during the in-country trial." *Id.* at BIO-0007692 n.2, BIO-0007693 (emphasis added).

**RESPONSE TO 143**:          Plaintiffs object to Paragraph 143 as entirely based upon hearsay.

*See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 143 simply quotes a document written

by BIO (Def. Ex. 26), which is an out of court statement offered for the truth of the matter

asserted. Plaintiffs also dispute that China is the only country that requires in-country field

testing for import approval. Ex. 67, Latner Rpt. ¶ 41 (noting that Japan requires in-country

testing); *see also* Ex. 70, USDA Foreign Agriculture Service GAIN Report, November 18, 2016

at 15 (noting that for import approval, Japan requires field testing in domestic soil to assess the

effect of a genetically modified crop's release into the local environment); *see also* Ex. 87,

Deposition of Scott Huber Vol. II at 452 ("Japan requires some in-country studies.").

> 144. BIO's document entitled "U.S. Agricultural Commodity Exports to China: Limiting Market Access through Onerous Biotech Requirements" states, in comparing China's biotechnology regulatory system to other countries', that:

14

"Applicants must import seed and grain into China in order to conduct the in-country studies. Source countries for seed are very restrictive and exclude the United States. Chile is a commonly used source country. Unique phytosanitary requirements call for inspections for unrelated plant pests which source counties refuse to conduct given the global convention on sanitary/phytosanitary testing." *Id*. at BIO-0007693. The document states that, in China, Submissions are only accepted three times per year preceding the tri-annual meeting of the National Biosafety Committee (NBC). The NBC meeting calendar is a considerable barrier for U.S. agriculture, and is unlike the risk assessment calendar of any other major importing country. At a minimum the NBC should meet on a monthly basis, and decisions by the NBC should be promulgated by MOA within a reasonable time period." *Id*. The document also states:

> China should develop scientifically rational distinctions between import approvals and in-country cultivation approvals. For import approvals, the following changes should be made:
>
> > a.  No requirement that a risk assessment begin only after the product is deregulated in a major production market - China should accept submissions as soon as the data is generated to conduct the appropriate risk assessment.
> >
> > b.  In country environmental trials should only be required if the safety assessment identifies environmental risks.
> >
> > c.  China should recognize animal feeding studies conducted outside China and eliminate the requirement for in-country rat feeding studies for the food/feed assessment.
>
> *Id*. at BIO-0007694.

**RESPONSE TO 144**:         Plaintiffs object to and dispute Paragraph 144 as entirely based upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 144 simply quotes a document written by BIO (Def. Ex. 26), which is an out of court statement offered for the truth of the matter asserted.

145.  Shull states in his report that: "Ultimately, China's use of its regulatory system to block or significantly delay approvals of *[sic]* unjustified regulatory barriers to our exports of these products were deemed so egregious that the U.S. government decided to exert pressure at the very highest levels. President Obama himself, as well as all U.S. Cabinet and Sub-Cabinet officials on the JCCT delegation

(Treasury Secretary, Secretary of State, USTR Ambassador, and Deputy National Security Advisor), applied political pressure to the Chinese government to address these actions. All of these officials actively engaged with their counterparts in the Chinese government on this issue, encouraging them to fix this unnecessary irritant in our bilateral relations." Ex. 3 (P. Shull Expert Rep. ¶ 173).

**RESPONSE TO 145**:          Plaintiffs do not dispute that Syngenta has accurately quoted portions of Shull's report in Paragraph 145, but dispute and have moved to strike Shull's testimony. ECF No. 2868. If Shull's testimony is stricken, Paragraph 145 lacks a factual basis.

146.    Shull states in his report that: "At the time Syngenta submitted its initial MIR162 dossier in March 2010, a company could submit its initial application, final dossier, and responses to any questions from the MOA at only three designated times during the year." *See* Ex. 3 (Shull Expert Rep. ¶ 100). Shull also states that: "To slow approvals even further, the MOA will issue approvals only during select 'windows' throughout the year. Whereas China used to issue approvals three times per year, it has retreated to issuing approvals only once per year at an unexpected time." *Id.* ¶ 101.

**RESPONSE TO 146**:          Plaintiffs do not dispute that Syngenta has accurately quoted portions of Shull's report in Paragraph 146, but dispute and have moved to strike Shull's testimony. ECF No. 2868. If Shull's testimony is stricken, Paragraph 146 lacks a factual basis.

147.    Shull states in his report that "[t]here is no scientific basis for restricting when approvals are issued, and it runs counter to international practice" and that he is "not aware of any other country that imposes these kinds of temporal restrictions on when an application or responses to questions may be submitted, when questions may be asked, or when an approval may be granted." Ex. 3 (Shull Expert Rep. ¶ 101).

**RESPONSE TO 147**:          Plaintiffs do not dispute that Syngenta has accurately quoted portions of Shull's report in Paragraph 147, but dispute and have moved to strike Shull's testimony. ECF No. 2868. If Shull's testimony is stricken, Paragraph 147 lacks a factual basis.

148.    Bryan Lohmar, the China Director of the U.S. Grains Counsel was asked in the USGC corporate representative deposition "Your understanding—your understanding in May of 2012 was that MIR162 was awaiting the minister's signature?" and he testified in response "Yeah. That's my understanding, yes."

> *See* Ex. 15 (6/23/2016 B. Lohmar Dep. Tr. 33:6-9); *see also* Ex. 14 (B. Lohmar
> Dep. Ex. 62, at SYNG_00787622).

**RESPONSE TO 148**:        Plaintiffs object to and dispute the testimony quoted in Paragraph

148 as speculation, lacking foundation, and not based upon personal knowledge. Lohmar

testified that he had a general understanding about MIR162 at the time he joined the U.S. Grains

Council in 2012, but that he did not have an understanding of the details of Syngenta's import

application in China. Ex. 68, Deposition of Bryan Lohmar Vol. I ("Lohmar Vol. I") at 29:3-16.

The document that Syngenta's counsel attempted to use to refresh Lohmar's recollection was a

draft of minutes from a May 9, 2012 U.S. Grains Council Biotechnology Advisory Team

Meeting that Lohmar did not attend. *Id.* at 29:19-31:9. The portion of the document that

Syngenta's counsel specifically attempted to use to refresh Lohmar's recollection was a

statement made during the meeting by another U.S. Grains Council representative. *Id.* at 31:10-

20. When asked again whether that was his understanding at the time, Lohmar testified he had no

personal knowledge because he was "new to the job, but that's how, you know, it was

characterized[.]" *Id.* at 39:10-11. Plaintiffs also object to Syngenta's citation to Deposition

Exhibit 62 to Lohmar's deposition. That exhibit is a presentation Lohmar prepared for a

February 2014 meeting and does not support Syngenta's statement that Lohmar understood in

May 2012 that the MIR162 application was awaiting the Minister's signature.

> 149.    Thomas Sleight, the President of the U.S. Grains Counsel was asked in the USGC
> corporate representative deposition "was the hang-up, then, at this point on the
> Beijing 19, that was, was that across the board for those traits, regardless of who
> the manufacturer was?" and he testified "Yes. It was the system that was the
> problem, the approval system." *See* Ex. 16 (6/22/2016 T. Sleight Dep. Tr. 332:18-
> 23). Lohmar testified on behalf of the USGC that this was "[t]he first time all the
> companies with final approvals submitted. These are the final approvals to import
> granted after the preliminary recommendation by the National Biosafety

17

Committee got rejected. Usually some do and some don't." Ex. 15 (6/23/2016 B. Lohmar Dep. Tr. 48:2-52:18).

**RESPONSE TO 149**:            Plaintiffs object to and dispute the testimony of Lohmar quoted in Paragraph 149 as speculation, lacking foundation, and not based upon personal knowledge. Lohmar testified he was "just starting to get my head around these issues, these approval issues. I hadn't worked at them, on them before. You know, I'm experienced doing stuff in China and I know a bit how the government works and whatnot, but I didn't know any of these details." Ex. 68, Lohmar Vol. I at 50:2-7. The information that Lohmar conveyed in the email referred to in his testimony came from biotechnology companies (including Syngenta) as well as the Foreign Agricultural Service office in Beijing. *See* Ex. 69 (Lohmar Dep. Ex. 54). Plaintiffs do not dispute that Paragraph 149 accurately quotes the testimony of Sleight and Lohmar.

150.    Carrato, an author of the BIO Policy, testified that he is "personally aware that the system stopped functioning and that in that timeframe there were as many as 20 or more traits that were just sitting there without the China system functioning at all." Ex. 50 (Carrato Dep. Tr. 368:21-369:4).

**RESPONSE TO 150**:            Plaintiffs do not dispute that Paragraph 150 accurately quotes Carrato's testimony, but dispute and have moved to strike his testimony. ECF No. 2872. If Carrato's testimony is stricken, Paragraph 150 lacks a factual basis. Moreover, Carrato's testimony is hearsay offered for the truth of the matter asserted and, therefore, in admissible.. Information about the status of import approvals are confidential, *see* SOAF ¶ 375, so Carrato's testimony could only be based on what he was purportedly told by other companies.

151.    BIO's corporate representative testified that in June 2012, BIO "clarifi[ed] its policy so that it could be clearly understood that China was not a functioning regulatory system." Ex. 50 (T. Carrato Dep. Tr. 279:20-280:7).

**RESPONSE TO 151**:        Plaintiffs dispute Paragraph 151 because the fact asserted is not supported by record evidence cited, Def. Ex. 50, which is not testimony from the BIO corporate representative.

> 152.   The National Corn Growers Association's corporate representative testified that it did not "believe that the Chinese regulatory process was transparent in this time frame in 2012" and did not "believe that the Chinese regulatory approval process for biotech traits was objective in 2012." Ex. 22 (5/10/2016 N. Fields Dep. Tr. 333:19-336:10).

**RESPONSE TO 152**:        Plaintiffs object to and dispute the testimony quoted in Paragraph 152 as speculation, lacking foundation, not based upon personal knowledge, and based entirely upon hearsay. Syngenta has laid no foundation showing Fields or the NCGA staff's "beliefs" regarding the Chinese regulatory are based upon sound facts, and Fields admitted that he and the NCGA staff had no knowledge pertaining to the Chinese regulatory process beyond "second hand information from Syngenta and other groups." Ex. 71, Deposition of Nathan Fields Vol. II at 495:23-498:25.

> 153.   China did not grant regulatory approval to any new GM traits in all of 2012. *See* Ex. 3 (Shull Expert Rep. ¶ 101); *see also* Ex. 9 (Carrato Expert Rep. ¶ 45) ("China's regulatory system effectively shut down in 2012 for corn and soybean traits.").

**RESPONSE TO 153**:        Undisputed but incomplete. China granted import approval for many traits in November 2011 and throughout 2013. *See, e.g.,* Ex. 86, SYNG_00239350 at 352 (listing approvals throughout 2011 and 2013); Ex. 85, Deposition of Shull at 222:22-223:19 (discussing approval of GMO traits in May 2013).

> 154.   China also did not grant regulatory approval to any new GM traits between July 31, 2013 and December 1, 2014. *See* Ex. 3 (Shull Expert Rep. ¶ 101).

**RESPONSE TO 154**:          Undisputed but incomplete. China granted import approval for

many traits in November 2011 and throughout 2013. *See, e.g.,* Ex. 86, SYNG_00239350 at 352

(listing approvals throughout 2011 and 2013); Ex. 85, Deposition of Shull at 222:22-223:19

(discussing approval of GMO traits in May 2013).

> 155. The U.S. Grains Council's corporate representative testified as follows about a question that China's Ministry of Agriculture raised regarding allergenicity of Viptera: "Q. So it was one Chinese individual [who] had a protein concern? A. Yes. Q. Do you know if there was any scientific basis for that [allergenicity question] whatsoever? [objection omitted] A. His own." Ex. 16 (6/22/2016 T. Sleight Dep. Tr. 357:8-14).

**RESPONSE TO 155**:          Plaintiffs object to and dispute Paragraph 155 because it

mischaracterizes the witness's testimony. Sleight testified that the U.S. Grains Council heard

from one individual that the Chinese had concerns about allergenicity. *See* Def. Ex. 16 at 357:4-

7. Sleight did not testify that only one person in the Chinese government had the concern, as

Syngenta's selective excerpts imply. Plaintiffs further object because Syngenta has laid no

foundation showing Mr. Sleight has knowledge of the scientific basis for "Chinese

individual[s']" concerns about allergenicity. His testimony is based entirely upon hearsay and

speculation.

> 156. Alan McHughen, a geneticist and one of Syngenta's proffered experts, states in his report that there is "no scientific rationale to question the food/feed safety of MIR162." Ex. 18 (McHughen Expert Rep. ¶ 119). He also states "there are no peer-reviewed studies in the scientific literature providing any indication that MIR162 or its components present any health safety issues." *Id.* ¶ 117. He also states that "[i]f there was going to be a health safety issue unique to consuming MIR162 or its derived foods, it would almost certainly be attributable to the Vip3Aa20 protein," but "[a]ll three agencies, USDA, EPA and FDA reviewed the toxicology safety data regarding Vip3Aa20, and none of the three agencies raised any concerns." *Id.* McHughen states that the results of the federal government's analysis "revealed that there was no significant identity between any of the sequential 80-amino acid peptides of Vip3Aa20 and any entry in the Syngenta

Allergen Database. Therefore, Vip3Aa20 does not share overall sequence homology with any known allergenic protein." *Id.* ¶ 118. He further states that:

> The Vip3Aa20 protein sequence was also screened for matches of eight contiguous amino acids between the Vip3Aa20 sequence and the allergen sequences in the Syngenta Allergen Database to screen for short, local regions of amino acid identity that might indicate the presence of common T-cell binding epitopes (Hileman et al., 2002; Stadler and Stadler, 2003; Silvanovich et al., 2006). There were no matches of eight contiguous amino acids between Vip3Aa20 and any entry in the allergen database. No significant amino acid sequence identity of Vip3Aa20 to known or putative allergenic proteins having implications for allergenic potential was identified.

> *Id.*

**RESPONSE TO 156**:        Plaintiffs do not dispute that Syngenta has accurately quoted portions of McHughen's report in Paragraph 156, but dispute and have moved to strike McHughen's testimony regarding whether there is a "scientific basis" for Chinese regulators to have conducted a safety review of MIR162 before granting import approval as required under Chinese law. ECF No. 2877. If McHughen's testimony is stricken, Paragraph 156 lacks a factual basis.

157.    The U.S. Trade Representative stated in a 2011 report that "China's regulatory infrastructure is still developing, and includes biotech regulations that present market access impediments. The barriers include asynchronous approval, which requires that a product must be fully approved in the originating country before an application can be filed for approval in China." Ex. 10 (USDA Foreign Agricultural GAIN Report CH11050 (Oct. 17, 2011)). In a 2014 report, the USTR stated that "China's dysfunctional biotechnology approval process continues to affect trade." Ex. 23 (2014 Report to Congress on China's WTO Compliance, at 23).

> Meanwhile, other U.S. concerns with China's biotechnology regulations and implementing rules remain. For example, China requires a product to be approved in the country of origin before it can be submitted in China for approval, and China's National Biosafety Committee normally reviews new product applications only during three meetings each year. In 2014, the United States learned that MOA

21

only will issue regulatory decisions on applications once a year, and that MOA considers factors other than science, such as public opinion, when evaluating new biotechnology applications. These practices present significant and unnecessary delays for bringing U.S. goods into the China market. China's lack of clarity on the requirements applicable to products stacked with multiple traits is a cause for additional concern, as are China's sometimes duplicative and unprecedented testing requirements.

*Id*. at 101-02. The report also stated:

Disruptions to trade continued to be a concern thereafter due to China's asynchronous approval process, excessive data requests, duplicative requirements, an onerous process for extension of existing certificates and the potential for low-level presence of an unapproved event. In late 2012, China also re-introduced the requirement that biotechnology seed companies must submit viable seed with their biotechnology applications. In addition, an apparent slow-down in issuing approvals generated concern, as approvals were overdue for numerous biotechnology events. At the same time, investment restrictions continued to constrain foreign companies' ability to increase product development in China and to maintain control over important genetic resources.

*Id*. at 102.

**RESPONSE TO 157**:          Plaintiffs object to and dispute Paragraph 157 as entirely based

upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 157 simply quotes reports

by the USDA, which are out of court statements offered for the truth of the matter asserted.

158.    In a December 2013 email, ADM's Senior Director of Government Relations in China stated: "I and others tend to believe that China is using MIR162 as a technical barrier to slow down corn imports while China has a bumper corn harvest in 2013 and domestic corn crop starts to come to market." Ex. 26 (ADM Ex. 474).

**RESPONSE TO 158**:          Plaintiffs object to and dispute Paragraph 158 as entirely based

upon hearsay and speculation. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 158

simply quotes an email by an ADM employee, and Syngenta has established no foundation for

22

which this employee had the personal knowledge on which to opine on the Chinese regulatory system.

      159.    China accepted any U.S. corn containing MIR162 in the years leading up to November 2013. *See*, e.g., Ex. 97 (BGNA00030778) (Bunge employee explaining a "compromise solution" applied by Chinese port regulators that "allowed 0.5% M[I]R162 content internally, or supervised the cargo distribution etc."); Ex. 98 (J. Chen Dep. Ex. 15 (Cargill employee admitting that "when MIR162 was found in all those 2011 & 2012 corn vessels, CIQ officials didn't take any action a[n]d all the cargoes were discharged smoothly"); Ex. 88 (5/16/2016 R. Giroux Dep. Tr. 73:2-19) ("[I]t was our understanding that the Chinese—all signs pointed to the Chinese not enforcing and testing and enforcing against the presence of MIR162 in US corn shipments."); Ex. 16 (T. Sleight Dep. Tr. 413:15-414:9) (testimony of CEO of U.S. Grains Council that MIR162 was in shipments of DDGS to China from 2011 to 2014); Ex. 3 (Shull Expert Rep. ¶ 159) (describing an example from August 2013 of "China clear[ing] for import a 60,000 metric ton bulk shipment of corn from Argentina despite the fact that it reportedly contained traces of MIR162").

**RESPONSE TO 159**:      Plaintiffs dispute Paragraph 159 because it is based upon hearsay and does not support the notion that China accepted U.S. corn containing MIR162 – the evidence cited does not show that any shipment tested positive for MIR162 at its destination in the years preceding 2013.

    Def. Ex. 97, which Plaintiffs object to as hearsay, discusses a plan to try to convince China to allow a low-level presence of MIR162.

    Def. Ex. 9, which Plaintiffs object to as hearsay, is an email from Andrew Wong of Cargill, which is hearsay. Syngenta introduced this email at the deposition of Jerrity Chen of Cargill, who was not even on the email thread. Chen testified that he did not recall whether shipments of corn in China tested positive for MIR162 in 2011 and 2012. Ex. 74, Deposition of Jerrity Chen Vol. II. at 251:16-20. Plaintiffs further object to Def. Ex. 9 because Syngenta has laid no foundation showing Wong had personal knowledge regarding the events described in his

email. In fact, in connection with a similar email that he wrote, Wong testified that he had no personal knowledge of whether China allowed vessels that tested positive for MIR162 to discharge. Wong was asked: "Are you aware of MIR162 having been found in corn boats arriving in China and the cargo on those boats having been let in without issue?" Wong responded: "I cannot recall exactly how I heard it, but around the time, in 2012, on the marketplace, there were some rumors about unapproved GMO being found of certain corn cargo on vessels, and yet they were allowed in without problems, but these were only rumors, and I'm not quite clear in my memory." Ex. 75, Deposition of Andrew Wong Vol. II at 284:3-24. Wong was also asked: "What were the sources of information in the marketplace from which you might have received that information?" Wong testified: "I'm not sure, because there were many rumors on the marketplace. Because the marketplace often had many rumors circulating, such as about the GMO, matters including when a certain trait would be approved, et cetera, but very often these rumors were wrong, so we are not clear about this rumor." *Id*. at 284:25-285:10.

Plaintiffs admit that Syngenta accurately quotes the testimony of Randal Giroux of Cargill, but the testimony does not support the fact that China allowed shipments that tested positive for MIR162. Giroux testified that, because of Syngenta's representations that its MIR162 had been "approved" from a safety perspective, he believed that China may have been exercising some level of regulatory discretion for the presence of MIR162 in vessels containing U.S. corn based upon the information he was receiving from Syngenta. *See* Ex. 76, Deposition of Randal Giroux as a corporate representative Vol. II ("Giroux 30b6 Vol. II") at 390-91 ("Syngenta had assured us that there was a food and feed safety approval was completed, it was strictly an administrative step. That seemed consistent with allowing for regulatory discretion.").

24

Syngenta has laid no foundation to show Giroux knows that China allowed shipments containing MIR162, and Plaintiffs object on that ground as well.

With respect to Def. Ex. 16, Plaintiffs object because Syngenta has also laid no foundation showing that Thomas Sleight had any personal knowledge that MIR162 was in DDGS purchased by Chinese buyers in 2010 through 2014.

> 160.    Shull states in his report that by the fall of 2013, "world corn prices had plummeted, while the corn supply and domestic corn prices in China were extremely high." Ex. 3 (Shull Expert Rep. ¶ 165).

**RESPONSE TO 160**:        Plaintiffs do not dispute that Paragraph 160 accurately quotes portions of Shull's expert report, but dispute and have moved to strike Shull's testimony. ECF No. 2868. If Shull's testimony is stricken, Paragraph 160 lacks a factual basis. Moreover, Plaintiffs object because Shull uses unreliable hearsay, as the only basis for Shull's statement is a single conclusory and source-less sentence is newspaper article. Shull states in his report that by the fall of 2013, "world corn prices had plummeted, while the corn supply and domestic corn prices in China were extremely high." Def. Ex. 3 (Shull Expert Rep. ¶ 165).

> 161.    The U.S. Trade Representative has explained that "[w]ith its accession to the WTO, China assumed obligations under the Agreement on Technical Barriers to Trade" ("TBT Agreement") and that "China also became obligated" to the Agreement on the Application of Sanitary & Phytosanitary Measures ("SPS Agreement"). Ex. 1 (U.S. Trade Representative's 2013 Rep. to Congress on China's WTO Compliance, at 54, 87).

**RESPONSE TO 161**:        Plaintiffs object to Paragraph 161 as hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 161 simply quotes the out of court statement of the U.S. Trade Representative. Moreover, to the extent Syngenta intended to suggest that the United States views China's GMO regulatory requirements as violations of the SPS Agreement, the

United States has not filed any complaint with the WTO alleging violation of the agreement. *See* Exhibit 85, Deposition of P. Shull at 177:20-25.

> 162.   The SPS Agreement requires WTO members to, among other things, (1) use import-approval procedures that "are undertaken and completed without undue delay and in no less favourable manner for imported products than for like domestic products," Ex. 2 (SPS Agreement, at Annex C.1(a) & Art. 2.3); (2) rely on import-approval procedures that are "applied only to the extent necessary to protect human, animal or plant life or health, based on scientific principles and not maintained without sufficient scientific evidence," *id*. at Art. 2.2; (3) base their regulatory measures "on international standards, guidelines or recommendations, where they exist," *id*. at Art. At 3.1; and (4) not apply regulatory measures "in a manner which would constitute a disguised restriction on international trade," *id*. at Art. 2.3.

**RESPONSE TO 162**:          Undisputed but immaterial that the quoted words are accurate. Disputed as to context and because Syngenta selectively quotes from the SPS Agreement. The SPS Agreement does not use the words "import-approval procedures" or "regulatory measures." The SPS Agreement does not dictate any particular regulatory process, but considers compliance on a case-by-case basis.

According to the WTO, the phrase "undue delay" must be construed in view of a case-by-case assessment for each GMO trait under approval and take into account the "relevant facts and circumstances." Def. Ex. 6 at 665 (¶ 7.1497). Even lengthy delays are not "undue" if they are supported by a justification. *Id.* at ¶ 7.1496 ("Similarly, we do not consider that a demonstration that a particular approval procedure has been delayed by, say, two years would always and necessarily be sufficient to establish that the relevant procedure has been 'unduly' delayed."). And a country "is not legally responsible for delays which are not attributable to it." *Id.* at ¶ 7.1497. "Hence, delays attributable to action, or inaction, of an applicant must not be held against a Member when a determination is made regarding whether that Member has undertaken

or completed approval procedures 'without undue delay.'" *Id.* Delays associated with the import approval of Viptera in China were accompanied by justifications and were attributable to Syngenta, not China. *See* ECF No. 2940, SOAF ¶¶ 249-323.

Furthermore, Members to the Agreement "must in principle be allowed to take the time that is reasonably needed to determine with adequate confidence whether their relevant SPS requirements are fulfilled…." *Id.* at 665 (¶ 7.1498). Essentially, the WTO applies a "good faith" test in determining if the requirements of the SPS Agreement are met. *Id.* Thus, "if new or additional information becomes available at a late stage in an approval procedure and that information may appropriately be considered to have a potential impact on a Member's determination on whether an application fulfils that Member's relevant SPS requirements, it might be justifiable for the Member concerned to delay the completion of the procedure and give itself the additional time needed to assess the information." *Id.* New information became available to the Ministry of Agriculture during the course of the approval process, including without limitation the existence of Syngenta's adverse Daphnia study, that required Syngenta to submit additional information. *See* ECF No. 2940, SOAF ¶¶ 249-323.

With respect to Syngenta's quotation that procedures should be based on "scientific evidence," the WTO has considered whether non-science based delays are *per se* "undue." It has rejected that position. *Id.* at 665 (¶ 7.1500) ("[W]e do not agree that such delays must in all cases be considered 'undue.'"). The WTO gives an example of a delay "caused by a temporary government shutdown" or where a "sharp increase in the number of products submitted for approval" as examples of non-science based delays that might, nonetheless, be justified. *Id.*

27

China experienced a government slowdown during the approval of Viptera due to a once-in-a-decade government transition. *See* Ex. 67, Latner Rpt. 39 n.127.

Finally, Syngenta's misleading quotations suggest that any regulatory process not based on international standards is necessarily inconsistent with the SPS Agreement. But paragraph 3 of Article 3 of the agreement provides that "Members may introduce or maintain sanitary or phytosanitary measures which result in a higher level of sanitary or phytosanitary protection than would be achieved by measures based on the relevant international standards, guidelines or recommendations, if there is a scientific justification, or as a consequence of the level of sanitary or phytosanitary protection a Member determines to be appropriate in accordance with the relevant provisions of paragraphs 1 through 8 of Article 5." Def. Ex. 6 at 943 (¶ 7.2951) (quoting SPS Agreement Article 3.3).

163. The U.S. Trade Representative has stated that the SPS Agreement "require[s] that sanitary and phytosanitary measures address legitimate human, animal and plant health concerns, do not arbitrarily or unjustifiably discriminate between WTO members' agricultural and food products, and are not disguised restrictions on international trade," and "requires that the measures in question be based on scientific grounds, developed through risk assessment procedures and adopted with transparency." Ex. 1 (U.S. Trade Representative's 2013 Rep. to Congress on China's WTO Compliance, at 87).

**RESPONSE TO 163**: Plaintiffs object to Paragraph 163 as hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 163 simply quotes the out of court statement of the U.S. Trade Representative. Moreover, to the extent Syngenta intended to suggest that the United States views China's GMO regulatory requirements as violations of the SPS Agreement, the United States has not filed any complaint with the WTO alleging violation of the agreement. *See* Ex. 85, Shull Depo. 177:20-25.

Moreover, "transparency" for purposes of the SPS Agreement is simply defined as "publish[ing] promptly in such a manner as to enable interested Members to become acquainted with" all sanitary and phytosanitary regulations. Def. Ex. 2 at 79 (Annex B ¶ 1). Syngenta does not allege that China's GMO regulations were not published and available to it. So the assertion is immaterial.

164.   The TBT Agreement states that one of its purposes is "to ensure that technical regulations and standards, including packaging, marking and labelling requirements, and procedures for assessment of conformity with technical regulations and standards do not create unnecessary obstacles to international trade" and "recogniz[es] the important contribution that international standards and conformity assessment systems can make in this regard by improving efficiency of production and facilitating the conduct of international trade." Ex. 5 at 1. Article 2.1 of the TBT Agreement includes a provision that: "Members shall ensure that in respect of technical regulations, products imported from the territory of any Member shall be accorded treatment no less favourable than that accorded to like products of national origin and to like products originating in any other country." *Id.* at 3. Article 2.2 of the TBT Agreement includes a provision that: "Members shall ensure that technical regulations are not prepared, adopted or applied with a view to or with the effect of creating unnecessary obstacles to international trade. For this purpose, technical regulations shall not be more trade-restrictive than necessary to fulfil a legitimate objective, taking account of the risks non-fulfilment would create." *Id.* at 3.

**RESPONSE TO 164**:      Plaintiffs do not dispute that Paragraph 164 accurately quotes the cited material.

165.   The U.S. Trade Representative has stated that the TBT Agreement, "establishes rules that help distinguish legitimate standards and technical regulations from protectionist measures," including by requiring that standards "are to be developed and applied transparently and on a non-discriminatory basis by WTO members and should be based on relevant international standards and guidelines, where appropriate." Ex. 1 (U.S. Trade Representative's 2013 Rep. to Congress on China's WTO Compliance, at 54-55).

**RESPONSE TO 165**:          Plaintiffs object to Paragraph 165 as hearsay. *See PAS Commc'ns,*

139 F. Supp. 2d at 1179. Paragraph 165 simply quotes the out of court statement of the U.S.

Trade Representative.

> 166.   Plaintiffs' expert Kevin Latner stated in his report: "[T]he application for import
> approval and the application for cultivation approval should be reviewed
> independently." Ex. 19 (K. Latner Expert Rep. ¶ 223).

**RESPONSE TO 166**:          Plaintiffs object and dispute Paragraph 166, which selectively

quotes the export Report of Kevin Latner. Latner's report reads:

> While the application for cultivation and import approval should be reviewed
> independently, the reviewers, including the BMD and NBC members, will
> essentially be the same, especially if the applications are submitted concurrently. In
> practice, an application for cultivation is likely to be a consideration when
> reviewing an application for import approval. As the same regulators and expert
> panelists will be reviewing both applications, scientific questions, including
> environmental impact, food safety and risk management, are likely to influence
> decisions respect to each application. Consistent with my experience, others in the
> industry recognize that cultivation approval attracts additional regulatory scrutiny
> because of, among others, potential environmental concerns. Such applications can
> and likely will delay import approval. Syngenta recognized this reality and
> understood that seeking cultivation approval could delay or create additional issues
> than merely seeking import approval.

Def. Ex. 19 ¶¶ 223-226.

> 167.   A June 28, 2012 email from the Rick Tolman at the National Corn Growers
> Association included the statement that: "Viptera is caught in a Chinese political
> game. We had anticipated approval by planting, but obviously that didn't happen.
> Approval of Viptera and other events appears caught up in an internal political
> game in China and as a bargaining chip in trade negotiations between China and
> the U.S. on other trade disputes. This move does not engender much confidence in
> China's regulatory approval process being transparent and objective." Ex. 20 (N.
> Fields Dep. Ex. 2241, at NCGA0007037).

**RESPONSE TO 167**:          Plaintiffs object to and dispute Paragraph 167 as entirely based

upon hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 167 simply quotes an

email from Rick Tolman, a former NCGA staff member. Plaintiffs also object because Syngenta

also has not established Tolman has any foundation to opine on matters related to the Chinese regulatory system.

168.     The NCGA's corporate representative was asked during his deposition: "Did the NCGA believe that the Chinese regulatory process was transparent in this time frame in 2012?" He testified in response: "At this point, in this time frame in 2012, no." He was further asked: "Did NCGA believe that the Chinese regulatory approval process for biotech traits was objective in 2012?" He testified in response: "At this point in 2012, no." Ex. 22 (N. Fields Dep. Tr. 333:19-336:10).

**RESPONSE TO 168**:          Plaintiffs object to and dispute the testimony quoted in Paragraph 168 as speculation, lacking foundation, and not based upon personal knowledge. Syngenta has laid no foundation showing Fields' or the NCGA's "beliefs" regarding the Chinese regulatory are based upon sound fact, and Fields admitted that he and the NCGA no knowledge pertaining to the Chinese regulatory process beyond "second hand information from Syngenta and other groups." Ex. 71, Deposition of Nathan Fields Vol. II at 495:23-498:25.

169.     An August 23, 2011 letter from NCGA to its corn grower members stated that: "Commercialization of Viptera was done in accordance with the US regulatory approval system and has met the policy requirements of NCGA and Biotechnology Industry Organization." Ex. 63; Ex. 22 (N. Fields Dep. Tr. 433:12-434:10, 436:20-437:9).

**RESPONSE TO 169**:          Plaintiffs do not dispute that the NCGA sent the letter described in Response to Paragraph 169, but Plaintiffs object to any statement from the NCGA regarding whether "commercialization of Viptera was done in accordance with the policy requirements of . . . the Biotechnology Industry Organization" because of lack of personal knowledge and lack of foundation. Fields, the corporate representative of the NCGA, testified that he understood that the Biotechnology Industry Organization Product Launch Stewardship Policy required Syngenta to consult with members of the value chain, including the grain trade. Fields testified that the only information the NCGA had on Syngenta's consultations with the grain trade came "from

Syngenta" and that he had no personal knowledge on consultations with the grain trade "specific to Viptera." Ex. 72, Deposition of Nathan Fields Vol. I ("Fields Vol. I") at 122:11-127:20.

170.    The USDA has stated, in response to certain comments on Syngenta's petition for deregulation of Duracade and in response to other petitions for deregulations of new GM traits: "When international acceptance of a specific event has not been attained, *US elevators and grain buyers* may either refuse to purchase the grain, or may require that it be diverted to elevators that are solely designated as sources for domestic grain sale." Ex. 18 (A. McHughen Expert Rep. ¶ 100) (emphasis added) (quoting USDA-APHIS. Response to Public Comments on Syngenta SYN-05307-1 Corn, at 24 (2012), https://www.aphis.usda.gov/brs/aphisdocs/10_33601_rtc.pdf; USDA-APHIS, Response to Public Comments on Stine Seed HCEM485 Corn, at 27 (2013), https://www.aphis.usda.gov/brs/aphisdocs/09_06301p_fonsi.pdf; USDA-APHIS, Response to Public Comments on Bayer FG72 Soy, at 49 (2013), https://www.aphis.usda.gov/brs/aphisdocs/09_32801p_fonsi.pdf).

**RESPONSE TO 170**:        Plaintiffs do not dispute that Syngenta has accurately quoted portions of McHughen's report in Paragraph 170, but dispute and have moved to exclude this portion of McHughen's testimony. ECF No. 2877. If McHughen's testimony on this subject is excluded, there will be no factual basis for Paragraph 170.

171.    The NCGA's corporate representative testified that it operates the "Know Before You Grow" website, which lists the approval status of commercially available hybrids and "is a simplified means of information dissemination to growers and elevators as to the current status of biotech traits in select world markets." Ex. 22 (N. Fields Dep. Tr. 421:16-21). NCGA's corporate representative further testified that the "Know Before You Grow" website was consistently updated to reflect that MIR162 was not approved for export to China. *Id*. at 421:13-433:2.

**RESPONSE TO 171**:        Plaintiffs do not dispute that Paragraph 171 correctly quotes the testimony, but disputes the testimony. The NCGA corporate representative testified that it did not add Viptera's approval status in China to the Know Before You Grow website until July, 2012. Ex. 71, Deposition of Nathan Fields Vol II at 427:12-428:23.

172.    The NCGA's corporate representative was asked during his deposition: "Did NCGA consider China in May of 2011 to be a major export market for US corn?"

He responded: "No." He was further asked: "At any point prior to May of 2011 did NCGA consider China to be a major export market for US corn?" In response, he testified: "Not to my recollection, no." Ex. 22 (N. Fields Dep. Tr. 427:5-11).

**RESPONSE TO 172**:      Plaintiffs admit that Syngenta has accurately cited the testimony

quoted in Paragraph 172.

173.    In a May 15, 2015 letter for the USDA, the U.S. Biotech Crops Alliance "urge[d] that China be encouraged to develop an approval system that mirrors the general international practices followed by Argentina, Brazil, Japan and South Korea": "1) accept and review applications year-round with no time window restrictions, 2) allow the process to continue after receiving each application and response to technical questions, instead of restarting the process, and 3) after the technical review is completed, issue the approval within a reasonable timeframe, such as 20 working days." Ex. 21 (Letter from U.S. Biotech Crop Alliance).

**RESPONSE TO 173**:      Plaintiffs object to and dispute Paragraph 173 as hearsay. *See PAS*

*Commc'ns,* 139 F. Supp. 2d at 1179. Syngenta cites a letter from the US Biotech Crops Alliance

to the USDA.

174.    The NCGA's Director of Biotechnology & Crop Inputs, Nathan Fields, stated in an April 2014 email that: "the Chinese took the trader's lunch, noting that the difference between the time corn was bought then rejected was a $3 drop (not due to the rejections, we just grew enough corn) thus the Chinese were getting out of high price corn contracts. Price of doing business with the Chinese." Ex. 27 (N. Fields Dep. Ex. 2251, at NCGA0046095).

**RESPONSE TO 174**:      Plaintiffs object to and dispute Paragraph 174 as hearsay, double

hearsay, and triple hearsay. *See PAS Commc'ns,* 139 F. Supp. 2d at 1179. Syngenta cites an

email from a member of the NCGA, which recounts a supposed conversation with unnamed

"traders," who supposedly related a conversation they had with "the Chinese."

175.    After attending "a call with the US Govt," Dow, Monsanto, Bayer, CropLife International, and BIO in June 2013, Syngenta's Lisa Zannoni sent an email to her colleagues stating that "US Govt said the feedback on questions received on files that did not receive approvals were not science-based and were apparently asking old questions for purposes to delay the files." Ex. 24 (Email re China Information, at SYNG_00376494). Her email further stated that "US Govt concerns include:

33

(1) system is no longer science-based and China is playing politics with approvals; (2) growing concern that China appears to be providing South America a competitive advantage in the global market; (3) concern that China is not honest anymore which adds an element of uncertainty in how they work with them in future dealings (this is new element-- in the past, China has always done what they say they will do); (4) recent actions show that the Chinese regulatory system is not a functioning system; and (5) think that the company and product may have played into the decision-making on approvals." *Id*.

**RESPONSE TO 175**:          Plaintiffs object to and dispute Paragraph 175 as hearsay, double hearsay, and triple hearsay. *See PAS Commc'ns*, 139 F. Supp. 2d at 1179. Paragraph 175 recounts an email by a Syngenta employee that purports to recount a conversation with unnamed members of two biotech industry trade organizations and unnamed persons with "the U.S. Government." This email does not establish any fact for summary judgment purposes.

176.    In response to an April 4, 2014 email noting that there was "[n]o Chinese approval yet for MIR162 corn," Cargill's Alex Sanfeliu responded with an email that stated: "It's a political decision. Guess the day they need corn it will get approved in 2 seconds." Ex. 25 (A. Sanfeliu Dep. Ex. 24).

**RESPONSE TO 176**:          Plaintiffs object to Paragraph 176 as hearsay. *See PAS Commc'ns*, 139 F. Supp. 2d at 1179. Paragraph 176 simply recounts an email by a Cargill employee, which is an out of court statement offered for the truth of the matter asserted.

177.    In a December 4, 2013 email about "MIR162 and China," the President and CEO of the U.S. Grains Council stated that: "Many fear the original theory on China's not approving the trait is proving true, namely that China withheld approval to use in case they got into a market inverse type of situation. China is struggling with internal logistics and prices in dealing with its large harvest; continuing strong demand for corn, and plunging world prices. Cynics are saying that China withheld approval of 162 for just such a situation to give some bargaining leverage. MIR162 was detected in a recent shipment from Argentina, but it was cleared. China is no longer buying to replenish reserves, incoming corn is going straight to private feed millers." Ex. 28 (B. Lohmar Dep. Ex. 55, at US Grains-057007). His email also stated that: "[w]e feel the focus should be on why this trait cannot simply be approved after all internal approval steps but one, the minister of Ag's approval, have been long completed." *Id*.

34

**RESPONSE TO 177**:          Plaintiffs object to Paragraph 177 as hearsay and speculation. *See*

*PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 177 simply cites an email from Thomas

Sleight to others reciting speculative theories on the motivations of unnamed members of the

Chinese government.

> 178.   In a December 12, 2013 email, the U.S. Grains Council's China Director, Bryan
> Lohmar, stated: "'China is likely trying to use this as a trade barrier. The timing
> (of the cargo rejections) came just after a series of policies to encourage
> consumption of local corn' and 'The state reserves says they have large corn
> stocks that they want to sell, but right now such sales would have to compete with
> a significant corn import program.'" Ex. 29 (B. Lohmar Dep. Ex. 57, at US
> Grains-066631).

**RESPONSE TO 178**:          Plaintiffs object to Paragraph 178 as hearsay and speculation. *See*

*PAS Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 178 simply quotes an email from Bryan

Lohmar with the U.S. Grains Council, who testified that he "put the word 'likely' in there on

purpose." Ex. 68, Lohmar Vol. I at 79:20-21.

> 179.   Syngenta's Dr. Yongsheng Zhang testified in his deposition that he expected
> approval for Viptera by March 2012, "based on the time frame for approvals by
> MoA in the past and the procedures for approvals at the time, as well as the
> quality of the dossier we submitted." Ex. 86 (Y. Zhang Dep. Tr. 692:16-693:4).

**RESPONSE TO 179**:          Plaintiffs do not dispute that Paragraph 179 accurately quotes the

testimony, but Plaintiffs dispute the testimony because the record clearly shows that Syngenta

did not, in fact, expect approval in March 2012, nor did it view its dossier as "quality." *See* ECF,

2940, Pl. MSJ Opp., SOAF ¶¶ 249-343.

> 180.   Syngenta's Global Head of Regulatory Affairs, Lisa Zannoni, testified that the
> fact that Syngenta had "most of our approvals already from . . . quite a few
> countries" and that, by 2012, Syngenta had "already [had] any questions that we
> would have" from China, meant that "there was no reason to believe that we
> would have [additional] questions" from China. Syngenta's MSJ Ex. 24 (L.
> Zannoni Dep. Tr. 633:16-635:12).

**RESPONSE TO 180**:          Plaintiffs do not dispute that Paragraph 180 accurately quotes the

testimony, but Plaintiffs dispute the testimony because the record clearly shows that Syngenta

did, in fact, have reason to believe that it would receive additional questions. *See* ECF No. 2940,

Pl. MSJ Opp., SOAF ¶¶ 249-343.

     181.    NCGA's corporate representative testified as follows:

> Q. Why did the National Corn Growers Association Biotech Working
> Group specifically decide not to include China as a major market in its
> biotech policy?
>
> A. At that time there was a robust discussion, there was also review of
> export trends, and also review of the worldwide corn markets overall.
> They did not believe at this time that China was going to continue to
> import corn beyond what Japan imported. And there were other
> markets still importing more than China was currently trending to
> import.
>
> Ex. 22 (N. Fields Dep. Tr. 302:14-25).

**RESPONSE TO 181**:          Plaintiffs do not dispute that Paragraph 181 accurately quotes the

portion of Nathan Fields's deposition testimony cited.

    182.    Cargill economist Tim Bodin was asked during his deposition: "Can we agree
that, as of July of 2010, there continued to be a debate within Cargill as to
whether or not China was going to become a structural importer of corn?" In
response, he testified: "Yes, that's -- that's what we do." Ex. 66 (T. Bodin Dep.
Tr. 135:4-8).

**RESPONSE TO 182**:          Plaintiffs object to and dispute the selective quotation of Bodin's

testimony in Paragraph 182 and ask the Court to read the entire answer given by Bodin pursuant

to Fed. R. Evid. 106. Moreover, later in his deposition, Bodin clarified that "We encouraged

debates, and particularly with our young people that -- that don't have a lot of experience yet, we

want them to have an opinion, and we don't necessarily always say, you're wrong. We want to

encourage them to have courage to speak their minds, and over time, we will learn and they will

Case 2:14-md-02591-JWL   Document 2994   Filed 03/13/17   Page 46 of 123

learn to be better and better in their opinions." Ex. 77, Deposition of Timothy Bodin Vol. II

("Bodin Vol. II") at 622:14-22. Bodin was also asked: "Was it a consensus position of Cargill in

2010 that China was likely to increase its imports of corn into the future?" And Bodin responded:

"It was." *Id.* at 624:21-25.

> 183.    As of 2015, Cargill's Commitment to Corporate Responsibility webpage included
> the following statement: "Cargill's responsibility extends beyond our own
> operations to the suppliers, partners and other stakeholders in our supply chains.
> A responsible supply chain respects people and human rights; produces safe and
> wholesome food; treats animals humanely; promotes the best, most responsible
> agricultural practices; and reduces environmental impact, including protecting the
> land and conserving scarce resources. Achieving this will require collaboration
> with all stakeholders across developed and emerging markets." Ex. 30 (Cargill's
> Commitment to Corporate Responsibility Webpage) (emphasis added). Cargill's
> 2015 Corporate Responsibility Report also stated that "Cargill's interest extends
> beyond our own operations to the suppliers, partners and other stakeholders in our
> supply chains," and that "[a]chieving this will require collaboration with all
> stakeholders across developed and emerging markets." Ex. 31 (Cargill's 2015
> Corporate Responsibility Report, at 16, (same); *see also* Ex. 32 (2014 Cargill Fact
> Sheet, at 2 (same).

**RESPONSE TO 183**:          Plaintiffs object to and dispute Paragraph 183 as hearsay. *See PAS*

*Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 183 simply quotes a purported document

authored by Cargill, and then references another out of court statement in the form of a purported

report.

> 184.    Cargill's 2015 Annual Report states that "We also know our customers and other
> partners expect us to lead—in supply chain management, food safety, nutrition,
> risk management and sustainability." Ex. 33 (2015 Cargill Annual Report, at 1).

**RESPONSE TO 184**:          Plaintiffs object to and dispute Paragraph 184 as hearsay. *See PAS*

*Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 184 simply quotes a report purportedly authored

by Cargill.

> 185.    Archer Daniels Midland ("ADM") states the following on its "Working to
> Advance Sustainable Agriculture Worldwide" webpage: "ADM connects the

harvest to the home, making products for food, animal feed, chemical and energy uses. We generally do not grow crops; we typically buy them from growers and third parties that market crops from many different growers. But because we occupy a prominent position in the agricultural value chain that extends from the farm gate to the consumer's plate, we work with our industry peers, trade associations, peers growers, governments, NGOs and operating communities to improve the quality and availability of crops in the global supply chain, and the lives of farmers and communities that grow these crops."

**RESPONSE TO 185**:        Plaintiffs object to and dispute Paragraph 185 as hearsay. *See PAS*

*Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 185 simply quotes a purported ADM webpage.

186.   ADM's Code of Conduct states: "By knowing and following our Code, each of us does our part to maintain and further build trust with our various stakeholders— including our colleagues, customers and business partners, shareholders and communities. It is important that we fulfill our commitments to these groups and uphold integrity in our interactions at all times." Ex. 35 (ADM Code of Conduct, at 4).

**RESPONSE TO 186**:        Plaintiffs object to and dispute Paragraph 186 as hearsay. *See PAS*

*Commc'ns,* 139 F. Supp. 2d at 1179. Paragraph 186 simply quotes a document purportedly

authored by ADM.

187.   ADM's former Senior Manager of Scientific Affairs, Richard Grabiel, testified in his deposition as follows:

If I had a Panamax – if I had results for a Panamax that was tested that was positive for MIR162, yeah, that would increase your risk because you've already found it, plus you've – that would be a direct violation of your – I – I believe – I mean, you've got a legal issue there in terms of—you know, but I won't comment on that. I mean, why would you—if you already know something is noncompliant for market *why would you ship it is my question.*

Ex. 127 (R. Grabiel Dep. Tr. 509:21-510:21) (emphasis added).

**RESPONSE TO 187**:        Plaintiffs dispute Paragraph 187's selective quotation of Gabriel's

testimony, and object on lack of foundation. Grabiel was subsequently asked, "And my question

is on that hypothetical of an exporter shipping a Panamax after a positive test for MIR 162, are

you offering a legal opinion . . . that that would violate some law?" Grabiel responded, "No. . . . I do not know whether or not that would violate some law or not." Ex. 73, Deposition of Richard Grabiel Vol. II at 528:20-529:4. Grabiel also testified that he was not aware of what other departments within ADM were doing in terms of a risk analysis to determine whether to ship to China. *Id.* at 536:19-537:6.

Plaintiffs also object to Paragraph 187's selective excerpt of testimony because it relates to an improper hypothetical. Prior to the selective testimony cited by Syngenta, Grabiel was asked by Syngenta's counsel, "Do you know what kind of testing ADM did of Panamax vessels?" Grabiel replied, "I do not know the extent testing for Panamax vessels" and that he did not know if any testing was done. *Id.* at 505:17-25. "Do you have any view as to whether or not there should be testing of Panamax vessels?" Grabiel responded, "Right. In my opinion I don't know how you would make that viable and the validity of the testing. It would – it would take, once again, a coordinated effort with the developers, industry, shipping, and the governments as to what – the definitive result, what that definition would be." *Id.* at 506:15-25.

188.   Plaintiffs' experts in this litigation and the Minnesota litigation stated that "[a] necessary condition for there to be a market loss to U.S. corn growers is that the China ban on U.S. corn exports resulted in a drop in demand for U.S. corn." Ex. 59 (B. Babcock Expert Rep. ¶ 85); *see also* Ex. 60 (C. Carter Expert Rep. ¶ 41) ("Under the bedrock economic law of supply and demand, for an exportable good, when there is less foreign demand for a product, particularly one with a relatively inelastic demand and supply curves, the price is lower than it otherwise would be."); Ex. 61 (D. Sumner Expert Rep. ¶ 124) ("The expected magnitude of the price decline depends first on the size of the loss in market demand from losing the export market in China relative to the market for United States corn."); *see also* Ex. 62 (12/22/2016 W. Thurman Expert Rep. ¶ 73) ("Plaintiffs' experts acknowledge that a drop in overall demand for U.S. corn caused by the MIR162 import restriction is a necessary condition for there to be market loss.").

**RESPONSE TO 188**: Plaintiffs admit that Paragraph 188 correctly recounts opinions from Babcock's and Carter's expert reports. Plaintiffs object to and dispute the subsequent citations to Defendants' experts reports, which are not related to the fact alleged in Paragraph 188, as well as the citation to the export report of Sumner, who is an expert designated in the Minnesota litigation but not in this MDL litigation.

189.   One of Syngenta's economic experts, Walter Thurman, states that "a decline in U.S. exports to China does not necessarily translate into an aggregate decline in demand for U.S. corn exports." Ex. 62 (12/22/2016 W. Thurman Expert Rep. ¶ 73). After analyzing bilateral trade flows and annual U.S. corn export data, Thurman concludes that "any reduction in U.S. corn exports to China was more than offset by increases in corn exports to other destinations," *id.* ¶ 59, and thus there were "no signs that overall demand for U.S. corn was affected by China's MIR162 import restriction," *id.* ¶ 62.

**RESPONSE TO 189**: Plaintiffs do not dispute that Paragraph 189 correctly quotes portions of Thurman's expert report, but dispute and have moved to exclude, that testimony. ECF No. 2855. If Thurman's testimony is excluded, Paragraph 189 lacks a factual basis. Plaintiffs further dispute Paragraph 189 based upon the opinions of Plaintiffs' expert economists, which refute Thurman's opinion. *See* Exhibit 65, Carter Rpt. ¶¶ 39-40; *see also* Exhibit 66, Babcock Rpt. ¶¶ 15, 44, 47-48, 87, 151.

190.   Professor Robert Daines states in his report that "in a market for a homogenous product with many buyers and sellers, a decision by a particular buyer ("Buyer A") not to purchase from a particular seller ('Seller 1') would not affect aggregate demand or price," and "[u]nder those circumstances, Buyer A's decision not to buy from Seller 1 might result in a rearrangement of trade flows between buyers and sellers but *would not change the aggregate quantity demanded* at any particular price." Ex. 63 (R. Daines Expert Rep. ¶ 21) (emphasis added). Daines illustrates this point using a hypothetical scenario in which China bans U.S. corn and a scenario in which China does not ban U.S. corn, the result of which is that the net demand for U.S. corn exports does not change. *Id.* ¶ 22. His report further states that "a Chinese ban on U.S. corn imports results in rearrangement of corn trade flows between the importing and exporting countries, but no reduction in the aggregate demand for U.S. corn," *id.*, and that "rearrangement of trade flows is

feasible as long as the total corn imports by countries that would accept U.S. corn was greater than or equal to the total amount of U.S. corn exports," *id.* ¶ 23. His report also noted that "imports by countries other than China substantially exceeded U.S. corn exports in each marketing year" from marketing year 2010/11 through marketing year 2015/16. *Id.* Daines then applies his analysis to the real-world data on annual imports and exports of corn from 2010 to 2016, and Daines concludes that a Chinese ban on U.S. corn imports during the relevant period would not necessarily have reduced the demand for U.S. corn or the price of U.S. corn." *Id.*

**RESPONSE TO 190**:          Plaintiffs object to Paragraph 190. On March 3, 2017, Syngenta withdrew its designation of Professor Daines as an expert witness in this case. *See* ECF No. 2971.

191.    Producer plaintiff Falwell testified that "[t]he pollen can travel farther if the wind blows harder or certain other conditions would permit it to cross-pollinate." Ex. 36 (K. Falwell Dep. Tr. 197:5-15). Producer plaintiff Justison testified that the effects of cross-"pollination is weather related, wind related," Ex. 37 (T. Justison Dep. Tr. 106:7-10), and depended in part on his neighbor's farming practices and what varieties his neighbor grew, *see id.* at 103:22-104:15.

**RESPONSE TO 191**:          Plaintiffs do not dispute that Falwell testified as quoted in Paragraph 191.

192.    Producer Plaintiff Falwell testified that a buyer of non-GM corn required him to follow certain prescribed farming practices and procedures, including isolation through planting border rows and testing his farm equipment. *See* Ex. 36 (K. Falwell Dep. Tr. 98:12-99:15). Producer plaintiff Jacobs testified that he used an "isolation area" to produce "identity preserved [white] corn." Ex. 43 (D. Jacobs Dep. Tr. 175:2-25). Producer plaintiff Annexstad testified that he was required to follow segregation procedures when growing seed beans for Pioneer, including being "very very strict about border rows, about cleaning augers out, cleaning the combine out, cleaning the grain auger out, cleaning the combine" and that "if there's any contamination at all, they'd reject the whole thing." Ex. 41 (G. Annexstad Dep. Tr. 301:20-302:12).

**RESPONSE TO 192**:          Plaintiffs do not dispute that Falwell and Annexstad testified as quoted in Paragraph 192.

193.   Producer plaintiff Hadden was asked during his deposition: "And then in the years that you've grown IP corn, did you take any steps at planting to separate IP corn from non-IP corn?" He responded: "Cleaned the planter out, put the IP corn in, planted it in a field that had buffer strips around it; i.e., soybean fields or pasture." Ex. 42 (D. Hadden Dep. Tr. 138:12-138:18).

**RESPONSE TO 193**:        Plaintiffs do not dispute that Hadden testified as quoted in Paragraph 193.

194.   The August 2009 and March 2011 versions of Syngenta's Stewardship Agreement for Viptera included provisions that required purchasers to "[c]hannel grain produced from Seed to appropriate markets as necessary to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . . ." Ex. 38 (SYNG_00004253-54) (Aug. 2009 version); Ex. 39 (SYNG_00004255) (March 2011 version).

**RESPONSE TO 194**:        Plaintiffs do not dispute Paragraph 194.

195.   In response to comments about a petition to deregulate a new GM trait, the USDA has stated that "conventional growers, similar to organic growers who desire to minimize cross pollination from G[M] corn into their plantings, have the same basic options for avoiding pollination from other corn." Ex. 40 (USDA, *Finding Of No Significant Impact for Syngenta Seeds, Inc. Alpha-Amylase Maize Event 3272*, at 41 (Comment 5).

**RESPONSE TO 195**:        Plaintiff's object on relevance. The Finding of No Significant Impact quoted was not made in reference to MIR162, but to another GM trait.

196.   Producer plaintiff Bottoms Farms Partnership testified at his deposition that he increased the amount of popcorn that he planted because of the reduced price of corn allegedly caused by China's rejection of U.S. corn. *See* Ex. 90 (K. Bell Dep. Tr. 239:16-241:19).

**RESPONSE TO 196**:        Plaintiffs do not dispute that Bell testified as quoted in Paragraph 196.

197.   Producer plaintiff Henderson testified at his deposition nthat [sic] he did not plant any corn in 2015 because of the alleged drop in U.S. corn price. *See* Ex. 81 (T. Henderson Dep. Tr. 106:17-107:3).

**RESPONSE TO 197**:          Plaintiffs do not dispute that Henderson testified as quoted in

Paragraph 197.

> 198.   Producer plaintiff Pedersen testified at his deposition that he planted less corn and
> increased the amount of soybeans he planted as a result of the alleged drop in U.S.
> corn prices caused by China's rejection of U.S. corn. *See* Ex. 99 (A. Pedersen
> Dep. Tr. 143:25-144:9, 167:18-168:3).

**RESPONSE TO 198**:          Plaintiffs do not dispute that Pedersen testified as quoted in

Paragraph 198.

> 199.   Producer plaintiff Lex testified at his deposition that he switched from planting
> corn to planting soybeans in 2015 because the price of corn had dropped. *See* Ex.
> 100 (C. Lex Dep. Tr. 195:21-196:13).

**RESPONSE TO 199**:          Disputed. Lex testified that he planted more beans. He did not

testify that he switched all corn to beans. *See* Def. Ex. 100, 195:21-196:13.

> 200.   Kansas plaintiffs Gregory Kaffenbarger, James McKinney, Richard Bieber, Mike
> DaVault, Richard Ensor, James Holmbeck, Bret Kendrick, Eugene Goerring,
> David Polifka, David Schwaninger, Eugene Volnek, Steven Wentworth, Roger
> White, Gary Harshberger, Robert Luck, Joseph Murnane, James Shortt, Orville
> Williams, Richard Oswald, Daniel Chism, Charles Frickey, Beaver Creek Farms,
> D&S Grain and Cattle Company, Demmer Farms, Grafel Farms, LLC, Dale
> Hadden, and Frank James testified at their depositions that they did not switch to
> planting crops other than corn and instead kept planting, or even increased, the
> same amount of corn following the drop in the price of corn in 2013. *See* Ex. 91
> (G. Kaffenbarger Dep. Tr. 69:14-70:7); Ex. 92 (J. McKinney Dep. Tr. 156:6-18);
> Ex. 93 (R. Bieber Dep. Tr. 44:8-14); Ex. 101 (R. Beiber Dep. Ex. 3, at 2); Ex. 94
> (M. DaVault Dep. Tr. 60:25-61:9); Ex. 102 (M. DaVault Dep. Ex. 2, at 2); Ex. 95
> (R. Ensor Dep. Tr. 35:5-11; 131:23-25); Ex. 96 (J. Holmbeck Dep. Tr. 54:5-55:7);
> Ex. 47 (B. Kendrick Dep. Tr. 210:8-15); Ex. 103 (B. Kendrick Dep. Ex. 8, at 2);
> Ex. 104 (E. Goering Dep. Tr. 215:10-15); Ex. 82 (D. Polifka Dep. Tr. 75:14-17);
> Ex. 105 (D. Schwaninger Dep. Tr. 35:3-37:18); Ex. 106 (D. Schwaninger Dep.
> Ex. 22 at DSchwaninger000003734, DSchwaninger000003739); Ex. 107 (E.
> Volnek Dep. Tr. 173:4-6, 168:7-10); Ex. 108 (S. Wentworth Dep. Tr. 110:2-13);
> Ex. 109 (R. White Dep. Tr. at 155:6-8); Ex. 110 (R. White Dep. Ex. 1, at 2); Ex.
> 111 (G. Harshberger Dep. Tr. 204:23-205:2); Ex. 112 (G. Harshberger Dep. Ex. 7,
> at 2); Ex. 113 (R. Luck Dep. Ex. 2, at 2); Ex. 114 (J. Murnane Dep. Tr. 75:7-10);
> Ex. 115 (J. Shortt Dep. Ex. 5, at 2); Ex. 116 (O. Williams Dep. Tr. 98:12-15); Ex.
> 117 (R. Oswald Dep. Tr. 192:2-23); Ex. 118 (D. Chism Dep. Tr. 225:17-226:18);

Ex. 119 (C. Frickey Dep. Tr. 120:18-21); Ex. 46 (D. Grafel Dep. Tr. 262:18-21); Ex. 42 (D. Hadden Dep. Tr. 192:22-25); Ex. 120 (F. James Dep. Tr. 160:18-21).

**RESPONSE TO 200**:          Disputed. Kaffenberger testified that his crops are rotated so in some years he plants more corn than in other years. Ex. 78, Deposition of Kaffenberger at 69:14-71:7. McKinney, Bieber, Ensor, Holmbeck, Kendrick, Goering, and Polifka also testified that they rotate their corps. *See* Ex. 79, Deposition of McKinney at 156:16-18; Ex. 80, Deposition of Bieber at 81:5-83:12, Ex. 84, Deposition of Ensor at 33:25-35:4; Ex. 81, Deposition Holmbeck at 53:7-14; Ex. 82, Deposition of Goering at 88:14-89:14; Ex. 83, Deposition of Polifka at 74:2-75:13.

Additionally, the cited testimony for Harshberger, Oswald, and Frickey only generally reference those farmers not changing farming practices. Def. Ex. 111, 117, 118.

201.    Producer plaintiff Dierking testified as follows during his deposition: "Q. Would you agree that you wouldn't want to give seed companies control over your crops? [objection omitted] A. Over what I grow and sell? Q. Yes. A. No, I don't think they should have control of that. Ex. 45 (L. Dierking Dep. Tr. 84:17-23).

**RESPONSE TO 201**:          Plaintiffs do not dispute that Paragraph 201 accurately quotes the cited testimony.

202.    Producer plaintiffs Grafel and Kendrick did not take any steps to protect their farms against cross-pollination. *See* Ex. 46 (D. Grafel Dep. Tr. 210:14-16); Ex. 47 (B. Kendrick Dep. Tr. 193:12-20).

**RESPONSE TO 202**:          Plaintiffs do not dispute that Paragraph 202 accurately quotes the cited testimony.

203.    Syngenta's Stewardship Guide stated that "grain harvested from U.S.-approved hybrids can only be exported to nations that have authorized the event" and directs growers to National Corn Growers Association "Know Before You Grow" website for current overseas approval information. Ex. 14 (SYNG_00681717) (2010); Ex. 15 (SYNG_00403152) (2011); Ex. 16 (A. Vulcan Dep. Ex. 236 at SYNG_00004254). In a section of the Stewardship Guide entitled "Pollen

Movement," the Stewardship Guide states "it is important to understand the conditions and factors that influence the amount of pollen movement" and encourages growers "to consider these factors and talk with your neighbors to understand each other's cropping intentions." Ex. 14 (SYNG_00681719).

**RESPONSE TO 203**:          Disputed. Def. Exs. 14 and 5 do not contain the cited language and

do not relate to a Stewardship Guide. Moreover, Plaintiffs note that Syngenta only references the

2010 and 2011 version of its Stewardship Guide.

204. Thomas Carrato (a co-author of the BIO Policy) testified at his deposition that: "As an antitrust matter, companies are not allowed to collude on identifying key export markets." Ex. 48 (T. Carrato Dep. Tr. 286:16-18). He also testified that companies, "because of concerns about antitrust law, could not sit around a table and agree that they were or were not going to consider a particular country a key export market, so each made their own determination of what the key export markets are." *Id*. at 456:19-25. He further testified that "[t]here was never an agreement among companies about which markets were key export markets for fear of violating collusion requirements or collusion or collaboration limitations with regard to countries of export." *Id*. at 215:24-216:5.

**RESPONSE TO 204**:          Plaintiffs do not dispute that Paragraph 204 accurately quotes

Carrato's testimony, but dispute and have moved to strike his testimony. ECF No. 2872. If

Carrato's testimony is stricken, Paragraph 204 lacks a factual basis.

205. The BIO Antitrust Statement states: "All BIO meeting activities shall be conducted to abide strictly by all applicable antitrust laws." One of the "antitrust principles" listed in the BIO Antitrust Statement is that "It is therefore important for speakers and attendees at BIO meetings to avoid discussing confidential business plans or information that is competitively sensitive, including the following: . . . . Sales or research in particular markets or sales to particular customers, including whether or how to sell in specific markets, whether to bid for specific business or participate in specific programs, conditions (such as resale restrictions) applicable to particular private or governmental customers, and whether to conduct research in particular areas." Ex. 054 (M. O'Mara Dep. Ex. 17, at BIO-0010941).

**RESPONSE TO 205**:          Plaintiffs do not dispute Paragraph 205.

206. Syngenta's David Morgan was asked in his deposition: "Okay. Did you have any conversations with any of your competitors about whether they thought you

45

should get approval from China before launching Viptera?" Morgan responded: "Not that I'm aware of and I would hope that we wouldn't have had conversations with our competitors about our intended commercialization of products for reasons of antitrust." Ex. 55 (2/11/2016 D. Morgan Dep. Tr. 493:16-24).

**RESPONSE TO 206**:          Plaintiffs do not dispute Paragraph 206.

207.   NAEGA's corporate representative, Gary Martin, was asked during his deposition: "Can you—are you aware of any examples where NAEGA has elected to prioritize the introduction of a new technology above a market risk or if there was a risk of a trade disruption where you took the position within the industry that exporters simply should not ship to that—that location?" Martin responded: "Definitely not. We'd think that would be a violation of our antitrust obligations." Martin was then asked, "In what way?" and Martin responded: "We would be trying to instruct our membership on who to sell to." Ex. 17 (G. Martin Dep. Tr. 225:11-22).

**RESPONSE TO 207**:          Plaintiffs object to Paragraph 207 as irrelevant. Even if Syngenta had properly pled and maintained an antitrust defense, which Plaintiffs dispute, the testimony cited in Paragraph 207 is irrelevant thereto. Syngenta claims its antitrust defense applies to three purported Plaintiffs' theories: (1) the BIO policy sets an inadequate standard of care because there is no coordination among market players and no auditing; (2) Syngenta was required to consult its competitors, the grain trade, or other market players and get agreement about which export markets' approvals require delaying seed sales in the U.S.; or (3) the grain trade associations' policies set the standard of care for which markets require delaying seed sales in the U.S. The cited testimony does not fall within any of these categories. Moreover, it refers to a hypothetical, speculative, purely horizontal arrangement among NAEGA members without any express or tacit agreement from Syngenta, either through vertical arrangement or hub-and-spoke conspiracy, that would be necessary to support Syngenta's purported affirmative defense.

208.   ADM's corporate representative Anthony Reed testified during his deposition as follows:

46

Q. So as you sit here today, you don't know whether the topic of elevators accepting MIR162 was discussed on that call or not?

A. Correct.

Q. Presumably, you'd have to speak with – make some sort of inquiry with your colleagues to determine that, correct?

A. Correct. But I would – I would – I would offer that that conversation would likely not happen on a NAEGA call as it would violate antitrust.

Q. Please explain.

A. Well, we would not discuss whether ADM or other people would collectively put signs up or accept or not accept products.

Q. Because of antitrust concerns?

A. Because of antitrust concerns. Yes. Any conversation about whether ADM would post questions about an elevator accepting, I assume would happen internally only.

Ex. 57 (6/1/2016 A. Reed Dep. Tr. 112:7-18).

**RESPONSE TO 208**:          Plaintiffs object to Paragraph 208 as irrelevant. Even if Syngenta had properly pled and maintained an antitrust defense, which Plaintiffs dispute, the testimony cited in Paragraph 208 is irrelevant thereto. Syngenta claims its antitrust defense applies to three purported Plaintiffs' theories: (1) the BIO policy sets an inadequate standard of care because there is no coordination among market players and no auditing; (2) Syngenta was required to consult its competitors, the grain trade, or other market players and get agreement about which export markets' approvals require delaying seed sales in the U.S.; or (3) the grain trade associations' policies set the standard of care for which markets require delaying seed sales in the U.S. The cited testimony does not fall within any of these categories. Moreover, it refers to a hypothetical, speculative purely horizontal arrangement among NAEGA members without any

47

express or tacit agreement from Syngenta, either through vertical arrangement or hub-and-spoke conspiracy, that would be necessary to support Syngenta's purported affirmative defense.

## ARGUMENT

## I.   SYNGENTA IS PRECLUDED FROM PURSUING WAIVED OR ABANDONED THEORIES OF COMPARATIVE FAULT.

Failure to make timely disclosures warrants exclusion. *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 895 (10th Cir. 2006) (affirming exclusion of expert "untimely disclosed" under scheduling order). While Rule 37(c)(1) permits undisclosed evidence if the lack of disclosure was "substantially justified" or "harmless," those circumstances do not apply here. Syngenta argues that "Plaintiffs have failed to show how the description of Syngenta's defense . . . warrants" exclusion, Syngenta Opp. to Pl. Mot. Partial S.J. ("Opp."), ECF No. 2947 at 79, but it has the burden backwards. "The burden to establish harmlessness is on the party who failed to make the required disclosure." *Burton v. R.J. Reynolds Tobacco Co.*, 203 F.R.D. 636, 639 (D. Kan. 2001). Syngenta fails to do that.

Syngenta contends that "Plaintiffs admit that [it] expressly identified the Producer Plaintiffs, [China, and ADM/Cargill] more than a year ago," Opp., ECF No. 2947 at 123, 76-77, but Syngenta also was required to "specify the nature of the fault which is claimed." Scheduling Order No. 2, ECF No. 1098 at 8. The fault that Syngenta seeks to assign at trial is not the fault it disclosed.[1] Syngenta cannot establish good cause for altering its theory. It has not even sought

---

[1] Syngenta abandons assignment of any fault to Viptera growers, contending that it "has never asserted an intention to argue comparative fault as to Viptera growers," Opp., ECF No. 2947 at 2, n.2. Viptera growers were identified in the "prefatory" paragraph of its Comparative Fault Disclosure, ECF No. 1270 at 1-2, as persons Syngenta contends have a duty in the interconnected market, but its disclaimer now confirms that this prefatory paragraph was not intended to be a fault identification.

48

leave to amend its comparative-fault pleading. In evaluating good cause, the Court has strictly construed any request to modify the pleadings if it would "affect the orderly progress of the MDL proceeding." Order, ECF No. 2502 at 5. Specifically, at Syngenta's invitation, Plaintiffs were denied leave to amend their Lanham Act claim where Syngenta contended it would need to re-open depositions to ask *two* questions of each plaintiff. The Court found no good cause because Plaintiffs failed to advise the Court that they *might* seek to amend. *Id.* at 8 ("they were obliged to notify the Court that such a modification may be necessary"). If Plaintiffs waited too long to advise the Court that they *might* seek leave to amend *during discovery*, it is hardly debatable that Syngenta is untimely where it *never* sought leave, discovery is over, and trial is less than three months away.

### A.      Syngenta Did Not Disclose That Producer Plaintiffs Were at Fault for Failing to Create a "China channel" of Viptera-Free Corn.

Syngenta has completely changed the scope of fault alleged against Producer Plaintiffs. In its Comparative Fault Disclosure (ECF No. 1270), Syngenta stated they "failed to mitigate any alleged damages from China's rejection of U.S. corn shipments beginning in November 2013." *Id.* at 3. "[F]ailure to mitigate" is different than comparative fault, (*see* Pl. Mem. Supp. Mot. Partial S.J. ("Mem."), ECF No. 2859 at 542-545), which Syngenta does not now dispute. *Accord* ECF No. 2846 (Jan. 30, 2017 Hr'g Tr.) 18:21-24 (COURT: "that's a different issue than comparative fault for not taking steps to separate the grain"). Instead, Syngenta seeks to pursue a theory that "Plaintiffs' could have prevented the spread of Viptera into their corn into export channels sufficiently to satisfy China's zero-tolerance policy." Opp., ECF No. 2947 at 123. Although Syngenta promised "to supplement or amend" its disclosure if necessary (ECF No. 1270 at 2), it never did so. Nor would Syngenta have been entitled to make such an amendment

49

without leave of Court. *Garcia v. Tyson Foods, Inc.*, No. CIV.A. 06-2198-JWL, 2010 WL 5392660, at *11 (D. Kan. Dec. 21, 2010) ("A party cannot simply unilaterally extend a court-ordered deadline by 'reserving the right,' or stating an intention, to file a motion beyond the deadline."). To obtain leave, Syngenta would have needed to demonstrate that it "could not have met the amendment deadline even if it had acted with due diligence." *Skepnek v. Roper & Twardowsky, LLC*, No. 11-CV-4102-DDC-JPO, 2014 WL 4377706, at *9 (D. Kan. Sept. 4, 2014). Syngenta does not even attempt to do so. Instead, it appears to rest its entire opposition on absence of prejudice. But lack of prejudice is not alone sufficient. *Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan. 1995) ("In the Tenth Circuit, courts may deny leave for untimeliness or undue delay without a showing of prejudice to the opposing party.").

Moreover, there obviously is prejudice. While Syngenta argues that Plaintiffs were on notice of its theory by pointing: *first*, to one page in 100 pages of interrogatory response, served over five months after the pleading deadline; and *second*, to the Pretrial Order filed fourteen months after the deadline which expressly disclaims amending *any* pleading, *see* ECF No. 2848, ¶ 6 at 31 ("**AMENDMENTS TO PLEADINGS[:]** None"). Opp., ECF No. 2947 at 123. But even the earliest of those papers – the May 11, 2016 interrogatory response – was served *after* Plaintiffs had deposed 30 of the 32 Syngenta witnesses in this case, including 30(b)(6) witnesses on channeling and cross-pollination. *See* Pl. Ex. 88, Syn. Resp. 30(b)(6) Interrogs. dated May 11, 2016; Pl. Ex. 93, Notice of Rule 30(b)(6) Dep. at ¶¶ 21, 39; *see also* Order Denying Pl. Mot. for Leave to Amend (ECF No. 2330) at 10 (finding prejudice because Syngenta would have to re-

open depositions *during discovery* to ask two additional questions).[2] Moreover, Plaintiffs had no obligation to conduct discovery or disclose experts regarding a theory that Syngenta failed to plead, despite whatever assertions it made in an interrogatory response. By Syngenta's logic, a party could ignore the scheduling order, drop a statement in a discovery response, and pretend its pleading has been amended. But prejudice is measured at the time the disclosure is properly made, and it cannot be seriously argued that it is too late for Producer Plaintiffs to conduct discovery and disclose experts on Syngenta's new theory.[3]

### B.   Syngenta Did Not Disclose that Cargill and ADM Were at Fault for Shipping Corn to China.

Syngenta concedes for the first time that it is not seeking to assign fault to any non-producer other than Cargill or ADM in the Nationwide and Kansas trial. Opp., ECF No. 2947 at 76. Thus, partial summary judgment is warranted with respect to all other non-producers. Syngenta also expressly disclaims that it seeks to compare fault of Cargill and ADM "based on any failure by the grain trade to channel MIR162 corn away from China," *id.* at 117, despite the

---

[2] Syngenta also objects that it affirmatively abandoned its comparative-fault defense against Producer Plaintiffs, arguing that by removing the Twenty-Fifth and Twenty-Sixth defenses from the Pretrial Order, Syngenta was only removing defenses aimed at plaintiffs "who might have been Viptera purchasers." Opp., ECF No. 2947 at 124. Yet, 112 pages earlier in its brief Syngenta unequivocally states that it "has never asserted an intention to argue comparative fault as to Viptera growers." *Id.* at 2 n.2. Both statements cannot be true. In addition, Syngenta did not remove these defenses in part, but in whole. Moreover, the notion that the scope of Syngenta's comparative-fault allegations, even those in the Pretrial Order, was clear is wholly unbelievable. At the Pretrial Conference, Syngenta's own lawyers played coy until the Court forced them to "fish or cut bait." *See* ECF No. 2846 (Jan. 30, 2017 Hr'g Tr.) 15:10-18:2.

[3] The two cases cited by Syngenta do not even address untimely attempts by litigants to disclose a new theory. Opp., ECF No. 2947 at 125. In any event, they are distinguishable. *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1171 (10th Cir. 2009) (reversing because district court narrowly construed Pretrial Order to omit "the central issue in the case"). The other case, *Wilson v. Muckala*, 303 F.3d 1207 (10th Cir. 2002), is hardly supportive of Syngenta's position. *Id.* at 1215 ("we do not normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order, especially in such cursory form").

fact that the failure-to-channel theory of fault was the only theory asserted in Syngenta's Comparative Fault Disclosure. *See* ECF No. 1270 at 3 (non-producers including Cargill and ADM "commingled corn that they knew or should have known was likely to contain Viptera or Duracade with corn that they knew or should have known was likely to be delivered into export channels."). Partial summary judgment is warranted on that basis as well.

The only theory Syngenta now seeks to pursue against Cargill and ADM is that they knowingly shipped corn containing MIR162 to China, again a theory not set out in ECF No. 1270. In a footnote (Opp., ECF No. 2947 at 76-77 n.6), Syngenta contends that Plaintiffs were on notice based on its Third-Party Complaint (ECF No. 1259) against ADM and Cargill. *Id.* at 76-77 n.6. But that complaint only underscores the deficiency. In the complaint, Syngenta alleged separate bases of fault: *one* was "failing to segregate corn containing Viptera," ECF No. 1259 at ¶ 91; and *another* was "exporting corn to China, even though the [ADM and Cargill] knew or should have known that their corn shipments to China contained Viptera," *id.* at ¶ 92. Each was supported by separate factual allegations. *Compare id.* at Section III (¶¶ 52-62) *with* Section IV ¶¶ 63-86. In its Comparative Fault Disclosure, served days *after* the Third-Party Complaint, Syngenta identified only the first basis of fault, but not the second – that is, the *only* theory that it now seeks to pursue. Given the Third-Party Complaint's separate treatment of these theories,

Producer Plaintiffs had no reason to believe that Syngenta was pursuing *both* when its Comparative Fault Disclosure identified only *one*.[4]

### C.      Syngenta Abandoned Comparative Fault of China.

Syngenta's reference to interrogatory responses is notably absent in regard to China. *See* Pl. Ex. 90 at 15-21 (Interrog. No. 93) (nowhere describing conduct claimed to constitute fault of China). In the Pretrial Order, Syngenta recounted purported events pertaining to its import application, and says that "China's motivations for rejection [of] U.S. corn were driven by economic or political considerations," ECF No. 2848 at 20, but when describing persons it contends "caused and/or contributed to plaintiffs' alleged harm," identifies only Cargill and ADM. ECF No. 2848 at 20. Syngenta claims that "multiple pleadings and submissions . . . have made it clear . . . that Syngenta is asserting comparative fault against China." Opp., ECF No. 2947 at 79. For this, it cites Shull's Dec. 22, 2016 report, Syngenta's March, 2015 opposition to the motion to remand (ECF No. 323), and supplemental initial disclosures. Opp., ECF No. 2947 at 77-79. None of these references provide the "clarity" Syngenta suggests, and none explain what Syngenta said in the Pretrial Order.

Shull opines on China's regulatory system. At his deposition, Shull stated his understanding that he was asked to serve as expert "because . . . one of the key parts of this case is that – is determining *whether Syngenta behaved properly* in, in terms of – in its decision to

---

[4] Moreover, the Third-Party Complaint was dismissed. Producer Plaintiffs had no obligation to conduct discovery on a dismissed pleading. And again, Syngenta never sought leave to amend its Comparative Fault Disclosure to assert additional bases of fault against Cargill and ADM, although plainly aware of the fault it alleged. Nor does Syngenta attempt to establish "good cause," either by claiming justified mistake or inadvertence. Syngenta claims only that its Disclosure adequately encompasses the present theory (Opp., ECF No. 2947 at 77 n.6), despite the fact that Syngenta itself treated them separately in the Third-Party Complaint and they plainly are distinct theories.

commercialize, based on the fact that China was or was not a key market for US corn." Pl. Ex. 85, Shull Dep. at 31:20-32:4 (emphasis added). In its remand opposition (ECF No. 323), Syngenta argued that legality of China's conduct pertained to "presumptions" and proof requirements under Arkansas and Louisiana law in respect to duty and causation. *Id.* at 10, 12, 21-27. Of course, none of this addresses Kansas law. Nor would it place China on a comparative fault line. Syngenta's supplemental initial disclosures cite a multitude of documents, all of which Syngenta said only "may be relevant" to unspecified "claims and defenses." Def. Ex. 58 at 33-34. Finally, it is no answer to say simply that the Comparative Fault Disclosure identified China. Opp., ECF No. 2947 at 78. Syngenta can and did drop other defenses in the Pretrial Order, as it admits with respect to Viptera growers and non-producers. It also is no answer that Syngenta did not identify parties by name in its "Defenses" paragraph 9. *See* Opp., ECF No. 2947 at 78; ECF No. 2848 at 24. Syngenta *did* identify parties it contends caused or contributed to cause Plaintiffs' injury and identified only two: Cargill and ADM. ECF No. 2428 at 20.

## II.    KANSAS COMPARATIVE FAULT DOES NOT APPLY TO THE LANHAM ACT CLAIM.

Kansas state-law comparative fault principles do not apply to Plaintiffs' federal Lanham Act claims. Notwithstanding its general arguments regarding availability of common law defenses to statutory claims, Syngenta does not cite any provision of the Lanham Act recognizing comparative fault as a defense, nor to any case law holding that comparative fault principles apply in defense of Lanham Act claims. Moreover, in Kansas, comparative fault is not a common law defense, but a statutory one. Syngenta cites no precedent holding that a federal statutory claim can be limited by a state statute.

Syngenta's reliance upon *FDIC v. Ashley*, 749 F. Supp. 1065, 1067 (D. Kan. 1990) is misplaced. Opp., ECF No. 2947 at 73. There, the Court addressed whether, as a matter of federal common law, comparative fault defenses existed to claims asserted by the FDIC in its corporate capacity, and looked to Kansas law as guidance. *Id.* at 1066-68. The issue was what law – federal or state – would apply depending upon the capacity in which the FDIC sued, not whether the claims were created under federal law. *Id.* It is the latter situation applicable here. Plaintiffs have sued under a federal statute, the Lanham Act, and Syngenta can point to no provision of that act permitting any state common law defenses, much less any specific reference to comparative fault. Rather, such state defenses are not available against Lanham Act claims because that act was created under federal law. *See* Mem., ECF No. 2859 at 37 (citing *Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628 (D. Md. 2006)).[5]

---

[5] The Lanham Act is not a statute invading common law, as was the statute in *Isbrandtsen Co. v. Johnson*, 343 U.S. 779 (1952), cited by Syngenta. Opp., ECF No. 2947 at 73. Indeed, the only case Syngenta cites which purportedly allows assertion of common law defenses to Lanham Act claims, *Fluid*

Moreover, even if *Ashley* applied, it merely stands for the proposition that this Court must determine whether, as a matter of federal law, the defense would be available and state law (here, Kansas) would be but one source to examine. *Ashley*, 749 F. Supp. at 1067-68. Comparative fault does not apply to the Lanham Act claims because as a matter of federal common law, Plaintiffs' Lanham Act claims are treated as analogous to fraud claims and under Kansas law, neither contributory nor comparative fault is a defense to fraud claims.

Syngenta errs in its argument that because intent is not an element under the Lanham Act, Kansas law would permit the comparative fault defense. Plaintiffs have made the requisite allegations of intent which would on their face avoid application of Kansas' comparative fault statute. *See* Third Am. Comp. (ECF No. 2531), at ¶ 397 ("Syngenta's representations, statements and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity"); Pre-Trial Order (ECF No. 2848), at 15 ("Syngenta knew or should have known that these types of statements were misleading"). Moreover, even though the Lanham Act claims

---

*Control Products, Inc. v. CAS Aeromotive, Inc.*, 2010 WL 427765 (E.D. Mo. Feb. 1, 2010), was only deciding a motion to strike affirmative defenses and did not squarely address the availability of state law affirmative defenses generally, nor comparative fault, under the Lanham Act. *See id.* at *1. Nor does *Duty Free Americas, Inc. v. Estee Lauder Cos.*, *Inc.* 797 F.3d 1248, 1277 (11th Cir. 2015), support Syngenta's position. In announcing that general tort liability concepts would apply, *Duty Free* only addressed whether other actors, in addition to the manufacturer, could be liable for contributory infringement, but did not address whether state law defenses would apply, or specifically whether statutory comparative fault of third-parties not otherwise available under common law would apply. *See id.* at 1274-79. Indeed, in *Duty Free*, the Court recognized Supreme Court authority that "the principles underlying the Lanham Act contemplate liability that extends beyond direct violators of the trademark provisions of § 43(a)." *Id.* at 1276. That was a determination of federal law, not state law. When deciding questions under federal common law, courts must look to the federal statute. *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1315 (7th Cir. 1992). When the statute is silent on the issue, Courts have authority to formulate federal common law only under limited circumstances: (1) when Congress has given the courts the power to develop substantive law, and (2) when a federal rule of decision is necessary to protect uniquely federal interests. *Mid-Valley Pipeline Co. v. S.J. Louis Const., Inc.*, 847 F. Supp. 2d 982, 988 (E.D. Ky. 2012). Neither of those situations are present here.

56

generally do not require a showing of intent, Opp., ECF No. 2947 at 73-74, federal courts, as a matter of federal common law, have nonetheless generally recognized that both the trademark protections and the false advertising prohibitions of the Lanham Act, 15 U.S.C. § 1125(a), are derived from the tort of unfair competition which has its origins in the law of deceit. *See, e.g.*, *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc*., 797 F.3d 1248, 1276 (11th Cir. 2015) (citing *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003) (Lanham Act's trademark protections and prohibition on false advertising are "part of the broader law of unfair competition that has its sources in English common law."); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996) ("it is clear that both intent and fraud play an important role in all Lanham Act claims."); *Full Draw Productions v. Easton Sports, Inc*., 85 F. Supp. 2d 1001, 1011 (D. Colo. 2000) (that "the tort of unfair competition, which encompasses much of the same subject matter as the Lanham Act, has its origins in the common law tort of deceit"). Indeed, in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc*., 489 U.S. 141 (1989), the Supreme Court similarly recognized that "[t]he law of unfair competition has its roots in the common-law tort of deceit." *Id*. at 157.

Syngenta argues that the Lanham Act does not include an intent element, Opp., ECF No. 2947 at 73-74, but as the court *in Mylan Laboratories, Inc. v. Pharm. Basics, Inc*., 808 F. Supp. 446 (D. Md. 1992), *rev'd on other grounds, Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) explained, it is "impossible to find a perfect fit when looking for state legislation which is most closely analogous to federal statutes." *Id.* at 453-54. Furthermore, although intent is not a necessary element of a Lanham Act claim, "the degree to which a business intends to mislead the public will bear on how carefully it undertakes the deception and, therefore, the

likelihood of its success." *Id*. Even without the requirement of intent the court found that the most analogous state law, for limitations, was fraud. *Id*.

Contributory negligence was "not a defense to fraud," *Goff v. Am. Sav. Ass'n of Kansas*, 561 P.2d 897, 903 (Kan. Ct. App. 1977), and thus, comparative fault is not available either. *See Arredondo v. Duckwall Stores, Inc*., 610 P.2d 1107, 1110 (Kan. 1980) ("If contributory negligence or an analogous defense *would not* have been a defense to a claim, the comparative negligence statute does not apply." (emphasis added). As a matter of federal common law, the Lanham Act is most analogous to a fraud claim and, under Kansas law, comparative fault is inapplicable to Plaintiffs' Lanham Act claims.

## III. SYNGENTA CANNOT ASSIGN FAULT TO THE GOVERNMENT OF CHINA.

Syngenta seeks to assign fault to China for its own laws based on the theory that China's regulations governing approval of GM traits are not scientific enough, too political, and violate WTO agreements. Syngenta cites no case holding a foreign government – or for that matter any government – negligent for failing to have different laws. There is no precedent for such a "negligent governing" claim. Syngenta's desire to place China on the comparative-fault line fails because: *first,* the act-of-state doctrine prohibits assigning fault to official acts of a foreign government; *second*, there is no duty for a foreign government to adopt different laws for the

protection of foreign nationals; and *third,* Syngenta asserts intentional acts which cannot be compared under Kansas law.[6]

### A.        Assigning Fault to China Violates the Act-of-State Doctrine.

The act-of-state doctrine requires that the "acts of foreign sovereigns taken within their own jurisdictions be deemed valid," *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 409 (1990), and bars both claims *and defenses* that call into question the official acts of a foreign state. *Bank Tejarat v. Varsho-Saz*, 723 F. Supp. 516, 517 (C.D. Cal. 1989) (holding that act-of-state doctrine barred setoff and unclean-hands defenses challenging foreign acts). The root of act-of-state doctrine is one "of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder.'" *W.S. Kirkpatrick,* 493 U.S. at 404 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).

Syngenta's own brief boldly *underscores* that assigning comparative fault to the (entire!) government of China here is prohibited.[7] The "fault" claimed by Syngenta is premised on allegations that China: violated WTO agreements, (Opp., ECF No. 2947 at 89-91), manipulated the regulatory approval of GM imports for political reasons (*id.* at 85), and failed to follow its

---

[6] Syngenta contends that "[t]o the extent Plaintiffs argue that China's immunity from suit as a foreign sovereign prohibits allocating a percentage of fault to China," Kansas law permits allocation to non-parties and immune actors. Opp., ECF No. 2947 at 80-81. Plaintiffs do not argue immunity and Syngenta's point is a non-issue. Syngenta's immunity arguments pertaining to Cargill and ADM are addressed, *infra*, Section V.A.1.

[7] Syngenta argues that Plaintiffs cannot "cite a single case holding that a comparative fault defense seeking to allocate fault to a foreign government as a non-party is barred by the act-of-state doctrine," (Opp., ECF No. 2947 at 81), but conversely Syngenta fails to cite a single case where comparative fault was assigned to a foreign government.

own regulations (*id.* at 91).[8] It boldly alleges that China acted "in violation of international legal obligations," and "*no longer ha[d] the* '*right*' . . . to block the GM trait from import." Opp., ECF No. 2947 at 138 (emphasis added). In opposing remand of non-producer claims, Syngenta itself conceded that there are "state-to-state negotiations" occurring between the United States and China over these issues. ECF No. 323 at 42 ("a ruling from a court that China's actions were unlawful (or lawful) could obviously affect diplomatic efforts."). "[*A*]*ny* judicial pronouncement concerning the legality of China's actions would have" an effect "on ongoing negotiations" between the Executive and China. ECF No. 323 at 43 (emphasis original). It is beyond debate that Syngenta seeks judicial determination that China's actions and, frankly, its entire regulatory system are unlawful. It is precisely such determinations that the act-of-state doctrine forecloses.

Aggrieved countries can seek to enforce WTO obligations, not through the judiciary, but "diplomatic channels and the [WTO's] processes." *In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 193 (2d Cir. 2016). The U.S. government has filed *fifteen* trade enforcement challenges against China in the WTO. Pl. Ex. 12 Shull Rpt. ¶ 41. But it has not filed one challenging China's GMO regulations. Pl. Ex. 85, Shull Dep. at 177:9-178:18. And it has filed such enforcement actions against *other* countries, like the EU, challenging the "operation and application of [its] regime for approval of biotech products." *See* Def. Ex. 6 at 3. In December 2016, the U.S. government did request "consultation" under WTO settlement procedures with China regarding its process for imposing import quotas on agricultural products, but did not include any complaints about China's biotech-approval regime. *See* WTO Dispute Settlement:

---

[8] The last theory is spurious because although Syngenta alleges the MOA was 50 days and 19 days late in responding to two of Syngenta's applications (Opp., ECF No. 2947 at 91-92), it does not allege that this in any way caused or contributed to Plaintiffs' harm.

DS517: China – Tariff Rate Quotas for Certain Agricultural Products, available at https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds517_e.htm. Syngenta cites public statements by members of the U.S. government regarding China's system, but the fact that the Executive has *not* chosen to institute WTO proceedings further underscores the political and diplomatic nature of the inquiry. By putting China on the comparative-fault line, however, Syngenta would ask the jury to do what the Executive has chosen not to do, directly and unequivocally adjudicate China's compliance with WTO agreements. In fact, the nature of China's alleged fault is an unprecedented violation of the act-of-state doctrine, as Syngenta challenges not merely an official *act*, but China's actual *laws*.[9] *Cf. Sharon v. Time, Inc.,* 599 F. Supp. 538, 544 (S.D.N.Y. 1984) (holding that the doctrine applies to *"laws, decrees, decisions, seizures, and other officially authorized 'public acts.'"*).[10] Never before – so far as the undersigned can determine – has a foreign government, or any government, been found negligent or at "fault" for not adopting laws that benefit foreign citizen in another country.

Syngenta relies on *W.S. Kirkpatrick* as an example of why the act-of-state doctrine does not apply here. Opp., ECF No. 2947 at 83-84. There, however, the Court held the doctrine did not apply based on the possibility of a verdict that defendant paid a bribe to obtain a contract that would otherwise have gone to plaintiff merely because that verdict "may *suggest*" that the

---

[9] Syngenta's challenges go far beyond whether China gave MIR162 a fair review. It argues that China's regulations *facially* violate a duty to the Producer Plaintiffs. *See* Opp., ECF No. 2947 at 93 (challenging requirement of "approv[al] in another country"), 95 (challenging requirement for toxicology studies), 95 (challenging requirement for in-field testing), & 97-98 (challenging Minister's authority to give or deny final approval).

[10] Syngenta cites *Sharon* (Opp., ECF No. 2947 at 86) but in that libel suit based on an article written by the defendant, the "the issue in [the] litigation [wa]s not whether [the foreign] acts are valid, but whether they occurred." *Sharon,* 599 F. Supp. at 546. Thus, it involved no question of the validity of a foreign act, only its occurrence. *Id.*

contract awarded by the foreign government was illegal. Opp., ECF No. 2947 at 84 (quoting *W.S. Kirkpatrick*, 493 U.S. at 406). Here, Syngenta does more than seek a judgment "suggesting" that China's regulatory system is unlawful; it seeks to prove that China was at ***fault*** because its regulatory system violates international obligations. That is precisely one of the things the act-of-state doctrine prohibits. *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 145-46 (2d Cir. 2012) ("the validity of the foreign state's act may not be examined even if [it is alleged] that the [act] violates customary international law . . . or the foreign state's own laws.") (internal citations and quotations omitted).

Syngenta cites a number of cases for the proposition that the doctrine "does not preclude a court from deciding a case that implicates the motives or justifications" of a foreign sovereign's acts. Opp., ECF No. 2947 at 85. That may be so, but Syngenta seeks to do more than implicate China's "motives or justifications." Syngenta wants this Court to first hold that China owed a legal duty to U.S. farmers and then prove to a jury that China violated that duty. Proving fault through negligence does not even require proof of China's motives. It requires proof that China violated a duty to Producer Plaintiffs by not adopting different laws governing its GM regulatory approval process. That clearly involves a determination of whether China's acts and laws are valid, not mere proof of its motivations.

The act-of-state doctrine cannot be so limited that it only applies when a federal court is called upon to "enforce[e] (or refus[e] to enforce) [a foreign government's] decrees," a proposition Syngenta makes without supporting authority. Opp., ECF No. 2947 at 85. *W.S. Kirkpatrick*, 493 U.S. at 406, itself described, without overruling, the doctrine's invocation in *Underhill* as barring a *tort* claim against a military commander for unlawful detention, long after

the detention occurred. *Underhill v. Hernandez*, 168 U.S. 250, 254 (1897). Seeking to find the military commander at fault for detaining the plaintiff in a foreign country was sufficient to invoke the prohibition. *Id*. Similarly, a defendant cannot be held liable for contributory infringement by inducing a foreign government to infringe plaintiff's copyrights because it would require proof that the foreign state's acts were "unlawful under the Copyright Act." *Geophysical Servs., Inc. v. TGS-Nopec Geophysical Servs.*, No. CIV.A. 14-1368, 2015 WL 6869733, at *9 (S.D. Tex. Nov. 9, 2015). Syngenta seeks to do much more here because it seeks to assign fault expressly to the government of China.

There is no inconsistency between Producer Plaintiffs' position and the one taken by Cargill and ADM when those entities moved for remand. Opp., ECF No. 2947 at 87. In that memorandum, it was argued that a "mere *finding* that plaintiffs had failed to prove their case under state law" would not amount to a declaration of invalidity of a foreign act. *Id*. (quoting ECF No. 284 at 29). While that remains true, Syngenta now seeks more than a general verdict in its favor: it asks the jury to assign fault *to* China.

Syngenta argues that precluding its attempt to allocate fault to China because of the act-of-state doctrine would result in "absurd and unprecedented consequences" such as preventing Syngenta from presenting evidence and argument on causation. Opp., ECF No. 2947 at 89. This argument is misplaced on multiple levels. To begin, Plaintiffs disagree that they have to prove that China "had a functioning regulatory system" or that it "predictably applied science and the law in order to establish proximate causation." *Id*. Neither is necessary to establish cause-in-

fact[11] or to establish foreseeability that the presence of Viptera would result in a *de facto* ban of U.S. corn exports to China. *See infra* Section III.C. In any event, the *evidentiary* impact of the act-of-state doctrine is not presently before the Court.[12] Whether the act-of-state doctrine would permit Syngenta to argue, in favor of a general defense verdict, that China's rejections of MIR162 were pretextual or whether those acts should be declared valid is best presented by a motion in *limine*. The question here is whether Syngenta can obtain a judicial determination that China was at ***fault*** because its actions were unlawful and that China's very regulatory system violated international law. Under the act-of-state doctrine, Syngenta may not.

### B.    Syngenta Has No Precedent for Asserting that a Government Has a Duty to Enact and Execute Laws for the Benefit of Citizens of a Foreign State.

Syngenta does not dispute that to assign fault to China, it must establish a duty, for which Syngenta points: *first,* to "international law and treaty commitments" ("WTO agreements"); and, *second,* to "China's own laws and regulations." Opp., ECF No. 2947 at 89, 91. Syngenta fails to cite a single case to support its duty argument, much less a case where an international treaty or foreign law provides the basis for finding a foreign government at fault for failing to act for the benefit of citizens in another country. That is a preposterous notion, particularly when combined with what Syngenta claims China had a duty to do – that is, to pass different laws respecting approval of GMO traits so as not to require cultivation approval in a country of origin first,

---

[11] Even momentarily assuming Syngenta's argument that China "delayed" approval of MIR162 for political reasons were correct, if Syngenta had not launched Viptera prior to said approval, any "delay" by China could not have caused Producer Plaintiffs' harm.

[12] The act-of-state doctrine is not a principle of jurisdiction, but a principle of choice-of-law that directs the court to accept, similar to principles of *res judicata,* an official foreign act as conclusive, RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 41 (1965), or, as it was stated in *Kirkpatrick*, 493 U.S. at 409, official foreign acts "shall be deemed valid." Syngenta may thus be precluded from litigating these issues although that issue is not yet before the Court.

toxicology studies, or in-country field tests (Opp., ECF No. 2947 at 93-96) and to change the timeframes under which its scientists meet to review applications (*id*. at 99-100).

It is unsurprising then that Plaintiffs find no support for Syngenta's proposition in the case law. To the contrary, the few cases touching upon the subject reject Syngenta's arguments. In *Stutts v. De Dietrich Grp.*, No. 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006), the district court refused to find that even a *private* defendant can be subject to a duty based on international law. There, like here, the duty-advancing party did "not cite any authority" and "[i]n the absence of any such authority, plaintiffs' *ipse dixit* that it is 'illogical' that international law documents would not be regarded under the law of negligence per se as codifications of the common law (negligence) standard of care is not persuasive." *Id.* at *19. Syngenta relies on China's WTO obligations, yet "[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 907 cmt. a (1987) ("customary international law does not grant rights to private persons that would serve as a basis for remedies in domestic courts."). Exceptions are "a matter of interpretation of the agreement," RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 907 cmt. a, but Syngenta points to nothing in the relevant WTO agreements (or Chinese law) to support the idea that they were intended to create the duties alleged. *Cf. Usinor, Beautor, Haironville, Sollac Atlantique, Sollace Lorraine v. United States*, 342 F. Supp. 2d 1267 (Ct. Int'l Trade 2004) ("WTO Agreements are not self-executing" so as to be enforceable law even in the United States).

Setting aside the absence of authority for relying on international obligations, principles of U.S. tort law confirm that these agreements create no duty. "[A]lthough the legislature can and

sometimes does create a duty of care to a new class of injured persons, the mere fact that a statute *defines* due care does not in and of itself create a duty enforceable by tort law." *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004) (applying Illinois law).[13] Otherwise, "every statute in effect would create an implied right of action – which clearly is not the law." *Id.* A duty arises from a statute only "where the legislature intended violation of that statute to give rise to civil liability." *Id.* (quoting *Marquay v. Eno*, 662 A.2d 272, 277 (N.H. 1995)). This is a general principle. Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 158 (2d ed.). It is followed in Kansas, where the proponent must establish both that the statute was "designed to protect a specific group of people rather than to protect the general public" *and* that "a private right of action was intended." *Pullen v. West*, 92 P.3d 584, 588, 594 (Kan. 2004). Syngenta clearly fails the second prong at minimum, as it does not even argue that either WTO Agreements or China's GMO laws were intended to create a private right of action for U.S. farmers, *see* Opp., ECF No. 2947 at 92, a contention too outlandish to assume.

Moreover, any suggestion that the WTO Agreements created such a duty is undermined by the fact that the WTO Agreements created only *one* mechanism for their enforcement. That mechanism is an express dispute-resolution process through the WTO, and available only to nations, not private parties. *See* Pl. Ex. 92 (Rules and Procedures Governing the Settlement of Disputes, Annex 2 Art. 3) ("Members affirm their adherence to the principles for the management of disputes" contained therein). That process is "a central element in providing security and predictability to the multilateral trading system" and is multi-staged, requiring

---

[13] A statute can define due care where there is a preexisting duty at common law, which gives rise to the doctrine of negligence *per se*. *Id.*

formal mediation prior to instituting a panel to make an adjudication. *Id.; see also id.* at Art. 4.5-4.7. China and other WTO nations would not have intended to resolve disputes between countries by such a process while simultaneously creating a private cause of action for any injured foreign citizen to sue to enforce WTO agreements. *Cf. Nichols v. Kansas Political Action Comm.*, 11 P.3d 1134, 1144-45 (Kan. 2000) (refusing to imply right of action under Kansas campaign finance law where "the legislature intended for alleged violations of the CFA to be processed by the Commission.").

That the issue of China's fault arises in terms of comparative fault does not alter the outcome. Fault requires duty. Mem., ECF No. 2859 at 40. Syngenta does not argue that China had a common law duty, but that WTO agreements and Chinese law create such a duty, which it fails to establish. Whether Kansas permits assignment of fault to immune parties, Opp., ECF No. 2947 at 80, is a non-issue. Immunity is different than duty. *Infra*, Section V.A.1. In the only Kansas case Syngenta cites involving comparative fault to a government agency, Kansas first passed a law permitting an injured plaintiff to sue for damages caused by defective bridges. *Wilson v. Probst*, 581 P.2d 380, 383 (Kan. 1978) (citing K.S.A. § 68-419). No such statute exists here.

Finally, the rhetorical notion that China cannot be "such a necessary part of the interconnected global market that Syngenta had to obtain its import approval before selling Viptera in the United States and simultaneously claim that China does not *owe* any obligations whatsoever" to U.S. farmers is unsupported and unsupportable. Opp., ECF No. 2947 at 91. *First*, China may have obligations through WTO agreements designed to facilitate fair trade, but those obligations are between member countries – not between member countries and private parties.

67

Any concerns about China's compliance can and must be addressed diplomatically. *Second*, Syngenta continues to overstate this Court's observations in respect to an "interconnected market." For example, in distinguishing *Hoffman v. Monsanto Canada Inc.,* a case brought by organic farmers, the Court rightly observed that "plaintiffs there had not alleged any expectations, representations, reliance, or special relationship between the parties," while here, "plaintiffs have alleged facts showing a relationship between the parties in an interconnected market, as well as representations by Syngenta concerning steps that it would take to protect stakeholders." Order, ECF No. 1016 at 20-21. But "the Court certainly did not conclude that *everyone* in the industry owes a duty to everyone else in the industry to prevent any possible harm from all actions." Order, ECF No. 2426 at 12 (emphasis added). The Court, in referencing the "inter-connected industry and market," made no mention of foreign governments. ECF No. 1016 at 14. Expanding duty to assign fault to a government that allegedly fails to promulgate or execute laws for the benefit of foreign nationals is a bridge too far. Syngenta cites no special relationship between the Chinese government and U.S. farmers, or basis for reasonable expectation that China (or any government) will act for the benefit of foreign citizens.[14]

_____

[14] Although the foregoing shows that no defense of China's regulations are required, it is important to note that there are disagreements as to the interpretation of the relevant provisions of WTO agreements cited by Syngenta. Opp., ECF No. 2947 at 89-90. For example, Syngenta argues that the agreement that prohibits "unnecessary obstacles to international trade," the TBT, requires China to treat imported products from one country 'no less favorabl[y] than like producers from another country or like domestic products." *Id*. at 90. There is, however a heated debate among nations about whether biotech and non-biotech products are considered "like products," where China and other nations takes the position that they are not. Ex. 94 at 5.40 ("China believes that the factual evidence relating to each of the four criteria makes it clear that biotech products and non-biotech products must not be considered to be 'like products'."); *id.* at 5.47. The issue was raised in the context of the complaint filed against the EU by U.S. and other countries, and while the outcome of that decision was unfavorable to the EU, the WTO Panel *expressly* "did *not* examine" the disagreement over "like" products. *Id.* at ¶ 8.3. Given that disagreement, the Court cannot merely accept Syngenta's cursory assertions of international law.

**C.    China's Alleged Intentional Conduct Cannot Be Compared Under Kansas Law.**

After recounting its version of the "evidence" in regard to China's conduct, Syngenta claims that Plaintiffs "cannot discount" it "by arguing that China's actions were intentionally tortious and thus cannot be compared for purposes of allocating fault." Opp., ECF No. 2947 at 104. Plaintiffs' point is not a "discounting" of evidence, but that as a matter of law, China cannot go on a comparative fault line. Aside from the act-of-state doctrine, Kansas law does not compare intentionally tortious conduct with negligence.

Incomparability of intentional with negligent conduct is not, as Syngenta suggests, limited to situations such as bailment and duties of a school to protect children under its care. Opp., ECF No. 2947 at 105. In *M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc.*, 675 P.2d 864 (Kan. 1984), for example, the Court found error in allowing a thief's fault to be compared to a negligent bailee: "We have not . . . interpreted K.S.A. 60-258a to require the comparison of negligence with intentional wrongdoing." *Id.* at 867. In *Gould v. Taco Bell,* 722 P.2d 511 (Kan. 1986), the Court rejected defendant's attempt to limit *M. Bruenger* to bailment cases. A bailee has a "duty of reasonable and ordinary care to prevent the theft of bailed property" while a premises owner has a duty of "reasonable and ordinary care for the safety of invitees," but in either case, "[t]he duty is the same." *Id*. at 517. Kansas courts more generally hold that adoption of comparative fault does not bring intentional conduct within a fault allocation. *See Sieben v. Sieben*, 646 P.2d 1036, 1041 (Kan. 1982) (comparative fault statute does not "change the common law rule of joint and several liability for defendants in intentional tort actions."); *Lynn v. Taylor*, 642 P.2d 131, 135 (Kan. Ct. App. 1982) ("There is . . . no authority for including an intentional tort such as fraud within the ambit of comparative fault principles"); *Sandifer*

69

*Motors, Inc. v. City of Roeland Park*, 628 P.2d 239, 247 (Kan. Ct. App. 1981) ("contributory negligence is no defense to an intentional nuisance.").

Syngenta had a duty of reasonable care in the manner, timing and scope of commercialization under circumstances presenting foreseeable risk of trade disruption when a new GM trait is not approved for import into a foreign country, in this case, China. Plaintiffs do not allege an unlawful act; rather, Syngenta has interposed a contention that China's conduct was unlawful and/or intentional. Kansas does not compare intentional conduct. Moreover, and even where a plaintiff does allege intentional conduct, there is no requirement that "the defendant specifically had a duty 'to protect the plaintiff from *the act committed* by the intentional tortfeasor" as Syngenta suggests. Opp., ECF No. 2947 at 104 (emphasis added). The passage Syngenta quotes from *Kansas State Bank & Tr. Co. v. Specialized Transportation Services., In*c., 819 P.2d 587 (Kan. 1991) is from the Court's description of an argument by amicus. *Id.* at 605. Indeed, the Court held that plaintiffs were *not* required to demonstrate foreseeability of (or duty to protect against) the specific act committed. There, a child was sexually molested by a school bus driver. Plaintiff alleged that the school and employer negligently retained and supervised the driver upon "reason to believe that an undue risk of harm to others" existed due to general "quality of the employee." *Id*. at 597. It was *not* necessary that "the precise nature of the injury . . . would have been foreseen." *Id.* at 598. There was no evidence that defendants had any knowledge that the driver was disposed toward sexual misconduct, or even that he actually had such proclivities. *See id*. at 594 (detective report indicated no information that driver had ever been involved "in any sort of sexual molestation."). Rather, evidence foreboding risk of *any kind of battery* (on which the jury was instructed) was

70

sufficient. Among other things, the school received reports of rude behavior to teachers and parents, which the Court said, "established that children on the bus were in *a sphere of risk*." *Id.* at 598 (emphasis added). This case in no way says that Plaintiffs must prove foreseeability that China would take specific actions or a duty to protect against specific "acts committed." Opp., ECF No. 2947 at 104. Just the reverse. Even where a plaintiff alleges specific conduct, it is sufficient that a risk of harm was foreseeable, not the manner in which it comes about.

Here, the risk of harm clearly included the risk of trade disruption created by unrestrained commercialization that dispersed MIR162 through the U.S. corn supply and detection of unapproved MIR162 in corn imports to China. As clearly, the risk was foreseeable. Syngenta was well aware of the risk of trade disruption through release of a new GM trait without foreign import approvals. Syngenta was a member of BIO, which expressly recognizes risk of trade disruption. *See* SOF ¶ 9. Syngenta knew that China had a zero tolerance policy. *Id.* at ¶ 87. Syngenta knew, before commercialization, that trade with Chinese buyers was picking up, presenting a "problem for . . . the industry down the road." *Id.* at ¶ 13 (quoting Pl. Ex. 27, email from Bernens dated June 9, 2010).

Syngenta claims that it "did not have a duty to protect American farmers . . . from a foreign government's *dysfunctional* regulatory system," it says was intentionally "in violation of international obligations." Opp., ECF No. 2947 at 105 (emphasis original). If that is Syngenta's formulation of a duty analysis, it not only is contrary to Kansas law but self-defeating. Syngenta's conduct created risk to American famers in the first place. And Syngenta *cannot* disavow foreseeability of China's "dysfunction," as indeed, that purported dysfunction forms the basis for Syngenta's argument that it complied with a standard of care,

71

(incorrectly) identified as the BIO launch policy, which it (also incorrectly) asserts did not require pre-commercialization approval from foreign countries lacking a functional regulatory system. *See* Opp., ECF No. 2947 at 94.

For present purposes, however, neither Syngenta's duty nor its negligence is at issue; rather, the question is whether Syngenta can allocate fault to China. As this Court recognized in *Battenfeld of Am. Holding Co., Inc. v. Baird, Kurtz & Dobson*, 60 F. Supp. 2d 1189 (D. Kan. 1999) (Lungstrum, J.), "analysis of [a defendant's] comparative fault designations presupposes that [the defendant] breached a duty owed to [plaintiff]." *Id.* at 1207. There, much like Syngenta here, the defendant urged that third parties' *negligence* could be established with evidence demonstrating violation of statutory obligations. This Court rejected that argument, observing that defendant neither raised a negligence *per se* theory during the litigation nor preserved it in the pretrial order. *Id.* at 1207-08. The same is true here (*see* Pretrial Order, ECF, No. 2848). The Court also recognized that the evidence set out by defendant spoke not of negligent, but intentional, conduct. *Id.* at 1209. Syngenta's suggestion that a jury might conclude, based on the "evidence" it recounts, that China "was acting negligently or recklessly out of economic protectionism or based on invalid science" (Opp., ECF No. 2947 at 105) is a contradiction in terms. Moreover, Syngenta's Comparative Fault Disclosure describes the nature of China's "fault" as "improperly" delaying approval of Viptera for "non-science based reasons," and deciding that it was in "[China's] own interest" to reject U.S. corn. ECF No. 1270 at 2-3. It is abundantly clear that what Syngenta contends and means to assert is that China's conduct was intentional. Not only does the act-of-state doctrine forbid a finding that China was at "fault" for

its chosen regulatory system, but Kansas law does not allow a comparison of intentional conduct with Syngenta's negligence.

## IV.   SYNGENTA CANNOT ASSIGN FAULT TO PRODUCER PLAINTIFFS.

### A.   The Grain Standards Act Preempts a Duty That Would Require Plaintiffs to Create a "China-Only" Channel of Viptera-Free Corn.

For the same reasons that the GSA preempts any duty of Cargill and ADM, *see infra* Section V.A.2, it also preempts any duty that Producer Plaintiffs create a "China-only" channel for Viptera-free corn. Such a duty necessarily would impose a condition on the sale of corn by virtue of whether the corn contains or does not contain MIR162. A duty by Producer Plaintiffs to comply with that condition, or that would impose on them an obligation to ensure that others do so, amounts to a state law "requirement."

### B.   Syngenta Fails to Adduce Any Evidence of Causation or that Producer Plaintiffs Breached a Standard of Care.

In addition, there is no evidence that the 400,000 or so ***non-Viptera*** growers were required to or feasibly could channel the entire commodity corn market around Syngenta's desire to commercialize Viptera and still preserve the ability to serve China's desire for U.S. corn. The notion itself is not only unsupported by any evidence, it is ludicrous, as the paucity of record citations in Syngenta's argument demonstrates. Opp., ECF No. 2947 at 126-31.

*First*, in their opening brief Plaintiffs argued that "Syngenta has no evidence that Producer Plaintiffs . . . could have forced buyers to keep their non-Viptera corn separate or that this would have made a difference even if they had. Because it cannot establish causation, summary judgment is proper." Mem. ECF No. 2859 at 55. Syngenta confirms that assertion by

73

not just failing to offer evidence but not even responding to the argument. *See* Opp., ECF No. 2947 at 125-31. The absence of evidence regarding causation is fatal to Syngenta's defense.

*Second*, and independently, as Plaintiffs also pointed out, Syngenta has adduced absolutely *no* evidence of a standard of care for non-Viptera growers. It points to no expert, despite its own insistence that expert testimony is *required*. Syngenta Mem. Supp. S.J. ("Def. MSJ"), ECF No. 2861 at 92. It does not cite a *single* example where a GM trait was commercialized in the U.S. (or elsewhere) where non-users successfully channeled around that new product to serve an unapproved export market. And nothing in the record even suggests that reasonable persons would engage in such activity, particularly where Syngenta does not dispute that it is *not* generally undertaken. RSOF ¶¶ 28, 32-34.

Nor does Syngenta's argument make a lick of sense. Much of it is built around the tautological claim that "MIR162-free corn (the kind of corn needed to serve the Chinese market)" is "*not* a commodity crop." Opp., ECF No. 2947 at 127. The only proof Syngenta offers is the USDA's definition of #2 yellow corn as "[c]orn that is yellow kerneled." *Id.* But MIR162-free corn clearly fits that definition. After all, it was commodity corn long before Viptera contaminated the commodity system. Commodity corn is corn which, "in the ordinary course," is not "commingled and not segregated for special handling or use when it enters the chain of commerce." *See* RSOF ¶ 28. Although Syngenta claims that all 400,000 or so producers *should* have segregated their non-Viptera for delivery to China, it cites nothing to suggest that, in the bulk commodity system, it was segregated in the "ordinary course." *See id.* at ¶ 34 ("It is not a common practice for commodity farmers to segregate corn by GM trait.").

Syngenta calls Plaintiffs' assertion that it has failed to adduce evidence on the standard of care for producers "flatly incorrect," but cites nothing relevant. Opp., ECF No. 2947 at 128. Its cited evidence pertains *only* to steps by organic growers to prevent the spread of GM traits to organic crops. *See id.* at 128 & n.40 (citing farmer testimony and USDA response to comment). Plaintiffs agree that the types of precautions taken in specialty markets demonstrate how Viptera growers could have prevented the spread of MIR162 through cross pollination (or dust), making trade disruption based *solely* on such contamination very unlikely. *See* Pl. Mem. Opp. Mot. S.J. ("Pl. MSJ Opp."), ECF No. 2940 at 165 & n.21. But even assuming Syngenta could establish that some 400,000 non-Viptera growers reasonably should have taken those precautions, that does not establish or even suggest a standard of care for how they could have delivered non-Viptera corn to China. Corn is commingled in the commodity system and it is the commodity system that feeds all the exports. *See* RSOF ¶ 71.[15]

Producers do not sell corn to China. They sell it to elevators and into the bulk commodity system, which serves all export markets, including China. Syngenta offers no standard of care even suggesting how Plaintiffs could have served the Chinese market. In a specialty market, the grower has a dedicated outlet for their crop. *See* RSOF ¶ 54 ("A 'closed loop' system is a system employed for specialty traits where seed is sold to a grower *who has a dedicated outlet for delivering it*." (emphasis added)). Here, there is no dedicated outlet for producers to deliver their corn to China, and Syngenta offers no evidence as to why it would reasonable (or even possible) for non-Viptera growers to create one. Where should they have delivered their corn? How would

---

[15] Although Syngenta purports to dispute paragraph 71, its cited evidence does not dispute that significant commingling occurs when corn is sold into the commodity system. RSOF ¶ 71.

it get to China? And critically, at what price? Syngenta offers no evidence about the costs of creating a separate "China-only" channel, without which it cannot be said that any reasonable producer would undertake the effort to create a new commodity market for China. The absence of any evidence that a single reasonable person would undertake the endeavor to reorganize how the entire export market works so as to allow the intrusion of Viptera is a terminal wound to Syngenta's comparative-fault defense.

The rest of Syngenta's rhetorical arguments also do not create a genuine dispute as to breach of any standard of care. *First*, the duty Syngenta seeks to impose on non-Viptera growers is indisputably distinguishable from Plaintiffs own limited launch theory of liability. Viptera growers can deliver their Viptera corn to feedlots, ethanol plants, or use that corn as "feed on farm," keeping it out of the commodity system until the trait is approved and thereby preserving that system's ability to sell to China. Pl. MSJ Opp., ECF No. 2940 at 158 & n.16. But Producer Plaintiffs – not the *limited* number involved in a limited launch, but all 400,000 of them – would have to (somehow) reorganize that entire system to channel *around* Viptera. *Second*, the relative size of the Chinese market to all U.S. corn production is irrelevant. Opp., ECF No. 2947 at 129. Syngenta does not seek to compare fault of producers whose corn was *sold* to China (because there is no way to trace any particular farmer's corn in a bulk commodity system). Calling it a *niche* market (even if accepted as true) does not solve the absence to of any alternative means to serve that market and avoid Plaintiffs' harm. *Third*, resurrecting its previously rejected argument, Syngenta argues that imposing a duty on Syngenta makes it an "insurer for the rest of the industry" but that is equally irrelevant here. *Id.* at 130. Syngenta's cases involve attempts to make the defendant "subject to liability without fault." *Jones v. Hittle Serv., Inc.*, 549 P.2d 1383,

1388 (Kan. 1976). As the Court previously held: "Syngenta is not unfairly being made an insurer for all growers; rather, plaintiffs assert claims to hold Syngenta responsible for particular actions having foreseeable and foreseen consequences." ECF No. 1016 at 29. Inability to disprove that its conduct was unreasonable, does not make Syngenta an insurer, or explain why Syngenta can blame producers without evidence that they violated any standard of care.

## V. SYNGENTA CANNOT ASSIGN FAULT TO CARGILL AND ADM.

### A. Fault Requires Duty, Which Is Preempted.

There is nothing "cursory" or undeveloped about Plaintiffs' argument on duty and preemption. Opp., ECF 2947 at 106. It was set forth clearly and involves two rather straightforward principles. *First*, as discussed (Mem., ECF No. 2859 at 30), Kansas law requires that "one must first be a tortfeasor" before fault can be compared, and fault requires duty: "There first must be a duty owed before there can be negligence. Without such a duty, a person cannot be at fault and therefore cannot be made a party subject to having his negligence compared." *Akins ex rel. Akins v. Hamblin*, 703 P.2d 771, 776 (Kan. 1985); *see also, e.g.*, *Siruta v. Siruta,* 348 P.3d 549, 563 (Kan. 2015) ("negligence can only be compared" if there is a duty to the injured party); *Weldin v. IBP, Inc.*, No. 00-4110-SAC, 2002 WL 1378215, at *1 (D. Kan. June 6, 2002) ("Where there is no duty, there can be no breach."). *Second*, this Court has ruled that the GSA forecloses the duty Syngenta seeks to impose. Mem., ECF No. 2859 at 341-42 (citing Order, ECF No. 1803 at 2, 4-6). It is Syngenta, not Plaintiffs, who has the analysis wrong. Plaintiffs have no quarrel with Syngenta's recitation that Kansas law allows fault of parties not sued or immune from suit to be compared. Opp., ECF No. 2947 at 80-81, 107. But immunity is not preemption. Here there is no duty, and there can be no fault comparison.

### 1.    Immunity from suit is different than preemption of duty.

Syngenta quite clearly errs in equating immunity with duty. Immunity is a protection from suit or perhaps payment of judgment, as illustrated even in the cases Syngenta cites. For example, at one time Kansas recognized parental immunity. The question is not duty, which is well assumed in cases involving parents and children, but whether the child can sue.[16] Spousal immunity, *Miles v. West*, 580 P.2d 876, 879 (Kan. 1978), at one time meant that "one spouse could not sue the other." *Sink v. Sink*, 239 P.2d 933, 933 (Kan. 1952), *overruled by Flagg v. Loy*, 734 P.2d 1183 (Kan. 1987). Statutes may immunize government actors under certain circumstances. *Wilson* 581 P.2d at 384. Workers have remedy in the form of benefits for injury but cannot sue their employer. *Anderson v. Nat'l Carriers, Inc.*, 695 P.2d 1293, 1297-98 (Kan. Ct. App. 1985). Immunity does not mean there is no duty. *See Fitzpatrick v. Allen*, 955 P.2d 141, 148 (Kan. Ct. App. 1998) ("The concept of immunity does not mean there is no duty; only that there is a prohibition against the recovery of damages if a duty is breached."). Neither does immunity mean there *is* a duty. In *Weldin,* 2002 WL 1378215, for example, an employee of the USDA was injured while working on defendant's premises. The employee received worker's compensation benefits and could not sue the USDA. "Defendant, seeking to spread the liability," sought to compare fault of the USDA. *Id.* at *1. The Court recognized that "fault of parties immune to suit . . . may be compared," *id*., but nevertheless, the immune party must still have a duty: "Where there is no duty, there can be no breach." *Id.* (citing *Kennedy v. Kansas Dept. of*

---

[16] *See Nocktonick v. Nocktonick*, 611 P.2d 135, 136 (Kan. 1980) ("(S)o long as the parent is under obligation to care for, guide and control . . . no such action as this can be maintained . . . [as] public policy, . . . forbid[s] to the minor child a right to appear in court in the assertion of a claim.") (quoting *Hewellette v. George*, 9 So. 885, 887 (Miss. 1891)).

*Soc. and Rehab. Srvs.,* 26 Kan. App. 2d 98, 100 (1999)). Holding that the USDA did not have a duty, the Court rejected a fault comparison. *Id*. at \*2.

As fundamentally, immunity from suit and federal preemption of duty are two entirely different things. While immunity derives from various "guarantee[s] that trial will not occur," *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989), preemption prevents recognizing duty in the first place. Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Congress may consequently pre-empt, *i.e.,* invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.,* 135 S. Ct. 1591, 1595 (2015). Preemption *supplants* state law, rendering it null. *See, e.g.*, *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) ("It is basic to this constitutional command [of the Supremacy Clause] that all conflicting state provisions be without effect."); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 526 (1992) (preemption provision "*supersedes* petitioner's . . . fraudulent-misrepresentation theory") (emphasis added); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334-35 (2008) ("[a] preemption clause . . . tells us that Congress intended to *supersede or modify* state law to some extent," and may involve the task of "determining the substance and scope of Congress's *displacement* of state law.").

Syngenta's own words condemn its attempt to equate immunity from suit with preemption of duty. Syngenta conceded that Cargill and ADM "cannot *be subject* to a state tort law duty to inspect for and segregate Viptera corn," and the GSA "precludes *the imposition of* any state tort law duty that would require [them] to inspect, test, or describe corn according to the 'characteristic' of whether or not it contains Viptera." Order, ECF No. 1803 at 4 (emphasis

79

added); *see also* Syn. Opp. Non-Producer Mot. Dismiss, ECF No. 1661 at 30-31.[17] Where preempted, state law is supplanted. It is a misnomer to speak of how much fault stems from breach of a state-law duty that does not exist.

Syngenta invokes *Brown v. Keill,* 580 P.2d 867 (Kan. 1978) as somehow holding that allocation should always occur among "all parties to the occurrence" in all circumstances (Opp., ECF No. 2947 at 80). *Brown* itself recognizes that there is no fault comparison where a party other than the defendant "lack[s] . . . negligence." *Id*. at 876. The comparative fault statute does not create duties, *Akins*, 703 P.2d at 776-77, but only allocates responsibility among those *with* a duty, and who have breached a duty. *Id.* at 776.

> ### 2. This Court already has ruled that the GSA preempts the duty Syngenta seeks to assert.

This Court already has held that Cargill and ADM do not have the duty Syngenta seeks to impose – a "duty not to ship or sell to China corn that is known to include the Viptera trait." Order, ECF No. 1803 at 5. The Court reasoned:

> *imposing such a duty* would require either that the shipped or sold corn be tested for the presence of the Viptera trait or that the corn be effectively described as Viptera-free. The only alternative would be a complete ban on the sale of any corn to China because of the possibility of the presence of the Viptera trait, and such a ban imposed by state law would run afoul of Congress's unmistakable intent to reserve to the federal government

---

[17] Syngenta made similar arguments in its motion for partial judgment on the pleadings, stating: "Just as the [GSA] preempts *any duty* on elevators and exporters that would require testing or inspecting corn for the presence of Viptera or Duracade or describing corn according to whether or not it contained those genetic traits, the Act likewise precludes imposing *the same duty* on Syngenta." Syn. Mem. Supp. Mot. Partial Jdgmt., ECF No. 1928 at 17 (emphasis added); *see also* Syn. Reply, ECF No. 2190 at 15 ("The express preemption clause thus forecloses *all* state-imposed standards for inspecting or describing grain, whether or not they actually conflict with a federal standard.") (emphasis original).

> any such regulation on interstate or foreign commerce in grain based on
> characteristics of the grain.

*Id.* at 5-6 (emphasis added). Syngenta proposes that there is some sort of distinction between duty for purposes of liability and duty for purposes of fault allocation. It has no authority for such a proposition. Duty exists or it does not. Syngenta's citation to cases for the idea that state common-law duties are "requirement[s]" only where "applied to impose liability" and hence "'require[]' the entity to comply with the duty to avoid a penalty" (Opp., ECF No. 2947 at 98) is irrelevant. Whether analyzed in terms of a threat of liability or not, the Court has held that the duty that Syngenta seeks to impose is preempted. That ends the analysis.

### 3.    Liability is not the basis for preemption.

Even were Syngenta's citations relevant, which they are not, liability follows duty, not the reverse. For example, *Riegel* considered "whether New York's tort duties constitute "requirements" under the preemption language of 21 U.S.C. § 360k(a). *Riegel*, 552 U.S. at 323. The Court recounted *Bates* and *Cipolline,* in which it "held that a provision pre-empting state 'requirements' pre-empted common law duties." *Id.* The Court stated that "[a]bsent other indication, reference to a State's 'requirements' includes its *common-law duties*. As the plurality opinion said in *Cipollone,* common-law liability is '*premised on the existence of a legal duty*,' and a tort judgment therefore establishes that the defendant has violated a state-law obligation." *Riegel,* 552 U.S. at 324 (quoting *Cipollone*, 505 U.S. at 522) (emphasis added). It hardly bears repeating, but as *Riegel* states, liability flows from recognition of duty, not the other way around.

In *Cipollone*, the Court addressed a preemption provision in the Public Health Cigarette Smoking Act of 1969 barring "requirement[s] or prohibition[s] . . . imposed under State law" in respect to advertising or promotion of cigarettes. 505 U.S. at 520. The Court addressed plaintiff's

contention that the words "requirement or prohibition" mean injunction or positive state pronouncement such as statutes or regulations. The plurality disagreed, stating that these words "sweep[] broadly and suggest[] no distinction between positive enactments and common law." *Id.* at 522. In aid of its point and to dispel distinction between pre-conduct proscription (*e.g.*, statute) and post-conduct lawsuit, the plurality observed that "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief" as either can be a means of "governing conduct and controlling policy." *Id.* (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247 (1959)). Syngenta takes that observation as a liability-requiring rule (which it is not) and again neglects the simple order of any tort claim. In addressing why the preemption provision encompassed common-law actions, *Cipollone* explained that because tort actions "are premised on the existence of a legal duty," it would be "difficult to say that such actions do not impose "requirements or prohibitions." *Id.* (citing W. Prosser, Law of Torts 4 (4th ed. 1971); Black's Law Dictionary 1489 (6th ed. 1990) (defining "tort" as "always [involving] a violation of some duty owing to plaintiff")). Using language Syngenta quotes from other cases (Opp., ECF No. 2947 at 109), there can be no "fear of liability" before duty is first recognized.

The GSA does not immunize against state penalties, fines, or judgments, but overrides state laws that in whatever form "require inspection or description in accordance with . . . characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce." 7 U.S.C.A. § 87g(a). Liability is possible only if one first recognizes an obligation, requirement, or duty, to inspect or test corn, and describe it as Viptera-free. That, the GSA does not permit. In further illumination on analysis, the Court rejected Plaintiffs' argument that

Syngenta is a seller of seed rather than corn (grain), holding that GSA preemption "does not refer to state-law requirements imposed on any particular actor; thus, the statute preempts any claims based on a requirement of inspection or description by anyone, not just the seeming target of the state law." Order, ECF No. 2426 at 22. The Court also rejected Plaintiffs' argument that preemption does not reach voluntary contractual undertakings by farmers, holding that Syngenta would still be "required" to sell seed to "certain growers who made certain agreements, and inspection or description of corn by someone [would still be] *required*." *Id.* at 24 (emphasis original). Whether ultimate liability attaches or not, a finding of duty (necessary to a fault allocation) still must first recognize a duty which preemption precludes.[18]

## B. Syngenta Otherwise Fails to Produce Evidence That It Was Foreseeable to Cargill and ADM That By Shipping U.S. Corn to China, Injury Would Result.

Syngenta otherwise fails to show that Cargill had a duty to U.S. producers "based on the same reasoning under which the Court found a duty on Syngenta." Opp., ECF No. 2947 at 111. Under Kansas law, "to find a legal duty to support a negligence claim, (1) the plaintiff must be a foreseeable plaintiff and (2) the probability of harm must be foreseeable." *Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287, 290 (Kan. 2011). "A foreseeable plaintiff is one that is 'within the

---

[18] *Mut. Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2475 (2013), cited by Syngenta, did not address a "requirements" preemption statute but conflict between federal law prohibiting a drug manufacturer from independently changing its label and a state-law design defect / failure-to-warn claim that would "impose[] a duty . . . *not* to comply" with that federal law." *Id.* at 2470 (emphasis original). Here too, the analysis turned on what duty state law would impose and what compliance with that duty would entail. In fact, the Court first rejected the plaintiffs' argument that the state design-defect claim was "compensatory, not regulatory" because the cause of action "imposes affirmative duties on manufacturers." *Id.* at 2473. To comply with a duty to ensure that products are not unreasonably dangerous, the manufacturer would have to change the drug's labeling. *Id.* at 2474. The Court's reference to "escape [from] liability" was in discussion on the action a manufacturer would need to take to comply with the state-law duty (change the label). *Id.* One, of course, does "avoid liability" (Opp., ECF No. 2947 at 108) by compliance with duty but the nub of analysis is what that compliance entails.

range of apprehension.'" *Id.* And "the risk to be perceived defines the duty to be obeyed . . . *risk imports relation*." *Id.* (quoting *Durflinger v. Artiles*, 673 P.2d 86, 91 (1983) (emphasis original). "The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based." *Id.* (marks omitted).

Unlike "the duty asserted against Syngenta, who is alleged to have started a harmful chain of events by commercializing" Viptera and Duracade, Cargill's and ADM's acts "occurred farther down the supply chain, after the alleged negligence by Syngenta." Order, ECF No. 2426 at 12 ("the Court certainly did not conclude that everyone in the industry owes a duty to everyone else in the industry to prevent any possible harm from all actions."). Syngenta identifies Cargill's and ADM's "fault" as "deciding to ship U.S. corn to China" where that corn contained MIR162, and, therefore might be rejected by China. Opp., ECF No. 2947 at 111. But Syngenta fails to present any evidence that "deciding to ship" created or increased foreseeable risk of harm to producers. Syngenta points only to testimony by Cargill and ADM that they were aware of a risk that China would reject the ships if MIR162 was detected. *Id.* at 113. If that evidence is accepted, a jury may find foreseeability that shipping presented a commercial risk to Cargill and ADM, *id.*, but it does not follow that Cargill and ADM set in motion, or contributed to, a chain of events that would foreseeably harm others. Indeed, *those rejections* did not create foreseeable harm at all. *First* it was the presence of MIR162 in the corn supply that occasioned injury, not shipper or shipment. *Second*, Cargill and ADM were not the only shippers, a fact Syngenta continues to ignore. Pl. MSJ Opp., ECF No. 2940 at SOAF ¶¶ 511-22. But let us assume for the moment that they were. The alternative available – not to ship – occasions the

same market loss as a decision to ship that can result in a rejection. Either way, the ability to serve Chinese demand for U.S. corn is lost due to the presence of MIR162. Syngenta presents no evidence that it was foreseeable to Cargill and ADM – the only grain handlers it contends are comparatively at fault – that they might produce harm to an interconnected market. To the contrary, by trying to ship corn to China, Cargill and ADM were attempting to hold on to Chinese demand for the benefit of the entire market and for as long as possible, *despite* the "harmful chain of events" that Syngenta started. Order, ECF No. 2426 at 12.

Although the absence of evidence on foreseeability is dispositive, Syngenta also wrongly contends that Cargill and ADM were "in an equal or better position than Syngenta to avoid or minimize the risk of harm." Opp., ECF No. 2947 at 114. No evidence supports that statement either. Certainly, Cargill and ADM were not in an "equal or better position" than Syngenta to prevent Viptera from causing a trade disruption. Syngenta admits that it was the only actor who could have set that risk to zero. *See* Def. MSJ, ECF No. 2861 at 88 (quoting McHughen that "[t]he only way to guarantee no MIR162 grain (or dust) would end up in China would be by not cultivating MIR162 in the first place."). And Syngenta contends that Cargill and ADM were best positioned to avoid risks created by "dispersion of Viptera in the corn supply," even while disclaiming any theory of comparative fault "based on any failure by the grain trade to channel MIR162 corn away from China." Opp., ECF No. 2947 at 114, 117. The rest of its arguments depend on the unsupported contention that shipping corn created a foreseeable risk. *Id.* As duty is a question of law, Syngenta's assertion of fault must be dismissed for a lack of evidence supporting that duty.

**C.      Syngenta Fails to Produce Evidence that Shipping U.S. Corn to China by Cargill and ADM Caused Producer Plaintiffs' Harm.**

Having now made clear that it indeed does not intend to pursue comparative fault as to any non-producers other than Cargill and ADM, Syngenta makes a causation argument that relies on unsupported pretense. As in its own summary judgment motion, Syngenta contends that it was the decision of Cargill and ADM "to ship U.S. corn to China that was rejected, as opposed to shipping elsewhere, [that] caused Plaintiffs' harm." Opp., ECF No. 2947 at 119. Ignoring all Viptera growers, and all other elevators, transporters, grain handlers, and exporters entirely, Syngenta also suggests that if Cargill and ADM had not shipped to China in 2012, Plaintiffs' harm would not have occurred because *these two* exporters could have avoided a "net drop" in demand for U.S. corn. *Id*. at 120-22. Syngenta's argument is a study in avoidance.

From beginning to end, Syngenta's argument depends on fictional, unsupported account of Plaintiffs' claim and what was taking place in 2010-2013. *See id.* at 144. As already noted, Plaintiffs do not allege that it was China's rejection of corn in shipments from Cargill or ADM that triggered the de facto ban but only that China "began rejecting shipments" of corn in November 2013. Pl. MSJ Opp., ECF No. 2940 at 174. Plaintiffs' damage experts do not hinge their analysis on rejected corn in Cargill/ADM shipments either. Carter explains that negative price impact occurred in September 2013, attributable to Chinese buyers' anticipation, or fear, that MIR162 would be detected and U.S. corn rejected by Chinese authorities. *Id.* at 174-75

(citing SOAF ¶¶ 505-506; Pl. Ex. 291 (here, Pl. Ex. 65) Carter Rpt. ¶¶ 16, 89-93).[19] Syngenta's own expert McHughen (who does not take into account measures Syngenta might have taken to effect a limited, controlled launch) opines that exporters could not have done anything to prevent that detection. Def. Ex. 18, McHughen Rpt. at ¶¶ 28-29, ECF No. 2947 at 806-07. It was Syngenta's broad, unfettered commercialization, resulting in wide-spread dispersion of MIR162 throughout the U.S. supply that caused injury. As Carter also explains, had China begun its rejections earlier or if "U.S. exporters had stopped shipping U.S. corn to China earlier for fear of rejection," injury would only have started earlier and been greater. Pl. Ex. 65, Carter Rpt. at ¶ 38.

Moreover, Syngenta provides no evidence that Cargill and ADM were the only shippers to China, or the only shippers with corn rejected by Chinese authorities. It does not because it cannot. Other exporters were shipping corn to China *before* Syngenta commercialized Viptera and were doing so thereafter, including the period Syngenta contends Cargill and ADM sat out in 2011. *See* Pl. MSJ Opp., ECF No. 2940 at 175.[20] Corn shipped by other exporters also was rejected in 2013, in substantially higher combined metric tons than corn shipped by Cargill or ADM. *See id.* (citing SOAF ¶¶ 511-22: more than two thirds of the rejected amounts were exported by companies other than Cargill and ADM).

---

[19] Syngenta acknowledged that Carter finds price impact based on "the market anticipating" detection of MIR162, but superimposed its own characterization that this anticipation is keyed to "rejections of Cargill's shipment in November 2013." Def. MSJ, ECF No. 2861 at 96 n.49. While Carter cited the November 15 Cargill rejection (Pl. Ex. 65, Carter Rpt. at ¶ 18), he nowhere indicates that it was that rejection – or any rejection of corn shipped by Cargill or ADM – that triggered a de facto ban.

[20] *See, e.g.,* Pl. Ex. 65, Carter Rpt. at ¶ 10 (in the marketing year Sept. 2009-Aug. 2010, China imported over one million metric tons of U.S. corn); Pl. Ex. 26 (Dep. Ex. 1048) at SYNG_00597560 (paper by Bernens entitled "Technology Acceptance and Product Launch Stewardship" containing table listing China as 6th largest importer for U.S. corn with 1.157 metric tons for marketing year Oct. 1, 2009-Sept. 30, 2010); Def. Ex. 62, Thurman Rpt. at 28 Fig. 14 (table showing U.S. exports of corn and DDGS to China in Sept.-Aug. 2010-2011, Sept. 2011-Aug. 2012, and Sept. 2012-Aug. 2013).

The whole of Syngenta's argument is a creature of unsupported invention. Principally, Syngenta suggests that if Cargill and ADM had only sat out permanently and sold to other buyers, a "rearrangement of trade flows" – under Syngenta's theory, affected solely by these two shippers – "would not have involved any net drop in overall demand for U.S. corn." Opp., ECF No. 2947 at 120-22. That theory is preposterous, as Syngenta must surely know. No expert has analyzed supply and demand based on Cargill and ADM alone. Syngenta quotes from Thurman's report for a contention that "a decline in *U.S. exports* to China does not necessarily translate into an aggregate decline in demand for U.S. corn exports." *Id*. at 120 (quoting Def. Ex. 62, Thurman Rpt. ¶ 73) (emphasis added). On its face, that passage does nothing to isolate Cargill and ADM. Plainly, Thurman opines in respect to exports in the aggregate.[21] Syngenta also cites Daines' "Buyer A" and "Seller 1" analysis (Opp., ECF. No. 2947 at 120) but that too is in the aggregate. *See* Def. Ex. 63, Daines Rpt. at ¶ 23 ("such a rearrangement of trade flows would be feasible as long as the total corn imports by countries that would accept U.S. corn was greater than or equal

---

[21] *See also* Def. Ex. 62, Thurman Rpt. ¶ 59 ("any reduction in U.S. corn exports to China was more than offset by increases in corn exports to other destinations."); *id.* at ¶ 62 ("examination of aggregate annual U.S. corn export data shows no signs that overall demand for U.S. corn was affected by China's MIR162 import restriction.").

to the total amount of U.S. corn exports.").[22] Syngenta moreover has withdrawn Daines as an expert, ECF No. 2988, and none of Daines' opinion can even be considered.

Consistent with its overall proof failure, even if Syngenta could demonstrate the hypothetical possibility that Cargill or ADM *could* have sold elsewhere (Opp., ECF No. 2947 at 122), it makes no effort to demonstrate to whom such hypothetical sales would have been, how many metric tons such sales would have represented, or most pertinently, that such sales would have maintained the price of U.S. corn. Syngenta relies solely on (withdrawn) Daines and Thurman, neither of whom address Cargill or ADM specifically, or purport to isolate their particular impact on supply, demand, or impact on the price of U.S. corn. *See id.* (citing Def. Ex. 63, Daines Rpt. ¶ 23; Def. Ex. 62, Thurman Rpt. ¶ 59). In sum, Plaintiffs' injury was by trade disruption – caused by widespread presence of MIR162 in the U.S. supply – resulting in a lost *market*, not lost boatloads of two exporters. Syngenta artificially carves off Cargill and ADM as market-manipulating machines who did, or could, affect supply and demand for U.S. corn on their own. It has no evidence for that proposition because it does not exist.

Syngenta cannot demonstrate causation, which is Syngenta's burden to do before it can put either Cargill or ADM on a comparative fault line.[23] Syngenta ignores, but cannot dispute

---

[22] It should also be noted that Syngenta's "rearrangement of trade flows" theory is itself wholly unsupported and is directly at odds with fundamental economic principles. It ignores the reality that the U.S. had more than adequate capacity to supply China's corn import needs as well as those of other corn importing countries. A decline in Chinese demand for U.S. corn necessarily means that world demand for U.S. corn was lower than it otherwise would be. Thurman conceded in his deposition that world demand for U.S. corn is simply the sum of the demand of each corn importing country. Thurman also conceded that Chinese demand for U.S. corn was reduced due to MIR162. None of Syngenta's experts could point to a single country whose demand for U.S. corn (as contrasted with quantity demanded due to a lower price) *increased* as a result of MIR162. Thus, there can be no reasonable question that world demand for U.S. corn decreased due to MIR162 regardless of any supposed "rearrangement of trade flows." *See* Pls.' Opp. to Syngenta's Mot. to Exclude Bruce Babcock, ECF No. 2958 at 6-10; Pls.' Mem. Supp. Mot. to Exclude Walter Thurman, ECF No. 2885 at 7-15.

that Chinese demand for U.S. corn was unserved during 2011 when it says Cargill and ADM sat out. It was. *See* Def. Ex. 62, Thurman Rpt. at 28 Fig. 14. Syngenta makes no effort to demonstrate that if these two exporters had permanently sat out as Syngenta suggests they should have done (Opp., ECF No. 2947 at 121), the risk of MIR162 detection/rejection would have gone away (which it did not), or that MIR162 detections/rejections would not have occurred (which they did). And if exporters had forsworn China due to fear of rejections, the market still would have been lost and the injury would be the same or greater. While dismissing this as "*ipse dixit*" (*id*. at 118), Syngenta does not and cannot deny what in truth is inescapable logic. A market consists of demand from buyers and supply from sellers. In this case, the fly in the ointment was Viptera. Whether Chinese buyers stop buying, or U.S. sellers stop selling, for fear that corn contaminated with unapproved MIR162 would be rejected, the market has dried up either way. Syngenta's effort to create a genuine issue is based entirely on its mischaracterization of Plaintiffs' complaint and unsupported presentation of Cargill and ADM as sole operators within the China market. Other than ignoring all activity of all persons (other than Plaintiffs, who neither grew Viptera nor delivered it into the commodity stream, and Cargill/ADM, who were two exporters among many), Syngenta makes no effort whatsoever to demonstrate that but for Cargill and ADM, the injury would not have occurred. *Drouhard-Nordhus v. Rosenquist,* 345 P.3d 281, 286 (Kan. 2015). Pretense does not create a genuine issue.

---

[23] *See, e.g.*, *Cuiksa v. Hallmark Hall of Fame Prods., Inc*., No. 00-1389-JAR, 2004 WL 303553, at *3 (D. Kan. Jan. 26, 2004) ("The comparative fault of another party is an affirmative defense for which defendants bear the burden of proof."); *Gust v. Jones*, 162 F.3d 587, 593 (10th Cir. 1998) ("allegations that a nonparty's negligence caused a plaintiff's harm must be supported by adequate evidence before the negligence of that person may be argued to the jury or before the judge may instruct the jury to compare the nonparty's fault."); *McGraw v. Sanders Co. Plumbing & Heating, Inc.*, 667 P.2d 289, 295 (Kan. 1983) (defendant has the burden to plead and prove comparative negligence).

## VI.   CHINA, CARGILL, AND ADM ARE NOT INTERVENING SUPERSEDING CAUSES OF PLAINTIFFS' INJURY.

Kansas recognizes intervening, superseding causes, "which cut off liability for earlier negligence," only in "extraordinary cases." *Reynolds v. Kan. Dep't of Transp.*, 43 P.3d 799, 805 (Kan. 2002). "An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence," *i.e.*, "breaks the connection between the initial negligent act and the harm caused." *Puckett v. Mt. Carmel Reg'l Med. Ctr.,* 228 P.3d 1048, 1060-61 (Kan. 2010) (quoting *Hale v. Brown*, 197 P.3d 438, 441 (Kan. 2008)). Even then, "one more factor – foreseeability – must be considered." *Id.; see also State Farm Fire & Cas. Co. v. Bell,* 30 F. Supp. 3d 1085, 1124 (D. Kan. 2014) ("Whether the negligent conduct of the original wrongdoer is to be insulated . . . by the intervening negligent act of another is determined by the test of foreseeability") (quoting *George v. Breising*, 477 P.2d 983, 988 (1970)).

Syngenta continues to insist that it is Plaintiffs' burden to show foreseeability in order to demonstrate proximate cause, rather than Syngenta's burden to show lack of foreseeability in order to show superseding cause by which it can escape liability. Opp., ECF No. 2947 at 133-34. In *Puckett,* the Kansas Supreme Court expressly explained that "even if we were to accept that the evidence was sufficient to create a jury question on whether there was a superseding, intervening cause, there must also be evidence that such cause was *not foreseeable*." 228 P.3d at 1068 (emphasis added); *see also id.* at 1069 (upholding intermediate court as "correctly conclud[ing] this case is not one of extraordinary circumstances where an intervening cause instruction should have been given" as it found "no evidence supporting a conclusion that the aspiration event *was not foreseeable.*") (emphasis added); *see also, e.g.*, *Roberts v. Printup*, 595 F.3d 1181, 1189-90 (10th Cir. 2010) ("Whether a third party's intervening cause produced the

91

injury in question is a defense for which the defendant bears the burden of proof.") (citing *Worden v. Union Gas System, Inc.,* 324 P.2d 513, 514 (Kan. 1958)). Syngenta does not and cannot meet that burden. Even if viewed from the other direction, however, the record unequivocally demonstrates that Syngenta knew the risks of trade disruption, it was foreseeable that grain trade participants, including exporters, would continue operating in normal course of a commodity corn system, and China might detect MIR162 in U.S. corn imports and reject them. Inescapably, Syngenta cannot set up China, Cargill, or ADM as superseding its own negligence.

### A.    China Is Not a Superseding Cause of Plaintiffs' Injury.

Syngenta argues loud and long that China improperly delayed its application for political reasons and rejected U.S. corn contrary to international trade obligations. *See, e.g.,* Opp., ECF No. 2947 at 89-105, 137-38. All of this illustrates why a fault comparison cannot be had under the act-of-state doctrine and Kansas law. It also illustrates the risk that *Syngenta* created when it broadly commercialized Viptera, without restraint and without China's import approval.

All of Syngenta's accusations about China's supposed "unjustifiabl[e] fail[ure]" to give approval due to "non-science" reasons, China's supposed "violation of international law," and China's "inconsisten[t]" enforcement of its zero-tolerance policy "in the years leading up to the rejections" (*id.* at 137-40) do not insulate it from liability. As an initial matter, China would have ***no reason*** to reject U.S. corn had Viptera not been released (in broad, unrestrained fashion) into the U.S. corn supply and in that respect, cannot be considered an intervening, superseding cause at all. Such a cause is one that "so entirely supersede[s] the operation of the defendants negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury . . . [and] [c]onversely, . . . does not operate to exempt a defendant from

liability if that cause is put into operation by the defendant's wrongful act or omission." *Puckett*, 228 P.3d at 1063-64 (quoting *Williams v. Le*, 662 S.E.2d 73, 77 (Va. 2008) (internal citations and quotation marks omitted).[24]

An intervening act also is not a superseding cause if within the risk defendant itself negligently created. The question is not whether Syngenta foresaw the particular acts it recounts, but whether it was foreseeable that broad, unrestrained commercialization of a new GM trait unapproved for import to China presented risk of trade disruption. Syngenta admits that as of 2010, it was a member of BIO, which it also admits recognizes the risk of (and had at least one purpose to minimize) trade disruption. *See* RSOF ¶¶ 9-10. The BIO policy in fact specifically recognizes that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for [GM] products not yet authorized results in the potential for major trade disruptions." Pl. Ex. 17 at SYNG_00367784. That China could reject U.S. corn containing unapproved traits such as MIR162, and the possibility that MIR162 would not be approved before detection, were most certainly risks "reasonably to be perceived" by Syngenta, making it "immaterial" whether China's conduct "was innocent, negligent, intentionally tortious or

---

[24] *See also* Pattern Instr. for Kansas Civ. 4th at § 104.03 ("When an injury is caused by *unrelated* acts occurring at different times, you must consider whether the last act *alone* would have caused the injury. If so, the person committing the first act is not at fault, unless the last act could have reasonably been foreseen by the person responsible for the first act.") (emphasis added); *Sims v. Williamsburg Twp.,* 141 P. 581, 582-83 (Kan. 1914) ("principle that if two distinct causes are successive and unrelated in their operation, one of them must be the proximate and the other the remote cause . . . has no application . . . [where] two causes were related in their operation") (internal quotations and citations omitted).

criminal." *Cooper v. Eberly,* 508 P.2d 943, 950 (Kan. 1973);[25] *see also Puckett*, 228 P.3d at 1067 ("intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.") (quoting 57A Am.Jur.2d, Negligence § 599, quoting RESTATEMENT (SECOND) OF TORTS § 443 (1965).[26] Syngenta proposes that China had no "right" to reject U.S. corn due to "international legal obligations" (Opp., ECF No. 2947 at 137-38), but does not and *cannot* argue with the basic fact that China *could* reject U.S. corn based on the presence of MIR162, which it did. *See* Mem., ECF No. 2859 at 65.

The other problem for Syngenta, as discussed, is Syngenta's own position that at the time it commercialized Viptera, China's regulatory system was not "functional" but politicized and non-science-based, which Syngenta contends gave it license to fail pre-commercialization approval. *See* Opp, ECF No. 2947 at 94. Far from claiming that China's "dysfunction" was unforeseeable, Syngenta claims it was known. Its about-face on intervening cause cannot stand.

---

[25] Foreseeability, for purposes of negligence, is "a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account." *Nkemakolam v. St. John's Military Sch.,* 994 F. Supp. 2d 1193, 1203 (D. Kan. 2014) (Lungstrum, J.) (quoting *Cupples v. State*, 861 P.2d 1360, 1372 (Kan. Ct. App. 1993)). "For one to be negligent it is not necessary that he foresee injury in the precise form in which it in fact occurs" and it is no defense that "the injury sustained is greater than he anticipates." *Frazier v. Cities Serv. Oil Co.,* 157 P.2d 822, 826 (Kan. 1945); *see also State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1114-15, 1122 (D. Kan. 2014) (assessment of duty does not ask whether defendant could foresee particular acts of a third party it claims were unlawful, but whether defendant could foresee that injury might occur; question was not whether "defendant could have foreseen that the criminal actions of [underage driver]" but whether "defendant could have anticipated the general conduct at issue," i.e., driving over curb and onto sidewalk).

[26] The Restatement describes "normal" not in the sense of what is usual or customary, but rather "the antithesis of abnormal, of extraordinary." RESTATEMENT (SECOND) OF TORTS § 443 cmt. b. "It means that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside of the class of normal events." *Id.*

For all Syngenta's bluster and spin, the possibility that its application would not be approved before MIR162 was detected by Chinese officials was within the risk Syngenta created by its own negligence. Syngenta's negligence is not even here at issue, but only whether China can be considered to have "entirely supersede[d] the operation of [that] negligence." *Puckett*, 228 P.3d at 1063-64 (quoting *Williams*, 622 S.E.2d at 77); *see also id.* at 1061 ("Superseding cause operates to cut off the liability of an admittedly negligent defendant") (quoting *Godbee v. Dimick,* 213 S.W.3d 865, 884 (Tenn. App. 2006)). Plainly it cannot.

Syngenta takes umbrage at the idea that it could not accurately predict when approval would occur, but admits that it could not possibly have expected approval until, at the earliest, March, 2012. Opp., ECF No. 2947 at 140.[27] It should be recalled at this juncture that Syngenta affirmatively contends that that the more than 1.2 million Viptera acres in the spring of 2011 was "more than enough . . . to ensure that MIR162 would be present throughout the corn supply at levels sufficient to be rejected under China's zero-tolerance standard." Def. MSJ, ECF No. 2861

---

[27] Syngenta does not claim unforeseeability of China's practice to not allow import applications until the new trait has secured cultivation approval elsewhere. *See* Def. SOAF ¶ 136. Syngenta says this was "not standard international practice," not that it was unexpected. China's requirement that the trait be "approved in the country of development before the authorization process in China can begin" has been, according to Syngenta's fact statement, in place since at least 2007. *Id.* at ¶ 140. Syngenta claims no surprise at other pre-application requirements either. *See*, *e.g., id.* at ¶¶ 146-47. Syngenta quibbles with Plaintiffs' characterization of a "complete application" but does not deny that "completed field-studies" (which it says is the "second" step) were not submitted until November 2011. RSOF ¶ 78. Syngenta concedes that the MOA then had up to 270 days to respond to that application. *Id.* ¶ 79; *see also* Def. SOAF ¶ 134. Syngenta admits that each time an approval application is submitted or re-submitted, the 270-day clock for responding to a submission resets. *Id.* at ¶ 82. Syngenta admits that questions from the MOA were "a very common, very normal thing" and could "delay the approval process[] because Syngenta may have to do additional studies or take additional steps to answer those questions" (but only expands that admission by saying that "companies could get questions at any stage of the process of import approval in China."). RSOF ¶ 80. The "surprise" Syngenta claims is *not* that the MOA would ask questions, that such questions might well entail further steps or studies, or that delays might thereby ensue but only that China's questions would be "non-science-based," Opp., ECF No. 2947 at 140, a possibility Syngenta embraces by its position that China's system was just that.

at 20-21. At the time it sold that seed and those acres were planted, Syngenta had no assurance whatsoever that China would forgo enforcement of its zero-tolerance policy, which could happen at any time. While contending that the acreage figures Plaintiffs set out do not account for returns, Syngenta does not deny that it sold substantially *more* seed, and substantially *more* Viptera was grown in 2012 and 2013. RSOF ¶¶ 16-22. Out of Syngenta's own mouth, it was not a matter of if, but when, China would detect MIR162 and reject U.S. corn. If China had done so earlier, the injury would only have been greater. Pl. Ex. 65, Carter Rpt. ¶ 38.

Syngenta's argument that "China enforced its zero-tolerance policy inconsistently as a matter of China's whim" (Opp., ECF No. 2947 at 138) is not only factually inconsequential but is self-defeating. *First*, any "understanding in the industry" as to why China was accepting shipments of U.S. corn *after* commercialization (*id*. at 139) says nothing about risks *at the time of* commercialization. It is undisputed that China had a zero-tolerance policy, meaning that "no trace levels of a particular trait should be detectable within an importing country." RSOF ¶¶ 85-86. Syngenta knew of that policy. Syngenta suggests "dispute" only in respect to whether China "adhered" to its policy given its acceptance of U.S. corn in 2011 and 2012. RSOF ¶ 87. Syngenta, however, makes no suggestion that before commercialization, China somehow gave it to understand that it would stave off enforcement until approval was granted. *Second*, whatever "whim" existed with respect to enforcement only proves the point that Syngenta was playing a beat-the-clock game. That China did not, for whatever reason, enforce its zero-tolerance policy in 2011-2012 illustrates no more than the ticking time bomb Syngenta itself acknowledges.

Syngenta also attempts to create a fact issue over its own purported conclusions, or the beliefs or debates of others, about whether China would become a more significant importer than

it had been in the past. Opp., ECF No. 2947 at 136-37. The purported conclusion of Syngenta's CEO (*id.* at 136) does not change the fact that Syngenta's own documents report that very possibility, of which Syngenta was warned numerous times by its own Jack Bernens. *See* SOF ¶ 13. Whether Syngenta heeded that risk does not change the fact that it was aware of it.

Having failed to raise any genuine issue of fact material to its defense, Syngenta may not submit intervening, superseding cause as to China.

**B.      Cargill and ADM Are Not A Superseding Cause of Plaintiffs' Injury.**

Syngenta faults Plaintiffs for not addressing in their motion the arguments Syngenta raised in *its* motion about Cargill and ADM. Opp., ECF No. 2947 at 131-33, 143-44. Syngenta is flat wrong. *First*, as addressed, Syngenta's Fault Disclosure did not address shipping. *Second*, Syngenta not only just made clear that indeed it intends to blame only Cargill and ADM, but as Plaintiffs detailed in their opposition, the singular focus Syngenta lays upon the two exporters who sued it is an immaterial side-show. Pl. MSJ Opp., ECF No. 2940 at 175–76, 181-86, 189-90. Plaintiffs could hardly predict that Syngenta would mount a theory that, even *if* focused on Cargill and ADM, would misconstrue the allegations of Plaintiffs' complaint, misrepresent the opinion of Plaintiffs' experts, and disregard *entirely* what is historical fact: that export activity to China was occurring both before and after Syngenta's commercialization by exporters *other* than Cargill and ADM. Plaintiffs could not predict that Syngenta would contend that commercialization of Viptera was a mere "condition" upon which exportation intruded, rather than the reverse. *Id.* at 180-81. Plaintiffs could not predict that Syngenta's case for superseding cause would not only do all that, but disregard Kansas law that where third-party acts – here, commingled exportation ***by anyone*** – was part of the risk, such acts do not cut off liability

whether "innocent, negligent, intentionally tortious, or criminal." *Id*. at 189.[28] In neither its own motion, nor here, does Syngenta even attempt to demonstrate unforeseeability that grain trade participants, including exporters, would continue normal-course operation (in accord with federal law), that exporters would continue exporting to China, or that, given its broad unrestrained release, MIR162 would be aboard those shipments and ultimately detected by Chinese authorities.

It is Syngenta who has dropped the ball by mischaracterizing Plaintiffs' complaint as alleging injury "based entirely on the alleged market response to the specific rejection by China of U.S. corn shipments that *Cargill and ADM* sent to China in November, 2013" (Opp., ECF No. 2947 at 143-44) and then disdaining to provide any evidence or argument beyond that incorrect premise. The complaint *nowhere* alleges that rejection of corn in shipments by Cargill or ADM in particular caused the trade disruption. Syngenta offers no evidence, because it is entirely false, that Cargill and ADM were the only exporters to China. As held in one of the very cases Syngenta cites, while the summary judgment standard requires review in the light most favorable to the non-movant, "it does not require [the Court] to make unreasonable inferences in favor of the [non-movant]." *Carney v. City & County of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs,* 117 F. Appx. 64, 69 (10th Cir. 2004)). Syngenta does not dispute, and offers no evidence on which to create a genuine issue on the fact that it could foresee that other exporters would ship commodity, commingled corn to China or that MIR162 would be detected in corn aboard those vessels. Syngenta offers no evidence to demonstrate that it was the

---

[28] Syngenta also suggests that Plaintiffs were somehow amiss in not addressing its "net decrease" contentions (Opp., ECF No. 2947 at 142) articulated for the first time in its opposition. *See id*.

particular involvement of Cargill and ADM that caused Plaintiff's injury at all, and cannot even get to a superseding cause analysis before it does. *See State Farm,* 30 F. Supp. 3d at 1123 ("Whether the actions of a third person were an 'intervening cause' . . . do not 'come into play until after causation in fact has been established.'") (quoting *Puckett* 228 P.3d at 1060).

Syngenta's retort to Plaintiffs' point about the BIO policy is confounding. Expressly recognizing risk of trade disruption from asynchronous authorizations (and particularly in respect to countries with zero tolerance policy), BIO directs technology developers to determine whether the new product is for commodity or special use, to conduct a trade assessment "that anticipate[s] and consider[s] the potential impacts within the value chain," and to engage stakeholders on matters including "conditions related to handling, distribution, processing and testing." Pl. Ex. 17 at SYNG_00367782-83. It also states that technology providers should meet approval requirements in key countries with functioning regulatory systems. *Id.* at SYNG_00367785. As Plaintiffs observed, none of this would be necessary if these stakeholders were actually expected to adapt to introduction of a new GM trait and channel it away from unapproved markets. This is not an "impermissible inference" contrary to a review of evidence in a light most favorable to the non-movant. Opp., ECF No. 2947 at 144. Even Syngenta did not subscribe to such a view, as illustrated by the fact that it did secure approvals from multiple other countries. Pretrial Order, ECF No. 2848 at 17; *see also* Def. SOAF ¶¶ 128-29. Syngenta's citation to Carrato's report (Opp., ECF No. 2947 at 145) only further illustrates that Syngenta cannot disclaim foreseeability that exporters would not change normal behavior to accommodate Syngenta. Syngenta cites paragraph 43 of that report but neglects the preceding paragraph.

99

Carrato *first* proclaims that "[t]he exporter element of the grain trade always took and stated the position that *any* country that they exported to (or could export to at some point in the future) was a 'major' export market" for which approval should be secured, a position he says technology providers did not accept. Def. Ex. 9, Carrato Rpt. ¶ 42 (emphasis original). He then opines on what "technology providers agreed to follow," described as a position that once the technology provider obtains approval in countries with functioning regulatory systems, responsibility shifts to growers "and the rest of the grain channels" to meet their obligations with regard to exports." *Id.* at ¶ 43. Assuming but not conceding that this opinion conforms to the actual BIO policy, Carrato is speaking of a position held by technology providers only, and was *contrary* to a known, stated position of exporters. Carrato also states that the grain trade "***does not*** isolate or segregate corn grain based on the source or type," and (quite legitimately) ***does not want*** to convert from commodity to specialty practices "due to the added expense and lack of existing infrastructure." *Id*. at ¶ 31. Syngenta gives no basis whatsoever for any contention, which it actually does not advance, that it was unforeseeable that the grain trade, including exporters, would not take on such expense or create an infrastructure to accommodate Syngenta. To the contrary, its own expert says that exporters voiced their opposition to such an imposition.

Syngenta also points to BIO's directive that technology developers make a test method available. Opp., ECF No. 2947 at 145. This constitutes no evidence of expectation that grain trade members *would* test, or suggest unforeseeability that they would not. Syngenta's own Jack Bernens stated in July, 2011 that: "In my opinion, nobody will test. Issue is even if you Ship test negative at origin, it can test positive at Destination!" RSOF ¶ 76. And according to McHughen, it would not have made a difference even if they had. *See* Pl. Ex. 9, McHughen Rpt. ¶ 28.

Plaintiffs' point about the *Bunge* lawsuit is part of the larger point that Syngenta was assuring everyone in the grain trade that Vipera would be approved in the spring of 2012, encouraging the message that the commodity pipeline should proceed per normal, and indeed attempted to stop one such member (Bunge) from refusing Viptera because China had not yet approved it. Mem., ECF No. 2859 at 70. Syngenta raises a (misplaced) First Amendment argument (Opp., ECF No. 2947 at 146) (*see* Pl. MSJ Opp., ECF No. 2940, at 204-06) but does not dispute foreseeability that grain trade members would not channel or exporters would not continue to ship to China.

Plaintiffs' point that "no single member of the grain trade could have prevented Viptera from reaching export markets" (Opp., ECF No. 2947 at 146) remains relevant, particularly in view of Syngenta's wholesale disregard for anyone other than Cargill and ADM. Syngenta points the finger at those two exporters while presenting no evidence that they were the *only* exporters, had anything to do with the decisions and activity of other exporters, or could have prevented Viptera from reaching China in shipments by means of other exporters. Syngenta's come-back that it could not attempt to coordinate any efforts of grain trade members because of antitrust concerns (*id.*) is only an attempt at excuse, which not only is wrong, but concedes that all grain trade participants were left to their own devices. Again, this only frames the dearth of evidence from Syngenta that Cargill and ADM were the cause of injury at all, much less a superseding cause.

Finally, like all its arguments, Syngenta's contention that it "would have reasonably expected that any disruption of exports to China would not have affected U.S. corn prices" depends on the continued, but unsupported, idea that because Cargill and ADM "had previously

101

refrained from shipping to China and successfully arranged contracts to ship U.S. corn to countries where MIR162 had been approved, the need to do so again after the rejections would not have caused any *net decrease* in demand for exports at all." Opp., ECF No. 2947 at 141-42. All this relies on the unspoken and unsupported assumption that Cargill and ADM were the only exporters and further, that they alone did or could account for increase or decrease on demand.

Syngenta merely refers by reference to the argument it outlines its own motion. *Id.* at 141. Plaintiffs similarly refer to their opposition, ECF No. 2940, at 39, but make these points in conclusion: (1) Syngenta concedes that commodity corn is "commingled at every stage from farmer through grain trade participants," (RSOF ¶ 70), which includes all exporters, not just Cargill and ADM; (2) Syngenta does not contend, and provides no evidence on which to raise a genuine issue, that at the time it commercialized Viptera, it had any expectation that exporters generally would stop exporting; (3) whatever Cargill and ADM did or did not do, there could be no injury had Viptera not been widely present in the U.S. corn supply, meaning that neither they nor any other shipper, as a matter of law, can be superseding causes independent of Syngenta's negligence; (4) it is immaterial whether China could or would reject U.S. corn containing MIR162 in shipments by Cargill, ADM, or some other exporter; (5) Syngenta does nothing to demonstrate that Cargill or ADM were the only exporters; (6) Syngenta does not dispute foreseeability that unrestrained dispersion of MIR162 in an undisputedly commingled supply chain would lead to detection of MIR162 and rejection of corn shipped by somebody; and (7) Syngenta does not dispute that it could, or did, foresee that very risk. Syngenta has "failed to carry its burden to show the possible existence of an intervening and superseding cause" and

102

summary judgment is warranted. *Spirit Aerosystems, Inc. v. SPS Techs., LLC*, No. 09-CV-1144-EFM-KGG, 2013 WL 6196314, at *14 (D. Kan. Nov. 27, 2013).

## VII. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON SYNGENTA'S MITIGATION DEFENSE.

Syngenta does not dispute that it has the burden of proving a failure to exercise reasonable diligence to support its mitigation defense. Its arguments only highlight the failings of that defense. This matter is properly disposed of on summary judgment. *See Swift-Eckrich, Inc. v. Advantage Sys., Inc.*, 55 F. Supp. 2d 1280, 1289-90 (D. Kan. 1999).

The evidence shows (and Syngenta does not dispute) that crop selection is a multi-factor decision process of which price is but one component. Mem., ECF No. 2859 at 61 (citing SOF ¶¶ 99-104); *see* RSOF ¶ 99. Syngenta offers no actual evidence of unreasonable crop selection. It merely notes that some farmers changed their crop mix while others did not. Opp., ECF No. 2947 at 137. This presumes that price is the sole relevant factor and failure to switch crops is de facto unreasonable. Such a presumption is not only unsupported, but contrary to the evidence. The mere fact that some farmers changed crops, while others did not, does not suggest that *either* acted unreasonably. In fact, Syngenta's own expert, although not designated for trial, was unable to identify any farmer who did not use his best judgment in crop decisions. RSOF ¶ 110.

The law also is clear that an obligation to mitigate arises only once harm is known or at least foreseen. Mem., ECF No. 2859 at 60. Syngenta's claim that "every grower knew of China's rejection" in time to alter planting after 2013 (ECF No. 2947 at 148) is unsupported and wrong. Plaintiffs did not know what the price impact was, and could not have predicted the timing of Viptera approval or impact of another unapproved trait. Mem., ECF No. 2859 at 61 (citing SOF ¶¶ 107, 109); RSOF ¶¶ 107, 109. Syngenta's bald statement that reducing corn acres was "the

most rudimentary step to avoid losses" and a "natural" way to "avoid depressed corn prices" is simply unsupported. ECF No. 2947 at 148-49. It has no evidence to contest that planting corn (even at artificially depressed prices)[29] was reasonable or that other considerations (like rotation) did not warrant continued corn planting. *See* RSOF ¶ 104.

Syngenta's superficial storage analysis also underscores the insufficiency of its arguments. Syngenta asserts that a decaying market impact means that simply storing corn[30] would have "ensured" Plaintiffs had "reduced losses." Opp., ECF No. 2947 at 149. This *post hoc* judgment presumes (incorrectly) that farmers knew the quantum and duration of the market impact and had the capacity to store crop indefinitely without risk (i.e. from further unrelated market reductions or deteriorating quality that could impact marketability). Further, Syngenta makes no effort to account for (or even consider) any additional storage costs. It has no evidence that selling rather than storing was unreasonable and, absent such evidence, whether "reduced losses" would be "ensured" is pure speculation.

Syngenta also does not contest its burden to prove the amount of any mitigation offset. Instead, it makes the incredible argument that it does not need an expert because the jury can just use "simple multiplication." Opp., ECF No. 2947 at 150. It alleges that Plaintiffs' damages can be boiled down to a simple multiplication of damages per bushel times bushels sold (*id*.), but evidence, including extensive expert analysis and production/sales records, provide the relevant

---

[29] Syngenta's suggestion that other crops would be more profitable because corn suffered from "an additional" price decline presumes that all crop prices would have moved in tandem absent the loss of the Chinese corn market, and is completely unsupported. *Id*. at 148.

[30] Syngenta's parenthetical assertion regarding selling under a futures contract with a later delivery date, Opp., ECF No. 2947 at 149, is not supported by Carter's findings. Damages are based on the time of sale, not delivery. *See* Pl. Ex. 65 Carter Rpt. at ¶ 131. No damages would have been avoided by a later delivery date.

factors for Plaintiffs' calculation. Syngenta, on the other hand, fails to even describe what numbers the jury would multiply or what evidence (expert or otherwise) would quantify each factor in its "simple multiplication" equation. It provides no methodology (let alone evidence) for determining whether and to what extent crop changes would have benefitted farmers, or the effect a large scale change would have had on crop prices. It provides no evidence of how long corn could be stored, the expense of storage, the impact of alleged alternative contracting options or the ability or economic consequences of using corn for livestock. Nor is any of this information available to the jury "through experience or common sense." *Jackson v. City of Kan. City*, 947 P.2d 31, 36 (Kan. 1997). Absent evidence supporting a mitigation calculation, and absent an expert (which Syngenta did not designate for trial), the jury will be left to "mere speculation." *Id.* Syngenta cannot invite guesswork. Plaintiffs' motion should be granted.

## VIII.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON SYNGENTA'S NEW ANTITRUST DEFENSE.

Syngenta belatedly attempts to shoehorn its antitrust theory into its opposition to Plaintiffs' motion seeking judgment on Syngenta's defense that "Plaintiffs' claims are barred because Syngenta's conduct was reasonable and based on independent, legitimate business and economic justifications." Syngenta's effort to do so fails. Moreover, Syngenta errs in its argument that Plaintiffs have waived the right to seek summary judgment on Syngenta's new theory. *See* Opp., ECF No. 2947 at 150-51. Plaintiffs generally moved against Syngenta's business justification defense, pointing out that there is no statutory or decisional authority supporting it. Although Plaintiffs then argued that the defense failed to the extent Syngenta meant to raise it as a business judgment rule defense, that *specific* argument in no way limited the broader application of Plaintiffs' motion that no authority supports the defense. Plaintiffs

may not have had the prescience to anticipate Syngenta's coded meaning but that does not immunize Syngenta from challenge. In any event, the defense, as urged by Syngenta, raises no more than strawman arguments and Syngenta fails to establish a plausible theory.

## A. Syngenta's New Defense Is Insufficiently Plead and Unpreserved in the Pretrial Order.

By claiming that its business and economic justification defense embraces the antitrust theory it now argues, Syngenta demonstrates that it did not satisfy the "fair notice" pleading standard traditionally applied to affirmative defenses. *Wyshak v. City Nat'l Bank*, 607 F. 2d 824, 827 (9th Cir.1979) (*per curiam*); *Unicredit Bank AG v. Bucheli*. No. 10-2436-JWL, 2011 WL 4036466, at *6 (D. Kan. Sept., 12, 2011). Under the "fair notice" standard, "Rule 8 is intended to give the opposing party fair notice of the claim and the grounds upon which it rests." *Wilhelm v. TLC Lawn Care, Inc.*, No. CIV.A. 07-2465-KHV, 2008 WL 474265, at *2 (D. Kan. Feb. 19, 2008); *see also Kohler v. Staples the Office Superstore, LLC*, 291 F.R.D. 464, 468 (S.D. Cal 2013) ("Fair notice generally requires that the defendant state the nature and grounds for the affirmative defense."). Here, Syngenta's defense of alleged "independent, legitimate business and economic justification" does not give "fair notice" of the new antitrust theory now advanced. Not only is the term "preemption" not mentioned, but the defense, as stated, does not refer to any antitrust statutes or even suggest concepts of competition or restraint of trade. An unpled or inadequately plead affirmative defense may not be raised for the first time in summary judgment proceedings "without meeting Rule 16(b) and Rule 15(a)'s requirements." *Hernandez v. Creative Concepts, Inc.*, 295 F.R.D. 500, 505 (D. Nev. 2013). Syngenta has not attempted to meet those requirements, nor can it do so. The Court should reject Syngenta's attempt to now raise its

antitrust argument as support for its business and economic justification defense because, as plead by Syngenta, it did not provide fair notice to Plaintiffs.

Syngenta not only failed to adequately plead, but has waived any argument, that federal antitrust laws preempt Plaintiffs' claims based on Syngenta's purported concern that the duty recognized by this Court places it "between the proverbial rock and a hard place" and requires Syngenta "to risk violating federal or state antitrust laws." Opp., ECF No. 2947 at 151-52 & n.49. In the Pretrial Order, Syngenta asserted that "Plaintiffs' claims are preempted in whole or in part by federal or state law*" designating by asterisk a defense this Court "already addressed" and listed merely to preserve appellate rights. Pretrial Order, ECF No. 2848 at ¶ 11; *see also id.* at 22 n.6 ("Defenses marked with an asterisk (*) are listed here solely in order to ensure that they are preserved for appeal."). This Court's August 17, 2016 Order (ECF No. 2426) is the only order addressing a preemption defense raised by Syngenta, and that concerned the GSA. ECF No. 1927; ECF No. 2426. Neither Syngenta's motion nor the Order addressed any claim that antitrust laws preempt Plaintiffs' claims.[31] Therefore, antitrust preemption is not within the scope of preemption defenses raised in Syngenta's ¶ 11 in the Pretrial Order, has been waived rather than preserved for appeal, and should not be considered as a ground supporting its defense.[32]

---

[31] Even when asked to identify the "principal and material facts" on which it relies in asserting that "Plaintiffs' Claims are preempted in whole or in part by federal or state law," including which state or federal laws preempt these claims," Syngenta identified only the GSA. *See* Pl. Ex. 90, Resp. (30)(b)(6) Interreges. at 29-30.

[32] Nor does the Twenty-Seventh affirmative defense asserted by Syngenta in the Pretrial Order change this result. In that defense – "Plaintiffs' claims are barred because plaintiffs' acts and omissions, including this lawsuit, seek to unlawfully restrain trade in violation of the law and public policy" – the focus is on Plaintiffs' acts and omissions and it too lacks fair notice of the theory now advanced. If Syngenta intended to include the defense as now argued within the Twenty-Seventh defense, it would not have needed to raise these arguments under the defense now being challenged.

### B.     Syngenta's Antitrust Defense is Substantively Meritless.

Even if considered, Syngenta's theory fails on the merits. Syngenta states that its defense based on "independent, legitimate business and economic justification . . . consists of a valid defense based on antitrust law, depending on the theory of liability and standard of care that Plaintiffs intend to argue at trial." Opp., ECF No. 2947 at 150. Yet, Plaintiffs' theories of liability and standards of care are known, have been disclosed, and do not involve violations of the Sherman Act or analogous state law. Neither the duty to exercise reasonable care in timing, scope and manner of commercialization nor Plaintiffs arguments for its existence suggest that to satisfy the duty, Syngenta would need to enter into agreements. Of course, an agreement is the *sine qua non* of an antitrust claim under §1 of the Sherman Act. *See* 15 U.S.C. § 1 (declaring "illegal" "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations").[33] And even where there is an agreement, only those that are anti-competitive are prohibited. *National Soc. Of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 694-95 (1978). Horizontal agreements among competitors to fix prices or divide markets are *per se* illegal. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). But all other restraints must be evaluated under a rule of reason where the "factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* at 885.

---

[33] Syngenta does make passing reference to § 2 of the Sherman Act. *See* Opp., ECF No. 2947 at 152. However, Syngenta presents no plausible allegation, nor any evidence, of its market share or power to justify consideration of such claims. Moreover, the references to the alleged market power of the grain trading companies regarding the export market, *id.*, at 154, misses the mark in considering whether Syngenta would be faced with antitrust concerns by complying with the duty found to exist in this case.

Syngenta's "defense" fails on every front. First it has produced no evidence, including absolutely no expert testimony, that complying with the standard of care is either *per se* unlawful or unlawful under a rule of reason. Plaintiffs nowhere suggested biotech companies – the only "horizontal" competitors to Syngenta – engage in price fixing or market division such that compliance would be *per se* unlawful.[34] The rest of the industry, like the grain trade or the growers, are not horizontal competitors and Syngenta failed to develop any record that coordinating their launch with them to avoid a market disruption is unlawful under the rule of reason. *Leegin*, 551 U.S. at 888. The argument by Syngenta that using the grain trade as a "conduit through which [biotech companies] agreed to restrict each other's products," Opp., ECF No. 2947 at 153, is beside the point. Commercializing reasonably does not require coordination with other biotech companies, so the suggestion that coordinating with the grain trade would be a pretext for a horizontal restraint of trade is a fiction.

Second, the standard of care articulated by Mr. Giroux does not require that Syngenta enter into agreements with biotech industries, but to assess risk, manage risk and accept responsibility. *See* Pl. Ex. 89, Giroux Discl., Sect. C at 3-5. Nothing requires an agreement, combination, or conspiracy implicating antitrust concerns. Giroux indeed recognizes that "the decision to commercialize is within the complete control of the biotechnology company," *id.* Sect. B at 2, and that it is "reasonable for biotechnology companies to own the risks and costs of

---

[34] Plaintiffs have not argued that biotech companies should agree on which countries are "key" markets, as Syngenta suggests. Rather, they criticize Carrato's articulation that each company was free to identify key markets themselves without any objective standard or measurement. *See* ECF No. 2874 (Mem. Supp. Mot. Strike J. Thomas Carrato) at 21 ("The notion that each company can interpret its own standard of care is inconsistent with an objective standard, showing why the BIO Policy *cannot* be that standard.").

commercializing new biotech traits because they own the reward of commercialization and have *complete control over the decision to commercialize.*" *Id.*, Sect. C at 5 (emphasis added). Giroux opines that Syngenta should have *consulted* with "other members of the supply chain" and "*communicate transparently* with relevant stakeholders regarding the scale and scope of the commercialization and the status of approvals in key markets around the world." *Id.* at 4 (emphasis added). He does not suggest agreements, much less agreements in restraint of trade.

There is nothing facially anticompetitive about requiring participants in an inter-related market to collaborate. As the Federal Trade Commission has recognized: "In order to compete in modern markets, competitors sometimes need to collaborate. Competitive forces are driving firms toward complex collaborations to achieve goals such as expanding into foreign markets, funding expensive innovation efforts, and lowering production and other costs."[35] Syngenta has wholly failed to provide any factual basis or put forth expert testimony explaining why the BIO Policy follows outside of this safe harbor.

Syngenta sets up strawman arguments to support is new antitrust preemption theory. *See* Opp., ECF No. 2947 at 151. Giroux does not state that the BIO Policy requires agreement between Syngenta and others in the industry about when to commercialize new traits. Rather, he states that the BIO Policy recognizes risks from premature commercialization, the need for engagement of stakeholders and the critical role of making non-misleading disclosures. Pl. Ex. 89, Giroux Discl. Sect. C at 3. Giroux *does not* say Syngenta was required to get agreement from competitors, the grain trade or other market players "about which export markets' approvals

---

[35] *See* Federal Trade Comm'n, Dealings With Competitors, *https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors*.

require delaying seed sales in the U.S." Opp., ECF No. 2947 at 151. He states only that a reasonably careful biotechnology company would make its assessment in consultation with supply chain members and communicate transparently. Giroux also does not say that trade association policies set the standard of care for which markets require delaying seed sales. His only reference to trade associations – NGFA and NAEGA – was to identify them as among those "best positioned to predict the importance of unapproved markets to U.S. export interests." Pl. Ex. 89, Giroux Discl., Sect. C at 4.

The communication requirements articulated by Giroux are also similar to the BIO Policy's consultation requirements in making trade assessments and commercialization decisions. *See* Pl. Ex. 91, BIO Policy at 3-4. These consultations and communications do not restrain trade and, in any event, could only, at worst, be alleged to be non-price, vertical restraints judged under the rule of reason. *See Continental T.V., Inc. v. GTE Sylvania Inc*. 433 U.S. 36, 59 (1977).[36] But Syngenta, of course, does not challenge the BIO Policy – including its consultation provisions – as an unreasonable restraint of trade. Its strawman arguments to the contrary, Syngenta is not placed in a position where it must choose between compliance with a duty to exercise reasonable care and antitrust laws. Summary judgment is warranted.

_____

[36] Contrary to Syngenta's arguments, Opp., ECF No. 2947 at 153-54, this case does not present a hub and spoke conspiracy to consider whether certain countries are or are not key markets. Nor does the standard of care even mention use of a list of key markets generated by trade associations. *Id*. at 154. The reason for communication includes the recognized fact that the members of the supply chain have relevant information. Pl. Ex. 89, Giroux Discl. at 4. Moreover, Syngenta states that "[g]iven the Court's ruling on duty at the motion-to-dismiss stage, Syngenta notes this point [the combination of a horizontal agreement among competing exporters and vertical agreement between seed developers and distributors would limit consumer choice by delaying introduction of new GM seed] merely to preserve it for appeal." Opp., ECF No. 2947 at 155 n.53. However, when it challenged duty, Syngenta did not raise any of these supposed anticompetitive concerns. *See* ECF No. 856, ECF No. 857, ECF No. 950. Syngenta's efforts to do so now represent an impermissible attempt to expand the scope of any appeal Syngenta may pursue.

## <u>CONCLUSION</u>

Most of Syngenta's arguments are unpreserved or waived. Even if considered, they are unsupported by evidence or law, demonstrating the unsustainable nature of Syngenta's efforts to shift blame and/or escape entirely from its own negligence. For all the reasons stated, Plaintiffs are entitled to summary judgment.

Dated: March 13, 2017

            Respectfully Submitted,

            /s Scott Powell_____
            Scott Powell
            **HARE WYNN NEWELL & NEWTON**
            2025 3rd Ave. North, Suite 800
            Birmingham, AL 35203
            Telephone: (205) 328-5330
            scott@hwnn.com

                   **CO-LEAD AND CLASS COUNSEL FOR PLAINTIFFS**

            Patrick J. Stueve—KS Bar #13847
            **STUEVE SIEGEL HANSON LLP**
            460 Nichols Road, Suite 200
            Kansas City, MO 64112
            Telephone: (816) 714-7100
            stueve@stuevesiegel.com

                   **CO-LEAD COUNSEL, LIAISON AND CLASS COUNSEL FOR PLAINTIFFS**

            Don M. Downing
            **GRAY, RITTER & GRAHAM, P.C.**
            701 Market Street, Suite 800
            St. Louis, MO 63101
            Telephone: (314) 241-5620
            ddowning@grgpc.com

                   **CO-LEAD AND CLASS COUNSEL FOR PLAINTIFFS**

            William B. Chaney
            **GRAY REED & MCGRAW, LLP**
            1601 Elm Street, Suite 4600
            Dallas, TX 75201
            Telephone: (214) 954-4135
            wchaney@grayreed.com

                   **CO-LEAD AND CLASS COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 13, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record. Further, a copy was electronically mailed to Liaison Counsel for the Defendants, Tom Schult, Berkowitz Oliver LLP, 2600 Grand Blvd., Suite 1200, Kansas City, Missouri 64108, tschult@berkowitzoliver.com.

/s/  Scott Powell
Co-Lead Counsel for Plaintiffs