## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| *IN RE SYNGENTA AG MIR162 CORN  LITIGATION* | Master File No. 2:14-MD-02591-JWL-JPO |
| THIS DOCUMENT RELATES TO:* | MDL No. 2591 |
|     Nationwide Lanham Act Class Action | |
|     Kansas State Class Action | |

**[UNREDACTED] SYNGENTA'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT ON
NATIONWIDE LANHAM ACT CLASS CLAIMS
<u>AND KANSAS STATE CLASS CLAIMS</u>**

<span style="color:red">**<u>FILED UNDER SEAL:</u>**
**CONTAINS DISCOVERY MATERIAL**
**MARKED HIGHLY CONFIDENTIAL/CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**</span>

---

\*     Pursuant to the Court's January 10, 2017 Order, Dkt. 2789, the underlying Motion for Summary Judgment applies to the claims brought by the Kansas State Class and Nationwide Lanham Act Class.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ..................................................................................... 1

SYNGENTA'S REPLIES IN SUPPORT OF ITS STATEMENT OF UNDISPUTED
     MATERIAL FACTS .......................................................................... 6

ARGUMENT ......................................................................................... 97

I.     Plaintiffs Lack Evidence To Sustain The Lanham Act Claim. ......................... 97

     A.     Plaintiffs Lack Any Evidence Of False Or Misleading Statements of Fact. ........ 97

          1.     Plaintiffs Lack Evidence To Show Literal Falsity. ....................... 97

          2.     Plaintiffs Cannot Rely On Implicit Falsity Concerning A Prediction
                Of A Future Event—And They Lack Any Evidence In Any Event. ........... 98

     B.     Plaintiffs Lack Any Evidence Of Consumer Deception. ......................... 99

     C.     Plaintiffs Lack Any Evidence Of Materiality. .................................... 100

     D.     Plaintiffs Lack Any Evidence of Causation. ...................................... 101

     E.     Disgorgement is Not Available as a Matter of Law. ............................. 103

II.     Plaintiffs' Limited-Launch Theories Of Duty Fail For Lack Of Causation. .................. 104

     A.     Partial Summary Judgment Is Appropriate On Plaintiffs' Limited-Launch
          Theory. ............................................................................ 104

     B.     All Theories Of Duty Short Of The Duty Not To Sell Viptera At All Fail. ............. 106

III.     Plaintiffs Abandon Any Recall Theory And Their Theory That Syngenta Should
     Have "Stopped Selling" Fails For Lack Of Evidence Of Causation. ............................ 110

IV.     Plaintiffs Cannot Establish Proximate Cause On Any Claim As A Matter Of Law. ...... 110

     A.     Plaintiffs' Two Responses Are Meritless. ......................................... 112

     B.     Chinese Law And Exporters' Contracts Prohibit Exporters From Shipping
          Corn To China Containing A GM Trait Not Listed On The Trader's
          Certificate. ....................................................................... 114

V.     Petitioning Activity Cannot Be The Basis For Liability. ............................... 116

VI.     Any Theories Of Duty Based On Voluntary Undertaking Fail As A Matter Of
        Law. ........................................................................................................................... 118

VII.    Failure To Warn Cannot Support The Negligence Claim. .............................................. 119

VIII.   Any Theory of Liability In Negligence Based On Misrepresentations Fails.................. 120

IX.     All Claims Based On Duracade Fail As A Matter Of Law............................................ 122

X.      Plaintiffs Fail To Counter Syngenta's Showing That Punitive Damages Cannot Be
        Awarded In This Case Consistent With Due Process And Kansas Law. ....................... 123

CONCLUSION ..................................................................................................................... 126

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
    913 F.2d 958 (D.C. Cir. 1990) ............................................................................103

*Am. Council of Certified Podiatric Physicians & Surgeons v.*
    *Am. Bd. of Podiatric Surgery, Inc.*,
    185 F.3d 606 (6th Cir. 1999) .....................................................................99, 101

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    823 F.3d 51 (2d Cir. 2016)................................................................................101

*Ast v. BNSF Ry. Co.*,
    No. 09-2519-EFM/DWB, 2012 WL 252140 (D. Kan. Jan. 26, 2012)........................16, 17, 34

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*,
    204 F.3d 683 (6th Cir. 2000) .....................................................................99, 104

*Battenfeld of Am. Holding Co., Inc. v. Baird, Kurtz & Dobson*,
    60 F. Supp. 2d 1189 (D. Kan. 1999) (Lungstrum, J.) ....................................107, 108

*Bedford-Curbow v. Westerfield North Townhomes Coop, Inc.*,
    77 P.3d 1008 (Kan. Ct. App. 2003) ..................................................................107

*Bishop v. Equinox Int'l Corp.*,
    1998 WL 650080 (10th Cir. Sept. 4, 1998) ........................................................104

*Blackmon v. Nelson, Hesse, Cyril, Weber & Sparrow*,
    419 So. 2d 405 (Fla. Dist. Ct. App. 1982) .........................................................118

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)........................................................................................124

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
    627 F. Supp. 2d 384 (D.N.J. 2009) ..................................................................103

*Brand v. Mazda Motor Corp.*,
    978 F. Supp. 1382 (D. Kan. 1997)....................................................................119

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)........................................................................................116

*Cardenas v. Kanco Hay, LLC*,
    2016 WL 3881345 (D. Kan. July 18, 2016) .......................................................106

*Cardtoons, L.C. v. Major League Baseball Players Assoc.*,
208 F.3d 885 (10th Cir. 2000) (en banc) .............................................................116

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
No. C10-861 RSM, 2015 WL 1735517 (W.D. Wash. April 15, 2015) ..........................99, 104

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue*,
284 F.3d 302 (1st Cir. 2002) .............................................................101

*City & Cnty. of San Francisco v. Philip Morris, Inc.*,
957 F. Supp. 1130 (N.D. Cal. 1997) .............................................................118

*City of Chanute, Kan. v. Williams Natural Gas Co.*,
743 F. Supp. 1437 (D. Kan. 1990) .............................................................109

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919, 1018 (C.D. Cal. 2015) .............................................................100

*Cook Inc. v. Bos. Sci. Corp.*,
No. 01 C 9479, 2002 WL 335314 (N.D. Ill. Feb. 28, 2002) .............................................................116

*Ctr. for Food Safety v. Vilsack*,
718 F.3d 829 (9th Cir. 2013) .............................................................117

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008) .............................................................124

*Feliciano v. Ciman*,
No. A-0353-06T5, 2008 WL 2078182
(N.J. Super. Ct. App. Div. May 19, 2008) .............................................................125

*Fisher v. Lynch*,
CIV. A. 07-2154-KHV, 2008 WL 717961
(D. Kan. Mar. 17, 2008) .............................37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 53, 54

*Folks v. Kan. Power & Light Co.*,
755 P.2d 1319 (Kan. 1988) .............................................................125

*Gardin v. Emporia Hotels, Inc.*,
61 P.3d 732 (Kan. Ct. App. 2003) .............................................................113

*Geiger-Schorr, D.O. v. Todd*,
901 P.2d 515 (Kan. Ct. App. 1995) .............................................................117

*Gen. Steel Domestic Sales v. Chumley*,
627 F. App'x 682 (10th Cir. 2015) .............................................................100, 101

*In re Genetically Modified Rice Litig.*,
  Nos. 4:06MD1811 CDP, 2011 WL 5024548 (E.D. Mo. Oct. 21, 2011) .............................125

*George Basch Co., Inc. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992).....................................................................................99

*George v. Breising*,
  477 P.2d 983 (Kan. 1971) ........................................................................................113

*Gragg v. Wichita State Univ.*,
  934 P.2d 121 (Kan. 1997) ........................................................................................113

*Harper House, Inc. v. Thomas Nelson, Inc.*,
  889 F.2d 197 (9th Cir. 1989) ....................................................................................103

*HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*,
  264 F.R.D. 146 (D.N.J. 2009).......................................37, 39, 41, 42, 43, 44, 46, 47, 50, 53, 54

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*,
  258 F. Supp. 2d 1197 (D. Kan. 2003) ...........................................................................100

*Independent Drug Wholesalers Grp., Inc. v. Denton*,
  833 F. Supp. 1507 (D. Kan. 1993) (Lungstrum, J.) ..........................................................5, 108

*James v. Grigsby*,
  220 P.2d 267 (Kan. 1923) ........................................................................................108

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) ..................................................................................101

*Jones v. Cole*,
  08-1011-JTM, 2009 WL 2163185 (D. Kan. July 17, 2009) ..................................................55

*Jones v. UPS Ground Freight*,
  683 F.3d 1283 (11th Cir. 2012) ...........................................................19, 62, 68, 70, 73, 75, 81

*June v. Union Carbide Corp.*,
  577 F.3d 1234 (10th Cir. 2009) ..................................................................................107

*Kansas Waste Water, Inc. v. Alliant Techsys., Inc.*,
  2005 WL 1109456 (D. Kan. 2005) ...............................................................................105

*Kerber v. Qwest Grp. Life Ins. Plan*,
  647 F.3d 950 (10th Cir. 2011) ......................................................................................9

*Kimberly-Clark Worldwide, Inc. v. Cardinal Health 200, LLC*,
  No. CIV.A. 11-1228-RGA, 2012 WL 3063974 (D. Del. July 27, 2012)...................................116

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ............................................................................3, 101, 103

*Lloyd v. State Farm Mut. Auto. Ins.*,
  860 P.2d 1300 (Ariz. Ct. App. 1992) ..................................................................118

*In re Marriage of Hake*,
  162 P.3d 66, 2007 WL 2080539 (Kan. Ct. App. 2007) ......................................125

*Marvellous Day Elec. (S.Z.) Co., Ltd. v. Ace Hardware Corp.*,
  900 F. Supp. 2d 835 (N.D. Ill. 2012) ....................................................................99

*Mathison v. United States*,
  619 F. App'x 691 (10th Cir. 2015) ......................................................................107

*McDonald v. Smith*,
  472 U.S. 479 (1985).............................................................................................116

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d (7th Cir. 2011) ......................................................................................117

*Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
  960 F.2d 294 (2d Cir. 1992)...................................................................................99

*Michnovez v. Blair, LLC*,
  2012 WL 2627567 (D.N.H. July 5, 2012) ...........................................................105

*Miller v. Pfizer Inc. (Roerig Division)*,
  196 F. Supp. 2d 1095 (D. Kan. 2002)..................................................................120

*Moore v. Associated Material & Supply Co.*,
  948 P.2d 652 (Kan. 1997).....................................................................................107

*Muhler Co. v. Ply Gem Holdings, Inc.*,
  637 F. Appx 746 (4th Cir. 2016)..........................................................................103

*Mun. Rev. Servs., Inc. v. Xspand, Inc.*,
  No. 4:05CV671, 2005 WL 1367416 (M.D. Penn. June 8, 2015) .........................116

*Murphy v. City of Topeka-Shawnee Cty. Dep't of Labor Servs.*,
  630 P.2d 186 (Kan. Ct. App. 1981) .....................................................................124

*Nero v. Kan. Stat. Univ.*,
  861 P.2d 768 (Kan. 1993)......................................................................................113

*NetQuote. Inc. v. Byrd*,
  No. 07-cv-00630-DME-MEH, 2008 WL 5225880 (D.Colo. Dec. 15, 2008)...............100, 104

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010,*
No. MDL 2179, 2012 WL 85447 (E.D. La. Jan. 11, 2012) ..........................................68, 69, 74

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.,*
No. 09-MD-02063-JLK-KMT (D. Colo. Mar. 22, 2013) ....................................................106

*Ostroski v. Kathleen S. Lynn Revocable Tr.,*
326 P.3d 1090, 2014 WL 2747571 (Kan. Ct. App. 2014) ...................................................124

*Parkinson v. Cal. Co.,*
233 F.2d 432 (10th Cir. 1956) ............................................................................................121

*PAS Comm., Inc. v. Sprint Corp.,*
139 F. Supp. 2d 1149
(D. Kan. 2001) ...................16, 17, 18, 19, 34, 36, 50, 59, 72, 73, 74, 77, 78, 79, 81, 82, 83, 84

*Patton v. TIC United Corp.,*
859 F. Supp. 509 (D. Kan. 1994) ........................................................................................124

*PBM Prod., LLC v. Mead Johnson & Co.,*
No. 3:09-CV-269, 2010 WL 723750 (E.D. Va. Mar. 2, 2010),
*aff'd,* 639 F.3d 111 (4th Cir. 2011) .....................................................................................102

*PhotoMedex, Inc. v. Irwin,*
601 F.3d 919 (9th Cir. 2010) .................................................................................................97

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,*
227 F.3d 489 (5th Cir. 2000) ...............................................................................................101

*Powell v. Stewart,*
2006 WL 3335515 (S.D. Miss. Nov. 16, 2006) ...................................................................105

*Princeton Graphics Op., L.P. v. NEC Home Elec. (U.S.A.), Inc.,*
No. 87 CIV. 7257 (CES), 1990 WL 144799 (S.D.N.Y. Sept. 24, 1990).............................101

*Pritchard v. S. Co. Servs.,*
92 F.3d 1130 (11th Cir. 1996),
*amended on reh'g in part,* 102 F.3d 1118 (11th Cir. 1996)................19, 62, 68, 70, 73, 75, 81

*Partex Apparel Int'l LTDA S.A. de C.V. v. GFSI, Inc.,*
No. 10-2678, 2012 WL 1059854 (D. Kan. Mar. 28, 2012) ...................................................36

*Pugh v. Munguia,*
146 P.3d 1108 (Kan. Ct. App. 2006) ...................................................................................125

*Ross v. Rothstein,*
92 F. Supp. 3d 1041, 1076 (D. Kan. 2015)..............................................................................9

*Rudolph v. First S. Fed. Sav. & Loan. Ass'n*,
    414 So. 2d 64 (Ala. 1982) ................................................................118

*Runde v. Vigus Realty, Inc.*,
    617 N.E.2d 572 (Ind. Ct. App. 1993) ...............................................118

*Sanchez v. Vilsack*,
    695 F.3d 1174 (10th Cir. 2012) ...................................................12, 36

*SanMedica Int'l, LLC v. Amazon.com, Inc.*,
    No. 2:13-CV-00169-DN, 2016 WL 527055 (D. Utah Jan. 20, 2016) .....................3, 100, 101

*Seibert v. Vic Regnier Builders, Inc.*,
    856 P.2d 1332 (Kan. 1993) .......................................................112, 113

*Sliding Door Co. v. KLS Doors, LLC*,
    No. EDCV 13-00196 .......................................................................116

*Smith v. Printup*,
    938 P.2d 1261 (Kan. 1997) ...............................................................125

*South ex rel. South v. McCarter*,
    119 P.3d 1 (Kan. 2005) ...................................................................113

*Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*,
    500 F. Supp. 2d 1290 (D. Kan. 2007).............10, 11, 13, 14, 15, 18, 37, 39, 40, 41, 42, 43, 44,
                                                        45, 46, 47, 48, 49, 53, 54, 61, 62, 65, 67, 71, 72,
                                                        76, 83, 86, 87, 88, 89, 96

*In re StarLink Corn Prods. Liab. Litig.*,
    212 F. Supp. 2d 828 (N.D. Ill. 2002) ...............................................125

*State Farm Fire & Cas. Co. v. Bell*,
    30 F. Supp. 3d 1085, 1119-20 (D. Kan. 2014)......................................113

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003).........................................................................124

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
    427 F. Supp. 2d 1032 (D. Kan. 2006) ...............................................100

*Theno v. Tonganoxie Unified Sch. Dist.*,
    377 F. Supp. 2d 952 (D. Kan. 2005) (Lungstrum, J.) .........................117

*In re TMJ Implants Prods. Liab. Litig.*,
    113 F.3d 1484 (8th Cir. 1997) .........................................................118

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) ............................................................103

*Treaster v. HealthSouth Corp.*,
  442 F. Supp. 2d 1171 (D. Kan. 2006) (Lungstrum, J.) ......................4, 105, 106, 107

*Trevizo v. Adams*,
  455 F.3d 1155 (10th Cir. 2006) ..........................................19, 62, 68, 70, 73, 75, 81

*Tucker v. Am. Int'l Grp., Inc.*,
  2011 WL 6020851 (D. Conn. Dec. 2, 2011)......................................................106

*U.S. v. Hardman*,
  297 F. 3d 1116 (10th Cir. 2002) ............................................................97

*United Marine Marketing Grp., LLC v. Jet Dock Sys., Inc.*,
  No. 810CV2653T35TBM, 2013 WL 12148864 (M.D. Fla. Mar. 6, 2013)..........................116

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  133 S. Ct. 2517 (2013)............................................................102

*In re Universal Serv. Fund Tel. Billing Pracs. Litig.*,
  No. 02-MD-1468-JWL, 2008 WL 1884125
  (D. Kan. Apr. 25, 2008) ...............................10, 11, 16, 17, 20, 22, 24, 25, 26, 27,
                                                          28, 29, 30, 31, 32, 33, 34, 35, 38, 39, 41,
                                                          42, 43, 44, 46, 47, 50, 52, 56, 57, 58, 59,
                                                          61, 65, 66, 76, 80, 88

*Watco Cos., Inc. v. Campbell*,
  371 P.3d 360 (Kan. Ct. App. 2016) ............................................................125

*In re Welter*,
  No. 15-10160, 2016 WL 424812 (Bankr. N.D. Cal. Feb. 3, 2016) ......................................105

*Weroha v. Craft*,
  951 P.2d 1308 (Kan. 1998)............................................................113

*Western Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*,
  427 F.3d 1269 (10th Cir. 2005) ............................................................104

*Wilcox v. Homestake Mining Co.*,
  619 F.3d 1165 (10th Cir. 2010) ............................................................107

*Wooderson v. Ortho Pharm. Corp.*,
  681 P.2d 1038 (Kan. 1984)............................................................120

*Wozniak v. Lipoff*,
  750 P.2d 971 (Kan. 1988)............................................................108

*Wultz v. Bank of China Ltd.*,
   No. 11 Civ. 1266(SAS), 2012 WL 5431013 (S.D.N.Y. Nov. 5, 2012) ...............................114

*Zimmer, Inc. v. Stryker Corp.*,
   No. 3:14-CV-152 JD, 2016 WL 6476315 (N.D. Ind. Nov. 1, 2016)....................................106

**Statutes**

7 U.S.C. § 87g(a) ....................................................................................................................105

15 U.S.C. § 117(a) ..................................................................................................................103

**Rules**

D. Kan. Local Rule 56.1 .........................6, 13, 14, 15, 18, 61, 62, 65, 67, 71, 72, 83, 86, 88, 89, 96

Fed. R. Civ. P. 44.1 .................................................................................................................114

Fed. R. Civ. P. 56 ...................................................................................................................106

# INTRODUCTION[1]

Plaintiffs' opposition confirms that summary judgment is warranted because Plaintiffs cannot point to any *genuine* issue of *material* fact that would fill the gaps Syngenta has identified on multiple elements of their causes of action. The avalanche of more than 500 additional purported "facts" that Plaintiffs attach to their opposition is a diversion. Most are distortions of the record, and in any event they are focused on points that are irrelevant because they would not actually establish the missing elements of Plaintiffs' claims even if accepted. As Syngenta has explained, three overarching points dispose of Plaintiffs' case.

*First*, Plaintiffs lack the evidence to get to a jury on their Lanham Act claim. Plaintiffs do not even contest that they lack evidence to maintain a claim as to the Fact Sheet, or as to any aspect of the Grower Letter other than the statement that Syngenta "expect[ed]" Chinese approval by the end of the first quarter of 2012. *See* Opp. 2 n.2; *infra* pp.96-97. The entire Lanham Act claim is thus limited to that single statement in the Grower Letter. Every element of their claim as to that statement fails as a matter of law.

To start, Plaintiffs do not dispute that establishing falsity requires a showing that the author of the Grower Letter *subjectively* did not have a good faith belief in the estimated date of Chinese approval. They lack any evidence to make that showing. The unrefuted record shows that the supposed evidence Plaintiffs cite consists of outdated information that is irrelevant to anyone's state

---

[1]    "Syngenta's MSJ" refers to Syngenta's Corrected Memorandum in Support of its Motion for Summary Judgment. "SOF" refers to Syngenta's Statement of Facts in its summary judgment motion. "Opp." refers to Plaintiffs's opposition to Syngenta's motion for summary judgment. "SOF Replies" refers to Syngenta's replies in support of its statement of facts, *see infra* p.6. "Pls. SOAF" refers to Plaintiffs' statement of additional facts in their opposition to Syngenta's summary-judgment motion, and "Resp. to SOAF" refers to Syngenta's responses to Plaintiffs's statement of additional facts, *see* Appendix A. "Pls. MSJ" refers to Plaintiffs' Memorandum in Support of his Motion for Partial Summary Judgment, and "Pls. SOF refers to Plaintiffs's Statement of Facts in his summary-judgment motion. "Syngenta's Opp." refers to Syngenta's opposition to Plaintiffs' motion for partial summary judgment, "Syngenta's SOAF" refers to Syngenta's statement of additional facts in its opposition to Plaintiffs's motion for partial summary judgment, and "Syngenta's Opp. Ex." refers to an exhibit attached to Syngenta's opposition to Plaintiffs's motion for partial summary judgment. Unless otherwise noted, "Ex." refers to an exhibit submitted with this Reply or Syngenta's motion for summary judgment. "MTD Order" refers to the Court's order on Syngenta's motion to dismiss, *see* ECF No. 1016, and "Rule 12(c) Order" refers to the Court's order on Syngenta's motion for partial judgment on the pleadings, *see* ECF No. 2426.

of mind when the Grower Letter was sent in August 2011; stray e-mails from employees who had no role or responsibilities with respect to the timing of Chinese approval; or the unremarkable acknowledgment that there were "challenges" in meeting the estimated timeline, primarily due to the need for in-country field studies—studies that had actually already started in time to meet the planned November 2011 submission window by the time the Grower Letter was sent. *See* Resp. to SOAF ¶¶ 36-42, 249-288, 344-357, 393-450. In addition, contrary to Plaintiffs' assertions, there is no implicit falsity option for Plaintiffs given that they are basing their claim on a prediction of a future event. A prediction is either a good faith statement or it is not. Plaintiffs cannot point to a single case applying an implicit falsity standard in this context.

Even if Plaintiffs could show literal falsity, their claim would still fail as a matter of law because they lack any evidence of materiality or causation.

Plaintiffs do not seriously contend that they can prove materiality. They never took the most rudimentary step for preparing their claim for trial by conducting a consumer survey or pursuing *any* method for showing that growers purchasing seed would actually be influenced by predictions about Chinese approval. At best, Plaintiffs note that, out of more than 100 producers deposed in the Coordinated Litigation, *three* asked about overseas approval before buying seed and a handful more *assumed* that their seed dealers sold seed that was approved overseas. Resp. to SOAF ¶¶ 479-488. The unrefuted evidence shows that the overwhelming majority of producers *do not* consider overseas approvals (let alone Chinese approval) in purchasing corn seed. SOF ¶ 134. Plaintiffs themselves recognize that they cannot establish materiality on this basis, and instead ask the Court to *presume* materiality simply because Syngenta *intended* the Grower Letter to reassure purchasers. There is no support in the law for such a presumption. In addition, to the extent Plaintiffs ask the Court to presume materiality if Plaintiffs can show literal falsity, that is also wrong as a matter of law. That

approach has been rejected by every circuit to consider it except the Fifth Circuit, and is expressly rejected by courts in this Circuit.  *See, e.g.*, *SanMedica Int'l, LLC v. Amazon.com, Inc.*, No. 2:13-CV-00169-DN, 2016 WL 527055, at *11 (D. Utah Jan. 20, 2016) (rejecting as "incorrect" a presumption of materiality; granting summary judgment where plaintiffs "failed to present any evidence on the materiality element").

Lastly, Plaintiffs lack any evidence whatsoever to show causation.  Their suggestion that the Lanham Act has a diluted causation standard misstates the law.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390, 1395 (2014).  And Plaintiffs lack any evidence from which a jury could find that, *but for* the prediction about Chinese approval in the Grower Letter, the events leading to Plaintiffs' injury would not have happened.  As Syngenta has explained, Viptera had already been planted on more than a million acres before the Grower Letter was sent, and that was more than sufficient to spread MIR162 in the corn supply at levels sufficient to ensure that exports could not meet China's zero tolerance standard.  Plaintiffs have no response at all on that point.  Nor is there any evidence from which a jury could find that the statement in the Grower Letter prompted *any* sales.  All but one of the producers deposed in the Coordinated Litigation (including Viptera and Duracade growers) who were asked whether they had ever seen the Grower Letter—over 100 producers—testified that they had not.  SOF ¶ 133; Reply To SOF ¶ 133.  The *only* Viptera grower who said he *might* have seen the Letter testified that, if anything, he bought *less* Viptera seed as a result.  SOF ¶ 131.

The bottom line from Syngenta's motion stands unrefuted: Plaintiffs cannot point to a shred of evidence showing that anyone, anywhere ever actually relied on the predicted date of Chinese approval in the Grower Letter in deciding to buy more Viptera.  And they certainly cannot point to any evidence from which a jury could identify incremental sales attributable to that particular

3

statement *and* find that those incremental sales were a but-for cause of Plaintiffs' alleged injury. There is no basis for allowing the Lanham Act claim to go to a jury.

*Second*, Plaintiffs lack any evidence that breach of alleged limited-launch duties—that is, duties short of the duty to refrain from selling Viptera *at all*—caused Plaintiffs' alleged injuries. The assertion that the Court cannot separately assess those theories of duty on summary judgment misstates the law. This Court has frequently analyzed alternative theories under a single negligence claim and winnowed them out from the case at summary judgment. *See, e.g.*, *Treaster v. HealthSouth Corp.*, 442 F. Supp. 2d 1171, 1179-80, 1184 (D. Kan. 2006) (Lungstrum, J.).

Plaintiffs' limited launch theory cannot survive because the unrefuted evidence (including from Syngenta's expert, McHughen) shows, that once Viptera was launched commercially, MIR162 would inevitably spread at levels making it impossible for exports to satisfy China's zero-tolerance standard. To show an issue of fact, Plaintiffs would have to present expert analysis establishing the efficacy of measures to address cross-pollination, explaining the levels of MIR162 in the corn supply that would still allow exports to meet zero tolerance testing in China, and explaining how some set of duties would have made it more likely than not that MIR162 would remain below those levels in the corn supply. Plaintiffs have no expert addressing any of this. And the evidence they do cite fails to address the relevant point. Evidence that certain practices may have *some* effects in reducing cross-pollination, without any supporting analysis or quantification, would not permit a jury to find that such measures would more likely than not have enabled MIR162 to be launched in the U.S. while still satisfying China's zero tolerance testing. The rest of the proffered evidence is also irrelevant because it addresses limited-launch duties *in combination with* other practices for channeling and segregating harvested grain (such as closed-loop systems)—duties that are preempted under the Grain Standards Act.

Recognizing that they lack *any* evidence on causation, Plaintiffs try to pull a rabbit out of their hat with a convenient, eleventh-hour declaration from their co-plaintiff, Cargill. Randy Giroux, a Cargill executive who has fueled Cargill's effort to sue Syngenta and serves as the mouthpiece for its case, provides a new declaration asserting, without elaboration, that "it is more likely than not" that exporters could have continued to serve China under a limited launch of Viptera. Opp. Ex. 303 (Giroux Decl. ¶ 7). The problem with that self-serving assertion is that it directly contradicts Giroux's prior sworn testimony. When Giroux was deposed as a non-retained expert, he was specifically asked, "[W]hat kind of limited launch do you think in your opinion could satisfy the zero tolerance standard that China has?" He answered: "I don't know the answer to that question." Ex. 341 (11/16/2016 R. Giroux Dep. Tr. 37:19-23). He went on to explain that the "ability to manage to zero tolerance under a limited launch *is unlikely*." Ex. 341 (R. Giroux Dep. Tr. 34:5-35:8) (emphasis added). Given the direct contradiction with his prior testimony, the eleventh-hour declaration must be disregarded, *see Independent Drug Wholesalers Grp., Inc. v. Denton*, 833 F. Supp. 1507, 1520-21 (D. Kan. 1993) (Lungstrum, J.), and in any event, Giroux's conclusory assertion, unsupported by any explanation or analysis, is insufficient to create a triable issue for a jury.

*Third*, the unrefuted evidence shows that Plaintiffs cannot establish proximate cause because the actions of Cargill and ADM in knowingly sending illegal shipments of MIR162 corn to China were an intervening cause. Plaintiffs' arguments miss the point. They cannot successfully portray Cargill's and ADM's unlawful actions as foreseeable. There is no evidence that could be treated as giving Syngenta notice that such unlawful conduct would occur, when even Cargill's and ADM's own employees insist that their companies would never do what they actually did. And Plaintiffs' lengthy quibbles about the details of Chinese law are irrelevant. Plaintiffs cannot dispute the basic point that it is unlawful to bring a shipment of corn containing a GM trait into China when the trait

01981291.DOCX;-1

5

has not been approved in China.  And Cargill and ADM knowingly participated in attempting to ship precisely such shipments of corn into China.  It was not foreseeable to Syngenta that Cargill and ADM would engage in such knowingly unlawful activity, and their actions are an intervening cause.

## SYNGENTA'S REPLIES IN SUPPORT OF ITS
## STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

Pursuant to D. Kan. Rule 56.1(b), Syngenta responds to Plaintiffs' response to Defendants' Statement of Undisputed Material Facts ("SOF").  Many of Plaintiffs' so-called disputes purport to dispute "facts" that are not actually contained in Syngenta's Statement of Facts, and/or are not actually disputes.  In multiple places, Plaintiffs summarize multiple facts presented by Syngenta rather than responding to each individually, making it especially difficult to determine what Plaintiffs dispute and the basis for any dispute.

In addition, Syngenta notes that Plaintiffs do not dispute the following facts: 1, 7, 9, 11, 13, 14, 21, 22, 24, 29, 32, 33, 40, 41, 50, 76, 92, 99, 110, 111, 113, 119, 120, 121, 123, 136.  With respect to statements of fact that Plaintiffs purport to dispute, Syngenta replies as follows, with each original statement of fact and Plaintiffs' response included for ease of reference.

2.     The Kansas Class Representatives and bellwether plaintiffs testified that they never saw Syngenta's Deregulation Petition for Viptera before this litigation. *See* Ex. 55 (C. Frickey Dep. Tr. 124:11-23); Ex. 58 (D. Grafel Dep. Tr. 205:2-10); Ex. 76 (B. Kendrick Dep. Tr. 22:24-23:4); Ex. 59 (D. Polifka Dep. Tr. 156:8-16); Ex. 50 (E. Goering Dep. Tr. 133:4-19); Ex. 63 (G. Harshberger Dep. Tr. 26:22-27:15)); Ex. 77 (R. Luck Dep. Tr. 271:3-7); Ex. 177 (J. Shortt Dep. Tr. 98:19-21); Ex. 178 (O. Williams Dep. Tr. 164:16-165:18).

**PLAINTIFFS' RESPONSE TO NO. 2**:     Plaintiffs admit Paragraph 2 is undisputed in part, but deny the portion referencing the testimony of Mr. Polifka because the attached testimony refers to whether he received a letter and does not reference Syngenta's Deregulation Petition for Viptera.

**Syngenta's Reply To No. 2**:  The correct citation for Ex. 59 is D. Polifka Dep. Tr. 154:15-19.  The correct pages of the deposition transcript of Mr. Polifka cited by Syngenta are included in corrected Def. Ex. 59, and establishes that Mr. Polifka testified as such. Syngenta's MSJ Ex. 59 (D. Polifka Dep. Tr. 154:15-19).

---

[2]     Syngenta's responses to Plaintiffs' Statement of Additional Facts ("SOAF") are attached as Appendix A.
01981291.DOCX;-1

3.      The USDA deregulated MIR162 in April 2010 without restrictions on its usage or sale. *See* Ex. 207 (NEPA Decision & Finding of No Significant Impact: MIR162 Maize (Apr. 12, 2010)), https://www.aphis.usda.gov/brs/aphisdocs2/07_25301p_com.pdf; Ex. 208 (USDA Animal & Plant Health Inspection Service, Syngenta Biotechnology, Inc.; Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance, Docket No. APHIS-2009-0072, 75 Fed. Reg. 20560 (Apr. 20, 2010)); Pretrial Order, Dkt. 2848 ¶ 2(a)(36). MIR162 "is no more a plant pest than conventional corn cultivars" and "does not pose a plant pest risk." Ex. 210 (USDA, Determination of Nonregulated Status for MIR162 Corn, at 1 (Apr. 12, 2010)), https://www.aphis.usda.gov/brs/aphisdocs/07_25301p_det.pdf.

**PLAINTIFFS' RESPONSE TO NO. 3**: Plaintiffs dispute Paragraph 3 because Syngenta mischaracterizes the cited materials.  The USDA did not state that "MIR does not post a plant pest risk," as asserted by Syngenta but instead stated: "MIR162 and its progeny *are unlikely* to pose a plant pest risk" and that statement was based upon the deregulation materials submitted by Syngenta.  Def. Ex. 208 at 1 (emphasis added).  The EPA, USDA, and FDA did not undertake independent research in evaluating Syngenta's deregulation petition, but instead relied upon information supplied solely by Syngenta.   Ex. 257, Deposition of Alan McHughen ("McHughen Dep.") at 81:4-84:19.

> **Syngenta's Reply To No. 3:**  Plaintiffs' response does not create a genuine dispute of material fact.  The USDA stated:  "Based on APHIS' analysis of field, greenhouse, and laboratory data submitted by Syngenta, references provided in the petition, information analyzed in the EA, the plant pest risk assessment, comments provided by the public, and information provided in APHIS' response to those public comments, APHIS has determined that Syngenta's MIR162 corn *will not pose a plant pest risk* and should be granted nonregulated status."   Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance, Docket No. APHIS-2009-0072, 75 Fed. Reg. 20560 (Apr. 20, 2010)) (emphasis added).

> The USDA also stated: "Based on the scientific analysis of data presented in APHIS' plant pest risk assessment, APHIS has determined that the MIR162 corn is no more likely to become a weed than other cultivated corn varieties; it is not a plant pest; and gene flow between the MIR162 corn and weedy and wild relatives will not occur in the United States (USDA-APHIS 2009)."  Syngenta's MSJ Ex. 210 (Final Environmental Assessment of Insect Resistant MIR162 Corn (Mar., 2010), at 16).

> The full excerpt indicates that it was APHIS's own determination that MIR162 corn will not pose a plant pest risk.  Plaintiffs' contention that the government agencies did not "undertake independent research" is irrelevant to the assertions in No. 3.

4.      The EPA registered MIR162 as a pesticide on November 26, 2008. *See* Ex. 209 (EPA, Notice of Pesticide Registration, MIR162 Maize (Nov. 26, 2008)), http://www3.epa.gov/pesticides/chem_search/ppls/067979-00014-20081126.pdf. USDA's Animal and Plant Health Inspection Service and the EPA stated that MIR2162 "will have no adverse effects in the environment." *See* Ex. 210 (USDA, Final Environmental Assessment: Syngenta Biotechnology, Inc. Insect Resistant MIR162

Corn, No. SYN-IR162-4, at 24 (Mar.        2010)),
https://www.aphis.usda.gov/brs/aphisdocs/07_25301p_fea. pdf.

**PLAINTIFFS' RESPONSE TO NO. 4**: Plaintiffs dispute Paragraph 4 because Syngenta mischaracterizes the cited material.  The USDA and EPA did not find that MIR162 "will have no adverse effects in the environment" as Syngenta contends, but instead stated: "MIR162 corn will not cause any *unreasonable* adverse effects on the environment during the time of the *conditional registration* . . . ." Def. Ex. 210 at 24 (emphasis added).  And this statement was based upon the information submitted by Syngenta rather than independent research by the government.  Ex. 257, McHughen Dep. at 81:4-84:19.

> **Syngenta's Reply To No. 4**:  Plaintiffs' response does not create a genuine dispute of material fact.  The USDA stated:  "APHIS concurs with the EPA assessment (EPA 2009) that the protein produced by this variety will have no adverse effects in the environment."
>
> Plaintiffs' contention that the government agencies did not undertake "independent research" is irrelevant to the assertions in No. 4.  Furthermore, as Dr. Alan McHughen pointed out, "After consultation with Syngenta, FDA determined corn grown from MIR162 was safe to consume. The scientifically rigorous data in the dossier convinced FDA experts that MIR162 corn and its derivative foods and feeds were safe for animals and humans to consume. While some analytes of MIR162 were somewhat higher or lower than the comparator variety, FDA recognized that the values were well within the range commonly found in commercial varieties of corn, so there was no basis for concern. Also, FDA was sufficiently confident in their conclusion that they did not require or request animal feeding studies, as such studies are used only where there is some residual uncertainty."  Syngenta's MSJ Ex. 66 (A. McHughen Expert Rep. ¶ 115).

5.   On December 1, 2008, the FDA stated that "food and feed derived from . . . MIR162 are as safe and nutritious as food and feed derived from convention maize." The FDA had "consider[ed] Syngenta's consultation on maize event MIR162 to be complete."  *See* Ex. 222 (FDA, Biotechnology Consultation Note to the File BNF No.        000113, Maize Event        MIR162        (Dec.        1,        2008)), http://www.fda.gov/Food/FoodScienceResearch/GEPlants/ Submissions/ucm155598.htm

**PLAINTIFFS' RESPONSE TO NO. 5**:  Plaintiffs dispute Paragraph 5 because Syngenta mischaracterizes the cited materials.  The FDA did not state that "food and feed derived from maize event MIR162 are as safe and nutritious as food and feed derived from conventional maize," as Syngenta contends, but instead stated: "*Syngenta concluded* that food and feed derived from maize event MIR162 are as safe and nutritious as food and feed derived from conventional maize."  Def. Ex. 222 (emphasis added).

> **Syngenta's Reply To No. 5**:  Plaintiffs' response does not create a genuine dispute of material fact.  As Dr. Alan McHughen pointed out, "After consultation with Syngenta, FDA determined corn grown from MIR162 was safe to consume. The scientifically rigorous data in the dossier convinced FDA experts that MIR162 corn and its derivative foods and feeds were safe for animals and humans to consume. While some analytes of

MIR162 were somewhat higher or lower than the comparator variety, FDA recognized that the values were well within the range commonly found in commercial varieties of corn, so there was no basis for concern. Also, FDA was sufficiently confident in their conclusion that they did not require or request animal feeding studies, as such studies are used only where there is some residual uncertainty." Syngenta's MSJ Ex. 66 (A. McHughen Expert Rep. ¶ 115). Furthermore, Plaintiffs point to no contradictory evidence that MIR162 is not as safe or nutritious as conventional maize, and thus fail to create a genuine dispute of material fact.

6.  In March 2010, the USDA's Final Environmental Assessment for MIRI62 included the statement that: "MIR162 corn would have no significant impacts on human or animal health" (other than on the corn insect pests that it is designed to control). *See* Ex. 210 (USDA, Final Environmental Assessment: Syngenta Biotechnology, Inc. Insect Resistant MIR162 Corn, No. SYN-IR162-4, at 17 (Mar. 2010)), https://www.aphis.usda.gov/brs/aphisdocs/07_25301p_fea.pdf.

> **PLAINTIFFS' RESPONSE TO NO. 6**: Plaintiffs dispute Paragraph 6 because Syngenta mischaracterizes the cited materials. The USDA-APHIS actually stated: "*From the assessment of laboratory evidence provided in Syngenta's petition and the accompanying scientific literature*, APHIS has concluded that MIR162 corn would have no significant impacts on human or animal health." Def. Ex. 210 at 17 (emphasis added). And this statement was based upon the information and literature submitted by Syngenta rather than independent research by the government. Ex. 257, McHughen Dep. at 81:4-84:19.

> > **Syngenta's Reply To No. 6**: Plaintiffs' response does not create a genuine dispute of material fact. *See, e.g., Ross v. Rothstein,* 92 F. Supp. 3d 1041, 1076 (D. Kan. 2015) ("A dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party' on the issue.") (quoting *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011)). The response admits that the USDA-APHIS actually made the statement "APHIS has concluded that MIR162 corn would have no significant impacts on human or animal health." No. 6 did not contain any statement about the basis for this determination, and so Plaintiffs' response does not create a genuine dispute of material fact.

8.  After USDA deregulation, Syngenta started to circulate external marketing materials in the United States regarding Viptera corn seed on July 19, 2010. Ex. 211 (4/8/2016 Syngenta Seeds, Inc.'s Resps. & Objs. to Pls.' Second Set of Interrogs., Resp. No. 3).

> **PLAINTIFFS' RESPONSE TO NO. 8**: Plaintiffs dispute Paragraph 8. Syngenta started circulating marketing materials in the United State for Viptera prior to USDA deregulation. In 2008, Syngenta promoted Viptera at trade shows using "props," including story boards, "bug displays" and "maps." Ex. 260, (Dep. Ex. 625) at SYNG_00648402-03; Ex. 50, Deposition of Jill Wheeler Vol. I ("Wheeler Vol. I") at 31:3-36:25. Syngenta also conducted internal training of agronomists and sales representatives so those employees could promote Viptera to the public. Ex. 260, (Dep. Ex. 625) at SYNG_00648402-03; *see also* Ex. 261 (Dep. Ex. 626) (2008 marketing "Talking Points" on Viptera"); Ex. 50, Wheeler Vol. I at 63:7-78:18. These marketing efforts continued in 2009, as Syngenta

created a plan to create "fear, uncertainty, and doubt" in the minds of farmers to drive demand for Viptera, because internally, Syngenta knew the pests MIR162 controls were not found on a regular basis in most areas of the United States and did insignificant damage. Ex. 50, Wheeler Vol. I at 63:7-78:18; Ex. 260 (Dep. Ex. 625); *see infra* Pl. SOAF ¶¶ 16-21.

> **Syngenta's Reply To No. 8:** Plaintiffs' response fails to create a genuine dispute of material fact. First, many of Plaintiffs' citations are cursory and fail to include specific excerpts supporting their assertions. *See Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations."). Secondly, Plaintiffs improperly rely on citations to their own statement of additional facts instead of properly controverting Defendants' statements. *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").
>
> Pls.' Opp. Ex. 260 (J. Wheeler Dep. Ex. 625, at SYNG_00648402-SYNG_00648403) (cited three times in Plaintiffs' response), does not indicate any props, story boards, bug displays, or maps had been publicly circulated in 2008; at most, the exhibit indicates only that such materials were being considered and planned for.
>
> Pls.' Opp. Ex. 50 (J. Wheeler Dep. Tr. 31:3-36:25) does not indicate any external marketing materials were circulated in the relevant time frame.
>
> Pls.' Opp. Ex. 261 (J. Wheeler Dep. Ex. 626, at SYNG_00658579-SYNG_00658582) does not indicate any external marketing materials were circulated in the relevant time frame.
>
> Pls.' Opp. Ex. 50 (J. Wheeler Dep. Tr. 63:7-78:18) (cited two times in Plaintiffs' response) does not indicate any external marketing materials were circulated in the relevant time frame.
>
> In addition, whether any marketing materials were created prior to July 2010 is immaterial to any ground on which Syngenta seeks summary judgment.

10.   Syngenta's first shipment of Viptera corn seed to commercial purchasers in the United States was on November 12, 2010. Ex. 211 (4/8/2016 Syngenta Seeds, Inc.'s Resps. & Objs. to Pls.' Second Set of Interrogs., Resp. Nos. 7-8).

> **PLAINTIFFS' RESPONSE TO NO. 10**:   Plaintiffs deny Paragraph 10. Charles Lee testified Syngenta's first orders shipped in December 2010. *See* Ex. 400, September 19,

2012 hearing in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, in the United States District Court for the Northern District of Iowa, Western Division.

> **Syngenta's Reply To No. 10**:  Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs have not established that Mr. Lee has a foundation to testify about the specifics of seed shipments to purchasers in the United States.  Lee testified: "Q. And thereafter sales would have begun in I think you said -- did I hear you say December of 2010 probably would have been the time for first sales? A. So legally we don't book the sale until the corn ships which usually is early December, correct. Q. So maybe the right word would be ordering. The first orders for Viptera corn would have been in late 2010; is that fair? A. I would say the first orders were August 2010. The first shipments of Viptera to the third party, it's outside of the organization's possession, would have been December." Pls.' Opp. Ex. 400 (September 19, 2011 hearing in *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, No. 5:11-cv-04074-MWB, in the United States District Court for the Northern District of Iowa, Western Division).  Mr. Lee's testimony establishes that corn only *usually* ships in early December and does not create a genuine dispute of material fact given the precise date provided in Syngenta's responses to interrogatories.

> Furthermore, whether Viptera corn seed first shipped on November 12, 2010, or early December 2010 is immaterial to any ground on which Syngenta seeks summary judgment.

12.    Viptera was fully approved in the U.S. before Syngenta began selling Viptera corn seed in the U.S. *See supra* SOF ¶¶ 3, 9-11.

> **PLAINTIFFS' RESPONSE TO NO. 12**:    Plaintiffs dispute Paragraph 12 and object to the term "fully approved," which is not a term of art, is argumentative, and is ambiguous.  Viptera was not approved in all key markets as called for by the policies of industry organizations, including the Biotechnology Industry Organization Product Launch Stewardship Policy, which Syngenta adopted. *See infra*, Pl. SOAF ¶¶ 56-82, 133-144.

> **Syngenta's Reply To No. 12**:  Plaintiffs' response fails to create a genuine dispute of material fact.  First, Plaintiffs' citations are cursory and fail to include specific excerpts supporting their dispute.  *See Sprint Commc'ns Co.*, 500 F. Supp. 2d at 1304 ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in their broad citations.").  Secondly, Plaintiffs improperly rely on citations to their own statement of additional facts instead of properly controverting Defendants' statements. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

Furthermore, Plaintiffs' assertion that Viptera had not been approved in "all key markets" is irrelevant to Statement of Fact No. 12, which states only that Viptera "was fully approved *in the U.S.*" before Syngenta began selling it in the U.S. In addition, "approve" has a commonly understood definition of "to give formal or official sanction." *See* https://www.merriam-webster.com/dictionary/approve. Viptera had received official sanction from the relevant U.S. government bodies before Syngenta began to sell it in the U.S. Plaintiffs have not cited to any other approvals Syngenta did not receive. The BIO Organization does not give approvals to products. *See, e.g.,* Pls.' Opp. Ex. 47 (J. Bernens Dep. Ex. 1013, at SYNG_00202102-SYNG_00202106) failing to lay out process for BIO approval and noting "Under BIO's bylaws and applicable antitrust laws, individual member companies are not bound by this Association policy"); Ex. 369 (M. O'Mara Dep. Tr. 155:3-6) ("Q Okay. Does BIO take positions on whether any of its member companies have complied with its product launch policy? A We do not.").

15.    All growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds, Inc. Stewardship Agreement ("Stewardship Agreement"). Ex. 218 (A. Vulcan Dep. Tr. 54:14-21, 58:6-19).

   **PLAINTIFFS' RESPONSE TO NO. 15**:    Disputed. Syngenta's designated expert, William Sheppard, testified that he has grown Viptera yearly since 2011 (six growing seasons) without signing a Stewardship Agreement. Ex. 151, Deposition of William Sheppard ("Sheppard Dep.") at 59:20-60:16; 71:22-73:13; 118:24-120:2. And the self-serving testimony of Ms. Vulcan, who is a Syngenta employee, does not prove the fact alleged by Syngenta.

      **Syngenta's Reply To No. 15**: Plaintiffs' response fails to create a genuine dispute of material fact. First, Plaintiffs' citations are cursory and fail to include specific excerpts supporting their dispute.

      Plaintiffs' reliance on the deposition of William Sheppard does not indicate that Sheppard was not asked to sign a stewardship agreement, only that he stated he did not sign an agreement. None of the cited testimony indicates Sheppard was not "asked to execute" a stewardship agreement.

      Furthermore, Plaintiffs' criticism of Ms. Vulcan's testimony as "self-serving" and the fact that she is an employee of Syngenta fails to create a genuine dispute of fact concerning the facts she testified to. *Cf. Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n. 4 (10th Cir. 2012) ("So long as an affidavit is based upon personal knowledge and set[s] forth facts that would be admissible in evidence, it is legally competent to oppose summary judgment, irrespective of its self-serving nature.") (citations and internal quotation marks omitted).

16.    During the relevant time period, Syngenta's Stewardship Agreement included, among other obligations, an agreement by the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . .." *E.g.*, Ex. 219

(SYNG_00004253-54) (Aug. 2009 version); Ex. 220 (SYNG_00004255) (Mar. 2011 version).

**PLAINTIFFS' RESPONSE TO NO. 16**:    Plaintiffs dispute Paragraph 16 because the cited materials do not support the fact alleged. Syngenta has cited to the "08/2009" version of the Stewardship Agreement. Def. Ex. 219. Viptera was not sold in the United States until 2010. ECF 2861, SOF ¶ 9. So the Stewardship Agreement cited is not from "the relevant time period," which would have been after Syngenta sold Viptera.

Syngenta also cites to the to the "3/24/2011" revision of its Stewardship Agreement, which would fall in the relevant time period.  But Syngenta provides no other versions of the Stewardship Agreement from 2010, 2012, or 2014-present.  Nor does it provide affidavit or deposition testimony establishing when each agreement was used, or when, or whether the agreements all contained the same cited language.

> **Syngenta's Reply To No. 16**:  Plaintiffs' response fails to create a genuine dispute. Syngenta has cited to excerpts from both 2009 and 2011, including during the time frame during which Viptera was being sold in the United States, as Plaintiffs recognize in their Response.  Syngenta employee Abby Vulcan reviewed a June 19, 2009 version, the August 2009 version, and a 2013 version during her deposition. *See* Ex. 325 *(*A. Vulcan Dep. Tr. 72:20-75:12).  As Ms. Vulcan testified, this 08/2009 version and the 2013 version were the only ones in effect after the initial shipments of Viptera corn seed. *Id.* at 116:22-117:14 ("Let me move back to the previous topic, topic for a second.  We went through the Stewardship Agreements, the various versions.  Are you aware of any other versions during the time period from 2009 through 2013, that we didn't go through? ... A From what I can recall at this time, those are the main versions of the agreement that I am -- that I can recall and am familiar with at this time. Q    (BY MR. DOWNING) Is that June 2013 Stewardship Agreement -- and I can get it out for if you'd like -- is that the one that's currently in effect?  A    Yes.  That is the one that is currently still in effect.").

> Plaintiffs cite no record evidence or other admissible evidence to controvert the fact that during the relevant time period the agreements included the cited text, and have thus failed to properly meet the substance of Syngenta's assertion. *Sprint Commc'ns,* 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

17.    During the relevant time period, the Stewardship Agreement also contained a section entitled "LIMITATIONS OF WARRANTIES AND REMEDIES," which states in part:

> No claim shall be asserted against Syngenta unless Grower reports
> to Syngenta promptly after discovery any condition that might lead
> to a complaint. All claims must be asserted within one year from
> the date of acceptance. GROWER'S EXCLUSIVE REMEDY
> FOR ANY CLAIM OR LOSS, INCLUDING, WITHOUT
> LIMITATION, CLAIMS RESULTING FROM BREACH OF

> WARRANTY, BREACH OF CONTRACT, TORT, STRICT
> LIABILITY OR NEGLIGENCE, SHALL BE LIMITED TO
> REPAYMENT OF THE AMOUNT OF THE PURCHASE
> PRICE. IN NO EVENT SHALL SYNGENTA, ITS
> DISTRIBUTORS, OR DEALERS BE LIABLE FOR ANY
> INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL
> DAMAGES.
>
> Ex. 184 (A. Vulcan Dep. Ex. 231 at SYNG_00004254).

**PLAINTIFFS' RESPONSE TO NO. 17**:  Plaintiffs dispute Paragraph 16 because the cited materials do not support the fact alleged.  Syngenta has cited to the "08/2009" version of the Stewardship Agreement.  Viptera was not sold in the United States until 2010.  ECF 2861, SOF ¶ 9.  So the Stewardship Agreement cited is not from "the relevant time period," which would have been after Syngenta sold Viptera.

> **Syngenta Response to No. 17**: Plaintiffs' response fails to create a genuine dispute.  The provision from the 08/2009 version appears in Syngenta's MSJ Ex. 220 (SYNG_00004255), the March 2011 version.  Syngenta has cited to excerpts from 2009 that contains the same provision as the 2011 version, which was in effect during the time frame during which Viptera was being sold in the United States.
>
> Syngenta employee Abby Vulcan reviewed a June 19, 2009 version, the August 2009 version, and a 2013 version during her deposition.  *See* Ex. 325 *(*A. Vulcan Dep. Tr. 72:20-75:12).  As Ms. Vulcan testified, this 08/2009 version and the 2013 version were the only ones in effect after the initial shipments of Viptera corn seed.  *Id.* at 116:22-117:14 ("Let me move back to the previous topic, topic for a second.  We went through the Stewardship Agreements, the various versions.  Are you aware of any other versions during the time period from 2009 through 2013, that we didn't go through? ...  A   From what I can recall at this time, those are the main versions of the agreement that I am -- that I can recall and am familiar with at this time. Q      Is that June 2013 Stewardship Agreement -- and I can get it out for if you'd like -- is that the one that's currently in effect?  A    Yes.  That is the one that is currently still in effect.").
>
> Plaintiffs cite no record evidence or other admissible evidence to controvert the fact that during the relevant time period the agreements included the cited text, and have thus failed to properly meet the substance of Syngenta's assertion.  *Sprint Commc'ns*, 500 F. Supp. 2d at 1303  ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

18.    During the relevant time period, each bag of Viptera corn seed has included a tag that states: "READ BEFORE PLANTING." Ex. 221 (SYNG_00316509-10). These tags read in part:

> "Prior to planting this hybrid, carefully read this information and
> the Insect Resistance Management Stewardship Guide. … A

Syngenta Stewardship Agreement signed by the grower must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way."

"By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement and will practice responsible Insect Resistance Management (IRM) on your farm."

Under the heading "Grain Marketing Guidelines": "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted.  Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com."

*E.g.*, Ex. 221 (SYNG_00316509-10).

**PLAINTIFFS' RESPONSE TO NO. 18**:   Plaintiffs dispute Paragraph 18 because the evidence cited does not establish the fact alleged.  Syngenta has only cited a specimen of a "bag tag" from "8/13," but presents no affidavit or deposition testimony establishing that each bag of Viptera featured this tag, or in fact, that any bag of Viptera featured this tag. And Syngenta did not follow its own stewardship policies for Viptera.  Ex. 151, Sheppard Dep. at 59:20-60:16; 71:22-73:13; 118:24-120:2.

**Syngenta's Reply To No. 18**: Plaintiffs' response fails to create a genuine dispute. Syngenta has cited an excerpt of a bag tag from 2013, which includes the time frame during which Viptera was being sold in the United States, as Plaintiffs recognize in their Response.

Plaintiffs cite no record evidence or other admissible evidence to controvert the fact that during the relevant time period the bag tags included the cited text or that each bag included the tag, and have thus failed to properly meet the substance of Syngenta's assertion. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)). The reference to Pls.' Opp. Ex. 151 (W. Sheppard Dep. Tr. 59:20-60:16, 71:22-73:13, 118:24-120:2), is irrelevant and fails to address the substance of No. 18.

Furthermore, the Declaration of Abby Vulcan confirms that "Since Viptera and Duracade seeds were first sold in 2010 and 2013 respectively, and continuing to today, it has been Syngenta's policy to affix a tag to each and every bag that is similar in form and substance to the language that appears in Syngenta Exhibit 20 (Viptera tag), which is

Bates stamped SYNG_00316509 through SYNG_00316510, and Exhibit 172 (Duracade tag), which is Bates stamped SYNG_00327904 through SYNG_00316501." Ex. 326 (A. Vulcan Decl. ¶ 8).

19.   The U.S. National Academies concluded in a 2010 report that "'[a] zero tolerance for the presence of GE traits in non-GE crops is generally impossible to manage and is not technically or economically feasible.'" Ex. 66 (A.McHughen Expert Rep. ¶ 24) (quoting U.S. National Academy of Science, The Impact Of Genetically Engineered Crops On Farm Sustainability In The United States 171 (2010)).

**PLAINTIFFS' RESPONSE TO NO. 19**:   Plaintiffs dispute and object to Paragraph 19 and Def. Ex. 66. Paragraph 19 quotes Syngenta's expert's report, which in turn, quotes a study by a third-party organization. Paragraph 19 is therefore inadmissible double hearsay. *See PAS Comm., Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment because, "[o]f course, if evidence is not admissible at trial, neither is it admissible in an affidavit or deposition used to support or resist the grant of summary judgment") (Lungstrum, J.). Moreover, even if the material was considered, Syngenta draws an unreasonable inference from the Academy publication, which goes on to state "that "[c]ontrolling volunteer GE crops in non-GE crops may *not be difficult*" it just "requires considerable diligence." Ex. 395,*The Impact of Genetically Engineered Crops on Farm Sustainability in the United States* at 3-33 & 3-34. Further, it states that "reducing the adventitious presence [cross-pollination] of GE traits in non-GE corn from 1 percent to .3 percent" is possible, although it would raise "production costs by about 35%." *Id.* at 3-34. The paper did not discuss limited and managed launches like the ones Syngenta could have used to be non-negligent. *See generally id.*

**Syngenta's Reply To Number 19**: Plaintiffs' response fails to create a genuine dispute of fact.  First, Syngenta's cited evidence is admissible because an expert may rely on otherwise inadmissible evidence.  "Rule 703 permits experts to rely upon other inadmissible evidence '[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'"  *Ast v. BNSF Ry. Co.*, No. 09-2519-EFM/DWB, 2012 WL 252140, at *5 (D. Kan. Jan. 26, 2012) (footnote call number omitted).  Plaintiffs do not contend that the facts of data relied upon are not the kind of facts or data other experts would reasonably rely upon.  Furthermore, Plaintiffs fail to properly dispute that the U.S. National Academies came to the stated conclusion. This is precisely the type of statement that the Rules require to be admitted as undisputed.  *See In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiff's statement of fact number 71 states as follows: According to an AT & T memorandum, AT & T's intent is to pass both these charges on to customers, so that they are recognized as tax-like assessments required by the FCC. In this way, the customers will not perceive that these are fees developed by AT & T or the other IXC's to generate revenues. Plaintiffs then cite the memorandum itself. This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple undisputed because it cannot dispute the fact that the memorandum so states.") (footnote call number and internal quotation marks omitted).

20.     In a 2014 article, research scientist Stuart Smyth and Professor Peter Phillips stated that
"'[t]he international trade of bulk agricultural commodities never has, and realistically
cannot function with zero-tolerance as the threshold[.]'" *Id.* ¶ 25 (quoting S. Smyth & P.
Phillips, Risk, Regulation, And Biotechnology: The Case Of GM Crops § 5:3, 170-77
(2014)).

**PLAINTIFFS' RESPONSE TO NO. 20**:  Plaintiffs dispute and object to Paragraph 20 and
Def. Ex. 66. Paragraph 20 quotes Syngenta's expert's report, which in turn, quotes a study by
a third-party organization.   Paragraph 20 is therefore inadmissible double hearsay.  *PAS
Communications*, 139 F. Supp. 2d at 1179.  Moreover, the article cited by Syngenta does not
lead to the inference Syngenta seeks to draw.   The authors wrote that "bulk agricultural
commodities" trade "cannot[] function with zero-tolerance as the threshold," but none of the
supporting examples given by the authors for that proposition involved a limited launch
product.   Indeed, most of the supporting evidence relied on by the authors did not even
involve a trade disruption. Ex. 396, Stuart J Smyth and  Peter  WB  Phillips,  *Risk,
Regulation, and Biotechnology: The Case of GM Crops* (2014). Rather, they involved
unapproved GM *seed* being planted in an unapproved market, where the only harmful result
was destruction of the contaminated crop.  In another supporting incident, a *single* ship of
Canadian mustard was detected to have "trace amounts of GM material," but the authors
admit that "[t]here is no information on what the European importers did with the mustard
shipment." *Id.*  at 5.  Logically, if Viptera had been detected on only a single ship, ships
testing negative would have been permitted into China and exporters could have continued
serving the market. It was because Viptera had so contaminated the supply based on its wide
and uncontrolled release that the U.S. corn market could no longer serve Chinese buyers.
Finally, the only actual trade disruption cited involved detections of Herculex RW in ships to
the EU in 2006 before it had been approved by the EU.  *Id.* at 174.  But there is no
suggestion therein that the channeling program for Herculex RW included reasonable
precautions or was a limited or managed launch. *Id.*

**Syngenta's Reply To No. 20**: Plaintiffs' response fails to create a genuine dispute of
fact.  First, Syngenta's cited evidence is admissible because an expert may rely on
otherwise inadmissible evidence.   "Rule 703 permits experts to rely upon other
inadmissible evidence '[i]f experts in the particular field would reasonably rely on those
kinds of facts or data in forming an opinion on the subject.'"  *Ast v. BNSF Ry. Co.*, No.
09-2519-EFM/DWB, 2012 WL 252140, at *5 (D. Kan. Jan. 26, 2012) (footnote call
number omitted).  Plaintiffs do not contend that the facts of data relied upon are not the
kind of facts or data other experts would reasonably rely upon.  Furthermore, Plaintiffs
fail to properly dispute that the U.S. National Academies came to the stated conclusion.
This  is  precisely  the  type  of  statement  that  the  Rules  require  to  be  admitted  as
undisputed.  *See In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2
("[P]laintiff's statement of fact number 71 states as follows: According to an AT & T
memorandum, AT & T's intent is to pass both these charges on to customers, so that they
are recognized as tax-like assessments required by the FCC. In this way, the customers
will not perceive that these are fees developed by AT & T or the other IXC's to generate
revenues. Plaintiffs then cite the memorandum itself. This is the type of fact paragraph
the court expects to see because AT & T's response is and should be, appropriately, a

simple undisputed because it cannot dispute the fact that the memorandum so states.")
(footnote call number and internal quotation marks omitted).

23.    Plaintiffs Olson has testified that "[o]nce that seed is out of the bag, the genie is out of
the bottle," and he did not think there was any "way to control it after that." Ex. 73 (D.
Olson Dep. Tr. 122:14-21).

> **PLAINTIFFS' RESPONSE TO NO. 23**:    Plaintiffs object to Paragraph 23 as ambiguous
> as to the terms "genie out of the bottle" and "no way to control it," and state that the
> testimony cited does not relate to the issue of whether a limited and controlled launch of a
> genetically modified trait can reduce the risk of a trade disruption.

> > **Syngenta's Reply To No. 23**: Plaintiffs' response fails to create a genuine dispute of
> > material fact.  Plaintiffs do not contend that Plaintiffs Olson did not testify as quoted in
> > SOF No. 23, and SOF No. 23 did not make any statement concerning "the issue of
> > whether a limited and controlled launch of a genetically modified trait can reduce the risk
> > of a trade disruption."  Plaintiffs cite no record evidence or other admissible evidence to
> > controvert Syngenta's assertion, and have thus failed to properly meet the substance of
> > Syngenta's assertion. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing
> > the motion for summary judgment must respond in a similar fashion. In doing so, the
> > response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule
> > 56.1(b), (e)).

25.    Cargill's Randy Giroux stated in a 2011 presentation that "[l]ow level presence of GMOs
can [will] occur in all transboundary shipments of all commodities (both GMOs and non-
GMOs) shipped from countries having GMOs in commercial production." Ex. 65
(CARRATO-399) (bracketing in original).

> **PLAINTIFFS' RESPONSE TO NO. 25**:    Plaintiffs dispute and object to Paragraph 25
> because it is a portion of Syngenta's expert materials which attribute statement to Giroux and
> is therefore double hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.  Plaintiffs' also
> dispute any inference that Mr. Giroux has the opinion that a limited and controlled launch of
> a genetically modified trait cannot reduce the risk of a trade disruption because Mr. Giroux
> testified otherwise. Ex. 157, Deposition of Randal Giroux (Expert) (11/16/16) ("Giroux
> Expert Dep.") at 37:19-40:6 ("[T]here have been some instances where people have done a
> limited launch and put very rigorous controls around where those acres are planted, how
> many acres are planted, what is the -- where does that grain go, how do they buffer that corn
> and create what they call pollen scrubbers to keep the pollen where it belongs.  There's been
> many instances – there have been, I think, a few instances where limited launch has not
> resulted in a trade disruption in a key market.  And so I think it's – it's possible.").
> Additionally, Syngenta has represented, both internally and externally, that limited launch,
> stewardship, and channeling are effective measures for reducing the risk of a trade
> disruption. *See Infra*, Pl. SOAF ¶¶ 145-162.

> > **Syngenta's Reply To No. 25**: The testimony of Mr. Giroux is not hearsay.  Furthermore,
> > the content of Exhibit 131 may be considered by the Court.  Mr. Giroux has been
> > designated as a non-retained expert in this case.  Pls.' Opp. Ex. 352 (Disclosure of R.

Giroux, at 1). To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial. … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)"). Because Plaintiffs seek to have Mr. Giroux testify at trial, he would be available to testify about his March 2012 internal Cargill statement.

26. Cargill's Randy Giroux has testified that "[w]e have been consistent since, I'm sure, the year 2000 . . . that -- it is not possible to grain channel to zero." Ex. 121 (R. Giroux Dep. Tr. 448:6-10); Ex. 65 (CARRATO-399) (2011 presentation by Giroux stating that "[n]either Identity-Preservation (IdP) nor grain channeling can manage these events to zero").

**PLAINTIFFS' RESPONSE TO NO. 26**: Plaintiffs admit that Syngenta has correctly quoted the cited portion of Giroux's testimony. Plaintiffs again object to the double hearsay contained in Def. Ex. 65. *PAS Communications*, 139 F. Supp. 2d at 1179.

**Syngenta's Reply To No. 26**: The testimony of Mr. Giroux is not hearsay. Furthermore, the content of Exhibit 131 may be considered by the Court. Mr. Giroux has been designated as a non-retained expert in this case. Pls.' Opp. Ex. 352 (Disclosure of R. Giroux, at 1). To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial." … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)"). Because Plaintiffs seek to have Mr. Giroux testify at trial, he would be available to testify about his March 2012 internal Cargill statement.

27. Each of the four Kansas class representatives testified either that (1) it is impossible to prevent cross-pollination, (2) it is not feasible to prevent cross-pollination, or (3) that they are not aware of measures that can prevent cross-pollination. Ex. 59 (D. Polifka Dep. Tr. 170:14-19) ("physically impossible," unless you "build a dome over" the corn crops); Ex. 58 (D. Grafel Dep. Tr. 210:11-13, 210:17-211:3) ("not aware of measures that could be taken" to prevent cross-pollination, and "guess[ed] [that] the only way to do so

would be [] detaseling the corn" plants after they are grown to remove each of the pollen-producing flowers or else to "build[] giant walls around the field" of every farm"); Ex. 76 (B. Kendrick Dep. Tr. 197:8-12) ("you just can't stop" cross-pollination); Ex. 55 (C. Frickey Dep. Tr. 132:9-14) ("wouldn't be practical" to try to prevent cross-pollination).

**PLAINTIFFS' RESPONSE TO NO. 27**:   Disputed.  Three of the class representatives, who are non-Viptera growers, were merely asked if they took any measures to prevent cross-pollination on their farms. *See* Def. Ex. 59, Polifka Dep. at 170:14-17 ("And do you take any steps to prevent cross-pollination among your crops?"); Def. Ex. 58, Grafel Dep. 210:5-211:12 ("Do you take any measures to prevent cross-pollination on your farm?"); Def. Ex. 55 Frickey Dep. 132:9-10 ("Do you take any measures to prevent cross-pollination on your farms?").  The other, in the context of a question regarding whether "Viptera or Duracade caused physical harm to [his] corn," testified it "could have." Def. Ex. 76 (Kendrick Dep. 197:4-7. He was then asked "what do you mean by that" and he answered that "you just can't stop" cross pollination. *Id.* at 197:8-12. This testimony does not support the inference Syngenta seeks to draw that preventing cross-pollination is *generally* infeasible.  None of these farmers were asked to opine on whether the use of border rows by *Viptera* growers would have been effective.  *Id.; see* Pl. SOAF ¶¶ 119-26, 176-77, 184.

> **Syngenta's Reply To No. 27**: Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs in part improperly rely on citations to their own statement of additional facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").
>
> As for Plaintiffs' citations to the record, these fail to create a genuine dispute of fact.  Plaintiffs Polifka, Grafel, and Frickey all testified that (1) it is impossible to prevent cross-pollination, (2) it is not feasible to prevent cross-pollination, or (3) that they are not aware of measures that can prevent cross-pollination.  The form of the question to which they made these responses is irrelevant to their testimony.  As for Plaintiffs Kendrick's testimony, the exchange went as follows: "Q Has Viptera or Duracade caused physical harm to your corn? A I -- I don't know. It sure could have, but I don't know. Q And when you say it sure could have, what do you mean by that? A *Well, how do I stop, like I say, the cross-pollination and -- you know, you just can't.* There are definite number of ways that it could possibly have done that and I'm not aware of.") Syngenta's MSJ Ex. 76 (B. Kendrick Dep. Tr. 197:1-14) (emphasis added).  Kendrick clearly testified that one "just can't" stop cross-pollination, which clearly indicates he believes either (1) it is impossible to prevent cross-pollination, or (2) it is not feasible to prevent cross-pollination.

28.     The Producer Plaintiffs who have been deposed in the Coordinated Litigation who were asked about whether cross-pollination could be prevented testified that (1) it is impossible to prevent cross-pollination; (2) it is not feasible to prevent cross- pollination; and/or (3) that they are not aware of measures that can prevent cross- pollination. *See* Ex. 79 (S. Wentworth Dep. Tr. 170:4-10) (preventing cross- pollination is "not possible" and "would be cost-prohibitive"); Ex. 56 (C. Ledeboer Dep. Tr. 112:25-113:19) ("no" measures that could be taken to prevent cross- pollination unless you detasseled corn plants or otherwise "covered every ear with a plastic bag," which, at "36,400 plants per acre" for a 200-acre farm, would require "every free moment"); Ex. 80 (S. Wubben Dep. Tr. 185:16-24) (only way is "putting a plastic bag over each one of the ears"); Ex. 81 (D. Schwaninger Dep. Tr. 164:12-18) ("Q. Are steps available that can be taken if you wanted to prevent cross-pollenization? [objection omitted] A. Only if you're in a dome. You can't— you can't keep corn a mile and a half away from another field in our area. It's impossible."); Ex. 82 (J. Widener Dep. Tr. 148:8-23) ("It would be impossible. . . . you can't control Mother Nature. You can't put a dome over 2100 acres."); Ex. 54 (B. Bulman Dep. Tr. 160:8-161:2) (would require "putting a bubble over [his] farm"); Ex. 83 (L. Gilbertson Dep. Tr. 283:8-10) ("I don't know how you could possibly" prevent cross-pollination); Ex. 84 (R. Haerr Dep. Tr. 290:23-291:3) (testifying that he could prevent cross-pollination by "put[ting] an acre of pharmaceutical corn on an island in the South Pacific"); Ex. 85 (R. Ward Dep. Tr. 169:3-6) (testifying that methods to isolate specialty corn "wouldn't work" for Viptera "because the cross-pollinated stuff went back in to regular No. 2 dent corn"); Ex. 86 (J. McKinney Dep. Tr. 201:25-202:5) ("no" way to prevent cross- pollination); Ex. 87 (J. Cap Dep. Tr. 203:11-14, 203:21-3) ("very hard" to prevent cross-pollination, and "personally would never make th[e] assumption" that it is "possible to ensure a hundred percent there will be no cross-pollination"); Ex. 88 (T. Jansen Dep. Tr. 231:17-232:11) ("buffer strips" as a potential step are a "joke, depending on how the wind blows"); Ex. 89 (W. Crandall Dep. Tr. 307:23-24) ("I don't know of any way to prevent cross-pollination."); Ex. 90 (L. Claas Dep. Tr. 19:5-9) ("don't know what could be done" to prevent cross-pollination); Ex. 223 (G. Harris Dep. Tr. 112:7-12) ("I can't even imagine what one would do to stop it."); Ex. 91 (L. Dierking Dep. Tr. 83:9-16) ("I don't think it's possible" to stop cross-pollination); Ex. 92 (C. Fulkerson Dep. Tr. 148:23-149:8) ("not feasible" to prevent cross-pollination); Ex. 93 (B. Riessland Dep. Tr. 91:9-15) (similar); Ex. 94 (D. McDonald Dep. Tr. 218:4-5) ("There's no steps that [plaintiff] McDonald AG can take."); Ex. 95 (L. Messersmith Dep. Tr. 139:14-18) ("there is not anything we can do about it"); Ex. 96 (S. Moorman Dep. Tr. 317:11-14) (cross-pollination cannot be prevented by farmers); Ex. 97 (R. Glanzer Dep. Tr. 135:20-23) ("impossible"); Ex. 98 (D. Wegner Dep. Tr. 107:15) ("impossible"); Ex. 99 (J. Runsick Dep. Tr. 198:23-24) ("You can't stop it."); Ex. 100 (W. Maloney Dep. Tr. 140:17-22) ("I don't know that you can prevent it 100 percent, because it can travel, you know, fairly long distances due to wind and weather and things like that."); Ex. 101 (R. Olthoff Dep. Tr. 133:17-134:4) ("cost-prohibitive" to even try to prevent); (similar); Ex. 102 (J. DeBoom Dep. Tr. 118:15-22) ("I don't feel that I can prevent it."); Ex. 61 (G. Rosborough Dep. Tr. 136:12-25) (testifying that efforts to isolate their white corn from yellow corn with a quarter-mile buffer still resulted in "3 to 5 percent" of their white corn being cross-pollinated); Ex. 103 (R. Ulmer Dep. Tr. 211:17-19) ("There was even concern about pollination a mile or two away into other fields that weren't Syngenta

corn."); Ex. 104 (G. Matthews Dep. Tr. 172:12-15) (not aware of any methods to prevent cross-pollination); Ex. 105 (R. Overgard Dep. Tr. 179:24-180:4) (same); Ex. 106 (T. Baumgart Dep. Tr. 186:20-22) (same); Ex. 107 (D. Belknap Dep. Tr. 132:13-15) (same); Ex. 108 (J. Goebel Dep. Tr. 144:25-145:7) (same); Ex. 109 (R. Kruse Dep. Tr. 141:5-9) (same); Ex. 110 (L. Mosier Dep. Tr. 158:23-25) (same); Ex. 111 (L. Wallin Dep. Tr. 129:24-4) (same); Ex. 112 (J. Schmaltz Dep. Tr. 119:6-9) (cross-pollination is "always a possibility"); Ex. 113 (C. Laubenthal Dep. Tr. 117:4-16) (". . . "it's all cross contaminated in the United States. There's no way to keep pollen movement. You're done. Once it's done, it's done. . . . We're cross-pollinated everywhere. If our neighbors plant corn, it comes into our fields.  We don't know what we have.").

**PLAINTIFFS' RESPONSE TO NO. 28**:    Plaintiffs admit that Paragraph 28 summarizes the quoted testimony correctly, but note that the testimony referenced deals with cross-pollination generally, not the issue of whether a limited launch can reduce the risk of a trade disruption.

> **Syngenta's Reply To No. 28**: Plaintiffs have admitted No. 28 is undisputed.  No. 28 does not reference "the issue of whether a limited launch can reduce the risk of a trade disruption," and this portion of Plaintiffs' response is thus irrelevant for purposes of the Response.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

30.   David Morgan, Syngenta's Global Head of Vegetables, has testified that "there's nothing in [Syngenta's] procedures that could address issues about dust coating a, coating a grain car." Ex. 19 (2/10/2016 D. Morgan Dep. Tr. 156:12-15).

**PLAINTIFFS' RESPONSE TO NO. 30**:    Plaintiffs admit that Paragraph 30 accurately quotes Mr. Morgan's testimony, but dispute the testimony.  Mr. Morgan's apparent belief that Syngenta could not institute procedures to prevent contamination of United States grain shipments lacks merit. Syngenta could have waited for import approval from China before commercializing Viptera or conducted a limited launch of Viptera with robust stewardship. *See infra*, Pl. SOAF ¶¶56-82, 133-144, 197-233.

> **Syngenta's Reply To No. 30**: Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs improperly rely on broad citations to their own statement of additional facts instead of properly attempting to controvert Defendants' statements with specific record evidence.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").  No. 30 does not reference the accuracy of Mr. Morgan's testimony and this portion of Plaintiffs' response is thus irrelevant for purposes of the Response.  *Cf. In re*

*Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

31.    The Kansas Class Representatives could not identify any physical harm to their corn or other property from the conduct challenged in this case. *See* Ex. 55 (C. Frickey Dep. Tr. 139:21-140:21, 171:20-172:3) ("no way of knowing" of any physical harm to his corn and "not aware" of any harm other than reduction in corn price); Ex. 59 (D. Polifka Dep. Tr. 224:13-225:5) (testifying that he could not identify "any physical harm" to his "corn," "farm equipment," or "land" as a result of Syngenta's actions); Ex. 76 (B. Kendrick Dep. Tr. 199:12-200:4) (testifying that he has "no idea" if Viptera or Duracade caused physical harm to his property); Ex. 58 (D. Grafel 217:3-218:10) (testifying, when asked about physical harm to his property, that the "[o]nly harm I would claim is the price").

**PLAINTIFFS' RESPONSE TO NO. 31**: Plaintiffs dispute Paragraph 31 because the citation to Mr. Kendrick's testimony is inaccurate and incomplete.  Mr. Kendrick testified Viptera "sure could have" caused "physical harm" to his corn through cross-pollination, "it could possibly have done that and I'm not aware of[,]" and "it changed what my corn actually is, correct? So it could have." Def. Ex. 76 (B. Kendrick Dep. Tr. 197:4-14; 199:3-5).

**Syngenta's Reply To No. 31**: Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs Kendrick testified he was not sure whether Viptera actually changed what his corn was, only that it "could have" and in fact "it might not have"; the only physical harm to his corn that he identified is having "changed what my corn actually is…."  He thus "could not identify any physical harm to their corn or other property from the conduct challenged in this case," as No. 31 states.  Syngenta's MSJ Ex. 76 (B. Kendrick Dep. Tr. 198:17-199:8) (Q Well, I'm just trying to figure out what you mean by physical harm to your corn, you said it could have resulted in physical harm to your corn. What -- what to you is physical harm to your corn? … A Yeah, to me physical harm is it -- it changed what my corn actually is, correct? So it could have. Q Okay. A And it might not have, but it sure could have.").

34.    In the 2008/09 marketing year, approximately 13.5% of U.S. corn was exported.  Ex. 1 (USDA Feed Grains: Yearbook Tables, Corn: Supply and Disappearance Full Table, accessed at https://www.ers.usda.gov/data-products/feed-grains- database/feed-grains-yearbook-tables/ (total exports were 1,849 million bushels, total supply was 13,681 million bushels)).

**PLAINTIFFS' RESPONSE TO NO. 34**:  Plaintiffs dispute Paragraph 34 because Syngenta has incorrectly calculated the percentage of U.S. Corn exported. Syngenta's denominator is "total supply," which is production plus imports plus beginning stocks. It is more typical and more reasonable to report exports as a percentage of production because stocks represent a buffer and would never be drawn down to zero.  So Syngenta has heavily inflated production by adding stocks.

**Syngenta's Reply To No. 34**:  Plaintiffs fail to create a genuine dispute of material fact. First, Plaintiffs fail to controvert Defendants' statements by citation to record or other evidence, and thus fail in their burden to controvert Syngenta's evidence.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").  For instance, Plaintiffs provide no citation to authority that it is "more typical" to use a different figure, that it is "more reasonable" to use a different figure, that stocks "would never be drawn down to zero," or why that assertion impacts Syngenta's statement.

Second, even on the merits, Plaintiffs' response fails to create a genuine dispute of material fact.  The straightforward definition of "U.S. corn" is corn that is *in the United States*.  That is precisely what is represented by the "total supply" figure used in Syngenta's calculation.  There can be no reasonable dispute that the supply of U.S. corn that is stocks, production, and imports are all available to be exported (or re-exported), and there is thus no genuine dispute that in the 2008/09 marketing year, approximately 13.5% of U.S. corn was exported.

Even using Plaintiffs' suggested figures, the result would be 12,043 million bushels of production, such that 15.35% of U.S. corn was exported.   The difference is not material to any arguments presented in Syngenta's motion for summary judgment.

35.   In the 2009/10 marketing year, approximately 13.4% of U.S. corn was exported.  Ex. 1 (USDA Feed Grains: Yearbook Tables, Corn: Supply and Disappearance Full Table, accessed at https://www.ers.usda.gov/data-products/feed-grains- database/feed-grains-yearbook-tables/ (total exports were 1,979 million bushels, total supply was 14,749 million bushels)).

**PLAINTIFFS' RESPONSE TO NO. 35**:      Plaintiffs dispute Paragraph 35 because Syngenta has incorrectly calculated the percentage of U.S. Corn exported. Syngenta's denominator is "total supply," which is production plus imports plus beginning stocks. It is more typical and more reasonable to report exports as a percentage of production because stocks represent a buffer and would never be drawn down to zero.  So Syngenta has heavily inflated production by adding stocks.

**Syngenta's Reply To No. 35**:  Plaintiffs fail to create a genuine dispute of material fact. First, Plaintiffs fail to controvert Defendants' statements by citation to record or other evidence, and thus fail in their burden to controvert Syngenta's evidence.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").  For instance, Plaintiffs provide no citation to authority that it is "more typical" to use a different figure, that it is "more reasonable" to use a different figure, that stocks "would never be drawn down to zero," or why that assertion impacts Syngenta's statement.

Second, even on the merits, Plaintiffs' response fails to create a genuine dispute of material fact. The straightforward definition of "U.S. corn" is corn that is *in the United States*. That is precisely what is represented by the "total supply" figure used in Syngenta's calculation. There can be no reasonable dispute that the supply of U.S. corn that is stocks, production, and imports are all available to be exported (or re-exported), and there is thus no genuine dispute that in the 2009/10 marketing year, approximately 13.4% of U.S. corn was exported.

Even using Plaintiffs' suggested figures, the result would be 13,067 million bushels of production, such that 15.14% of U.S. corn was exported. The difference is not material to any arguments presented in Syngenta's motion for summary judgment.

36.    In the 2010/11 marketing year only 12.9% of U.S. corn was exported. Ex. 1 (USDA Feed Grains: Yearbook Tables, Corn: Supply and Disappearance Full Table, accessed at https://www.ers.usda.gov/data-products/feed-grains-database/feed-grains-yearbook-tables/ (total exports were 1,831 million bushels, total supply was 14,161 million bushels)).

**PLAINTIFFS' RESPONSE TO NO. 36**: Plaintiffs dispute Paragraph 36 because Syngenta has incorrectly calculated the percentage of U.S. Corn exported. Syngenta's denominator is "total supply," which is production plus imports plus beginning stocks. It is more typical and more reasonable to report exports as a percentage of production because stocks represent a buffer and would never be drawn down to zero. So Syngenta has heavily inflated production by adding stocks.

**Syngenta's Reply To No. 36**: Plaintiffs fail to create a genuine dispute of material fact. First, Plaintiffs fail to controvert Defendants' statements by citation to record or other evidence, and thus fail in their burden to controvert Syngenta's evidence. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted."). For instance, Plaintiffs provide no citation to authority that it is "more typical" to use a different figure, that it is "more reasonable" to use a different figure, that stocks "would never be drawn down to zero," or why that assertion impacts Syngenta's statement.

Second, even on the merits, Plaintiffs' response fails to create a genuine dispute of material fact. The straightforward definition of "U.S. corn" is corn that is *in the United States*. That is precisely what is represented by the "total supply" figure used in Syngenta's calculation. There can be no reasonable dispute that the supply of U.S. corn that is stocks, production, and imports are all available to be exported (or re-exported), and there is thus no genuine dispute that in the 2010/11 marketing year only 12.9% of U.S. corn was exported.

Even using Plaintiffs' suggested figures, the result would be 12,425 million bushels of production, such that 14.7% of U.S. corn was exported. The difference is not material to any arguments presented in Syngenta's motion for summary judgment.

37.    In the 2011/12 marketing year only 11.4% of U.S. corn was exported. Ex. 1 (USDA Feed
       Grains: Yearbook Tables, Corn: Supply and Disappearance Full Table, accessed at
       https://www.ers.usda.gov/data-products/feed-grains-database/feed-   grains-yearbook-
       tables/ (total exports were 1,539 million bushels, total supply was 13,471 million
       bushels)).

       **PLAINTIFFS' RESPONSE TO NO. 37**:       Plaintiffs dispute Paragraph 37 because
       Syngenta has incorrectly calculated the percentage of U.S. Corn exported. Syngenta's
       denominator is "total supply," which is production plus imports plus beginning stocks. It is
       more typical and more reasonable to report exports as a percentage of production because
       stocks represent a buffer and would never be drawn down to zero.  So Syngenta has heavily
       inflated production by adding stocks.

            **Syngenta's Reply To No. 37**:  Plaintiffs fail to create a genuine dispute of material fact.
            First, Plaintiffs fail to controvert Defendants' statements by citation to record or other
            evidence, and thus fail in their burden to controvert Syngenta's evidence. *In re Universal
            Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This practice runs afoul of the
            various rules requiring the specific facts to be presented with record support …, to refer
            with particularity to those portions of the record upon which plaintiff is relying, and to
            fairly meet the substance of the matter asserted.").  For instance, Plaintiffs provide no
            citation to authority that it is "more typical" to use a different figure, that it is "more
            reasonable" to use a different figure, that stocks "would never be drawn down to zero,"
            or why that assertion impacts Syngenta's statement.

            Second, even on the merits, Plaintiffs' response fails to create a genuine dispute of
            material fact.  The straightforward definition of "U.S. corn" is corn that is *in the United
            States*.  That is precisely what is represented by the "total supply" figure used in
            Syngenta's calculation.  There can be no reasonable dispute that the supply of U.S. corn
            that is stocks, production, and imports are all available to be exported (or re-exported),
            and there is thus no genuine dispute that in the 2011/12 marketing year only 11.4% of
            U.S. corn was exported.

            Even using Plaintiffs' suggested figures, the result would be 12,314 million bushels of
            production, such that 12.5% of U.S. corn was exported.  The difference is not material to
            any arguments presented in Syngenta's motion for summary judgment.

38.    In the 2012/13 marketing year, approximately 6.1% of U.S. corn was exported. Ex. 1
       (USDA Feed Grains: Yearbook Tables, Corn: Supply and Disappearance Full Table,
       accessed at https://www.ers.usda.gov/data-products/feed-grains- database/feed-grains-
       yearbook-tables/ (total exports were 730 million bushels, total supply was 11,904 million
       bushels)).

       **PLAINTIFFS' RESPONSE TO NO. 38**:       Plaintiffs dispute Paragraph 38 because
       Syngenta has incorrectly calculated the percentage of U.S. Corn exported. Syngenta's
       denominator is "total supply," which is production plus imports plus beginning stocks. It is
       more typical and more reasonable to report exports as a percentage of production because

stocks represent a buffer and would never be drawn down to zero.  So Syngenta has heavily inflated production by adding stocks.

> **Syngenta's Reply To No. 38**:  Plaintiffs fail to create a genuine dispute of material fact. First, Plaintiffs fail to controvert Defendants' statements by citation to record or other evidence, and thus fail in their burden to controvert Syngenta's evidence.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").  For instance, Plaintiffs provide no citation to authority that it is "more typical" to use a different figure, that it is "more reasonable" to use a different figure, that stocks "would never be drawn down to zero," or why that assertion impacts Syngenta's statement.

> Second, even on the merits, Plaintiffs' response fails to create a genuine dispute of material fact.  The straightforward definition of "U.S. corn" is corn that is *in the United States*.  That is precisely what is represented by the "total supply" figure used in Syngenta's calculation.  There can be no reasonable dispute that the supply of U.S. corn that is stocks, production, and imports are all available to be exported (or re-exported), and there is thus no genuine dispute that in the 2012/13 marketing year, approximately 6.1% of U.S. corn was exported.

> Even using Plaintiffs' suggested figures, the result would be 10,755 million bushels of production, such that 6.8% of U.S. corn was exported.  The difference is not material to any arguments presented in Syngenta's motion for summary judgment.

39.    In 2010, 12,425,330,000 bushels of corn were produced in the U.S., and 1,025,396 metric tons were exported to China. Ex. 191 (USDA Economic Research Serv. Feed Grains Database). Converting the 1,025,396 metric tons to bushels (39.368 bushels per metric ton, or about 40,367,790 bushels) and dividing by total production shows that only 0.32% of U.S. corn was exported to China in 2010. *See* Ex. 230 (USDA, Weights, Measures, and Conversion Factors for Agricultural Commodities and Their Products, USDA Handbook No. 697, at 10 (June 1992)) (Table 5: for "56- pound bushel of shelled corn," "1 metric ton = 39.368 bushels").

> **PLAINTIFFS' RESPONSE TO NO. 39**:      Plaintiffs dispute Paragraph 39 because Syngenta has incorrectly calculated the percentage of U.S. Corn exported. Syngenta's denominator is "total supply," which is production plus imports plus beginning stocks. It is more typical and more reasonable to report exports as a percentage of production because stocks represent a buffer and would never be drawn down to zero. So Syngenta has heavily inflated production by adding stocks.

> **Syngenta's Reply To No. 39**:  Plaintiffs fail to create a genuine dispute of material fact. Plaintiffs have simply copied and pasted their response to the previous statement without noticing that, in fact, Syngenta did not use a "total supply" denominator, but instead used a "total production" of approximately 12,425 million bushels.  *See* Syngenta's MSJ Ex.

1 (USDA Feed Grains: Yearbook Tables, Corn: Supply and Disappearance Full Table) (total supply was 14,161 million bushels; total production was 12,425 million bushels).

Second, Plaintiffs fail to controvert Defendants' statements by citation to record or other evidence, and thus fail in their burden to controvert Syngenta's evidence. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted."). For instance, Plaintiffs provide no citation to authority that it is "more typical" to use a different figure, that it is "more reasonable" to use a different figure, that stocks "would never be drawn down to zero," or why that assertion impacts Syngenta's statement.

42.   According to the U.S.D.A's annual report on biotechnology issues in China, "the process of getting a biosafety certificate for imported biotech food crops for processing (like soybeans) will last about two years." Ex. 192 (K. Latner Dep. Ex. 11) (Plaintiffs' expert).

**PLAINTIFFS' RESPONSE TO NO. 42**:   Plaintiffs admit Paragraph 42 accurately states the content of the USDA report, but dispute any suggestion that Syngenta projected approval of MIR162 in two years. Syngenta's internal communications establish that it knew the import approval process in China would likely 28 months or more from the date of its application. *See infra*, Pl. SOAF ¶ 249. And as Mr. Latner stated in his deposition, the USDA must rely on biotech companies for its information regarding the length of the application process in China because submissions in China are kept confidential. Ex. 161, Deposition of Kevin Latner ("Latner Dep.") at 268:15-269:9 ("Q. You agree that that's what the USDA was reporting in its 2010 biotechnology annual, right? A. I agree that that's what was reported there. Of course they would rely on representations by the biotech companies because the dates of when things are happening are confidential.")

**Syngenta's Reply To No. 42**: Plaintiffs' response fails to create a genuine dispute of material fact. The statement does not reference "any suggestion that Syngenta projected approval of MIR162 in two years," and this portion of Plaintiffs' response is thus irrelevant. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

43.   Syngenta's Chuck Lee was asked during his deposition "On August 17, 2011, what was the source of your information that you were expecting approval from China in March 2012?," and in response Mr. Lee testified: "So I think it's fairly common knowledge from regulatory, and they relayed this, that, you know, there's a two- year delay between, as we discussed, the asynchronicity of China, between USDA deregulation, which enables us to apply for import approval in China, and that approval, and you know, to this point, you know, we put a fair amount of traits through China, and those traits had all operated roughly on that two-year delay, so we expected -- regulatory said they expected that to occur. We were able to get data submitted into China, the in-country study submitted on time in China, and so we expected -- you know, everything I was told, we

expected approval to come in Q2 of -- of '12 -- or Q1 of 2012." Ex. 16 (3/8/2016 C. Lee Dep. Tr. 177:19-179:8). Mr. Lee also testified that "our time line was Q1 2012. It had always been Q1 2012. That's what we planned to and -- and worked around." Mr. Lee also testified "our belief was, and we said it over and over, that we'd have, you know, China import approval in Q2 of 2012." Ex. 16 (3/10/2016 C. Lee Dep. Tr. 495:2-496:7; 735:14-736:16). In PLAINTIFF'S RESPONSE TO the question "so the head of corn for North America says that as of August 2011, there was no indication that China was not going to approve Viptera as of first quarter 2012?," Mr. Lee testified "No definitive information. No." Ex. 16 (8/3/2016 C. Lee Dep. Tr. 106:10-15); *see also* Ex. 16 (3/10/2016 C. Lee Dep. Tr. 534:2-536:10) ("Yeah, again, we expected approval in Q1 of 2012, as we've discussed multiple times here.").

**<u>PLAINTIFFS' RESPONSE TO NO. 43</u>**:   Plaintiffs admit Paragraph 43 accurately quotes   Mr.  Lee's testimony.   The record establishes that Syngenta had no reasonable basis to expect import approval from China in March 2012, and in fact, expected approval late in 2013 at the earliest.   The record establishes that Syngenta misrepresented its expected import approval date to protect sales of Viptera.   *See infra,* Pl. SOAF ¶¶ 249-343.

> **Syngenta's Reply To No. 43**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs cannot dispute that Mr. Lee so testified. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).  Plaintiffs also improperly rely on broad citations to their own statement of additional facts instead of properly controverting Defendants' statements.   *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

> Furthermore, Mr. Lee was testifying about the basis for his belief in something he wrote in the August 2011 grower letter. The accuracy of his testimony about his belief cannot only be challenged by evidence that shows his contemporaneous belief.  Plaintiffs' cited sources do not address the issue of Mr. Lee's belief at the time the letter was written and thus fail to create a genuine dispute of material fact.

44.   Syngenta's Chuck Lee was asked during his deposition "I believe you said that you understood that the field trials were planted in the summer of 2011 and the tests done by November; is that correct?" and Mr. Lee responded: "Again, that's my understanding from Lisa [Zannoni] and the regulatory group." Mr. Lee was asked "And I believe you said that from Lisa, you understood that if you got the field trials done by November, then you would have approval in March 2012?" and Mr. Lee responded "So yeah, there's

two reasons again why we believed that. I mean, Lisa said if we had the in-country done, and, you know, by November, we can submit the final dossier for review. And also, you know, up until this point, you know, we put a fair amount of traits through China, and they had operated on this time two-year frame from USDA deregulation 'til approval. It wasn't -- we really hadn't had issues before, and nor had really any of the other companies had any real issues, so we fully expected that this time line would execute." Ex. 16 (3/8/2016 C. Lee Dep. Tr. 189:17-190:11).

**PLAINTIFFS' RESPONSE TO NO. 44**:   Plaintiffs admit that Paragraph 44 accurately quotes Mr. Lee's testimony, but dispute the testimony.   The record establishes that Syngenta had no reasonable basis to expect import approval from China in March 2012, and in fact, expected approval in 2013 at the earliest.  The record establishes that Syngenta misrepresented its expected import approval date to protect sales of Viptera. *See infra,* Pl. SOAF ¶¶ 249-343.

> **Syngenta's Reply To No. 44**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs cannot dispute that Mr. Lee so testified. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).  Plaintiffs also improperly rely on broad citations to their own statement of additional facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

> Furthermore, Mr. Lee was testifying about the basis for his belief in something he wrote in the August 2011 grower letter.  The accuracy of his testimony about his belief cannot only be challenged by evidence that shows his contemporaneous belief.  Plaintiffs' cited sources do not address the issue of Mr. Lee's belief at the time the letter was written and thus fail to create a genuine dispute of material fact.

45.   Syngenta's Davor Pisk has testified that "I know or I believe we communicated in a transparent way, to the best of our knowledge, what our expectations were" regarding the timing for approval of MIR162, and that "first quarter of 2012" "was at that point in time the best information that we had available." Ex. 225 (4/21/2016 D. Pisk Dep. Tr. 190:24-191:14; 197:2-199:6). Mr. Pisk testified: "The pattern at that time, at least again as we could judge it, and as I mentioned or as you have seen from previous documents, the pattern is not always discernible, but there was plenty of precedent for reviews to be provided at the next window. So typically what happened in China at that time we thought was there would be three windows of submissions and responses, and we expected a response in the next window, which would have been the following March,

and that having satisfied the requirements, that that is the most reasonable expectation we had of a positive approval." Ex. 225 (D. Pisk Dep. Tr. 200:10-202:18). When asked during his deposition "you provided that approval in China was expected by the end of March of 2012, right?," Mr. Pisk testified "That was our expectation." Ex. 225 (4/22/2016 D. Pisk Dep. Tr. 368:21-369:18).

**PLAINTIFFS' RESPONSE TO NO. 45**:    Plaintiffs admit that Paragraph 45 accurately quotes Mr. Pisk's testimony, but dispute the testimony.  The record establishes that Syngenta had no reasonable basis to expect import approval from China in March 2012, and in fact, expected approval in 2013 at the earliest.    The record establishes that Syngenta misrepresented its expected import approval date to protect sales of Viptera.  *See infra,* Pl. SOAF ¶¶ 249-343.

> **Syngenta's Reply To No. 45**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs cannot dispute that Mr. Pisk so testified. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted). Plaintiffs also improperly rely on broad citations to their own statement of additional facts instead of properly controverting Defendants' statements. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").
>
> Furthermore, Mr. Pisk was testifying about the basis for his belief about Syngenta's communications in 2011.  The accuracy of his testimony about his belief cannot only be challenged by evidence that shows his contemporaneous belief.  Plaintiffs' cited sources do not address the issue of Mr. Pisk's belief at the time the communications were made and thus fail to create a genuine dispute of material fact.

46.    Syngenta's Lisa Zannoni has testified that "at this point, you know we talked about China in industry groups, so it was two years was the timeline that industry was using, and so that fit into that timeline." When asked "Two years would be from when the application was initially submitted, correct, in March of 2010?," Ms. Zannoni answered "Yes." Ms. Zannoni also has testified that "we knew that the dossier would be reviewed in the December meeting. So to us, that was on track for Q1." Ms. Zannoni also has testified that "Well, usually general practice was that you would get questions or none before the next window, which was in, would have been March.  And if we --so that would keep us on a Q1 if we had no questions on that, on the final submission." Ms. Zannoni also testified that "we had quite a few, most of our approvals already from 162 so quite a few countries that already reviewed the package. We had already, any questions that we would have had, we already responded. So at that point since China is the last submission

that typically we do, . . . there was no reason to believe that we would have questions." Ex. 24 (4/13/2016 L. Zannoni Dep. Tr. 629:2-637:3).

**PLAINTIFFS' RESPONSE TO NO. 46**:   Plaintiffs admit that Paragraph 46 accurately quotes Ms. Zannoni's testimony, but dispute the testimony. The record establishes that Syngenta had no reasonable basis to expect import approval from China in March 2012, and in fact, expected approval in 2013 at the earliest. The record establishes that Syngenta misrepresented its expected import approval date to protect sales of Viptera. *See infra,* Pl. SOAF ¶¶ 249-478.

> **Syngenta's Reply To No. 46**:  Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs cannot dispute that Ms. Zannoni so testified. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).  Plaintiffs also improperly rely on broad citations to their own statement of additional facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").
>
> Furthermore, Mr. Zannoni was testifying about the basis for her belief about Syngenta's communications in 2011.  The accuracy of her testimony about her belief cannot only be challenged by evidence that shows her contemporaneous belief.  Plaintiffs' cited sources do not address the issue of Ms. Zannoni's belief at the time the communications were made and thus fail to create a genuine dispute of material fact.

47.   Syngenta's Yongsheng Zhang was asked during his deposition "When you became the manager of the Chinese regulatory affairs group in the spring of 2011, did you have a best estimate about when Syngenta could expect to receive import approval for MIR162?," and in response he has testified "So at the time, the best estimate was around the end of first quarter of 2012." Dr. Zhang was asked to testify as to his "impression as of August of 2011 as to when you expected import approval of MIR162," and Dr. Zhang testified "it was expected to get approved by the end of the first quarter of 2012." Dr. Zhang was asked "And when you say 'the end of the first quarter of 2012,' is that a particular time of year?," and he answered ""Around March or so." *See* Ex. 20 (3/24/2016 Y. Zhang Dep. Tr. 692:9-694:6); *see also* Ex. 20 (Y. Zhang Dep. Tr. 734).

**PLAINTIFFS' RESPONSE TO NO. 47**:   Plaintiffs admit that Paragraph 47 accurately quotes Mr. Zhang's testimony, but dispute that testimony.  The record establishes that Syngenta had no reasonable basis to expect import approval from China in March 2012, and in fact, expected approval in 2013 at the earliest.  The record establishes that Syngenta

misrepresented its expected import approval date to protect sales of Viptera.  *See infra,* Pl. SOAF ¶¶ 249-478.

> **Syngenta's Reply To No. 47**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs cannot dispute that Dr. Zhang so testified. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).  Plaintiffs also improperly rely on broad citations to their own statement of additional facts — over *220 paragraphs of them* — instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

> Furthermore, Dr. Zhang was testifying about the basis for his belief about Syngenta's communications in 2011.  The accuracy of testimony about his belief cannot only be challenged by evidence that shows his contemporaneous belief.  Plaintiffs' cited sources do not address the issue of Dr. Zhang's belief at the time the communications were made and thus fail to create a genuine dispute of material fact.

48.   Plaintiffs' expert Kevin Latner was asked during his deposition "that two to three- year time period, that runs from the time of the initial submission, right?," to which he responded "That's correct." Mr. Latner was asked "So the two to three years does not run from the final complete submission typically speaking, right?," to which he responded "That's correct." Ex. 192 (K. Latner Dep. Tr. 265:6-266:13).

> **PLAINTIFFS' RESPONSE TO NO. 48**:     Plaintiffs admit that Paragraph 48 correctly describes the quoted testimony.  Plaintiffs additionally note that the two to three-year estimate for import approval of genetically modified traits in China referenced in Mr. Latner's testimony would be extended by mistakes and delays by the applicant. *See infra,* Pl. SOAF ¶¶ 249-250.

> **Syngenta's Reply To No. 48**: Plaintiffs' response fails to create a genuine dispute of material fact.  Statement 48 does not reference any alleged mistakes or delays and this portion of Plaintiffs' response is thus irrelevant for purposes of the Response. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

49.     According to the industry group CropLife China, if an initial submission is made in March of year 1, the "timeline" for approval in China was "24 months." Ex. 11 (K. Latner Dep. Tr. Ex. 17 at SYNG_00477129).

**PLAINTIFFS' RESPONSE TO NO. 49**:     Plaintiffs dispute and object to Paragraph 49 and Def. Ex. 11. Paragraph 49 refers to and quotes an email from an employee of CropLife China, which is hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179; Def. Ex. 11.

> **Syngenta's Reply To No. 49**: Plaintiffs' response fails to create a genuine dispute.  First, the evidence is admissible.  "Rule 703 permits experts to rely upon other inadmissible evidence '[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'"  *Ast v. BNSF Ry. Co.*, No. 09-2519-EFM/DWB, 2012 WL 252140, at *5 (D. Kan. Jan. 26, 2012) (footnote call number omitted).  Plaintiffs do not contend that the facts of data relied upon are not the kind of facts or data other experts would reasonably rely upon. This is precisely the type of statement that the Rules require to be admitted as undisputed.  *See In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiff's statement of fact number 71 states as follows: According to an AT & T memorandum, AT & T's intent is to pass both these charges on to customers, so that they are recognized as tax-like assessments required by the FCC. In this way, the customers will not perceive that these are fees developed by AT & T or the other IXC's to generate revenues. Plaintiffs then cite the memorandum itself. This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple undisputed because it cannot dispute the fact that the memorandum so states.") (footnote call number and internal quotation marks omitted).

51.     ADM's Wes Uhlmeyer testified that "We have a letter from Syngenta from June of 2012 saying that Chinese regulatory authorities had . . . an additional request." Ex. 122 (6/16/2016 W. Uhlmeyer Dep. Tr. 312:6-15.

**PLAINTIFFS' RESPONSE TO NO. 51**:     Plaintiffs admit that Paragraph 51 accurately quotes a portion of Mr. Uhlmeyer's testimony, but to the extent Syngenta intends to suggest ADM was fully informed of the status of import approval, that suggestion is disputed. Although Syngenta informed ADM in June 2012 that Syngenta had received an additional request from the Chinese authorities, Syngenta kept ADM in dark about any specifics. ADM's Wes Uhlmeyer testified, "Up until the meeting JuHui [Huang of ADM] attended in December 2013 . . . we really had no idea what was going on behind the scenes." Ex. 77, Deposition of Wes Uhlmeyer 30(b)(6) Vol. II ("Uhlmeyer 30b6 Vol. II) at 310:20-311:8.

> **Syngenta's Reply To No. 51**: Plaintiffs' response fails to create a genuine dispute of material fact. The statement does not reference any "suggestion" or inference, and this portion of the response is thus irrelevant.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

52.     ADM's Anthony Reed, who testified as ADM's corporate representative, was asked during his deposition "this update to the grain trade on June 15th, 2012 says, yesterday, I received a call from Syngenta on the status of their application for China to approve the Agrisure Viptera MIR162 trait for trade. Did I read that correctly?" and he testified "Yes." Mr. Reed was then asked "so that would reflect that within two days or so of receiving those questions, Syngenta reached out to the trade to inform the trade about the questions it received from the Chinese regulators, right?" and Mr. Reed testified "It would be appear to be, yes." Ex. 146 (10/14/2016 A. Reed Dep. Tr. 117:7-120:7).

**PLAINTIFFS' RESPONSE TO NO. 52**:     Plaintiffs object to and dispute Paragraph 52 because Mr. Reed lacks personal knowledge of when Syngenta reached out to ADM in relation to when Syngenta received additional questions from the grain trade.  Mr. Reed testified "I can't say one way or the other when they [Syngenta] received questions." Ex. 124, Deposition of Anthony Reed Vol. III ("Reed Vol. III") at 117:16-21.

> **Syngenta's Reply To No. 52**: Plaintiffs' response fails to create a genuine dispute of material fact.  The statement does not reference the personal knowledge of Mr. Reed, who was testifying as a corporate representative, and this portion of the response is thus irrelevant.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

53.     The president and corporate representative of the National Grain and Feed Association has testified that Syngenta "informed the NGFA that it had received questions from the MOA as far back as June of 2012" when the first questions were received, and that information, when received by NGFA, "was transmitted by the NGFA to the members of [its] Biotechnology Committee, which included ADM and Cargill." Ex. 226 (6/6/2016 R. Gordon Dep. Tr. 222:4-13).

**PLAINTIFFS' RESPONSE TO NO. 53**:     Plaintiffs admit that that Paragraph 53 correctly states the quoted testimony, but dispute that the "first questions" Syngenta received from the Ministry of Agriculture were in June of 2012.  The Ministry of Agriculture presented issues in response to Syngenta's initial application submitted in March 2010.  *See infra*, Pl. SOAF ¶ 258.

> **Syngenta's Reply To No. 53**: Plaintiffs' response fails to create a genuine dispute of material fact.  The evidence cited in support of Pls.' SOAF ¶ 258 does not support this assertion or the assertion in SOAF ¶ 258.  Pls.' Opp.. Ex. 364 (Y. Yongsheng Dep. Ex. 729, at SYNG_00353947) does not reference "the issuance of import permits for the test seeds necessary for the in-country testing of MIR162" or the identification of "numerous deficiencies."  Similarly, the testimony in Pls.' Opp.. Ex. 354 (Y. Zhang Dep. Tr. 448:11-449:12) relates to Daphnia, not the issuance of import permits for in-country tests. Pls.' Opp.. Ex. 125 (S. Huber Dep. Ex. 61) and Pls.' Opp.. Ex. 126 (S. Huber Dep. Ex. 67) do not support Plaintiffs' assertion because they are entirely in Chinese and no translation has been cited to substantiate plaintiffs' assertions.  Nor does the cited testimony in Pls.' Opp. Ex. 31 (S. Huber Dep. Tr. 390:9-23, 410:20-411:9) which merely

recites the dates on the documents marked Exhibit 61 and 67. Thus, Plaintiffs have provided no evidence whatsoever to support their assertion that "in granting the import permit, the Ministry of Agriculture identified numerous deficiencies in Syngenta's initial application."

54. ADM's Wes Uhlmeyer, testifying as ADM's corporate representative, testified "Rick Grabiel from ADM sent a request form to get us Chinese biosafety certificate for MIR162 and got the email that's on tab B back from a Terese Rennie from Syngenta saying: Rick, I received your request form. However, Viptera, MIR162, hasn't been released yet. We are very close to getting our approval. I will issue the certificate to you as soon as I receive it." Ex. 122 (6/16/2016 W. Uhlmeyer Dep. Tr. 341:24-342:22).

**PLAINTIFFS' RESPONSE TO NO. 54**: Plaintiffs admit that Paragraph 54 accurately states the quoted testimony but dispute and object to 342:17-22 of Mr. Uhlmeyer's testimony as hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

**Syngenta's Reply To No. 54**: Plaintiffs challenge a portion of an email from Terese Rennie of Syngenta to ADM as hearsay, but the cited portion is not being offered for the truth of the matter asserted, only for its effect on the listener, and thus is not hearsay. *Partex Apparel Int'l LTDA S.A. de C.V. v. GFSI, Inc.*, No. 10-2678, 2012 WL 1059854, at *2 (D. Kan. Mar. 28, 2012) (rejecting assertion that affidavits contained hearsay and considering evidence at summary judgment as "such demands/assertions do not qualify as hearsay because they are offered to show the effect on the listener").

55. Syngenta's Terese Rennie was asked during his deposition "What would your process be if you received a completed form from a requester, requesting a biosafety certificate, and that requester had checked the box MIR162, what would your process be then?" and Ms. Rennie testified "So our process at the time was that even though the box was checked, I always clarified with the requesters via phone or e-mail that MIR162 has not been approved yet, but that we would keep their request on file so that when it would become available, we could issue the certificates." Ex. 23 (2/23/2016 T. Rennie Dep. Tr. 36:24-37:9).

**PLAINTIFFS' RESPONSE TO NO. 55**: Plaintiffs admit that Paragraph 55 accurately quotes Ms. Rennie's testimony, but dispute the testimony. Ms. Rennie's testimony is self-serving and Syngenta cites no evidence to corroborate Ms. Rennie's claim that she "always" clarified for requesters that MIR162 "has not been approved yet."

**Syngenta's Reply To No. 55**: Plaintiffs' response fails to create a genuine dispute. Furthermore, Plaintiffs' criticisms of Ms. Rennie's' testimony as "self-serving" and the fact that she is an employee of Syngenta are legally irrelevant and fail to create a genuine dispute of fact concerning the facts she testified to. *Cf. Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n. 4 (10th Cir. 2012) ("So long as an affidavit is based upon personal knowledge and set[s] forth facts that would be admissible in evidence, it is legally competent to oppose summary judgment, irrespective of its self-serving nature.") (citations and internal quotation marks omitted).

56.    Article 12 of China's Administrative Measures for Safety Control in the Import of Agricultural GMOs ("the Import Measures") includes a provision that: "To export agricultural GMOs to the People's Republic of Chinas to be used as raw materials, an overseas company shall file an application with the Ministry of Agriculture for a safety certificate of agricultural GMOs." Ex. 127 (H. Zhang Expert Rep. ¶ 48).

**PLAINTIFFS' RESPONSE TO NO. 56**:     Plaintiffs dispute and object to Paragraph 56 because it relies on expert testimony of Dr. Hongjun Zhang, who is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object to Paragraph 56, which is a legal argument and not an admissible statement of fact. *See generally Sprint Commc'ns Co. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007); *Fisher v. Lynch*, CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 n.2 (D. Kan. Mar. 17, 2008).

Plaintiffs further object to Paragraph 56 because it is a vague and incomplete statement on Chinese law. For example, terms "overseas company" and "safety certificate of agricultural GMOs" are not defined. Zhang testified that, as used in this chapter of the Import Measures, "foreign overseas company means foreign trader." Ex. 127, Deposition of Dr. Hongjun Zhang ("H. Zhang Dep.") at 133:10-12.  But Zhang also testified that the term "foreign trader" or "foreign exporter" includes the overseas offices of China-headquartered companies. *Id.* at 34:12-36:22, 39:22-41:15; *see also* Def. Ex. 127 at ¶ 22.  And Zhang also testified that "foreign trader" or "foreign exporter" could include Syngenta.  *Id.* at 41:16-43:4. Zhang also testified that "foreign GM trait developer[s]" must comply with Article 12. Ex. 127, H. Zhang Dep. 251:23-252:2; *see also id.* 250:23-251:5 ("Foreign GM trait developers must follow the above requirements in Article 33 of the GMO regulations and Article 12 of the Import Measures.").

**Syngenta's Reply To No. 56**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

Furthermore, whether the terms "overseas company" and "safety certificate of agricultural GMOs" are defined, or the definition of "foreign trader" or "foreign exporter" is irrelevant to the assertion in this Statement of Fact.   Furthermore, Zhang did not testify that "foreign trader" or "foreign exporter" could include Syngenta. Pls.' Opp.. Ex. 127 (H. Zhang Dep. Tr. 42:18-24) ("Q. And a foreign GMO trait developer such as Syngenta could also be a foreign exporter, as you define that term, correct? A. You know, I don't know exactly Syngenta or other company, whether they do, they do export GMO product into China.  I don't know, I have that -- I don't have that knowledge.").

57.   Article 19 of the Import Measures includes a provision that: "The following materials are required for the foregoing application:

   1.   Registration form for the safety control of import (see Appendix);

   2.   A declaration for safety assessment (see Appendix V to the Measures for the Administration of the Safety Assessment of Agricultural GMOs);

   3.   Supporting documents that it is permitted in the country or region of export to use them for corresponding purposes and to be put into market;

   4.   Materials proving that scientific experiments in the country or region of export have showed that no harm will result to the human being, animals, plants, microorganisms and the biological environment;

   5.   The test report issued by a technological institutions entrusted by the Ministry of Agriculture concerning the safety to the human beings, animals, plants, microorganisms and biological environment; and

   6.   The safety measures to be adopted by the overseas company in the process of exporting to the People's Republic of China.

   If the application has passed the safety assessment, the Ministry of Agriculture shall issue a safety certificate of agricultural GMOs."

   Ex. 127 (H. Zhang Expert Rep. ¶ 50).

**PLAINTIFFS' RESPONSE TO NO. 57**:   Plaintiffs dispute and object to Paragraph 57 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object to and dispute Paragraph 57 because it is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs also dispute Paragraph 57 because the factual allegation is incorrect. Article 19 of the Import Measures does not set forth requirements for an application to the Ministry of Agriculture for a safety certificate.

To extent that the reference to Article 19 was a typographical error and Syngenta meant to reference Article 13, Plaintiffs further object to Paragraph 57 on grounds that it is a vague and incomplete statement on Chinese law. Numerous terms are not defined, including each of six categories of materials purportedly required for an application. (E.g.,"[r]egistration form for the safety control of import," "declaration for safety assessment," "test report issued by a technological institution[]" etc.). Zhang testified that he did not know what kind of materials would satisfy the purported requirements of Article 13. Ex. 127, H. Zhang Dep. at 131:7-10 ("I do not and I did not intend to address . . . or answer . . . what the technical information would be"); *id.* at 132:3-6 ("What would be satisfy in front of MOA, that is not something I tried to identify and it is not something I intend to testify today based on my report."). Dr. Zhang further testified he has not counseled any company "in applying or obtaining" for a certificate that is purportedly subject to Article 13 of the Import Measures. *Id.* at 137:17-138:19. Finally, according to Dr. Zhang, Article 13 also applies to "foreign GM trait developers." Ex. 177 (Zhang Report) ¶¶ 50-51.

> **Syngenta's Reply To No. 57**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes. Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).
>
> Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")
>
> The remaining portion of Plaintiffs'' response constitutes extraneous facts or arguments that are improper. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1

("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

58.     Article 3 of No. 349 Notice of the MOA includes a provision that: "Foreign exporters applying for the GMO biosafety certificate for importing purpose shall provide the following materials:

    1.     Copies of foreign developer's Agricultural GMOs' Biosafety Certificate (Import)

    2.     Registration Form of Safety Administration on Import of Agricultural GMOs (to be used as raw materials for processing)

    3.     Safety measures that are planned to be carried out. Ex. 127 (H. Zhang Expert Rep. ¶ 51).

**PLAINTIFFS' RESPONSE TO NO. 58**:     Plaintiffs dispute and object to Paragraph 58 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object because Paragraph 58 is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs further object to Paragraph 58 on grounds that it is vague and incomplete. Numerous terms are defined, including each of the three categories of materials purportedly required. Zhang admitted during his deposition that several categories of materials listed in Article 13 of the Import Measures, which purportedly set forth the application requirements for "a safety certificate of agricultural GMOs," do not appear in Article 3 of No. 349 Notice of the Ministry of Agricultural. Ex. 127, H. Zhang Dep. at 136:10-19.

**Syngenta's Reply To No. 58**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963), which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment").  Here, Dr. Zhang's statement is on foreign law, and the "use of an

expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

59.     Article 12 of the Import Measures includes a provision that: To export agricultural GMOs to the People's Republic of Chinas to be used as raw materials, an overseas company shall file an application with the Ministry of Agriculture for a safety certificate of agricultural GMOs." Ex. 127 (H. Zhang Expert Rep. ¶ 48).

**PLAINTIFFS' RESPONSE TO NO. 59**:     Plaintiffs dispute and object to Paragraph 59 because it relies on expert testimony of Dr. Hongjun Zhang, who is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object to Paragraph 59, which is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs further object to Paragraph 59 on grounds that it is vague and incomplete. For example, terms "overseas company" and "safety certificate of agricultural GMOs" are not defined. Zhang testified that, as used in this chapter of the Import Measures, "foreign overseas company means foreign trader." Ex. 127, H. Zhang Dep. at 133:10-12. But Zhang also testified that the term "foreign trader" or "foreign exporter" includes the overseas offices of China-headquartered company. *Id.* at 34:12-36:22, 39:22-41:15; *see also* Def. Ex. 127 at ¶ 22. And Zhang also testified that "foreign trader" or "foreign exporter" could include Syngenta. *Id.* at 41:16-43:4. Zhang also testified that "foreign GM trait developer[s]" must comply with Article 12. *Id.* at 251:23-252:2; *see also id.* 250:23-251:5 ("Foreign GM trait developers must follow the above requirements in Article 33 of the GMO regulations and Article 12 of the Import Measures.")).

**Syngenta's Reply To No. 59**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law.  *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304  (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment").  Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2  ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

60.    Article 19 of the Import Measures includes a provision that: "For the import of agricultural GMOs for production or raw materials, the contract thereof may not be concluded until a safety certificate of agricultural GMOs issued by the Ministry of Agriculture has been obtained." Ex. 127 (H. Zhang Expert Rep. ¶¶ 31, 54).

**PLAINTIFFS' RESPONSE TO NO. 60**:    Plaintiffs dispute and object to Paragraph 60  of  Syngenta's Statement of Undisputed Material Facts because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object to Paragraph 60 because it is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs dispute Zhang's interpretation of Article 19 of the Import measures as imposing obligations on sellers/exports.  A Global Agriculture Information Network (GAIN) Report of

the USDA Foreign Agricultural Service has translated Article 19 of the Import Measures as follows: "Those who import Ag GMOs for the use of production or raw materials shall not sign any contract until the Ag GMO safety certificate issued by the Ministry of Agriculture is obtained." Ex. 375, GAIN Report CH7053, at 15 (6/22/2007); https://apps.fas.usda.gov/gainfiles/200706/ 146291495.doc. So the USDA interprets Chinese law as imposing an obligation on Chinese buyers/importers to obtain the GMO safety certificate.

> **Syngenta's Reply To No. 60**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes. Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

> Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

> The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

61.   Article 20 of the Import Measures includes a provision that "imported agricultural GMOs shall be returned or be destroyed in the absence of a safety certificate of agricultural GMOs or relevant approval document issued by the agriculture department under the State Council, or if such GMOs are not in conformity with the certificate or approval document." Ex. 127 (H. Zhang Expert Rep. ¶ 64).

> **<u>PLAINTIFFS' RESPONSE TO NO. 61</u>**:   Plaintiffs dispute and object to Paragraph 61 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No.

2883 at 8-11, which is incorporated herein for all purposes.  In the event the Court sustains Plaintiffs' objection, the Court should disregard Paragraph 61 because it is not supported by any evidence.

Plaintiffs further object because this paragraph is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs further object to Paragraph 61 on grounds that it is vague, incomplete, and contains numerous undefined terms, including "safety certificate of agricultural GMOs" and "relevant approval document."

> **Syngenta's Reply To No. 61**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law.  *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment").  Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

> Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

> The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

62.   Article 33 of China's Regulations on Administration of Agricultural Genetically Modified Organism Safety ("the GMO Regulations") includes a provision that: "Any company outside the territory of China that exports to the People's Republic of China agricultural genetically modified organisms to be used as raw materials for processing shall make an application to the competent agricultural administrative department of the

State Council; for those meeting the following conditions and passing the safety evaluation, the competent agricultural administrative department of the State Council shall issue a safety certificate of agricultural genetically modified organisms:

> 1. the exporting country or region has permitted the usage for the same purpose and the putting into market thereof;

> 2. the exporting country or region has, through scientific experiment, proved that they are harmless to human beings, animals and plants, microorganisms and ecological environment;

> 3. the technical inspection body of agricultural genetically modified organisms has confirmed, upon inspection, that there is no danger to human beings, animals, plants, microorganisms and ecological environment;

> 4. having adopted appropriate safety administration and precautionary measures."

> Ex. 127 (H. Zhang Expert Rep. ¶ 50).

**PLAINTIFFS' RESPONSE TO NO. 62**:    Plaintiffs dispute and object to Paragraph 62 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object to Paragraph 62 because it is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs further object to Paragraph 62 on grounds that it is vague and incomplete. Numerous terms are not defined, including each of four categories of materials purportedly required for an application. (E.g., "technical inspection body of agricultural genetically modified organisms"; "appropriate safety administration and precautionary measures," "[r]egistration form for the safety control of import," "declaration for safety assessment," "test report issued by a technological institution[]" etc.). Plaintiffs also note that Dr. Zhang testified that "foreign GM trait developer[s]" must comply with Article 33 of the GMO Regulations. Ex. 127, H. Zhang Dep. at 251:23-252:2; *see also id.* at 250:23-251:5 ("Foreign GM trait developers must follow the above requirements in Article 33 of the GMO regulations and Article 12 of the Import Measures.")). Dr. Zhang testified that he has never advised a company how to comply with Chinese laws and regulations to obtain a safety certificate of agricultural genetically modified organisms. *Id.* at 138:14-19, 145:25-148:7, 179:22-180:5.

> **Syngenta's Reply To No. 62**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as

that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

63.   Article 38 of the GMO regulations includes a provision that "agricultural products with GMO traits that are imported without a safety certificate issued by the MOA and [other] relevant documents of approval, or not conforming to the certificate or the documents of approval, shall be rejected or destroyed." Ex. 127 (H. Zhang Expert Rep. ¶ 56).

**PLAINTIFFS' RESPONSE TO NO. 63**:   Plaintiffs dispute and object to Paragraph 63 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes. In the event the Court sustains Plaintiffs' objection, the Court should disregard Paragraph 63 because it is not supported by any evidence.

Plaintiffs further object to Paragraph 63 because it is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs further object to Paragraph 63 on grounds that it is vague, incomplete, and contains numerous undefined terms, including "safety certificate of agricultural GMOs" and "relevant documents of approval."

**Syngenta's Reply To No. 63**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law.  *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment").  Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper.  *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

64.     The MOA has issued interpretive guidance on the import of GMOs from abroad into China. *See* Ex. 127 (H. Zhang Expert Rep. ¶ 26) (citing MOA, 100 Questions & Answers Concerning Agricultural GMOs (June 2011)). In this interpretive guidance, Q&A No. 68 includes:

> Q:  What is the procedure for importing GMOs to be used as raw materials for processing?
>
> A:  Overseas companies which for the first time import agricultural GMOs  for purposes of using them as raw materials for processing, and the overseas R&D unit shall apply to the Ministry of Agriculture for an agricultural GMO safety certificate (import).
>
> *Id.*

**PLAINTIFFS' RESPONSE TO NO. 64**:     Plaintiffs dispute and object to Paragraph 64 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth

in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs further object to Paragraph 63 [sic] because it is a legal argument and not an admissible statement of fact. *See generally Sprint*, 500 F. Supp. 2d at 1304; *Fisher*, 2008 WL 717961, at *1 n.2.

Plaintiffs further object to Paragraph 63 [sic] on grounds that it is vague and incomplete. Q&A No. 68, in its entirety, provides as follows:

Q: What is the procedure for importing GMOs as raw materials for processing?

A: Where foreign companies export agricultural GMOs to the People's Republic of China as raw materials for processing for the first time, the foreign developers shall apply to the Ministry of Agriculture for Safety Certificate of Agricultural Genetically Modified Organisms (import). Procedures:

> (1) Acceptance of application documents: the General Office for Administrative Examination and Approval of the Ministry of Agriculture accepts and preliminarily examines the Application Form for Safety Assessment of Agricultural GMOs and related documents submitted by the applicant.

> (2) Examination: the Office for Agricultural GMO Safety of the Ministry of Agriculture designates an expert team to examine the application documents in accordance with relevant state regulations.

> (3) Issue of approval document on entry of GMO materials: the Office for Agricultural GMO Safety of the Ministry of Agriculture makes a proposal based on the examination findings, submits it to the minister for final approval and then issue an approval document on entry of GMO materials to the applicant.

> (4) Import of materials: foreign developers go through the necessary procedures for the import of test materials with the Ministry of Agriculture and the General Administration of Quality Supervision, Inspection and Quarantine of P.R.C upon receipt of the Approval of GMO materials into China, and complete the import of test materials.

> (5) Technical testing: the institution for technical testing of agricultural GMOs entrusted by Ministry of Agriculture performs the environmental and edible safety testing and produces a test report.

(6) Expert examination: the Office for Agricultural GMO Safety of Ministry of Agriculture designates the National Committee on Safety of Agricultural

GMOs to examine the application documents and the test report.

(7) Reply: the Office for Agricultural GMO Safety makes a proposal according to the examination results, submits it to the minister for final examination and then gives a written reply to the applicant.

Upon approval of foreign developers' application for Safety Certificate of Agricultural Genetically Modified Organisms (import), foreign traders shall ask the Ministry of Agriculture to issue the Safety Certificate of Agricultural Genetically Modified Organisms (import) if they export GMOs to China. Procedures:

First: acceptance of application documents. The General Office for Administrative Examination and Approval of the Ministry of Agriculture accepts and preliminarily examines the Registration Form for Safety Administration of Import of the Agricultural Genetically Modified Organisms (Used as Processing Materials) and related documents submitted by the applicant.

Second, expert examination. The Office for Agricultural GMO Safety of the Ministry of Agriculture designates an expert team to examine the application documents.

Third, reply. The Office for Agricultural GMO Safety of the Ministry of Agriculture makes a proposal based on the examination findings, submits it to the minister for final approval and then gives a written reply to the applicant.

The foreign company shall, with the Safety Certificate of Agricultural Genetically Modified Organisms issued by the Ministry of Agriculture, go through the necessary procedures with the relevant authorities in accordance with law. If the imported agricultural GMOs are viable, an import record shall be established, indicating the sources, storage, transportation of such GMOs and other necessary information. Suitable safety control measures shall be taken to ensure that the agricultural GMOs do not enter the environment and will not be used for other purposes.

Ex. 293 (Dep. Ex. 931).

**Syngenta's Reply To No. 64**: Plaintiffs' response fails to create a genuine dispute of material fact. Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes.  Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law.  *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and

conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Furthermore, whether or not the provision exists and what it says is a matter of fact, not a question of law. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.")

The remaining portion of Plaintiffs' response constitutes extraneous facts or arguments that are improper. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *1 ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief.").

65. Gary Martin, President of the North American Export Grain Association, stated in a December 20, 2012 email to ADM, Cargill, and other exporters that "Exporter applies for Certificate through MOA," that "Exporter required to list the GE events that are contained in the shipment," and "1 certificate needed per ship," with "multiple certificates" needed for "multiple vessels." Ex. 227 (B. Flickinger Dep. Ex. 239 at ADM-00062745). Mr. Martin's email stated "The exporter does have to declare the events listed for the imported product in order to acquire this certificate." *Id*.

**PLAINTIFFS' RESPONSE TO NO. 65**:    Plaintiffs dispute and object to Paragraph 65 and Def. Ex. 239 because Paragraph 65 is based upon hearsay contained in Def. Ex. 239. *PAS Communications*, 139 F. Supp. 2d at 1179. Mr. Martin's testimony is also contradicted by numerous other witnesses' testimony. *See* Pl. SOAF ¶¶ 556-558. For example, Anthony Reed, ADM's corporate representative, testified that, "in the application for [a trader's certificate] you are not required, nowhere in the regulation or in practice that you list the event[s] that are contained in the shipment. Again, the applicant can choose the traits that they wish to put in the application and it is not correlated to the shipment." Ex. 124, Anthony Reed 30(b)(6) Deposition ("Reed Vol. III") at 286:19-25; *see id*. 180:3-5 ("[A]t no point does the--does the application require a statement or declaration of what events are in the shipment.").

**Syngenta's Reply To No. 65**:  Plaintiffs' response fails to create a genuine dispute of material fact.  The cited excerpts are not hearsay; they are instead statements made by Gary Martin in an email that are not quotations or otherwise excerpts from third parties.

*See generally* Syngenta's MSJ Ex. 227 (B. Flickinger Dep. Ex. 239). Plaintiffs do not clarify the meaning of "based upon hearsay" in their response, and no such evidentiary objection is apparent to Defendants. Furthermore, Plaintiffs' contention that the testimony is contradicted by other witnesses' testimony is irrelevant to the assertion in No. 65. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

Furthermore, Anthony Reed is not a lawyer and candidly admitted that he was "not an expert in the Chinese process" and "would not" consider himself "to be an expert on Chinese regulations on biosafety," Ex. 327 (10/14/2016 A. Reed Dep. Tr. 281:22, 307:14-17). Brent Flickinger, ADM's Vice President of Regulatory & Scientific Affairs, testified as ADM's corporate representative that a separate trader's certificate must "accompan[y] each shipment," Syngenta's MSJ Ex. 228 (6/30/2016 B. Flickinger Dep. Tr. 139:3-7), and that the exporter must apply for the certificate, including by "declar[ing] the events listed in that shipment," *id.* at 139:8-23; *see also id.* at 140:5-19. He also testified that it was "ADM's understanding" that "for each load, you need to have a biocertificate [i.e., trader's certificate] for import," *id.* at 146:2-7.

66. Brent Flickinger, ADM's Vice President of Regulatory & Scientific Affairs, testified as ADM's corporate representative that a separate trader's certificate must "accompan[y] each shipment," Ex. 228 (6/30/2016 B. Flickinger Dep. Tr. 139:3-7), and that the exporter must apply for the certificate, including by "declar[ing] the events listed in that shipment," *id.* at 139:8-23; see also id. at 140:5-19. He also testified that it was "ADM's understanding" that "for each load, you need to have a bio certificate [i.e., trader's certificate] for import," *id.* at 146:5-7.

**PLAINTIFFS' RESPONSE TO NO. 66**: Plaintiffs admit that Paragraph 66 accurately cites the quoted testimony, but Plaintiffs object to Syngenta's use of Mr. Flickinger's testimony as a "corporate representative" testimony for ADM. As discussed during the October 14, 2016, deposition of Anthony Reed as a corporate representative for ADM, Mr. Reed was correcting Mr. Flickinger's testimony. Ex. 124, Reed Vol. III. at 190:12-192:4. Reed testified that, "in the application for [a trader's certificate] you are not required, nowhere in the regulation or in practice that you list the event that are contained in the shipment. Again, the applicant can choose the traits that they wish to put in the application and it is not correlated to the shipment." *Id.* at 286:19-25; *see id.* at 180:3-5 ("[A]t no point does the--does the application require a statement or declaration of what events are in the shipment.").

**Syngenta's Reply To No. 66**: Plaintiffs' response fails to create a genuine dispute of material fact. ADM never withdrew the testimony of Mr. Flickinger, and Mr. Flickinger's testimony is consistent with other ADM witnesses (such as that of Mr. Grabiel and Dr. Hongjun Zhang). Furthermore, Anthony Reed is not a lawyer and candidly admitted that he was "not an expert in the Chinese process" and "would not" consider himself "to be an expert on Chinese regulations on biosafety," Ex. 327 (10/14/2016 A. Reed Dep. Tr. 281:22, 307:14-17). Brent Flickinger, ADM's Vice

President of Regulatory & Scientific Affairs, testified as ADM's corporate representative that a separate trader's certificate must "accompan[y] each shipment," Syngenta's MSJ Ex. 228 (6/30/2016 B. Flickinger Dep. Tr. 139:3-7), and that the exporter must apply for the certificate, including by "declar[ing] the events listed in that shipment," *id*. at 139:8-23; *see also id*. at 140:5-19. He also testified that it was "ADM's understanding" that "for each load, you need to have a bio certificate [i.e., trader's certificate] for import," *id*. at 146:2-7. The testimony is also consistent with Gary Martin's December 2012 email. *See supra* ¶ 65.

67.    Richard Grabiel, ADM's former Senior Manager of Scientific Affairs, testified that "China required a packet of all registered . . . copies of the – the event certificates with every shipment," Ex. 138 (R. Grabiel Dep. Tr. 126:11-15), and that ADM thus "interpreted" Chinese law as requiring that "[a] shipment needs to include copies of the certificates for every GMO event in that load," *id*. at 126:18-20.

**PLAINTIFFS' RESPONSE TO NO. 67**:    Plaintiffs dispute Paragraph 67. Mr. Grabiel was testifying in his individual capacity. Anthony Reed, testifying as a corporate representative for ADM, testified that ADM's understanding that either the importer or the exporter may submit the Biosafety Certificate for import under Chinese law. However, ADM may contractually agree with its buyer to apply for the Biosafety Certificate for import. Ex. 124, Reed Vol. III at 168:21-170:10, 192:10-21, 194:24-195:18. The Biosafety Certificate for import is presented by the importer when the cargo reaches the Chinese port. *Id*. at 177:8-21.

**Syngenta's Reply To No. 67**:    Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs' contention that the testimony is contradicted by other witnesses' testimony, including that of a corporate representative, is irrelevant to the assertion in No. 67. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

68.    Dr. Zhang states that the documents in Exhibit 229 are trader's certificates issued by the Ministry of Agriculture to Cargill International S.A. Ex. 229 (CARGILL000616275, CARGILL000616277, CARGILL000616279, CARGILL0006162781, CARGILL0006162783, CARGILL0006162785, CARGILL0006162787). These trader's certificates list the foreign exporter, Cargill International S.A., as the applicant, and indicate which GM events are in each shipment, the country of origin for each shipment, the purpose of the commodity in each shipment, and the method of transportation for each shipment. *Id*. These trader's certificates also explicitly state that the "certificate is valid for once during the validity period and will be canceled after it has been verified by the entry-exit inspection and quarantine department." *Id*.

**PLAINTIFFS' RESPONSE TO NO. 68**:    Plaintiffs object to and dispute Paragraph 68 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth

in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs also dispute that the trader's certificates "list the foreign exporter, Cargill International S.A., as the applicant." The trader's certificate lists Cargill International S.A. ("CISA") as the "applying unit," and Cargill's corporate representative on this topic, Maurice Hurst, testified that the application form for applying for a trader's certificate is signed by both the seller and Chinese buyer. Ex. 266, Deposition of Maurice Hurst ("Hurst Dep.") at 143:23-144:5. Hurst testified that he did not know whether that was "meant to reflect that the application was made by CISA." *Id*. at 170:16-20.

Plaintiffs further dispute that the trader's certificates "indicate which GM events are in each shipment." Hurst testified that the trader's certificate lists GM traits that the applicant applied for and the Ministry of Agriculture has approved. *Id*. at 122:8-11 ("[the trader's certificate lists] only the traits that have been approved and that have been requested that that get put on that certificate"); *id*. at 119:22-25 ("It's my understanding . . . that the GMO trading certificate lists the GM traits that have been approved by the MOA."). Hurst further testified that GM testing was not a requirement of Cargill's corn contracts with Chinese buyers and it was not a requirement to apply for a trader's certificate, *id*. at 134:8-16, and therefore there would be no way for anyone to know what GM traits were in the corn at the time of shipment. *Id*. at. 120:13-15.

Anthony Reed, ADM's corporate representative on topics related the trader's certificate, also testified that, in the application for [a trader's certificate] you are not required, nowhere in the regulation or in practice that you list the event that are contained in the shipment. Again, the applicant can choose the traits that they wish to put in the application and it is not correlated to the shipment." Ex. 124, Reed Vol. III at 285:13-287:13. Reed further testified that: "[T]he general practice is to list all events that have been authorized and approved by Chinese regulators. Again, what I've said before is you may have traits that are in the application that are in the shipment. Again, it doesn't say put the products in the shipment. The regulations simply state list GMO products so out of abundance of caution you generally list everything." *Id*. at 305:4-306:9.

With respect to the validity period, Plaintiffs state that the trader's certificates are valid for six months. Ex. 266, Hurst Dep. at 174:17-18 ("My understanding was they were valid for six months")).

**Syngenta's Reply To No. 68**: Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes. Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and

the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Anthony Reed is not a lawyer and candidly admitted that he was "not an expert in the Chinese process" and "would not" consider himself "to be an expert on Chinese regulations on biosafety," Ex. 327 (10/14/2016 A. Reed Dep. Tr. 281:22, 307:14-17). Brent Flickinger, ADM's Vice President of Regulatory & Scientific Affairs, testified as ADM's corporate representative that a separate trader's certificate must "accompan[y] each shipment," Syngenta's MSJ Ex. 228 (6/30/2016 B. Flickinger Dep. Tr. 139:3-7), and that the exporter must apply for the certificate, including by "declar[ing] the events listed in that shipment," *id.* at 139:8-23; *see also id.* at 140:5-19. He also testified that it was "ADM's understanding" that "for each load, you need to have a bio certificate [i.e., trader's certificate] for import," *id.* at 146:2-7. The testimony is also consistent with Gary Martin's December 2012 email. *See supra* ¶ 65.

69.   Dr. Zhang states that this validity limitation confirms that each trader's certificate can be used only for one shipment and that a foreign exporter needs to obtain a separate certificate for each shipment. Ex. 127 (H. Zhang Expert Rep. ¶ 35(d)).

**PLAINTIFFS' RESPONSE TO NO. 69**:   Plaintiffs object to Paragraph 69 because Dr. Zhang is not qualified to offer any opinions regarding Chinese law, as set forth in Plaintiffs' Memorandum in Support of Motion to Exclude Dr. Hongjun Zhang, ECF No. 2883 at 8-11, which is incorporated herein for all purposes.

Plaintiffs also dispute Paragraph 69 because ADM's Anthony Reed testified that the trader's certificates are not based on shipments, but rather are "customer specific." Ex. 124, Reed Vol. III at 285:13-287:13. Reed testified that "if there is a ship with 60,000 metric tons there could be four or five different customers [and there] would be four or five different [trader's certificates] needed per customer." *Id.*

**Syngenta's Reply To No. 69**: Hongjun Zhang is qualified to offer testimony regarding Chinese law, as set forth in Defs.' Opp. to Mot. to Exclude Dr. Hongjun Zhang (ECF No. 2963) which is incorporated herein for all purposes. Dr. Zhang's statement is not a legal conclusion as that term is used in summary judgment case law. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 (noting section contained "mostly argument, attorney commentary, and conclusory statements regarding the patents and technology at issue"); *Fisher v. Lynch*, No. CIV. A. 07-2154-KHV, 2008 WL 717961, at *1 n.2 (D. Kan. Mar. 17, 2008) (assertion that "she was acting in the scope and course of her employment when she made the alleged statements" was "a legal conclusion which is not competent evidence on summary judgment"). Here, Dr. Zhang's statement is on foreign law, and the "use of an expert report to assist the [C]ourt in its determination of foreign law is entirely different from use of an expert report, pursuant to [Fed. R. Evid. 702] to aid the jury in determining the facts." *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (internal quotation marks omitted).

Anthony Reed is not a lawyer and candidly admitted that he was "not an expert in the Chinese process" and "would not" consider himself "to be an expert on Chinese regulations on biosafety," Ex. 327 (10/14/2016 A. Reed Dep. Tr. 281:22, 307:14-17). Brent Flickinger, ADM's Vice President of Regulatory & Scientific Affairs, testified as ADM's corporate representative that a separate trader's certificate must "accompan[y] each shipment," Syngenta's MSJ Ex. 228 (6/30/2016 B. Flickinger Dep. Tr. 139:3-7), and that the exporter must apply for the certificate, including by "declar[ing] the events listed in that shipment," *id*. at 139:8-23; *see also id*. at 140:5-19. He also testified that it was "ADM's understanding" that "for each load, you need to have a bio certificate [i.e., trader's certificate] for import," *id*. at 146:5-7. The testimony is also consistent with Gary Martin's December 2012 email. *See supra* ¶ 65.

Furthermore, the quoted excerpt from Mr. Reed does not properly controvert Statement of Fact No. 69, as Dr. Zhang did not testify that one ship would necessarily have only one trader certificate.

70. In 2010, China rejected a Cargill shipment of U.S. corn that contained an unapproved Monsanto GM trait. Ex. 169 (A. Wong Dep. Tr. 185:16-187:5); *see also* Ex. 197 (Niu Shuping & Tom Miles, China Quarantine Bureau Rejects U.S. Corn Cargo (Nov. 2, 2010), http://tinyurl.com/zta67vm). Instead, China approved the Monsanto trait in December 2010. Ex. 212 (USDA Foreign Agric. Serv., China Agric. Biotechnology Annual (2013), http://tinyurl.com/hlkz645). The rejected shipments were re-sold to other countries. Ex. 197 (Shuping & Miles).

**PLAINTIFFS' RESPONSE TO NO. 70**: Plaintiffs object to and dispute Paragraph 70 because it relies on a Reuters newspaper article (Def. Ex. 197) and a report of the USDA Foreign Agricultural Service, both of which are hearsay. *See Jones v. Cole*, 08-1011-JTM, 2009 WL 2163185, at *6 (D. Kan. July 17, 2009) (excluding from its findings on summary judgment all "putative uncontroverted facts premised on newspaper articles or other potential hearsay statements").

Plaintiffs as dispute Paragraph 70 because Def. Ex. 169 does not contain the cited deposition transcript of Andrew Wong.

Plaintiffs also dispute Paragraph 70 because Wong did not testify that "China rejected a Cargill shipment of U.S. corn." Rather, Wong testified that he wrote in an email, dated November 21, 2013, that the MV Polsaka Walczaka arrived at a Chinese port on October 26, 2010, discharge was completed on November 21st, [and the] cargo was detained by local CIQ soon after discharge was completed." Ex. 263, Deposition of Andrew Wong Vol. II ("Wong Vol II") at 185:24-186:6.

The Reuters newspaper article also does not state that China rejected a Cargill shipment or that the rejected shipments were re-sold to other countries. Rather, the article states: "The official said the cargo was most likely resold to the overseas market. COFCO bought the cargo from a Japanese trading house, Mitsubishi Corp, three trading sources said. Traders from both companies could not be immediately reached for comment, and both companies have earlier declined to comment on the Reuters story." Def. Ex. 197. The article does not

mention Cargill. Instead, it cites an unnamed "official" who said that the cargo was "mostly likely" re-sold and three unnamed "trading sources" stating that COFCO bought the cargo from Mitsubishi Corp. *Id.*

> **Syngenta's Reply To No. 70**:  Plaintiffs' response fails to create a genuine dispute of material fact.  As for the first sentence, the full deposition of Andrew Wong cited by Syngenta includes an email excerpt from Mr. Wong in which he wrote: "Unsure if you gents still remember the GMO issue (MON89034) that hit us exactly three years ago. … The cargo was detained by local CIQ soon after discharge was completed." Pls.' Opp. Ex. 263 (A. Wong Dep. Tr. 185:16-186:6).  The email thus indicates that China rejected a Cargill shipment of U.S. corn that contained an unapproved Monsanto GM trait (specifically, MON89034).

> As for the second sentence, Syngenta's MSJ Exhibit 212 (USDA Foreign Agric. Serv., China Agric. Biotechnology Annual 2013) qualifies as a hearsay exception under Rule 803(8) because the GAIN report is a "record or statement of a public office" that "sets out … a matter observed while under a legal duty to report …."  Thus, the Court may consider this exhibit at summary judgment.

71.    Mike Mack of Syngenta testified that Syngenta communicated "very publically" with the grain market that Syngenta was "coming with this brand-new trait [Viptera], and we told everything that we were going to launch it in 2011." *See* Ex. 313 (4/29/2016 M. Mack Dep. Tr. 636:2-23).

> **PLAINTIFFS' RESPONSE TO NO. 71**:   Plaintiffs admit that Paragraph 71 accurately states  the  quoted testimony of Mr. Mack but deny the testimony.  The record establishes that Viptera was not launched in 2011 – it was launched in 2010 – and that Syngenta did not communicate with "the grain market" in advance of the launch.  *See infra* Pl. SOAF ¶¶ 92-93.

> **Syngenta's Reply To No. 71**: Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs' contention that the testimony is contradicted by other witnesses' testimony, including that of a corporate representative, is irrelevant to the assertion in No. 71.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

> There is no dispute between the parties that seed sales began in 2010 for plantings in 2011.  Furthermore, Plaintiffs' citations do not establish that Syngenta did not "communicate" with the grain market in advance of the launch.  For instance, in Opp. SOAF ¶ 92, Plaintiffs cite to the deposition testimony of Randy Gordon.  In the cited testimony, Mr. Gordon states, "we certainly had meetings going back to 2010, 2011 with -- with Syngenta about its plans for commercialization and raise the importance of the Chinese market and what we perceived to be USDA's own projections on the importance of the Chinese market." Pls.' Opp. Ex. 71 (R. Gordon Dep. Tr. 391:2-7).  Mr. Gordon also testified, "I think in our view, the primary consultation with Syngenta based its

decision to launch was primarily, if not almost exclusively, with the input from the National Corn Growers' Association." *Id*. at 391:7-11.  Finally, Mr. Gordon testified, "I -- I can't speak to exactly who all Syngenta met with in the value chain." *Id*. at 391:16-17.

72.   Cargill's David Baudler testified as Cargill's corporate representative that Cargill's ocean-freight subsidiary CISA "decided not to sell China U.S. corn in August 2011" because it was "[n]ot a risk profile we are willing to take to ship unapproved traits to that market and would not be how we run the business." *See* Ex. 120 (5/16/2016 D. Baudler Dep. Tr. 261:24-262:4, 275:19-24).

**PLAINTIFFS' RESPONSE TO NO. 72**:    Plaintiffs object to and dispute this testimony because the witness lacked the personal knowledge and/or foundation for the testimony. William Hale, not David Baudler was Cargill's corporate representative on topics related to when and why Cargill and CISA began shipping corn from the U.S. to China. *See* Ex. 250, Deposition of William Hale as Corporate Representative Vol. I ("Hale 30(b)(6) Vol. I") at 8; Ex. 264 (Cargill Dep. Ex. 101).

When Baudler, who was offered as a corporate representative of Cargill on other topics, was asked: "Why had Cargill decided not to sell US corn to China in August 2011?," counsel for Cargill objected on the basis that the question was outside the scope of the designated topics and that Baudler lacked foundation. Ex. 96, Deposition of David Baudler as a 30(b)(6) Representative of Cargill Vol. I ("Baudler 30b6 Vol. I") at 262:7-8. Then Baudler answered: "So, all of the decisions of execution of the export sale of US corn to China was not made by me. That -- that topic has been assigned to Bill Hale, who was -- and/or Geneva, who was directly involved in it." *Id*. at 262:9-14.  Counsel for Cargill similarly objected on the basis of scope when Baudler was asked: "What did you mean when you wrote that it was not a risk profile that Cargill was willing to take?" *Id*. at 275:25-276:6.  Baudler responded: "These are better answered by Bill, who was actually involved in it, rather than a secondhand account of my conversations with him." *Id*. at 276:7-10.

**Syngenta's Reply To No. 72**: Plaintiffs' response fails to create a genuine dispute of material fact.  Even if Mr. Baudler was not a corporate rep, he testified to it in his personal capacity.  Mr. Hale testified likewise that Cargill did not ship corn in 2011 to China.  Ex. 328 (5/18/2016 W. Hale Dep. Tr. 88:20-89:2) ("And in 2011, Cargill sold corn to China customers? A. We did not sell corn to load ourselves prior   to the first quarter 2012.  We had some sales that took place in November of 2011 but they were for shipment, Q1 -- or late Q1 of 2012.").  Plaintiffs have not provided record evidence controverting Statement No. 72.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).  Plaintiffs do not even point to any contradictory testimony from the deposition of Mr. Hale; in fact, Mr. Hale testified consistently with this.  Mr. Hale has not contradicted the assertion in Statement of Fact No. 72, and there is no genuine dispute of material fact.

73.     An internal Cargill email from August 2011 stated "Cargill Geneva in tandem with Goscna and CAH decided not to sell China US corn because this trait [MIR162] is sprinkled throughout the corn belt and we know there is a possibility that the trait will be found at destination if the CNF China market collapses and may go thru without a hitch if the flat prices rally (aka treated beans). Not a risk profile we were willing to take to ship unapproved traits to that market and would not be how we run the business." Ex. 231 (D. Baudler Dep. Ex. 7, at CARGILL000073192).

**PLAINTIFFS' RESPONSE TO NO. 73**:     Plaintiffs object to and dispute Paragraph 73 because the declarant lacks personal knowledge and foundation.  As discussed in response to Paragraph 72, when asked about this email, Baudler testified that "[t]hese [question] are better answered by Bill, who was actually involved in it, rather than a secondhand account of my conversations with him." Ex. 96, Baudler 30b6 Vol. I at 276:7-10; *see also id* at 262:9-11 ("So, all of the decisions of execution of the export sale of US corn to China was not made by me.").

> **Syngenta's Reply To No. 73**: Plaintiffs' response fails to create a genuine dispute of material fact.  Even if Mr. Baudler was not a corporate rep, he testified to it in his personal capacity.  Mr. Hale testified likewise that Cargill did not ship corn in 2011 to China.  Ex. 328 (5/18/2016 W. Hale Dep. Tr. 88:20-89:2)  ("And in 2011, Cargill sold corn to China customers? A. We did not sell corn to load ourselves prior   to the first quarter 2012.  We had some sales that took place in November of 2011 but they were for shipment, Q1 -- or late Q1 of 2012.").  Plaintiffs have not provided record evidence controverting Statement No. 73.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).  Plaintiffs do not even point to any contradictory testimony from the deposition of Mr. Hale; in fact, Mr. Hale testified consistently with this.  Mr. Hale has not contradicted the assertion in Statement of Fact No. 73, and there is no genuine dispute of material fact.

74.     Cargill's  Vice  President  of  Finance  for  the  Agricultural  Supply  Chain,  Mark Stonacek, testified that Cargill "did not participate in selling corn to China in 2011 because of the risk that it might be rejected for containing MIR162." Ex. 70 (5/24/2016 M. Stonacek Dep. Tr. 326:13-17).  Mr. Stonacek also testified that "there was a first round of sales where Cargill chose not to participate, because we were in a very difficult situation with the risk of commercialized product relative to the approvals in China." Ex. 70 (5/23/2016 M. Stonacek Dep. Tr. 124:7-12).

**PLAINTIFFS' RESPONSE TO NO. 74**:     Plaintiffs dispute and object to Paragraph 74 because it is factually incorrect and the testimony referenced lacks foundation.  Mr. Stonacek was asked: "[Cargill] did not participate in selling corn to China in 2011 because of the risk that it might be rejected for containing MIR162?" And he responded: "My understanding is *that's part of the decision*, yes." Ex. 265, Deposition of Mark Stonacek Vol. II ("Stonacek Dep. Vol. II") at 326:13-17. He further testified that he did not know other parts of the decision because he "wasn't directly involved in that decision." *Id*. at 326:20-21.

Cargill's Steven Smalley testified that, based on information from Syngenta, Cargill sold corn to Chinese buyers in October 2011 for delivery in May, June, and July of 2012. Ex. 164, Deposition of Steven Smalley Vol. I ("Smalley Vol. I") at 217:8-219:13 ("Syngenta told us that the approval process was proceeding as planned, and that they anticipated approvals, which would be on the regular timeline of March and April 2012. So, in October of 2011, we made a sale for 720,000 tons for delivery in May, June, July of 2012, which would have preceded what were told– or gone past what we would have --- we were told by Syngenta they would have received approval on Viptera.")

> **Syngenta's Reply To No. 74**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs' contention that the testimony is contradicted by other witnesses' testimony is irrelevant to the assertion in Statement of Fact No. 74. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted). Furthermore, the cited excerpt does not indicate that Mr. Stonacek lacked foundation for his answer to the question whether Cargill participated in selling corn to China in 2011 because of the risk that it might be rejected for containing MIR162. Mr. Stonacek's testimony that he was not "directly involved" in the decision regarding sales to China does not establish that he lacked foundation about the reason or reasons for not selling corn to China in 2011.

75. Cargill's corporate representative Randy Giroux testified that "we thought the risk was too high with a zero-tolerance requirement in China and a potential for enforcement, we decided to stay out of that window." Ex. 121 (5/16/2016 R. Giroux Dep. Tr. 99:3-6).

> <u>**PLAINTIFFS' RESPONSE TO NO. 75**</u>: Plaintiffs dispute Paragraph 75 because Def. Ex. 121 does not contain the quoted testimony.

> **Syngenta's Reply To No. 75**: The page of the deposition transcript cited by Syngenta is included in corrected Syngenta's MSJ Exhibit 121, which establishes that Mr. Giroux testified as stated. In addition, the corrected citation to Exhibit 121 is Syngenta's MSJ Ex. 121 (6/9/2016 R. Giroux Dep. Tr. 99:3-6).

77. An internal ADM email from August 2011 stated that Viptera was "unapproved for China," but "[w]e do not have any sales on to China, therefore we are ok to receive [Viptera corn] at this time." Ex. 124 (W. Uhlmeyer Dep. Ex. 182, at ADM-00056286). Another internal ADM email from August 2011 with the subject line "MIR162" stated "ADM has nothing sold to China so export group has indicated they will not reject the variety as only way to detect would be to test every inbound load of commercial corn." Ex. 125 (H. Cooklin Dep. Ex. 5, at ADM-0003795).

> <u>**PLAINTIFFS' RESPONSE TO NO. 77**</u>: Plaintiffs object to dispute Paragraph 77 because it quotes Def. Ex. 124 and Def. Ex. 125, which are emails of ADM employees and are hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 77**:  Mr. Uhlmeyer was questioned about and confirmed the content of Syngenta's MSJ Exhibit 124 (Deposition Exhibit 182) at his deposition. *See* Ex. 329 (6/15/2016 W. Uhlmeyer Dep. Tr. 127:5-128:16) (confirming content).  Mr. Cooklin likewise was questioned about and confirmed the content of Syngenta's MSJ Exhibit 125 (Deposition Exhibit 5).  *See* Ex. 330 (H. Cooklin Dep. Tr. 156:4-13).

78.   Cargill and ADM did not export any U.S. corn harvested in 2010 to China. Ex. 126 (S. Smalley Dep. Tr. 217:24-218:6) ("first sale to [] China" after 2010 was contract entered in October 2011 for delivery in summer 2012); Ex. 122 (6/15/2016 W. Uhlmeyer Dep. Tr. 166:8-20) (first export was 2012).

> **PLAINTIFFS' RESPONSE TO NO. 78**:     Plaintiffs dispute Paragraph 78. In 2010 and 2011, ADM sold corn pursuant to "free on board" – or "FOB" – contracts to buyers which then shipped that corn to China.  Ex.  349, Deposition of Wes Uhlmeyer as a corporate representative Vol. I ("Uhlmeyer 30b6 Vol. I") at 135:25-136:18, 137:20-138:17. Under an FOB contract, payment for the shipment and transfer of title to the shipment from ADM to the buyer occur at the U.S. port from which the shipment departs.  Ex. 350, Deposition of Pablo Altuna ("Altuna Dep.) at 333:23-334:8, 337:22-25.  Also under an FOB contract, the vessel on which the shipment is loaded is chartered by the buyer, and the buyer decides where to ship that vessel.  *Id.* at 337:14-20; Ex. 251, Taets Vol. I at 61:4-25.
>
> Cargill's Steven Smalley testified that, based on information from Syngenta, Cargill sold corn to Chinese buyers in October 2011 for delivery in May, June, and July of 2012. Ex. 164, Deposition of Steven Smalley Vol. I ("Smalley Vol. I") at 217:8-219:13 ("Syngenta told us that the approval process was proceeding as planned, and that they anticipated approvals, which would be on the regular timeline of March and April 2012. So, in October of 2011, we made a sale for 720,000 tons for delivery in May, June, July of 2012, which would have preceded what were told– or gone past what we would have --- we were told by Syngenta they would have received approval on Viptera."). Cargill did sell U.S. corn to Chinese buyers in 2010 for delivery in the fall of 2010.  *See* Ex. 346-347 (Hale Dep. Ex. 151 and 154).

> **Syngenta's Reply To No. 78**: Syngenta objects to the Response to No. 78 because Plaintiffs' Exhibit 349 does not contain all of the cited excerpts (including the excerpts on pages 137 and 138).
>
> Plaintiffs' response fails to create a genuine dispute of material fact.  As Mr. Uhlmeyer testified, as for any sales in 2010 and 2011, "The corn ended up going to China.  It wasn't our sale to China, but the corn that we loaded on a vessel went to China. … We sell to third parties all the time.  To say we sold it to them so they could take it to China, it seems like a strange question.  I don't know how to answer it.  We sold it, and they bought it at its normal course of business.  They happened to take it to China." Syngenta's MSJ Ex. 122 (6/15/2016 W. Uhlmeyer Dep. Tr. 137:20-138:17).  Thus, Plaintiffs' citations do not create a genuine dispute that ADM was not exporting *its* corn to China in 2010.

Plaintiffs' citations to evidence from Cargill does not establish that Cargill actually exported any corn to China in 2010; at most, the evidence relates to *sales* in 2010, not actual exports.  Thus, Plaintiffs' citations do not create a genuine dispute that Cargill was not exporting its corn to China in 2010.  Furthermore, Mr. Hale testified that Cargill did not ship corn in 2011 to China. Ex. 328 (5/18/2016 W. Hale Dep. Tr. 88:20-89:2) ("And in 2011, Cargill sold corn to China customers? A. We did not sell corn to load ourselves prior to the first quarter 2012. We had some sales that took place in November of 2011 but they were for shipment, Q1 -- or late Q1 of 2012.").  Plaintiffs have not provided record evidence controverting this statement.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2  ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted).

79.    According to a July 14, 2011 email from David Morgan of Syngenta, at a "[c]onstructive and cordial meeting with Cargill" in July 2011, Cargill told Syngenta that Cargill "will pass on supplying new corn crop to China this year as [Cargill] [is] simply unwilling to run the risk of a returned boat" because Cargill "incurred a $6M cost for the returned MON 89034 vessel last year and ha[s] no appetite for repeating the experience." Ex. 129 (SYNG_00367968).

**PLAINTIFFS' RESPONSE TO NO. 79**:    Plaintiffs object to and dispute Paragraph 79 because it quotes from Def. Ex. 129 – an email from David Morgan, which is hearsay, that relates a conversation with a Cargill employee, which is double hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

Plaintiffs further dispute that Mr. Morgan's email accurately reflects that the conversation occurred in the manner he suggests, and also notes that record establishes that Cargill repeatedly inquired about the status of Chinese import approval in 2011 based upon its interest in shipping to China.  *See infra* Pl. SOAF ¶¶ 396, 398, 402, 409.  And Cargill's Steven Smalley testified that, based on information from Syngenta, Cargill sold corn to Chinese buyers in October, 2011 for delivery in May, June, and July of 2012. Ex. 164, Deposition of Steven Smalley Vol. I ("Smalley Vol. I") at 217:8-219:13 ("Syngenta told us that the approval process was proceeding as planned, and that they anticipated approvals, which would be on the regular timeline of March and April 2012. So, in October of 2011, we made a sale for 720,000 tons for delivery in May, June, July of 2012, which would have preceded what were told – or gone past what we would have --- we were told by Syngenta they would have received approval on Viptera.")

In addition, Syngenta knew in 2012 that Cargill had sold U.S. corn to Chinese buyers. *See* Pl. SOAF ¶¶ 497.

**Syngenta's Reply To No. 79**:  Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs state that they "dispute that Mr. Morgan's email accurately reflects that the conversation occurred in the manner he suggests" but fail to indicate in what way it does not accurately reflect the conversation, for instance by citing to record evidence.  They have thus failed to properly meet the substance of Syngenta's assertion.

*Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

Plaintiffs' additional citations instead reflect additional information that does not controvert the substance of the July 2011 conversation (including activities in October 2011 and 2012). Syngenta's MSJ Exhibit 129 is not hearsay because it is a statement by Mr. Morgan, not a statement by a third party.

80. According to a July 12, 2011 email from Jessica Adelman of Syngenta, ADM "confirmed" after "sp[eaking] to [their] head corn trader" that "they aren't selling China terms because they can't guarantee them" and because "they don't have any interest in seeing this become an issue." Ex. 130 (SYNG_00393525). According to a July 12, 2011 email from Jack Bernens of Syngenta, Syngenta had a second conversation with ADM that again confirmed ADM's decision to not sell U.S. corn to China. *Id*.

**PLAINTIFFS' RESPONSE TO NO. 80**:    Plaintiffs object to and dispute Paragraph 80, which quotes Syngenta emails that are hearsay. *See PAS Communications*, 139 F. Supp. at 1179. Plaintiffs further dispute that Ms. Adelman's email accurately reflects that the conversation occurred in the manner she suggests, and note that Syngenta provides no corroborating testimony, so the underlying facts alleged in the email are disputed.

**Syngenta's Reply To No. 80:** Plaintiffs' response fails to create a genuine dispute of material fact. To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)"). Because Mr. Bernens is a Syngenta employee and Syngenta intends to present his testimony live at trial, he would be available to testify about his email statement.

Plaintiffs state that they "dispute that Ms. Adelman's email accurately reflects that the conversation occurred in the manner she suggests," but fail to indicate in what way it does not accurately reflect the conversation, for instance by citing to record evidence. They have thus failed to properly meet the substance of Syngenta's assertion. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)). Their citations instead reflect additional information that does not controvert the substance of the July 2011 conversation (including activities in October 2011 and 2012).

Syngenta's MSJ Exhibit 130 is not hearsay because it is a statement by Ms. Adelman and Mr. Bernens, not statements of third parties.

81.   Cargill and ADM had their own sources, including within China's Ministry of Agriculture, from which they obtained information regarding regulatory approvals, including the regulatory approval status of Viptera. Ex. 146 (10/14/2016 A. Reed Dep. Tr. 105:11-22; 107:5-21); Ex. 161 (8/16/2016 D. Buchanan Dep. Tr. 171:25-172:9); Ex. 233 (8/16/2016 D. Buchanan Dep. Tr. Ex. 107); Ex. 234 (7/25/2016 J. Taets Dep. Tr. 273:12-20); Ex. 235 (6/30/2016 W. Hale Dep. Tr. Ex. 22); Ex. 236 (6/30/2016 W. Hale Dep. Tr. Ex. 26); Ex. 237 (6/30/2016 W. Hale Dep. Tr. Ex.118); Ex. 69 (6/29/2016 W. Hale Dep. Tr. 172:16-25; 181:10-25; 202:9-203:22); Ex. 121 (6/9/2016 R. Giroux Dep. Tr. 162:19-163:6); Ex. 238 (6/3/2016 A. Reed Dep. Tr. Ex. 128); Ex. 239 (5/18/2016 W. Hale Dep. Ex. 112); Ex. 240 (5/18/2016 W. Hale Dep. Tr. Ex. 145); Ex. 241 (CARGILL000022153); Ex. 242 (CARGILL000015595); Ex. 243 (CARGILL000014530).

**PLAINTIFFS' RESPONSE TO NO. 81**:   Plaintiffs dispute Paragraph 81. Numerous witnesses testified that Syngenta was the only source of reliable information regarding the regulatory approval status of Viptera. Randy Giroux, for example, repeatedly testified that "Syngenta had a monopoly on that information and wasn't sharing with us up to this period of time or after this period of time that they had had problems with those applications." Ex. 186, Deposition of Randal Giroux 30(b)(6) Vol. II ("Giroux 30b6 Vol. II") at 376:17-25. Giroux further testified that, "as you can see in the email record, there was lots of speculation at times on what the status of the application was. I don't know the source of the -- of those speculations. In most of -- in all of those cases, they were incorrect, so there were misguided speculations on when those approvals would be granted. We mostly relied heavily on Syngenta, who had a monopoly on the information, on a confidential business information." *Id*. at 403:21-404:9. And in response to the question: "Did Cargill accept that information as true and accurate when they received it from Syngenta concerning those assertions?" Giroux responded: "Absolutely. Syngenta has a monopoly on that information. It's their confidential business information. . . . . we believed that we had a good relationship with Syngenta, that they were honest and truthful with us so that we could effectively manage our risk as a company and make good commercial decisions based on the facts, and so, of course, we relied– we relied on most heavily on what we heard from Syngenta in terms of how we would manage our commercial business." *Id*. at. 629:13-630:4; *see also id* at 543:6-544:4; Ex. 75, Deposition of Randall Giroux 30(b)(6) Vol. I ("Giroux 30b6 Vol I.") at 316:13-23, 318:15-21, 323:24-324:18.

Bill Hale of Cargill provided similar testimony. In response to the question, "Syngenta was not the sole source of information you had about the status of approval of MIR162, correct?" Hale responded: "They were the only source who really had an idea of what was going on. Any other source of information was strictly speculative." Ex. 279, Deposition of William Hale (Personal) Vol. I at 129:17-22. Other witnesses also testified that information regarding when Viptera would be approved was based on little more than unsubstantial rumors. *See, e.g.*, Ex. 263, Wong Vol. II. at 284:25-285:18 (". . . in the last few years, there were some rumors saying when – we were talking earlier, when the approval would be completed, but since 2012, we saw that -- all these rumors about, say, within how many months the approval

process would be finished, et cetera, or a lot of these rumor were there, but they were all wrong . . .”). ADM's witnesses have further explained that ADM's decision to start selling U.S. commodity corn and DDGs directly to Chinese buyers was based, in part, on Syngenta's representations to the market that Chinese approval of MIR162 was imminent. Ex. 251, J. Taets Vol I. at 224:5-226:5, 228:16-229:7; Ex. 349, Uhlmeyer 30b6 Vol. I. at 143:16-21.

With respect to some of the exhibits cited by Syngenta:

The pages of the deposition transcript of Anthony Reed cited by Syngenta are not included in Def. Ex. 146.

The pages of the deposition transcript of David Buchanan are not included in in Def. Ex. 161. But in the pages cited, Buchanan testified that Alex Sanfeliu wrote an email on July 5, 2011: "We have ross and fausto in China and cofco told us they expect mir162 to get approved by November 2011." Ex. 268, Deposition of David Buchanan ("Buchanan Dep.) at 171:25-172:9; *see also* Def. Ex. 233. This email from Alex Sanfeliu is hearsay and what COFCO purportedly told Ross and Fausto is double hearsay, which is inadmissible. *See PAS Communications*, 139 F. Supp. at 1179. In any event, Buchanan testified that he relied more on information that Randy Giroux received from seed companies. Ex. 268, Buchanan Dep. at 173:2-8 ("Generally, that comes from Randal who's going to say, here's what the list is from the seed companies, here's the new events that are being registered and he would keep track of that. And that was the system that we relied on more than getting from a buyer in China when he thinks an event is going to be approved."). Def. Ex. 233 is the same email from Alex Sanfeliu dated July 5, 2011, which is inadmissible hearsay and double hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

Syngenta's citation to Joseph Taets's deposition transcript in Def. Ex. 234 is misleading and incomplete. Taets also testifies that "So to be perfectly clear on the record, I think we can both agree Syngenta filed for regulatory approval in China. They were the applicant. They were having all the dialog as to how the application approval process was going. So they possess that information, not ADM. So irrespective of the source, they were the applicant. So they were the ones having the interaction with China." Ex. 251, Deposition of Joseph Taets Vol. I ("Taets Vol. I") at 274:2-10.

Def. Ex. 241 is an email thread involving Ai Li, a member of Cargill's trade execution team in China, purportedly relying information she learned from the Ministry of Agriculture about when MIR162 might be approved. These emails from Ai Li are hearsay and what certain people purportedly told Ai Li about Syngenta's MIR162 application is double hearsay, which is inadmissible. *See PAS Communications*, 139 F. Supp. at 1179.

Plaintiffs further dispute Paragraph 81 because Maurice Hurst, Cargill's corporate witness on topics related to Cargill's trade execution team in China, testified that he spoke with Ai Li in preparation for his deposition. Ex. 266, Hurst Dep. at 22:12-22. Hurst was asked: "Does the trade execution team in China have contacts at the Ministry of Agriculture?" Hurst responded: "My understanding of their contacts at the Ministry of Agriculture is, um, there's a service window there, and that would be the context." *Id*. at. 98:25-99:6. Hurst testified

that the service window was where the trade execution team took "their application for . . . the trading certificates." *Id*. at 99:7-10. Hurst testified that there was no specific person that Ai Li or the trade execution team in China spoke to at the Ministry of Agriculture. *Id*. at 98:25-101:18 ("the understanding I got on the discussion with Ai Li and Jessie, there wasn't anyone specific that they had contact with"). Hurst was also asked: "What sorts of information would Cargill's trade execution team be provided by this person at the MOA?" And he responded: "Are our certificates ready? How long will they take to be ready? Um, and there was also questions on if MIR162 had been approved, and the answers were no. It was just a simple yes/no answer, and the answer was that it was not." *Id*. at 101:19-102:19-24.

Def. Ex. 242 is an email thread involving Katherine Yin in the May 2013 time period. On May 15, 2013, Yin wrote: "Just confirmed with MOA, GM events, including SB and corns (MIR162) will probably be approved by the end of this May or early June before, during or right after Sino-US ministerial meeting." These statements are hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

Def. Ex. 243 is an email from Andrew Wong, dated December 3, 2013. These statements are hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

> **Syngenta's Reply To No. 81**: Plaintiffs' response fails to create a genuine dispute of material fact, as no sources indicate that the third parties did not have their own sources of information. *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT&T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted). Furthermore, Plaintiffs' only statement about ADM is "ADM's witnesses have further explained that ADM's decision to start selling U.S. commodity corn and DDGs directly to Chinese buyers was based, in part, on Syngenta's representations to the market that Chinese approval of MIR162 was imminent," which is irrelevant to Syngenta's contention about ADM (i.e., that it had its own sources) and fails to properly meet the substance of Syngenta's assertion. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).
>
> As for Plaintiffs' specific challenges: The pages of the deposition transcript of Anthony Reed cited by Syngenta are included in the corrected Syngenta's MSJ Exhibit 146, and establishes that ADM had its own sources from which it obtained information regarding regulatory approvals, including the regulatory approval status of Viptera. *See* Syngenta's MSJ Ex. 146 (10/14/2016 A. Reed Dep. Tr. 105:11-22; 107:5-21).
>
> The pages of the deposition transcript of David Buchanan are included in corrected Exhibit 161. In addition, the correct citation is Syngenta's MSJ Ex. 161 (D. Buchanan Dep. Tr. 171:25-172:9) and the correct citation for Exhibit 233 is Syngenta's MSJ Ex. 233 (D. Buchanan Dep. Ex. 107). As for Exhibits 161, 233, and 268, the statements discussing the documents were made under oath are not hearsay.

Def. Exhibits 241, 242, and 243 are not hearsay because they are not being offered to prove the truth of the matter asserted, only that Cargill had sources concerning regulatory approvals. The content of what these sources told Cargill is irrelevant to the assertion in Statement No. 81.

As for Plaintiffs' contentions about Ai Li and Maurice Hurst, no foundation has been laid for Mr. Hurst to testify about what Ms. Li performed her tracking responsibilities, whether she had contacts in the Ministry of Agriculture, or her interaction with authorities.

82. Maurice Hurst of Cargill testified that Cargill had "a process of . . . tracking . . . the GM traits that had been approved by Ministry of Agriculture in China." *See* Ex. 244 (M. Hurst Dep. Tr. 98:3-5); Ex. 245 (CARGILL000383118) (internal email reminding Cargill personnel that MIR162 was not approved); Ex. 139 (CARGILL000021370) (same).

**PLAINTIFFS' RESPONSE TO NO. 82**:    Plaintiffs to object to and dispute Paragraph 82 because it based upon emails from Cargill employees (Def. Ex. 245 and 139) which are hearsay. Further, Def. Ex. 139, which appears to relay information that a Cargill employee heard from some of Cargill's customers, is inadmissible double hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

Plaintiffs further dispute Paragraph 82 because it is factually incomplete and incorrect. Maurice Hurst, Cargill's corporate witness on topics related to Cargill's trade execution team in China, testified that Ai Li was responsible for tracking which GM traits had been approved in China. Ex. 266, Hurst Dep. at 97:20-98:24. When asked "how did Ms. Li go about tracking which GM traits were approved in China," Hurst responded: "I believe she obtained it from websites that were available, um, and just general awareness from trade communications" such as "general communications in the trade, so it could have been news stories on the Internet." *Id*. at 98:12-19. As noted in response to Paragraph 81, Hurst testified that the trade execution team, including Ai Li, did not have any specific contacts at the Ministry of Agriculture.  *Id*. at 98:25-99:6, 99:20-101:18. Hurst further testified that the information that Ai Li received from the "service window," for "questions on if MIR162 had been approved, and the answers were no. It was just a simple yes/no answer, and the answer was that it was not." *Id*. at 101:19-102:19-24.

**Syngenta's Reply To No. 82**: Plaintiffs' response fails to create a genuine dispute of material fact.  Mr. Hurst testified under oath and his testimony is not hearsay.  Plaintiffs do not clarify the meaning of "based upon hearsay" in objecting to the testimony of Mr. Hurst, and no such evidentiary objection is apparent to Defendants.  Furthermore, Plaintiffs' contention that the testimony is contradicted by other witnesses' testimony is irrelevant to the assertion in No. 82.  *Cf. In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple 'undisputed' because it cannot dispute the fact that the memorandum so states.") (footnote call number omitted). Furthermore, no foundation has been laid for Mr. Hurst to testify about what Ms. Li performed her tracking responsibilities, whether she had contacts in the Ministry of Agriculture, or her interaction with the purported "service window."

83.     Randy Giroux of Cargill testified that he was "emphatically clear" in a June 2011 email that MIR162 "'will NOT be approved in China by this fall [of 2011]." Ex. 121 5/16/2016 R. Giroux Dep. Tr. 87:3-9); Ex. 131 (R. Giroux Dep. Ex. 78, at CARGILL000383583) (email).  Mr. Giroux also testified that Cargill knew in October 2011 that MIR162 "was not yet approved, because the Ministry of Agriculture had not yet signed the [biosafety certificate] and given them the certificate." Ex. 121 (5/16/2016 R. Giroux Dep. Tr. 119:9-23); Ex. 132 (R. Giroux Ex. 81, at CARGILL000004161) (October 2011 email from Giroux discussing prospect for Chinese approval of MIR162).

**PLAINTIFFS' RESPONSE TO NO. 83**:    Plaintiffs dispute and object to Paragraph 83 on the grounds of lack of foundation and personal knowledge because Giroux testified he did not specifically recall the June, 2011 email. When asked: "Do you have any reason to think your assessment was inaccurate as of June 2011?" Giroux testified: "Yeah, I would prefer not to speculate." Ex. 244, Giroux Vol. I at 83:3-8 (objection omitted)). Giroux was also asked: "[D]o you have any reason to believe that you were inaccurate when you wrote your assessment in June of 2011?" Giroux responded: "So, I would hope that when I wrote this email, it was factual, and it was based on information -- accurate information, but at that time, in 2011, you know, knowing what I know now, that Syngenta did not share accurate information with us during that period of time, whether or not I felt it was accurate at the time, I'm sure I would have provided an accurate -- what I considered to be an accurate answer at that time, but knowing that -- knowing that we weren't getting accurate information from– from Syngenta on the status of its application in 2011, I'm not sure it's accurate." *Id*. at 83:17-84:10.  Giroux also testified: "I'm not an expert on the data collection and data analysis that has to be conducted by Syngenta on field trials, but, you know, I guess, I was speculating at this point that it wouldn't happen in 2011, and so then it would fall into the 2012 year, but I would prefer not to speculate on all the facts related to this email back in 2011." *Id*. at 86:6-14.

Plaintiffs also object to Def. Ex. 131, which is the June 2011 email discussed above, on hearsay grounds. *See PAS Communications*, 139 F. Supp. at 1179.

   **Syngenta's Reply To No. 83**: Plaintiffs' response fails to create a genuine dispute of material fact.

   As for the first sentence, Mr. Giroux confirmed that he was "emphatically clear on" the fact that MIR162 would not be approved in 2011. Ex. 331 (6/9/2016 R. Giroux Dep. Tr. 86:15-22).  Mr. Giroux did not testify that he did not recall the June 2011 email as Plaintiffs contend; instead, he testified he preferred not to speculate about whether his "assessment was inaccurate as of June 2011". *Id*. at 83:3-8. The first sentence of No. 83 does not deal with the accuracy of Mr. Giroux's statement, and so Plaintiffs' citations on this point are irrelevant.

   Plaintiffs do not address the remainder of No. 83 in their Response, and so Plaintiffs fail to meet their burden to contradict the assertion with record evidence. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

Finally, the testimony of Mr. Giroux is not hearsay. Furthermore, the content of Syngenta's MSJ Exhibit 131 may be considered by the Court. Mr. Giroux has been designated as a non-retained expert in this case. *See* Pls.' Opp. Ex. 352 (R. Giroux Expert Disclosure). To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)"). Because Plaintiffs seek to have Mr. Giroux testify at trial, he would be available to testify about his March 2012 internal Cargill statement.

84.   An internal July 2012 Cargill document reminded employees that MIR162 "hasn't been approved yet" and that Cargill's "relationship official" at the Ministry of Agriculture "said there's still no schedule for the permission release." Ex. 133 (CARGILL000022154). The document stated that "as times mentioned before, please pay more attention to avoid unapproved Mir162 contained in corn, DDGS shipments, that will be rejected to discharge at local port.")

   **PLAINTIFFS' RESPONSE TO NO. 84**:   Plaintiffs object to Paragraph 84 and Def. Ex. 133 as hearsay. *See PAS Communications*, 139 F. Supp. at 1179. Additionally, as discussed in Plaintiffs Response to Paragraphs 81-82 above, Cargill did not have specific contacts in the Ministry of Agriculture.

   **Syngenta's Reply To No. 84**: Plaintiffs' response fails to create a genuine dispute of material fact. Exhibit 133 is not hearsay because it is not being offered to prove the truth of the matter asserted, only that Cargill had sources concerning regulatory approvals. The content of what these sources told Cargill is irrelevant to the assertion in Statement No. 84. Regardless, the emails fall under the hearsay exception for regularly conducted activities, Rule 803(6), because it was "the business's regular practice to make the record at issue—the email that the declarant/defendant's employee sends or receives," and "the email, as a 'record' within the meaning of Rule 803(6), [] pertain[s] to a 'regularly conducted' business activity." *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2012 WL 85447, at *5 (E.D. La. Jan. 11, 2012). Here, the content of the email indicates Ai Li regularly reported on the approval and other regulatory statuses of GMO events in China to others within Cargill, and the number of similar emails from Ai Li indicate it was her regular practice to make such records. Thus, even if it is hearsay, the email qualifies for a hearsay exception.

85.   An internal August 2012 email titled "No Schedule for Mir162 Entry Approval in China," stated that "Syngenta continues to await MIR162 corn to be approved to import into China" and that, "[a]s we have all known, until MIR162 obtain[s] Chinese

government entry permission, we still have to pay close attention to the potential discharge rejection risks, check with the origin supplier to **ensure NO MIR162 contained in our corn shipments to China**." Ex. 134 (CARGILL00002153) (emphasis in original).

**PLAINTIFFS' RESPONSE TO NO. 85**:    Plaintiffs dispute Paragraph 85 because Def. Ex. 134 is not the email described in Paragraph 85. Plaintiffs also object to and dispute Paragraph 85 because it relies upon Cargill emails, which are hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

In addition, Maurice Hurst, Cargill's corporate witness testified, that "Ai Li [the sender of the email] has a very limited administrative role as it relates to process -- processes related to GMO trading certificate application. She doesn't make recommendations. . . . She's not an analyst. She doesn't analyze risk. She doesn't make decisions. As part of her responsibility was to send notice to others in Cargill." Ex. 266, Hurst Dep. at 244:20-245:2; 96:17-23 ("Ai Li . . . would send notice internally to our . . . team. Um, she did send e-mails relating to MIR162 not being approved.  It was a very administrative role. . . . She's not an analyst. She wasn't making decisions. She wasn't making recommendations. She was simply providing notice.")).

> **Syngenta's Reply To No. 85**: The correct citation for CARGILL00002153 is Syngenta's MSJ Ex. 241 (8/31/2012 email re MIR162 in China, at CARGILL000022153).
>
> Plaintiffs' response fails to create a genuine dispute of material fact.  Exhibit 134 is not hearsay because it is not being offered to prove the truth of the matter asserted, only that Cargill had sources concerning regulatory approvals.  The content of what these sources told Cargill is irrelevant to the assertion in Statement No. 85.  Regardless, the emails fall under the hearsay exception for regularly conducted activities, Rule 803(6), because it was "the business's regular practice to make the record at issue—the email that the declarant/defendant's employee sends or receives," and "the email, as a 'record' within the meaning of Rule 803(6), [] pertain[s] to a 'regularly conducted' business activity." *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2012 WL 85447, at *5 (E.D. La. Jan. 11, 2012).  Here, the content of the email indicates Ai Li regularly reported on the approval and other regulatory statuses of GMO events in China to others within Cargill, and the number of similar emails from Ai Li indicate it was her regular practice to make such records.  Thus, even if it is hearsay, the email qualifies for a hearsay exception.
>
> Furthermore, no foundation has been laid for Mr. Hurst to testify about what Ms. Li performed her tracking responsibilities, whether she had contacts in the Ministry of Agriculture, or her interaction with the purported "service window."

86.    An August 2012 email from Randy Giroux of Cargill stated that Syngenta and other biotechnology companies had told Cargill that approval for MIR162 would "not [come] before NOV[ember] and perhaps not till late March 2013." Ex. 135 (R. Aspell Dep. Ex. 9, at CARGILL000006412).

**PLAINTIFFS' RESPONSE TO NO. 86**:    Plaintiffs object to and dispute Paragraph 86 because the August 2012 email from Randy Giroux is hearsay and what Giroux wrote about what anyone at Syngenta said is double hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

> **Syngenta's Reply To No. 86**: Plaintiffs' response fails to create a genuine dispute of material fact.  The content of Syngenta's MSJ Exhibit 135 may be considered by the Court.  Mr. Giroux has been designated as a non-retained expert in this case.  *See* Pls.' Opp. Ex. 352 (Disclosure of R. Giroux, at 1).  To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial." … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form."  *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted).  "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)").  Because Plaintiffs seek to have Mr. Giroux testify at trial, he would be available to testify about his statement.

87.    A June 2012 internal Cargill email reported that Cargill hosted a dinner in June 2012 with six officials from China's [CIQ], during which they told Cargill that "you are aware are you not that there is still an unapproved GMO event in corn this year that maybe coming to China"—which "started [Cargill's attendees] to sweat"— indeed, it made them "sweat[] bullets."  Ex. 136 (B. Hale Dep. Ex. 4, at CARGILL000302856).

**PLAINTIFFS' RESPONSE TO NO. 87**:    Plaintiffs object to and dispute Paragraph 87 because the June 2012 email between Cargill employees is hearsay and the quotation of a comment that a person allegedly employed by CIQ allegedly made is double hearsay. *See PAS Communications*, 139 F. Supp. at 1179.

> **Syngenta's Reply To No. 87**: Plaintiffs' response fails to create a genuine dispute of material fact.  Mr. Hale was questioned about and confirmed the content of Syngenta's MSJ Exhibit 136 (W. Hale Deposition Exhibit 4) at his deposition.  *See* Ex. 333 (6/29/2016 W. Hale Dep. Tr. 167:17-168:3).

88.    In June 2013, Syngenta informed Cargill that "no safety certificates" were available for MIR162. Ex. 137 (C. Lee Dep. Ex. 573, at CARGILL000006494). In August 2013, a Cargill employee stated to other Cargill employees that "Mir162 still hasn't been permitted to enter the country." Ex. 139 (CARGILL000021370). In October 2013, Randy Giroux of Cargill noted that Cargill doesn't "have a timeline for MIR162" approval. Ex. 140 (R. Giroux Dep. Ex. 116, at CARGILL000150940).

**PLAINTIFFS' RESPONSE TO NO. 88**:  Plaintiffs object to and dispute Paragraph 88. With respect to Def. Ex. 137 and 140 (emails involving Giroux), Giroux testified that by

June 2013, "we had it communicated to us for quite some time that that application was completed for food and feed approval and was only waiting for the Minister to sign --to sign it." Ex. 244, Giroux Dep. Vol. I at 171:7-11; *id.* at 97:14-23 ("[B]ecause Syngenta had a monopoly on the information of the status of that application, and because we relied solely on Syngenta to provide us with information on the status of their application, by 2012, if I'm not mistaken, we had been informed several times by Syngenta that it was -- that they had been granted approval, and it just needed a signature on the Minister's desk."). Giroux was asked: "you understood that until they had actually received the safety certificates, hat they didn't have the safety certificates, right?" Giroux testified: "So, I see it as two different steps. There's the approval, the food and feed safety approval; and then there's the administrative step of signing and granting the safety certificate. So -- so, I think what Chuck's relating to here is that they did have their food and feed approval, which they had told us for a long period of time at this point but had not passed that administrative step of being handed the safety certificate." *Id.* at 172:9-19.

And with respect to Def. Ex. 139 (emails involving Ai Li), Maurice Hurst, Cargill's corporate witness on topics related to Cargill's trade execution team in China, testified that "Ai Li has a very limited administrative role as it relates to process -- processes related to GMO trading certificate application. She doesn't make recommendations. . . . She's not an analyst. She doesn't analyze risk. She doesn't make decisions. As part of her responsibility was to send notice to others in Cargill." Ex. 266 Hurst Dep. at 244:20-245:2; *see also* 96:17-23. And when asked "how did Ms. Li go about tracking which GM traits were approved in China," Hurst responded: "I believe she obtained it from websites that were available, um, and just general awareness from trade communications" such as "general communications in the trade, so it could have been news stories on the Internet." *Id.* at 98:10-15.

> **Syngenta's Reply To No. 88**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs' citations to the record do not controvert the assertions that "In June 2013, Syngenta informed Cargill that 'no safety certificates' were available for MIR162"; that in "August 2013, a Cargill employee stated to other Cargill employees that 'Mir162 still hasn't been permitted to enter the country,'" or that "In October 2013, Randy Giroux of Cargill noted that Cargill doesn't 'have a timeline for MIR162' approval." The citations are all irrelevant additional facts, and Plaintiffs have thus failed to meet the substance of the matter asserted. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).
>
> Furthermore, no foundation has been laid for Mr. Hurst to testify about what Ms. Li performed in her tracking responsibilities, whether she had contacts in the Ministry of Agriculture, or her interaction with authorities.

89.    ADM's corporate representative Anthony Reed was asked during his deposition "So as of February 9th of 2010, ADM knew that MIR162 was not approved in China, right?," to which he responded "Correct." Mr. Reed was asked in his deposition "At any point before November 18th, 2013, did ADM believe that MIR162 was approved in China?," to which he responded "No." Mr. Reed was asked "At no time between November of

2013 and December of 2014 did ADM believe that MIR162 had been approved in China, right?," to which he responded "That's correct." Ex. 146 (6/1/2016 A. Reed Dep. Tr. 81:13-15; 132:17-19; 282:9-12).

**PLAINTIFFS' RESPONSE TO NO. 89**:   Disputed.  Plaintiffs object to Syngenta's selective quotation from Mr. Reed's October 14, 2016, corporate representative deposition. Mr. Reed testified that in May 2012 ADM heard from Syngenta directly that Syngenta's import application had been approved by the Chinese National Biosafety Committee.  Ex. 124, Deposition of Anthony Reed as a corporate representative (Reed Vol. III) at. 107:5-21.

> **Syngenta's Reply To No. 89**: Plaintiffs' response fails to create a genuine dispute of material fact.  Their citations to the record do not controvert the assertions that Mr. Reed was asked the questions or gave the answers provided.  Furthermore, the citation is an irrelevant additional fact concerning approval by the NBC, which unlike the MOA cannot give full import approval for import into China.  Plaintiffs have thus failed to meet the substance of the matter asserted. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion.  In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

90.    ADM's Richard Grabiel also testified that "[t]here was never a doubt" that MIR162 "had not yet been approved." Ex. 138 (R. Grabiel Dep. Tr. 201:1-8); Ex. 141 (R. Grabiel Dep. Ex. 18, at ADM-00003463, ADM-00003462) (internal ADM emails in December 2013 stating that "MIR162 is not approved in China" and thus that "[t]he Syngenta MIR162 Trader's Certificate has not issued from the MOA").

**PLAINTIFFS' RESPONSE TO NO. 90**:   Admitted in part, but Plaintiffs object to Def. Ex. 141 as hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 90**: Plaintiffs' response fails to create a genuine dispute of material fact about Mr. Grabiel's testimony, which is the portion of the statement that they admit.

91.    Cargill's corporate representative David Baudler was asked in his deposition "Syngenta was providing Cargill, in August 2011, with a map of -- estimating where Viptera had been sold?," and Mr. Baudler testified: "Yes, that's how it looks to me." Ex. 120 (5/16/2016 D. Baudler Dep. Tr. 248:15-18); *see also* Ex. 142 (4/5/2016 J. Bernens Dep. Tr. 487:24-488:12).

**PLAINTIFFS' RESPONSE TO NO. 91**:  Plaintiffs admit that Paragraph 91 accurately quotes a portion of the testimony, but notes that Syngenta has omitted that Mr. Baudler testified: "these maps hit us as a bit of shock and surprise of being isolated -- hoping they were isolated areas that it was being released in. And when we saw the breadth of the release is when we really came to the conclusion that this has been a commercial release to an unapproved destination, and at that point it was, look at the map – look at the map and feel the concern." Ex. 96, Deposition of David Baudler as 30(b)(6) Representative of Cargill, 254:22-255:7.

**Syngenta's Reply To No. 91**: Plaintiffs' response fails to create a genuine dispute of material fact. The additional facts cited by Plaintiffs do not affect the assertion in Statement of Fact No. 91.

93.   An internal ADM email dated August 13, 2011 with subject line "MIR162" stated "GMO event in Syngenta stack that does not have approval in China. Planted on about 2% of corn acres." Ex. 149 (H. Cooklin Dep. Ex. 5, at ADM-00037952). On September 9, 2011, Syngenta's Chuck Lee sent ADM "a set of maps showing origination locations status on Viptera." Ex. 150 (H. Cooklin Dep. Ex. 9, at SYT00307187).

**PLAINTIFFS' RESPONSE TO NO. 93**:   Plaintiffs dispute and object to Paragraph 93 and Def. Ex. 149 and 150 as hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

**Syngenta's Reply To No. 93**: Plaintiffs' response fails to create a genuine dispute of material fact. Mr. Cooklin was questioned about and confirmed the content of Syngenta's MSJ Exhibit 149 (Deposition Exhibit 5) and Syngenta's MSJ Exhibit 150 (Deposition Exhibit 9) at his deposition. *See* Ex. 330 (H. Cooklin Dep. Tr. 150:15-152:2; 185:2-186:10).

As for Syngenta's MSJ Exhibit 150, Mr. Lee is a Syngenta employee whom Syngenta intends to present at trial. *See* Ex. 334 (Syngenta's Witness Disclosures). To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)"). Because Syngenta intends to have Mr. Lee testify at trial, he would be available to testify about his statement.

94.   Cargill's Randy Giroux was asked in his deposition "So, you recognized then in July 2011 that there would be a very low odd of avoiding presence of MIR162 in exports to China; is that right?," and he testified: "Yeah -- I would -- yes, based on -- based on the number of acres that were being broadly planted by Syngenta and based on the commingling that goes on in our commodity agricultural supply chain it would be -- we would expect some number of vessels or some number of consignments to contain the trait, especially if nothing was done to  try to manage it in the -- out of the commodity system." Ex. 121 (6/9/2016 R. Giroux Dep. Tr. 115:7-20). Giroux testified that "there were, in fact, no ways for [Cargill] to completely manage risk to a zero tolerance, nor is there an ability to do so in the –in the US ag supply chain." Ex. 121 (5/16/2016 R. Giroux Dep. Tr. 115:7-20; 164:13-17); *see also* Ex. 144 (CARGILL000177831) (internal acknowledgment that it was "impossible to ship" Viptera-free corn to China);Ex. 145 (CARGILL000004898) (similar). Mr. Giroux also testified that "[t]here is no testing

available that allows us to manage that risk to a zero tolerance in export markets." Ex. 121 (R. Giroux Dep. Tr. at 20:13-21:2).

**PLAINTIFFS' RESPONSE TO NO. 94**:   Plaintiffs admit that Paragraph 94 accurately describes the quoted testimony, but object to Syngenta's citation to and reliance on Def. Ex. 144 (handwritten notes) and Def. Ex. 145 (email from Andrew Wong). The handwritten notes and emails are hearsay. And Wong's email relaying to others at Cargill what representatives of COFCO may have said to Chinese regulatory authorities about whether it is possible to ship MIR162-free corn from the United States lacks foundation and is double hearsay. *See PAS Communications*, 139 F. Supp. 2d at 1179; *Stark*, 856 F. Supp. at 1512.

Plaintiffs also note that testimony by Mr. Giroux in Paragraph 94 concerns the ability to channel Viptera and manage the risk of Viptera after Syngenta's unreasonable, uncontrolled, and nationwide launch of that trait.   It does not concern whether a limited launch of a genetically modified trait can reduce the risk of a trade disruption.

> **Syngenta's Reply To No. 94**: Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs do not dispute the content of the deposition testimony.
>
> Exhibits 144 and 145 are not hearsay because it is not being offered to prove the truth of the matter asserted, only that Cargill had sources concerning regulatory approvals.  The content of what these sources told Cargill is irrelevant to the assertion in Statement No. 94.  Regardless, the emails fall under the hearsay exception for regularly conducted activities, Rule 803(6), because it was "the business's regular practice to make the record at issue—the email that the declarant/defendant's employee sends or receives," and "the email, as a 'record' within the meaning of Rule 803(6), [] pertain[s] to a 'regularly conducted' business activity." *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2012 WL 85447, at *5 (E.D. La. Jan. 11, 2012).  Here, the content of the Exhibit 145 indicates Andrew Wong regularly reported on the approval and other regulatory statuses of GMO events in China to others within Cargill, and the number of similar emails from Andrew Wong indicate it was his regular practice to make such records.  Thus, even if it is hearsay, the email qualifies for a hearsay exception.  Furthermore, the content of Exhibit 144 indicates it was a regular practice to record this information in handwritten notes and that this practice was regularly conducted.
>
> Furthermore, Exhibit 144 is not hearsay because it is being offered for purposes of impeachment of the declaration of Randy Giroux.

95.   In an internal March 14, 2012 email, Cargill's Randy Giroux wrote that "our guess is all boats are positive for this trait [MIR162] if tested." Ex. 162 (R. Giroux Dep. Ex. 105); *see also* Ex. 246 (R. Giroux Dep. Ex. 93, at CARGILL000073787) (June 2013 email from Giroux stating that lack of MIR162 approval is "for sure" a problem for U.S. corn).

**PLAINTIFFS' RESPONSE TO NO. 95**:   Plaintiffs object to and dispute Paragraph 95 and Def. Ex. 162 and 246.  Paragraph 95 quotes Def. Ex. 162 and Def. Ex. 246, which are emails by Cargill employees that are hearsay. *See PAS Communications*, 139 F. Supp. 2d at

1179.  Plaintiffs object to and dispute Syngenta's selective question of Giroux's email, which discussed Monsanto's DroughtGard product.

> **Syngenta's Reply To No. 95**:  Plaintiffs' response fails to create a genuine dispute of material fact.  The content of Exhibits 162 and 246 may be considered by the Court.  Mr. Giroux has been designated as a non-retained expert in this case.  *See* Ex. Pls.' Opp. Ex. 352 (R. Giroux Expert Disclosure).  To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted).  "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs*., 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)").  Because Plaintiffs seek to have Mr. Giroux testify at trial, he would be available to testify about his statements.

> The fact that the statement about MIR162 was made in an email also discussing DroughtGard is irrelevant to the statement Mr. Giroux made.

96.      Stuart [sic] Smalley, Cargill's Vice President and General Manager of the Grain & Oilseed Supply Chain, stated in a July 2011 email that there was "[n]o question in [his] mind that with 2 myl acres of this stuff [Viptera] planted, it will show up in some boats . . . so just a question if someone from China blows the whistle." Ex. 151 (S. Smalley Dep. Ex. 29, at CARGILL000006545).

**PLAINTIFFS' RESPONSE TO NO. 96**:      Plaintiffs admit that Paragraph 96 quotes a portion of the email appearing as Def. Ex. 151, but dispute Paragraph 96 because of the selective quotation of the email. The full sentence of the quoted sentence is: "No question in my mind that with 2 myl acres of this stuff planted, it will show up in some boats given 2.4 myl tons of sales (starlink, BT10, E32 all previous examples) so just a question if someone from China blows the whistle….. don't know how you get comfortable with that one." Def. Ex. 151. Syngenta's ellipses removed the important fact that, while Cargill did not sell U.S. corn to Chinese buyers for delivery in 2011, there were 2.4 million tons of sales to China by other exporters.

Paragraph 96 also omits that the emails provide: "know [Syngenta] have talked to Bunge so highly likely they shared maps with them as well. No mention of LDC [Louis Dreyfus Commodities] but Syn know they sold PRC so if haven't shared as yet, would expect them to in near future." Def. Ex. 151.

> **Syngenta's Reply To No. 96**: Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs do not dispute the quotes are accurate; the additional portions are

irrelevant to the portion of the statement relevant to Syngenta's motion for summary judgment.

97.    Cargill's David Baudler testified that Cargill "could not manage Viptera in a channeling—in channeling to a zero tolerance, that there's no way we would find zero [MIR162] during that period." Ex. 120 (6/15/2016 D. Baudler Dep. Tr. 545:10-546:7). Cargill's Mark Stonacek was asked "Is Cargill capable of channeling grain?," to which he responded "Not at a zero-tolerance level, no."   Ex. 70 (M. Stonacek Dep. Tr. at 293:16-20. Cargill's Corey Jorgenson testified that Cargill generally did not segregate Viptera corn and non-Viptera corn because "there's no way to segregate or to channel away from a . . . zero tolerance policy for import." Ex. 153 (C. Jorgenson Dep. 153:18-154:4).

PLAINTIFFS' RESPONSE TO NO. 97:    Plaintiffs' admit that Paragraph 97 accurately describes the quoted testimony.  To the extent that Syngenta suggests that a limited controlled launch of a genetically modified trait cannot reduce the risk of a trade disruption, Plaintiffs dispute that suggestion.  See infra, Pl. SOAF ¶¶ 133-248.

Syngenta's Reply To No. 97: Plaintiffs' response fails to create a genuine dispute of material fact.  Statement of Fact No. 97 does not contain any suggestion about a "limited controlled launch", and this is precisely the type of statement that the Rules require to be admitted as undisputed.  See In re Universal Serv. Fund Tel. Billing, 2008 WL 1884125, at *2 ("[P]laintiff's statement of fact number 71 states as follows: According to an AT & T memorandum, AT & T's intent is to pass both these charges on to customers, so that they are recognized as tax-like assessments required by the FCC. In this way, the customers will not perceive that these are fees developed by AT & T or the other IXC's to generate revenues. Plaintiffs then cite the memorandum itself. This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple undisputed because it cannot dispute the fact that the memorandum so states.")

Regardless, Plaintiffs' citations to dozens of statements of additional fact are cursory and fail to include specific excerpts supporting and purported dispute of fact.  See Sprint Commc'ns, 500 F. Supp. 2d at 1304 ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations.").

98.    ADM's corporate representative Chris Boerm testified that "there was no way to have a zero-tolerance-type policy or get a hundred percent purity. It was impossible." Ex. 152 (6/20/2016 C. Boerm Dep. Tr. 83:22-84:2). Mr. Boerm testified that even if ADM were to use the best identity-preservation program available with perfect compliance, "zero tolerance . . . is unachievable."   Id. at 214:1-17.

PLAINTIFFS' RESPONSE TO NO. 98:    Disputed.  Plaintiffs object to Syngenta's selective quotation from Mr. Boerm's testimony on pages 83 and 84.  Mr. Boerm testified, "Well, this was a very difficult situation that we were put into. The way MIR162 was introduced into the grain stream, there was no way to have a zero-tolerance-type policy or

get a hundred percent purity. It was impossible." (emphasis added). Mr. Boerm acknowledges that he does not know of a specialty grain program (as opposed to a commodity grain) that maintains one hundred percent purity. Ex. 87 at 213:2-215:10. Mr. Boerm also testified that "*in the case of Viptera specifically*, there was no program in place to where there was a stewardship, a strong stewardship program with farmers being trained on how to plant, how to clean their planters, how to harvest the grain, how to clean out the combines, how to deliver." *Id.* at 217:3-217:9 (emphasis added).

> **Syngenta's Reply To No. 98**:  Plaintiffs' response does not create a genuine dispute of material fact.  Plaintiffs do not dispute that Mr. Boerm so testified, and the additional excerpt they quote does not change the meaning of his statement, especially given that he explicitly agreed that zero tolerance is unachievable in even the best identity-preservation program with perfect compliance.  The fact that MIR162 was not introduced in an identity-preserved manner is irrelevant to Mr. Boerm's testimony that "zero tolerance . . . is unachievable."  Syngenta's MSJ Ex. 152 (C. Boerm Dep. Tr. 214:1-17).  Plaintiffs' response admits that "Mr. Boerm acknowledges that he does not know of a specialty grain program (as opposed to a commodity grain) that maintains one hundred percent purity."  Obviously, a commodity grain program would not be able to maintain "one hundred percent purity" if an identity-preservation program cannot.  The fact that Viptera had no such identity-preservation programs set up is irrelevant to his testimony that zero tolerance is unachievable.

100.    In December 2011, Cargill tested multiple shipments of U.S. corn—which tested positive for Viptera. Ex. 155 (S. Smalley Dep. Ex. 31); Ex. 156 (R. Giroux Dep. Ex. 83); Ex. 157 (R. Giroux Dep. Ex. 85, at CARGILL000074081). Cargill's Stuart Smalley testified "We had not sold anything direct to China. We had sold eight cargoes to other people [Glencorp and Bunge] who had sold [to] China, so we were just kind of curious, you know, what could potentially show up on those boats that we had sold to outside parties." When asked "Did Cargill share the results of the tests with Glencorp and Bunge?," Mr. Smalley testified "No, we did not." Ex. 126 (5/18/2016 S. Smalley Dep. Tr. at 230:3–235:12, 251:23–253:15); Ex. 247 (CARGILL000006821); Ex. 123 (CARGILL000024763) (Nov. 2013 email stating that Cargill decided to enter China market based in part on prior experience of MIR162 getting into China).

**PLAINTIFFS' RESPONSE TO NO. 100**: Plaintiffs admit Paragraph 100, but object to and dispute Def. Ex. 123, which is a string of Cargill emails that are hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 100**: Plaintiffs' response fails to create a genuine dispute of material fact about the testimony of Cargill witnesses, which is the portion of the paragraph they admit.
>
> Furthermore, Ex. 123 (CARGILL000024763) is the same document as Exhibit 12 from the deposition of William Hale on June 29, 2016, Ex. 353 (CARGILL000024763 - CARGILL000024764), to which the parties did not make a hearsay objection. *See* Ex. 354 (Ltr. from C. Schmitter (09/13/2016) & attachment) (failing to identify any objection). The Amended Order Regarding Qualification of Documents Generated by A

Party as Authentic And/or Records of Regularly Conducted Activity ("Business Record Order") (ECF No. 1744) is "binding on all parties and their counsel in all Coordinated Actions unless otherwise expressly noted" and establishes that "any party wishing to contest a deposition exhibit's presumptive qualification as a Business Record or Opposing Party's Statement as set forth in paragraphs 3 or 4, shall advise Plaintiffs' Lead Counsel …. Any objections to consideration as Business Records or Opposing Party's Statements made pursuant to this paragraph by Plaintiffs' Lead MDL Counsel shall presumptively be treated as also being made on behalf of other plaintiffs' counsel in the Coordinated Actions." *Id.* Having failed to make such an objection, Plaintiffs have waived their opportunity to challenge the content of the email, and it is presumptively admissible under the terms of the Business Record Order.

101.   In June 2012, Cargill tested samples of its barges on the Mississippi River en route to its Gulf export terminals as part of a project to gauge the risks of MIR162 being in shipments to China. The first set of tests revealed that 50% of those barges were positive for Viptera. Ex. 158 (CARGILL000072474). Cargill tested a different set of barges later in June 2012, and 50% of those barges tested positive for Viptera. Ex. 159 (R. Giroux Dep. Ex. 103).

   **PLAINTIFFS' RESPONSE TO NO. 101**:  Plaintiffs object to and dispute Paragraph 101 and Def. Ex. 159. Paragraph 101 is based upon a document produced by Cargill, which is hearsay.     *PAS Communications*, 139 F. Supp. 2d at 1179.

   Plaintiffs also dispute Syngenta's characterization, with no citation to the record, that "Cargill tested samples of its barges on the Mississippi River en route to its Gulf export terminals as part of a project to gauge the risks of MIR162 being in shipments to China."

   In addition, as noted in response to Paragraph 100, numerous Cargill witnesses testified that testing at origin is not indicative of testing at destination, which is the test result that matters. Ex. 322, Deposition of Steven Smalley 30(b)(6) (Smalley 30b6) at 116:25-117:5; Ex. 75, Deposition of Randal Giroux 30(b)(6) Vol. I (Giroux 30b6 Vol. I), 55:23-56:10. Smalley further testified that testing is imprecise because the test result may produce both false positives and false negatives.  Ex. 322, Smalley 30b6 at 116:24-117:5. When asked why Cargill, after June 2012, never tested any of the barges for MIR162, Giroux responded: "we did not routinely test for the presence of MIR162. In our export pipe, because the zero-tolerance requirement really made . . . testing an ineffective tool for our managing risk for the presence of MIR162 in our export pipeline." Ex. 75, Giroux 30b6 Vol. I, 53:21-54:3.

   Finally, Smalley testified that "when we were notified that barges may contain Viptera, we instructed the facilities then that these barges may contain Viptera, and they're then designated in the pipeline as potentially containing Viptera, and that they needed to be handled separately and to go onto vessels that did not go to China." Ex. 165, Smalley Vol. I at 73:15-22; *see also* Ex. 75, Giroux 30b6 Vol. I, 50:21-24 ("if there was ever a positive test for the presence of MIR162, there was a requirement that those consignments not enter into -- enter into China.").

**Syngenta's Reply To No. 101**: Syngenta's MSJ Exhibits 158 and 159 may be considered by the Court because they qualify for the business record exception to the rule against hearsay. Syngenta's MSJ Ex. 158 (6/18/2012 Analysis Report, at CARGILL000072474); Syngenta's MSJ Ex. 159 (R. Giroux Dep. Ex. 103). The testing results are records of regularly conducted activity conducted in the ordinary course of Cargill's business.

Plaintiffs do not address the second two sentences of Statement of Fact No. 101, and so have failed to meet their burden to contradict the assertion with record evidence.

102. In July 2012, Cargill's Chinese regulatory team wrote in an internal email that, "as times mentioned before, please pay more attention to avoid unapproved MIR162 contained in corn, DDGS shipments, that will be rejected to discharge at local port." Ex. 160 (7/5/16 Q. Chen Dep. Ex. 4, at CARGILL000022179). The internal email further stated that "we can clearly see and feel MOA's more and more strictly control and inspection process on GMO agricultural productions importation to China." *Id*.

**PLAINTIFFS' RESPONSE TO NO. 102**: Plaintiffs object to and dispute Paragraph 102 and Def. Ex. 160. Paragraph 102 quotes Def. Ex. 160, a Cargill email which is hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

Plaintiffs also dispute the characterization that the email was written by "Cargill's Chinese regulatory team" and object on the grounds of lack of personal knowledge and foundation of the email author. The emails were written by Ai Li, a member of Cargill's trade execution team in China. Ex. 266, Hurst Dep. at 87:4-23. Maurice Hurst, Cargill's corporate witness on topics related to Cargill's trade execution team in China, testified that "the main function, the core of the team, the trade execution team in China, is performing the activities related to the import of commodity, where Cargill China -- or Cargill is the importer of the record in China." *Id*. at 87:19-23. With respect to corn sales to Chinese buyers, Hurst testified that "they would have involvement of the— the application for the GMO trading certificate" and "would help facilitate communication between the buyers and sellers." *Id*. at 90:9-15. Hurst also testified that "Ai Li has a very limited administrative role as it relates to process -- processes related to GMO trading certificate application. She doesn't make recommendations. She doesn't – She's not an analyst. She doesn't analyze risk. She doesn't make decisions. As part of her responsibility was to send notice to others in Cargill." *Id*. at 244:20-245:2.

**Syngenta's Reply To No. 102**: Cargill witness Jerrity Chen was questioned about and confirmed the content of Syngenta's MSJ Exhibit 160 (Deposition Exhibit. 4) at his deposition. *See* Ex. 335 (J. Chen Dep. Tr. 156:19-159:18).

Furthermore, no foundation has been laid for Mr. Hurst to testify about what Ms. Li performed her tracking responsibilities, whether she had contacts in the Ministry of Agriculture, or her interaction with authorities.

103. Cargill's Vice President of Finance for the Agricultural Supply Chain, Mark Stonacek, testified that he "believe[d] that Cargill missed out on a trade opportunity by

not selling corn to China in 2011" and that "the risk of MIR162 and how that would be enforced by the Chinese authorities[] was known and part of the decision we made" in reversing course. Ex. 70 (5/24/16 M. Stonacek Dep. Tr. at 328:6-13; 330:2-9).

**PLAINTIFFS' RESPONSE TO NO. 103**:   Plaintiffs admit that Syngenta has accurately quoted portions of Mr. Stonacek's testimony. But Plaintiffs note that Syngenta omitted the portions of his testimony that explain the "opportunity missed" and the decision made by Cargill.  In response to the question, "what did you believe the opportunity was that you missed," Stonacek responded: "Our role in the marketplace is to provide value to both our farmer customers, as well as our destination customers, by connecting areas and quantities of excess supply with the demand for that supply in the world. So, to do that effectively and efficiently, you know, we are best placed when we can match up all of the -- you know, look at all of the competitive growing regions in the world, competitive growing regions in the United States, match that up against the demand base that exists in the world and try to put the supply with the demand, and any time you're excluded from part of that equation, I think by definition, you have -- you have -- you have less of an opportunity than if the entire market is open to you." Ex. 265, Stonacek. Vol. II at 328:16-329:9.

In terms of the making the decision to sell U.S. corn to Chinese buyers, Stonacek was asked: "what were the natures of the conversations that you had regarding China's decision to sell corn to -- Cargill's decision to sell corn to China in -- in 2013?" Stonacek responded: "The nature of the discussion generally was . . . China continues to buy large quantities of corn. We believe it makes sense for us to participate, given our interest in being the best market for the US farmer. MIR162 is -- is not yet approved, but we believe it's on a track record to be approved based on the information we'd received from Syngenta, and we -- we were in a very difficult situation between the risk of how China may eventually approve or choose to enforce the lack of approve relative to the importance of China for the US farmer, and we had a very difficult decision to participate in those sales." Ex. 269, Deposition of Mark Stonacek Vol. I ("Stonacek Vol. I") at 127:15-128:11. Stonacek continued: "And so, the conversation . . . was basically sizing up that situation and -- and confirming that we were going to go ahead and decide to take what we believed to be a calculated but managed risk . . . to manage the situation that was a very difficult situation that we were put into by Syngenta's decision to commercialize this product without those approvals." *Id*. at 128:12-20.

Syngenta's Reply To No. 103: Plaintiffs' response fails to create a genuine dispute of material fact.  The statement does not contain any suggestion that Mr. Stonacek did not provide additional information on the topic of No. 103, and No. 103 is precisely the type of statement that the Rules require to be admitted as undisputed.  *See In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiff's statement of fact number 71 states as follows: According to an AT & T memorandum, AT & T's intent is to pass both these charges on to customers, so that they are recognized as tax-like assessments required by the FCC. In this way, the customers will not perceive that these are fees developed by AT & T or the other IXC's to generate revenues. Plaintiffs then cite the memorandum itself. This is the type of fact paragraph the court expects to see because AT & T's response is and should be, appropriately, a simple undisputed because it

cannot dispute the fact that the memorandum so states.") (internal quotation marks omitted).

**PLAINTIFFS' RESPONSE TO NO. 104**: Plaintiffs admit that Paragraph 104 accurately quotes the cited testimony.

105. Cargill's Randy Giroux stated in a March 2012 internal Cargill email that "our guess is all boats are positive for this trait [MIR162] if tested." Ex. 162 (R. Giroux Dep. Ex. 105).

**PLAINTIFFS' RESPONSE TO NO. 105**: Plaintiffs object to and dispute Paragraph 105 and Def. Ex. 162.

Paragraph 105 simply quotes Def. Ex. 162, which is an email from a Cargill employee that is hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 105**: Plaintiffs' response fails to create a genuine dispute of material fact. Mr. Giroux has been designated as a non-retained expert in this case. *See* Ex. Pls.' Opp. Ex. 352 (Disclosure of R. Giroux, at 1). To be considered on summary judgment, evidence need not be "submitted in a form that would be admissible at trial … However, to determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury in some form." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (citations, alteration, and internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citation omitted); *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) (noting "SCSI's evidence (the affidavit of Carl Watts) [] can be reduced to admissible form at trial (the testimony of Carl Watts)"). Because Plaintiffs seek to have Mr. Giroux testify at trial, he would be available to testify about his statement.

106. ADM's Wes Uhlmeyer testified that "[w]hen [ADM] chose to make sales to China, we did it knowing that there was risk." Ex. 122 (6/23/2016 W. Uhlmeyer Dep. Tr. 97:22-24).

**PLAINTIFFS' RESPONSE TO NO. 106**: Disputed. Plaintiffs object to Syngenta's selective quotation from Mr. Uhlmeyer's testimony. Mr. Uhlmeyer also testified in response to the same question about whether ADM sold corn to China without testing that corn for the presence of MIR162 that "[n]o amount of testing was going to eliminate that risk because of all the things I've just said because it was widespread through the supply chain, because it's a zero tolerance, the testing, the threshold on the testing does not go down to zero, because there's other things like dust and whatnot that you couldn't even test. So I wouldn't say that the risk was greater or lower based on testing protocol. When we chose to make sales to China, we did it knowing that there was risk. And we felt like there was nothing we could do to – Well, there was nothing we could do to eliminate that risk. But our other choice at the time was, okay, sell to China, take that risk, or don't sell to China and just don't participate in the Chinese market, with corn. And if you take that logic further, corn, some amount of foreign material in soybean shipment is corn, gets in there. You could take that logic on that

we shouldn't sell soybeans to China, we shouldn't sell wheat to China, we shouldn't sell sorghum to China if you don't have to have any risk that's out of your control because of the situation with MIR 162." Ex. 270, Deposition of Wes Uhlmeyer (Personal) ("Uhlmeyer Dep.") at 97:14-98:12.

> **Syngenta's Reply To No. 106**: Plaintiffs' response does not create a genuine dispute of material fact.  Regardless of the ability to eliminate the risk, Mr. Uhlmeyer testified that "[w]hen [ADM] chose to make sales to China, we did it knowing that there was risk." Plaintiffs' citations to additional facts are irrelevant to the assertion in No. 106.

107.   Mr. Uhlmeyer stated in a March 24, 2014 internal Cargill email that "the risk we took with corn in China was done with eyes wide open by all levels of management." Ex. 138 (R. Grabiel Dep. Ex. 22).

**PLAINTIFFS' RESPONSE TO NO. 107**:  Plaintiffs object to and dispute Paragraph 107 and Def. Ex. 138. Paragraph 107 quotes an email of an ADM employee, which is hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 107**: Plaintiffs' response does not create a genuine dispute of material fact.  The email was introduced and inquired about in the deposition of Mr. Uhlmeyer, who verified that he wrote it.  Ex. 336 (6/16/2016 W. Uhlmeyer Dep. Tr. 366:18-367:8) ("Q.  In your response to his email, you write:  Apparently you have misunderstood my email. I'm not suggesting that anything was poorly managed. The risk that we took with corn in China was done with eyes wide open by all levels of management.  Do you see that?  A.  Yes.  Q.  So all levels of management at ADM were aware of the risk that ADM was taking when it sold corn to China in 2013? ...  A.  To my knowledge, it was up to Joe Taets' level.") (objection omitted).

108.   A July 7, 2011 internal ADM email stated "if our cargo contains this variety [MIR162] which is not approved by the MOA, we can not get certificate from MOA and we have a high risk that the cargo will be rejected." Ex. 164 (S. Von Lamezan Dep. Ex. 255).

**PLAINTIFFS' RESPONSE TO NO. 108**:  Plaintiffs object to and dispute Paragraph 108 and Def. Ex. 164.  Paragraph 108 quotes an email from an ADM employee, which is hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 108**: Plaintiffs' response does not create a genuine dispute of material fact.  Mr. von Lamezan was questioned about and confirmed he content of the document at his deposition.  *See* Ex. 337 (S. Von Lamezan Dep. Tr. 67:19-77:11).

109.   ADM's Stephan von Lamezan testified that ADM "management made the decision that [ADM] would participate" in selling corn to China, even as they admitted that "maybe [it] was wrong to feel that way."   Ex. 166 (S. Von Lamezan Dep. Tr. 145:13-146:2).

**PLAINTIFFS' RESPONSE TO NO. 109**:   Plaintiffs object to and dispute Syngenta's selective quotation which mischaracterizes Mr. von Lamezan's deposition testimony. When read in its full context, Mr. Von Lamezan's statement that "[a]nd we felt maybe that was wrong to feel that way . . ." related to his testimony that ADM had been staying out of the

Chinese market even though other exporters, ADM's competitors, had been shipping to China. The Court should consider Mr. von Lamezan's entire answer pursuant to Fed. R. Evid. 106. Ex. 304, Deposition of Stephan von Lamezan ("von Lamezan Dep.") at 144:15-147:10.

> **Syngenta's Reply To No. 109**: Plaintiffs' response does not create a genuine dispute of material fact. Mr. Von Lamezan's additional statements included by Plaintiffs do not alter the meaning of Statement No. 109, and Plaintiffs have thus failed to properly controvert the assertion. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

112. ADM's corporate representative Anthony Reed was asked during his deposition "If a shipment contained MIR162 before it was approved, ADM understood that shipment could get rejected?," and he testified "Correct." Mr. Reed was then asked "And in the vast majority of the contracts, ADM agreed that it assumed the risk of rejection, right?," and he testified "Yeah. So in the vast majority of contracts, the allocation of risk, should there be a rejection, ADM agreed --ADM agreed to take that allocation of risk." Ex. 146 (6/1/2016 A. Reed Dep. Tr. 198:5-14).

> **PLAINTIFFS' RESPONSE TO NO. 112**: Plaintiffs dispute Paragraph 112 because it is not found in Def. Ex. 146.

>> **Syngenta's Reply To No. 112**: The pages of the deposition transcript of Anthony Reed cited by Syngenta are included in corrected Def. Ex. 146, and establishes that Anthony Reed testified as stated. In addition, the correct citation is Ex. 146 (10/14/2016 A. Reed Dep. Tr. 197:25-198:13).

114. Cargill's Guiding Principles include the statement that: "With [Cargill's] global reach comes the responsibility to understand and manage its impact," including "the responsibility to comply with all of the laws that apply to [its] businesses." Ex. 249 (A. Wong Dep. Ex. 9 at 8-9).

> **PLAINTIFFS' RESPONSE TO NO. 114**: Plaintiffs object to Paragraph 114 and Def. Ex. 249. Paragraph 114 cites a Cargill document, which is hearsay. *PAS Communications*, 139 F. Supp. 2d at 1179.

>> **Syngenta's Reply To No. 114**: Mr. Wong was questioned about and confirmed the content of Ex. 249 (A. Wong Dep. Ex. 9) at his deposition, and so the information contained within is reducible to admissible form. Ex. 338 (A. Wong Dep. Tr. 235:10-240:16).

115. ADM's publicly available Code of Conduct states that because ADM "ships products and services to countries all over the world," its "international trading operation are subject to the laws and regulations of the countries in which [ADM] conduct[s]

business," and thus ADM "must abide by all applicable laws and regulations regarding international trade." Ex. 314 (ADM Code of Conduct).

**PLAINTIFFS' RESPONSE TO NO. 115**:  Plaintiffs dispute and object to Paragraph 115 and Def. Ex. 314 as hearsay.  *PAS Communications*, 139 F. Supp. 2d at 1179.

> **Syngenta's Reply To No. 115:** Exhibit 314 is not hearsay because it is not being offered to prove the truth of the matter asserted, only to show ADM's state of mind merely by the fact that the statement itself was made.

116.    Cargill Trader Andrew Wong testified that "there would not be such a scenario of the loaded cargo not meeting the requirements" of Chinese law or Cargill's contracts with Chinese purchasers, because that would be "unlawful" and would "violat[e] the terms and conditions of our contract[s]."  Ex. 169 (8/31/2016 A. Wong. Dep. Tr. 370:6-19, 371:21-372:15).  Wong testified that he would be "very surprised" if Cargill shipped U.S. corn to China knowing that it contained MIR162 and "really think[s] it would not happen." *Id*. at 371:21-372:15. Wong testified that even to ask whether Cargill would send a shipment to China that tested positive for MIR162 (in violation of Chinese law) was not a "reasonable" question given that Cargill had publicly committed to comply with Chinese law. *Id*. at 369:21-370:4.

**PLAINTIFFS' RESPONSE TO NO. 116**:   Plaintiffs admit that Paragraph 116 correctly quotes portions of Mr. Wong's testimony, but dispute and object to Paragraph 116 because Mr. Wong lacked personal knowledge and a sufficient foundation for the testimony.  Wong testified that he is a food grains manager. Ex. 271, Deposition of Andrew Wong Vol. I at 56:15-20. Wong testified that his primary responsibility was to "manage the trading relationship with COFCO and Sinograin" concerning corn and wheat. *Id*.; *id*. at 74:24-75:3; *see also* 146:14-16 ("I know my responsibility, which was focus on the trade surrounding corn and wheat with COFCO and Sinograin."). Wong testified that: "I, in my work, mainly acted as a bridge between Cargill and COFCO. So, my work actually focused more on the sales and marketing." *Id*. at 73:22-24; *see also id*. at 75:6 ("my expertise is primarily in marketing").

Wong testified consistently and repeatedly that "whether a GMO trait that has not been approved was contained in a shipment of our vessel" was "not within [his] area of focus," and so he "would not interfere or get involved." *Id*. at 75:16-24; *see also id*. at 76:13-17 ("the presence of the GMO trait on the Cargill shipment, now that is not within my scope of work, so I could only trust the specialties or expertise of my colleagues and would not get involved"). Wong testified that Cargill has a "very clear division of labor, and [his] responsibility are on the sales and marketing area. As for the GMO matters, they are dealt with by other colleagues in other department." *Id*. at 74:4-9; *see also* Ex. 263, Wong Vol. II at 209:8-11 ("we have an explicit division of labor within our company, so I was not the one responsible for the GMO issue").

Wong also testified that because of "the division of labor," issues related to loading "would be handled by [his] colleagues in the US." Ex. 272, Deposition of Andrew Wong Vol. III ("Wong III") 360:14-18; *see also id*. at 367:4-7 ("With the US corn, it should be handled by

the department headed by Bill Hale in performing a contract."). In response to the questions "Are you familiar with what your colleagues do in the US with respect to the loading and testing of U.S. corn?" He testified: "I am not." *Id*. at 495:3-6. Wong testified that he was not responsible for interpreting contracts between Cargill and Chinese buyers. *Id*. at 494:5-10. He further testified that he has not had any legal training, that he was not a lawyer, and that he does not have expertise in Chinese law. *Id*. at 493:2-9.

> **Syngenta's Reply To No. 116**: Plaintiffs' response fails to create a genuine dispute of material fact. Mr. Wong had the foundation to testify regarding contract execution and negotiations with Chinese buyers. Internal ADM correspondence indicates that Mr. Wong offered recommendations on whether or not to accept or reject certain terms with Chinese buyers, and so he has familiarity with contract terms as well as the interpretation of those terms. Ex. 339 (Email re COFCO, at CARGILL000137558). Mr. Wong also reviewed revisions to contracts with Chinese buyers. *See id*. He clearly has sufficient personal knowledge to have testified as he did. Mr. Wong communicated with other Cargill employees about Cargill's failure to apply for a GMO certificate for MON89034 in 2011. Ex. 340 (A. Wong Dep. Ex. 2, at CARGILL000024254). He also communicated about the presence of unapproved GMOs in Cargill shipments, including MON89034. *Id.*

117. ADM's former Senior Manager of Regulatory & Scientific Affairs testified that it was "very clear that if the certificate is not issued you do not ship period" and that "we'd been telling them [ADM corn traders] that for four or five years." Ex. 138 (9/8/2016 R. Grabiel Dep. Tr. 171:13-15).

**PLAINTIFFS' RESPONSE TO NO. 117**: Disputed. Mr. Grabiel is a former ADM employee who testified in his individual capacity. When asked later in his deposition about the selective quotation Syngenta relies on, Mr. Grabiel clarified, "Well, I may have – if I state that as an absolute, it wasn't within my purview to say that, but if – I think in that situation they wanted a result. If you do not want to risk – or do not want to run the risk of rejection, do not ship the material." Ex. 351, Deposition of Richard Grabiel Vol. II ("Grabiel Vol. II") at 419:7-19. Mr. Grabiel further explained that it was not within his job responsibilities at ADM to decide whether to ship corn to China. *Id.* at 426:2-20.

Anthony Reed, testifying as a corporate representative for ADM, testified that ADM's understanding of Chinese law is that the importer, not the exporter, is required to submit the Biosafety Certificate for import under Chinese law. However, ADM may contractually agree with its buyer to apply for the Biosafety Certificate for import. There is nothing in Chinese law that requires the exporter to obtain the Biosafety Certificate for import. Ex. 124, Reed Vol. III at 168:21-170:10, 192:10-21, 194:24-195:18. The Biosafety Certificate for import is presented by the importer when the cargo reaches the Chinese port. *Id*. at 177:8-21. Thus, Mr. Gabriel was mistaken in his testimony about the obligations on ADM under Chinese law.

> **Syngenta's Reply To No. 117**: Plaintiffs' response fails to create a genuine dispute of material fact. Plaintiffs do not dispute the content of Mr. Grabiel's testimony, and his purported clarification does not undermine his statement. Mr. Grabiel said that "it

wasn't within my purview to say that," but did not change his testimony that it was "very clear that if the certificate is not issued you do not ship period" and that "we'd been telling them [ADM corn traders] that for four or five years." Statement No. 117 does not address Mr. Grabiel's job responsibilities, whether the importer or export is required to submit the Biosafety Certificate, or obligations under Chinese law, and so Plaintiffs' quotations on these points are irrelevant. Plaintiffs have thus failed to meet the substance of the matter asserted. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

118.   In November 2013, China began rejecting shipments of U.S. corn from Cargill, citing the presence of MIR162. On November 20, 2013, Cargill received a laboratory report that at least six corn shipments that were currently on their way to China contained MIR162. Ex. 250 (CARGILL..........-CARGILL.........) (M/V Coal Hunter, M/V Hanjin New Orleans, M/V Yong Li, M/V Moonlight, M/V Palma Bulker, M/V Tiger South, and M/V Nord Navigator). Cargill nonetheless delivered at least five of these shipments to China. Some of the vessels that Cargill knew had tested positive for MIR162 in the United States were accepted despite having tested positive for MIR162. Ex. 316 (CARGILL000019623); Ex. 317 (CARGILL000009865) (M/V Moonlight); Ex. 318 (CARGILL000022414); Ex. 319 (CARGILL000019043); Ex. 320 (CARGILL000019048) (M/V Tiger South). Several other ships that Cargill knew had tested positive for MIR162 in the United States, however, were rejected due to the presence of MIR162, which was "not authorized" by the trader's certificate Cargill submitted to the port authorities for the shipment. Ex. 253 (CARGILL000000001-CARGILL000000006) (rejection notices for M/V Coal Hunter); Ex. 204 (CARGILL000124718); Ex. 254 (CARGILL000124719); Ex. 7 (CARGILL000335588) (rejection notice, phytosanitary certificate, and test results for M/V Yong Li); Ex. 205 (CARGILL000124718); Ex. 255 (CARGILL000157923) (rejection notice and phytosanitary certificate for Hanjin New Orleans). The M/V Pedhoulas Builder was rejected prior to the testing. Ex. 251 (CARGILL000000013) (rejection notice for M/V Pedhoulas Builder). The M/V Yasa H Mulla was not included in the U.S. testing and was rejected. Ex. 252 (CARGILL000165908) (rejection notices and CIQ test results for M/V Yasa H. Mulla).

**PLAINTIFFS' RESPONSE TO NO. 118**:   Plaintiffs admit that in November 2013, China rejected shipments of U.S. Corn from Cargill citing the presence of MIR162. Plaintiffs admit that the M/V Yasa H Mulla was rejected and that samples from that vessel were not tested before shipment.  Plaintiffs admit that the M/V Pedhoulas Builder was rejected and was not tested before shipment.

Plaintiffs admit that on November 20, 2013, Cargill received a report that samples taken from shipments tested positive MIR162.  However, Plaintiffs dispute that Cargill knowingly shipped MIR162 corn to Chinese buyers. The evidence establishes that, soon after Cargill learned that MIR162 had been detected in corn that it had sold and that the buyer had discharged from the vessel, there were discussions within Cargill (and discussions between Cargill and Syngenta) about seeking a "low-level presence" allowance for MIR162 from the Chinese government. *See* Pl. SOAF ¶¶ 574-587. To obtain additional data to support an LLP

proposal, including the level at which the LLP should be set (1% or 3%), Cargill sent samples drawn from nine vessels that had been loaded from Cargill's Gulf facilities for MIR162 testing. Pl. SOAF ¶ 577. All nine samples were drawn from vessels that had either arrived in China or were on the water en route to China. Pl. SOAF ¶ 577. In other words, Cargill did not knowingly load MIR162 corn on vessels bound for China. *See* Pl. SOAF ¶¶ 574-587 Plaintiffs dispute that Cargill "nonetheless delivered these shipments to China" because title to the shipment had transferred to the buyer. *See* Pl. SOAF ¶¶ 582-587. Plaintiffs also note that Cargill did not "deliver" many of the shipments. Cargill worked with Chinese buyers, again the owners of the corn, to have CIQ "pre-inspect" arriving vessels for the presence of MIR162 *before* corn from the vessels discharged. Under this pre-inspection procedure, CIQ would take and test a sample of corn, and the vessel would wait for CIQ's test result. If the sample tested positive, the corn would be sold to another buyer without any of the MIR162-tainted corn ever leaving the vessel. *See* Pl. SOAF ¶¶ 584-85 (describing the M/V Yong Li and M/V Hanjin New Orleans). If the sample tested negative, and if CIQ granted discharge permission, the corn would be discharged. *See* Pl. SOAF ¶¶ 586-87 (describing the M/V Moonlight and M/V Tiger South). Numerous witnesses testified that testing is imprecise and that a test result at origin is not indicative of the test result at destination, which is the only test result that matters. *See* Pl. SOAF ¶¶ 501.

Plaintiffs dispute that any shipment that was rejected tested positive at <u>destination</u>, as suggested in Paragraph 118, and Syngenta has provided no evidence of that proposition.

Plaintiffs also dispute that Cargill "submitted [trader's certificates] to port authorities for the shipment[s]." The evidence shows that the Chinese buyers owned the corn long before the vessel reaches Chinese waters and that the Chinese buyers are responsible for importing the corn and clearing customs. Pl. SOAF ¶¶ 560-66, 582

> **Syngenta's Reply To No. 118**: Plaintiffs' response fails to create a genuine dispute of material fact. First, Plaintiffs' citations to dozens of statements of additional fact are cursory and fail to include specific excerpts supporting their dispute. *See Sprint Commc'ns*, 500 F. Supp. 2d at 1304 ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations.").
>
> Syngenta incorporates its responses to Plaintiffs' Statements of Additional Fact to this reply to No. 118.

122.   The USDA deregulated Event 5307 in January 2013 without any restrictions on its usage or sale. *See* Ex. 258 (NEPA Decision & Finding of No Significant Impact: Event 5307 Maize (Jan. 29, 2013)); Ex. 259 (USDA, Determination of Nonregulated Status for Event 5307 Corn, Docket No. APHIS-2012-0024, 78 Fed. Reg. 13302 (Feb. 27, 2013)).

   **<u>PLAINTIFFS' RESPONSE TO NO. 122</u>**:   Plaintiffs admit the USDA deregulated Event 5307 in January 2013, but dispute the phrase "without any restrictions on its usage or sale" which is not a term of art, is ambiguous and argumentative. *See also supra* Response to No. 3.

**Syngenta's Reply To No. 122**:  Plaintiffs' response fails to create a genuine dispute of material fact.  Plaintiffs do not cite any record evidence controverting the assertion that the USDA did not impose any restrictions on Event 5307's usage or sale. Plaintiffs have thus failed to meet the substance of the matter asserted. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

124.    Duracade was fully approved in the U.S. before Syngenta began selling Duracade seeds in the U.S. *See* supra SOF ¶¶ 122-23.

**PLAINTIFFS' RESPONSE TO NO. 124**:    Plaintiffs object to Paragraph 124 because   the   term   "fully approved," which is not a term of art, is ambiguous and argumentative.  Duracade was not approved in all key markets as called for by the policies of numerous industry organizations, including the Biotechnology Industry Organization Product Launch Stewardship Policy, which Syngenta adopted. *See infra*, Pl. SOAF. ¶¶ 527-529, 56-82, 133-144. Thus, Duracade was not "fully approved" in the U.S.

**Syngenta's Reply To No. 124**: Plaintiffs' response fails to create a genuine dispute of material fact.  First, Plaintiffs' citations to dozens of statements of additional fact are cursory and fail to include specific excerpts supporting their dispute. *See Sprint Commc'ns,* 500 F. Supp. 2d at 1304 ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations.").  Secondly, Plaintiffs improperly rely on broad citations instead of properly controverting Defendants' statements with identified record support. *In re Universal Serv. Fund Tel. Billing*, 2008 WL 1884125, at *2 ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

Furthermore, "approve" has a commonly understood definition of "to give formal or official sanction."   *See*   Merriam-Webster dictionary, at https://www.merriam-webster.com/dictionary/approve.  Duracade had received formal or official sanction from the relevant government bodies before Syngenta began to sell it.  Plaintiffs have not cited to any other approvals Syngenta did not receive.  The BIO Organization does not give approvals to products. *See, e.g.,* Pls.' Opp. Ex. 298 (M. O'Mara Dep. Ex. 2, at 2 n.2) (failing to lay out process for BIO approval and noting "Under BIO's bylaws and applicable antitrust laws, individual member companies are not bound by this Association policy"); Ex. 369 (6/29/2016 M. O'Mara Dep. Tr. 155:3-6) ("Q Okay. Does BIO take positions on whether any of its member companies have complied with its product launch policy? A We do not.").

125.    During the relevant time period, each bag of Duracade corn seed has included a tag that states: "READ BEFORE PLANTING." Ex. 260 (SYNG_00327904-05, SYNG_00316500-01). The bag tags for Duracade stated:

> 1. "Prior to planting this seed, carefully read this information and the Insect Resistance Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way."

> 2. "Any crop or material from this product can only be exported to, or used, processed, or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product."

> 3. "By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement and will practice responsible Insect Resistance Management (IRM) on your farm."

> *Id.*

**PLAINTIFFS' RESPONSE TO NO. 125**:    Plaintiffs dispute Paragraph 125 because the evidence cited does not establish the fact alleged.  Syngenta has only cited a specimen of a "bag tag" from "4-2014," but cites no evidence establishing that that each bag of Duracade featured this tag, or that any bag of Duracade featured this tag. And Syngenta did not follow its own stewardship policies. Ex. 151, Deposition of William Sheppard ("Dep. Sheppard") at 53:6-25, 64:16-66:6; 109:25-110:25.

**Syngenta's Reply To No. 125**: Plaintiffs' response fails to create a genuine dispute. Syngenta has cited to an excerpt of a bag tag from 2014, which includes the time frame during which Duracade was being sold in the United States, as Plaintiffs recognize in their Response.  Plaintiffs cite no record evidence or other admissible evidence to controvert the fact that during the relevant time period the bag tags included the cited text or that each bag included the tag, and have thus failed to properly meet the substance of Syngenta's assertion.  *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 (D. Kan. 2007) ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).  The reference to Plaintiffs' Exhibit 151 is irrelevant and fails to address the substance of Statement of Fact No. 125. Pls.' Opp. Ex. 151 (W. Sheppard Dep. Tr. 53:6-25, 64:16-66:6, 109:25-110:25).

Furthermore, the Declaration of Abby Vulcan confirms that "Since Viptera and Duracade seeds were first sold in 2010 and 2013 respectively, and continuing to today, it has been

Syngenta's policy to affix a tag to each and every bag that is similar in form and substance to the language that appears in Syngenta Exhibit 20 (Viptera tag), which is Bates stamped SYNG_00316509 through SYNG_00316510, and Exhibit 172 (Duracade tag), which is Bates stamped SYNG_00327904 through SYNG_00316501." Ex. 326 (Declaration of A. Vulcan ¶ 8).

126. Plaintiffs' expert Colin Carter was asked during his deposition "So am I correct, sir, that in every marketing year after September 2013 total U.S. corn exports were greater than each marketing year prior to that after marketing year 2009/2010?," and he testified "Correct." Ex. 261 (C. Carter Dep. Tr. at 115:25-116:4); *see also* Ex. 262 (Dr. Thurman Expert Report, dated Dec. 22, 2016, at 13).

**PLAINTIFFS' RESPONSE TO NO. 126**:   Plaintiffs object to and dispute Syngenta's selective quotation from Mr. Carter's deposition testimony in Paragraph 126 which changes the meaning of the actual testimony, and requests the Court to consider his entire answer at 115:1-116:4 pursuant to Fed. R. Evid. 106. Ex. 305, Deposition of Collin Carter (Carter Vol. III 11/18/2016) at 115:1-116:4.

**Syngenta's Reply To No. 126**: Plaintiffs' response fails to create a genuine dispute of material fact.  Dr. Carter testified as stated above.  The excerpt does not "change[] the meaning" by omitting any portions, as the omitted portions merely clarified which time periods were being addressed by the question. Syngenta's MSJ Ex. 261 (11/18/2016 C. Carter Dep. Tr. 115:15-24) ("Q.  You would agree with me, sir, that after 2013 total U.S. corn exports were greater in each of those years than in any year since 2010?  MR. DOWNING: Objection. Vague and ambiguous. THE WITNESS: 2009/10, right, to be precise? BY MR. HEINZ:  Q.  So am I correct, sir -- A.  You're netting out the 50 million [identified in the 2009/2010 marketing year]; right? Q.  Correct.  A.  Yeah.").

127. Plaintiffs' expert Bruce Babcock was asked during his deposition "Are you aware of any shipment to China that has been rejected due to the presence of Duracade?," and Dr. Babcock testified "Not rejected, no." Dr. Babcock was asked "China continues to accept US corn today; right?" and Dr. Babcock answered "Well, I don't know if they're accepting any corn today. They accepted corn in the 2015/16 marketing year, about 300,000 tons." Dr. Babcock was then asked "Which is the last available marketing year?," and Dr. Babcock testified "That's correct." Ex. 116 (11/16/2016 B. Babcock Dep. Tr. 182:16-184:2).

**PLAINTIFFS' RESPONSE TO NO. 127**: Plaintiffs dispute Paragraph 127 because the quoted testimony does not appear in the Exhibit cited.

**Syngenta's Reply To No. 127**: The pages of the deposition transcript of Dr. Babcock cited by Syngenta are included in corrected Syngenta's MSJ Ex. 116, which establishes that Dr. Babcock testified as stated.

128. Plaintiffs' expert Colin Carter was asked during his deposition "So other than what you believe to be supported by the deposition of Steven Smalley, did you conduct any of your own analysis regarding whether Syngenta's launch of Agrisure Duracade, quote,

exacerbated the situation?," and he testified "That was not a question I was asked to examine." Ex. 261 (06/28/2016 C. Carter Dep. Tr. 88:4-12).

**PLAINTIFFS' RESPONSE TO NO. 128**: Plaintiffs dispute Paragraph 128 because the quoted testimony does not appear in the Exhibit cited.

**Syngenta's Reply To No. 128:** The pages of the deposition transcript of Colin Carter cited by Syngenta are included in corrected Syngenta's MSJ Ex. 261, which establishes that Dr. Carter testified as stated.

129. Plaintiffs' expert Bruce Babcock was asked during his deposition "Have you studied the presence of Duracade in the US corn supply?," and he testified "No. I relied on others." Dr. Babcock was then asked "And you refer to the – this Steven Smalley deposition, right?" and he responded "I do." Dr. Babcock was asked "Any source other than the Steven Smalley deposition?" and he responded "No." Ex. 116 (11/16/2016 B. Babcock Dep. Tr. 180:10-18); Ex. 116 (07/06/2016 B. Babcock Dep. Tr. 269:14-20) ("I requested any information or testimony about why corn shippers in the United States weren't exporting corn to China -- and attorneys provided me this deposition.").

**PLAINTIFFS' RESPONSE TO NO. 129**:  Plaintiffs dispute Paragraph 129 because the quoted testimony does not appear in the Exhibit cited.

**Syngenta's Reply To No. 129:** The pages of the deposition transcript of Dr. Babcock cited by Syngenta are included in corrected Syngenta's MSJ Ex. 116, which establishes that Dr. Babcock testified as stated.  In addition, the correct citation for the second quotation is Syngenta's MSJ Ex. 116 (07/06/2016 B. Babcock Dep. Tr. 269:14-21).

130. Eleven of the producer plaintiffs that were deposed grew Viptera or Duracade. Ex. 50 (E. Goering Dep. Tr. 113:18-25); Ex. 109 (R. Kruse Dep. Tr. 86:6-13); Ex. 113 (C. Laubenthal Dep. Tr. 75:4-7); Ex. 53 (D. Mensik Dep. Tr. 87:3-16); Ex. 110 (L. Mosier Dep. Tr. 78:7-22); Ex. 51 (D. Peterson Dep. Tr. 133:6-8); Ex. 74 (S. Roenfeldt Dep. Tr. 56:2-59:5); Ex. 61 (G. Rosborough Dep. Tr. 217:7-218:23; 141:25-142:7); Ex. 103 (R. Ulmer Dep. Tr. 111:2-113:13); Dep. 263 (M. Wohlers Dep. Tr. 35:18-20); Ex. 264 (K. Kuechenmeister Dep. Tr. 46:25-47:8).

**PLAINTIFFS' RESPONSE TO NO. 130**:  Plaintiffs dispute Paragraph 130 because the quoted testimony does not appear in the Exhibits cited.

**Syngenta's Reply To No. 130**: The pages of the deposition transcripts cited by Syngenta are included in the corrected exhibits, which establish that eleven of the producer plaintiffs that were deposed grew Viptera or Duracade.  In addition, the corrected citation to Syngenta's MSJ Exhibit 53 is Syngenta's MSJ Ex. 53 (D. Mensik Dep. Tr. 86:24-87:16).

131. One plaintiff's representative, George Rosborough, testified that he saw the August 17, 2011 Letter and that, if he took any action based on the letter, he "probably bought less [Viptera] seed." Ex. 61 (G. Rosborough Dep. Tr. 193:2-3, 193:6-194:7).

**PLAINTIFFS' RESPONSE TO NO. 131**: Plaintiffs dispute Paragraph 131 because it misstates testimony and calls for speculation. Mr. Rosborough did not testify that he had seen the August 17, 2011 letter. Ex. 273, Deposition of George Rosborough ("Rosborough Dep.") at 192:12-193:4 ("I think I have" seen the letter. "I can't say for sure that I've seen it, but it looks to me like its something I've probably seen.").

> **Syngenta's Reply To No. 131:** Plaintiffs' response does not create a genuine dispute of material fact. Mr. Rosborough testified that he thought he had seen the letter and did not indicated that he had *not* seen the letter. Plaintiffs' response fails to contradict Statement of Fact No. 131

**PLAINTIFFS' RESPONSE TO NO. 132**:   Plaintiffs admit Paragraph 132.

133. Of the more than one hundred producer plaintiffs that offered testimony on the August 17, 2011 Letter to Growers, all but one testified that they had never seen it. Ex. 266 (D. Adams Dep. Tr. 61:4-19, 63:3-6); Ex. 267 (R. Albers Dep. Tr. 41:22- 23); Ex. 268 (J. Anderson Dep. Tr. 61:2-61:21); Ex. 269 (G. Annexstad Dep. Tr. 153:12-14); Ex. 270 (M. Bargen Dep. Tr. 134:9-11); Ex. 106 (T. Baumgart Dep. Tr. 144:79); Ex. 271 (R. Beiber Dep. Tr. 16:4-19, 62:16-63:18); Ex. 107 (D. Belknap Dep. Tr. 93:21-22); Ex. 272 (K. Bell (Bottoms Farms Partnership) Dep. Tr. 71:16-72:6; 116:24-117:6); Ex. 273 (N. Bell Dep. Tr. 27:23-28-5); Ex. 265 (S. Bell Dep. Tr. 70:24-25); Ex. 54 (B. Bulman Dep. Tr. 83:18-22; 129:4-12); Ex. 274 (R. Byro Dep. Tr. 77:4-78:21, 265:13-19); Ex. 87 (J. Cap Dep. Tr. 39:5-19); Ex. 52 (D. Chism Dep. Tr. 42:23-4; 56:14-57:2; 127:19-22); Ex. 90 (L. Claas Dep. Tr. 15:4-6; Ex. 89 (W. Crandall Dep. Tr. 156:21-157:9); Ex. 275 (R. Cronin Dep. Tr. 151:4-5); Ex. 276 (S. Curry Dep. Tr. 101:25-102:3); Ex. 277 (M. DaVault Dep. Tr. 66:15-20; 67:25-69:27); Ex. 102 (J. Deboom Dep. Tr. 83:20-22); Ex. 278 (W. Determan (LBJ) Dep. Tr. 61:5-8, 109:15-17); Ex. 91 (L. Dierking Dep. Tr. 49:23- 25; 56:10-12); Ex. 279 (L. Edlund Dep. Tr. 109:3-110:24; 196:20-205:19); Ex. 187 (R. Ensor Dep. Tr. 12:17-23, 28:3-19); Ex. 60 (D. Ewert Dep. Tr. 26:16-18); Ex. 280 (K. Falwell (Eagle Lake) Dep. Tr. 196:5-7); Ex. 55 (C. Frickey Dep. Tr. 13:16- 22); Ex. 92 (C. Fulkerson Dep. Tr. 32:18-24); Ex. 62 (M. Gardner Dep. Tr. 91:4- 5); Ex. 83 (L. Gilbertson Dep. Tr. 155:24-156:2); Ex. 97 (R. Glanzer Dep. Tr. 54:2- 4); Ex. 108 (J. Goebel (J&S Goebel Farms, Inc.) Dep. Tr. 60:14-16 98:10-18); Ex. 50 (E. Goering Dep. Tr. 113:18-25); Ex. 58 (D. Grafel (D&S) Dep. Tr. 160:18-20); Ex. 57 (D. Hadden Dep. Tr. 48:2-7: 60:12-61:7); Ex. 84 (R. Haerr (Haerr Grain Farms) Dep. Tr. 28:2-9, 43:25- 44:7); Ex. 84 (R. Haerr (HGF Irrigated) Dep. Tr. 30:15-7); Ex. 84 (R. Haerr (Three H Farms) Dep. Tr. 44:20-46:12); Ex. 281 (C. Hamilton Dep. Tr. 107:18-20 (never purchased Syngenta seed); Ex. 282 (G. Harris Dep. Tr. 21:19-22:4; 116:3-14); Ex. 63 (G. Harshberger Dep. Tr. 206:4-206:5); Ex. 202 (T. Henderson Dep. Tr. 52:5-8, 53:12-15: 111:8-112:15); Ex. 201 (J. Holmbeck Dep. Tr. 41:15-17); Ex. 283 (D. Jacobs Dep. Tr. 123:5-22, 167:23-168:4, 168:22- 169:2); Ex. 284 (F. James Dep. Tr. 75:16-21; 147:9-10); Ex. 88 (T. Jansen Dep. Tr. 52:3-14); Ex. 285 (L. Kaliff Dep. Tr. 41:20-41:22); Ex. 76 (B. Kendrick (Five Star Farms) Dep. Tr. 32:4-16); Ex. 286 (K. Kennedy Dep. Tr. 40:8-15; 71:11-18; 82:21- 83:2); Ex. 287 (R. Koeller Dep. Tr. 59:16-62:19); Ex. 109 (R. Kruse Dep. Tr. 86:6- 13); Ex. 264 (K. Kuechenmeister Dep. Tr. 46:5-22); Ex. 113 (C. Laubenthal Dep. Tr. 75:4-7); Ex. 56 (C. Ledeboer Dep. Tr. 37:19-22); Ex. 288 (C. Lex Dep.Tr. 151:8-14 61:2-13); Ex. 77 (R. Luck Dep. Tr. 45:13-17, 76:20-22); Ex. 289 (W.

Luther Dep. Tr. 100:14-17); Ex. 290 (D. Maher Dep. Tr. 110:20-111:14); Ex. 100 (W. Maloney Dep. Tr. 52:19-24, 87:4-11); Ex. 104 (G. Matthews Dep. Tr. 129:14- 129:16); Ex. 94 (D. McDonald Dep. Tr. 150:25-151:2); Ex. 291 (D. McKee Dep. Tr. 114:23-25); Ex. 86 (J. McKinney Dep. Tr. 32:5-13; 43:9-11; 44:6-8); Ex. 53 (D. Mensik Dep. Tr. 87:3-6 87:14-16); Ex. 95 (L. Messersmith Dep. Tr. 29:17-19, 79:22-82:9); Ex. 292 (J. Montony Dep. Tr. 92:9-93:21, 125:5-23); Ex. 96 (S. Moorman Dep. Tr. 65:3-5); Ex. 110 (L. Mosier Dep. Tr. 78:7-22); Ex. 293 (J. Murnane Dep. Tr. 15:22-24; 126:19-21); Ex. 294 (C. Murphy Dep. Tr. 180:15-16); Ex. 295 (E. Noonan (Noonan Farms) Dep. Tr. 59:7-20); Ex. 73 (D. Olson Dep. Tr. 77:24-5); Ex. 101 (R. Olthoff Dep. Tr. 33:23-35:8; 71:18-21); Ex. 296 (R. Oswald Dep. Tr. 151:23-5); Ex. 105 (R. Overgard Dep. Tr. 67:3-68:16, 69:2-18); Ex. 297 (A. Pedersen Dep. Tr. 37:8-17, 109:10-11); Ex. 298 (D. Petefish Dep. Tr. 33:2-13, 99:22-24); Ex. 51 (D. Peterson Dep. Tr. 133:6-8); Ex. 299 (M. Petska Dep. Tr. 157:14-22); Ex. 59 (D. Polifka Dep. Tr. 143:8-10); Ex. 300 (D. Prohaska (J3B Partnership) Dep. Tr. 69:12-72:3); Ex. 301 (N. Rath Dep. Tr. 83:20-84:6); Ex. 93 (B. Riessland Dep. Tr. 84:21-23); Ex. 74 (S. Roenfeldt Dep. Tr. 56:2-59:5); Ex. 302 (M. Royster (Agro Farms) Dep. Tr. 124:9-11, 127:23-128:12); Ex. 99 (J. Runsick Dep. Tr. 51:15-21); Ex. 112 (J. Schmaltz Dep. Tr. 183:20-186:20, 187:2- 23); Ex. 303 (V. Schroeder (Partners 5 LLC) Dep. Tr. 95:9-16); Ex. 81 (D. Schwaninger Dep. Tr. 12:15-6); Ex. 177 (J. Shortt Dep. Tr. 57:9-11; 38:3-39:23); Ex. 304 (P. Skarda Dep. Tr. 100:4-7); Ex. 305 (J. Sumerfelt Dep. Tr. 58:25-59:2); Ex. 306 (N. Thompson Dep. Tr. 137:9-12); Ex. 103 (R. Ulmer Dep. Tr. 111:2- 113:13); Ex. 307 (Y. Vogel (Eveyln Linder Child's Trust) Dep. Tr. 106:21-108:10); Ex. 308 (E. Volnek Dep. Tr. 108:4-5); Ex. 111 (L. Wallin Dep. Tr. 76:21-77:18); Ex. 85 (R. Ward Dep. Tr. 140:22-141:10, 154:9-13); Ex. 98 (D. Wegner Dep. Tr. 89:19-20); Ex. 79 (S. Wentworth Dep. Tr. 157:19-24); Ex. 309 (R. White Dep. Tr. 86:3-86:8); Ex. 82 (J. Widener (R&W Farms) Dep. Tr. 32:13-14; 114:22-24); Ex. 178 (O. Williams Dep. Tr. 130:5-10); Ex. 310 (W. Wilman Dep. Tr. 115:17-116:16, 272:21-25); Ex. 263 (M. Wohlers Dep. Tr. 35:18-20); Ex. 311 (I. Woltemath (State Line Farm Company) Dep. Tr. 23:13-14); Ex. 203 (L. Wright (Wright Bros P'ship) Dep. Tr. 61:3-4); Ex. 80 (S. Wubben Dep. Tr. 69:17-69:21).

**PLAINTIFFS' RESPONSE TO NO. 133**:  Plaintiffs dispute Paragraph 133 because the cited evidence does not support the fact alleged. Specifically, the cited pages do not concern the Grower Letter but instead relate to the fact those producers did not grow Viptera or Duracade.

**Syngenta's Reply To No. 133**: The corrected pages of the deposition transcripts cited by Syngenta are included in the corrected exhibits, which establish that of the more than one hundred producer plaintiffs that offered testimony on the August 17, 2011 Letter to Growers, all but one testified that they had never seen it.  The corrected citations are:

Ex. 266 (D. Adams Dep. Tr. 268:16-23); Ex. 267 (R. Albers Dep. Tr. 124:18-23); Ex. 268 (J. Anderson Dep. Tr. 154:19-155:6);  Ex. 269 (G. Annexstad Dep. Tr. 281:13-282:10); Ex. 270 (M. Bargen Dep. Tr. 137:18-138:7); Ex. 271 (R. Bieber Dep. Tr. 121:24-122:4); Ex. 272 (K. Bell (Bottoms Farms Partnership) Dep. Tr. 245:24-246:12); Ex. 54 (B. Bulman Dep. Tr. 138:24-139:6); Ex. 274 (R. Byro Dep. Tr. 261:10-20); Ex. 87 (J. Cap Dep. Tr. 199:18-22); Ex. 52 (D. Chism Dep. Tr. 176:3-24); Ex. 90 (L. Claas Dep. Tr. 156:4-12); Ex. 89 (W. Crandall Dep. Tr. 220:22-222:12); Ex. 275 (R. Cronin

Dep. Tr. 28:22-25); Ex. 276 (S. Curry Dep. Tr. 139:20-140:3); Ex. 277 (M. DaVault Dep. Tr. 192:20-193:8); Ex. 102 (J. Deboom Dep. Tr. 135:2-9); Ex. 278 (W. Determan (LBJ) Dep. Tr. 130:24-131:6); Ex. 91 (L. Dierking Dep. Tr. 71:8-10); Ex. 279 (L. Edlund Dep. Tr. 280:21-281:4); Ex. 60 (D. Ewert Dep. Tr. 33:9-16); Ex. 280 (K. Falwell (Eagle Lake) Dep. Tr. 219:25-220:14); Ex. 55 (C. Frickey Dep. Tr. 128:10-16); Ex. 92 (C. Fulkerson Dep. Tr. 144:9-12); Ex. 62 (M. Gardner Dep. Tr. 146:7-19); Ex. 97 (R. Glanzer Dep. Tr. 151:15-23); Ex. 57 (D. Hadden Dep. Tr. 198:13-17); Ex. 84 (R. Haerr (Haerr Grain Farms) Dep. Tr. 276:7-15); Ex. 281 (C. Hamilton Dep. Tr. 157:14-21); Ex. 202 (T. Henderson Dep. Tr. 111:8-15); Ex. 201 (J. Holmbeck Dep. Tr. 103:18-104:2); Ex. 284 (F. James Dep. Tr. 183:10-14); Ex. 88 (T. Jansen Dep. Tr. 203:13-204:3); Ex. 285 (L. Kaliff Dep. Tr. 79:3-12); Ex. 286 (K. Kennedy Dep. Tr. 118:12-119:3); Ex. 287 (R. Koeller Dep. Tr. 232:7-13); Ex. 109 (R. Kruse Dep. Tr. 138:20-139:3); Ex. 264 (K. Kuechenmeister Dep. Tr. 174:10-16); Ex. 113 (C. Laubenthal Dep. Tr. 165:2-14); Ex. 288 (C. Lex Dep. Tr. 65:6-19); Ex. 289 (W. Luther Dep. Tr. 235:5-8); Ex. 290 (D. Maher Dep. Tr. 261:9-17); Ex. 100 (W. Maloney Dep. Tr. 136:16-23); Ex. 94 (D. McDonald Dep. Tr. 212:25-213:13); Ex. 291 (D. McKee Dep. Tr. 163:3-14); Ex. 86 (J. McKinney Dep. Tr. 200:8-14); Ex. 53 (D. Mensik Dep. Tr. 145:17-146:6); Ex. 95 (L. Messersmith Dep. Tr. 101:18-24); Ex. 292 (J. Montony Dep. Tr. 26:3-10); Ex. 96 (S. Moorman Dep. Tr. 206:9-13); Ex. 110 (L. Mosier Dep. Tr. 155:19-23); Ex. 293 (J. Murnane Dep. Tr. 128:3-10); Ex. 294 (C. Murphy Dep. Tr. 183:15-184:7); Ex. 295 (E. Noonan (Noonan Farms) Dep. Tr. 186:12-19); Ex. 73 (D. Olson Dep. Tr. 77:19-23); Ex. 101 (R. Olthoff Dep. Tr. 131:6-21); Ex. 296 (R. Oswald Dep. Tr. 198:21-199:2); Ex. 105 (R. Overgard Dep. Tr. 139:16-24); Ex. 297 (A. Pedersen Dep. Tr. 30:23-31:2); Ex. 298 (D. Petefish Dep. Tr. 160:19-161:2); Ex. 299 (M. Petska Dep. Tr. 166:18-24); Ex. 59 (D. Polifka Dep. Tr. 156:7-16); Ex. 300 (D. Prohaska (J3B Partnership) Dep. Tr. 275:6-15); Ex. 301 (N. Rath Dep. Tr. 187:6-14); Ex. 93 (B. Riessland Dep. Tr. 87:24-88:12); Ex. 74 (S. Roenfeldt Dep. Tr. 130:9-15); Ex. 302 (M. Royster (Agro Farms) Dep. Tr. 149:22-150:2); Ex. 99 (J. Runsick Dep. Tr. 193:6-194:4); Ex. 112 (J. Schmaltz Dep. Tr. 260:18-25); Ex. 303 (V. Schroeder (Partners 5 LLC) Dep. Tr. 147:15-148:2); Ex. 81 (D. Schwaninger Dep. Tr. 177:12-17); Ex. 304 (P. Skarda Dep. Tr. 39:24-40:4); Ex. 305 (J. Sumerfelt Dep. Tr. 84:17-18); Ex. 306 (N. Thompson Dep. Tr. 190:22-191:5); Ex. 103 (R. Ulmer Dep. Tr. 219:24-220:9); Ex. 307 (Y. Vogel (Eveyln I. Linder Trust) Dep. Tr. 156:11-22); Ex. 308 (E. Volnek Dep. Tr. 127:12-16); Ex. 98 (D. Wegner Dep. Tr. 132:12-20); Ex. 79 (S. Wentworth Dep. Tr. 163:4-16); Ex. 309 (R. White Dep. Tr. 110:25-111:12); Ex. 310 ( W. Wilman Dep. Tr. 133:3-7); Ex. 263 (M. Wohlers Dep. Tr. 107:9-14); Ex. 311 (I. Woltemath (State Line Farm Company) Dep. Tr. 133:2-8); Ex. 203 (L. Wright (Wright Bros P'ship) Dep. Tr. 216:12-22); Ex. 80 (S. Wubben Dep. Tr. 182:11-182:17); Ex. 106 (T. Baumgart Dep. Tr. 185:19-25); Ex. 107 (D. Belknap Dep. Tr. 129:13-21); Ex. 265 (S. Bell Dep. Tr. 159:13-21); Ex. 187 (R. Ensor Dep. Tr. 108:17-20); Ex. 83 (L. Gilbertson Dep. Tr. 281:5-11); Ex. 108 (J. Goebel (J&S Goebel Farms, Inc.) Dep. Tr. 142:21-143:9); Ex. 50 (E. Goering Dep. Tr. 135:12-17); Ex. 58 (D. Grafel (D&S) Dep. Tr. 207:22-208:2); Ex. 223 (G. Harris Dep. Tr. 109:10-110:8); Ex. 63 (G. Harshberger Dep. Tr. 29:25-30:7); Ex. 283 (D. Jacobs Dep. Tr. 172:8-24); Ex. 76 (B. Kendrick (Five Star Farms) Dep. Tr. 24:21-25:4); Ex. 56 (C. Ledeboer Dep. Tr. 110:25-111:7); Ex. 77 (R. Luck Dep. Tr. 271:20-272:2); Ex. 104 (G. Matthews Dep. Tr. 172:9-17); Ex. 51 (D. Peterson Dep. Tr. 202:22-203:5); Ex. 177 (J. Shortt Dep. Tr. 99:10-14);

Ex. 111 (L. Wallin Dep. Tr. 129:2-11); Ex. 85 (R. Ward Dep. Tr. 160:10-25); Ex. 82 (J. Widener (R&W Farms) Dep. Tr. 146:6-14); Ex. 178 (O. Williams Dep. Tr. 168:4-7).

134.   Producer Plaintiffs have testified that they do not consider foreign market approval in deciding which GM seeds to purchase and plant. Ex. 54 (B. Bulman Dep. Tr. 70:15-71:14) (testifying that he has never thought to ask questions about foreign approval when purchasing corn seed); Ex. 55 (C. Frickey Dep. Tr. 114:7-115:13) (testifying that he does not investigate or research which foreign countries have approved the genetic traits that are in the corn seeds planted on his land because he assumes that if seeds are in the stream of commerce they are safe to plant for export); Ex. 56 (C. Ledeboer Dep. Tr. 98:6-99:19) (testifying that he believed that the GM corn seed he planted from 2010 to present was "approved worldwide" but that in "this day and age" he does not ask his seed dealer questions about foreign approvals); Ex. 57 (D. Hadden Dep. Tr. 133:25-134:13) (testifying that he does not "consider particular countries' markets in deciding whether purchase a certain seed or not" unless he is "growing it for IP to go to that country"); Ex. 52 (D. Chism Dep. Tr. 186:23-187:3; 237:12-16) (testifying that he does not know whether the GM corn he plants has been approved for import in any foreign countries and that he has "no idea" whether the corn he delivers to Cargill has been approved in China); Ex. 58 (D. Grafel Dep. Tr. 195:13-21) (testifying that he does not know or investigate which countries a particular GMO seed has been a approved in before planting them); Ex. 53 (D. Mensik Dep. Tr. 91:12-93:10; 107:9-12) (testifying that from 2013 to the present he was not aware of which foreign import markets had approved for import the genetically modified corn seeds that he grew, including— prior to his involvement in this lawsuit—Viptera, and Duracade; that he has not taken any steps to learn which foreign import markets have approved the genetically modified corn seed that he grows); Ex. 59 (D. Polifka Dep. Tr. 80:9- 81:5) (testifying that he does not have personal knowledge of whether the traits in the corn seed he grows have been approved in foreign countries); Ex. 50 (E. Goering Dep. Tr. 126:8-18; 143:21-144:5; 150:9-16) (testifying that he has never asked his Syngenta seed dealer whether the traits in the seeds he purchases were approved to be exported); Ex. 60 (D. Ewert Dep. Tr. 20:13-20; 260:22-261:3) (testifying that he did not make any decisions about what to plant and when to plant based on whether or not China or any other country imported corn from the United States and that when making planting decisions he has never inquired of the seed dealer whether the corn was cleared for export to any particular country).

**PLAINTIFFS' RESPONSE TO NO. 134**:   Plaintiffs admit that some Producer Plaintiffs testified that they do not consider foreign market approval in deciding which GM seeds to purchase and plant, others have testified to the contrary.  *See infra* Pl. SOAF ¶¶ 479-489. Additionally, Paragraph 134 incorrectly cites the cited testimony of Hadden, Holmbeck, and Grafel is mischaracterized.

> **Syngenta's Reply To No. 134**:  Plaintiffs' response fails to create a genuine dispute of material fact as to Holmbeck and Grafel.  First, the deposition testimony of Plaintiffs Holmbeck is not cited in Statement of Fact No. 134.
>
> Second, the deposition testimony of Plaintiffs Grafel is not mischaracterized.  He testified that he does not "generally" know which countries a GMO seed has been

approved in before planting, and that he never investigated the issue. Syngenta's MSJ Ex. 58 (D. Grafel Dep. Tr. 195:13-21). As he does not investigate the issue and generally does not even know which countries have approved a GMO seed before planting, he does not consider foreign market approval in deciding which GM seeds to purchase and plant.

135.   Three Plaintiffs have testified that they used GM seeds that were unapproved by China or other export markets or failed to determine whether their seeds were approved in key export markets. Ex. 201 (J. Holmbeck Dep. Tr. 85:8-12); Ex. 202 (T. Henderson Dep. Tr. 106:12-16); Ex. 58 (D. Grafel Dep. Tr. 199:13-16).

**PLAINTIFFS' RESPONSE TO NO. 135**:   Plaintiffs dispute Paragraph 135. The cited testimony for Def. Ex. 201 does not appear in the exhibit. Additionally, the cited testimony does not support the fact alleged. *See* Def. Ex. 202 at 106:12-16 (testimony on when producer learned of China's rejection of U.S. corn due to Viptera); Def. Ex. 58 at 199:13-16 (testimony regarding producer's knowledge of when China began rejecting Viptera corn).

**Syngenta's Reply To No. 135**: The correct citations for these exhibits are: Syngenta's MSJ Ex. 201 (J. Holmbeck Dep. Tr. 76:8-12; 84:9-12); Syngenta's MSJ Ex. 202 (T. Henderson Dep. Tr. 90:13-16; 91:12-16); Syngenta's MSJ Ex. 58 (D. Grafel Dep. Tr. 195:13-21). The correct pages of the deposition transcripts cited by Syngenta are included in the corrected exhibits, which establish that three Plaintiffs have testified that they used GM seeds that were unapproved by China or other export markets or failed to determine whether their seeds were approved in key export markets.

137.   Kansas Plaintiffs Eugene Goering, Charley Frickey, and David Polifka stated in response to interrogatories that they received a lower price for corn priced after the Chinese government rejected corn shipments in 2013, Ex. 312 (Goering Trust Supp. Resp. to Syngenta AG Interrog. No. 20); Ex. 55 (C. Frickey Resp. to Syngenta AG Interrog. No. 20); Ex. 199 (D. Polifka Suppl. Resp. to Syngenta AG Interrog. No. 20), and these lower prices benefited American corn consumers.

**PLAINTIFFS' RESPONSE TO NO. 137**:   Plaintiffs dispute Paragraph 137 because the three producers referenced did not testify that "these lower prices benefited American corn consumers" or that lower corn prices were passed along to American corn consumers.

**Syngenta's Reply To No. 137**: Plaintiffs' response fails to create a genuine dispute of material fact. These Plaintiffs stated that they received lower prices from purchasers, who are the consumers of corn. As such, *these* consumers of American corn paid less for corn and thus benefitted from the lower prices. Plaintiffs cite no record evidence or other admissible evidence to controvert this fact and have thus failed to properly meet the substance of Syngenta's assertion. *Sprint Commc'ns*, 500 F. Supp. 2d at 1303 (D. Kan. 2007) ("The party opposing the motion for summary judgment must respond in a similar fashion. In doing so, the response must 'fairly meet the substance of the matter asserted.'") (citing D. Kan. Rule 56.1(b), (e)).

## ARGUMENT

### I. Plaintiffs Lack Evidence To Sustain The Lanham Act Claim.

Plaintiffs' opposition confirms that Plaintiffs lack any evidence to sustain the sole remaining portion of their Lanham Act claim—namely, the claim based on the statement in the Grower Letter about the anticipated date of Chinese approval.[3] They have no evidence that prediction was not made in good faith; no evidence that a single grower was somehow misled by it; no evidence that it was material to anyone's purchasing decisions; and no evidence that a *single* grower anywhere ever actually read it and relied on it to buy a *single bag* of seed. Instead, Plaintiffs want their claim to survive based on nothing more than a series of *presumptions* strung together without any evidence that the Grower Letter had *any* impact on the chain of events relevant to this case. The Court should reject their invitation to rewrite settled law by creating the unprecedented series of presumptions they seek.

#### A. Plaintiffs Lack Any Evidence Of False Or Misleading Statements of Fact.

##### 1. Plaintiffs Lack Evidence To Show Literal Falsity.

It is undisputed that a prediction of the future is not actionable under the Lanham Act unless it was *subjectively* "known at that time by the speaker to be false" or the speaker "lacks a good faith belief in the truth of the statement." *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 931 (9th Cir. 2010). Plaintiffs lack any evidence sufficient to raise a triable question on whether Chuck Lee lacked a good faith belief in the statement in the Grower Letter describing the "expect[ed]" timeline for Chinese approval, and they cannot rely on irrelevant distortions to avoid summary judgment. *First*, assertions that Syngenta had a "deliberate communications plan," Opp. 3-4, are beside the point. That is not evidence of bad faith. *Second*, Plaintiffs try to mislead the Court into thinking there were contradictory internal timelines by pointing to outdated projections Syngenta had made *prior to 2008* more than *three years earlier*. Opp. 4

---

[3]   Plaintiffs have abandoned claims based on the Plant with Confidence Fact Sheet, *see* Opp. 2 n.2, and their cursory footnote asserting that statements about the importance of the Chinese market in the Grower Letter were "implicitly false," *id.* at 9 n.7, is insufficient to preserve a claim. *See, e.g.*, *U.S. v. Hardman*, 297 F. 3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

01981291.DOCX;-1

(citing Pls.' SOAF ¶¶ 41, 42). Non-contemporaneous projections based on different facts are irrelevant to the good faith of the Grower Letter, which was based on information as of August 2011. Any evidence that Plaintiffs point to prior to August 2011—including evidence of supposed "mistakes" delaying the initial Chinese submission over a year earlier—is irrelevant.[4] *Third*, the mere fact that some employees expressed "concern[s]" about the March 2012 date before in-country field studies had started, or recognized that there were "issues" to be overcome, do not raise a triable question of *bad faith*. Bad faith would require evidence that the *speaker* did not believe the estimate in the Letter. Individual expressions of "concern" by others, (especially those who were not working on the project or who lacked updated information, *see* Syngenta's Resp. to Pls.' SOAF ¶ 423) are not proof of bad faith. Moreover, by the time the Grower Letter was sent, in-country field studies had commenced and Syngenta was on track to meet the November 2011 submission window, so the concerns identified in those e-mails had been addressed. *See id.* ¶¶ 41, 273, 274, 275, 422, 423, 433, 434, 435.

*Fourth*, contrary to Plaintiffs' assertions, Syngenta's expectation is consistent with industry timelines. Up until 2012, the entire industry viewed 24 months as a reasonable timeline for expecting Chinese approval. *See* Syngenta's MSJ SOF ¶¶ 42-49; Ex. 5 (Shull Expert Rep. ¶ 125).

### 2. *Plaintiffs Cannot Rely On Implicit Falsity Concerning A Prediction Of A Future Event—And They Lack Any Evidence In Any Event.*

Implicit falsity is not even an available theory for Plaintiffs given that their claim is now based solely on a prediction of a future event.[5] A prediction is actionable *only* if it is literally false because it is

---

[4]    The suggestion that "just weeks before mass distribution of the Grower Letter" Syngenta regulatory affairs team advised management that China approval would not come until Q2 2013 is wrong. Opp. 6. Plaintiffs cite an e-mail from May 2011, which could not take into account that Syngenta did actually plant seeds in China in sufficient time to expect to make the final submission in the November 2011 window. *See* Syngenta's Resp. to Pls.' SOAF ¶¶ 274, 433.

[5]    Plaintiffs' cursory footnote, Opp. 9 n.7, asserting that statements about the importance of the Chinese market were implicitly false is insufficient to preserve a claim. It also fails on the merits. Plaintiffs complain that the accurate information in the Grower Letter did not include *other* information (such as imports of DDGs). But Plaintiffs still fail to point to any *evidence* (such as a consumer survey) showing that the accurate facts in the Grower Letter somehow conveyed a false message. Absent such evidence, Plaintiffs cannot establish implicit falsity. Nor can Plaintiffs appeal to a presumption of deception based on intent to deceive because they once again have no evidence of such intent and assert only that the statements "were

01981291.DOCX;-1

not a good faith reflection of the speaker's *actual* expectation.  If made in good faith, it cannot be *implicitly* false, because all it conveys is a prediction.  Plaintiffs have not cited a single case in which a prediction about the future was found *not* literally false but nevertheless *implicitly* false.

In any event, Plaintiffs also concede that they have *no evidence* that the prediction about Chinese approval was misleading.  They cannot point to a consumer survey or a statement from any grower.  Thus, they fail the most basic requirement for an implicit falsity theory.[6]  Nor can Plaintiffs invoke a *presumption* of deception based on intent to deceive.  If a prediction about a future event is not literally false, that means it was made in good faith and there can be no intent to deceive.  Nor can Plaintiffs point to any evidence of intent to deceive.  Instead, they merely point to evidence that Syngenta sought to protect its sales with the Grower Letter.  But a desire to protect sales is no evidence of intent to deceive.[7]

Even if Plaintiffs could show literal falsity or intent to deceive, the Court may not "grant relief." Opp. 6.  Plaintiffs still must show materiality and, because they seek damages, causation.[8]

### B.    Plaintiffs Lack Any Evidence Of Consumer Deception.

Plaintiffs must provide evidence of actual deception because they cannot show literal falsity. They concede that they have no such evidence—they have no consumer survey and of the more than one

---

intentionally made in order to foster sales."  Opp. 9 n.7.  A desire to foster sales is not evidence of intent to deceive.

[6]    *See, e.g.*, *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) ("Where statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (*i.e.*, evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product)."); *see also Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) ("[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey.").

[7]    *Cf. George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir. 1992) ("There is an 'essential distinction . . .between a deliberate attempt to deceive and a deliberate attempt to compete.'") (citation omitted; ellipses in original).  A presumption of deception also requires deliberate and egregious conduct, for which there is no evidence here.  *See, e.g.*, *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298–99 (2d Cir. 1992).

[8]    *See, e.g.*, *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 693 (6th Cir. 2000) ("[T]he "literal falsity" rule has never permitted a plaintiff to recover marketplace damages without other proof that such damages occurred.  Rather, this rule has been stated in suits in which the plaintiff sought injunctive relief."); *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861 RSM, 2015 WL 1735517, at *5 (W.D. Wash. April 15, 2015) (explaining that, "in instances in which a defendant's advertisement does not directly compare its product with the plaintiff's product, the plaintiff is entitled to a presumption that consumers were directly deceived but *not* a presumption that a plaintiff was damaged as a result of the deception.") (emphasis in original); *Marvellous Day Elec. (S.Z.) Co., Ltd. v. Ace Hardware Corp.*, 900 F. Supp. 2d 835, 842 (N.D. Ill. 2012) (vacated in part on other grounds) ("Though it alleges that the advertisements were literally false and therefore that consumer deception is presumed, Marvellous Day falters on the required 'materiality' and 'causation' elements."); *see also infra* n.11.

01981291.DOCX;-1

hundred growers deposed in this coordinated litigation, not a *single one* testified that he was deceived by the statement about when Chinese approval was expected. *See* SOF ¶¶ 131, 133.

### C.   Plaintiffs Lack Any Evidence Of Materiality.

The materiality requirement is not an open question. *Cottrell* listed materiality as an element of a Lanham Act claim and district courts throughout the Tenth Circuit apply materiality as a required element.[9] Here, Plaintiffs concede that they have no evidence whatsoever to show materiality. Nor can they plausibly dispute the fact that growers deposed in this litigation have consistently testified that they do *not* consider foreign approval in purchasing GM seeds. *See* SOF and Reply SOF ¶ 134; *see also* Syngenta's Resp. to Pls.' SOAF ¶¶ 479-489. [10]

Lacking evidence, Plaintiffs again resort to a mistaken presumption, arguing that the prediction about approval *must* be material because Syngenta *intended* it to affect purchasing decisions. That approach has no support in the law. *Gen. Steel Domestic Sales v. Chumley* did not endorse it. Instead, *Chumley* held that statements were material where there was evidence from the defendant's Chief Operating Officer that the subjects at issue were "important to [the company's] brand" and gave it "a competitive edge." 627 F. App'x 682, 685 (10th Cir. 2015). If the mere fact that a defendant *intended* its statement to influence sales established materiality, the requirement would effectively be read out of the Act. Virtually all statements made in "commercial advertising or promotion" are, by definition, *intended* to enhance sales. Even the Fifth Circuit—the only circuit permitting a presumption of materiality for

---

[9]   *See, e.g.*, *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1211 (D. Kan. 2003) ("[Plaintiffs] must additionally prove the materiality of the false representations."); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1058, 1060-61 (D. Kan. 2006) (analyzing materiality as an element of a Lanham Act claim); *NetQuote. Inc. v. Byrd, 2008 WL 5225880, at *4 (D.Colo. Dec. 15, 2008) SanMedica Int'l, LLC v. Amazon.com, Inc.*, No. 2:13-CV-00169-DN, 2016 WL 527055, at *11 (D. Utah Jan. 20, 2016) ("The Tenth Circuit has stated that materiality of the misrepresentation is a required element for a false advertising claim.").

[10]   Plaintiffs' footnote assertion that "[s]everal farmers" have testified that foreign approval status would be of concern to them is not sufficient evidence to establish materiality. Plaintiffs cite only *three* farmers out of more than 100 deposed who actually inquired about foreign approval of seeds. *See* Pls.' SOAF ¶¶ 479, 485, 486. And they cite only eight more who claimed that they simply *assumed* that their seed dealers would not recommend products that hadn't been approved in foreign markets. None of that is sufficient for materiality. *Cf., e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1018 (C.D. Cal. 2015) (finding materiality where one survey indicated that 59% of consumers found the relevant statement material, and another survey found that 65% of respondents found it material).

01981291.DOCX;-1

literally false statements—has refused to find materiality merely because the speaker *thought* that it would improve sales.[11]  As the Fifth Circuit put it, there is "no precedent" for the proposition that the "subjective intent of defendant's corporate executives" is "evidence of the fact that consumers in fact relied on the message to make their purchases" and that such evidence of intent "does not address the ultimate issue of materiality."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 503 (5th Cir. 2000).  *Chumley*, moreover, provides a particularly weak basis for the radical innovation Plaintiffs propose, given that it is an unpublished decision in which the Tenth Circuit expressly warned that it was not deciding "the lines that [a materiality] inquiry should follow."  627 F. App'x at 685.

### D.    Plaintiffs Lack Any Evidence of Causation.

Plaintiffs' suggestion that causation standards are diluted because the Lanham Act "[l]ack[s] any express causation requirement," and that other courts have adopted "broad definitions of causation," Opp. 10-11, flatly misstates the law.[12]  The Supreme Court has made clear that "we generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute," and has expressly held that a Lanham Act plaintiff "cannot obtain relief without *evidence* of injury proximately caused by [the defendant's] alleged misrepresentations."  *Lexmark Int'l, Inc. v.*

---

[11]     Plaintiffs also attempt to bootstrap the presumption of *consumer deception* that arises from literally false statements into a presumption of *materiality*.  That approach has been rejected by every circuit to address the issue except the Fifth Circuit.  "[E]ven when a statement is literally false or has been made with intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers."  *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Avenue*, 284 F.3d 302, 312 n.10 (1st Cir. 2002); *accord Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 68 (2d Cir. 2016) ("Once literal falsity is proved, there is no requirement of extrinsic evidence showing consumer deception.  But [plaintiff] is not thereby relieved of the burden of showing materiality . . . ."); *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) ("The plaintiff must establish materiality even when a court finds that the defendant's advertisement is literally false.").  Courts in this Circuit follow the majority rule.  *See, e.g.*, *SanMedica Int'l, LLC v. Amazon.com, Inc.*, No. 2:13-CV-00169-DN, 2016 WL 527055, at *11 (D. Utah Jan. 20, 2016) (rejecting as "incorrect" the assertion that "the literally false nature of [defendant's] ads do not require a showing of materiality" and granting summary judgment for defendant because plaintiffs "failed to present any evidence on the materiality element").

[12]     *American Council* did not adopt a reduced causation standard and instead stated that "[t]he injury element asks whether the defendant's deception . . . *caused harm* to the plaintiff."  185 F.3d at 613-14 (emphasis added).  In any event, any other standard has been overruled by *Lexmark*.  *Princeton Graphics*, an unpublished magistrate's order, said only that a *particular case* could not be read "to support defendant's narrow definition of 'causation.'"  *Princeton Graphics Op., L.P. v. NEC Home Elec. (U.S.A.), Inc.*, No. 87 CIV. 7257 (CES), 1990 WL 144799, at *2 (S.D.N.Y. Sept. 24, 1990).

01981291.DOCX;-1

*Static Control Components, Inc.*, 134 S. Ct. 1377, 1390, 1395 (2014) (emphasis added).[13]

Here, Plaintiffs must come forward with evidence to show that the *incremental sales* prompted by the statement in the Grower Letter about expected Chinese approval constituted the critical increment that made MIR162 present in the corn supply at a level sufficient to trigger China's rejection of U.S. corn—in other words, that *but for* the incremental sales caused by the Letter, the rejections would not have happened. That is *impossible* to prove, because Viptera had already been planted on more than one million acres by the time the Letter was sent, which was more than sufficient to disperse MIR162 throughout the corn supply and trigger the subsequent events Plaintiffs allege produced their harm.

Plaintiffs offer no response at all. They have no expert who testifies that the rejections would not have happened but for sales attributable to the Grower Letter. Indeed, they do not point to any evidence that a *single bag* of Viptera was sold *because of* the prediction in the Letter. They cannot dispute that out of more than one hundred producers deposed, all but one said that they had never even seen the Grower Letter. SOF ¶ 133. And the only grower that testified that he *may* have seen the Letter said that, if anything, he purchased *less* Viptera as a result. *Id.* ¶ 131. In fact, Plaintiffs effectively concede that they have *no* evidence to show that *any* sales were attributable to that statement, as the *only* evidence they cite for causation is the general level of sales in 2012, Opp. 11,—as if the Court should presume that *all* sales were attributable to the single statement about Chinese approval in the Grower Letter. That is precisely the approach that courts routinely hold is *not* sufficient to survive summary judgment. For example, in *PBM Prod., LLC v. Mead Johnson & Co.*, No. 3:09-CV-269, 2010 WL 723750, at *5 (E.D. Va. Mar. 2, 2010), *aff'd*, 639 F.3d 111 (4th Cir. 2011), the court rejected plaintiffs' evidence as insufficient where plaintiffs' expert "assumed that every . . . sale [defendant] made was attributable to the 'compare to' ad

---

[13]    The Supreme Court has consistently explained that "[c]ausation in fact—*i.e.*, proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim," that "this standard requires the plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct," that this "is the background against which Congress legislate[s]" and "these are *the default rules it is presumed to have incorporated*, absent an indication to the contrary in the statute itself." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013) (emphasis added).
01981291.DOCX;-1

on the products and that [defendant] would not have made any other sales but for the ad." As that court explained, "[w]ithout proof of causation, the Lanham Act claim cannot go to the jury." *Id.* Other courts regularly reach the same result.[14]

Here, moreover, it is even more difficult for Plaintiffs to prove causation than in the typical competitor case, because increased sales of Viptera do not automatically establish or even suggest that damages to Plaintiffs would result.[15] Instead, Plaintiffs' unprecedented theory requires proof that incremental Viptera sales prompted by the Grower Letter were the straw that broke the camel's back and triggered China's rejection of U.S. corn. *See, e.g.*, *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 209 & n.8 (9th Cir. 1989) ("actual evidence of some injury *resulting from the deception* is an essential element of the plaintiff's case").

### E.  Disgorgement is Not Available as a Matter of Law.

Disgorgement is permitted only where equitable and also must "constitute compensation and not a penalty." 15 U.S.C. § 117(a). Based on those statutory commands, courts have held that in "false *comparative* advertising cases" between competitors, it may be "appropriate" to permit disgorgement of profits absent clear proof of damage to the plaintiff because "it's reasonable to presume that every dollar defendant makes has come directly out of plaintiff's pocket." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011).[16] But where, as here, a false advertising claim does *not* involve competitors, a similar inference is not warranted and a court can have "no way to determine with any degree of certainty" that awarding defendant's profits would be compensatory and not punitive.

---

[14]   *See, e.g.*, *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 487–88 (D.N.J. 2009) (explaining that "inferences of causation based solely on the chronology of events" are "not reasonable inferences" and that a plaintiff must have some evidence to show that misleading statements actually caused purchasing decisions); *Muhler Co. v. Ply Gem Holdings, Inc.*, 637 F. Appx 746, 748-49 (4th Cir. 2016) (finding proximate causation lacking where "the evidence presented fails to establish that [plaintiff's] alleged losses are attributable to any discernable degree to [defendant's] alleged mislabeling").

[15]   *Cf. Lexmark*, 134 S. Ct. at 1392 ("[A] plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation.").

[16]   *See also, e.g.*, *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 & n.8 (9th Cir. 1989).

01981291.DOCX;-1

*TrafficSchool*, 653 F.3d at 831.[17]   As a result, "unless there is some proof that plaintiff lost sales or profits, or that defendant gained them, the principles of equity do not warrant an award of defendant's profits."  *Balance Dynamics Corp.*, 204 F.3d at 695.  In other words, a "trial court must dismiss a non-comparative false advertising claim where the plaintiff fails to produce proof of past injury or causation because [the court] has no way to determine with any degree of certainty what award would be compensatory," and thus "a showing of some evidence of actual injury is required for [false-advertising] Lanham Act claims to survive the summary judgment stage."  *Cascade Yarns*, 2015 WL 1735517, at *5; *accord NetQuote. Inc. v. Byrd*, 2008 WL 5225880, at *4 (D.Colo.  Dec. 15, 2008) (holding that court cannot order "an accounting or disgorgement without proof of actual injury").[18]

To the extent the Tenth Circuit has stated that a plaintiff need not "demonstrate actual damages to sustain a profit award," *Western Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005), it has done so only in *trademark* cases, not false advertising cases.  That holding is based on the rationales that (1) because "trademarks are protected property rights," "misappropriation" of the trademark "result[s] in an unjust enrichment" even if it does not damage the plaintiff's own sales, or (2) that "an award of profits may be proper as a means to prevent willful trademark infringement."  *Id.*; *Bishop v. Equinox Int'l Corp.*, 1998 WL 650080, at *3 (10th Cir. Sept. 4, 1998) (same).  Those rationales do not apply to a false advertising case—especially one not between competitors—and there is no reason to conclude that the Tenth Circuit would not follow the law from other courts holding that an award of profits cannot be justified in such a case absent proof of causation of actual damages.

## II.     Plaintiffs' Limited-Launch Theories Of Duty Fail For Lack Of Causation.

### A.     Partial Summary Judgment Is Appropriate On Plaintiffs' Limited-Launch Theory.

---

[17]     *See also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) ("[T]he court must ensure that the record adequately supports all items of damages . . . lest the award become speculative or violate the [Lanham Act's] prohibition against punishment.") (Thomas, J.).

[18]     *See also, e.g.*, *Cascade Yarns*, 2015 WL 1735517, at *5 (disgorgement not permitted "without any direct evidence of injury" and explaining that "actual evidence of some injury *resulting from the deception* is an essential element of the plaintiff's case") (quotation marks and citation omitted) (emphasis in original).

01981291.DOCX;-1

The assertion that it would be improper for the Court to address partial summary judgment on Plaintiffs' limited launch theory of negligence is specious. Plaintiffs have presented two alternative routes under which they may argue duty and breach for their negligence cause of action. They may argue for a duty not to sell Viptera *at all* absent Chinese approval. Alternatively, they may argue that, if Syngenta sold Viptera, it had a duty to restrict the "manner" and "scope" of the sales (and planting or other handling of the seed) so as to reduce the spread of MIR162.[19] Those theories are not cumulative—they do not suggest a single combined course of conduct. Instead, they are *alternative* and *mutually exclusive*. If Syngenta abided by the duty not to sell *at all*, it obviously could not also abide by limited-launch duties. Syngenta's motion for summary judgment simply demonstrates that Plaintiffs cannot show causation on *one* of their alternative theories because they lack *any* evidence from which a jury could conclude that abiding by limited-launch duties would have avoided Plaintiffs' alleged injuries.

It is entirely proper to address partial summary judgment on that theory and prevent it from going to the jury when there is no evidence to sustain it. For example, in *Treaster v. HealthSouth Corp.*, 442 F. Supp. 2d 1171 (D. Kan. 2006) (Lungstrum, J.), the plaintiff asserted thirteen theories of negligence against a physician. The defendant sought partial summary judgment "on theories (3), (6), (10), (11), (12), and (13)," and this Court (after analyzing the evidence on each theory) granted it "because plaintiff has failed to present expert testimony on the standard of care and causation to support these theories." *Id.* at 1184; *see also id.* at 1179-80. Courts routinely follow that approach to eliminate theories of a negligence claim (or similar cause of action) when there is no basis for that theory to go to the jury.[20]

---

[19] Plaintiffs are limited to duties related to pre-harvest handling of seed, and cannot combine those duties with post-harvest duties related to segregating grain, due to preemption under the Grain Standards Act. 7 U.S.C. § 87g(a); *see* Dkt. 2426 at 19-25. Asserted duties thus must relate to the sale or planting of Viptera seed (or restricting grain to intrastate uses).

[20] *See, e.g.*, *Michnovez v. Blair, LLC*, 2012 WL 2627567, at *7, *11 (D.N.H. July 5, 2012) (granting partial summary judgment on negligent failure to warn claim *to the extent* it asserted a duty to warn of a danger the court deemed obvious); *Kansas Waste Water, Inc. v. Alliant Techsys., Inc.*, 2005 WL 1109456, at *7 (D. Kan. 2005) ("grant[ing] partial summary judgment on plaintiffs' negligent-misrepresentation claim insofar as that claim is based on statements of future intent"); *Powell v. Stewart*, 2006 WL 3335515, at *4-7 (S.D. Miss. Nov. 16, 2006) (granting partial summary judgment on the "theory of negligence relating to the management of plaintiff's diabetes," but denying partial summary judgment on "particular theory of
01981291.DOCX;-1

Plaintiffs have no authority rejecting such an approach.  *In re Welter*, No. 15-10160, 2016 WL 424812, at *2 (Bankr. N.D. Cal. Feb. 3, 2016), declined summary judgment because the "motion [was] made on the eve of trial," "the facts . . . are intertwined with claims that which will have to be tried," and "there [was] little benefit to partial adjudication."[21]  Plaintiffs' other cases (Opp. 16-17) hold only that partial summary judgment is not available on particular "elements" of a claim, such as "a finding of foreseeability," which would still leave the claim for trial.  *Cardenas v. Kanco Hay, LLC*, 2016 WL 3881345, at *7 (D. Kan. July 18, 2016).[22]  That principle is irrelevant here, because Plaintiffs' don't-launch and limited-launch theories are *mutually exclusive* theories of negligence and Syngenta seeks judgment on one theory in its entirety, thereby removing an entire theory of negligence from the case for trial.  *Cf. Treaster*, 442 F. Supp. 2d at 1183 (noting that partial judgment eliminated one theory of negligence as "a separate stand-alone basis on which plaintiff may seek to recover").[23]

## B.    All Theories Of Duty Short Of The Duty Not To Sell Viptera At All Fail.

Plaintiffs' limited-launch theory fails because there is no evidence from which a jury could conclude that restricting seed sales and planting practices would more likely than not have avoided Plaintiffs' alleged harm.

*First*, to the extent Plaintiffs suggest that they need not show but-for causation—that it is enough to show that breach of a limited-launch duty "contributed" to the presence of MIR162 or increased the

---

negligence" that defendants "fail[ed] to timely identify and adequately treat plaintiff's post-operative infection").

[21] *Tucker v. Am. Int'l Grp., Inc.*, 2011 WL 6020851, at *9 n.24 (D. Conn. Dec. 2, 2011), is an irrelevant procedural decision allowing plaintiff more time to complete discovery before responding to summary judgment.

[22] Any broader dicta relies on cases holding that the pre-2010 version of Rule 56 does not permit partial summary judgment. *See, e.g.*, *Cardenas*, 2016 WL 3881345, at *7.  Such dicta is not persuasive authority, because Rule 56(a) was amended in 2010 and now makes clear that "partial" judgment may be sought on "part of" a claim.

[23] The other cases cited by Plaintiffs did not involve alternative theories of negligence at all, but instead involved a defendant trying to seek summary judgment on one aspect of a single negligence theory that alleged multiple factors forming part of the same causal set or what they called "intertwined" aspects.  *See* ECF 429, *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, No. 09-MD-02063-JLK-KMT (D. Colo. Mar. 22, 2013) (declining partial summary judgment on plaintiffs' "leverage ratio allegations" because they "are intertwined with other allegations regarding liquidity, negative equity, and bond collapses," given that all of these were aspects of a single theory of negligence and "cannot be viewed in isolation" as a standalone negligence theory); *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152 JD, 2016 WL 6476315, at *6 (N.D. Ind. Nov. 1, 2016) (one aspect of a single theory that was "not a severable aspect of the Plaintiffs's claims").

01981291.DOCX;-1

risk of a trade disruption (Opp. 19)—that is wrong as a matter of law.  In rejecting precisely the sort of confusion Plaintiffs attempt to sow here, the Tenth Circuit has explained that, under the Restatement (Second) of Torts (which Kansas follows) there are "only two situations" in which but-for causation is not required: (1) where two defendants simultaneously take the same action but it is "difficult or impossible . . . to prove which defendant caused the harm;" and (2) "situations in which multiple sufficient acts result in an indivisible injury" (e.g., two separate fires, each sufficient to destroy a building). *Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1167-68 (10th Cir. 2010); *see also June v. Union Carbide Corp.*, 577 F.3d 1234, 1243 (10th Cir. 2009).  Neither exception applies.  In particular, there is no suggestion here that there was some *other* independent action that would have produced Plaintiffs' injury apart from Syngenta's actions.  Instead, as explained above, Plaintiffs have two mutually exclusive theories about what Syngenta allegedly did wrong.  To show that their limited launch theory of duty can satisfy the element of causation, they must point to *evidence* showing that, if Syngenta had abided by that duty, Plaintiffs' alleged harm would have been avoided.  It is crystal clear, moreover, that in a case such as this "a defendant cannot be held liable simply on the basis that its product could have . . . contributed to" alleged harm.  *Wilcox*, 619 F.3d at 1168.

**Second**, expert evidence is required to prove causation for Plaintiffs' limited-launch theory because the propensity for GM traits to spread through cross pollination and commingling and the efficacy of various measures in stopping their spread—especially to satisfy zero tolerance—are matters requiring specialized knowledge outside that of a lay juror.[24]  Plaintiffs' assertion (Opp. 19-23) that

---

[24]   "[E]xpert testimony is required under Kansas law unless the record evidence concerning negligence and causation is 'self-evident' or is otherwise established through the testimony of an individual with specialized knowledge or personal experience bearing on the matters at issue." *Battenfeld of Am. Holding Co., Inc. v. Baird, Kurtz & Dobson*, 60 F. Supp. 2d 1189, 1211-12 (D. Kan. 1999) (Lungstrum, J.); *Treaster*, 442 F. Supp. 2d at 1179-80 (Lungstrum, J.); *see also, e.g., Bedford-Curbow v. Westerfield North Townhomes Coop, Inc.*, 77 P.3d 1008 (Kan. Ct. App. 2003) ("[E]xpert testimony is required when the subject matter is complicated or outside the common knowledge of the jurors," and requiring expert testimony to prove that plaintiff's "specific injuries" were caused by untimely repair of gas leak); *Mathison v. United States*, 619 F. App'x 691, 694 (10th Cir. 2015) (expert testimony "necessary when proof of causation requires answering technical questions which are beyond the discernment capacity of laypersons").

01981291.DOCX;-1

Kansas law broadly permits the jury to rely on non-expert evidence to determine causation even in a case involving technical matters such as this misstates the law. As this Court has explained, in *Moore v. Associated Material & Supply Co.*, 948 P.2d 652 (Kan. 1997), the plaintiff *did* present expert evidence of causation, and the causal theory that a pile of sand diverted floodwater was also "self-evident." *Battenfeld*, 60 F. Supp. 2d at 1211. The other cases cited by Plaintiffs likewise involved self-evident causation within the common knowledge of the jury.[25]

*Third*, Plaintiffs lack any expert evidence on causation, and the self-serving, eleventh-hour Giroux declaration cannot fill that void. To start, Giroux's declaration, which asserts that "it is more likely than not" that exporters could have continued to serve China have zero-tolerance under a limited launch, Opp. Ex. 303 (Giroux Decl. ¶ 7), directly contradicts his prior testimony. When Giroux was deposed as a non-retained expert, he was specifically asked, "[W]hat kind of limited launch do you think in your opinion could satisfy the zero tolerance standard that China has?" He answered: "I don't know the answer to that question." Ex. 341 (11/16/2016 R. Giroux Dep. Tr. 37:19-23). Thus, he confirmed that he could not (and would not) provide any opinion on that issue. Indeed, he went on to explain that the "ability to manage to zero tolerance under a limited launch *is unlikely*."[26] Plaintiffs cannot trot out Giroux now to contradict his prior sworn testimony. As this Court has explained, where prior testimony was "clear, [and] there is no confusion in the deposition that needs to be explained," and a later declaration "offers no supporting facts to explain . . . the striking contradiction," a contradictory declaration should be disregarded and cannot stave off summary judgment. *Independent Drug*

---

[25]   *Wozniak v. Lipoff*, 750 P.2d 971, 983 (Kan. 1988) ("It is evident that a depressed patient might commit suicide despite the best of care."); *James v. Grigsby*, 220 P.2d 267, 269 (Kan. 1923) (applying the principle that "[r]esults, *if so pronounced as to be apparent*, may be testified to by any one" and do not require expert testimony) (emphasis added).

[26]   "Q. Now, let's talk about the limited launch concept. And you said that you do not condone the limited launch; is that right? A. It's not our preferred solution. . . . And so, you know, our preference is to not commercialize ahead of a key market because we recognize that zero tolerance or *their ability to manage to zero tolerance under a limited launch is unlikely*." Ex. 341 (11/16/2016 Giroux Dep. Tr. 34:5-35:8) (emphasis added).

01981291.DOCX;-1

*Wholesalers Grp., Inc. v. Denton*, 833 F. Supp. 1507, 1520-21 (D. Kan. 1993) (Lungstrum, J.).[27]  In addition, Giroux's conclusory assertion that exporters "more likely than not" could have continued shipping to China under a limited launch, unsupported by any analysis whatsoever, cannot create a triable factual issue.  *See, e.g., City of Chanute, Kan. v. Williams Natural Gas Co.*, 743 F. Supp. 1437 (D. Kan. 1990) (no triable issue unless an expert "at a minimum, set[s] forth a process of reasoning beginning from a firm foundation").

  ***Fourth***, the evidence Plaintiffs cite (including the Giroux declaration), Opp. 22-29, is beside the point.  None of it addresses whether complying with non-preempted restrictions on seed sales and planting practices would have made it more likely than not that exports would have met China's zero-tolerance policy.  Instead, Plaintiffs' supposed evidence all either (1) addresses pre-harvest restrictions *in combination* with preempted duties relating to testing, segregating, channeling, inspecting, or labeling harvested grain in order to restrict where the harvested grain goes,[28] or (2) merely says that restricting seed sales and planting practices can *reduce the risk* of cross-pollination generally, but does not provide

---

[27] In fact, Plaintiffs *admit* that summary judgment is appropriate where "Plaintiffs' own expert testified 'that it was unlikely'" that the plaintiff's injuries were caused by the defendant—which is exactly what Giroux conceded concerning the limited-launch theory of duty in in his deposition.  Pls.' Opp. 20.

[28] For example, Giroux's declaration and prior testimony state that there have been "some instances" in which selling a GM crop with "very rigorous controls" over several factors, including "where does that grain go," has "not resulted in a trade disruption in a key market."  Ex. 341 (11/16/2016 R. Giroux Dep. Tr. 38:7-17); Pls.' Opp. Ex. 303 (Giroux Decl. ¶ 8).  But that explicitly involves imposing preempted requirements to channel "where" harvested grain is delivered based on its GM characteristics and would necessarily involve, at a minimum, *describing* the harvested grain according to GM traits.

 The restrictions that Monsanto used for Droughtgard are even more irrelevant.  *Cf.* Pls.' Opp. 23-28.  *First*, under the DroughtGard restrictions, a "farmer must designate a shipping destination for the grain at the time he enters the stewardship agreement," Ex. 342 (E-mail re Monsanto/Cargill Meeting, at CARGILL000686529), which would require inspecting the harvested grain to identify and describe it as containing the DroughtGard trait and labeling it to restrict its shipment.  That is exactly what the Grain Standards Act preempts.

 *Second*, those restrictions were not for a limited commercial launch at all, but instead were part of a trial program "prior to commercial introduction."  Ex. 343 (4/10/2012 Monsanto Press Release re DroughtGard); *see also* Ex. 344 (E-mail re Monsanto Droughtgard, at ADM-00016186) (DroughtGard program was not "a commercialization as defined by the BIO Policy"); Ex. 345 (Monsanto "did not sell [DroughtGard] seed that year, but had field scale trials with approx. 250 growers on less than 10,000 acres").

 *Third*, Plaintiffs cite no evidence that the restrictions used for DroughtGard would have reduced the spread of MIR162 sufficiently to satisfy zero tolerance.  Indeed, it is unrefuted that Monsanto "acknowledged that the controls [for DroughtGard] are not designed to achieve the regulatory zero tolerance of China."  Ex. 344 (E-mail re Monsanto Droughtgard, at ADM-00016186).  The fact that the DroughtGard trait did not affect trade with China, Opp. 23-28, provides no evidence of the efficacy of the measures in limiting gene flow, because China approved DroughtGard for import before the first commercial crop was harvested—so there was never an opportunity for the commercial launch of DroughtGard to cause a trade disruption. *See* Ex. 346 (T. Carrato Dep. Ex. 10).

01981291.DOCX;-1

any quantification of the efficacy of those practices or any basis on which a jury could conclude that those practices would have been effective enough to permit exports to satisfy zero tolerance, *see* Resp. to Pl. SOAF ¶¶ 208-233. A jury presented with this evidence could not find but-for causation without resorting to utter speculation. *E.g.*, *Voelkel*, 846 F. Supp. at 1477 (jury is not permitted to speculate).[29]

## III.  Plaintiffs Abandon Any Recall Theory And Their Theory That Syngenta Should Have "Stopped Selling" Fails For Lack Of Evidence Of Causation.

Plaintiffs ultimately retreat from a recall duty to assert solely that Syngenta should have "stop[ped] selling" Viptera. Opp. 37-39. But for the same reasons explained in Part II.B, there is no evidence that stopping subsequent sales of Viptera after its launch would have reduced the presence of MIR162 in the corn supply sufficiently to avoid Plaintiffs' alleged harm. To the contrary, the only evidence says the opposite and makes clear that after Viptera had been planted on more than a million acres in 2010 it would have taken years to eliminate MIR162 from the corn supply.[30]

## IV.  Plaintiffs Cannot Establish Proximate Cause On Any Claim As A Matter Of Law.

Plaintiffs do not dispute the core facts that Cargill and ADM (1) knew at all times that MIR162

---

[29]    The Deregulation Petition does not remotely address whether limited-launch approaches alone could keep MIR162 out of Chinese export channels. *Cf.* Pls.' Opp. 24-25 (citing Pls.' Opp. Ex. 89). What the Deregulation Petition actually says is that "[t]here should be no effects on the U.S. maize export market since Syngenta is actively pursuing regulatory approvals for MIR162 maize in countries with functioning regulatory systems." Pls.' Opp. Ex. 89, at SYNG_00447198. In other words, it tied preserving export markets primarily to securing foreign regulatory approvals, not to "stewardship." To the extent the Deregulation Petition referred to "stewardship" mechanisms, it was not addressing a limited-launch or restricted-sale scenario, but referred only to "channeling" of harvested grain away from export channels—which would be preempted under the Grain Standards Act. *See supra* n.19. In addition, the Deregulation Petition did not suggest that the best way to preserve export markets was to restrict and channel MIR162 corn (which, after MIR162 was approved, would be commodity corn lawfully part of the U.S. corn supply). Instead, it pointed to the demonstrated ability "to channel particular types of maize"—specialty maize—"for particular uses, such as the export market" through mechanisms such as "identity preservation measures." Pls.' Opp. Ex. 89 at SYNG_00447198. In other words, it pointed to the ability of those who wanted to serve the export market with a specialty corn (MIR162-free corn) to keep that corn separate from the corn supply—an approach that also would require preempted requirements of inspection, testing, and description of grain. The Deregulation Petition thus makes the same fundamental point that Syngenta made in its opening motion—that "[t]he only way to even begin to account for the spread of GM traits from Viptera through cross-pollination" would be through preempted duties "requiring the testing, inspection, description, and segregation of grain to ensure that corn grown by *other* farmers (*i.e.*, non-Viptera purchasers) did not contain the GM trait from Viptera." Syngenta's MSJ 77.

[30]    *See* Ex. 347 (G. Martin Dep. Tr. 397:7-16) (NAEGA testifying that it would take "at least ten years" after stopping sales of Viptera to purge it from the U.S. corn supply sufficient "to meet a zero-tolerance standard"); Ex. 348 (J. Adelman Dep. Tr. 478:8-11) ("[I]t's not a practical solution to stop selling Viptera, because it takes like years to get out of the agricultural supply chain."); *see also* Syngenta's MSJ 71-72.

01981291.DOCX;-1

was not approved for import into China; (2) knew that MIR162 would be spread throughout the corn supply once Viptera was launched and for that reason decided not to ship new U.S. corn to China in 2011; (3) reversed course in 2012 and sent U.S. corn to China anyway; (4) admitted that they knowingly undertook a significant risk in doing so; and (5) that in November 2013 China detected MIR162 in several shipments that Cargill tried to deliver *after* Cargill had discovered that they had tested positive for MIR162.  *See* Syngenta's MSJ 80-86, 89-95; *see supra* Syngenta's Replies to SOFs ¶¶ 70-119. Incredibly, Plaintiffs' main argument is that Cargill's and ADM's actions were business as usual and perfectly lawful and that they have nothing to do with Plaintiffs' theory of injury in any event.

That ignores reality.  First, Plaintiffs cannot paint the knowing shipment of unapproved GM traits to a country where it is unlawful to import them as business as usual.  Cargill and ADM's own employees have testified that it would be a violation of Chinese law, company codes of conduct, and their contracts to knowingly deliver corn that could not satisfy China's zero-tolerance GM standards.  *See* Syngenta's MSJ SOF ¶¶ 115-17; Syngenta's Pl. SOAF ¶ 187.  Cargill's efforts at a cover up confirm that its actions were anything but business as usual.  Cargill sought to keep knowledge of the positive test results for MIR162 in the 2013 shipments strictly secret and limited to a gang of five: Hale, Giroux, Smalley, Sanfeliu, and Friant.  Cargill told other employees to "disregard and delete the email" with the test results because it "needs to be kept Cargill confidential," Ex. 349 (S. Smalley Dep. Ex. 4, at CARGILL000728734); *see* Resp. to SOAF ¶ 570.  The gang of five also kept the secret: they never told Cargill's senior management, Chinese buyers, or the Chinese government about tests.  *See* Ex. 355 (2/16/2016 Smalley Dep. Tr. 116:9-119:25).  Four of the five even sought to keep them secret from Syngenta and wrongly testified at deposition that Cargill did *not* test for MIR162 in any shipments after 2012.  Resp. to SOAF ¶ 570.

Second, the pretense that Cargill's and ADM's actions played no particular role in triggering

China's embargo, Opp. 41-42, is specious. The few examples of other isolated rejections that Plaintiffs scrounge up rely in part on secondhand rumors and other inadmissible hearsay. *See* Resp. to SOAF ¶¶ 520-522. And Plaintiffs' own evidence makes plain that exporters decided to forgo shipping to China only after the *Cargill* rejections. *See, e.g.*, Pls.' Opp. Ex. 329 (Bunge emails, at BGNA0028404) ("No cargo got passed since Cargill's rejection"). As Cargill's grain export manager testified, China's shift away from U.S. exports "all started, I guess, November 15, 2013, when *we* had our first boat of corn rejected by China for the presence of Viptera" and except for a "few cargos" that may have later gotten in, "the US was more or less refraining from selling corn to China." Ex. 328 (5/18/2016 W. Hale Dep. Tr. 79:21-80:6) (emphasis added); Ex. 115 (Carter Expert Rep. ¶ 18). Indeed, the fact that an isolated detection and detention of a Cargill shipment due to a different unapproved trait in 2010 prompted a different reaction (no de facto ban), *see supra* SOF Replies ¶¶ 70, 78, makes clear that it was Cargill's and ADM's repeated series of MIR162 shipments and detections in November and December 2013 that caused exporters to forgo the Chinese market and allegedly "close" it.

## A.    Plaintiffs' Two Responses Are Meritless.

Plaintiffs' remaining responses boil down to two meritless assertions. *First*, Plaintiffs claim that a trade disruption causing a drop in U.S. corn prices was foreseeable and that Cargill's and ADM's unlawful and intentional intervening actions need not have been foreseeable.[31] That misstates Kansas law. The general rule is that a defendant is not obligated to protect against tortious or unlawful acts by a third party. *Seibert v. Vic Regnier Builders, Inc.*, 856 P.2d 1332, 1339 (Kan. 1993). To overcome that rule, Plaintiffs have the burden of showing facts from which a jury could infer that Syngenta was reasonably on notice that exporters would intentionally unlawfully deliver U.S. corn to China that could not satisfy zero tolerance. While Kansas law has held that a history of strictly similar unlawful acts is not

---

[31]   The assertion that intervening cause is a defense (Opp. 50-51) misses the point. As Plaintiffs do not dispute, they have the burden of proving proximate cause, and Kansas courts routinely grant summary judgment where *plaintiffs* fail to provide evidence that an intervening cause was foreseeable, *see* Syngenta's MSJ 87 & n.54 (collecting cases).

01981291.DOCX;-1

the *only* way of proving foreseeability of an intervening unlawful act, the "most significant factor" in determining foreseeability of unlawful acts is prior unlawful incidents. *Id.* Other factors to be considered also relate to whether the defendant was on notice of the probability of the *unlawful act* occurring. *Id.* (whether parking lot is in "known high crime area").[32] The foreseeability analysis thus focuses entirely on whether the *unlawful intervening act*—not the ultimate injury—was foreseeable. Kansas courts routinely find no foreseeability as a matter of law when there is no prior history of unlawful acts.[33] Plaintiffs point to *no* history or other circumstances putting Syngenta on notice of the intentional and unlawful exports here.[34]

Plaintiffs' unsupported assertions aside, Syngenta *has* disputed the foreseeability of (1) unlawful and intentional acts in shipping corn containing MIR162 to China; (2) corn being reliably and consistently shipped to China at all after Viptera's launch; and (3) any trade disruption resulting from Viptera's launch (given that, as Dr. Thurman explains, trade flows are readjustable from one foreign market to another to avoid any effect on U.S. corn prices so long as net worldwide demand for U.S. corn exports does not decrease).   Syngenta incorporates those arguments here rather than repeat them. *See* Syngenta's MSJ 80-86, 97-100; Syngenta's Opp. 110-12, 125-27.[35]

---

[32]   *See generally Nero v. Kan. Stat. Univ.*, 861 P.2d 768, 780 (Kan. 1993) ("Prior similar acts committed upon invitees furnish actual or constructive notice to a landowner.").

[33]   *See, e.g.*, *South ex rel. South v. McCarter*, 119 P.3d 1, 15 (Kan. 2005) (not foreseeable where mobile home park did not have specific information about an attacker's past conduct and the actual risk involved with having him on the property); *Gragg v. Wichita State Univ.*, 934 P.2d 121, 135 (Kan. 1997) (not foreseeable that third party would shoot patron at fireworks show because no "prior knowledge that [third party] intended to shoot anyone" and no similar incidents at fireworks shows the last 17 years, even though there was another shooting at a different festival); *Weroha v. Craft*, 951 P.2d 1308, 1314 (Kan. 1998) (not foreseeable that plaintiff would be attacked at arcade because "no evidence of previous violent activity at Planet Pinball, in the area, in the arcade business, or with the alleged assailants at Planet Pinball"); *George v. Breising*, 477 P.2d 983, 988 (Kan. 1971) (not "foresee[able] that a thief would steal his car, negligently drive it, and injure a third party"); *Gardin v. Emporia Hotels, Inc.*, 61 P.3d 732, 739 (Kan. Ct. App. 2003) (not foreseeable where "no evidence the motel knew that members of the Worldwide sales group had engaged in prior criminal activity").

[34]   In the case Plaintiffs cite, there was such prior history. *See State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1119-20 (D. Kan. 2014) (a prior "2009 incident at the convenience store in issue in this case and the '100 plus' vehicle incursions at defendant's other stores give rise to factual issues" whether a vehicle incursion was foreseeable).

[35]   Plaintiffs' assertion that Mack and others knew that MIR162 would end up in shipments to China distorts the evidence. As Syngenta's witnesses Mack and Hull have testified, the e-mails Plaintiffs cite show only that shipments of corn from the U.S. to China would contain MIR162 in them *if they were actually shipped* (a decision over which Syngenta had no control),

01981291.DOCX;-1

*Second*, Plaintiffs characterize the export U.S. corn to China as the status quo and Viptera as the intervening force, so as to argue that Cargill's and ADM's decisions to subsequently ship U.S. corn to China were somehow caused by and not independent of Syngenta's decision to sell Viptera seeds in 2010. That flips the law and facts on their head—including Cargill and ADM's testimony that their practice was to adapt to the condition created by a trait's presence in the corn supply (e.g., whether the Monsanto trait resulting in Chinese detection in 2010 or Viptera), and that they made independent risk-versus-reward choices to ship to China in spite of, not due to, Viptera. Syngenta incorporates its arguments here rather than repeating them. Syngenta's Opp. 103-112; Syngenta's MSJ 78-100.

### B.   Chinese Law And Exporters' Contracts Prohibit Exporters From Shipping Corn To China Containing A GM Trait Not Listed On The Trader's Certificate.

Plaintiffs' opposition does nothing to undermine the fundamental points that Chinese law: (1) requires the foreign exporter to obtain a trader's certificate for at least each shipment before exporting any GM trait to China; (2) permits a trader's certificate to be issued only for GM traits China has approved for import; and (3) requires rejection of a shipment if any GM trait is detected that is not listed on the trader's certificate. *See* Syngenta's MSJ 88-89.[36]

Unable to dispute the fundamentals of Chinese law, Plaintiffs spend pages on hypertechncial quibbling about irrelevant points such as when title transfers; whether Chinese law specifically requires an exporter to list *every* GM trait in a shipment (and thus to test the shipment) or simply makes it unlawful to deliver a shipment if it is found to contain a GM trait *not* listed on the certificate; whether one must acquire the trader's certificate before *signing* the contract or before *performance*; and whether some contracts call for delivery more than six months after signing.[37] All of that is irrelevant to the

---

and that the presence of MIR162 could provide an incentive for Chinese regulators to announce a tolerance for permissible low levels of MIR162 to *avoid* a trade disruption. *See* Resp. to SOAF ¶ 35.

[36]   Admissibility objections to any evidence used to determine Chinese law are baseless. *See* Fed. R. Civ. P. 44.1; *see* Syngenta's MSJ 87-88; Syngenta's Opp. to Mot. to Exclude Zhang 10-13 (ECF No. 2963).

[37]   Plaintiffs' assertion that Dr. Zhang's interpretation is inconsistent with the delivery timeframes in contracts, Opp. 68-69, is inaccurate, as contracts routinely call for delivery within six months. *See* Resp. to Pl. SOAF ¶ 547. Regardless, Plaintiffs'
01981291.DOCX;-1

bottom line: no one disputes that it is illegal to attempt to bring a shipment of grain into China if the grain has a GM trait in it that has not been approved for import.  Cargill and ADM *knowingly* participated in illegally trying to deliver shipment after shipment in violation of that basic rule.

For example, Plaintiffs assert that an exporter can "choose" which GM traits to list in applying for the trader's certificate.  Opp. 65.  That may be true in the theoretical sense that failing to list a GM trait on the certificate is not treated as an independent paperwork violation, but the fact remains that if an exporter presents a trader's certificate that does not list all of the GM traits *found* in a shipment upon testing, that constitutes a violation and the shipment will be rejected.  That is precisely why Cargill's contracts with private Chinese buyers expressly required, for example, that the "GMO events in the shipment ***shall be in accordance with*** safety certificate issued by the Ministry of Agriculture" and "shall be within the 12 varieties stipulated in the safety certificate."  Resp. to Pl. SOAF ¶ 546.  Likewise, it is silly for Plaintiffs to suggest that it is not *really* unlawful to ship corn with unapproved GM traits to China because Randy Giroux does not know of fines ever being imposed on exporters for presenting a shipment with an unapproved GM trait—as if what makes something illegal is whether a fine is imposed (as distinct from the cargo being rejected or destroyed.[38]  Indeed, even Giroux admits that it would at least be a "technical violation" to deliver corn containing a GM trait not listed on the safety certificate.  Ex. 350 (M. Hurst Dep. Ex. 7, at CARGILL000075500).    And Plaintiffs' broadside assertion that Cargill received the positive test results after title transferred to the buyer for *some* shipments, Opp. 65-67, is both irrelevant and untrue for many of the shipments at issue here.  *See* Resp. to Pl. SOAF ¶¶ 559-

---

assertion would just mean that exporters and importers cannot perform the contract consistent with Chinese law and should not enter contracts that call for delivery outside the validity period of the trader's certificate.  It does *not* mean that how a few deals have been carried out in practice somehow trumps or determines what the law requires.  Plaintiffs cite only *Wultz v. Bank of China Ltd.*, No. 11 Civ. 1266(SAS), 2012 WL 5431013, at *4 (S.D.N.Y. Nov. 5, 2012), but that case makes only the unremarkable point that legal interpretation should take into account the practices of Chinese government "*legal institutions*," referring in that case to decisions of Chinese "courts"—not the dealings of private actors.

[38]    Plaintiffs are wrong if they mean to suggest no fines are prescribed as a punishment.  As Dr. Zhang explains, Articles 15 and 16 of the Customs Regulations make it illegal and imposes fines on "any consignee or consigner of import and export goods" who "fail[s] to declare the true condition" of the goods.  Ex. 127 (H. Zhang Expert Rep. ¶ 65).

01981291.DOCX;-1

63, 582.  The evidence from Cargill shows that it had positive test results in hand by November 20, 2013 for several vessels before the buyer paid (and thus before title passed even according to Plaintiffs), yet Cargill did not tell anyone about the results and delivered the vessels to China anyway.  *Supra* p.111.[39]

At bottom, Plaintiffs' avalanche of hundreds of contested additional facts are irrelevant to intervening cause.  But if the Court finds that they foreclose summary judgment in Syngenta's favor, they equally foreclose summary judgment in Plaintiffs' favor and Plaintiffs' cross-motion should be denied.

## V.    Petitioning Activity Cannot Be The Basis For Liability.

Plaintiffs' arguments for avoiding the Petition Clause are meritless.

*First*, the suggestion that immunity under the Petition Clause does not reach Lanham Act claims is incorrect.[40]  Plaintiffs do not cite a *single* case so holding,[41] nor would such a holding make sense.  Congress cannot abrogate a constitutional protection by creating a federal tort statute.  Immunity under the Petition Clause has been applied to many federal statutory causes of action, *see, e.g.*, 1 Herbert Hovenkamp et al, IP and Antitrust § 11.3(b)(5)(A) (3d ed. 2016) (immunity from RICO, § 1983, and

---

[39]    Ex. 356 (P. Locken Dep. Ex. 17, at 1) ("cash received" for M/V Moonlight on 11/22/2013 and for M/V Tiger South on 12/2/2013).  Plaintiffs' assertion that Cargill had China "pre-inspect" some shipments before the corn was discharged, Opp. 67 n.59, is also beside the point.  Pre-inspections *before* discharge simply mitigated the risk of loss to Cargill of rejection *after* discharge on account of their knowing delivery of MIR162.  *See* Resp. to Pl. SOAF ¶ 582.  The fact that Cargill sometimes took this step is irrelevant to whether it was legal for Cargill to ship corn containing MIR162 into China.

[40]    As the Tenth Circuit has explained, Plaintiffs err by conflating the *Noerr-Pennington* doctrine, which is a particular application of the Petition Clause in combination with a construction of the Sherman Act, with immunity under the Petition Clause.  *See Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 208 F.3d 885, 889-90 (10th Cir. 2000) (en banc); *McDonald v. Smith*, 472 U.S. 479, 486-87 (1985).  Because many cases similarly refer to immunity under the Petition Clause using the *Noerr-Pennington* label, however, Syngenta uses the same terminology in describing the holdings in those cases.

[41]    In each case Plaintiffs cite, the court declined to apply Petition Clause immunity to a Lanham Act claim for some *other* reason, such as the particular procedural posture of the case.  *See United Marine Marketing Grp., LLC v. Jet Dock Sys., Inc.*, No. 810CV2653T35TBM, 2013 WL 12148864, at *5 (M.D. Fla. Mar. 6, 2013) (finding the *Noerr–Pennington* doctrine inapplicable because "[t]he matter at issue in this context does not concern any assertion of liability against the Defendants for their conduct or speech") (emphasis in original); *Kimberly-Clark Worldwide, Inc. v. Cardinal Health 200, LLC*, No. CIV.A. 11-1228-RGA, 2012 WL 3063974, at *2 & n.1 (D. Del. July 27, 2012) (declining to reach the *Noerr–Pennington* doctrine because "that legal issue is also best left for summary judgment or trial."); *Mun. Rev. Servs., Inc. v. Xspand, Inc.*, No. 4:05CV671, 2005 WL 1367416, at *2 (M.D. Penn. June 8, 2015) (declining to apply *Noerr–Pennington* "at this early stage" of the case, but noting that "we may ultimately determine that the *Noerr/Pennington* doctrine has applicability to this case"); *Cook Inc. v. Bos. Sci. Corp.*, No. 01 C 9479, 2002 WL 335314, at *2 (N.D. Ill. Feb. 28, 2002) (finding that "[a]lthough the actions Boston took could conceivably fall under other umbrellas, *such as the First Amendment right to petition*, Boston asserts only *Noerr-Pennington* immunity." (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)) (emphasis added).  To the extent courts have suggested that lower courts are split on the issue, they similarly fail to cite any case declining to apply immunity under the Petition Clause to a Lanham Act claim as a matter of law.

01981291.DOCX;-1

applies to the Lanham Act.  *See, e.g.*, *Sliding Door Co. v. KLS Doors, LLC*, No. EDCV 13-00196 JGB (DTBx), 2013 WL 2090298, at *6 (C.D. Cal. May 1, 2013).

*Second*, the fact that Plaintiffs do not seek to establish liability based "exclusively" on statements from Syngenta's petitioning activity is irrelevant.  Plaintiffs cannot rely on those statements *at all* as the basis for liability.

*Third*, whether statements from petitioning activity can be used merely as evidence to show collateral matters (such as knowledge) is irrelevant to Syngenta's motion, which seeks to establish solely that Plaintiffs cannot point to petitioning activity as the basis for liability.

*Fourth*, Plaintiffs have not established any genuine dispute of material fact as to whether the "fraud exception" applies to statements in the Deregulation Petition.  They do not point to any statement that "(1) [was] intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d at 841, 843 (7th Cir. 2011).  The statement that Syngenta's China application was "in process" was correct because Syngenta was in the process of compiling materials for that filing, which could not be made until Viptera had been approved in another country.  *See* Ex. 351 (1/27/2016 S. Huber Dep. Tr. 78:15-79:5); Ex. 352 (D. Ward Dep. Tr. 166:16-167:18).  In any event, the Deregulation Petition elsewhere made clear that the Chinese application had not yet been filed, Ex. 206 (S. Huber Dep. Ex. 20, at SYNG_00447100-01) (stating that "[r]egulatory filings for MIR162 *will* be made in . . . China.") (emphasis added), and whether that application was in process or not was immaterial, because the USDA could not legally use the status of an application in another country as the basis for its decision.  *See Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 842 (9th Cir. 2013).  Similarly, Plaintiffs do not dispute that statements about a stewardship program were not material because the USDA could not consider the economic impacts in ruling on the petition.  *See id.* at 841; MTD Order, Dkt. 1016 at 15.

01981291.DOCX;-1

117

As for the *Bunge* lawsuit, Plaintiffs do not even attempt to offer evidence to satisfy the two-prong test for sham litigation.

## VI.     Any Theories Of Duty Based On Voluntary Undertaking Fail As A Matter Of Law.

Plaintiffs' voluntary undertaking theories, including based on the BIO Policy, fail.

*First*, Kansas law does not extend liability for voluntary undertakings to claims "for non-physical harm to persons or things." *Geiger-Schorr, D.O. v. Todd*, 901 P.2d 515, 520 (Kan. Ct. App. 1995); *Theno v. Tonganoxie Unified Sch. Dist.*, 377 F. Supp. 2d 952, 969 (D. Kan. 2005) (Lungstrum, J.). And it is settled that Plaintiffs have no claim for physical harm in this case. *See* Dkt. 2547 at 28; Dkt. 1016 at 19-20. Assertions that other States apply a different rule are wrong and irrelevant.[42]

*Second*, Plaintiffs do not dispute that Syngenta "cannot be held liable for a task [it] did not agree to assume." *See* Syngenta's MSJ 104. Plaintiffs simply assert that support for the BIO Policy somehow translates into assumption of a duty not to sell Viptera in the U.S. absent Chinese approval. Opp. 74-75.[43] But Plaintiffs cite no evidence that Syngenta specifically undertook to commercialize Viptera so as to protect the Chinese market. To the contrary, the whole point is that Syngenta—like other players in the industry, *see, e.g.*, Syngenta's Pl. SOAF ¶¶ 168-69, 172, 181-82—considered commercializing Viptera without Chinese approval consistent with the BIO Policy. *See In re TMJ Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1493 (8th Cir. 1997) (plaintiffs must show that "the defendant undertook a duty with respect to the specific product" at issue).

*Third*, liability requires proof that beginning the undertaking made Plaintiffs worse off—either through detrimental reliance, which Plaintiffs do not assert, *see* Opp. 75-76, or through an increase in risk

---

[42]     Three cases Plaintiffs cite involved physical harm, *see City & Cnty. of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1143 (N.D. Cal. 1997); *Rudolph v. First S. Fed. Sav. & Loan. Ass'n*, 414 So. 2d 64, 71 (Ala. 1982); *Blackmon v. Nelson, Hesse, Cyril, Weber & Sparrow*, 419 So. 2d 405, 406 (Fla. Dist. Ct. App. 1982), and the rest contradict the rule from the Restatement (Second) of Torts §§ 323 and 324A, *see Runde v. Vigus Realty, Inc.*, 617 N.E.2d 572, 575 (Ind. Ct. App. 1993); *Lloyd v. State Farm Mut. Auto. Ins.*, 860 P.2d 1300, 1303 (Ariz. Ct. App. 1992).
[43]     It is irrelevant whether the "BIO Policy is the industry standard and standard of care in the industry." Opp. 72. That conflates the standard of care imposed on Syngenta by common law with whether Syngenta undertook a duty.
01981291.DOCX;-1

of physical harm.  *See* Syngenta's MSJ 103-04.  But Plaintiffs have *no* claim for physical harm and cite *no* evidence of any physical harm or increase in such risk.  *See also* MTD Order, Dkt. 1016 at 19-20 (dismissing allegation that there was physical harm to every Plaintiffs' property as too conclusory).

## VII.  Failure To Warn Cannot Support The Negligence Claim.

*First*, the theory that the Court cannot grant partial judgment on failure to warn because it is only one part of Plaintiffs' negligence claim fails for the reasons stated in Part II.A, *supra*.

*Second*, Plaintiffs err by arguing that only specific knowledge of the precise danger at hand can eliminate a duty to warn.  Opp. 77.  As Plaintiffs' own cases show, knowledge of the *risk* involved and the *type* of injury is sufficient.  *See Brand v. Mazda Motor Corp.*, 978 F. Supp. 1382, 1389 (D. Kan. 1997) (refusing to frame the level of knowledge required "too narrow[ly]").  Here, unrefuted evidence shows that producers understood the risk that cross pollination spreads GM traits and that corn with some GM traits cannot be exported to some countries. *See* Syngenta MSJ Br. 106.  Nothing more is required to eliminate a duty to warn of those obvious facts.[44]

*Third*, as for the adequacy of warnings, Plaintiffs remarkably complain about the absence of warnings to "non-Viptera purchasers," Opp. 78—that is, farmers who did *not buy* Syngenta's product. Plaintiffs cite no precedent suggesting that Syngenta had a duty to warn non-customers.  And it is undisputed that Syngenta did warn customers that Viptera seed was not approved for export to all markets and that growers needed to take steps to ensure the seed did not end up in unapproved markets. *See* SOF ¶¶ 14-18.  Complaints about warnings to *others* in the industry are a diversion both because they merely rehash the impermissible attempt to base a negligence claim on alleged misrepresentations, *see infra* Part VIII, and because exporters undeniably knew the risks.  *See* SOF ¶¶ 51-54, 72-117; Syngenta's Resp. to Pls.' SOAF ¶¶ 375-76, 393-99, 414-20, 434-35, 449-59, 462-78, 567-69, 572.

---

[44]   Plaintiffs do not even dispute that other industry participants, such as grain elevators and exporters, were well aware of the risks associated with the dispersion of GM traits and asynchronous approvals.   Any failure to warn claim as to non-producers is foreclosed for that reason alone.

*Fourth,* recognizing that they lack evidence of causation, Plaintiffs again complain that the Court should not assess failure to warn in isolation. That is wrong. *See supra* Part II.A. In any event, even if failure to warn is considered together with other limited-sale duties, there is still *no* evidence from which a jury could find causation. Out of more than 100 farmers deposed, Plaintiffs point to *three* who asked about foreign approval status when buying seeds and a handful of others (eight) who *assumed* their dealers sold seed approved overseas. Pls.' SOAF ¶¶ 479-88; Syngenta's Resp. to Pls.' SOAF ¶¶ 479-88. Given the overwhelming evidence that the vast majority of farmers do *not* consider export markets when purchasing seed, SOF ¶ 134, Plaintiffs' anecdotal handful of farmers is no evidence that different warnings would have radically reduced overall Viptera sales. And it certainly does not provide evidence from which a reasonable jury could find that warnings would have avoided Plaintiffs' injury, because there is no evidence (especially expert evidence) providing any analysis to show how warnings would have affected sales or how low sales would have to be (along with other restrictions) to make it more likely than not that corn exports would satisfy zero tolerance. The jury would have to speculate on all of that. Summary judgment resolves matters where there is precisely such an absence of evidence.[45]

## VIII.   Any Theory of Liability In Negligence Based On Misrepresentations Fails.

Knowing that they cannot meet the requirements for a negligent misrepresentation claim,

---

[45] Plaintiffs cannot appeal to a presumption of causation. Opp. 79. The presumption applied by Kansas is actually a presumption that a warning would be heeded. *See Wooderson v. Ortho Pharm. Corp.*, 681 P.2d 1038, 1057 (Kan. 1984) (citing Restatement (Second) of Torts § 402A, comment j). Where there was no warning, there is a presumption that a warning would have been heeded (and avoided harm). Here, however, Viptera bag tags and the Stewardship Agreement expressly cautioned that the seed was not approved in all export markets and that growers were responsible for keeping their grain out of unapproved export channels. The undisputed evidence thus refutes any presumption that a warning would be heeded. Indeed, unrefuted evidence shows both (i) that the vast majority of purchasers would not base purchasing decisions on information about foreign approval and (ii) there are no actions that Syngenta could have taken, warning or otherwise, that would have satisfied China's zero tolerance policy or caused exporters to act differently. *See* Syng. Br. 108-10. This easily suffices as "credible evidence" that shifts the burden back to Plaintiffs. *Miller v. Pfizer Inc. (Roerig Division)*, 196 F. Supp. 2d 1095, 1127 (D. Kan. 2002). Lastly, the presumption that a warning would be heeded applies to *individual* purchasers or users and is based on their self-interest. But Plaintiffs' theory here would require producers to base purchasing decisions on Plaintiffs' particular view of the rational *collective interests* of the entire industry, rather than short term individual interests of the purchaser (for example, in increasing yield). Plaintiffs cannot pretend that Kansas law applies a presumption that a warning to individual purchasers can magically resolve a collective action problem by ensuring that all purchasers will act based on collective interests and can point to no case supporting such a theory.

01981291.DOCX;-1

Plaintiffs attempt a sleight of hand to avoid those requirements. They insist that this industry is special, that the duty of care here required Syngenta to communicate honestly with other industry members, and that, as a result, the ordinary rules for negligent misrepresentation simply don't apply to them. Opp. 80-81.[46] Recognizing the flimsiness of all this, Plaintiffs spend most of their argument asserting disputed facts trying to paint Syngenta as a bad actor. Opp. 81-85. That is all irrelevant because Plaintiffs' entire theory fails as a matter of law.

Plaintiffs cannot circumvent the restrictions on negligent misrepresentation claims by arguing that their industry is different. If that approach worked, every plaintiff could evade the standards for the tort of negligent misrepresentation by arguing that the circumstances in his industry warranted a different rule. Plaintiffs lack a *single* case endorsing such an approach.[47] In particular, Plaintiffs cannot justify avoiding the rules for negligent misrepresentation based on the assertion that "companies like Syngenta have a monopoly on information." Opp. 81. The requirements for a negligent misrepresentation claim are designed to address situations in which some players in a market may have key information and others might tend to rely on any such information they can get. Nevertheless, the law strictly limits when liability can be imposed even in such scenarios. As Syngenta has explained, the limits on negligence misrepresentation exist to limit the scope of a duty to use reasonable care in providing information precisely "because of the extent to which misinformation may be . . . circulated"—that is, due to the number of people that might attempt to rely on information—and the "magnitude of the losses" that may follow. Restatement (Second) of Torts § 552 cmt. a. It is precisely for interconnected industries like this that the limits on negligent misrepresentation were adopted.

---

[46]   In support, they cite testimony of Randy Giroux (an employee of Cargill, the company that master-minded the first Viptera lawsuit in September 2014), who self-servingly claims that the standard of care required Syngenta to communicate transparently with members of the industry (including Cargill) regarding its commercialization plans and regarding approval status of GM traits. Opp. 80-81.

[47]   *Parkinson v. Cal. Co.*, 233 F.2d 432 (10th Cir. 1956), is doubly irrelevant. It addressed whether failure to malodorize gas constituted negligence and addressed the "representation that it had been malodorized" only tangentially in that context. *Id.* at 440. Moreover, unlike the claim here, it involved liability for physical harm (an explosion) for which different rules apply. *See* Restatement (Second) of Torts § 310.

01981291.DOCX;-1

121

In addition, Plaintiffs do not even attempt to provide a rationale for avoiding another requirement for liability based on a misrepresentation, namely, that the plaintiff himself must have *relied* on the misrepresentation. Plaintiffs do not dispute that that is the law. Nor do they dispute that they lack any evidence whatsoever that any Plaintiffs relied on any statement from Syngenta. Instead, their factual assertions all focus on supposed representations that allegedly affected decisions by *others*. That alone is fatal for basing liability in negligence for economic losses on supposed misrepresentations. *See* Syngenta's MSJ 111-112 & n.84.

Plaintiffs obviously want to accuse Syngenta of falsehoods in front of the jury. But Plaintiffs have not made either a claim for fraud or a claim for negligent misrepresentation, because they know that the facts support neither. The Court should confirm, as it already held once, that absent a viable claim meeting the standards for negligent misrepresentation (which Plaintiffs concede they cannot meet), Plaintiffs cannot evade the restrictions on that tort by attempting to base liability for negligence on misrepresentations, and thus there is "no basis for Syngenta's liability based on false representations." Rule 12(c) Order, Dkt. 2426 at 20.[48]

## IX.    All Claims Based On Duracade Fail As A Matter Of Law.

Plaintiffs fail to provide any evidence that Duracade affected U.S. corn prices. Instead, they repeat the same conclusory expert testimony and speculative second-hand documents that Syngenta has already shown are insufficient to sustain their claim. Plaintiffs cannot undo the fatal admissions of their own experts, both of whom conceded that they *did nothing* to assess the impact of Duracade on corn prices.[49] Nor has Syngenta misquoted the speculative statements that provided the only source on which

---

[48] The assertion (Opp. 86) that evidence of misrepresentations may be relevant for punitive damages is beside the point. Syngenta's motion for summary judgment seeks to establish solely that Plaintiffs may not base liability for a general negligence claim on alleged misrepresentations. Whether or not the existence of certain facts could be admissible for some *other* purpose is not at issue here and is properly left for motions in limine.

[49] *See* Ex. 261 (06/28/2016 C. Carter Dep. Tr. 88:4-12) ("Q. So other than what you believe to be supported by the deposition of Steven Smalley, did you conduct any of your own analysis regarding whether Syngenta's launch of Agrisure Duracade, quote, exacerbated the situation? A. That was not a question I was asked to examine.") (objection omitted); Ex. 116

01981291.DOCX;-1

Plaintiffs' experts relied for their own conclusory assertions. Steven Smalley (a Cargill vice president) offered only his speculation that "we *could be* going through the same -- the same situation with Duracade that we just experienced with -- with Viptera, in 2013 and early '14." Pls.' Opp. Ex. 165 (5/19/2016 Smalley Dep. Tr. 493:8-22) (emphasis added). Similarly, the Grain Inspection Advisory Committee meeting minutes stated merely that, "[e]ven if China approves MIR162 soon, problems *may continue* next crop year because Syngenta plans to commercialize Duracade." Pls.' Opp. Ex. 291 (C. Carter Expert Rep. ¶ 17) (emphasis added). Both statements are nothing more than supposition suggesting something that *might* happen, and neither points to any evidence showing that China is refusing to import U.S. corn due to Duracade or that Duracade has had any impact on prices.

Nor can an appeal to supposed "common sense" salvage Plaintiffs' claim. Plaintiffs provide no support for their assertion that "Chinese buyers are paying more for lower-quality corn substitutes," other than conclusory statements from their own expert Dr. Carter. Pls.' Opp. 87, Pls.' Pl. SOAF ¶ 526. But even if this statement were true, Plaintiffs have no evidence from which a reasonable jury could conclude 1) that China would prefer to import U.S. corn, and 2) that China has not done so because of Duracade. As Syngenta's experts have explained, there are many reasons why China reduced imports of U.S. corn in 2013 and after—Duracade is not one of them. *See* Ex. 262 (W. Thurman Expert Rep. ¶¶ 39-40, Ex. 3).[50] Plaintiffs' attempt to prop up their Duracade claims based on conjecture and their own say-so fails, and these claims must be dismissed as a matter of law.

## X. Plaintiffs Fail To Counter Syngenta's Showing That Punitive Damages Cannot Be Awarded In This Case Consistent With Due Process And Kansas Law.

Punitive damages are foreclosed as a matter of law by basic principles of due process and Kansas

---

(11/16/2016 B. Babcock Dep. Tr. 180:10-23) ("Q. Have you studied whether corn is being -- US corn is being kept out of China because of the presence of Duracade in the US corn supply? A. I relied on Steven Smalley for that, and something's keeping US corn out.").

[50] Indeed, Plaintiffs' expert Babcock admitted that he is unaware of any shipment that has tested positive for Duracade and that China has, in fact, continued to accept U.S. corn. Babcock Vol. 2 179:18-180:12; 180:24-182:7; 182:16-184:2.

01981291.DOCX;-1

law.  The cherry-picked quotations that Plaintiffs highlight to focus on Syngenta's conduct (all of which involve contested facts) (Opp. 89-92) are irrelevant to Syngenta's motion, because the *law* requires summary judgment without regard to the facts Plaintiffs raise.

      *First*, due process and Kansas law bar punitive damages because Syngenta lacked adequate notice that selling a U.S.-approved product in the U.S. could subject it to liability at all, much less punitive damages.  Plaintiffs argue that Syngenta could not have believed that its conduct "was entirely lawful," (Opp. 94), but that is not the standard.  Due process turns on *fair notice*, and the Constitution does not permit Plaintiffs to play "gotcha" with punitive damages, which are a form of punishment.  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 504 (2008) (punitive damages advance the same interests of punishment and deterrence as criminal law); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (similar); *Ostroski v. Kathleen S. Lynn Revocable Tr.*, 326 P.3d 1090, 2014 WL 2747571, at *4 (Kan. Ct. App. 2014) (unpublished opinion) (collecting Supreme Court cases).  As a result, the Due Process Clause requires that offenses triggering punishment be clearly defined *before* a person acts.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  Kansas law also does not permit inventing theories of liability on the fly and tacking on punitive damages and thus bars punitive damages where it "was not clearly known" that particular conduct "would give rise to an action for damages."  *Murphy v. City of Topeka-Shawnee Cty. Dep't of Labor Servs.*, 630 P.2d 186, 193 (Kan. Ct. App. 1981).

      Thus, as this Court has explained, punitive damages may be awarded only where prior decisions "were sufficient to give defendant fair notice of the potential for an award of punitive damages."  *Patton v. TIC United Corp.*, 859 F. Supp. 509, 512 (D. Kan. 1994).  To the extent Plaintiffs point to *Patton* to argue that punitive damages are barred only where liability "represents a clear reversal of existing law," (Opp. 93), that misstates the due process standard.  In the more than 20 years since *Patton*, intervening Supreme Court decisions have substantially developed due process limits on punitive damages and have

made clear that the touchstone is adequate notice. There is no requirement that, in order for punitive damages to be barred, previous law must have affirmatively established that conduct was *lawful*, such that liability would be a *reversal* of existing law, as Plaintiffs suggest.

In any event, treating Syngenta's actions as giving rise to an action for damages *is* a reversal from the only prior cases addressing similar facts. Plaintiffs argue that the *StarLink* and *GM Rice* litigation provided notice of potential liability. But the theory of liability in those cases was wholly different because they involved GM traits *unapproved* for human consumption in the U.S. or anywhere else and the defendants were under existing duties *under federal regulations* to prevent the spread of the unapproved traits. *See In re Genetically Modified Rice Litig.*, Nos. 4:06MD1811 CDP, 2011 WL 5024548, at *4 (E.D. Mo. Oct. 21, 2011); *In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 843 (N.D. Ill. 2002). Here, by contrast, Viptera was fully approved for all uses in the U.S. The only cases addressing comparable claims about the commercialization of *approved* GM traits (*Sample* and *Hoffman*) had rejected the claims. *See* Syngenta's MSJ 116-17 & n.99. And contrary to Plaintiffs' unexplained assertion, this Court has never provided a rationale to distinguish the decision in *Sample*.

Nor can Plaintiffs avoid the public policy implications of their proposed due process-lite rule for tort defendants by arguing that public policy is not "a relevant consideration in Kansas." Opp. 95. That is incorrect. The only purpose of punitive damages in Kansas is to advance the State's public policy interests in punishing and deterring conduct. *See Folks v. Kan. Power & Light Co.*, 755 P.2d 1319, 1336 (Kan. 1988); *Smith v. Printup*, 938 P.2d 1261, 1273-74 (Kan. 1997).[51]

*Third*, Plaintiffs cannot justify their theory that they can seek punitive damages against Syngenta when they did not handle their GM corn with the same level of care they would impose on Syngenta. Plaintiffs offer no support for the argument that Producer Plaintiffs may act with total disregard for

---

[51]    *Cf. Pugh v. Munguia*, 146 P.3d 1108, 1112 (Kan. Ct. App. 2006) (punitive damages "serve no useful purpose" and are not available where the "dual purposes of punishment and deterrence are avoided").

01981291.DOCX;-1

whether the GM seeds they *plant* have been approved in overseas markets but simultaneously may impose punitive damages on Syngenta for *selling* seeds without foreign approvals. *See* Opp. 98-100. Because Plaintiffs thus participated in spreading GM traits in the corn supply without any regard to foreign approvals, the doctrine of unclean hands precludes any award of punitive damages in the class trial.[52] *See, e.g.*, *Feliciano v. Ciman*, No. A-0353-06T5, 2008 WL 2078182, at *4 (N.J. Super. Ct. App. Div. May 19, 2008) (abuse of discretion to award punitive damages to plaintiff who "was in part, a willing participant" in the conduct at issue). The Court should not countenance Plaintiffs' attempt to use a class trial to sweep under the rug the fact that many class members' conduct spread GM traits that were unapproved overseas in the corn supply, and thus bars them from seeking punitive damages.

## CONCLUSION

For the foregoing reasons, Syngenta respectfully requests that the Court grant summary judgment in Syngenta's favor on all claims asserted by the Nationwide Lanham Act Class and Kansas State Class.

---

[52] Unclean hands is not an affirmative defense that must be included in the pretrial order or lost. *See In re Marriage of Hake*, 162 P.3d 66, 2007 WL 2080539, at *8 (Kan. Ct. App. 2007) (unpublished decision) (rejecting argument that "unclean hands is an affirmative defense that must be pled"). That makes sense, because "[i]n applying the unclean hands doctrine, courts act for their own protection, and not as a matter of 'defense' to the defendant." *Watco Cos. v. Campbell*, 371 P.3d 360, 371 (Kan. Ct. App. 2016).

01981291.DOCX;-1

Dated: March 13, 2017

Respectfully submitted,

*/s/ Thomas P. Schult*

Thomas P. Schult (tschult@berkowitzoliver.com)
Jennifer B. Wieland (jwieland@berkowitzoliver.com)
**BERKOWITZ OLIVER LLP**
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Telephone (816) 561-7007
Fax: (816) 561-1888

*Liaison Counsel for Syngenta Defendants*

Michael D. Jones (mjones@kirkland.com)
Edwin John U (edwin.u@kirkland.com)
Patrick F. Philbin (patrick.philbin@kirkland.com)
Ragan Naresh (ragan.naresh@kirkland.com)
Patrick Haney (patrick.haney@kirkland.com)
**KIRKLAND & ELLIS LLP**
655 15th Street N.W., Suite 1200
Washington, D.C.  20005
Telephone:  (202) 879-5000
Fax:  (202) 879-5200

*Lead Counsel for Syngenta AG Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 13, 2017, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ Thomas P. Schult*
Thomas P. Schult