**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| *IN RE SYNGENTA AG MIR 162 CORN LITIGATION*<br><br>THIS DOCUMENT RELATES TO:[1]<br><br>    Nationwide Lanham Act Class Action<br><br>    Kansas State Class Action | Master File No. 2:14-MD-02591-JWL-JPO<br><br>MDL No. 2591 |

**APPENDIX A: SYNGENTA'S
RESPONSE TO PLAINTIFFS'
STATEMENT OF ADDITIONAL FACTS**

<span style="color:red">**FILED UNDER SEAL:
CONTAINS DISCOVERY MATERIAL
MARKED HIGHLY CONFIDENTIAL/CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER**</span>

---

[1]    Pursuant to the Court's January 10, 2017 Order, Dkt. 2789, this document applies in the cases brought by the Kansas State Class and Nationwide Lanham Act Class.

## SYNGENTA'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

1. Syngenta has long trailed Monsanto and Pioneer in the United States seed business. *See* Ex. 1, Deposition of Travis Milne ("Milne Dep.") at 157:2-24.[2]

**RESPONSE TO NO. 1.** **Disputed, unsupported by the evidence cited, lack of foundation, and immaterial to Syngenta's arguments for summary judgment.** Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position. That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, in the deposition pages cited, Travis Milne was asked only about his perception of the "seed market" generally as it existed at the time of his deposition. He did not testify about historical market shares and thus not about whether Syngenta "has long trailed" Monsanto and Pioneer historically. *See* Pls.' Opp'n Ex. 1 (T. Milne Dep. Tr. 157:2-24). Milne further testified that national market share is not necessarily reflective of market share in a state or regional market—including his market in northwest

---

[2]   Plaintiffs' Statement of Additional Facts includes a number of headings. *See, e.g.,* Opp'n xviii ("A. Syngenta rushed to commercialize MIR162 to avoid losing market share to its competitors."). These headings are argument and impermissible. *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *1 (D. Kan. Apr. 25, 2008) ("The most glaring deficiency … in plaintiffs' response brief is that plaintiffs have used the fact portion of their brief to argue their case rather than restricting it to setting forth specific facts that are directly supported by the record. … [P]laintiffs' arguments that the court should draw certain inferences from the facts should be reserved for the argument portion of their brief."). While Syngenta disputes these characterizations, this response does not specifically address each heading.

Missouri, where Pioneer has the largest market share, Syngenta is second, and Monsanto is third.  *See id.* at 158:7-22.

Furthermore, Plaintiffs did not establish Mr. Milne has the foundation to testify about Syngenta's relative position in the U.S. seed marketplace.  Mr. Milne was only designated to opine about "the benefits of Viptera to U.S. corn growers, including Viptera's effectiveness in increasing farmers' yield and Viptera's efficacy in combating pests," "the demand for Viptera among U.S. corn farmers," and "the impact on U.S. corn farmers if new U.S.-approved biotechnology traits are unavailable to U.S. corn farmers."  *See* Ex. 357 (Syngenta's Expert Disclosures, at 2-3).

2.      Syngenta began developing the genetically modified trait "MIR162" in the 1990s, but terminated the project in 2005 because MIR162 caused "male sterility" in corn plants.  Ex. 2, Deposition of Lawrence Zeph ("Zeph Dep.") at 115:11-121:11; Ex. 3 (Dep. Ex. 25) at SYT00322853-SYT00322855); Ex. 4, Deposition of Charles Lee Vol. I ("Lee Vol. I") at 241:4-243:9; Ex. 5 (Dep. Ex. 521) at SYT00254210-SYT00254215.

**RESPONSE TO NO. 2.** **Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment**.  Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position.  That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs' Exhibit 5 indicates: "In October, 2004 event MIR152 was terminated because greater than 80% of inbreds showed partial or complete male sterility.  MIR162 was then elevated to lead and only event, but it also was terminated in April, 2005 for the U.S. market because of the male sterility issue."  Pls.' Opp'n Ex. 5 (C. Lee Dep. Ex. 521, at SYT00254210).  Plaintiffs' citations do not establish that MIR162

2

caused male sterility in corn plants, only that with MIR152, greater than 80% of inbreds showed partial or complete male sterility. None of Plaintiffs' other citations establish the fact they assert. *See* Pls.' Opp'n Ex. 2 (L. Zeph Dep. Tr. 115:11-121:11 (failing to indicate that the project was terminated "because" MIR162 caused "male sterility"); Pls.' Opp'n Ex. 3 (L. Zeph Dep. Ex. 25, at SYT00322853-SYT00322855) at (same); Pls.' Opp'n Ex. 4 (C. Lee Dep. Tr. 241:4-243:9) (same).

3.      Later in 2005, Syngenta resurrected MIR162 upon learning of a new Monsanto corn seed called "SmartStax."   Ex. 3 (Dep. Ex. 25) at SYT00322856-SYT00322859; ("competition – always pressing – especially Monsanto").

<u>**RESPONSE TO NO. 3.**</u> **Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.**  Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position.  That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, the cited excerpt does not indicate Syngenta "resurrected" MIR162 upon learning about anything.  The bullet-point presentation slide is headlined "2005-2007 Dynamic Landscape" and does not establish that Syngenta took any actions in response to any specific factor.  *See* Pls.' Opp'n Ex. 3 (L. Zeph Dep. Ex. 25, at SYT00322856-SYT00322859).

4.      SmartStax featured a new genetically modified trait called "MON89034," which offered control for the same lepidopteran pests MIR162 controls.  Ex. 6, Deposition of Jack Bernens Vol. I ("Bernens Vol. I") at 201:23-202:16.

**RESPONSE TO NO. 4.** Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position. That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, the cited excerpt does not indicate MON89034 "offered control for the same lepidopteran pests MIR162 controls," only that Monsanto's product would "compete with Viptera and Herculex 1." Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 201:23-202:16).

5.      SmartStax also offered a dual mode of action for lepidopteran pest control, making SmartStax eligible for a "reduced refuge" requirement under EPA regulations, which provides added convenience for farmers. *See id.* at 181:9-192:25.

**RESPONSE TO NO. 5.** Disputed, unsupported by the evidence cited, lack of foundation, and immaterial to Syngenta's arguments for summary judgment. Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position. That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' citation to eleven pages of transcript text is cursory and fails to include specific excerpts supporting its assertion of fact. *Cf. Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) ("Neither Sprint nor the

court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations."). Second, Plaintiffs have not established that Jack Bernens, a Syngenta employee, has a foundation to testify about the requirements of the EPA for a competitor's product. Finally, the cited excerpt does not indicate SmartStax was eligible for a reduced refuge requirement under EPA regulations or that such a requirement provides added convenience for farmers. *See* Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 181:9-192:25) (failing to indicate Plaintiffs' assertions).

6.     Syngenta executives discussed that SmartStax posed a "huge threat" to its seeds business. *Id.*; *see also* Ex. 7 (Dep. Ex. 1019) at SYT00254231 ("There is a very large risk that Monsanto will launch their own broad lep[idopteran] trait for which they may be able to reduce the corn refuge throughout the United States to 10%. This is clearly a huge threat if we are still at 20%.")

<u>**RESPONSE TO NO. 6.**</u> Undisputed.

7.     Syngenta concluded "MIR162 was the answer to" this threat, so "MIR162 went from the trash bin in May, 2005 to EPA submission [in] May, 2007." Ex. 3 (Dep.  Ex. 25) at SYT00322857-SYT00322859, SYT00322868.

<u>**RESPONSE TO NO. 7.**</u> Undisputed.

8.     Syngenta wanted MIR162 "on the market at the same time as MON89034," which Monsanto planned to launch in the U.S. in 2009. Ex. 6, Bernens Vol. I at 202:22-203:16; Ex. 8 (Dep. Ex. 1022) at SYNG_00013408.  So Syngenta decided upon a "very challenging" schedule for applying for global approval of MIR162. Ex. 3 (Dep.  Ex. 25) at SYT00322868.

<u>**RESPONSE TO NO. 8.**</u> Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position. That

assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' citations to the record do not establish that Syngenta wanted MIR162 "on the market at the same time as MON89034" or that Monsanto planned to launch MON89034 in the U.S. in 2009. *See* Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 202:22-203:16); Pls.' Opp'n Ex. 8 (J. Bernens Dep. Ex. 1022, at SYNG_00013408). Plaintiffs' Exhibit 8 contains an email laying out a "timetable … for when we anticipate approvals" and that under the time table, "it gets us on the market at the same time as MON89034." *Id.* The cited evidence does not state that Syngenta "wanted" MIR162 on the market at any specific time, or anything about the planned U.S. launch date for MON89034. *See generally id.* Plaintiffs' citations also do not establish that Syngenta decided upon any "very challenging" schedule for applying for global approval; instead, the evidence only states that "SBI had the lion's share of this burden — very challenging." Pls.' Opp'n Ex. 3 (L. Zeph Dep. Ex. 25, at SYT00322868). Plaintiffs' Exhibit 3 SYT00322868 does not mention applying for global approvals. *See id.*

9.    At a meeting of Syngenta's global regulatory affairs team in New Orleans in June 2007, Syngenta management informed its regulatory team that MIR162 presented a "premium pricing opportunity" and a chance to grow market share by "3-4 points." Ex. 9, Deposition of Dennis Ward ("Ward Dep.") at 63:18-67:17; Ex. 10 (Dep. Ex. 325) at SYNG_00339004, SYNG_00338996 ("Maize (corn) =$$$$").

**RESPONSE TO NO. 9.** Disputed, unsupported by the evidence

cited, and immaterial to Syngenta's arguments for summary

**judgment.**   Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position.  That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, neither Plaintiffs' Exhibit 9 nor Exhibit 10 indicate that Syngenta management informed the regulatory team that MIR162 "presented … a chance to grow market share by '3-4 points.'"  Pls.' Opp'n Ex. 9 (D. Ward Dep. Tr. 63:18-67:17); Pls.' Opp'n Ex. 10 (D. Ward Dep. Ex. 329).   Mr. Ward testified he did not "recall this bullet point specifically" and that to him, it was meant to convey that "growth for a company like Syngenta is important.  And one way to measure growth is whether or not your share of the corn seed market is increasing.  And if we're successful in increasing our share by even 1 point, it's worth $2.1 million in share point to the company is what we were projecting -- is what somebody was projecting at that time"  Pls.' Opp'n Ex. 9 (D. Ward Dep. Tr. 67:5-13).  Nothing in either exhibit indicates that MIR162 itself presented a chance to grow market share by 3-4 points.

10.     Syngenta also informed its regulatory team about the "new threat" posed by SmartStax.  Ex. 9, Ward Dep. at 82:23-84:13; Ex. 11 (Dep. Ex 329) at SYNG_00340075.

**RESPONSE TO NO. 10.**     **Disputed, lack of foundation, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.**     Plaintiff apparently intends its assertions in this paragraph to support the

contention that Syngenta had a commercial motive for launching Viptera to preserve its market position.  That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs have not established a foundation for Mr. Ward to testify about the content of the document.  Asked about the statement on a "new threat," Mr. Ward testified, "A. I don't recall this slide specifically. But I can -- I know what the information says." Pls.' Opp'n Ex. 9 (D. Ward Dep. Tr. 84:11-12). Plaintiffs have thus failed to lay a foundation for their assertion that Syngenta informed its regulatory team about a "threat" from SmartStax.

11.     Syngenta petitioned the United States Department of Agriculture ("USDA") for deregulation of MIR162 in August 2007 and hoped to start selling the trait in 2008 in the US for the 2009 growing season.  Ex. 6, Bernens Vol. I at 181:9-192:25; Ex. 7 (Dep. Ex. 1019) at SYT00254212 ("MIR162 will be sold in the fall, 2008 for planting in the 2009 US growing season.").

**RESPONSE TO NO. 11.**        **Disputed in part and unsupported by the evidence cited.**  Syngenta does not dispute that it petitioned the USDA for deregulation of MIR162 in August 2007.  However, Plaintiffs' citations to the record do not establish that Syngenta "hoped" to start selling seed containing MIR162 in 2008 for the 2009 growing season, only that the author of the G-H progression TRC Review stated that "According to the regulatory timelines, MIR162 will be sold in the fall, 2008 for planting in the 2009 U.S. growing season." Pls.' Opp'n Ex. 7 (J. Bernens Dep. Ex. 1019, at SYT00254212).  As the context makes clear, the launch depended

on regulatory timelines, and the fall 2008 and 2009 growing season

times were estimates based on regulatory timelines.

12.     But Syngenta ran into unexpected delays in gaining deregulation in the U.S., thus delaying its planned launch of MIR162.  Ex. 6, Bernens Vol. I at 181:9-192:25.

**RESPONSE TO NO. 12.**        **Disputed, unsupported by the**

**evidence cited and immaterial to Syngenta's arguments for**

**summary judgment.**     Any delay in gaining USDA approval is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.  In any event, Plaintiffs' citations to the record do not

establish that any delay was "unexpected," only that there was a

delay of approximately two years due in part to lawsuits challenging

the USDA, including one concerning Roundup Ready products.

Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 190:24-192:25).  As stated in

Syngenta's Response to No. 11, *supra,* the G-H progression TRC

Review stated that the launch of MIR162 depended on regulatory

timelines, and the fall 2008 and 2009 growing season times were

estimates based on regulatory timelines.

13.     Syngenta estimated its losses associated with the delay at "$13M" with a further delay resulting "in $21M more in loss for a total impact of $35M."  Ex. 12, Deposition of David Morgan in his personal capacity ("Morgan Vol. I") at 84:14-87:7; Ex. 13 (Dep.   Ex. 523) at SYT00313159.

**RESPONSE TO NO. 13.**        **Disputed and unsupported by the**

**evidence cited and immaterial to Syngenta's arguments for**

**summary judgment.**     Any cost resulting from a potential delay in

USDA approval is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment.  In any event, Plaintiffs' citations to

the record only establish that Chuck Lee estimated the delay in receiving 2010 deregulation from the USDA would have estimated losses of $35 million.  Pls.' Opp'n Ex. 12 (D. Morgan Dep. Tr. 84:14-87:7); Pls.' Opp'n Ex. 13 (D. Morgan Dep.  Ex. 523, at SYT00313159).

14.     Syngenta feared its failure to gain deregulation would create a "two-year gap" between the launch of Monsanto's SmartStax and the "Syngenta equivalent" seed containing MIR162. Ex. 6, Bernens Vol. I at 215:2-225:11; Ex. 14 (Dep. Ex. 1023) at SYNG_00203467; Ex. 34 (Dep. Ex. 1021) at SYNG_00201840; Ex. 6, Bernens Vol. 1 at 196:23-197:18. ("[I]t appears to me we will lose market share in both corn and soybeans.  Not telling you anything new, but from what I am hearing I am concerned about the state of our business and the outcome for the 2009 season.").

**RESPONSE TO NO. 14.**     **Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.**  Plaintiff apparently intends its assertions in this paragraph to support the contention that Syngenta had a commercial motive for launching Viptera to preserve its market position.  That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, neither Plaintiffs' Exhibit 14 nor Plaintiffs' Exhibit 6 establish that it was Syngenta's "failure to gain deregulation" that could create a gap between the launch of SmartStax and a Syngenta equivalent, because the cited excerpts do not mention "deregulation," let alone a failure to gain deregulation. Pls.' Opp'n Ex. 14 (J. Bernens Dep. Ex. 1023, at SYNG_00203467), Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 215:2-225:11).  Likewise, Plaintiffs' Exhibit 34 and Plaintiffs' Exhibit 6 do not mention deregulation. Pls.' Opp'n Ex. 34

10

(J. Bernens Dep. Ex. 1021, at SYNG_00201840), Pls.' Opp'n Ex. 6

(J. Bernens Dep. Tr. 196:23-197:18).

15.     In 2008 emails, a Syngenta agronomist noted his view that the commercialization plans for MIR162 were being driven by promises to stockholders rather than concerns for key import markets.   Ex. 285 (Dep. Ex. 330) (Feb. 14, 2008: "CSTT kind of [re-wrote] the plan Dennis Bracht and I had proposed by saying 'we will not commercialize until we have key import approvals but we told stockholders we would launch in 2009, and by gosh that is what we will do!'").

**RESPONSE TO NO. 15.         Disputed,   unsupported   by   the**

**evidence  cited,  and  immaterial  to  Syngenta's  arguments  for**

**summary  judgment.**   Plaintiff apparently intends its assertions in

this  paragraph  to  support  the  contention  that  Syngenta  had  a

commercial  motive  for  launching  Viptera  to  preserve  its  market

position.     That  assertion  is  irrelevant  to  the  grounds  asserted  in

Syngenta's motion for summary judgment.   In any event, the cited

excerpt  does  not  establish  that  it  was  Wayne  Fithian's  view  that

"that  the  commercialization  plans  for  MIR162  were  being  driven  by

promises  to  stockholders  rather  than  concerns  for  key  import

markets,"  only  that  the  CSTT  altered  a  proposed  plan,  and

mentioned  both  key  import  approvals  and  information  provided  to

stockholders.    Pls.'  Opp'n  Ex.  285  (D.  Ward  Dep.  Ex.  330).

Nothing  in  this  evidence  establishes  that  any  plans  were  being

"driven" by "promises to stockholders."

16.     In April, 2009, Jill Wheeler (formerly Jill Wenzel), Syngenta's Communications Manager, discussed a plan to create "fear, uncertainty, and doubt in the minds of growers to help sell Viptera."  Ex. 50, Deposition of Jill Wheeler Vol.  I ("Wheeler Vol. I") at 12:12-23, 17:17-18:20, 64:7-78:18; Ex. 262 (Dep. Ex. 627) at SYNG_00752680.

**RESPONSE TO NO. 16.         Undisputed**.

17.     Wheeler asked a Syngenta agronomist and a Syngenta regulatory scientist for information showing the pests MIR162 controlled posed "a problem worth addressing." Ex. 50, Wheeler Vol. I at 12:12-23, 17:17-18:20, 63:7-78:18; Ex. 262 (Dep. Ex. 627) at SYNG_00752680.

**RESPONSE TO NO. 17.** **Undisputed.**

18.     Dennis Ward, a member of the Syngenta regulatory team, responded:

Good luck on this.  Two years ago when I started drafting the benefits document for the EPA application I searched for this same kind of information (e.g. annual yield losses and economic costs associated with lepidopteran pests).  I assumed the company [Syngenta] would have a good fix on what market opportunity was before investing in a new technology, right?  If someone had the information I couldn't find them.

Ex. 262 (Dep. Ex. 627) at SYNG_00752679-80.

**RESPONSE TO NO. 18.**     **Undisputed only to the extent the quotation without the bracketed portion ("[Syngenta]") reflects a portion of Mr. Ward's response.**

19.     Wayne Fithian, a Syngenta agronomist, responded "I agree with Dennis," and noted: "The burden of creating a market for Viptera is on us – there is no source for comprehensive information of the pests we are promising control of." *Id.* at SYNG_00752678-79.

**RESPONSE TO NO. 19.**     **Undisputed only to the extent the quotation reflects a portion of Mr. Fithian's response.**

20.     Mr. Fithian added: "We need to constantly remember that these insects are secondary pests of corn.  They are considered secondary pests because they are regionally versus nationally distributed, occur sporadically through time, cause a relatively minor amount of damage overall . . . and are often observed at sub-economic levels." *Id.*

**RESPONSE TO NO. 20.**     **Undisputed only to the extent the quotation reflects a portion of Mr. Fithian's response.**

21.     Another Syngenta executive, Tracy Mader, responded: "Be sure to hit FUDD [fear, uncertainty, doubt] hard . . . .!" *Id.* at SYNG_00752678.

**RESPONSE TO NO. 21.**     **Undisputed only to the extent the quotation reflects a portion of Mr. Mader's response.**

22.      In December, 2009, Syngenta internal documents noted: "Existing products will not be able to compete with SmartStax–significant risk of loss of market share."  Ex. 15 (Dep. Ex. 1420) at 3; Ex. 12, Morgan Vol. I at 225:23-232:8.

**RESPONSE TO NO. 22.**          **Undisputed only to the extent the quotation reflects a portion of the document.**

23.      Syngenta planned for a U.S. launch of one million units of "Agrisure Viptera," the trade name for the corn seed containing the MIR162 trait, in 2010 upon receiving deregulation in the United States.  Ex. 15 (Dep. Ex. 1420) at 7; Ex. 12, Morgan Vol. I at 225:23-232:8.

**RESPONSE TO NO. 23.**          **Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.**   The amount of Viptera planned to be launched upon deregulation is irrelevant tot eh grounds asserted in Syngenta's motion for summary judgment.  In any event, the cited excerpts do not establish that Syngenta planned for a U.S. launch of one million units of Viptera. Pls.' Opp'n Ex. 15 (D. Morgan Dep. Ex. 1420, at 7); Pls.' Opp'n Ex. 12 (D. Morgan Dep. Tr. 225:23-232:8).  The cited testimony of David Morgan does not mention one million units.  The cited page in Plaintiffs' Exhibit 15 is a "pre-read" document sent by Rachel Raymond, Pls.' Opp'n Ex. 15 (D. Morgan Dep. Ex. 1420, at 1), and indicates only: "1st sales stacks Sept 2010 for planting April 2011 … Up to 1m u …."  *Id.* at 7.  At most, this indicates one Syngenta employee who drafted the document indicated that "[u]p to 1m" units could be sold.

24.      Syngenta planned to commercialize Viptera "as soon as possible" in several Syngenta meetings in 2010.  Ex. 16, Deposition of David Morgan in his personal capacity ("Morgan Vol. II") at 435:7-441:6; Ex. 17 (Dep. Ex. 1414) at SYNG_00155212, SYNG_00155234 ("Very strong drivers to launch Viptera as soon as possible to remain competitive in both US & Brazil. . . . Strong need to commercialize MIR162 products as soon as possible in US . . . . MIR162 will be

essential to enable us to compete with latest competitor offerings in these markets."); Ex. 18, Deposition of Davor Pisk Vol. I ("Pisk Vol. I") at 133:3-135:2; Ex. 19 (Dep. Ex. 1711) at SYNG_00364166 ("Strong need to commercialize MIR162 products as soon as possible in US . . . MIR162 will be essential to enable us to compete with latest competitor offerings in these markets."); *see also* Ex. 20, Deposition of Grant Ozipko ("Ozipko Dep.") at 117:3-21, 120:3-12, 128:14-131:20; Ex. 21 (Dep. Ex. 487) at SYNG_006520701-02; Ex. 22 (Dep. Ex. 488) at SYNG_00364146-47.

**RESPONSE TO NO. 24.**    **Undisputed** to the extent that Syngenta

*employees* stated their desire to commercialize Viptera "as soon as

possible" during meetings of Syngenta personnel in 2010.

25.    Syngenta knew that if it launched Viptera in the U.S. in 2010, MIR162 "could be in export channels by Q4 2011." Ex. 15 (Dep. Ex. 1420) at 7.

**RESPONSE TO NO. 25.**    **Undisputed**.

26.    In March, 2010, internal Syngenta documents predicted sales associated with Viptera at "$300 m[illion]," but noted, "key import approvals still pending." Ex. 23 (Dep. Ex. 1416) at SYNG_00243550-51; Ex. 12. Morgan Vol. I. at 136:24-138:12.

**RESPONSE TO NO. 26.**    **Disputed, unsupported by the**

**evidence cited, and immaterial to Syngenta's arguments for**

**summary judgment.**    The projected sales and foreign market

approvals pending in March 2010 are irrelevant to the grounds

asserted in Syngenta's motion for summary judgment. In any event,

the cited excerpts do not establish that Syngenta documents

predicted sales "associated with Viptera" at $300 million. Instead,

Plaintiffs' Exhibit 23 SYNG_00243550-51 deals with information

on MIR162, which could include licensing the trait to other

technology providers, as the document itself indicates is a

possibility. Pls.' Opp'n Ex. 23 (D. Morgan Dep. Ex. 1416, at

SYNG_00243551) ("Global platform: ~$300m trait premium peak

sales … Out-licensed globally to PHI"). Furthermore, the document

14

indicates that whatever the figure refers to, *approximately* $300

million is the correct figure, as indicated by the use of the tilde.

27.    The USDA deregulated MIR162 in April 2010.  Syngenta began accepting orders for Viptera on August 5, 2010, and shipped those orders in December 2010.  This resulted in the first commercial planting in the U.S. in April 2011 and the first harvest in the fall of 2011.  ECF No. 2861, at SOF ¶¶ 3, 9, 11; Ex. 400, Charles Lee testimony from *Syngenta Seeds, Inc. v. Bunge North America, Inc.*

**RESPONSE TO NO. 27.**    **Disputed in part.**  Syngenta does not

dispute that the USDA deregulated MIR162 in April 2010.

However, Syngenta's first shipment of Viptera corn seed to

commercial purchasers in the United States was on November 12,

2010.  *See* Syngenta's MSJ Ex. 211 (4/8/2016 Syngenta Seeds, Inc.'s

Resps. & Objs. to Pls.' Second Set of Interrogs., Resp. Nos. 7-8).

28.    The active harvest period for corn is in the fall.  *See* Ex. 24, the Deposition of Charles Lee taken in the matter of *In re Syngenta Mass Tort Actions*, *Poletti et al. v. Syngenta AG et al.* dated August 3, 2016 ("Lee Vol. IV") at 19:17-20:2 (noting Viptera would be planted in March through June and would be harvested the following fall).  Farmers typically order seed in the winter or fall for the upcoming spring planting season.  Ex. 24, D. Martin Vol. I at 88:11-22; *see also* Ex. 4, Lee Vol. IV at 19:17-25.

**RESPONSE TO NO. 28.**    **Undisputed as to the first sentence.**

The second sentence is undisputed to the extent this describes a

general or normal practice, but disputed to the extent it is construed

to indicate that all farmers order seeds at these times, as Plaintiffs'

cited evidence does not support such an interpretation.

29.    Syngenta wanted to and did commercialize Viptera as widely and "aggressively as possible."  Ex. 49 (Dep. Ex. 1801) at SYNG_00439713 (Dec. 12-13, 2009 emails); Ex. 25, Deposition of Michael Mack Vol. I ("Mack Vol. I") at 80:14-19; 88:3-89:13 ("Q.  And so also in this email that we've been going through, you made it clear that – that – I think your language was.  'I believe it's in our best interest to commercialize this' – meaning Agrisure Viptera – 'as widely and aggressively as possible.' Right? A.  Yes.  Q.  And that's what you did? . . . A.  To the extent that we could, yes.").

**RESPONSE TO NO. 29.**    **Undisputed.**

30.     In fact, Syngenta marketed and sold Viptera throughout the corn belt and in virtually all 48 states where corn is grown.  Ex. 24, D. Martin Vol. I at 121:9-123:8.

**RESPONSE TO NO. 30.**       **Undisputed.**

31.     Syngenta knew it was commercializing MIR162 without import approval in China.  Ex. 85, D. Martin Vol. II at 200:15-25 (noting that Syngenta was aware that it would be commercializing without Chinese import approval).

**RESPONSE TO NO. 31.**       **Undisputed.**

32.     Syngenta sold approximately 458,481 units of Viptera seed to 13,593 farmer purchasers for planting and harvesting in 2011.  Ex. 24, D. Martin Vol. I at 153:21-154:19.

**RESPONSE TO NO. 32.**       **Undisputed.**

33.     On average, a unit of Viptera seed covers 2.66 acres.  Ex. 4, Lee Vol. I at 233:11-22.

**RESPONSE TO NO. 33.**       **Undisputed that a unit of Viptera covers approximately 2.66 acres and undisputed that approximately 458,481 units units were sold.**  However, Syngenta notes that Plaintiffs' cited evidence fails to account for seed that was not planted (for instance, seed that was returned or discarded).  *See, e.g.,* Syngenta's Opp'n Ex. 70 (9/1/2011 email re Viptera planting details, at SYT00306937) ("Total units shipped (this is about 18% higher than reality due to returns)").

34.     Over 1.2 million acres of Viptera were planted beginning in the spring of 2011.  ECF 2861 at SOF ¶ 13.

**RESPONSE TO NO. 34.**       **Undisputed that over 1.2 million acres of Viptera were planted in 2011 and that planting began in the spring of 2011**.

35.     Syngenta knew that MIR162 could be present in exports to China by Fall of 2011.  Ex. 25, Mack Vol. I at 235:22-236:6. ("Q.  So you knew that at some level, shipments of corn going from the US to China would arrive in export channels, and they would contain MIR162 in them, before you had obtained approval from China?  You knew that? . . . A.  That biologically, if

the Chinese were intent on – on evaluating, on a biological basis, all of the corn coming in there, that the likelihood that they would find it, if they looked for it, was extremely high, yes."); Ex. 26, Deposition of Sarah Hull Vol. I ("Hull Vol. I") at 337:9-13 2 (noting Syngenta informed a U.S. embassy representative in Beijing that Viptera would likely be present in every shipment by fall of 2011); 152:11-21 (noting Viptera grain could be in export channels in the fourth quarter of 2011).

**RESPONSE TO NO. 35.**   **Disputed, unsupported by the evidence cited.**  The cited excerpts do not establish that Syngenta knew that MIR162 could be present in exports to China by Fall of 2011, because they do not establish that Syngenta knew that U.S. corn containing MIR162 would be shipped to China in violation of Chinese law.  Instead, Plaintiffs' Exhibit 25 merely indicates that Mr. Mack knew that shipments of corn from the U.S. to China would contain MIR162 in them *if they were actually shipped*. Pls.' Opp'n Ex. 25 (M. Mack Dep. Tr. 235:22-236:6). The cited testimony in Plaintiffs' Exhibit 26 likewise indicates that Ms. Hull knew that shipments of corn from the U.S. to China would contain MIR162 in them *if they were actually shipped*.  Pls.' Opp'n Ex. 26 (S. Hull Dep. Tr. 337:9-13, 152:11-21).  However, none of the cited evidence indicates Syngenta knew that exporters *would* ship U.S. corn containing MIR162 to China by the fall of 2011.

36.    China's application process for import approval of genetically modified traits entails three steps: First, a company initiates the application process by completing the initial Chinese application.  The hope with this first application is to obtain approval to bring test samples into China and begin in-country safety tests at approved facilities.  This first stage application could result in questions the applicant must address.   Ex. 356 (Dep. Ex. 48) at SYNG_00389378; Ex. 28, Deposition of Scott Huber Vol. I ("Huber Vol. I") at 240:6-242:7, 249:20-25, 246:24-248:22.

**RESPONSE TO NO. 36.**   **Disputed, hearsay, unsupported by the evidence cited.**  Plaintiffs' Exhibit 356 is a discussion paper

written by the International Food & Agricultural Trade Policy Council, is hearsay, and is thus inadmissible. Pls.' Opp'n Ex. 356 (S. Huber Dep. Ex. 48, at SYNG_00389378). *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Plaintiffs' Exhibit 28 is testimony that recites the content of Exhibit 356 and is thus also inadmissible hearsay.  Pls.' Opp'n Ex. 28 (S. Huber Dep. Tr. 240:6-242:7, 249:20-25, 246:24-248:22). Furthermore, none of the cited excerpts address Plaintiffs' assertion that "This first stage application could result in questions the applicant must address."

37.    Second, the company must complete the full dossier, which would include addressing any questions raised by the Ministry of Agriculture in the first stage, providing the PCR test methodology (test to detect the genetically modified trait) and sequencing, obtaining appropriate import and testing permits, and importing test samples and performing mandatory tests.   The second stage often results in a list of issues, questions, and tests the applicant must address in the third stage. Ex. 356 (Dep. Ex. 48) at SYNG_00389378; Ex. 28, Huber Vol. I, 246:24--253:25.

<u>**RESPONSE TO NO. 37.**</u>        **Disputed, hearsay, unsupported by the evidence cited.**  Plaintiffs' Exhibit 356 is a discussion paper written by the International Food & Agricultural Trade Policy Council, is hearsay, and is thus inadmissible. Pls.' Opp'n Ex. 356 (S. Huber Dep. Ex. 48, at SYNG_00389378). *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Plaintiffs' Exhibit 28 is testimony that recites the content of Exhibit 356 and is thus also inadmissible hearsay. Pls.' Opp'n Ex. 28 (S. Huber Dep. Tr. 246:24-253:25).   Furthermore, none of the cited

18

excerpts mentions a PCR test methodology.  *See* Pls.' Opp'n Ex. 356 (S. Huber Dep. Ex. 48, at SYNG_00389378); Pls.' Opp'n Ex. 28 (S. Huber Dep. Tr. 246:24-253:25).

38.     Finally, the applicant must satisfactorily respond to all outstanding regulator questions through an interactive process.   The more complete and forthcoming the applicant is during the initial stages, the more streamlined the third stage of the process. Ex. 356 (Dep. Ex. 48) at SYNG_00389378; Ex. 28, Huber Vol. I, 253:10-256:23, 282:3-285:21; Ex. 357 at SYNG_00441934-00441936.

**RESPONSE TO NO. 38.**        **Disputed, hearsay, unsupported by the evidence cited.**    Plaintiffs' Exhibit 356 is a discussion paper written by the International Food & Agricultural Trade Policy Council, is hearsay, and is thus inadmissible. Pls.' Opp'n Ex. 356 (S. Huber Dep. Ex. 48, at SYNG_00389378).  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Furthermore, Plaintiffs' Exhibits 356, 357, and 28 do not contain any information about being "complete and forthcoming" or making the process "more streamlined." Pls.' Opp'n Ex. 356 (S. Huber Dep. Ex. 48, at SYNG_00389378); Pls.' Opp'n Ex. 357 (S. Huber Dep. Ex. 52, at SYNG_00441934-00441936); Pls.' Opp'n Ex. 28 (S. Huber Dep. Tr. 253:10-256:23, 282:3-285:21).

39.     In, January 11, 2009, Syngenta regulatory personnel predicted import approval of MIR162 in China by the third quarter of 2013 "Q3 2013" if an application were submitted to China in Q4 2009.  Ex. 31, Deposition of Scott Huber Vol. II ("Huber Vol. II") at 356:22-357:17, 359:4-24; Ex. 32 (Dep. Ex. 57).

**RESPONSE TO NO. 39.**        **Disputed, unsupported by the evidence cited.**    Plaintiffs' Exhibit 32 indicates that China anticipated approval was "Q3 2012" for "MIR162 Maize" and "Q2-

19

Q3 2010" for Bt11xMIR162 Maize.  See Pls.' Opp'n Ex. 32 (S.

Huber Dep. Ex. 57). Furthermore, nothing in the testimony of Scott

Huber or Exhibit 32 indicates that the prediction of import approval

depended on the date of submission of an application.    See Pls.'

Opp'n Ex. 31 (S. Huber Dep Tr. 356:22-357:17, 359:4-24); Pls.'

Opp'n Ex. 32 (S. Huber Dep. Ex. 57).

40.    In reality, Syngenta did not submit its initial Chinese application for MIR162 until
March 2010.  ECF 2861 at SOF ¶ 41.

**RESPONSE TO NO. 40.**        Undisputed.

41.    Syngenta based its initial projections of when China would approve MIR162 upon a
plan to apply for approval from China in 2008. Ex. 29, Deposition of Lisa Zannoni Vol. II
("Zannoni Vol. II") at 430:9-448:21; Ex. 30 (Dep. Ex. 332).  On June 3, 2009, Syngenta believed the
earliest date for import approval of MIR162 in China was a mere "30%" chance in "Q3 2012."
Ex. 70 (Dep. Ex. 538); Ex. 31, Huber Vol. II at 374:15–375:1; Ex. 69, Deposition of Charles Lee
Vol. II ("Lee Vol. II") at 316:7-318:8.

**RESPONSE TO NO. 41.**        **Disputed,   unsupported   by   the**

**evidence cited, improperly supported by record citations, and**

**immaterial to Syngenta's arguments for summary judgment.**

The initial projects of when China would approval MIR162 is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.    In any event, Plaintiffs improperly rely on broad,

unfocused citations instead of properly controverting Defendants'

statements.  *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*,

No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25,

2008) ("[P]laintiffs cross-reference large groups of their own

paragraphs of factual material, such as to controvert one of AT &

T's statements of fact or to establish other 'facts.' For example, in

response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").  As for the first sentence, Plaintiffs fail to identify which portions of the 18 transcript pages of Plaintiffs' Exhibit 29, or the 26 pages contained in Plaintiffs' Exhibit 30, support their assertion that "Syngenta based its initial projections of when China would approve MIR162 upon a plan to apply for approval from China in 2008."

A biotech company cannot pinpoint when it will be able to obtain import approval to China because China does not permit applications until the trait has been approved in another county.  *See* Syngenta's Opp'n Ex. 13 (M. O'Mara (BIO) Dep. Ex. 26, at BIO-0007693) ("China's system requires that a biotech trait be approved in a cultivation country before an application for a risk assessment can be made in China.").  Before Syngenta has received approval in a cultivating country, it does not know when it would be able to seek Chinese approval, but before 2012, Syngenta always believed (based on industry practice) that it would take two years from initial submission.  *See, e.g.,* Syngenta's MSJ Ex. 24 (L. Zannoni Dep. Tr. 629:2-16) ("Q. All right.  So you said it was general practice, I think you've used the term common practice and that would have been put approval in Q1 in your review?  Is that, is that consistent with what you testified?   A.  Of the four to six months so the four months would be March.   Q.   Where does, where does that common practice come from where do you get that?  A.   If I'm looking, from working, looking at what files in the process had been doing, not just their own, but others, and at this point, you know

21

we talked about China in industry groups, so it was two

years was the timeline that industry was using, and so that fit into that timeline."). While there are

initial timelines before the submission can be made, those are simply working papers subject to

revision, not official timelines. *See, e.g.,* Ex. 352 (D. Ward Dep. Tr. 169:21-170:10) ("Q.  Do you

have any understanding as to whether timelines changed over time?   A.   They do.   Q.   And why

do they change over time?     A.   It's the nature of the beast.   Timelines in some countries are

relatively unpredictable.   They are always trying to anticipate what is going to happen in the future.

The farther away you make such predictions, the less reliable predictions are.   And the nature of

regulatory timelines are -- is that you are depending upon the work and decisions made by entities.

In  this  case,  governments  that  are  outside  of  Syngenta's  control.    So  they  are  inherently

unpredictable.   They change.").   Once Syngenta made its initial submission in March 2010, it

always believed it would get approval in Mar. 2012. *See, e.g.,* Syngenta's MSJ Ex. 24 (L. Zannoni

Dep. Tr. 629:2-16).   Regardless, these documents long pre-date the August 17, 2011 letter sent by

Chuck Lee to Viptera growers. They do not have any bearing on Syngenta's expectations of the

timeline for Chinese approval in August 2011.

Furthermore, the cited evidence also does not support Plaintiffs' assertions.   Ms. Zannoni

testified she did not know what purpose Plaintiffs' Exhibit 30 was prepared for.   Pls.' Opp'n Ex. 30

(L. Zannoni Dep. Ex. 332); Pls.' Opp'n Ex. 29 (L. Zannoni Dep. Tr. 437:22-24).

This indicates that, based on one document, the expected submission was in 2008 and the

anticipated  approval  was  in  2012,  but  does  not  indicate  that  Syngenta  "based"  an  "initial

projection[]" of Chinese approval *on the 2008 date*.   Plaintiffs' Exhibit 30, the document about

which Ms. Zannoni was testifying, likewise does not contain any statement that would support

Plaintiffs' inference.   *See generally* Pls.' Opp'n Ex. 30 (L. Zannoni Dep. Ex. 332).   Furthermore,

Ms. Zannoni testified that a related document containing a timeline was not an official timeline:

"This is a -- in part of the probability chart that some of the project teams wanted, but this is -- this wouldn't be seen as their official timeline." Ex. 358 (L. Zannoni Dep. Tr. 454:15-18).

As for the second sentence, the citations to the record do not establish that Syngenta as a company believed that  on June 3, 2009, the earliest date for import approval of MIR162 in China was a 30% chance in "Q3 2012." Mr. Lee testified that he did not know who prepared Plaintiffs' Exhibit 70 (Deposition Exhibit 538). Pls.' Opp'n Ex. 69 (C. Lee Dep. Tr. 319:4-5). Mr. Huber testified that he did not agree with the information contained in the same document, *see* Pls.' Opp'n Ex. 31 (S. Huber Dep. Tr. 374:15–375:1), and that "I don't know who wrote it and -- and where they got their numbers. …  I don't know where the person -- whether the person had the right information." Ex. 359 (S. Huber Dep. Tr. 365:10-16) (referencing Deposition Exhibit 58, the same document as Plaintiffs' Exhibit 70).

Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.  See, e.g., Ex. 734 (from Yongsheng Dep.); SYNG_00450146; Y. Zhang Dep. Tr. at 693:5-20 (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012).  Any alleged delays in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window.  See Pl. Opp. Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission.");

see also Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4 ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15 ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").

42.     Syngenta's internal communications confirm it understood Chinese import approval would take almost three years from the submission of the application, assuming no delays or mistakes by Syngenta. Ex. 31, Huber Vol. II at 332:7-333:16 (average approval time of greater than 28 months); Ex. 57, Deposition of Jack Bernens Vol. II ("Bernens Vol. II") at 472:7-473:25; Ex. 33 (Dep. Ex. 1056); Ex. 6, Bernens Vol. I, at 276:22-277:7; Ex. 34 (Dep. Ex. 1029) (April 19, 2010 internal Syngenta email stating: "Other key approvals like China and EU will be several years out so would not mention them.").

**RESPONSE TO NO. 42.**     **Disputed, vague and ambiguous, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.** Internal estimates of China import approval are irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' assertion about "almost three years" is vague and poorly defined. The cited evidence does not establish that internal communication confirm Syngenta's understanding. Mr. Huber was testifying about a May 2014 CropLife China document, *see* Ex. 359 (S. Huber Dep. Tr. 328:9-23), and thus his testimony does not establish that "Syngenta's internal communications confirm" anything. Plaintiffs' Exhibit 6 contains no testimony concerning a timeline of "almost three years." Pls.' Opp'n Ex. 57 (J. Bernens Dep. Tr. 472:7-473:25). Plaintiffs' Exhibit 33 does not contain any statement concerning the date of submission of the application, and thus does

24

not establish Plaintiffs' assertion.  Plaintiffs' Exhibit 33 (Deposition Exhibit 1056) and Plaintiffs' Exhibit 6 contain two preliminary questions concerning the date, recipients, and general content of an email and do not establish Plaintiffs' assertion. Pls.' Opp'n Ex. 33 (J. Bernens Dep. Ex. 1056); Pls.' Opp'n Ex. 6 (J. Bernens 276:22-277:7).  Plaintiffs' Exhibit 34 is not the correct cited deposition exhibit, but the correct deposition exhibit (Exhibit 1029) likewise does not establish that approval would take "almost three years" from submission, because Mr. Bernens stated that China approval "will be several years out," a statement that merely indicates his belief it would take at least two years — putting approval in April 2012, entirely consistent with Syngenta's expected time frame for approval.    *See* Ex. 362 (J. Bernens Dep. Ex. 1029, at SYNG_00352243).

Regardless, numerous Syngenta employees testified that they understood that Chinese import approval would take approximately two years, and Plaintiffs' assertion that "Syngenta's internal communications confirm it understood" that approval would take longer is thus incorrect. Pls.' Opp'n Ex. 4 (C. Lee Dep. Tr. 177:19-178:7) ("So I think it's fairly common knowledge from regulatory, and they relayed this, that, you know, there's a two-year delay between, as we discussed, the asynchronicity of China, between USDA deregulation, which enables us to apply for import approval in China, and that approval, and you know, to this point, you know, we put a fair amount of traits through China, and those traits had all operated roughly on that two-year delay, so we expected -- regulatory said they expected that to occur."); *id.* 189:17-190:11 ("And also, you know, up until this point, you know, we put a fair amount of traits through China, and they had

operated on this time two-year frame from USDA deregulation 'til approval."); Syngenta's MSJ

Ex. 24 (L. Zannoni Dep. Tr. 629:2-630:7) (Ms. Zannoni testified that "at this point, you know we

talked about China in industry groups, so it was two years was the timeline that industry was using,

and so that fit into that timeline."  When asked "Two years would be from when the application

was initially submitted, correct, in March of 2010?," Ms. Zannoni answered "Yes.").

Regardless, these documents long pre-date the August 17, 2011 letter sent by Chuck Lee to

Viptera growers. They do not have any bearing on Syngenta's expectations of the timeline for

Chinese approval in August 2011.

43.    At the time that Syngenta chose to commercialize Agrisure Viptera, Syngenta
knew that China had a "zero tolerance policy" for unapproved genetically modified traits, meaning
that even trace detections of an unapproved trait could result in China's rejection of U.S. corn
shipments. Ex. 36, Deposition of Lisa Zannoni Vol. I ("Zannoni Vol. I") at 222:18-20; 242:23-243:6
(Syngenta's global head of regulatory affairs admitting knowledge of China's zero tolerance policy);
Ex. 26, Hull Vol. I at 56:12-25 (Syngenta's head of external affairs admitting knowledge of policy
and that "zero is meaning, they don't allow any of it, even trace amount of it").

**RESPONSE TO NO. 43.       Undisputed       that       Syngenta**

**understood that China had, on paper, a zero tolerance policy.**

Disputed whether or not China adhered to its zero tolerance policy,

especially when the record evidence shows that China continued to

accept shipments of U.S. corn in 2011 and 2012 even though

MIR162 was lawfully in the U.S. corn supply. *See, e.g.*, Syngenta's

Opp'n Ex. 80 (W. Uhlmeyer Dep. Tr. 370:12-371:18) ("Q.  After

ADM learned that China started rejecting shipments of corn for the

presence of MIR162, did ADM make any decisions to ship corn to

China, let's say, through 2014? … A.   So on the tab labeled topic

12, 13, 14, 15, 37, 69, there's a table there showing our exports of

corn to China.  And in 2014, it shows we shipped nearly 2.7 million

bushels to China.").

In addition, Plaintiffs provide no evidence that Syngenta knew that a detection of a trace

amount of an unapproved event — if China decided to enforce the policy — could lead to a

shutdown of trade of U.S. corn to China.  The cited excerpts do not establish this assertion.  *See*

Pls.' Opp'n Ex. 36 (4/12/2016 L. Zannoni Dep. Tr. 222:18-20; 242:23-243:6; Pls.' Opp'n Ex. 26

(3/23/2016 S. Hull Dep. Tr. 56:12-25).

44.     Michael Mack, Syngenta's Chief Executive Officer, knew about China's zero
tolerance policy.  Ex. 25, Mack Vol. I at 117:25-118:20 (Syngenta employees informing Mack of the
importance of the zero tolerance policy); 236:25-237:14 ("Q. [Y]ou understood that because of
China's zero tolerance policy, if they detected MIR162 in incoming shipments before it was
approved for import, China could reject those shipments? You understood that? … A. They
could reject a shipment, if they – if they – if they warranted that they found something that was not
approved by them. That's all there is to it.").

**RESPONSE TO NO. 44.**        **Undisputed in part and disputed in**

**part.**   Undisputed that Mr. Mack understood that China had, on

paper, a zero tolerance policy.   Disputed whether or not China

adhered to its zero tolerance policy, especially when the record

evidence shows that China continued to accept shipments of U.S.

corn in 2011 and 2012 even though MIR162 was lawfully in the

U.S. corn supply.  *See, e.g.*, Syngenta's Opp'n Ex. 80 (W. Uhlmeyer

Dep. Tr. 370:12-371:18) ("Q.    After ADM learned that China

started rejecting shipments of corn for the presence of MIR162, did

ADM make any decisions to ship corn to China, let's say, through

2014? … A.   So on the tab labeled topic 12, 13, 14, 15, 37, 69,

there's a table there showing our exports of corn to China.  And in

2014, it shows we shipped nearly 2.7 million bushels to China.").

45.    Syngenta knew it was creating a risk for U.S. corn exports when it commercialized Viptera years ahead of Chinese import approval.  Ex. 38, Deposition of Miloud Araba Vol. I ("Araba Vol. I") at 171:16-172:5; Ex. 84, Deposition of Miloud Araba Vol. II ("Araba Vol. II") at 539:16-18 (testifying that the potential for disruption was a known risk to Syngenta).

**RESPONSE TO NO. 45.**    **Disputed, vague and ambiguous, immaterial to Syngenta's arguments for summary judgment, and unsupported by the evidence cited.**  Exhibit 38 does not contain the cited deposition pages.

Even considering the cited excerpts from Mr. Araba's deposition, the excerpt does not support Plaintiffs' assertion.  First, the phrase "risk for U.S. corn exports" is vague, ambiguous, and not defined by the evidence cited.  Pls.' Opp'n Ex. 38, (3/3/2016 M. Araba Dep. Tr. 171:16-172:5, indicates only that a document states there is a "*potential* to disrupt trade of U.S. corn products" — not that Syngenta knew it was creating a risk.  *See id.* (emphasis added).  To the extent Plaintiffs attempt to rely on this assertion to show the risk was foreseeable, a risk that is merely "potential" is irrelevant to showing the risk was foreseeable.

, Plaintiffs' Exhibit 84 citing the deposition of Miloud Araba is merely a reference to a portion of a question from Plaintiffs' counsel, not any statement by Mr. Araba.  ("Q. Between 2010 and 2015, you would agree with me that there is a significant economic risk to farmers if Syngenta launches a corn trait prior to"), and thus does not support Plaintiffs' contention.  Pls.' Opp'n Exhibit 84 (3/4/2016 M. Araba Dep. Tr. 539:16-18).  Even considering the full question and answer, the exchange does not support Plaintiffs' assertion.  ("Q.    Between 2010 and 2015, you would agree with me that there is a significant economic risk to farmers if Syngenta launches a corn trait prior to Chinese regulatory approval, correct?  … A.  Well, I'll have to have a crystal ball, I suppose.").  Mr. Araba's testimony illustrates how speculative any potential risk was — not that Syngenta *knew* it was creating a risk.  Pls.' Opp'n Ex. 84 (3/4/2016 M. Araba Dep. Tr. 539:16-22).

Furthermore, Syngenta knew that China is inherently unpredictable and historically had not been a major importer of corn, let alone of U.S. corn.  *See, e.g.,* Ex. 363 (Agrisure Traits Questions & Answers, Chinese Import of Corn Hybrids with the Agrisure Viptera trait (August 17, 2011), at SYT00001502) (noting "China has not previously represented a substantial portion of the U.S. corn export market"); Ex. 364 (C. Lee Dep. Ex. 572 (SYNG_00285273) (05/15/2012 email noting "As you have already known that the Chinese MoA has become more selective on issuing GMO safety certificates and the new proposed approvals has been rebuffed by the Minister Han in its batch based approval procedure (issue and deny permits in a group based on a particular submit window)").

46.     Years before it commercialized Viptera, in March 2007 Syngenta commercialized a genetically modified corn trait called "MIR604" under the name "Agrisure RW" before obtaining import approval from Japan.  Ex. 4, Lee Vol. I at 227:4-10.

**RESPONSE TO NO. 46.**          **Disputed in part, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.**   The commercialization of MIR604 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Plaintiffs' citation to seven lines of testimony does not establish Syngenta commercialized MIR604 in March 2007.  *See* Pls. Opp'n Ex. 4 (3/8/2016 C. LeeDep. Tr. 227:4-10).  Undisputed that MIR604 was commercialized under the name Agrisure RW.

47.     Japan was the largest export market for U.S. corn at the time.  Ex. 39, Deposition of Gary Martin Vol. I ("G. Martin Vol. I") at 134:15-135:1 (stating that Japan "at that time was the largest of corn markets for the United States.")

**RESPONSE TO NO. 47.**          **Undisputed.**

48.     Members of the corn industry, including grower industry groups, the grain trade, and Japanese importers, expressed concern about Syngenta commercializing Agrisure RW without Japanese approval.  Ex. 6, Bernens Vol. I at 67:24-78:25; Ex. 40 (Dep. Ex. 1004) at 95-99.

**RESPONSE TO NO. 48.       Undisputed, but immaterial to Syngenta's arguments for summary judgment.**    The commercialization of MIR604 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Syngenta notes that no industrywide policy or other industry consensus, such as the BIO Policy, was in effect at the time of Agrisure RW's commercialization that concerned the foreign approvals needed before U.S.-approved products could be sold in the U.S.

49.     Nevertheless, Syngenta launched MIR604 without Japanese approval because "it was critical for the business to launch in March" and because it sought to "force the Japanese Government into a solution."  Ex. 41 (Dep. Ex. 966) at SYNG_00809495; Ex. 294, Deposition of Sarah Hull, Vol. II ("Hull Vol. II") at 557:2-6.

**RESPONSE TO NO. 49.       Disputed, unsupported by the evidence cited, and immaterial for Syngenta's arguments seeking summary judgment.**  The commercialization of MIR604 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, this is a retrospective analysis under the heading "What was different this time?"  It does not establish that the reason for launching "without Japanese approval" was because "it was critical for the business to launch in March."  Pls.' Opp'n Ex. 41 (S. Hull Dep. Ex. 966, at SYNG_00809495),  Further, Plaintiffs' Opposition Exhibit 294 is merely a portion of a question and testimony from Sarah Hull that she is "on" an email, and does

not support Plaintiffs' assertion.  Pls.' Opp'n Ex. 294 (3/24/2016 S.

Hull Dep. Tr. 557:2-6).

50.      "The decision to launch was taken by M. M[ack] with involvement from SEC [Syngenta Executive Committee] colleagues." Ex. 41 (Dep. Ex. 966) at SYNG_00809496.

**RESPONSE TO NO. 50.**      **Undisputed that the exhibit contains**

**the cited text without the bracketed portions**, **but immaterial for**

**Syngenta's arguments seeking summary judgment.**      The

commercialization of MIR604 is irrelevant to the grounds asserted

in Syngenta's motion for summary judgment.

51.      Syngenta's actions forced Japan to approve MIR604 "faster than any other [trait] in history," and outside of its normal regulatory process.      Ex. 44 (Dep. Ex. 1216) at SYNG_00823057; Ex. 36, Zannoni Vol. I at 297:15-298:10.

**RESPONSE TO NO. 51.**      **Disputed, hearsay, unsupported by**

**the evidence cited, and immaterial for Syngenta's arguments**

**seeking summary judgment.**  The commercialization of MIR604 is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.  In any event, Exhibit 44 quotes a third party as saying

the registration came "faster than any other in history," Pls. Opp'n

Ex. 44 (L. Zannoni Dep. Ex. 1216, at SYNG_00823057), but Sarah

Hull is just recounting this third-party statement and it is thus

inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp.

2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay

evidence on summary judgment).   Furthermore, nothing in the

exhibit indicates that it was Syngenta's actions that "forced Japan to

approve MIR604" faster or that it was outside of its normal

regulatory process.  *See* Pls.' Opp'n Ex. 44 (L. Zannoni Dep. Ex.

31

1216, at SYNG_00823057).   Plaintiffs' Opposition Exhibit 36

(4/12/2016 L. Zannoni Dep. Tr.297:15-298:10), likewise does not

support Plaintiffs' contention, as the cited excerpt does not even

include any mention of MIR604 or Agrisure RW.  *See id.*

52.     But prior to Japanese approval, several members of the grain trade and transportation industry announced their intention to refuse harvested Agrisure RW corn.   Ex. 42, Deposition of Patrick Steiner Vol. I ("Steiner Vol. I") at 218:2-220:7; Ex. 43 (Dep. Ex. 1771) at SYNG_00786333.

**RESPONSE TO NO. 52.**        **Undisputed, but immaterial for**

**Syngenta's arguments seeking summary judgment.**        The

commercialization of MIR604 is irrelevant to the grounds asserted

in Syngenta's motion for summary judgment.

53.     Japanese importers sought an apology from Syngenta for its conduct, but Syngenta's Mack did not apologize. Ex. 44 (Dep. Ex. 1216).

**RESPONSE TO NO. 53.**        **Disputed, unsupported by the**

**evidence cited, and immaterial for Syngenta's arguments**

**seeking summary judgment**.   The commercialization of MIR604 is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.   In any event, Exhibit 44 indicates Sarah Hull wrote, "I

think they wanted an apology from him when they said that this was

a very emotional issue for them and that they had to spend

considerable time helping us get the registration when they did not

think that should be their job."   Nothing indicates that these

representatives actually "sought an apology."

54.     Instead, in internal documents, Syngenta discussed that by "putting pressure on" a foreign market, Syngenta could change that market and create "a new dynamic."   Ex. 41 (Dep. Ex. 966) at SYNG_00809495.

**RESPONSE TO NO. 54.** **Disputed, unsupported by the evidence cited, and immaterial for Syngenta's arguments seeking summary judgment.** The commercialization of MIR604 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' Opposition Exhibit 41 (D. Morgan, S. Hull and L. Zannoni Dep. Ex. 966, at SYNG_00809495), is a retrospective analysis under the heading "What was different this time?" It does not establish that Syngenta discussed that Syngenta's actions "could change" a market.

55. Syngenta's decision to sell Agrisure RW without Japanese approval of MIR604 was unprecedented at the time. Ex. 45, Deposition of Randall Giroux in his personal capacity Vol. II ("Giroux Vol. II") at 310:24-312:21 ("Well, so, of course, in the beginning of their – taking their position was the commercialization of Agrisure RW in 2007, where, for the first time, a technology owner commercialized the trait without the most important export market for US corn, namely, Japan.").

**RESPONSE TO NO. 55.** **Disputed, vague and ambiguous, and unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (MIR604) than the one at issue in this case (Viptera). In any event, it was not "unprecedented at the time" in any meaningful sense for a seed company to refrain from delaying commercialization because there was no industry standard in 2007 requiring GM seed companies to delay commercialization of seeds containing a U.S.-approved GM trait based on whether a foreign market had approved the trait for import. It was not until the BIO

33

Product Launch Stewardship Policy subsequently came into existence that there was any industry standard recommending that GM seed companies delay commercialization of a seed containing a U.S.-approved GM trait until "key import markets" with "functioning regulatory systems" have approved the trait for import. Pls.' Opp'n Ex. 47 (J. Bernens Dep. Ex. 1013, at SYNG_00202102-06).

56.    Syngenta's actions motivated the biotechnology industry to create the Biotechnology Industry Organization Product Launch Stewardship Policy ("BIO Policy").  Ex. 46 (Dep. Ex. 1012) Ex. 6, Bernens Vol. I at 127:23-128:9; Ex. 186, Deposition of Randall Giroux as a corporate representative Vol. II ("Giroux 30b6 Vol. II") at 482:11-20 ("Q. Let me ask you this: Did Cargill have any involvement in providing input with respect to the BIO policy which you had testified earlier you were generally aware of?  A. So, the – so, the product line stewardship policy, which I think you're referring to as the BIO policy, really emerged as an outcome of the aggressive commercialization of Agrisure RW in the year 2007."); Ex. 26, Hull Vol. I at 37:20-38:6 ("Q. Would you agree with me that it [the BIO policy] was developed in part to  address  the controversies that were created when Syngenta decided to launch a new genetically modified trait called Agrisure RW without having Japanese approval prior to planting? . . . A. The BIO policy was a – an outcome of the challenges that – and frustrations that some of the corn groups felt on that decision.").

**RESPONSE TO NO. 56.**    **Disputed, lack of foundation, unsupported by the evidence cited, and immaterial for Syngenta's arguments seeking summary judgment.** The impetus for the Bio Policy is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs have not established that the individuals cited in No. 56 have foundation to testify as to the motivation for the creation of the BIO Policy. Furthermore, the cited excerpts do not indicate that it was Syngenta's actions that motivated the biotechnology industry to create the BIO Policy.  BIO's corporate representative testified that

34

no specific events gave rise to the policy.  Syngenta's Opp'n Ex. 11 (6/29/2016 M. O'Mara Dep. Tr. 40:10-20) ("Q. Do you know if there were any specific events involving asynchronous approvals that gave rise to the adopt – the development and adoption of Exhibit 2 [the 2007 BIO Policy]?  A.  This document, along with – well, this document was not drafted in response to any specific asynchronous approval situation, but, rather, the – was – was reflective of more innovation coming to the market, the importance of trade, and the need for a policy that – around, you know, to build communications around and advocacy around.").

57.     The BIO Policy calls for seed developers to take the following steps before commercializing a new genetically modified commodity trait in the U.S.: (1) conduct a market and trade assessment to identify key export markets; (2) consult at an early stage with the rest of the value chain about the market and trade assessment; (3) meet applicable regulatory requirements in key markets prior to commercialization; and (4) manage introduction of a new trait to avoid the disruption of global markets.  *See* Ex. 47 (Dep. Ex. 1013); Ex. 6, Bernens Vol. I, 130:20-131:8.

**RESPONSE TO NO. 57.        Undisputed in part and disputed in part, and immaterial for Syngenta's arguments seeking summary judgment.**  These terms of the BIO Policy are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, it is undisputed that the BIO Policy calls for technology providers to

1.  Conduct a market and trade assessment to identify key import markets, including those with functioning regulatory systems, prior to the commercialization of any new biotechnology product (crop by event) in any country of commercial launch.  In that market and trade assessment, consult at an early stage with the value chain for the specific crop.  Manage the product's introductions so that choice of production methods (i.e., facilitate coexistence) and markets (e.g., specialty, identity preservation, and global) for that crop are available and preserved.

2.  Meet applicable regulatory requirements in key markets (which at a minimum shall include the United States, Canada, and Japan) prior to commercialization of a new biotechnology product in commodity corn, soybeans, and canola in the United States or Canada, unless determined otherwise in the consultation with the value chain for the crop.

3.  Follow generally accepted best seed quality practices designed to prevent adventitious presence of unauthorized products and minimize unintended incidental presence of products authorized in the country of production pending full implementation of BIO's Food and Agriculture Section Quality Management Program.

4.  Make available prior to commercialization a reliable detection method or test for use by growers, processors and buyers that enables crop identity verification for intended use.

5.  Promptly communicate broadly and in a transparent manner with stakeholders as to its company-specific product launch stewardship policies and their implementation.

Pls.' Opp'n Ex. 47 (J. Bernens Dep. Ex. 1013, at SYNG_00202102-06) (footnote call number omitted).

Disputed to the extent this assertion purports to delineate all of the procedures and suggestions in the BIO Policy.  For instance, in addition to conducting a market and trade assessment to identify key export markets, the BIO Policy calls for technology providers to identity key import markets "including those with functioning regulatory systems …." Pls.' Opp'n Ex. 47 (J. Bernens Ex. 1013, at SYNG_00202102-06).  And meeting "applicable regulatory requirements in key markets (which at a minimum shall include the United States, Canada, and Japan prior to commercialization," should be done "unless determined otherwise in the consultation with the value chain for the crop." *Id.*

58.    Syngenta understood that the market and trade assessment was not a static analysis.  Rather, biotech companies like Syngenta should conduct a case-specific analysis of key markets prior to commercializing each new trait because markets change.  *See* Ex. 25, Mack Vol. I at 259:9-20; *See also supra* SOAF ¶ 142.

**RESPONSE TO NO. 58.**    **Disputed,    unsupported    by    the**

**evidence   cited,   and   immaterial   for   Syngenta's   arguments**

**seeking summary judgment.** The trade assessment is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, as Thomas Carrato testified, each company determined how to implement and apply the BIO Policy for itself, given antitrust concerns. Syngenta's Opp'n Ex. 48 (J. Carrato Dep. Tr.286:12-18) ("Q Now, according to your interpretation of BIO, you state that each company had its own interpretation of the Market and Trade Assessment requirement, correct, sir? A As a antitrust matter, companies were not allowed to collude on identifying key export markets. So yes, each had its own interpretation.").

59.    Syngenta represented to the corn industry that it supported and would follow the BIO Policy. Ex. 48, Deposition of David Morgan as a corporate representative Vol. I ("Morgan 30b6 Vol. I") at 240:2-241:4; Ex. 6, Bernens Vol. I at 130:20-132:7; Ex. 47 (Dep. Ex. 1013).

**RESPONSE TO NO. 59.**        **Undisputed that at the time it commercialized Viptera in 2010, Syngenta supported the BIO Policy and agreed to abide by the BIO Policy, but immaterial for Syngenta's arguments seeking summary judgment.** The representations to the corn industry are irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event,

60.    But behind the scenes, Mack called the BIO Policy a "wretched policy" that "served no legitimate purpose." Ex. 25, Mack Vol. I at 77:4-83:17; Ex. 49 (Dep. Ex. 1801) at SYNG_00439713.

**RESPONSE TO NO. 60.**        **Disputed, unsupported by evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.** Mr. Mack's statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In

any event, Plaintiffs' selective quotation of the email
mischaracterizes the intent of the email.   Mr. Mack wrote that
"Nevertheless, we are signatories to the BIO policy and so long as
we are in the association, we will abide it."  Pls.' Opp'n Ex. 49 (M.
Mack Dep. Ex. 1801, at SYNG_00439713).

61.     Mack told Syngenta employees that the "risk assessment for MIR162" would
have "nothing to do with the BIO Policy."  Ex. 25, Mack Vol. I at 77:4-83:17; Ex. 49 (Dep. Ex.
1801) at SYNG_00439713.

**RESPONSE TO NO. 61.**          **Disputed, unsupported by evidence**
**cited. and immaterial to the grounds on which Syngenta seeks**
**summary judgment**.  Mr. Mack's statements are irrelevant to the
grounds asserted in Syngenta's motion for summary judgment.  In
any event,      Plaintiffs' selective quotation of the email
mischaracterizes the intent of the email.   Mr. Mack wrote that
"Nevertheless, we are signatories to the BIO policy and so long as
we are in the association, we will abide it."   Pls.' Opp'n Ex. 49 (M.
Mack Dep. Ex. 1801, at SYNG_00439713).

62.     David Morgan, one of the four executives Syngenta has identified as making the
decision to commercialize Viptera, has denied that the BIO Policy called for Syngenta to assess the
risk of a trade disruption, although the BIO Policy states its purpose is to "minimize trade
disruptions."   Ex. 12, Morgan Vol. I at 211:21-212:5; Ex. 47 (Dep. Ex. 1013) at SYNG_00202105;
Ex. 88, Syngenta AG Response to Plaintiffs' First Interrogatories and Requests for Production
("First Int. Resp.") at Resp. Int. 2 ("Syngenta identifies Mike Mack, Davor Pisk, David Morgan, and
Chuck Lee as the persons most accurately characterized as being "principally responsible" for
Syngenta's decisions regarding the timing, scope, and manner of commercialization of Viptera and
Duracade.").

**RESPONSE TO NO. 62.**          **Disputed,   unsupported   by   the**
**evidence   cited,   and   immaterial   to   the   grounds   on   which**
**Syngenta seeks summary judgment.**  The BIO Policy's statements

38

on trade disruptions are irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta has identified Mr. Morgan as having been "principally responsible" for decisions regarding the commercialization of Viptera, not as one who made the decision. Further, while Syngenta does not dispute that to "minimize trade disruptions" is one purpose of the BIO Policy, it notes that facilitating "the flow of goods in commerce," "faciliat[ing] the availability of crops and products with the appropriate function and composition for intended uses," and to help ensure "the continued adoption of agricultural biotechnology globally and to continue to have products of agricultural biotechnology bring value to the marketplace" are other purposes. Pls.' MSJ Ex. 17 (BIO Launch Policy at SYNG_00367783). (Check.) In addition, Mr. Morgan testified: "A. I don't think there's anything in the BIO policy that says you need to assess the risk of a trade disruption. It says do a trade assessment based upon historical evidence of the nature of the trade between the parties." Ex. 365 (4/12/2016 D. Morgan Dep. Tr. 211:25-212-5).

63.    Corn from the United States has long been exported to foreign countries. *See* Ex. 291, Expert Report of Dr. Colin Carter ("Carter Rpt.") at ¶ 14 ("The United States produces approximately 320 million metric tons (mmt) of corn . . . each year and exports about 14% of the crop.").

**RESPONSE TO NO. 63.**    **Undisputed, but immaterial for Syngenta's arguments seeking summary judgment.** The length of time corn has been exported from the U.S. is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In

39

any event, the citation to Dr. Carter's report establishes only the

current export level, not any historical level and not the assertion

that corn from the U.S. has "long been exported" to foreign

countries.   Corn exports from the United States have historically

been a small percentage of U.S. corn.   For instance, in the 2012/13

marketing year, approximately 6.1% of U.S. corn was exported.

Syngenta's MSJ Ex. 1 (USDA Feed Grains: Yearbook Tables, Corn:

Supply   and   Disappearance   Full   Table,   accessed   at

https://www.ers.usda.gov/data-products/feed-grains-  database/feed-

grains-yearbook-tables/ (total exports were 730 million bushels,

total supply was 11,904 million bushels)).

64.    Exportation of U.S. corn to China was taking place during marketing year 2009-
2010.  *Id.* at ¶ 10 (in marketing year Sept. 2009-Aug. 2010, China imported over one million
metric tons of U.S. corn); Ex. 292 (Dep. Ex. 1048) at SYNG_00597560 (paper by Jack Bernens
entitled "Technology Acceptance and Product Launch Stewardship" containing table listing
China as 6th largest importer for U.S. corn with 1.157 metric tons during Oct. 1, 2009-Sept. 30,
2010).

**RESPONSE TO NO. 64.**        **Undisputed,   but   immaterial   for**

**Syngenta's arguments seeking summary judgment.**  2009-2010

marketing year shipments to China are irrelevant to the grounds

asserted in Syngenta's motion for summary judgment.  In any event,

but Syngenta notes that before marketing year 2009-2010 China had

not been a significant importer of corn.

65.    On May 29, 2009, Syngenta employees internally designated China as a "key
export market approval" for Viptera.  Ex. 50, Wheeler Vol I. at 100:18-104:9; Ex. 51 (Dep. Ex.
635) at SYNG_00401117 and 00401120; Ex. 20, Ozipko Dep. at 100:13-102:17; Ex. 52 (Dep. Ex.
484).

**RESPONSE TO NO. 65.**      Disputed, unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.   Pls.' Opp'n Ex. 52 (G. Ozipko Dep. Ex. 484) and Pls.' Opp'n Ex. 51 (J. Wheeler Dep. Ex. 635, at SYNG_00401120) are the same document; they include the word China beneath "Key Export Market Approvals," but they do not state that China actually had been designated a key export market.  In fact, the document lists "Key Export Market Approvals" and three bullet points; the final bullet point reads: "EU, China import approvals ????"  *Id.*   The four question marks undermine Plaintiffs' assertion that a Syngenta employee was actually designating China as a key export market approval.   Furthermore, nothing in the document indicates that "key export market approvals" had the same meaning as that of the BIO Policy or any other launch policy.     Pls.' Opp'n Ex. 50 (J. Wheeler Dep. Tr. 100:18-104:9), and Pls.' Opp'n Ex. 20 (G. Ozipko Dep. Tr. 100:13-102:17), do not support Plaintiffs' assertion; the deposition excerpts involve reviewing the content of the exhibits, but neither Mr. Ozipko nor Ms. Wheeler testified that Syngenta employees internally designated China as a "key export market approval" for Viptera.   Moreover, Mr. Ozipko was not part of Syngenta's regulatory group, had no experience working on Chinese approvals, was not even working on any corn traits by July 2011, and there is no evidence to suggest that Mr. Ozipko's belief regarding Chinese

41

approval was transmitted to Chuck Lee.  Ex. 366 (G. Ozipko Dep. Tr. at 12:16-25, 46:10-23).

66.     In May 2010, Jack Bernens, the person Syngenta identified as being "principally responsible for conducting a market and trade assessment in connection with commercialization of Viptera," sent an email about the decreasing "stocks to use ratio" in China and "the fear of China approvals might be bigger than anyone thought."  Ex. 6, Bernens Vol. I at 288:2-289:7; Ex. 53 (Dep. Ex. 1032); Ex. 54, First Int. Resp. at Resp. Int. 4.

**RESPONSE TO NO. 66.        Disputed, unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.**  The May 2010 estimates of Mr. Bernens are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, the cited quotation omits a question mark from Mr. Bernens' email.  The full email reads: "Look at the stocks to use ratio. The fear of China approvals might be bigger than anyone thought?"  Pls.' Opp'n Ex. 53 (J. Bernens Dep. Ex. 1032, at SYT00162351-53).

67.     Bernens wrote to other Syngenta executives in June 9, 2010, stating that U.S. trade with Chinese buyers was "picking up" and that China "may become and [sic] issue for unapproved biotech traits and international trade" and that "this could become a problem for us." Ex. 6, Bernens Vol. I at 294:10-298:8; Ex. 55 (Dep. Ex. 1033) (Bernens noting China had already purchased 26.6 million bushels of U.S. corn in 2010).

**RESPONSE TO NO. 67.        Undisputed that the email contains each of the quotations that Plaintiffs pluck out of context, disputed regarding Plaintiffs' interpretations, and immaterial to the grounds on which Syngenta seeks summary judgment.**  The May 2010 statements of Mr. Bernens are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Mr. Bernens wrote: "That said, I had a call from Bunge on this

42

yesterday so I know the trade is picking up and this could become a

problem for us and the industry down the road (see below)."   Mr.

Bernens clearly stated that it could result in a problem for "us and

the industry," not just "us."   In addition, the quote is not clear that

U.S. trade with Chinese buyers was "picking up," only that Mr.

Bernens knows that the "trade is picking up," which could be a

reference to the grain trade becoming *aware* of the issue ('picking

up on' the issue).  Pls.' Opp'n Ex. 55 (J. Bernens Dep. Ex. 1033, at

SYNG_00203885).

68.    On July 30, 2010, Bernens warned: "China is becoming a significant corn importer and might become an issue for the grain trade market."   Ex. 6, Bernens Vol. I at 306:15-308:17; Ex. 56 (Dep. Ex. 1034) at SYNG_00156978.

**RESPONSE TO NO. 68.**        **Disputed,   unsupported   by   the**

**evidence   cited,   and   immaterial   to   the   grounds   on   which**

**Syngenta seeks summary judgment.**   The 2010 estimates of Mr.

Bernens are irrelevant to the grounds asserted in Syngenta's motion

for summary judgment.   In any event, Plaintiffs' citations do not

establish that Bernens made the statement.   Mr. Bernens testified

that he was not sure if he wrote Plaintiffs' Exhibit 56, and that "It

looks like someone took, you know, what they thought was said and

put it in a document."   Pls.' Opp'n Ex. 6, (J. Bernens Dep. Tr.

306:15-308:17).  As for the statement in the document that "China

is   becoming   a   significant   corn importer and might become an

issue for the grain trade market," Bernens testified: "So I can't say

that I said that."

43

69.      After Syngenta began taking orders for Viptera on August 5, 2010, Bernens continued to warn Syngenta of the importance of China.  *See infra* SOAF ¶¶ 70-78.

<div style="margin-left:2em">

**RESPONSE TO NO. 69.**      **Disputed, vague and ambiguous, unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.**   The estimates of Mr. Bernens are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, the cited evidence does not establish that Bernens "warn[ed]" Syngenta of the "importance" of China.   Furthermore, Plaintiffs' citations are cursory and fail to include specific excerpts supporting its assertion. *See Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations.").

</div>

70.      On August 4, 2010, (the day before Syngenta began taking orders for Viptera), Bernens helped create a written presentation for the National Grain and Feed Association ("NGFA") that identified China as a "key import approval."  Ex. 57, Bernens Vol. II at 524:20-530:15; Ex. 58 (Dep. Ex. 1064); Ex. 59 (Dep. Ex. 1065).

<div style="margin-left:2em">

**RESPONSE TO NO. 70.**      **Disputed, unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.**  The August 2010 statements of Mr. Bernens are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, the cited exhibit 58 does not indicate that Mr. Bernens "helped create a written presentation" on August 4, 2010.  On August 4, 2010, Mr. Bernens

</div>

did send an email that reads, "Jess, I think Lloyd is joining in person and I might call in if available?" but nothing else indicates he helped "create" a presentation on that day.  As for Mr. Bernens' testimony about Plaintiffs' Exhibit 59 (Deposition Exhibit 1065), Mr. Bernens said: "I don't recall creating this document, but I may have provided input for it."  Ex. 57 (4/5/2016 J. Bernens Dep. Tr.529:3:4).  This does not support Plaintiffs' assertion that Mr. Bernens "helped create" it.

71.    On August 23, 2010, Bernens emailed other Syngenta executives noting that Bunge, a large grain exporter, was "worried about China becoming a very big player in 2011. Maybe as much as 5 million MT [metric tons]."  Ex. 60 (Dep. Ex. 1035) at SYNG_00610531; Ex. 6, Bernens Vol. I at 309:19-310:7.

**RESPONSE TO NO. 71.**    **Disputed, unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.**  The 2010 estimates of Mr. Bernens are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, the citation omits relevant portions of the email.  The actual excerpt from the email states about a Bunge meeting: "Seemed to be worried about China becoming very big player in 2011. Maybe as much as 5 million MT?" Plaintiffs' excerpt omits the "[s]eemed to be" and the question mark at the end.  Pls.' Opp'n Ex. 60 (J. Bernens Ex. 1035, at SYNG_006105301).

72.    On August 24, 2010, after learning that Syngenta had delayed its import approval submissions to China, Bernens sent an email stating "corn exports continue to grow in China. Some estimate over 1 million [metric tons] in 2010 and maybe as much as 5 million [metric tons] in 2011. This would make China the 4th largest import market for corn from the U.S., behind Korea but

ahead of Taiwan." Ex. 61 (Dep. Ex. 1036) at SYNG_00610533; Ex. 6, Bernens Vol. I at 314:10-18, 317:17-19.

> **RESPONSE TO NO. 72.** **Undisputed, but immaterial to Syngenta's arguments for summary judgment.** Syngenta does not dispute that the quoted excerpt without the bracketed portions appears in the email. Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

73.     In the same email thread, Bernens noted he found it "disturbing" and "alarming" that Syngenta had delayed the submission to China, that "China is going to become a major issue for us," and that the "magnitude of the issue for the business is pretty self-evident." Ex. 61 (Dep. Ex. 1036) at SYNG_00610532.

> **RESPONSE TO NO. 73.** **Undisputed that the quoted excerpt appears in the email, but immaterial to the grounds on which Syngenta seeks summary judgment.** Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

74.     On September 22, 2010, before any order of Viptera had shipped, Bernens forwarded an article entitled "China turns into regular corn importer," to which another executive responded: "we need to take a look at what this means for our corn traits in the U.S." Ex. 62 (Dep. Ex. 1038) at SYNG_00408817; Ex. 6, Bernens Vol. I at 331:24-332:7.

> **RESPONSE TO NO. 74.** **Undisputed, but immaterial to the grounds on which Syngenta seeks summary judgment.** Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

75.     On December 22, 2010, Bernens told Syngenta executives that China would import between 3 to 7 million metric tons of corn in 2011 making it the third largest importer of corn from the U.S., and reminded them he had raised the issue of China's importance "24 months or more ago." Ex. 63 (Dep. Ex. 1039); Ex. 6, Bernens Vol. I at 335:20-336:8.

**RESPONSE TO NO. 75.**          **Disputed, and unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.**  Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Mr. Bernens wrote, "China *is estimated* to import between 3 to 7 million metric tons in 2011, *which if true,* will make them #3 importer of corn behind Japan and Mexico." Pls.' Opp'n Ex. 63 (J. Bernens Dep. Ex. 1039, at SYNG_00630353-54) (emphasis added),  Mr. Bernens was clearly relaying an estimate, not that "China *would*" import this quantity.   In addition, Mr. Bernens wrote, "As I predicted 24 months or more ago individual grain companies are raising issues about MIR162 not having EU or China approval," not that he had "raised the issue of China's importance," as Plaintiffs state.

76.     On February 25, 2011, Bernens reported China had become the sixth largest importer of U.S. corn, the number one importer of U.S. DDGS (a corn by-product used as livestock feed), and the number one importer of U.S. soybeans.  Ex. 64 (Dep. Ex. 1040) at SYNG_00628850; Ex. 6, Bernens Vol. I at 347:6-348:2.

**RESPONSE TO NO. 76.**          **Undisputed**, **but immaterial to the grounds on which Syngenta seeks summary judgment.**   Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

77.     On March 30, 2011, days before the first commercial planting of Viptera, Bernens passed along information showing that "China may buy up to 2.5 million tons of corn this year," and warned "I hope our seed has arrived in China and we are doing all we can to get it planted [for regulatory trials]?" Bernens further noted that "U.S. business will suffer!!!" if import approval from China did not come until 2013.  Ex. 65 (Dep. Ex. 1041); Ex. 57, Bernens Vol. II at 388:2-9.

**RESPONSE TO NO. 77.**     Undisputed that the email contains the cited excerpts without the bracketed portion, but immaterial to the grounds on which Syngenta seeks summary judgment. Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

78.     In July 2011, Bernens stated: "China has become a substantial market and we could see this was going to happen . . . I have been warning of this pending potential development for some time." Ex. 66 (Dep. Ex. 1042); Ex. 57, Bernens Vol. II at 390:6-391:11.

**RESPONSE TO NO. 78.**     Undisputed that the email contains the cited excerpts, but immaterial to the grounds on which Syngenta seeks summary judgment. Mr. Bernens' statements are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

79.     Syngenta documents show that others in Syngenta's management understood Bernens' warnings, but did nothing to alter their commercialization plans for Viptera. *See infra* SOAF ¶¶ 80-81.

**RESPONSE TO NO. 79.**     Disputed, vague and ambiguous, and unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment. Mr. Bernens' statements and other employees' reactions are irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, he cited evidence does not establish that Syngenta management "understood Bernens' warnings" or that they "did nothing to alter their commercialization plans for Viptera." Furthermore, Plaintiffs' citations are cursory and fail to include specific excerpts supporting its assertion. *See Sprint Commc'ns Co.*

*L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D.

Kan. 2007) ("Neither Sprint nor the court can or should be forced to

sift through the record to determine whether Vonage is relying on

mere argument or whether there is some support in its broad

citations.").

80.     On January 25 and 26, 2011, before any Viptera was commercially planted, Charles Lee and other Syngenta employees prepared written responses to questions posed by *Thrive* Magazine.   They responded to one of the questions: "China has moved from an insignificant importer of U.S. corn to the *second most important* market for U.S. corn." Ex. 67 (Dep. Ex. 507) at SYT00244466 (emphasis added); Ex. 4, Lee Vol. I at 154:19-157:6.

**RESPONSE TO NO. 80.**     **Undisputed in part and disputed in**

**part.** Undisputed that the response appears in the document, but the

assertion is contrary to the evidence and immaterial to the grounds

on which Syngenta seeks summary judgment.   Plaintiffs' cited

evidence does not establish that Mr. Lee drafted the response.

Furthermore, at the time, China imported approximately 980,000

metric tons of corn from the U.S. in the 2010-2011 marketing year,

making it approximately the *seventh* largest market for U.S. corn,

after Japan, Mexico, South Korea, Egypt, Taiwan, and the European

Union.   Syngenta's MSJ Ex. 1 (USDA Feed Grains: Yearbook

Tables, Corn: Supply and Disappearance Full Table, accessed at

https://www.ers.usda.gov/data-products/feed-grains-database/feed-

grains-yearbook-tables/ (Table 22)).

81.     On February 9, 2011, Syngenta CEO Michael Mack, stated that China's "import requirements alone influence global commodity prices." Ex. 68 (Dep. Ex. 1715) at SYNG_00357105); Ex. 18, Pisk Vol. I at 274:5-14.

**RESPONSE TO NO. 81.**     **Undisputed,   but   immaterial   to**

**Syngenta's arguments for summary judgment**.   Mr. Mack's

assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In addition, Syngenta notes that Mr. Mack's statement referred to import requirements in general and not corn specifically.  *See* Pls.' Opp'n Ex. 68 (D. Pisk  Ex. 1715, at SYNG_00357105).

82.    In a May 9, 2011 report regarding the commercialization of a second generation of Viptera seed, Syngenta management noted that China was an important and growing export market for U.S. corn and that MIR162 could disrupt corn and soybean export trade with China. Ex. 353 (Dep. Ex. 444) at SYNG_00631672-73.

**RESPONSE TO NO. 82.**    **Disputed, unsupported by the evidence cited, and immaterial to the grounds on which Syngenta seeks summary judgment.**  The May 2011 estimates are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, the presentation was a submission by the Reduced Refuge Team, *see* Pls.' Opp'n Ex. 353 (M. Araba Ex. 444, at  SYNG_00631663),  and  does  not  indicate  that  "Syngenta *management* noted" anything.  Furthermore, the presentation does not note that MIR162 could disrupt the corn export trade with China.  Instead, it states only that "China is also the #1 importer of U.S. soybeans, and it is very possible that unapproved corn traits in China could have the potential to disrupt this very large *soybean* import market." Ex. 353 (M. Araba Ex. 444, at SYNG_00631672-73).

83.    In August 2010, Syngenta representatives attended a joint meeting of the National Grain  and  Feed  Association  ("NGFA")  and  North  American  Export  Grain  Association ("NAEGA").    Ex. 71, Deposition of Randall Gordon Vol. II ("Gordon Vol. II") at 341:19-342:18; Ex. 39, G. Martin Vol. I at 63:15-64:10; Ex. 72, Deposition of Anthony Reed Vol. I ("Reed Vol. I") at 96:16-98:11.

**RESPONSE TO NO. 83.**        **Disputed in part and**

**unsupported by the evidence cited.**    Syngenta does not dispute

that Syngenta representatives attended an NGFA Biotech Committee

in August 2010 and that representatives of NGFA and NAEGA were

present at that meeting.

84. Syngenta identified China as a "key import approval" in a presentation during that August 2010 meeting.  Ex. 57, Bernens Vol II. at 524:20-530:15; Ex. 58 (Dep. Ex. 1064) (email discussing meeting with NGFA in August 2010); Ex. 59 (Dep. Ex. 1065) (Power Point presentation for the meeting).

**RESPONSE TO NO. 84.**        **Disputed in part and**

**unsupported by the evidence cited.**  Plaintiff apparently intends its

assertions in this paragraph to support the contention that China was

a key import market for U.S. corn in August 2010.  Syngenta does

not dispute that China was listed under the heading "Key import

approvals" in a presentation in August 2010, along with other

countries including New Zealand, Australia, and the Philippines, but

Syngenta disputes that China was actually a key import market for

corn in 2010.  *See, e.g.*, Syngenta's MSJ Ex. 5 (P. Shull Expert Rep.

¶ 5) ("China was not a 'key market' for U.S. corn imports in the years

leading up to 2010 when Syngenta began selling Viptera, or in 2011,

when Viptera was first commercially planted. In large part because of

China's food security policies, China was not a consistent, reliable

importer of corn generally, nor of corn from the United States,

specifically, at that time."); Syngenta's Opp'n Ex. 65 (T. Bodin Dep.

Ex 230) (Cargill official analysis characterizing China as a "key

uncertainty" as of January 2011); Syngenta's Opp'n Ex. 66 (T. Bodin

Dep. Tr. 150:24-151:5) (Cargill corporate representative on China's market testifying "Q. [In] October of 2010, it was very difficult to size up China correctly, right? THE WITNESS: It's always been difficult to size up China.") (objection omitted); Syngenta's Opp'n Ex. 67 (A. Sanfeliu Dep. Ex. 5, at CARGILL000124390), attached to email dated March 25, 2010 ("Will China be a permanent net corn importer like soybean? No, subjectively, China doesn't want to it happen [sic]. Objectively, China might import some corn after some consecutive crop loss due to the weather issue."); Syngenta's Opp'n Ex. 68 (T. Bodin Dep. Ex. 236, at CARGILL00064305) (in October 2010, Cargill was "struggl[ing] massively to size up China correctly"); Syngenta documents also indicate that China was not a predictable importer of corn and not likely to become a consistent and significant importer of U.S. corn. *E.g.* Syngenta's Opp'n Ex. 69 (E-mail re Viptera China Approvals, at SYNG_00381932) ("Rick has been in discussions with Tom Dorr, CEO of the US Grains Council. Tom express that the North American Export Grain Association believed that NCGA considered China to be a major corn market thus the reason for concern. Tolman assured me that NCGA does not consider China today a major US export market and was only listed in a ranking of their annual report of export markets for 2010.").

85. During the meeting, Syngenta referenced Japan "being the sole" major market, and NAEGA President and Chief Executive Officer Gary Martin told Syngenta that China was an important and major market that needed to be considered as well.  Ex. 71, Gordon Vol. II at 341:19-342:18; Ex. 39, G. Martin Vol. I at 63:15-64:10.

**RESPONSE TO NO. 85.**        **Disputed,**

**unsupported by the evidence cited, and immaterial to**

52

**Syngenta's arguments for summary judgment.**   Plaintiffs apparently intend to use the assertions in this paragraph to support the contention that Gary Martin told Syngenta not to commercialize Viptera without Chinese approval in August 2010.  That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  It is also disputed.  *See, e.g.,* Ex. 367 (J. Bernens Dep. Tr. 598:10-599:18) ("Q.  But apparently Gary -- Gary did like the Viptera plan?  A.    Yeah.  I mean, he's told us that -- and I think it was after we got Japan approval, and he said, yeah, you guys have what you need to move forward on Viptera.").  Moreover, the cited excerpts do not indicate that Syngenta referenced Japan "being the sole" major market for U.S. corn, but rather state that "Syngenta was referencing the National Corn Growers Association's policy of Japan being the -- the sole determinant of whether a country was a major market or not."  Pls.' Opp'n Ex. 71 (R. Gordon Dep. Tr. 341:19-342:18).  In addition, the cited excerpts do not establish that "Gary Martin told Syngenta that China was an important and major market that needed to be considered as well."  *See id.* ("And I think the point that Mr. Martin was trying to make here was that … China was *becoming* an important market, as well, and needed to be considered.") (emphasis added).

86. Mr. Martin "forcefully" told Syngenta representatives that China was a key market and that NAEGA did not support commercialization without major/key market approvals. Ex. 72, Reed Vol. I at 96:16-98:11.

**RESPONSE TO NO. 86.**   Disputed, hearsay,

**unsupported by the evidence cited, and immaterial to**

53

**Syngenta's arguments for summary judgment.** Plaintiffs apparently intend to use the assertion in this paragraph to support the contention that Gary Martin told Syngenta not to commercialize Viptera without Chinese approval in August 2010. That assertion is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. It is also disputed. *See, e.g.,* Ex. 367 (J. Bernens Dep. Tr. 598:10-599:18) ("Q. But apparently Gary -- Gary did like the Viptera plan? A. Yeah. I mean, he's told us that -- and I think it was after we got Japan approval, and he said, yeah, you guys have what you need to move forward on Viptera."). Plaintiffs' Exhibit 72 is the deposition transcript of Anthony Reed, in which he testifies about statements allegedly made by third-parties at a meeting in August 2010. This is hearsay, and is thus inadmissible. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). The cited testimony also fails to establish Plaintiffs' asserted fact. The evidence that Plaintiffs cite in paragraph 85 contradicts that "Mr. Martin 'forcefully' told Syngenta representatives that China was a key market and that NAEGA did not support commercialization without major/key market approvals." Mr. Gordon's cited testimony states, that "Gary Martin told Syngenta that China was an important and major market that needed to be considered as well." *See* Pls.' Opp'n Ex. 71 (R. Gordon Dep. Tr. 341:19-342:18). ("And I think the point that Mr.

54

Martin was trying to make here was that … China was *becoming* an

important market, as well, and needed to be considered.") (emphasis

added).

87. On September 8, 2010, NAEGA followed upon with a memorandum to the Biotechnology Industry Organization ("BIO"), where it identified China as a major market where import approval should be obtained before commercialization of a new genetically modified trait.  Ex. 57, Bernens Vol. II at 616:12-620:17; Ex. 73 (Dep. Ex. 1077).

**RESPONSE TO NO. 87.**          **Disputed   in   part,**

**unsupported by the evidence cited.**  Syngenta does not dispute that

on  September  8,  2010,  NAEGA  sent  a  memorandum  to  the

Biotechnology  Industry  Organization  "encourag[ing]  BIO  [to]

define  the  minimum  markets  in  which  regulatory  requirements

should  be  met  prior  to  commercialization  to  include  the  United

States, Canada, Japan, Mexico, The Philippines, China, Taiwan, and

Korea for biotechnology product in commodity corn, soybeans, and

canola  in  the  United  States  or  Canada."  *See* Pls.' Opp'n Ex. 73

(Memo to BIO, at SYNG_00200018).    However, Plaintiffs' cited

evidence  does  not  support  the  fact  plaintiff  seeks  to  establish

because the cited evidence says nothing about China being identified

as  a  "major  market".    Moreover,  BIO  considered  NAEGA's

suggestion  but  declined  to  include  China  and  has  never  included

China  as  a  minimum  market  in  which  import  approval  should  be

obtained before commercialization.  *See*, Ex. 1 (M. O'Mara Dep. Tr.

77:20-81:23)

88. In August, 2010, Syngenta's Jack Bernens met with representatives of Bunge, a major exporter, who warned Bernens "about China becoming a very big player in 2011."  Ex. 57, Bernens Vol. II at 688:19-689:4; Ex. 60 (Dep. Ex. 1035) at SYNG_00610531.

**RESPONSE TO NO. 88.**          **Disputed  in  part,**

**unsupported by the evidence cited.**  Syngenta does not dispute that

the Mr. Bernens met with representatives of Bunge in August 2010.

However, Plaintiffs' cited evidence does not support the fact that

plaintiff seeks to establish, because the cited excerpt and exhibit do

not establish that Bunge *warned* Mr. Bernens about anything.

89. Bernens passed the information from Bunge along to other Syngenta executives. Ex. 60 (Dep. Ex. 1035) at SYNG_00610531.

**RESPONSE TO NO. 89.**          **Undisputed.**  Syngenta

does not dispute that Mr. Bernens summarized his meeting with

Bunge in an email to others at Syngenta.

90. Cargill "repeatedly tr[ied] to discourage them [Syngenta] from broadly commercializing Viptera across the U.S. corn belt" without Chinese approval.  Ex. 75, Deposition of Randall Giroux as a corporate representative of Cargill ("Giroux 30b6 Vol. I") at 291:3-16.

**RESPONSE TO NO. 90.**          **Disputed,          the**

**evidence cited does not establish the asserted fact, and**

**immaterial to Syngenta's arguments for summary judgment.**

Plaintiffs apparently intend the assertions in this paragraph to

support the contention that restricting seed sales or planting

practices would have reduced the incidence of cross-pollination and

the spread of MIR 162 from dust in shared equipment and thereby

would have sufficiently reduced the presence of MIR 162 in U.S.

corn exports to China so as to make it more likely than not that those

exports would satisfy China's zero-tolerance policy.  These

assertions are immaterial to that causation question, however,

because the facts asserted suggest only that restricting seed sales and

planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  The only evidence that Plaintiffs cite in support of their asserted fact is the self-serving deposition testimony of Plaintiff Cargill's Randy Giroux, which is insufficient to establish the asserted fact.  To the contrary, Mike Mack testified at his deposition as follows:

You know, I find it -- I find it ironic, at the minimum I find it ironic that Syngenta was very clear about where it was going with Viptera. I don't know the very first date we talked about it, whether it was 2008 or '9, but we communicated into the market that we were coming with this brand-new trait, and we told everyone that we were going to launch it in 2011.  And we did all of this very publically. Gary Martin understood it, to the extent that his members followed, they understood, and no one -- and I do mean no one -- ever one time sent us a letter telling us, "Don't launch this trait."  They never once said don't launch the trait until after we did it, so when talking about seriousness of purpose, serious companies that are transparent and clear about what they're going to do, we -- we said, "Here's what we're going to do and we're going to follow the rules of the road, regulatorily and otherwise," and when we turned around and did it, and it was only after that that we've got all of these people saying, "My business model's damaged."  I don't -- you know, so something -- something's wrong with the picture.

Syngenta's MSJ Ex. 313 (M. Mack Dep. Tr. 636:2-23)

57

91. Syngenta knew at the time it commercialized Viptera that China was a key export market for U.S. corn, yet it commercialized knowing that it would not have import approval in China. *See supra* SOAF ¶¶ 36-42, 63-90.

<u>**RESPONSE TO NO. 91.**</u>        **Disputed,**

**unsupported by the evidence cited, and improperly supported**

**by record citations,.**   Plaintiffs fail to "refer [to facts] with

particularity to those portions of the record upon which [Plaintiffs]

rely." *See* D. Kan. L. R. 56.1.  Plaintiffs improperly rely on broad,

unfocused citations instead of properly controverting Defendants'

statements.  *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*,

No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25,

2008) ("[P]laintiffs cross-reference large groups of their own

paragraphs of factual material, such as to controvert one of AT & T's

statements of fact or to establish other 'facts.' For example, in

response to approximately twenty of AT & T's facts, plaintiffs state

'see also GI 205–220' …. This practice runs afoul of the various

rules requiring the specific facts to be presented with record support

…, to refer with particularity to those portions of the record upon

which plaintiff is relying, and to fairly meet the substance of the

matter asserted.").  In any event, Syngenta does not dispute that it

knew that it would not have import approval in China at the time it

commercialized Viptera, particularly given China's precondition

that a trait receive approval in an export country before an

application could be submitted for import approval in China, and

that precondition created a "significant gap between authorizations

in cultivation countries, most major importing countries and China."

58

*See* Ex. 368 (M. O'Mara Dep. Ex. 38, at BIO-0018254); Ex. 369 (M. O'Mara Dep. Tr. 339:5-17; 340:2-22; 363:10-20). Syngenta disputes that China was a key export market for U.S. corn at the time it commercialized Viptera. *See, e.g.*, Syngenta's MSJ Ex. 5 (P. Shull Expert Rep. ¶ 5) ("China was not a 'key market' for U.S. corn imports in the years leading up to 2010 when Syngenta began selling Viptera, or in 2011, when Viptera was first commercially planted. In large part because of China's food security policies, China was not a consistent, reliable importer of corn generally, nor of corn from the United States, specifically, at that time."); Syngenta's Opp'n Ex. 65 (T. Bodin Dep. Ex 230) (Cargill official analysis characterizing China as a "key uncertainty" as of January 2011); Syngenta's Opp'n Ex. 66 (T. Bodin Dep. Tr. 150:24-151:5) (Cargill corporate representative on China's market testifying "Q. [In] October of 2010, it was very difficult to size up China correctly, right? THE WITNESS: It's always been difficult to size up China.") (objection omitted); Syngenta's Opp'n Ex. 67 (A. Sanfeliu Dep. Ex. 5, at CARGILL000124390), attached to email dated March 25, 2010 ("Will China be a permanent net corn importer like soybean? No, subjectively, China doesn't want to it happen [sic]. Objectively, China might import some corn after some consecutive crop loss due to the weather issue."); Syngenta's Opp'n Ex. 68 (T. Bodin Dep. Ex. 236, at CARGILL00064305) (in October 2010, Cargill was "struggl[ing] massively to size up China correctly"); Syngenta documents also indicate that China was not a predictable importer of corn and not likely to become a consistent and significant importer of

U.S. corn. *E.g.* Syngenta's Opp'n Ex. 69 (E-mail re Viptera China Approvals, at SYNG_00381932) ("Rick has been in discussions with Tom Dorr, CEO of the US Grains Council. Tom express that the North American Export Grain Association believed that NCGA considered China to be a major corn market thus the reason for concern. Tolman assured me that NCGA does not consider China today a major US export market and was only listed in a ranking of their annual report of export markets for 2010.").

92. Syngenta failed to consult with the portions of the value chain most knowledgeable about export markets, such as the NGFA, NAEGA, or individual members of the grain trade, prior to making the decision to commercialize Viptera, including whether to launch Viptera on a limited basis with robust stewardship. Rather, Syngenta only told the grain trade after it began taking orders for Viptera. Ex. 71, Gordon Vol. II at 390:8-391:11, 338:3-339:14.

**RESPONSE TO NO. 92.** **Disputed, the evidence cited does not establish the asserted fact, and immaterial to Syngenta's arguments for summary judgment.** Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in

reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162. Plaintiffs cite to the deposition testimony of Randy Gordon. In the cited testimony, Mr. Gordon states, "we certainly had meetings going back to 2010, 2011 with -- with Syngenta about its plans for commercialization and raise the importance of the Chinese market and what we perceived to be USDA's own projections on the importance of the Chinese market." Pls.' Opp'n Ex. 71 (R. Gordon Dep. Tr. 391:2-7). Mr. Gordon also testified, "I think in our view, the primary consultation with Syngenta based its decision to launch was primarily, if not almost exclusively, with the input from the National Corn Growers' Association." *Id.* at 391:7-11. Finally, Mr. Gordon testified, "I -- I can't speak to exactly who all Syngenta met with in the value chain." *Id.* at 391:16-17.

93. This is so even though Syngenta identified China as a "key import approval" in a presentation to the grain trade in August, 2010. Ex. 57, Bernens Vol II. at 524:20-530:15; Ex. 58 (Dep. Ex. 1064) (email discussing meeting with NGFA in August 2010); Ex. 59 (Dep. Ex. 1065) (Power Point presentation for the meeting).

**RESPONSE TO NO. 93.** **Disputed in part, unsupported by the evidence cited.** Plaintiff apparently intends its

61

assertions in this paragraph to support the contention that China was a key import market for U.S. corn in August 2010. Syngenta does not dispute that China was listed under the heading "Key import approvals" in a presentation in August 2010, along with other countries including New Zealand, Australia, and the Phillipines, but Syngenta disputes that China was actually a key import market for corn in 2010. *See, e.g.*, Syngenta's MSJ Ex. 5 (P. Shull Expert Rep. ¶ 5) ("China was not a 'key market' for U.S. corn imports in the years leading up to 2010 when Syngenta began selling Viptera, or in 2011, when Viptera was first commercially planted. In large part because of China's food security policies, China was not a consistent, reliable importer of corn generally, nor of corn from the United States, specifically, at that time."); Syngenta's Opp'n Ex. 65 (T. Bodin Dep. Ex 230) (Cargill official analysis characterizing China as a "key uncertainty" as of January 2011); Syngenta's Opp'n Ex. 66 (T. Bodin Dep. Tr. 150:24-151:5) (Cargill corporate representative on China's market testifying "Q. [In] October of 2010, it was very difficult to size up China correctly, right? THE WITNESS: It's always been difficult to size up China.") (objection omitted); Syngenta's Opp'n Ex. 67 (A. Sanfeliu Dep. Ex. 5, at CARGILL000124390), attached to email dated March 25, 2010 ("Will China be a permanent net corn importer like soybean? No, subjectively, China doesn't want to it happen [sic]. Objectively, China might import some corn after some consecutive crop loss due to the weather issue."); Syngenta's Opp'n Ex. 68 (T. Bodin Dep. Ex. 236, at CARGILL00064305) (in October 2010, Cargill

was "struggl[ing] massively to size up China correctly"); Syngenta documents also indicate that China was not a predictable importer of corn and not likely to become a consistent and significant importer of U.S. corn. *E.g.* Syngenta's Opp'n Ex. 69 (E-mail re Viptera China Approvals, at SYNG_00381932) ("Rick has been in discussions with Tom Dorr, CEO of the US Grains Council. Tom express that the North American Export Grain Association believed that NCGA considered China to be a major corn market thus the reason for concern. Tolman assured me that NCGA does not consider China today a major US export market and was only listed in a ranking of their annual report of export markets for 2010.").

94. Unlike Syngenta, Dow consulted with the grain industry before launching its new genetically modified traits.  Ex. 77, Deposition of Wes Uhlmeyer 30(b)(6) Vol. II ("Uhlmeyer 30b6 Vol. II") at 418:18-420:23.  Monsanto also consulted with the grain trade about its Intacta trait, and ultimately held off commercializing based on the trade's concerns about a lack of Chinese approval.  Ex. 91, Reed Vol. II at 312:20-315:12, 316:16-318:5.

## RESPONSE TO NO. 94.        Disputed,

**unsupported by the cited evidence, speculative, and immaterial to Syngenta's arguments for Summary Judgment.**    This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about traits that are not at issue in this litigation.  Plaintiffs' cited evidence does not support the fact that plaintiffs seek to establish.  First,  the cited evidence says nothing about consultation with the grain trade generally, but only rather that Dow collaborated with ADM with respect to a single corn trait that Dow intended to launch without having Chinese import approval in 2014 and Mr. Uhlmeyer "suspect[ed with] others in the

grain industry." Pls.' Opp'n Ex. 77 (6/16/2016 W. Uhlmeyer Dep.
Tr. 418:18-420:23); *see also* Ex. 370 (W. Uhlmeyer Dep. Ex. 194 at
ADM-00142085). Second, Pls.' Opp'n Ex. 91 (A. Reed Dep. Tr.
312:20-315:12, 316:16-318:5), concerns a *soybean* trait, Intacta, not
a corn trait. *See* Ex. 371 (A. Reed Dep. Ex. 127). It is undisputed
that no biotechnology company has ever launched a soybean trait
without Chinese approval. Ex. 372 (1/28/2017 J. Carrato Dep. Tr.
336:6-11). Syngenta also disputes Plaintiffs' assertion that Syngenta
did *not* consult with the grain industry before launching Viptera. In
Plaintiffs' Exhibit 71, NGFA's Mr. Gordon states, "we certainly had
meetings going back to 2010, 2011 with -- with Syngenta about its
plans for commercialization and raise the importance of the Chinese
market and what we perceived to be USDA's own projections on the
importance of the Chinese market." Pls.' Opp'n Ex. 71 (R. Gordon
Dep. Tr. 391:2-7). Mr. Gordon also testified, "I think in our view,
the primary consultation with Syngenta based its decision to launch
was primarily, if not almost exclusively, with the input from the
National Corn Growers' Association." *Id.* at 391:7-11.

95. Both Bayer and Dow decided not to commercialize genetically modified traits without Chinese
approval. Ex. 45, Giroux Vol. II at 295:10-299:6; Ex. 78 (Dep. Ex. 1070) (Bernens noting that
Bayer decision to wait on China approval "not helpful"). Ex. 57, Bernens Vol. II, 560:2-
561:3. DuPont, Dow, and Monsanto implemented limited launches of some traits with robust
stewardship programs that included on-farm audits, after consultations with the grain trade. Ex.
91, Reed Vol. II at 286:22-288:22; Ex. 79 (Reed Dep. Ex. 133) at ADM-00139924.

**<u>RESPONSE TO NO. 95.</u>** **Disputed, hearsay,**
**unsupported by the evidence cited, and immaterial to**
**Syngenta's arguments for Summary Judgment.** Plaintiffs

64

apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Moreover, this paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about traits that are not at issue in this litigation. Plaintiffs' Exhibit 45 is the deposition testimony of Cargill's Randy Giroux, in which he testifies about Bayer's commercialization practices based on discussions that he has had with Bayer, and based on his review of Exhibit 78. Plaintiffs'

Exhibit 79 is an email from ADM's JuHui Huang to Anthony Reed, relaying what Huang had been told on a phone call from the regulatory director of Dow Agrosciences. Plaintiffs' Exhibit 79 and Mr. Giroux's statements based on discussions with individuals at Bayer are hearsay, and are thus inadmissible. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Mr. Giroux's cited testimony does not say anything about Dow's commercialization practices. Plaintiffs' Exhibit 91 is deposition testimony from Mr. Reed that seeks to authenticate Exhibit 79, and does not support the facts Plaintiffs seek to establish because it says nothing about Dow's stewardship practices or product launches.

Syngenta also notes that Plaintiffs' Exhibit 78 includes a published statement from Bayer that it will not market traits in the U.S. unless those traits are approved in China. However, this statement was made in November 2014, *after* China's rejections of Viptera, and *after* the first Viptera lawsuit had been filed. The citation to Mr. Bernens testimony is nothing more than a regurgitation of the contents of Plaintiffs' Exhibit 78.

96. Monsanto and DuPont commercialization policies provided that if the company decided to launch without all key market approvals it would take responsibility for the losses suffered by the value chain for any trade disruption if their limited launch plans failed and caused a trade disruption. Ex. 45, Giroux Vol. II at 305:11-309:12; Ex. 358, Deposition of David Morgan as a 30(b)(6) Representative of Syngenta Vol II ("Morgan 30b6 Vol. II"); 486:6-21; Ex. 80 (Dep. Ex. 308) (Monsanto Launch Policy) at SYNG_00199803 ("Monsanto will make the directly affected stakeholders in the chain of commerce for that Commodity Crop whole from legally recognized and established losses . . . ."); Ex. 45, Giroux Vol. II at 335:2-336:18; Ex. 81 (Giroux Dep. Ex. 180) ("Dupont agreed to pay full cost of direct damages when their systems fail in perpetuity").

**RESPONSE TO NO. 96.**    Disputed,   hearsay,

unsupported   by   the   cited   evidence,   and   immaterial   to

66

**Syngenta's arguments for Summary Judgment.**   None of the cited evidence states that Monsanto or DuPont would "take responsibility for the losses suffered by the value chain for any trade disruption if their limited launch plans failed and caused a trade disruption."   In fact, Plaintiffs' Exhibit 80, which is Monsanto's Stewardship Policy states that only that "Monsanto will make the directly affected stakeholders in the chain of commerce for that Commodity Crop whole from *legally recognized* and *established losses, provided that they have followed any applicable regulatory or stewardship requirements or conditions of approval, and have taken appropriate and reasonable steps to prevent or mitigate loss.*"   Pls.' Opp'n Ex. 80, at SYNG_00199803 (emphasis added).   Monsanto's statement that "'[k]ey export markets' exclude markets with no regulatory system or with non-functioning regulatory systems," makes clear that any policy Monsanto had regarding responsibility for trade disruptions only applied to countries with a functioning regulatory system.   *Id*. at SYNG_00199802.   Monsanto also notes that it "can not, and by enacting these policies does not guarantee zero presence or escape of an event or trait, and does not assume any responsibility for variability of sampling or testing methods or results."   *Id*. at SYNG_00199803.

Additionally, portions of Mr. Giroux's testimony cited by Plaintiffs are based on "conversations with senior executives in Monsanto."   Pls.' Opp'n Ex. 45, at 309:7-12.   This is hearsay and is thus inadmissible.   *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149,

1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). The remaining portions of testimony are simply regurgitations of the contents of Plaintiffs' Exhibits 80 and 81.

Plaintiffs' Exhibit 358 is deposition testimony from David Morgan that seeks to authenticate Exhibit 80, and does not support the facts Plaintiffs seek to establish because it says nothing about Monsanto or Dupont's stewardship or launch policies.

Plaintiffs' Exhibit 81 is an email from Randal Giroux to Greg Page, making the unsubstantiated statement that "Dupont agreed to pay full cost of direct damages when their systems fail in perpetuity." There is absolutely no indication of the source or validity of this statement. Regardless, the Dupont product discussed the email cited by Plaintiffs as Exhibit 81 is "a functionally-unique product; High Oleic Soybeans" *not* a commodity crop. Pls.' Opp'n Ex. 81, at CARGILL000003836.

97. A "commodity" crop is one which in the ordinary course is grown using common agricultural practices and is commingled and not segregated for special handling or use when it enters the chain of commerce. Ex. 299 (Dep. Ex. 901) at SYNG_00367784 (BIO Launch Policy); Ex. 294, Deposition of Sarah Hull Vol. II ("Hull Vol. II") at 569:7-570:6; Ex. 286, Deposition of J. Thomas Carrato Vol. I ("Carrato Vol. I") at 79:12-80:5.

**RESPONSE TO NO. 97.** **Undisputed that this language tracks the BIO definition of "commodity" crop.**

98. Syngenta's expert witness Alan McHughen states in his report: "For bulk commodity crops, such as commodity corn, farmers are free to buy and plant the seeds, cultivate the crop, eventually harvest it and deliver the grain into the commodity stream." Ex. 295, Expert Report of Dr. Alan McHughen ("McHughen Rpt.") at ¶ 15.

**RESPONSE TO NO. 98.** **Undisputed.**

99. The U.S. grain handling system is a highly efficient bulk system in which significant commingling normally takes place. Ex. 157, Deposition of Randall Giroux as an Expert ("Giroux Expert Dep.") at 27:23-28:5 ("So we know that within the U.S. grain handling system, which is a highly efficient bulk system, and based on the biology of raising corn plants and based on the infrastructure that we have both from the farm, all the way through that finished, that final customer, that there is significant commingling that goes on.").

**RESPONSE TO NO. 99.**        **Disputed    and    not supported by the evidence**.  The cited testimony is not included within Plaintiffs' Exhibit 157. Syngenta does not dispute that Mr. Giroux offered the quoted testimony during his November 16, 2016 deposition, however this statement does not support the fact that Plaintiffs seek to establish, because the because the citation says nothing about all aspects of the U.S. grain handling system and is directed only to the commodity corn handling system, as Giroux mentions corn in both the preceding sentence and cited sentence. *See* Pls.' Opp'n Ex. 157 (11/16/2016 R. Giroux Dep. Tr. 27:19-23) ("So any presence, any detection of any corn kernels in China that were of that trait that was not yet approved would be -- would create -- has the potential to create a trade disruption."). Giroux testified that there are aspects of the U.S. grain handling system that are not highly efficient, such as identity-preservation systems. Ex. 331 (6/9/2016 R. Giroux Dep. Tr. 206:12-20) ("And so, because the commodity supply chain really is developed around a commingling of grain, we have to take significant measures in that identity-preservation program to keep -- what we say, keep things out. We have a high-value product. We don't want to dilute that value with a commodity corn, for example."); *id.* at 207:5-209:23 (noting identity preservation requires, among other things, setting up specific times for grain delivery, cleaning infrastructure, and possibly "validating or verifying the legs or the way we transport that grain inside the facility").

100.   Syngenta's expert Carrato admits that the grain trade does not typically segregate or identity preserve commodity corn.  Ex. 286, Carrato Vol. I at 81:10-23; *see also* Ex. 287,

Expert Report of J. Thomas Carrato ("Carrato Rpt.") at ¶ 31 ("most #2 yellow field corn is commingled and handled as commodity corn grain, and the grain trade generally does not isolate or segregate corn grain based on the source or type.").

**RESPONSE TO NO. 100.**   Syngenta does not dispute that Mr. Carrato testified that, "Generally speaking yes.  The grain trade does not isolate or segregate or identity-preserve commodity corn."  *See* Pls.' Opp'n Ex. 286 (J. Carrato Dep. Tr. 81:21-23).  However Syngenta disputes Plaintiffs' reference to Mr. Carrato's expert report as incomplete.   Paragraph 31 of Mr. Carrato's report states, "While most #2 yellow field corn is commingled and handled as commodity corn grain, and the grain trade generally does not isolate or segregate corn grain based on the source or type, *there are identity preservation (IP) systems and identity preserved products.  However, the grain trade does not want to segregate, channel, or IP corn grain due to the added expense and lack of existing infrastructure*."  Pls.' Opp'n Ex. 287 (J. Carrato Expert Rep. ¶ 31) (emphasis added).

101.   The grain trade does not have the infrastructure to segregate corn based on source or type. Ex. 287, Carrato Rpt. at ¶ 31; *see also* Ex. 286, Carrato Vol. I at 84:2-6 ("Q: Now, with respect to the grain trade, you would agree that they don't typically have the infrastructure to segregate corn based on even source or type, right? A: Generally speaking that's correct.").

**RESPONSE TO NO. 101.**   **Disputed and not supported by the evidence.**  Plaintiffs' cited evidence does not support the fact that they seek to establish, because the citation says nothing about the grain trade uniformly lacking the infrastructure to segregate corn based on source or type, only that the grain trade "typically" does not have the infrastructure. Pls.' Opp'n Ex. 286 (J.

Carrato Dep. Tr. 84:2-6). In addition, Carrato's Expert Report states,

"While most #2 yellow field corn is commingled and handled as

commodity corn grain, and the grain trade generally does not isolate

or segregate corn grain based on the source or type, there are

identity preservation (IP) systems and identity preserved products."

Pls.' Opp'n Ex. 287 (J. Carrato Expert Rep. ¶ 31).

102.    Viptera seed was sold to farmers for production of commodity corn.  Ex. 294, Deposition
of Sarah Hull Vol. II ("Hull Vol. II") at 569-70; Ex. 4, Lee Vol. I at 41:18-23.

**RESPONSE TO NO. 102.        Undisputed.**

103.    Syngenta did not implement practices that would "prevent commingling" of Viptera
and non-Viptera corn such as "using in a limited geographic area[] [like] a geographic area that
is in a feed market."  Ex. 82, Chris Boerm Deposition Vol. II ("Boerm Vol. II") at 406:18-
410:5, 469:21-471:19.

**RESPONSE TO NO. 103.        Disputed,        not**

**supported by the evidence, and immaterial to Syngenta's**

**arguments for summary judgment.**  Plaintiffs apparently intend

the assertions in this paragraph to support the contention that

restricting seed sales or planting practices would have reduced the

incidence of cross-pollination and the spread of MIR162 from dust

in shared equipment and thereby would have sufficiently reduced

the presence of MIR162 in U.S. corn exports to China so as to make

it more likely than not that those exports would satisfy China's zero-

tolerance policy.  These assertions are immaterial to that causation

question, however, because the facts asserted suggest only that

restricting seed sales and planting practices could have some

indeterminate marginal effect in reducing the risk of cross-

pollination, but do not provide any evidence purporting to quantify

71

the effectiveness of those measures or the degree to which they would reduce cross-pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.   Furthermore, Syngenta required growers to channel grain to appropriate markets after harvest.   All growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds, Inc. Stewardship Agreement ("Stewardship Agreement").  Syngenta's Opp'n Ex. 73 (A. Vulcan Dep. Tr. 54:14-21, 58:6-19). During the relevant time period, Syngenta's Stewardship Agreement included, among other obligations, an agreement by the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . . ." E.g., Syngenta's Opp'n Ex. 38 (Aug. 2009 Syngenta Seeds Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (Mar. 2011 Syngenta Seeds Stewardship Agreement, at SYNG_00004255). During the relevant time period, each bag of Viptera corn seed also included a tag that states: "READ BEFORE PLANTING." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag

Tag, at SYNG_00316509-10). These tags read in part: "Prior to planting this hybrid, carefully read this information and the Insect Resistance Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way." and "By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement …." Under the heading "Grain Marketing Guidelines," the tags stated: "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com."  Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10).

104. Instead, Syngenta conducted "intense marketing" of Viptera in the "heart of the Corn Belt," including Nebraska, Iowa, Southern Minnesota and throughout the Midwestern states. Ex. 24, D. Martin Vol. I at 121:9:123:2

**RESPONSE TO NO. 104.**      Undisputed      that Syngenta broadly marketed its safe, effective, U.S.-approved product in the U.S.

105.   It also targeted the "Midsouth" and "Southeast" regions of the United States.  *Id.* at 122:19-21, 136:25-137:14.

> **RESPONSE TO NO. 105.**   Undisputed   that
>
> Syngenta broadly marketed its safe, effective, U.S.-approved
>
> product in the U.S.

106.   Syngenta did not limit sales of Viptera anywhere because, it claims, Viptera provided benefits to "[v]irtually anywhere a producer grows corn." *Id.* at 122:22-25, 135:4-136:4.

> **RESPONSE TO NO. 106.**   Undisputed   that
>
> Syngenta broadly marketed its safe, effective, U.S.-approved
>
> product in the U.S.

107.   Viptera was distributed widely across the United States. *Id.*

> **RESPONSE TO NO. 107.**   **Undisputed.**

108.   In its first year (2011), Syngenta sold 458,481 units of Viptera to 13,593 farmers. Ex. 83 (Dep. Ex. 200) at SYNG_00647310; Ex. 24, D. Martin Vol. I at 26:2-8, 153:13-154:9.

> **RESPONSE TO NO. 108.**   **Undisputed.**

109.   Syngenta continued to market Viptera for the 2012 and 2013 growing seasons and its market share grew during that period. Answer, ECF No. 2623 at ¶ 294 (admitted).

> **RESPONSE TO NO. 109.**   **Undisputed.**

110.   In its second year (2012), Syngenta sold 688,488 units of Viptera to 17,640 farmers. Ex. 83 (Dep. Ex. 200) at SYNG_00647311; Ex. 24, D. Martin Vol. I at 157:12-22, 161:2-7.

> **RESPONSE TO NO. 110.**   **Undisputed**

111.   Based on an average planting rate of 2.66 acres per unit, about 1,831,378 acres were planted with Viptera corn in 2012 (2.66 x 688,488 = approx. 1,831,378). *See* Ex. 24, D. Martin Vol. I at 157:12-22; Ex. 4, Lee Vol. I at 233:11-22.

> **RESPONSE TO NO. 111.**   **Disputed   and   not**
>
> **supported by the evidence.**  Plaintiffs' cited evidence does not
>
> support the fact that they seek to establish, because the citations says
>
> nothing about the amount of seed that may have been returned,

discarded, or otherwise not planted. *See, e.g.,* Syngenta's Opp'n Ex. 70

(9/1/2011 Email re Viptera planting details, at SYT00306937) ("Total

units shipped (this is about 18% higher than reality due to returns)").

112.   In its third year (2013) Syngenta sold 916,075 units of Viptera to 20,276 farmers. Ex. 83
(Dep. Ex. 200) at SYNG_00647312; Ex. 24, D. Martin Vol. I at 161:8-12.

**RESPONSE TO NO. 112.        Undisputed.**

113.   Syngenta expected and hoped that the Viptera seed it sold would be planted by Viptera
Growers.  *See* Ex. 246, Lee Vol. III at 501:2-6 ("Q. And it was important to Syngenta that
those Viptera seeds that had been sold make their way into the ground in 2011, correct?  A.
Any seed we sell we hope gets planted, correct.").

**RESPONSE TO NO. 113.        Undisputed.**

114.   Based on an average planting rate of 2.66 acres per unit, about 2,436,759 acres were
planted with Viptera corn in 2013 (2.66 x 916,075.12 = approx. 2,436,759). *See* Ex. 24, D.
Martin Vol. I at 161:8-16; Ex. 83 (Dep. Ex. 200, Tab 11); Ex. 4, Lee Vol. I at 233:11-22.

**RESPONSE TO NO. 114.        Disputed     and     not**

**supported by the evidence.** Plaintiffs' cited evidence does not support

the fact that they seek to establish, because the citations says nothing

about the amount of seed that may have been returned, discarded, or

otherwise not planted. *See, e.g.,* Syngenta's Opp'n Ex. 70 (9/1/2011

Email re Viptera planting details, at SYT00306937) ("Total units

shipped (this is about 18% higher than reality due to returns)").

115.   In 2011, Syngenta distributed Viptera in 41 states, including: Alabama, Arkansas,
California, Colorado, Connecticut, Delaware, Florida, Georgia, Iowa, Idaho, Illinois, Indiana,
Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri,
Mississippi, North Carolina, North Dakota, Nebraska, New Jersey, New Mexico, Nevada,
New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee,
Texas, Utah, Virginia, Vermont, Wisconsin, and West Virginia.    Ex. 83 (Dep. Ex. 200) at
SYNG_00647310.

**RESPONSE TO NO. 115.        Disputed  in  part**. In

2011, Viptera was distributed in Maine but not Massachusetts.

Syngenta does not dispute any other aspect of Plaintiffs' asserted

fact.  *See*  Pls.' Opp'n Ex. 83 (Syngenta sales figures, at SYNG_00647310).

116.   In 2012, Syngenta distributed Viptera in 48 states, including those identified in the immediately preceding paragraph and also in Arizona, Maine, Montana, New Hampshire, Rhode Island, and Wyoming.  Ex. 83 (Dep. Ex. 200) at SYNG_00647311.

<u>**RESPONSE TO NO. 116.**</u>        **Undisputed.**

117.   In 2013, Syngenta distributed Viptera all 47 states, all of the states identified above except Connecticut.  Ex. 83 (Dep. Ex. 200) at SYNG_00647312.

<u>**RESPONSE TO NO. 117.**</u>        **Disputed.**     In 2013, Syngenta distributed Viptera in all of the states identified in Opp'n SOAF ¶¶ 115-116 except Connecticut.  Viptera was also distributed in Washington in 2013.

118.   Syngenta did not impose any channeling requirements on its growers for Viptera, even though it had the authority under its stewardship agreements to do so.  Ex. 84, Deposition of Miloud Araba Vol. II ("Araba Vol. II") at 436:18-23, 623:23-627:8.

<u>**RESPONSE TO NO. 118.**</u>        **Disputed,**
**unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.** *First*, Syngenta's stewardship agreements included a binding contractual obligation for the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time." *See, e.g.*, Syngenta's Opp'n Ex. 38 (August 2009 Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (March 2011 Stewardship Agreement, at SYNG_00004255).   Additionally, Syngenta's Stewardship Guide

alerted growers of the requirement to sign a Syngenta Seeds Stewardship Agreement and noted that it included the "terms and conditions of growing hybrids with Agrisure traits, including the terms of . . . grain channeling requirements" and that "grain harvested from U.S. approved hybrids can only be exported to nations that have authorized the event." Syngenta's MSJ Ex. 217 (2011 Stewardship Guide, at SYNG_00403142, SYNG_00403152); *see also* Ex. 373 (2012 Stewardship Guide, at SYNG_00159487) (requiring stewardship agreement); Ex. 374 (2013 Stewardship Guide, at SYNG_00324865) (same); Ex. 375 (2014 Stewardship Guide, at SYNG_00338067) (same); Ex. 376 (2015 Stewardship Guide, at SYNG_00291183) (same); Ex. 377 (2016 Stewardship Guide, at SYNG_00681763) (same).

*Second*, whether Syngenta required its growers to channel is irrelevant to Syngenta's motion for summary judgment and in fact irrelevant to this case because the Court has held that a requirement to channel corn grain is preempted by the Grain Standards Act. *See* Rule 12(c) Order 19-25 (ECF No. 2426).

*Third*, Plaintiffs cite only Araba's individual deposition, who was not testifying as a corporate representative. In the deposition pages Plaintiffs cite, Araba—a technical product lead whose responsibility is coordinating projects in the pre-commercialization stage—repeatedly disclaimed knowledge of Syngenta's post-commercialization channeling requirements. *See* Pls.' Opp'n Ex. 84 (M. Araba Dep. Tr. 625:3-6) ("Once again, you're asking me about things that I don't know a lot of details about, so some other people might be in a better place to answer that."); *id.* at 625:15-21 ("I mean, I have no comments about that, so it's a commercial -- you're talking about

things -- traits that have been commercialized. You're talking to a technical product lead, where I'd be a lot more concerned about technical aspects. There are better people and better places than I am to be able to address those questions."); *id.* at 625:22-626:4 ("Q.  There may be better people to address them, but as the project lead on Viptera, you would know if Syngenta imposed any channeling requirements on its producers, correct?  [objection omitted] A.  By the time I've come in in 2010, the project has already gone into commercial stage.").  Araba testified only that he was "not aware of" post-commercialization channeling requirements that Syngenta imposed on Viptera producers.  *Id.* at 626:25-627:6.

119.    One precaution Syngenta could have taken to "prevent cross-pollination" is requiring that Viptera be planted using border or buffer rows (referred to as "border rows").  Ex. 87, Boerm Vol. I at 217:9-13.

**RESPONSE TO NO. 119.**        **Disputed by plaintiffs' own statements of fact.**  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on

which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Plaintiffs' own statements of fact contradict the assertion that Syngenta could have "prevent[ed] cross-pollination." *See* Pls.' MSJ SOF ¶ 40 (citing to producer testimony that there is "no means to prevent cross-pollination except 'detasseling the corn or building giant walls around the field'" and that it's "physically impossible" unless a producer were to "build a dome over" the corn). Syngenta also disputes that it had a responsibility or obligation to require the use of border or buffer rows. *See* Syngenta's MSJ Part I.

120.   The use of border rows, along with training on how to clean equipment, would "keep [unwanted traits] out of the ordinary stream" of the commodity market. Ex. 82, Boerm Vol. II at 471:16-19.

**RESPONSE TO NO. 120.**   **Disputed   as characterized.** Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that

restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Plaintiffs' cited evidence includes testimony from Mr. Boerm, in which he discusses ways to "minimize" commingling. His testimony does not suggest that it is possible to keep grain out of the ordinary stream full-stop.

Pls.' Opp'n Ex. 82 (C. Boerm Dep. Tr. 471:10-19).

121. According to S y n g e n t a, as testified by their 30(b)(6) witness Duane Martin, border rows are an "*effective way to manage*" cross-pollination. Ex. 85, D. Martin Vol. II at 54:12-55:2 (emphasis added) (testifying that it would be effective for someone "concerned with identity preservation").

**RESPONSE TO NO. 121.        Undisputed.**

122. Another Syngenta witness, Ponsi Trivisvavet, when asked if there is "always a risk that with corn, that a trait planted in one field will spread to a neighboring field," answered that "it depends on how you plant it and how you manage the stewardship and how you create the border rows," clearly suggesting that with appropriate precautions there would not be a risk. Ex. 86, Deposition of Ponsi Trivisvavet Vol. II ("Trivisvavet Vol. II") at 467:6-12, 468:7-12 ("There is a risk if there is no management, but it depends on the environment. . . . For example, the environment could be the set-up of the field, the timing of the growing . . ."

**RESPONSE TO NO. 122.        Disputed        as**

**characterized.**   Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or

planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Syngenta does not dispute that Ms. Trivisvavet provided the quoted testimony, but disagrees that this testimony "clearly suggest[ed] that with appropriate precautions there would not be a risk." Ms. Trivisvavet did not state that it is possible to eliminate all risks of cross-pollination. Syngenta disputes that corn can be channeled to zero tolerance. *See* Syngenta's MSJ Ex. 66 (A. McHughen Expert Rep. ¶ 23) ("Given that corn naturally outcrosses, ensuring 100% genetic

purity in corn grain is scientifically impossible, as at least some of the grain will have outcrossed with other corn from some distance away from the farm where the grain was harvested.").

123.    Border rows "can be used" to prevent cross-pollination. *Id*. at 477:13-15.

**RESPONSE TO NO. 123.**    **Disputed      and unsupported by the cited evidence.**  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  Plaintiffs' cited evidence does not establish that border rows can "prevent" cross-

pollination.  The quoted testimony states, "Border rows can be used for specialty corn to be separated from the other areas that we prefer not to have the cross-pollination."  Pls.' Opp'n Ex. 86 (P. Trivisvavet Dep. Tr. 477:13-15); *see also*, Pls.' Opp'n Ex. 87 (C. Boerm Dep. Tr. 168:11-13) ("And as we talked about earlier today, there is no IP program that is a hundred percent foolproof any way.").

124.    Despite the availability of this precaution, Syngenta did not attempt to prevent "cross-pollination" of Viptera "by having border rows."  Ex. 87, Deposition of Chris Boerm Vol. I ("Boerm Vol. I") at 167:18-168:18, *see also id.* at 164:14-165:19; Ex. 24, D. Martin Dep. Vol. I at 303:24-304:9; Ex. 85, D. Martin Vol. II at 246:7-12 ("Q. . . . Syngenta did not advise all Viptera growers to plant border rows, did it?  A. We did not.").

**RESPONSE TO NO. 124.**  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone

or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  Syngenta does not dispute that in response to the question "But Syngenta did not advise all Viptera growers to plant border rows, did it?," Duane Martin testified, "We did not.  And once again, because the trait was fully approved to be in the US marketplace."   Pls.' Opp'n Ex. 85 (2/9/2016 D. Martin Dep. Tr. 246:7-12).

125.   In fact, Syngenta "didn't give the farmers any prescriptive means to try and minimize the contamination of the crop." Ex. 87, Boerm Vol. I at 168:9-15.

<u>**RESPONSE TO NO. 125.**</u>    **Disputed.**    Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they

provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.   Syngenta objects to the term "contamination" because Viptera was a U.S.-approved product being grown in the U.S.

Syngenta required growers to channel grain to appropriate markets after harvest.  All growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds, Inc. Stewardship Agreement ("Stewardship Agreement"). Syngenta's Opp'n Ex. 73 (A. Vulcan Dep. Tr. 54:14-21, 58:6-19). During the relevant time period, Syngenta's Stewardship Agreement included, among other obligations, an agreement by the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . . ." E.g., Syngenta's Opp'n Ex. 38 (Aug. 2009 Syngenta Seeds Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (Mar. 2011 Syngenta Seeds Stewardship Agreement, at SYNG_00004255). During the relevant time period, each bag of Viptera corn seed also included a tag that states: "READ BEFORE PLANTING." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10). These tags read in part: "Prior to planting this hybrid, carefully read this information and the Insect Resistance Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way." and "By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement …." Under the heading

"Grain Marketing Guidelines," the tags stated: "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10).

126.   In the estimation of one Archer Daniels Midland ("ADM") witness, the lack of border rows was "reckless[]" and, as a result, it was "safe to assume that the entire crop was probably . . . tainted with Viptera." *Id*. at 184:3-8.

**RESPONSE TO NO. 126.**      Plaintiffs      apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone

86

or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Syngenta does not dispute that one ADM witness testified, "because of the way it was introduced, recklessly from the standpoint that there weren't border rows taken care of, it was safe to assume that the entire crop was probably, you know, tainted with Viptera." Pls.' Opp'n Ex. 87 (C. Boerm Dep. Tr. 184:5-8). Syngenta notes the Viptera was commercialized as a U.S.-approved commodity crop. *See* Opp'n SOAF ¶ 102.

127.   Syngenta had "no program in place" at all for a "stewardship program with farmers being trained on how to plant, how to clean their planters, how to harvest the grain, how to clean out the combines, [or] how to deliver." *Id*. at 216:21-217:13.

**RESPONSE TO NO. 127.**   **Disputed.**   Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence

87

purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Syngenta notes that Viptera was commercialized as a U.S.-approved commodity crop. *See* Opp'n SOAF ¶¶ 102.

Syngenta disputes that it had no program in place for stewardship. Syngenta required growers to channel grain to appropriate markets after harvest. All growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds, Inc. Stewardship Agreement ("Stewardship Agreement"). Syngenta's Opp'n Ex. 73 (A. Vulcan Dep. Tr. 54:14-21, 58:6-19). During the relevant time period, Syngenta's Stewardship Agreement included, among other obligations, an agreement by the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . . ." E.g., Syngenta's Opp'n Ex. 38 (Aug. 2009 Syngenta Seeds Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (Mar. 2011 Syngenta Seeds Stewardship Agreement, at SYNG_00004255). During the relevant time period, each bag of Viptera corn seed also included a tag that states: "READ BEFORE PLANTING." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10). These tags read in part: "Prior to planting this hybrid, carefully read this information and the Insect Resistance Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower

must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way." and "By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement …." Under the heading "Grain Marketing Guidelines," the tags stated: "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com."  Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10).

128.   As with cross-pollination, although "there are practices that you can use to greatly reduce the commingling of grain . . . it must start in the beginning before the crop is planted." Ex. 82 Boerm Vol. II at 473:12-474:3 (describing the use of an "action plan on how to handle the seed before planting, how to handle the seed during harvesting, and to have measures in place that can prevent cross-pollination that can occur with corn.").

**RESPONSE TO NO. 128.**      **Disputed.**      Plaintiffs

apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing

the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Syngenta disputes the accuracy of Mr. Boerm's testimony to the extent that he testifies about specifically which practices can reduce the commingling of grain.

129. But "[n]one of those steps took place" with Viptera. *Id.*

**RESPONSE TO NO. 129.** **Disputed, not supported by the evidence, and immaterial to Syngenta's arguments for summary judgment.** Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-

pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross-pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.    Furthermore, Syngenta required growers to channel grain to appropriate markets after harvest.    All growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds, Inc. Stewardship Agreement ("Stewardship Agreement"). *See* Syngenta's Opp'n Ex. 73 (A. Vulcan Dep. Tr. 54:14-21, 58:6-19). During the relevant time period, Syngenta's Stewardship Agreement included, among other obligations, an agreement by the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . . ." *See* Syngenta's Opp'n Ex. 38 (Aug. 2009 Syngenta Seeds Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (Mar. 2011 Syngenta Seeds Stewardship Agreement, at SYNG_00004255). During the relevant time period, each bag of Viptera corn seed also included a tag that states: "READ BEFORE PLANTING." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-

10). These tags read in part: "Prior to planting this hybrid, carefully read this information and the Insect Resistance Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way." and "By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement …." Under the heading "Grain Marketing Guidelines," the tags stated: "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com."  Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10).

130.    To the contrary, Syngenta hastened the spread of Viptera by encouraging growers to plant Viptera next to non-Viptera corn.  Ex. 1, Milne Dep. at 34:17-35:2, 112:1-118:12 (Syngenta Seed Advisor and Viptera grower describing side-by-side growing of Viptera next to other corn hybrids on an annual basis with the help of Syngenta and its agronomists).

**RESPONSE TO NO. 130.**    **Disputed.**    The cited testimony is Mr. Milne's description of a test plot that he participated in as a Syngenta seed dealer, in which he planted Viptera corn next to non-Viptera corn and realized a 20-bushel

increase                              in                      yield.

*See* Ex. 378 (T. Milne Dep. Tr. 112:15-118:17).

131.   And in late September, 2011, a Viptera grower from Illinois left a message for a Syngenta employee wanting to "understand the possibility of pollen drift to his neighbor's farm and if he is liable for that?"   During a follow-up conversation, the farmer told a Syngenta representative he was concerned about "potential liability that he incurs if he informs a neighbor that they may have corn that cross-pollinated w/ his Viptera."   The Syngenta representative consulted with Syngenta's legal department, then called the farmer back and advised the farmer "that he was under no legal requirement to inform neighboring growers that he had planted Viptera."   Ex. 249 (Dep. Ex. 432); Ex. 289, Deposition of Mark Sather ("Sather Dep.") at 319:10-322:9.

**RESPONSE TO NO. 131.**      **Disputed,      hearsay.**

Plaintiffs' Exhibit 249 contains an email exchange in which various Syngenta employees are discussing conversations that they have had with third-parties.   This is hearsay, and is thus inadmissible.   *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).   Plaintiffs' citation to the deposition transcript of Mark Sather simply includes a recitation of the contents of the email in Plaintiffs' Exhibit 249 (Deposition Exhibit 432) and is inadmissible for the same reasons. Pls.' Opp'n Ex. 289 (M. Sather Dep. Tr. 319:10-322:9).

132.   Prior to Syngenta's commercialization of Viptera, there has been no trade disruption with China due to the presence of an unapproved genetically modified trait. Ex. 296, July 5, 2016 Deposition of Jerrity Chen Vol. I at 124:10-25 ("China had not rejected any shipment because of genetically modified trait.").

**RESPONSE TO NO. 132.**      **Disputed      and unsupported by the cited evidence.**   The cited testimony states, "*As far as I can remember*, and to my understanding, *I'm not sure if this is correct*; however, since I joined this industry in 2006, China

93

had not rejected any shipment because of genetically-modified traits until MIR162. *I mean, China had not rejected a whole shipment of grains, but I'm not sure if they did with containers, but this is, to my knowledge, only -- and I'm not sure if this is correct or not.*" Pls.' Opp'n Ex. 296 (Jerrity Chen Dep. Tr. 124:10-25) (emphasis added). Syngenta disputes Plaintiffs' assertion that prior to Syngenta's commercialization of Viptera there has been no trade disruption with China due to the presence of an unapproved genetically modified trait. *See* Ex. 379 (7/14/2011 email from D. Morgan to S. Hull et al, at SYNG_00367968) ("[Cargill] will pass on supplying new crop corn to China this year as they are simply unwilling to run the risk of a returned boat. They incurred a $6M cost for the returned MON 89034 vessel last year and have no appetite for repeating the experience.").

133.   In 2007, the Biotechnology Industry Organization ("BIO") published its BIO Product Stewardship Launch Policy. Ex. 297, Deposition of Matthew O'Mara, 30(b)(6) for BIO, ("O'Mara Vol. I) 37:22-38:15; Ex. 298 (BIO Dep. Ex. 2) (2007 BIO Policy).

**RESPONSE TO NO. 133.        Undisputed.**

134.   It was prepared and adopted because "global trade of agricultural products [is] extremely important to the U.S. agricultural industry." Ex. 297, O'Mara Vol. I at 39:21-40:9. Its purpose was to address the risks created by asynchronous approvals among importing and exporting countries. *Id*. at 40:10-20.

**RESPONSE TO NO. 134.**        Syngenta   does   not dispute that Mr. O'Mara testified that his understanding of the general reasoning for the adoption of the BIO policy *included* the reasoning asserted in Opp'n SOAF ¶ 134.

135.   One of its purposes was to prevent or minimize trade disruptions. Ex. 301, O'Mara Vol. II at 164:12-165:5; Ex. 298 (BIO Dep. Ex. 2).

**RESPONSE TO NO. 135.**      Syngenta      does      not

dispute that Mr. O'Mara testified that *one* of the purposes of the BIO

products launch policy was to minimize trade disruptions.

136.   BIO adopted a launch policy to "facilitate the flow of goods in commerce, minimize trade disruptions, and facilitate the availability of crops and products with the appropriate function and composition for intended uses."   Ex. 299   (Dep. Ex. 901) at SYNG_00367783 (December 10, 2009 BIO Launch Policy).

**RESPONSE TO NO. 136.**   Syngenta   does   not

dispute that the 2009 BIO Policy states that "BIO's Food and

Agriculture Section supports actions that facilitate the flow of

goods in commerce, minimize trade disruptions, and facilitate

the availability of crops and products with the appropriate

function and composition for intended uses." This is *one* stated

purpose of the BIO Launch Policy, but not the sole stated purpose of

that policy.  The BIO Policy also states its purpose is to "encourage

the continued adoption of agricultural biotechnology globally and to

continue to have products of agricultural biotechnology bring value

to the market place."  Pls.' Opp'n Ex. 299 (S. Hull Dep. Ex. 901, at

SYNG_00367783).

137.   As of 2009, Syngenta was a member of the Biotechnology Industry Organization ("BIO") and agreed to abide by the BIO Launch Policy.  *See* Ex. 25, Mack Vol. 1 at 264:11-23, 312:25-316:2.

**RESPONSE TO NO. 137.**   **Undisputed.**

138.   BIO recognizes that "[a]synchronous authorizations combined with importing countries maintaining 'zero tolerance' for recombinant-DNA products not yet authorized results in the potential for major trade disruptions." Ex. 298 (BIO Dep. Ex. 2) at 1. Hence, developers of new GM traits should not commercialize until they receive approval in all key markets with functioning regulatory systems. *Id.*

**RESPONSE TO NO. 138.** **Disputed and unsupported by the evidence cited.** Plaintiffs' cited evidence does not support the second part of their statement. The cited evidence states, "BIO's Food and Agriculture Section believes that henceforth individual member companies should, prior to commercialization, meet applicable regulatory requirements in key countries identified in a market and trade assessment that have functioning regulatory systems and are likely to import the new biotechnology-derived plant products." Pls.' Opp'n Ex. 298 (M. O'Mara (BIO) Dep. Ex. 2, at 2).

139.    The 2007 BIO Policy recommends that biotech companies "consult at an early stage with the value chain for the specific crop" in conducting a market and trade assessment, and then to "[p]romptly communicate broadly and in a transparent manner with stakeholders as to its company-specific product launch stewardship policies and their implementation." Ex. 298 (BIO Dep. Ex. 2) at 2-3.

**RESPONSE TO NO. 139.** **Undisputed.**

140.    The BIO Policy was amended in November 2012 to place more "emphasis on the communication along the value chain in terms of when a company decided to bring a product to market or not." Ex. 297, O'Mara Vol. I at 54:7-17.

**RESPONSE TO NO. 140.** **Disputed as characterized.** Syngenta does not dispute that Matthew O'Mara testified that generally, the purpose of the 2012 amendments was to "be more reflective of -- of the situation we were seeing globally, as well as the importance that we felt in terms of ensuring or encouraging communication, placing an emphasis on the communication along the value chain in terms of when a company decided to bring a product to market or not." Pls.' Opp'n Ex. 297 (M. O'Mara Dep. Tr. 54:7-17). When questioned about what

96

"global situation" he was referring to, Mr. O'Mara testified, "Well, over time, more and more countries have become, have established, you know, regulatory frameworks for biotechnology.  And as more countries come online, the, you know, the issue of asynchronous approval is -- is -- becomes more prominent, there's more countries to address in terms of working with those countries."  *Id* at 54:25-55:7.

141.   In addition to requiring that new GM products not be commercialized ahead of key import approvals, the 2007 Policy requires a company to manage the introduction of new GM products so that global markets are "available and preserved."  Ex. 298 (BIO Dep. Ex. 2) at 2007 BIO at 2 ("Manage the product's introductions so that choice of production methods (i.e., facilitate coexistence) and markets (e.g., specialty, identity preservation, and global) for that crop are available and preserved.").

**RESPONSE TO NO. 141.**      **Disputed            as**

**characterized.**   Syngenta does not dispute that the quoted text appears in the 2007 BIO Policy.   Syngenta disputes plaintiffs' characterization of the BIO Policy "requiring" such action.  Instead, the BIO Policy "encourages" individual member companies to follow certain commercialization practices.  *See* Pls.' Opp'n Ex. 298 (M. O'Mara (BIO) Dep. Ex. 2, at 2).  The BIO Policy also states, "BIO's Food and Agriculture Section believes that henceforth individual member companies should, prior to commercialization, meet applicable regulatory requirements in key countries identified in a market and trade assessment that have functioning regulatory systems."  *Id*.  Syngenta agreed to comply with the BIO launch policy on the understanding that China was neither a major market for corn nor had a functioning regulatory system.

142.    The 2012 Policy provides further guidance on the obligation to manage a product's introduction until all key import approvals are obtained.  Specifically, it advises that where a market is not key, at the time of commercialization, but becomes a key market, a company should "adjust its stewardship plans, as appropriate, to minimize the potential for trade disruption where [the product is] already launched, or if continuing the launch."  Ex. 300 (BIO Dep. Ex. 25) (2012 BIO Policy); Ex. 301, Deposition of Matthew O'Mara Vol. II ("O'Mara Vol. II") at 242:4-20.

**RESPONSE TO NO. 142.**        Syngenta        disputes Plaintiffs characterization of the BIO policy imposing "obligations." Plaintiff does not dispute that the BIO Policy is non-binding.  Pls.' SOAF ¶ 144.  Syngenta does not dispute that the 2012 BIO Policy states that "[i]f there is a significant change in circumstances, the company should re-evaluate its stewardship of a planned . . . or ongoing product launch, or where a product has already been launched, taking into account the changed circumstances, and should adjust its stewardship plans, as appropriate, to minimize the potential for trade disruption where already launched or if continuing the launch."  Pls.' Opp'n Ex. 300 (2012 BIO Policy, at SYNG_00684123).

143.    Syngenta endorsed the BIO Policy and externally communicated that it supported the policy and would "implement it within Syngenta."  Ex. 47 (Dep. Ex. 1013) ("Syngenta was actively involved in the development of this policy.  I can confirm with you that we support the policy and that we will implement it within Syngenta."); Ex. 26, Hull Vol. I at 147:7-24 ("Our intent was to demonstrate to corn growers and other stakeholders that we will abide by the policy that's on our website."), Ex. 294, Hull Vol. II at 565:2-566:5; Ex. 302 (Dep. Ex. 967) (Syngenta's published "Implementation Principles" for the BIO Policy).

**RESPONSE TO NO. 143.**        Undisputed.

144.    The BIO Policy is "non-binding" and does not define key markets because "BIO was absolutely paranoid about antitrust issues" and the biotech companies could not formally agree to such issues.  Ex. 286, Carrato Vol. I at 215:23-216:5, 234:7-9 ("No.  BIO is very careful to make sure that it was not a policy, because they're so paranoid about antitrust issues."). Nonetheless, "Syngenta had adopted and followed" the policy.  *Id.* at 360:19-21.

**RESPONSE TO NO. 144.**       Syngenta    does    not

dispute that the BIO Policy is "non-binding" but disputes Plaintiffs'

characterization of the BIO Policy's position on defining key

markets.   The 2012 BIO policy does not specifically define key

markets, but rather it says "companies . . . should meet applicable

regulatory requirements in key countries identified in the trade

assessment that have functioning regulatory systems and are likely

to import commodities including the new biotechnology-derived

plant products."      Pls.' Opp'n Ex. 300 (2012 BIO Policy at

SYNG_00684123).  To the extent that Plaintiffs assert that the BIO

Policy does not define how to conduct an analysis of key markets,

the BIO Policy states, "[i]n preparing the trade assessment, consult

at an early stage with the value chain for the specific crop.  Manage

the product's introductions so that choice of production methods and

purpose or use (e.g., specialty, identity preservation, and global) for

that crop are available and preserved."  *Id.*  Syngenta agreed to

comply with the BIO launch policy on the understanding that China

was neither a major market for corn nor had a functioning regulatory

system.

145.   In verified interrogatory responses, Syngenta identified Miloud Araba as a person
principally responsible for developing and enforcing Syngenta's stewardship policies.   Ex.
38, Araba Vol. I at 35:14-36:7; Ex. 88, Syngenta AG's Am. Responses & Obj. to Pls.' First Set
of Interrog. No. 1.

**RESPONSE TO NO. 145.       Disputed        and**

**unsupported by the cited evidence**.   Syngenta's verified

interrogatory  responses  indicate  that  "the  development  and

enforcement of Syngenta's stewardship policies used in connection with the products at issue in this case resulted from a collaborative effort that required input and assistance from a number of persons in multiple departments across Syngenta entities.  As it relates to the development of the products at issue in this case, Syngenta identifies Miloud Araba and Jack Bernens as the persons most accurately characterized as being 'principally responsible' for developing Syngenta's stewardship policies at the relevant time, and Syngenta identifies Abby Vulcan as the person most accurately characterized as being 'principally responsible' for monitoring and enforcing Syngenta's Stewardship Agreements for the products at issue in this litigation."   Pls.' Opp'n Ex. 88 (Syngenta's Responses to Pls.' Interrog., at 2-3).

146.    Araba was the technical lead for Syngenta's Enogen corn product. Ex. 38, Araba Vol. I at 54:2-20.

**RESPONSE TO NO. 146.    Undisputed and immaterial to Syngenta's arguments for summary judgment.**  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Syngenta notes that "technical product lead" was not Mr. Araba's title during the relevant time period, but simply how he referred to his role at his deposition.  *See* Pls.' Opp'n Ex. 38 (M. Araba Dep. Tr. 54:13-20).

147.    In 2010, he became the technical product lead for Viptera and Duracade.  *Id*. at 55:21-56:4.

**RESPONSE TO NO. 147.**     **Undisputed.**   However, Syngenta notes that "technical product lead" was not Mr. Araba's title during the relevant time period, but simply how he referred to his role at his deposition.  *See* Pls.' Opp'n Ex. 38 (M. Araba Dep. Tr. 54:13-20).

148.   Araba defined channeling as a means of "ensuring grain is going to a certain space or place that you decided where you want it to go, or avoiding it from going somewhere else," whether that be a particular geographic place or a market. *Id.* at 31:11-32:5.

**RESPONSE TO NO. 148.**     **Undisputed.**

149.   One form of "channeling" is a limited and targeted geographic launch of a new product, along with domestic limitations on the use of the grain (like "feed on farm").  Ex. 84, Araba Vol. II at 483:24-13.

**RESPONSE TO NO. 149.**     **Disputed,**

**mischaracterizes the evidence.**  When asked, "But with respect to the limited and targeted geographic launch, you had the launch zone. And then within that launch zone, you had the specific requirement that the farmer who purchases Duracade must feed -- use that Duracade corn as feed on the farm, or ship to elevators, feed mills, feed lots and ethanol plants for domestic use, or if for shipment, it would have to be shipment to an approved export market, correct?," Mr. Araba responded, "That's what the document says.   Yes." When asked, "And all of those processes there would be consistent with your definition of channeling.  Fair enough, Mr. Araba?," Mr. Araba responded, "That's fair enough."  Pls.' Opp'n Ex. 84 (M. Araba Dep. Tr. 483:24-484:13).

150.   One way to "eliminate the risk of trade disruption" is to have all import approvals "before launch."  *Id.* at 507:7-17 ("A. That's fair enough.").

**RESPONSE TO NO. 150.**    Syngenta    does    not dispute that when asked, "But if you have all the countries that require regulatory approval, if you have their approvals before launch, you're going to eliminate the risk of trade disruption.  Fair enough?," Mr. Araba responded, "That's fair enough."  Pls.' Opp'n Ex. 84 (M. Araba Dep. Tr. 507:13-17).  Syngenta notes that it would be an impossible business model to await approval from *all the countries that require regulatory approval*, without any consideration as to the importance of the market or the reliability of the regulatory system, before commercializing a given product.

151.   Another way to eliminate that risk is to commercialize with only a limited launch of the product.  *Id.* at 506:16-21 ("Q….The idea of a limited launch and keeping it away from export markets is to avoid the potential for trade disruption in those countries where their export – or import approval has not been secured.  Fair enough?" in which Araba answers "That's a possibility.  Yes.").

**RESPONSE TO NO. 151.**    **Disputed.**    Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence

purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162. Syngenta does not dispute the accuracy of the quoted deposition testimony. Syngenta disputes Plaintiffs' characterization of this as a "way to *eliminate*" the risk of a trade disruption. The cited testimony does not support this characterization.

152. Syngenta stated in its petition for deregulated status of MIR162 ("MIR162 Deregulation Petition") that it would require "growers to divert [Viptera] away from export markets (i.e., channeling) where the grain has not yet received regulatory approval for import." Ex. 89 (Dep. Ex. 20) at 111; Ex. 360, Deposition of Cheryl L. Quain at 169:8-11.

**RESPONSE TO NO. 152.    Disputed    and**

**incomplete.**    Syngenta stated in its Deregulation Petition that, "Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (*i.e.* channeling) where the grain has not yet received regulatory approval for import."  Pls.' Opp'n Ex. 89 (C. Quain Dep. Ex. 20, at 111).  Syngenta required growers to channel grain to appropriate markets after harvest.  All growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds, Inc. Stewardship Agreement ("Stewardship Agreement").  Syngenta's Opp'n Ex. 73 (A. Vulcan Dep. Tr. 54:14-21, 58:6-19).

During the relevant time period, Syngenta's Stewardship Agreement included, among other obligations, an agreement by the grower to "[c]hannel grain produced from Seed to appropriate markets as necessary to prevent movement to markets where the grain has not yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as it may be updated from time to time . . . ." E.g., Syngenta's Opp'n Ex. 38 (Aug. 2009 Syngenta Seeds Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (Mar. 2011 Syngenta Seeds Stewardship Agreement, at SYNG_00004255). During the relevant time period, each bag of Viptera corn seed also included a tag that states: "READ BEFORE PLANTING." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10). These tags read in part: "Prior to planting this hybrid, carefully read this information and the Insect Resistance Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any way." and "By opening this package of seed, you affirm that you have signed and are obligated to follow the terms and conditions of the Syngenta Stewardship Agreement …." Under the heading "Grain Marketing Guidelines," the tags stated: "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to

consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com." Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10). It is undisputed that Syngenta exercised its First Amendment right to petition the U.S. government for the deregulation of MIR162.

153.   Syngenta did not consider cross-pollination or commingling insurmountable risks, but instead characterized its proposed channeling "procedures [as] not hypothetical;" rather, "[t]he ability to channel particular types of maize for particular uses, such as the export market, is demonstrated by the continuing success of the specialty maize market." Ex. 89 (Dep. Ex. 20) at 111.

**RESPONSE TO NO. 153.** **Disputed** **as** **characterized**. In reference to the terms in its stewardship agreement requiring growers to divert Viptera away from export markets where it had not been approved, Syngenta stated in its Deregulation Petition that, "As noted in the context of the IRM program, these procedures are not hypothetical." Syngenta also stated, "The ability to channel particular types of maize for particular uses, such as the export market, is demonstrated by the continuing success of the specialty maize market." Pls.' Opp'n Ex. 89 (C. Quain Dep. Ex. 20, at 111). The cited evidence does not support Plaintiffs statement that "Syngenta did not consider cross-pollination or commingling insurmountable risks."

154.   Syngenta characterized channeling as "well established" and "successful[]." *Id.*

105

**RESPONSE TO NO. 154.**     Syngenta   does   not
dispute that it stated in its Deregulation Petition that, "Channeling
programs are well established for separating each of these maize
varieties.    As set out above, these practices have continued
successfully long after the introduction of numerous varieties of
transgenic maize." Pls.' Opp'n Ex. 89 (C. Quain Dep. Ex. 20, at
111).

155.    According to Syngenta, as testified by its 30(b)(6) witness: "Our position [is] that corn can
be channeled." Ex. 28, Huber Vol. I at 107:2.

**RESPONSE TO NO. 155.**     **Syngenta disputes that**
**corn can be channeled to zero tolerance.**  *See* Syngenta's MSJ Ex.
66 (A. McHughen Expert Rep.  ¶ 23) ("Given that corn naturally
outcrosses, ensuring 100% genetic purity in corn grain is
scientifically impossible, as at least some of the grain will have
outcrossed with other corn from some distance away from the farm
where the grain was harvested.").

156.    And, according to that same witness, not just in small amounts, but in "large amount[s]," *id.*
at 105:7-11 (citing "examples of the industry channeling large amount of corn."), including as
many as 2 million acres.   Huber Vol. I at 91:16-92:19 (referring to "clear examples of
channeling").

**RESPONSE TO NO. 156.**     **Disputed,      and**
**unsupported by the cited evidence.**  Syngenta does not dispute that
Scott Huber stated "we were referring to this report as examples of
the industry channeling large amount of corn," in response to the
question, "What was it you were looking to in that report to support
that statement?".  Pls.' Opp'n Ex. 28 (1/27/2016 S. Huber Dep. Tr.

105:7-11).  Mr. Huber's reference to "two million acres" was a reference to a combination of "all the value enhanced corn."

157.    Internally, Syngenta believed that corn could be effectively channeled to preserve the Chinese market for U.S. corn.  *See* Ex. 90 (Dep. Ex. 459); Ex. 84, Araba Vol. II, 465:12-21; Ex. 57, Bernens Vol. II at 411:20-412:5, 424:1-425:7; Ex. 258 (Dep. Ex. 1047) at SYNG_00400755 ("A key tool to help mitigate the risk of trade disruptions is the design and implementation of appropriate grain management program(s) to ensure MIR162 grain does not enter any unapproved export channels.").

**RESPONSE TO NO. 157.**        **Undisputed.**

158.    Syngenta does not appear to dispute that a limited launch would have reduced the risk of a trade disruption. Its own expert testified that a limited launch "would reduce, but not preclude the possibility." Ex. 257, McHughen Dep. at 126:19-20.

**RESPONSE TO NO. 158.**        **Disputed          and**

**unsupported by the cited evidence.**  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone

or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  Mr. McHughen was asked the following question, "Well, what we're talking about in this case, though, is that channeling of commodity corn bearing -- having the trait 162 would not be effective in keeping 162 from reaching the export market and potentially finding its way to China, would it?"  Mr. McHughen responded, "It would reduce, but not preclude the possibility."  Pls.' Opp'n Ex. 257 (A. McHughen Dep. Tr. 126:13-20).

159.    A Panamax vessel contains about 60,000 tons of corn.  Ex. 320, Jingwen Chen Dep. Vol. I at 125:8-18.

**RESPONSE TO NO. 159.**    **Undisputed.**  Syngenta notes that the cited evidence does not contain the asserted fact.  Nonetheless, Syngenta does not dispute the assertion.

160.    Every kernel in a ship cannot be tested without destroying the shipment. *Id*. at 241:2-16.

**RESPONSE TO NO. 160.**    **Undisputed.**

161.    Thus, only the sample "sent to the laboratory" is actually tested.  *Id*. at 309:23-310:6. In China, the sample size is 3,000 kernels. *Id*. at 254:11-15.

**RESPONSE TO NO. 161.**    **Disputed.**    There are various ways of testing for GM traits, some of which do not require sending a sample to a laboratory, but instead can be completed on site.  *See* Pls.' Opp'n Ex. 320 (Jingwen Chen Dep. Tr. 253:3-7) (explaining that lateral flow strips are "made for testing trucks" and

"are very easy to use"); Ex. 380 (Jingwen Chen Dep. Tr. 264:23-25)

("Remember, the strips are made for enabling grain trade to test at a

grain truck level. The industry is doing this for decades."). Mr.

Chen testified that it "was the belief" that China used a sample size

of 3,000 kernels for a PCR test during the relevant time period. Pls.'

Opp'n Ex. 320 (J. Chen Dep. Tr. 254:11-15).

162.    To put that in perspective, a Panamax vessel carrying 66,000 tons of corn has over 300
trillion kernels of corn on it. Ex. 322, Smalley 30b6 at 124:16-125:5 (66,000 tons has over
300 trillion kernels); Ex. 265, Stonacek Vol. II at 344:12-20 (320 trillion kernels). The odds
that a single kernel in a vessel will be tested and cause a rejection are necessarily astronomical.

**RESPONSE TO NO. 162.**        **Disputed            and**

**unsupported by the cited evidence.**  Plaintiffs' cited evidence says

nothing about the odds of a vessel testing positive for MIR162,

much less that the odds were "astronomical."  As Alan McHughen

testified, "[t]he problem with the detections in a zero-tolerance

system is it doesn't have to be quantified.  So if there is a detection

at the limit of 1 percent of the grain in a given shipload or .1 percent,

that's immaterial.  It is still counted as a detection.  So I am not sure

if that makes sense, but it is where I'm coming from.  You're not --

even with a limited release, and the ability of PCR particularly to

detect tiny fragments in dust, you're still going to run that risk of

getting the detection."  Ex. 381 (A. McHughen Dep. Tr. 134:10-21).

163.    As ADM's Anthony Reed testified: DuPont, Monsanto, and Bayer have also stewarded
some of their products in a way that "are definitely good examples of companies doing it."  Ex.
91, Reed Vol. II at 323:12-19.

**RESPONSE TO NO. 163.**        **Undisputed            and**

**immaterial to Syngenta's arguments for Summary Judgment.**

Syngenta does not dispute that Mr. Reed offered testimony that "there are definitely good examples of companies doing it this way." Mr. Reed also testified that it's not possible to channel or steward products to a zero-tolerance level. *See* Pls.' Opp'n Ex. 91 (6/3/2016 A. Reed Dep. Tr. 322:25-323:6 ("So that was quite a strong stewardship program, in addition to other things like buffer strips and planting the product where it has limited to zero -- well, there's never zero, but as limited a possibility of cross-contamination with other corn plants or -- or other commodities.").  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-

pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

164.   Cargill's Randy Giroux testified Syngenta could have released Viptera on "much fewer acres and in a much more controlled manner to help protect the export market." Ex. 45, Giroux Vol. II at 372:9-12; *see also* Ex. 303, Declaration of Randal Giroux ("Giroux Decl.") ¶ 7.

**RESPONSE TO NO. 164.**   Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  Syngenta does not

dispute that Cargill's Randy Giroux offered the quoted testimony. Syngenta commercialized Viptera as U.S.-approved commodity corn and received import approval in all key markets before doing so. Syngenta notes that Cargill is an interested party in this litigation, and Mr. Giroux's testimony as to what Syngenta "could have" done in no way establishes any such obligation on Syngenta.

165.    In comparing Viptera to Monsanto's DroughtGard, Giroux testified that there is a "significant magnitude difference between a broad commercialization . . . throughout the Corn Belt of millions of acres compared to a very small and controlled commercialization," like the plan for DroughtGard.  Ex. 45, Giroux Vol. II at 371:23-372:4; *see also* Ex. 303, Giroux Decl. ¶¶ 6-7.

**RESPONSE TO NO. 165.**        **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**    This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system."  Opp'n 27.  Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the

undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch. *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements." *Id.* The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that " the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China. Syngenta does not dispute that Mr. Giroux provided the quoted tautological statement at his deposition.

166.    As Giroux explained: the "Western Corn Belt," where DroughtGard was commercialized, "tends to flow by rail up to the Pacific Northwest" and "not to . . . the Chinese market." Ex. 45, Giroux Vol. II at 371:7-9; *see also* Ex. 303, Giroux Decl. ¶ 9.

**RESPONSE TO NO. 166.**        **Disputed, unsupported**

**by the cited evidence, and immaterial to Syngenta's arguments**

113

**for summary judgment.**   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).   Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system."  Opp'n 27.  Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.   Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch.  *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements."  *Id*.  The record establishes that while Monsanto told NAEGA it

did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that " the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China.

167.   The number of acres, 10,000, was very limited and it was targeted to "specific farmers that knew how to manage a trait and maintain some degree of segregation on their farm." Ex. 45, Giroux Vol. II at 371:16-22; *see also* Ex. 303, Giroux Decl. ¶¶ 4-5.

**RESPONSE TO NO. 167.**   **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).   Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system."   Opp'n 27.   Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.   First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in

meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch. *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements." *Id.* The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that " the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China.

Syngenta does not dispute that Mr. Giroux testified, "So my sense is, and as I shared earlier, this was to go with specific farmers that knew how to manage a trait and maintain some degree of segregation on their farm. In many cases, these would have been seed growers who are

practiced in the art of segregation as part of seed production." Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 371:16-22).   It is unclear whether Mr. Giroux is testifying specifically about Monsanto's DroughtGard, and if so, what the basis of his knowledge is, other than conversations with individuals at Monsanto, which are hearsay and thus, inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

168.   These were farmers "who are practiced in the art of segregation as part of seed production."  Ex. 45, Giroux Vol. II at 371:16-22; Ex. 303, Giroux Decl. ¶¶ 4-5.

**RESPONSE TO NO. 168.      Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system." Opp'n 27.  Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program

was *not* a commercial launch.  *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements."  *Id.*  The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that " the 'controls' are not designed to achieve the regulatory zero tolerance of China…."  *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China.

Syngenta does not dispute that Mr. Giroux testified, "So my sense is, and as I shared earlier, this was to go with specific farmers that knew how to manage a trait and maintain some degree of segregation on their farm.  In many cases, these would have been seed growers who are practiced in the art of segregation as part of seed production." Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 371:16-22).  It is unclear whether Mr. Giroux is testifying specifically about Monsanto's DroughtGard, and if so, what the basis of his knowledge is, other than conversations

118

with individuals at Monsanto, which are hearsay and thus, inadmissible.  *See PAS Commc'ns, Inc.*

*v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence

on summary judgment).

169.    Because DroughtGard corn "was not to be delivered to grain elevators," but delivered to "an
identified feedlot or would be fed on farm … none of this material would have entered into that
bulk commodity system, into grain elevators and then through [the] barge and rail networks."
Ex. 45, Giroux Vol. II at 374:9-22; Ex. 303, Giroux Decl. ¶¶ 4-5.

**RESPONSE TO NO. 169.**        **Disputed, unsupported by the cited evidence, and**

**immaterial to Syngenta's arguments for summary judgment.**  This paragraph is irrelevant to the

grounds asserted in Syngenta's motion for summary judgment because it is about an entirely

different product (DroughtGard) from the one at issue in this case (Viptera).  The record establishes

that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000

farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy

because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives

acknowledged to NAEGA that "the 'controls' are not designed to achieve the regulatory zero

tolerance of China…."  *Id.*

These assertions are immaterial to the causation question because the facts asserted

suggest only that restricting grain sales could have some indeterminate marginal effect in reducing

the risk of commingling, but do not provide any evidence purporting to quantify the effectiveness

of those measures or the degree to which they would reduce commingling, nor do they provide any

basis on which a reasonable jury could conclude that these measures (alone or in combination with

others) would reduce the effects of cross-pollination and commingling sufficiently to make it more

likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the

presence of MIR162.  Syngenta does not dispute that Mr. Giroux provided the quoted testimony at

his deposition.

170.   These precautions were designed in light of the fact that the commodity system "can't be completely clean to [satisfy a] zero" tolerance, so "nothing goes to grain elevators" but "direct to a feedlot."  Ex. 45, Giroux Vol. II at 375:14-23; *see also* Giroux Decl. ¶¶ 4-5.

**RESPONSE TO NO. 170.**        **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that "the 'controls' are not designed to achieve the regulatory zero tolerance of China…."  *Id.*

These assertions are immaterial to the causation question because the facts asserted suggest only that restricting grain sales could have some indeterminate marginal effect in reducing the risk of commingling, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce commingling, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  Mr. Giroux testified that "because as we recognized, based on the infrastructure we have in the United States and the commodity system that we've developed, there is a potential for commingling in a grain elevator, that they can't be completely clean to zero, and so to manage that risk, Monsanto said no -- nothing goes to grain elevators, direct to a feedlot."  Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 375:14-23).

171.   "Monsanto didn't simply give the seed to the producers" but monitored compliance with steps necessary to prevent cross-pollination or spread of dust.  Ex. 45, Giroux Vol. II at 377:6-18; *see also* Giroux Decl. ¶¶ 4-5.

120

**RESPONSE TO NO. 171.** **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.** Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

This paragraph is also irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertion in this paragraph to support

their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system."  Opp'n 27.  Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch.  *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements."  *Id.*  The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that " the 'controls' are not designed to achieve the regulatory zero tolerance of China…."  *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China.

The quoted testimony is nothing more than Cargill's "understanding."   Pls.' Opp'n Ex. 45
(6/10/2016 R. Giroux Dep. Tr. 377:6-18).

172.   These precautions are all "risk management steps," none of which Syngenta took with
      Viptera. Ex. 45, Giroux Vol. II at 375:5-8, 377:2-25; *see also* Giroux Decl. ¶ 6.

      **<u>RESPONSE TO NO. 172.</u>**      **Disputed, unsupported by the cited evidence, and
immaterial to Syngenta's arguments for summary judgment.**   This paragraph is irrelevant to the
grounds asserted in Syngenta's motion for summary judgment because it is about an entirely
different product (DroughtGard) from the one at issue in this case (Viptera).

      Syngenta required growers to channel grain to appropriate markets after harvest.  All
growers who purchase or plant Viptera or Duracade seeds are asked to execute a Syngenta Seeds,
Inc. Stewardship Agreement ("Stewardship Agreement"). Syngenta's Opp'n Ex. 73 (A. Vulcan
Dep. Tr. 54:14-21, 58:6-19). During the relevant time period, Syngenta's Stewardship Agreement
included, among other obligations, an agreement by the grower to "[c]hannel grain produced from
Seed to appropriate markets as necessary to prevent movement to markets where the grain has not
yet received regulatory approval for import" and "[a]bide by the terms of the Stewardship Guide, as
it may be updated from time to time . . . ." E.g., Syngenta's Opp'n Ex. 38 (Aug. 2009 Syngenta
Seeds Stewardship Agreement, at SYNG_00004253-54); Syngenta's Opp'n Ex. 39 (Mar. 2011
Syngenta Seeds Stewardship Agreement, at SYNG_00004255). During the relevant time period,
each bag of Viptera corn seed also included a tag that states: "READ BEFORE PLANTING."
Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10). These tags
read in part: "Prior to planting this hybrid, carefully read this information and the Insect Resistance
Management Stewardship Guide. … A Syngenta Stewardship Agreement signed by the grower
must be on file with Syngenta Seeds, Inc. before taking delivery of, or using these seeds in any
way." and "By opening this package of seed, you affirm that you have signed and are obligated to
follow the terms and conditions of the Syngenta Stewardship Agreement …." Under the heading

"Grain Marketing Guidelines," the tags stated: "Any crop or material produced from this product can only be exported to, or used, processed or sold in countries where all necessary regulatory approvals have been granted. Syngenta encourages growers to consult the National Corn Growers Association web site, Know Before You Grow, for the approval status of commercially available hybrids and talk to their grain handler to confirm their buying position for this product. Know Before You Grow, an information service provided by the National Corn Growers Association at www.ncga.com."  Syngenta's Opp'n Ex. 74 (Agrisure Viptera 3111 Bag Tag, at SYNG_00316509-10).  Syngenta also notes that Cargill is an interested party in this litigation, and the self-serving testimony of Cargill's representatives is insufficient to establish the asserted fact.

173.   Between 2010-2014, Syngenta obtained the same number of Chinese import approvals for GM corn traits as Monsanto.  Ex. 92 (Dep. Ex. 540) at SYNG_00439032; Ex. 69 Lee Vol. II, 337:13-20.

**RESPONSE TO NO. 173.**      **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**   Plaintiffs' cited evidence does not indicate that Syngenta obtained the same number of Chinese import approvals for GM corn traits as Monsanto.   The cited evidence includes information regarding the number of *single* corn events approved in China by competitor and by year, and it indicates that Syngenta received more Chinese import approvals than Monsanto between the years 2010-2014.  *See* Pls.' Opp'n Ex. 92 (C. Lee Dep. Ex. 540, at SYNG_00439030).

174.   Beginning in 2011, Viptera was the only corn trait broadly commercialized without Chinese approval.  Ex. 76 (Dep. Ex. 468); Ex. 84, Araba Vol. II at 547:24-548:8.   After shipments of U.S. Corn were rejected in China based upon the detection of MIR162, Syngenta regulatory manager Lawrence Zeph, was tasked with finding examples of other corn traits commercialized without Chinese approval.  *Id.*  His conclusion: "There are no good examples of GM corn products launched prior to approval in China, Mexico, or Japan."   *Id.* at SYNG_00194273.

**RESPONSE TO NO. 174.**        **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**  Plaintiffs' cited evidence does not support the assertion that Lawrence Zeph was "tasked with finding examples of other corn traits commercialized without Chinese approval" and instead indicates only that Syngenta was looking into whether its competitors had "followed similar timelines by releasing traits without every country being approved."  Pls.' Opp'n Ex. 76 (M. Araba Dep. Ex. 468, at SYNG_00194275).  Syngenta noted that during the relevant time period, DroughtGard was on the market in the US without full EU approval.  *Id.* at SYNG00194273.  The undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch.  *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").  It is also clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance requirements.

175.    Only Viptera caused a trade disruption.   Ex. 296, Chen Vol. I at 124:10-25 ("China had not rejected any shipment because of" an unapproved genetically modified trait.).

125

**RESPONSE TO NO. 175.**    Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment. Syngenta disputes that Viptera *caused* a trade disruption. *See* Syngenta's MSJ Part III. Furthermore, numerous traits have caused trade disruptions in the past. Syngenta disputes Plaintiffs' assertion that only Viptera caused a trade disruption. *See* Ex. 379 (7/14/2011 email from D. Morgan to S. Hull et al at SYNG_00367968) ("[Cargill] will pass on supplying new crop corn to China this year as they are simply unwilling to run the risk of a returned boat. They incurred a $6M cost for the returned MON 89034 vessel last year and have no appetite for repeating the experience.").

176.    Grant Annexstad, a farmer, used border rows and cleaning procedures when he planted certain Pioneer specialty crops. Ex. 93, Deposition of Grant M. Annexstad ("Annexstad Dep.") at 301:20-12. He testified that "if it's managed properly" channeling and segregation "can be effective." *Id.* at 304:2-4.

**RESPONSE TO NO. 176.**    Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some

indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

Syngenta does not dispute that Mr. Annexsted testified regarding "seed beans," that "The only time I [channeled or segregated crops] was when I grew seed beans for Pioneer. I had to be very very strict about border rows, about cleaning augers out, cleaning the combine out, cleaning the grain auger out, cleaning the combine. Everything had to be perfectly cleaned because if there was any corn in there at all or anything that would -- . . . if there's any contamination at all, they'd reject the whole thing. So I've had experience with segregating and cleaning equipment." Pls.' Opp'n Ex. 93 (G. Annexstad Dep. Tr. 301:23-302:12). Syngenta also does not dispute that Mr. Annexsted testified that "if it's managed properly" channeling and segregation "can be effective." *Id.* at 304:2-4.

177.   Kent Falwell, a farmer, testified that border rows can be used to reduce the risk of cross-pollination, along with other measures like "not even planting corn . . . in the same location as something that you didn't want to cross-pollinate with something else."  Ex. 94, Deposition of Kent Falwell ("Falwell Dep.") at 197:16-198:21.

**RESPONSE TO NO. 177.**     Plaintiffs     apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust

in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

Syngenta does not dispute that Mr. Falwell testified that, "I have never heard of a buffer row.  I have heard of buffer rows, and -- and they are rows that would supposedly keep the pollination from going any further for the vast -- for the most part than -- than the buffer rows." Pls.' Opp'n Ex. 94 (K. Falwell Dep. Tr. 197:25-198:7).  When asked what sort of measures, other than buffer rows, a farm could take to reduce cross-pollination, Mr. Falwell testified "They would be planting in different locations, not even planting corn at a -- in -- at the same location as something that you didn't want to cross-pollinate with something else."  *Id.* at 198:8-21.

178.   Enogen is a corn seed sold by Syngenta that "has an enzyme, an amylase that breaks down starch."  Ex. 38, Araba Vol. I at 50:5-12.  This enzyme allows ethanol plants to "produce more ethanol or produce ethanol more efficiently."  *Id.* at 50:19-21.

**RESPONSE TO NO. 178.** **Undisputed and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).

179.   It has no agronomic value to the farmer, but is "thermal-tolerant and resists the heat that corn goes through when it's being converted into ethanol." Ex. 95, Deposition of Brett Bell ("Bell Dep.") at 151:9-152:2.

**RESPONSE TO NO. 179.** **Disputed and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera). Syngenta does not dispute that Enogen is thermal-tolerant and resist the heat that corn goes through when it's being converted into ethanol. Syngenta disputes the assertion that Enogen "has no agronomic value to the farmer." The production of Enogen corn provides similar benefits to a producer as production of any other type of corn—the profits gained off of selling that corn to an end user, regardless of the ultimate use of the grain. *See* Ex. 382 (J. Bernens Dep. Tr. 867:9-20) (explaining that farmers that plant and steward Enogen receive a premium on their grain sales).

180.   Although valuable to ethanol plants, Enogen corn "creates all kinds of problems in the food chain" because it "doesn't work well" in other processed foods, like in the production of corn chips. Ex. 96, Deposition of David Baudler as a corporate representative of Cargill Vol. I ("Baudler 30b6 Vol. I") at 243:14-244:9.

**RESPONSE TO NO. 180.**    **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**    This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera). Syngenta does not dispute that Enogen was designed to provide benefits in the production of ethanol, not the production of food products. However, Syngenta disputes the cited language that Enogen corn "'creates all kinds of problems in the food chain' because it 'doesn't work well' in other processed foods." Plaintiffs' Exhibit 96 is the deposition transcript of David Baudler, in which he testifies about his "understanding" based on his attendance at "industry meetings." Pls.' Opp'n Ex. 96 (5/16/2016 D. Baudler Dep. Tr. 243:17-18).   This testimony is speculative and based on hearsay, and is thus inadmissible and insufficient to establish the asserted fact. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Syngenta's Jack Bernens testified that Enogen corn "certainly wasn't harmful in terms of any kind of safety issues or anything like that" but that it was grown "for a specific end use," namely, ethanol production. Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 175:5-176:10).

181.   As a result, Syngenta designed what it called a "closed loop" stewardship plan for Enogen to keep it out of the commodity market.  Ex. 85, D. Martin Dep. Vol. II at 43:9-16; Ex. 6, Bernens Dep. Vol. I at 174:23-176:21 (Enogen was not "appropriate functionally" for certain types of production processes); Ex. 225, Deposition of Nathan Fields Vol. I ("Fields Vol. I")

at 207:23-209:11 ("[I]t is a closed loop system based upon the fact that if . . . finds its way into an unintended market, there are possible negative implications that could occur.").

**RESPONSE TO NO. 181.** **Undisputed and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than

not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

Syngenta does not dispute that it designed a closed loop production system for Enogen. As Syngenta's Jack Bernens testified, "the reason it was called closed production is it's under contract with the grower.  So no growers, you know, they have a financial incentive to deliver it to the ethanol plant.  So it was a -- the term closed production system meant that not anybody could buy it.  It was closed to those people that were participating in the contract, which was, you know, growing the corn for a specific end use and delivering it to that specific end use." Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 175:10-19).

182.  As part of that plan, Syngenta trains Enogen growers and seed dealers.  *See* Ex. 98 (Dep. Ex. 250); Ex. 85, D. Martin Vol. II at 49:10-50:15.

**RESPONSE TO NO. 182.**  **Undisputed   and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).   Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that

132

restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

183.   Precautions included: (1) cleaning out equipment, such as the planter, before and "after completing Enogen planting," (2) segregating seed from other corn seed at the time of receipt, and (3) planting 12-16 border rows around the perimeter of Enogen fields.  Ex. 98 (Dep. Ex. 250) at SYNG_00164405-09.

**RESPONSE TO NO. 183.**        **Disputed, unsupported by the cited evidence and immaterial to Syngenta's arguments for summary judgment.**   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-

tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

Syngenta disputes that the Enogen training presentation cited in Plaintiffs' Exhibit 98 instructed growers to segregate seed from other corn seed at the time of receipt.  Instead, growers were instructed to "Segregate Enogen seed from other corn seed in the storage facility."  Pls.' Opp'n Ex. 98 (D. Martin Dep. Ex. 250, at SYNG_00164406).

184.    According to Syngenta, if followed, the use of 12-16 border rows provides "a substantial and effective pollen filter to/from neighboring fields" because most corn pollen "settles quickly" and "dies soon after being shed."  *Id*. at 20 (emphasis is Syngenta's).

**RESPONSE TO NO. 184.**        **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting

seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.  Syngenta does not dispute that the Enogen training presentation cited in Plaintiffs' Exhibit 98 included the statement that "12 to 16 border rows provides a substantial and effective pollen filter to/from neighboring fields." Pls.' Opp'n Ex. 98 (D. Martin Dep. Ex. 250, at SYNG_00164413).  Syngenta disputes Plaintiffs' characterization that this is "because most corn pollen 'settles quickly' and 'dies

soon after being shed.'"  That assertion is not supported by the cited evidence.

185.    According to Syngenta, if these procedures were followed, the risk of cross- pollination between Enogen and non-Enogen plants was as little as one-half of one percent.  *Id*. at 6.

**RESPONSE TO NO. 185.**     **Undisputed    and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Syngenta provides a number of "optimistic estimate[s]" of the potential contamination in identity-preserved corn if the cleanout and/or operational management strategies are used with a typical grain handling system.  Among other things, Syngenta notes that the estimated risk during seed handling is 1%, the estimated risk during planting is 0.1%, the estimated risk caused by pollination is 0.5%.  *See* Pls.' Opp'n Ex. 98 (D. Martin Dep. Ex. 250, at SYNG_00164399).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that

restricting seed sales and planting practices could have some marginal effect in reducing the risk of cross-pollination, but do not provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

186.    According to Syngenta, estimated risk of contamination due to improper seed handling was only one percent. *Id*. at 13.

**RESPONSE TO NO. 186.**    **Undisputed      and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Syngenta provides a number of estimates of the potential contamination in identity-preserved corn if the cleanout and/or operational management strategies are used with a typical grain handling system.  Among other things, Syngenta notes that the estimated risk during seed handling is 1%, the estimated risk during planting is 0.1%, the estimated risk caused by pollination is 0.5%. *See* Pls.' Opp'n Ex. 98 (D. Martin Dep. Ex. 250, at SYNG_00164399).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-

pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some marginal effect in reducing the risk of cross-pollination, but do not provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

187.   Identity-preservation procedures, like those used with Enogen, "can be used in any commodity." Ex. 82, Boerm Dep. Vol. II at 477:20-478:14; 482:25-483:12 ("If those protocols are adopted at the very beginning before planting . . . it can prevent that [trait] from getting out into the rest of the marketplace, yes, it can.").

### RESPONSE TO NO. 187.     Undisputed,

**unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera). The cited evidence is testimony offered by ADM's Chris Boerm, regarding *ADM's* identity preservation protocols, *not* the protocols used with Enogen.

Pls.' Opp'n Ex. 82 (C. Boerm Dep. Tr. 477:20-478:14, 482:25-483:12).  Syngenta also notes that Viptera was commercialized as commodity corn, *not* identity-preserved corn.  Whether it would have made sense for those who wished to sell non-MIR162 corn (not U.S. commodity corn as defined by the USDA) to use IP measures is a factual matter on which Plaintiffs have introduced no evidence.

Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

188.   Unlike Viptera, Enogen was not sold in large volume: in the first year of its launch, Syngenta sold just 5,000 units; in the second year, only 20,000 units were sold.  Ex. 57, Bernens Vol. II at 484:11-24.

**RESPONSE TO NO. 188.**      **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment

because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Plaintiffs' cited evidence is only evidence of *estimates* of the amount of Enogen.   Jack Bernens testified that he "thinks" that 5,000 units of Enogen were sold in the first year of sales and that "around 20 or so" were sold in the second year of sales.  Pls.' Opp'n Ex. 57 (J. Bernens Dep. Tr. 484:15-24).

Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

189.    The Enogen channeling program has been successful in preventing a trade disruption.  *See* Ex. 99 at CARGILL000295630-31 (Jan. 17, 2014 email ("No positive detections around [Enogen] draw area" so "risk is considered very low and should not be [trade] barrier")); *see also* Ex. 303, Decl. Giroux ¶ 8.

**RESPONSE TO NO. 189.**        **Undisputed        and**

**immaterial to Syngenta's arguments for summary judgment.**

This paragraph is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera). Enogen was approved in China in June 2013. Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted suggest only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR162.

190.   In 2010, Syngenta planted Viptera for testing and seed production.  Ex. 84, Araba Dep. Vol. II at 603:16-19.

**RESPONSE TO NO. 190.**       Undisputed.

191.   Because Viptera was not yet approved in key export markets, Syngenta implemented strict stewardship requirements on those test product plots.  *Id*. at 603:20-604:3.

**RESPONSE TO NO. 191.**   **Disputed and unsupported by the cited evidence.**   Plaintiffs' cited testimony does not support the fact they seek to establish.  Mr. Araba testified "I can't recall exactly, but I believe, maybe" in response to the question "And because of the non-approvals, because of the fact that Syngenta had not yet been approved in key export markets, Syngenta implemented strict stewardship requirements on those test production plots, right?"  Pls.' Opp'n Ex. 84 (M. Araba Dep. Tr. 603:20-604:3).   Syngenta also notes that Viptera did not receive approval in the United States until April 2010.  *See* Syngenta's Opp'n Ex. 121 (MIR162 Import Timeline, at SYNG_00811754).  As a result, Syngenta's stewardship practices during the 2010 growing season were based on a pre-deregulation program called "regulated trialing."   *See* Ex. 383 (G. Ozipko Dep. Ex. 489, at SYNG_00663564; Ex. 366 (G. Ozipko Dep. Tr. 132:2-135:3).  As Grant Ozipko testified, "2010 was a demonstration trial year" and Syngenta was "still under the regulated trialing program at this point."  *Id*. 62:24-63:5; 148:15-20.  *See also*, *id* at 151:25-152:17 (explaining that although MIR162 was approved in April 2010, Syngenta wanted to finish the growing year as a regulated trial).

192.   Describing the requirements of its sales agreements during this time, Syngenta stated: "In order to insure compliance of channeling Agrisure Viptera by-products for domestic use only" Syngenta would prepare and submit a written plan for each production site.  Ex. 100 (Dep. Ex. 442) (August 6, 2010 email); Ex. 38, Araba Vol. I at 97:25-98:15.

**RESPONSE TO NO. 192.**      **Disputed and the cited evidence does not support the asserted fact.**  The document states, "In order to insure compliance of channeling Agrisure Viptera by-products for domestic use only, I will need a submitted written plan from each site [].  During the 2010 harvest, I will plan to audit by desktop and/or visit to your site to review plan submitted and records kept for channeling the Viptera by-products." Pls.' Opp'n Ex. 100 (M. Araba Dep. Ex. 442, at SYNG_00179123).  Syngenta's stewardship practices during the 2010 growing season were based on a pre-deregulation program called "regulated trialing."  *See* Ex. 383 (G. Ozipko Dep. Ex. 489, at SYNG_00663564; Ex. 366 (G. Ozipko Dep. Tr. 132:2-135:3).  As Grant Ozipko testified, "2010 was a demonstration trial year" and Syngenta was "still under the regulated trialing program at this point."  *Id*. 62:24-63:5; 148:15-20. *See also*, *id* at 151:25-152:17 (explaining that although MIR162 was approved in April 2010, Syngenta wanted to finish the growing year as a regulated trial).

193.    That plan would include audits at each site and require records "for channeling" kept by the grower.  Ex. 100 (Dep. Ex. 442) at SYNG_00179123.

**RESPONSE TO NO. 193.**      **Disputed and the cited evidence does not support the asserted fact.**  The document states, "In order to insure compliance of channeling Agrisure Viptera by-products for domestic use only, I will need a submitted written plan from each site [].  During the 2010 harvest, I will plan to audit by desktop and/or visit to your site to review plan submitted and

143

records kept for channeling the Viptera by-products." Pls.' Opp'n Ex. 100 (M. Araba Dep. Ex. 442, at SYNG_00179123).  Syngenta's stewardship practices during the 2010 growing season were based on a pre-deregulation program called "regulated trialing."  *See* Ex. 383 (G. Ozipko Dep. Ex. 489, at SYNG_00663564; Ex. 366 (G. Ozipko Dep. Tr. 132:2-135:3).   As Grant Ozipko testified, "2010 was a demonstration trial year" and Syngenta was "still under the regulated trialing program at this point." *Id*. 62:24-63:5; 148:15-20. *See also*, *id* at 151:25-152:17 (explaining that although MIR162 was approved in April 2010, Syngenta wanted to finish the growing year as a regulated trial).

194.    Syngenta required that Viptera by-products be shipped by specific, contracted truckers and that trucks then be cleaned out.  *Id*.

 **RESPONSE TO NO. 194.**        **Disputed and the cited evidence does not support the asserted fact.**  The document states, "The plan should include the following: . . . 3) Contract Truckers to be hired or Vendor trucks-indicate if truck drivers will be trained to clean/sweep out trucks/trailers between Viptera and Non Viptera loads and/or if trucks used for other outside hauling of similar products-shucks/screenings/ cobs for other companies during harvest." Pls.' Opp'n Ex. 100 (M. Araba Dep. Ex. 442, at SYNG_00179123).   Syngenta's stewardship practices during the 2010 growing season were based on a pre-deregulation program called "regulated trialing."  *See* Ex. 383 (G. Ozipko Dep. Ex. 489, at SYNG_00663564); Ex. 366 (G. Ozipko Dep. Tr. 132:2-135:3).   As

Grant Ozipko testified, "2010 was a demonstration trial year" and Syngenta was "still under the regulated trialing program at this point." *Id*. 62:24-63:5; 148:15-20. *See also*, *id* at 151:25-152:17 (explaining that although MIR162 was approved in April 2010, Syngenta wanted to finish the growing year as a regulated trial).

195.   Syngenta required that these by-products be used "for domestic use only" or "sold to livestock feeder during harvest or after harvest" until "export approval occurs." *Id*.

**RESPONSE TO NO. 195.**   **Disputed and the cited evidence does not support the asserted fact.** The document states, "export of Viptera grain or Viptera grain by-products are not allowable at this time. Therefore, it will be important that Viptera cobs and other by-products, listed below, are channeled for domestic feed use only until further notice. In most cases, the acceptable means of disposal is to a local cattle and/or hog feeder. Delivery to Ethanol plant will be allowed if products and by-products are for domestic use only with a signed Agrisure Viptera By-Products Sales Agreement []. Delivery to cob Vendors that process cobs for products that are exported will be prohibited. Viptera cobs can be delivered to a cob vendor that agrees to channel for domestic use only, and signs an Agrisure Viptera by-Products Sales Agreement[]." Pls.' Opp'n Ex. 100 (M. Araba Dep. Ex. 442, at SYNG_00179131). Syngenta's stewardship practices during the 2010 growing season were based on a pre-deregulation program called "regulated trialing." *See* Ex. 383 (G. Ozipko Dep. Ex. 489, at SYNG_00663564); Ex. 366 (G. Ozipko Dep. Tr. 132:2-135:3). As

Grant Ozipko testified, "2010 was a demonstration trial year" and Syngenta was "still under the regulated trialing program at this point." *Id.* 62:24-63:5; 148:15-20. *See also*, *id* at 151:25-152:17 (explaining that although MIR162 was approved in April 2010, Syngenta wanted to finish the growing year as a regulated trial).

196.   There was no trade disruption caused by Viptera in 2010.   Ex. 296, Jerrity Chen Vol. I at 124:10-25 ("China had not rejected any shipment because of" an unapproved genetically modified trait.").

**RESPONSE TO NO. 196.**     **Undisputed.     Viptera**

**was commercialized for growing season 2011.**

197.   In 2015, Dow launched a new GM corn seed, Enlist, in the United States without Chinese approval, but did so "only [on] a few contracted farms" that "will ensure these crops not get into commodity trading with China."  Ex. 101 (Reed Dep. Ex. 133) at ADM-00139924; Ex. 91, Reed Vol. II at 287:2-14, 321:3-10; Ex. 102, Deposition of Thomas Sleight (US Grains Council) Vol. I ("Sleight Vol. I") at 160:9-162:18.

**RESPONSE TO NO. 197.**     **Disputed, hearsay, and**

**immaterial to Syngenta's arguments for Summary Judgment.**

This paragraph is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment because it is about a product (Enlist)

that is not at issue in this litigation.   Syngenta disputes that Enlist

was commercialized in 2015.   Instead, "a select group of farmers"

planted Enlist in 2015 and "full commercial launch of the Enlist

traits . . . [was] expected in 2016."  Ex. 384 (Agweb article, Dow's

Enlist Products on Track for 2016 Launch).  Plaintiffs' Exhibit 101

is an email from ADM's JuHui Huang to Anthony Reed, relaying

what JuHui had been told on a phone call from the regulatory

director of Dow Agrosciences.  Pls.' Opp'n Ex. 101 (A. Reed Dep.

Ex. 133). This is hearsay, and is thus inadmissible.   *See PAS*

*Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Plaintiffs' Exhibit 91 is deposition testimony from Mr. Reed that seeks to authenticate Exhibit 101, and does not support the facts Plaintiffs seek to establish because it says nothing about Dow's launch of Enlist. Pls.' Opp'n Ex. 91 (6/3/2016 A. Reed Dep. Tr. 287:2-14). Plaintiffs' Exhibit 102 is the deposition of Tom Sleight in which he summarizes discussions that the U.S. Grain Council had with Dow regarding commercializing Enlist. In his testimony, Mr. Sleight could not recall whether Enlist was a soy trait or a corn trait, nor did he know when or if Dow had commercialized it. *See* Pls.' Opp'n Ex. 102 (T. Sleight Dep. Tr. 160:22-161:11). This is also hearsay and thus inadmissible. *See PAS Commc'ns, Inc.*, 139 F. Supp. 2d at 1179. In any event, Mr. Sleight testifies, "We talked about some of the problems that there are. You know, one of the main things is about where they were going to commercialize it. They were just seeking our input and we gave it to them. You know, whether they did anything with that or not, I don't know, that was their decision, but, you know, they -- they asked us and we did. And, you know, Syngenta did the same thing with Viptera -- with Duracade." *Id.* at 161:23-162:7. Plaintiffs' Exhibit 102 says nothing about the geographic expanse of Dow's launch of Enlist, nor does it address any steps taken to "ensure these crops not get into commodity trading with China."

147

198.   In doing so, Dow met with (at least) the U.S. Grains Council, and ADM and discussed their plan "to do a limited launch" for a "handful of growers in very specific places under heavy stewardship."   Ex. 102, Sleight Vol. I at 160:9-162:18; Ex. 91, Reed Vol. II at 320:5-19; Ex. 82, Boerm Vol. II at 477:14-19.

**RESPONSE TO NO. 198.**   **Undisputed        and**

**immaterial to Syngenta's arguments for Summary Judgment.**

This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about a product (Enlist) that is not at issue in this litigation.  Syngenta disputes that Enlist was commercialized in 2015.  Instead, "a select group of farmers" planted Enlist in 2015 and "full commercial launch of the Enlist traits . . . [was] expected in 2016."  Ex. 384 (Agweb article, Dow's Enlist Products on Track for 2016 Launch).   Thus, all evidence related to Enlist in 2015 is irrelevant because it was *not* a commercial launch.   Syngenta does not dispute that ADM's Anthony Reed testified that Dow "came and met with [ADM] several times to talk about how they would like to do a limited launch, and, in this case, I think they did, you know, a handful of growers in very specific places under heavy stewardship". Pls.' Opp'n Ex. 91 (6/3/2016 A. Reed Dep. Tr. 320:13-17).  Plaintiffs' Exhibit 102 includes the testimony of Mr. Sleight of USGC, in which he states, "We talked about some of the problems that there are.  You know, one of the main things is about where they were going to commercialize it.  They were just seeking our input and we gave it to them.  You know, whether they did anything with that or not, I don't know, that was their decision, but, you know, they --

148

they asked us and we did.  And, you know, Syngenta did the same

thing with Viptera -- with Duracade."  Pls.' Opp'n Ex. 102 (T.

Sleight Dep. Tr. 161:23-162:7).

199.   Dow's stewardship included "a robust audit program," Reed Vol. II at 322:1-5; and, it had Dow employees "on the farm when the seed's delivered," "when they clean out their equipment" and "when they deliver the grain," *id*. at 322:16-25.

**RESPONSE TO NO. 199.       Disputed, hearsay, not**

**supported by the cited evidence, and immaterial to Syngenta's**

**arguments for Summary Judgment.**  This paragraph is irrelevant

to the grounds asserted in Syngenta's motion for summary judgment

because it is about a product (Enlist) that is not at issue in this

litigation.   Syngenta disputes that Enlist was commercialized in

2015.  Instead, "a select group of farmers" planted Enlist in 2015

and "full commercial launch of the Enlist traits . . . [was] expected in

2016."  Ex. 384 (Agweb article, Dow's Enlist Products on Track for

2016 Launch).   Thus, all evidence related to Enlist in 2015 is

irrelevant because it was *not* a commercial launch.  Plaintiffs' cited

evidence contains nothing more than Mr. Reed's speculation and

recollections from meetings with Dow representatives. Mr. Reed

testifies, "*my recollection* of the Dow program . . . there are Dow

employees on the farm when the seed's delivered, when they clean

out their equipment, when they deliver the grain . . ." Pls.' Opp'n

Ex. 91 (6/3/2016 A. Reed Dep. Tr. 322:16-21).   Furthermore, Mr.

Reed suggests that his knowledge of the Dow stewardship program

is based on meetings with Dow, "I think I -- I even met, mentioned

up above that we had, that they met with the grain division . . ." *Id* at

321:23-25).  Testimony on what Mr. Reed learned at these meetings

is based on hearsay and is thus inadmissible.  *See PAS Commc'ns,*

*Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001)

(declining to consider hearsay evidence on summary judgment).

200. This was in addition to "buffer strips and planting the product" to create "as limited a possibility of cross-contamination with other corn plants – or other commodities."  Ex. 91, Reed Vol. II at 323:2-6.

**RESPONSE TO NO. 200.**        **Disputed, hearsay, not**

**supported by the cited evidence, and immaterial to Syngenta's**

**arguments for Summary Judgment.**  This paragraph is irrelevant

to the grounds asserted in Syngenta's motion for summary judgment

because it is about a product (Enlist) that is not at issue in this

litigation.  Syngenta disputes that Enlist was commercialized in

2015.  Instead, "a select group of farmers" planted Enlist in 2015

and "full commercial launch of the Enlist traits . . . [was] expected in

2016."  Ex. 384 (Agweb article, Dow's Enlist Products on Track for

2016 Launch).  Thus, all evidence related to Enlist in 2015 is

irrelevant because it was *not* a commercial launch.  Plaintiffs' cited

evidence contains nothing more than Mr. Reed's speculation and

recollections from meetings with Dow representatives. Mr. Reed

testifies, "*my recollection* of the Dow program . . . there are Dow

employees on the farm when the seed's delivered, when they clean

out their equipment, when they deliver the grain . . ." Pls.' Opp'n

Ex. 91 (6/3/2016 A. Reed Dep. Tr. 322:16-21).  Furthermore, Mr.

Reed suggests that his knowledge of the Dow stewardship program

is based on meetings with Dow, "I think I -- I even met, mentioned

up above that we had, that they met with the grain division . . ." *Id* at 321:23-25).  Testimony on what Mr. Reed learned at these meetings is based on hearsay and is thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

201.   ADM was "very impressed with the program" that Dow put together.  *Id*.  at 320:18-19.

**RESPONSE TO NO. 201.**   **Undisputed      and immaterial to Syngenta's arguments for Summary Judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about a product (Enlist) that is not at issue in this litigation.  Syngenta disputes that Enlist was commercialized in 2015.  Instead, "a select group of farmers" planted Enlist in 2015 and "full commercial launch of the Enlist traits . . . [was] expected in 2016."  Ex. 384 (Agweb article, Dow's Enlist Products on Track for 2016 Launch).  Thus, all evidence related to Enlist in 2015 is irrelevant because it was *not* a commercial launch.   Syngenta does not dispute that Mr. Reed testified that, "I think they did, you know, a handful of growers in very specific places under heavy stewardship, to the point where our guys were very impressed with the program that they were putting together."  Pls.' Opp'n Ex. 91 (6/3/2016 A. Reed Dep. Tr. 320: 15-19).

202.   It was a "great example of a stewarded launch limited that has not" resulted in "an escape or a trade disruption" because Dow was "very responsible."  *Id*. at 321:8-12.

151

**RESPONSE TO NO. 202.** **Disputed, evidence is incomplete, and immaterial to Syngenta's arguments for Summary Judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about a product (Enlist) that is not at issue in this litigation. Syngenta disputes that Enlist was commercialized in 2015. Instead, "a select group of farmers" planted Enlist in 2015 and "full commercial launch of the Enlist traits . . . [was] expected in 2016." Ex. 384 (Agweb article, Dow's Enlist Products on Track for 2016 Launch). Thus, all evidence related to Enlist in 2015 is irrelevant because it was *not* a commercial launch. Plaintiffs' cited evidence contains the following statement, "So this is a great example of a stewarded launch limited that has not, *to my knowledge*, seen an escape or a trade disruption because they've done it in a -- in a very responsible manner." Pls.' Opp'n Ex. 91 (6/3/2016 A. Reed Dep. Tr. 321:8-12).

203.   Monsanto commercialized a genetically modified corn seed called "DroughtGard" after Syngenta commercialized MIR162. Ex. 43 (Dep. Ex. 1771) at SYNG_00786334.

**RESPONSE TO NO. 203.** **Undisputed and immaterial to Syngenta's arguments for summary judgment.** Syngenta does not dispute that Monsanto commercialized DroughtGard after Syngenta commercialized MIR162. However the cited evidence does not establish this fact.

204.   Unlike Syngenta, Monsanto engaged in "extensive channeling," by conducting only a limited launch of DroughtGard to prevent it from contaminating the export channel that served China. *See id.*

**RESPONSE TO NO. 204.** **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.** This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system." Opp'n 27. Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch. *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements." *Id.* The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that "the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China.

Plaintiffs' cited evidence says nothing about Syngenta's channeling efforts for Viptera. Additionally, the cited evidence includes an identification of the "likely position" that Monsanto would take with regard to DroughtGard, and does not establish any of Monsanto's actual channeling practices or the extent of the launch of DroughtGard.  Pls.' Opp'n Ex. 43 (P. Steiner Dep. Ex. 1771, at SYNG_00786334).

205.   Monsanto only sold DroughtGard to 250 farmers in the Great Western Plains region of the United States, where it was only planted on about 10,000 acres.  Ex. 103 (Baudler Dep. Ex. 221) at CARGILL000012004; Ex. 74, Baudler Vol. I, 217:21-218:7; Ex. 104, SYNG_00315939 (product was limited to "farmers in Central Texas and Eastern Kansas"); Ex. 106 (Giroux Dep. Ex. 85) at CARGILL000074081.

**RESPONSE TO NO. 205.**        **Disputed, hearsay, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system."  Opp'n 27.  Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch.  *See* Ex. 343

(4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements." *Id.* The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that "the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China. Plaintiffs' Exhibit 103 is an email from Tony Nugteren to various individuals at Cargill, in which he summarizes what he "heard" at a meeting with Monsanto, and he states "I'm fully aware I may have misinterpreted, so pls correct/add where needed." Pls.' Opp'n Ex. 103 (D. Baudler Dep. Ex. 221, at CARGILL000012003). Plaintiffs' Exhibit 106 is an email from Cargill's Randy Giroux to other individuals at Cargill relating information "[d]irect from Monsanto; not public". Pls.' Opp'n Ex. 106 (R. Giroux Dep. Ex. 85, at CARGILL000074081). Both documents are hearsay, and are thus inadmissible. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Plaintiffs' Exhibit 74 is

deposition testimony from Mr. Baudler that seeks to authenticate Exhibit 103, and does not support the facts Plaintiffs seek to establish because it says nothing about Monsanto's sales of DroughtGard. Pls.' Opp'n Ex. 74 (6/14/2016 D. Baudler Dep. Tr. 217:21-218:7).   Plaintiffs' Exhibit 104 is a Q&A regarding Syngenta's Agrisure Artesian, and although it mentions DroughtGard it says nothing about the number of farmers using DroughtGard or the number of acres on which it was planted.  Pls.' Opp'n Ex. 104 (Agrisure Artesian Q&A, at SYNG_00315939-41).  For the 2013 growing season, "[DroughtGard] was introduced in the Western Great Plains under stewardship requirements."  *Id*.  The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that "the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id*.

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China.

206.    Farmers in this region actually needed the new technology.   Ex. 105, Deposition of Steven Becraft ("Becraft Dep.") at 228:24-231:13.

**RESPONSE TO NO. 206.**         **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs' citation to Mr. Becraft's deposition transcript says nothing about whether farmers in the Great Western Plains

region of the United States actually needed DroughtGard. Pls.' Opp'n Ex. 105 (S. Becraft Dep. Tr. 228:24-231:13).

207.   And most of the corn from the Great Western Plains region went to "domestic feed or ethanol, so keeping the grain out of export channels isn't as much of a concern."  Ex. 103 (Baudler Dep. Ex. 221) at CARGILL000012003.

**RESPONSE TO NO. 207.**        **Disputed, unsupported by the cited evidence, and immaterial to Syngenta's arguments for summary judgment.**  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertion in this paragraph to support their contention that Syngenta could have implemented a program to "limit use of the [Viptera] grain to prevent it from ever entering the commodity system."  Opp'n 27.  Plaintiffs' purported evidence is still irrelevant and could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that the 2012 DroughtGard Program was *not* a commercial launch.  *See* Ex. 343 (4/10/2012 Monsanto Press Release) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 346 (J. Carrato Dep. Ex. 10, at 1) (showing that "in 2012, more than 250 farmers in the Western Great Plains planted DroughtGard hybrids on their farm through Monsanto's GroundBreakers program").

For the 2013 growing season, "the product was introduced in the Western Great Plains under stewardship requirements."  *Id*.  The record establishes that while Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some

'controls,'" Ex. 344 (ADM-00016182), Monsanto representatives acknowledged to NAEGA that "the 'controls' are not designed to achieve the regulatory zero tolerance of China…." *Id.*

Thus, descriptions of Monsanto's 2012 non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China, and the record is clear that Monsanto's 2013 more broad introduction of DroughtGard was not designed to achieve zero tolerance in China. Plaintiffs' cited evidence is an email from Barry Bauer to others at Cargill stating, "Majority of our corn goes to domestic feed or ethanol, so keeping the grain out of export channels isn't as much of a concern as having a consistent Cargill policy when these types of situations come up." Pls.' Opp'n Ex. 103 (D. Baudler Dep. Ex. 221, at CARGILL000012003). It says nothing about the end destination of corn in the Great Western Plains region.

208.   Monsanto required growers to agree to use the corn grown from the trait for on- farm feed or deliver the corn to local feed operations, such as in-state feed lots. Ex. 45, Giroux Vol. II at 372:21-375:23.

**RESPONSE TO NO. 208.**      Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not

provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch.  *See* Ex. 343 (4/10/12 Monsanto Press Release, available at http://news.monsanto.com/press-release/monsanto-debuts-ground-breakers%E2%84%A0-program-give-farmers-first-hand-look-upcoming-pipelin) (describing 2012 DroughtGard program as a "new, on-farm trial program" that gives "a farmer [the] chance to see how products will perform…prior to commercial introduction"); Ex. 344 (ADM-00016182) (showing that Monsanto told NAEGA it did not "consider this case of selling seed to around 2000 farmers to plant 120,000 to 150,000 acres to be a commercialization as defined by the BIO policy because they have provided some 'controls.' While identifying their actions as either 'controlled' or 'pre' commercialization the Monsanto representatives [Gary Martin] talked to acknowledge that the 'controls' are not designed to achieve the regulatory zero tolerance of China…."); Ex. 346 (J. Carrato Dep. Ex. 10) (showing China approved DroughtGard around June 20, 2013, after 2013 planting had occurred).   Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept

out of shipments to China. Indeed, Cargill's Randal Giroux admits in the cited deposition pages that "there is a potential for commingling in a grain elevator, that they can't be completely clean to zero…." Pls.' Opp'n Ex. 45 (6/10/2015 R. Giroux Dep. Tr. 375:18-20). In any event, the cited testimony describes Giroux's "expectation" that growers would not deliver Monsanto's DroughtGard corn to grain elevators, not what Monsanto itself actually "required," or whether those requirements were actually followed and could satisfy China's zero tolerance policy. *See id.* at 374:7-22.

209. Monsanto required growers to clean their equipment to prevent cross-contamination. *Id.* at 377:6-18.

**RESPONSE TO NO. 209.** Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch. *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10). Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. In any event, the cited testimony describes Randal Giroux's "understanding" of Monsanto's DroughtGard program, not what Monsanto itself actually "required," or whether those requirements were actually followed and could satisfy China's zero tolerance policy. *See* Pls.' Opp'n Ex. 45 (6/10/2015 R. Giroux Dep. Tr. 377:6-18).

210.   Monsanto required growers to surround DroughtGard plants with buffer rows to prevent cross-pollination. *Id.* at 373:21-25; Ex. 106 (Giroux Dep. Ex. 85); Ex. 244, Deposition of Randal Giroux in his personal capacity Vol. I (Giroux Vol. I) at 138:4-140:2.

**RESPONSE TO NO. 210.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared

equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch. *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10). Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162

would have been successfully isolated and kept out of shipments to China. In any event, the cited document and deposition testimony at 373:21-25 describe Randal Giroux's understanding of Monsanto's DroughtGard program, not what Monsanto itself actually "required," or whether those requirements were actually followed and could satisfy China's zero tolerance policy. *See* Pls.' Opp'n Ex. 45 (6/10/2015 R. Giroux Dep. Tr. 377:6-18). The deposition testimony at Pls.' Opp'n Ex. 244 (5/16/2016 R. Giroux Dep. Tr. 138:4-140:2) describes Giroux's views on the corn and soybean markets, and does not discuss Monsanto, DroughtGard, or buffer rows. To the extent that Pls.' Opp'n Ex. 244 contains the wrong deposition transcript and Plaintiffs meant to reference the 6/9/2016 Giroux Dep. Tr. at 138:4-140:2, that testimony also does not show what Monsanto required DroughtGard growers to actually do, or whether those requirements were actually followed or whether they could satisfy China's zero tolerance policy.

211.   Monsanto monitored compliance with these provisions to ensure that growers complied with them. Ex. 45, Giroux Vol. II at 377:5-18.

> **RESPONSE TO NO. 211.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-

tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch.  *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10).  Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of  shipments to China.  In any event, the cited testimony describes Randal Giroux's "understanding" of Monsanto's DroughtGard program, not what Monsanto itself actually "monitored," or whether that monitoring was actually

conducted and could satisfy China's zero tolerance policy.  *See* Pls.' Opp'n Ex. 45 (6/10/2015 Giroux Dep. Tr. 377:6-18).

212.    This plan to protect the market was designed in consultation with the grain trade. Ex. 107, Deposition of David Baudler as a corporate representative of Cargill Vol. II ("Baudler 30b6 Vol. II") at 483:10-484:3.

<u>**RESPONSE TO NO. 212.**</u>        Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-

pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch.  *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (1/28/2017 R. Carrato Dep. Ex. 10).  Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of  shipments to China.  In any event, the cited deposition testimony describes a meeting where Monsanto informed Cargill's David Baudler about its plan to release DroughtGard.  *See* Pls.' Opp'n Ex. 107 (5/17/2016 Baudler Dep. Tr. 483:19-484:3).  The testimony does not suggest that the launch of DroughtGard was a "plan to protect the market," nor does it describe a consultative process in which Cargill provided any input.

213.   Monsanto went through the details of the plan with Cargill prior to the launch including explaining how they would manage the approvals and where DroughtGard would be sold.  *Id.*

**RESPONSE TO NO. 213.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this

case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard

was *not* a commercial launch.  *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10).  Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of  shipments to China.  In any event, the cited deposition testimony describes a meeting where Monsanto informed Cargill's David Baudler about its plan to release DroughtGard.  *See* Pls.' Opp'n Ex. 107 (5/17/2016 Baudler Dep. Tr. 483:19-484:3).  The testimony does not indicate which "details" Monsanto covered other than Baudler's statement that Monsanto conveyed to him "what their plan was with regard to their lease -- release, how they were planning on managing approvals, where, timing, and what they would do if it was not approved in a certain time period."  *Id.* at 483:23-484:3.  For example, based upon Baudler's description of the meeting, it is unclear whether Monsanto conveyed to Cargill the number of seeds it planned to sell or the status of foreign approvals.

214.   A plan existed where if something went wrong, and the trait ended up unexpectedly in the commodity supply chain, Monsanto communicated that fact to the grain trade, who would "manage that with" Monsanto. Ex. 107, Baudler 30b6 Vol. II at 484:9-485:16.

> **RESPONSE TO NO. 214.**      Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared

equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch. *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (1/28/2017 J. Carrato Dep. Ex. 10). Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not

that MIR 162 would have been successfully isolated and kept out of shipments to China. In any event, Baudler testified about Monsanto's plan for instances where a "truck got away" containing a "non-commercially released product" and Monsanto had information about the date of delivery and the identity of the farmer. Pls.' Opp'n Ex. 107 (5/17/2016 Baudler Dep. Tr. 484:23-485:7) ("They had a plan, a very specific plan, on managing if we have received multiple calls from them on a non-commercially released product, not a lot, but once in a while, where they will say we believe we have a truck that got away, we believe it unloaded at your elevator Tuesday of last week, we believe it was from this farmer."). Baudler's testimony does not indicate that "a plan existed" for all instances where Monsanto's *commercially-released products* "ended up" in the commodity supply chain, nor does it suggest that such plans, if they existed, were effective in eliminating the likelihood that the product was kept out of shipments to export destinations where it was not approved—particularly China, which has (on paper) a zero tolerance standard.

215.   This management worked even though Cargill was not testing or channeling for DroughtGard. Ex. 74, Deposition of David Baudler is his personal capacity ("Baudler Vol. I") at 181:7-23.

**RESPONSE TO NO. 215.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more

likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch. *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10). Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. In any event, in the cited deposition testimony, Baudler confirms that Cargill was not testing any inbound or outbound

corn for DroughtGard, and that he did not know if Cargill was doing any barge testing for DroughtGard.  *See* Pls.' Opp'n Ex. 74 (6/14/2016 Baudler Dep. Tr. 181:7-23).  Baudler did not testify that Monsanto's management plan "worked" to keep DroughtGard corn out of export channels, or that Monsanto's management plan satisfied China's zero tolerance policy.  Indeed, because Cargill did not test for the presence of DroughtGard, it would be impossible for Cargill to know whether DroughtGard nevertheless ended up in inbound and outbound corn shipments, including on barges to export destinations.

216.  Given the precautions taken, the risks of a trade disruption caused by DroughtGard were viewed as "low," "especially in comparison to the [2 million] ac]res" of Viptera that were planted. Ex. 244, Giroux. Vol. I at 139:3-140:2; Ex. 106 (Giroux Dep. Ex. 85).

> **RESPONSE TO NO. 216.**     Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some

indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch. *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10). Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. The deposition testimony at Pls.' Opp'n Ex. 244 (5/16/2016 R. Giroux Dep. Tr. 139:3-140:2) describes Giroux's views on the corn and soybean markets, and does not reference DroughtGard or the risk of a trade disruption. To the extent that Pls.' Opp'n Ex. 244 contains the wrong deposition transcript and Plaintiffs meant to reference the 6/9/2016 R. Giroux Dep. Tr. at 139:3-140:2, Giroux testified that he believed "export risks" were low, but that testimony does not establish whether the precautions

referenced in paragraph 216 were actually taken, or whether they could satisfy China's zero tolerance policy.

217.    The broad commercialization of Viptera, undertaken by Syngenta with "no attempts to try to manage that trait out of the commodity supply chain or out of the market at all," resultantly posed a "higher risk" of causing a trade disruption.  Ex. 244, Giroux Vol. I at 204:5-24.

<u>**RESPONSE TO NO. 217.**</u>      Disputed, unsupported by the evidence

cited, and immaterial to Syngenta's arguments for summary

judgment.  This paragraph is irrelevant to the grounds asserted in

Syngenta's motion for summary judgment because it is about an

entirely different product (DroughtGard) from the one at issue in this

case (Viptera).  Plaintiffs apparently intend the assertions in this

paragraph to support the contention that restricting seed sales or

planting practices would have reduced the incidence of cross-

pollination and the spread of MIR 162 from dust in shared

equipment and thereby would have sufficiently reduced the presence

of MIR 162 in U.S. corn exports to China so as to make it more

likely than not that those exports would satisfy China's zero-

tolerance policy.  These assertions are immaterial to that causation

question, however, because the facts asserted state only that

restricting seed sales and planting practices could have some

indeterminate marginal effect in reducing the risk of cross-

pollination, but do not provide any evidence purporting to quantify

the effectiveness of those measures or the degree to which they

would reduce cross pollination, nor do they provide any basis on

which a reasonable jury could conclude that these measures (alone

> or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons.  First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime.  Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch.  *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10).  Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of  shipments to China.  The deposition testimony at Pls.' Opp'n Ex. 244 (5/16/2016 R. Giroux Dep. Tr. 204:5-24) describes Giroux's views on Chinese regulatory system, and not the risk of a trade disruption.  To the extent that Pls.' Opp'n Ex. 244 contains the wrong deposition transcript and Plaintiffs meant to reference the 6/9/2016 R. Giroux Dep. Tr. at 204:5-24, that testimony states that Cargill would conduct tests for DroughtGard "depending on how [it] assess[ed] the risk."  Giroux did not testify that any measures taken to manage broadly commercialized traits could satisfy China's zero tolerance policy.  Giroux's comparative statement of the lower risk associated with a *non-commercial* release is irrelevant because it provides no information from which a jury could permissibly conclude that a *commercial release* could be limited in ways that make it more likely than not that U.S. corn shipments would satisfy China's zero tolerance policy.

218.   As Plaintiffs' expert, Randy Giroux, will testify the trade disruption caused by Viptera would likely have been avoided if Syngenta had taken the same or similar precautions as those Monsanto took with respect to DroughtGard.  Ex. 303, Giroux Decl. ¶ 6.

**RESPONSE TO NO. 218.**       Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (DroughtGard) from the one at issue in this case (Viptera). Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than

not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Monsanto asked farmers to implement certain restrictions provides no evidence concerning how effective those restrictions were in meeting the requirements of a zero-tolerance regime. Second, all evidence related to DroughtGard is irrelevant because the undisputed record establishes that DroughtGard was *not* a commercial launch. *See* Ex. 343 (4/10/12 Monsanto Press Release); Ex. 344 (ADM-00016182); Ex. 346 (J. Carrato Dep. Ex. 10). Thus, descriptions of Monsanto's non-commercial restricted cultivation of DroughtGard provide no evidence whatsoever that a limited commercial launch of Viptera could have been restricted in ways to make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. Plaintiffs also mischaracterize Giroux's testimony by falsely stating that he will testify about the likely avoidance of a trade disruption when in fact Giroux only states that "a limited and managed launch like Monsanto's DroughtGard plan presents a far lower risk to the ability of exporters to serve the unapproved export market than broad commercialization." Pls.' Opp'n Ex. 303 (Giroux Decl. ¶ 6.). Indeed, Giroux testified that Cargill has "been consistent since, I'm sure, the year 2000….that -- it is not possible to grain channel to zero." Syngenta's MSJ Ex. 121 (R. Giroux Dep. Tr. 448:6-10). Giroux's comparative statement of the lower risk associated with a *non-commercial* release is irrelevant because it provides no information from which a jury could permissibly conclude that a *commercial release* could be limited in ways that make it more likely than not that U.S. corn shipments would satisfy China's zero tolerance policy. Indeed, Giroux's declaration does not state that a "trade disruption caused by Viptera would likely have been avoided if Syngenta had taken the same or similar precautions as those Monsanto took with respect to DroughtGard." Instead,

Giroux's declaration explicitly states: "This does not mean that the risk is zero. The only way to guarantee there will be no trade disruption is to commercialize only after key import approvals have been obtained." Thus, Plaintiffs' expert Randy Giroux has indicated he will *not* be offering testimony to support their assertion that a trade disruption would have been avoided if Syngenta had taken the same or similar precautions as Monsanto. *Id.*

219.  Corn grown in the "Western Corn Belt tends to flow by rail up to the Pacific Northwest," which does not serve the Chinese market. Ex. 45, Giroux Vol. II at 371:7-15 (discussing why limited launch of DroughtGard was located in Western Corn Belt).

**RESPONSE TO NO. 219.** Disputed and immaterial to Syngenta's arguments for summary judgment. Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than

not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162. The mere existence of regions where inbound *grain* allegedly goes to areas that do not serve the Chinese market provides no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China."). Ensuring that grain grown from Viptera seed is brought to dedicated facilities would also be a channeling requirement, which this Court has held is preempted by the Grain Standards Act. *See* Rule 12(c) Order, Dkt. 2426 at 19-25. In any event, Giroux's testimony regarding the "tendency" of corn grain in particular regions to "flow" to certain export destinations does not establish that *all* grain from the Western Corn Belt is sent to the Pacific Northwest, or that *all* grain sent to the Pacific Northwest is not shipped to China. Indeed, discovery in this case suggests that some grain from the Pacific Northwest *did* serve the Chinese market. *See* Ex. 385 (A. Reed Dep. Ex. 604, at ADM-00158678) (contract for sale of U.S. corn to China "Ex-PNW").

220.   In addition, there are areas of the country where "a hundred percent of their grain goes to feed yards or to feed mills," so "having the unapproved varieties was not a problem." Ex. 87, Boerm Vol. I at 85:20-86:4.

179

**RESPONSE TO NO. 220.**      Disputed that there are any areas of the country in which grain can be grown to keep GM events out of export channels and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.  The mere existence of areas where inbound *grain* goes to feed yards or feed mills provides no evidence whatsoever that a limited sale of *seed* to those

areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. Indeed, Mr. Boerm testified in the same response that it was "impossible" to "get a hundred percent purity." Pls.' Opp'n Ex. 87 (6/20/2016 C. Boerm Dep. Tr. 83:25-84:2); *see also* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China."). Ensuring that grain grown from Viptera seed is brought to dedicated facilities would also be a channeling requirement, which this Court has held is preempted by the Grain Standards Act. *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

221. Such areas include parts of Kansas, Oklahoma, and Texas. *Id.*; Ex. 82, Boerm Vol. II at 399:15-21 ("We talked about Corpus Christie, Texas, and Galveston, Texas, do not export corn, do not handle corn. And there are times, there are locations that in Kansas and Oklahoma, for example, Optima, Oklahoma, Hereford, Texas, where they do not handle corn that is going to be exported directly or to a feed mill or to a processing plant that will be.").

**RESPONSE TO NO. 221.** Disputed that there are any areas of the country in which grain can be grown to keep GM events out of export channels and immaterial to Syngenta's arguments for summary judgment. Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-

tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.  The mere existence of areas where inbound *grain* is not exported provides no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China.  Indeed, Mr. Boerm testified in the same response that "most elevators…either directly or indirectly, ship to an export or processing market that is tributary to the export market."  Pls.' Opp'n Ex. 82 (6/21/2016 C. Boerm Dep. Tr. 399:23-400:3); *see also* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").  In any event, ensuring that grain grown from

Viptera seed is brought to dedicated facilities would be a channeling requirement, which this Court has held is preempted by the Grain Standards Act.  *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

222.    ADM has facilities that also are "not part of ADM's export supply chain of corn." Ex. 82, Boerm Vol. II at 401:9-18.

**RESPONSE TO NO. 222.**      Disputed that there are any areas of the country in which grain can be grown to keep GM events out of export channels and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than

not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.  The mere existence of facilities where inbound *grain* is not exported provides no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China.  Ensuring that grain grown from Viptera seed is brought to dedicated facilities would be a channeling requirement, which this Court has held is preempted by the Grain Standards Act.  *See* Rule 12(c) Order, Dkt. 2426 at 19-25.  Even if ADM has facilities that are not part of ADM's export supply chain, that does not ensure that it can satisfy zero tolerance for any commercially-available corn trait.  *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").

223.  Cargill similarly has such facilities, including parts of Texas, California, Ohio, and Kansas.  Ex. 322, Deposition of Steven Smalley as a corporate representative of Cargill ("Smalley 30b6 Dep.") at 182:13-183:14 ("Yeah, we would have some interior facilities that would not be export oriented that would not ship to export."), *id*. at 84:7-23 ("We have facilities that are co-located with ethanol plants.  All of that corn would go into ethanol production.  We have other facilities that are tributary to California, feed markets and poultry operations, poultry feeding, feed mills, etcetera."), *id*. at 185:6-12 ("Northern Ohio would probably go either to a feed destination or to an ethanol facility.").  *Id*. at 185:13-18 (Western Kansas and Nebraska "would be domestic-oriented origins.").

**RESPONSE TO NO. 223.**      Disputed that there are any areas of the country in which grain can be grown to keep GM events out of export channels and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs apparently intend the assertions in

184

this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162. The mere existence of facilities where inbound *grain* is not exported provides no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. Ensuring that grain grown from Viptera seed is brought to dedicated facilities would be a channeling requirement, which this Court has held is

preempted by the Grain Standards Act.  *See* Rule 12(c) Order, Dkt. 2426 at 19-25.  Even if Cargill has facilities that are not part of Cargill's export supply chain, that does not ensure that it can satisfy zero tolerance for any commercially-available corn trait.  *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").

224.   When Cargill considered channeling Enogen corn to ethanol plants for Syngenta in 2010-11, they would have kept it to the Western Corn Belt "because the further east you go, the bigger risk you run [Enogen] gets into a place you don't want it, the food supply [or] export markets."  Ex. 95, Bell Dep. at 155:5-156:1-6.

<u>**RESPONSE TO NO. 224.**</u>        Disputed that there are any areas of the country in which grain can be grown to keep GM events out of export channels and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation

question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Cargill considered a certain approach for channeling Enogen provides no evidence concerning how effective that approach would be in meeting the requirements of a zero-tolerance regime. Second, all evidence related to Enogen is irrelevant because the undisputed record establishes that Enogen was a special use trait *not* a commodity use trait. *See* Ex. 386 (2/10/16 D. Morgan Dep. Tr. 165:5-22) ("Enogen is…what we would define as a special use trait. It changed the profile of corn, had an incredibly beneficial impact, still does have a very beneficial impact on helping to improve the output and economics of ethanol production, but is a [trait] that we would segregate away from certain feed uses because it changes the functionality of the corn and it would have not the, not the right profile for certain food processing."). Unlike Viptera, special use traits like Enogen have qualities that "may have significant, unintended processing or product functional or compositional effects in crops, crop uses, and/or processing streams," and are thus commercialized in channeled or closed

loop systems.  *See* Syngenta's MSJ Ex. 173 (M. O'Mara Dep. Ex. 3, at SYNG_00367787).  Any evidence suggesting Syngenta should have implemented a similar closed loop system for Viptera would be a channeling requirement, which this Court has held is preempted by the Grain Standards Act.  *See* Rule 12(c) Order, Dkt. 2426 at 19-25.  Thus, any evidence of what Cargill considered for channeling a special use trait is irrelevant to Syngenta's motion for summary judgment.  *See also* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").

225.    Cargill also would have kept it out of the commodity system and had it delivered directly from the farm to its end use.  *Id*. at 156:16-157:3.

**RESPONSE TO NO. 225.**    Disputed that there are any types of limited launch in which grain can be grown to keep GM events out of export channels and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because it is about an entirely different product (Enogen) from the one at issue in this case (Viptera).  Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that

188

> restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Plaintiffs' purported evidence in this paragraph could not support a jury finding of causation for Plaintiffs' limited launch theories for two reasons. First, the mere fact that Cargill "would have" taken a certain approach for channeling Enogen provides no evidence concerning how effective that approach would be in meeting the requirements of a zero-tolerance regime. Second, all evidence related to Enogen is irrelevant because the undisputed record establishes that Enogen was a special use trait *not* a commodity use trait. *See* Ex. 386 (2/10/16 D. Morgan Dep. Tr. 165:5-22). Unlike Viptera, special use traits like Enogen have qualities that "may have significant, unintended processing or product functional or compositional effects in crops, crop uses, and/or processing streams," and are thus commercialized in channeled or closed loop systems. *See* Syngenta's MSJ Ex. 173 (M. O'Mara Dep. Ex. 3, at SYNG_00367787). Any evidence suggesting Syngenta should have implemented a similar closed loop system for Viptera would be a channeling requirement, which this Court has held is preempted by the Grain Standards Act. *See* Rule 12(c) Order, Dkt. 2426 at 19-25. Thus, any evidence of what Cargill "would have" done is irrelevant to Syngenta's motion for summary judgment. *See also* Syn. MSJ Ex. 66 (A. McHughen Expert Rep.

¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").

226.   Corn is produced in nearly every U.S. state.   The following chart, published by the USDA, shows 2013 corn production in the United States:



Source:  USDA Agricultural Marketing Service analysis of data from USDA National Agricultural Statistics Service State and county level statistics 2013, and Federal Grain Inspection Service port inspection data, 2013.
*Grain Consuming Animal Units

Ex. 108 (Smalley Dep. Ex. 16) at Fig. 5; Ex. 322, Smalley 30b6 Dep. at 181:15-24.

**RESPONSE TO NO. 226.**   Undisputed.

227.   Consistent with the USDA analysis, Plaintiffs' expert, Dirk Maier, provided the following figure to show how corn flows to export markets in the United States (depicted in the yellow arrows):



Ex. 109, Expert Report of Dirk Maier ("Maier Rpt.") at Fig. 9.

> **RESPONSE TO NO. 227.**     Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.    Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Syngenta does not dispute that this figure appears as Figure 9 in Plaintiffs' expert Dirk Maier's report.  However, Syngenta disputes the extent to which this figure is "consistent with" an

unspecified USDA analysis, and the extent to which the figure actually depicts "how corn flows to export markets in the United States."  Plaintiffs apparently intend the assertion in this paragraph to support the contention that Syngenta could have "substantially reduced" the risk that a GM trait will spread by cross-pollination by "limiting sale of seed to non-exporting regions of the country." Opp'n 29.  But the mere existence of areas where inbound *grain* is not exported provides no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China.  *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").  Ensuring that grain grown from Viptera seed is brought to dedicated facilities would also be a channeling requirement, which this Court has held is preempted by the Grain Standards Act.  *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

228.    As that figure shows, there are large areas of the corn growing country that are spatially separated from the export channel.  *Id.*

> **RESPONSE TO NO. 228.**        Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.   Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.  These assertions are immaterial to that causation question, however, because the facts asserted state only that

restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Syngenta does not dispute that this figure appears as Figure 9 in Plaintiffs' expert Dirk Maier's report.  However, Syngenta disputes the extent to which this figure shows that there are "large" areas of corn growing country that are spatially separated from the export channel. Plaintiffs apparently intend the assertion in this paragraph to support the contention that Syngenta could have "substantially reduced" the risk that a GM trait will spread by cross-pollination by "limiting sale of seed to non-exporting regions of the country."  Opp'n 29.  But this figure does not show any significant corn-producing regions that are *not* connected to export channels.  In fact, Plaintiffs' expert Maier does not assert in his report that "large areas" of the country are spatially separated from the export channel, nor does he place that interpretation on this figure or offer any testimony to that effect.  Plaintiffs' argument from this map is not evidence.  In any event, the mere existence of areas that are spatially separated from the export channel provides no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China.  *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release

with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China."). Ensuring that grain grown from Viptera seed is brought to dedicated facilities would also be a channeling requirement, which this Court has held is preempted by the Grain Standards Act. *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

229.   Syngenta's expert, Dr. Thurman, who relies on the Corn Transportation Profile cited above (Ex. 108 (Smalley Dep. Ex. 16) at Fig. 5), also contends that 65% of corn for export was shipped from the Mississippi Gulf, while only 13 percent was shipped from the Pacific Northwest. Ex. 110, Expert Report on Class Certification of Dr. Walter Thurman ("Thurman Rpt.") at ¶ 95.

   **RESPONSE TO NO. 229.**   Undisputed.

230.   He contends that only 1% of corn grown in the Atlantic, 1% of corn grown in the Texas Gulf, and .3% of corn grown in California is even exported. *Id.*

   **RESPONSE TO NO. 230.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they

> would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Syngenta disputes Plaintiffs' interpretation of Figure 30 of Dr. Thurman's report, which appears to be the basis for their assertion in this paragraph. Figure 30 of Dr. Thurman's report illustrates corn exports by port region, not the amount of corn grown in each region that is exported. *See* Pls.' Opp'n Ex. 110 (7/20/2016 W. Thurman Rep. ¶ 95, Fig. 30, n.102). Thus, Plaintiffs misinterpret Dr. Thurman's Figure 30 when they state that "only 1% of corn grown in the Atlantic" is exported. Rather, Figure 30 illustrates that 1% of corn *exports* were shipped from the Atlantic port region. Even when properly interpreted, this evidence is immaterial to Syngenta's motion for summary judgment. Plaintiffs apparently intend the assertion in this paragraph to support the contention that Syngenta could have "substantially reduced" the risk that a GM trait will spread by cross-pollination by "limiting sale of seed to non-exporting regions of the country." Opp'n 29. But whether corn is exported from the Atlantic or the Texas Gulf provides no evidence whatsoever that a limited sale of *seed* outside those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. Moreover, ensuring that grain grown from Viptera seed is brought to dedicated facilities would also be a channeling requirement, which this Court has held is preempted by the Grain Standards Act. *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

231.   As the figures above show, there are corn-growing regions, such as the Atlantic and parts of California, that do not serve export markets at all. *See also* Ex. 303, Giroux Decl. at ¶ 9 (discussing areas of the country that are outside of the export channel).

**RESPONSE TO NO. 231.**      Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.   Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy.   These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

Syngenta disputes Plaintiffs interpretation of the figures in paragraphs 226 and 227, neither of which illustrate that "there are corn-growing regions…that do not serve export markets at all." Indeed, Plaintiffs' contention that the Atlantic and parts of California "do not serve export markets

at all" is contradicted by the figure in paragraph 226 and Figure 30 in Dr. Thurman's report (which Plaintiffs cite in support of paragraph 230 above) both of which show that *some* corn is exported from both of these regions. *See* Pls.' Opp'n Ex. 110 (7/20/2016 W. Thurman Rep. ¶ 95, Fig. 30). The cited testimony from Giroux also does not support Plaintiffs' assertion that some regions "do not serve export markets at all," because Giroux only states that there are some areas where corn is "much less likely to enter the export channel." Pls.' Opp'n Ex. 303 (R. Giroux Decl. ¶ 9). Giroux does not even list "the Atlantic and parts of California" as examples, instead claiming that these areas include "Kansas, Nebraska, Northeastern Ohio and parts of the Southeastern United States." In any event, Plaintiffs' assertion is irrelevant to Syngenta's motion for summary judgment. Even if there were areas that do not serve export markets, that is not evidence that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to China. *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China."). That would require ensuring that grain grown from Viptera seed is brought to dedicated facilities, which constitutes a channeling requirement that this Court has held is preempted by the Grain Standards Act. *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

232.    The figures also show a significant number of grain consumer animal units that need corn as feed, further evidencing that the corn is consumed locally. *Id.*

**RESPONSE TO NO. 232.**    Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared

equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162.

The figure in paragraph 226 illustrates some grain consuming animal units, however that only supports Plaintiffs' assertion to the extent that it shows *some* corn is consumed locally in the United States. The figure in paragraph 227 does not show any grain consuming animal units, nor does it support Plaintiffs' assertion that "corn is consumed locally" because according to Plaintiffs' expert Maier it only purports to illustrate the "flow of United States grain to export markets." *See* Pls.' Opp'n Ex. 109 (D. Maier Expert Rep. Fig. 9). In any event, Plaintiffs' assertion is irrelevant to Syngenta's motion for summary judgment. The mere existence of areas where corn is consumed locally is no evidence whatsoever that a limited sale of *seed* to those areas would make it more likely than not that MIR 162 would have been successfully isolated and kept out of shipments to

China.  *See* Syn. MSJ Ex. 66 (A. McHughen Expert Rep. ¶¶ 24-28) ("[E]ven having a highly restricted geographical release with restrict contracts on farmer disposition of grain cannot guarantee to 100% certainty that no MIR162 will end up in China.").  That would require ensuring that grain grown from Viptera seed is brought to dedicated facilities, which constitutes a channeling requirement that this Court has held is preempted by the Grain Standards Act.  *See* Rule 12(c) Order, Dkt. 2426 at 19-25.

233.   Syngenta could have limited the launch of Viptera to the numerous areas where grain is consumed locally, where grain is not exported, and could have instituted robust stewardship measures to lessen the risk of a trade disruption.  It did not because it viewed a loss of the Chinese market for U.S. corn as advantageous to its business interests.  *See infra* SOAF ¶¶ 234-248, 344-374.

> **RESPONSE TO NO. 233.**      Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs' assertion in this paragraph is not a fact in evidence but rather counsel's argument.  Plaintiffs improperly rely on an unfocused citation to over 30 paragraphs of their own Statement of Additional Facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the

record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

Plaintiffs apparently intend the assertions in this paragraph to support the contention that restricting seed sales or planting practices would have reduced the incidence of cross-pollination and the spread of MIR 162 from dust in shared equipment and thereby would have sufficiently reduced the presence of MIR 162 in U.S. corn exports to China so as to make it more likely than not that those exports would satisfy China's zero-tolerance policy. These assertions are immaterial to that causation question, however, because the facts asserted state only that restricting seed sales and planting practices could have some indeterminate marginal effect in reducing the risk of cross-pollination, but do not provide any evidence purporting to quantify the effectiveness of those measures or the degree to which they would reduce cross pollination, nor do they provide any basis on which a reasonable jury could conclude that these measures (alone or in combination with others) would reduce the effects of cross-pollination and commingling sufficiently to make it more likely than not that U.S. corn exports would have satisfied China's zero tolerance standard for the presence of MIR 162. As explained in further detail below, Syngenta disputes almost all of the purported facts asserted in Plaintiffs' SOAF ¶¶ 234-248, 344-374 because they are unsupported by the evidence Plaintiffs cite. In addition to the issues raised in response to SOAF ¶¶ 234-248, 344-374, there is no indication based on the evidence cited in these paragraphs as to what Syngenta "could" have done and no mention in the evidence cited in these paragraphs of Syngenta's alleged "view" that "a loss of the Chinese market for U.S. corn as advantageous to its business interests."

234.    Syngenta's former CEO, Michael Mack, referred to the North American seed business as the "home turf" of Monsanto and Pioneer. Ex. 16, Morgan Vol. II at 338:2-22; Ex. 111 (Dep. Ex. 1431) at SYNG_00431118.

**RESPONSE TO NO. 234.**        Undisputed that Monsanto and Pioneer are headquartered in the United States, but otherwise unsupported by the evidence cited and immaterial to Syngenta's arguments for

200

summary judgment.   This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.   None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.  In any event, the cited document does not refer to "the North American seed business" as the "home turf" of Monsanto and Pioneer.  The document states: "Finally, as for wishing to have made more substantive progress there ... I had to smile a bit reading that. ... I recall ... vividly so (I even remember where you were sitting the meeting room in 1001.3.13 when you made a remark about the lack of progress in NAFTA Corn and Soya and how it needed some serious intervention. I just had to smirk to myself at the time since I had a plan in mind ... but all the while knowing that it was a tall order to make inroads in the home turf of MON and PHI. From the vantage point of the outside world, we have moved mountains." Pls.' Opp'n Ex. 111 (D. Morgan Dep. Ex. 1431, at SYNG_00431118).  Mr. Mack does not specify what he considered the "home turf" of Monsanto and Pioneer to be in his statement. The cited deposition testimony provides no further elaboration and quotes nothing more than the introduction of Exhibit 1431 as a deposition exhibit.

235.   Mack worried: "Our competitors are out to get us and have plenty of weapons and resource[s] at their disposal." Ex. 111 (Dep. Ex. 1431) at SYNG_00431118.

**RESPONSE TO NO. 235.**    Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.  None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.  In any event, Syngenta does not dispute that Mr. Mack wrote this statement in Pls.' Opp'n Ex. 111 (D. Morgan Dep. Ex. 1431, at SYNG_00431118), however Syngenta disputes Plaintiffs' characterization that Mr. Mack was "worried," which is not contained anywhere in the cited document.

236.    Mack's paranoid view of Syngenta's quest for market share permeated Syngenta management, so when competitors agreed to delay their commercialization of genetically modified traits in Brazil awaiting export market approvals, including approval by China, Syngenta executives viewed these efforts as an attempt "to block us in the catch-up of competitiveness."  Ex. 112 (Dep. Ex. 913) at SYNG_00408665; Ex. 26, Hull Vol. I, 171:4-16; *see also* Ex. 6, Bernens Vol. I at 255:10-258:9; Ex. 113 (Dep. Ex. 1027) (email noting that Monsanto call for all seed developers to wait for Chinese import approval before commercializing in Brazil as "trying to leverage some advantage they perceive?").

**RESPONSE TO NO. 236.**    Disputed, hearsay, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.  None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n

88.     In any event, the quoted document states: "I have an information [sic] from two different good sources that Monsanto and BASF are talking to the traders and committed with an agreement about no launch of any new product which is not approved in key export markets. This, of course, is an interesting strategic movement of Monsanto which assure the goodwill with the traders (in Brazil they are key for the collection of the royalties of RR in soy) and to block us in the catch up of competitiveness. They [sic] still working hard with stakeholders and government about our MIR."  Pls.' Opp'n Ex. 112 (S. Hull Dep. Ex. 913, at SYNG_00408665).  This document does *not* support Plaintiffs' assertion that Mr. Mack had a "paranoid view of Syngenta's quest for market share," that Mr. Mack's views "permeated Syngenta management," or that Syngenta's competitors "agreed to delay their commercialization of genetically modified traits in Brazil awaiting export market approvals, including approval by China."  Nor does this document establish that "Syngenta executives viewed" any actions by Syngenta's competitors as "an attempt" to do anything.  The cited deposition testimony also does not establish these facts. Pls.' Opp'n Ex. 26 (3/23/2016 S. Hull Dep. Tr. 171:4-16) merely notes Ms. Hull's recollection that in February 2010 BASF received cultivation approval from Brazil for genetically modified soybeans. Similarly, Pls.' Opp'n Ex. 6 (4/4/2016 J. Bernens Dep. Tr. 255:10-258:9) contains several pages of testimony merely reciting the

content of Exhibit 1027 and is thus inadmissible hearsay. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).   Pls.Opp'n Ex. 113 (J. Bernens Dep. Ex. 1027, at SYT00253639) itself simply notes that there was discussion amongst biotech companies "to sign [an] agreement not to commercialize before approvals in important markets are in place – important markets for Brazil are EU & China."   All of these documents are about cultivation approval for soybeans in Brazil, and none even remotely suggest Syngenta's competitors had agreed to delay commercialization *for soybeans in Brazil* pending Chinese approval, let alone for corn in the United States.   They also do not discuss any "paranoid views."   Thus, Plaintiffs' assertions are blatantly unsupported by the evidence they cite.

237.   When controversy arose in the U.S. surrounding the lack of import approval of MIR162 in China, Mack and other Syngenta executives hoped Syngenta's broad launch of MIR162 would force China to grant approval outside of its normal regulatory process similar to Japan in 2007.  Ex. 114 (Dep. Ex.  313).

**RESPONSE TO NO. 237.**        Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.  None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument. *See* Opp'n 88.  In any event, the cited

document does not reference any "controversy…surrounding the lack of import approval [for] MIR162 in China," nor does it discuss Mr. Mack's or any other Syngenta executives "hopes."  Although Plaintiffs fail to specify the language they rely upon to support their assertion, at best, the document states: "Davor and I briefed Mike on the China/trader situation last night. He wants the Chinese to know that every ship carrying corn into China this fall will have 162 in it at some level." Pls.' Opp'n Ex. 114 (D. Morgan Dep. Ex. 313). This statement does not support Plaintiffs assertion that "Mack and other Syngenta executives hoped Syngenta's broad launch of MIR162 would force China to grant approval outside of its normal regulatory process similar to Japan in 2007."  In fact, nowhere does the document reference "forcing" China to do anything, or the words "Japan" and "2007."  Plaintiffs' assertion has no support whatsoever by the evidence they cite.

238.    Syngenta thought it could use the pressure of a potential trade disruption to force China to change its import approval system.  *See* Ex. 345 (Dep. Ex. 939) (emails detailing plan to pressure government of China); Ex. 294, Hull Vol. II at 588:6-592:6.  Syngenta believed it had created a "major problem" for China by commercializing not only in the United States, but in Brazil and Argentina as well. That way, even if China attempted to solve their "grain sourcing challenge" by seeking corn from these alternative markets, China "needed to understand that wherever they were going to source their corn, if in Argentina, Brazil or the U.S., [the corn] would potentially have Viptera in it."  Ex. 345 (Dep. Ex. 939); Ex. 294, Hull Vol. II at 588:6-592:6.

**RESPONSE TO NO. 238.**    Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not

available under Kansas Law. None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument. *See* Opp'n 88. In any event, the string of emails cited in Pls.' Opp'n Ex. 345 (S. Hull Dep. Ex. 939) contain a discussion regarding Syngenta's efforts to engage the US embassy in China and the USDA on "MIR162 Biosafety Certificate issues," an effort that these emails note the U.S. Grains Council was also undertaking with Chinese importers. The emails do not discuss what Syngenta as a company "thought," nor do they reference "us[ing] the pressure of a potential trade disruption to force China to change its import approval system." This document also provides no support for Plaintiffs' assertion regarding Syngenta's "beliefs," and only states: "I also think a key consideration is finding the right balance of pressure. This is going to be a major problem for China if they maintain a 0 tolerance and enforce it." *Id.* at SYT00243449. As Ms. Hull explained repeatedly in the deposition testimony cited by Plaintiffs, "The context for this, if you start at the beginning, is about the fact that 162 is also being commercialized in Brazil and Argentina. And if China were sourcing corn from Brazil and Argentina [and] the U.S., that they needed to understand Viptera was approved there." Pls.' Opp'n Ex. 294 (3/24/2016 S. Hull Dep. Tr. 589:14-19); *see also id.*

206

589:23-590:3 ("They needed to understand that wherever they were going to source their corn, if in Argentina, Brazil or the U.S., they would potentially have Viptera in it because it's legally commercialized there.").  The cited excerpt from Pls." Opp'n Ex. 294 contains no other testimony about Syngenta's "thoughts" or "beliefs," nor does Ms. Hull testify about any efforts to "pressure" or "force China to change its import approval system."  Once again, Plaintiffs' assertions are blatantly unsupported by the evidence they cite.

239. When that plan failed, and China did not grant special permission for MIR162, Mack and Syngenta Chief Operating Officer, Davor Pisk, hoped MIR162 would disrupt corn shipments to China.  Ex. 115 (Dep. Ex. 946); Ex. 294, Hull Vol. II at 450:5-12.

**RESPONSE TO NO. 239.**        Disputed, hearsay, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.   None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.  In any event, none of the cited evidence discusses any "failed plans" or the "hopes" of Mr. Mack and Mr. Pisk that "MIR162 would disrupt corn shipments to China."  Pls.' Opp'n Ex. 115 (S. Hull Dep. Ex. 946) states: "Having boats get turned around and

207

quarantined is precisely what we need to help pressurize this."  As Mr. Mack explained at his deposition (which Plaintiffs conveniently do not cite), "by 'pressure' I mean precisely that which I talked about back in 2007, which is the business of getting clarity around the asynchronicity of these approval processes is something that needs to be dealt with, dealt with in a -- in a proper and clear way, so that these various people who had various interests in the whole thing could -- could proceed with confidence, and that wasn't happening."  Ex. 387 (4/28/2016 M. Mack Dep. Tr. 203:21-204:4).  Thus, if anything, it is clear from the evidence in the record that Mr. Mack did *not* "hope[] MIR162 would disrupt corn shipments to China," as Plaintiffs assert.  Pls.' Opp'n Ex. 294 (3/24/2016 S. Hull Dep. Tr. 450:5-12) is testimony that recites the contents of Exhibit 946 and is thus inadmissible hearsay.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).  The cited deposition testimony in no way establishes Plaintiffs' assertion.

240.   In October, 2011, Mack and Pisk learned from Charles Lee that Bunge vessels carrying U.S. corn had run into issues in China.  Lee worried about the implications of MIR162 causing a trade disruption, but Mack wrote to Pisk: "I think Chuck [Lee] worries about this wrongly.  Having boats get turned around and quarantined is precisely what we need to help pressurize this.  Moreover, having more press about it is better than less press since this will put pressure on everyone else who has a vested interest in the broader issue to force an industry solution." Ex. 115 (Dep. Ex. 946).

**RESPONSE TO NO. 240.**      Disputed, hearsay, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.   None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.   The cited document also contains an email from Mr. Lee stating "I just spoke with CHS and they stated that Bunge has 2 boats in China that have not been allowed to unload."  Pls.' Opp'n Ex. 115 (S. Hull Dep. Ex. 946).  This statement is hearsay and is thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).  In any event, the email does not state that Bunge vessels carrying U.S. corn "had run into" non-descript "issues in China."   The email also does not state that Mr. Lee "worried about the implications of MIR162 causing a trade disruption."   Instead, Mr. Mack writes: "I think Chuck worries about this wrongly."  Pls.' Opp'n Ex. 115 (S. Hull Dep. Ex. 946).   Syngenta does not dispute that Mr. Mack also writes: "I think Chuck [Lee] worries about this wrongly.  Having boats get turned around and quarantined is precisely what we need

209

to help pressurize this.  Moreover, having more press about it is better than less press since this will put pressure on everyone else who has a vested interest in the broader issue to force an industry solution."  *Id.*  However, contrary to Plaintiffs' assertion, Mr. Mack did not write that statement solely to Mr. Pisk, but rather to a number of other individuals.

241.   Pisk then forwarded Mack's email to Lee stating: "Mike is right; this is good news for us in the long run." Ex. 116 at SYNG_01091685.

  **RESPONSE TO NO. 241.**   Undisputed.

242.   Later, on December 9, 2013, when discussing a potential "permanent ban" by China of MIR162, Pisk told Mack that "would not be such a bad result if it prompts the grain trade to stop selling there." Ex. 117 at SYNG_01089685.

  **RESPONSE TO NO. 242.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.  None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.  In any event, the cited document states: "Cant [sic] understand why the Chinese would ban 162 'permanently' but maybe this would not be such a bad result if it prompts the grain trade to stop selling there."  Pls.' Opp'n Ex. 117 (SYNG_01089685).  Thus, Mr. Pisk was not "discussing a

potential 'permanent ban' by China of MIR162," but rather his

lack of understanding as to why China would "ban 162

'permanently.'"

243.   On December 12, 2013, after learning that China had rejected six U.S. corn vessels because of MIR 162, Mack wrote to a number of high-level Syngenta executives, including Pisk and John Ramsay (the CFO at the time): "This isn't a bad outcome [for Syngenta] . . . since it is on the one hand short-term (i.e. the situation with China WILL resolve itself at some point . . . and by that I mean either corn will stop being traded with them since the trading model can't deal with this level of uncertainty . . . or it will get a registration) . . . on the other hand, it won't do much damage to our long-term story since it seems that Viptera is a worthy trait." Ex. 284 (Dep. Ex. 1845).

**RESPONSE TO NO. 243.**   Disputed, unsupported by the

evidence cited, and immaterial to Syngenta's arguments for

summary judgment.   This paragraph is irrelevant to the grounds

asserted in Syngenta's motion for summary judgment because

Syngenta argues that as a matter of law, punitive damages are not

available under Kansas Law.   None of Plaintiffs' evidence

purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann.

§ 60-3702(c) is relevant to Syngenta's legal argument.   *See* Opp'n

88.   In any event, Plaintiffs mischaracterize Mr. Mack's email.

Mr. Mack wrote his email after being sent a news report that

states: "China has now rejected six US cargos of corn

representing 180,000 tonnes of product.   The authorities have

found Syngenta's Viptera Agrisure corn seed in the mix, which

are not yet approved for import or consumption in China."   Pls.'

Opp'n Ex. 284 (M. Mack Dep. Ex. 1845, at SYNG_00370954).

Contrary to Plaintiffs' assertion, the news article does not

211

specifically state China rejected those shipments because of MIR162. Plaintiffs also erroneously insert the words "for Syngenta" in the document they purport to quote. Mr. Mack actually wrote: "This isn't a bad outcome....since it is on the one hand short-term (i.e. the situation with China WILL resolve itself at some point...and by that I mean either corn will stop being traded with them since the trading model can't deal with this level of uncertainty...or it will get a registration)....on the other hand, it won't do much damage to our long-term story since it seems that Viptera is a worthy trait." *Id.*

244. Mack and Pisk were identified by Syngenta as principally responsible for the decisions concerning the commercialization of Viptera. Ex. 88, First Int. Resp. at Resp. Int. 2 ("Syngenta identifies Mike Mack, Davor Pisk, David Morgan, and Chuck Lee as the persons most accurately characterized as being "principally responsible" for Syngenta's decisions regarding the timing, scope, and manner of commercialization of Viptera and Duracade.").

**RESPONSE TO NO. 244.** Undisputed that Mack and Pisk were among those identified as being principally responsible for the decisions regarding the commercialization of Viptera.

245. Syngenta remained steadfast in its view that its commercial interests were more important than the interests of farmers. In November 2011, in discussing what would happen to farmers who purchased Viptera seed in the event that the unapproved trait was detected in foreign markets, Syngenta stated that if farmers attempted to return the seed, "they likely won't be able to replace it. Poor things will have to roll the dice." Ex. 391, (Dep. Ex. 656) at SYNG_00692958.

**RESPONSE TO NO. 245.** Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds

212

asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.   None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.   In any event, the cited document states nothing about Syngenta's "view that its commercial interests were more important than the interests of farmers" or Plaintiffs' assertion that "Syngenta remained steadfast" in that alleged "view."  That assertion is entirely unsupported by the evidence cited. Moreover, the cited email discussion was not about "what would happen to farmers who purchased Viptera seed in the event that the unapproved trait was detected in foreign markets."  Instead, the email chain discusses returns on Viptera seed orders.   In response, Jill Wenzel (now Jill Wheeler) stated in her personal capacity—and not as a representative of Syngenta, as Plaintiffs assert—"they likely won't be able to replace it. Poor things will have to roll the dice."   Syngenta does not contest that Ms. Wheeler included this sentence in an email she wrote.  As Ms. Wheeler explained in her deposition (which Plaintiffs do not cite), that statement was "a reflection of the frustration I was feeling, as well as my sympathy for the farmers in the position that they were in with Agrisure Viptera, and the way the market

213

had changed."  Ex. 388 (3/17/2016 J. Wheeler Dep. Tr. 211:20-212:4).  Contrary to Plaintiffs' assertion, Ms. Wheeler's statement was not an indication that Syngenta viewed that its commercial interests were more important than the interests of farmers.

246.   In December 2013, Michael Mack exchanged emails with Michel Demare, who was then on the Board of Directors of Syngenta and is currently Chairman of the Board.  Ex. 370 (Dep. Ex. 1829); Ex. 236, Mack Vol. II at 422:17-425:20.  When Mr. Demare stated that China's corn rejection was "[q]uite a headache for the farmers," Mr. Mack replied in part: "Ahhhh, the farmers."

**RESPONSE TO NO. 246.**     Disputed,   unsupported   by   the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law.   None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument.  *See* Opp'n 88.  Syngenta does not dispute that Pls.' Opp'n Ex. 370 (M. Mack Dep. Ex. 1829) contains a December 2013 email exchange between Mr. Mack and Mr. Demare.   Syngenta also does not dispute that Mr. Mack testified that Mr. Demare became the board chair at the annual general meeting in 2013.  *See* Pls.' Opp'n Ex. 236 (4/29/2016 M. Mack Dep. Tr. 423:6-7).   However, Mr. Demare simply stated in his email: "Quite a headache for the farmers."  Pls.' Opp'n Ex. 370 (M. Mack Dep. Ex. 1829).  It is

not clear from the cited document whether Mr. Demare's comment's was in reference to China's corn rejection or another statement in Mr. Mack's prior email, such as the statement explaining that "The thin[g] with Chins is that they are so unreliable that they will let [MIR162] flow for 3 years and then they will reject something. Cargill has made many millions of dollars over the years sending corn to China even though they know the risks." *Id.* Thus, Plaintiffs cannot support their assertion that Mr. Demare "stated that China's corn rejection was '[q]uite a headache for the farmers.'"

247. When asked about this email in his deposition and whether Mr. Demare "was sympathetic to the farmers" when he heard about the Chinese corn rejections, Mr. Mack stated: "I don't have any--sympathetic to the farmers: Michel doesn't—isn't--as you said." Ex. 236, Mack Vol. II at 423:17-21.

**RESPONSE TO NO. 247.** Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment. This paragraph is irrelevant to the grounds asserted in Syngenta's motion for summary judgment because Syngenta argues that as a matter of law, punitive damages are not available under Kansas Law. None of Plaintiffs' evidence purporting to show that "Syngenta's conduct fits" Kan. Stat. Ann. § 60-3702(c) is relevant to Syngenta's legal argument. *See* Opp'n 88. In any event, Plaintiffs blatantly cut off Mr. Mack's quoted testimony mid-sentence in an attempt to suggest he stated something entirely different. Mr. Mack was asked: "And when he

215

heard about the rejections of the shipments, he was sympathetic to

the farmers, wasn't he?"  In response, Mr. Mack repeated part of

the question and explained that Mr. Demare was asking for input

on the situation: "I don't have any -- sympathetic to the farmers:

Michel doesn't -- isn't -- as you said, he's new to the board; I

think he would have seen news of this and would have asked me

how to -- how he should think about it."  Pls.' Opp'n Ex. 236

(4/29/2016 M. Mack Dep. Tr. 423:17-23).

248.    He wrote to the Chairman of the Syngenta Board of Directors regarding Viptera: "[W]e have made hundreds of millions in sales.  Any suggestion that we should have waited is nuts."  Ex. 118, SYNG_00356317 (April 23, 2015 email).

   **RESPONSE TO NO. 248.**    Undisputed.

249.    At the time Syngenta submitted its application for approval of MIR162 with Chinese regulators, internal communications confirm Syngenta understood import approval would take at least 2-3 years.  Ex. 31, Huber Vol. II at 332:7-333:16 (average approval time of greater than 28 months); Ex. 32 (Dep. Ex. 57) (January 11, 2009 document stating that the approval time for MIR162 if an application were submitted in China in Q4 2009 would be Q3 2012).

   **RESPONSE TO NO. 249.**    Disputed, vague and ambiguous,

unsupported by the evidence cited, and immaterial to Syngenta's

arguments for summary judgment.  Plaintiffs apparently intend

their assertions in this paragraph to support their contentions in

other paragraphs that "Syngenta had no basis to predict approval

by '2011 harvest' and was simply trying to protect sales of

Viptera," *see* Pl. SOAF ¶ 349 (relying on over 90 other SOAF

paragraphs for this assertion), and that "a November 2009

submission was more consistent with a Fall, 2011 approval date,"

*see* Pl. SOAF ¶ 403. This is wholly improper. *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008). In any event, none of these assertions are material to Syngenta's arguments for summary judgment because Syngenta does not argue it predicted approval "by 2011 harvest" or "Fall, 2011" but rather by "March 2012." *Cf.* Pl. SOAF ¶ 349, 403; Syngenta's MSJ 54. Plaintiffs' assertion of "at least 2-3 years" is also vague and poorly defined. Moreover, the cited evidence does not establish that internal communications confirm any purported understanding by Syngenta that "approval would take at least 2-3 years." Mr. Huber's testimony confirms the contents of a May 2014 CropLife China document, *see* Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 328:9-23), and thus his testimony does not establish "Syngenta's understanding" of the Chinese import approval timeline "[a]t the time Syngenta submitted its application for approval of MIR162." The timelines contained in the May 2014 document itself do not reflect the timeline for approval *at the time Syngenta submitted its application* in March 2010. Similarly, the January 11, 2009 document cited by Plaintiffs indicates a *less than* 2-3 year timeline, which is inconsistent with Plaintiffs' assertion that Syngenta understood import approval "would take at least 2-3 years." In any event,

217

numerous Syngenta employees testified that they understood that Chinese import approval would take approximately two years (as Plaintiffs' own expert Latner confirmed, *see* Ex. 389 (K. Latner Dep. Tr. 327:9-18)), and Plaintiffs' assertion that Syngenta's internal communications confirm it understood that approval would take longer is thus incorrect.  Ex. 390 (3/8/2016 C. Lee Dep. Tr. 177:19-179:8) ("So I think it's fairly common knowledge from regulatory, and they relayed this, that, you know, there's a two-year delay between, as we discussed, the asynchronicity of China, between USDA deregulation, which enables us to apply for import approval in China, and that approval, and you know, to this point, you know, we put a fair amount of traits through China, and those traits had all operated roughly on that two-year delay, so we expected -- regulatory said they expected that to occur."); *id.* 189:17-190:11 ("And also, you know, up until this point, you know, we put a fair amount of traits through China, and they had operated on this time two-year frame from USDA deregulation 'til approval."); Ex. 358 (4/13/2016 L. Zannoni Dep. Tr. 629:2-629:21) (Ms. Zannoni testified that "at this point, you know we talked about China in industry groups, so it was two years was the timeline that industry was using, and so that fit into that timeline."   When asked "Two years would be

from when the application was initially submitted, correct, in March of 2010?," Ms. Zannoni answered "Yes.")

250.     In the opinion of Kevin Latner, an expert on the Chinese genetically modified trait approval process, without the numerous mistakes by Syngenta that delayed the process, MIR162 likely would have been approved within a normal two- to three-year timeframe.  Ex. 27, Latner Rpt. at ¶ 257.

**RESPONSE TO NO. 250.**      Undisputed that Mr. Latner purports to offer that opinion, which Syngenta disputes both for its validity and its admissibility.  Disputed that Syngenta made "numerous mistakes . . . that delayed the process."

251.     Syngenta knew that China requires cultivation approval in an exporting country, such as the U.S. or Brazil, prior to accepting an application for import approval. Ex. 28, Huber Vol. I at 91:5–15; Ex. 119 (Dep. Ex. 56) at SYNG_00344572; Ex. 31, Huber Vol. II 345:23-346:18.

**RESPONSE TO NO. 251.**      Disputed and unsupported by the evidence cited.  Syngenta does not dispute that it knew China requires cultivation approval in another country prior to accepting an application for import approval.  However, Syngenta disputes whether the approval is required from "an exporting country, such as the U.S. or Brazil."  Plaintiffs' cited evidence does not support their assertion.  Pls.' Opp'n Ex. 28 (1/27/2016 S. Huber Dep. Tr. 91:5-15) states: "So China only allows you to make submissions after you have a cultivation approval and that's when we made our submission."   Mr. Huber's testimony does not mention a cultivation approval from "an exporting country" is required. Similarly, in Pls.' Opp'n Ex. 119 (S. Huber Dep. Ex. 56) Rui Li

states: "[W]e are aware of that currently simultaneous application is not allowed in China," but also does not reference approvals from "exporting countries."  Pls. Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 345:23-346:18) is testimony that recites the date and author of Exhibit 56 and as such does not support Plaintiffs' assertion.

252.    Syngenta projected the U.S. would deregulate MIR162 as early as "Q4 2008," and planned to seek import approval in China in Q4 2009, with an anticipated approval date of Q3 2012 or July to September 2012.  Ex. 32 (Dep. Ex. 57) at SYNG_00345226.

**RESPONSE TO NO. 252.**    Disputed and immaterial to Syngenta's arguments for summary judgment.   Plaintiffs apparently intend their assertions in this paragraph to support their contentions in another paragraph that "Syngenta had no basis to predict approval by '2011 harvest' and was simply trying to protect sales of Viptera," *see* Pl. SOAF ¶ 349 (relying on over 90 other SOAF paragraphs for this assertion).   This is wholly improper.  *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008).   In any event, neither of these assertions are material to Syngenta's arguments for summary judgment because Syngenta does not argue it predicted approval "by 2011 harvest" but rather by "March 2012."  *Cf.* Pl. SOAF ¶ 349, 403; Syngenta's MSJ54.  Syngenta disputes the admissibility of Ex. 32 (Y. Zhang Dep. Ex. 57), which appears to be draft or unofficial timeline.  *See*

Ex. 358 (4/13/2016 L. Zannoni Dep. Tr. 451:12-16) ("I don't know who prepared this."); *id.* at 455:12-24 ("The actual, the official timelines is what we put in DeCo documents. That's what the -- these are all graphics and kind of work product while we are going through, so these are all subject to change. It's what we put in DeCo documents, and then even those we look at constant changes in timelines and issues in countries and adjust accordingly.").  Moreover, Plaintiffs cite a single document in support of their assertion but ignore the fact that Syngenta continuously revised and updated its projections as new information became available.  Syngenta's Dennis Ward, whose name is on the document cited by Plaintiffs, testified that timelines change over time because "[i]t's the nature of the beast. Timelines in some countries are relatively unpredictable.  They are always trying to anticipate what is going to happen in the future. The farther away you make such predictions the less reliable predictions are. And the nature of regulatory timelines are -- is that you are depending upon the work and decisions made by entities. In this case, governments that are outside of Syngenta's control. So they are inherently unpredictable. They change."  Ex. 352 (2/17/2016 D. Ward Dep. Tr. 169:21-170:10).  Chuck Lee also testified that "there's uncertainty, as you can see, in these documents. It's difficult to predict the exact time line of every

regulatory submission and approval."  Ex. 391 (3/9/2016 C. Lee Dep. Tr. 325:5-11).  The only relevant projection here is the one communicated to growers and industry members, which was made at the time Viptera was commercialized.  Those projections state that Syngenta anticipated approval in the first or second quarter of 2012.  *See* Syn. Mem. SOF ¶¶ 43-47.  Thus, Plaintiffs' assertion is immaterial to Syngenta's arguments for summary judgment.

253.   But Syngenta's projections of U.S. deregulation were incorrect –MIR162 was not deregulated until April, 2010.  ECF 2861 at SOF ¶ 3.

**RESPONSE TO NO. 253.**   Disputed and unsupported by the evidence cited.  Syngenta does not dispute that the USDA deregulated MIR162 in April 2010.  Syngenta does dispute Plaintiffs' characterization that Syngenta's projections of U.S. deregulation were incorrect.  ECF 2861 at SOF ¶ 3 contains no such statement, nor have Plaintiffs provided any evidence to support that assertion.

254.   On September 17, 2009 (Q3 2009), Syngenta received cultivation approval of MIR162 from Brazil. Ex. 27, Latner Rpt. at 280; Ex. 120 (Dep. Ex. 60) (initial application to China for MIR162); Ex. 31, Huber Vol. II at 388:24-389:17.

**RESPONSE TO NO. 254.**   Disputed, inadmissible, and unsupported by the evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 280) claims: "On or about September 17, 2009 (Q3 2009), Syngenta received cultivation approval of MIR162 from Brazil."  Mr. Latner's bare

assertion of a factual statement without proper foundation, however, does not sufficiently establish Plaintiffs' alleged fact. Syngenta did not receive final cultivation approval for MIR162 in Brazil until November 2009. *See* Ex. 392 (3/31/2016 A. McConville Dep. Tr. 91:15-92:3) ("My understanding was that the approval was November 2009. It was backdated to September 2009. The approval was received - my understanding is the approval was received in November 2009."); *see also* Ex. 359 (1/28/2016 S. Huber Dep. Tr. 368:18-369:16) ("[T]hey backdate the approval.   The approval date isn't after they've done the review. It's actually the date that they finish the technical review. So the time after the technical review is not -- it doesn't -- it's not reflected in a final approval date.").   Plaintiffs acknowledge as much in their Statement of Additional Facts.   *See* Pls.' Opp'n SOAF ¶ 403.   Plaintiffs' other cited evidence does not support their assertion.   Pls.' Opp'n Ex. 120 (S. Huber Dep. Ex. 60) is a more than 150-page document entirely in Chinese for which no translation was provided.   Plaintiffs indicate that this document is the "initial application to China for MIR162," but that description alone says nothing about the date on which Syngenta received *Brazilian* cultivation approval for MIR162.   Similarly, Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 388:24-389:17) merely seeks to authenticate Exhibit 60.

255.   This gave Syngenta the opportunity to attempt to submit its initial application to China in the November 2009 window, but because Syngenta was not aware that it could use Brazilian approval to start the process, Syngenta missed this opportunity and did not make its initial submission to China until four months later on March 1, 2010.  Ex. 120 (Dep. Ex. 60); Ex. 26, Hull Vol. II at 615:10-616:19, 620:12-15; Ex. 121 (Dep. Ex. 976) at SYNG_00408636; Ex. 31, Huber Vol II at 384:9-385:7; Ex. 145, Y. Zhang Vol. I at 82:21-23, 155:20-157:13; Ex. 364 (Dep. Ex. 729 at SYNG_00353947).

<u>**RESPONSE TO NO. 255.**</u>        Disputed and unsupported by the evidence cited.  Plaintiffs apparently intend their assertions in this paragraph to support their contentions in several other paragraphs. *See* Pls.' SOAF ¶ 387 (asserting "Syngenta did not actively pursue regulatory approval until years later in 2010"), ¶ 403 (asserting Syngenta "did not submit its request to import the grain and seed for the in-country studies required by the Chinese regulatory process until March 2010), ¶ 474 (asserting "Syngenta could have submitted its application to the Chinese authorities in time for the November 2009 window").  This is wholly improper. *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of

the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

In any event, Syngenta did not have an "opportunity to attempt to submit its initial application to China in the November 2009 window" using Brazilian approval because Syngenta did not receive Brazilian approval until November 2009. *See* Ex. 392 (3/31/2016 A. McConville Dep. Tr. 91:15-92:3); Ex. 359 (1/28/2016 S. Huber Dep. Tr. 368:18-369:16). Indeed, Plaintiffs acknowledge as much in their Statement of Additional Facts. *See* Pls.' Opp'n SOAF ¶ 403. As Mr. Huber clearly testified, it is "not correct" that "Syngenta, in fact, had the ability to meet [the November 2009] deadline, but failed to use the Brazilian approval that was available in September of 2009." Ex. 359 (1/28/2016 S. Huber Dep. Tr. 368:11-16). None of the evidence cited by Plaintiffs' supports their assertions in this paragraph. Pls.' Opp'n Ex. 120 (S. Huber Dep. Ex. 60) is a more than 150-page document entirely in Chinese, for which no translation has been provided. Pls.' Opp'n Ex. 26 (3/23/2016 S. Hull Dep. Tr. 615:10-616:19, 620:12-15) also does not support any of Plaintiffs' assertions because it does not contain the cited testimony. To the extent that Plaintiffs intended to cite to Pls.' Opp'n Ex. 294 (3/24/2016 S. Hull Dep. Tr. 615:10-616:19, 620:12-15), Ms. Hull's testimony does not state that Syngenta had an "opportunity to attempt to submit its initial application to China in the November 2009 window." Ms. Hull also does not testify that "Syngenta was not aware that it could use Brazilian approval to start the process," nor did she testify that "Syngenta missed this opportunity." The same is true for the testimony of Mr. Huber and Dr. Zhang in Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 384:9-385:7) and Pls.' Opp'n Ex. 145 (3/21/2016 Y. Zhang Dep. Tr. 82:21-23, 155:20-157:13). Pls.' Opp'n Ex. 121 (S. Hull Dep. Ex. 976) likewise does not contain any statements about Syngenta's "opportunity to attempt to submit its initial application to China in the

November 2009 window."  Likewise, Pls.' Opp'n Ex. 364 (Y. Zhang Dep. Ex. 729) is a May 2010 document that merely states: "We just received notice from MoA China that they accepted our MIR162 and 3272 import submission with Brazil or Canada approval (no USDA approval yet on March 1), so our bypassing USDA approval try is success."  None of the cited documents or testimony support Plaintiffs' assertions in this paragraph.

256.   In its March 1, 2010 application, Syngenta did not include its 2009 research regarding *Daphnia magna* ("Daphnia"), which Syngenta undertook pursuant to a request by the United States' EPA as a condition of registration of MIR162 in the United States. Ex. 122 (Dep. Ex. 104) at SYNG_00489109; Ex. 31, Huber Vol. II at 570:10-25; Ex. 354, Deposition of Yongsheng Zhang, Vol. III ("Y. Zhang Vol. III") at 544:6-25.  This research showed that MIR162 had an adverse impact on Daphnia.  Ex. 123 (Dep. Ex. 83) at SYNG_00002335; Ex. 31, Huber Vol. II at 482:4-12; Ex. 31, Huber Vol. II at 523:2-529:4.

> **RESPONSE TO NO. 256.**   Disputed and unsupported by the evidence cited.  Plaintiffs apparently intend their assertions in this paragraph to support their contentions in paragraph 403.  *See* Pls.' SOAF  ¶ 403 (asserting "Syngenta's response to Giroux was misleading in several ways. First, although Syngenta received Brazilian approval in November of 2009, it failed to submit in China during the November 2009 window.").  This is wholly improper.  *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008).   In any event, Plaintiffs' assertions in this paragraph regarding the Daphnia study for MIR162 are entirely irrelevant to their assertions in paragraph 403 on the subject of Brazilian approval. Moreover, Plaintiffs' cited evidence does not support their assertions. Syngenta does not dispute that Pls.'

226

Opp'n Ex. 122 (S. Huber Dep. Ex. 104 at SYNG_00489109) contains a bullet point which states "the 10-day study with *D. magna* and Vip3Aa20 was conducted to comply with the US EPA's request." Nothing in the cited portions of Pls.' Opp'n Ex. 122, however, state that Syngenta "did not include its 2009 research regarding Daphnia" in its March 1, 2010 application or that Syngenta undertook this study "as a condition of registration of MIR162 in the United States." Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 570:10-25) and Pls.' Opp'n Ex. 354 (3/23/2016 Y. Zhang Dep. Tr. 544:6-25) both consist of testimony that recites the Bates number and title of Exhibit 104 and thus also do not support Plaintiffs' assertions. Pls.' Opp'n Ex. 123 (S. Huber Dep. Ex. 83 at SYNG_00002335) also does not support Plaintiffs' assertion that "this research showed that MIR162 had an adverse impact on Daphnia," because it is entirely in Chinese and no translation has been provided. The same is true for Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 482:4-12) in which Mr. Huber testifies that he cannot identify Exhibit 83 which is dated June 24, 2012, and Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 523:2-529:4), which contains six pages of testimony that never once mentions an "adverse impact." Indeed, contrary to Plaintiffs' assertion that the study found an "adverse impact on Daphnia," Mr. Huber explains that "the study was accepted by the

EPA, and our -- our expert said the study was supportive of the *lack of an effect*, [and] the statistical issues were not -- not relevant." *Id.* at 529:5-15 (emphasis added).

257.    One witness with over 20 years of experience in biotechnology characterized a Daphnia study as the "canary in a coal mine-type study" because an adverse Daphnia study result could indicate an environmental problem caused by the release of the new GMO product into the environment.  Ex. 186, Deposition of Randal Giroux as a corporate representative of Cargill Vol. II ("Giroux 30b6 Vol. II") at 471:8-12, 591:15-592:20.

**RESPONSE TO NO. 257.**    Disputed and unsupported by the evidence cited.  Syngenta disputes Plaintiffs' characterization of Randal Giroux as a witness with "over 20 years of experience in biotechnology."    Mr. Giroux  testified  that  he  has  been "connected" with the biotechnology industry for 20 years, but he has spent almost his entire career at Cargill, an interested party in this litigation.  *See* Pls.' Opp'n Ex. 186 (5/17/2016 R. Giroux Dep.  Tr.  471:8-12).    Mr. Giroux  has  never  worked  for  a biotechnology company, he has never been involved in an application for a safety certificate, and he is "not an expert on the data  collection  and  data  analysis  that  has  to  be  conducted  by Syngenta on field trials" for Chinese import approval.  *See* Ex. 331  (6/9/2016  R.  Giroux  Dep.  Tr.  85:20-86:14,  131:3-7). Syngenta admits that Mr. Giroux testified that a Daphnia study "is like a canary in a coal mine-type study, that that study reflects general  water  quality,"  and  that  Mr. Giroux  further  stated  that "when such an adverse study would be -- would be found, that

there might be a problem, an environmental issue *related to* the release of that product into the environment." Pls.' Opp'n Ex. 186 (5/17/2016 R. Giroux Dep. Tr. 591:15-592:20). Mr. Giroux did *not* testify that the environmental issue was *caused* by the release of a "new GMO" product into the environment.

258. Less than 90 days after this initial application, on May 6, 2010, the Chinese Ministry of Agriculture approved the issuance of import permits for the test seeds necessary for the in-country testing of MIR162. But in granting the import permit, the Ministry of Agriculture identified numerous deficiencies in Syngenta's initial application. Ex. 145, Y. Zhang Vol. I (3/21/2016) 82:21-23, 155:20-157:13; Ex. 364 (Dep. Ex. 729 SYNG_00353947). Ex. 125 (Dep. Ex. 61) (MOA Response); Ex. 31, Huber Vol. II at 390:9-23; Ex. 354, Y. Zhang Vol. III, 448:11-449:12; Ex. 126 (Dep. Ex. 67) (import permit); Ex. 31, Huber Vol. II at 410:20-411:9.

**RESPONSE TO NO. 258.** Disputed and unsupported by the evidence cited. Plaintiffs apparently intend their assertions in this paragraph to support their contentions in several other paragraphs. *See* Pls.' SOAF ¶ 405 (asserting "The field and rat-feeding study then had to be completed and then submitted with the full dossier. The next conceivable window to do so was not until November 1, 2011, so Syngenta could not and did not reasonably expect an 'update' from the Chinese government until after that submission"), ¶ 406 (asserting "Only after Syngenta received those results—and assuming the results were positive—could Syngenta submit its complete dossier to China for import approval of Viptera"), ¶ 411 (asserting "Syngenta had already received negative feed-back from the Ministry of Agriculture on its initial import application and had delayed over one year in

importing the test seeds for in-country testing"). This is wholly improper. *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008). Nothing in this paragraph, which is itself unsupported by the evidence Plaintiffs' cite, further supports the statements in Pls.' SOAF ¶¶ 405, 406, 411. Syngenta admits that it submitted its initial application in March 2010, and that May 6, 2010 would be "less than 90 days" after this date. *See* Syngenta's MSJ SOF ¶ 41. But Pls.' Opp'n Ex. 364 (Y. Zhang Dep. Ex. 729 at SYNG_00353947) does not reference "the issuance of import permits for the test seeds necessary for the in-country testing of MIR162" or the identification of "numerous deficiencies." Similarly, the testimony in Pls.' Opp'n Ex. 354 (3/23/2016 Y. Zhang Dep. Tr. 448:11-449:12) relates to Daphnia, not the issuance of import permits for in-country tests. Pls.' Opp'n Ex. 125 (S. Huber Dep. Ex. 61) and Pls.' Opp'n Ex. 126 (S. Huber Dep. Ex. 67) do not support Plaintiffs' assertion because they are entirely in Chinese and no translation has been cited to substantiate plaintiffs' assertions. Nor does the cited testimony in Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 390:9-23, 410:20-411:9) which merely recites the dates on the documents marked Exhibit 61 and 67. Thus, Plaintiffs have provided no evidence whatsoever to support their assertions that import

permits are "necessary for the in-country testing of MIR162," and that "in granting the import permit, the Ministry of Agriculture identified numerous deficiencies in Syngenta's initial application."

259.   Test seeds are used to conduct the in-country toxicity (laboratory) tests and environmental (field) tests necessary to obtain approval in China. Ex. 356 (Dep. Ex. 48) at SYNG_00389378; Ex. 28, Huber Vol. I at 250:2-253:3.

**RESPONSE TO NO. 259.**      Undisputed that test seeds are used to conduct in-country tests as part of the approval process in China. However, Pls.' Opp'n Ex. 356 (S. Huber Dep. Ex. 48 at SYNG_00389378) is a discussion paper written by the International Food & Agricultural Trade Policy Council, is hearsay, and is thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Plaintiffs' cited page in Pls.' Opp'n Ex. 356 does not contain the assertion in Plaintiffs' paragraph.  The same is true for Pls.' Opp'n Ex. 28 (1/27/2016 S. Huber Dep. Tr. 250:2-253:3).

260.   The field tests typically take five to six months, assuming that the test seeds arrive in time to meet the Chinese corn planting season of May to June.  Ex. 28, Huber Vol. I at 252:2-253:3.

**RESPONSE TO NO. 260.**      Disputed and unsupported by the evidence cited.  Plaintiffs apparently intend their assertions in this paragraph to support their contentions in several other paragraphs. *See* Pls.' SOAF ¶ 405 (asserting "The field and rat-feeding study

then had to be completed and then submitted with the full dossier. The next conceivable window to do so was not until November 1,2 011, so Syngenta could not and did not reasonably expect an 'update' from the Chinese government until after that submission"), ¶ 406 (asserting "Only after Syngenta received those results—and assuming the results were positive—could Syngenta submit its complete dossier to China for import approval of Viptera"). This is wholly improper. *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008). Nothing in this paragraph, which is itself unsupported by the evidence Plaintiffs' cite, further supports the statements in Pls.' SOAF ¶¶ 405, 406. In any event, Pls.' Opp'n Ex. 28 (1/27/2016 S. Huber Dep. Tr. 252:2-253:3) does not support Plaintiffs assertion. Mr. Huber testified that he believed the environmental field trial for MIR162 went from July to October. He did not testify that "field tests typically take five to six months, assuming that the test seeds arrive in time to meet the Chinese corn planting season of May to June."

261.   After receiving approval to import the seeds in May 2010, Syngenta delayed importing the test seeds for over a year until June 2011 – a delay that Syngenta acknowledged was due to "internal issues" caused by Syngenta's staff's inability to determine the correct legal entity to import the seeds. Ex. 31, Huber Vol. II at 408:21-409:8, 411:10-413:2; Ex. 128 (Dep. Ex. 958); Ex. 294, Hull Vol. II, 509:13-522:6; ("The issues have been internal, rather than with the Government."; "I know internally we did not resolve the issue expeditiously but I really don't want to publicly admit that?"); Ex. 129 (Dep. Ex. 72); Ex. 31, Huber Vol. II at 428:23-430:8; (Syngenta internally admitted that it had "a year delay due to an internal

restriction on shipping seeds to China needed to start the field testing."); *see also* Ex. 130 (Dep. Ex. 74); Ex. 31, Huber Vol. II at 446:8-449-10; ("Mandatory field test: Planting occurred on July 3.  Late planting due to delays in sending seed into China (due to legal entity issue)"); Ex. 131 (Dep. Ex. 450); Ex. 84 Araba Vol. II at 377:20-378:17; ("This reinforces our discussion this morning in that we need to ensure *Viptera seed for local regulatory testing* enters China and be planted this year to avoid further delays to registration" (emphasis original)); *see also* Ex. 132 (Dep. Ex. 1060); Ex. 57, Bernens Vol. II at 499:18-500:7 [written in error in the transcript as Exhibit 1066]; Ex. 133 (Dep. Ex. 1061); Ex. 57, Bernens Vol. II at 505:12-506:25; Ex. 134 (Dep. Ex. 1212); Ex. 36,  Zannoni Vol. I, 186:5-187:8.

**RESPONSE TO NO. 261.**   Disputed, unsupported by the evidence cited, immaterial to Syngenta's arguments for summary judgment.  Plaintiffs apparently intend their assertions in this paragraph to support their contentions in several other paragraphs. *See* Pls.' SOAF ¶ 404 (asserting that "Second, the notion that Syngenta 'would have a better sense in [a] few months following an update from Chinese government' was also false."), ¶ 405 (asserting "The field and rat-feeding study then had to be completed and then submitted with the full dossier. The next conceivable window to do so was not until November 1, 2011, so Syngenta could not and did not reasonably expect an 'update' from the Chinese government until after that submission"), ¶ 406 (asserting "Only after Syngenta received those results—and assuming the results were positive—could Syngenta submit its complete dossier to China for import approval of Viptera").  This is wholly improper.  *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008).  Nothing in this paragraph, which is

233

itself unsupported by the evidence Plaintiffs' cite, further supports
the statements in Pls.' SOAF ¶¶ 404, 405, 406.

In any event, *none* of Plaintiffs' cited evidence supports their assertion in this paragraph. Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 408:21-409:8, 411:10-413:2) does not reference any delays "for over a year," Pls.' Opp'n Ex. 128 (S. Hull Dep. Ex. 958) similarly does not discuss a yearlong delay.  Pls.' Opp'n Ex. 294 (3/24/2016 S. Hull Dep. Tr. 509:13-522:6) references a range of thirteen pages of deposition testimony that mainly reiterates the contents of Exhibits 958 and 959.  The quoted language in Plaintiffs' paragraph is actually portions of the questions posed by Plaintiffs' counsel, *not* testimony given by Ms. Hull.   Indeed, Ms. Hull testified in this deposition excerpt that "[w]e were working to get the approval when we thought we would be getting it, after two years submission in China, that we would get it in the spring of 2012." *Id.* at 514:15-23.  The same is true for Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 428:23-430:8, 446:8-449:10), where Mr. Huber merely confirmed Plaintiffs' counsel's recitation of statements in Exhibits 72 and 75 was correct.  Plaintiffs now misconstrue that testimony as an "internal admission" or as testimony confirming the truth of those statements, which they clearly are not.  Similarly, Pls.' Opp'n Ex. 130 (S. Huber Dep. Ex. 74) does not mention a yearlong delay.  Pls.' Opp'n Ex. 131 (M. Araba Dep. Ex. 450) contains a news article confirming that China's politics have "put a damper" on their importation of U.S. DDGS and is entirely unrelated to the "approval to import seeds."  Pls.' Opp'n Ex. 84 (3/4/2016 M. Araba Dep. Tr. 377:20-378:17) contains a quotation of counsel's question reading a Syngenta document, *not* Mr. Araba's testimony.  Pls.' Opp'n Ex. 132 (J. Bernens Dep. Ex. 1060) likewise does not contain any discussion of a purported yearlong "delay."  Pls.' Opp'n Ex. 57 (4/5/2016 J. Bernens Dep. Tr. 499:18-500:7, 505:12-506:25)  and Pls.' Opp'n Ex. 36 (4/12/2016 L. Zannoni Dep. Tr.

186:5-187:8) contain testimony seeking to authenticate Exhibits 1066, 1061, and 1212 and do not support the facts Plaintiffs seek to establish. Pls.' Opp'n Ex. 133 (J. Bernens Dep. Ex. 1061) states: "As of May 17th, 2011 China trial for MIR162 had not been planted, could result in 1 year delay," but this document does not show that a one year delay *actually occurred.* The same is true for Pls.' Opp'n Ex. 134 (L. Zannoni Dep. Ex. 1212) which speculates about a possible one year delay but does not show that any such delay occurred. Similarly, the statement in Pls.' Opp'n Ex. 129 (S. Huber Dep. Ex. 72) is in reference to Enogen, not Viptera. Plaintiffs' assertion is contradicted by the testimony of Syngenta's Yongsheng Zhang who testified that any alleged "delay" lasted at most a few months. *See* Ex. 393 (3/21/2016 Y. Zhang Dep. Tr. 106:7-23) ("It was not very accurate, so like I just said, there were some changes and some areas that were not very well defined in China's regulations, so it took us some time to clear things up, and what was inaccurate was about the delay for over a year, because normally the application, the process will take a couple months."). Dr. Zhang also explained that any alleged "delay" was immaterial to Syngenta's application process: "So regarding the import of the seeds, we had a lot of discussion already yesterday. I was telling you the legal team were spending time to work on some necessary issues. That was first. Secondly, the delay, it was -- the planting was a bit later than the ideal situation, but it did not have any negative impact. Also, what you just said that the seeds lost weight because of the delay, that was not accurate." Ex. 394 (3/22/2016 Y. Zhang Dep. Tr. 223:2-17); *id.* at 223:18-224:7 ("[T]he so-called delay was merely a little bit later than what it would be in an ideal situation."); Ex. 395 (3/24/2016 Y. Zhang Dep. Tr. 690:23-691:4 ("Q. If seed and grain have been imported for in-country studies in the fall of 2010, would Syngenta have been able to make a final submission for MIR162 in an earlier submission window than November of 2011? A. No, it could not be earlier.").

235

262.    After receiving the import permits in May 2010, Syngenta was required to submit to China the PCR detection methods and molecular characterization of the seeds Syngenta intended to import. See, e.g., Ex. 136 (Dep. Ex. 66); Ex. 365 (Dep. Ex. 68) SYNG_00447787-00447788, email, Ex. 31, Huber Vol. II at 411:10-413:2.

> **RESPONSE TO NO. 262.**    Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 136 (S. Huber Dep. Ex. 66) is entirely in Chinese and no translation has been provided, thus it does not support Plaintiffs' alleged statement of fact.  Pls.' Opp'n Ex. 365 (S. Huber Dep. Ex. 68) does not describe what Syngenta was "required" to submit, but does contain a statement by Yongsheng Zhang that he "submitted the revised detection method to MoA."  Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr.  411:10-413:2) seeks to authenticate and recites the contents of Exhibit 67, but does not describe what Syngenta was "required to submit to China," and thus does not establish Plaintiffs' asserted fact.

263.    Syngenta did not submit the PCR detection methods and molecular characterization until January 10, 2011, a delay of almost eight months after receiving the import permit. After self-characterizing its initial submissions as "not clear," Syngenta re-submitted the PCR detection methods and molecular characterization on May 16, 2011. Ex. 365 (Dep. Ex. 68) SYNG_00447787-00447788; Ex. 31, Huber Vol.  II at 411:10-413:2; Ex. 27, Latner Rpt. at ¶¶314-316; Ex. 126 (Dep. Ex. 67).

> **RESPONSE TO NO. 263.**    Disputed, inadmissible, and unsupported by the evidence cited.  Pls.' Opp'n Ex. 365 (S. Huber Dep. Ex. 68) contains a statement by Yongsheng Zhang that he "submitted the revised detection method to MoA," but does not describe any alleged "delay of almost eight months" or

236

characterizations of Syngenta's initial application for import approval.  Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 411:10-413:2) seeks to authenticate and recites the contents of Exhibit 67, but does not establish Plaintiffs' asserted fact. Syngenta does not dispute that paragraphs 315 and 316 Mr. Latner's expert report recite verbatim the fact it seeks to support, however it does dispute these assertions to the extent that Mr. Latner's report makes these statements by drawing inferences that mischaracterize Syngenta documents and deposition testimony.  Mr. Latner has no personal knowledge of Syngenta's regulatory submissions and thus his opinions cannot support Plaintiffs' factual assertion in this paragraph.  None of Plaintiffs' cited materials support the alleged facts in this paragraph.

264.   When Syngenta finally imported the test seeds, they did not meet the minimum weight required for tests, as specified by the import permit.   Ex. 135 (Dep. Ex. 732) at SYNG_00446378; Ex. 146, Y. Zhang Vol. II at 220:19-222:7.

**RESPONSE TO NO. 264.**       Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 135 (Y. Zhang Dep. Ex. 732 at SYNG_00446378) does not state that Syngenta's imported seeds did not meet a "minimum weight requirement."  Instead, it contains a statement by Yongsheng Zhang that the Chinese Ministry of Agriculture "weighted each sample using an electrical scale and found three of them was less than 2.5 kg (claimed number in permit) even in gross weight."  Likewise, Pls.' Opp'n

Ex. 146 (3/22/2016 Y. Zhang Dep. Tr. 220:19-222:7) seeks to authenticate and recites the contents of Exhibit 732, but does not describe a "minimum weight requirement" or what the import permit actually specified, and thus does not establish Plaintiffs' asserted fact.

265.    Syngenta also incorrectly labeled the seeds, and as a result, on June 22, 2011, sent a letter and declaration of authenticity correcting the label. Ex. 31, Huber Vol. II at 425:4-25 See Ex. 137 (Dep. Ex. 70).

**RESPONSE TO NO. 265.**    Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 137 (S. Huber Dep. Ex. 70) is entirely in Chinese and no translation has been provided.  Thus, it does not establish the fact that Plaintiffs assert.  Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 425:4-25) contains testimony seeking to authenticate Exhibit 70 and thus also does not establish Plaintiffs' assert fact.  None of Plaintiffs' cited materials support the alleged facts in this paragraph.

266.    These delays compounded to cause Syngenta to miss the May-June 2011 planting season for the in-country field testing of MIR162. Ex. 31, Huber Vol. II at 413:3-414:9; 424:17-20. Ex. 132 (Dep. Ex. 1060); Ex. 133 (Dep. Ex. 1061).

**RESPONSE TO NO. 266.**    Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 413:3-414:9;  424:17-20) does not contain any testimony regarding "delays" that "compounded to cause Syngenta to miss the May-June 2011 planting season."  Similarly, Pls.' Opp'n Ex. 132 (J. Bernens Dep. Ex. 1060) and Pls.' Opp'n Ex. 133 (J.

Bernens Dep. Ex. 1061) do not suggest any alleged "delays" had an impact on the approval timeline for MIR162. None of Plaintiffs' cited materials support the alleged facts in this paragraph. In fact, Dr. Zhang testified that Syngenta did *not* miss the 2011 planting season. *See* Ex. 393 (3/21/2016 Y. Zhang Dep. Tr. 179:19-180:6) ("[T]he planting in the beginning of July is not a delay. It was actually acceptable in that year."); Ex. 395 (3/24/2016 Y. Zhang Dep. Tr. 690:23-691:4 ("Q. If seed and grain have been imported for in-country studies in the fall of 2010, would Syngenta have been able to make a final submission for MIR162 in an earlier submission window than November of 2011? A. No, it could not be earlier.").

267.    Having missed the season for planting in 2010 and now 2011, Syngenta requested and received permission from China to plant its seeds late. Ex. 132 (Dep. Ex. 1060).

**RESPONSE TO NO. 267.**    Disputed and unsupported by the evidence cited. Syngenta does not dispute that Lisa Zannoni states in Pls.' Opp'n Ex. 132 (J. Bernens Dep. Ex. 1060) that "China authorities ok'd the paperwork and seed has been shipped….China regulatory (Yongsheng Zhang) has already streamlined the paperwork and have received a commitment for a late planting from the institute." Syngenta does dispute however any characterization that it "missed the season for planting in 2010 and now 2011," as nothing in Pls.' Opp'n Ex. 132 suggests this is the case. Indeed, the evidence shows that Syngenta did not

"miss" any planting seasons. *See also* Ex. 395 (3/24/2016 Y. Zhang Dep. Tr. 690:23-691:4) ("Q. If seed and grain have been imported for in-country studies in the fall of 2010, would Syngenta have been able to make a final submission for MIR162 in an earlier submission window than November of 2011? A. No, it could not be earlier.").

268.    Syngenta finally delivered test seeds to the Chinese environmental testing authority on June 23, 2011, long after planting should have started. Syngenta delivered test seeds to the Chinese toxicity testing authority on July 12, 2011, again long after this test should have been started to meet the upcoming November 1, 2011 submission window. Ex. 27, Latner Rpt. ¶¶ 27, 325; Ex. 138 (Dep. Ex. 69); Ex. 31, Huber Vol. II at 415:10-417:6; Ex. 146, Y. Zhang Vol. II at 255:4-20; Ex. 125 (Dep. Ex. 61).

RESPONSE TO NO. 268.    Disputed, inadmissible, and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 325) states: "The July 12, 2011 delivery of seed samples for the toxicity test led to results dated November 7, 2011, approximately four months later and after the November 1 deadline for application submissions." This statement does not establish that Syngenta delivered test seeds on June 23, 2011, it does not establish that the date of delivery was "long after planting should have started," and it does not establish that any delivery made on July 12, 2011 was "long after this test should have been started to meet the upcoming November 1, 2011 submission window." Pls.' Opp'n Ex. 138 (S. Huber Dep. Ex. 69) likewise provides no support for when seeds were actually delivered or when they should have been delivered.

The same is true for Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 415:10-417:6) and Pls.' Opp'n Ex. 146 (3/22/2016 Y. Zhang Dep. Tr. 255:4-20), which contain testimony from Mr. Huber and Dr. Zhang, respectively, seeking to authenticate Exhibit 69. Indeed, Mr. Huber testified that "I don't know 'delay' is the right word.  We just -- this is the time it was shipped, in June of 2011." Pls.' Opp'n Ex. 125 (S. Huber Dep. Ex. 61) also does not support Plaintiffs' asserted fact because the document is entirely in Chinese and no translation has been provided.

269.    Syngenta's delay in importing the test seeds delayed the submission of what would be the first full application dossier for MIR162.  Ex. 27, Latner Rpt. ¶ 323.

**RESPONSE TO NO. 269.**    Disputed, inadmissible, and unsupported by the evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 323) claims: "The delay in importing the seed samples delayed the submission of what would be the first complete submission of the application for MIR162." Mr. Latner's bare assertion purporting to state a fact without foundation, however, does not sufficiently establish that any alleged delay had any impact whatsoever on the submission of Syngenta's final application for Chinese import approval and stands in contrast to the actual evidence in the record.  *See* Ex. 395 (3/24/2016 Y. Zhang Dep. Tr. 690:23-691:4) ("Q. If seed and grain have been imported for in-country studies in the fall of 2010, would Syngenta have been able to make a final submission

for MIR162 in an earlier submission window than November of

2011? A. No, it could not be earlier."). Thus, Plaintiffs' cited

evidence fails to support their asserted fact.

270. The June 23, 2011 delivery of test seeds for the environmental study led to results delivered October 28, 2011, four months later and close to the November 1 deadline for application submissions. Ex. 125 (Dep. Ex. 61, SYNG_00001971) Ex. 27, Latner Rpt. at ¶ 324.

**RESPONSE TO NO. 270.** Undisputed.

271. The July 12, 2011 delivery of seeds for the toxicity test led to results dated November 7, 2011, approximately four months later and *after* the November 1 deadline for application submissions. Ex. 27, Latner Rpt. at ¶ 325; Ex. 146, Y. Zhang VoL. II at 297:3-14; 302:3-303:2; 316:5-17; Ex. 140 (Dep. Ex. 735); Ex. 125 (Dep. Ex. 61).

**RESPONSE TO NO. 271.** Disputed, inadmissible, and

unsupported by the evidence cited. Syngenta does not dispute

that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 325) states: "The

July 12, 2011 delivery of seed samples for the toxicity test led to

results dated November 7, 2011, approximately four months later

and after the November 1 deadline for application submission."

Mr. Latner's bare assertion of a factual statement without proper

foundation, however, does not sufficiently establish the date of

seed delivery, the date results were delivered, or the deadline for

application submissions set by the Chinese Ministry of

Agriculture. Pls.' Opp'n Ex. 146 (3/22/2016 Y. Zhang Dep. Tr.

297:3-14; 302:3-303:2; 316:5-17) also does not support Plaintiffs'

asserted fact because it consists solely of deposition testimony

seeking to authenticate and reciting the contents of Exhibits 735

and 61.  Pls.' Opp'n Ex. 140 (Y. Zhang Dep. Ex. 735) and Pls.'
Opp'n Ex. 125 (S. Huber Dep. Ex. 61) do not themselves support
Plaintiffs' assertion because they do not establish the date of seed
delivery, the date results were delivered, or that Syngenta made a
submission "after" the "deadline for application submissions."
Pls.' Opp'n Ex. 125 (S. Huber Dep. Ex. 61) also does not support
Plaintiffs' assertion because it is entirely in Chinese and no
translation has been provided.  In fact, in Pls.' Opp'n Ex. 140
Yongsheng Zhang states: "[t]his morning I made the final
submission of MIR162 to MoA with a complete dossier to
replacing prior split version made on Nov 1. Finally we make it to
catch up Nov 1 window on 162 submission," showing Syngenta
*met* the deadline to submit a final application within the
November 2011 window.   In fact, Syngenta had explicit
permission from the Ministry of Agriculture to make a split
submission.   Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-
124:4) ("There was one submission made on November 1 in the
time frame, and then we had permission, 10 days for the MoA
report to get done and provided in with the submission); *id.* at
124:16-23 ("The November 1 submission had a complete package
except for the MoA study, which we had permission from the
head of the GMO office to submit); Ex. 361 (3/23/2016 Y. Zhang
Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to

resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").

Plaintiffs' cited evidence fails to support their asserted fact.

272.   As Syngenta internally discussed, Syngenta rushed these tests and then rushed the analyses of these tests.  Data analysis that normally takes two months was compressed into two weeks. *See, e.g.,* Ex. 141 (Dep. Ex. 78); Ex. 31, Huber Vol. II at 461:24-462:9; Ex. 142 (Dep. Ex. 739); Ex. 146, Y. Zhang Vol. II at 370:20-371:3; *see also* Ex. 125 (Dep. Ex. 61).  Syngenta knew the late tests threatened the overall quality of the data. Ex. 27, Latner Rpt. at ¶¶ 326-330; *see also* Ex. 141 (Dep. Ex. 78); Ex. 31, Huber Vol. II at 461:24-462:9; *see also* Ex. 142 (Dep. Ex. 739); Ex. 146, Y. Zhang Vol. II at 370:20-371:3; Ex. 125 (Dep. Ex. 61).

**RESPONSE TO NO. 272.**   Disputed, vague and ambiguous, inadmissible, and unsupported by the evidence cited.  Plaintiffs' reference to "these tests" is vague and lacks sufficient specificity. Moreover, *Syngenta* could not have "rushed these tests," because the tests are conducted by third parties over which Syngenta has no control.  *See* Ex. 395 (3/24/2016 Y. Zhang Dep. Tr. 689:5-7). Nothing in Plaintiffs' cited evidence shows that Syngenta "rushed these [unspecified] tests," that Syngenta "rushed the analyses of these [unspecified] tests," that data analysis of this kind "normally takes two months," that data analysis was "compressed" in any way, that the tests were "late" in any way, or that Syngenta as a company "knew" these purportedly "late" tests "threatened the overall quality of the data."  Pls.' Opp'n Ex. 141 (S. Huber Dep. Ex. 78) does not reference "rushing" tests or analyses, nor does it reference the "quality of the data."  Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 461:24-462:9) and Pls.' Opp'n 146 (3/22/2016

244

Y. Zhang Dep. Tr. 370:20-371:3) contain testimony from Mr. Huber and Dr. Zhang seeking to authenticate Exhibits 78 and 739, respectively, and thus do not support Plaintiffs' asserted fact. Pls.' Opp'n Ex. 142 (Y. Zhang Dep. Ex. 739) is a document titled "Brief submission history of MIR162 in China so far," but does not discuss the alleged "rushing" of any test results. Pls.' Opp'n Ex. 126 (S. Huber Dep. Ex. 61) is a 354-page document entirely in Chinese for which no translation has been provided, thus it too does not support Plaintiffs' asserted fact. Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 326) states: "As Syngenta internally discussed, Syngenta rushed these tests and then rushed the analyses of these test. Data analysis that normally takes two months was compressed into two weeks." Syngenta also does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 327) states: "Syngenta, internally at the staff and executive level, discussed that the late tests threatened the overall quality of the data…." Mr. Latner's bare assertions, however, do not automatically substantiate or establish these so-called facts on Plaintiffs' behalf, and they certainly do not establish *Syngenta's* knowledge of anything. The same is true for Pls.' Opp'n Ex. 141 (S. Huber Dep. Ex. 78) which does not say anything about "rushing" Plaintiffs' unspecified tests, does not indicate that the unspecified tests were "late" in any way, and does not mention

245

that the unspecified tests "threatened the overall quality of the data."

273.    On July 8, 2011, Syngenta's Global Regulatory Lead, Lisa Zannoni wrote that rushed tests may "generate poor data which may cause a further delay." Ex. 143 (Dep. Ex. 511); Ex. 4, Lee Vol. I at 182:6-183:6.

> **RESPONSE TO NO. 273.**    Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.   Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.  *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation,   SYNG_00450146).   Any   alleged   delays   in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and

Syngenta made its submission in the November submission window. *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").  In any event, Plaintiffs' assertion is unsupported by the evidence they cite.   In Pls.' Opp'n Ex. 143 (C. Lee Dep. Ex. 511), Ms. Zannoni writes: "There is always a chance the studies generate poor data which may cause a further delay." Ms. Zannoni does not mention any "rushed tests."  Pls.' Opp'n Ex. 4 (3/8/2016 C. Lee Dep. Tr. 182:6-183:6) contains testimony from Chuck Lee seeking to authenticate Exhibit 511 and does not support Plaintiffs' assertion.

274.   In fact, on or about May 16, 2011, Syngenta's regulatory affairs team advised Syngenta management: "Latest guidance for China approval of MIR162 [would be] *Q2 2013*." Ex. 144 (Dep. Ex. 76) at SYNG_00174431 (emphasis added); Ex. 31, Huber Vol. II at 453:20-455:24.

**RESPONSE TO NO. 274.**    Disputed,   unsupported   by   the evidence   cited,   and   immaterial   to   Syngenta's   arguments   for summary   judgment.    Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.  *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation,   SYNG_00450146).    Any   alleged   delays   in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window.  *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to

248

catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").  In any event, Syngenta disputes the admissibility of Pls.' Opp'n Ex. 144 (S. Huber Dep. Ex. 76), as it appears to be a draft presentation. Syngenta does not dispute that Pls.' Opp'n Ex. 144 (S. Huber Dep. Ex. 76) at SYNG_00174431 is a slide containing a bullet point that states "Latest guidance for China approval of MIR162, Q2 2013." However this slide does not establish that anyone from "Syngenta's regulatory affairs team" advised "Syngenta management," or that the alleged advisement occurred "on or about May 16, 2011."  For example, the only individual identified on the slides is Jack Bernens, who is not a member of Syngenta's regulatory affairs team.   Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 453:20-455:24) contains testimony from Mr. Huber seeking to authenticate Exhibit 76 and does not support Plaintiffs' assertion.

275.    Syngenta management told members of the sales staff in July 2011 that Syngenta did not expect approval in China "*for a few years*."  Ex. 20, Ozipko Dep. at 159:1-162:13; Ex. 35 (Dep. Ex. 495) at SYNG_00013670.

**RESPONSE TO NO. 275.**    Disputed, unsupported by the evidence cited, and irrelevant to Syngenta's arguments for summary judgment.   Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.  *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation,   SYNG_00450146).   Any  alleged  delays  in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window. *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the

final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").

In any event, Syngenta does not dispute that Pls.' Opp'n Ex. 35 (G. Ozipko Dep. Ex. 495 at SYNG_00013670) contains an email that appears to be authored by Brian Walsh stating: "I spoke with Grant Ozipko about China approval. Agrisure Viptera won't likely get approval for a few years yet."  Plaintiffs' cited evidence does not establish that Mr. Walsh is a member of "Syngenta management," that Mr. Walsh was speaking on behalf of Syngenta at the time he wrote this email, that Mr. Walsh had any knowledge of when Chinese approval was expected, or that Mr. Walsh's statements conveyed *Syngenta's* expectations about the timing of Chinese approval.  Pls.' Opp'n Ex. 20 (3/7/2016 G. Ozipko Dep. Tr. 159:1-162:13) contains deposition testimony seeking to authenticate Exhibit 495 and thus does not support Plaintiffs' assertion. Moreover, Mr. Ozipko was not part of Syngenta's regulatory group, had no experience working on Chinese approvals, was not even working on any corn traits by July 2011, and there is no evidence to suggest that Mr. Ozipko's belief regarding Chinese approval was transmitted to Chuck Lee.  Ex. 366 (G. Ozipko Dep. Tr. 12:16-25, 46:10-23).

276.     Syngenta told its stakeholders a different story.  *See infra* SOAF ¶¶ 344-478.

> **RESPONSE TO NO. 276.**     Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs' assertion in this paragraph is not a fact in evidence but rather counsel's argument.    Plaintiffs improperly rely on an unfocused citation to over 120 paragraphs of their own Statement of Additional Facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

As explained in further detail below, Syngenta disputes almost all of the purported facts asserted in Plaintiffs' SOAF ¶¶ 344-478 because they are unsupported by the evidence Plaintiffs cite.  In addition to the issues raised in response to SOAF ¶¶ 344-478, there is no indication based on the evidence cited in these paragraphs as to whether the statements made by Syngenta to its stakeholders were "different" from some unspecified "story."   The assertion in this

paragraph is entirely immaterial to Syngenta's arguments for summary judgment because it is

not a fact subject to dispute but rather counsel's argument.

277.   Due to its late testing, Syngenta missed submitting a full dossier (the application
containing results of the toxicity and field tests) before the November 1, 2011 submission
window.   Instead, Syngenta submitted an incomplete dossier because the results of its
toxicity test were not complete. Syngenta requested and China granted permission for
Syngenta to submit a late supplement to its dossier in November 2011.   Ex. 145,
Deposition of Yongsheng Zhang Vol. I ("Y. Zhang Vol. I") at 188:8-192:4; Ex. 141 (Dep.
Ex. 78); Ex. 140 (Dep. Ex. 735).

<u>**RESPONSE TO NO. 277.**</u>   Disputed and unsupported by the

evidence cited.   Pls.' Opp'n Ex. 141 (S. Huber Dep. Ex. 78)

states: "Just an [sic] note to let you know we received today the

study report needed to complete the MIR162 submission in China.

It will be officially submitted on Thursday."   Pls.' Opp'n Ex. 140

(Y. Zhang Dep. Ex. 735) contains an email from Yongsheng

Zhang stating: "This morning I made the final submission of

MIR162 to MoA with a complete dossier to replacing prior split

version made on Nov 1. Finally we make it to catch up Nov 1

window on 162."   Neither statement supports Plaintiffs' assertion

that "Syngenta missed submitting a full dossier…before the

November 1, 2011 submission window."   Indeed, Dr. Zhang's

statement directly contradicts Plaintiffs' asserted fact by

demonstrating that Syngenta *did* meet the November submission

window.   Plaintiffs' cited evidence also does not establish that the

submission made by Syngenta was "incomplete" or that a "late

supplement" was made to its dossier.   Pls.' Opp'n Ex. 145

(3/21/2016 Y. Zhang Dep. Tr. 188:8-192:4) also does not establish these facts. Indeed, Dr. Zhang testified that "So on November 1, 2011, on that specific day, maybe we did not submit a complete dossier, but during the November 1 window, we did submit a complete dossier." *Id.* at 189:9-13. Syngenta does not dispute that Dr. Zhang testified that "the Ministry of Agriculture indeed approved our request to extend the date for a late submission."

278. Syngenta submitted its first full dossier on November 9, 2011. Ex. 145, Deposition of Yongsheng Zhang Vol. II ("Y. Zhang Dep. Vol. II") at 316:5-17; Ex. 125 (Dep. Ex. 61).

<u>**RESPONSE TO NO. 278.**</u>     Undisputed that Syngenta made its first complete submission in the November 2011 window.

279. Consistent with Syngenta's own understanding of the timeline for approval, Syngenta should have expected that approval would occur no earlier than 270 days later, or approximately August 2012.    Ex. 31, Huber Vol. II at 445:24-446:5 (confirming that the November 2011 submission would put the earliest approval in Q3 2012).

<u>**RESPONSE TO NO. 279.**</u>     Disputed and unsupported by the evidence cited. In Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 445:24-446:5) Mr. Huber was asked: "And assuming the 270 days or nine months after November 2011, would put the very earliest approval if there were not questions, would be the third quarter of 2012, correct?" Mr. Huber responded: "Assuming that time frame, the duration that you were mentioning, yes, that's nine months plus." Mr. Huber *did not* confirm Syngenta's understanding that it should have

expected approval would occur no earlier than 270 days later" nor did he state that this date was "approximately August 2012"—he was *asked in the question to assume* approval would occur no earlier than 270 days after November 2011. Plaintiffs' cited testimony does not support their asserted fact. Mr. Huber actually testified that Syngenta expected approval in the first or second quarter of 2012. Ex. 351 (1/27/2016 S. Huber Dep. Tr. 279:10-20).

280.    Syngenta's first full dossier in November 2011, however, did not include any reference to the research Syngenta had done on Daphnia that indicated adverse effects on this indicator species. Ex. 354, Y. Zhang Vol. III at 447:25-449:12; Ex. 125 (Dep. Ex. 61).

<u>**RESPONSE TO NO. 280.**</u>    Disputed and unsupported by the evidence cited. Pls.' Opp'n Ex. 126 (S. Huber Dep. Ex. 61) does not support the fact asserted by Plaintiffs' because it is a 354-page document entirely in Chinese for which no translation has been provided. Syngenta does not dispute that Dr. Zhang was asked at his deposition: "So there was no reference to the adverse effect on Daphnia growth resulting from MIR162 protein in the initial submission that you submitted to the MoA on November 10, 2011, correct?" Dr. Zhang responded: "I just looked at this. It was not." Pls.' Opp'n Ex. 354 (3/23/2016 Y. Zhang Dep. Tr. 449:7-12). However, Dr. Zhang's response does not discuss "indicator species" or "the research Syngenta had done" and thus this testimony does not support Plaintiffs' cited assertion.

255

281.    This omission was glaring because Syngenta's research, conducted by Dr. Alan Raybould, was initially published online in September 2010—*after* MIR162 had been deregulated in the United States—and in the peer-reviewed publication *Transgenic Research* in June 2011.  Ex. 27, Latner Rpt. at ¶¶ 340-341.

> **RESPONSE TO NO. 281.**    Disputed,    inadmissible,    and
>
> unsupported by the evidence cited.  Syngenta does not dispute
>
> that paragraph 340 of Mr. Latner's purports to claim: "Syngenta's
>
> research, conducted by Dr. Alan Raybould, was initially
>
> published online in September 2010—*after* MIR162 had been
>
> deregulated in the United States—and in the peer-reviewed
>
> publication *Transgenic Research* in June 2011."  Pls.' Opp'n Ex.
>
> 27 (K. Latner Expert Rep. ¶ 340).  Syngenta also does not dispute
>
> that paragraph 341 of Mr. Latner's report purports to claims that
>
> "Given that the research discussing these adverse effects had been
>
> published in peer reviewed professional journals, it was
>
> foreseeable that Syngenta would need to candidly disclose and
>
> fully address the potential impact of this research and that China
>
> would have legitimate scientific-based questions about these
>
> negative test results."  *Id.* ¶ 341.  Mr. Latner's bare assertions,
>
> however, do not sufficiently establish that there was an
>
> "omission," that the alleged omission was "glaring," that Dr.
>
> Raybould conducted Syngenta's research, that Dr. Raybould's
>
> research "was initially published online in September 2010," or
>
> that Dr. Raybould's research had been published in the "peer-

reviewed publication *Transgenic Research* in June 2011."   Thus,

Plaintiffs' cited evidence fails to support their asserted fact.

282.   Further calling attention to this omission, Syngenta requested a new import permit along with its November 2011 dossier, which was unusual because Syngenta had already received an import permit and the Chinese government had not requested further in-country tests. Ex. 27, Latner Rpt. at ¶ 342.

> **RESPONSE TO NO. 282.**      Disputed,      inadmissible,      and
>
> unsupported by the evidence cited.  Syngenta does not dispute
>
> that paragraph 342 of Mr. Latner's report claims: "In the
>
> November 2011 submission, Syngenta also requested an import
>
> permit. This is an unusual request because Syngenta had
>
> previously received an import permit for MIR162 and no further
>
> in-country tests were needed at that time." Pls.' Opp'n Ex. 27 (K.
>
> Latner Expert Rep. ¶ 342).  Mr. Latner's bare assertions of facts
>
> without proper foundation, however, do not sufficiently establish
>
> that Syngenta "call[ed] attention to" any alleged omissions, that
>
> Syngenta actually requested a new permit in its November 2011
>
> submission, that the alleged request was "unusual," that Syngenta
>
> "had already received an import permit," or that "the Chinese
>
> government had not requested further in-country tests."   Thus,
>
> Plaintiffs' cited evidence fails to support their asserted fact.

283.   In Mr. Latner's opinion, because there was no other reason to seek an additional import permit, this request suggested to Chinese regulators the data Syngenta submitted with its dossier was compromised, data was missing, or that tests would need to be redone. *Id*. at ¶ 343.

**RESPONSE TO NO. 283.**    Disputed,    inadmissible,    and unsupported by the evidence cited.   Syngenta does not dispute that paragraph 343 of Mr. Latner's report states: "In my opinion, because there was no other reason to seek an additional import permit at that time, this request suggests to me and likely to the Chinese regulators that the data Syngenta submitted with the application was compromised, that tests would need to be redone and/or that the research showing the adverse effect on Daphnia magna once uncovered would need to be addressed with further in-country research."  Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 343).  Mr. Latner's statement that this request "likely" suggested to Chinese regulators that the data was somehow compromised is sheer speculation and improper expert testimony.   Mr. Latner lacks the foundation to opine on what Chinese regulators thought about the data submitted to them by Syngenta. Thus, Mr. Latner's testimony is inadmissible and Plaintiffs cannot support their assertion with cited materials.

284.    In any of these cases, requesting an import permit indicates to Mr. Latner that Syngenta expected that this dossier would not be its last before MIR162 was approved. *Id.* at ¶ 343.

**RESPONSE TO NO. 284.**    Disputed,    inadmissible,    and unsupported by the evidence cited.   Syngenta does not dispute that paragraph 343 of Mr. Latner's report states: "In any of these cases,   requesting   an   import   permit   indicates   to   me   that

Syngenta expected that this application would not be its last before MIR162 was approved." Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 343). However Mr. Latner's views on what Syngenta expected are impermissible speculation about Syngenta's state of mind and improper expert testimony. Thus, Mr. Latner's testimony is inadmissible and Plaintiffs cannot support their assertion with cited materials.

285. On May 15, 2012, the Ministry of Agriculture rejected Syngenta's MIR162 dossier and identified scientific issues to resolve before any subsequent application. Ex. 27, Latner Rpt. at ¶ 345; Ex. 147 (Dep. Ex. 88); Ex. 31 Huber Vol. II at 502:10-503:6; Ex. 148 (Dep. Ex. 373); Ex. 361, Deposition of Terese Rennie at 226:13-24; Ex. 149 (Dep. Ex. 85).

**RESPONSE TO NO. 285.** Disputed, inadmissible, and unsupported by the evidence cited. Syngenta does not dispute that paragraph 345 of Mr. Latner's report claims: "On May 15, 2012, the MOA rejected Syngenta's MIR162 application and identified two issues to resolve before any subsequent submission." Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 345). Mr. Latner's bare assertions of facts without proper foundation, however, do not sufficiently establish that Syngenta's dossier was "rejected" or that the issues identified by the Ministry of Agriculture were "scientific." Similarly, Pls.' Opp'n Ex. 147 (S. Huber Dep. Ex. 88) is a document titled "Approving Process for MIR 162 in China" that explicitly notes that in May 2012 "Syngenta receive MoA requests to submit additional dossier to address potential technical concern," and does not state that the

Ministry of Agriculture "rejected" Syngenta's dossier or that the issues identified by the Ministry were "scientific." Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 502:10-503:6) and Pls.' Opp'n Ex. 361 (2/23/2016 T. Rennie Dep. Tr. 226:13-24) contain testimony attempting to authenticate Exhibit 88 and Exhibit 85, respectively, and thus do not support Plaintiffs' asserted fact. Syngenta also disputes the suggestion in this assertion that it received notice of the Ministry of Agriculture's questions before June 2012. Syngenta did not receive a response from the Ministry of Agriculture until June 2012. *See* Ex. 394 (3/22/2016 Y. Zhang Dep. Tr. 322:23-323:6).

286.   The Ministry of Agriculture noted that Syngenta failed to provide a comparison of data of the bioassay test against non-target organisms.   Ex. 149 (Dep. Ex. 85) at SYNG_00369418; Ex. 31, Huber Vol. II at 485:3-20; Ex. 150 (Dep. Ex. 1724); Ex. 197, Pisk Vol. II at 401:12-21.

**RESPONSE TO NO. 286.**      Undisputed that China claimed that the dossier did not contain a comparison of data of the bioassay test against non-target organisms, but disputed whether the dossier did not, in fact, contain the data requested by Chinese regulators. Pls.' Opp'n Ex. 150 (D. Pisk Dep. Ex. 1724) is identical to Pls.' Opp'n Ex. 149 (S. Huber Dep. Ex. 85) and Syngenta does not dispute that both documents at SYNG_00369418 state: "The questions are:…2. didn't provide the comparison data of bioassay test (NOEC dose) of Vip3Aa20 with Cry1Ab, Cry1Ac, etc, against non-target organisms such as

pink spotted ladybird beetle, green lacewings, bee and collembola."  Syngenta notes that Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 485:3-20) and Pls.' Opp'n Ex. 197 (4/22/2016 D. Pisk Dep. Tr. 401:12-21) contain testimony seeking to authenticate Exhibit 85 and 1724, respectively, but do not independently support Plaintiffs' asserted fact.    Moreover, Syngenta disputes that the MIR162 dossier did not contain the requested information in the first place.  *See* Ex. 351 (1/27/2016 S. Huber Dep. Tr. 207:9-208:14, 211:9-21).

287.   Syngenta internally acknowledged that addressing this issue would require sharing information about its Daphnia study, which was likely to cause concerns with the Chinese regulators.  Ex. 146, Y. Zhang Vol. II. at 375:21-378:11.

**RESPONSE TO NO. 287.**      Disputed and unsupported by the evidence cited.    Nothing in Dr. Zhang's testimony supports Plaintiffs' assertion in this paragraph.  Dr. Zhang did not testify on behalf of Syngenta, and he did not testify that Syngenta "internally acknowledged" anything.   Instead, Dr. Zhang was asked: "But 'PS expressed this result couldn't be went around.' What do you mean by that? What this a statement made to the NBC that it 'couldn't be went around'?"  Dr. Zhang answered: "I think it was probably not. This was for the internal discussion, because we had a lot of data."  Pls.' Opp'n Ex. 146 (3/22/2016 Y. Zhang 377:6-12).  Dr. Zhang also did not testify that information about a Daphnia study "was likely to cause concerns with the

261

Chinese regulators."   Instead, he testified: "So like I just said, there was some data that was not very -- not perfect, but it was very clear in our paper that they wouldn't cause any safety concerns, but we know MoA. Sometimes they overly concerned. Even if something has been proved in academia that there's no safety concerns, they may still ask questions."  *Id.* 377:20-378:2. Plaintiffs' cited testimony fails to support their asserted fact.

288.   Because Syngenta's first full dossier to China failed, Syngenta had to submit a new dossier, and receipt of that submission restarted the 270-day clock to approval, assuming no further mistakes by Syngenta.    Ex. 27, Latner Rpt. ¶ 348; Ex. 147 (Dep. Ex. 88) at SYNG_00352232-33.

**RESPONSE TO NO. 288.**   Disputed, inadmissible, and unsupported by the evidence cited.  Syngenta does not dispute that paragraph 348 of Mr. Latner's report states: "Having been rejected, a new application had to be submitted and receipt of that submission would restart the 270-day clock."  Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 348).   Mr. Latner's bare assertions, however, do not sufficiently establish that "Syngenta's first full dossier to China failed" in any regard, that Syngenta's subsequent submission constituted a "new dossier," or that receipt of any subsequent submission "restarted the 270-day clock to approval," or that Syngenta had made any mistakes or "further mistakes" in its submissions to China.   Similarly, Pls.' Opp'n Ex. 147 (S. Huber Dep. Ex. 88) does not state that "Syngenta's first full dossier to China failed."  However, Syngenta does not dispute

that it submitted another dossier addressing the questions issued

by the Chinese regulators.

289.   In June, 2012, Syngenta submitted a new MIR162 dossier for the July 1, 2012 application submission window. Ex. 354, Y. Zhang, Vol. III at 397:22-398:8.  Ex. 123 (Dep. Ex. 83).

**RESPONSE TO NO. 289.**        Disputed and unsupported by the

evidence cited.   Plaintiffs' assertion is unsupported by Dr.

Zhang's testimony.   Dr. Zhang was asked: "And then you --

Syngenta Chinese regulatory then resubmitted the full dossier

with answers to the questions raised in June on July 1, 2012; is

that correct?"  Dr. Zhang responded, "Yes."  Dr. Zhang did not

testify that Syngenta submitted a "new" dossier.  Pls.' Opp'n Ex.

354 (3/23/2016 Y. Zhang Dep. Tr. 397:22-398:8).  Similarly, Pls.'

Opp'n Ex. 123 (S. Huber Dep. Ex. 83) does not support Plaintiffs'

assertion because it is a 369-page document entirely in Chinese

for which no translation has been provided.  However, Syngenta

does not dispute that it submitted another dossier addressing the

questions issued by the Chinese regulators in time for the July

2012 submission window.

290.   In this new submission, Syngenta attempted to address the issues raised by the Ministry of Agriculture in its May 15, 2012 rejection and for the first time disclosed to Chinese regulators the existence of its *Daphnia* adverse effect research.  Ex. 142 (Dep. Ex. 739).

**RESPONSE TO NO. 290.**        Disputed and unsupported by the

evidence cited.   Pls.' Opp'n Ex. 142 (Y. Zhang Dep. Ex. 739)

does not reference a "new submission," nor does it call the

feedback from the Ministry of Agriculture a "rejection." This document also does not mention "*Daphnia* adverse effect research." Instead, the document shows that Syngenta made a "resubmission with response to MoA questions" on July 1, 2012. It does not note what was contained in the resubmission. Thus, this document does not support Plaintiffs' asserted fact.

291.    Syngenta provided some, but not all, of the information regarding this research. Ex 27, Latner Rpt. ¶ 352; Ex. 123 (SYNG_00002324 at 333) (Syngenta provided a summary of the Daphnia report and a table of data and citations, which references but did not attach the peer-reviewed paper).   Ex. 27, Latner Rpt. ¶ 354; Ex. 354, Y. Zhang, Vol. III at 398:10-25, 399:17-400:12, 436:16-20, 437:20-438:2; Ex. 142 (Dep. Ex 739) ("In followed response to above Q2, the slightly adverse effect of Vip on Daphnia growth was mentioned in P[roduct] S[afety] response. At that time we indicated this statement might cause China NBC's concern . . . . Actually the result has been reported in paper of 2011.").

**RESPONSE TO NO. 291.**    Disputed, inadmissible, and unsupported by the evidence cited. Syngenta provided all of the information requested by the Ministry of Agriculture. Plaintiffs' asserted fact is not supported by the evidence they cite. Syngenta does not dispute that paragraph 352 of Mr. Latner's report claims: "For example, in addressing the MOA's question regarding the data of the bioassay test against non-target organisms, Syngenta for the *first time* disclosed the existence of the Daphnia magna adverse effect research. Syngenta appears to have provided some, but not all, of the information regarding this research." Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 352). Mr. Latner's bare assertions, however, do not sufficiently establish that "Syngenta provided some, but not all, of the information regarding this

research." Similarly, Ex. 142 (Y. Zhang Dep. Ex. 739) does not indicate that Syngenta withheld information from the Ministry of Agriculture. Pls.' Opp'n Ex. 354 (3/23/2016 Y. Zhang Dep. Tr. 398:10-25, 399:17-400:12, 436:16-20, 437:20-438:2) is also inapplicable because none of Dr. Zhang's testimony establishes that Syngenta did not disclose all of the requested information to the Ministry of Agriculture. Indeed, Dr. Zhang explains that "in our response to the second question in June of 2012, we included a brief result or summarized result for the Daphnia study which was done in the US in 2011. We also included reference information." *Id.* 426:16-20. Dr. Zhang notes that the data from the Daphnia study "had been submitted to many governments in other countries, and it had passed stringent review. It also had been published in international journals." *Id.* at 399:6-11. Thus, none of Plaintiffs' cited evidence indicates that Syngenta did not disclose everything that was requested by the Ministry of Agriculture.

292.    In Mr. Latner's opinion, the incomplete disclosure of this known adverse environmental research was likely to lead to the rejection of the second dossier. Ex. 27, Latner Rpt. ¶ 353.

**RESPONSE TO NO. 292.**    Undisputed that Latner's report contains this purported opinion, but inadmissible. Syngenta does not dispute that paragraph 353 of Mr. Latner's report claims: "In my opinion, the incomplete disclosure of this known adverse environmental research was likely to lead to the rejection of this

265

application." Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 353). Mr. Latner's bare assertions, however, do not establish that Syngenta's applications were "incomplete," nor do they establish that there was any "known adverse environmental research" that Syngenta failed to disclose in its submissions. Mr. Latner's testimony regarding what the Chinese Ministry of Agriculture was "likely" to do is speculative and he lacks the foundation and expertise to offer an opinion on what a third-party would have done in a hypothetical scenario. Mr. Latner's testimony is thus inadmissible and cannot support the fact that Plaintiffs seek to establish.

293.   On June 17, 2013, the Ministry of Agriculture sent a letter to Syngenta informing Syngenta it had rejected the June 2012 dossier for MIR162 and provided Syngenta three questions. Ex. 152 (Dep. Ex. 738); Ex. 146, Y. Zhang Vol. II at 357:25-364:9; Ex. 142 (Dep. Ex. 739).

**RESPONSE TO NO. 293.**   Disputed and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 152 (Y. Zhang Dep. Ex. 738) is an English translation of a response from the Ministry of Agriculture dated May 21, 2013 providing "feedback." Syngenta does not dispute that this feedback was not transmitted to Syngenta until June 17, 2013. Nowhere does this letter state that the Ministry of Agriculture has "rejected" the June 2012 dossier for MIR162. Similarly, Pls.' Opp'n Ex. 142 (Y. Zhang Dep. Ex. 739) is a document titled "Brief submission history of MIR162 in China so far," and it too

266

does not indicate anywhere that the Ministry of Agriculture "rejected" Syngenta's June 2012 dossier.   Syngenta does not dispute that this document shows that the Ministry of Agriculture asked Syngenta three questions on or about June 17, 2013.  Pls.' Opp'n Ex. 146 (3/22/2016 Y. Zhang Dep Tr. 357:25-364:9) provides testimony seeking to authenticate Exhibit 738 but does not provide any additional support for Plaintiffs' assertion.  Thus, Plaintiffs have failed to show that their asserted fact is supported by the evidence they cite.

294.   The Ministry of Agriculture asked for additional detail regarding Daphnia.  Ex. 142 (Dep. Ex. 739); Ex. 153 (SYNG_00015280-SYNG_00015725); ("[i]nformation provided on the impact of MIR162 transgenic maize on 12 NTOs showed that one organism (Daphnia) grows slower.  A local lab test using daphnia should be conducted in China.") Ex. 27, Latner Rpt. at ¶ 355; Ex. 354, Y. Zhang, Vol. III at 400:13-401:5; 411:4-16.

**RESPONSE TO NO. 294.**      Undisputed.

295.   Syngenta's internal communications show Syngenta recognized that the Ministry of Agriculture rejected the second full dossier on scientific grounds. *See* Ex. 154 (Dep. Ex. 87); Ex. 31, Huber Vol. II at 492:17-496:21; Ex. 147 (Dep. Ex. 88); Ex. 155 (Dep. Ex. 95); Ex. 31, Huber Vol. II at 539:20-540:10.

**RESPONSE TO NO. 295.**      Disputed and unsupported by the evidence cited.  None of Plaintiffs' cited documents show that Syngenta as a company "recognized" anything, nor do they show that the Ministry of Agriculture "rejected" Syngenta's July 1, 2013 submission on so-called "scientific grounds."  As an initial matter, Pls.' Opp'n Ex. 147 (S. Huber Dep. Ex. 88) is not an internal communication.  In Pls.' Opp'n Ex. 155 (S. Huber Dep. Ex. 95) Dr. Zhang states: "As for MoA evaluation, I got message

there were committee members asked questions on Daphnia study of MIR162 but don't know exactly how the questions will be landed in final feedback." Dr. Zhang's statement does not suggest the MoA "rejected" Syngenta's submission, nor does it suggest that any purported "rejection" was on "scientific grounds." Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 492:17-496:21, 539:20-540:10) contains testimony seeking to authenticate Exhibits 87 and 95, and thus does not independently support Plaintiffs' assertion in this paragraph. In fact, Mr. Huber testified that the Ministry of Agriculture's questions were decidedly *not* science-based. *See* Ex. 351 (1/27/2016 S. Huber. Dep. Tr. 218:11-16) ("Q. And it's your testimony on behalf of Syngenta that those are nonscientific-based questions? A. They're not sound science."). Syngenta does not dispute that Pls.' Opp'n Ex. 154 (S. Huber Dep. Ex. 87) contains an email from Claire Xu to Sean Wang dated May 21, 2013 in which Ms. Xu writes: "Based on my information MIR 162 failed the 2nd GM Bio-safety Commission review in 2012 following its re-submission July last year. Since the panel is the scientific review before MoA administrative process, this result will directly lead to 162 rejection by GM office." However, Ms. Xu's statements are not made on behalf of Syngenta, and were based on a rumor she overheard during a visit to the MoA office.

296.   In reviewing the concerns raised by China, Syngenta internally acknowledged the need for new in-country testing to respond to these issues. Ex. 142 (Dep. Ex. 739) at SYNG_00232158 ("A local lab test using daphnia should be conducted in China.").

**RESPONSE TO NO. 296.**        Undisputed.

297.   On June 19, 2013, Syngenta commissioned an "acute study" of Daphnia, which was completed six days later on June 25, 2013. The purpose of the study was to attempt to address MOA's questions about the implications of Syngenta's Daphnia research.  Ex. 142 (Dep. Ex. 739) at SYNG_00232158; Ex. 27, Latner Rpt. ¶ 361; (Dep. Ex.  97) at SYNG_00002692.

**RESPONSE TO NO. 297.**        Undisputed.

298.   On June 25, 2013, Syngenta submitted a third full dossier for the July 1, 2013 application submission window. Ex. 27, Latner Rpt. at ¶ 362; Ex. 123 (Dep. Ex. 83); Ex. 160, (Dep. Ex. 37) at SYNG_00351597-98; Ex. 142 (Dep. Ex 739).

**RESPONSE TO NO. 298.**        Undisputed.

299.   Although Syngenta's in-country regulatory affairs staff thought the June 2013 submission was "much better than previous," Syngenta also believed a longer-term Daphnia study would ultimately be required to address China's outstanding questions. Ex. 31, Huber Vol. II at 563:3-8; Ex. 158 (Dep. Ex. 94), Ex. 31, Huber Vol II at 536:22-539:19.

**RESPONSE TO NO. 299.**        Disputed and unsupported by the

evidence cited.  Plaintiffs' assertion regarding what Syngenta as a

company "believed" would be "ultimately required to address

China's outstanding questions" is unsupported by the documents

they cite.  Pls.' Opp'n Ex. 158 (S. Huber Dep. Ex. 94) does not

indicate that Syngenta's in-country regulatory affairs staff thought

the June 2013 submission was "much better than previous."

Likewise, there is no mention in this document of Syngenta's

"beliefs," or a "long-term Daphnia study."  Similarly, Pls.' Opp'n

Ex. 31 (1/28/2016 S. Huber Dep. Tr. 563:3-8) does not establish

that a "longer-term Daphnia study would ultimately be required to

address China's outstanding questions." Similarly, Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 536:22-539:19) presents a discussion regarding how Syngenta did not have to do any further testing after submitted this study, but again that testimony does not establish that a long-term Daphnia study was "required to address China's outstanding questions."

300.   It was Syngenta's belief that without this longer-term study, MIR162 would not be approved.  Ex. 158 (Dep. Ex. 94).

**RESPONSE TO NO. 300.**     Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 158 (S. Huber Dep. Ex. 94) is an email chain between Yongsheng Zhang, Lisa Zannoni, Simon Barber, and Scott Huber.  It does not reflect Syngenta's "beliefs," merely the statements of those individuals.  Moreover it does not discuss a "longer-term study."  Thus, the cited document does not support Plaintiffs' assertion in this paragraph.

301.   Anticipating that the Ministry of Agriculture might request this longer term Daphnia study, Syngenta began such a study.  Ex. 156 (Dep. Ex. 97); Ex. 31, Huber Vol. II at 550:24-552:6; *see also* Ex. 159 (Dep.     Ex. 120) at SYNG_00231326 (discussing research in October 2013); Ex. 54, Deposition of Scot Huber Vol. III ("Huber Vol. III") at 665:17-668:25.

**RESPONSE TO NO. 301.**     Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 156 (S. Huber Dep. Ex. 97) is a more than 500-page document entirely in Chinese for which no translation has been provided.  Pls.' Opp'n Ex. 159 (S. Huber Dep. Ex. 120, at SYNG_00231327) shows that a third-party

exposure study found "no adverse effects showed on Daphnia growth measured items of length and weight on all concentrations of Vip3A." Mr. Zhang's statements in this document do not reflect "anticipation" by Syngenta that "the Ministry of Agriculture might request [a] longer term Daphnia study." Similarly, Pls.' Opp'n Ex. 54 (1/29/2016 S. Huber Dep. Tr. 665:17-668:25) pertains to Syngenta's Chinese submissions for Duracade and also does not provide support for Plaintiffs' assertion.

302. On October 28, 2013, the Ministry of Agriculture rejected Syngenta's June 26, 2013 MIR162 dossier. Ex. 160 (Dep. Ex. 37) at SYNG_00351597-98; Ex. 28, Huber Vol. I at 36:8-37:2.

**RESPONSE TO NO. 302.** Disputed and unsupported by the evidence cited. Plaintiffs' cited evidence fails to show the Ministry of Agriculture "rejected" Syngenta's June 2013 submission. Pls.' Opp'n Ex. 160 (S. Huber Dep. Ex. 37, at SYNG_00351597-98) notes that Syngenta received additional question from the Ministry of Agriculture on October 28, 2013 but does not mention a "rejection." Pls.' Opp'n Ex. 28 (1/27/2016 S. Huber Dep. Tr. 36:8-37:2) simply seeks to authenticate Exhibit 37 but does not provide any additional support for Plaintiffs' assertion.

303. The Ministry of Agriculture identified two outstanding issues, both questions involving Daphnia. First, Syngenta had not provided the full negative results from its Daphnia research or a copy of the study. Second, the Ministry of Agriculture questioned whether the acute study fully addressed MIR162's impact on Daphnia. *Id.*

**RESPONSE TO NO. 303.** Disputed and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 160 (S. Huber Dep. Ex. 37, at SYNG_00351597-98) notes the Ministry of Agriculture's questions were regarding "negative results of target protein (Vip3A) effect on Daphnia" and whether the "local acute Daphnia study can't fully address concern of Daphnia growth slower than Vip." Nowhere does this document state that the Ministry identified as an "outstanding issue" the assertions in Statement of Additional Fact No. 303. Thus, this document does not support the facts asserted in this paragraph.

304. On October 31, 2013, Syngenta renewed its application for the November 1, 2013 submission window. Ex. 27, Latner Rpt. at ¶ 367; Ex. 160 (Dep. Ex. 37) at SYNG_00351597-00351598. *Id.*

**RESPONSE TO NO. 304.** Disputed, inadmissible, and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 367) claims, in part: "On or about October 31, 2013, Syngenta renewed its application to the MOA for the November 1, 2013 submission window." Syngenta does not dispute that it submitted another "complete dossier submission (with response to MoA questions)" on November 1, 2013 in accordance with Chinese law, *see* Pls.' Opp'n Ex. 160 (S. Huber Dep. Ex. 37, at SYNG_00351597-98), but disputes Plaintiffs' characterization of this submission as a "renewal."

305.   In this application, Syngenta for the first time discussed in detail its Daphnia research, including that there was an original 10-day study commissioned by Syngenta in 2009. Syngenta also included a longer, 21-day study regarding Daphnia.  Ex. 27, Latner Rpt. ¶ 367; Ex.160 (Dep. Ex. 37) at SYNG_00351597-98. Ex. 354, Y. Zhang Vol. III at 442:3-443:4; Ex. 142 (Dep. Ex 739).

**RESPONSE TO NO. 305.**   Disputed,   inadmissible,   and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 367) claims, in part: "In this application, Syngenta for the first time discussed in detail its Daphnia magna research, including that there was an original 10-day study commissioned by Syngenta in 2009. Syngenta also included a longer, 21-day study regarding Daphnia magna." However, Syngenta disputes Plaintiffs' characterization that this was the "first time" Syngenta discussed "in detail its Daphnia research."   Mr. Latner's bare assertion does not sufficiently establish that this was the "first time" Syngenta "discussed in detail its Daphnia research."   Nor do Pls.' Opp'n Ex. 160 (S. Huber Dep. Ex. 37, at SYNG_00351597-98), Pls.' Opp'n Ex. 142 (Y. Zhang Dep. Ex. 739), and Pls.' Opp'n Ex. 354 (Y. Zhang Dep. Tr. 442:3-443:4) because none of this evidence describes everything that was stated in Syngenta's November 2013 submission or earlier submissions.   *See id.*   442:15-19 ("[B]y November of 2013 we had not provided the published *full text* paper yet") (emphasis added).   Thus, Plaintiffs' cited evidence does not support their assertion.

273

306.   The longer study was initiated on September 9, 2013, and completed on September 30, 2013, with the final report dated October 24, 2013. Ex. 156 (SYNG_00002692) at 705.

> **RESPONSE TO NO. 306.**   Disputed and unsupported by the evidence cited.  Pls.' Opp'n Ex. 156 (S. Huber Dep. Ex. 97, at SYNG_00002705) is entirely in Chinese and no translation has been provided.  Thus, it does not support Plaintiffs' assertion in this paragraph.

307.   In discussing new information to insert in the re-submitted application, Syngenta's Yongsheng Zhang relayed his conversation with a "key" Chinese regulator who said Syngenta needed to "explain why US study led to opposite result."  Ex. 27, Latner Rpt. ¶ 367; Ex. 162 (Dep. Ex. 99) at SYNG_00231988; Ex. 31, Huber Vol. II at 555:23-557:4.

> **RESPONSE TO NO. 307.**   Undisputed that Pls. Opp'n Ex. 162 (S. Huber Dep. Ex. 99, at SYNG_00231988) contains the following statement from Mr. Zhang: "Last week I visited one key NBC member to brief him our MIR162 status, in particular the new generated positive local study result.  He mentioned the positive local study is important to respond to NBC's concern.  However, it is also important to explain why US study led to opposite result."

308.   Syngenta has admitted these questions are "legitimate question[s] by scientists." This is particularly true here, where Syngenta admitted that its internal scientists could not with certainty explain these differences and Syngenta should respond in a manner that "avoid[s] any new questions from [the Ministry of Agriculture]." Ex. 31, Huber Vol. II at 557:22-558:23, 559:7-561:12.

> **RESPONSE TO NO. 308.**   Disputed, vague, and unsupported by the evidence cited.  Plaintiffs' assertion is vague in its reference to "these questions."  When asked whether questions by scientists

274

"to want to know why different tests resulted in different results" are "legitimate questions," Mr. Huber responded that they were. *See* Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 557:22-558:23). Because Plaintiffs' assertion is vague, it is not clear that the type of question Mr. Huber testified was "legitimate" is in fact the type of question referred to in Statement of Additional Fact No. 308. Moreover, Mr. Huber's testimony is insufficient to support Plaintiffs' assertion that their vague "questions" are particularly legitimate "here, where Syngenta admitted that its internal scientists could not with certainty explain these differences and Syngenta should respond in a manner that 'avoid[s] any new questions from [the Ministry of Agriculture].'" Nowhere does Mr. Huber admit that Syngenta's "internal scientists could not with certainty explain these differences." Mr. Huber also did not testify that Syngenta should "respond in a manner that avoids any new questions"—that language is quoted from counsel's question, not Mr. Huber's testimony. *See id.* at 559:7-561:12.

309.   Chinese regulators were also concerned that the negative results came from a test funded by and jointly published with Syngenta, rather than a test undertaken by a neutral third party. Ex. 31, Huber Vol. II at 564:3-565:3; Ex. 163 (Dep. Ex. 100) at SYNG_00232156; Ex. 31, Huber Vol. II at 563:13-564:2.

**RESPONSE TO NO. 309.**   Disputed, hearsay, and unsupported by the evidence cited. Nothing in Plaintiffs' cited evidence establishes the "concerns" of Chinese regulators. Syngenta does

275

not dispute that Yongsheng Zhang wrote to Lisa Zannoni:
"However NBC can't look down on negative results of US study
as…US study was conducted by Syngenta self instead of other
unqualified third party or individual." Pls.' Opp'n Ex. 163 (S.
Huber Dep. Ex. 100, at SYNG_00232156).   Any statements by
Chinese regulators relayed to Mr. Zhang are hearsay and therefore
inadmissible.   *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F.
Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider
hearsay evidence on summary judgment).   Further the testimony
of Scott Huber also does not support Plaintiffs' assertion because
that testimony merely recites the contents of Pls.' Opp'n Ex. 163
(S. Huber Dep. Ex. 100).

310.   Even before receiving word its fourth dossier was rejected, Syngenta resubmitted an
application on November 21, 2013, with answers to the questions asked by the Ministry of
Agriculture, thus submitting a fifth dossier.  Ex. 142 (Dep. Ex. 739) at SYNG_00232158.

**RESPONSE TO NO. 310.**       Disputed, hearsay, and unsupported
by the evidence cited.   Nothing in Pls.' Opp'n Ex. 142 (Y. Zhang
Dep. Ex. 739, at SYNG_00232158) establishes that Syngenta's
"fourth dossier was rejected" or the date on which Plaintiffs claim
Syngenta received word of the alleged rejection.   This document
shows that Syngenta made a "resubmission with response (long-
term study) to MoA questions on Nov 2013" on November 21,
2013.   The document does not refer to this resubmission as a

"fifth dossier."  Thus, Plaintiffs' assertion is unsupported by the

document cited.

311.    In December 2013, a delegation from NAEGA, including representatives from Cargill, visited China and met with regulators to find out additional information on the status of the MIR162 applications following the rejection of U.S. corn shipments.  Chinese regulators told NAEGA there were "legitimate concerns" with Syngenta's application, including health and environmental concerns related to Daphnia and to a paper published by Syngenta in 2011. Ex. 164, Deposition of Steve Smalley Vol. I ("Smalley Vol. I") at 142:3-143:19; Ex. 165, Deposition of Steve Smalley Vol. II ("Smalley Vol. II") at 499:16-500:22.

RESPONSE TO NO. 311.    Disputed, hearsay, and unsupported

by the evidence cited.   Syngenta does not dispute that in

December 2013 a delegation from NAEGA, including

representatives on Cargill, visited China and met with regulators

in response to China's rejection of U.S. corn shipments.

Syngenta also does not dispute that Mr. Smalley said the

quoted language in his testimony, but Mr. Smalley's recitation

of what Chinese regulators told him is hearsay and is thus

inadmissible. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F.

Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider

hearsay evidence on summary judgment).    Syngenta notes that

Mr. Smalley also testified that Chinese regulators "got into some

fairly technical terminology and technical explanations that didn't

make a lot of sense to me at the time."  Pls.' Opp'n Ex. 164

(5/18/2016 S. Smalley Dep. Tr. 143:10-13).

312.    When the NAEGA delegation visited Syngenta's Chinese offices later that day, Syngenta told them it had "done everything requested of them from [the Ministry of Agriculture]" and that Syngenta "[h]ad no idea what the 2011 case study that [the Ministry

of Agriculture] told us conflicted with their applicat[io]n was all about." Ex. 166 (Smalley Dep. Ex. 26); Ex. 164, Smalley Vol. I at 166:4-7.

> **RESPONSE TO NO. 312.**   Undisputed that Plaintiffs accurately quote Pls.' Opp'n Ex. 166 (S. Smalley Dep. Ex. 26), which states: "SYN—met them late today.  Continue to say they have done everything requested of them from MOA…Had no idea what the 2011 case study that MOA told us conflicted with their application was all about. In fact they amazed that MOA sharing info with us given we a third party and saying first they have heard."

313.   Syngenta then immediately sent a letter to the Ministry of Agriculture requesting a meeting and expedited approval of MIR162. Ex. 167 (SYNG_00004016); Ex. 27, Latner Rpt. at ¶ 376.

> **RESPONSE TO NO. 313.**   Disputed, vague, inadmissible, and unsupported by the evidence cited.  Plaintiffs' assertion is vague as to timeframe and does not indicate *when* Plaintiffs assert Syngenta "immediately" sent a letter.  Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 376) claims: "After that meeting, Syngenta sent a letter to the Ministry of Agriculture requesting a meeting and expedited approval of MIR162."   Mr. Latner's bare assertion, however, does not sufficiently establish that Syngenta actually wrote a letter "requesting a meeting and expedited approval of MIR162." Plaintiffs' citation of Pls.' Opp'n Ex. 167 (Syngenta letter, at SYNG_00004016) also does not support their assertion because

> this document is entirely in Chinese and no translation has been
>
> provided.  Syngenta does not dispute that a letter was sent was
>
> sent to the Ministry of Agriculture after Syngenta met with a
>
> NAEGA delegation, but disputes Plaintiffs' characterization that
>
> the letter was sent in response to the meeting with the NAEGA
>
> delegation.

314.    On January 20, 2014, the Ministry of Agriculture rejected Syngenta's fourth, October 31, 2013 dossier. Ex. 168 (Dep. Ex. 103) (at SYNG_00003376); Ex. 169 (Dep. Ex. 748) at SYNG_00232899; Ex. 31, Huber Vol. II at 571:8-18; Ex. 27, Latner Rpt. at ¶ 377.

> **RESPONSE TO NO. 314.**    Disputed,    inadmissible,    and
>
> unsupported by the evidence cited.  Syngenta does not dispute
>
> that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 377) claims: "On
>
> January 20, 2014, the MOA rejected the October 31, 2013
>
> application."  Mr. Latner's bare assertion, however, does not
>
> sufficiently establish that the Ministry of Agriculture "rejected"
>
> anything.  Mr. Latner's statement also provides no support for
>
> Plaintiffs' characterization of the October 31, 2013 submission as
>
> a "fourth dossier."  The same is true for the other evidence cited
>
> by Plaintiffs.  Pls.' Opp'n Ex. 168 (S. Huber Dep. Ex. 103) is a
>
> Chinese language document for which no translation was
>
> provided.  Pls.' Opp'n Ex. 169 (Y. Zhang Dep. Ex. 748, at
>
> SYNG_00232899) explicitly states: "This afternoon I just took
>
> back the feedback letters for MIR162, 5307 and COT102 from
>
> MoA and also had conversation with officials on questions in the

office."  Mr. Zhang's statement in this document does not support Plaintiffs' assertion that the Ministry of Agriculture "rejected" what Plaintiffs call "Syngenta's fourth, October 31, 2013 dossier."  Mr. Zhang does not reference a "fourth dossier," nor does he say the submission was "rejected."  Similarly, Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 571:8-18) does not support Plaintiffs' assertion because it simply seeks to authenticate Plaintiffs' Exhibit 168 (Deposition Exhibit 103).

315.   The Ministry of Agriculture outlined several issues, including a failure to provide sufficient rational and scientific explanation for the different outcomes in the October 24, 2013 *Daphnia* tests and those published in 2011 by Dr. Raybould. Ex. 27, Latner Rpt. at ¶ 378; Ex. 169 (Dep. Ex. 748); Ex. 354, Y. Zhang Vol. III at 543:10-544:5; *see also* Ex. 170 (Dep. Ex. 96); Ex. 31, Huber Vol. II at 546:23-547:8; Ex. 171 (Dep. Ex. 101); Ex. 31, Huber Vol. II at 566:19-568:2;  Ex. 172 (SYNG_00232318).

> **RESPONSE TO NO. 315.**       Disputed, vague, inadmissible, and unsupported by the evidence cited.  Plaintiffs' assertion is vague as to where Plaintiffs allege the Ministry of Agriculture "outlined several issues."  Nevertheless, Plaintiffs' cited evidence does not support their assertion.  Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 378) claims: "The key outstanding issues were: a failure to provide sufficient rational and scientific explanation for the different outcomes in the October 24, 2013 tests and those published in 2011 by Dr. Raybould; a failure to compare the allergy safety evaluation report with other allergens using a Blot 6 allergen test; and a question regarding the experimental design for the PMI serum

280

screening test."  Mr. Latner's bare assertion, however, does not sufficiently establish that the Ministry of Agriculture "outlined several issues," or that one of those "issues" was the failure to "provide sufficient rational and scientific explanation for the different outcomes in the October 24, 2013 *Daphnia* tests and those published in 2011 by Dr. Raybould."  Likewise Pls.' Opp'n Ex. 170 (S. Huber Dep. Ex. 96), Pls.' Opp'n Ex. 171 (S. Huber Dep. Ex. 101), and Pls.' Opp'n Ex. 172 (Email re DDGS media inquiries, at SYNG_00232318) do not mention any "failure to provide sufficient rational and scientific explanation."   The testimony contained in Pls.' Opp'n Ex. 354 (Y. Zhang Dep. Tr. 543:10-544:5) and Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 546:23-547:8, 566:19-568:2) also provide no support for Plaintiffs' assertions because it merely seeks to authenticate Plaintiffs' Exhibit 169 (Deposition Exhibit 748), Plaintiffs' Exhibit 170 (Deposition Exhibit 96), and Plaintiffs' Exhibit 171 (Deposition Exhibit 101).

316.   On or about February 25, 2014, Syngenta staff, including Dr. Raybould, met with the Ministry of Agriculture's scientists to answer outstanding questions related to adverse Daphnia test results.  *See* Ex. 27, Latner Rpt. ¶ 380; Ex. 122 (Dep. Ex. 104); Ex. 362, Deposition of Andrew McConville Vol. II ("McConville Vol. II") at 335:18-25; Ex. 176 (Dep. Ex, 783); Ex. 362 McConville Vol. II at 382:10-17.

**RESPONSE TO NO. 316.**     Undisputed.

317.   Syngenta's PowerPoint presentation for this meeting argued that the scientific concerns the Ministry of Agriculture had raised regarding Daphnia were only relevant if Syngenta were seeking cultivation approval, which Syngenta stated it was not. Ex. 122 (Dep.

Ex. 104) at SYNG_00489127; Ex. 31, Huber Vol. II at 570:12-25; Ex. 146, Y. Zhang Vol. II at 544:12-20.

**RESPONSE TO NO. 317.**     Disputed   unsupported   by   the

evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex.

122 (S. Huber Dep. Ex. 104, at SYNG_00489127) states: "The

effects on *Daphnia* growth and reproduction were only seen at

concentrations   at   or   above   752µg   Vip3Aa20/L;   This

concentration   represents   10   the   worst-case   concentration

estimated   for   *cultivation*   of   MIR162   maize   from   the

GENEEC….Finally, MIR162 maize is to imported not cultivation

in China….Import of MIR162 maize poses minimal risk to the

environment   in   China."     This   document   does   not   support

Plaintiffs' assertion that Syngenta's presentation "argued that the

scientific concerns the   Ministry   of   Agriculture   had   raised

regarding   Daphnia   were   only   relevant   if Syngenta were

seeking cultivation approval."  The testimony contained in Pls.'

Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 570:12-25) and Pls.'

Opp'n Ex. 354 (Y. Zhang Dep. Tr. 544:12-20) does not support

Plaintiffs'   assertion   because   it   merely   seeks   to   authenticate

Plaintiffs' Exhibit 122 (Deposition Exhibit 104).

318.   As discussed below, however, Syngenta had been seeking Chinese cultivation approval since July 2010 and had only suspended its cultivation approval efforts in November 2013, just a few months prior to this meeting.  *See infra* SOAF ¶¶ 324-332.

**RESPONSE TO NO. 318.**     Disputed  and  unsupported  by  the

evidence cited.  Plaintiffs' assertion in this paragraph is not a fact

in evidence but rather counsel's argument.  Plaintiffs improperly rely on an unfocused citation to 8 paragraphs of their own Statement of Additional Facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

As explained in further detail below, Syngenta disputes almost all of the purported facts asserted in Opp'n SOAF ¶¶ 324-332 because they are unsupported by the evidence Plaintiffs cite.  In addition to the issues raised in response to Opp'n SOAF ¶¶ 324-332, there is no indication based on the evidence cited in these paragraphs that "Syngenta had been seeking Chinese cultivation approval since July 2010," or that Syngenta "only suspended its cultivation approval efforts in November 2013."

319.   After this meeting addressing these technical questions, on February 28, 2014, Syngenta renewed its application for the March 1, 2014 submission window.  Ex. 31, Huber Vol. II at 571:8-572:4; Ex. 168 (Dep. Ex. 103); Ex. 27, Latner Rpt. ¶¶ 380-383.

**RESPONSE TO NO. 319.**     Disputed, vague, inadmissible, and unsupported by the evidence cited.  Plaintiffs' reference to "this meeting" is vague as it does not specify which meeting Plaintiffs intend to reference.  Plaintiffs' citation to Pls.' Opp'n Ex. 168 (S. Huber Dep. Ex. 103) does not support their assertion because that is an over 500-page document entirely in Chinese for which no translation was provided.  Plaintiffs' citation to Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 571:8-572:4) is also unavailing as that testimony only seeks to authenticate Plaintiffs' Exhibit 168 (Deposition Exhibit 103).  Syngenta does not dispute that Pls.' Opp'n Ex. 27 (K. Latner Expert Rep. ¶ 383) claims: "After this meeting addressing these technical questions, on February 28, 2014, Syngenta renewed its application for the March 1, 2014 submission window with the likely approval now in Q4 2014 if no further questions were asked."  Syngenta does not dispute that it submitted another "complete dossier submission (with response to MoA questions)" in March 2014 in accordance with Chinese law, *see* Pls.' Opp'n Ex. 160 (S. Huber Dep. Ex. 37, at SYNG_00351597-98), but disputes Plaintiffs' characterization of this submission as a "renewal."  Mr. Latner's bare assertion does not sufficiently establish that Syngenta's February 28, 2014 submission constituted a "renewal," or that the vague meeting referenced in Plaintiffs' assertion "address[ed] technical

284

questions." Plaintiffs fail to cite sufficient evidence to support their assertion in this paragraph.

320.   On October 7, 2014, Syngenta's Scott Huber reported Syngenta would soon publish a paper comparing the results from the original and Chinese studies and ultimately concluding that MIR162 has no meaningful impact on Daphnia.  Ex. 31, Huber Vol. II at 585:23-586:22; Ex. 178 (Dep. Ex. 110).

**RESPONSE TO NO. 320.**      Undisputed that on October 7, 2014, Scott Huber wrote an email to Lisa Zannoni stating: "A detailed scientific explanation of how the results from the original and Chinese studies clearly show no meaningful impact on daphnia was presented to NBC during a meeting in February and in Syngenta's official written response….A publication containing data from the original study and the Chinese study was prepare by the environment safety group within PS. This paper supports our position that the observed statistical differences are the result of the high concentrations of protein rather than a toxic effect….I'm writing this letter to let you know that this publication was accepted by the journal and it will be published once we provide the required payment."  Pls.' Opp'n Ex. 178 (S. Huber Dep. Ex. 110).

321.   Syngenta believed that publishing this paper would add more weight and credibility to their efforts to reconcile their two studies.  Ex. 31, Huber Vol. II at 586:2-22; Ex. 178 (Dep. Ex. 110).

**RESPONSE TO NO. 321.**      Disputed and unsupported by the evidence cited.  The cited document does not state Syngenta's "beliefs" and also does not state that Syngenta believed

> publishing a paper "would add more weight and credibility to their efforts to reconcile their two studies." Instead, Mr. Huber wrote in Pls.' Opp'n Ex. 178 (S. Huber Dep. Ex. 110) that: "This paper supports our position that the observed statistical differences are the result of the high concentrations of protein rather than a toxic effect." Plaintiffs' citation to Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 586:2-22) does not support their assertion either because it merely contains testimony seeking to authenticate Plaintiffs' Exhibit 178 (Deposition Exhibit 110).

322.    Syngenta, working with Dr. Raybould, published this peer-reviewed paper on October 30, 2014.  Ex. 27, Latner Rpt. ¶ 385.

> **RESPONSE TO NO. 322.**    Undisputed that Syngenta worked with Dr. Raybould to publish this peer-reviewed paper, but disputed that Syngenta is listed as an author on the paper.

323.    In December, 2014, the Ministry of Agriculture granted import approval of MIR162.  Pretrial Order, ECF No. 2848, Stipulation No. 37.

> **RESPONSE TO NO. 323.**    Undisputed.

324.    In Mr. Latner's opinion and based upon his experience and knowledge of the Chinese regulatory system, a company that wants to expedite Chinese import approval would not simultaneously seek cultivation approval because there is a risk that simultaneous cultivation and import approval ultimately would delay import approval.  Ex. 27, Latner Rpt. ¶ 390.

> **RESPONSE TO NO. 324.**    Undisputed that Mr. Latner purports to offer this opinion, which Syngenta disputes both for its validity and its admissibility.  Contrary to Plaintiffs' assertion, evidence in the record indicates that beginning the process for cultivation approval has no impact on the import application.  *See* Ex. 361

(3/23/2016 Y. Zhang. Dep. Tr. 491:3-14) ("First of all, I don't think that the cultivation application for 162 would impact the import approval application."); Syngenta's MSJ Ex. 5 (P. Shull Expert Rep. ¶ 131).

325.   Syngenta sought cultivation approval of MIR162 in China at the same time it was seeking import approval. Ex. 69, Lee Vol. II at 396:14-399:14; Ex. 179 (Dep. Ex. 114); Ex. 31, Huber Vol. II at 607:15-608:2; Ex. 180 (Dep. Ex. 552).

**RESPONSE TO NO. 325.**      Disputed and unsupported by the evidence cited.  Plaintiffs' cited evidence fails to support the asserted fact.  Pls.' Opp'n Ex. 179 (S. Huber Dep. Ex. 114) and Pls.' Opp'n Ex. 180 (C. Lee Dep. Ex. 552) both show that, like other companies did with their traits, Syngenta took initial steps regarding the cultivation approval process in China for MIR162 and a triple stack containing MIR162 by conducting initial field trials in China with the permission of the Chinese government and local Chinese provinces. However, Syngenta never submitted a final cultivation approval dossier for MIR162 or the triple stack containing MIR162, and none of those documents suggest it did. The deposition testimony at Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 607:15-608:2) does not provide additional support for Plaintiffs' assertion because it merely contains testimony seeking to authenticate Plaintiffs' Exhibit 179 (Deposition Exhibit 114).   Syngenta does not dispute that Chuck Lee testified: "Syngenta applied for cultivation approval of I believe all the

traits we have sold in China -- or sold in China, applied for in

China, so like BT11, we'd applied for cultivation approval,

Viptera, we applied for cultivation approval, etcetera. I didn't

know that. I wasn't the Asia Pacific corn guy, so I didn't realize

that 'til later on, that that was -- that was done as a standard

operating procedure."  Pls.' Opp'n Ex. 69 (3/9/2016 C. Lee Dep.

Tr. 397:9-16).

326.   Syngenta's purpose in seeking cultivation approval was to enter the Chinese market
to sell its genetically modified corn seed in China. Ex. 181, Deposition of Ponsi Trivisvavet
Vol. I ("Trivisvavet Vol. I") at 106:1-12, 138:5-20.

**RESPONSE TO NO. 326.**      Disputed and unsupported by the

evidence cited.  Pls.' Opp'n Ex. 181 (P. Trivisvavet Dep. Tr.

106:1-12) does not discuss Syngenta's "purpose in seeking

cultivation approval."   Ms. Trivisvavet clearly testified that:

"Cultivation approval in China would mean that once you get

approval, you can sell GM traited seeds in China, grown in China,

planted in China."   Ms. Trivisvavet did not testify about

Syngenta's purpose in this excerpt.  The same is true for the

testimony cited in *id.* at 138:5-20, where Ms. Trivisvavet

describes that "we were *planning to apply* for cultivation for corn

in China in order to sell seeds, not grain, seeds in China."

(emphasis added).  Nowhere does the cited testimony describes

Syngenta's "purpose" in taking initial steps regarding the

cultivation approval process.

327.   Syngenta was concerned that it did not have enough resources and people to properly handle the numerous regulatory approvals being sought in China. Ex. 182 (Dep. Ex. 742) at SYNG_00457160; Ex. 354, Y. Zhang Vol. III at 468:20-470:24; Ex. 183 (Dep. Ex. 1575); Ex. 181, Trivisvavet Vol. I at 185:11-186:2.

<u>**RESPONSE TO NO. 327.**</u>   Disputed and unsupported by the evidence cited.  Plaintiffs cited evidence does not show Syngenta "was concerned," nor does it show Syngenta "did not have enough resources and people to properly handle the numerous regulatory approvals being sought in China."  For example, Pls.' Opp'n Ex. 182 (Y. Zhang Dep. Ex. 742, at SYNG_00457160) contains a bullet point which states: "we need additional person in the team asap," but that does not support Plaintiffs' assertion that Syngenta "did not have enough resources and people."  Similarly, Syngenta does not dispute that Pls.' Opp'n Ex. 183 (P. Trivisvavet Dep. Ex. 1575) contains a statement by Dr. Zhang that "we don't have resources (people power) now to handle all these things," but once again, that has no bearing on whether Syngenta had "*enough* resources and people."  The deposition testimony in Pls.' Opp'n Ex. 354 (Y. Zhang Dep. Tr. 468:20-470:24) and Pls.' Opp'n Ex. 181 (P. Trivisvavet Dep. Tr. 185:11-186:2) provides no additional support for Plaintiffs' assertion because it merely seeks to authenticate Plaintiffs' Exhibit 182 (Deposition Exhibit 742) and Plaintiffs' Exhibit 183 (Deposition Exhibit 1575).

289

328.   Syngenta knew its cultivation application could slow down its import application. Ex 184 (Dep. Ex. 86) (internally acknowledging its cultivation application could "affect the MIR162 and 5307 import approvals."); Ex. 31, Huber Vol. II at 490:22-491:7.

**RESPONSE TO NO. 328.**   Disputed and unsupported by the evidence cited.   Nothing in Plaintiffs' cited evidence supports their assertion that Syngenta "knew" its alleged cultivation application "could slow down its import application."  Pls.' Opp'n Ex. 184 (S. Huber Dep. Ex. 86) does not reference what Syngenta "knew," nor does it even reference the possibility that cultivation applications could "slow down" import applications.  Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 490:22-491:7) also provides no support because it only seeks to authenticate Plaintiffs' Exhibit 184 (Deposition Exhibit 86).

329.   After starting the cultivation application process in 2010 and continuing that process for three years, Syngenta suspended its cultivation applications in November 2013 (when the first rejections of U.S. corn shipments occurred), "to avoid potential impact on MIR162 import approval." Ex. 179 (Dep. Ex. 114); Ex. 181, Trivisvavet Vol. I at 138:5-140:25.

**RESPONSE TO NO. 329.**   Disputed and unsupported by the evidence cited.   Syngenta does not dispute that it withdrew its cultivation application for MIR162 in China in November 2013, however Syngenta disputes that Plaintiffs' cited evidence demonstrates that Syngenta withdrew its cultivation file with the rejections of U.S. corn shipments in November 2013 "to avoid potential impact on MIR162 import approval."  For example, Plaintiffs' citation to Pls.' Opp'n Ex. 181 (P. Trivisvavet Dep. Tr.

138:5-140:25) does not discuss the withdrawal of cultivation files and thus does not support Plaintiffs' assertion.   Similarly, the author of Pls.' Opp'n Ex. 179 (Deposition Exhibit 114) testified that: "I remember I drafted this.   I was saying I don't think that the -- I don't believe the 162 cultivation submission will have impact on the import submission. If we did believe it, we should have withdrawn at an early time. We wouldn't have waited until 2013 to make the withdrawal."   Ex. 361 (3/23/2016 Y. Zhang. Dep. Tr. 491:16-492:2).

330.   When called on the issue, Syngenta falsely told members of the grain trade that it had never sought MIR162 cultivation approval.   Ex. 69, Lee Vol. II at 396:14-397:20.

RESPONSE TO NO. 330.      Disputed and unsupported by the evidence cited.      Nothing in Plaintiffs' cited testimony demonstrates that Syngenta as a company made false statements to unspecified "members of the grain trade" that it "never sought MIR162 cultivation approval."      Plaintiffs cite deposition testimony from Chuck Lee that he told Cargill's Randal Giroux: "I didn't think we'd applied for cultivation approval in China." Pls.' Opp'n Ex. 69 (3/9/2016 C. Lee Dep. Tr. 397:17-20).     As explained above, Syngenta took initial steps regarding the cultivation approval process in China for MIR162 and a triple stack containing MIR162 by conducting initial field trials in China with the permission of the Chinese government and local Chinese provinces. However, Syngenta never submitted a final

291

cultivation approval dossier for MIR162 or the triple stack
containing MIR162.  Mr. Lee testified that at the time he made
this statement he did not know that Syngenta had taken initial
steps regarding cultivation approval.  *Id.* at 397:2-5.  Thus, any
assertion that Mr. Lee's statement was false is incorrect.

331.   Lee stated in a May 30, 2014 email: "[W]e did seek commercial cultivation.  This is
going to be very difficult to manage with the grain trade if they can confirm it."  Ex. 185
(Dep. Ex. 1560) at SYNG_00241420; Ex. 199, Adelman Vol. II at 671:6-672:6.

**RESPONSE TO NO. 331.**      Undisputed.    Syngenta does not
dispute that a May 30, 2014 email from Chuck Lee contains the
quoted language, but Plaintiffs' quoted language cuts off the first
sentence of Mr. Lee's email.   Mr. Lee stated: "I think the
comments below show we did seek commercial cultivation. This
is going to be very difficult to manage with the grain trade if they
can confirm it."  Pls.' Opp'n Ex. 185 (J. Adelman Dep. Ex. 1560,
at SYNG_00241420).

332.   Grain trade members have testified, it is "unheard of" for seed developers to apply for
cultivation approval in China and that such a cultivation application would have impacted all
of the represented timelines for import approval."   Ex. 186, Giroux 30b6 Vol. II at
606:19-610:18.

**RESPONSE TO NO. 332.**      Disputed and unsupported by the
evidence cited.  Syngenta does not dispute that Cargill's Randal
Giroux testified that: "It's not customary for any of the
technology owners to apply for cultivation approval in China. In
fact, it's unheard of, so it wouldn't even be a question that we
would think about all applications to China were strictly for food

292

and feed import approvals, and we had heard of nobody up until this point, that nobody had applied for cultivation approval aside from Chinese companies, inside of China, so we never would have asked." Pls.' Opp'n Ex. 186 (5/17/2016 R. Giroux Dep. Tr. 607:14-24).  Similarly, Syngenta does not dispute that Mr. Giroux testified: "And so, you know, adding in a cultivation approval adds a whole different good group of scientists at the Chinese level in term so of [sic] under -- looking at the application. It complicates the food and safety approval, and so, we would -- we would not have have relied, if at all, on this 24-month window had we known that they applied for a cultivation approval." *Id.* at 608:10-18.   However Mr. Giroux's testimony does not support Plaintiffs' assertion that "cultivation application would have impacted *all* of the represented timelines for import approval." Mr. Giroux's testimony is contradicted by evidence in the record indicating that it has been routine for multinational biotech companies to submit separate applications to China for both cultivation and import approvals for corn and other crops. *See* Ex. 397 (China submission update slides, at SYNG_00353536) ("There were 13 cultivation submission on last November 1, one is from Syngenta and rest of them from Monsanto and Pioneer, all of them were rejected on March 5, 2010. There were 7 cultivation submission on March 1, 2010, Two from Syngenta and 5 from

Monsanto, all of them were rejected on May 18."); *see also* Syngenta's MSJ Ex. 5 (Shull Expert Rep. ¶¶ 132-134). Mr. Giroux's testimony is also contradicted by evidence in the record indicating that an application for cultivation approval is a separate and independent application from an application for import approval and thus has no impact on the timelines for import approval. *See, e.g.*, Ex. 398 (J. Huang Dep. Tr. 64:6-13).

333.    Syngenta competitors timely obtained Chinese import approval for their traits. For example, Monsanto was successful in obtaining approval of new traits from 58 days to 207 days after the submission of a complete application.    Ex. 187 (Dep. Ex. 955) at SYNG_00355446; Ex. 294, Hull Vol. II at 494:4-23.

**RESPONSE TO NO. 333.**    Disputed and unsupported by the evidence cited.  Plaintiffs cited document fails to support their assertion in this paragraph.  Pls.' Opp'n Ex. 187 (S. Hull Dep. Ex. 955, at SYNG_00355446) appears to be a table compiling submission and approval dates for various GM traits.  Nothing in this document verifies that these are the *actual* submission and approval dates for each trait.  On its face, this document also does not confirm that Monsanto's approvals were "timely."  Because this document does not list any information for other biotechnology companies, it also does not support Plaintiffs' assertion that other competitors "timely obtained Chinese import approval for their traits."  Pls.' Opp'n Ex. 294 (S. Hull Dep. Tr. 494:4-23) does not independently support Plaintiffs' assertion

because it merely contains testimony seeking to authenticate

Plaintiffs' Exhibit 187 (Deposition Exhibit 955).

334.    After reviewing an internal spreadsheet that described Syngenta's approval timelines versus Monsanto's, Charles Lee concluded that "it appears Monsanto is better a[t] getting import approval in China on recent traits vs Syngenta." Ex. 188 (Dep. Ex. 106); Ex. 31, Huber Vol. II at 576:14-24; Ex. 187 (Dep. Ex. 955 at SYNG_00355445).

**RESPONSE TO NO. 334.**    Disputed and unsupported by the

evidence cited.  Syngenta does not dispute that a May 14, 2014

email from Chuck Lee contains the quoted language, but

Plaintiffs' quoted language cuts off the first sentence of Mr. Lee's

email.  Mr. Lee actually stated: "I don't see a real clear pattern

here other than it appears Monsanto is better and getting import

approval in China on recent traits vs Syngenta."  Pls.' Opp'n Ex.

188 (S. Huber Dep. Ex. 106); Pls.' Opp'n Ex. 187 (S. Hull Dep.

Ex. 955, at SYNG_00355445).    Syngenta disputes the

admissibility of Pls.' Opp'n Ex. 188 (S, Huber Dep. Ex. 106)

because it is missing an attachment and is obviously incomplete.

Nothing in this document suggests Mr. Lee "concluded" anything,

nor does it confirm that Mr. Lee wrote this statement "after

reviewing" the attached internal spreadsheet.  Pls.' Opp'n Ex. 31

(1/28/2016 S. Huber Dep. Tr. 576:14-24) does not independently

support Plaintiffs' assertion because it merely contains testimony

seeking to authenticate Plaintiffs' Exhibit 188 (Deposition Exhibit

106). Thus, Plaintiffs have failed to support their assertion.

335.   Andrew McConville, Syngenta's Head of Corporate Affairs for the Asia-Pacific region, stated that "[i]t is worth noting that the informal feedback we received some months ago is that our dossier was simply not up to the standards of [Monsanto]." Ex. 31, Huber Vol. II at 548:12-20; Ex. 170 (Dep. Ex. 96) (October 9, 2013 email).

**RESPONSE TO NO. 335.**   Undisputed.

336.   Eddie Zhu, after being hired away from Monsanto by Syngenta, noted: "Science has become the weakest link [for Syngenta] in the entire process which it shouldn't be." Ex. 189 (Dep. Ex. 108) at SYNG_00421396; Ex. 31, Huber Vol. II at 578:22-579:5.

**RESPONSE TO NO. 336.**   Disputed and unsupported by the evidence cited. Syngenta does not dispute that a June 10, 2014 email from Eddie Zhu states: "Science has become the weakest link in the entire process which it shouldn't be." Pls.' Opp'n Ex. 189 (S. Huber Dep. Ex. 108, at SYNG_00421396). Syngenta disputes Plaintiffs' insertion of "[for Syngenta]" into the quoted language, as nothing in the email supports that addition. The cited document also does not support the assertion that Mr. Zhu wrote this email "after being hired away from Monsanto by Syngenta." Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 578:22-579:5) does not independently support Plaintiffs' assertion because it merely contains testimony seeking to authenticate Plaintiffs' Exhibit 189 (Deposition Exhibit 108). Thus, Plaintiffs assertion is unsupported by the document they cite.

337.   Syngenta compared its application process with Monsanto's, which had its application approved "at first sitting," Andrew McConville stated: "This worries me in that it would seem we have an issue around the quality of our dossiers—exactly the problem we had in China although vehemently denied by [regulatory affairs] but confirmed by Eddie [Zhu] and subsequent government consultants." Ex. 190 (Dep. Ex. 105); Ex. 31, Huber Vol. II at 573:11-24 (confirming that Eddie Zhu, Head of Regulatory Affairs for Corn at Syngenta, said "bad things about the quality of [Syngenta's] dossiers").

296

**RESPONSE TO NO. 337.**       Disputed and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 190 (S. Huber Dep. Ex. 105) contains the quoted language, but disputes that "Syngenta" as a company "compared its application process with Monsanto's" and that Monsanto actually had an unspecified application "approved at first sitting." Nothing in this email supports those assertions. Plaintiffs' citation to Pls.' Opp'n Ex. 31 (1/28/2016 S. Huber Dep. Tr. 573:11-24) also does not support their assertions in this paragraph because Mr. Huber did not "confirm that Eddie Zhu said bad things about the quality of Syngenta's dossiers" in this excerpt. Instead, Mr. Huber stated that he believed "Lisa might have mentioned something to me one time about Eddie saying bad things about the quality of the dossiers." This statement does not "confirm" Mr. Zhu actually said anything. Thus, Plaintiffs' assertion is unsupported by the materials they cite.

338.   Syngenta internally recognized its dossiers did not meet China's requirements. Ex. 191 (Dep. Ex. 774); Ex. 362, McConville Vol. II at 332:23-333:7; Ex. 174 (Dep. Ex. 775); Ex. 362, McConville Vol. II at 334:8-14.

**RESPONSE TO NO. 338.**       Disputed and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 191 (A. McConville Dep. Ex. 774) contains a May 19, 2014 email from Andrew McConville that states: "This worries me in that it would seem we have an issue around the quality of our dossiers."

However, Mr. McConville's statement was not made on behalf of Syngenta nor does it reference "China's requirements," and thus does not support Plaintiffs' assertion in this paragraph. Similarly, Pls.' Opp'n Ex. 174 (A. McConville Dep. Ex. 775) makes no reference to whether Syngenta's dossiers did or did not "meet China's requirements," and instead only shows Syngenta wanted its dossiers to be "of the highest possible quality." The testimony contained in Pls.' Opp'n Ex. 362 (A. McConville Dep. Tr. 332:23-333:7, 334:8-14) also does not support Plaintiffs' assertion because it merely seeks to authenticate Plaintiffs' Exhibit 191 (Deposition Exhibit 774) and Plaintiffs' Exhibit 174 (Deposition Exhibit 775).

339.    Syngenta has acknowledged staffing turnover in its regulatory affairs department and that new individuals who joined the department were not experienced in seeking Chinese approval of new GMO traits. *See infra* SOAF ¶¶ 340-341.

**RESPONSE TO NO. 339.**        Disputed and unsupported by the evidence cited. Plaintiffs' assertion in this paragraph is not a fact in evidence but rather counsel's argument. Plaintiffs improperly rely on an unfocused citation to other paragraphs of their own Statement of Additional Facts instead of properly controverting Defendants' statements. *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert

one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

As explained in further detail below, Syngenta disputes some of the purported facts asserted in Opp'n SOAF ¶¶ 340-341 because they are unsupported by the evidence Plaintiffs cite.  In addition to the issues raised in response to Opp'n SOAF ¶¶ 340-341, there is no indication based on the evidence cited in these paragraphs that Syngenta as a company "acknowledged staffing turnover in its regulatory affairs department" or that "new individuals who joined the department were not experienced in seeking Chinese approval of new GMO traits."

340.   In 2010, Yongsheng Zhang joined Syngenta's regulatory affairs department from Syngenta's "collaboration" department. Ex. 145, Y. Zhang Vol. I at 33:1-35:17.   In the collaboration department, Zhang's "job responsibility at the time was to look for, in the Asia-Pacific area, particularly in China, to look for research projects that academic institutions, including universities and some research institutions, the research projects they were working on, and try to find which ones the company would be interested in, and then we would try to build a, a connection and collaboration.  Also we manage this type of collaboration."  Ex. 145, Y. Zhang Vol. I at 33:2-11.

**RESPONSE TO NO. 340.**   Undisputed.

341.   Prior to joining the regulatory affairs department, Zhang had never had direct responsibility for seeking regulatory approval for a genetically modified trait. *Id*. at 34:22-35:2.

**RESPONSE TO NO. 341.**   Disputed and unsupported by the evidence cited.   Plaintiffs misquote the cited testimony.

Dr. Zhang was asked: "Did you have any direct responsibility for seeking *Chinese* regulatory approval for a GMO trait prior to 2010?"  In response, Dr. Zhang answered "No."  However, this does not mean Dr. Zhang had never had direct responsibility for seeking regulatory approvals more generally.  *See* Pls.' Opp'n Ex. 145 (Y. Zhang Dep. Tr. 34:22-35:2).  Indeed, he testified that "when I was in the university, when we work on transgenic experiments, sometimes we also need the approval, so it is possible that I may have helped to prepare for the application at some time." *Id.* at 35:3-12.

342.   By 2011, Zhang had become the head of regulatory affairs in China for Syngenta. *Id.* at 62:2-7.

**RESPONSE TO NO. 342.**   Undisputed that Dr. Zhang was the head of China regulatory affairs in 2011 and has held this position since 2011.

343.   From 2010 to 2012, other than Zhang, the entire regulatory affairs team in China left Syngenta. *Id.* at 63:9-14.

**RESPONSE TO NO. 343.**   Undisputed that the only member of the Syngenta regulatory affairs team who was working in China in 2010 that was still working there in 2012 was Dr. Zhang.

344.   In the summer of 2011, the first Viptera seeds were planted in the U.S. and set for harvest. *See supra* SOAF ¶¶ 27-28.

**RESPONSE TO NO. 344.**   Disputed and unsupported by the evidence cited.  Plaintiffs' assertion in this paragraph contradicts their assertion in Opp'n SOAF ¶ 27 that "the first commercial

planting in the U.S. [occurred] in April 2011," and thus Plaintiffs' assertion is unsupported by the evidence they cite.   Plaintiffs' reliance on other paragraphs of their own Statement of Additional Facts is also improper. *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted."). As explained in further detail above, Syngenta disputes some of the purported factual assertions in Opp'n SOAF ¶¶ 27-28.   In any event, Syngenta reiterates that Plaintiffs' assertion in this paragraph contradicts their assertion in Opp'n SOAF ¶ 27 that "the first commercial planting in the U.S. [occurred] in April 2011." Nevertheless, Syngenta disputes this statement because the first commercial planting of Viptera in the United States occurred in April 2011, and not "the summer of 2011." *See* Syngenta's MSJ SOF ¶ 11.

301

345.    The Agrisure RW launch experience in 2007 taught Syngenta that as harvest approached, grain elevators were likely to put up signs refusing to accept Viptera based upon its lack of approval in export markets, and that would hurt sales.  *See* Ex. 192 (Dep. Ex. 638) at SYT00253354 ("When signs are erected, there is likely to be confusion in the market, as well as media inquiries.   If Syngenta efforts to communicate effectively to farmers are unsuccessful, *seed sales could be affected*.") (emphasis added); Ex. 50, Wheeler Vol. I at 122:2-13; *see also* Ex. 64 (Dep. Ex. 1040) (Syngenta's Head of Technology Acceptance, noted  the  explosive growth of the Chinese demand for U.S. corn and then wrote, "I think [Syngenta's] Chuck [Lee] just want[s] to make sure you understood the risk to our business should the grain trade all of a sudden put up signs saying they will not take Agrisure Viptera because it is not approved in China."); Ex. 6, Bernens Vol. I at 347:6-15.

<u>**RESPONSE TO NO. 345.**</u>        Disputed  and  unsupported  by  the

evidence cited.  The cited evidence does not support Plaintiffs'

assertions in this paragraph.  Pls.' Opp'n Ex. 192 (J. Wheeler

Dep. Ex. 638, at SYT00253354) does not reference the "Agrisure

RW launch experience in 2007" or any "teachings" from it, nor

does it suggest that "as harvest approached, grain elevators were

likely to put up signs refusing to accept Viptera" due to lack of

approval in unspecified "export markets."   The document also

does  not  say  signs  would  "hurt  sales."   Instead,  it  states  that

"[w]hen signs are erected, there is likely to be confusion in the

market, as well as media inquiries."  Similarly, Pls.' Opp'n Ex. 64

(J. Bernens Dep. Ex. 1040) does not reference Agrisure RW or

any  "teachings"  from  it,  nor  does  Syngenta's  Jack  Bernens

discuss "the explosive growth of the Chinese demand for U.S.

corn."   Instead, Mr. Bernens relays statistics on China's whole

corn and DDGS imports to Ponsi Trivisvavet.  These numbers do

not  support  Plaintiffs'  assertion  of  "explosive  growth."

Mr. Bernens' email also does not discuss the whether it was "likely" that grain elevators would "put up signs refusing to accept Viptera based upon its lack of approval in export markets." Indeed, he states in this email: "I am not sure I can put a probability on that happening?" Moreover, the testimony contained in Pls.' Opp'n Ex. 50 (J. Wheeler Dep. Tr. 122:2-13) and Pls.' Opp'n Ex. 6 (J. Bernens Dep. Tr. 347:6-15) merely seek to authenticate Plaintiffs' Exhibit 192 (Deposition Exhibit 638) and Plaintiffs' Exhibit 64 (Deposition Exhibit 1040), respectively, and thus do not independently support Plaintiffs' assertions.

346.    On July 1, 2011, a Consolidated Grain and Barge-owned elevator sent an email to farmers that said, "Due to new Chinese restrictions, CGB-Mt. Vernon will no longer be able to dump any corn with the Syngenta trait, Agrisure Viptera 3111.  This will be effective for harvest 2011." Ex. 248 (Dep.  Ex. 1051) at SYNG_00222917; Ex. 57, Bernens Vol. II at 452:4-23.

**RESPONSE TO NO. 346.**        Undisputed.

347.    Jack Bernens forwarded this email to other Syngenta executives, adding, "[t]he signs are starting to go up!" Ex. 248 (Dep.  Ex. 1051).

**RESPONSE TO NO. 347.**    Undisputed.

348.    In response to this news, Syngenta developed an action plan to "[s]end our Chinese folks into the USGC representatives in China [to] update them on where the status of the field trials and the expected timing to see if they can help reassure their members in the US that approval will happen in time for the 2011 harvest." *Id.* at SYNG_00222916.

**RESPONSE TO NO. 348.**        Disputed, vague, and unsupported by the evidence cited.  Plaintiffs' reference to "this news" is vague because it fails to specify what the news is.  Syngenta does not dispute that Pls.' Opp'n Ex. 248 (J. Bernens Dep. Ex. 1051, at SYNG_00222916) reflects the quoted language, but disputes that

303

this statement is attributable to Syngenta as a company because the e-mail was only authored by a single individual (Sarah Hull). Plaintiffs also mischaracterize Ms. Hull's statement in this document as "developing an action plan" "in response to" vague and unspecified news. Nothing in Ms. Hull's email supports those assertions.

349.   Syngenta had no basis to predict approval by "2011 harvest" and was simply trying to protect sales of Viptera. *See supra ¶¶* 249-343.

**RESPONSE TO NO. 349.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs' assertion in this paragraph is not a fact in evidence but rather counsel's argument.   Plaintiffs improperly rely on an unfocused citation to over 30 paragraphs of their own Statement of Additional Facts instead of properly controverting Defendants' statements.  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with

particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

As explained in further detail above, Syngenta disputes almost all of the purported facts asserted in Opp'n SOAF ¶¶ 249-343 because they are unsupported by the evidence Plaintiffs cite. In addition to the issues raised in response to Opp'n SOAF ¶¶ 249-343, there is no indication based on the evidence cited in these paragraphs that "Syngenta had no basis to predict approval by 2011 harvest" or that "Syngenta was simply trying to protect sales of Viptera." In any event, neither of these assertions are material to Syngenta's arguments for summary judgment because Syngenta does not argue it predicted approval "by 2011 harvest" but rather by "March 2012."

350. Syngenta's Lee characterized CGB's decision to not accept Viptera as "causing massive disruption to our entire seed franchise and costing us significant financial damage." Ex. 194 (Dep. Ex. 534) at SYT00307022; Ex. 69, Lee Vol. II at 312:5-13.

**RESPONSE TO NO. 350.** Disputed and unsupported by the evidence cited. Syngenta does not dispute that the quoted language is reflected in Pls.' Opp'n Ex. 194 (C. Lee Dep. Ex. 534, at SYT00307022), but disputes Plaintiffs' assertion to the extent it assumes Mr. Lee was "characterizing CGB's decision to not accept Viptera" in his email. As Mr. Lee testified, the first email in this document is about Afla-Guard, "a biological product that protects corn from mycotoxins." Pls.' Opp'n Ex. 69 (3/9/2016 C. Lee Dep. Tr. 312:12-13). It is not clear from the email that Mr. Lee was referring solely to "CGB's decision to not accept

305

Viptera" when formulating this response.    Thus, Plaintiffs'

assertion is unsupported by the evidence they cite.

351.    On July 5, 2011, Syngenta's Sarah Hull noted, "We get daily questions from the other grain traders about the China and EU (Brazil trade) approvals.  I think they will wait until a bit closer to harvest time to determine their actions.  *Most important is that we get them comfortable that the approval is close so they don't not only tell farmers not to bring their 162 varieties to them but also not to buy the varieties for planting next year*." Ex. 195 (Dep. Ex. 931) at SYNG_00273594 (emphasis added); Ex. 26, Hull Vol. I at 295:4-9.

**RESPONSE TO NO. 351.**    Undisputed.

352.    Bunge North America, Inc. ("Bunge"), another key member of the grain trade, also erected signs in July 2011 announcing to farmers that it would not accept Viptera at its elevators.  Bunge erected the signs because Bunge "had sold millions of dollars worth of corn to China in the spring of 2011 for delivery between September 2011 and January 2012." *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.,* 820 F. Supp. 2d 953, 961 (N.D. Iowa 2011) (noting evidence on this point "undisputed.").

**RESPONSE TO NO. 352.**    Disputed and unsupported by the evidence cited.  Syngenta does not dispute that the court's order states: "There is also undisputed evidence that Bunge had sold millions of dollars worth of corn to China in the spring of 2011 for delivery between September 2011 and January 2012." *Syngenta Seeds, Inc. v. Bunge N. Am., Inc.,* 820 F. Supp. 2d 953, 961 (N.D. Iowa 2011).  The court's order does *not* state that Bunge is a "key member of the grain trade," or that Bunge erected those signs *because* it had outstanding sales of corn to China. Thus, Plaintiffs have failed to provide sufficient evidence to support their assertions in this paragraph.

353.    Syngenta's David Morgan was concerned that Bunge's action would scare farmers away from purchasing Viptera for the 2012 growing season.  Ex. 196 (Dep. Ex. 1873) at SYT00145120 (noting that Bunge's decision was "really disruptive to growers who have

306

planted in 2011, *let alone the effect for 2012*.") (emphasis added); Ex. 363, Deposition of Rex Martin Vol. I ("R. Martin Vol. I") at 159:12-24.

**RESPONSE TO NO. 353.**    Disputed and unsupported by the evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex. 196 (R. Martin Dep. Ex. 1873, at SYT00145120) contains an email from David Morgan which states: "Bunge put up 'no Viptera' signs today. This is really disruptive to growers who have planted in 2011, let alone the effect for 2012."  However, this email does not establish that David Morgan "was concerned" or that Mr. Morgan was "concerned that Bunge's action would scare farmers away from purchasing Viptera for the 2012 growing season."  The same is true for the testimony in Pls.' Opp'n Ex. 363 (R. Martin Dep. Tr. 159:12-24), which merely seeks to authenticate Plaintiffs' Exhibit 196 (Deposition Exhibit 1873). Thus, Plaintiffs have failed to provide sufficient support for this assertion.

354.  Syngenta's Chief Operating Officer, Davor Pisk, acknowledged that in the summer of 2011, Syngenta's sales force was concerned about "the policies of the grain trade, the fact that some elevators were putting up signs not to accept Viptera, and that that would have an impact" on their ability to sell Viptera for the 2012 growing season.  Ex. 197, Deposition of Davor Pisk Vol. II ("Pisk Vol. II") at 331:21-333:25.

**RESPONSE TO NO. 354.**    Undisputed.

355.  Syngenta's Product Lead for Commercial Traits, Jill Wheeler, also admitted that the grain trade's actions and the general uncertainty regarding approval of MIR162 was making it difficult for her sales team to sell Viptera. Ex. 50, Wheeler Vol. I at 203:17-206:2 ("One of the concerns that we talked about was negative impacts on the [seed sales] business."); *id.* at 295:25-296:16 ("I would agree that anything that is a problem for customers can lead to reduced sales.").

307

**RESPONSE TO NO. 355.**       Disputed, vague, and unsupported by the evidence cited.  Plaintiffs' assertion is vague as to timeframe and does not specifically state when the "grain trade's actions" took place, what those "actions" were, or when "general uncertainty regarding approval" existed.   Plaintiffs' cited testimony also does not provide sufficient support for their assertions.  Syngenta does not dispute that when asked whether her team "was focusing on whether [they] might lose seed sales," Ms. Wheeler testified: "One of the concerns that [my team] talked about was negative impacts on the business."  Pls.' Opp'n Ex. 50 (J. Wheeler Dep. Tr. 204:16-17).  Syngenta also does not dispute that Ms. Wheeler stated "I would agree that anything that is a problem for customers can lead to reduced sales."  *Id.* 296:10-16. However neither of these two statements references the grain trade's vague "actions" or the "general uncertainty regarding approval of MIR162."  Moreover, Ms. Wheeler did not testify that these actions or uncertainty were "making it difficult for her sales team to sell Viptera."  Thus, Plaintiffs' assertion is unsupported by the evidence they cite.

356.    After receiving complaints from farmers about the rejection of their harvested corn by elevators, the Syngenta sales team noted: "this needs to get resolved quick or we will pay the price with lost sales." Ex. 392 (Dep. Ex. 716) at SYT00006004; Ex. 259, Deposition of Jill Wheeler Vol. II (Wheeler Vol. II) at 578:24-579:8.

**RESPONSE TO NO. 356.**       Disputed  and  unsupported  by  the evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex.

392 (J. Wheeler Dep. Ex. 716, at SYT00006004) contains an email from Syngenta's Al Borth reflecting the quoted language. However, Mr. Borth's email was not in response to a complaint from a farmer whose harvested corn was *rejected* by an elevator. Instead the grower in this email noted that he could deliver his corn to Cargill or ADM in Hennepin. *Id.* at SYT00006005. The cited deposition testimony also does not support Plaintiffs' assertion because it merely seeks to authenticate Plaintiffs' Exhibit 392 (Deposition Exhibit 716). Pls.' Opp'n Ex. 259 (J. Wheeler Dep. Tr. 578:24-579:8). Thus, the cited evidence does not establish that Syngenta "received complaints" from multiple farmers "about the rejection of their harvested corn by elevators," or that the "Syngenta sales team" noted anything.

357. Syngenta estimated $810 million in losses if the grain trade refused to accept Viptera. Ex. 198 (Dep. Ex. 1533) at SYNG_00692438; Ex. 201 Deposition of Jessica Adelman Vol. I (Adelman Vol. I) at 340:8-19; Ex. 199 Deposition of Jessica Adelman Vol. II (Adelman Vol. II) at 438:16-439:16 ("So I think we've established that Syngenta didn't like the signs, they wanted them to come down, because they felt like the signs deterred farmers from buying seed, and as a business, Syngenta wanted to sell seed.").

**RESPONSE TO NO. 357.** Disputed, inadmissible, and unsupported by the evidence cited. Syngenta disputes the admissibility of Pls.' Opp'n Ex. 198 (J. Adelman Dep. Ex. 1533), which the cover email suggests is a draft. In any event, Plaintiffs misquote that document at SYNG_00692438, which does not show that "Syngenta estimated $810 million in losses if the grain trade refused to accept Viptera." Instead, that particular slide

illustrates a "Decision tree - illustrative link to damages assessment" which shows a "potential range of NPV Impact" from $810 million to $10 million.  The testimony at Pls.' Opp'n Ex. 201 (J. Adelman Dep. Tr. 340:8-19) also does not support Plaintiffs' assertion because it merely seeks to authenticate Plaintiffs' Exhibit 198 (Deposition Exhibit 1533).  The same is true for the testimony at Pls.' Opp'n Ex. 199 (J. Adelman Dep. Tr. 438:16-439:16), which has no bearing on what Plaintiffs' claim are the estimated losses "if the grain trade refused to accept Viptera."

358.   When Syngenta read media reports of grain handlers like Bunge refusing to accept MIR162 corn, Syngenta's Dennis Ward replied: "F them!!![] Let those pigs and cows starve . . . ." Ex. 348 (Dep. Ex. 344).

**RESPONSE TO NO. 358.**   Disputed and unsupported by the evidence cited.  Syngenta does not dispute that the email from a single Syngenta employee, Dennis Ward, reflects the quoted language, but disputes Plaintiffs' assertion that *Syngenta* "read media reports of grain handlers like Bunge refusing to accept MIR162 corn."  The news article titled "Bunge and Continental Grain Refuse Syngenta Agrisure Viptera Hybrids - NK, Golden Harvest, Garst," was only circulated to certain individuals within Syngenta, not the entire company.

359.   On July 10, 2011, Syngenta CEO Michael Mack sent an email to certain Syngenta executives with the subject line, "CONFIDENTIAL: Bunge/162/Playing Offense."  Ex.  200 (Dep. Ex. 936); Ex. 26, Hull Vol. I at 325:16-329:19; Ex. 306 (Dep. Ex. 1810); Ex. 25, Mack Vol. I at 252:2-8.

**RESPONSE TO NO. 359.**   Undisputed.

360.   Mack advocated filing suit against Bunge to "go on the offensive in a major and concerted way against their firm," and noted: "I gather that we may have the early potential for even considering a racketeering lawsuit against them."   Ex. 200 (Dep. Ex. 936) at SYNG_00636506.

> **RESPONSE TO NO. 360.**   Disputed and unsupported by the evidence cited.  Syngenta does not dispute that the email from Mr. Mack reflects the quoted language in Plaintiffs' assertion, but Plaintiffs' quoted language is incomplete and out of context. Mr. Mack stated: "*I don't for example, have any basis to imagine that they have considered what might happen if we went* on the offense, in a major and concerted away, against their firm and their corporate reputation against technology, in many of their major markets and in a broad-based way."  Pls.' Opp'n Ex. 200 (S. Hull Dep. Ex. 936, at SYNG_00636505) (emphasis added). Plaintiffs' cited language does not show Mr. Mack "advocated" for anything, let alone that he advocated "going on the offensive" or "filing suit against Bunge" in this statement.  Thus, Plaintiffs' cited evidence fails to support their assertion.

361.   Mack advocated a "no holds barred" approach to Bunge, "which is perfectly designed to make news and give them something to think about alongside our legal offering. . . . Ex. 200 (Dep. Ex. 936) at SYNG_00636506.

> **RESPONSE TO NO. 361.**   Disputed, vague, and unsupported by the evidence cited.  Plaintiffs' assertion is vague as to timeframe and does not explain *when or where* they assert Mr. Mack advocated the alleged approach to Bunge.  Syngenta does not

dispute that the email from Mr. Mack reflects the quoted language in Plaintiffs' assertion, but Plaintiffs' quoted language is incomplete and out of context.  Mr. Mack stated: "It's a 'no holds barred' *tone* which is perfectly designed to make news and give them something to think about alongside our legal offering."  Pls.' Opp'n Ex. 200 (S. Hull Dep. Ex. 936, at SYNG_00636506) (emphasis added).  Plaintiffs' cited language does not show Mr. Mack "advocated" for anything, let alone a "no holds barred *approach* to Bunge."

362.   Mack stated: "We need to give the other grain traders pause before getting on this bandwagon." Ex. 200 (Dep. Ex. 936) (emphasis added).

**RESPONSE TO NO. 362.**   Undisputed.

363.   In his email, Mack suggested that David Morgan (another Syngenta's executive) hold a press conference and answer questions as follows: "Q: Why do suppose Bunge put up the signs? A: It's a marketing stunt designed to help them sell more grain to the Chinese. Q: What do you intend to do about it? A: We have already alerted the Chinese authorities that Viptera is a broad-acre trait and has been in the market now for several years. We are working with the Chinese authorities which they know full well but have told them that virtually every single boat arriving in China will have Viptera aboard and they should be especially suspicious, indeed we have encouraged them to specifically test all Bunge ships which might be masquerading as somehow being genetically free." *Id.* at SYNG_00636505-6.

**RESPONSE TO NO. 363.**        Disputed and unsupported by the evidence cited.  Syngenta does not dispute that the email from Mr. Mack reflects the quoted language in Plaintiffs' assertion, but Plaintiffs misstate Mr. Mack's intentions in writing the quoted passage.  Mr. Mack did not "suggest" that Mr. Morgan "hold a press conference and answer questions" in a manner similar to the

Q&As in the quoted passage.  Instead, Mr. Mack hypothesized the following: "Imagine, soon, an[] interview in which has some [sic] of the following questions (Q) put to David Morgan for example…." Pls.' Opp'n Ex. 200 (S. Hull Dep. Ex. 936, at SYNG_00636505).  Plaintiffs' misconstrue Mr. Mack's speculative hypothetical statements as "suggestions," but that is entirely unsupported by the document they cite.

364.  Michael Mack said Bunge should adapt to a "new corporate reality," a "reality" that, if Syngenta executives had their way, would involve a "long term de-commoditization of [U.S.] corn" or closure of key U.S. trade flows to countries where Syngenta could not secure approval as quickly as it wanted.  *See id.*; Ex. 325 (Dep. Ex. 1718) (July 8, 2011 email from Pisk to Hull).

**RESPONSE TO NO. 364.**  Disputed, vague, and unsupported by the evidence cited.  Plaintiffs' assertion is vague as to timeframe and does not explain *when or where* they assert Mr. Mack made the alleged statements.  Pls.' Opp'n Ex. 325 (D. Pisk Dep. Ex. 1718) contains no statements made by Mr. Mack and thus does not support Plaintiffs' assertion regarding what "Michael Mack said."  Plaintiffs also misstate the contents of Pls.' Opp'n Ex. 200 (S. Hull Dep. Ex. 936).  Mr. Mack did *not* say "Bunge should adapt to a new corporate reality," he stated: "[m]y assertion is simply that we should quickly begin to assemble a gameplan that could enable either or both of these to be their new corporate reality."  Mr. Mack did not reference Syngenta executives "having their way," the "long term de-commoditization of U.S.

corn," the "closure of key U.S. trade flows," or "countries where Syngenta could not secure approval as quickly as it wanted" in this email. Plaintiffs' attempt to foist their own language upon Mr. Mack fails, as the cited document does not support *any* of Plaintiffs assertions in this paragraph.

365.   Around the same time, in July 2011, Syngenta executives considered a number of options in dealing with negative reactions to its commercialization of MIR162. One option, called "Open Challenge," had as a "pro" that farmers would be "on [Syngenta's] side as blame is projected to grain trade." Ex. 372 (Dep. Ex. 577). Another option, called "Joint Solution," had a "pro" "Blame based on China and not SYN or grain trade." *Id.*

**RESPONSE TO NO. 365.**      Disputed and unsupported by the evidence cited. Plaintiffs cite to Pls.' Opp'n Ex. 372 (C. Lee Dep. Ex. 577), a 198-page photocopy of a notebook containing handwritten notes, but fail to identify with specificity the evidence that supports their assertion. This is improper. *See Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations."). Syngenta does not dispute that the quoted language is contained within this document, but disputes Plaintiffs' blatant attempt to string together scattered notes into a self-serving narrative. Nothing from this document indicates that the notes in question are from July 2011, or that they reflect the "considerations" of "Syngenta executives" in

314

"dealing with negative reactions to its commercialization of MIR162." Thus, the cited document fails to support Plaintiffs' assertions.

366.   Syngenta's Adelman testified "the primary purpose of the lawsuit was . . . to get Bunge to remove the signs, and if that happened, then there would be minimal impact on Viptera sales." Ex. 201, Deposition of Jessica Adelman Vol. I ("Adelman Vol. I") at 354:14-355:8 ("The reason, the way I understood it, the reason Syngenta launched the lawsuit or filed the lawsuit was to get Bunge to take down their signs."), *id*. at 175:15-176:5 ("The business guys didn't like the signs, and there was a lawsuit launched, and *typically business guys like to have customers* . . . ."); Ex. 199, Adelman Vol. II at 406:17-407:6 ("So yes, Syngenta sued Bunge, and they wanted the signs to come down, and one of the reasons they wanted the signs to come down is because they wanted to sell seed."); Ex. 50, Wheeler Vol. I at 154:10-155:17 ("Q: Any you knew if the growers couldn't find markets for their Agrisure Viptera grain, they weren't going to be buying that seed next spring, didn't you? A: We knew that this could create a barrier to future sales.").

<u>**RESPONSE TO NO. 366.**</u>   Disputed and unsupported by the evidence cited.  Syngenta does not dispute that Ms. Adelman was asked the following question: "And that's in fact, what the primary purpose of the lawsuit was, right, to get Bunge to remove the signs, and if that happened, then there would be minimal impact on Viptera sales, right?"  Ms. Adelman responded: "Yeah, I think we've covered it before…The reason, the way I understood it, the reason Syngenta launched the lawsuit or filed the lawsuit was to get Bunge to take down their signs."  Pls.' Opp'n Ex. 201 (J. Adelman Dep. Tr. 354:18-355:2).   Thus, Ms. Adelman did *not* testify that "the primary purpose of the lawsuit was . . . to get Bunge to remove the signs, and if that happened, then there would be minimal impact on Viptera sales"—that quoted language is from counsel's own question.

315

367.   Syngenta followed through with Mack's plan by suing Bunge in federal court on August 22, 2011, seeking an injunction requiring Bunge to accept Viptera corn.  Ex. 202 (Dep. Ex. 1099) (Complaint); Ex. 37, Bernens Vol. III at 813:21-814:8.

> **RESPONSE TO NO. 367.**      Disputed and unsupported by the evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex. 202 (J. Bernens Dep. Ex. 1099) was filed in federal court on August 22, 2011.  However, nothing in this document suggests Syngenta was "following through" with an alleged "plan" of Mr. Mack's by filing this document.  The same is true for the deposition testimony in Pls.' Opp'n Ex. 37 (J. Bernens Dep. Tr. 813:21-814:8), which merely seeks to authenticate Plaintiffs' Exhibit 202 (Deposition Exhibit 1099). Thus, Plaintiffs' assertion is unsupported by the document they cite.

368.   Syngenta also launched a "'whisper campaign' among farmers/dealers/salesforce" against Bunge.  Ex. 203 (Dep. Ex. 1585) at SYNG_00682658; Ex. 181, Trivisvavet Vol. I at 325:25-327:17.

> **RESPONSE TO NO. 368.**      Disputed and unsupported by the evidence cited.  Plaintiffs misquote the document.  Pls.' Opp'n Ex. 203 (P. Trivisvavet Dep. Ex. 1585) is titled "Potential Media Plan" and does not describe anything that Syngenta actually "launched."  Furthermore, this document at SYNG_00682658 states "Begin a 'whisper campaign' among farmers/dealers/salesforce – grass roots type activity," but does not specify that any potential grass roots type activity would be directed "against Bunge." The same is true for the deposition

316

testimony in Pls.' Opp'n Ex. 181 (P. Trivisvavet Dep. Tr. 325:25-327:17), which merely seeks to authenticate Plaintiffs' Exhibit 203 (Deposition Exhibit 1585).  Thus, Plaintiffs' cited evidence fails to support their assertion in this paragraph.

369.   Syngenta issued a press release announcing that it was "taking this action to remove the illegal impediment Bunge imposed on growers when they announced . . . that they would not accept grain enhanced by the Agrisure Viptera™ trait." Ex. 204 (Dep. Ex. 582); Ex. 246 Deposition of Charles Lee Vol. III ("Lee Vol. III") at 591:16-25.

**RESPONSE TO NO. 369.**      Disputed and unsupported by the evidence cited.  Plaintiffs misquote the cited document.  The media release issued in Pls.' Opp'n Ex. 204 (C. Lee Dep. Ex. 582) actually states: "We are taking this action to remove the illegal impediment Bunge imposed on growers when they announced *mid-season* that they would not accept grain enhanced by the Agrisure Viptera™ trait."

370.   During the Bunge litigation, Syngenta's Charles Lee admitted there was a "real risk" that China would reject grain shipments due to the presence of unapproved genetically modified traits.  *See* Ex. 205, Charles Lee Deposition (9/7/2011) (*Bunge*) at 94-95.  Indeed, in October, 2011, Syngenta prepared an "Agrisure Viptera Contingency Communications Plan" for its public relations staff *in anticipation* of China rejecting shipments of U.S. corn based on the presence of MIR162.  Ex. 393 (Deposition Exhibit 1473) at SYNG_00842996-97 ("Shipments of corn from the 2011 harvest can now be assumed to be en route to China.  Given China's zero- tolerance policy for unapproved traits, detection of the Agrisure Viptera trait in a shipment of grain to China could result in the shipment being refused."); Ex. 291, Minehart Vol. I. at 290:13-291:24.

**RESPONSE TO NO. 370.**      Disputed and unsupported by the evidence cited.  Plaintiffs blatantly misquote Mr. Lee's testimony.  In his deposition in *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, Mr. Lee was asked: "But there's always going to be a level

of risk because it always depends upon the sampling process, where you pulled the sample?"   Mr. Lee responded: "Yeah, there's some level of risk. Correct."   Pls.' Opp'n Ex. 205 (9/7/2011 C. Lee Dep. Tr. 94:12-16).   Mr. Lee *never* said there was a "real risk" of anything.   Mr. Lee was not even testifying about the risk "that China would reject grain shipments due to the presence of unapproved genetically modified traits."   Instead, he testified that there was "some level of risk," depending on the sampling process, that a shipment has some percent of an unapproved GM trait.   Plaintiffs also misstate the purpose of Pls.' Opp'n Ex. 393 (P. Minehart Dep. Ex. 1473), an email chain attaching a document titled "Agrisure Viptera Contingency Communications Plan–positive detect in China."   Syngenta does not dispute the title of this document, but does dispute that the document was "for its public relations staff," or that the document was created "in anticipation of China rejecting shipments of U.S. corn based on the presence of MIR162."   Nothing in the cited document suggests its use was limited to Syngenta's public relations staff, and nothing suggests that Syngenta prepared this document "in anticipation" of an actual rejection.   Similarly, Plaintiffs can find no support for their false assertions in Plaintiffs' Exhibit 291, which is a copy of Dr. Colin Carter's November 15, 2016 report.   To the extent that Plaintiffs

intended to cite Ex. 219 (P. Minehart Dep. Tr. 290:13-291:24),

that too fails to support their assertions because it merely seeks to

authenticate Plaintiffs' Exhibit 393 (Deposition Exhibit 1473).

371.   The district court denied Syngenta's requested injunction.  *Syngenta Seeds, Inc.,* 820 F. Supp. 2d at 992.

**RESPONSE TO NO. 371.**   Undisputed.

372.   In 2011, ADM posted signs at its facilities stating that it would not accept grains containing GM traits that were not approved in export markets including China. According to ADM's Chris Boerm, testifying as a corporate representative for ADM, those signs did not expressly mention Viptera by name because ADM did not want to get sued. Ex. 82, Boerm Vol. II at 484:22-485:16, 492:20-493:5.

**RESPONSE TO NO. 372.**       Disputed and unsupported by the

evidence cited.  Mr. Boerm's testimony does not establish that in

2011, ADM posted signs at *all* of its facilities stating that "it

would not accept grains containing GM traits that were not

approved in export markets including China."    Mr. Boerm

repeatedly testified that he could not confirm whether every ADM

facility in fact posted these signs.  *See* Pls.' Opp'n Ex. 87 (C.

Boerm Dep. Tr. 229:10-15) ("I don't have any with me, any other

signs. I believe there were other signs"); Ex. 399 (C. Boerm Dep.

Tr. 421:2-6).   Indeed, Syngenta disputes the authenticity of the

only two examples of such signs that ADM has produced as part

of this litigation.  *See* Ex. 400 (C. Boerm Dep. Ex. 204, at tab 8).

Syngenta notes that the signs ADM purportedly posted state:

"ADM will not accept grains, oilseeds or wheat containing

transgenic events not approved for U.S. export markets; such

319

markets to include Canada, China, South Korea, the European Union, Japan, and Mexico." Notwithstanding these signs, ADM accepted grain containing Viptera and shipped it to China. *See* Syngenta's MSJ SOF ¶¶ 77, 106-107.

373.    In August 2012, Mack notified Cargill that Syngenta had sued "Bunge North America to remove an illegal impediment they established against corn technology when they posted signs in elevators attempting to block the legal merchandising of the Agrisure Viptera trait." Ex. 373 (Baudler Dep. Ex. 7).

**RESPONSE TO NO. 373.**         Disputed and unsupported by the evidence cited.   Syngenta does not dispute that the quoted language is reflected in the cited document, but Plaintiffs' quoted language is incomplete.   Mr. Mack actually  wrote to Cargill's CEO Greg Page: "I just wanted to inform you as a courtesy of a legal action we have undertaken against Bunge North America to remove an illegal impediment they established against corn technology when they posted signs in elevators attempting to block the legal merchandising of the Agrisure Viptera trait." Pls.' Opp'n Ex, 373 (D. Baudler Dep. Ex. 7, at CARGILL000073195).

374.    Randy Giroux testified that he was "very concerned" that Syngenta might sue Cargill if Cargill also put up signs to refuse Viptera. Ex. 186, Giroux 30b6 Vol. II at 575 ("We were unclear at this point what was the -- what was the catalyst for Bunge being sued but not others, and, clearly, saw it as a shot across the bow of the other grain companies, that should they put up signs that they might also get sued.").

    **RESPONSE TO NO. 374.**   Undisputed.

375.    Because the Ministry of Agriculture keeps import submission confidential, "only one party" knows the status of Syngenta's application in China, and that is Syngenta. Ex. 251, Deposition of Joseph Taets Vol. I ("Taets Vol. I") at 272:13-273:11; Ex. 244, Giroux Vol. I at 97:9-98:9 (Cargill witness noting "Syngenta had a monopoly on the information of the

status of that application" and "we relied solely on Syngenta to provide us with information on the status of their application.").

**RESPONSE TO NO. 375.**     Disputed and unsupported by the evidence cited.  Plaintiffs' cited testimony does not support their assertions.     Mr. Taets did not testify that the "Ministry of Agriculture keeps import submission confidential."   Mr. Taets's bare assertion that "only one party knows" "how the application was going in China" is contradicted by the documents and testimony of several ADM and Cargill employees who received information directly from the Ministry of Agriculture regarding the status of Syngenta's MIR162 submission, sometimes even before Syngenta.  *See* Syngenta's MSJ SOF ¶ 81.  The same is true for Mr. Giroux's testimony, the quoted portion of which does not appear anywhere in Plaintiffs' Exhibit 244.  Nevertheless, any bare assertions by Mr. Giroux that "Syngenta had a monopoly on the information of the status of that application," or that he "relied solely on Syngenta to provide us with information on the status of their application."  is belied by the testimony and documents of other Cargill employees. *See* Syngenta's MSJ SOF ¶ 81.

376.  So the grain handling and exporting industry must rely on Syngenta for information on the status of import approval applications in China.  Ex. 186, Giroux 30b6 Vol. II at 629:13-630:4 ("Syngenta has a monopoly on that information. It's their confidential business information. . . . . [W]e believed that we had a good relationship with Syngenta, that they were honest and truthful with us so that we could effectively manage our risk as a company and make good commercial decisions based on the facts, and so, of course, . . . we relied on most heavily on what we heard from Syngenta in terms of how we would manage our commercial business.").

**RESPONSE TO NO. 376.**    Disputed and unsupported by the evidence cited.  Syngenta does not dispute that Pls.' Opp'n Ex. 186 (5/17/2016 R. Giroux Dep. Tr. 629:13-630:4) contains the quoted testimony.  However, Mr. Giroux's testimony that Cargill "relied" on Syngenta for information on the status of import applications in China—which is contradicted by Cargill's own witnesses and documents, *see* Syngenta's MSJ SOF ¶ 81—does not support Plaintiffs' assertion that the *entire* "grain handling and exporting industry *must* rely on Syngenta for information on the status of import approval applications in China."  That assertion is flatly contradicted by the testimony of various members of the "grain handling and exporting industry," as well as publically available information such as the National Corn Grower Associations' "Know Before You Grow" website.  *See* Syngenta's MSJ SOF ¶ 81.

377.  Syngenta's own expert, Thomas Carrato, acknowledges that transparency regarding approval status is important to the grain trade.  Ex. 286, Carrato Vol. I at 228:7-9; Ex. 287, Carrato Rpt. at ¶ 48.

**RESPONSE TO NO. 377.**    Disputed and unsupported by the evidence cited.  Syngenta does not dispute that Mr. Carrato was asked "Transparency is also a core concept in the BIO policy, correct?"  Mr. Carrato responded: "I believe it is, yes."  Pls.' Opp'n Ex. 286 (J. Carrato Dep. Tr. 228:7-9).  Mr. Carrato did *not* testify that transparency—and in particular transparency

"regarding approval status"—is "important to the grain trade." Syngenta does not dispute that paragraph 48 of Mr. Carrato's report states: "The BIO Product Launch Policy has always contained a provision for consultation with the stakeholders in the grain trade (e.g., growers, handlers, processors, exporters, etc.) regarding pending plans to commercialize ag biotech crop products.  The primary purpose of that consultation provision is to ensure that technology providers transparently inform the corn and grain industry through its grower and grain trade associations of product development and commercialization plans. It is also to receive feedback and input from the grain industry (including growers) on those commercialization plans…." Pls.' Opp'n Ex. 287 (J. Carrato Expert Rep. ¶ 48).  Mr. Carrato's report similarly does not mention "transparency regarding approval status," nor does it mention that such transparency is "important to the grain trade."  Thus, Plaintiffs' cited evidence does not support their assertion in this paragraph.

378.    Mr. Carrato testified that a biotechnology company's transparency is a core concept in the BIO Product Launch Stewardship Policy, which he claims (incorrectly) is the standard of care.  Ex. 286, Carrato Vol. I at 49:6-9, 228:7-9.

**RESPONSE TO NO. 378.**        Disputed and unsupported by the evidence cited.  Plaintiffs' assertion that Mr. Carrato "claims (incorrectly) [that the BIO Policy is] the standard of care" is not a fact, it is counsel's argument and entirely inappropriate.  Syngenta

disputes Plaintiffs' argumentative assertion that the BIO policy is not the industry standard.  In any event, Syngenta does not dispute that Mr. Carrato testified—in the context of the BIO Launch Policy's consultation requirement—that he believed "[t]ransparency is also a core concept in the BIO policy," and that in his opinion, the BIO Launch Policy is the industry standard. Pls.' Opp'n Ex. 286 (J. Carrato Dep. Tr. 227:17-228:9).

379.   Mr. Carrato agrees that biotechnology companies should consult with grain trade stakeholders regarding their pending commercialization plans, and should "transparently inform the corn and grain industry through its grower and grain trade associations of product development and commercialization plans." *Id*. at 228:7-9.

RESPONSE TO NO. 379.   Disputed and unsupported by the evidence cited.  Syngenta does not dispute that paragraph 48 of Mr. Carrato's report states: "The BIO Product Launch Policy has always contained a provision for consultation with the stakeholders in the grain trade (e.g., growers, handlers, processors, exporters, etc.) regarding pending plans to commercialize ag biotech crop products.  The primary purpose of that consultation provision is to ensure that technology providers transparently inform the corn and grain industry through its grower and grain trade associations of product development and commercialization plans…." Pls.' Opp'n Ex. 287 (J. Carrato Expert Rep. ¶ 48).   However, Plaintiffs fail to cite to Mr. Carrato's report and instead cite to a portion of his deposition testimony that does not support their assertion.  Even if this is the

result of an inadvertent error on Plaintiffs' part, nothing in that paragraph of Mr. Carrato's report suggests what biotechnology companies "should" do. Instead, that paragraph discusses the "primary purpose" of the consultation provision of the BIO Product Launch Policy. Thus, Plaintiffs' assertion remains unsupported.

380. Plaintiffs' expert, Randal Giroux also testified that a reasonably careful biotechnology company like Syngenta would communicate transparently with industry stakeholders about the scale and scope of the commercialization, the status of key export market approvals, and the biotechnology company's willingness to accept the risk of a trade disruption. Ex. 45, Giroux Vol. II at 322:16-327:15; Ex. 157, Giroux Expert Dep. at 62:9-65:9.

**RESPONSE TO NO. 380.** Disputed and unsupported by the evidence cited. In Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 322:16-327:15), Mr. Giroux discusses generally his opinion that biotechnology companies should "reach out and consult with other stakeholders in that -- in that supply chain," but Mr. Giroux never once mentions "transparency," the words "scale and scope," or "a company's willingness to accept the risk of a trade disruption." Furthermore, Mr. Giroux never describes in his testimony what a "reasonably careful" biotechnology company should do, just what a "biotech company" would do. Similarly, nowhere in Pls.' Opp'n Ex. 157 (11/16/2016 R. Giroux Dep. Tr. 62:9-65:9), does Mr. Giroux discuss "reasonable carefulness," "transparency," the words "scale and scope," or "a company's willingness to accept the risk of a trade disruption." Instead,

Mr. Giroux testifies that in his view "it wasn't about the plan…it was about the outcome," in other words, he believed the biotech company needed to "put [it]s money where [it]s mouth is." *Id.* at 63:21-22, 65:8-9. None of Mr. Giroux's cited testimony supports Plaintiffs' assertions in Statement of Additional Fact No. 380.

381. Giroux will testify that the relevant standard of care requires transparent and honest communications with all stakeholders about the scale and scope of commercialization, the risks, and likelihood and timelines of import approval. Ex. 45, Giroux Vol. II at 321:3-10, 322:16-327:15; Ex. 157, Giroux Expert Dep. at 62:9-65:9; Ex. 352, Fed. R. Civ. P. 26(a)(2)(c) Disclosure for Randy Giroux at 4.

**RESPONSE TO NO. 381.** Disputed and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 352 (Fed. R. Civ. P. 26(a)(2)(c) Disclosure for R. Giroux, at 4) states: "He may also testify that a reasonably careful biotechnology company would communicate transparently with relevant stakeholders regarding the scale and scope of the commercialization and the status of approvals in key markets around the world, as summarized in his depositions, including the one on June 10, 2016 at pp. 323-27." However, Pls.' Opp'n Ex. 352 (Fed. R. Civ. P. 26(a)(2)(c) Disclosure for R. Giroux) does not state anything about "honest communications," nor does it specifically discuss the "risks, and likelihood and timelines of import approval." The cited testimony from Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 321:3-10, 322:16-327:15) and Pls.' Opp'n Ex. 157 (11/16/2016 R. Giroux Dep. Tr. 62:9-65:9) discuss

the "three components" of Mr. Giroux's beliefs regarding the reasonable steps a biotech company should take, but does not mention what Mr. Giroux *will testify to at trial*. Syngenta also disputes whether Mr. Giroux *will testify* at trial, *see* ECF No. 2878 (Syngenta's Mot. to Exclude Testimony and Opinions of R. Giroux), particularly where Mr. Giroux has previously testified that there is no industry standard, *see* Ex. 341 (11/16/2016 R. Giroux Dep. Tr. 21:7-18) ("You keep asking me about a standard…these documents…are not mandatory, nor are they binding standards."). Thus, none of Plaintiffs' cited evidence supports their assertion in this paragraph.

382.   Syngenta's campaign of misinformation regarding the approval status of MIR162 began long before Bunge and other grain handlers began posting signs in July 2011. But after that point, Syngenta conducted a coordinated, multi-pronged effort to mislead the entire corn industry about the status of MIR162 in China. *See infra* ¶¶ 383-474.

**RESPONSE TO NO. 382.**     Disputed and unsupported by the evidence cited. Plaintiffs' assertion in this paragraph is not a fact in evidence but rather counsel's argument. Plaintiffs improperly rely on an unfocused citation to over 90 paragraphs of their own Statement of Additional Facts instead of properly controverting Defendants' statements. *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.'

327

> For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

As explained in further detail below, Syngenta disputes almost all of the purported facts asserted in Opp'n SOAF ¶¶ 383-474 because they are unsupported by the evidence Plaintiffs cite. In addition to the issues raised in response to Opp'n SOAF ¶¶ 383-474, there is no indication based on the evidence cited in these paragraphs that demonstrates "Syngenta's campaign of misinformation regarding the approval status of MIR162," when that alleged "campaign" began, or Syngenta's alleged conduct of "a coordinated, multi-pronged effort to mislead the entire corn industry about the status of MIR162 in China."

383.   On August 31, 2007, Syngenta submitted its petition seeking deregulation of MIR162 ("MIR162 Deregulation Petition"). *See* Ex. 89 (Dep. Ex. 20).

**RESPONSE TO NO. 383.**   Undisputed.

384.   Syngenta stated in the MIR162 Deregulation Petition that it understood "that a copy of the MIR162 Deregulation Petition may be made available to the public as part of the public comment process." *Id*. at 3.

**RESPONSE TO NO. 384.**   Undisputed.

385.   The USDA Animal and Plant Health Inspection Service's Notice, published in the Federal Register on January 13, 2010 (75 Fed. Reg. 1749) (the "MIR162 Deregulation Notice"), expressly invited public comment regarding the MIR162 Deregulation Petition and further provided instructions as to how copies of the petition and accompanying draft environmental assessment and plant pest risk assessment could be obtained either by placing a phone call or accessing them on the internet.

**RESPONSE TO NO. 385.**   Undisputed. Syngenta notes that

Plaintiffs have provided no citation or evidence to support this

328

asserted fact, but nonetheless Syngenta does not dispute Fact 385

which is a matter of public record.

386.    In its Deregulation Petition, Syngenta represented "there should be no effects on the U.S. maize export markets" because "Syngenta *is actively pursuing regulatory approvals* for MIR162 maize in countries with functioning regulatory systems for genetically modified organisms and that import maize from the U.S. or Canada. Regulatory filings for MIR162 maize *are in process for . . . China. . . .*" Ex. 89 (Dep. Ex. 20) at 111 (emphasis added).

**RESPONSE TO NO. 386.**     Undisputed that Syngenta exercised

its First Amendment right to petition the U.S. government for the

deregulation of MIR162.  Syngenta does not dispute that Pls.'

Opp'n Ex. 89 (C. Quain Dep. Ex. 20, at 111) states: "Syngenta is

actively pursuing regulatory approvals for MIR162 maize in

countries with functioning regulatory systems for genetically

modified organisms and that import maize from the U.S. or

Canada.  Regulatory filings for MIR162 maize are in process

for  Colombia, Japan, South Korea, Taiwan, China, the

Philippines, Australia and New Zealand, South Africa, the

European Union, Russia, and Switzerland."  Syngenta disputes

Plaintiffs' assertion that this statement was a "representation."

Syngenta also notes that Pls.' Opp'n Ex. 89 (C. Quain Dep. Ex.

20, at 13-14) states: "Regulatory filings *will be made* in Mexico,

Colombia, Japan, South Korea, Taiwan, China, the Philippines,

Australia and New Zealand, South Africa, the European Union,

Russia and Switzerland" (emphasis added).

387.   But Syngenta did not actively pursue regulatory approval until years later in 2010. *See supra* SOAF ¶ 255.

> **RESPONSE TO NO. 387.**   Disputed, unsupported by the evidence cited, and immaterial to Syngenta's arguments for summary judgment.  Plaintiffs' assertion in this paragraph is not a fact in evidence but rather counsel's argument.   Plaintiffs improperly rely on an unfocused citation to another paragraph of their own Statement of Additional Facts.  *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 1884125, at *2 (D. Kan. Apr. 25, 2008) ("[P]laintiffs cross-reference large groups of their own paragraphs of factual material, such as to controvert one of AT & T's statements of fact or to establish other 'facts.' For example, in response to approximately twenty of AT & T's facts, plaintiffs state 'see also GI 205–220' …. This practice runs afoul of the various rules requiring the specific facts to be presented with record support …, to refer with particularity to those portions of the record upon which plaintiff is relying, and to fairly meet the substance of the matter asserted.").

As explained in further detail above, Syngenta disputes the purported facts asserted in Opp'n SOAF ¶ 255 because they are unsupported by the evidence Plaintiffs cite.  In any event this assertion is immaterial to Syngenta's arguments for summary judgment because Syngenta does not dispute that it made its initial submission to China's Ministry of Agriculture for import approval of Viptera in March 2010, *see* Syngenta's MSJ SOF ¶ 41, which was the first opportunity it could do so.

330

388.   The MIR162 Deregulation Petition also stated that stewardship agreements with growers would require channeling of MIR162 away from export markets which had not approved import of MIR162 maize, that Syngenta would undertake "a wide-ranging grower education campaign" respecting channeling, and that channeling would effectively prevent economic disruption based upon prior experiences.  *See* Ex. 89 (Dep. Ex. 20) at 111.

                      <u>**RESPONSE TO NO. 388.**</u>   Disputed and unsupported by the evidence cited. Syngenta does not dispute that Pls.' Opp'n Ex. 89 (C. Quain Dep. Ex. 20, at 111) states: "Syngenta's stewardship agreements with growers will include a term requiring growers to divert this product away from export markets (i.e. channeling) where the grain has not yet received regulatory approval for import.   Syngenta will communicate these requirements to growers using a wide-ranging grower education campaign (e.g., grower Stewardship Guide)."  This document does *not* state that stewardship agreements "would require channeling of MIR162 away from export markets which had not approved import of MIR162 maize," but rather that those agreements would "include a term *requiring growers to divert this product away* from export markets" where the grain had not yet received regulatory approval for import.   *Id.*   Further, the document does not state that Syngenta would itself undertake a wide-ranging grower education campaign "respecting channeling," but rather that it would *communicate requirements to growers* using a "wide-ranging grower education campaign."  Nowhere does this document state that "channeling would effectively prevent economic disruption

331

based upon prior experiences."    Thus, none of Plaintiffs'

assertions in this paragraph are supported by the actual statements

contained in the Deregulation Petition.

389.    Now, ten years later, Syngenta takes the opposite position in its summary judgment papers, arguing that channeling and stewardship could not have prevented the loss of the Chinese market.  ECF No. 2861, Br. at 71-72.

**RESPONSE TO NO. 389.**    Disputed, unsupported by the

evidence cited, and immaterial to Syngenta's arguments for

summary judgment.  Plaintiffs' assertion in this paragraph is not a

fact in evidence but rather counsel's argument.    Syngenta's

arguments on summary judgment speak for themselves, and

Plaintiffs' citation to Syngenta's MSJ does not in any way support

their assertion in this paragraph.    Syngenta has not taken an

"opposite position" that is contrary to the statements contained in

its Deregulation Petition.

390.    On April 12, 2010, APHIS concluded that MIR162 corn should be deregulated. *See* Syngenta Biotechnology, Inc. Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance, 75 Fed. Reg. 20560 (April 20, 2010).

**RESPONSE TO NO. 390.**    Undisputed.

391.    Nine days later, Syngenta issued its press release: "Syngenta receives approval for breakthrough corn trait technology in the U.S."  Ex. 206 at SYNG_00016939 (April 21, 2010).

**RESPONSE TO NO. 391.**    Undisputed.

392.    The press release stated: "The trait will be combined with the Agrisure 3000GT trait stack to provide corn growers with broad-spectrum, insect control and glyphosate tolerance for maximum convenience and productivity." *Id*.

**RESPONSE TO NO. 392.**    Undisputed.

393.   As Syngenta began taking order for Viptera on August 5, 2010, it began externally representing that MIR162 would receive approval in China by fall 2011, even though there existed no internal predictions by Syngenta's regulatory affairs group containing such an expected approval date. Ex. 207 (Giroux Dep. Ex. 106); Ex. 75 Giroux 30b6 Vol. I at 82:11-22; see also Ex. 128 (Dep. Ex. 958) (Feb 2011 Syngenta emails noting that MIR162 will not have approval by fall of 2011); Ex. 208 (Dep. Ex. 959) (Bernens celebrating success of misleading email to Giroux); Ex. 294, Hull Vol. II at 517:8-13; Ex. 45, Giroux Vol. II at 340:22–345:9, 358:24–360:22.

**RESPONSE TO NO. 393.**       Disputed, hearsay, and unsupported by the evidence cited.  Syngenta does not dispute that it first accepted orders in the United States for commercial sales of Viptera corn seed on August 5, 2010.  *See* Syngenta's MSJ SOF ¶ 9.  However, Plaintiffs' cited evidence fails to support the remainder of its assertions in this paragraph.  Pls.' Opp'n Ex. 207 (R. Giroux Dep. Ex. 106) contains the following statement by Mr. Giroux: "SYN indicated that there has been some 'consternation,' but did not extend their prediction beyond harvest 2011."  Mr. Giroux's statement in this email is hearsay and as such is inadmissible.  Moreover, Mr. Giroux's interpretation of "indications" he attributes to Syngenta does not show that "there existed no internal predictions by Syngenta's regulatory affairs group containing such an expected approval date."  Additionally, Mr. Giroux claims Syngenta predicted "harvest 2011," which is not the same as Plaintiffs' asserted "fall 2011."  The same is true for Pls.' Opp'n Ex. 128 (J. Bernens Dep. Ex. 958), in which Mr. Bernens informs Mr. Giroux that "the industry all had some troubles with China this past year *so not really sure we can*

*predict*." *Id.* at SYNG_00352206.  This document does not show that Syngenta "began externally representing that MIR162 would receive approval in China by fall 2011."  It also does not show that *Syngenta as a company* made any external representations regarding the the approval date for MIR162.  If anything it indicates that Mr. Giroux's interpretation of Syngenta's "indications" in Pls.' Opp'n Ex. 207 (R. Giroux Dep. Ex. 106) was false.  Likewise, Pls.' Opp'n Ex. 208 (J. Bernens Dep. Ex. 959) does not show "Bernens celebrating success of misleading email to Giroux."  Plaintiffs' blatant mischaracterization of this document does not mean it supports their assertion.  Pls.' Opp'n Ex. 208 (J. Bernens Dep. Ex. 959) shows that Mr. Bernens informed Mr. Giroux: "We will have a better sense in few months following an update from Chinese government and can give you a better update now."  It does not contain *any* external representations *by Syngenta* that Syngenta would receive approval in "fall 2011" or "harvest 2011," nor does it show any internal predictions by Syngenta's regulatory affairs group.  Plaintiffs' citation to Pls.' Opp'n Ex. 75 (5/16/2016 R. Giroux Dep. Tr. 82:11-22), Pls.' Opp'n Ex. 294 (S. Hull Dep. Tr. 517:8-13), and Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 340:22–341:23) merely seeks to authenticate Plaintiffs' Exhibit 207 (Deposition Exhibit 106), Plaintiffs' Exhibit 208 (Deposition Exhibit 959),

and Plaintiffs' Exhibit 207 (Deposition Exhibit 106) respectively, and therefore does not support Plaintiffs' assertions in this paragraph. Finally, Mr. Giroux's interpretation of his own email in Pls.' Opp'n Ex. 45 (6/10/2016 R. Giroux Dep. Tr. 340:22–345:9, 358:24–360:22) to create an inference that Syngenta represented to him that MIR162 would receive approval in China by "fall 2011," does not show that Syngenta *actually made* those representations and is entirely controverted by statements in both of the *actual* communications between Mr. Giroux and Syngenta's Jack Bernens which show that Syngenta as a company made no such representations. Thus none of Plaintiffs' statements in this paragraph can be substantiated by the evidence they cite.

394.   Syngenta made these statements to help its sales in fall 2010 and early 2011 before the spring 2011 planting season in the United States. Ex. 128 (Dep. Ex. 958); Ex. 57, Bernens Vol. II at 634:13-653:8, 662:2-663-10.

**RESPONSE TO NO. 394.**      Disputed, vague, and unsupported by the evidence cited.   Plaintiffs' assertion is vague as to what "these statements" are.   Nothing in Plaintiffs' cited document supports their statement in this paragraph.  Pls.' Opp'n Ex. 128 (J. Bernens Dep. Ex. 958) does not discuss Syngenta's "sales in fall 2010 and early 2011 before the spring 2011 planting season in the United States."  Pls.' Opp'n Ex. 57 (J. Bernens Dep. Tr. 634:13-653:8, 662:2-663:10) improperly cites over twenty pages of deposition testimony. *See Sprint Commc'ns Co. L.P. v. Vonage*

*Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) ("Neither Sprint nor the court can or should be forced to sift through the record to determine whether Vonage is relying on mere argument or whether there is some support in its broad citations."). However it too fails to support Plaintiffs' assertions. Pls.' Opp'n Ex. 57 (J. Bernens Dep. Tr. 634:13-653:8, 662:2-663:10) shows Mr. Bernens consulted with Ms. Zannoni to "get the correct information" regarding the approval date for MIR162 to convey to Mr. Giroux. *Id.* at 643:2-3. Indeed, Mr. Bernens testified that he has no "record that Randy came back and said that was an inadequate answer." *Id.* at 647:5-6. And when Mr. Bernens obtained new information he provided it to Mr. Giroux. *See id.* 663:3-10. Nothing in this testimony discusses Syngenta's sales in fall 2010 and early 2011, and thus Plaintiffs have failed to provide evidence to support their assertion in this paragraph

395. Mr. Latner reviewed Syngenta's regulatory submissions to China and concluded that there was no reasonable basis to represent that China approval would come in fall 2011 or early 2012. Ex. 27, Latner Rpt. ¶ 389 (noting no reasonable basis to expect approval in less than two years from initial submission).

**RESPONSE TO NO. 395.** **Disputed.** Syngenta does not dispute that Plaintiffs' expert on the Chinese GM trait approval process offers the purported opinion, but Syngenta disputes that "there was no reasonable basis to represent the China approval would come" in early 2012. The undisputed record is that Syngenta made its initial import approval

submission to China in March 2010 and that the typical timeline for approval is 24 months.  *See, e.g.*, Syngenta's MSJ Ex. 11 (K. Latner Dep. Ex. 17 at SYNG_00477129) (according to CropLife China, if an initial submission is made in March of year 1, the "timeline" for approval in China was "24 months"); *see also* Syngenta's MSJ SOF ¶¶ 42-49.

396.   In early 2011, Syngenta again told Cargill's Randy Giroux that China would approve MIR162 by "harvest 2011." *See* Ex. 128 (Dep. Ex. 958); Ex. 208 (Dep. Ex. 959); Ex. 34 (Dep. Ex. 1021); Ex. 58 (Dep. Ex. 1064); Ex. 209 (Giroux Dep. Ex. 78); Ex. 244, Giroux Vol. I at 80:13-24; Ex. 45, Giroux Vol. II at 340:22-345:9, 358:24-360:22; Ex. 186, Giroux 30b6 Vol. II at 524:18-525:10; Ex. 244.

**RESPONSE TO NO. 396.** **Disputed, not supported by the cited evidence, hearsay, and immaterial to the grounds on which Syngenta seeks summary judgment.** What Syngenta told Randal Giroux in early 2011 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs' cited evidence fails to support the fact it seeks to establish, because none of the cited evidence reflects a conversation between Syngenta and Mr. Giroux in early 2011 in which Syngenta stated that China would approve MIR162 by harvest 2011.  Exhibits 34, 58, and 128 are all email chains that do not involve Mr. Giroux.  Exhibit 209 is an internal Cargill email.  Exhibit 208 reflects a March 2011 conversation between Jack Bernens and Mr. Giroux about the approval status of MIR162 in China, but Syngenta does not mention when Syngenta expects Chinese approval of MIR162.  The cited testimony from Mr.

337

Giroux likewise does not reflect a representation by Syngenta that Chinese approval would come by "harvest 2011."  In one instance in the cited testimony, Mr. Giroux refers to an internal Cargill email where he indicates to another employee at Cargill that "MIR162 by Syngenta still has some approvals to go" and that "Syngenta anticipates having major market approvals before planting/harvest." Pls.' Opp'n Ex. 45 (R. Giroux Dep. Tr. 340:22-341:23).  Mr. Giroux also states that "China is one where we will apply some pressure." *Id.*  Plaintiffs seem to assert that Mr. Giroux interpreted "major market approvals" by harvest 2011 as a representation by Syngenta (Mr. Giroux testified this conversation was with Mr. Bernens) that China would supply import approval by harvest 2011.  Pls.' Opp'n Ex. 186 (R. Giroux Dep. Tr. 524:18-525:10).  But that is not what Mr. Bernens said—he said major market approvals—and Syngenta (as well as the grain trade at large) thought that China, at least up to early 2011, was not a major market for U.S. corn imports.  Indeed, Mr. Giroux's own summary of his discussion with Mr. Bernens indicates that Syngenta did not represent that it would receive Chinese approval by harvest 2011, insofar as Mr. Giroux singles out China as a place "where we will apply some pressure."  In any event, Mr. Giroux's testimony about a discussion with someone at Syngenta is hearsay, and is therefore inadmissible evidence.  *See PAS Commc'ns, Inc. v. Sprint*

338

*Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to

consider hearsay evidence on summary judgment).

397.    Syngenta strategized about how to encourage industry groups to "reassure their members
in the US that the approval will happen in time for the 2011 harvest." Ex. 231 (Dep. Ex.
931), Ex. 248 (Dep. Ex. 1051); Ex. 57, Bernens Vol. II at 452:4-23, 662:2-12; *see also* Ex.
214 (Dep. Ex. 1080).

**RESPONSE TO NO. 397.   Disputed and not supported by the cited**

**evidence.**   Plaintiffs' asserted fact is vague, as it does not specify

which country's approval it refers to.   To the extent that plaintiff refers

to approval in China, Plaintiffs' cited evidence does not establish that

Syngenta "strategized" about how to "encourage" industry groups and

does not show that Syngenta ever represented that Viptera would be

approved in time for the 2011 harvest.   Syngenta does not dispute that

Plaintiff's Ex. 231 contains the quoted language.   However, Sarah Hull

(the author of the email) testified that "harvest 2011" was not a

reference to Syngenta's expectations for when MIR162 would receive

import approval, but instead a reference to when the grain "could

potentially move into . . . importing countries" based on the

expectation that China would approve MIR162 for import at the end of

the first quarter of 2012.   Syngenta's MSJ Ex. 15 (S. Hull Dep. Tr.

298:8-300:23).   In fact, Syngenta did not tell the US Grains Council it

should advise its members that approval would be granted by harvest

2011.    Pls.' Opp'n Ex. 231 (S. Hull Dep. Ex. 931, at

SYNG_00273595-96).   The remaining cited evidence likewise does

not support Plaintiffs' statement of fact.   Exhibit 248 is a different

version of the same email change with the quoted language. Exhibit

214 is an email from Jack Bernens to Randal Giroux informing Mr.

Giroux that MIR162 approval is expected in Q1 2011. Exhibit 57 is

deposition testimony from Mr. Bernens that seeks to authenticate

Exhibits 248 and 214, and does not support the facts Plaintiffs seek to

establish.

398. In March 2011, Giroux again asked Syngenta when it expected China to approve Viptera for import. Ex. 128 (Dep. Ex. 958) at SYNG_00352205-06 (Bernens relaying question of Giroux to Syngenta executive via email).

**RESPONSE TO NO. 398.** **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.** Mr. Giroux's questions to Syngenta are

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment. In any event, Syngenta does not dispute that Jack Bernens

wrote on email on March 1, 2011 reflecting a question from Randal

Giroux concerning the timing of the safety certificate for MIR162, but

disputes that Plaintiffs' cited evidence reflects that Mr. Giroux was

asking "again."

399. In crafting a response, Jack Bernens of Syngenta admitted: "I was trying to buy some time[] until we get things planted this spring, but if I am fudging the truth to[o] much then I can go with March 2012." *Id.* He also admitted why he was "fudging" the truth: "I am trying to find a response that does not prompt them to put up signs right away." *Id.*

**RESPONSE TO NO. 399.** **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.** Jack Bernens' work on a response to Randal

Giroux is irrelevant to the grounds asserted in Syngenta's motion for

summary judgment.  In any event, Syngenta does not dispute that the

email from Mr. Bernens reflects the quoted language, but Plaintiffs

misstate Mr. Bernens intentions in sending that email.  As the email

reflects, Mr. Bernens actually states the opposite of what Plaintiffs'

state—Mr. Bernens sent around the proposed response to Syngenta's

head of regulatory because he did *not* want to "fudge the truth."  Pls.'

Opp'n Ex. 128 (J. Bernens Dep. Ex. 958 at SYNG_00352204).

400.    Syngenta wanted to stop Cargill and others in the grain trade from erecting signs warning growers about the dangers of planting Viptera without Chinese approval, which would hurt Viptera sales.  *See id.* (admitting that if Syngenta had told the truth then Cargill "might put up signs NOW and that impacts our sales this spring negatively." (emphasis in original)).

**RESPONSE TO NO. 400.**  **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.**  Whether Syngenta wanted to stop Cargill and

others from erecting signs is irrelevant to the grounds asserted in

Syngenta's motion for summary judgment.  In any event, Plaintiffs'

cited evidence fails to support the fact they seek to establish, because

nothing in the quoted language reflects the content of the "signs," that

Syngenta would not be telling the truth, or that Syngenta specifically

wanted Cargill to not erect signs.

401.    Syngenta also knew that Cargill and others in the grain trade would have communicated Syngenta's position on Viptera directly to its farmer clients. Ex. 186, Giroux 30b6 Vol. II at 508:22-510:6 ("We do communicate qui[te] a bit internally inside of Cargill, and so, if information was shared with me from a technology owner, I would in turn share that with our AgHorizons business unit. That would quickly then be communicated out to our regional, farm service group leaders, and then, ultimately, to those individual elevators."); Ex. 211 (Giroux Dep. Ex. 129) ("The goal is to reflect the commercial reality that farmers are asking us if we will take new events before they purchase them...."); Ex. 186, Giroux 30b6 Vol. II at 511:21-513:6.

**RESPONSE TO NO. 401.**   **Disputed, not supported by the cited evidence, speculation, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Whether Syngenta knew Cargill and others would have communicated Syngenta's position on Viptera directly to farmers is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Plaintiffs' cited evidence fails to support the fact they seek to establish, because Randall Giroux's opinion about what information he intends to communicate, and then, in turn, what Mr. Giroux expects others to communicate, does not reflect Syngenta's knowledge and is speculative.

402.   Syngenta ultimately responded to Giroux's e-mail by stating:

> Randy, sorry but your (sic) right I have been a bit busy. We will have a better sense in few months following an update from Chinese government and can give you a better update then. But we used our Brazilian approval which was granted in Nov 2009, instead of waiting for USDA approval which was in April 2010. As you may know we have been working with other industry players to put pressure on China to speed up/better define the approval process USGC has move it to top priority for the Biotech action team and ASA is sponsoring a conference in Beijing June 2011 (21 & 22 are the target date).

Ex. 212 (Dep. Ex. 1582). Ex. 181, Trivisvavet Vol. I at 287:20-288:4.

**RESPONSE TO NO. 402.**   **Immaterial to the grounds on which Syngenta seeks summary judgment.**   Jack Bernens' response to Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.

403.   Syngenta's response to Giroux was misleading in several ways. First, although Syngenta received Brazilian approval in November of 2009, it failed to submit in China during the November 2009 window. *See supra* SOAF ¶¶ 254-256. Rather, Syngenta did not submit its request to import the grain and seed for the in-county studies required by the Chinese regulatory process until March 2010. *See supra* SOAF ¶ 255. The March 1, 2011 e-mail was

intended to mislead Cargill into believing that Syngenta's application had been submitted five months before it actually had been submitted. This is important for Syngenta because a November 2009 submission was more consistent with a Fall, 2011 approval date. *See supra* SOAF ¶¶ 249-250.

> **RESPONSE TO NO. 403.** **Disputed, not supported by the cited evidence, argumentative, and immaterial to the grounds on which Syngenta seeks summary judgment.** Jack Bernens' response to Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. Syngenta also disputes that its response to Mr. Giroux was misleading, and incorporates herein its responses to Pls.' SOAF ¶¶ 249-250, 254-256. Plaintiffs' cited evidence does not support Plaintiffs' characterization of Syngenta's motivations; in fact, the discussions relating to Syngenta's email to Mr. Giroux referenced in the foregoing statements of fact reflects that Syngenta wanted to ensure that its response was accurate. *See* Pls.' Opp'n Ex. 128 (J. Bernens Dep. Ex. 958). Syngenta additionally notes that the email to Mr. Giroux did not state that Syngenta had submitted its approval application to China in November 2009.

404. Second, the notion that Syngenta would "have a better sense in [a] few months following an update from Chinese government" was also false. In February of 2011, Syngenta was not waiting on the Chinese government but rather on its own legal department to approve the import of the test seeds for in-country field and toxicology studies. *See supra* SOAF ¶ 261.

> **RESPONSE TO NO. 404.** **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.** Jack Bernens' response to Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.  In any event, Plaintiffs' cited evidence fails to support the fact they seek to establish, because there is no cited evidence regarding what Mr. Bernens intended when he provided the quoted language.  To the extent Plaintiffs attempt to re-establish facts set forth in Pls.' SOAF ¶ 261, Syngenta incorporates its response to Pls.' SOAF ¶ 261 herein.

405.    The field study and rat-feeding study then had to be completed and then submitted with the full dossier. The next conceivable window to do so was not until November 1, 2011, so Syngenta could not and did not reasonably expect an "update" from the Chinese government until after that submission. *See supra* SOAF ¶¶ 258-285.

**RESPONSE TO NO. 405.**  **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**  Syngenta does not know what fact Plaintiffs seek to establish, but to extent Plaintiffs are referring to the statement by Mr. Bernens in Plaintiffs' Opposition Exhibit 212, Mr. Bernens' response to Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  Furthermore, Plaintiffs' cited evidence fails to support the fact they seek to establish, because there is no cited evidence regarding what Mr. Bernens intended when he stated Syngenta would have a better sense in a few months.   To the extent Plaintiffs attempt to re-establish facts set forth in Pls.' SOAF ¶¶ 258-285, Syngenta incorporates its response to Pls.' SOAF ¶¶ 258-285 herein.

406.    Only after Syngenta received those results-and assuming the results were positive—could Syngenta submit its complete dossier to China for import approval of Viptera. *See supra* SOAF ¶¶ 258-285.

**RESPONSE TO NO. 406.** **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.** Syngenta does not know what fact Plaintiffs seek to establish, but to extent Plaintiffs are referring to the statement by Mr. Bernens in Plaintiffs' Opposition Exhibit 212, Mr. Bernens' response to Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. Furthermore, Plaintiffs' cited evidence fails to support the fact they seek to establish, because there is no cited evidence regarding what Mr. Bernens intended when he stated Syngenta would have a better sense in a few months. To the extent Plaintiffs attempt to re-establish facts set forth in Pls.' SOAF ¶¶ 258-285, Syngenta incorporates its response to Pls.' SOAF ¶¶ 258-285 herein.

407.  Moreover, Syngenta knew, but did not disclose, that the Ministry of Agriculture could respond with additional questions that would require re-submission and delay. *See supra* SOAF ¶¶ 36-37.

**RESPONSE TO NO. 407.** **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.** Syngenta does not know what fact Plaintiffs seek to establish, but to extent Plaintiffs are referring to the statement by Mr. Bernens in Plaintiffs' Opposition Exhibit 212, Mr. Bernens' response to Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. Furthermore, Plaintiffs' cited evidence fails to support the fact they seek to establish, because

there is no cited evidence regarding what Mr. Bernens intended when he stated Syngenta would have a better sense in a few months. To the extent Plaintiffs attempt to re-establish facts set forth in Pls.' SOAF ¶¶ 36-37, Syngenta incorporates its response to Pls.' SOAF ¶¶ 36-37 herein. Additionally, and in any event, as Mr. Giroux from Cargill explained, it was well understood that Chinese politics could get in the way of approval and cause delay. Pls.' Opp'n Ex. 207 (R. Giroux Dep. Ex. 106 at CARGILL000004903) ("Blv it's crap shoot, and chn politics could get in the way of this.").

408. The rest of the grain trade received similar misinformation. *See* Ex. 186, Giroux 30b6 Vol. II at 362:5-14; *see also* Ex. 195 (Dep. Ex. 931) at SYNG_0027359 ("[H]ere are actions we are going to undertake immediately: Send our Chinese folks into the USGC representatives in China [to] update them on where the status of the field trials and the expected timing to see if they can help reassure their members in the US that the approval will happen in time for the 2011 harvest")

**RESPONSE TO NO. 408.** **Disputed, not supported by the cited evidence, hearsay, and immaterial to the grounds on which Syngenta seeks summary judgment.** Whether the rest of the grain trade received similar misinformation is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' cited evidence fails to support the fact they seek to establish, because the evidence provided is deposition testimony by Mr. Giroux about an email that China's actions with respect to MIR162 "reeks of politics" (Exhibit 186) and an email that was intended to reflect Syngenta's intentions to inform the USGC representatives about the status of field trials and expectations that Syngenta would receive

346

approval at the end of the first quarter of 2012 (Exhibit 195).  As the author of the cited email, Sarah Hull, explained, "harvest 2011" was not a reference to Syngenta's expectations for when MIR162 would receive import approval, but instead a reference to when the grain "could potentially move into . . . importing countries" based on the expectation that China would approve MIR162 for import at the end of the first quarter of 2012.  Syngenta's MSJ Ex. 15 (S. Hull Dep. Tr. 298:8-300:23).  Moreover, a later email in time in the same email chain states that Syngenta would merely provide information to the US Grains Council regarding their safety certificate application development, and the expected timeline for receiving approval, *not* that the US Grains Council advise its members that approval would be granted by harvest 2011.  Pls.' Opp'n Ex. 231 (S. Hull Dep. Ex. 937 at SYNG_00273595-96).  Finally, Mr. Giroux's testimony about what Syngenta said to the grain trade is hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

409.   In June 2011, when Cargill asked Syngenta to "remind me of timeline for MIR162 approvals in china??," Syngenta responded and represented that MIR162 was "still on track for two years or less from USDA approval, which was April 2010." Ex. 214 (Dep. Ex. 1080); Ex. 31, Huber Vol. II at 455:17-456:17.

**RESPONSE TO NO. 409.**  **Immaterial to the grounds on which Syngenta seeks summary judgment.**  Syngenta's response to Cargill in June 2011 about the timeline for MIR162 approval in China is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.

410.    But Syngenta internally recognized that the Chinese import approval process takes on
average 28 months, not "two years or less." Ex. 31, Huber Vol. II at 332:7-333:16, 356:24-
361:13 (average approval time of greater than 28 months); Ex. 32 (Dep. Ex. 57) (January 11,
2009 internal document predicting that the anticipated approval time for MIR162 if an
application were submitted in China in Q4 2009 would be Q3 2012).

**RESPONSE TO NO. 410.** **Disputed and not supported by the**

**evidence.** Plaintiffs' cited evidence fails to support the fact they seek

to establish, because the deposition testimony of Scott Huber reflects

data provided by a third party, CropLife China, and does not reflect the

actual timeline expected by the regulatory team. Pls.' Opp'n Ex. 31

(S. Huber Dep. Tr. 332:7-333:16). The undisputed record is that the

typical timeline for approval is 24 months. *See, e.g.*, Syngenta's MSJ

Ex. 11 (K. Latner Dep. Ex. 17 at SYNG_00477129) (according to

CropLife China, if an initial submission is made in March of year 1,

the "timeline" for approval in China was "24 months"); *see also*

Syngenta's MSJ SOF ¶¶ 42-49. Exhibit 32 likewise fails to support

the fact Plaintiffs seek to establish, because the exhibit is a preliminary

spreadsheet that does not reflect the actual timeline expected by the

regulatory team. *See also* Pls.' Opp'n Ex. 31 (S. Huber Dep. Tr.

356:24-361:13) (discussing Pls.' Opp'n Ex 32 (S. Huber Dep. Ex.

57)). According to Ms. Zannoni, the "actual, the official timelines is

what we put in DeCo documents." Ex. 358 (4/13/2016 L. Zannoni

Dep. Tr. 455:18-19). And contrary to Plaintiffs' assertion, Syngenta's

belief was that approval would take 24 months.  *See* Syngenta's MSJ

SOF ¶¶ 42-43, 46, 48-49.

411.    And Syngenta had already received negative feed-back from the Ministry of Agriculture on its initial import application and had delayed over one year in importing the test seeds for in-country testing. *See supra* SOAF ¶ 258.

### RESPONSE TO NO. 411.   **Disputed and not supported by the cited**

**evidence.**   Syngenta does not know what fact Plaintiffs seek to

establish, but notes that there is no cited evidence beyond a citation to

an earlier SOAF.  Syngenta incorporates its response to Pls.' SOAF

¶ 258 herein.

412.    That delay meant that Syngenta could submit a full dossier in November 2011 at the earliest, and because Chinese regulations allow up to nine months to evaluate a completed application, approval in Q3 2012 was the best-case scenario for a November 2011 submission at that point. Ex. 27, Latner Rpt. ¶ 279.

### RESPONSE TO NO. 412.   **Undisputed.**  Syngenta does not dispute that

Plaintiffs' expert Kevin Latner has offered that purported opinion, but

disputes that opinion and notes that while Chinese regulations allow up

to nine months for China to evaluate a completed application for

import approval, Lisa Zannoni testified that in practice Chinese

regulators would typically approve the completed import application

within four to six months.  *See, e.g.*, Syngenta's MSJ Ex. 24 (L.

Zannoni Dep. Tr. 629:2-8) ("Q. All right. So you said it was general

practice, I think you've used the term common practice and that would

have been put approval in Q1 in your review? Is that, is that consistent

with what you testified?  A. Of the four to six months, so the four

months would be March.").  In fact, third-party documents confirm the

industry understanding that if an applicant submits a final dossier in November, approval would be expected the following March. *See* Syngenta's MSJ Ex. 11 (K. Latner Dep. Ex. 17 at SYNG_00477129) (according to CropLife China, if an initial submission is made in March of year 1, the "timeline" for approval in China was "24 months").

413.    Syngenta also misled exporters on how broad its commercialization of Viptera was going to be in 2011.

**RESPONSE TO NO. 413.**    **Disputed, not supported by any cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**  Whether Syngenta misled exporters concerning its commercialization of Viptera is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs provide no cited evidence for the asserted statement of fact.

414.    In February 2011, Cargill's Randy Giroux reported to his colleagues that Syngenta would plant a maximum of 50,000 acres of Viptera in 2011. Giroux said he got that information from Jack Bernens. Ex. 75, Giroux 30b6 Vol. I at 87:22-88:12; Ex. 186 Giroux 306b Vol. II at 521:19-523:2, 544:25-549:2; Ex. 188 (Dep. Ex. 106); Ex. 215 (Giroux Dep. Ex. 131).

**RESPONSE TO NO. 414.**    **Hearsay and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Randal Giroux reported to his colleagues about the number of acres for Viptera is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event,  Syngenta does not dispute the factual assertion as to what Ms. Giroux reported to his colleagues and Mr. Giroux's representation as to the purported source of the information,

but Syngenta notes that Plaintiffs' cited evidence does not establish that Jack Bernens, or anyone else from Syngenta, actually provided that information to Mr. Giroux.  This is hearsay, and is thus inadmissible. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).  Nor does the citation suggest that *Syngenta* (as opposed to producers) would plant Viptera corn.  Syngenta further notes Mr. Giroux conceded that he was aware in February 2011 that MIR162 might be planted in up to 2 million U.S. acres for 2011. Syngenta's MSJ SOF ¶ 92.   And yet Mr. Giroux inexplicably continued to advise his colleagues that 50,000 acres of MIR162 would be planted despite knowing that was incorrect. *Compare* Ex. 401 (R. Giroux Dep. Ex. 77 at CARGILL000072489) ("Re: MIR 162 . . . may be up to 2 million US acres this year"), *with* Pls.' Opp'n Ex. 215  (R. Giroux Dep. Ex. 131 at CARGILL000072428) ("MIR 162 will only be planted on 50k acres in the USA this year").

415.    In March 2011 Jack Bernens told a representative of Consolidated Grain and Barge that "acres will be quite limited in 2011." Ex. 57, Bernens Vol. II at 478:10-23, 482:7- 483:24; Ex. 216 (Dep. Ex. 1059) at SYT00161666. Syngenta actually sold enough seed to plant 1.2 million acres in 2011. *See supra* SOAF ¶ 34.

**RESPONSE TO NO. 415.**    **Disputed and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Jack Bernens told a representative from Consolidated Grain and Barge about the number of acres for Viptera is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta

does not dispute that Jack Bernens provided the quoted language, but disputes the characterization of what it represented concerning the release of Viptera. Syngenta did not represent that it would be doing a limited release, and Plaintiffs have put forth no evidence, here or otherwise, to suggest that Syngenta was anything but transparent in its broad acre release of Viptera. With regard to second sentence of this statement of fact, Syngenta incorporates its response to Pls.' SOAF ¶ 34 herein.

416.   Syngenta knew at the time it launched the sale of Viptera that its 50,000-acre estimate was false. It takes nearly two years of planning to produce enough seed to market and sell to 12,000 farmers for planting on almost two million acres, a process that began long before the spring of 2011. Ex. 186, Giroux 30b6 Vol. II at 547:3-548:8.

**RESPONSE TO NO. 416.**   **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   What Syngenta knew about Viptera acres in 2011 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' cited evidence fails to support the fact they seek to establish, because the cited Randal Giroux testimony does not reflect what Syngenta knew, represented, or the timeline for producing and marketing seed to sell to farmers.

417.   Cargill's Randy Giroux testified: "[T]he magnitude of [Cargill's] response would have been significantly different. . . had we[] known that the plan was to commercialize almost 2 million acres ahead of the Chinese approval."). Ex. 186, Giroux 30b6 Vol. II at 548:10-549:1.

**RESPONSE TO NO. 417.**   **Disputed, assumes facts not in evidence, speculation, and immaterial to the grounds on which Syngenta**

**seeks summary judgment.**  What Randal Giroux would have done had he received different acreage information than he allegedly knew is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Mr. Giroux provide the quoted language, but it is patently false to assert that Mr. Giroux and the grain trade did not know in February 2011 that MIR162 would be planted on up to 2 million acres.  *See* Ex. 401 (R. Giroux Dep. Ex. 77 at CARIGLL000072489) ("Re: MIR 162 . . . may be up to 2 million US acres this year"); Syngenta's MSJ Ex 121 (R. Giroux Dep. Tr. 74:16-24) ("Q: So, does this refresh your memory that, as of February 16th, 2011, you were informed that MIR162 might be planted in up to 2 million US acres for 2011? A. Yes, that's correct."); *see also* Syngenta's MSJ SOF ¶ 92.  Moreover, Mr. Giroux's testimony is based on an inaccurate hypothetical that is not supported by the facts in evidence as to the timeline for Chinese approval.  Pls.' Opp'n Ex. 186 (R. Giroux Dep. Tr. 548:10-16) ("Q. If Cargill and other members of NAEGA had known in March of 2011 that, in fact, Syngenta would not have China approval by the fall of 2011, and that its plans were to sell enough seed to be planted on almost 2 million acres, would the industry have reacted differently with that information?").  Moreover, Mr. Giroux's testimony as to what Cargill would have done is speculative.

418.   Cargill also would have communicated its position on Viptera directly to its "roughly 102 elevators" and "roughly 50,000 producers," or farmers, with whom it works in the United

States. *Id.* at 432:9-433:11, 425:2-7, 508:22-510:6. 538:8-11 (answering "absolutely" we would have communicated the truth to its front-facing marketers who dealt with farmers). Farmers who did business with Cargill, if told Cargill would not accept Viptera because it was not going to be approved in the fall 2011, would not have purchased the seed. *Id.* at 539:13-540:2.

**RESPONSE TO NO. 418.  Disputed, not supported by the cited evidence, speculation, and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Randal Giroux would have done had he received different acreage information than he allegedly knew is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs' cited evidence fails to support the fact it seeks to establish, because there is no evidence linking what information Plaintiffs' believe Cargill did not receive and what Cargill would have then done had it had that information.  Moreover, the cited deposition testimony is pure conjecture on the part of Mr. Giroux as to whom he would have relayed information and Cargill's purported position, what information he would have shared, what the people he purported he would have told his position to would have done with that information, and what actions farmers would have taken had they received the information.  Indeed, Mr. Giroux concedes that had he received the purported accurate information Plaintiffs' allege Cargill did not receive, he does not even know what Cargill facilities would have done.  Pls.' Opp'n Ex. 186 (R. Giroux Dep. Tr. 539:8-11) ("If there was no approvals to

be granted, there was likely facilities where we would not have been

willing to accept that trait.").

419.   Many in the [sic] grain trade believed Syngenta had made its submission to China in
November 2009 and that Syngenta was going to receive Chinese approval in the fall of 2011.
*Id*. at 529:17-24, 532:25-533:6; Ex 217 (Giroux Dep. Ex. 79) at CARGILL000003042
("[T]he time to approval has been shared across the membership by NAEGA several
times.").

**RESPONSE TO NO. 419.**   **Disputed, not supported by the cited**

**evidence, hearsay, and immaterial to the grounds on which**

**Syngenta seeks summary judgment.**  What people in the grain trade

believed about when Syngenta made its initial submission to China for

import approval is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment.  In any event, Plaintiffs' cited evidence

fails to support the fact they seek to establish, which is ambiguous as

to time, because the cited evidence has no relation to what the grain

trade believed with regard to when Syngenta made its submission for

import approval to China and when Syngenta was going to receive

Chinese approval.   Randal Giroux's cited testimony, which is not

included as part of Exhibit 186, reflects only Cargill's belief.  Exhibit

217 does not relate to the timeline for approval for MIR162 or the

grain trade's understanding of when MIR162's import application was

initially submitted in China, but rather relates to the understood

approval process for Chinese import approvals of GM traits.  Finally,

Plaintiffs' statement as to what many in the grain trade believed is

hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns, Inc.*

*v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining

to consider hearsay evidence on summary judgment).

420.    By July 2011, Syngenta was getting "daily questions" from grain traders about the status of China's approval. It was "[m]ost important" to Syngenta to "get them comfortable that the approval is close, so they don't not only tell farmers not to bring their 162 varieties to them, but also not to buy the varieties for the planting next year." Ex. 195 (Dep. Ex. 931) at SYNG_00273594; Ex. 26, Hull Vol. I at 295:4-306:22.

**RESPONSE TO NO. 420.**    **Disputed and not supported by the cited**

**evidence.**  Syngenta does not dispute that Sarah Hull wrote the quoted

language in an email, but Plaintiffs' cited evidence fails to support the

fact they seek to establish, because Ms. Hull's email reflects that the

questions it was receiving from grain traders was not limited to

Chinese approval, but also related to EU approval.  Pls.' Opp'n Ex.

195 (S. Hull Dep. Ex. 931).  As to what Syngenta was saying to grain

traders "to get them comfortable," Syngenta's message was consistent

with its expectation that approval was coming in Q1 2012, because at

the time Syngenta had still not received questions on its dossier, and

still expected approval "in the first quarter of 2012."  Syngenta's MSJ

Ex. 15 (S. Hull Dep. Tr. 531:13-532:3).  Moreover, others in the grain

trade, like Syngenta, understood that Chinese approval in 2012 was

likely.  *See, e.g.*, Ex. 327 (A. Reed Dep. Tr. 90:12-92:7) (testifying

that two years from March 2010 submission was within the range of

when MIR162 ordinarily would be approved in China).

421.    In July 2011, Syngenta's corporate affairs department prepared Q&A sheets on the status of Viptera in China. In that document Syngenta stated it "expects Agrisure Viptera approval in China by the end of Q1 2012." Ex. 218 (Dep. Ex. 1527) at SYNG_00610047; Ex. 201, Adelman Vol. I at 237:13-238:16.

**RESPONSE TO NO. 421.**   **Undisputed.**

422.   On July 8, 2011, Syngenta's Ponsi Trivisvavet forwarded Charles Lee an email exchange Ms. Trivisvavet had with Lisa Zannoni about the status of Syngenta's Chinese submission. Ms. Trivisvavet wrote to Mr. Lee: "Not sure whether I feel good about Q1/Q2 2012." Ex. 4, Lee Vol. I at 182:10-183:21; Ex. 143 (Dep. Ex. 511).

**RESPONSE TO NO. 422.**   **Disputed and immaterial to the grounds on which Syngenta seeks summary judgment.**   Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.   At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.   But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.   *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation, SYNG_00450146).   Any alleged delays in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window.   *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing

357

prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").   In any event, Syngenta does not dispute that Ponsi Trivisvavet wrote the quoted language, but disputes the factual assertion to the extent Plaintiffs seek to establish that Syngenta believed as of July 8, 2011 that Chinese approval in the first half of 2012 was unachievable.   As Ms. Trivisvavet explained when discussing a similar email during her deposition, in reading this email, "you have to look at the context of the whole thing."  Syngenta's MSJ Ex. 34 (P. Trivisvavet Dep. Tr. 506:5-13).  Ms. Trivisvavet had just taken on her "new role as head of global corn and GM traits" and she was trying to understand the situation of regulatory.  *Id.* at 507:6-11. Ms. Trivisvavet further explained: "I started to get into the learning of that, and it you follow, there are emails after this that the head of regulatory, Lisa Zannoni, explained to me more why Q1 and Q2 2012 is achievable. She explained more, and with that, there was a document just few days after July the 8th, 2011 that she tries to

clarified it, and I had discussion with her, and that brought me up to have the comfort level and understand the regulatory, and there was a subsequent e-mail after that." *Id.* at 506:13-22.  *See also* Pls.' Opp'n Ex. 143 (C. Lee Dep. Ex. 511 at SYT00145021) (Ms. Zannoni explaining how the Chinese approval process works and the anticipated timeline).

423.    Later that same day, Ms. Trivisvavet emailed Mr. Lee again about "Viptera China: I'm really concerned whether Q1/Q2 2012 is still achievable. Could we talk on this still?" Ex. 4, Lee Vol. I at 179:19-182:4; Ex. 307 (Dep. Ex. 510).

> **RESPONSE TO NO. 423.**   **Disputed and immaterial to the grounds on which Syngenta seeks summary judgment.**  Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.  *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation, SYNG_00450146).  Any alleged delays in importing seeds into China for the in-country field

studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window. *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response."). In any event, Syngenta does not dispute that Ponsi Trivisvavet wrote the quoted language, but disputes the factual assertion to the extent Plaintiffs seek to establish that Syngenta believed as of July 8, 2011 that Chinese approval in the first half of 2012 was unachievable. As Ms. Trivisvavet explained when discussing this email during her deposition, in reading this email, "you have to look at the context of the whole thing." Syngenta's MSJ Ex. 34 (P. Trivisvavet Dep. Tr. 506:5-13). Ms. Trivisvavet had just taken on her "new role as head of global corn and GM traits" and she was trying to understand the situation of regulatory. *Id.* at 507:6-11. Ms.

Trivisvavet further explained: "I started to get into the learning of that, and it you follow, there are emails after this that the head of regulatory, Lisa Zannoni, explained to me more why Q1 and Q2 2012 is achievable.   She explained more, and with that, there was a document just few days after July the 8th, 2011 that she tries to clarified it, and I had discussion with her, and that brought me up to have the comfort level and understand the regulatory, and there was a subsequent e-mail after that."  *Id.* at 506:13-22.

424.    In August 2011, Syngenta crafted a "Agrisure Viptera: China Communications Plan." Ex. 219, Deposition of Paul Minehart Vol. I ("Minehart Vol. I") at 157:14-166:17; Ex. 220 (Dep. Ex. 1457) at SYNG_00697436.

## RESPONSE TO NO. 424.   Undisputed.

425.    The purpose of the Communications Plan was: "Assure growers the issue in being resolved to maintain confidence in the Agrisure Viptera Trait and mitigate impact on 2012 sales" Ex. 220 (Dep. Ex. 1457) at SYNG_00697436.

## RESPONSE TO NO. 425.   Disputed and not supported by the cited evidence.   Undisputed that the document cited contains the quoted language, but Plaintiffs' cited evidence fails to support the fact they seek to establish, because the quoted language from the "Agrisure Viptera: China Communications Plan" is a "strategy", and not specifically the plan's "purpose".

426.    The Communications Plan called for a letter to "address issues" from Charles "Chuck" Lee to growers, seed advisors (independent seed sales persons), and retail seed sales companies. *Id.* at SYNG_00697436-37.

## RESPONSE TO NO. 426.   Disputed and not supported by the cited evidence.   Syngenta does not dispute that the Communications Plan, as set forth in Plaintiffs' Opposition Exhibit 220, contemplated letters

from Chuck Lee, but Plaintiffs' cited evidence fails to support the suggestion that Mr. Lee would send a single letter to growers, seed advisors, and retail seed sales companies.

427.   The Communications Plan also called for distribution of the Q&As providing that Syngenta expected China to approve MIR162 by March 2012 to licensees, agronomists, ethanol plants, and key account managers. *Id.*

> **RESPONSE TO NO. 427.**   **Undisputed.**  Syngenta does not dispute that the Communications Plan, as set forth in Plaintiffs' Opposition Exhibit 220, contemplated as a strategy to distribute Q&As to the identified groups of individuals reflecting that Syngenta expected Chinese approval by the end of Q1 2012.

428.   Syngenta followed through by distributing the Q&As to these audiences, hoping the information would pass to growers and protect Viptera sales. Ex. 219, Minehart Vol. I at 171:6-174:17; 176:12-182:5; Ex. 221 (Dep. Ex. 1459) at SYNG_00697485 ("mitigate impact on 2012 sales").

> **RESPONSE TO NO. 428.**   **Disputed and not supported by the cited evidence.**  It is unclear what Plaintiffs mean by "these audiences," but to the extent they refer to the groups of individuals mentioned in Pls.' SOAF ¶ 427, Plaintiffs' cited evidence fails to support the facts they seek to establish, because the cited evidence does not actually show that Syngenta "followed through by distributing the Q&As."  Exhibit 221 is an email attaching the Communications Plan and related documents, and Exhibit 219 is testimony from Paul Minehart that discusses the Communications Plan, but Mr. Minehart does not actually testify regarding if the information had been disseminated. Syngenta does not dispute that Mr. Minehart testified that Syngenta

hoped that the information in the Q&As would be disseminated to growers after it was distributed to the other groups of individuals, but Plaintiffs' cited evidence fails to support that the intent behind that hope was to "protect Viptera sales."

429. On August 17, 2011, Syngenta mass distributed Charles Lee's "Letter to Growers" that reiterated Syngenta's expectation of a March 2012 approval date. Ex. 219, Minehart Vol. I at 174:23-176:6; Ex. 223 (Dep. Ex. 1458); Ex. 4, Lee Vol. I 166:8-20; Ex. 222 (Dep. Ex. 498).

**RESPONSE TO NO. 429.** **Disputed and not supported by the cited evidence.** Plaintiffs' factual assertion is vague as to the word "mass distributed." Syngenta does not dispute that Chuck Lee sent a letter to growers on August 17, 2011 that stated Syngenta expected Chinese approval for MIR162 in March 2012, but Plaintiffs' cited testimony does not specifically state that the letter was "mass distributed." Rather, the cited testimony just discusses the content of the August 17, 2011 letter.

430. The Letter to Growers was distributed to all corn purchasers of Syngenta, and not just Viptera purchasers. It was also sent to Syngenta's distributor brands and licensee brands. According to Lee, "the goal" of the Grower Letter "was to make sure that we — we picked up as many growers that we had in our system that plant corn." Ex. 4, Lee Vol. I at 166:14-24.

**RESPONSE TO NO. 430.** **Undisputed.** Syngenta does not dispute that the statement of fact accurately reflects Mr. Lee's understanding of the dissemination and goal of the August 17, 2011 letter.

431. Syngenta also sent a letter from Lee to "resellers" on August 17, 2011 that also stated that Syngenta expected Chinese approval in March 2012. Ex. 69, Lee Vol. II at 286:12- 287:12, Ex. 368 (Dep. Ex. 528).

**RESPONSE TO NO. 431.** **Undisputed.**

363

432.    On August 22, 2011, Syngenta sent additional letters to growers and "channel partners" alerting them that Syngenta sued Bunge for refusing to accept Viptera. Ex. 69, Lee Vol. II at 287:22-289:4, 292:4-10; Exs. 371 and 369 (Dep. Exs. 529 and 530).

> **RESPONSE TO NO. 432.**    **Undisputed.**  Syngenta does not dispute that it sent a letter to channel partners and growers that mentioned that Syngenta had filed a complaint against Bunge, but Plaintiffs' factual assertion is vague in its use of the word "alerting."    Syngenta additionally notes that Exhibit 371, which purports to be the August 22, 2011 letter sent to growers, is a rough draft.

433.    But in the weeks leading up to these letters, Syngenta's regulatory affairs team advised Syngenta management: "Latest guidance for China approval of MIR162 [would be] *Q2 2013* ." Ex. 144 (Dep. Ex. 76) at SYNG_00174433 (May 2011) (emphasis added).

> **RESPONSE TO NO. 433.**    **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**    Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet the November 2011 deadline.  *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. at 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011,

approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation, SYNG_00450146).   Any alleged delays in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window.  *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").  In any event, Plaintiffs' cited evidence fails to support the fact they seek to establish, because the draft slides do not reflect the advice of the regulatory affairs team to Syngenta management, and do not even establish that the information was ever sent to Syngenta management. Nor does Exhibit 144 reflect the actual timeline expected by the regulatory team.  According to Ms. Zannoni, the "actual, the official timelines is what we put in DeCo documents."  Ex. 358 (4/13/2016 L.

365

Zannoni Dep. Tr. 455:18-19).   Syngenta's belief was that approval

would take 24 months after the initial application submission.   *See*

Syngenta's MSJ SOF ¶¶ 42-43, 46, 48-49.

434.   And in July 2011, before the marketing staff created the Communications Plan, other
Syngenta managers had expressed to sales staff that Syngenta did not expect approval in
China "*for a few years.*" Ex. 20, Ozipko Dep. at 159:1-162:13; Ex. 35 (Dep. Ex. 495) at
SYNG_00013670 (emphasis added).

**RESPONSE TO NO. 434.**   **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.**   Pre-August 2011 documents expressing

uncertainty about Viptera's approval in China are irrelevant.   At most,

these documents reflect that prior to planting the in-country field

studies, there was uncertainty within Syngenta regarding whether or

not Syngenta would be receive the results of in-country field studies in

time for the November 2011 submission window.   But by the time

the August 17, 2011 Grower Letter was distributed, the field studies

were well underway and Syngenta knew that it was on track to meet

the November 2011 deadline.   *See, e.g.*, Syngenta's MSJ Ex. 35;

Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20)

(Syngenta's head of Chinese regulatory stating that as of August 2011,

approval was expected in Mar. 2012); Ex. 396 (Email re Support for

Viptera deregulation, SYNG_00450146).   Any alleged delays in

importing seeds into China for the in-country field studies are also

irrelevant because the in-studies were on track to meet the November

2011 submission window by August 2011, and Syngenta made its

submission in the November submission window.  *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response.").  In any event, Syngenta does not dispute that the cited email contains the quoted language, but disputes the assertion that Plaintiffs seem to make that Syngenta believed that MIR162 would not be approved in China until a few years after July 2011.  Exhibit 35 is an email between the Syngenta marketing team and a third party, and does not reflect the actual timeline expected by the regulatory team.  According to Ms. Zannoni, the "actual, the official timelines is what we put in DeCo documents."  Ex. 358 (4/13/2016 L. Zannoni Dep. Tr. 455:18-19).  Syngenta's belief was that approval would take 24 months after the initial application submission.  *See* Syngenta's MSJ SOF ¶¶ 42-43, 46, 48-49.  Syngenta also disputes the assertion that Exhibit 35 reflects a message from "Syngenta managers."  Plaintiffs' cited evidence does

367

not establish that Mr. Walsh, the author of the email in Exhibit 35, is a member of "Syngenta management," that Mr. Walsh was speaking on behalf of Syngenta at the time he wrote this email, that Mr. Walsh had any knowledge of when Chinese approval was expected, or that Mr. Walsh's statements conveyed *Syngenta's* expectations about the timing of Chinese approval.  Exhibit 20 is deposition testimony from Grant Ozipko that seeks to authenticate Exhibit 354, and does not support the facts Plaintiffs seek to establish.  In any event, Mr. Ozipko was not part of Syngenta's regulatory group, had no experience working on Chinese approvals, and was not even working on any corn traits by July 2011.  Ex. 366 (G. Ozipko Dep. Tr. 12:16-25, 46:10-23).

435.   Just three weeks before Syngenta blanketed the industry with Lee's letters, Zannoni emailed Lee, "Hopefully we can pull it off [March 2012 deregulation] but there are some significant issues to get through." Ex. 4, Lee Vol. I at 192:20-194:7, 194:14-18; Ex. 308 (Dep. Ex. 514) at SYT00153002.

<u>**RESPONSE TO NO. 435.**</u>   **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Pre-August 2011 documents expressing uncertainty about Viptera's approval in China are irrelevant.  At most, these documents reflect that prior to planting the in-country field studies, there was uncertainty within Syngenta regarding whether or not Syngenta would be receive the results of in-country field studies in time for the November 2011 submission window.  But by the time the August 17, 2011 Grower Letter was distributed, the field studies were well underway and Syngenta knew that it was on track to meet

the November 2011 deadline. *See, e.g.*, Syngenta's MSJ Ex. 35; Syngenta's MSJ Ex. 20 (3/24/16 Y. Zhang Dep. Tr. 693:5-20) (Syngenta's head of Chinese regulatory stating that as of August 2011, approval was expected in Mar. 2012); Ex. 396 (Email re Support for Viptera deregulation, SYNG_00450146). Any alleged delays in importing seeds into China for the in-country field studies are also irrelevant because the in-studies were on track to meet the November 2011 submission window by August 2011, and Syngenta made its submission in the November submission window. *See* Pls.' Opp'n Ex. 140 ("[t]his morning I made the final submission of MIR162 to MoA with a complete dossier to replacing prior split version made on Nov 1. Finally we make it to catch up Nov 1 window on 162 submission."); *see also* Ex. 360 (4/12/2016 L. Zannoni Dep. Tr. 123:22-124:4) ("There was one submission made on November 1 in the time frame, and then we had permission, 10 days for the MoA report to get done and provided in with the submission"); Ex. 361 (3/23/2016 Y. Zhang Dep. Tr. 520:24-521:15) ("MoA was allowing the companies to resubmit because they themselves missed the cutoff, the date November 1 when they were supposed to give a response."). In any event, Syngenta does not dispute that Lisa Zannoni wrote the quoted text, but disputes the implication that the quoted text meant that Syngenta believed it would not receive approval at the end of Q1 2012. At the time of the email, reflected in Plaintiffs Opposition

Exhibit 308, the field trials in China were still underway.  To be sure,

Syngenta fully expected approval in March 2012 given that Syngenta

already had "most of our approvals already from . . . quite a few

countries that already reviewed the package," and the view that "[w]e

had already [had] any questions that we would have [from China] . . .

[so] there was no reason to believe that we would have [additional]

questions." Syngenta's MSJ Ex. 24 (L. Zannoni Dep. Tr. 633:16-

635:12); *see also* Pls.' Opp'n Ex. 4 (C. Lee Dep. Tr. 194:9-13)

(regarding Exhibit 308) ("So the regulatory team, you know, stayed on

their Q1 approval time line belief. Certainly there was some challenges

to that date, but they never waivered from that date in their projected

target launch date, no.").

436.    As calls poured in from farmers, Syngenta created the call center contemplated in the
Communications Plan. Syngenta gave call center representatives a script to inform farmers
that Syngenta was "on track" to receive approval from China by March 2012. Ex. 219,
Minehart Vol. I at 183:2-186:16; Ex. 224 (Dep. Ex. 1460) at SYNG_00690838.

**RESPONSE TO NO. 436.**    **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.**    Syngenta's creation of a call center and what

the script used at the call center said is irrelevant to the grounds

asserted in Syngenta's motion for summary judgment.  In any event,

Syngenta does not dispute that it created a call center and created

materials for call center staff to use, but Plaintiffs' cited evidence fails

to support the fact they seek to establish regarding the volume of calls,

because there is no cited evidence that "calls poured in from farmers"

370

or that Syngenta set up the call center because of calls pouring in from farmers.  Further, although the call center materials stated that the staff may report that Syngenta was "on track" to receive approval in China in March 2012, the "on track" language was intended to reflect that the expected approval had not changed, which is consistent with the instruction in other parts of the call center materials that provided that the call center staff could confirm that Syngenta currently "expected" that Chinese approval "will be in late March 2012."  Pls.' Opp'n Ex. 224 (P. Minehart Dep. Ex. 1460, at SYNG_00690837); *see also* Pls.' Opp'n Ex. 219 (P. Minehart Dep. Tr. 183:2-186:16) (discussing Exhibit 224 and confirming its contents).

437.    Syngenta's Communications Plan materials also downplayed the importance of China and claimed that China was not a "key market" for U.S. com. Ex. 218 (Dep. Ex. 1527) at SYNG_00610048 (Q&As claim that Syngenta had received approval from all "key markets); Ex. 222 (Dep. Ex. 498) (Grower Letter claiming China not a "key market" and "China has not previously represented a substantial portion of the U.S. corn export market.").

RESPONSE TO NO. 437.   Disputed and not supported by the cited evidence.  Syngenta does not dispute that the Q&As and August 17, 2011 letter to growers did not identify China as a key market, but Plaintiffs' cited evidence fails to support the notion that those materials "downplayed the importance of China" as a market for U.S. corn.  It is undisputed that Syngenta did not consider China to be a key market as of August 2011, a position that is consistent with the USDA data, BIO, and the position of the NCGA.  *See* Syngenta's SOF ¶¶ 33-40 (discussing USDA data); Syngenta's MSJ Ex. 173 (M. O'Mara

371

Dep. Ex. 3 at SYNG_00367782 n.2, SYNG_00367785) (BIO policy

identifying key markets); Ex. 403 (Sept. 7, 2011 e-mail from B.

Lawless attaching NCGA letter at SYNG_00675794)

("Commercialization of Viptera was done in accordance with the U.S.

regulatory approval system and met the policy requirements of NCGA

and Biotechnology Industry Organization.").

438.   The Communications Plan also called for an effort to gain the support of the National
Corn Growers Association ("NCGA"). Ex. 220 (Dep. Ex. 1457) at SYNG_00697437. So
Syngenta misled the NCGA about the status of import approval.

**RESPONSE TO NO. 438.**   **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.**   Whether Syngenta had a communications plan

that called for an effort to gain the support of the NCGA is irrelevant

to the grounds asserted in Syngenta's motion for summary judgment.

In any event,  Plaintiffs' cited evidence fails to support the facts they

seek to establish, because there is no cited evidence reflecting that the

Communications Plan specifically sought "to gain the support of the"

NCGA.  Rather, the Communications Plan, as reflected in Plaintiffs'

Opposition Exhibit 220, states that it sought to provide information to

enable the NCGA "to be supportive of Syngenta's position and

reassure growers."  There is no evidence to suggest that the NCGA

was not already supportive of Syngenta's position.  Indeed, the NCGA

"put in writing that -- that Syngenta launched [MIR162] appropriately,

and they supported the launch of [MIR162]."  Ex. 402 (C. Lee Dep.

Tr. 762:18-25); *see also, e.g.*, Ex 403 (Sept. 7, 2011 e-mail from B. Lawless attaching NCGA letter at SYNG_00675794) ("Commercialization of Viptera was done in accordance with the U.S. regulatory approval system and met the policy requirements of NCGA and Biotechnology Industry Organization."). Furthermore, Plaintiffs' claim that "Syngenta misled the NCGA about the status of import approval" has no citation and is false.

439.   Mike Mack told the NCGA that Syngenta had done everything possible as of July 2011 to secure Chinese approval. Ex. 225, Deposition of Nathan Fields Vol. I ("Fields Vol. I") at 66:8-20; Ex. 226 (Dep. Ex. 2204) at NCGA0023690.

**RESPONSE TO NO. 439.**   **Hearsay and immaterial to the grounds on which Syngenta seeks summary judgment.**   What Mike Mack told the NCGA about Chinese approval in July 2011 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Rick Tolman, in summarizing a discussion he had with Mr. Mack, stated that Mr. Mack said "Syngenta has done everything possible."  Pls.' Opp'n Ex. 226 (N. Fields Dep. Ex. 2204, at NCGA0023690).  Mr. Mack further stated that, despite that effort, MIR162 "will not be approved until next winter or spring at best."  Furthermore, Mr. Tolman's recollection of what Mr. Mack said is hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

440.   Syngenta told the NCGA that it did not expect any delays with the import approval. Ex. 225, Fields Vol. I at 64:10-18.

373

**RESPONSE TO NO. 440.** **Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.** What Syngenta told the NCGA about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute that Nathan Fields provided the cited testimony, but Mr. Fields' testimony cannot support the alleged statement of fact because MDL plaintiffs' counsel's question assumed facts without foundation in asserting that "Syngenta told the NCGA that it did not expect any delays with the import approval," and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.

441.  Syngenta did not disclose to the NCGA that its own scientists had published scientific data that contradicted the data in Syngenta's Chinese dossier. *Id.* at 63:10-16.

**RESPONSE TO NO. 441.** **Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.** What Syngenta told the NCGA about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute that Nathan Fields provided the cited testimony, but Mr. Fields' testimony cannot support the alleged statement of fact because MDL plaintiffs' counsel's question assumed erroneous and misleading facts without foundation in his deposition question, asserting that "Syngenta did not disclose to the NCGA that its own scientists had published scientific data that contradicted the data in

Syngenta's Chinese dossier," and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.

442.    Syngenta did not disclose that its own employees considered its dossier to be of poor quality. *Id.* at 63:21-64:4.

> **RESPONSE TO NO. 442.   Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Syngenta told the NCGA about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Nathan Fields provided the cited testimony, but Mr. Fields' testimony cannot support the alleged statement of fact because MDL plaintiffs' counsel's question assumed erroneous and misleading facts without foundation in his deposition question, asserting that "Syngenta did not disclose that its own employees considered its dossier to be of poor quality," and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.

443.    Syngenta did not disclose that its regulatory personnel in China felt understaffed and underfunded. *Id.* at 64:6-9

> **RESPONSE TO NO. 443.   Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Plaintiffs' asserted fact is vague insofar as Plaintiffs do not indicate to whom "Syngenta did not disclose."  Assuming Plaintiffs refer to the NCGA, what Syngenta told the NCGA about Chinese approval is irrelevant to the grounds asserted

in Syngenta's motion for summary judgment.  In any event, Syngenta

does not dispute that Nathan Fields provided the cited testimony, but

Mr. Fields' testimony cannot support the alleged statement of fact

because MDL plaintiffs' counsel's question assumed erroneous and

misleading facts without foundation in his deposition question,

asserting that Syngenta "did not disclose that its regulatory personnel

in China felt understaffed and underfunded," and thus the question and

answer are inadmissible hypotheticals rather than evidence of facts.

444.    Syngenta did not disclose that it missed the November 2009 deadline to submit its
application. Ex. 227, Deposition of Nathan Fields Vol. II ("Fields Vol. II') at 485:11-21.

> **RESPONSE TO NO. 444.  Disputed, assumes fact not in evidence,**
>
> **lacks foundation, and immaterial to the grounds on which**
>
> **Syngenta seeks summary judgment.**  Plaintiffs' asserted fact is
>
> vague insofar as Plaintiffs do not indicate to whom "Syngenta did not
>
> disclose."  Assuming Plaintiffs refer to the NCGA, what Syngenta told
>
> the NCGA about Chinese approval is irrelevant to the grounds asserted
>
> in Syngenta's motion for summary judgment.  In any event, Syngenta
>
> does not dispute that Nathan Fields provided the cited testimony, but
>
> Mr. Fields' testimony cannot support the alleged statement of fact
>
> because ADM's counsel's question assumed erroneous and misleading
>
> facts without foundation in his deposition question, asserting that
>
> "Syngenta did not disclose that it missed the November 2009 deadline
>
> to submit its application," and thus the question and answer are
>
> inadmissible hypotheticals rather than evidence of facts.

376

445.   Syngenta did not disclose it waited one year to ship seeds to China for field tests due to its own internal indecision, which delayed plantings until July 2011. *Id.* at 485:22-486:18.

> **RESPONSE TO NO. 445.  Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.**  Plaintiffs' asserted fact is vague insofar as Plaintiffs do not indicate to whom "Syngenta did not disclose."  Assuming Plaintiffs refer to the NCGA, what Syngenta told the NCGA about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Nathan Fields provided the cited testimony, but Mr. Fields' testimony cannot support the alleged statement of fact because ADM's counsel's question assumed erroneous and misleading facts without foundation in his deposition question, asserting that "Syngenta did not disclose it waited one year to ship seeds to China for field tests due to its own internal indecision, which delayed plantings until July 2011," and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.

446.   Syngenta did not disclose that its employees believed the late plantings could result in bad data. *Id.* at 486:19-25.

> **RESPONSE TO NO. 446.  Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.**  Plaintiffs' asserted fact is vague insofar as Plaintiffs do not indicate to whom "Syngenta did not disclose."  Assuming Plaintiffs refer to the NCGA, what Syngenta told

the NCGA about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Nathan Fields provided the cited testimony, but Mr. Fields' testimony cannot support the alleged statement of fact because ADM's counsel's question assumed erroneous and misleading facts without foundation in his deposition question, asserting that "Syngenta did not disclose that its employees believed the late plantings could result in bad data," and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.

447.    Syngenta did not disclose that the Ministry of Agriculture had 270 days from the submission of Syngenta's completed, full dossier to respond. *Id.* at 487:10-21.

**RESPONSE TO NO. 447.**   **Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Plaintiffs' asserted fact is vague insofar as Plaintiffs do not indicate to whom "Syngenta did not disclose."  Assuming Plaintiffs refer to the NCGA, what Syngenta told the NCGA about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta also notes that the referenced testimony is not contained in the cited exhibit.   That said, Syngenta does not dispute that Nathan Fields provided the cited testimony, but Mr. Fields' testimony cannot support the alleged statement of fact because MDL plaintiffs' counsel's question assumed erroneous and misleading facts without foundation in his deposition question, asserting that "Syngenta did not disclose

378

that the Ministry of Agriculture had 270 days from the submission of Syngenta's completed, full dossier to respond," and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.

448. Syngenta similarly did not disclose these facts to the U.S. Grains Council, Cargill and ADM. Ex. 102, Sleight Vol. I at 262:2-10, 270:2-273:9-15; Ex. 228, Deposition of William Hale as a corporate representative of Cargill Vol. II ("Hale 30b6 Vol. II") at 404:14-420:21; Ex. 82, Boerm Vol. II at 500:7-509:19.

**RESPONSE TO NO. 448.** **Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.** Plaintiffs' asserted fact is vague in its use of "these facts," but for purposes of this question, Syngenta assumes that Plaintiffs refer to the same stock questions that Plaintiffs asked Nathan Fields in the foregoing statements of fact, even though the questions in the cited testimony are not entirely the same as those asked of Mr. Fields. Assuming so, what Syngenta told the U.S. Grains Council, Cargill, and ADM about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Messrs. Sleight, Boerm, and Hale's testimonies concerning these facts cannot support the alleged statements of fact because counsel's question assumed erroneous and misleading facts without foundation in the deposition questions, and thus the questions and answers are inadmissible hypotheticals rather than evidence of facts.

379

449.   Syngenta consistently stayed on message with the constant and consistent theme to all audiences that Syngenta "was on track" to receive approval from China by March 2012. Ex., 219, Minehart Vol. I at 205:11-206:5; 237:14-239:8; *see also* Ex. 229 (Dep. Ex. 1463) (August 22, 2011 press release).

### RESPONSE TO NO. 449.   Immaterial to the grounds on which Syngenta seeks summary judgment.   Whether Syngenta consistently stayed on message with regard to Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Syngenta does not dispute that it believed MIR162 would receive Chinese approval by March 2012 and communicated that belief.

450.   Syngenta was concerned that any uncertainty about whether Viptera would be approved by the first quarter of 2012 — in time for planting season — would hurt sales. Lee circulated a draft letter to growers accompanied by an internal memo stating the objective of the letter was to "encourage purchase of seed with the Agrisure Viptera trait." Ex. 219, Minehart Vol. I at 298:13-301:22; Ex. 230 (Dep. Ex. 1475) at SYNG_00675492.

### RESPONSE TO NO. 450.   Disputed and not supported by the cited evidence.   Syngenta does not dispute that Plaintiffs' Opposition Exhibit 230 is an email attaching a draft letter that is accompanied by an internal document reflecting the quoted objective, but Plaintiffs' cited evidence fails to support the other facts they seek to establish, because there is no indication that Chuck Lee circulated the rough draft of letter, or even reviewed the letter by this point in time, and there is no evidence to support the statement that "Syngenta was concerned that any uncertainty about whether Viptera would be approved by the first quarter of 2012 — in time for planting season — would hurt sales."   Plaintiffs' citation to the testimony of Paul

Case 2:14-md-02591-JWL   Document 2996-1   Filed 03/13/17   Page 382 of 475

Minehart attempts to authentic Exhibit 230, and does not support the

facts Plaintiffs seek to establish.

451.    Syngenta emails state the company needed to get grain elevators "comfortable that the approval is close so they don't not only tell farmers not to bring their 162 varieties to them but also not to buy the varieties for planting next year." Ex. 231 (Dep. Ex. 931) at SYNG_00273594.

> **RESPONSE TO NO. 451.  Disputed, not supported by cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Syngenta emails state about grain elevators getting comfortable that approval is close is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that a July 5, 2011 email from Sarah Hull contains the quoted language, but disputes that the email specifically refers to what Syngenta needs to do with respect to grain elevators, as opposed to what Ms. Hull sees as important for grain traders that are asking questions.  Pls.' Opp'n Ex. 231 (S. Hull Dep. Ex. 931, at SYNG_00273594).

452.    In another internal email chain, Jack Bernens said he was "trying to buy some time until we get things planted this spring." Ex. 128 (Dep. Ex. 958) at SYNG_00352205.

> **RESPONSE TO NO. 452.  Immaterial to the grounds on which Syngenta seeks summary judgment.**  What Jack Bernens said concerning "buying more time" is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Jack Bernens wrote the quoted text, but notes that Ms. Bernens email is from March 1, 2011.

381

453.  In May 2012, Syngenta's Angus Kelley emailed Anthony Reed at ADM that "there are no scientific/safety concerns with [Viptera]. It's just snagged in the labyrinthine Chinese regulatory system." Ex. 232 (Reed Dep. Ex. 70) at ADM-00121161; Ex. 72, Reed Vol. I at 341:7-343:4.

**RESPONSE TO NO. 453.  Immaterial to the grounds on which Syngenta seeks summary judgment.**  What Agnus Kelley told Anthony Reed about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Angus Kelley wrote the quoted text, but notes that Syngenta did not receive questions from Chinese regulators regarding MIR162 until June 15, 2012.  *See* Syngenta's MSJ SOF ¶¶ 51-53.

454.  In April 2012, Syngenta released sales and customer marketing "Talking Points" for use with customers. The Talking Points stated "Syngenta has had several indications that a successful review of its application has been completed; however the notification of the approval has yet to be received." Ex. 233 (SYNG_00610149); *see also* Ex. 234 (Dep. Ex. 1478); Ex. 219 Minehart Vol. I at 321:21-325:5; Ex. 235 (Dep. Ex. 80) at SYT000377262; Ex. 31, Huber Vol. II at 467:17-470:13.

**RESPONSE TO NO. 454.  Immaterial to the grounds on which Syngenta seeks summary judgment.**  The existence and contents of Syngenta talking points is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta notes that Plaintiffs cite several different emails with talking points, only one of which relates to the Sales and Customer Marketing team.

455.  In fact, Syngenta had not heard from Chinese officials. Ex. 31, Huber Vol. II at 467:17-470:13, 480:23-482:2.

**RESPONSE TO NO. 455.  Disputed, not supported by the facts, and immaterial to the grounds on which Syngenta seeks summary**

382

**judgment.**   Whether Syngenta heard from the Chinese officials is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Plaintiffs asserted fact is vague, as it is not clear what time Plaintiffs are referring to and what is meant by "Syngenta had not heard from Chinese officials."   To the extent Plaintiffs refer to around the time of dissemination of the talking points referred to in Pls.' SOAF ¶ 455, Scott Huber testified that, although he could not specifically point to any documents, "there were a lot of communications going" with the Ministry of Agriculture.  Pls.' Opp'n Ex. 31 (S. Huber Dep. Tr. 469:3-14).

456.   Cargill's Randy Giroux testified: "[B]ecause Syngenta had a monopoly on the information of the status of that application, and because we relied solely on Syngenta to provide us with information on the status of their application, by 2012, if I'm not mistaken, we had been informed several times by Syngenta that. . . they had been granted approval, and it just needed a signature on the Minister's desk." Ex. 244, Giroux Vol. I at 97:9-98:9.

**RESPONSE TO NO. 456.**   **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   What Randal Giroux stated about Syngenta's purported monopoly on the information is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Plaintiffs' cited evidence does not contain the quoted language, but Syngenta does not dispute that quoted language appears in the record. Syngenta specifically disputes that "Syngenta had a monopoly" on information.  *See supra*, Syngenta's Response to Pls.' SOAF ¶ 376.

457.   William Hale of Cargill similarly testified: "I don't think any of us ever believed that MIR162 wasn't an issue anymore, other than when Syngenta would tell us, you know, it's on

the minister's desk to be signed, or we have approval, we're just waiting for the safety certificates to be delivered. That's the only information we could really rely on. We had no other information that would be better than what Syngenta could tell us, and that's information we relied on to make sales." Ex. 250, Deposition of William Hale as a corporate representative of Cargill Vol. I ("Hale 30b6 Vol. I") at 222:17-223:4; *see also* Ex. 279, Deposition of William Hale is his personal capacity Vol. I ("Hale Vol. I") at 185:8-13 ("Cargill would take that as input, along with many other inputs, but it was secondary to what Syngenta would be telling us. That was only true source of what was going on in China at the time.").

**RESPONSE TO NO. 457.** **Mischaracterizes evidence and immaterial to the grounds on which Syngenta seeks summary judgment.** Bill Hale's testimony about reliance on Syngenta's information is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute that the quoted language is contained in Plaintiffs' cited evidence, but Syngenta notes that Plaintiffs omit the language shortly before or after that testimony reflecting that Cargill had contacts within China that could inform Cargill about the status of MIR162's approval in China. *See, e.g.*, Pls.' Opp'n Ex. 250 (W. Hale Dep. Tr. 222:8-11) ("Q: So, you don't know -- did Cargill have contacts in China in the 2012/2013 time period? A. Well, our contacts would be our customer relationship individuals talking to COFCO of the privates. It could be that Andrew Wong may have been talking to a lower-level government person who really wouldn't be in the know"); Pls.' Opp'n Ex. 279 (W. Hale Dep. Tr. 186:21-24) (explaining that Cargill was "looking for any piece of information we get", which included asking its Chinese customers about MIR162).

384

458.   Randy Giroux testified that, as of November 1, 2011, he did not recall that anyone at
Syngenta told him Syngenta had "blown the November 1st, 2011, window for submission to
China" or that "Syngenta had not completed one of the two studies required, the rat study."
Ex. 186, Giroux 30b6 Vol. II at 588:23-589:6.

**RESPONSE TO NO. 458.**   **Disputed, assumes fact not in evidence,**

**lacks foundation, and immaterial to the grounds on which**

**Syngenta seeks summary judgment.**   Randal Giroux's recollection

about whether Syngenta told him about "blowing" the November 1,

2011 window is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment.   In any event, Syngenta does not

dispute that Mr. Giroux provided the cited testimony, but Mr. Giroux's

testimony cannot support the alleged statement of fact because MDL

plaintiffs' counsel's question assumed erroneous and misleading facts

without foundation in his deposition question, and thus the question

and answer are inadmissible hypotheticals rather than evidence of

facts.

459.   In response to the question: "Did anyone at Syngenta share with you on or about
November 1st, 2011, that Syngenta was concerned that because of the late planting and
because of the rush for the rat study that the data they may submit could be bad?" Giroux
responded: "They shared - they shared no — no information with us on the — on the
technical issues related to that submission." *Id.* at 590:8-17.

**RESPONSE TO NO. 459.**   **Disputed, assumes fact not in evidence,**

**lacks foundation, and immaterial to the grounds on which**

**Syngenta seeks summary judgment.**   Randal Giroux's testimony

about what information Syngenta shared with him is irrelevant to the

grounds asserted in Syngenta's motion for summary judgment.   In any

event, Syngenta does not dispute that Randall Giroux provided the

385

cited testimony, but Mr. Giroux's testimony cannot support the alleged

statement of fact because MDL plaintiffs' counsel's question assumed

erroneous and misleading facts without foundation in his deposition

question, and thus the question and answer are inadmissible

hypotheticals rather than evidence of facts.

460.    On April 8, 2012, Syngenta's CEO, Michael Mack, told reporters on an earnings call that approval in China would be "in a matter of a couple of days." Ex. 236, Mack Vol. II at 378:23-384:5; Ex. 238 (Dep. Ex. 1821) at 24.

**RESPONSE TO NO. 460.    Disputed, incomplete, not supported by**

**the cited evidence, and immaterial to the grounds on which**

**Syngenta seeks summary judgment.**  What Mike Mack told reporters

on an earnings call is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment.   In any event, Syngenta does not

dispute that Mr. Mack participated in an earnings call in April 2012,

but disputes that the call took place on April 8, 2012.  Plaintiffs' cited

evidence reflects that an earnings call took place on April 18, 2012.

Syngenta also disputes that the version of the April 18, 2012 earnings

call cited by Plaintiffs is necessarily accurate.   Syngenta does not

dispute that Mr. Mack said the quoted language during that call, but

Plaintiffs' quoted language is incomplete. The complete statement from

Mr. Mack in the correct version of the April 18, 2012 earnings call

transcript is as follows, "On the import approval, it has import approval in

all of the major markets. There isn't outstanding approval for China,

which we expect to have quite frankly within the matter of a couple of

days. That remains on track for approval to the very best of our ability. Of

386

course, the regulatory authorities are not something that we can handicap definitively, but we know of no issue with that whatsoever…" Pls.' Opp'n Ex. 238 (M. Mack Dep. Ex. 1821).

461.   In June 2012, Charles Lee sent another letter to Syngenta growers advising them that China had "an additional request ahead of granting approval for the Agrisure Viptera trait." Ex. 239 (Taets Dep. Ex. 340); Ex. 251, Taets Vol. I at 285:25-286:19.

**RESPONSE TO NO. 461.   Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Chuck Lee's June 2012 letter to Syngenta growers is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Plaintiffs' asserted fact is vague, as it unclear what Plaintiffs mean by "another" letter.   Syngenta does not dispute that Mr. Lee sent a letter to Syngenta customers on June 21, 2012 that includes the quoted language, but Plaintiffs' cited evidence shows only that the letter was sent to individuals at ADM.   Exhibit 251 is deposition testimony from Joe Taets that seeks to authenticate Exhibit 239, and does not support the facts Plaintiffs seek to establish.

462.   ADM's Joseph Taets received the letter and interpreted this statement to mean there were not any issues with the application and approval was coming. Ex. 240, Taets Vol. II at 450:16-451:4, 451:11-452:18.

**RESPONSE TO NO. 462.   Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Joe Taets' interpretation of Chuck Lee's June 21, 2012 letter is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Syngenta does not dispute that Joe Taets recalled receiving the June 21, 2012 letter from

387

Chuck Lee, but Plaintiffs' cited evidence fails to support the fact that Mr. Taets "interpreted this statement to mean there were not any issues with the application and approval was coming," because Mr. Taets does not use those words in his testimony.  Rather, Mr. Taets testifies that "It sounds like they asked a few questions ahead of granting approval."  Pls.' Opp'n Ex. 240 (J. Taets Dep. Tr. 452:3-4).  Plaintiffs' cited evidence contains no testimony concerning when Mr. Taets expected approval.  Moreover, Syngenta's June 21, 2012 letter speaks for itself.  That letter specifically states that Chinese regulatory authorities had raised questions on the MIR162 dossier and that Syngenta is "diligently working with the Chinese regulatory authorities to address this request."  Pls.' Opp'n Ex. 239 (J. Taets Dep. Ex. 340 at ADM-00133102).  Further, the letter states that Syngenta has even "enlisted the support of the U.S. Department of Agriculture, the U.S. Trade Representative and other authorities in the countries that trade with China and where the Agrisure Viptera trait has been approved."  *Id.*

463.    Syngenta repeatedly told Cargill in 2012 that Viptera was "on track" for approval and that the application was sitting on the Minister's desk awaiting his signature. Ex. 186, Giroux 30b6 Vol. II at 597:4-15; Ex. 241 (Dep. Ex. 571); Ex. 45, Giroux Vol. II at 378:3-379:2; Ex. 242 (Giroux Dep. Ex. 88) at CARGILL000006833; Ex. 244 Giroux Vol. I at 148:20-151:23.

**RESPONSE TO NO. 463.    Disputed, incomplete, not supported by the cited evidence, hearsay, and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Syngenta told Cargill about Chinese approval is irrelevant to the grounds asserted in

388

Syngenta's motion for summary judgment.  In any event, Plaintiffs' asserted fact is vague, insofar as it is unclear what Plaintiffs mean when they state "on track" for approval.  Syngenta does not dispute that Plaintiffs' cited evidence contains a May 10, 2012 email from Chuck Lee to Randal Giroux stating Viptera's approval was on track, but Plaintiffs' cited evidence does not show a representation by Syngenta beyond the "on track" statement as to Syngenta's expected approval date.  As of May 10, 2012, Syngenta had not received any indication from Chinese regulators that MIR162 would not be approved.  *See* Syngenta's MSJ SOF ¶¶ 51-53.  Plaintiffs' cited evidence likewise fails to support the fact that Syngenta told Cargill that the "application was sitting on the Minister's desk awaiting his signature."  This asserted fact presumably relates to Exhibit 242, wherein Mr. Lee states in a May 9, 2012 email that approval was "still pending signature," but this is not a complete quote.  Mr. Lee states: "Currently the entire biotech dossier is on the MOA's desk still pending signature. It is our understanding that no trait approvals have been granted due to issues with a few specific trait submissions. It it also our understanding that this delay has nothing to do with the Viptera submission. The unfortunate issue is we do not know when the approval will be granted. I should get an update tomorrow morning. I will try to call you after the meeting with the latest information."  Pls.' Opp'n Ex. 242 (R. Giroux Dep. Ex. 88, at CARGILL000006833).

389

Plaintiffs' cited evidence, which also provides two examples of updates from Syngenta to Cargill, also does not support the fact that in 2012, Syngenta "repeatedly" provided the asserted information.  The cited deposition testimony from Mr. Giroux does not provide otherwise.  Exhibits 45 and 186 attempt to authenticate Exhibits 186 and 242, and do not support the facts Plaintiffs seek to establish.  The testimony cited in Exhibit 244 relates to the 2014 timeframe and does not discuss communications between Syngenta and Cargill.  Finally, Cargill's testimony about what Syngenta said is hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

464.    Cargill's Giroux was asked: "Now, were you aware that in the summer or June of 2012 that, in fact, Syngenta's November 2011 submission had been rejected by the Chinese regulatory authorities and they had asked technical questions that had to be responded to by Syngenta?" Giroux testified: "No, we were unaware they had rejected that application." Ex. 186, Giroux 30b6 Vol. II at 599:14-23. And to the question "were you aware that [Chinese regulatory authorities] had raised technical questions that Syngenta needed to answer," Giroux responded: "We were unaware there were substantial technical questions, that's correct." *Id.*

**RESPONSE TO NO. 464.**   **Disputed, assumes fact not in evidence, lacks foundation, and immaterial to the grounds on which Syngenta seeks summary judgment.**   What Cargill knew about Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Syngenta does not dispute that Randal Giroux provided the quoted testimony, but notes that second portion of the quoted testimony in which Mr. Giroux states

he was not aware of "substantial technical questions" was not included in Plaintiffs' cited evidence. Mr. Giroux's testimony also cannot support the alleged statement of fact because MDL plaintiffs' counsel's question assumed erroneous and misleading facts without foundation in his deposition question, and thus the question and answer are inadmissible hypotheticals rather than evidence of facts. Syngenta specifically disputes that Cargill was not made aware that Syngenta had received questions from Chinese regulators in June 2012. *See* Ex. 404 (D. Baudler Dep. Ex. 16) ("Syngenta called to confirm that China gov has come back to them official with additional safety questions.").

465.    And when Giroux was asked: "Had Cargill known that Syngenta's first full submission had been rejected on scientific grounds in the summer of 2012 and its resubmission rejected on scientific grounds in the summer of 2013, would . . . Cargill have taken different actions armed with that information?" Giroux testified: "Yes, so, as I indicated in my earlier testimony, that the regulatory status of that trait and the basis of that regulatory status ... is a significant part of our risk assessment internally in terms of . . . the commercial decisions we make, and so . . . . it's one thing to hear that it's completed the full food and feed safety assessment, and it's strictly an administrative issue and that's the reason, and we could very well understand why we would see regulatory discretion from the Chinese Government. If we'd have known this, that there were scientific problems with the application and the scientific problems had gone on for years within the Chinese Government, we may have thought differently about how long China would continue to let this event be present in China or . . . how long it would take until the fact that there was scientific issues here, whether or not the Chinese Government would feel they would need to take action against this particular trait." *Id.* at 604:2-605:14.

**RESPONSE TO NO. 465.**    **Disputed, assumes fact not in evidence, lacks foundation, speculation, and immaterial to the grounds on which Syngenta seeks summary judgment.**    What Cargill knew about Chinese approval is irrelevant to the grounds asserted in

391

Syngenta's motion for summary judgment.  In any event, Syngenta

does not dispute that Randal Giroux provided the quoted testimony,

but Mr. Giroux's testimony cannot support the alleged statement of

fact because MDL plaintiffs' counsel's question assumed erroneous

and misleading facts without foundation in his deposition question,

asserting "Had Cargill known that Syngenta's first full submission had

been rejected on scientific grounds in the summer of 2012 and its

resubmission rejected on scientific grounds in the summer of 2013,

would . . . Cargill have taken different actions armed with that

information?", and thus the question and answer are inadmissible

hypotheticals rather than evidence of facts.  Moreover, Mr. Giroux's

response concerning Cargill's reaction in this factually inaccurate and

hypothetical scenario is speculative.   Syngenta specifically disputes

that Cargill was not made aware that Syngenta had received questions

from Chinese regulators in June 2012.  *See* Ex. 404 (D. Baudler Dep.

Ex. 16) ("Syngenta called to confirm that China gov has come back to

them official with additional safety questions.").

466.    On June 11, 2013, Lee told Giroux that Syngenta "heard it had received approval" from
the Chinese government for Viptera. Ex. 243 (Dep. Ex. 573) at CARGILL000006494
(emphasis in original); Ex. 186, Giroux 30b6 at Vol. II at 598:3-599:13; Ex. 246, Lee Vol. Ill
at 552:17-553:20; *see also* Ex. 244, Giroux Vol. I at 170:6-11, 171:19-172:19; Ex. 245
(Giroux Dep. Ex. 92) at CARGILL000006494.

**RESPONSE TO NO. 466.** Disputed, mischaracterizes evidence,

hearsay, and immaterial to the grounds on which Syngenta seeks

summary judgment.  What Chuck Lee told Randal Giroux about

392

Chinese approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute that Mr. Lee sent an email on June 11, 2013 to Mr. Giroux regarding Chinese approval, but Plaintiffs' quoted text is misstated and incomplete. Mr. Lee stated: "As usual it is complicated with China. We have <u>heard</u> we have approval, but we have seen no safety certificates. I will email and/or call as soon as we have them available." Pls.' Opp'n Ex. 243 (C. Lee Dep. Ex. 573, at CARGILL000006494) (emphasis in original); Pls.' Opp'n Ex. 245 (R. Giroux Dep. Ex. 92, at CARGILL000006494). As indicated in the complete quote, Mr. Lee is not certain that there was actually approval at the time, noting that China is "complicated" and emphasizing what he had "<u>heard</u>." Mr. Giroux testified, before seeing the actual document, that in June 2013 he recalls Mr. Lee telling him that Syngenta "had received approval," Pls.' Opp'n Ex. 186 (R. Giroux Dep. Tr. 598:3-20), but that is not a reasonable interpretation of the June 11, 2013 email reflected in Exhibits 243 and 245; Mr. Lee did not state that Syngenta had received approval, and by June 2013, given the history of the approval process, Mr. Giroux could not reasonably have believed otherwise. The remaining cited testimony does not establish otherwise. The cited testimony in Exhibit 246 attempts to authentic Exhibit 573, and does not support the facts Plaintiffs seek to establish. The cited testimony in Exhibit 244 appears to be an error, as it does

not relate to the asserted fact.  Finally, Mr. Giroux's recollection of what Mr. Lee told him is hearsay, and is thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

467.  In fact, Syngenta had learned just three weeks earlier that Syngenta's latest application had been rejected. Ex. 186, Giroux 30b6 Vol. II at 601:12-603:24; Ex. 154 (Dep. Ex. 87) at SYNG_00230453.

**RESPONSE TO NO. 467.  Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**  What Syngenta had purportedly learned about the Chinese application is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs' cited evidence fails to support the facts they seek to establish, because the cited evidence does not say Syngenta's application had been rejected, but rather provides an opinion about what might happen "based on [Claire Xu's] information" regarding MIR162.  Pls.' Opp'n Ex. 154 (S. Huber Dep. Ex. 89, at SYNG_00230453).   The information obtained by Ms. Xu was just a rumor.  As Ms. Xu explained during her deposition, she "accidently heard some information from the Ministry of Agriculture" during a visit to the Ministry of Agriculture, and there was no reason to believe the information was accurate.  Ex. 405 (C. Xu Dep. Tr. 32:3-12).  Indeed, as Mr. Huber explained, this information was inconsistent with what

Syngenta was hearing from the Ministry of Agricultural and the timeline of events.  Pls.' Opp'n Ex. 31 (S. Huber Dep. Tr. 500:5-15) (testifying that he was "aware of all questions and delays" and that what was contained in Ms. Xu's email was not one of them).  In fact, Syngenta did not receive news of the questions until June 17, 2013.  *See* Pls.' Opp'n Ex. 160, at 9.

468.    That information was passed on to Lee on June 14, 2013, three days after he told Giroux Syngenta "had received approval." Lee doesn't know whether he informed Giroux of his prior misstatement. Ex. 246, Lee Vol. Ill at 553:25-555:13; Ex. 243 (Dep. Ex. 573) at CARGILL000006494; Ex. 247 (Dep. Ex. 574) at SYNG_00209484.

**RESPONSE TO NO. 468.** **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**  Whether this information was passed on to Chuck Lee or Randal Giroux is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Plaintiffs' asserted fact is vague as to the phrase "[t]hat information was passed on to Lee," as it is unclear what information exactly would be "passed on."  To the extent Plaintiffs refer to the specific information contained in Plaintiffs Opposition Exhibit 154, there is no cited evidence that the specific information contained therein was "passed on" to Chuck Lee.  To the extent the information Plaintiffs suggests was passed on was that China would reject Syngenta's application for Chinese approval for MIR162 in June 2013, Ms. Zannoni notes that "[w]e received an unofficial call from MoA today. We expect to get the approval for amylase, but additional questions on MIR162. . . . We expect official

notification on Monday from MoA."  Pls.' Opp'n Ex. 247 (C. Lee

Dep. Ex. 574, at SYNG_00209484).  Syngenta does not dispute that

Mr. Lee cannot recall whether he informed Mr. Giroux of what he

learned on Friday, June 14, 2013, but there is no cited evidence to

suggest that Mr. Lee did not share that information with Mr. Giroux.

In fact, it is undisputed that Mr. Giroux was aware the MIR162 had

not been approved only several business days later, after China issued

the official notices for import approvals.  Ex. 422 (R. Giroux Dep. Ex.

93 at CARGILL000073787) (Gary Martin: "[J]ust heard from

Syngenta that Viptera / MIR162 is still not approved.").  Moreover,

Syngenta specifically disputes the characterization that Mr. Lee had

made a "prior misstatement," as discussed *supra* ¶ 466.

469.    Cargill relied on Syngenta's representations of the timing and status of the application
when deciding whether to enter into contracts with Chinese buyers. Ex. 250, Hale 30b6 Vol.
I at 171:15-172:3.

**RESPONSE TO NO. 469.**  **Disputed, not supported by the cited**

**evidence, and immaterial to the grounds on which Syngenta seeks**

**summary judgment.**    Whether Cargill relied on Syngenta's

representations when it entered into contracts with Chinese buyers is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.  In any event, Plaintiffs' asserted fact is vague as to time

that Cargill purportedly relied on Syngenta's representations.

Syngenta does not dispute that Mr. Hale testified that Cargill decided

to ship corn to customers based on Syngenta's statements that it

expected approval in Q1 2012.  It is unclear what time frame Mr. Hale

is referring to with regard to the statements Cargill relied on, but

Syngenta does not dispute that it had originally expected approval by

the end of Q1 2012 and that it had made statements to participants in

the grain trade that it expected approval at the end of Q1 2012.  *See*

Syngenta's MSJ SOF ¶¶ 403-406.  Plaintiffs' cited evidence fails to

support the implication that Syngenta's representations were the only

reason that Cargill decided to make shipments of U.S. corn to China in

2012; Mr. Hale does not testify to that.  In fact, there are numerous

other reasons why Cargill shipped to China in 2012, including that it

had sold corn containing MIR162 to other exporters that successfully

shipped MIR162 corn to China in 2011.  *See supra* Response to Pls.'

SOAF ¶ 494.

470.   At the NGFA's biotechnology committee meeting on December 16, 2013, Syngenta's
Rex Martin provided an update on the status of Viptera in China. Martin told the committee
that Syngenta had received a "minor question" from the Ministry of Agriculture during its
last review. Martin did not identify any scientific concerns with the application, and did not
identify any other issues Syngenta was having with its application. Ex. 72, Reed Vol. I at
330:14-331:11, 333:4-334:24, 340:10-11, 341:10-16, 342:22-343:17.

**RESPONSE TO NO. 470.**  **Disputed, not supported by the cited**

**evidence, hearsay, and immaterial to the grounds on which**

**Syngenta seeks summary judgment.**  Rex Martins' statements about

Chinese approval for Viptera at the NGFA biotechnology meeting are

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.  In any event, Syngenta does not dispute that there was a

NGFA biotechnology committee meeting on December 16, 2013 and

Syngenta does not dispute that Mr. Reed claims that Mr. Martin made a presentation during which he stated that Syngenta had received a minor question during its last review, but Plaintiffs' cited evidence fails to support the fact that "Martin did not identify any scientific concerns with the application, and did not identify any other issues Syngenta was having with its applications."  Mr. Reed was specifically unaware of what Mr. Martin stated beyond what he had in his written notes that were presented to him at his deposition.  Pls.' Opp'n Ex. 72 (A. Reed Dep. Tr. 334:18-24).   The remainder of Mr. Reed's cited testimony refers to a May 11, 2012 email from Angus Kelly, which is before Syngenta received questions for the Ministry of Agriculture concerning its MIR162 import application, and does not reflect what Mr. Martin stated in December 2014.  Pls.' Opp'n Ex. 72 (A. Reed Dep. Tr. 340:10-11; 341:10-16; 342:22-343:17).    Syngenta also disputes the implication by Plaintiffs that it did not inform the grain trade when it received questions from the Ministry of Agriculture. Indeed, once Syngenta first received questions from the Ministry of Agriculture in June 2012, it informed the grain trade.   *See, e.g.*, Syngenta's MSJ SOF ¶¶ 52-54.  Finally, Mr. Reed's recollection of what Mr. Martin said is hearsay, and is thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

471.   On December 17, 2013, the delegation from the North American Export Grain Association (NAEGA) traveled to China to meet with representatives from the Ministry of Agriculture. The delegation learned at that meeting the truth about the status of Syngenta's application. *See supra* SOAF ¶¶ 311-312.

> **RESPONSE TO NO. 471.   Disputed, argumentative, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   The meeting involving NAEGA representatives and the Ministry of Agriculture is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta disputes that the "the delegation learned at that meeting the truth about the status of Syngenta's application," and incorporates herein its responses to Pls.' SOAF ¶¶ 311-312.  Aside from citing other SOAFs, Plaintiffs provide no cited evidence to support the factual assertions, and thus Plaintiffs' cited evidence fails to support the fact they seek to establish.  Syngenta specifically disputes the characterization that the delegation "learned . . . the truth" at the meeting with the MOA; as the China Director for the U.S. Grains Council, an impartial third party who attended the meeting, reported, the stated reasons for the MOA's delays were "blowing smoke" and NAEGA bought it "hook, line, and sinker."  Ex. 406 (B. Lohmar Dep. Ex. 59).

472.   The delegation then confronted Syngenta representatives in China, who responded: "You weren't supposed to know that." Ex. 39, G. Martin Vol. I at 108:5-17; Ex. 186, Giroux 30b6 Vol. II at 339:2-343:17, 626:18-629:11; Ex. 252 (Giroux Dep. Ex. 121) at CARGILL00087285.

**RESPONSE TO NO. 472.**  **Disputed, not supported by the cited evidence, hearsay, and immaterial to the grounds on which Syngenta seeks summary judgment.**  The meeting involving NAEGA representatives and the Ministry of Agriculture is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' factual assertion is vague concerning what it was Syngenta purportedly said "you weren't supposed to know." Syngenta does not dispute that Gary Martin provides the quoted testimony based on a purported discussion with Pierre Cohadon, but the cited testimony does not specifically state what Mr. Martin asked Mr. Cohadon, or otherwise state what was actually discussed.  Pls.' Opp'n Ex. 39 (G. Martin Dep. Tr. 108:5-17).  Nor does it provide that the delegation "confronted Syngenta representatives in China." Exhibit 252 is an email from Mr. Smalley in which he summarizes a conversation he had with Syngenta representatives on December 17, 2013.  Mr. Smalley's summary of that meeting does not support the factual assertion that Syngenta represented that there was something that Cargill was not supposed to know, and in fact, Mr. Smalley concludes his summary by agreeing with Syngenta "it all politics (pick your reason but economics seem to prevail)."  Pls.' Opp'n Ex. 252 (R. Giroux Dep. Ex. 121 at CARGILL000087286.  Syngenta also disputes that it did not disclose that it received questions from the Ministry of Agriculture concerning its Chinese import application for MIR162, as

400

Mr. Giroux implies in his cited testimony. Indeed, once Syngenta received questions from the Ministry of Agriculture in June 2012, it informed the grain trade. *See, e.g.*, Syngenta's MSJ SOF ¶¶ 52-54. Finally, Mr. Martin's testimony about what Mr. Cohadon told him is hearsay, and is thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

473. Following the NAEGA delegation meetings, Syngenta blanketed the industry with a letter from David Morgan outlining Syngenta's version of events. Ex. 253 (Dep. Ex. 1432) at SYNG_0393697; Ex. 16 Morgan Vol. II at 1033:3-1034:3.

**RESPONSE TO NO. 473.** **Disputed, argumentative, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.** David Morgan's "blanketing the industry" with a letter is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' factual assertion is argumentative and vague as to "blanketed" and "Syngenta's version of events." To the extent Plaintiffs are referring to the import application process for MIR162 in China, Syngenta disputes that it has a "version of events" different from what actually occurred. Syngenta does not dispute that it sent a letter from David Morgan to members of the grain industry, but Plaintiffs' cited evidence fails to support the other facts they seek to establish. Specifically, the cited evidence is only an email from Syngenta attaching a December 17, 2013 letter from David Morgan to

"stakeholders" and testimony from David Morgan that is not contained in the cited exhibit, neither of which purport to present a "version of events" and does not support the assertion that Syngenta "blanketed the industry with the letter."

474. Morgan's letter stated Syngenta's submission in March 2010 was the "earliest opportunity to do so," yet Syngenta received Brazilian approval in September 2009. That meant Syngenta could have submitted its application to the Chinese authorities in time for the November 2009 window. Ex. 16, Morgan Vol. II at 350:4-24, 355:20-356:5, 356:22-357:2, 357:8-16; *see supra* SOAF ¶¶ 254-255.

**RESPONSE TO NO. 474.** **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.** David Morgan's letter is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute that David Morgan's December 17, 2013 letter contains the quoted language, but Plaintiffs' cited evidence does not establish the date of the Brazilian cultivation approval and does not otherwise discuss when Syngenta could have first submitted its MIR162 import application to China. The cited evidence— testimony from Mr. Morgan—mostly relates to the contents of the December 17, 2013 letter and Mr. Morgan's understanding of when Syngenta received cultivation approval in Brazil. Notably, Plaintiffs include in its cited evidence Mr. Morgan's deposition testimony from 356:22-357:2 and 357:8-16, and omit the portion of testimony in between where Mr. Morgan states that his understanding of when cultivation approval was received in Brazil "was in the latter stages of

2009. I don't recall the precise date."  Pls.' Opp'n Ex. 16 (D. Morgan

Dep. Tr. 357:3-7).  Plaintiffs otherwise only cite to earlier statements

of fact, and Syngenta incorporates its responses to Pls.' SOAF ¶¶ 254-

255 herein.  Syngenta specifically disputes that it could have sought

approval in China before March 2010, because it did not receive final

approval in Brazil until November 2009 and March 2010 was the first

application window in China thereafter.  Indeed, the assertion that

Syngenta received approval in Brazil in September 2009 is

inconsistent within Plaintiffs' own factual narrative.  *See supra*

Syngenta's Response to Pls.' SOAF ¶ 255.

475.   The letter also stated that recent questions Syngenta had received from Chinese authorities were "more relevant to studies about seed cultivation, even though Syngenta is only seeking grain import approval." Ex. 253 (Dep. Ex. 1432) at SYNG_0393697.

**RESPONSE TO NO. 475.**   **Immaterial to the grounds on which**

**Syngenta seeks summary judgment.**   David Morgan's letter is

irrelevant to the grounds asserted in Syngenta's motion for summary

judgment.

476.   But Syngenta had, in fact, sought cultivation approval. *See supra* Pls.' SOAF ¶¶ 321-332.

**RESPONSE TO NO. 476.**   **Immaterial to the grounds on which**

**Syngenta seeks summary judgment.**   Whether Syngenta sought

cultivation approval is irrelevant to the grounds asserted in Syngenta's

motion for summary judgment.   In any event, Syngenta does not

dispute that it, like most multi-national companies, initiated the

process of seeking cultivation approval from China for MIR162.

Syngenta's MSJ Ex. 5 (P. Shull Expert Rpt. ¶ 132).

477.    Cargill independently discovered the cultivation application and confronted Syngenta's management about it in 2014. Ex. 186, Giroux 30b6 Vol. II at 606:19-607:11; Ex. 244, Giroux Vol. I at 23:24-26:2.

> **RESPONSE TO NO. 477.   Disputed, not supported by the cited**
>
> **evidence, and immaterial to the grounds on which Syngenta seeks**
>
> **summary judgment.**  Whether Syngenta sought cultivation approval
>
> is irrelevant to the grounds asserted in Syngenta's motion for summary
>
> judgment.  In any event, Plaintiffs' cited evidence fails to support the
>
> fact they seek to establish, because the cited deposition testimony from
>
> Mr. Giroux states that he learned of Syngenta's cultivation application
>
> during a meeting with Davor Pisk and David Morgan, not
>
> "independently," and there is no indication that Cargill "confronted"
>
> Syngenta after learning this information.  Pls.' Opp'n Ex. 186 (R.
>
> Giroux Dep. Tr. 606:19-607:16).  The cited deposition testimony in
>
> Exhibit 244 appears to have been included in error, as it relates to
>
> testing, not cultivation approval.

478.    Syngenta's management finally fessed up to the cultivation application, but discounted its impact - even though Syngenta had recently withdrawn the cultivation application because of concerns it was delaying the import application. Ex. 45, Giroux Vol. II at 391:10, 392:11-397:7; Ex. 374 (Giroux Dep. Ex. 182) at CARGILL000162578.

> **RESPONSE TO NO. 478.   Disputed, argumentative, not supported**
>
> **by the cited evidence, assumes facts not in evidence, lacks**
>
> **foundation, hearsay, and immaterial to the grounds on which**
>
> **Syngenta seeks summary judgment.**  Whether Syngenta sought

cultivation approval is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Plaintiffs' factual assertion is vague and argumentative as to "fessed up" and "discounted," and also vague as to time. Syngenta does not dispute that Randal Giroux sent an internal email on February 13, 2014 summarizing a meeting with individuals at Syngenta, which reflected that he had learned about Syngenta seeking cultivation approval for the first time, but Plaintiffs' cited evidence fails to support the fact that Syngenta "fessed up" or "discounted its impact." Pls.' Opp'n Ex. 374 (R. Giroux Dep. Ex. 182 at CARGILL000162578). Syngenta specifically disputes that it has any duty to proactively identify every application of any sort in any country to the grain trade or others. Indeed, the fact that Mr. Giroux apparently believed that there was something unique about the fact that Syngenta had initiated the cultivation process for MIR162 in China, Pls.' Opp'n Ex. 186 (R. Giroux Dep. Tr. 607:13-24), indicates that other biotech companies also did not publicly share their global regulatory strategies with third parties like the grain trade given that it was routine to seek cultivation approval in China, Syngenta's MSJ Ex. 5 (P. Shull Expert Rpt. ¶ 132). Mr. Giroux's email summary of the meeting also does not discuss whether the cultivation application had been withdrawn, let alone the reasons for withdrawing the cultivation application. Rather, the portion of the asserted facts relating to Syngenta purportedly

withdrawing "the cultivation application because of concerns it was delaying the import application," comes from a single question from MDL Plaintiffs' counsel during Mr. Giroux's deposition.  Pls.' Opp'n Ex. 45 (R. Giroux Dep. Tr. 396:22-397:7).  Mr. Giroux's testimony cannot support this alleged statement of fact concerning the withdrawal of cultivation approval because MDL plaintiffs' counsel's question assumed facts without foundation in posing the question, and thus the question and answer are inadmissible hypotheticals rather than evidence of facts.  In fact, Syngenta's witnesses have explained that the cultivation approval submission should have no effect on the import approval submission.  *See, e.g.*, Ex. 361 (Y. Zhang Dep. Tr. 492:24-493:21).   Finally, Mr. Giroux's testimony regarding what Syngenta told him is hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

**Q.    Producers' testimony on export market approvals.**

479.    Producer Jon Anderson testified that he asked his seed dealers in 2014 if his seeds were approved in foreign markets. Ex. 274, Deposition of Jon Anderson ("Anderson Dep.") at 49:1-54:25.

**RESPONSE TO NO. 479.   Undisputed  but  incomplete.**   Syngenta does not dispute that Jon Anderson asked his seed dealer about whether the GM seed he was buying was approved in import markets, but Syngenta notes that Mr. Anderson has only asked this question to a

seed dealer "once" and he only did so after the Chinese rejections of corn shipments.  Pls.' Opp'n Ex. 274 (J. Anderson Dep. Tr. 53:2-20). Syngenta also notes that Mr. Anderson testified that "[f]rom 2010 to the present," he has never been aware "of which foreign import markets had approved [his] genetically modified corn seed that [he's] grown on [his] farm."  *Id.* at 49:9-13.

480.    Producer Glenn Bix testified that he relies on AgriGold seed dealer to study seeds that should be planted. Ex. 275, Deposition of Glenn Bix ("Bix Dep.") at 32:23-33:6.

**RESPONSE TO NO. 480.**  **Incomplete and immaterial to the grounds on which Syngenta seeks summary judgment.**  Whether farmers rely on seed dealers to study seeds that should be planted is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Glenn Bix testified that he relies on his seed dealer, but the cited evidence does not support that Mr. Bix only relies on his seed dealer (he stated that he "pretty much" relies on the dealer) and the evidence does not support that Mr. Bix specifically relies on the seed dealer to study seeds that should be planted.  Pls.' Opp'n Ex. 275 (G. Bix Dep. Tr. 32:23-33:2).  Furthermore, Plaintiffs have not cited to any evidence that Mr. Bix relies on his seed dealer not to sell him products that have not been approved in particular foreign export markets, nor do plaintiffs cite to any evidence that this was an issue that Mr. Bix investigated or inquired about at any time.

481.    Producer John Cap testified that he doesn't ask specifically regarding seed approvals, but that he assumes his seed dealer is doing what is best for him. Ex. 276, Deposition of John Cap ("Cap Dep.") at 82:20-23.

> **RESPONSE TO NO. 481.**   **Undisputed but incomplete.**    Syngenta does not dispute that John Cap provided the cited testimony, but Syngenta notes that Mr. Cap is not clear by what he means when he assumes that "Pioneer is doing what's best for me," particularly whether that relates to the approval of GM traits in foreign countries, as is suggested.  Pls.' Opp'n Ex. 276 (J. Cap Dep. Tr. 82:20-23). Syngenta also notes that Mr. Cap testified that he cannot recall any farmer at seed meetings ever asking "if the GM traits are approved in the United States" and "whether the GM traits were approved in China."  *Id.* at 83:5-15.   Furthermore, Plaintiffs do not cite any evidence that Mr. Cap ever investigated or inquired about the foreign approval of the seed products he purchases.

482.    Producer Luke Claas testified that he trusts that his seed dealer will sell him something that has been approved: "I trust him to sell me something that has been approved." Ex. 277, Deposition of Luke Claas ("Claas Dep."), at 17:19-24.

> **RESPONSE TO NO. 482.**   **Undisputed but incomplete.**    Syngenta does not dispute that Luke Claas provided the quoted testimony, but Syngenta notes that Mr. Claas does not recall ever asking his seed dealer whether the seed he purchased "was approved for the Chinese market."  Pls.' Opp'n Ex. 277 (L. Claas Dep. Tr. 17:19-24).

483.    Producer Morris Crandall testified that if he knew that the corn couldn't be exported, "I wouldn't buy it." Ex. 278, Deposition of Morris Crandall ("Crandall Dep.") at 175:11-16.

**RESPONSE TO NO. 483.**   **Undisputed but incomplete.**   Syngenta

does not dispute that Walter Morris Crandall provided the quoted

testimony, but Syngenta disputes that Mr. Crandall would have

refrained from purchasing corn if he knew it could not be exported.

Specifically, Mr. Crandall is unaware of whether "the varieties of

genetically-modified corn that" he purchased and grew were

"approved for import into every country," and Mr. Crandall took no

steps to inform himself concerning the approval status of the GM seed

he purchased.  Ex. 407 (W. Crandall Dep. Tr. 176:24-177:9).

484.   Producer Kenny Falwell testified that "if the seed that the seed company is selling the producer is not approved for export, they should know that. The producer should know that. And then he has the ability to decide whether or not he wants to plant that seed or not plant that seed." Ex. 94, Falwell Dep. at 195:2-7. Mr. Falwell also testified: "We trusted our seed dealers to not be out there trying to sell us something that had not been approved for export. We knew a vast majority — or a lot of soybeans were exported, as was corn. And I would have been very disappointed if they had been trying to sell me something that was not approved." *Id.* at 230:10-19.

**RESPONSE TO NO. 484.**   **Undisputed but incomplete.**   Syngenta

does not dispute that Kenny Falwell provided the quoted testimony,

but Syngenta notes that prior to Chinese rejections of U.S. corn in late

2013, Mr. Falwell's farm—Eagle Lake Farms—"did not ask its seed

dealer . . . about the . . . exportability of any particular [corn] variety."

Ex. 408 (L. Falwell Dep. Tr. 232:13-19).

485.   Producer Richard Glanzer is also a small seed dealer. Mr. Glanzer testified that he inquired of his seed dealer whether the seeds he was purchasing and selling were approved for import in foreign markets, including European Union and China. Ex. 280, Deposition of Richard Glanzer ("Glanzer Dep.") at 126:14-127:5. Mr. Glanzer also testified that if he knew there was an issue with regard to whether seeds were cleared for export, "I wouldn't be selling them to my customers." *Id.* at 127:6-19.

**RESPONSE TO NO. 485.   Undisputed but incomplete.**   Syngenta does not dispute that Richard Glanzer provided the quoted testimony, but notes that the testimony is unclear regarding the "issue" that would cause Mr. Glanzer not to sell seed to his customers.  Pls.' Opp'n Ex. 280 (R. Glanzer Dep. Tr. 127:15-19). Syngenta also notes that Mr. Glanzer testified that while his customers would "ask [him] about the different traits contained within the seeds" he was selling, his customers would never ask "whether particular seeds had been approved for import into foreign markets." *Id.* at 125:16-126:13. Mr. Glanzer would likewise never provide information to his customers about "whether particular seeds were approved for import into particular countries." *Id.* at 127:20-128:2.

486.    Producer Dale Hadden testified that he asks his seed dealer if the seeds it is selling have "cleared all the channels to be exported." Ex. 281, Deposition of Dale Hadden ("Hadden Dep.") at 126:8-127:5.

**RESPONSE TO NO. 486.   Undisputed but incomplete.**   Syngenta does not dispute that Dale Hadden provided the quoted testimony, but Syngenta notes that Mr. Hadden's testimony, which states he has "asked" a seed dealer, is not reflective of a regular practice, as Plaintiffs suggest. Pls.' Opp'n Ex. 281 (D. Hadden Dep. Tr. 126:12-14).  Mr. Hadden also testified that he asked a seed dealer whether the "majority players" overseas are "purchasing our products," and did not ask whether specific countries had approved GM traits. *Id.* at 126:18-21.

487.    Producer Greg Harris testified that "you rely on your seed salesman" to tell if you cannot sell the corn where it is ordinarily sold. Ex. 282, Deposition of Greg Harris ("Harris Dep.") at 115:14-116:17.

> **RESPONSE TO NO. 487.**    **Undisputed.**  Syngenta does not dispute that
>
> Greg Harris testified that he relies on his seed salesmen for certain
>
> information, but notes that Mr. Harris provides no testimony about
>
> what disclosures his seed salesman ever provided, if any.   Syngenta
>
> also notes that Plaintiffs point to no evidence that Mr. Harris has ever
>
> investigated or inquired about the foreign approval of the seed
>
> products he purchases.

488.    Producer Frank James testified that he would "assume they wouldn't sell me seed that . . . wouldn't be able to be exported" and that "I didn't see that it was necessary to ask because there wasn't a problem." Ex. 283, Deposition of Frank James ("James Dep.") at 157:18-158:20.

> **RESPONSE TO NO. 488.**    **Undisputed.**  Syngenta does not dispute that
>
> Frank James provided the quoted testimony, but notes that Plaintiffs
>
> point to no evidence that Mr. James ever investigated or inquired about
>
> the foreign approval of the seed products he purchases.

489.    Doug Johns of ADM testified that in his experience with his grower customers, growers of Viptera were often unaware of the problems Viptera could cause for export markets, and they were unaware that there were traits commercialized that could not go to export markets. Exhibit 288, Deposition of Doug Johns Vol. II (Johns Vol. II) at 324:22-329:5.

> **RESPONSE TO NO. 489.**    **Disputed and not supported by the cited**
>
> **evidence.**  Syngenta does not dispute the statement of fact to the extent
>
> Plaintiffs seek to establish that farmers are not concerned about
>
> whether a GM trait has been approved when purchasing seed, but
>
> disputes the statement of fact for all other purposes as Plaintiffs' cited
>
> evidence does not support the fact that they seek to establish, because

411

Mr. Johns' testimony does not relate to his experiences discussing Viptera with grower customers.

**R.      Viptera caused the loss of the Chinese market for U.S. corn.**

490.    A chart appearing in the report of Syngenta's expert Walter Thurman shows exports of corn and DDGs from the United States to China each month during the marketing year September 2011-August 2012 and during the marketing year September 2012-August 2013. *See* Ex. 110, Thurman Rpt. at ¶ 39, Fig. 14.

**RESPONSE TO NO. 490.    Immaterial to the grounds on which Syngenta seeks summary judgment.**  The amount of corn and DDGs exported from the United States to China during marketing year September 2011-August 2012 and marketing year September 2012-August 2013 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Walter Thurman's report has a chart reflecting corn and DDGs exports from the United States to export markets, including China, for marketing years 2011/12 and 2012/13, but Syngenta notes that the chart is reflected by Figures 16, 17, and 19, not Figure 14, as cited by Plaintiffs.

491.    Numerous exporters sold U.S. corn or DDGs to Chinese buyers, including Bunge, Louis Dreyfus, Gavilon, Glencore, and Trans Coastal. *See, e.g.*, Ex. 309 (BGNA00002269) (Bunge contract to sell 60,000 metric tons of U.S. corn to a Chinese buyer, dated March 28, 2011); Ex. 312 GAVMDL353207 (January 2011 contract for 15,000 metric tons of DDGs); Ex. 313 (Fisher Dep. Ex. 2001) at NGFA0023135 (noting 980,000 metric tons of U.S. corn was exported to China in 2010/11 and 5,146,000 metric tons of U.S. corn was exported in 2011/12); Ex. 250, Hale 30b6 Vol. I at 89:3-15, 133:22-135:21; Ex. 388 (LDC00003094) (loading instructions for 60,000 metric tons of U.S. corn for a Chinese buyers, dated October 28, 2011); Ex. 389 (LDC000001489); Ex. 250, Hale 30b6 Vol. I at 89:3-15, 133:22-135:21; Ex. 314, Deposition of Robert Aspell Vol. I ("Aspell Vol. I") at 132:24-133:15; Ex. 164, Smalley Vol. I at 232:6-18; Ex. 315, Deposition of Alex Sanfeliu Vol. II ("Sanfeliu Vol. II") at 622:21-623:6 and errata sheet thereto; *Trans Coastal Supply Co. v. Syngenta AG,* et al., No. 14-2221 (C.D. 111.), Complaint ¶¶ 50-56 (ECF No. 1)).

**RESPONSE TO NO. 491.   Hearsay and immaterial to the grounds on which Syngenta seeks summary judgment.**  Whether numerous exporters sold U.S. corn or DDGs to Chinese buyers is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that ADM and Cargill shipped corn to China.  It is inadmissible hearsay as it relates to whether Bunge, Louis Dreyfus, Gavilon, Glencore, and Trans Coastal may have sold to Chinese buyers.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

492.   Cargill sold directly to Chinese buyers in 2010 for delivery in fall 2010. *See* Ex. 346 (Hale Dep. Ex. 154) (July 2010 contract w/ COFCO).

**RESPONSE TO NO. 492.   Undisputed.**  Syngenta does not dispute that Cargill, through Cargill International SA, contracted to sell corn to COFCO in 2010.

493.   In 2011, like ADM, Cargill sold eight vessels FOB to Glencore and Bunge. Cargill sold directly to Chinese buyers in 2011, but it was for delivery in May, June, July of 2012. *See* Ex. 347 (Hale Dep. 151) (chart of corn sales).

**RESPONSE TO NO. 493.   Undisputed as to Cargill, disputed as to ADM.**  The cited evidence does not support that ADM sold FOB to Glencore and Bunge in 2011—Exhibit 347 relates only to Cargill. Syngenta also notes that Cargill intentionally avoided selling U.S. corn to China after 2010 because of the risk of rejection due to the presence of MIR162 and that Cargill's first sale to China after 2010 was not until a contract entered into in October 2011 for delivery in summer

2012.   Pls.' Opp'n Ex. 347 (W. Hale Dep. Ex. 151); *see also*

Syngenta's MSJ SOF ¶¶ 72-76, 78.

494.   Cargill did not sell U.S. corn to Chinese buyers for delivery in 2011. Based on information it had received from Syngenta about the timeline for approval of MIR 162 in China, Cargill sold corn to Chinese buyers in October 2011 for delivery in May, June, and July of 2012. *See, e.g.,* Ex. 164, Smalley Vol. I at 217:8-219:13.

**RESPONSE TO NO. 494.**   **Disputed and not supported by the facts.**

Syngenta does not dispute that Cargill did not sell U.S. corn to Chinese

buyers for delivery in 2011, but disputes that Cargill starting selling

corn to Chinese buyers in October 2011 for delivery in 2012 based on

information it had received from Syngenta.  Indeed, Cargill first had

other exporters conduct test runs to determine whether shipping corn

to China was safe to ship MIR162 despite its approval status.

According to Mr. Smalley, Cargill sold four cargoes of corn to

Glencore and four cargoes of corn to Bunge in 2011 that were shipped

to China.  Pls.' Opp'n Ex. 164 (S. Smalley Dep. Tr. 232:3-19).  Cargill

tested the cargoes it sold to Glencore and Bunge for MIR162 because

"[m]aybe we'll find out from others what's going to happen, because

we had not sold anything ourselves direct to China, so these were the

first boats . . . and so if they went to China . . . we would have a little

bit of an insight maybe on whether the Chinese . . . were going to exert

regulatory discretion or not. . . . [W]e were just trying to -- to get a

better feel for -- for the landscape."  Ex. 409 (5/18/2016 S. Smalley

Dep. Tr. 234:18-235:12; *see also id.* at 242:10-16 (test results were

positive for MIR162).   These shipments were not rejected by China.

*Id.* at 242:17-20.

495.   In May 2012 - before resuming shipments to Chinese buyers - Cargill inquired about the status of Syngenta's application for approval of MIR162 in China, and advised that Cargill had "vessels line[d] up." Ex. 344 (Giroux Dep. Ex. 88).

**RESPONSE TO NO. 495.   Disputed, not supported by the facts, and**

**hearsay.**   Syngenta does not dispute that Randal Giroux from Cargill

made inquiries to Syngenta in May 2012, but Syngenta disputes that in

May 2012 Cargill had yet to resume shipments to Chinese buyers.

Rather, Cargill contracted in 2011 to sell U.S. corn to Chinese buyers

for May 2012 delivery.  Pls.' Opp'n Ex. 347 (W. Hale Dep. Ex. 151).

In addition, Cargill's recollection of what Syngenta stated is hearsay,

and is thus inadmissible evidence.  *See PAS Commc'ns, Inc. v. Sprint*

*Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to

consider hearsay evidence on summary judgment).

496.   The following month—again, before Cargill and ADM resumed their shipments to Chinese buyers—Cargill advised Syngenta that the "industry [had] millions of tons of corn on the books to China," from which Syngenta fully understood that Cargill "ha[d] supply contracts with China." Ex. 324 (SYNG_00379335).

**RESPONSE TO NO. 496.   Disputed and not supported by the cited**

**evidence.**   Syngenta does not dispute that Bill Hale from Cargill made

a representation to Syngenta regarding the amount of corn on the

books to China, but Syngenta disputes that, in June 2012, Cargill and

ADM had yet to resume shipments to Chinese buyers.  For example,

Cargill contracted in 2011 to sell U.S. corn to Chinese buyers for May

2012 delivery.  Pls.' Opp'n Ex. 347 (W. Hale Dep. Ex. 151).

497.    Syngenta knew that Cargill was selling U.S. corn to Chinese buyers in 2012. Ex. 324 (SYNG_000379335) (David Morgan on June 4, 2012 to Pisk, Hull, and Trivisvavet: "Bill Hale followed up with this message. It is clear that they have supply contracts with China and sound far less willing to help in 2012").

**RESPONSE TO NO. 497.    Undisputed.**  Syngenta does not dispute that

David Morgan understood from Bill Hale that Cargill had decided to

ship MIR162 corn to China knowing that it was unapproved in China.

498.    In addition to marketing years 2009-2010, 2010-2011, and 2011-12, numerous exporters other than ADM and Cargill sold U.S. corn and DDGs to Chinese buyers for delivery in fall 2013 and early 2014. *See, e.g.,* Ex. 317 (BGNA00033727) (Bunge Sales Confirmation to COFCO dated April 24, 2013); Ex. 318 (BGNA00033816) (Bunge Contract with COFCO dated April 19, 2013 "Bunge-COFCO Contract"); Ex. 319 (LDC00013347) (Louis Dreyfus Contract with Xinxing Jiayu Trading Limited dated February 2013 ("LDC-Contract")).

**RESPONSE TO NO. 498.    Disputed, not supported by the cited**

**evidence, and hearsay.**  It is not clear what fact Plaintiffs intend to

support by the beginning of this statement of fact, but Plaintiffs'

evidence does not show that any of these exporters sold U.S. corn and

DDGS to Chinese buyers in "marketing years 2009-2010, 2010-2011,

and 2011-12."  The cited evidence relates to contracts in 2013.  With

regard to Bunge and Louis Dreyfus, any information is based on

hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns, Inc.*

*v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining

to consider hearsay evidence on summary judgment).

499.    Syngenta knew exporters could not meet a zero-tolerance requirement, given its broad commercialization of Viptera. Jingwen Chen, Syngenta's Global GMO Detection Lead, testified that in order to meet a zero tolerance, every kernel would have to be tested and that in a practical sense, that is not possible. Ex. 320, Deposition of Jingwen Chen ("Jingwen Chen Dep.") at 240:16-241:8 ("Our methods will be able to enable you to meet that zero tolerance, okay, provided you test every single kernels on your ship. ... In practice, you don't do that."); *see also* Ex. 321, Deposition of Thomas Carrato Vol. II ("Carrato Vol. II") at 469:3-7 ("It's important also to note, as this policy does, that there is no zero in the biological

system. So any program that's put together to channel products is not going to achieve zero in terms of the presence of a trait."), 483:20-23 ("[T]here being no zero in a biological system . . . .").

**RESPONSE TO NO. 499.** **Disputed and not supported by the evidence.** Syngenta does not dispute that Jingwen Chen testified that testing for zero tolerance would not be possible in a practical sense, nor does Syngenta dispute that the zero tolerance standard cannot be satisfied, but Syngenta disputes that the evidence supports that the inability to test for zero tolerance was because of Syngenta's "broad commercialization of Viptera." The cited deposition testimony does not support this statement and does specifically refer to the "broad commercialization of Viptera." The record establishes that there are many other reasons why zero tolerance is not possible, including commingling by the grain trade and cross-pollination. *See, e.g.*, Syngenta's MSJ SOF ¶¶ 19-31.

500.    Syngenta imposed a zero tolerance risk on exporters "[b]y commercializing the MIR162 [trait] in the way that [it] did," which was not "not manageable based on the way in which Syngenta commercialized Viptera." Ex. 75, Giroux 30b6 Vol. I at 21:3-9, 196:1-25.

**RESPONSE TO NO. 500.** **Disputed and not supported by the cited evidence.** Syngenta does not dispute that Randal Giroux offered an opinion that Syngenta imposed on Cargill a zero tolerance risk, but Plaintiffs' cited evidence, Mr. Giroux's testimony, does not support that Syngenta imposed a zero tolerance risk on any other exporters. Plaintiffs have not offered any evidence to suggest that Syngenta was responsible for enacting China's zero tolerance policy.

417

501.     Testing was not a realistic risk management strategy for grain handers given the broad launch Viptera. Testing not only is imprecise but testing at origin is not indicative of testing at destination, and only the test result at destination is determinative. Ex. 322, Smalley 30b6 Dep. at 116:25-117 ("You could have false negatives, had false positives [of tests at origin], but what really mattered was what CIQ [China's quarantine and inspection agency] determined at destination."); *id* at 124:16-125:5 ("everything was subject to destination testing"); Ex. 250, Hale 30b6 Vol. I at 233:23-234:21 ("In a zero tolerance environment like China is, whether you're shipping a trait . . . whether we would test that origin and find or not find something would not guarantee the same result on the other end. . . . [T]here's vagaries in sampling. So, if they are scooping a bucket off the top of a holding in China, they may not find the same thing that we would have found with a more sophisticated system in drawing samples in the US."); Ex. 186, Giroux 30b6 Vol II at 459:12-18 ("It was not a reasonable risk management strategy for us, because we could do all this testing, we could spend all this money on testing, thousands of tests, yet we have many examples where that vessel showed up in Japan and it was positive for the presence of Bt10."); Ex. 322, Smalley 30b6 Dep. at 124:16-125:5 (testifying that samples tested consisted of 30 kernels of corn and that a vessel carrying over 66,000 tons of corn would have over 300 trillion kernels of corn); Ex. 75, Giroux 30b6 Vol. I at 55:23-56:10, 230:14-231:16; Ex. 186 Giroux 30b6 Vol. II at 458:14-459:18; Ex. 323, Deposition of Alex Sanfeliu Vol. I ("Sanfeliu Vol. I") at 130:14-131:12.

**RESPONSE TO NO. 501.   Disputed.** Syngenta does not dispute that the testimony contains the quoted language and that the cited testimony discusses a wasted effort insofar as a "negative" test at origin may does not necessarily mean that there will be a negative test at destination, but Syngenta disputes that it was not a "realistic risk management strategy for grain handlers" to test for MIR162. Significantly, exporters could have tested a barge or vessel to determine if it was positive for MIR162 and, if so, could have avoided sending corn in that barge or vessel that tested positive for MIR162 to China. *See, e.g.*, Ex. 410 (M. Giltner Dep. Tr. 173:9-19 ("Q: What about the scenario where the test of the composite sample on the barge was positive for MIR162? Would you agree that that would have told you that at least that lot of corn contained MIR162? . . . A. Well, if we

-- if we would have tested it, yeah, that would have stated that had MIR162 in it, if that's correct. But that didn't necessarily mean that . . . I guess, yeah, it would have, yeah."); Ex. 421 (9/9/2016 R. Grabiel Dep. Tr. 510:12-15) ("A. If I had a Panamax -- if I had results for a Panamax that was tested that was positive for MIR 162, yeah, that would increase your risk because you've already found it . . . ."). For example, in June 2012, Cargill tested samples of its barge on the Mississippi River en route to its Gulf export terminal, and several of the barges tested positive.   Syngenta's MSJ SOF ¶ 101.   At a minimum, Cargill knew which corn *not* to include on a vessel to China.   Indeed, ADM's Stephan Von Lamezan testified that "ADM tested barges of DDGs to ensure that they didn't contain MIR162 with respect to its exports to the EU."   Ex. 329 (W. Uhlmeyer Dep. Tr. 218:19-219:7).

502.   There was no viable way for grain handlers to test for and then segregate corn by GM traits, given Syngenta's broad commercialization of Viptera. Ex. 75, Giroux 30b6 at 21 ("[Syngenta created] a risk that was not manageable based on the way in which Syngenta commercialized Viptera."); Ex. 186, Giroux 30b6 II at 456:10-457:25.

**RESPONSE TO NO. 502.**   **Disputed and unsupported by the cited evidence.** Syngenta disputes that "[t]here was no viable way for grain handlers to test for and then segregate corn by GM traits."   Unrefuted testimony from ADM employee Sean Miller indicates that a test for GMO presence takes approximately 12 to 14 minutes to conduct and is similar to an aflatoxin and vomitoxin test and the test could be run using the very same samples.   Syngenta's Opp'n ¶ 33; Syngenta's Opp'n Ex. 71 (S.

Miller Dep. Tr. 118:22-119:12; 215:8-13). In addition, Plaintiffs' cited evidence does not support the fact that they seek to establish, because the testimony from Mr. Giroux says nothing about testing for GM traits.

503.    Syngenta itself understands the issues with testing. Ex. 320, Jingwen Chen Dep. at 217-224, 267-71.

> **RESPONSE TO NO. 503.  Disputed and unsupported by the cited evidence.**  Plaintiffs' cited evidence fails to support the fact that they seek to establish, because the citation merely reflects the opinion of one person who states that certain sampling and testing, such as PCR, can be a complicated process, and that for strip testing, cross-contamination of samples should be avoided. Dr. Chen's cited testimony has nothing to do with the feasibility of testing and whether testing is a realistic risk management tool.

504.    In a July 18, 2011 email, Bernens wrote to others at Syngenta: "In my opinion, nobody will test. Issue is even if you Ship test negative at origin, it can test positive at Destination! And China will not let you verify result." Ex. 324 (Dep. Ex. 1204); Ex. 6, Bernens Vol. I at 19:20-20:20; Ex. 37, Bernens Vol. Ill at 911:7-912:21.

> **RESPONSE TO NO. 504.  Disputed and unsupported by the cited evidence.**  Plaintiffs' cited evidence does not support the fact that they seek to establish, because the cited evidence does not contain the July 18, 2011 email and, in any event, Mr. Bernens explained that his email was intended to reflect the opinion in the industry that "if China wants to stop trade, they'll say they found a positive whether they did or not. And they won't let you verify it." Pls.' Opp'n Ex. 37 (J. Bernens Dep. Tr. 911:15-912:3).  Exhibit 324 does not relate to testing and does not involve Mr. Bernens.

420

505.    In his report, Plaintiffs' damages expert Colin Carter explains that China rejected Syngenta's dossier request for import approval of MIR162 in June 2013 and instituted testing protocols in August 2013. Ex. 291, Carter Rpt. at ¶¶ 12, 30, 37.

> **RESPONSE TO NO. 505.**    **Undisputed.** Syngenta does not dispute that Plaintiffs' damages expert offers the purported opinion, but Syngenta disputes the opinions set forth in the cited paragraphs of Mr. Carter's report, particularly with regard to when the market reacted to China's actions concerning MIR162 and whether Carter has any basis for offering this opinion.

506.    Carter found impact on the price of U.S. corn as of September, attributable to fear of Chinese buyers that U.S. corn would be rejected due to the presence of MIR162. Ex. 291, Carter Rpt. at ¶¶ 87, 90; *see also id.* at ¶ 30 ("In the case of Agrisure Viptera, . . . the market reacted one or two months before China officially closed the door."); Ex. 305, Carter Vol. Ill at 87:13-16 ("Q. Am I correct, sir, that you believe that in September of 2013 Chinese importers began anticipating that U.S. corn exports to China would be stopped? A. Yes."); *id.* at 96:3-9 ("Q. Sir, let's talk about a few contracts for U.S. corn shipments. Am I correct, sir, that you believe that the U.S. corn market reacted in September 2013 to anticipated rejections at that point in time of U.S. corn? A. That's what I found."); *id.* at 254:6-256:15 (estimating the impact of this anticipated rejection of U.S. corn by China in the month of September 2013 to be 15 cents per bushel).

> **RESPONSE TO NO. 506.**    **Undisputed.** Syngenta does not dispute that Plaintiffs' damages expert offers the purported opinion and quoted testimony, but Syngenta notes that it disputes the opinion that U.S. corn prices were impacted as of September 2013, as set forth at length in the Thurman, Goodwin, and Fischel expert reports.

507.    In November 2013, China rejected shipments of U.S. corn after detecting MIR162, which was not approved for import. Ex. 4, Lee Vol. I at 90:2-10; Answer, ECF No. 2623 at ¶ 301 ("Syngenta admits that China began rejecting certain shipments containing U.S. corn in November 2013."); *id.* at ¶ 344 (same); Ex. 254 (Smalley Dep. Ex. 45) at CARGILL00151808 (official Chinese notice of rejection for "Pedhoulas Builder" vessel); Ex. 201, Adelman Vol. I at 312:3-17; Ex. 255 (Dep. Ex. 1072) at SYNG_00705080; Ex. 57, Bernens Vol. II at 568:9-569:6; Ex. 165 Smalley Vol. II at 481:9-482:10 ("All of the rejected shipments have contained Syngenta's Agrisure Viptera corn (MIR 162), which is not yet

approved for import in China."); Ex. 310 (Dep. Ex. 1101) at SYNG_00364608-00364609 (January 18, 2014 McConville email noting Chinese Assistant Minister for the Ministry of Commerce's concern about the presence of the unapproved MIR162 corn trait in corn shipments).

**RESPONSE TO NO. 507.** **Undisputed.** Syngenta does not dispute that

China claimed to have detected MIR162 in the rejected vessels.

508.   On November 19, 2013, Syngenta issued a "media statement" that said: "Syngenta learned today (Nov 19) that the Agrisure Viptera® trait (event MIR162) has been detected in a shipment of corn in China." Ex. 290 (Dep. Ex. 1547) at SYNG_00402517; Ex. 199, Adelman Vol. II at 533:23-536:13.

**RESPONSE TO NO. 508.** **Undisputed.**

509.   Syngenta admits that China rejected US corn shipments after detecting the presence of MIR162. Ex. 84, Araba Vol. II at 428:4-10 ("Q: Sir, do you recall that on or around November of 2013 that it became public knowledge that China had detected MIR162 on shipments of U.S. corn to China and that it was turning U.S. corn shipments away? A: I'm aware of that news. Yes."); Ex. 197, Pisk Vol. II at 357:12-358:9 (conceding that Chinese authorities "had grounds for rejecting those shipments," namely the presence of MIR162), and at 444:21-445:4.

**RESPONSE TO NO. 509.** **Disputed and not supported by the cited**

**evidence.** Plaintiffs' cited evidence does not support the fact that they

seek to establish, because the cited evidence states only that

individuals at Syngenta became aware of the rejections. Pls.' Opp'n

Ex. 84 (M. Araba Dep. Tr. 428:4-10); Ex. 412 (D. Pisk Dep. Tr.

444:21-445:4). Aside from a general awareness, Plaintiffs' cited

evidence provides only that MIR162 was used by China as the claimed

reason for rejecting shipments at the same time China "had a serious

domestic over-production." Ex. 412 (D. Pisk Dep. Tr. 356:15-358:9)**.**

510.   On November 20, 2013, Syngenta's head of corporate affairs Asia-Pacific emailed: "MIR 162 is widespread in the US [and] so [it is] difficult to isolate and very likely that it will continue to be in shipments to China." Ex. 326 (Dep. Ex. 770) (Email from Andrew McConville dated November 20, 2013); Ex. 316, Deposition of Andrew McConville Vol. I ("McConville Vol. I") at 41:22-42:5, 248:9-17.

422

**RESPONSE TO NO. 510.** **Undisputed.** Syngenta does not dispute that Andrew McConville wrote the quoted language in a November 20, 2013 email, but Syngenta notes that Mr. McConville testified that he was unsure whether this was his opinion "or whether [has was] reporting the views of someone else." Pls.' Opp'n Ex. 316 (A. McConville Dep. Tr. 248:9-17)**.**

511.   Numerous grain exporters had shipments rejected due to the detection of MIR162. Ex. 256, G. Martin Vol. II at 403:13-17; Ex. 39 G. Martin Vol. I at 122:4-13 (identifying Cargill, ADM, and Gavilon as entities that notified NAEGA that China was rejecting US corn shipments due to the presence of MIR 162).

**RESPONSE TO NO. 511.** **Disputed and hearsay.** Syngenta does not dispute that China rejected shipments of U.S. corn shipments, citing the presence of MIR162 as the basis for the rejection, but Gary Martin's testimony regarding what happened to particular exporters is inadmissible hearsay evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). Syngenta also notes that China first rejected shipments of U.S. corn from Cargill on this basis, in November 2013. *See* Syngenta's MSJ SOF ¶ 118.

512.   Exporters who sold corn to Chinese buyers in shipments rejected, quarantined by the Chinese government, or diverted by the exporter prior to arrival in China included Louis Dreyfus, CHS, Gavilon, Zen-Noh, ADM, and Cargill. Ex. 39, G. Martin Vol. I 121:15-127:4.

**RESPONSE TO NO. 512.** **Disputed and hearsay.** Syngenta does not dispute that Gary Martin testified that Louis Dreyfus, CHS, Gavilon, Zen-Noh, ADM, and Cargill had shipments of U.S. corn to China that were rejected by China, quarantined by China, or diverted prior to

arrival in China, but Mr. Martin's testimony regarding what happened to particular exporters is inadmissible hearsay evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

513.   Four shipments of U.S. corm sold by Louis Dreyfus to Chinese buyers arriving in November or December were rejected by Chinese officials, with two rejected after the Chinese buyers had discharged the corn from the vessels and two rejected before they discharged the corn from the vessels. Ex. 327 (LDC00000488-LDC0000489); *see also Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG et al.,* 16-cv-3588 (D. Minn.), Compl. ¶ 5 ("LDC had four vessels carrying its corn to China rejected by the Chinese government in 2013 due to their contamination with MIR162, and also had shipments that were bound for China but, due to MIR162-related rejections, had to be reroute to other locations.").

**RESPONSE TO NO. 513.** **Disputed, not supported by the cited evidence, and hearsay.** Plaintiffs' cited evidence fails to support the fact that they seek to establish, because the cited evidence provides only a summary spreadsheet concerning the status of various shipments to China, and the spreadsheet does not show that four vessels had been rejected by China. The cited evidence is also hearsay, and in thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment). The only other document cited by Plaintiffs for this statement of fact is Louis Dreyfus' untested complaint filed in the District of Minnesota.

514.   By December 19, 2013, four shipments of U.S. corn by Gavilon to Chinese customers were rejected by the Chinese government. Ex. 328 (GAVMDL030513, GAVMDL247969-GAVMDL247970).

**RESPONSE TO NO. 514.** **Disputed, not supported by the cited evidence, and hearsay.** Plaintiffs' cited evidence fails to support the fact that they seek to establish, because the cited evidence is an email that does reflect official rejections by China and, in any event, Exhibit 328 states that only two shipments had been rejected (as opposed to testing positive for MIR162). Moreover, the cited evidence is hearsay, and is thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

515. Two shipments sold by Bunge to Chinese buyers were rejected by Chinese officials on or around December 6 and 10, 2013. Ex. 329 (BGNA00028744; BGNA00029063; BGNA00028400); *see also* Ex. 410, Bunge Business Records Certification ("Bunge Cert."); Ex. 411 (BGNA00028252, December 2013 internal emails at Bunge discussing China's rejection of Bunge's ships).

**RESPONSE TO NO. 515.** **Disputed, not supported by the cited evidence, and hearsay.** Plaintiffs' cited evidence fails to support the fact that they seek to establish, because the cited evidence only reflects discussions of the likelihood of rejection, and does not contain an official rejection notice. *See, e.g.*, Pls.' Opp'n Ex. 329, at BGNA00028400 ("We have two vsls in the ports which will be rejected - not yet official but it will happen."). Moreover, the cited evidence is hearsay, and is thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

425

516.   Trans Coastal sold corn to a Chinese buyer that tested positive for MIR162. Ex. 97 Deposition of Pam Moses Vol. IV ("Moses Vol IV") at 1033:5-1035:20, 1042:3-13; Ex. 210 (Moses Dep. Ex. 54) at TCSC01100100.

RESPONSE TO NO. 516.   **Disputed and not supported by the cited evidence.**  Plaintiffs' cited evidence fails to support the fact that they seek to establish, because the cited evidence does not reflect any official rejection of U.S. corn shipments by Trans Coastal.  Syngenta further notes that the cited evidence reflects that Trans Coastal was testing shipments of grain for MIR162 in January 2014 before that grain arrived in China.  Pls.' Opp'n Ex. 210 (P. Moses Dep. Ex. 54).

517.   Test results from Genescan in January 2014 revealed that 15 of 16 samples of corn and ground yellow corn tested positive for MIR162. Ex. 210 (Moses Dep. Ex. 56). Trans Coastal had shipments of DDGs to China that were rejected because they tested positive for MIR162. Ex. 237, Deposition of Pam Moses Vol. V ("Moses Vol. V") at 1330:8-13; *see also Trans Coastal Supply Co. v. Syngenta AG,* et al., No. 14-2221 (C.D. 111.), Complaint ¶¶ 61-63 (ECF No. 1).

RESPONSE TO NO. 517.   **Disputed.**  Plaintiffs' cited evidence fails to support the fact that "15 of 16 samples of corn and ground yellow corn tested positive," because the cited evidence does not contain the results of the tests, or even a description of results.  Pls.' Opp'n Ex. 210 (P. Moses Dep. Ex. 54).  Plaintiffs' cited evidence also fails to support the fact that "Trans coastal had shipments of DDGs to China that were rejected because they tested positive for MIR162," because the cited deposition testimony provides only that Trans Coastal was informed of positive MIR162 test results from its buyers, and further notes that Trans Coastal asked for, but never received, the testing results.  Pls.' Opp'n Ex. 237 (P. Moses Dep. Tr. 1330:8-25).  The remaining

426

evidence is a citation to Trans Coastal's complaint against Syngenta, and is not properly considered as evidence.

518.    Prairie Creek Grain Company, Inc. sold some corn or DDGs to China directly in 2014. Some of that corn was rejected because MIR 162 was found in a sample. Ex. 330, Deposition of Robert Briscoe in his personal capacity ("Briscoe Dep.") at 121:7-122:6.

> **RESPONSE TO NO. 518.**   **Disputed and not supported by the cited evidence.**   Syngenta does not dispute that Prairie Creek Grain Company sold corn or DDGs to China in 2014, but disputes that "corn was rejected because MIR 162 was found in a sample."   Plaintiffs' cited evidence fails to support the fact that they seek to establish, because the cited testimony indicates only that the witness "believes" that corn or DDGs were rejected, and only that he "believes" the rejected was related to MIR162 being found in a sample.  Pls.' Opp'n Ex. 330 (R. Briscoe Dep. Tr. 121:18-122:6).  The cited testimony also does not distinguish between whether the believed rejection was corn or DDGs.  *Id.*

519.    By December 9, 2013, CHS had already approached Syngenta to request compensation for its losses related to the Chinese government's rejections of U.S. corn, suggesting that corn sold by CHS to Chinese buyers also was rejected by the Chinese government. *See* Ex. 331 (Dep. Ex. 558) at SYNG_00355899.

> **RESPONSE TO NO. 519.**   **Disputed.**  Syngenta does not dispute that a December 9, 2013 email from C. Lee reflects a question by an individual at CHS regarding if Syngenta would compensate CHS for losses, but disputes the factual assertion to the extent Plaintiffs seek to infer that China had rejected CHS vessels by December 9, 2013.  The cited email reflects that CHS had no "boats in port yet" and that CHS

"[a]greed that the situation was difficult for all parties."  Further, Mr.

Lee testified that he recalled CHS told him "that they had some boats

that came in and they went through without any rejection."  Ex. 391

(C. Lee Dep. Tr. 418:21-419:15).

520.    A study from the National Grain and Feed Association reports that China rejected
1,450,000 metric tons of corn. Ex. 332 (M. Fisher Dep. Ex. 2001).

**RESPONSE TO NO. 520.**    **Disputed and hearsay.**  The NGFA report

is hearsay, and is thus inadmissible evidence.  *See PAS Commc'ns,*

*Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001)

(declining to consider hearsay evidence on summary judgment).

Syngenta also notes that the cited study refers to the 2013/14 U.S. corn

sales with China and states that the 1.45 million metric tons of corn

reported by the study was "substantially more" than the reported

rejections by China for the same time frame.  Pls.' Opp'n Ex. 332 (M.

Fisher Dep. Ex. 2001 at NGFA-00023139).

521.    China authorities rejected approximately 245,000 metric tons of corn that Cargill sold to
Chinese buyers and 179,000 metric tons of corn that ADM sold to Chinese buyers. *See* Ex.
333 (CARGILL0000001855); Ex. 334 (Sanfeliu Dep. Ex. 28); Ex. 335 (NGFA-00031812).

**RESPONSE TO NO. 521.**    **Undisputed as to Cargill, disputed and**

**not supported by the cited evidence as to ADM.**  Syngenta does not

dispute that the cited evidence relating to Cargill, which are undated

internal Cargill spreadsheets, supports the statement that China

authorities rejected approximately 245,000 metric tons of corn from

Cargill, but Syngenta notes that the spreadsheets do not reflect actual

rejection notices.  Plaintiffs' cited evidence fails to support the fact

428

that they seek to establish as to ADM, because the cited evidence

purportedly relating to ADM does not even state that the rejected

vessels relates specifically to ADM corn shipments.  Pls.' Opp'n Ex.

335.

522.    Thus, over 1 million metric tons - more than two thirds of the rejected amounts - were exported by companies other than Cargill and ADM. *See supra* SOAF ¶¶ 520-521.

**RESPONSE TO NO. 522.**    **Disputed and not supported by the cited**

**evidence**.  Plaintiffs' cited evidence fails to support the fact that they

seek to establish, because there is no indication that the numbers relied

upon in Pls.' SOAF ¶ 520 and Pls.' SOAF ¶ 521 are from the same

source or even from the same point in time.    Syngenta also

incorporates herein its response to Pls.' SOAF ¶¶ 520-21.

523.    Numerous companies, where possible, diverted shipments or cancelled contracts upon learning of China's enforcement of its zero-tolerance requirement. *See, e.g.*, Ex. 335 (NGFA-00031812); Ex. 336 (Sanfeliu Dep. Ex. 8); Ex. 338 (BGNA00029045, BGNA00029063); Ex. 337 (GAVMDL247171; GAVMDL247971; GAVMDL0030513); Ex. 339 (LDC00000921, LDC000011826).

**RESPONSE TO NO. 523.**    **Disputed, not supported by the cited**

**evidence, and hearsay.**    Syngenta does not dispute that exporters

diverted shipments of U.S. corn destined for China following the

rejections of U.S. corn shipments by China in November 2013, but

Plaintiffs' cited evidence does not support the statement that the reason

exporters diverted these shipments was specifically "upon learning of

China's enforcement of its zero-tolerance requirement."  None of the

cited evidence mentions the zero-tolerance requirement.  Moreover,

the cited evidence is hearsay, and is thus inadmissible evidence.  *See*

429

*PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

524.   The NGFA Report concluded that, for the 2013-14 marketing year alone, "[f]or the U.S. corn, DDGS and soybean sectors, the MIR 162-induced trade disruption has resulted in market price loss on unfulfilled export sales, price loss on diverted sales because of the compromised economic negotiating position of U.S. exporters, demurrage costs, and lower market prices for U.S. commodities and products. The total loss for these sectors of the U.S. grain industry is estimated to range from $1 billion to $2.9 billion." Ex. 332 (M. Fisher Dep. Ex. 2001).

**RESPONSE TO NO. 524.   Disputed and hearsay.**   The NGFA report is hearsay, and is thus inadmissible evidence.   *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

525.   Plaintiffs' expert Dr. Colin Carter explained that if China had begun rejecting U.S. corn earlier or if "U.S. exporters had stopped shipping U.S. corn to China earlier for fear of rejection," injury would only have been greater. Ex. 291, Carter Rpt. at ¶ 38.

**RESPONSE TO NO. 525.   Speculation and immaterial to the grounds on which Syngenta seeks summary judgment.**   Syngenta does not dispute the characterization of the purported content of Plaintiffs' expert report, but disputes the content itself, which is conjecture and immaterial to arguments raised by Syngenta on summary judgment.   There is no argument relating to what the injury would have been had exporters shipped U.S. corn to China earlier in time.

526.   Since the de facto ban on U.S. corn, Chinese buyers are paying more for corn substitutes, clearly evidencing a need for U.S. corn - as Dr. Carter opines - China's economy requires. Ex. 367, Carter Dep. Vol. II 194:16-25 (testifying that shift to sorghum "costing China

money relative to corn); Ex. 291, Carter Rpt. ¶ 64 (explaining China's growing need for feed grains), *id.* at ¶ 94 (explaining China is buying more expensive substitutes).

> **RESPONSE TO NO. 526.** **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.** Whether Chinese buyers are paying more for substitutes is irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute the characterization of the purported content of Plaintiffs' expert report, but disputes the content itself. According to Walter Thurman, one of Syngenta's economic experts, "a decline in U.S. exports to China does not necessarily translate into an aggregate decline in demand for U.S. corn exports. Pls.' Opp'n Ex. 110 (W. Thurman Expert Rep. ¶ 73). After analyzing bilateral trade flows and annual U.S. corn export data, Thurman concludes that "any reduction in U.S. corn exports to China was more than offset by increases in corn exports to other destinations," and thus there were "no signs that overall demand for U.S. corn was affected by China's MIR162 import restriction." *Id.* ¶¶ 59, 62. Furthermore, Syngenta's experts have identified alternative reasons for China's shift to importing corn substitutes. As Mr. Shull has explained, China's TRQ on corn is one reason that "private Chinese importers gravitated towards corn alternatives, such as sorghum and DDGs, for which there are no import quotas." Syngenta's MSJ Ex. 5 (P. Shull Expert Rep. ¶ 40 and n. 29).

431

527.    In 2014, Syngenta commercialized another corn trait called Duracade (Event 5307) in the U.S., which is not approved for import to China. Ex. 18, Pisk Vol. I at 148:25- 149:4 (Q: And today Duracade is not approved by China, is it? A: Duracade is not approved in China, that is correct.").

> **RESPONSE TO NO. 527.**   **Immaterial to the grounds on which**
>
> **Syngenta seeks summary judgment.**   Whether Syngenta
>
> commercialized Duracade and whether Duracade is approved in China
>
> is irrelevant to the grounds asserted in Syngenta's motion for summary
>
> judgment.

528.    The de facto ban on U.S. corn exports to China is continuing to occur in part due to the presence of Duracade in the U.S. corn supply. Ex. 291, Carter Rpt. ¶ 16 ("China closed their import market to U.S. corn in the fall of 2013, and it remains effectively closed. Agrisure Viptera was eventually approved for import by China's regulatory authorities in December 2014 but that did not result in any meaningful reopening of commercial sales as the reputation of the U.S. corn supply was already damaged. Despite the problems created by Viptera, Syngenta then pushed Agrisure Duracade into the market without import approvals from China, and that exacerbated the situation." Ex. 366, Babcock Rpt. at ¶ 44 ("The continuing lack of approval for corn produced from Syngenta's Duracade corn seed and Duracade's presence in the U.S. corn supply continues to keep U.S. corn exports out of China.").

> **RESPONSE TO NO. 528.**   **Disputed and immaterial to the grounds**
>
> **on which Syngenta seeks summary judgment.**   Whether there is a de
>
> facto ban on U.S. corn exports to China in part due to the presence of
>
> Duracade in the U.S. corn supply is irrelevant to the grounds asserted
>
> in Syngenta's motion for summary judgment.   In any event, Syngenta
>
> does not dispute that Plaintiffs' experts purport to use the term "de
>
> facto ban" with regard to Duracade's impact on the Chinese market,
>
> but Syngenta disputes to the extent to which Duracade impacts U.S.
>
> corn exports to China.   For example, China has never rejected a
>
> shipment of U.S. corn because of the presence of Duracade.   *See* Ex.

413 (B. Babcock Dep. Tr. 179:19-180:12, 180:24-182:7, 182:16-183:5, 183:18-184:2) (testifying that he has not studied how Duracade is sold in the U.S. and that he is unaware of any shipment being rejected in China due to the presence of Duracade).

529.    Cargill did not export corn to China after December, 2014 due to the presence of unapproved Duracade. Ex. 165, Smalley Vol. II at 493:8-22 ("Q: In light of those opportunities that you just identified for US whole corn sales, why has Cargill not initiated new sales of US whole corn at least after December of 2014 when China approved Viptera? A: Because we have another event that Syngenta has put out on the market without receiving commercial approvals in China, and that's - - and that's Duracade, so we could be going through the same - - the same situation with Duracade that we just experienced with - - with Viptera, in 2013 and early '14.").

**RESPONSE TO NO. 529.** **Disputed and immaterial to the grounds on which Syngenta seeks summary judgment.** Whether Cargill does not export corn to China after December 2014 because of the presence of Duracade is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Cargill's representative provided the cited testimony, but Syngenta notes that Mr. Smalley's testimony relates only to Cargill's export of U.S. corn, not exports of all corn to China.  Syngenta further disputes that Duracade is the real reason that Cargill has not shipped corn to China; rather, China has an oversupply of corn and has resumed *exporting* corn.  Syngenta's MSJ Ex. 5 (P. Shull Expert Rpt. ¶¶ 57-58).

530.    According to Syngenta's expert Hongjun Zhang, a foreign exporter must file an application with China's Ministry of Agriculture for a trader's certificate to import GM products into China, and "inform the Chinese importer that the imported commodity contains GM products so that the Chinese importer can make the appropriate port and customs declaration." Ex. 177, Hongjun Zhang Expert Report ("H. Zhang Rpt.") at ¶¶ 23, 25, 43. According to Zhang, it is "illegal" to export GM products without approval, and this is so

regardless of whether the exporter "had no knowledge of the existence of the GMO traits or that the GMO traits included in a shipment do not conform to the certificate." *Id.* at ¶¶ 55, 57.

### RESPONSE TO NO. 530.   Undisputed.

531.   When asked at his deposition, Zhang was unable to identify any specific Chinese law or regulation that contained an express requirement that foreign exporters test for GM traits in a shipment or that the exporters list all GM traits in a shipment. *See* Ex. 127, Deposition of Hongjun Zhang ("H. Zhang Dep.") at 97:20-103:19.

### RESPONSE TO NO. 531.   Disputed and not supported by the cited

evidence.   Plaintiffs' cited evidence fails to support the facts Plaintiffs

seek to establish, because Dr. Zhang did not testify that he could not

specify a law or regulation that required exporters to test for GM traits,

but stated that he could not identify a specific law during questioning.

Pls.' Opp'n Ex. 127 (H. Zhang Dep. Tr. 101:24-102:11).   Dr. Zhang

offered to review his report again and the law to identify the relevant

legal provisions, but the questioning attorney did not permit him to do

so.   *Id.*   Plaintiffs' cited evidence also fails to support the fact that Dr.

Zhang "was unable to identify any specific Chinese law or regulation

that contained an express requirement . . . that the exporters list all GM

traits in a shipment."   Dr. Zhang was not asked that question in the

cited deposition testimony, and his report does identify the laws

requiring exporters to list the GM traits in a shipment.   Syngenta's

MSJ Ex. 127 (H. Zhang Expert Rpt. ¶¶ 38-43).

532.   Neither in his report nor at his deposition did Zhang cite any evidence or example that Cargill, ADM, or any other exporter has ever been issued a citation, warning, fine, or any other penalty by the Chinese government for violating Chinese law in connection with the sale and shipment of agricultural products, as he interpreted the law. *See generally* Ex. 177.

**RESPONSE TO NO. 532.**   **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Syngenta does not dispute that Dr. Zhang does not identify specific penalties in his expert report, but notes that Dr. Zhang's expert report provides an interpretation of Chinese law and regulations, and Dr. Zhang does not offer an opinion regarding the enforcement of those provisions against ADM and Cargill.  Plaintiffs' cited evidence fails to support the fact that Dr. Zhang identifies no citations, warnings, fines, or penalties in his deposition, because Dr. Zhang's testimony is not part of the cited evidence and Plaintiffs have not provided a complete copy of Dr. Zhang's testimony among their exhibits.   Moreover, whether exporters have been issued citations, warnings, fines, or any other penalty is immaterial to Syngenta's arguments regarding Chinese law, including whether exporters violated Chinese law when they shipped unapproved GM traits to China.  Syngenta also notes that the cited evidence does not support that China has never issued a citation, warning, fine, or other penalty to an exporter because an exporter shipped grains with unapproved GM traits to China.

533.    In Zhang's expert report, he cites to a number of Chinese regulations that impose fines or penalties for certain unlawful actions. Ex. 177 (H. Zhang Rpt.) ¶¶ 41, 65, 73-74. But he has not identified any instance in which the Chinese government imposed fines or penalties on a U.S. exporter resulting from detection of an unapproved GMO trait where the Chinese buyer owned the cargo being imported. Representatives of Cargill are not aware of any U.S. exporter subjected to a fine or any other penalty by the Chinese government as a result of a shipment of corn being rejected due to the presence of an unapproved GM trait. *See* Ex. 303, Giroux Decl. at ¶ 13.

**RESPONSE TO NO. 533.**   **Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Syngenta does not dispute that Dr. Zhang does not specifically identify any fines or penalties or that Randal Giroux states in his declaration that he is not aware of any exporters being subject to fines or penalties, but it is immaterial to Syngenta's arguments regarding Chinese law, including whether exporters violated Chinese law, whether exporters has been issued a penalty in connection with the sale and shipment of agricultural products. Syngenta also notes that the cited evidence does not support that China has never issued such a penalty to an exporter.   In addition, Syngenta notes that among the penalties discussed by Dr. Zhang are rejected cargoes, *e.g.*, Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶¶ 73-74), and it is undisputed that China rejected U.S. corn shipments because of the presence of unapproved traits.

534.   Zhang, was asked: "Have you counseled any clients as to how to comply with the requirements to obtain a trader certificate?" Zhang testified: "I counsel client on general GMO regulation of China. I did not counsel any company particularly in applying or obtaining trader certificate." Ex. 127, H. Zhang Dep. at 138:14-19; *see also id.* at 132:3-6 ("that is not something I tried to identify and it is not something I intend to testify today based on my report.").

**RESPONSE TO NO. 534.**   **Undisputed.**   Syngenta does not dispute that Dr. Zhang provided the quoted testimony, but notes that Dr. Zhang has extensive experience "counseling clients on product import and export, GMO laws, biotechnology and related issues."   Syngenta's MSJ Ex.

436

127  (H. Zhang Expert Rep. ¶ 3); *see also* Syngenta's Opp'n to Pls.'

Mot. to Exclude H. Zhang, at 13-16.

535.    Although touting his experience as a legislative director for the Environmental Protection and Natural Resources Conservation Committee when he was in China, *see* Ex. 177, H. Zhang Rpt. Ex. A, Zhang was not involved in the drafting any of the GMO-related regulations or their implementation. *See* Ex. 127, H. Zhang Dep. 236:21-238:14, 240:10-241:18. In private practice in the United States, Zhang has not personally represented any exporters or traders related to their sale of agricultural genetically modified products to China. *See id.* at 152:15-21.

**RESPONSE TO NO. 535.**    **Disputed, argumentative, and immaterial**

**to Syngenta's arguments for summary judgment.**  Syngenta does

not dispute that Dr. Zhang state that he did not participate in drafting

certain GMO regulations, but whether Dr. Zhang drafted a particular

regulation does not preclude someone from interpreting and explaining

that regulation.      Plaintiffs' cited evidence does not support the

asserted fact that Dr. Zhang has not personally represented any

exporters or traders, because the cited testimony from Dr. Zhang has

no relation whatsoever to his representation of traders or exporters

generally, let alone with regard to a particular subject matter.  *See* Pls.'

Opp'n Ex. 127 (H. Zhang Dep Tr. 152:15-21) (testimony regarding

whether a foreign trader must test every portion of the shipment).

Lastly, Plaintiffs' attempt to undermine Dr. Zhang's credentials is

misplaced.  Dr. Zhang is unquestionably qualified in the relevant

Chinese law—he is a former member of the National People's

Congress in China and Chinese regulator, a lawyer admitted to the

Chinese bar, and in private practice, advises clients on Chinese

regulatory compliance and governments relations, "includ[ing] counseling clients on product import and export, GMO laws, biotechnology and related issues." Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 3). *See also* Wright & Miller, *Federal Practice & Procedure* § 2444 ("Since foreign law is an issue to be determined by the district judge, an expert witness has not been required to meet *any* special qualifications." (emphasis added)); Syngenta's Opp'n to Pls.' Mot. to Exclude H. Zhang, at 13-16.

536.   The United States Department of Agriculture Foreign Agricultural Service has translated the Administrative Measures for Safety Control in the Import of Agricultural GMOs (the "Import Measures"). *See* Ex. 375, US Department of Agriculture, Foreign Agricultural Service, *China, People's Republic of FAIRS Product Specific: Agricultural GMO Implementation Measures* (updated), GAIN Report CH7053, June 22, 2007.

**RESPONSE TO NO. 536.**   **Undisputed.**  Syngenta does not dispute that the USDA has provided a translation of the Import Measures, but notes that this translation is unofficial.

537.   The USDA translated Article 19 of the Import Measures as follows: "Those who ***import*** Ag GMOs for the use of production or raw materials shall not sign any contract until the Ag GMO safety certificate issued by the Ministry of Agriculture is obtained." *Id.* at 14 (emphasis added). The USDA translated Article 20 of the Import Measures as follows: "Imported Ag GMOs, without the Ag GMO safety certificate or without relevant approval documents issued by the Agricultural Administrative Department of the State Council or Ag GMOs that do not conform to the certificate or the other documents shall be returned or destroyed." *Id.* Zhang opines that, according to Article 19 of the Import Measures, a foreign *exporter* may not sign a contract to sell products containing GM traits until it first obtains a trader's certificate. Ex. 177, H. Zhang Rpt. at ¶¶ 31, 54 (emphasis added).

**RESPONSE TO NO. 537.**   **Undisputed.**

538.   Zhang opines that, according to Article 19 of the Import Measures, a foreign ***exporter*** may not sign a contract to sell products containing GM traits until it first obtains a trader's certificate. Ex. 177, H. Zhang Rpt. at ¶¶ 31, 54 (emphasis added).

**RESPONSE TO NO. 538.**   **Undisputed.**

539.    According to Zhang's report, foreign GM trait developers, like Syngenta, must comply with Article 12 of the Import Measures and Article 33 of China's Regulations on Administration of Agricultural Genetically Modified Organism Safety. *See* Ex. 177, H. Zhang Rpt. at ¶¶ 50-51.

**RESPONSE TO NO. 539.    Undisputed.**

540.    ADM, Bunge, Cargill, and Louis Dreyfus sold U.S. corn to Chinese buyers on very similar terms, and each of the companies sold U.S. corn to the same customer (COFCO) for delivery in fall 2013. *See* Ex. 340 (Sanfeliu Dep. Ex. 2) (contract with COFCO dated May 16, 2013 ("Cargill-COFCO Contract")); Ex. 341 (ADM00141678) (contract with COFCO dated May 22, 2013 ("ADM-COFCO Contract")); Ex. 318 (BGNA00033816, "Bunge-COFCO Contract"); Ex. 343 (LDC00013329) (contract with COFCO dated May 9, 2013 ("LDC-COFCO Contract")); Ex. 410, Bunge Cert; Ex. 412 (BNGA00028585, Bunge-COFCO invoice, dated October 30, 2013); Ex. 413 (BNGA00071906, additional Bunge-COFCO invoices, dated October 30, 2013); Ex. 342 (LDC00013329) (contract with COFCO dated May 9, 2013 ("LDC-COFCO Contract")).

**RESPONSE TO NO. 540.    Disputed, not supported by the cited evidence, and hearsay.** Syngenta does not dispute that an affiliate of ADM and Cargill each entered into a contract to sell U.S. corn to COFCO for delivery in fall 2013.  Plaintiffs' cited evidence does not support the fact that the contracts between COFCO and the exporters contained "very similar terms," because each contract had unique provisions as well as different shipment amounts, prices, destinations, and delivery periods, among other differences.  To the extent Plaintiffs seek to establish the similarities of non-COFCO contracts for U.S. corn for buyer other than COFCO, Plaintiffs' cited evidence does not support that asserted fact, because Plaintiffs only cite to COFCO contracts.   With regard to Bunge and Louis Dreyfus, the cited documents produced by Bunge and Louis Dreyfus are hearsay, and are thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F.

Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

541. Each of these contracts with COFCO was for commodity, yellow corn. For example, Maurice Hurst, one of Cargill's corporate representatives, testified that Cargill's corn contracts with Chinese buyers were for "commodity corn." Ex. 266, Deposition of Maurice Hurst ("Hurst 30b6 Dep.") at 134:13; *see also* Ex. 340 (Sanfeliu Dep. Ex. 2, Cargill-COFCO Contract) ("Commodity: US No. 2 or better Yellow Corn"); Ex. 341 (ADM00141678, ADM-COFCO Contract) ("U.S. No. 2 or Better Yellow Corn, 2013/14 Crop"); Ex. 318 (BGNA00033816, Bunge-COFCO Contract) (same); Ex. 410, Bunge Cert., Ex. 412 (BNGA00028585, Bunge- COFCO invoice) (same); Ex. 343 (LDC00013329, LDC-COFCO Contract) (same); Ex. 401 (ADM-00148433); Ex. 402 (ADM-00158561); Ex. 403 (ADM-00158526); Ex. 404 (ADM00158723); Ex. 406 (ADM-00158717).

**RESPONSE TO NO. 541. Disputed and hearsay.** Undisputed as to ADM and Cargill. Disputed as to Louis Dreyfus and Bunge, because the cited documents produced by Bunge and Louis Dreyfus are hearsay, and are thus inadmissible. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

542. The contracts between COFCO, on the one hand, and ADM, Bunge, Cargill, and Louis Dreyfus, on the other (respectively), contain a number of terms related to quality specifications and requirements, including: Quality "Specifications" (e.g., test weight, moisture, total damages kernels, vomitoxins, alfatoxins, etc.); "Phytosanitary Requirements" (e.g., "The corn supplied by the seller should be in sound condition, without any unpleasant odour [sic], free from any sign of mould [sic], fermentation or deterioration as well as substantially free from live insect pests"); and "Chemical Residues Requirements" (e.g., "The chemical residues of the corn should not exceed the maximum levels stipulated by the Ministry of Health of the People's Republic of China." Ex. 340 (Sanfeliu Dep. Ex. 2, Cargill-COFCO Contract); Ex. 341 (ADM00141678, ADM-COFCO Contract) (same or similar); Ex. 318 (BGNA00033816, Bunge- COFCO Contract) (same or similar); Ex. 410, Bunge Cert.; Ex. 414 (BGNA00033825, Bunge- COFCO Contract) (same or similar); Ex. 343 (LDC00013329, LDC-COFCO Contract) (same or similar).

**RESPONSE TO NO. 542. Disputed, not supported by the cited evidence, and hearsay.** Syngenta does not dispute the factual assertion as to the cited contracts for Cargill and ADM, but disputes

Plaintiffs' cited evidence supports that specifications and requirements

are in all corn contracts with COFCO.  With regard to Bunge and

Louis Dreyfus, the cited documents produced by Bunge and Louis

Dreyfus are hearsay, and are thus inadmissible.  *See PAS Commc'ns,*

*Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001)

(declining to consider hearsay evidence on summary judgment).

543.    But none of the above-mentioned specifications or requirements reference genetically
modified traits. The only reference to genetically modified organisms in corn contracts with
COFCO is in the section titled "Other terms." *See* Ex. 340 (Sanfeliu Dep. Ex. 2, Cargill-
COFCO Contract); Ex. 341 (ADM00141678, ADM-COFCO Contract) (same); Ex. 318
(BGNA00033816, Bunge-COFCO Contract) (same); Ex. 343 (LDC00013329, LDC-COFCO
Contract) (same).

**RESPONSE TO NO. 543.   Disputed, not supported by the cited**

**evidence, and hearsay.**   Syngenta does not dispute the factual

assertion as to the cited contracts for Cargill and ADM, but disputes

Plaintiffs' cited evidence supports that specifications and requirements

are in all corn contracts with COFCO.  Syngenta also notes that the

Bunge-COFCO contract is unsigned.  With regard to Bunge and Louis

Dreyfus, the cited documents produced by Bunge and Louis Dreyfus

are hearsay, and are thus inadmissible.  *See PAS Commc'ns, Inc. v.*

*Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to

consider hearsay evidence on summary judgment).

544.    The "Other terms" provision provides that the exporter shall obtain and pay for any GMO
safety certificates issued by Ministry of Agriculture of China. Ex. 340 (Sanfeliu Dep. Ex. 2,
Cargill-COFCO Contract); Ex. 341 (ADM00141678, ADM-COFCO Contract) (same); Ex.
318 (BGNA00033816, Bunge-COFCO Contract) (same); Ex. 343 (LDC00013329, LDC-
COFCO Contract) (same); Ex. 266, Hurst 30b6 Dep. at 117:2-3; Ex. 124, Reed Vol. III. at
171:13-14; *see also id.* at 174:17-19 ("So under the contract, we are agreeing to be the ones
to go to submit the application for the import Biosafety Certificate.").

441

**RESPONSE TO NO. 544.   Disputed, no foundation, not supported by the cited evidence, and hearsay.**  Syngenta does not dispute that the cited contracts for Cargill and ADM contain the provision set forth in this statement of facts, but Plaintiffs' cited evidence cannot support the interpretation of any terms in contracts other than those cited. With regard to Bunge and Louis Dreyfus, the cited documents produced by Bunge and Louis Dreyfus are hearsay, and are thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).  Syngenta also notes that the Bunge-COFCO contract is unsigned.   Further, Syngenta notes that to the extent Plaintiffs rely on the cited testimony of ADM and Cargill employees to support the factual assertion, those employees are not qualified to offer a legal opinion, and have no foundation to do so.

545.    An indemnity provision under the section "Other Terms" in each of COFCO's corn contracts provides an indemnity by exporters for COFCO expenses if a GMO trait beyond what is listed on the GMO safety certificate is detected at the time of import. Ex. 340 (Sanfeliu Dep. Ex. 2, Cargill-COFCO Contract); Ex. 341 (ADM00141678, ADM-COFCO Contract); Ex. 318 (BGNA00033816, Bunge-COFCO Contract) (same); Ex. 343 (LDC00013329, LDC- COFCO Contract) (same); Ex. 266, Hurst 30b6 Dep. at 119:7-13 ("if there's a GMO trait that's . . . found that's not on the trading certificate as it applies to this contract . . . CISA [the seller] would have an obligation to COFCO [the buyer] to take care of expenses related from the findings as it relates to this clause on the execution of this contract."; Ex. 410, Bunge Cert.; Ex. 414 (BGNA00033825, Bunge-COFCO Contract); Ex. 411 (BGNA00028252, December 2013 internal emails at Bunge discussing that its private contracts with COFCO include a GMO provision potentially shifting the risk to Bunge); *accord* Ex. 124, Reed Vol. III at 320:3-7.

**RESPONSE TO NO. 545.   Disputed, not supported by the cited evidence, and hearsay.**  Syngenta does not dispute that the seller, or

exporter in the contracts at issue here, is financially responsible for all the risks and expenses arising from the CIQ finding a corn GMO variety beyond what is listed in the GMO safety certificate, but Plaintiffs' cited evidence does not support characterizing the provision as an indemnification provision, because the cited contracts does not actually refer to these provisions as indemnification provisions.  Pls.' Opp'n Exs. 318 at BGNA00033822; 340 at CARGILL000000058; 341 at ADM-00141684; 343 at LDC00013337.   The cited portion of deposition testimony in Exhibit 124 refers only to risk allocation between the buyer and seller.   With regard to Bunge and Louis Dreyfus, the cited documents produced by Bunge and Louis Dreyfus are hearsay, and are thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

546.   "[T]he vast majority of the contracts would have this [GMO] provision put in it" at COFCO's or other Chinese buyer's insistence. *Id.* at 315:2-4. Its purpose was merely to "mitigate" and "try to allocate risk" of a rejection. *Id.* at 314:21:318:7; Ex. 319 (LDC00013347, LDC-Xinxing Contract); Ex. 124, Reed Vol. III at 318:19-320:7. These contracts made no representations that the corn or DDGS intended to be shipped would be entirely free of MIR162 or any other unapproved traits. Ex. 415, Uhlmeyer Deck at ¶ 10; *see also* Ex. 124, Reed Vol. III at 318:8-17; Ex. 349, Uhlmeryer 30b6 Vol. I at 178:21-17, 179:12-24, 186:8-18.

**RESPONSE TO NO. 546.**  **Disputed, not supported by the cited evidence, and no foundation.**  Syngenta does not dispute that Mr. Reed provides the quoted testimony, but disputes that Mr. Reed's testimony properly characterizes the terms reflected in all exporters' contracts and the purpose of those terms.  Syngenta notes that Mr.

Reed also explained that the reason ADM agreed to the "GMO provision" was because ADM "would likely not be able to do business with these buyers in China." Pls.' Opp'n Ex. 124 (A. Reed Dep. Tr. 316:23-317:8). Further, Plaintiffs' cited evidence does not support what is or is not reflected in the "contracts," including whether the shipment would be entirely free of unapproved traits, because Plaintiffs do not actually cite to the contracts themselves. Syngenta also disputes that the exporters' contracts with Chinese buyers for U.S. corn did not contain contractual conditions specifically requiring that MIR162 would not be included in a shipment of U.S. corn to China. For example, the Cargill-COFCO contract provides that Cargill was responsible for obtaining the GMO safety certificate. Pls.' Opp'n Ex. 340 (A. Sanfeliu Dep. Ex. 2, at CARGILL000000058). And Cargill's Andrew Wong acknowledged that if a cargo contained a GM trait "not meeting the requirements" of Chinese law or Cargill's contracts with Chinese purchasers, that would "unlawful" and would "violat[e] the terms and conditions of our contract[s]." Syngenta's MSJ Ex. 169 (A. Wong Dep. Tr. 370:6-19, 371:21-372:15). Other contracts with Chinese buyers were even more explicit. For example, a March 6, 2013 contract between Cargill and Xiamen C&D Commodity Trading Co, Ltd. stated that "GMO events contained in the Cargo shall be within the 12 varieties stipulated in the safety certificate issued by the Ministry of Agriculture of the People's Republic of China." Ex. 414 at

CARGILL000002109 (3/6/13 Cargill contract, CARGILL000002104-11). Lastly, Mr. Reed is not qualified to offer a legal opinion about the interpretation of contract, and has no foundation to do so.

547. ADM, Bunge, Cargill, and Louis Dreyfus have each entered into contracts with Chinese buyers for U.S. corn, which called for delivery of the corn more than six months after the contract was executed. *See* Ex. 341 (ADM00141678, ADM-COFCO Contract) (May 22, 2013 contract calling for 1 vessel (~60,000 metric tons) to be shipped between December 1 and December 31); Ex. 318 (BGNA00033816, Bunge-COFCO Contract) (April 19, 2013 contract calling for 1 vessel (~60,000 metric tons) to be shipped between November 1 and November 30); Ex. 376 (CARGILL000508031) (October 11, 2011 contract calling for 1 vessel (~60,000 metric tons) to be shipped between May 1, 2012 and May 31, 2012); Ex. 319 (LDC00013347, LDC-Xinxing Contract) (February 21, 2013 contract calling for 1 vessel (~62,000 metric tons) to be shipped between October 15 and November 15)).

**RESPONSE TO NO. 547.** **Disputed and hearsay.** Syngenta does not dispute that the Cargill and ADM contracts contain shipping periods that are more than six months after the contract date, but disputes that Plaintiffs' citation to just a few contracts establishes that contracts for corn are routinely executed over six months in advance of scheduled delivery. In fact, the record is replete with contracts to sell U.S. corn to Chinese buyers where the scheduled delivery is less than six months. *See, e.g.*, Ex. 415, at ADM-00000014 (7/10/13 Toepfer Contract with Shenzen Four Gardner Grain Co. Ltd., ADM-00000014-19 (delivery period is three months after the contract date); Ex. 416, at ADM-00000104 (10/16/13 Toepfer Contract with Xiamen Xiangyu Logistics Group Corporation, ADM-00000104-06) (delivery period is one month after the contract date); Ex. 417, at ADM-00000575 (6/19/13 Toepfer Contract with Chinatex Edible Oil Company Limited, ADM-00000575-79) (delivery period is four months after the

contract date).  With regard to Bunge and Louis Dreyfus, the cited

documents produced by Bunge and Louis Dreyfus are hearsay, and are

thus inadmissible.  *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F.

Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay

evidence on summary judgment).

548.    Representatives of Bunge, Louis Dreyfus, CHS, and Gavilon have not yet been deposed
in this litigation. Ex. 409, Decl. Patrick Stueve.

### RESPONSE TO NO. 548.    Undisputed.

549.    These contracts do not "call for testing of GM traits" and simply require delivery of
commodity corn. Ex. 266, Hurst 30b6 Dep. at 134:13-14; 123:2-; *id.* 131:20-21).

### RESPONSE TO NO. 549.    Disputed, not supported by the cited

**evidence, and no foundation.**  Syngenta does not dispute that Mr.

Hurst provides the quoted testimony, but Plaintiffs' cited evidence

does not support the fact they seek to establish, because Plaintiffs do

not provide any evidence of the "contracts" themselves, and the terms

therein.  Syngenta further notes the Mr. Hurst is not qualified to opine

on the legal interpretation of a contract, and has no foundation to do

so.

550.    The only GMO test required is the test conducted by China when the corn reaches its
destination. Ex. 322, Smalley 30b6 Dep. at 178:20-179:3 ("It's subject to a destination test
and a destination test governs").

### RESPONSE TO NO. 550.    Disputed, not supported by the cited

**evidence, and no foundation.**  Plaintiffs' cited evidence does not

support the fact they seek to establish, because Plaintiffs provide only

testimony from Mr. Smalley who purports to state what tests are done

at "destination" and does not reflect whether any other GMO tests are

446

required elsewhere.  The cited testimony also asks Mr. Smalley to

opine on the contents and requirements of "Cargill's contracts with its

Chinese buyers," Pls.' Opp'n Ex. 322 (S. Smalley Dep. Tr. 178:20-

22), and Mr. Smalley is not qualified to offer a legal opinion, and has

no foundation to do so.  *See* Ex. 355 (2/16/2017 S. Smalley Dep. Tr.

211:9-212:8) (discussing Mr. Smalley's lack of legal training and

knowledge).

551.    Even if the corn was tested, and was negative for the presence of MIR162, before it was
shipped, "it wouldn't matter" because it could "show up there" at the destination. Ex. 124,
Reed Vol. III at 164:6-15 ("the risk has been put on ADM from Syngenta by having a
product out there that you could not control for . . . . The way to mitigate the risk would be
not to have a product that's adequately stewarded, such that it wouldn't impact the export
chains.").

**RESPONSE TO NO. 551.**   **Disputed and not supported by the cited**

**evidence.**   Syngenta does not dispute that Mr. Reed provides the

quoted testimony, but Mr. Reed only offers an opinion as to ADM.

Syngenta also notes that Plaintiffs' selective quoting fails to account

for what ADM could have done had corn been tested for the presence

of MIR162 and the test result was positive.  *See* Syngenta's Response

to Pls.' SOAF ¶ 501.

552.    According to representatives for both Cargill and ADM, there was no requirement under
Chinese law for them to test for presence of genetically modified traits sold to Chinese
buyers. Ex. 322, Smalley 30b6 Dep. at 178:12-19; Ex. 124, Reed Vol. III at 163:13-18; *see
also id.* 304:22-305:3 ("[I]n Chinese regulations, nowhere does it say list the products that
are in the shipment. It doesn't say to test for products in the shipment and put on there what
is in the shipment. It says list GMO products."); Ex. 266, Hurst 30b6 Dep. at 199:23-24;
254:19-20.

**RESPONSE TO NO. 552.**   **Disputed, not supported by the cited**

**evidence, and no foundation.**  Syngenta does not dispute that Messrs.

Smalley and Reed provide an opinion concerning what is required under Chinese law, but Messrs. Smalley and Reed are not qualified to offer a legal opinion regarding the legal requirements under Chinese law and have no foundation to do so. *See, e.g.*, *See* Ex. 355 (2/16/2017 S. Smalley Dep. Tr. 211:9-212:8) (discussing Mr. Smalley's lack of legal training and knowledge).  Syngenta also notes that the citation to Mr. Hurst's testimony has nothing to do with the requirements of Chinese law.

553.  Moreover, as Syngenta's own witness (and scientist) Jingwen Chen explained, testing an entire shipment of corn for the presence of GMO traits would destroy every kernel of corn in that shipment. Ex. 320, Chen Dep. at 240:16-241:16; *see also* Ex. 415, Uhlymeyer Deck at ¶ 9. ADM's corporate representative also testified that trace amounts of corn can be found in entirely different commodities, such as soybeans. Ex. 349, Uhlmeyer 30b6 Vol. I at 142:21-143:15). If Zhang were correct that Chinese law requires ADM to test its shipments of corn and other commodities ADM sold to Chinese buyers to ensure that each shipment was entirely free of any unapproved GMO traits, that would have required testing of the entire shipment, which would not only have been impractical but would have destroyed the shipment in the process. Ex. 415, Uhlymeyer Deck at ¶ 9. ADM would not have been able to ship *any* commodities to China. *Id.*

**RESPONSE TO NO. 553.**   **Disputed and not supported by the cited evidence.**  Plaintiffs' cited evidence does not support the facts they seek to establish, because the citation to Dr. Chen's testimony does not specifically relate to any test for the presence of GMO traits. Plaintiffs' cited evidence likewise does not support that "trace amounts of corn" can get in soybean shipments, because the citation to Mr. Uhlmeyer's testimony does not actually refer to "trace amounts." Syngenta also disputes Plaintiffs' characterization of Dr. Zhang's conclusion, and Syngenta notes that another possibility aside from Mr.

Uhlmeyer's proposal that ADM test the "entire shipment" would be for the exporter to not ship corn to China when it was aware that it was shipping an unapproved trait.  *See* Syngenta's Response to Pls.' SOAF ¶ 501.

554.    Smalley, Cargill's corporate representative, also understands that "the Grain Standards Act. . . does not require GM testing. We have to meet certain specifications around 2 yellow corn, 3 yellow corn all the specifications but the Grains Standard Act and the U.S. law does not require . . . GM testing." Ex. 322, Smalley 30b6 Dep. at 177:20-25 (objection omitted); *see also id.* at 178:5-11 ("Q: To your knowledge is there anything under U.S. law that that requires Cargill to test its shipments for the presence of genetically modified trait?" A: No, there is not." (objection omitted)).

> **RESPONSE TO NO. 554.**  **Disputed and no foundation.**  Syngenta
> does not dispute that Mr. Smalley provides the quoted testimony, but
> the requirements under the U.S. Grains Standards Act and other U.S.
> laws is a legal question and Plaintiffs' effort to treat it as an assertion
> of fact is inappropriate.  Moreover, Mr. Smalley is not qualified to
> offer a legal opinion and has no foundation to do so.  *See* Ex. 355 (S.
> Smalley Dep. Tr. 211:9-212:8) (discussing Mr. Smalley's lack of legal
> training and knowledge, and specifically establishing that Mr. Smalley
> is not an expert on "the legal requirements of the Grains Standard
> Act").

555.    The GM traits listed on a trader's certificate is not a representation of what is in the shipment, but the traits that GM applicants have applied for and that the MOA has approved. Ex. 266, Hurst 30b6 Dep. at 122:9-11 ("[the trader's certificate lists] only the traits that have been approved and that have been requested that that get put on that certificate"); *id.* at 119:22- 25 ("It's my understanding . . . that the GMO trading certificate has to list the GM traits that have been approved by the MOA.").

> **RESPONSE TO NO. 555.**  **Disputed and no foundation.**  Syngenta
> does not dispute that the trader's certificates only contains traits that

have been approved by the Ministry of Agriculture, but Syngenta disputes the asserted fact to the extent Plaintiffs seek to establish that it is permissible to ship U.S. corn to China with unapproved GM traits. It is not permissible under Chinese law to ship agricultural products with unapproved GM traits, and any shipments that violate this law will be rejected or destroyed.  Syngenta's MSJ SOF ¶¶ 56-64 (citing Syngenta's MSJ Ex. 127 H. Zhang Expert Rep.); *see also* Ex. 418 (M. Hurst Dep. Tr. 139:24-140:10) ("Q. Would you be concerned at all if you learned that Cargill actually was testing the corn that was headed to China and knew it contained unapproved traits? . . . . A. Yeah. So in my capacity answering as Maurice Hurst, if -- if there was testing done and Cargill had an awareness and it wasn't on the GMO safety certificate, I'd have concern.").  Furthermore, to the extent Mr. Hurst seeks to offer an opinion regarding Chinese law or interpretation of contractual terms, he is not qualified to offer a legal opinion, and has no foundation to do so.

556.    "[N]owhere does it state in any regulation or in that you list the events that are contained in the shipment. Again, the applicant can choose the traits that they wish to put in the application and it is not correlated to the shipment." Ex. 124, Reed Vol III. at 286:19-25; *see id.* at 180:3-5 ("[A]t no point does the--does the application require a statement or declaration of what events are in the shipment.").

**RESPONSE TO NO. 556.**   **Disputed   and   no   foundation.**    Syngenta does not dispute that Mr. Reed provides the quoted testimony, but Syngenta disputes the asserted fact to the extent Plaintiffs seek to establish that it is permissible to ship U.S. corn to China with

unapproved GM traits.  It is not permissible under Chinese law to ship agricultural products with unapproved GM traits, and any shipments that violate this law will be rejected or destroyed.  Syngenta's MSJ SOF ¶¶ 56-64 (citing  Ex. 127 H. Zhang Expert Rep.); *see also* Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 37(b)) ("Both Article 14 of Import measures and the trader's certificates themselves make clear that every GM event in the shipment must be declared to avoid rejection or destruction of the shipment.").  Furthermore, to the extent Mr. Reed seeks to offer an opinion regarding Chinese law or interpretation of contractual terms, he is not qualified to offer a legal opinion, and has no foundation to do so.  Indeed, Mr. Reed's testimony stands in contrast to ADM's prior corporate representative's testimony on this issue.  *See* Syngenta's MSJ Ex. 228 (B. Flickinger Dep. Tr. 139:8-23) (testifying that ADM "would have to declare the events listed in that shipment" of China).

557.    ADM's corporate representative testified that, in applying for a GMO trader's certificate, Chinese law does not *require* the applicant to make any declaration or representation regarding trace amounts of each and every any every GMO trait that could conceivably be found in the shipment. Ex. 124, Reed. Vol. III at 284:15-285:2. Accordingly, when either ADM or a Chinese buyer purchasing an ADM shipment was the applicant for a biosafety certificate for import relating to an ADM shipment of U.S. corn or other U.S. agricultural commodity, their practice was to include in the application all GMO traits that had been commercialized in the U.S. for that commodity and that were approved in China. Ex. 124, Reed Vol. III at 306:2-17.

**RESPONSE TO NO. 557.   Disputed and no foundation.**   Syngenta

does not dispute that Mr. Reed provides the quoted testimony, but the

requirements under the Chinese law is a legal question and Plaintiffs'

effort to treat it as an assertion of fact is inappropriate.  Mr. Reed is

also not qualified to offer a legal opinion, and has no foundation to do

so.

558.   Cargill applied for, and obtained, a GMO trader's certificate for each shipment of U.S. corn that it sold and shipped to Chinese buyers. *See* Ex. 303, Giroux Decl. ¶ 12.

> **RESPONSE TO NO. 558.**   **No foundation.**  Syngenta does not dispute
>
> that Mr. Giroux provides the cited information in his declaration, but
>
> Syngenta notes that Plaintiffs have not established that Mr. Giroux has
>
> foundation to testify to this fact.   Indeed, Mr. Giroux's declaration
>
> only reflects his "understanding"; nor do Plaintiffs cite any of the
>
> relevant certificates.

559.   Chinese buyers are responsible for discharging corn purchased from U.S. exporters and clearing customs. *See* Ex. 315, Sanfeliu Vol. II at 607:21-608:13; Ex. 266, Hurst 30b6 Dep. at 115:15-22 (after receiving the GM trader's certificates, Cargill gave the certificates to Chinese buyers, and the buyers cleared the cargo into China). When a shipment of corn leaves the United States by boat en route to China, the shipment is typically at sea for 35-40 days. Ex. 350, Altuna Dep. at 333:23-334:8. Under a cost & freight contract, payment for the shipment by the Chinese buyer and *transfer of title to the shipment from the exporter to the Chinese buyer occur while the shipment is at sea*. *Id.* at 334:4-335:22. When the shipment arrives in China, the Chinese buyer owns the shipment, and it is the Chinese buyer, not the exporter, that is responsible for unloading the cargo and presenting all importation documents, including the GMO trader's certificate accompanying the shipment, to the Chinese authorities. *Id.* at 335:25- 336:15; Ex. 124, Reed. Vol. III at 177:8-178:11, 192:10-16).

> **RESPONSE TO NO. 559.**   **Disputed and no foundation.**  Syngenta
>
> does not dispute that the witnesses provide the cited testimony, but
>
> disputes the factual assertion to the extent Plaintiffs seek to establish
>
> that at some point in time the exporter no longer has any
>
> responsibilities with regard to the shipment.   At all times, the exporter
>
> is obligated to obtain the appropriate approval from the Chinese

government before exporting GMO traits, and that responsibility cannot be shifted to the importer.  Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 60).  The cited deposition testimony also purports to opine on the requirements of Chinese and U.S. law, particularly as it relates to ownership, title, and responsibility for the cargo, and the requirements under Chinese and U.S. law is a legal question and Plaintiffs' effort to treat it as an assertion of fact is inappropriate. Furthermore, Messrs. Sanfeliu, Hurst, Altuna, and Reed are not qualified to offer a legal opinion, and have no foundation to do so.

560.    The GM trader's certificate "is presented by the importer ... so that they can then offload the cargo and bring it through customs." Ex. 124, Reed Vol. III at 177:12-15; *see also id.* at 178:6-11.

**RESPONSE TO NO. 560.   Disputed and no foundation.**   Syngenta does not dispute that the importers would present the GM trader's certificate procured to the Chinese ports, and that those certificates would not list the unapproved traits contained in the shipment, but Syngenta disputes the asserted fact to the extent Plaintiffs seek to establish that it is permissible to ship U.S. corn to China with unapproved GM traits.  It is not permissible under Chinese law to ship agricultural products with unapproved GM traits, and any shipments that violate this law will be rejected or destroyed.  Syngenta's MSJ SOF ¶¶ 56-64 (citing Ex. 127 H. Zhang Expert Rep.).  Furthermore, to the extent Mr. Reed seeks to offer an opinion regarding Chinese law or

interpretation of contractual terms, he is not qualified to offer a legal

opinion, and has no foundation to do so.

561.  Title to the commodity corn in the shipments passed to the Chinese buyer before the vessels entered Chinese waters. Ex. 322, Smalley 30b6 Dep. at 120:7-10 ("We had a vessel rejected so after that point in time then we went to our buyers who were the ultimate owners of the corn because title had passed.); *id.* at 140:8-9 ("our customers owned the corn. We did not own the corn [because] title passed, payment had been made"); Ex. 315, Sanfeliu Vol. II at 611:4-8 ("Once [the buyers] pay us they own the documents. They are the owners of the corn. . . That will happen some time [sic] in these 35 days on the way to China.").

> **RESPONSE TO NO. 561.**  **Disputed and not supported by the cited**
>
> **evidence.**  Syngenta does not dispute that title to commodity corn in
>
> shipments eventually passes to the Chinese buyer, but Plaintiffs' cited
>
> evidence fails to support the fact they seek to demonstrate, because the
>
> evidence does not establish the actual point at which title passes.
>
> Syngenta also disputes the asserted fact to the extent Plaintiffs seek to
>
> establish that it is permissible to ship U.S. corn to China with
>
> unapproved GM traits.  It is not permissible under Chinese law to ship
>
> agricultural products with unapproved GM traits, and any shipments
>
> that violate this law will be rejected or destroyed.  Syngenta's MSJ
>
> SOF ¶¶ 56-64 (citing Ex. 127 H. Zhang Expert Rep.).

562.  "[G]enerally speaking, once the boat leaves, you know it's a long trip. You know, usually the documents will be exchanged during - during the course of the process. You mentioned the other certificates. They would be given to the buyer. The buyer being satisfied would then get payment to us as the seller. At that point, the ownership of the cargo changes hands." Ex. 124, Reed Vol. III at 175:20-176:4.

> **RESPONSE TO NO. 562.**  **Disputed.**  Syngenta does not dispute that
>
> Mr. Reed provided the quoted testimony, and Syngenta does not
>
> dispute that documents will be exchanged between the seller and buyer

at some point "during the course of the process," but Syngenta disputes the asserted fact to the extent Plaintiffs seek to establish that it is permissible to ship U.S. corn to China with unapproved GM traits. It is not permissible under Chinese law to ship agricultural products with unapproved GM traits, and any shipments that violate this law will be rejected or destroyed.  Syngenta's MSJ SOF ¶¶ 56-64 (citing Ex. 127 H. Zhang Expert Rep.).

563.    Because the Chinese importer owns the cargo at the time a vessel is discharged and unloaded in China, "the requirements of the regulations on China were on the importer, so the importer would have ownership of the product, cleared it through customs." *Id.* at 234:9-11.

RESPONSE TO NO. 563.    **Disputed and no foundation.**    Syngenta does not dispute that once the vessel is discharged and unloaded, the importer bears some responsibility for getting the shipment through customs, but Syngenta disputes the asserted fact to the extent it seeks to establish that at some point in time the exporter no longer has any responsibilities with regard to the shipment.  At all times, the exporter is obligated to obtain the appropriate approval from the Chinese government before exporting GMO traits, and that responsibility cannot be shifted to the importer.  Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 60).  Furthermore, Mr. Reed purports to opine on the requirements of Chinese law, and the requirements under Chinese law is a legal question and Plaintiffs' effort to treat it as an assertion of fact is inappropriate.   Mr. Reed is also not qualified to offer a legal opinion, and has no foundation to do so.

564.  "[U]nder the regulations, the impact on the regulations, should there not be - should there be an unapproved trait in the cargo would fall on - fall to the importer. There's nothing in the regulation that states any direct impact onto ADM, or Toepfer or in this particular case. This is a - this is a contract between two parties. And so again, if there was found to be an unapproved event under Chinese regulations, that vessel would be rejected. That's the direct impact on the importer. The indirect impact would be, again, if there was a contractual statement, as there is here [referring to the GMO provision in ADM's contract with COFCO], about the allocation of risk between the two parties, and that would be something that would be dealt with between ADM and the buyer." *Id.* at 319:16-320:7; *see also id.* at 193:3-6 ("And under Chinese regulations, if there is found to be out of place, a GMO trait, then the consequence of that, under the regulations, is the vessel shall be rejected.").

> **RESPONSE TO NO. 564.**  **Disputed and no foundation.**  Syngenta
>
> does not dispute that Mr. Reed provides the quoted testimony, but
>
> disputes that the importer alone bears the impact of enforcement of
>
> Chinese regulations.  At all times, the exporter is obligated to obtain
>
> the appropriate approval from the Chinese government before
>
> exporting GMO traits, and that responsibility cannot be shifted to the
>
> importer.  Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 60).
>
> Furthermore, Mr. Reed purports to opine on the requirements of
>
> Chinese law, and the requirements under Chinese law is a legal
>
> question and Plaintiffs' effort to treat it as an assertion of fact is
>
> inappropriate.  Mr. Reed is also not qualified to offer a legal opinion,
>
> and has no foundation to do so.

565.  Hurst testified that if CIQ (China's quarantine and inspection agency) finds a GM trait that is not on a trader's certificate, the consequence would be that the "corn can be rejected or destroyed." Ex. 266, Hurst 30b6 Dep. at 128:19; *see also* Ex. 322 Smalley 30b6 Dep. at 120:120:18-21 ("any unapproved event that was found, the remedy [or the] consequence was either rejection or destroying the cargo"). Hurst was not aware of other any penalties. *See* Ex. 266, Hurst 30b6 Dep. at 128:24-129:4.

> **RESPONSE TO NO. 565.**  **Disputed and no foundation.**  Syngenta
>
> does not dispute that if a GM trait is found that is not on the trader's

certificate that the consequence would be that the corn is rejected or destroyed, but Syngenta disputes the factual assertion to the extent Plaintiffs seeks to establish that there are no other penalties that Chinese regulators may impose. For example, China's Regulation on the Implementation of Customs Administrative Punishment provides for punishments including confiscation of gains and imposition of fines. Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 65). Furthermore, Messrs. Hurst and Smalley purport to opine on the requirements of Chinese law, and the requirements under Chinese law is a legal question and Plaintiffs' effort to treat it as an assertion of fact is inappropriate. Messrs. Hurst and Mr. Smalley are also not qualified to offer a legal opinion, and have no foundation to do so. The fact that one witness (who is not a lawyer or an expert on Chinese law) was ignorant of other penalties does not establish the fact that there were no other penalties for illegally shipping unapproved corn to China.

566. Zhang agrees that, under Chinese law, the owner of the cargo is responsible for importing the cargo and applying for inspection by the relevant Chinese authorities. *See* Ex. 177, H. Zhang Rpt. at ¶¶ 82-83.

> **RESPONSE TO NO. 566.** **Disputed and not supported by the cited evidence.** Syngenta does not dispute that Dr. Zhang provides that the owner of the cargo is responsible for inspection by the relevant Chinese authorities, but Plaintiffs' cited authority does not support their factual assertion concerning who is responsible for importing the cargo. Syngenta further disputes the factual assertion to the extent it

seeks to establish that at some point in time the exporter no longer has
any responsibilities with regard to the shipment.   At all times, the
exporter is obligated to obtain the appropriate approval from the
Chinese government before exporting GMO traits, and that
responsibility cannot be shifted to the importer.  Syngenta's MSJ Ex.
127 (H. Zhang Expert Rep. ¶ 60).

567.    ADM's corporate policy at all times relevant to this litigation was that it would not accept
grains that were unapproved in China or other U.S. export markets - and this policy applied
to MIR162. Ex. 87, Boerm Vol. I at 88:21-91:2, 92:16-93:3, 100:11-102:9, 102:24- 104:21,
171:5-10, Ex. 204; Ex. 349, Uhlmeyer 30b6 Vol. I at 194:18-23, 195:11-18; Ex. 406, Johns
Vol. I at 131:2-13, 133:5-17, 138:16-25, 148:7-23, 155:21-156:2, 164:23-165:10). The only
exception to this corporate policy was if an ADM customer gave ADM prior notice that
he/she was delivering grain containing an unapproved GMO trait, and ADM could keep the
grain segregated and out of the export channel. *See id.* In 2011, when MIR162 was
commercialized by Syngenta, ADM added language in its contracts with customers which
stated that "ADM will not accept grains, oilseeds or wheat containing transgenic events not
approved for U.S. export markets; such markets to include Canada, China, South Korea, the
European Union, Japan, and Mexico." Ex. 87, Boerm Vol. I at 94:9-23, 138:6-142:3, 147:24-
150:7; Ex. 204; Ex. 408 (ADM- 00097887). ADM also included this language in bid sheets
that it sent to customers. Ex. 87, C. Boerm Vol. I at 94:9-19, 231:7-25. ADM also posted
signs in its elevators and grain facilities stating that ADM would not accept grains, oilseeds
or wheat containing transgenic events not approved for U.S. export markets, including China.
Ex. 87, Boerm Vol. I at 121:19-24, 123:16- 21, 229:4-9, 231:7-25; Ex. 406; Johns Vol. I at
129:21-130:16, 132:15-133:4, 171:12-19, 172:14- 173:15; Ex. 407 (Johns Dep. Ex. 204).
ADM also communicated this policy through conversations between ADM's employees and
customers when the issue arose. Ex. 87, Boerm Vol. I at 165:20-166:2, 122:7-10, 231:7-25.
At no time before MIR162 was approved in China did ADM deliberately attempt to ship
MIR162 grain to China, nor did ADM send shipments to China that ADM knew in advance
contained MIR162 grain. Nor did ADM attempt to conceal from the Chinese government any
information about what GM traits might be contained in any of ADM's shipments from the
United States to China, whether MIR162 or otherwise. Ex. 415, Uhlmeyer Deck at ¶ 3.

**RESPONSE TO NO. 567.**  **Disputed  and  not  supported  by  the**

**evidence.**  Plaintiffs' cited evidence fails to support the facts they seek

to establish, because the testimony provides that ADM's policy "isn't

exactly  about  any  particular  trait.  It's  about  whether  or  not  it's

unapproved or not. And our policy is we only accept traits that are approved by our major export markets."  Pls.' Opp'n Ex. 349 (W. Uhlmeyer Dep. Tr. 195:14-18).  Syngenta disputes that China was a major export market "at all times relevant to this litigation."  Syngenta does dispute that in September 2011 ADM added a provision to its grower contracts and posted signs stating that ADM facilities would not accept seed unapproved in China, Pls.' Opp'n Ex. 406 (D. Johns Dep. Tr. 132:15-20); Pls.' Opp'n Ex. 408, but Plaintiffs' cited evidence also states that despite this change, certain facilities took Viptera corn, Pls.' Opp'n Ex. 87 (C. Boerm Dep. Tr. 100:11-24). Moreover, according to ADM's corn export manager, Matt Giltner, for export markets, ADM sourced its corn not only from ADM river facilities, which may or may not have enforced this policy, but also from other, non-ADM river facilities in the so-called "paper market." Ex. 410 (M. Giltner Dep. Tr. 83:22-85:25) (testifying that ADM purchases corn from third-party brokers in the paper market and stating that ADM "certainly can't always source enough grain from our own export elevator or from our own, I'm sorry, from our own river elevators to supply our export elevators").  And for the paper market, which supplied corn to ADM through third-party brokers, Mr. Giltner could not recall "require[ing] sellers to guarantee that their deliveries of corn wouldn't contain MIR162."  *Id.* at 262:2-14; *see also id.* at 89:16-90:13 (testifying that not until late 2013 or 2014, after

rejections, did ADM even try to insert a clause in the paper market purchaser contracts that it would not purchase corn not approved by major markets). Syngenta does not dispute that Mr. Uhlmeyer's declaration contains a statement concerning whether ADM deliberately shipped U.S. corn to China, but disputes that ADM did not knowingly and recklessly ship corn containing MIR162 to China. ADM was well aware of the approval status of MIR162, and knew it was a "high risk that cargo will be rejected" in China. Syngenta's MSJ Ex. 164 (S. Von Lamezan Dep. Ex. 255). Indeed, Mr. Uhlmeyer internally admitted that this "risk that [ADM] took with corn in China was done with *eyes wide open* by all levels of management." Syngenta's MSJ Ex. 165 (R. Grabiel Dep. Ex. 22) (emphasis added).

568.    In 2012, ADM resumed selling U.S. corn and DDGs directly to Chinese buyers. Ex. 349, Uhlmeyer 30b6 Vol. I at 112:24-113:16; 135:20-136:7. ADM's witnesses have explained that China was a significant export market for U.S. corn, and that other exporters had been shipping U.S. corn to China prior to 2012, i.e., after the introduction of MIR162. *Id.* at 142:21-143:7; Ex. 251,Taets Vol. I at 114:25-115:6. ADM's witnesses have further explained that, because of Syngenta's widespread commercialization of MIR162 prior to Chinese approval and without a reasonable stewardship program, ADM was forced into a situation in which it had to choose between two bad alternatives: either stay out of the important Chinese market to which other U.S. exporters were shipping corn and DDGs (thereby suffering not only immediate losses but long-term damage to ADM's relationships with Chinese buyers), or ship to China understanding the risk that ADM could not be certain that its shipments were 100 percent free of traces of MIR162, notwithstanding ADM's corporate policy not to accept GMO traits that were unapproved in U.S. export markets. *Id.* at 224:5-226:5, 228:16-229:7; Ex. 240, Taets Vol. II at 472:18-474:12, 476:9-480:12; Ex. 349, Uhlmeyer 30b6 Vol. I at 112:14-113:16, 142:21-142:15, 152:2-10; Ex. 304, Lamezan Dep. at 144:15-147:10. ADM's witnesses have further explained that ADM's decision to start selling U.S. corn and DDGs directly to Chinese buyers was based, in part, on Syngenta's representations to the market that Chinese approval of MIR162 was imminent and that Syngenta was unaware of any issues with its application. Ex. 251, Taets Vol. I at 224:5-226:5, 228:16-229:7; Ex. 349, Uhlmeyer 30b6 Dep. Vol. I at 143:16-21).

**RESPONSE TO NO. 568.**   **Disputed and not supported by the cited evidence.**   Syngenta does not dispute that ADM employees provided most of the cited testimony, but Plaintiffs' cited evidence fails to support that ADM had to choose between two bad alternatives "because of Syngenta's widespread commercialization of MIR162 prior to Chinese approval and without a reasonable stewardship program."   None of the cited testimony refers to the size of the commercialization of MIR162 before Chinese approval and the reasonableness of Syngenta's stewardship program.   Nor does the evidence establish that not shipping unapproved corn to China was a "bad alternative."

569.   Any risk that was known to ADM and Cargill was the ineradicable commercial risk to exporters like ADM and Cargill that Syngenta created with its widespread and uncontrolled commercialization of MIR162. Ex. 415, Uhlmeyer Deck at ¶ 6.

**RESPONSE TO NO. 569.**   **Disputed and not supported by cited evidence.**   Plaintiffs' cited evidence fails to support the fact that they seek to establish, because Wes Uhlmeyer's declaration relates only to ADM, not Cargill.   Syngenta does not otherwise dispute that Mr. Uhlmeyer's declaration contains the cited contents, but disputes the opinions set forth in the cited paragraph, except insofar as ADM recognized that there was a risk in shipping unapproved traits to China. Indeed, ADM knew it was a "high risk that cargo will be rejected" in China, Syngenta's MSJ Ex. 164 (S. Von Lamezan Dep. Ex. 255), and Mr. Uhlmeyer internally admitted that this is a "risk that [ADM] took

461

with corn in China was done with *eyes wide open* by all levels of management," Syngenta's MSJ Ex. 165 (R. Grabiel Dep. Ex. 22) (emphasis added).  Syngenta further notes that ADM was not required to ship corn to China in 2012 and 2013—in fact, ADM historically has not shipped corn to China.

570.   Cargill did not regularly test for the presence of GM traits in commodity corn because it is neither required by U.S. law nor is it an effective risk-management tool given Syngenta's broad commercialization of Viptera. *See* Ex. 322, Smalley 30b6 Dep. at 178:5-11 ("Q: To your knowledge is there anything under U.S. law that that requires Cargill to test its shipments for the presence of genetically modified trait?" A: No, there is not." (objection omitted)). Randy Giroux, one of Cargill's corporate representatives, testified that "as Cargill, we generally did not test for the presence of MIR162, because it didn't provide any risk management for the risks that Syngenta had imposed on us by commercializing that [trait]." Ex. 75, Giroux 30b6 Vol. I at 20:2-6.

### RESPONSE TO NO. 570.   Disputed and not supported by the cited

evidence.  Plaintiffs' cited evidence fails to support the facts they seek to establish, but none of the cited testimony reflects the frequency of Cargill's testing for its shipments to China.  And the record evidence demonstrates the opposite of Plaintiffs' asserted fact.  The record shows that Cargill *did* test U.S. corn shipments to China, including testing samples retained from numerous China-bound vessels in November 2013.  *See* Pls.' Opp'n Ex. 380 (C. Eldstrom Dep. Ex. 6); *see also, e.g.*, Syngenta's MSJ SOF ¶¶ 100-101.  The record further reflects that, after receiving the results, which showed that the China-bound vessels contained MIR162, Cargill attempted to hide them internally.  Mr. Smalley, the Cargill Vice President and General Manager responsible for U.S. corn exports who made the decision to

test, had the results delivered to him in hard copy.  Ex. 355 (2/16/2017 S. Smalley Dep. Tr. 76:20-77:12).  Afterward, on November 20, 2013, Cargill deliberately told other employees to "disregard and delete the email" reflecting the test results "as this is something for the regular corn group that needs to be kept confidential."  Ex. 350 (S. Smalley Dep. Ex. 4).  Mr. Smalley and Mr. Hale (Mr. Smalley's superior at the time) subsequently disclosed the results to only a select group of Cargill employees (Mr. Giroux, Mr. Friant, and Mr. Sanfeliu), and never informed Cargill's customers, or Chinese or U.S. government officials of the results.  *See* Ex. 350 (2/16/2017 S. Smalley Dep. Tr. 46:23-47:2, 55:5-8, 107:19-24, 108:21-109:3, 113:12-25, 132:22-133:5). Later in this litigation, at least four of the five employees aware of the results, falsely testified that this testing never happened. *See, e.g.*, Ex. 411 (N. Friant Dep. Tr. 137:25-138:9 ("Q. Did Cargill start using GeneScan to test its corn in November of 2013? A. I don't recall. Q. If Cargill was testing its corn for Viptera, is that something you would be aware of in your role as grain coordinator? A. I would say it's something I should be aware of."); Ex. 419 (5/16/2016 R. Giroux Dep. Tr. 44:24-45:10) (testifying that Cargill did not perform testing outside of what was reflected in test results from 2011 and 2012); Ex. 409 (5/18/2016 S. Smalley Dep. Tr. 246:2-8) ("Q: Other than testing barges on two occasions in 2011 and then test of the Glencorp vessel also in 2011, did Cargill do any other testing of its corn for the

presence of MIR162 . . . A. Not to my knowledge."); Ex. 420 (6/24/2016 A. Sanfeliu Dep. Tr. 420:14-23) ("We were not testing at origin, so I cannot answer if these boats had MIR162 or not."). Finally, Mr. Smalley purports to opine on the requirements of U.S. law, and the requirements under U.S. law is a legal question and Plaintiffs' effort to treat it as an assertion of fact is inappropriate. Mr. Smalley is not qualified to offer a legal opinion, and has no foundation to do so.

571. When Cargill performed "spot-checking" for the presence of MIR162 (Ex. 75, Giroux 30b6 Vol. I at 20:7-8) and detected the trait, Cargill required that the MIR162-tainted corn not be loaded on vessels bound for China. *See id.* at 50:21-24 ("So, if there was ever a positive test for the presence of MIR162, there was a requirement that those consignments not enter into -- enter into China."); *see also id.* at 53:11-17. Giroux also testified that Cargill took a number of steps "in an attempt to divert MIR162" away from key markets like China and "manage the risk imposed on us by Syngenta." *Id.* at 54:8-9, 56:18-20.

<u>RESPONSE TO NO. 571.</u>   **Disputed.**   Syngenta does not dispute that Randal Giroux provided the quoted testimony, but Syngenta disputes the asserted fact to the extent Plaintiffs seek to demonstrate that Cargill did not knowingly ship MIR162 corn to China while the GM trait was unapproved in China.  Indeed, Mr. Giroux wrote in March 2012, "our guess is all boats are positive for this trait [MIR162] if tested."  Syngenta's MSJ Ex. 162 (R. Giroux Dep. Ex. 105).

572. Given the way that Syngenta commercialized Viptera, there was some risk that MIR162 would be in shipments of commodity corn sold to Chinese buyers. *See, e.g*., Ex. 75, Giroux 30b6 Vol. I at 21:9-22; Ex. 415, Uhlmeyer Deck ¶ at 5 (There was no way for ADM to adequately assure itself that its shipments of U.S. Corn and DDGs to China were entirely free of traces of MIR162, down to a zero tolerance, given the widespread nature of Syngenta's commercialization).

**RESPONSE TO NO. 572.   Disputed.**   Syngenta does not dispute that Randal Giroux provided the cited testimony and that Wes Uhlmeyer provided the cited information in his declaration, but Syngenta disputes the asserted fact to the extent Plaintiffs seek to establish that ADM and Cargill did not knowingly ship corn containing MIR162 to China.  In fact, in Plaintiffs' cited evidence, both Mr. Giroux and Mr. Uhlmeyer admit that it was not possible to test for zero tolerance such that Cargill or ADM could guarantee that a shipment to China did not have MIR162.  Pls.' Opp'n Ex. 75 (R. Giroux Dep. Tr. 21:7-17) ("[T]here's a zero tolerance requirement for the presence of MIR162 in China, a risk that was not manageable . . . ."); Pls.' Opp'n Ex. 415 (W. Uhlmeyer Dec. at ¶ 5 ("ADM could not guarantee that there would be no trace amounts of MIR162 in ADM's corn shipments to China").  As Mr. Giroux stated in March 2012, "our guess is all boats are positive for this trait [MIR162] if tested."  Syngenta's MSJ Ex. 162 (R. Giroux Dep. Ex. 105).   Similarly, Mr. Uhlmeyer admitted internally that this "risk that [ADM] took with corn in China was done with eyes wide open by all levels of management."  Syngenta's MSJ Ex. 165 (R. Grabiel Dep. Ex. 22).

573.   ADM's contracts with Chinese buyers and its shipments of U.S. Corn and DDGs to China were in full compliance with ADM's corporate policies, including its Code of Conduct. Ex. 415, Uhlmeyer Deck at ¶ 12.

**RESPONSE TO NO. 573.   Disputed and no foundation.**   Syngenta does not dispute that Mr. Uhlmeyer provides the cited information in

his declaration, but disputes that ADM was in compliance with its corporate policies when it shipped U.S. corn and DDGs to China. For example, ADM's Code of Conduct states that ADM "must abide by all applicable laws and regulations regarding international trade." Syngenta MSJ Ex. 314. ADM violated this code of conduct when it shipped U.S. corn and DDGs with unapproved traits to China. *See* Syngenta's MSJ SOF ¶¶ 56-64 (citing Ex. 127 H. Zhang Expert Rep.).

574.    On or about November 16, 2013, Cargill learned that MIR162 had been detected in corn that it had sold to COFCO after the corn was discharged from the M/V Pedhoulas Builder. *See* Ex. 377 (Smalley 30b6 Dep. Ex. 17).

**RESPONSE TO NO. 574.    Undisputed.**

575.    Within days, Alex Sanfeliu, the head of the corn desk for CISA, began the process of rerouting vessels to other markets and delaying contracts. *See*, *e.g.,* Ex. 378 (CARGILL000035436).

**RESPONSE TO NO. 575.    Disputed and hearsay.**  Syngenta does not dispute that the cited document reflects that Cargill began a process to reroute certain vessels, but Syngenta disputes the asserted fact to the extent Plaintiffs seeks to establish that Cargill rerouted all of their China-bound vessels following the first Cargill vessel that China rejected based on the presence of MIR162. *See, e.g.*, Syngenta's MSJ SOF ¶ 118.  Moreover, the cited Cargill document is hearsay, and is thus inadmissible evidence. *See PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179 (D. Kan. 2001) (declining to consider hearsay evidence on summary judgment).

576.    On or about November 18, 2013, Steve Smalley and others at Cargill discussed mitigating damages by advocating to Chinese authorities to allow shipments containing small

amounts MIR162 into the country as low-level presence ("LLP"). *See* Ex. 322, Smalley 30b6 Dep. at 42:7-15; *id.* at 150:9-12; Ex. 379 (Smalley 30b6 Dep. Ex. 11).

> **RESPONSE TO NO. 576.   Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Cargill's efforts to advocate to Chinese authorities concerning LLP for MIR162 is irrelevant to the grounds asserted in Syngenta's motion for summary judgment.   In any event, Plaintiffs' cited evidence fails to support the fact they seek to establish, because the cited evidence does not actually refer to "mitigating damages by advocating to Chinese authorities."  Exhibit 379 discusses testing and LLP, but does not refer to "advocating to Chinese authorities."  Exhibit 322 does not actually contain the cited testimony.  Syngenta does not dispute that the testimony is in the record, but the testimony refers only to discussions by Mr. Smalley and Mr. Giroux regarding LLP and possibly talking to Chinese buyers; it does not refer to discussions with Chinese authorities about mitigating damages.

577.   To obtain additional data to support an LLP proposal, including the level at which the LLP should be set (e.g., one percent, three percent, or five percent), "retained" samples from nine vessels that had been loaded from Cargill's Gulf facilities were sent to Eurofins/Genescan for MIR162 testing on or about November 18, 2013. *See* Ex. 322, Smalley 30b6 Dep. at 43:24- 44:7; 105:23-106:3; Ex. 380 (Eldstrom Dep. Ex. 6). All of the samples tested came from vessels that had either arrived in China or were on the water en route to China. *See* Ex. 322, Smalley 30b6 Dep. at 43:24-44:3; 55:5-21; *see also id.* at 49:9-14 (listing the nine vessels).

> **RESPONSE TO NO. 577.   Disputed, not supported by the cited evidence, and immaterial to the grounds on which Syngenta seeks summary judgment.**   Cargill's efforts to obtain data to support an

LLP proposal are irrelevant to the grounds asserted in Syngenta's motion for summary judgment. In any event, Syngenta does not dispute that Cargill tested samples from vessels in November 2013 and does not dispute that Mr. Smalley testified that the purpose of that testing was to obtain data to support an LLP proposal, but Syngenta disputes the factual assertion to the extent Plaintiffs seek to establish that Cargill tested only to support an LLP proposal. Indeed, immediately following the test results, Cargill deliberately told employees to "disregard and delete the email" reflecting the test results "as this is something for the regular corn group that needs to be kept confidential." Ex. 350 (S. Smalley Dep. Ex. 4). And then Cargill proceeded to send several of the tested shipments to China despite knowing they had tested positive for MIR162. Syngenta's MSJ SOF ¶ 118. Cargill did so even though it knew based on the Eurofins/Genescan test results that the shipments would likely test positive when they reached China. Pls.' Opp'n Ex. 379 (S. Smalley Dep. Ex. 11 at CARGILL000008028) (Nick Friant explaining that the Genescan test "probably most closely reflects the limits of detection the Chinese would have in any tests they run").

578. Smalley testified that the test results were "a data point to say . . . quantitatively is it three percent. What do we need to go for an LLP? And we determined that a three percent LLP we should be able to live by and that's what we were pushing for ultimately." Ex. 322, Smalley 30b6 Dep. at 141:2-7; *see also id.* at 155:20-24. Smalley testified that the sample that was tested for each vessel was just 10 grams (or 30 kernels of corn). *Id.* at 124:19-25.

**RESPONSE TO NO. 578.**   **Disputed.**   Syngenta does not dispute that Mr. Smalley's cited testimony is in the record (it is not in the cited exhibit), but Syngenta disputes the factual assertion to the extent Plaintiffs seek to establish that Cargill tested only to support an LLP proposal.   Indeed, immediately following the test results, Cargill deliberately told employees to "disregard and delete the email" reflecting the test results "as this is something for the regular corn group that needs to be kept confidential."  Ex. 350 (S. Smalley Dep. Ex. 4).   And then Cargill proceeded to send several of the tested shipments to China despite knowing they had tested positive for MIR162.  Syngenta's MSJ SOF ¶ 118.  Cargill did so even though it knew based on the Eurofins/Genescan test results that the shipments would likely test positive when they reached China.  Pls.' Opp'n Ex. 379 (S. Smalley Dep. Ex. 11 at CARGILL000008028) (Nick Friant explaining that the Genescan test "probably most closely reflects the limits of detection the Chinese would have in any tests they run").

579.   On November 19, 2013, Randy Giroux contacted Syngenta to get more information. Steve Smalley testified that "Randy was in contact and Syngenta was telling Randy that they had been approved for food and feed. There were no safety issues, and they were waiting for just someone to sign off, a signature. There was . . . a national committee meeting in a couple weeks and so they felt it was imminent that it would be approved." Ex. 322, Smalley 30b6 Dep. at 189:3-9.

**RESPONSE TO NO. 579.**   **Disputed, mischaracterizes evidence, and hearsay.**   Syngenta does not dispute that the cited testimony is in the record (although not in the cited evidence), but disputes whether the cited testimony accurately reflects an email from Mr. Giroux regarding

469

a discussion he had with Syngenta on November 19, 2013, about which Mr. Smalley was testifying.   Specifically, on November 19, 2013, Mr. Giroux wrote an email summarizing a call with Syngenta in which Mr. Giroux states that Syngenta is "committed to work with us as we wish; they are being transparent and want to find outcome that is minimally disruptive to trade."  Pls.' Opp'n Ex. 377 (S. Smalley Dep. Ex. 17).  Mr. Giroux does not state that Syngenta was "waiting for just someone someone to sign off, a signature," but rather that Syngenta said there was a "[c]ommittee mtg in DEC if they follow formal process but there is precedence to move ahead." *Id.*  Furthermore, Mr. Giroux's email is a discussion of what unidentified people at Syngenta said to him, and is therefore inadmissible hearsay.

580.    On November 20, 2013, Eurofin/GeneScan emailed test results for the nine samples to Cargill. *See* Ex. 380 (Eldstrom Dep. Ex. 6). All of the samples showed some amount of MIR162, ranging from 1.2% (M/V Tiger South) to 2.8% (MW Pedhoulas Builder). *See id.*

> **RESPONSE TO NO. 580.**          **Undisputed.**

581.    In mid-December, Steve Smalley and other members of the North American Grain Exporters Association ("NAEGA") went to China and, among other things, advocated that to Chinese authorities that they allow low levels of MIR162 into the country. But their efforts were not successful. *See* Ex. 164, Smalley Vol. I at 153:2-10.

> **RESPONSE TO NO. 581.**          **Undisputed.**  Although not contained as part of the

cited evidence, Syngenta does not dispute that Mr. Smalley's quoted testimony is in the record.

582.    In addition to pursuing an LLP solution, Cargill worked with Chinese buyers to have CIQ "pre-inspect" arriving vessels for the presence of MIR162 before corn from the vessels discharged. It did so because the "buyers . . . were the ultimate owners of the corn because title had passed." Ex. 322, Smalley 30b6 Dep. at 120:9-10.

> **RESPONSE TO NO. 582.**          **Disputed and immaterial to the grounds on**

**which Syngenta seeks summary judgment.**  Cargill's efforts to have CIQ "pre-inspect" vessels

for the presence of MIR162 are irrelevant to the grounds asserted in Syngenta's motion for summary judgment.  In any event, Syngenta does not dispute that Mr. Smalley provided the cited testimony, but disputes the assertion of fact to the extent Plaintiffs seek to establish that at some point in time the importer alone bears the impact of enforcement of Chinese regulations.  At all times, the exporter is obligated to obtain the appropriate approval from the Chinese government before exporting GMO traits, and that responsibility cannot be shifted to the importer.  Ex. 127 (H. Zhang Expert Rep. ¶ 60).  Syngenta also disputes the assertion of fact to the extent Plaintiffs seek to establish that title passed prior to Cargill knowing that China-bound shipments of U.S. corn contained MIR162.  Cargill received test results for the M.V. Moonlight and M.V. Tiger South on November 20, 2013, Pls.' Opp'n Ex. 380 (C. Eldstrom Dep. Ex. 6), which is two days before Cargill received payment for the M.V. Moonlight shipment and almost two weeks before Cargill received payment for the M.V. Tiger South, *see* Ex. 356 (P. Locken Dep. Ex. 17 at 1). Syngenta also disputes the assertion of fact to the extent Plaintiffs seek to establish that the purpose of the pre-inspection was "because the buyers were the ultimate owners of corn from the vessels."  Rather, as Mr. Smalley later testified, Cargill "wanted to find out so [it] could take that vessel to another destination before have to having it discharged" and was "pushing for [its] customers to go for a preinspection with -- which would minimize everyone's costs involved."  Ex. 355 (2/16/2017 S. Smalley Dep. Tr. 120:21-23, 140:10-12).  Syngenta further notes that Cargill offered this testimony only after it was revealed that four witnesses had falsely testified that there had been no testing in November 2013.

583.    Smalley explained the CIQ pre-inspection process as follows: "So the vessels could come along berth. CIQ could inspect the vessels at berth without discharging. The vessel would go to an anchorage. It would set at an anchorage until we could get a result." *Id.* at 120:12-16; *see also id.* at 200:18-201:5 ("the vessel pulls up to the berth. CIQ comes to the vessel. They take samples from the vessel. Then we have to move. We have to order the vessel to an anchorage. It's on [demurrage]. We're paying costs as it sits there. And we're waiting for the

results from CIQ and then CIQ comes back with the results either saying it's negative and therefore we can bring the vessel back to berth and discharge the vessel or it's positive and we know we cannot take it into China and we have to find an alternative home for that vessel.").

> **RESPONSE TO NO. 583.**   **Disputed.**   Syngenta does not dispute that Mr. Smalley provided the cited testimony, but disputes the assertion of fact to the extent Plaintiffs seek to establish that at some point in time the importer alone bears the impact of enforcement of Chinese regulations.   At all times, the exporter is obligated to obtain the appropriate approval from the Chinese government before exporting GMO traits, and that responsibility cannot be shifted to the importer. Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 60).   Syngenta further notes that Cargill offered this testimony only after it was revealed that four witnesses had falsely testified that there had been no testing in November 2013.

584.    For example, the M/V Yong Li arrived at Fuzhou Port on November 25, 2013. *See* Ex. 381 (CARGILL000459568, Laytime Statement of Facts for the M/V Yong Li). Before the corn on the vessel discharged, CIQ inspected the cargo. *See id.* On November 29, 2013, the M/V Yong Li dropped anchor at outer anchorage to wait for the results of CIQ's inspection. *See id.* On or around December 2, 2013, CIQ provided to COFCO a notice that MIR162 had been detected. *See* Ex. 382 (CARGILL000694087, CIQ Notice). Cargill then sold the corn from the Yong Li to a buyer in Japan in January 2014. *See* Ex. 383 (CARGILL000001469, contract dated January 8, 2014). No corn from the Yong Li entered Chinese soil, save for whatever corn was in the sample that CIQ collected.

> **RESPONSE TO NO. 584.**   **Disputed** to the extent Plaintiffs seek to establish that at some point in time the importer alone bears the impact of enforcement of Chinese regulations.   At all times, the exporter is obligated to obtain the appropriate approval from the Chinese government before exporting GMO traits, and that responsibility

cannot be shifted to the importer.  Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 60).  Syngenta further notes that Cargill offered this testimony only after it was revealed that four witnesses had falsely testified that there had been no testing in November 2013.  Syngenta specifically disputes the suggestion that the Yong Li was not rejected by Chinese authorities**.**

585.    Similarly, after the M/V Hanjin New Orleans arrived in Huangpu Port on November 28, 2013, CIQ took a sample for testing before any corn was discharged from the vessel. *See* Ex. 384 (Wong Dep. Ex. 21). After detecting MIR162, CIQ refused to issue a discharge permit. *See id.* Around January 6, 2014, Cargill resold the corn on the M/V Hanjin New Orleans to a buyer in Japan. *See* Ex. 385 (CARGILL000127791). Again, no corn from the M/V Hanjin was discharged into Chinese soil.

<u>**RESPONSE TO NO. 585.**</u>   **Disputed** to the extent Plaintiffs seek to establish that at some point in time the importer alone bears the impact of enforcement of Chinese regulations.  At all times, the exporter is obligated to obtain the appropriate approval from the Chinese government before exporting GMO traits, and that responsibility cannot be shifted to the importer.  Syngenta's MSJ Ex. 127 (H. Zhang Expert Rep. ¶ 60).  Syngenta further notes that Cargill offered this testimony only after it was revealed that four witnesses had falsely testified that there had been no testing in November 2013.  Syngenta specifically disputes the suggestion that the M/V Hanjin New Orleans was not rejected by Chinese authorities**.**

586.    The two vessels that discharged without incident—the M/V Moonlight and the M/V Tiger South—were also pre-inspected by CIQ and were permitted to discharge their corn. *See* Ex. 322, Smalley 30b6 Dep. at 122:7-14; *see* Ex. 386 (CARGILL000417221, Laytime Statement of Facts for the M/V Moonlight).

**RESPONSE TO NO. 586.**   **Undisputed** that even in November 2013,

Chinese authorities were inconsistent in whether they were allowing

MIR162 corn to enter the country.

587.   The M/V Tiger South arrived in Fangcheng Port on December 13, 2013. *See* Ex. 387 (CARGILL000417225, Laytime Statement of Facts for the M/V Tiger South). On December 25, 2013, while the vessel was still at outer anchorage, CIQ took a sample from the vessel back for testing. *Id.* The vessel waited at outer anchorage for the results of CIQ's analysis. *Id.* CIQ granted permission for discharge on December 28, 2013, and discharge completed on January 2, 2014. *Id.*

**RESPONSE TO NO. 587.**   **Undisputed** that even in December 2013,

Chinese authorities were inconsistent in whether they were allowing

MIR162 corn to enter the country.