IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: SYNGENTA AG MIR 162 ) | MDL No. 2591 |
| CORN LITIGATION ) | |
| ) | Case No. 14-md-2591-JWL |
| This Document Relates To: ) | |
| ) | |
| The Kansas Class Certified by the Court ) | |
| _____) | |

## MEMORANDUM AND ORDER

In this multi-district litigation (MDL), plaintiffs assert various claims against defendants (collectively "Syngenta") relating to Syngenta's commercialization of corn seed products known as Viptera and Duracade, containing a genetic trait known as MIR 162, without approval of MIR 162 corn by China, an export market. Plaintiffs, who did not use Syngenta's products, allege that Syngenta's commercialization of its products caused corn containing MIR 162 to be commingled throughout the corn supply in the United States; that China rejected imports of all corn from the United States because of the presence of MIR 162; that such rejection caused corn prices to drop in the United States; and that plaintiffs were harmed by that market effect. By prior order, the Court certified state-wide classes for claims under the law of eight different states. *See In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856 (D. Kan. Sept. 26, 2016). The Court has first set for trial the claims of the Kansas state class, which asserts only a claim of negligence, and the Court has entered a pretrial order to govern that trial.[1]

_____

[1] That trial was also to include claims of the nationwide Lanham Act class, but the
(continued...)

This matter presently comes before the Court on the parties' motions to exclude expert testimony from the trial of the Kansas state class's negligence claims. As more fully set forth below, the Court rules as follows[2] with respect to the various experts:

<u>Plaintiffs' motions (Syngenta's experts)</u>

*Shull* (Doc. # 2868) – granted in part and denied in part;

*Milne* (Doc. # 2871) – granted in part and denied in part;

*Sheppard* (Doc. # 2912) – granted in part and denied in part;

*McHughen* (Doc. # 2877) – granted in part and denied in part;

*Thurman* (Doc. # 2884) – granted in part and denied in part;

*Goodwin* (Doc. # 2886) – granted;

<u>Syngenta's motions (plaintiffs' experts)</u>

*Maier* (Doc. # 2863) – granted in part and denied in part;

*Keaschall* (Doc. # 2866) – denied;

*Latner* (Doc. # 2870) – granted in part and denied in part;

*Giroux* (Doc. # 2876) – granted in part and denied in part;

---

[1](...continued)
Court has granted summary judgment to Syngenta on those claims.

[2]The Court stresses that, by this order, it rules only on the parties' specific requests to exclude certain expert testimony for particular reasons. It does not hereby rule on the ultimate admissibility of any testimony not excluded—such testimony must still be shown at trial to be relevant, and is still subject to other possible objections, including an objection that the testimony is cumulative. Nor does the Court by this order rule on the admissibility of any other evidence.

*Babcock* (Doc. # 2888) – denied;

*Carter* (Doc. # 2892) – granted in part and denied in part.[3]

## I.    Governing Standards

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

Supreme Court instructed that district courts are to perform a "gatekeeping" role

concerning the admission of expert testimony.  *See id.* at 589-93; *see also Kumho Tire

Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of expert

testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must

undertake a two-part analysis:  first, the Court must determine that the witness is

qualified by "knowledge, skill, experience, training, or education" to render the opinions;

and second, the Court must determine whether the witness's opinions are "reliable"

under the principles set forth in *Daubert* and *Kumho Tire*.  *See Ralston v. Smith &*

---

[3]The Court also denies Syngenta's motion to strike (Doc. # 2930), as discussed
below.  *See infra* Part II.D.1.

*Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee notes. The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *See Kumho Tire*, 536 U.S. at 152.

## II.    Plaintiffs' Motions to Exclude Testimony by Syngenta's Experts

### A.    *Philip Shull (Doc. # 2868)*

Plaintiffs seek to exclude certain expert opinions by Philip Shull, a former USDA official in China, concerning China's status as an export market and China's regulatory system. The Court grants the motion in part and denies it in part.

1.    Plaintiffs first seek to exclude certain opinions regarding the effect of politics on China's implementation of its regulatory system. Specifically, plaintiffs argue that because Mr. Shull has no scientific expertise, he is not qualified to offer the opinion that China's regulatory system is not based on science. The Court rejects this argument. Mr. Shull's opinions do not depend on any issue of science such as the validity of science-based reasons given for China's rejection of applications. Rather, his opinion is essentially that China acts for political reasons, which always trump scientific concerns. Mr. Shull is qualified by his experience with China and its regulatory system to give such opinions concerning the role of politics in that system.

Plaintiffs also seek to exclude any opinion by Mr. Shull concerning the rejection

4

of Syngenta's applications.  Plaintiffs argue that Mr. Shull should not be permitted to opine that those applications were rejected for non-science reasons, or that any stated scientific reasons were pretextual, because he did not review or analyze those applications or China's response to them, and because he failed to account for other possible causes of the rejections, such as the poor quality of those applications. Syngenta responds by arguing that Mr. Shull has not offered *any* opinion directed to Syngenta's applications specifically.  Syngenta is correct that, in plaintiffs' initial brief, plaintiffs cited no such opinion by Mr. Shull, and instead cited only testimony by Mr. Shull that any rejections by China of applications by any biotech companies would not have been for science-based reasons.  In their reply brief, plaintiffs cite a single sentence from Mr. Shull's report, in which he stated that "it is clear how a company like Syngenta could experience significant delays and receive pretextual questions on its MIR 162 import application in China."  That statement is consistent with his opinion that no rejections could actually have been for science-related reasons at that time, and thus it does not depend upon any analysis of Syngenta's particular applications.  Accordingly, the Court rejects this basis for exclusion.

Plaintiffs next seek to exclude any opinion by Mr. Shull that China had the ability to test for MIR 162 prior to 2013.  Plaintiffs argue that Mr. Shull had no basis for any such opinion or assumption.  Plaintiffs further argue that Mr. Shull's opinion that China must either have turned a blind eye to positive test results or decided not to test prior to 2013 presupposes an ability to test and thus should be excluded.  Syngenta argues in

5

response that although Mr. Shull has opined that China accepted MIR 162 corn before it began rejecting such corn in 2013, he does not offer any opinion concerning the time when China gained the ability to test for that trait.

Most of the opinions or testimony cited by plaintiffs in support of this argument do not actually presume China's ability to test prior to 2013. In his deposition, in response to a direct question from plaintiffs' counsel, Mr. Shull stated that he was aware that China was able to test for MIR 162 "at some point prior to 2013." Mr. Shull also testified, however, that he did not seek to make any such determination, as part of his opinions in this case, concerning when China gained that ability to test. In his report, Mr. Shull stated that in years prior to 2013, China accepted corn with MIR 162 (corn that *would have* tested positive for MIR 162) and that China turned a blind eye; but those opinions do not necessarily presume an ability to test, as China may have had another basis (news concerning the launch of Viptera, for instance) to assume that corn contained the trait and thus to have acted consciously in turning a blind eye. In one paragraph of his report (¶ 156), however, Mr. Shull opines that MIR 162 almost certainly would have been in corn shipments to China beginning in 2011 and that the trait would have been traceable in light of the sensitivity of the PCR test that China has used. That opinion, by linking the actual test to pre-2013 shipments, does suggest an ability to test before 2013. Syngenta has not identified any basis for such an opinion or assumption by Mr. Shull. Accordingly, the Court excludes that particular opinion as stated in the one paragraph from Mr. Shull's report. Mr. Shull may not testify that any tests in China would have

detected MIR 162 in corn prior to 2013, nor may he state an opinion that necessarily presupposes an ability to test before 2013, and plaintiffs' motion is granted to that extent.

2.     Plaintiffs seek to exclude Mr. Shull's opinions concerning whether China was a "key" import market for corn and whether China had a functioning regulatory system.  Plaintiffs argue that those opinions are related to the BIO launch policy that Syngenta agreed to follow, which policy required an assessment of those issues by Syngenta before it launched its products.

Plaintiffs argue that such opinions should be excluded because Mr. Shull did not consider or rely on Syngenta's own assessments.  Plaintiffs argue that, in light of Syngenta's position that the BIO policy provides the applicable standard of care in this case, an independent assessment is irrelevant.  The Court disagrees.  Whether China was a key market and whether it had a functioning regulatory system—issues referenced in the BIO policy—could be relevant in determining whether Syngenta acted reasonably in commercializing its products before gaining approval in China.  Any conflicts between Mr. Shull's assessments and Syngenta's assessments go to the weight of Mr. Shull's opinions and not to their admissibility.

Plaintiffs also argue that Mr. Shull did not conduct his assessments in a manner consistent with the BIO policy, but the Court rejects that argument for the same reason, as Mr. Shull's assessments of those important issues may be relevant even if they deviated from the BIO policy.  Moreover, plaintiffs' specific arguments under the BIO policy do not provide a basis for exclusion of any opinion by Mr. Shull.  First, plaintiffs

argue that the BIO policy required an assessment of key markets as of the 2011 planting of Viptera, not as of the 2010 date that Mr. Shull used for Syngenta's commercialization. Mr. Shull opined that China was not a key market in 2011 as well, however, and an assessment as of 2010 may nevertheless be relevant because (as Mr. Shull explained) that is when Syngenta made its decision to commercialize Viptera.  Second, plaintiffs argue that, in determining whether China was a key market, Mr. Shull improperly relied on historical data instead of looking forward, as suggested in the BIO policy.  Plaintiffs' interpretation of the policy is disputed, however, and, as the BIO representative testified, historical data is important in projecting into the future.  Third, plaintiffs argue that Mr. Shull improperly assumed that a market is only a key market under the BIO policy if it has a functioning regulatory system.  Plaintiffs rely on one reference in the policy to key markets, "including" those with functioning systems.  Again, however, plaintiffs' interpretation is a matter of dispute, as another place in the policy supports an interpretation requiring both a key market and a functioning system.  Moreover, Mr. Shull has offered separate assessments on those issues, both of which may be relevant. Fourth, plaintiffs argue that Mr. Shull, in determining whether China was a key market, improperly failed to consider DDGS, a corn byproduct, as required by the BIO policy. Mr. Shull testified, however, that considering DDGS would not have altered his conclusion that China was not a key market.  That opinion could be relevant, and plaintiffs' argument goes to the weight of that opinion.

Finally, plaintiffs argue that Mr. Shull is not qualified to offer these assessments

because he was not stationed in China during the 2010 to 2013 time period. The Court

rejects that argument. Mr. Shull worked in China for many years before that time period,

and he was the USDA's top official in China immediately after that period. That

experience is sufficient to provide Mr. Shull with expertise concerning the relevant

period. Again, plaintiffs' argument bears only on the weight of Mr. Shull's opinions.

3.      Plaintiffs seek to exclude the opinions contained in Section IX of Mr.

Shull's report, in which Mr. Shull discusses the effective veto power that China would

have if companies were required to await Chinese approval despite approval through the

U.S. regulatory system. The Court denies this basis for exclusion, however, as such

opinions may be relevant to the determination whether Syngenta acted reasonably in just

such a circumstance. If necessary, the jury may be instructed, as part of the legal

standard, that the danger of any such "veto" is not dispositive.[4]

>    *B.      Travis Milne (Doc. # 2871)*

Plaintiffs seek to exclude expert testimony by Travis Milne, a farmer and seed

dealer designated by Syngenta as both a non-retained expert witness and a fact witness.[5]

----

[4]Plaintiffs also seek a ruling that Mr. Shull may not testify to opinions or other matters not contained in his report. Such a ruling is not appropriate in the abstract, however, and there is no basis to assume that Mr. Shull intends to offer additional opinions. Plaintiffs cite only Mr. Shull's testimony that suggests he may have had other bases, not listed in his report, for certain specific opinions stated in the report, but plaintiffs had the opportunity to ask about any such bases in Mr. Shull's deposition. If appropriate, plaintiffs may object at trial if Mr. Shull cites a basis that he omitted in responding to such a question at his deposition.

[5]The Court rejects the argument, raised in plaintiffs' reply brief, that Syngenta has
(continued...)

The Court grants the motion in part and denies it in part.

Syngenta designated Mr. Milne as an expert to testify about three subjects: (1) "the benefits of Viptera to U.S. corn growers, including Viptera's effectiveness in increasing farmers' yield and Viptera's efficacy in combating pests;" (2) "the demand for Viptera among U.S. corn farmers;" and (3) "the impact on U.S. corn farmers if new U.S.-approved biotechnology traits are unavailable to U.S. corn farmers."[6] Plaintiffs argue that Mr. Milne is not qualified to offer such opinions as they apply to U.S. corn farmers generally. The Court agrees. Mr. Milne's expertise is limited to the geographic area, centered in Missouri, where he farms and where he has had seed customers. Conditions are different with respect to growing conditions and pests in different parts of the country, and neither Syngenta nor Mr. Milne has suggested otherwise. Thus, Mr. Milne's expertise in one geographic area does not qualify him to offer opinions relating to U.S. farmers as a whole. *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002) (conversations with firms in a limited geographic area did not

---

[5](...continued)
waived the opportunity to have Mr. Milne testify as a fact witness. The Court deems Syngenta's disclosures sufficient in that regard.

[6]Plaintiffs also seek to exclude opinions given by Mr. Milne in his deposition, in response to questions by plaintiffs' counsel, concerning whether China was a key market for U.S. corn and whether Syngenta acted reasonably in commercializing Viptera. Those subjects are not included in Syngenta's expert disclosure, and Syngenta has not indicated that it intends to offer such opinions from Mr. Milne at trial. If Syngenta does try to offer such opinions, the Court would sustain an objection, as the Court agrees with plaintiffs that Mr. Milne would not be qualified to offer those opinions.

support expert opinions concerning a worldwide market). Nor do Mr. Milne's conversations with other seed dealers (of whom he could name only one) qualify him as an expert concerning demand for Viptera in other regions. Mr. Milne may not simply parrot the hearsay of others in the guise of offering expert testimony. *See Ash Grove Cement Co. v. Employers Ins. of Wausau*, 246 F.R.D. 656, 661 (D. Kan. 2007) (Lungstrum, J.). Therefore, any expert opinions by Mr. Milne are limited to farmers in his geographic region.

The Court also agrees with plaintiffs that certain expert testimony by Mr. Milne concerning the performance of Viptera does not have a sufficiently reliable basis.[7] First, plaintiffs questions Mr. Milne's reliance, for his opinions concerning crop yield benefits, on marketing materials from Syngenta. In its response, Syngenta has not addressed this argument, and thus Syngenta does not assert that such materials provide a proper basis for expert testimony by Mr. Milne. The Court agrees with plaintiffs that such materials do not provide such a basis, as Mr. Milne testified that he did not retain any such materials and that he was unable to identify any particular material on which he relied. Thus, the basis for any reliance on marketing materials cannot be tested, and the reliability of any such materials cannot be confirmed. Again, Syngenta may attempt to

---

[7]Plaintiffs argue that the performance of Viptera is not relevant because only the MIR 162 trait is at issue and Viptera contains other traits. The Court rejects that argument, as plaintiffs have challenged Syngenta's commercialization of the Viptera and Duracade products, and thus the benefits of those products may be relevant to the reasonableness of Syngenta's conduct.

introduce other evidence concerning the performance of Viptera, but its proposed expert may not simply parrot such hearsay.

Plaintiffs further argue that Mr. Milne may not rely on anecdotal evidence from other farmers to opine concerning the performance of Viptera. In response, Syngenta argues that an expert may rely on his own personal observations and that Mr. Milne grew Viptera on his own farm. Syngenta has not addressed reliance on *other* farmers' experience with Viptera for Mr. Milne's opinions, however. "The federal courts have consistently excluded expert testimony premised on anecdotal reports where proffered to establish general causation." *See Toni's Alpacas, Inc. v. Evans*, 2010 WL 3730382, at *5 (D. Colo. Sept. 16, 2010) (citing cases). Crop yield and the effects on pests from the use of Viptera are matters that may be measured scientifically. The use instead of anecdotal evidence is not particularly reliable, as controls have not been implemented and potentially alternative causes for performance have not been excluded. *See id.* (citing *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 681 n.11 (W.D. Tex. 2002)). Accordingly, the Court excludes any opinions by Mr. Milne concerning the performance or benefits of Viptera based on discussions with others.

The Court does not exclude testimony by Mr. Milne concerning Viptera's performance based solely on his own experience using the product. The Court concludes that any such opinion is sufficiently reliable, and plaintiffs' criticism of a lack of scientific analysis goes to the weight of that opinion. Mr. Milne may not extend that opinion to the benefits of Viptera for farmers generally, however, as neither he nor

Syngenta has identified a reliable basis for doing so.

The Court reaches the same conclusion with respect to Mr. Milne's opinions concerning demand for Viptera. Mr. Milne is not precluded from recounting his experience with Viptera as a seed dealer with his particular customers. He may not testify about demand for the product generally, based solely on hearsay from others. Again, because demand is quantifiable, this anecdotal evidence is of relatively little relevance.

Plaintiffs have not made any specific argument with respect to the reliability of Mr. Milne's proffered opinions concerning impact. Thus, the Court will not limit such testimony except to enforce the geographic limitation discussed above, and testimony regarding impact within Mr. Milne's limited sphere of expertise will not be excluded.[8]

> C.    *William Sheppard (Doc. # 2912)*

Plaintiffs seek to exclude any expert opinions by William Sheppard, another Missouri farmer and sometime seed dealer designated by Syngenta as both a non-retained expert and a fact witness. The motion is granted in part and denied in part.

Syngenta designated Mr. Sheppard to give opinions concerning the same subjects disclosed for Mr. Milne. For the same reasons set forth above with respect to Mr. Milne, *see supra* Part II.B, the Court concludes that Mr. Sheppard is not qualified to offer opinions concerning matters beyond the limited geographic region in which he farms and

---

[8]Of course, testimony by Mr. Milne on each of these subjects would be admissible only if shown at trial to be relevant and not to be cumulative of other evidence.

sells seeds. The Court further concludes, for the same reasons set forth above, that Mr. Sheppard may discuss the benefits of Viptera only with respect to his own farming operation.

The Court excludes any expert testimony by Mr. Sheppard concerning demand. As explained above, Mr. Sheppard may not simply repeat hearsay from Syngenta agronomists and dealers concerning demand elsewhere. Mr. Sheppard did act as a seed dealer, but on a very limited basis, with only a few customers to whom he sold at cost. Mr. Sheppard did not identify those customers, in fact, as a basis for any opinion concerning demand. Thus, Mr. Sheppard lacks a reliable basis to offer opinions concerning demand for Viptera.[9]

Finally, although plaintiffs did not make any arguments specifically against Mr. Milne's impact opinions, they have challenged any such opinions by Mr. Sheppard as unreliable and outside his expertise. The Court does not agree with plaintiffs that such opinions could not be relevant. It does agree, however, that Mr. Sheppard's experience as a farmer and limited seed dealer does not qualify him to opine about the impact of a lack of access to new genetic traits on the industry generally. Syngenta has not shown that Mr. Sheppard has any knowledge of the industry's or other farmers' reliance on genetically-modified products. Thus, Mr. Sheppard's opinions would be limited to the

---

[9]This opinion does not address the admissibility of testimony by Mr. Sheppard as a fact witness concerning his own demand for Viptera.

impact on his own farming operation.[10]

> ### D.   *Alan McHughen (Doc. # 2877)*

Plaintiffs seek to exclude certain expert opinions by Alan McHughen, a geneticist. The Court grants the motion in part and denies it in part.

1.    Plaintiffs argue that Dr. McHughen is not qualified to give certain opinions concerning China's regulatory process. Syngenta does not dispute that Dr. McHughen has no expertise concerning the Chinese system. The thrust of the challenged opinions, however, are that particular regulatory requirements are not based on valid scientific concerns, and he is qualified to give such opinions. Moreover, he may offer opinions based on the assumption (to be proved by Syngenta) that China does have particular requirements. Thus, so long as Dr. McHughen does not suggest by his testimony that he is opining as an expert on Chinese regulatory requirements, he may testify in accordance with the challenged opinions. Plaintiffs also challenge testimony that Dr. McHughen gave concerning the Chinese system in direct response to questions posed by plaintiffs' counsel. Syngenta has not defended Dr. McHughen's qualifications to give such opinions. Accordingly, he is precluded from offering opinions as an expert specifically concerning the Chinese system. Again, he may only assume particular requirements in offering opinions concerning whether those requirements are scientifically valid.

---

[10]See *supra* note 8, which applies to Mr. Sheppard's testimony as well.

2.     Plaintiffs argue that Dr. McHughen is not qualified to offer particular opinions that touch on the economics or the "social cost" of awaiting approvals in other countries.  The Court rejects this argument, as Dr. McHughen's expertise is sufficient to allow him to testify generally about economic and societal benefits from having access to new biotechnology.  The Court also rejects plaintiffs' argument that Dr. McHughen has merely parroted other evidence, as he has properly cited that evidence to support his own opinions.

3.     The Court rejects plaintiffs' request for exclusion of Dr. McHughen's opinions concerning the benefits of genetically modified foods generally (not limited to the MIR 162 trait).  At least some testimony on that subject testimony may be relevant to Syngenta's defenses in this case.  The Court further rejects plaintiffs' argument under Fed. R. Evid. 403 at this juncture, as plaintiffs have failed to offer any specific explanation as to how such testimony would be unduly prejudicial or would confuse the jury.[11]

4.     Plaintiffs seek to exclude Dr. McHughen's opinions that Syngenta submitted a "high quality dossier" for its deregulation petition for MIR 162 and that the dossier contained "extensive information and data."  Plaintiffs argue that such opinions concerning the quality of Syngenta's petition represent improper character evidence

---

[11]Plaintiffs may object at trial if they believe that the amount of such testimony has exceeded the extent to which its probative value outweighs its tendency to confuse the issues or waste time.

under Fed. R. Evid. 404(a)(1), by which Syngenta seeks to imply that its China applications must also have been of high quality. The Court agrees that Dr. McHughen would not be permitted to make such a leap—to rely on a character trait (assuming that making good regulatory applications could be considered a character trait) to imply conformity therewith in China—but it does not appear that he has done so in his report. As Syngenta notes, the quality of its successful deregulation petition could be relevant to Syngenta's expectations concerning the likelihood and timing of Chinese approval and the absence of valid scientific issues. Thus, the Court denies the motion to exclude these particular opinions. The Court also denies plaintiffs' cursory request in a footnote to exclude the entire section of Dr. McHughen's report concerning the deregulation process.[12]

5.     In one section of his report, Dr. McHughen opines that the analyses of three U.S. agencies "show no scientific basis for health or safety concerns with the consumption of MIR 162 corn;" that no studies or literature suggests otherwise; and that "there is no scientific rationale to question the food/feed safety of MIR 162." Plaintiffs seek to exclude such opinions. Plaintiffs argue that the safety of MIR 162 corn is irrelevant. The Court concludes, however, that the safety of the corn could be relevant to Syngenta's argument that China did not reject such corn for valid scientific reasons. Thus, the Court denies this request for exclusion.

---

[12]See *supra* note 11, which applies also to general testimony about the deregulation process.

6.     Plaintiffs seek to exclude expert opinions by Dr. McHughen concerning any consideration of export market effects in the deregulation process by the USDA's Animal and Plant Health Inspection Service (APHIS). Plaintiffs first argue that any such consideration had no effect because the USDA could not legally deny deregulation because of export market effects. The Court rejects that argument. Syngenta and its expert are not seeking by this testimony to draw an inference from the USDA's decision to deregulate; rather, they rely directly on the apparent finding by APHIS in its mandated Environmental Assessment that deregulation would have no adverse effect on export markets.

Plaintiffs also cites authority indicating that agency findings that are made under different standards may not be used to establish causation under tort law. In response, Sygenta argues that such cases are inapposite because it seeks to use such evidence as relevant to the issue of the foreseeability of a trade disruption to Syngenta. The Court concludes, however, that APHIS's consideration and "finding" does not provide a proper basis for a permissible inference concerning foreseeability. The purported analysis in APHIS's Environmental Assessment to which Dr. McHughen cites is so cursory as to be nonexistent. In a single paragraph concerning the "Effects on the Export Market," the Assessment merely restates Syngenta's own expectation that there would be no effects on the export market from the cultivation of MIR 162. That paragraph, without any independent analysis, does not provide a reliable basis for any belief that no trade disruption would occur from Syngenta's commercialization of Viptera. Accordingly, Dr.

McHughen is precluded from offering any testimony concerning the purported consideration by APHIS or the USDA in the deregulation process of effects on the export market.

The Court also excludes the following opinion contained in Dr. McHughen's report (¶ 99): "Public comments are often submitted to the USDA regarding lack of approvals in export markets and the USDA is thus fully aware of any export market risks of deregulation." Plaintiffs argue that Dr. McHughen lacks a sufficient foundation for his opinion concerning the USDA's awareness. The Court agrees, as a mere lack of comments does not provide a reasonable basis to believe that the USDA was always aware of *any* export market risks. Syngenta also cites the Environmental Assessment as a basis for this opinion, but as discussed above, the Assessment concerning MIR 162 does not suggest any actual analysis by APHIS.

Finally, plaintiffs seek to exclude Dr. McHughen's opinions in paragraph 100 of his report in which he discusses the USDA's responses to public comments concerning three other products after the time Syngenta launched Viptera. As Syngenta notes, however, one of those three products was Duracade, which is the subject of claims by plaintiffs in this case. Plaintiffs have not addressed such claims in its reply. Thus, the Court will not exclude the reference to the USDA's response concerning Duracade. Syngenta has not explained, however, how comments relating to the other two products could be relevant here. Thus, the Court excludes any opinion relating to the other two products cited in paragraph 100, as well as Dr. McHughen's opinion that the USDA

"repeatedly" took a particular "position".

          *E.*    <u>*Walter Thurman (Doc. # 2884)*</u>

Plaintiffs seek to exclude certain expert opinions by Walter Thurman, an agricultural economist. The Court grants the motion in part and denies it in part.

1.    As a preliminary matter, the Court addresses Syngenta's motion to strike declarations by plaintiffs' experts Bruce Babcock and Colin Carter, which plaintiffs have submitted in support of their motions to exclude opinions by Walter Thurman and Barry Goodwin respectively. Syngenta argues that those expert declaration are prohibited by the governing scheduling order, which did not provide for rebuttal expert reports and which, after setting deadlines for each side's initial expert disclosures on the merits, stated that "[n]o further expert disclosures will be allowed."[13]

The Court denies the motion to strike. The scheduling order, which refers to "expert reports" and "expert disclosures," governs expert disclosures under Rule 26(a)(2) for purposes of trial testimony. It does not prohibit the submission of evidence from experts in support of or in opposition to *Daubert* motions. This difference in the use of the expert evidence (which difference Syngenta did not address in its reply brief) is critical—a rebuttal report is intended to disclose expert opinions intended to be offered at trial, while expert evidence submitted in connection with a *Daubert* motion instead

---

[13]By Order of February 15, 2017, the Magistrate Judge denied plaintiffs' motion for modification of the scheduling order to allow for the submission of a rebuttal report by Dr. Carter. The Magistrate Judge stated, however, that he was not addressing the appropriateness of Dr. Carter's declaration filed in support of plaintiffs' *Daubert* motion.

addresses the relevant expert's qualifications or the reliability of his or her opinions. Indeed, this Court often regrets that parties do not submit expert evidence in support of or in opposition to *Daubert* motions, and the scheduling order's deadlines for expert disclosures were not intended to foreclose the submission of such evidence.[14]

2. Plaintiffs seek to exclude Dr. Thurman's opinions concerning his "four-region framework," on the basis that the framework does not represent an accepted methodology for analyzing a demand shock. The Court concludes, however, that these opinions by Dr. Thurman are sufficiently reliable.

In the challenged section of his expert report, Dr. Thurman, in response to the opinions of plaintiffs' experts, opines that the Chinese ban on MIR 162 corn should not be analyzed as a purely bilateral phenomenon (involving only China and the United States), but should be considered in a framework of global corn trade that accounts for multiple other importing and exporting countries. Dr. Thurman then seeks to apply the principle "that trade disruptions in trade involving one export-import country pair will induce adjustments in other trade flows that, in general, can be expected to minimize price effects from the single, bilateral disruption." Dr. Thurman considers supply and demand for four "regions"—the United States as exporter of corn, other exporting

---

[14]This difference in the use of the expert evidence also means that neither Dr. Babcock nor Dr. Carter will be permitted at trial to offer any opinion stated in his declaration unless that opinion is also included in that expert's sole Rule 26(a)(2) disclosure. The Court notes that plaintiffs did not seek review of either the Magistrate Judge's scheduling order that did not allow for rebuttal reports or the Magistrate Judge's order denying plaintiffs' motion to amend to allow for such reports.

countries, China as importer, and other importing countries—in explaining how, in a global commodity market, exports and imports would become realigned among those four regions after a decrease in exports from the United States to China.

As Syngenta notes, these opinions are based on bedrock economic principles of supply and demand. Moreover, Dr. Thurman has supported his application of the premise that adjustments would occur to minimize price effects: he applied actual trade data from before and after the Chinese ban to demonstrate that a realignment of global exports and imports did occur; he cited studies supporting that premise; and he cited market commentary showing the flexibility of these markets. Dr. Thurman has not attempted to construct a model to calculate the magnitude of the effect of the purported demand disruption; rather he has attempted to show why there would have been little or no effect because of the application of basic economic principles. Thus, Dr. Thurman's failure to use one of a number of accepted econometric models (such as those employed by plaintiffs' experts) does not render his analysis unreliable. Moreover, plaintiffs have not challenged Dr. Thurman's underlying premise that a bilateral disruption ultimately will have little effect in a global market because of resulting realignment. The Court concludes that Dr. Thurman's framework does not represent "junk science," and plaintiffs' arguments go only to the weight of his opinions.[15]

---

[15]Plaintiffs argue that Dr. Thurman's framework fails to satisfy the economic principle of *ceteris pluribus*, which relates to the control of alternative factors. Dr. Thurman answered that particular criticism, however, explaining at his deposition that

(continued...)

Plaintiffs also argue that Dr. Thurman did not apply his framework reliably because he used a non-typical drought year—the 2012/2013 marketing year—when he inserted data into his framework. The Court rejects that argument. Dr. Thurman did not simply "cherry-pick" a favorable year, but rather applied data from the closest full years before and after the China ban. He also stated in his report that he accounted for the drought by scaling his data. Thus, Dr. Thurman's use of data from that particular year was sufficiently supported. Plaintiffs may not agree that the use of that year was proper, but such criticism goes merely to the weight of the opinions and not to their admissibility. The Court thus denies plaintiffs' motion to exclude testimony by Dr. Thurman concerning his four-region framework.

3. Plaintiffs also seek to exclude opinions included in one section of Dr. Thurman's report (¶¶ 142-55), in which he criticizes Dr. Babcock's reliance on forecasts of China's grain imports, which he deems unreliable. Dr. Thurman then, in separate subsections, discusses "[e]conomic conditions in China," "China's agricultural trade policy," and "[u]ncertainty associated with Chinese demand," in support of his criticism of Dr. Babcock.

Plaintiffs argue that Dr. Thurman—who has never been to China or published concerning issues particular to China—is not qualified to offer these opinions. Syngenta

_____

[15](...continued)
he had not attempted to construct an econometric model to which that principle might apply. Thus, plaintiffs' criticism goes only to the weight of the opinions and does not provide a basis for exclusion.

argues in response that, as an agricultural economist, Dr. Thurman is qualified to criticize Dr. Babcock's failure to consider certain factors. Syngenta also cites Dr. Thurman's deposition testimony that he is familiar with Chinese agricultural trade policy. The Court concludes that Dr. Thurman, as an economist, is qualified to identify factors or issues that Dr. Babcock should have considered. In places, however, Dr. Thurman has made statements about why China did particular things. Dr. Thurman may be qualified to discuss facts or data cited by him; but Syngenta has not shown that Dr. Thurman has sufficient knowledge of or expertise with Chinese trade policies or Chinese history to offer some of his conclusions. In general Dr. Thurman is qualified to discuss facts or data, but not to opine on causes or motivations. The Court addresses each subsection in turn.

In the first subsection (¶¶ 144-47), Dr. Thurman discusses "[e]conomic conditions in China." Dr. Thurman is qualified to discuss the particular data and facts—for which he has generally cited support—mentioned in these paragraphs. He is not qualified, however, to draw certain conclusions or to comment on causes or motivations. Thus the Court excludes the following opinions: that China's growth *resulted from* an economic liberalization starting in the late 1990s (¶ 144);[16] that China engaged in economic

---

[16] Thus, Dr. Thurman would be qualified to mention the growth (based on data), but not to identify its cause.

reforms (¶ 144);[17] that the economic crisis of the 2000s slowed expansion (¶ 144); that economic restrictions and regulations were removed *because of* the entry into the WTO (¶ 145); that low barriers spurred new demand (¶ 145); that China shifted to being a net importer for land-intensive products *because of* China's relative land scarcity (¶ 145); that the rapid growth of the Chinese economy *has led to* increasing urbanization, rising living standards, and changing consumption patterns (¶ 146);[18] and that China made certain investments *in an attempt to* do particular things (¶ 148).[19]  The Court does not exclude the other matters contained in these paragraphs.

In the second subsection (¶¶ 148-52), Dr. Thurman discusses "China's agricultural trade policy.  Although Dr. Thurman may opine that Dr. Babcock failed to consider China's trade policies generally, the particular opinions contained in these paragraphs are excluded.  In this subsection, Dr. Thurman has identified particular aspects of China's trade policy—generally without citation to authority—but Syngenta has not shown that Dr. Thurman has sufficient experience with that policy to  qualify him to give those opinions as an expert witness.

In the third subsection (¶¶ 153-55), relating to the "[u]ncertainty associated with

---

[17]Thus, Dr. Thurman would be qualified to note that China joined the WTO in 2001, but not that it joined as a part of its economic reforms.

[18]Dr. Thurman may note the particular facts in the remainder of paragraph 146 as items that Dr. Babcock failed to consider, but he may not opine on the cause of those things.

[19]Dr. Thurman may note the investments as an example of things not considered by Dr. Babcock.

Chinese demand," Dr. Thurman uses data to demonstrate the relative unreliability of certain projections of China's corn imports. Dr. Thurman is qualified as an agricultural economist to give those opinions, and the Court therefore denies plaintiffs' motion with respect to these paragraphs.

### F.    *Barry Goodwin (Doc. # 2886)*

Plaintiffs seek to exclude certain expert opinions by Barry Goodwin, an economist retained by Syngenta. The Court grants the motion.

1.    Plaintiffs first seek to exclude opinions based on Dr. Goodwin's vector error correction model (VECM), an econometric model by which he has attempted to analyze any price effect from China's ban on U.S. imports of corn. Plaintiffs focus on the two main equations stated in Dr. Goodwin's report, which were stated in terms of changes in the prices of corn and sorghum (i.e., price change = the sum of certain variables). Relying on a declaration by Dr. Carter, their own expert, plaintiffs argue that Dr. Goodwin in fact used a different model than the one disclosed in his report because his analytical program used two equations—stated in terms of price *levels* instead of price *changes*—different from those disclosed in the report. Syngenta points out in response that, because price changes are a function of price levels, the two sets of equations are mathematically equivalent, with the terms rearranged to isolate different terms on one side of the equations. Plaintiffs do not dispute that the two sets of equations are mathematically equivalent, but they argue that there is a material difference. As plaintiffs note and Syngenta concedes, the two sets of equations thus have

different dependent variables (the terms isolated on the left side of each set of equations). Plaintiffs argue that having the price level as the dependent variable means that Dr. Goodwin's model is not a true VECM. Plaintiffs further argue that the way the sets of equations are stated yields different results for the R-squared test, which tests for fit and indicates the explanatory power of the model. Dr. Goodwin cites a high R-squared value for the undisclosed equations that are stated in terms of price levels, and he testified that his focus on levels in that regard was appropriate.

The Court first rejects plaintiffs' argument that Dr. Goodwin's disclosures were insufficient because of the different sets of equations. Dr. Goodwin disclosed his R-squared results, and he was questioned extensively at his deposition on how the equations were stated. The Court also rejects plaintiffs' argument that Dr. Goodwin failed to apply his model reliably. His chosen event date had an adequate foundation (the date China began rejecting U.S. corn), and as the Court has concluded with respect to Dr. Carter, *see infra* Part III.F.1, plaintiffs' criticism thus goes merely to the weight of the opinions. Similarly, plaintiffs' criticism of Dr. Goodwin's interpretation of the results for the first two weeks of his study goes to weight and not admissibility.

Plaintiffs also argue that Dr. Goodwin's model is not reliable. Plaintiffs rely on evidence from their expert that Dr. Goodwin's model fails particular tests relating to his coefficients, the t-statistic test and the F-test. Dr. Goodwin testified that t-statistic results were not relevant to the reliability of his model for particular reasons. He further testified that he did not check his model against the F-test because the R-squared test

covers the same concerns and his model had achieved high R-squared values. Syngenta thus argues that Dr. Goodwin's model is reliable.[20]

If a model achieves good results on one test that informs the issue of reliability, the Court might ordinarily conclude that the failure to perform or pass a different test would provide an argument for cross-examination, bearing only on the weight of the opinions based on the model. Based on their expert's declaration, however, plaintiffs argue that the R-squared test in fact does *not* account for the concerns addressed by the F-test in this particular case. Dr. Carter opines in his declaration that because of the rearranged equations actually used by Dr. Goodwin, stated in terms of price levels, an additional variable has been added without a corresponding coefficient, which means that the coefficients jointly are not equivalent to zero as required by the F-test. Dr. Carter thus opines that the R-squared test and the F-test have lost their one-to-one correspondence, which means that Dr. Goodwin's R-squared results do *not* provide evidence that his model has explanatory power.

This evidence from plaintiffs is unrebutted. Despite the inclusion of these opinions in Dr. Carter's declaration and plaintiffs' raising this issue based on those opinions in two separate places in their brief, Syngenta has failed to address this particular issue in its own brief. Nor has Syngenta provided its own expert evidence to

---

[20]In this section of its opposition brief, Syngenta has not identified independent reasons why the model is reliable; rather, Syngenta has merely responded to particular arguments by plaintiffs why the model is not reliable.

address this criticism by Dr. Carter. Syngenta noted in its brief that it had filed a motion to strike Dr. Carter's declaration, but the Court has denied that motion. *See supra* Part II.F.1. Syngenta could have submitted its own expert evidence for the Court to consider if it did consider Dr. Carter's declaration, but Syngenta did not do so.

Thus, the Court is presented with unrebutted expert evidence that the sole basis on which Syngenta relies to establish the reliability of Dr. Goodwin's model—the high R-squared values and the correspondence between that test and the F-test—is not scientifically valid. Syngenta has therefore failed to meet its burden to establish the reliability of the methodology for Dr. Goodwin's model, and the Court as gatekeeper must exclude expert testimony based on that model. Accordingly, the Court excludes all testimony by Dr. Goodwin that relates to or is drawn from his VECM model.[21]

2. In a footnote, plaintiffs also argue that the Court should exclude testimony by Dr. Goodwin on the matters contained in paragraph 11 and paragraphs 87 to 99 of his report, in which he criticizes the opinions of two experts in the related Minnesota cases who have not been designated as testifying experts in this case. In its own footnote, Syngenta has opposed that request. Syngenta notes the coordinated discovery that has taken place in this MDL and the Minnesota cases, and it argues that "[t]here is no reason why Syngenta's experts should not be permitted to discuss the reports of Minnesota

---

[21]The Court does not exclude testimony concerning opinions contained in paragraphs 37 to 52 of Dr. Goodwin's report that do not relate to or depend on his VECM model.

experts in this MDL and vice versa, particularly where those experts employ the same or closely related methodologies and reach very different results."

The Court grants the motion to exclude such testimony. The Minnesota experts will not testify here; thus, their opinions will not be in evidence, and Dr. Goodwin's particular criticisms of those opinions are not relevant. Discovery may have been coordinated, but the cases are not consolidated. Complete disclosures of expert opinions were required in this case. If Dr. Goodwin intended to criticize Dr. Carter's opinions for reasons that have been explained in the context of the Minnesota experts' opinions, then Dr. Goodwin was obligated to disclose that intent in his report. Similarly, if Syngenta wished Dr. Goodwin to offer opinions based on differences among expert opinions in the two jurisdictions, Syngenta needed to disclose those particular opinions. Syngenta has not cited to any such disclosure in Dr. Goodwin's report. Thus, the Court excludes testimony by Dr. Goodwin criticizing the opinions of the Minnesota experts, as stated in paragraph 11 and paragraphs 87 to 99 of his report.

**III.**     **Syngenta's Motions to Exclude Testimony by Plaintiffs' Experts**

         *A.*     *Dirk Maier (Doc. # 2863)*

Syngenta seeks to exclude certain opinions offered by Dirk Maier, an expert designated by plaintiffs, who has experience in the grain handling industry. The Court grants in part and denies in part the motion.

      1.     Syngenta seeks to exclude Dr. Maier's opinions that corn containing MIR

162 was present at least at certain quantified levels in the corn supply in various counties in eight states. Specifically, Dr. Maier used estimates and data for the number of bags of Viptera sold in certain counties and the yield per bag to determine the minimum amount of MIR 162 corn in each county for certain years (without accounting for any cross-pollination), and he compared that figure to the total corn produced in those counties to show the percentage of MIR 162 corn in those counties' corn supply. Dr. Maier also calculated averages for each of the eight states.

Syngenta argues that an expert is not needed to perform such calculations. The Court rejects that argument, however, as it would be helpful to the jury and efficient for the calculations to be performed by the expert who has compiled the relevant data and estimates. Syngenta also argues that the particular figures are not relevant because the fact of the dispersion of Viptera corn is undisputed. The Court is not persuaded, however, that the particular levels could not be relevant in showing the extent to which MIR 162 corn pervaded the entire corn supply. Thus, the Court denies Syngenta's motion to exclude these opinions.

2.      Syngenta seeks to exclude an opinion by Dr. Maier that MIR 162 corn was present in every elevator that received corn in the United States. In his report, Dr. Maier opined that the widespread use of Viptera "caused the unapproved MIR 162 trait to be present on farms, and in country, terminal and export elevators across the nation." When asked at his deposition whether he meant *every* elevator, he clarified that he meant every elevator that received corn. Syngenta argues that Dr. Maier lacked a sufficient basis for

that opinion, in light of his concession that he did not conduct any testing or analysis to confirm that the MIR 162 trait was found at every elevator accepting corn in the United States. Syngenta also notes that no sales of Viptera occurred in various counties and various states.

The Court agrees that plaintiffs have failed to identify a sufficient basis for this particular opinion. Despite the clarity and specificity of Syngenta's argument on this issue, plaintiffs in their response brief defended only the statement in the report that the trait could generally be found on farms and in elevators. Only in a footnote did plaintiffs address Syngenta's argument based on Dr. Maier's clarification from his deposition, and in that footnote plaintiffs failed to identify any basis for that opinion, instead arguing conclusorily that the "alleged shortcomings" went merely to the weight of the opinion. Thus, in the absence of any basis identified for Dr. Maier's opinion, the Court is left only with impermissible speculation that the MIR 162 trait was present in every corn-receiving elevator in the United States in the relevant time period. Such an opinion is not sufficiently reliable, and the Court therefore grants the motion to exclude such testimony.

### B. _Joseph Keaschall (Doc. # 2866)_

Syngenta seeks to exclude various opinions by Joseph Keaschall, an expert in plant breeding and genetics who has opined that Syngenta's MIR 162 product offered only limited benefits to farmers. The Court denies the motion.

1. The Court rejects Syngenta's arguments for exclusion of Dr. Keaschall's

opinions concerning the product's effect on crop yield. The Court does not agree that Dr. Keaschall simply "regurgitates" certain evidence from testimony and exhibits; rather, he has properly identified evidence that supports his opinion concerning the lack of a yield benefit. Nor is his testimony unreliable because he did not perform his owns tests on the product, as he is qualified to offer his opinion based on his experience and expertise. The Court also does not agree that the witness may not rely on certain data from Syngenta's deregulation petition. Syngenta argues that the study in question was not intended to show a positive benefit from the product, but rather was intended to show the lack of a negative effect on yield in the absence of pests. The demonstrated lack of a positive effect in at least some conditions, however, could support Dr. Keaschall's general opinion that the product does not help crop yield, and Syngenta is free to inquire about the limited nature of the study on cross-examination. Dr. Keaschall was also entitled to point out a lack of data or other evidence from Syngenta showing a positive effect on crop yield, and Syngenta may inquire about the scope of his review of the evidence at trial.

2.      The Court rejects Syngenta's argument that certain opinions concerning types of insect pests should be excluded. Again, the lack of testing by the witness is not fatal, and Dr. Keaschall properly cited evidence to support his opinions. The Court also rejects Syngenta's argument concerning certain insect fact sheets cited in the expert report. Dr. Keaschall was sufficiently familiar with the source of the data in those sheets, and he further testified that he confirmed the information by checking additional

sources. Thus, this case is easily distinguished from *In re Universal Service Fund Telephone Billing Practices Litigation*, 2008 WL 4382141 (D. Kan. Sept. 26, 2008), in which the Court excluded opinions based solely on spreadsheets about which the experts knew nothing. *See id.* at *8.

3.      The Court rejects Syngenta's arguments for exclusion of certain opinions concerning the locations of particular insects and the availability of substitute products. The opinions concerning the product's effectiveness in particular parts of the United States could be relevant to support plaintiffs' theory of liability based on Syngenta's failure to conduct a limited launch of the product (with respect to which theory the Court denied Syngenta's motion for summary judgment). The opinions concerning substitute products—and Dr. Keaschall's opinions generally—may be relevant to combat Syngenta's arguments (revealed in Syngenta's summary judgment briefing) based on the benefits of its products. Any argument concerning the ability of farmers to "stack" multiple products goes to the weight of the opinions concerning substitutes, and not to the opinions' admissibility. The Court is persuaded that Dr. Keaschall is adequately qualified to offer his opinions concerning a product from Pioneer, his former employer. Finally, the Court rejects the argument that certain opinions as stated in the expert report are too cursory or vague. The Court notes in that regard that Syngenta had ample opportunity in its deposition of Dr. Keaschall to explore the scope and details of those opinions.

C.      *Kevin Latner (Doc. # 2870)*

Syngenta seeks to exclude various opinions by Kevin Latner, an expert with respect to China's regulatory system. The Court grants the motion in part and denies it in part.

1. Syngenta seeks to exclude testimony related to Mr. Latner's opinion that Syngenta should have conducted a risk assessment, including addressing the risk to stakeholders of a trade disruption, before launching its Viptera and Duracade products. The Court agrees that plaintiffs have not shown that Mr. Latner is qualified to offer such an opinion. As Syngenta points out, Mr. Latner had never conducted such an assessment prior to this case. Plaintiffs note that he has experience working with biotech companies, but they have not identified any such work related to the need for or the performance of a risk assessment in launching a new product. Plaintiffs point to Mr. Latner's work with WTO agreements and to the section of Mr. Latner's report dealing with risk assessments in that context, but those opinions relate to assessments performed by signatory countries in determining whether to approve traits. Finally, plaintiffs cite Mr. Latner's experience with BIO policies, and they argue that his opinions are tied to the BIO launch policy that may help inform the standard of care in this case. Mr. Latner made clear in his report, however, that the risk assessment that he believed Syngenta should have performed fell outside of the BIO policy here, which policy was incomplete for that reason in his view. Indeed, in their response brief, plaintiffs seemingly disclaim any opinion by Mr. Latner concerning the steps a biotech company should take outside of the adherence to the BIO policy. Plaintiffs have not shown that Mr. Latner has the necessary expertise to opine

on a standard of care outside of the BIO policy. Accordingly, the Court excludes testimony by Mr. Latner concerning this extra-policy requirement of a risk assessment, including the entirety of Part XIII and paragraphs 25-26, 42, 47, and 95-100 of his report.

2.    The Court denies Syngenta's request for exclusion of the remainder of Part V of Mr. Latner's report (paragraphs 79-145) and paragraphs 247-54, which relate to his opinion that Syngenta failed to comply with the BIO policy. Based on Mr. Latner's experience in the grain industry and with BIO personnel, the Court rejects Syngenta's argument that he is not qualified to offer these opinions. The thrust of his opinion is that China is a key import market that had a functioning regulatory system, and Syngenta does not dispute that Mr. Latner has sufficient qualifications concerning China's regulatory system. Syngenta's argument that Mr. Latner should have reviewed additional evidence concerning the BIO policy goes to the weight of his opinions and not to their admissibility. The Court also rejects Syngenta's argument that Mr. Latner has improperly recited evidence without any analysis, as the evidence was cited to support his opinion that China did have a functioning regulatory system. Mr. Latner's further opinion that Syngenta did not follow the policy is a proper subject for expert testimony and would be helpful to the jury.

3.    Mr. Latner stated in his report that, at the time Syngenta submitted its application for approval of MIR 162 in China, approval customarily took two to three years. He further opined that, without certain mistakes by Syngenta that delayed the

process, "MIR 162 likely would have been approved within a normal 2-3 year timeframe." Syngenta seeks to exclude that latter opinion. In his deposition, Mr. Latner testified that two-to-three years is the average timeframe; that another Syngenta application was approved within that timeframe; that issues arose with Syngenta's MIR 162 application that made it difficult to meet that timeframe for approval; and that it would be speculative to identify a particular timeframe in which Syngenta's application would have been approved if not for the mistakes. Thus, Mr. Latner conceded that the particular opinion contained in his report was speculative, and that particular opinion is therefore excluded. The Court does not exclude Mr. Latner's opinion concerning the average timeframe for approval or his opinion that the mistakes made it difficult to meet that average, as Mr. Latner did not make the same concession concerning those opinions. Accordingly, the motion is denied with respect to any opinion contained in paragraphs 22, 23, 255, or 312 of the report, or the opinion in the last sentence of paragraph 257.

4. With the exception of the first paragraph (paragraph 390), Syngenta seeks to exclude the opinions in Part IX of Mr. Latner's report, which concerns Syngenta's applications for cultivation approval (as contrasted with its applications for import approval). With respect to paragraphs 391-402, the Court rejects Syngenta's argument that Mr. Latner has merely recited evidence without analysis; that evidence concerning Syngenta's application history is properly cited in support of Mr. Latner's opinion that such an application could have contributed to any delay obtaining import approval from China. For the same reason, the Court rejects Syngenta's request to exclude opinions in

paragraph 226 of the report. Plaintiffs have not addressed paragraphs 403-08, however, which relate to purported failures by Syngenta to disclose the fact of its cultivation application. Thus, plaintiffs have not shown that those paragraphs relate to any expert opinion that Mr. Latner is qualified to give. Accordingly, the Court does exclude opinions relating to paragraphs 403-08 of the report.

5. The Court grants in part and denies in part Syngenta's motion as it relates to Part X of Mr. Latner's report, which concerns Syngenta's application for approval of Duracade in China. Syngenta argues that Mr. Latner has merely recited evidence without analysis. Mr. Latner noted, however, that one of his tasks was to consider the delay in Syngenta's Viptera and Duracade applications, and he opined that Syngenta repeated some of the same problems with its Duracade application that had caused delays for its MIR 162 application. Thus, for the most part the evidence cited by Mr. Latner supports his opinions concerning the cause for delay. The Court does exclude, however, the opinions contained in paragraphs 434-40 concerning Syngenta's decision to pull Duracade from shelves in Canada but not from those in the United States. Plaintiffs have not addressed Syngenta's argument concerning that portion of the report, and the evidence cited therein does not appear to support any particular opinion by Mr. Latner.

6. The Court grants in part and denies in part Syngenta's motion as it relates to Part XII of Mr. Latner's report. In general, the Court rejects Syngenta's argument that Mr. Latner has merely recited evidence, as the evidence supports his opinions concerning the cause of any delay in approval in China, including his opinion that lobbying efforts

such as those in which Syngenta engaged could be harmful to an application. The Court does exclude, however, opinions contained in the portion of the report relating to two other instances in which Syngenta allegedly disregarded regulatory requirements and commercialized a product prematurely (involving MIR 604 and Bt 10). Plaintiffs have not addressed those specific opinions; thus, plaintiffs have not shown that those opinions concerning alleged prior bad acts are admissible and or related to an opinion properly within Mr. Latner's expertise, such as his opinion that China has a functioning regulatory system. For the same reason, the Court excludes the opinion contained in paragraph 483 that "Syngenta's Swiss management has repeatedly prioritized its commercial interests at the expense of its partners in the grain ecosystem . . . and that it saw the threat of trade disruptions as a necessary tactic to change foreign government relations." Finally, the Court rejects Syngenta's specific arguments that Mr. Latner has improperly opined on Syngenta's knowledge or intent in paragraphs 508, 512, and 513. Any other similar objections may be addressed at trial in the context of particular testimony.

7.    Finally, the Court agrees with Syngenta that certain other opinions should be excluded, on the basis that plaintiffs have failed to show that those matters are relevant to any opinion within Mr. Latner's expertise. Thus, the Court excludes any opinions contained in paragraphs 236, 298, or 332 of the report.

D.    *Randal Giroux (Doc. # 2876)*

Syngenta moves to exclude certain expert opinions offered by Randal Giroux, a longtime employee of Cargill. The Court grants the motion in part and denies it in part.

1.      Syngenta challenges Dr. Giroux's qualifications to offer certain opinions. First, Syngenta argues that Dr. Giroux is not qualified to offer opinions concerning the acts of Syngenta and other biotech companies, including opinions concerning such companies' recognition of certain risks of commercialization of GM products and Syngenta's compliance with the BIO launch policy.  In support of that argument, Syngenta relies solely on the fact that Dr. Giroux has worked only in the grain trade and has not worked for a biotech company.  The Court concludes, however, that this witness is sufficiently qualified to offer these opinions by his long experience working with biotech companies, including with respect to the launch of new GM products. Syngenta's arguments concerning Dr. Giroux's role as an advocate for Cargill with interests adverse to Syngenta and other biotech companies go to the weight of his opinions and not to their admissibility.

The Court agrees with Syngenta, however, that Dr. Giroux has not been shown to be qualified to offer opinions concerning the Chinese regulatory system.  In arguing that Dr. Giroux is qualified to offer such opinions, plaintiffs primarily cite only his opinions, without identifying any particular experience.  Although plaintiffs argue that he has worked with companies that have sought regulatory approval in China, they have not shown that he has been involved in any such application or that he has other experience that would provide expertise with the Chinese regulatory system. Accordingly, the Court excludes any opinion by him based on the operation of that system, including any opinion that China has a functioning regulatory system, that China

40

acted predictably in rejecting Syngenta's application, that China generally acts for science-based reasons, or that China acted with "regulatory discretion." On the other hand, Dr. Giroux's opinion that biotech companies have a monopoly over information contained in their applications for approval is not necessarily specific to China, and the Court concludes that he is sufficiently qualified, by his experience in the industry, to opine concerning the information that biotech companies make public. Finally, in response to Syngenta's argument that Dr. Giroux is not qualified to offer opinions concerning Syngenta's applications in China, plaintiffs argue that he will not offer specific opinions concerning those applications, but will only testify concerning China's science-based reasons for rejecting them. Again, Dr. Giroux is not qualified to opine generally that Chinese regulators base their decisions on science. He is qualified, however, to opine concerning whether a particular rationale cited by China holds water scientifically.

2. Syngenta argues that Dr. Giroux should not be permitted to offer an opinion concerning the standard of care in this case because he did not identify any applicable industry standard in his depositions. Specifically, Dr. Giroux testified that he did not consider the BIO launch policy to be an industry standard because it was not mandatory and thus was more like a guidance document, and that although his "three-legged stool" standard had the potential to be an industry standard, it had not necessarily been adopted by technology owners. As plaintiffs note, however, the standard of reasonable care is not necessarily the same as the industry standard. *See, e.g.*, *NCUAB*

*v. UBS Sec., LLC*, 2017 WL 411338, at *6 (D. Kan. Jan. 31, 2017) ("compliance with industry standards does not necessarily establish compliance with the reasonable care standard, as the entire industry may have been acting unreasonably") (Lungstrum, J.); *Cerretti v. Flint Hills Rural Elec. Co-op. Ass'n*, 251 Kan. 347, 353 (1992) (distinguishing between compliance with industry standards and compliance with negligence standard). Thus, the fact that Dr. Giroux's standard is not an industry standard does not mean that it could not help inform the applicable standard of care here. Syngenta's only response to this argument is to state that while an expert may opine on the industry standard, he may not opine on the standard of care. That statement, for which Syngenta offers no authority, is clearly incorrect, as experts routinely opine on the applicable standard of care. Accordingly, the Court rejects this argument for exclusion by Syngenta.

3.  Syngenta also argues that Dr. Giroux's three-legged-stool standard is not sufficiently detailed. The Court rejects that argument, however, as it concludes that Dr. Giroux has adequately explained the prongs of his standard in his deposition testimony.

4.  The three prongs of Dr. Giroux's standard require risk assessment, risk management, and risk responsibility. Syngenta argues that in espousing the third prong, Dr. Giroux impermissibly offers a legal conclusion, and an incorrect one at that. The Court agrees that the third leg of Dr. Giroux's "stool" improperly imposes a legal standard akin to strict liability. As set forth in plaintiffs' expert disclosure for Dr. Giroux, under this prong, all costs to downstream stakeholders from the

commercialization of a product should be imposed on the biotech company. Similarly, Dr. Giroux testified that, under this prong, if a company creates a risk by commercializing a product, it must cover any costs. Plaintiffs argue that Dr. Giroux's standard is consistent with negligence law because if a company breaches the standard of care by failing to assess and manage the risks reasonably (the first two legs), it must then bear responsibility for the costs to others (damages). Even if plaintiffs were correct, however, the expert would be permitted to opine only about the breach of the standard of care, and not about the result of that breach (the law's imposition of damages). Moreover, plaintiffs are not correct in that analogy, as Dr. Giroux has *not* tied the third leg (responsibility for costs) to the launching company's failure to act reasonably, but rather has tied it to any action by the company. Thus, as Syngenta points out, under the third prong of Dr. Giroux's standard, a company would be responsible for all costs to others even if it acted reasonably in launching a product.

Accordingly, the Court excludes any testimony by Dr. Giroux based on the third prong of his three-legged-stool standard. His testimony concerning the applicable standard of care is thus limited to assessment and management of risks (the first two prongs).

5. Finally, the Court rejects Syngenta's argument that certain of Dr. Giroux's opinions would not be helpful to the jury. Dr. Giroux's expertise in the industry may provide insight concerning the prevailing understanding of biotech companies concerning certain risks. That expertise may also allow him to distinguish Syngenta's

actions and positions from those of other biotech companies, such that he may opine that Syngenta was an "outlier" in the industry in certain respects.

E.  *Bruce Babcock (Doc. # 2888)*

The Court denies Syngenta's motion to exclude opinions by Bruce Babcock, a damages expert.  Syngenta argues that Dr. Babcock, in his methodology, improperly assumed that a decrease in Chinese demand for U.S. corn resulted in a global decrease as well, that the decrease in Chinese demand was entirely attributable to the presence of MIR 162, and that the decrease in demand was of a particular magnitude and duration. Syngenta cites evidence that purportedly contradicts those assumptions.  The Court notes, however, than an expert may offer opinions based on assumptions—it is up to the plaintiffs in this case to show that any assumptions made by Dr. Babcock are sound. Moreover, the Court is not persuaded that these assumptions are so unfounded as to make his opinions impermissibly speculative, as plaintiffs have shown that Dr. Babcock did have bases for those "assumptions".  Syngenta argues that a decrease in Chinese demand may have been offset by an increase in demand elsewhere, even if that increase was unrelated to the presence of MIR 162 in the corn supply.  Through Dr. Babcock's testimony, plaintiffs are attempting to show the financial impact that resulted from the presence of MIR 162, and plaintiffs argue that even if global demand increased, a decrease in Chinese demand (if resulting from the presence of MIR 162) would still have the same *relative* effect on global demand (in the sense that global demand would be even greater but for the decrease in Chinese demand).  Syngenta may argue the contrary,

but that dispute is for the jury to resolve. Syngenta's arguments relating to any demand assumptions by Dr. Babcock go merely to the weight of his opinions.

The Court also rejects Syngenta's argument that Dr. Babcock's opinions should be excluded because he pooled data in performing his regression analysis (relating to the relationship between futures prices and local prices). Dr. Babcock has performed his analysis on a state-by-state basis, and Syngenta's argument for smaller pools goes merely to the weight to be afforded the regression analysis.

Finally, the Court rejects Syngenta's argument that various other assumptions make Dr. Babcock's analysis unreliable. Syngenta concedes that some assumptions are permitted, and Dr. Babcock has already answered each of the criticisms from Syngenta's expert on which Syngenta relies. Thus, plaintiffs have provided a basis for any assumptions by Dr. Babcock, and Syngenta's criticisms may be argued to the jury.

F.    _Colin Carter (Doc. # 2892)_

Syngenta seeks to exclude certain opinions by Colin Carter, another damages expert for plaintiffs, who is an expert in agricultural economics. The motion is granted in part and denied in part, as set forth more specifically below.

1.    Syngenta challenges the reliability of Dr. Carter's event study. Specifically, Syngenta argues that Dr. Carter should have used an event date of November 2013, when shipments were first rejected by China, and that Dr. Carter improperly "cherry-picked" a September 2013 date without a sufficient basis. The Court rejected this same argument at the class certification stage; in that order, it noted that the

date was based on the increase in milo exports to China and the historic break between corn and milo prices, and it therefore ruled that the choice of date was not impermissibly lacking in foundation and that Syngenta's criticism went merely to the weight of the opinions. *See In re Syngenta*, 2016 WL 5371856, at *10. Syngenta has not addressed that prior ruling, and the Court is not persuaded that there is reason to alter that ruling at this time. Dr. Carter's choice of event date does have a scientific basis—his structural break analysis—and thus his opinions satisfy the standard cited by Syngenta in its brief. *See Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) ("some passably scientific analysis" must support the time period used), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).

Moreover, Dr. Carter's date is not divorced from the rejection of shipments, as he sought to determine the beginning of the impact from that event. Syngenta concedes that a market may anticipate a later event. Syngenta argues that there is no evidence that such anticipation occurred here. Dr. Carter relies on his structural break analysis and the increase in milo imports to provide that evidence. Syngenta takes issue with that evidence, but that dispute is for the jury at trial. The Court rejects this argument for exclusion.

Syngenta also argues that Dr. Carter failed to consider and disaggregate other possible causes of the structural break. Dr. Carter testified, however, that he did consider and reject the particular alternatives proffered by Syngenta. Syngenta's criticisms thus go the weight of the opinions and may be argued to the jury. Similarly, Syngenta's

attacks on the particular inputs used by Dr. Carter, relating to the use of weekly or monthly data and the use of a particular market index, go to the weight of the opinions and not to their admissibility.

2. Dr. Carter calculated damages for a five-year period. Syngenta argues that Dr. Carter's opinion that the effect on prices from the Chinese embargo on U.S. corn would last that long is speculative, as Dr. Carter did not perform a separate analysis to determine the duration of the damages period. The Court rejects this argument, as there is sufficient support for Dr. Carter's opinion that the impact would last at least five years. The Court previously ruled, in its class certification order, that Syngenta's arguments concerning the rate of the dissipation of the impact goes only to the weight of Dr. Carter's opinions, *see In re Syngenta*, 2016 WL 5371856, at *10, and Syngenta has not addressed that ruling. The opinion is also supported by Dr. Carter's decay figures, the rate of dissipation in other cases, and academic literature. Thus, the Court concludes that Dr. Carter's opinions are not impermissibly speculative, and Syngenta's criticisms regarding that support go to the weight of the opinions and not to their admissibility.

3. Syngenta argues that Dr. Carter has improperly assumed that global demand for U.S. corn decreased as a result of the Chinese embargo on such corn. The Court rejects this argument for the same reasons stated above with respect to Dr. Babcock. *See supra* Part III.E. Plaintiffs' expert may rely on an assumption that plaintiffs may prove by other evidence, including through another expert. Moreover, in the context of Dr. Carter's opinions, Syngenta has not addressed plaintiffs' argument

(discussed above) that an actual increase in global demand may not necessarily mean that a decrease in demand from China had no effect on global demand in a *relative* sense. Accordingly, the Court denies Syngenta's motion to exclude to the extent based on this issue.

4. Syngenta argues that Dr. Carter did not perform any investigation to support his opinion that the presence in the United States of DDGS that did not go to China because of the import ban affected demand in this country. Specifically, Syngenta argues that Dr. Carter failed to analyze whether those DDGS were exported to other countries. Dr. Carter testified, however, that he did look at that issue and found that DDGS did not go elsewhere. Thus, Dr. Carter's opinion is not lacking in foundation, and the Court rejects this basis for exclusion.

5. Syngenta argues that Dr. Carter is not sufficiently qualified to offer certain opinions relating to the Chinese regulatory system. Plaintiffs argue rather summarily that Dr. Carter is qualified to offer opinions on China's regulatory system because he has traveled to China extensively concerning his work on the economics of Chinese agriculture and that he has authored works on China and its institutions. Plaintiffs have not addressed the specific opinions challenged by Syngenta, however. Therefore, plaintiffs have failed to show that Dr. Carter has the expertise needed to give those particular opinions that China has a functioning, predictable, and science-based regulatory system for approving biotech events; that that system is responsive to market demands; and that Syngenta's cultivation application delayed import approval and

violated a Chinese policy. Dr. Carter merely cited information from others for those opinions, but plaintiffs have not offered any evidence that those opinions fall within Dr. Carter's own expertise. Nor have plaintiffs argued that Dr. Carter need not be qualified to offer those opinions because he has permissibly relied on others to support his own separate opinions. Accordingly, the Court excludes the following testimony from Dr. Carter's report: the final three sentences of paragraph 32; the first sentence of paragraph 35; and the entirety of paragraph 36.

The Court rejects, however, Syngenta's argument that Dr. Carter is not qualified to render his opinion disputing Syngenta's position that the benefits of Viptera outweigh any costs. The Court concludes that the particular opinions contained in the challenged section of the report fall within Dr. Carter's expertise as an economist. Plaintiffs have not addressed Syngenta's additional request to exclude as irrelevant Dr. Carter's reference to Syngenta's net worth, found in footnote 111 to his report. The Court agrees with Syngenta that that information is not relevant to Dr. Carter's cost-benefit opinions. Accordingly, the Court excludes any such testimony by this witness.

6. Finally, the Court rejects Syngenta's argument that, in various places in his report, Dr. Carter improperly opined on the state of mind of Syngenta or others. The Court has reviewed the particular paragraphs cited by Syngenta and concludes that any opinions included therein are sufficiently related to Dr. Carter's economic opinions. Moreover, Dr. Carter has appropriately cited evidence to support those opinions.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiffs' motion to exclude expert testimony by Philip Shull (Doc. # 2868) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion to exclude expert testimony by Travis Milne (Doc. # 2871) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion to exclude expert testimony by William Sheppard (Doc. # 2912) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion to exclude expert testimony by Alan McHughen (Doc. # 2877) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion to exclude expert testimony by Walter Thurman (Doc. # 2884) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' motion to

exclude expert testimony by Barry Goodwin (Doc. # 2886) is hereby granted.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to exclude expert testimony by Dirk Maier (Doc. # 2863) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to exclude expert testimony by Joseph Keaschall (Doc. # 2866) is hereby denied.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to exclude expert testimony by Kevin Latner (Doc. # 2870) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to exclude expert testimony by Randal Giroux (Doc. # 2876) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to exclude expert testimony by Bruce Babcock (Doc. # 2888) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to exclude expert testimony by Colin Carter (Doc. # 2892) is hereby granted in part and denied in part, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' motion to strike certain declarations (Doc. # 2930) is hereby denied.

IT IS SO ORDERED.

Dated this 4th day of May, 2017, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge