IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: SYNGENTA AG MIR 162 | ) | MDL No. 2591 |
| CORN LITIGATION | ) | |
| | ) | Case No. 14-md-2591-JWL |
| This Document Relates To: | ) | |
| | ) | |
| *Louis Dreyfus Company Grains* | ) | |
| *Merchandising LLC v. Syngenta AG, et al.*, | ) | |
| No. 16-2788-JWL | ) | |
| _____ | ) | |

## <u>MEMORANDUM AND ORDER</u>

This single case within this MDL presently comes before the Court on the motion (Doc. # 3376 in the MDL docket) filed by defendants Syngenta AG; Syngenta Crop Protection AG; Syngenta Corporation; Syngenta Crop Protection, LLC; and Syngenta Seeds, LLC (collectively "Syngenta") to dismiss certain claims brought by plaintiff Louis Dreyfus Company Grains Merchandising LLC ("LDC"). For the reasons set forth below, the motion is **granted in part and denied in part**. Specifically, the Court dismisses LDC's Lanham Act and fraud claims, as well as any negligence claim to the extent based on particular theories on which the Court has previously ruled, and the motion is granted to that extent. The motion is denied with respect to Syngenta's argument under the contractual economic loss doctrine. In addition, as discussed below, LDC's motion to strike portions of Syngenta's reply brief (in support of the motion to dismiss) (Doc. # 3472) is **granted in part and denied in part**.

## I.    **Background**

This MDL includes hundreds of similar suits filed against Syngenta by corn farmers and others in the corn industry.  The suits generally relate to Syngenta's commercialization of genetically-modified corn seed products known as Viptera and Duracade (containing the trait MIR 162) without approval of such corn by China, an export market.  The farmer plaintiffs (corn producers), who did not use Syngenta's products, have alleged that Syngenta's commercialization of its products caused the genetically-modified corn to be commingled throughout the corn supply in the United States; that China rejected imports of all corn from the United States because of the presence of MIR 162; that such rejection caused corn prices to drop in the United States; and that corn farmers were harmed by that market effect.  The Court certified state-wide classes for tort claims by producers under the law of eight different states.[1]

The particular case within the MDL to which this order relates was brought by plaintiff LDC in the District of Minnesota.  LDC alleges that it operates grain elevators and that it buys, sells, and exports corn.[2]  By its first amended complaint, LDC asserts claims against Syngenta under the federal Lanham Act and state-law claims for

---

[1]The Court also certified a nationwide Lanham Act class of producers, but it subsequently granted summary judgment in favor of Syngenta on the claims under that statute.

[2]More precisely, LDC alleges that it sold corn to an affiliate that exported corn from the United States, but that the affiliate has assigned its claims against Syngenta to LDC.  Thus, for convenience, the Court refers to LDC generally as an elevator operator and an exporter.

negligence, fraudulent misrepresentation, and tortious interference with business expectations.

## II.   <u>Governing Standards</u>

The Court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law is dispositive, *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The complaint need not contain detailed factual allegations, but a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. *See Bell Atlantic*, 550 U.S. at 555. The Court must accept the facts alleged in the complaint as true, even if doubtful in fact, *see id.*, and view all reasonable inferences from those facts in favor of the plaintiff, *see Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Viewed as such, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 550 U.S. at 555. The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III.   <u>Lanham Act Claims</u>

LDC alleges that Syngenta violated the federal Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by making certain false or misleading representations regarding Chinese import approval of corn containing MIR 162. Specifically, LDC bases its Lanham Act claims on specific representations by Syngenta beginning in July 2011 and continuing through 2013. Among other arguments, Syngenta argues that LDC has not pleaded a plausible theory that any such representations caused LDC's alleged harm, based on the Court's reasoning in an earlier summary judgment ruling. The Court agrees, and it therefore dismisses LDC's Lanham Act claims.[3]

In its prior order, the Court granted summary judgment in favor of Syngenta on the Lanham Act claims by the Kansas class of corn producers, which were based on representations made by Syngenta in a Grower Letter dated August 17, 2011. *See In re Syngenta AG MIR 162 Corn Litig.*, 249 F. Supp. 3d 1224, 1229-31 (D. Kan. 2017) (Lungstrum, J.). One of the bases for the Court's ruling was the lack of causation because of the timing of the August 2011 representation:

> Plaintiffs do not take issue with Syngenta's premise that, in order to prove causation in fact here, plaintiff must show both that farmers read and were influenced by the Grower Letter and that the impact of the letter was great enough to cause the embargo that allegedly caused the price drop in this country. . . .
>
> Plaintiffs have not addressed at all Syngenta's argument based on the fact that, by the time of the Grower Letter in August 2011, Syngenta had been selling Viptera for many months and planting for the 2011

---

[3]In light of this ruling, the Court does not address Syngenta's other arguments relating to the Lanham Act claims.

season had been completed. Thus, under plaintiffs' own theory of liability here (under which contamination of the entire corn supply through cross-pollination and commingling was inevitable without additional safeguards), there was already more than enough corn containing MIR 162 in the system to cause the alleged trade disruption. Thus, there is no evidence that sales occurring after the Grower Letter affected the fact or duration of plaintiffs' economic injuries. That lack of evidence . . . means that plaintiffs have failed to provide the necessary evidence of causation. Syngenta is therefore entitled to summary judgment on plaintiffs' Lanham Act claims.

See id. at 1230-31 (footnote omitted).

In the present case, LDC pleads (and argues) the same theory of causation—that Syngenta's representations misled purchasers of Viptera and that if Syngenta had not made such false or misleading representations, "growers could have avoided a trade disruption by refusing to buy or plant Viptera seed, ensuring that it would not contaminate the U.S. corn supply and cause the loss of the Chinese market." Thus, as in the case of the claim by the Kansas producers, LDC's Lanham Act claims depend on a showing that the alleged representations caused enough sales of Viptera to cause the trade disruption (which disruption allegedly harmed LDC). LDC bases its claims on representations by Syngenta beginning in July 2011. LDC, however, also alleges that Syngenta commercialized Viptera in time for the 2011 growing season and that farmers would have purchased seed for that season between October 2010 and March 2011, in time for planting in Spring 2011. Thus, Viptera seed had already been planted by the time of the alleged representations beginning in July 2011. LDC further alleges that, because of cross-pollination and other processes, there was a "near-certainty that

eventually some corn bound for China would be contaminated with the MIR 162 trait." In light of these allegations that any widespread commercialization of Viptera would effectively have caused the contamination and resulting trade disruption, LDC's theory of causation based on representations after a full season of Viptera planting is simply not plausible, particularly in the absence of specific allegations that sales of Viptera were such that the presence of MIR 162 from the 2011 season would not have caused the trade disruption.

Like the Kansas class plaintiffs, LDC did not respond directly to this specific argument by Syngenta based on causation and the timing of the representations. Thus, LDC has not explained how its theory of causation is plausible. LDC generally notes that the Court's prior ruling was based on a lack of evidence at the summary judgment stage, while the present motion is based solely on the pleadings. LDC argues that it should have the opportunity to discover evidence that farmers in fact relied on Syngenta's representations. Such evidence, however, does not bear on this issue of the presence of MIR 162 in U.S. corn prior to the representations on which LDC's Lanham Act claims are based. Whether at the summary judgment stage or the pleading stage, the stated theory of causation is not plausible given the dates of the alleged representations underlying these claims. Thus, the claims are subject to dismissal.

IV.     **Contractual Economic Loss Doctrine**

        A.      *LDC's Motion to Strike*

6

As a preliminary matter, the Court addresses LDC's motion to strike certain material from Syngenta's reply brief relating to Syngenta's argument that the economic loss doctrine (ELD) precludes certain negligence claims by LDC. The Court grants the motion in part and denies it in part.

First, LDC moves to strike certain exhibits to the reply brief. The Court agrees with LDC that Syngenta has identified no proper basis for the Court's consideration of Exhibits A through K at this stage, when the Court's analysis is confined to the factual matters alleged in the amended complaint. The Court therefore strikes those exhibits (and any reliance thereon in the argument) and grants the motion to that extent.[4] The Court denies the motion with respect to Exhibits M and N, however; LDC has not explained why the Court may not consider a court decision and the brief submitted to that court that are related to a proper legal argument by Syngenta.

Second, LDC moves to strike three arguments from Syngenta's reply brief, on the basis that those arguments were improperly raised for the first time in that brief. The Court denies that motion, as the arguments are properly related to issues raised in Syngenta's initial brief and in LDC's response brief. Syngenta's argument about the lack of an independent duty responds to LDC's own arguments about the existence of

---

[4]Moreover, Syngenta did not address exhibits A through C at all in its response to the motion to strike.

such a duty under Washington law.[5]  Syngenta's argument that LDC had opportunities to allocate the risk of Chinese rejection relates directly to its initial argument based on the rationale of the ELD.  Finally, LDC's request to strike Syngenta's citation to the *Funk* case, which Syngenta also cited in its initial brief, patently has no merit.  It is clear, especially in the third instance, that LDC intended by its motion to create additional opportunities to argue points made by Syngenta without having to justify a surreply.

> ### B.    *Choice of Law*

Before addressing the ELD, the Court must determine which state's substantive law should govern LDC's common-law tort claims.  Syngenta argues that the Court should apply the law of Connecticut, the site of LDC's headquarters.  LDC argues that the claims should be governed by the law of Washington, where LDC has operations allegedly affected by Syngenta's conduct and the state from which LDC exports some corn.  The Court concludes that Connecticut law should apply here.

In an MDL such as this, the Court applies the choice of law rules of the state in which the particular action was originally filed, in this case Minnesota.  *See Johnson v. Continental Airlines Corp.*, 964 F.2d 1059, 1063 n.5 (10th Cir. 1992).  Minnesota has adopted the significant contacts test for choice-of-law analyses.  *See Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000) (citing *Jepson v.*

---

[5]Although the Court does not consider the parties' arguments on that issue, in light of its conclusion that Washington law does not apply, Syngenta's argument was not improper.

8

*General Cas. Co. of Wisc.*, 513 N.W.2d 467, 470 (Minn. 1994)).  Under that test, a court looks to the following five "choice influencing" factors:

> (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.

*See Jepson*, 513 N.W.2d at 470.  Further, under Minnesota law, "[t]hese factors were not intended to spawn the evolution of a set of mechanical rules but instead to prompt courts to carefully and critically consider each new fact situation and explain in a straight-forward manner their choice of law."  *See id.*

In this case, the Court gives no weight to the last three of these factors, as either state's law may be readily applied, Minnesota's own interest is not implicated (neither party argues otherwise), and the Court cannot say that one state's law is superior to the other.  Moreover, Minnesota courts have traditionally given little if any weight to the third and fifth factors.  *See Nodak*, 604 N.W.2d at 95-96 ("The third factor . . . has not been given much weight in this court's precedent. . . .  [T]his court has not placed any emphasis on [the fifth] factor in nearly 20 years.").

The first two factors weigh in favor of applying the law of Connecticut.  In these cases involving Syngenta's commercialization of its products, consistency of results is best achieved by application of the law of a plaintiff's state of residence, where the plaintiff suffered the alleged financial injury.  Indeed, this Court previously stated that "each plaintiff's state-law claims would be governed by that plaintiff's state of residence,

whether the choice-of-law analysis would look to the plaintiff's place of injury or to the state with the most significant relationship to the claim." *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1188 (D. Kan. 2015) (Lungstrum, J.). Similarly, in the related Minnesota state-court MDL, the court applied this same five-factor test and concluded that the law of each plaintiff's state of residence should apply to its common-law claims. *See In re Syngenta Litig.*, No. 27-CV-15-3785, Order and Memorandum of Law at 12-16 (Minn. Dist. Ct., 4th Jud. Dist., Apr. 7, 2016). Moreover, Connecticut has a stronger interest than Washington with respect to financial harm suffered by LDC, a Connecticut resident. *See Jepson*, 513 N.W.2d at 471 (concern of second factor is maintenance of "a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong").

LDC argues that these factors should be weighed in favor of applying the law of Washington because some of its operations there were affected. Companies often do business in multiple states, however, and application of the law of one state in which LDC conducted some operations would be too arbitrary and would lend itself too easily to manipulation concerning whether a legal duty exists, especially since any financial harm was ultimately suffered by LDC in Connecticut. *See Nodak*, 604 N.W.2d at 94 (first factor is intended to avoid forum-shopping). Between these two states, Connecticut has the stronger relationship to the injury alleged by LDC, and consistent application of the common law of the particular plaintiff's residence best serves the interest of having

predictable results.   Accordingly, applying Minnesota's choice-of-law test to this particular circumstance, the Court concludes that Connecticut law should govern LDC's state-law claims.

C.       *Application of Connecticut's Economic Loss Doctrine*

Syngenta argues that LDC's negligence claim is barred under Connecticut law by the contractual ELD to the extent that the claim is based on "damages for U.S. corn shipments that were rejected, delayed, or diverted allegedly because of the presence of MIR162 corn in those particular shipments."   The Court rejects this argument for dismissal at this stage.

In ruling on Syngenta's initial motion to dismiss in this MDL, the Court rejected Syngenta's argument for dismissal based on the stranger ELD (SELD) under the law of 22 different states.   *See In re Syngenta*, 131 F. Supp. 3d at 1193-1207.   The Court also rejected Syngenta's arguments based on the contractual ELD under the law of Illinois, Louisiana, Minnesota, and Mississippi.   *See id.* at 1207.   Subsequently, in one particular action within the MDL, the Court applied the contractual ELD under Indiana law to bar negligence claims by a distributor who had bought Viptera seed from Syngenta.   *See In re Syngenta AG MIR 162 Corn Litig. (Funk)*, 2017 WL 2080601, at *12-14 (D. Kan. May 15, 2017) (Lungstrum, J.).

Connecticut's appellate courts have rarely discussed the ELD, *see Dobco, Inc. v. Williams Dev. Co.*, 32 Conn. L. Rptr. 214, 2002 WL 1332227, at *1 (Conn. Super. May 17, 2002) (trial court noting that Connecticut's appellate courts to that point had not

accepted or rejected the ELD), but when they have, they have described it as applying to claims based on a breach of contract or claims by one party against another party to a contract. In *Flagg Energy Development Corp. v. General Motors Corp.*, 709 A.2d 1075 (Conn. 1998), the Connecticut Supreme Court, in affirming the dismissal of misrepresentation and unfair trade practices claims by one party to a contract against the other, did not refer to the ELD; but it stated that it agreed with courts in other jurisdictions that "commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation." *See id.* at 1088. The Court quoted a Virginia case in which the court had noted that "[t]he parties were free to allocate the risks, insure against potential losses, and adjust the contract price as they deemed most wise." *See id.* (quoting *Princess Cruises, Inc. v. General Elec. Co.*, 950 F. Supp. 151, 155 (E.D. Va. 1996)).

In *State v. Lombardo Brothers Mason Contractors, Inc.*, 54 A.3d 1005 (Conn. 2012), the supreme court allowed tort claims based on particular language in the parties' contract that provided for such claims. *See id.* at 1040. In light of that ruling, the court noted that it did not need to address an argument based on the ELD. *See id.* at 1040 n.41. The court defined the ELD as "a common-law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *See id.* (quoting *Flagstaff Affordable Housing Ltd. Partnership v. Design Alliance, Inc.*, 223 P.3d 664 (Ariz. 2010)).

In *Ulbrich v. Groth*, 78 A.3d 76 (Conn. 2013), the supreme court stated that "the

12

economic loss doctrine bars negligence claims that arise out of and are dependent on breach of contract claims that result only in economic loss." *See id.* at 100. The court held that the ELD did not bar an unfair trade practices claim that was based on more than a mere breach of contract, and it distinguished *Flagg* as a case involving only a breach of contract and nothing more. *See id.* at 102.

Finally, in *Lawrence v. O and G Industries, Inc.*, 126 A.3d 569 (Conn. 2015), the supreme court discussed the SELD in a case that did not involve claims between contracting parties. *See id.* The court did not decide that case on the basis of the SELD; rather, the court stated that the SELD was basically another way of saying that the defendant did not owe a legal duty, and it held that public policy factors precluded the imposition of a duty in that case. *See id.* at 574 n.8. In a footnote, the court stated as follows concerning the ELD:

> By way of background, we note that the economic loss doctrine is a multifaceted set of principles that influence three major areas concerning recovery of purely economic losses, namely: (1) whether purely economic losses caused by a defective product are recoverable under tort law; (2) whether a tort claim for economic damages is viable when there is some other contract between the parties (e.g., a service contract relating to nondefective goods or real estate) that allocates or could have allocated risks of economic loss; and (3) all of the rest of tort law.

*See id.* at 581 n.15 (internal quotations and citations omitted). The court further noted that the case before it concerned the third category, while in *Flagg* and *Ulbrich* it had previously considered that aspect of the ELD that "bars negligence claims for commercial losses arising out of the defective performance of contracts." *See id.*

13

(internal quotation omitted) (quoting *Ulbrich*, 78 A.3d 76).

Thus, the Connecticut Supreme Court has described the contractual ELD (as distinguished from the SELD, which Syngenta does not argue here) only as a rule that applies to claims based on an underlying breach of contract, or at least to claims by one contracting party against the other concerning the subject of the contract. That was the circumstance in *Funk*, in which this Court applied the ELD to dismiss negligence claims. In the present case, however, LDC (a corn purchaser) did not enter into a contract with Syngenta (a seed seller). Syngenta nevertheless asks the Court to apply the contractual ELD to LDC's negligence claim. Syngenta argues that Connecticut, like some other states would apply the contractual ELD if both parties were within the same chain of contracts, and also in situations in which the defendant supplied a component part or input to the good that was purchased by the plaintiff. Thus, in the present case, Syngenta argues that the contractual ELD applies because it supplied an input (corn seed) that it sold to farmers, who used the seed to grow corn that they sold to LDC. Syngenta argues that application of the contractual ELD in such a situation would serve the doctrine's rationale of precluding liability if the plaintiff and other parties within the chain had the opportunity to allocate any risks by contract terms or by price.

The Court rejects this argument. Connecticut's appellate courts have never recognized application of the contractual ELD to all parties within a chain of contracts or to parties supplying only a component part of a good, and in the absence of some language from those courts suggesting a broader scope, the Court is unwilling to assume

14

that the Connecticut Supreme Court would necessarily adopt the particular view of the

contractual ELD urged by Syngenta.[6]  In addition, the Court cannot say as a matter of

law that there is an unbroken chain of contracts here, such that a true allocation of risks

could be accomplished.  Under the theory as alleged by LDC, the presence of MIR 162

within the entire domestic corn supply was essentially inevitable because of cross-

pollination and commingling.  Under that theory, LDC may have (and almost certainly

did) purchase MIR 162 corn from sources that cannot be traced back to farmers that

purchased Viptera seed from Syngenta.  Indeed, under LDC's theory, it likely would

have had shipments rejected even if it purchased only from farmers who did not purchase

Viptera seed from Syngenta.  At this stage, there has been no evidence presented

concerning the farmers whose corn ended up in LDC's shipments.  Under such

circumstances, the Court is unwilling to extend existing Connecticut law concerning the

contractual ELD to preclude the claim asserted by LDC in this case.

Syngenta also argues that LDC's negligence claim for damages from rejected

shipments is precluded by a statutory provision in Connecticut's product liability act.

The provision states as follows:

> As between commercial parties, commercial loss caused by a product is
> not harm and may not be recovered by a commercial claimant in a product
> liability claim.  An action for commercial loss caused by a product may be
> brought only under, and shall be governed by, title 42a, the Uniform

---

[6]Indeed, the Court's previous analysis under the law of 22 different states reveals a wide range in how states have applied the ELD. *See In re Syngenta*, 131 F. Supp. 3d at 1193-1207.

Commercial Code.

*See* Conn. Gen. Stat. § 52-572n(c).  Again, the Court rejects Syngenta's argument for dismissal.  The clear intent of this provision is to distinguish commercial losses from other losses with respect to product liability claims.  *See also id.* § 52-572m(d) (defining "harm" under the act not to include commercial loss).  The statute provides that commercial losses must be redressed under the UCC's contract and warranty provisions. This case, however, does not present the usual product liability case, in which the injured party would have the opportunity for a remedy from its seller.  Indeed, as noted above, LDC's sellers include those who did not purchase from Syngenta, the allegedly wrongful party.  LDC has not claimed a defective product here, and as Syngenta points out, because the product was approved in the United States, MIR 162 corn cannot be considered defective.  Syngenta argues that the statute does not require a claim of a "defective" product, but as reasonably interpreted, that is the scope of the statute.  LDC does not claim damages caused by a product here; rather, it claims damages caused by an act by Syngenta that allegedly changed the market in a fundamental way.  Syngenta has not cited any authority to support extending the scope of this statute to cover the claim asserted here, and the Court concludes that the Connecticut Supreme Court would not hold that this statute bars the claim.  Accordingly, the Court denies Syngenta's motion for partial dismissal of LDC's negligence claim on the basis of the contractual

ELD.[7]

### V.    Fraudulent Misrepresentation Claims

####    A.    *Affirmative Misrepresentations*

LDC has asserted a fraud claim in its amended complaint.  By its brief in response to this motion, LDC has confirmed that it has alleged two instances of affirmative misrepresentations by Syngenta to LDC:  statements in a conference call on July 7, 2011, that Syngenta expected Chinese import approval for MIR 162 by the 2012 planting season (which, according to LDC's allegations, would mean Spring 2012); and statements during a conference call on January 17, 2012, in which Syngenta expressed confidence of such approval by the end of March 2012.  LDC has also confirmed that it does not seek damages on this claim based on a general drop in the market price for corn in this country; rather, it seeks only specific damages for expenses that it incurred because of China's rejection of U.S. corn beginning in November 2013.

Syngenta argues that LDC cannot have reasonably relied on the alleged misrepresentations in July 2011 and January 2012 as a matter of law.  *See Retrofit*

---

[7]In its brief, Syngenta includes a section in which it argues that LDC has not sufficiently alleged any physical injury or property damage from the allegedly wrongful acts.  Syngenta makes this argument in the context of arguing that this case does not fall within any exception to the ELD for claims for such harm.  In light of its ruling that the ELD does not bar LDC's claims here, the Court need not address this specific argument by Syngenta.  The Court does not understand Syngenta to be arguing that the absence of physical injury to person or property bars all tort claims by LDC other than in the context of the ELD.

*Partners I, L.P. v. Lucas Indus., Inc.*, 201 F.3d 155, 162 (2d Cir. 2000) (fraud requires

showing of justifiable reliance under Connecticut law) (citing *Citino v. Redevelopment*

*Agency of City of Hartford*, 721 A.2d 1197, 1206-07 (Conn. App. Ct. 1998)).[8]  LDC

alleges that it relied on the misrepresentations in three ways:

> (1) continuing to negotiate and enter into contracts for the shipment of
> U.S. corn to Chinese purchasers in 2012 and 2013; (2) discontinuing its
> testing of its U.S. corn shipments for the MIR 162 trait; and (3) purchasing
> corn from areas of the U.S. where MIR 162 contamination was a
> possibility for shipment to, among other locations, China.

LDC has not asserted in its response brief any other acts in reliance on those

representations.  Thus, in order to state a claim for fraud based on these representations,

LDC must be able plausibly to tie such acts that were reasonably performed in reliance

on the representations to harm sustained from the rejections beginning in November

2013.  The Court agrees with Syngenta, however, that LDC has not alleged such a

plausible claim.

First, LDC alleges that it relied by entering into contracts for shipments to China

in 2012 and 2013.  The Court agrees with Syngenta, however, that once Spring 2012

passed without Chinese approval of MIR 162, the July 2011 and January 2012

representations had been proved false, and LDC could no longer rely reasonably on those

representations.  LDC does not dispute that it could not have justifiably relied after

---

[8]Washington law also requires a showing of justifiable reliance. *See, e.g.*, *Elcon*
*Constr., Inc. v. Eastern Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012) (listing elements
of fraud).  Thus, the Court's ruling on this issue would be the same even if Washington
law governed.

Spring 2012; instead it argues that it acted in reliance in 2011 and early 2012. Thus, LDC may only base its claim on contracts for shipments to China that were executed in that time frame. Any such shipments, however, would have reached China in 2011 or 2012, as LDC has alleged that it generally entered into contracts in the spring and summer and then shipped in the late fall of the same year. China did not reject shipments of U.S. corn until November 2013; thus, LDC cannot have suffered any damages relating to shipments in 2011 or 2012. As noted above, LDC has alleged only damages resulting from the embargo beginning in November 2013, and LDC has not alleged that it contracted in 2011 or early 2012 to ship corn to China that was rejected in late 2013. Accordingly, LDC has not stated a plausible claim based on its first alleged act of reliance.

Second, LDC alleges that it relied by discontinuing its testing for MIR 162. Again, however, such reliance must have taken place in 2011 or early 2012, and such a lack of testing at that time would not have affected shipments in 2013 that were rejected. Once Syngenta's representations about Spring 2012 approval had been proved false, LDC could not reasonably rely by declining to test, and testing in 2013 would have revealed the presence of the unapproved MIR 162 trait.[9] Thus, LDC has not stated a

---

[9] In addition, if contamination of the entire U.S. corn supply was as inevitable as LDC alleges, then LDC cannot plausibly allege that it did not appreciate that shipments in 2013 included corn containing the unapproved trait; thus, it cannot plausibly claim that a failure to test caused it unknowingly to send shipments that were rejected by China.

plausible claim based on its second alleged act of reliance.

Third, LDC alleges reliance in purchasing corn from certain areas of the United States. Again, the timing dooms such a claim of reliance, as any such purchases in 2011 or 2012 would have been shipped in those years and thus did not cause damages from the 2013 embargo. Thus, LDC has not stated a plausible claim based on its third alleged act of reliance.

In its brief, LDC does argue, in a single sentence, that its acts in reliance in 2011 and early 2012 caused the contamination of its corn shipments *and its facilities*, which contamination caused the rejection of shipments in 2013. Once Syngenta's representations had been proved false by Spring 2012, however, LDC would have known that its facilities—and thus all future shipments—may be contaminated. LDC subsequently chose to enter into contracts for shipment to China in 2013, although it could have contracted for shipment elsewhere. LDC has not alleged that shipping elsewhere would have been less profitable that shipping to China. Thus, LDC has not stated a plausible claim of reasonable reliance before Spring 2012 that caused harm resulting from the embargo beginning in November 2013. Accordingly, the Court grants the motion to dismiss LDC's fraud claim based on affirmative misrepresentations.

### B.    *Nondisclosures*

Although LDC has labeled this count "fraudulent misrepresentation" in its amended complaint, LDC also alleges that Syngenta committed fraud from 2011 to 2013 by failing to disclose certain facts regarding its application for Chinese approval.

20

Syngenta also seeks dismissal of LDC's fraudulent nondisclosure claim.

LDC does not dispute that liability for fraud based on a failure to disclose facts arises only if there was a duty to speak. *See, e.g.*, *Duksa v. City of Middletown*, 376 A.2d 1099, 1100-01 (Conn. 1977) (mere nondisclosure does not amount to fraud; there must also be a duty to speak); *DiMichele v. Perrella*, 120 A.3d 551, 554 (Conn. App. Ct. 2015). Syngenta argues that no such duty arose from a transaction or a fiduciary relationship between the parties. In response, LDC argues instead that Connecticut law recognizes that "[s]uch a duty is imposed on a party insofar as he voluntarily makes disclosure," and that "[a] party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." *See Duksa*, 376 A.2d at 1101 (internal quotation and citation omitted); *accord DiMichelle*, 120 A.3d at 554 (quoting *Duksa*). LDC notes that it has alleged that Syngenta assumed such a duty when it voluntarily made the representations to LDC in July 2011 and January 2012 to the effect that China would approve MIR 162 by Spring 2012.

The Court agrees that, in making those statements, Syngenta assumed a duty to make a full disclosure at that time of all material facts concerning whether it would obtain Chinese approval by Spring 2012. Such a duty, however, cannot support liability for fraudulent nondisclosure in this case as a matter of law. As discussed above, once Spring 2012 passed without Chinese approval, any failure of disclosure was made evident, and Syngenta did not assume any duty to speak on other subjects after that time. LDC alleges a failure to disclosure throughout 2012 and 2013, but it has not asserted a

source for the necessary duty to speak other than the July 2011 and January 2012 statements, and liability for fraudulent omissions occurring after Spring 2012 cannot be based on a failure to disclose that Syngenta would not obtain approval in early 2012 (LDC cannot have reasonably relied on any such failure to disclose, as that date had passed). LDC has not cited any authority, under Connecticut law or otherwise, to support an argument that a party that speaks once (or twice) has a duty to disclose that persists indefinitely. Rather, as noted above, the duty as recognized in Connecticut requires a full and fair disclosure when one speaks. Moreover, after Spring 2012, any nondisclosure would have related to a different matter—the status and quality of Syngenta's application, for example, or the likelihood of approval by some later date—while the originally-assumed duty required full disclosure only with regard to the subject of Syngenta's representations, namely the likelihood of approval by Spring 2012. In the absence of authority suggesting that Syngenta had a duty to speak even after its initial representations proved false, the Court concludes that any liability for fraudulent nondisclosure must be based on omissions in or before Spring 2012.[10]

_____

[10]Again, the result would not change under Washington law, which also requires that liability for fraudulent nondisclosure be based on a duty to speak. *See Washington Mutual Sav. Bank v. Hedreen*, 886 P.2d 1121, 1123 (Wash. 1994). LDC has not cited any Washington cases on this issue and thus has not identified a potential source of such a duty under Washington law. Indeed, Washington has adopted Section 551 of the Restatement of Torts, which recognizes liability for nondisclosure only in the context of a transaction between the parties. *See Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 853 P.2d 913, 916 (Wash. 1993) (quoting Restatement (Second) of Torts § 551). There is no such transaction in this case.

So limited, LDC's claims for nondisclosure fail for the same reason that its affirmative misrepresentation claims fails—a lack of justifiable reliance as a matter of law. As discussed above, LDC has alleged three ways in which it acted in reliance prior to Spring 2012, and none of those acts may support a plausible claim of reasonable reliance leading to damages caused by rejections beginning in November 2013. Accordingly, the Court grants Syngenta's motion to dismiss LDC's fraud claims in their entirety.[11]

## VI.    Application of Prior Rulings

Finally, Syngenta requests that the Court apply various rulings previously made in this MDL to dismiss certain theories of liability as asserted by LDC in its complaint. Specifically, Syngenta seeks dismissal of any negligence claim to the extent liability is based on (1) a failure to warn or disclose information, because of FIFRA preemption and the absence of a cognizable claim for negligent nondisclosure; (2) misrepresentations, because of the absence of a cognizable claim for negligent misrepresentation; (3) statements made in Sygenta's deregulation petition or in the *Bunge* lawsuit, because of the First Amendment's Petition Clause; or (4) a voluntary undertaking theory, because of the absence of sufficient allegations to support such a theory. Syngenta also seeks dismissal of any state-law claim in which liability is based on breach of a duty to

---

[11]In light of this ruling, the Court need not address Syngenta's additional arguments relating to LDC's fraud claims.

segregate corn based on the presence of MIR 162, because of Grain Standards Act preemption.

In its response, LDC confirms that it has not intended to assert any such claims in its amended complaint, and it argues therefore that no order of dismissal is necessary. The Court agrees with Syngenta, however, that the complaint could reasonably be interpreted to assert such theories of recovery. Accordingly, the Courts grants Syngenta's motion as unopposed with respect to these theories, and it dismisses any claim by LDC to the extent based on any of these theories.[12]

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motion to dismiss (Doc. # 3376 in the MDL docket) is **granted in part and denied in part**, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff's motion to strike portions of defendants' reply brief (Doc. # 3472) is **granted in part and denied in part**, as set forth herein.

_____

[12]Syngenta also states in its motion that it preserves all prior arguments in this MDL for dismissal of claims against it, although it "accepts the Court's prior rulings on these issues for purposes of this motion." The Court therefore summarily denies any such *pro forma* requests for dismissal.

IT IS SO ORDERED.

Dated this 19th day of January, 2018, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge