## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE SYNGENTA AG MIR162 CORN LITIGATION | Master File No. 2:14-MD-02591-JWL-JPO |
| **THIS DOCUMENT RELATES TO ALL CASES <u>EXCEPT</u>:** | MDL No. 2591 |
| *Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG, et al., No. 16-2788-JWL-JPO* | |
| *Trans Coastal Supply Company, Inc. v. Syngenta AG, et al., No. 2:14-cv-02637-JWL-JPO* | |
| *The Delong Co., Inc. v. Syngenta AG et al., No. 2:17-cv-02614-JWL-JPO* | |
| *Agribase International Inc. v. Syngenta AG, et al., No. 2:15-cv-02279* | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, PROVISIONAL CERTIFICATION OF SETTLEMENT CLASS AND SUBCLASSES, APPOINTMENT OF SETTLEMENT CLASS COUNSEL, SUBCLASS COUNSEL, AND CLASS REPRESENTATIVES, APPROVAL TO DISSEMINATE THE CLASS NOTICE, APPOINTMENT OF THE NOTICE ADMINISTRATOR AND CLAIMS ADMINISTRATOR AND SPECIAL MASTERS, AND ADOPTION OF A SCHEDULE FOR <u>THE FINAL APPROVAL PROCESS</u>**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

    A.    Jurisdiction-Spanning Proceedings on Behalf of Producers and Non-Producers......4

    B.    Pre-Trial Proceedings for Class and Individual Producers and Non-Producers. .......8

    C.    Trial Proceedings and Verdict. ................................................................................12

    D.    Settlement Negotiations. ..........................................................................................13

    E.    The Settlement Agreement. .....................................................................................15

        1.    Settlement Relief and Release. ....................................................................15

        2.    The Proposed Allocation and Distribution Method. .....................................18

            a.    The Method of Allocation.................................................................18

            b.    The Proposed Claims Procedure.......................................................21

        3.    Opportunity to Opt Out or Object to the Settlement.....................................27

        4.    Attorneys' Fees and Litigation Expenses. ....................................................28

ARGUMENT.......................................................................................................................28

I.    THE SETTLEMENT EASILY PASSES MUSTER UNDER THE  STANDARD FOR PRELIMINARY APPROVAL. ........................................................................................28

    A.    The Settlement Readily Meets the Standards for Preliminary Approval...................28

        1.    The Settlement Was Fairly, Honestly, and Extensively Negotiated..............30

        2.    Disputed Questions of Law and Fact Remain................................................33

        3.    The $1.51 Billion Guaranteed Recovery Outweighs the "Mere Possibility" of Additional, Future Monetary Relief. .......................................................37

        4.    Settlement Class Counsel, Subclass Counsel, MDL Co-Lead  and Litigation Class Counsel, and the PNC Believe That the Settlement Is Fair and Reasonable. ...........................................................................................38

    B.    THE COURT SHOULD PROVISIONALLY CERTIFY THE SETTLEMENT CLASS AND SUBCLASSES AND APPOINT CLASS COUNSEL. .....................39

1.      The Settlement Class Satisfies Rule 23(a)'s Requirements...........................40

    a.      The Class and Subclasses Are Sufficiently Numerous. ....................40

    b.      There are Common Issues of Fact and Law Among  Each of the Proposed Class Members...................................................................42

    c.      The Representative Plaintiffs' Claims Are Typical of Those of Absent Members. ..............................................................................44

    d.      The Representative Plaintiffs Are Adequate......................................45

2.      The Proposed Class and Subclasses Satisfy the Rule 23(b)(3) Requirements. ................................................................................49

C.      NOTICE SHOULD BE DISSEMINATED TO THE CLASS. ................................52

D.      THE COURT SHOULD APPOINT SPECIAL MASTERS TO OVERSEE THE SETTLEMENT..........................................................................54

E.      THE COURT SHOULD ADOPT THE PROPOSED SCHEDULE FOR FINAL APPROVAL PROCEEDINGS ...............................................................56

CONCLUSION...........................................................................................57

CERTIFICATE OF SERVICE ......................................................................61

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Active Prods. Corp. v. A.H. Choitz & Co.*, 163 F.R.D. 274 (N.D. Ind. 1995) ................................55

*Adamson v. Bowen*, 855 F.2d 668 (10th Cir. 1988) ........................................................................44

*Alexander v. BF Labs Inc.*, No. 14-2159-KHV, 2016 WL 5243412 (D. Kan. Sept. 22, 2016) ........................................................................................................................................30

*Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540 (D. Colo. 1989) ...........................................30

*Amchem Prods, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................40, 45, 51

*Antonson v. Robertson*, 141 F.R.D. 501 (D. Kan. 1991) ...............................................................46

*Commander Properties Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529 (D. Kan. 1995) .............46

*Decoteau v. Raemisch*, 304 F.R.D. 683 (D. Colo. 2014) ...............................................................46

*DeJulius v. New England Health Care Emp. Pension Fund*, 429 F.3d 935 (10th Cir. 2005) ......................................................................................................................................52

*Dep't of Energy Stripper Well Exemption Litig.*, 653 F. Supp. 108 (D. Kan. 1986) ....................38

*DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010) .....................................42

*Doe v. Unified Sch. Dist. 259*, 240 F.R.D. 673 (D. Kan. 2007) .....................................................44

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .....................................................................54

*Emig v. Am. Tobacco Co.*, 184 F.R.D. 379 (D. Kan. 1998) ...........................................................46

*Freebird, Inc. v. Merit Energy Co.*, 10-1154-KHV, 2012 WL 6085135 (D. Kan. Dec. 6, 2012) ........................................................................................................................................29

*Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678 (D. Kan. 2009) .......................................................44

*Garcia-Mir v. Civiletti*, No. 81-4007, 1981 WL 380696 (D. Kan. May 12, 1981) .......................49

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ...................................................................45

*Harlow v. Sprint Nextel Corp.*, 254 F.R.D. 418 (D. Kan. 2008) ..................................................41

*In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485 (W.D. La. 2017) .................54

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) .......................33

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005) ...............................................40

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ..........................29, 47

*In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004) ..............................47

*In re Integra Realty Res., Inc.*, 354 F.3d 1246 (10th Cir. 2004) ...........................................33

*In re King Res. Co. Secs. Litig.*, 420 F. Supp. 610 (D. Colo. 1976) ...............................................38

*In re New Mexico Natural Gas Antitrust Litig.*, 607 F. Supp. 1491 (D. Colo. 1984) ....................31

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880 (E.D. La. July 27, 2015) ....................................................................................................55

*In re Urethane Antitrust Litig.*, 237 F.R.D. 440 (D. Kan. 2006) ................................................51

*Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322 (10th Cir. 1984) ...........................................30, 38

*Kerner v. City & Cnty. of Denver*, No. 11-CV-00256-MSK-KMT, 2012 WL 7802744 (D. Colo. Nov. 30, 2012) ..........................................................................................52

*Lowery v. City of Albuquerque*, 273 F.R.D. 668 (D.N.M. 2011) .................................................49

*Marcus v. Kan. Dep't of Revenue*, 209 F. Supp. 2d 1179 (D. Kan. 2002) ............................31, 39

*Marcus v. Kan., Dep't of Revenue*, 206 F.R.D. 509 (D. Kan. 2002) .............................................46

*Nakkhumpun v. Taylor*, No. 12-CV-01038-CMA-CBS, 2015 WL 6689399 (D. Colo. Nov. 3, 2015) ......................................................................................................29

*Nat'l Treasury Employees Union v. United States*, 54 Fed. Cl. 791 (2002) ..................................29

*Nieberding v. Barrette Outdoor Living, Inc.*, No. 12-CV-2353-DDC-TJJ, 2015 WL 1645798 (D. Kan. Apr. 14, 2015) ....................................................................................29

*Nieberding v Barrette Outdoor Living, Inc.*, 302 F.R.D. 600 (D. Kan. 2014) .............................44

*Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672 (D. Kan. 1991) ....................................40

*Payson v. Capital One Home Loans, LLC*, No. 07-2282-JTM, 2008 WL 4642639 (D. Kan. Oct. 16, 2008) ..........................................................................................44

*Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181 (10th Cir. 1975) .................................................44

*Pinkston v. Wheatland Enters., Inc.*, No. 11-CV-2498-JAR, 2013 WL 1302053 & n.40 (D. Kan. Mar. 27, 2013) ..........................................................................................41

*Rhodes v. Olson Assocs.*, 308 F.R.D. 664 (D. Colo. 2015) ........................................................31

*Robinson v. Gillespie*, 219 F.R.D. 179 (D. Kan. 2003) ................................................................46

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002)............................30, 46

*Schell v. Oxy USA, Inc.*, No. 07-1258-JTM, 2009 WL 2355792 (D. Kan. July 29, 2009)......40, 41

*Shaw v. Interthinx, Inc.,* No. 13-CV-01229-REB-NYW, 2015 WL 1867861 (D. Colo. April 22, 2015).........................................................................................................................30, 38

*Smith v. MCI Telecomms. Corp.*, 124 F.R.D. 665 (D. Kan. 1989) ..............................................44

*Stambaugh v. Kan. Dep't of Corr.*, 151 F.R.D. 664 (D. Kan. 1993) ...........................................44

*Swartz v. D-J Eng'g, Inc.*, No. 12-CV-01029-DDC-K, GG, 2016 WL 633872 (D. Kan. Feb. 17, 2016) .....................................................................................................................38

*Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir. 1975).....................................................44

*Tennille v. W. Union Co.*, 785 F.3d 422 (10th Cir. 2015)........................................................30, 33

*Tennille v. W. Union Co.*, No. 09-CV-00938-JLK-KMT, 2014 WL 5394624 (D. Colo. Oct. 15, 2014) ......................................................................................................................38

*Trevizo v. Adams*, 455 F.3d 1155 (10th Cir. 2006)......................................................................40

*Tripp v. Rabin*, No. 14-CV-2646-DDC-GEB, 2016 WL 3615572 (D. Kan. July 6, 2016).....30, 31

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ..........................................................50

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641 (W.D. Okla. 2012) .......................................................................................................49

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...........................................................42, 43

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir. 2005) ..................................29, 30

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013) ...................................................................................................................42

*Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029 (D. Kan. Sept. 11, 2007) .....................................................................................................................39

*Wyandotte Nation v. City of Kansas City*, 214 F.R.D. 656 (D. Kan. 2003)..................................46

*Zapata v. IBP, Inc.*, 167 F.R.D. 147 (D. Kan. 1996) ..............................................................44, 46

**Statutes**

28 U.S.C. § 1332(d) ...................................................................................................7

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... *passim*

Fed. R. Civ. P. 53 .....................................................................................................55

Fed. R. Civ. P. 54 .....................................................................................................13

**Other Authorities**

4 William B. Rubenstein *et al.*, *Newberg on Class Actions* § 8:23 (5th ed. 2015) .......................52

4 *Newberg on Class Actions* § 13:10 ........................................................................29

4 *Newberg on Class Actions* § 13:13 ........................................................................29

*Annotated Manual for Complex Litigation, Fourth* § 21.661 (rev. ed. 2016) ..............................55

## INTRODUCTION

Plaintiffs[1] seek an order granting provisional class certification of a Settlement Class, preliminarily approving the terms of the $1.51 billion settlement ("Settlement" or "Agreement") with the Syngenta Defendants ("Syngenta"),[2] appointing Christopher A. Seeger, Daniel E. Gustafson, and Patrick J. Stueve as counsel for the Settlement Class ("Settlement Class Counsel"), Lynn R. Johnson, Kenneth A. Wexler, and James E. Cecchi as Subclass Counsel, and Plaintiffs as class and subclass representatives, approving the form and manner of sending notice to the Class Members and of the process and form of making claims, appointing BrownGreer PLC as the Notice and Claims Administrator ("Administrator"), appointing the Special Masters needed to administrate the claims process, and adopting a schedule to determine whether to grant final approval under Rule 23(e) of the Federal Rules of Civil Procedure.  Consistent with Local Rule 5.4.4(e), a proposed order will be emailed to the Court.

On February 26, 2018, Settlement Class and Subclass Counsel, MDL Co-Lead and Litigation Class Counsel, and the Court-appointed Plaintiffs' Settlement Negotiation Committee, on behalf of the Plaintiffs, executed a $1.51 billion proposed class-wide settlement with Syngenta.  *See* Settlement Agreement, Exhibit A ("SA").[3]  This Settlement builds on top of the

---

[1] The proposed representatives for the Settlement Class are: Mike DaVault, Bradley DaVault, and David DaVault d/b/a DaVault ArkMo Farms, Steven A. Wentworth, Charles B. Lex, Five Star Farms, Grafel entities (Beaver Creek Farms, Inc., Demmer Farms, Inc., Grafel Farms, LLC, and D. and S. Grain & Cattle Co.), David Polifka, David Polifka Revocable Living Trust, Bottoms Farms Partnership, JPPL, Inc., NEBCO, Inc., TRIPLE BG Partnership, David Schwaninger, Kaffenbarger Farms, Inc., Bieber Farm, Rolling Ridge Ranch, LLC, Grant Annexstad, Roger Ward, Leroy Edlund, Charles Cobb (CE Cobb Farms), Robert & Todd Niemeyer (Custom Farm Services LLC), Marvin Miller, Kruseman Fertilizer Company, and Al-Corn Clean Fuel, LLC (collectively, "Plaintiffs" or "Representative Plaintiffs").

[2] "Syngenta" refers collectively to the various Syngenta affiliates that were named as defendants in this litigation (Syngenta AG, Syngenta Corporation, Syngenta Crop Protection AG, Syngenta Crop Protection LLC, Syngenta Biotechnology, Inc., and Syngenta Seeds, LLC (f/k/a Syngenta Seeds, Inc.), collectively with all of their affiliates and predecessor and successor entities, which are parties to the Settlement.

[3] They also memorialized in a side letter the thresholds by which Syngenta can exercise its absolute right to terminate the Agreement, known as its "Walk Away Right."  SA, Ex. A at § 8.31.  By separate motion, the Parties

extraordinary success achieved here, in the coordinated Minnesota-state court centralized litigation ("Minnesota state court"), and in the Illinois litigation on behalf of corn producers and non-producers – realized through the hard work and the persistence of Plaintiffs and their counsel.  This $1.51 billion settlement – none of which will revert to Syngenta and all of which will be distributed – is a record-breaking achievement in agricultural litigation, the largest-ever GMO settlement in the United States.  And the simple claims process and extensive notice campaign will ensure that a significant monetary recovery is made available and distributed to Class Members.

The Settlement easily satisfies the standards for preliminary approval under Rule 23 of the Federal Rules of Civil Procedure.  As the Court knows from its first-hand involvement and reports from the Court-appointed Special Master, this Settlement is the product of serious, informed, non-collusive negotiations achieved through the Court-ordered negotiation process only after a jury verdict in favor of the Plaintiffs.  It was secured through negotiations by Court-appointed leadership counsel, counsel representing over 50,000 individual producers and non-producers and the Plaintiffs' Settlement Negotiation Committee (hereinafter "PNC").  These negotiations were assisted by the Court-appointed mediator, a Court-appointed special master from the coordinated litigation in Illinois, and through the oversight and involvement of the Honorable John W. Lungstrum, United States District Judge for the District of Kansas, the Honorable David Herndon, United States District Judge for the Southern District of Illinois, and the Honorable Laurie J. Miller, District Judge for the for the Fourth Judicial District of Hennepin County, Minnesota, who was designated by this and the coordinating courts to oversee settlement negotiations.  Ultimately, the Settlement was achieved only after months of in-person

ask that this letter be filed under seal with access limited to Settlement Class Counsel, Subclass Counsel, Plaintiffs' Negotiating Committee, and Syngenta.  *Id.*  As set forth in the separate motion, the purpose of sealing the walkaway thresholds under seal is to discourage gamesmanship in the exclusion process.

and telephonic meetings between the negotiating parties and each of the constituent judges. Every material aspect of the Settlement was the product of hard-bargaining and difficult compromise. The $1.51 billion non-reversionary Settlement has no deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and easily falls within the range of possible approval. It contains none of the "red flags" sometimes associated with collusive settlements: there is no reversion of unclaimed funds, the 150-day proposed claims program where class members can submit claims online or by mail is robust and lengthy, discrete subclasses are represented by separate counsel, and the process for submitting claims is simple and non-burdensome (nearly all of the over 600,000 Class Members will be able to submit claims that will be automatically verified by government records and thus will not have to personally produce a single record).

Moreover, the Settlement has the full support of the PNC (who represented both class and individuals plaintiffs), the MDL Co-Lead and Litigation Counsel, who prosecuted the litigation through discovery and tried the Kansas class action to a favorable jury verdict, the Minnesota Co-Lead Counsel who prosecuted the Minnesota cases through discovery and were three weeks into the Minnesota class trial when a settlement term sheet was executed, and Subclass Counsel. This diverse group of Plaintiffs' lawyers "appropriately balances the goals of representing the interests of different groups of producer plaintiffs," including those who had pursued class action claims and those who had pursued individual actions. Order Appointing Plaintiffs' Settlement Negotiation Committee in the Syngenta Litig., ECF No. 3366. Finally, this $1.51 billion settlement was achieved despite the vigorous defenses advanced by Syngenta through top-caliber defense counsel, including the uncertainty of future jury verdicts and legal issues that had not yet been settled by any appellate court in these matters. For these reasons, the Agreement warrants

preliminary approval and dissemination of Notice to the over 600,000 members of the Settlement Class so that they may decide for themselves whether to accept this Settlement.

Additionally, the Settlement Class satisfies the standard for certification under Rule 23(a) and (b)(3) for reasons that this Court has largely already explained when it previously certified a nationwide litigation class in an order that the Tenth Circuit described as "well-researched and reasoned." Dec. 7, 2016 Order, No. 16-607 (10th Cir. Dec. 7, 2016) (ECF No. 2741 at 3). Further, the proposed Notice Plan – which will include twice-sent direct-mail notice to nearly all Class Members along with radio, Internet, targeted social media, and print advertising – far exceeds any procedural and constitutional requirements and is designed to reach each and every Class Member. In short, this historic settlement warrants provisional certification and preliminary approval so that Class Members may submit their claims for a share of the $1.51 billion in pure-cash relief achieved after nearly four years of hard-fought litigation.

For these reasons and those explained below, Plaintiffs respectfully request that the Court grant all relief requested and enter an order consistent with the proposed order submitted herewith.

## FACTUAL BACKGROUND

This Settlement is the result of almost four years of jurisdiction-spanning litigation, numerous legal rulings, hundreds of depositions taken across the world, two trials, and one jury verdict. Its history is recounted in summary form here.

### A.   Jurisdiction-Spanning Proceedings on Behalf of Producers and Non-Producers.

Beginning in the fall of 2014, numerous lawsuits were filed in multiple federal and state courts arising from Syngenta's decision to commercialize two genetically modified ("GMO") corn seeds containing the traits known as MIR162 and Event 5307 under the brand names

Agrisure Viptera (MIR162) ("Viptera") and Agrisure Duracade ("Duracade") prior to obtaining China's approval to import corn grown with those traits.  *See* Pls.' Fourth Am. Consolidated Master Class Action Compl. ("4th Am. Compl."), ECF No. 3505 at pp. 2-6.  As alleged by Plaintiffs, as a result of that decision, China – the world's largest market for feed grains and a growing and important importer of United States corn and the corn by-product DDGs – ceased imports from the United States.  *Id.* at ¶¶ 343-403.  This harmed corn producers because lower demand meant lower prices.  *Id.* at ¶¶ 387-88.  Moreover, that harm allegedly extended to the grain elevators who serviced that demand, *id.* at ¶¶ 390-93; and, to the ethanol-production facilities who produced DDGs from corn whose harm arose when China – the largest buyer of U.S. DDGs – stopped buying U.S. corn, *id.* at ¶¶ 394-403.

In December 2014, the Judicial Panel on Multidistrict Litigation ("JPML") consolidated the then-filed class and individual federal actions and transferred them to this District.  Transfer Order, ECF No. 1.  After entertaining applications for leadership, on January 22, 2015, the Court appointed Don M. Downing, William B. Chaney, Scott A. Powell, and Patrick J. Stueve as MDL Co-Lead Counsel.  Order Concerning Appointment of Counsel, ECF No. 67 at 6.  The Court further appointed an Executive Committee, consisting of Jayne Conroy, Christopher Ellis, David Graham, Richard Paul, Robert Shelquist, John Ursu, Stephen Weiss, Scott Poynter and Tom Bender.[4]  In selecting this leadership, the Court noted that this team "included representatives" of multiple interests, including "plaintiffs in this case [who] desire to proceed by individual actions," "[o]thers [who] prefer the certification of one or more classes," those "who seek or will seek remand to state court," "large entities, [and] others [who] operate small farms."  *Id.* at 67.

On March 13, 2015, the federal MDL Plaintiffs filed two consolidated master complaints

---

[4] Tom Cartmell was also appointed but subsequently withdrew from leadership on June 29, 2015.  ECF No. 891.  Mr. Graham also withdrew, but only recently, following his client's settlement with Syngenta.  ECF No. 3498.

in the MDL – one on behalf of corn producers and one on behalf of non-producers, including grain elevators.  ECF Nos. 296-97.  Plaintiffs with individual cases could join in those complaints by filing a simple Notice to Conform.  ECF No. 287.  Many did.  *See generally* ECF Nos. 386, 461.

Meanwhile, numerous individual producer and non-producer cases, along with a class action covering Minnesota producers, were filed and consolidated in Hennepin County, Minnesota state court.  *See In re Syngenta Class Action Litigation*, Court File No. 27-CV-15-12625 and 27-cv-15-3785 (4th Jud. Dist. Ct. Minn.) ("MN MDL").  Those cases were consolidated before a single judge.  On August 5, 2015, the Minnesota state court appointed Lewis A. Remele, Jr. and Francisco Guerra, IV as Co-Lead Counsel; William R. Siebel and Daniel E. Gustafson as Co-Lead Interim Class Counsel; and Robert K. Shelquist, Richard M. Paul III, Will Kemp, Tyler Hudson and Paul Byrd as members of the Plaintiffs' Executive Committee.[5]  Order, MN MDL (Aug. 5, 2014) at 2-3.  Minnesota Plaintiffs also filed a consolidated master complaint to which individual plaintiffs could conform their cases by filing a simple notice to conform.  *See* Order Approving Notices to Conform, MN MDL (Oct. 30, 2015).  Ultimately, more than 3,000 cases representing over 50,000 individual plaintiffs, were filed and consolidated in Minnesota.

On October 21, 2015, this Court entered a Coordination Order in which it encouraged and required the parties and the Courts in related actions, including the federal MDL and the Minnesota litigation, to coordinate the conduct of discovery against Syngenta.  Coordination Order, ECF No. 1099.  On November 4, 2015, the Minnesota state court adopted the MDL Coordination Order.  Coordination Order, MN MDL (Nov. 4, 2015).

---

[5] That court also appointed Clayton A. Clark but he withdrew from leadership shortly after the order was entered.

On November 3, 2015, more than one-hundred producer plaintiffs filed suit against Syngenta in Madison County, Illinois state court.  Syngenta removed their cases to the United States District Court for the Southern District of Illinois ("Illinois federal court"), pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) & 1453(b).  *See Poletti v. Syngenta AG*, No. 3:15-cv-01221-DRH, ECF No. 1 (S.D. Ill. Nov. 3, 2015).  On November 16, 2015, the Illinois federal court held that the matter was a "mass action" under CAFA and therefore not subject to multi-jurisdictional transfer by the JPML.  *Id.*, ECF No. 14; *see* 28 U.S.C. § 1332(d)(11(C)(i).  The *Poletti* action was subsequently split into two cases:  *Poletti* and *Tweet v. Syngenta AG,* No. 3:16-cv-00255-DRH (S.D. Ill.).  *Id.*, ECF No. 63, and consolidated as *In re Syngenta Mass Tort Actions*.  On February 1, 2016, the Coordination Order was entered in *Poletti. Id.*, ECF No. 44.

On January 7, 2016, nearly two hundred additional cases filed in Illinois state court were consolidated by the Illinois Supreme Court before the Honorable Brad K. Bleyer.  *Browning v. Syngenta Seeds, Inc. et al.,* No. 15-L-157 (Ill. Cir. Ct.).  Thereafter, thousands of additional individual cases were filed in Illinois state court.  Likewise, a number of class actions were filed on behalf of non-producer ethanol plants in Ohio, Michigan, Nebraska, Indiana, and Iowa state courts. *See Fostoria Ethanol, LLC v. Syngenta Seeds, Inc.* No. 15-cv-0323 (Seneca Cnty., Ohio); *Michigan Ethanol, LLC v. Syngenta Seeds, LLC, et al.,* No. 17-29831-NZ (Tuscola Cnty., Mich.); *Mid America Agri Products/Wheatland, LLC v. Syngenta Seeds, LLC, et al.* No. CI 14-32 (Perkins Cnty., Neb.); *Ultimate Ethanol, LLC v. Syngenta Seeds, Inc. et al.,* No. 48C05-1512-CT-000184 (Madison Cnty., Indiana); and *TCE, LLC v. Syngenta Seeds, Inc.,* No. EQCV 039491 (Carroll Cnty., Iowa).

**B.      Pre-Trial Proceedings for Class and Individual Producers and Non-Producers.**

Discovery proceeded immediately upon appointment of counsel in the federal MDL.  At MDL Plaintiffs' request, the Court ordered Syngenta to begin producing discrete categories of documents.  *See* Scheduling Order No. 1, ECF No. 123 at 9 (Feb. 4, 2015).  On May 29, 2015, MDL Plaintiffs filed amended master complaints on behalf of producers and non-producers asserting a federal Lanham Act and multiple state-law claims.  ECF Nos. 450-51.  On June 19, 2015, Syngenta filed a 250-page motion to dismiss the claims in both complaints, where it characterized the lawsuits as "unprecedented attempts to turn a seed manufacturer into an insurer."  Syngenta's Mem. of Law in Supp. of Mot. to Dismiss Producer and Non-Producer Pls.' Am. Class Action Master Compls., ECF No. 587 at 1.  Following briefing by the MDL Plaintiffs, this Court issued a 120-page memorandum and opinion granting in part and denying in part the motion to dismiss, leaving intact Plaintiffs' Lanham Act, negligence, tortious interference, and several consumer-protection claims.  Mem. & Order, ECF No. 1016 (Sept. 11, 2015).  The Court denied Syngenta's bid for interlocutory appeal of that ruling on October 19, 2015.  ECF No. 1097 at 1.

Syngenta filed a similar motion to dismiss in the Minnesota state court.  In a 55-page opinion, the Minnesota state court also issued a ruling largely denying dismissal.  Order, MN MDL (Apr. 7, 2016).  After lengthy briefing, motions to dismiss by Syngenta were also rebuffed in the Illinois state court litigation and the Southern District of Illinois "Mass Action" Litigation.  Syngenta re-urged the arguments presented in other jurisdictions, and dismissal was granted in full by an Ohio state court judge on all claims by a putative class of ethanol production facilities in *Fostoria Ethanol*.    J. Entry, *Fostoria Ethanol, LLC d/b/a Poet Biorefining-Fostoria v. Syngenta Seeds et al.,* 15-CV-032, (Ct. of Common Pleas of Seneca Cnty., Ohio July 10, 2017),

attached as Ex. B.

After the motions to dismiss were denied in this Court and in Minnesota, full fact discovery commenced for both the class and individual cases.  On October 21, 2015, this Court established a simultaneous track for both class and individual cases.  *See* Scheduling Order No. 2, ECF No. 1098.  Cognizant of the fact that some plaintiffs were "small family farmers" and "others are sophisticated farming conglomerates" and that some "are grain elevators that deliver grain into export channels" while "others are grain elevators serving domestic locales," the Court established an initial bellwether discovery pool of 5 non-producers and 6 producers from eight of the states from which plaintiffs had filed claims.  *Id.* at 6.  In addition, discovery commenced for each of the putative class representatives for these eight bellwether states as well as for six non-class representatives (individual) plaintiffs selected by the parties (three by Syngenta, three by plaintiffs) for each of the eight bellwether states.  *See Id.*  Fact discovery was scheduled to close on May 2, 2016, and Plaintiffs' motion for class certification, and any supporting expert reports, of the eight bellwether states was due on June 15, 2016.  *Id.* at 9-10.

The Minnesota state court adopted a similar approach with similar deadlines.  An initial discovery pool was established consisting of all named class representatives to the Minnesota class action and 40 bellwether plaintiffs to be selected by the parties.  Scheduling Order No. 2, MN MDL at 2.  There, the parties also had until May 2, 2016 to complete fact discovery on these cases and until June 15, 2016 to file a motion for class certification.  *Id.* at 3-4.  Both courts required all plaintiffs who filed cases to complete and submit to Syngenta limited written discovery in the form of a Plaintiff Fact Sheet.  *See* Scheduling Order No. 2, ECF No. 1098 at 7 ("Simply stated, plaintiffs initiated this litigation and it is only reasonable to expect them to devote the no more than one or two days of time necessary to gather the very limited and basic

information to complete their PFSs.").

As the cases proceeded, the MDL and Minnesota plaintiffs coordinated discovery against Syngenta and with respect to numerous third-party exporters and trade organizations. In total, Plaintiffs obtained 2.3 million pages of responsive documents from these parties, which were collected into a consolidated document depository made available in all coordinating cases, and subject to a thorough, multi-level document review. Declaration of Patrick J. Stueve ("Stueve Decl.") at ¶ 5. Plaintiffs deposed 31 Syngenta witnesses over the course of 57 days on 4 continents. *Id.* at ¶ 6. In total, 5,717 documents were marked as deposition exhibits. *Id.*

All of the bellwether plaintiffs and putative class representatives for the eight bellwether states in the MDL and in Minnesota responded to written discovery and were deposed. In total, seventy-seven plaintiff depositions were taken in the MDL. *Id.* at ¶ 7. MDL Co-Lead Counsel organized a deposition team to prepare and produce plaintiffs on behalf of, or in conjunction, with individual counsel. *Id.* In Minnesota, all of the plaintiff class representatives' depositions were taken as were those of numerous bellwether plaintiffs. Minnesota appointed counsel similarly organized a deposition team to prepare and produce plaintiffs. Declaration of Daniel E. Gustafson ("Gustafson Decl.") at ¶ 7.

The MDL and Minnesota Class Plaintiffs jointly retained two agricultural economists to provide opinions in support of class certification. Stueve Decl. at ¶ 8; Gustafson Decl. at ¶ 8. Both issued reports in support of class certification, laying out evidence of common injury and a class-wide damages methodology. Stueve Decl. at ¶ 8. The experts were produced for deposition on June 28-29, 2016 and July 6, 2016. *Id.*

On June 15, 2016, Plaintiffs in the MDL moved for certification of a nationwide class and the eight bellwether state-law classes. ECF No. 2156. Their supporting memoranda

contained 114 pages of argument and over 1,500 pages of evidence.  ECF No. 2164.  Syngenta filed a 127-page opposition brief with over 800 pages of evidence, including the reports of three economists.  ECF No. 2335.  Plaintiffs deposed each of the experts and filed a 104-page reply with another 1,800 pages of evidence.  ECF No. 2436.  The Court held an evidentiary hearing, which Judge Thomas M. Sipkins, then presiding over the Minnesota state court, attended, where it heard evidence from both of Plaintiffs' agricultural economists and argument from counsel.  Also on June 15, 2016, Plaintiffs in Minnesota moved to certify the Minnesota class with the same agricultural economists as the MDL Plaintiffs used.  Gustafson Decl. at ¶ 8.  On September 16, 2016, the Minnesota state court separately heard argument on Minnesota Plaintiffs' motion for class certification.

On September 26, 2016, the Court granted in full MDL Plaintiffs' motion for class certification.  Mem. & Order, ECF No. 2547.  On November 13, 2016, the Minnesota state court granted in full the Minnesota class motion.  Order, MN MDL (Nov. 3, 2016).  Syngenta petitioned for interlocutory appeal of both orders.  On December 7, 2016, the Tenth Circuit denied interlocutory review of the MDL order, finding it "well-researched and reasoned."  Dec. 7, 2016 Order, No. 16-607 (10th Cir.) (ECF No. 2741).  On January 10, 2017, the Minnesota Court of Appeals also denied interlocutory review.  Plaintiffs disseminated first-class, mailed notice to the respective classes.  Stueve Decl. at ¶ 10; Gustafson Decl. at ¶ 12.

Trials were set in Minnesota and the MDL.  In Minnesota, the first trial of an individual plaintiff was scheduled to begin in April 2017.  In the MDL, the first trial was set for June 2017.  The parties proceeded to expert discovery.  MDL Plaintiffs prepared and produced six expert witnesses, including two agricultural economists on issues related to biotechnology, the standard of care, GMO cross pollination, the Chinese regulatory system, agricultural

economics, and damages.  Stueve Decl. at ¶¶ 8, 11.  The Minnesota Plaintiffs produced reports for the same experts, along with additional experts on corporate governance, among other things, ultimately producing twelve expert reports in all.  Gustafson Decl. at ¶ 13.  Syngenta produced reports for 12 experts in the MDL and 14 experts in the Minnesota state cases.  All of the experts were deposed.  Stueve Decl. at ¶ 12; Gustafson Decl. at ¶ 15.

In February 2017, the parties on both sides filed motions for summary judgment (in Plaintiffs' case, partial summary judgment) in both the MDL and in Minnesota.  ECF Nos. 2858-62; Syngenta's Notice of Mot. and Mot. for P. Summ. J. on Minnesota Class Claims, MN MDL (May 26, 2017), Class Plaintiffs' Notice of Mot. and Mot. for P. Summ. J., MN MDL (May 26, 2017).  The motions were granted in part and denied in part.  ECF No. 3051; Order Regarding Summ. J. Mot., MN MDL (Aug. 17, 2017).  The parties also filed extensive briefing related to, and the respective courts ruled on, motions related to admissibility of expert opinions.  *E.g.*, ECF No. 3134.

### C.      Trial Proceedings and Verdict.

On April 26, 2017, in Minnesota, a mistrial was declared in the first bellwether case due to a problem that arose with the jury.  Gustafson Decl. at ¶ 16.  On June 5, 2017, a jury trial began in the MDL of the claims asserted on behalf of the Kansas class.  Stueve Decl. at ¶ 13.  The trial was preceded by extensive work on motions in limine (*see* ECF Nos. 3098, 3101, 3108, 3143), and disputed jury instructions (*see* ECF Nos. 3187, 3188, 3192).  Rule 50(a) motions for directed verdict came at the close of plaintiffs' case.  ECF Nos. 3265, 3266.  On June 23, 2017, the jury returned a $217.7 million verdict on behalf of the Kansas class.  Jury Verdict, ECF No. 3304.  On July 21, 2017, Syngenta filed a post-trial motion, seeking judgment as a matter of law (or alternatively a new trial) and/or remittitur.  ECF No. 3343.  In

addition, Syngenta filed a motion for entry of judgment pursuant to Rule 54(b) of the Federal Rule of Civil Procedure for the express purpose of taking an immediate appeal from the Kansas judgment.  ECF No. 3439.

On September 11, 2017, a jury trial began in Minnesota on behalf of the Minnesota class, and proceeded through the Plaintiffs' case-in-chief, when the parties announced they had executed a settlement term sheet.  That Court then dismissed the jurors because a term sheet was executed by Syngenta and the PNC.

### D.    Settlement Negotiations.

On February 25, 2016, the Court entered a coordination order related to settlement, indicating its intent to appoint a special master and require settlement coordination between the various jurisdictions where cases were then pending.  ECF No. 1600.  On March 23, 2016, the Court appointed Ellen K. Reisman ("Special Master") "to assist the court in efficiently coordinating settlement discussions in these proceedings."  Order Appointing Special Master for Settlement, ECF No. 1745 at 2.  With the assistance of the Special Master, the parties began meeting regularly and by telephone to discuss settlement.

Following the June 23 jury verdict in Kansas, on August 9, 2017, the Court, after consultation with the Special Master, as well as the courts in Minnesota and Illinois, appointed the PNC to work towards reaching a resolution of the various matters.  Order Appointing Plaintiffs' Settlement Negotiation Committee in the Syngenta Litig., ECF No. 3366.  The members of the PNC were: Christopher A. Seeger; Mikal Watts; Clayton A. Clark; and Daniel Gustafson.  *Id*. at 3.  The Court expressly found that this committee would "appropriately balance[] the goals of representing the interests of different groups of producer plaintiffs while maintaining a workably sized group to conduct settlement negotiations."  *Id.* at 3.  The group

13

included class counsel in Minnesota (Mr. Gustafson), lawyers representing tens of thousands of individual plaintiffs, including non-producers (Messrs. Clark and Watts), and Mr. Seeger, each of whom has had significant experience in resolving high-dollar multi-district litigation and whose law firms each performed key work in the MDL.  The order was also entered in Minnesota and Illinois.

The order directed the parties to "report on a weekly basis to the Honorable David R. Herndon" – the judge overseeing the federal mass-tort cases in Illinois.  *Id.* at 3.  The Special Master subsequently requested that the Honorable Daniel Stack (ret.), who was special discovery master in the Illinois state and federal cases, assist in settlement negotiations.  Decl. of Christopher A. Seeger ("Seeger Decl.") at ¶ 4.  The PNC met in person and by phone with counsel for Syngenta, the Special Master, and Judge Stack on numerous occasions.

On September 25, 2017, mid-way through the Minnesota class trial, the PNC executed a term sheet with Syngenta providing for a $1.51 billion settlement.  *Id.* at ¶ 6.  The jury in the Minnesota case was released.  *Id.*

Several months of further, intense negotiations over the precise terms of the settlement and the process for distributing the funds proceeded between the PNC, Syngenta, and MDL Co-Lead Counsel Patrick J. Stueve (on behalf of the MDL litigation classes).  *Id.* at ¶ 7.  In addition, separate counsel - Lynn R. Johnson, Kenneth A. Wexler, and James E. Cecchi - were involved to negotiate for the amount of relief and procedure for paying members of three subclasses defined in Section E-1 below.  *Id.* at ¶ 8.  At all times, the negotiations were held at arm's length and were non-collusive.  *Id.* at ¶ 9.  The assistance and involvement of the Special Master and Judge Stack were required on several occasions.

14

Throughout this time, the Court and Judges Herndon and Miller all played a critical active oversight role in these negotiations, holding regular telephone calls with the Special Master on at least a weekly basis, and helping counsel at meetings held in the Southern District of Illinois, Kansas City, and Minnesota to break the impasse on thorny issues that had become obstacles to the hammering out of a comprehensive settlement agreement.   *Id*. at ¶ 10.

Reflecting the vigorous representation by the parties involved and the extent to which each side was negotiating on behalf of their constituents, this Court, and the other courts, convened two in-person hearings to discuss the status of the settlement.   *See* Order Setting Settlement Status Conference, ECF Nos. 3481, 3488; Seeger Decl. at ¶ 11.  A further conference was set for February 26, 2018 in the event the parties had not finalized settlement documents, where the Court ordered it would "continu[e] from day-to-day thereafter."   Order Regarding Settlement Status Report, ECF No. 3492 at 2; Seeger Decl. at ¶ 11.

Additional in-person meetings were held in New York on February 21-22, 2018.  Seeger Decl. at ¶ 12.  Ultimately, on February 26, 2018, after months of hard-fought negotiations, Settlement Class Counsel, Subclass Counsel, the PNC, MDL Co-Lead and Litigation Class Counsel, and Syngenta executed the Settlement Agreement.  *Id.*

**E.      The Settlement Agreement.**

The Settlement provides an extraordinary monetary payment to the Class in exchange for a class-wide release.  The Settlement's key terms are discussed below.

**1.      Settlement Relief and Release.**

To resolve the claims of the Settlement Class, Syngenta has agreed to put $1.51 billion into escrow.  The first $200 million is due by March 28, 2018, a portion of which may be used to pay the fees and expenses of the Administrator, as well as for the Class Notice.  Ex. A, SA §

3.7.1.2. Syngenta will make a second deposit of $200 million no later than March 31, 2018 (*id.* at § 3.7.1.3), and the final installment constituting the remainder of the $1.51 billion will be deposited on April 1, 2019 or within thirty days of the Court's final approval of the Settlement, whichever is later (*id.* at § 3.7.1.5). As long as the settlement is approved and becomes Final, no portion of the $1.51 billion will revert to Syngenta. *See id. at* § 3.7.1.1 ("Upon the Final Effective Date of this Agreement, Syngenta shall have no right of reversion in the Gross Settlement Proceeds.").

For settlement purposes only, the Settlement Class is defined as: "Any Person in the United States that during the Class Period owned any Interest in Corn in the United States priced for sale during the Class Period <u>and</u> falls into one of the four sub-classes[.]" *Id.* at § 1.1. In turn, the Settlement Subclasses are defined as:

(1) <u>Subclass 1</u>:  Any Producer in the United States that, during the Class Period owned any Interest in Corn in the United States priced for sale during the Class Period, excluding Producers that, at any time prior to the end of the Class Period, purchased Agrisure Viptera and/or Agrisure Duracade Corn Seed and produced Corn grown from Agrisure Viptera or Agrisure Duracade Corn Seed.

(2) <u>Subclass 2</u>:  Any Producer in the United States that during the Class Period owned any Interest in Corn in the United States priced for sale during the Class Period and that, at any time prior to the end of the Class Period, purchased Agrisure Viptera and/or Agrisure Duracade Corn Seed and produced Corn grown from Agrisure Viptera and/or Agrisure Duracade Corn Seed.

(3) <u>Subclass 3</u>:  Any Grain Handling Facility in the United States that during the Class Period owned any Interest in Corn in the United States priced for sale during the Class Period.

(4) <u>Subclass 4</u>:  Any Ethanol Production Facility in the United States that during the Class Period owned any Interest in Corn in the United States priced for sale during the Class Period.

*Id.* at § 1.2. The Class Period spans from September 15, 2013 through (assuming it is granted) the date of preliminary approval of the Settlement. *Id. at* § 2.13. "Corn" and "Interest" have specific definitions pursuant to the Settlement Agreement based on their use therein. *See id. at* §

16

2.17 and § 2.34, respectively.

The Settlement Class does *not* include: (a) the Court and its officers, employees, appointees, and relatives; (b) Syngenta and its affiliates, subsidiaries, officers, directors, employees, contractors, agents, and representatives; (c) all plaintiffs' counsel in the MDL Actions or the Related Actions; (d) government entities; (e) those who opt out of the Settlement Class; and (f) a number of "Excluded Exporters" enumerated in section 2.22 of the Agreement. *Id. at* § 1.3.

Class Members who do not opt out will release Syngenta from claims co-extensive with the legal and factual claims that were or could have been made against Syngenta in the MDL and related litigation.  Specifically, the release extends to all claims

> that have been or could have been brought in connection with the development, introduction, production, distribution, sale, marketing, and efforts to gain regulatory approval of Agrisure Viptera and/or Agrisure Duracade Corn Seed, and including, but not limited to, any Claim based on the alleged decrease in price of Corn, soy, milo, DDGs, or any other commodity, grain re-direction costs, or any other form of alleged harm or damage, subject only to the express exceptions listed in the Reservation of Claims and Rights in Section 6.2 [of the Settlement Agreement].

*Id.* at § 6.1.1.  Any claims for bodily harm related to Agrisure Viptera or Duracade are *not* released.  *Id. at* § 6.2.1.  In addition, the release is mutual to the extent that Syngenta may not seek to assign "contributory or comparative fault, assumption of the risk, or similar claims for sharing or allocating fault" against Class Members, unless that Class Member obtains a judgment against a non-released party to which Syngenta is subjected to a claim for contribution or indemnity.  *Id. at* §§ 6.1.7 & 6.2.2.

If the Court does not approve the Settlement or certify the Settlement Classes, then pursuant to the Settlement Agreement, no class shall be deemed certified by or as a result of the Agreement, the Fourth Amended Complaint shall be stricken, and the MDL Actions and

Related Actions (as set forth in Exhibit 1 of Settlement Agreement) for all purposes shall revert to the status as of the date before execution of the Agreement, and all stayed proceedings shall resume in a reasonable manner approved by the Court.  *Id.* at § 6.2.4.  In the MDL, this would leave the resolution of Syngenta's Post-Trial Rule 50(b) Motion for Judgment as a Matter of Law and Alternatively, Rule 59 Motion for a New Trial and/or Remittitur (ECF No. 3343) as it relates to the Kansas Judgment and Jury Verdict entered on June 23, 2017 (ECF No. 3312), the seven currently remaining statewide classes to try their cases in three consolidated trials (ECF No. 3319), as well as a motion in the MDL to certify twelve additional statewide classes, which is currently pending.  ECF Nos. 3431, 3436.  In Minnesota, this would leave the Minnesota Class to have its claims tried, four bellwether trials, and an overwhelmingly large number of individual cases to proceed through discovery and trial.  In federal and state courts in Illinois, this would also leave an overwhelmingly large number of individual cases to proceed through discovery and trial.

### 2.  The Proposed Allocation and Distribution Method.

Subject to this Court's preliminary approval of the Settlement and the proposed form of notice, Plaintiffs will notify the Class about the method of allocation and distribution for the Net Settlement Fund as set forth in the Settlement Agreement.  The proposed allocation method, claims procedure and method for distribution are outlined below.

### a.  The Method of Allocation.

As set forth above, the PNC, Settlement Class Counsel, and Subclass Counsel engaged in arms-length negotiations to divide the Settlement Fund (the $1.51 billion) among the Subclasses. Those negotiations resulted in the following allocation:  All costs of Settlement Administration, including but not limited to, costs related to Class Notice, fees and expenses of the Claims

Administrator, Notice Administrator and the Special Masters, and the Fees and Expense Awards shall be deducted from the Settlement Fund.  Ex. A, SA § 3.7.2.1(a).  Then, no more than $22,600,000 of the Settlement Fund may be used to pay Subclass 2 (those producers who purchased and planted Agrisure Viptera or Duracade), provided the average recovery for Class Members in Subclass 2 cannot exceed the average recovery of those in Subclass 1 (*id.* at § 3.7.2.1(b)(i)); no more than $29,900,000 may be used to pay Subclass 3 (the Grain-Handling Facilities covered by the Settlement) (*id.* at § 3.7.2.1(b)(ii)); and no more than $19,500,000 may be used to pay Subclass 4 (the Ethanol Facilities that are covered by the Settlement) (*id.* at § 3.7.2.1(b)(iii)).  The remaining money from the Settlement Fund will be used to pay members of Subclass 1 (corn producers who did not purchase and plant Agrisure Viptera or Duracade corn seeds).  *Id.* at § 3.7.2.1(b)(iv).  To the extent that a Class Member has Interests in more than one Subclass, nothing prohibits that Class Member from recovering for each Interest, provided that there can be no duplicative recovery.  *Id.* at § 3.10.1.

In allocating among members of each Subclass, the settlement proceeds will be paid based on each Class Members' "Compensable Recovery Quantities."  *Id.* at § 2.15.  For Class Members in Subclasses 1 or 2 (Corn Producers), a Compensable Recovery Quantity means "a Corn bushel for which a Producer Class member is entitled to make a recovery under the Allocation Methodology."  *Id.* at § 2.15.1.  This will be determined as follows:

> For any acreage reported to USDA for Form FSA 578 purposes, Form FSA 578 shall be the exclusive manner in which acreage is determined. The Claims Administrator shall first determine the number of Corn acres reported on the Producer's Form FSA 578 in each Marketing Year, exclusive of acres reported as failed or for silage, which shall be multiplied by the Producer's share in those acres as reported on the Form FSA 578. The Claims Administrator shall then convert the Producer's acreage in each Marketing Year to bushels by (a) multiplying the Producer's acreage by the average county yield as reported by USDA NASS (or if no county yield is reported, the nearest average yield available as determined by the Claims Administrator); (b) deducting the

percentage of bushels reported as "fed on farm" as reported on the Producer's Claim Form; (c) multiplying the resulting bushels in each Marketing Year according to a weighted average; and (d) summing the resulting bushels.

*Id.* at § 2.15.1.1.

For any acreage not reported to USDA for Form FSA 578 purposes, but for which RMA Data is available, RMA Data shall be the exclusive manner in which acreage is determined. For this acreage, Compensable Recovery Quantity shall be determined in the same manner as that stated above except using RMA Data instead of Form FSA 578 data.

*Id*. at § 2.15.1.2.

For any acreage not reported to USDA for Form FSA 578 purposes and for which RMA Data is not available (including Claims by landlords whose Interest is not reflected in Form FSA 578 or RMA Data), Compensable Recovery Quantity shall be determined in the same manner as that stated above, except using information reported on the Claim Form.

*Id.* at § 2.15.1.3.  For purposes of determining the Compensable Recovery Quantities for Corn Producer Class Members (Members of Subclass 1 and 2), the following weighted averages will be used for each respective Marketing Year:

    2013/14 -  26%
    2014/15 -  33%
    2015/16 -  20%
    2016/17 -  11%
    2017/18 -  10%

These averages are equivalent to the per-bushel damages impact found by Marketing Year by Plaintiffs' economic experts during the litigation.

For Class Members in Subclass 3 (Grain-Handling Facilities), Compensable Recovery Quantities means "a Corn bushel for which a Grain Handling Facility Class member is entitled to make a recovery under the Allocation Methodology."  *Id.* at § 2.15.2.  This will be determined in the following manner:

The Claims Administrator shall (a) determine the number of Corn bushels reported as sold on the Grain Handling Facility's Claim Form in each Marketing

> Year; (b) multiplying the resulting bushels in each Marketing Year according to a
> weighted average; and (c) summing the resulting bushels.

*Id*. at § 2.15.2.1. For purposes of determining the Compensable Recovery Quantities for Grain Handling Facility Class Members, the same weighted averages described above for the Corn Producers (Subclass 1 and 2) will be used for each respective Marketing Year.

For Class Members in Subclass 4 (Ethanol Production Facilities) Compensable Recovery Quantities means "short ton of DDGs for which an Ethanol Production Facility Class member is entitled to make a recovery under the Allocation Methodology." *Id.* at § 2.15.3. This will be determined under the following manner:

> The Claims Administrator shall (a) determine the number of short tons of DDGs
> reported as sold on the Ethanol Production Facility's Claim Form in each
> Marketing Year; (b) multiplying the resulting short tons in each Marketing Year
> according to a weighted average; and (c) summing the resulting short tons.

*Id*. at § 2.15.3.1. For purposes of determining the Compensable Recovery Quantities for Ethanol Production Facility Class Members, the following weighted averages will be used for each respective Marketing Year:

> 2013/14 -  44%
> 2014/15 -  47%
> 2015/16 -  4%
> 2016/17 -  3%
> 2017/18 -  2%

These averages are based on the evidence and expert analysis in the case.

### b.  The Proposed Claims Procedure.

**(i) Class Notice.** If the Court grants Preliminary Approval of the Settlement, Settlement Class Counsel will oversee the preparation and mailing of the attached Notice in the form approved by the Court. *See id*., Ex. 3 to SA (proposed Long-Form Notice).

The Notice Plan provides for direct mail, print publication, radio, Internet, and social-

medial advertising.  Under the Notice Plan, a mailing list for U.S. corn producers who received crop subsidies in any year from 2013-2017 was obtained from the U.S. Department of Agriculture Farm Service Agency ("FSA"), which identifies 610,054 potential Settlement Class Members and will be utilized to send out direct mail notice of this Settlement.  Declaration of Orran L. Brown Sr. ("Brown Decl.") at ¶ 18.  In addition, the Notice Administrator will purchase mailing lists for Ethanol Production Facilities and Grain Handling Facilities in the United States and any supplemental lists of U.S. corn producers that are deemed necessary to ensure a robust list of addresses of prospective Class Members. *See* Ex. A, Ex. 5 to SA (Notice Plan); *see also* Brown Decl. at ¶¶ 19-20.  These mailing lists will be used to provide the Long-Form Notice of the Settlement to potential members of the Settlement Class. The Notice contains instruction on how to download and submit a Claim Form for each of the Settlement Subclasses or to request a hard copy of the Claim Form. *See* Ex. A, Ex. 3 to SA at Question 16 (proposed Long Form Notice).

Prior to mailing, all mailing addresses will be checked against the National Change of Address ("NCOA") database maintained by the U.S. Postal Service ("USPS" or "Postal Service"). The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years.  The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and known address. *See id.*, Ex. 5 to SA (Notice Plan); *see also* Brown Decl. at ¶ 17 n.1.

Any addresses returned by the NCOA database as invalid will be updated through a third-party address search service.  In addition, the addresses will be certified via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip code, and verified through Delivery

Point Validation ("DPV") in order to confirm the accuracy of the addresses.  Ex. A, Ex. 5 to SA (Notice Plan).  Once all duplicates and any Excluded Exporters have been removed from the list and the addresses have been verified and updated, the Notice Administrator will send the Long-Form Notice by First-Cass U.S. Mail, to all of the potential Settlement Class Members on the lists.  *Id.*  Additionally, a Notice will be mailed, by First-Class U.S. Mail, to all individuals who request one via the toll-free phone number.  The Notice will also be made available on the Settlement website, as described below.  *Id.*

The return address on the Notices will be a post office box maintained by the Notice Administrator.  *Id.*  Notices that are returned as undeliverable will be re-mailed to any address indicated by the Postal Service in the case of an unexpired automatic forwarding order.  For those notices that are returned as non-deliverable but for which a new address is not indicated by the Postal Service, the Notice Administrator will do additional public record research, using a third-party lookup service to identify potential updated mailing addresses.  *Id.*  If any address is found, the Notice will be re-mailed.  Address updating and re-mailing for undeliverable Notices will be ongoing.  *Id.*

Finally, following the deadline to submit requests for exclusion, the Notice Administrator will follow-up the direct mailing of the Long Form Notice with reminder postcards to everyone on the mailing lists who has not filed a claim in the Settlement and who did not opt out.  *Id.*  The reminder postcards will remind Class Members of the important deadlines for submitting a Claim Form.  *Id.*

In addition to direct mail notice, the Notice Plan contemplates an extensive publication plan in which a proposed summary Publication Notice will be published in various national and state publications specifically selected to target prospective Class Members.  *Id.*; *see id.*, Ex. 4 to

SA (proposed publication notice).  Specific media were chosen to reach the various groups comprising the Settlement Classes.  *See* Brown Decl. at ¶¶ 24-27.

The proposed media schedule includes publishing the Publication Notice one time in various industry publications, both national and state-specific, that are specifically targeted to reach corn producers, grain handlers and ethanol plants.  *See* Ex. A, Ex. 5 to SA (Notice Plan); Brown Decl. at ¶¶ 24-26.

Additionally, there will be digital advertising to provide Class Members with notice opportunities beyond the print publications.  This will include digital banner advertisements on various social media outlets, including those specifically targeting individuals with an interest in farming.  Ex. A, Ex. 5 to SA (Notice Plan).  Where possible, these advertisements will provide the ability for Class Members to "click through" directly to the settlement website to submit claims, and they will run until the deadline for the submission of claims or until Settlement Class Counsel otherwise direct.  *Id.*

Finally, the Notice Plan provides for thirty-second radio ads, which will air for a two-week period immediately following the mailing of the Long Form Notice, and again for another two-week period immediately following the mailing of the reminder postcards.  These ads will air on hundreds of radio stations in the corn belt.  *Id.*

To augment the Notice Plan, a party-neutral press release will be distributed via PR Newswire's US1 distribution, which will reach thousands of print and online media outlets. The release will highlight the toll-free telephone number and settlement website address where Class Members can obtain additional information relating to the settlement, including requesting a copy of the Long-Form Notice and Claim Form.  *Id.*

To build additional reach and to extend exposures, the Publication Notice and/or Press

Release will be provided to the various corn trade organizations, including various states' corn growers' associations, the National Corn Growers Association, the National Grain and Feed Association, and others for their consideration to distribute to their members or for insertion into news letters or other communications with their members. Publication Notice by these various organizations will provide additional notice exposures beyond that afforded by paid media. *Id.* In addition, Settlement Class Counsel will request that the FSA post at local FSA offices and in its newsletters around the country a public notice of the settlement informing claimants how to submit a claim. *Id.*

A Settlement Website will be established at the URL www.CornSeedSettlement.com to enable potential Class Members to obtain information on the Settlement. The Settlement Website will allow potential Settlement Class Members to download the Long Form Notice, submit the Claim Form, and review the Settlement Agreement. It will also have a list of Frequently Asked Questions and Answers, the substance of which will be agreed upon by Syngenta and Settlement Class Counsel. The Settlement Website address will be prominently displayed in all printed notice documents. *Id.*

A toll-free phone number will be established allowing Class Members to call and request that a Notice Packet be mailed to them. *Id.* The toll-free number will also provide Class Members with access to recorded information that will include answers to frequently-asked questions and direct them to the Settlement Website. *Id.* This automated phone system will be available around the clock. There will also be live operators available to answer Class Members' questions. *Id.* Finally, a post office box will be established, to allow Class Members to contact the Notice Administrator by mail with any specific requests or questions. *Id*.

**(ii) Submission, Processing and Review of Claim Forms.** Class Members may obtain

and submit a Claim Form online or they may request a paper copy of the Claim Form.  Within 150 days of the mailing of Long-Form Notice, Class Members must properly complete and submit the Claim Form as instructed in the Notice.  *Id.* at § 4.6.

Pursuant to the Settlement Agreement, Producer Class Members (Class Members in Subclass 1 and 2) must submit a Producer Claim Form (*id*. at § 3.7.3) through the online claims-submission process or in paper, as approved by the Court.  *See id*., Ex. 2 to SA (proposed Producer Claim Forms); Brown Decl. at ¶¶ 13-14.  The Producer Claim Form will include a consent authorizing the U.S. Government to disclose FSA Form 578 information and RMA (crop insurance) information to the Class Administrator for the 2013-2017 Marketing Years.  Ex. A, SA § 3.7.3.1.  Such FSA Form 578 (if it exists) and RMA information (if FSA Form 578 data does not exist) will be the exclusive manner in which a Producer may document an Interest in acreage.  *Id*. at § 3.7.3.1.  If no FSA Form 578 (or RMA data if no Form FSA 578 data) was filed with the Government for a particular farm or farms during the Class Period, Producer Class Members must complete and submit an additional section of the Claim Form and provide information that mirrors the information contained on Form FSA 578.  *Id.*  The Class Member must also declare that no Form FSA 578 or RMA Data exists with respect to the acreage for which the Class Member is submitting the Claim Form.  *Id.*

Class Members failing to submit the required release authorizing the government to disclose Form FSA 578 information (or RMA Data) to the Claims Administrator or, for those Class Members for whom no Form FSA 578 data (or RMA Data) exists, or who otherwise fail to properly complete the Claim Form, will have such Claim Form(s) rejected and returned for resubmission.  *Id.* at § 3.7.3.1.  All disputes over the adequacy or timeliness of the Claim Forms will first be decided by the Claims Administrator.  Anyone still aggrieved by the

decision of the Claims Administrator may appeal that decision to the Special Masters. *Id.*

Similarly, Grain Handling Facility and Ethanol Production Facility Class Members, those in Subclasses 3 and 4 (collectively "Non-Producer Class Members"), must submit Claim Forms, as approved by the Court. *See id.,* Ex. 2 to SA (proposed Grain Handling Facility and Ethanol Production Facility Claim Forms). These Class Members will be required to produce true, accurate, and authentic records documenting (1) storage capacity, if a Grain Handling Facility, or Production Capacity, if an Ethanol Production Facility; (2) the number of Corn bushels purchased per Marketing Year; (3) the number of Corn bushels sold per Marketing Year (if any); and (4) the number of short tons of DDGs sold per Marketing Year (if any). *Id.* at § 3.7.3.2. Non-Producer Class Members who fail to submit true, accurate, and authentic business records reflecting the foregoing items of information or that otherwise fail to properly complete the Claim Form(s) will have such Claim Form(s) rejected and returned for resubmission. *Id.* Again, as with the Producer Claim Forms, all disputes over the adequacy or timeliness of the Claim Forms will first be decided by the Claims Administrator and anyone still aggrieved by the decision of the Claims Administrator may appeal that decision to the Special Masters under procedures established and agreed to by the Parties for such appeals. *Id.* Rejected Claim Forms must be resubmitted within thirty days after the Claims Administrator has issued notice of rejection. *Id.* at § 3.7.3.3. Class Members failing to timely resubmit a rejected Claim Form will have their claims denied. *Id.* Likewise, if, after a second submission, a Claim Form is still not completed and supported, the Class Member's claim will be denied. *Id.* The Claims Administrator, in conjunction with the Notice Administrator (if necessary), is obligated to compile various reports detailing the implementation of the Settlement Process. *Id.* at § 3.9.

### 3.     Opportunity to Opt Out or Object to the Settlement.

Each Class Member will also have the opportunity to object to or opt out of the Settlement.  Any Class Member who wishes to opt out must do so, in writing, by timely mailing a request for exclusion to the Claims Administrator, personally signed by the Class Member, except as provided for in the Settlement Agreement.  *Id.* at § 4.3.1.  The request must contain the required information as set forth in the Long Form Notice and the Settlement Agreement.  *Id.* at § 4.3.2 & Ex. 3 to SA.  The request must be postmarked by the Opt-Out Deadline (which if approved by the Court is 90 days from the date of the first mailing of the Notice).  *See Id.* at § 4.6.1.  Class Members who do not properly and timely submit opt-out requests will be deemed to have waived all rights to opt out and remain in the Class.  *Id.* at § 4.3.6.

Each Class Member who does not timely opt out may object to the Settlement.  Any Class Member who wishes to object to any term of the Settlement Agreement must do so, in writing, personally signed by the Class Member, and, must file the written objection with the Clerk of the Court and mail it to Settlement Class Counsel and Syngenta's Counsel in the manner set forth in the Long Form Notice and the Settlement Agreement.  *See id.* at §§ 4.4.1-4.4.3 & Ex. 3 to SA.

### 4.     Attorneys' Fees and Litigation Expenses.

The Settlement Agreement provides that applications for attorneys' fees and expenses or service awards be made by the deadlines established by the Court.  *See id.* at §§ 7.2.1 & 7.2.4.  Any award of attorneys' fees and expenses will be determined by the Court, the Minnesota state court, and the Illinois Federal Court.  *Id.* at § 7.2.1.  Disputes arising out of client fee contracts and referring counsel agreements will be determined by these courts as set forth in sections 7.2.3.1 and 7.2.3.2 of the Settlement Agreement.

## ARGUMENT

## I.   THE SETTLEMENT EASILY PASSES MUSTER UNDER THE STANDARD FOR PRELIMINARY APPROVAL.

### A.   The Settlement Readily Meets the Standards for Preliminary Approval.

"Because preliminary approval is just the first step of the approval process, courts apply a 'less stringent' standard than that at final approval." *Nieberding v. Barrette Outdoor Living, Inc.*, No. 12-CV-2353-DDC-TJJ, 2015 WL 1645798, at *4 (D. Kan. Apr. 14, 2015). "The general rule is that a court will grant preliminary approval where the proposed settlement is neither illegal nor collusive and is within the range of possible approval." *Id.* (quoting 4 William B. Rubenstein *et al.*, *Newberg on Class Actions* § 13:10 (5th ed. 2015)); *see also Nakkhumpun v. Taylor*, No. 12-CV-01038-CMA-CBS, 2015 WL 6689399, at *3 (D. Colo. Nov. 3, 2015) (quoting 4 *Newberg on Class Actions* § 13:13). "Although the Court must assess the strength of plaintiffs' claims, it should 'not decide the merits of the case or resolve unsettled legal questions.'" *Freebird, Inc. v. Merit Energy Co.*, 10-1154-KHV, 2012 WL 6085135, at *5 (D. Kan. Dec. 6, 2012) (quoting *Nat'l Treasury Employees Union v. United States*, 54 Fed. Cl. 791, 797 (2002)). Instead, the Court need only decide whether the settlement is "within the range of possible approval." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 205 (5th Cir. 1981). Thus, at this initial stage, "the court's primary objective [at the preliminary approval stage] is to establish whether to direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a final fairness hearing." 4 *Newberg on Class Actions* § 13:10. If the Court grants preliminary approval, it directs notice to the class and sets a final approval hearing, the second step in the process. *Id.*

The Court's analysis is informed by the "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d

96, 116 (2d Cir. 2005) (citation and internal quotation marks omitted); *accord Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 551 (D. Colo. 1989) (noting strong policy in favor of settlements, particularly in class actions); *see Shaw v. Interthinx, Inc.,* No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *2 (D. Colo. April 22, 2015) ("[T]he essence of settlement is compromise, and settlements are generally favored.") (citation and internal quotation marks omitted).

At the final approval stage, Rule 23(e)(2) requires a finding that the settlement is fair, reasonable and adequate, and the factors considered in this analysis can serve as a useful guide at the preliminary approval stage as well. *Alexander v. BF Labs Inc.*, No. 14-2159-KHV, 2016 WL 5243412, at *10 (D. Kan. Sept. 22, 2016) (citing cases), *appeal dismissed,* No. 16-609, 2016 WL 9997919 (10th Cir. Dec. 9, 2016); *Tripp v. Rabin*, No. 14-CV-2646-DDC-GEB, 2016 WL 3615572, at *2 (D. Kan. July 6, 2016). The final approval standards are well established under Tenth Circuit law. A district court should consider: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Tennille v. W. Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002); *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). This Settlement satisfies each of these factors.

## 1. The Settlement Was Fairly, Honestly, and Extensively Negotiated.

A settlement is considered fairly and honestly negotiated when reached after arm's-length negotiations by experienced counsel. *E.g.*, *Tripp,* 2016 WL 3615572, at *3 ("The

30

contested nature of this suit, the engagement of a neutral mediator, and the extensive negotiation process constitute evidence that the parties negotiated the settlement agreement fairly and honestly."); *Rhodes v. Olson Assocs.*, 308 F.R.D. 664, 667 (D. Colo. 2015) (finding this factor satisfied where there was no indication "the settlement was the product of collusion" and where "the parties 'vigorously advocated their respective positions throughout the pendency of the case.'"); *Marcus v. Kan. Dep't of Revenue*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002) (finding this factor satisfied where the "settlement was reached after arm's-length negotiations . . . by experienced counsel for the class"); *In re New Mexico Natural Gas Antitrust Litig.*, 607 F. Supp. 1491, 1506 (D. Colo. 1984) (approving settlement where court was "wholly satisfied that the negotiations took place at arms length").

This Court's direct involvement in appointing a Special Master and the PNC demonstrates the arm's-length nature of the negotiations.  As recounted above, settlement discussions began after the Special Master was appointed in March 2016.  Numerous phone calls and in-person meetings with Syngenta's counsel and various plaintiffs' counsel occurred while the parties were preparing for trial in the MDL and Minnesota.

In August 2017, after the verdict in Kansas and prior to the start of the Minnesota class trial, the PNC was appointed to negotiate with Syngenta, representing both class and individual interests.  The Special Master and Judge Stack began conducting mediation sessions with the PNC and counsel for Syngenta on a regular basis.  This included several in-person meetings as well as frequent phone calls.  These negotiations continued even as the Minnesota class trial got underway.  On September 25, 2017, the PNC and counsel for Syngenta executed a term sheet with broad outlines for the $1.51 billion settlement.  But, even after the signing of the term sheet, months of extensive discussion and negotiations continued.  Again, this involved several more

months of arm's-length, adversarial, and often contentious negotiations. The negotiating committee was expanded to include, in addition to the PNC, MDL Co-Lead Counsel Stueve and counsel for Viptera and Duracade purchasers, ethanol plants, and grain handling facilities. *Supra* at 14. As a result, each distinct class of interests was represented by separate counsel advocating on behalf of their interests for a share of the Settlement Fund.

Ultimately, through an extended series of mediation and negotiation sessions, the Parties reached the agreement set forth in the Settlement. Moreover, the history of the litigation underscores the vigor with which counsel have represented the Class Members in all respects – including for settlement purposes. Counsel for Plaintiffs litigated the case skillfully against a well-funded adversary represented by elite defense counsel, who presented sustained and spirited defenses on Syngenta's behalf. Plaintiffs overcame motions to dismiss for failure to state a claim and for lack of personal jurisdiction (among others), vigorous opposition to their motions for class certification (including unsuccessful petitions to the Tenth Circuit and the Minnesota Court of Appeals for interlocutory appellate review), multiple summary judgment motions, motions to exclude the opinions of their experts, and a pre-verdict motion for judgment. Plaintiffs also vigorously pursued this action despite significant litigation victories for Syngenta. Syngenta prevailed on a number of issues that narrowed plaintiffs' claims, including at the motion to dismiss stage (where Syngenta obtained dismissal of plaintiffs' failure-to-warn, trespass-to-chattels, and nuisance claims, among others), at the motion for judgment on the pleadings stage (where Syngenta obtained an order narrowing plaintiffs' theories of liability), at the summary judgment stage (where Syngenta obtained summary judgment on plaintiffs' Lanham Act and negligent misrepresentation claims), and at trial (where Syngenta obtained a directed verdict on Plaintiffs' failure to warn claims). Although Plaintiffs would have appealed many or all of these

issues, against all these obstacles, Plaintiffs secured the certification of several classes and a class jury verdict and compensatory damages in the MDL (although Syngenta prevailed in defeating claims for punitive damages).  Minnesota plaintiffs were in the middle of a class trial when the term-sheet settlement with Syngenta was reached.

The $1.51 billion to be paid by Syngenta speaks for itself as to the competence and vigor of Plaintiffs' representation in the litigation and at the bargaining table.  This is an excellent result given the uncertainties of litigation and risks to the Class described below.  In sum, the history of the litigation, the Parties' negotiations, as well as the Settlement's terms demonstrate that the Settlement was fairly, honestly, and vigorously negotiated.

## 2.    Disputed Questions of Law and Fact Remain.

When considering a Motion for Preliminary Approval, the Court must determine whether "serious legal and factual questions placed the litigation's outcome in doubt." *Tennille*, 785 F.3d at 434; *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1266 (10th Cir. 2004).  The appropriate time to measure the risks facing Plaintiffs is the time the settlement is reached.  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011).

Despite one jury verdict on behalf of the Kansas class, substantial legal and factual risks to Class Members militate in favor of settlement.  Syngenta raised many defenses throughout both the MDL litigation and Related Actions.  For example, at the preliminary stages of the case, Syngenta vigorously argued that it had no legal duty to the Plaintiffs for selling a lawful product in the United States and because the "economic loss doctrine" and/or an absence of proximate cause broadly required dismissal of Plaintiffs' claims.  *See, e.g.*, Syngenta's Mem. in Supp. of Mot. to Dismiss, ECF No. 587.  Syngenta renewed these

arguments in its Rule 50(a) motion for judgment at the close of plaintiffs' case (ECF No. 3265, 3266), and also following the Kansas verdict.  Syngenta's Rule 50(b) Mot., ECF No. 3343; Syngenta's Mem. in Supp. of Rule 50(b) Mot., ECF No. 3344 at 9, 30, 42.  Although this Court and the Minnesota state court previously rejected these defenses (the post-trial motion as to the Kansas class judgment is still pending), Syngenta undoubtedly would have appealed, and given that these issues arguably raise pure questions of law, they would potentially be reviewed *de novo*.  Indeed, Syngenta itself sought, but failed to obtain, interlocutory appellate review prior to the Kansas jury trial, demonstrating its confidence in appellate review.  Syngenta's Mem. in Supp. of Mot. to Certify Order On Motions to Dismiss for Interlocutory Appeal, ECF No. 1082 (Oct. 13, 2015).  And it was seeking immediate appeal of the Kansas judgment (if its post-trial motions were denied).

Success on appeal was necessarily uncertain.  Syngenta repeatedly characterized the Court's ruling as unprecedented and novel.  *See id.* at 11 ("The ruling on duty is the first of its kind in this country addressing alleged duties in tort for manufacturers of GM seeds to restrict the introduction of *U.S.-approved* traits *in the U.S.* simply because the traits have not been approved in a foreign market like China.  Significantly, the Order acknowledges that Plaintiffs' claims rest entirely on allegations of economic harm, not physical injury.  As a result, the Order would allow an unprecedented obligation in tort requiring Syngenta to protect other businesses from purely economic harm based on the theory that Syngenta has a duty to conduct its business 'at least in part for the mutual benefit' of others as a result of the 'inter-connected web' of relationships in the corn industry.") (emphasis in original).  Although Plaintiffs disagree with that interpretation, the risk that an appellate court reviewing the issue *de novo* might conclude otherwise cannot be ignored and is not easily

quantified.

Moreover, Syngenta's defense theory was not limited to the Producer Plaintiffs. It raised similar arguments against the Non-Producer Plaintiffs, including the grain-handling facilities and elevator-production facilities. *See* MN MDL, Syngenta's Mem. of Law in Supp. of Mot. to Dismiss First Am. Non-Class and First Am. Minn. Class Action Compls. for Producers and Non-Producers at 57-68 (Nov. 9, 2015). Indeed, Syngenta contended that the duty at issue here would have required "*controlling the actions of the Non-Producer Plaintiffs themselves*," which it characterized as "literally unprecedented." Syngenta's Mem. in Supp. of Mot. to Dismiss Am. Compls., ECF No. 857, at 3 (emphasis in original).

These defenses also carry heightened risk for Subclass 2 (the Viptera/Duracade Purchaser Subclass). Those Class Members contracted with Syngenta to purchase and plant Viptera and/or Duracade corn seed; thus, the courts may not have applied the "stranger" economic loss doctrine, but the most robust and widely followed contractual economic loss doctrine. *See* Syngenta's Mem. in Supp. of Summ. J., MN MDL (Mar. 8, 2017); Syngenta's Mem. in Supp. of Mot. to Strike Expanded Class Allegations, ECF No. 1494 at 9-21 (outlining distinct arguments directed at purchasers in this regard). This Court has never ruled that Viptera and Duracade purchaser claims would survive Syngenta's arguments. Relatedly, Syngenta raised the defense of the contract limitations against Viptera and Duracade corn seed purchasers. *Id.* Although the Minnesota state court rejected this argument in one bellwether case, that decision would have been potentially subject to *de novo* review on appeal (Order, MN MDL (Apr. 11, 2017)), litigated in all future such cases, and this Court had also not yet ruled on that issue.[6]

---

[6] Syngenta would also likely contend that Class Members in Subclass 2, 3 and 4 would be subject to comparative fault, assumption of the risk defenses, or contributory negligence. Necessarily, those who purchased

Although the coordinating courts largely rejected Syngenta's argument that it owed no legal duty to any of the Plaintiffs, at least one court has accepted it.  In Ohio, a state court dismissed the claims of a putative class of ethanol plants, finding that: Syngenta had no duty to protect against economic harm caused by the intended use of its products, and that liability could not extend to parties who did not purchase corn directly from Syngenta but used corn affected by Syngenta, concluding this was too far removed, and that the damages allegedly suffered by Plaintiffs were the result of regular market activity, among other things.  *See* Ex. B, J. Entry, *Fostoria Ethanol,* 15-cv-0323 (June 28, 2017) (granting motion to dismiss). Although raised in the context of litigation brought by an ethanol plant, Syngenta sought to apply its reasoning in these cases, and would likely have pressed that argument on appeal if it proved unsuccessful here.  *See, e.g.*, Syngenta's Mem. in Supp. of its Rule 50 Mot., ECF No. 3344 at 1, 3 & 4.  This, again, highlights the ongoing risk Plaintiffs had in these litigations in proving liability.

Syngenta also took sustained issue with both the Plaintiffs' theory of and means of proving damages.  First, it repeatedly argued that the harm here – the drop in U.S. corn prices – was too remote to constitute a proximate cause because it "extends through far too many steps—and too many independent actions by third parties."  *Id.* at 46.  Second, renewing arguments made during *Daubert* and *Frye-Mack* (the expert-admissibility standard in Minnesota) motions, Syngenta also repeatedly argued that the damages methodologies employed by Plaintiffs were flawed as a matter of law.  In its post-trial motion on the Kansas verdict, it contended that the damages awarded were too speculative and, thus, must be

---

and planted Agrisure Viptera and/or Duracade corn seed (Subclass 2) and those engaged in the storage, transport and resale or grain (Subclasses 3 and 4), prior to Chinese import approval, were participants in the spread of Syngenta's unapproved traits throughout the commodity corn seed.  Consequently, they would also be subject to unique defenses not applicable to the Class Members in Subclass 1.

overturned.  *Id.* at 65.

As such, despite a jury verdict in favor of the Kansas class, seven more statewide classes were awaiting trial, and those outcomes on both the issue of liability and damages were far from certain.  As noted, in the MDL, Syngenta moved to set aside the Kansas class verdict (ECF No. 3343) and was also seeking entry of judgment for purposes of immediate appeal under Rule 54(b) (ECF No. 3439).  If the Court (or the Court of Appeals) adopted one or more of Syngenta's arguments, it would have diminished – and possibly eliminated – the ability of all Plaintiffs to seek compensation from Syngenta.

The Minnesota class trial was also facing risk.  The class trial was underway when the settlement was reached between the Parties.  Despite the Kansas jury verdict, a different jury could have reached a different result either as to the threshold issue of liability or as to the amount of damages awarded.  And, even if the jury rendered a verdict in plaintiffs' favor, Syngenta would certainly have appealed.

With respect to claims by grain-elevator facilities, Syngenta filed a motion to dismiss them under the economic loss doctrine in early October 2017.  Those plaintiffs faced substantial legal risks with respect to the continued viability of their claims.

In short, years of continued motion practice, trials and appeals regarding the merits (including numerous questions of law, sufficiency of evidence, and admissibility of experts' opinions) of the claims lay ahead – with the eventual outcome uncertain and perhaps even unknowable.  In contrast, the Settlement makes available $1.51 billion pure-cash relief, while eliminating these material risks.

3.      **The $1.51 Billion Guaranteed Recovery Outweighs the "Mere Possibility" of Additional, Future Monetary Relief.**

Next, the Court should "consider the vagaries of litigation and compare the

significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *In re King Res. Co. Secs. Litig.*, 420 F. Supp. 610, 625 (D. Colo. 1976); *accord Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984) (court looks to "whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation"). For the reasons summarized above, several years of further challenges lay ahead for plaintiffs, and victory was far from guaranteed. Moreover, even if they prevailed in the trial court and on appeal, a complex and uncertain road lay ahead with respect to the amount they would ultimately be able to recover and collect against a defendant whose parent company is incorporated and headquartered outside the United States. "In this respect, it has been held proper to take the bird in the hand instead of a prospective flock in the bush." *In King Res. Co. Secs. Litig.*, 420 F. Supp. at 625. (citations and internal quotations omitted); *accord Tennille v. W. Union Co.*, No. 09-CV-00938-JLK-KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014), *appeal dismissed*, 809 F.3d 555 (10th Cir. 2015).

The salient question is whether the guaranteed recovery of $1.51 billion outweighs the possibility that the Plaintiffs would have prevailed in further motion practice, trials and appeals – and then collected the judgment(s) from Syngenta. Given the multitude of risks entailed in this litigation, a negotiated settlement guaranteeing $1.51 billion is appropriate and in the best interests of the Class.[7]

---

[7] *See Swartz v. D-J Eng'g, Inc.*, No. 12-CV-01029-DDC-KGG, 2016 WL 633872, at *5 (D. Kan. Feb. 17, 2016) ("[T]he value of immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation."); *Shaw*, 2015 WL 1867861, at *3 (finding settlement was "fair, adequate, and reasonable, particularly given the significant risks and costs associated with continued litigation."); *In re Dep't of Energy Stripper Well Exemption Litig.*, 653 F. Supp. 108, 117 (D. Kan. 1986) ("The risks of continued litigation are substantial for all of the parties."); *King Resources*, 420 F. Supp. at 627 ("The Court recognizes that had these settlements not been reached, chances of the class prevailing against settling defendants would have been uncertain and disbursement of funds to the class, should it have prevailed, would undoubtedly have been delayed for some, perhaps lengthy, period of time given the high probability of an appeal or appeals in this case.").

     **4.**     **Settlement Class Counsel, Subclass Counsel, MDL Co-Lead and Litigation Class Counsel, and the PNC Believe That the Settlement Is Fair and Reasonable.**

Courts rely on the considered judgment of experienced counsel in evaluating the fairness of proposed class action settlements. *E.g.*, *Marcus*, 209 F. Supp. 2d at 1183 ("Counsels' judgment as to the fairness of the agreement is entitled to considerable weight."); *see also Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029, at *4 (D. Kan. Sept. 11, 2007) ("The endorsement of the parties' counsel is entitled to significant weight.") (citation and internal quotation marks omitted). Class and individual counsel – including the PNC, Settlement Class Counsel, Subclass Counsel, and the MDL Co-Lead and Litigation Class Counsel – who are among the most experienced and respected litigators in the nation and in the field of GMO litigation, have tirelessly advanced the Classes' claims since the litigation's inception. As reflected by their signatures to the Settlement and in their judgment, the Settlement is fair and reasonable – indeed, it represents an outstanding result for the Class. This judgment is based not only on the calculus of risk in engaging in further motion practice, trials and appeals, but also the sizable monetary recovery that the Settlement delivers now with certainty.

Relying on the judgment of counsel makes particular sense in the context of preliminary approval because preliminary approval is provisional and is followed by more formal and comprehensive review and objection procedures. Those criteria are satisfied here.

**B.**     **THE COURT SHOULD PROVISIONALLY CERTIFY THE SETTLEMENT CLASS AND SUBCLASSES AND APPOINT CLASS COUNSEL.**

Solely for purposes of the Settlement, the Court should provisionally certify the proposed Settlement Class and Subclasses in order to implement the settlement on a collective basis. Like

a litigation class, a settlement class must satisfy each Rule 23(a) requirement, and at least one of Rule 23(b)'s provisions.  *See Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 299 (3d Cir. 2005) ("[C]ertification of classes for settlement purposes only [is] consistent with Fed. R. Civ. P. 23, provided that the district court engages in a Rule 23(a) and (b) inquiry[.]").

Plaintiffs seek certification of the Class and Subclasses defined above.  *See* Ex. A, SA §§ 1.1-1.3 (defining the Settlement Class, Subclasses, and those excluded).   Certification is particularly appropriate given that both this Court and the Minnesota court have already certified classes constituting the vast majority of the Settlement Class, concluding that Rule 23's elements were satisfied over vigorous opposition by Syngenta and based on the evidence and argument presented in writing and at the evidentiary hearings.  *See, e.g.*, Mem. & Order, ECF No. 2547; MN MDL Order (Nov. 3, 2016).   Although the Settlement Class is somewhat broader in encompassing Subclasses 2-4, most of the Court's findings apply equally to the proposed Settlement Class, which also satisfies Rule 23's requirements.

### 1.      The Settlement Class Satisfies Rule 23(a)'s Requirements.

#### a.      The Class and Subclasses Are Sufficiently Numerous.

Rule 23(a) first requires that a class be sufficiently numerous so as to make joinder of all members impractical. Fed. R. Civ. P. 23(a)(1).   Although the Tenth Circuit has eschewed a bright-line rule as to what number of class members satisfies the numerosity test, *Trevizo v. Adams*, 455 F.3d 1155, 1162-63 (10th Cir. 2006), courts in this district have found a class of as few as fifty sufficient.  *See Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672, 679 (D. Kan. 1991) ("good faith estimate of at least 50 members adversely affected . . . is of sufficient size to be maintained as a class action"); *see also Schell v. Oxy USA, Inc.*, No. 07-1258-JTM, 2009 WL

2355792, at *3 (D. Kan. July 29, 2009) (class of 312 members sufficed based on "sheer" size), *aff'd in part and appeal dismissed in part as moot*, 814 F.3d 1107 (10th Cir. 2016); *Harlow v. Sprint Nextel Corp.,* 254 F.R.D. 418, 424 (D. Kan. 2008) (finding numerosity where there are "over 120 potential class members").  "A court may use common sense in making assumptions to support a finding of numerosity."  *Pinkston v. Wheatland Enters., Inc.*, No. 11-CV-2498-JAR, 2013 WL 1302053, at *3 & n.40 (D. Kan. Mar. 27, 2013).

The Court previously found that the members of the Non-Viptera/Duracade Subclass met this requirement. Mem. & Order, ECF No. 2547 at 10, 30-33.  Subclasses 2-4 also meet this requirement.  With respect to the Viptera/Duracade Purchaser Subclass (Subclass 2), Plaintiffs' expert, Dr. Bruce Babcock, previously estimated that Agrisure Viptera and Duracade purchasers produced at least 1.9 billion bushels a year.  *See* ECF No. 2889-2 at 83 (Table 17).  Such a large number of bushels could hardly be grown by a small number of individuals; thus, the numerosity requirement is satisfied for Subclass 2.

Numerosity is also clearly satisfied for both of the non-producer subclasses (Subclasses 3 and 4).  Based on the lists that have been purchased by BrownGreer, there are approximately 1,569 Grain Handling Facilities in the United States, who are part of the Class and 183 Ethanol Production Facilities.  *See* Brown Decl. at ¶¶ 19-20.

> **b.** **There are Common Issues of Fact and Law Among Each of the Proposed Class Members.**

In addition, Rule 23(a) requires questions of fact or law common to the proposed class as a whole. Fed. R. Civ. P. 23(a)(2). "[F]or purposes of Rule 23(a)(2) even a single common question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (internal quotation marks omitted); *accord DG ex rel. Stricklin*, 594 F.3d at 1195, so long as the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Dukes,* 564 U.S. at 350; *accord Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013).

Again, this Court already found that similar producer classes satisfy this requirement for litigation purposes as to both the Lanham Act and state-law negligence claims. *E.g.*, Mem. & Order, ECF No. 2547, at 10-11. It previously identified such common questions as:

> Syngenta's acts and knowledge in commercializing these products; Syngenta's duty of care with respect to that commercialization; and whether Syngenta breached that duty (in the case of the negligence claims; Syngenta's representations and whether those representations were false or misleading (in the case of the statutory claims); whether Syngenta intentionally interfered with corn producers business expectancies (in the case of the tortious interference claims); China's rejection of corn from the United States, and whether Syngenta's actions cause or contributed to that rejection; the importance of China as an export market; and the effect of China's rejection of the corn market in the United States.

*Id*. Logically, no different result should follow in the context of the Settlement Class or individual Subclasses, whose claims all depend on proof of Syngenta's acts and knowledge and of China's reason for rejecting U.S. corn and DDGs. *See* Mem. & Order, ECF No. 2547 at 11 ("Essentially, anything concerning Syngenta's actions and the general effects of those actions presents a common question that will be addressed and answered by common proof."); *accord* Order, MN MDL (Nov. 3, 2016) at 19-20.

These above-recognized common questions apply equally to the Viptera/Duracade

Purchaser Subclass. They are not, however, limited to those questions. Questions common to the Viptera/Duracade Purchaser Subclass include: whether Syngenta had a duty to exercise reasonable care in its commercialization of MIR162 and/or Event 5307 corn; whether Syngenta breached its duty of care in its commercialization of MIR162 and/or Event 5307 corn; whether Syngenta was negligent in breaching its duty of care in its commercialization of MIR162 and/or Event 5307 corn; whether Syngenta, through its acts or omissions, caused or contributed to cause the loss of export markets for U.S. corn, including China; whether Syngenta knew or should have known that its acts or omissions would cause or contribute to cause the loss of export markets for U.S. corn, including China; whether the loss of export markets for U.S. corn, including China, resulted in a reduction in the price that corn producers and non-producers received for U.S. corn; whether Syngenta is legally responsible for the loss of U.S. corn export markets and the reduction in the price received for U.S. corn, and whether Plaintiffs and Class members have sustained and continue to sustain damages as a result of Syngenta's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages for Subclass. *See* 4th Am. Compl., ECF No. 3505 at ¶ 410. Additionally, in the case of the two non-producer subclasses, the common core questions include those noted above, as well as whether the loss of the Chinese export market for U.S. corn and DDGs resulted in harm to U.S. Grain Handling Facilities and Ethanol Production Facilities. *See id.*

Simply put, to these common questions, "a classwide proceeding [would] generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citation, internal quotation marks, and emphasis omitted). Because these issues of law and fact can be resolved through generalized proof, the Rule 23(a)(2) commonality requirement is also satisfied within the meaning of *Dukes*.

c.    **The Representative Plaintiffs' Claims Are Typical of Those of Absent Members.**

The third requirement of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."   Fed. R. Civ. P. 23(a)(3).   The typicality test "requires a comparison of the claims or defenses of the representative with the claims or defenses of the class."   *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 270 (10th Cir. 1975), *overruled on other grounds* by *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 687-88 (1983). "A class representative must possess the same interest and suffer the same injury as the class members."   *Payson v. Capital One Home Loans, LLC*, No. 07-2282-JTM, 2008 WL 4642639, at *4 (D. Kan. Oct. 16, 2008).

But "[d]emonstrating typicality is not an onerous burden[.]"   *Stambaugh v. Kan. Dep't of Corr.*, 151 F.R.D. 664, 677 (D. Kan. 1993); *see also Zapata v. IBP, Inc.*, 167 F.R.D. 147, 160 (D. Kan. 1996).  Factual variations among class members do not defeat the typicality test so long as the class representative's claims and those of the absent members are based on the same legal or remedial theory.  *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) (citing authorities); *Penn v. San Juan Hosp., Inc.,* 528 F.2d 1181, 1189 (10th Cir. 1975) (same); *Nieberding v Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 610 (D. Kan. 2014) ("The interests and claims of the named plaintiff and class members need not be identical[.]"); *Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678, 689 (D. Kan. 2009).  Thus, the typicality test is satisfied where the proposed representative's harm is the type of harm suffered by absent class members, even if the representative's degree of harm may differ.  *Smith v. MCI Telecomms. Corp.*, 124 F.R.D. 665, 675 (D. Kan. 1989).  Only "vast factual differences" in class members' individual claims will defeat a showing of typicality.  *See Doe v. Unified Sch. Dist. 259*, 240 F.R.D. 673, 680 (D. Kan. 2007).

Here, as this Court already found for purposes of the litigation classes, the claims of all members of the proposed Non-Viptera/Duracade Purchaser Subclass (Subclass 1 and by logical extension the other Subclasses) arise from the same conduct by Syngenta, and the Representative Plaintiffs assert the same legal claims for Subclasses that they seek to represent. Specifically, this Court found that "all of the class members are alleged to have suffered the same injury (lower corn prices from a depressed market) resulting from the same conduct." Mem. & Order ECF No. 2547 at 11. Likewise, the Minnesota court also found that the claims here satisfy the typicality requirement of Rule 23. Order, MN MDL (Nov. 3, 2016) at 20-21. The Minnesota court found that "the claims of all members of the proposed class arise from the same conduct by Syngenta and all Plaintiffs assert the same legal claims on behalf of the class that they seek to represent." *Id.*

This same analysis applies equally to the Viptera/Duracade Purchaser Subclass, the Grain Handling Facility Subclass, and the Ethanol Facility Subclass. The respective Representative Plaintiffs of each of those Subclasses have claims that are typical of the claims of the absent Class members they seek to represent because they arise from the same course of conduct by Syngenta and are based on the same legal theories as are the claims of absent members. *See* 4th Am. Compl., ECF No. 3505 at ¶¶ 72-76, 94-403.

In sum, the Class and Subclasses satisfy the typicality requirement of Rule 23(a)(3).

### d.  The Representative Plaintiffs Are Adequate.

The final Rule 23(a) requirement is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This element "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-58 n.13

(1982)).  The adequacy element requires the proposed class representatives to "assure the court that their interests 'are sufficient to induce vigorous advocacy on their part; that their interests are not antagonistic to those of class members; and that they have the means, including competent counsel, to pursue their case.'"  *Robinson v. Gillespie*, 219 F.R.D. 179, 185 (D. Kan. 2003) (quoting *Wyandotte Nation v. City of Kansas City*, 214 F.R.D. 656, 661 (D. Kan. 2003)).

The adequacy of representation inquiry focuses on two issues:  (1) whether class counsel are sufficiently qualified and experienced to represent the class; and (2) whether the proposed representatives have any conflicts of interest that create a disincentive to fully prosecute the claims of the class.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002).[8]  Both are satisfied here.

First and foremost, this Court and the Minnesota state court have already determined that the Representative Plaintiffs for the Non-Viptera/Duracade Purchaser Subclass are adequate when they were appointed to represent the litigation classes.  Indeed, the Kansas and Minnesota Plaintiffs demonstrated their adequacy in having brought their cases all the way to trial.  *See* Mem. & Order, ECF No. 2547 at 11; MN MDL Order at 21-23 (Nov. 3, 2016).

The Court should also readily conclude that the Representative Plaintiffs for each of the Subclasses satisfy the adequacy component because, as discussed above, their claims are typical of the absent Class members.[9]  The claims of each of the Subclass Representatives arise from the

---

[8]  Once the plaintiff has made a *prima facie* showing of adequate representation, the burden shifts to the defendant; absent evidence to the contrary, a presumption of adequate representation applies.  *Decoteau v. Raemisch*, 304 F.R.D. 683, 689 (D. Colo. 2014); *accord Marcus v. Kan., Dep't of Revenue*, 206 F.R.D. 509, 512 (D. Kan. 2002) ("In absence of evidence to the contrary, courts will presume the proposed class counsel is adequately competent to conduct the proposed litigation."); *Zapata*, 167 F.R.D. at 161 (same).

[9]  *E.g.*, *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 387 (D. Kan. 1998) (noting that "[a]n overlap exists in the typicality and adequacy of representation requirements because if typicality is not present, the class representatives do not have an incentive to vigorously prosecute class claims."); *Commander Properties Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 535 (D. Kan. 1995) (same) (citing *Penn*, 528 F.2d at 1189); *Antonson v. Robertson*, 141 F.R.D. 501, 506 (D. Kan. 1991) ("Typicality also insures that the claims of the class representatives resemble the class' claims to an extent that adequate representation can be expected and conflict of interest can be

exact same conduct by Syngenta and they assert the same legal claims as do the absent members of their respective classes, giving them every incentive to vigorously pursue the claims on behalf of the absent members.  This Court and the Minnesota state court recognized this when certifying the litigation classes.  Mem. & Order, ECF at 2547; Order, MN MDL (Nov. 3, 2016) at 21.

There is nothing about the Subclass Representatives that would call for a different finding.  The Subclass Representatives of the Viptera/Duracade Purchaser Subclass – Charles Cobb (CE Cobb Farms); Robert & Todd Niemeyer (Custom Farm Services LLC) and Marvin Miller – are all corn producers who purchased and grew Viptera and/or Duracade corn seed prior to the end of the Class Period.  *See* 4th Am. Compl., ECF No. 3505 at ¶¶ 72-74.  As such, their claims, defenses and damages will be the same as the absent Class members in the Viptera/Duracade Purchaser Subclass.  Similarly, the Subclass Representative for the Grain Handling Facility – Kruseman Fertilizer Company – owned an Interest in Corn in the U.S. priced for sale during the Class Period.  *See id.* at ¶ 75.  As such, its claims, defenses and damages will be the same as the absent Class members in the Grain Handling Facility Subclass. Finally, Al-Corn Clean Fuel, LLC ("Al-Corn") owns and operates a biorefinery facility.  Al-Corn sold its DDGs on the open market and owned an Interest in Corn in the U.S. priced for sale during the Class Period.  *See id.* at ¶ 76.  As such, its claims, defenses and damages will be the same as the absent Class members in the Ethanol Production Facility Subclass.

In sum, each of the Plaintiff Representatives, share the overriding interest of all Class Members, which is to obtain the largest possible monetary recovery from this case, making them adequate class representatives.[10]

---

avoided.").

[10] *See In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (certifying settlement class and finding that "[t]here is no conflict between the class representatives and the other class members.  All share the common goal of maximizing recovery."); *In re Corrugated Container Antitrust Litig.*, 643

The Class is also adequately represented by attorneys with extensive experience in class action and complex litigation, some of whom Plaintiffs now request be approved as Settlement Class Counsel.  Plaintiffs are seeking the appointment of Daniel E. Gustafson, Christopher A. Seeger, and Patrick J. Stueve as Settlement Class Counsel.  Patrick J. Stueve was one of four attorneys appointed as Co-Lead and Litigation Class Counsel in this MDL and who, along with the other MDL Co-Lead and Litigation Class Counsel, has led the MDL litigation on behalf of plaintiffs and tried the Kansas case to verdict.  Daniel E. Gustafson participated in leading the Minnesota state court litigation as class counsel, in the Minnesota class trial, was one of the lead trial attorneys on behalf of the Minnesota class, and was appointed as a member of the PNC. Christopher A. Seeger, whose firm also was involved in representing Plaintiffs in the MDL litigation and who has extensive experience in litigating and resolving class action and mass tort litigation, was also previously appointed to the PNC.  Therefore, Plaintiffs ask the Court to approve the following counsel as Settlement Class Counsel:  Daniel E. Gustafson, Christopher A Seeger, and Patrick J. Stueve.

Additionally, each Subclass has been separately represented in the negotiations to ensure protection of absent members in each Subclass.  Like proposed Settlement Class Counsel, proposed additional Subclass Counsel, Messrs. Johnson, Wexler, and Cecchi, have extensive experience in class action litigation.  Plaintiffs accordingly also ask the Court to approve the following counsel as Subclass Counsel:

- Daniel E. Gustafson, Christopher A Seeger, and Patrick J. Stueve as Non-Viptera/Duracade Purchaser Subclass Counsel (Subclass 1);

- Lynn R. Johnson as Viptera/Duracade Purchaser Subclass Counsel

---

F.2d 195, 208 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes.") (quoting district court opinion).

(Subclass 2);

- Kenneth A Wexler as Grain Handling Facility Subclass Counsel (Subclass 3); and

- James E. Cecchi as Ethanol Production Facility Subclass Counsel (Subclass 4).

Attached as Exhibits C-G are resumes for Seeger Weiss LLP, Gustafson Gluek PLLC, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., Shamberg Johnson & Bergman, and Wexler Wallace LLP; *see also* ECF No. 2164 at Ex. JJJ (previously-filed resume for Stueve Siegel Hanson LLP).

Each of these counsel are highly experienced in class-action litigation, litigation involving farmers, litigation involving crop contamination by genetically-modified seed strains, or all three.[11]   Accordingly, the proposed Class and Subclasses pass muster under Rule 23(a)(4).

## 2. The Proposed Class and Subclasses Satisfy the Rule 23(b)(3) Requirements.

In order to certify a class under Rule 23(b)(3), the questions of law or fact that are common to the members of a class must predominate over any questions affecting only individual members.  Again, this Court has already found that the litigation classes satisfied this standard (ECF No. 2547 at 12-26) and should do so again for the Settlement Class.

As this Court noted in its order certifying the litigation classes, the Supreme Court has recently explained the predominance inquiry:

The predominance inquiry tests whether proposed classes are sufficiently

---

[11] *See United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 654 (W.D. Okla. 2012) ("experience and competence of the attorney representing the class" may inform court's Rule 23(a)(4) analysis) (quoting *Lowery v. City of Albuquerque*, 273 F.R.D. 668, 680 (D.N.M. 2011)); *Wakefield v. Monsanto Co.*, 120 F.R.D.112, 117 (E.D. Mo. 1988) (adequacy component met where plaintiff's attorneys "ha[d] shown that they have considerable 'experience in the field in which the suit [is] brought'") (quoting treatise); *Garcia-Mir v. Civiletti*, No. 81-4007, 1981 WL 380696, at *6 (D. Kan. May 12, 1981) (adequacy satisfied where plaintiffs "ha[d] the benefit of competent counsel who have successfully litigated similar cases"); *see generally* Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) (in appointing class counsel, a court must consider "the work counsel has done," their "experience in handling class actions, other complex litigation, and the types of claims asserted in the action," their "knowledge of the applicable law," and the "resources that [they] will commit").

49

> cohesive to warrant adjudication by representation. This calls upon courts to give careful scrutiny to the relation between common and individual question in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issues is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

ECF No. 2547, at 12 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal citations and quotation marks in *Tyson* omitted). This Court went on to recognize that Plaintiffs all "allege that the same conduct by Syngenta caused the same injury (lower corn prices); thus, this litigation involves a great many common questions, including all issues regarding Syngenta's conduct and the effects of that conduct." *Id*. at 12-13. The Court listed the many common questions raised in this litigation. *Id.* at 13.

Here, the common issues discussed above also satisfy the Rule 23(b)(3) predominance test because they tower over any questions pertaining to individual Class members, including members of each Subclass. As discussed above, and as this Court knows from witnessing the Kansas trial, the central issues in this litigation with respect to *each* of the Classes are Syngenta's representations, acts, and omissions in connection with its aggressive commercialization of Viptera and Duracade, Syngenta's knowledge that Chinese approval was anything but imminent and, given the unrestrained scope of commercialization, that contamination of the U.S. corn supply was inevitable, and that Syngenta actually foresaw, or at very least should have foreseen, that the loss of an important U.S. corn and DDGs export market was likely. This Court, as it did previously, and as the Minnesota court did, should find that common questions predominate with

respect to the Class and Subclasses.  Mem. & Order, ECF No. 2547, at 26; Order, MN MDL (Nov. 3, 2016), at 35.

Finally, under Rule 23(b)(3), Plaintiffs also must show that a class action is superior to individual actions, which is evaluated by four considerations:

> (A)     the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Again, this Court previously found that "class actions would be superior to other methods of adjudication of these claims."  Mem. & Order, ECF No. 2547 at 27.  The Court also noted that "although both predominance and superiority must be shown under Rule 23(b)(3), the predominance of common issues in this case makes class resolution superior to litigation of individual suits by all of the class members."  *Id.* (citing *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 453 (D. Kan. 2006)).

 Although this Court also noted that it did not foresee any particular difficulties in the management of this litigation on a class basis, and that ascertaining class membership did "not require difficult individualized inquiries," *id.,* manageability of the litigation is not an issue for purposes of certifying a settlement class.  *Amchem*, 521 U.S. at 620.

Moreover, for the reasons that Plaintiffs previously explained with respect to the litigation classes, individual Class members' damages, while not insignificant, are simply dwarfed by the amounts that would be necessary to hire counsel and experts and wage full-throttle litigation

against a well-financed corporate defendant such as Syngenta, and thus are "negative value" claims, strongly tipping the balance in favor of the superiority of class treatment. *See*, *e.g.*, Mem. & Order, ECF No. 2164 at 117-19; *see also* MN MDL, Order at 37 (Nov. 3, 2016) (finding that "the amounts at stake per farm are small enough that separate suites may be impracticable for many class members."); *Kerner v. City & Cnty. of Denver*, No. 11-CV-00256-MSK-KMT, 2012 WL 7802744, at *12 (D. Colo. Nov. 30, 2012) ("[O]ne of the most compelling rationales for finding superiority in a class action is the existence of a negative value suit."), *report and recommendation adopted*, 2013 WL 1222394 (Mar. 25, 2013).

In sum, the proposed Settlement Class and Subclasses warrant provisional certification, along with the appointment of Settlement Class Counsel, Subclass Counsel, and Representative Plaintiffs, as set forth above.

## C.   NOTICE SHOULD BE DISSEMINATED TO THE CLASS.

Rules 23(e) and 23(h) require that court-approved notice of the Settlement distributed to all reasonably identifiable Class members. *DeJulius v. New England Health Care Emp. Pension Fund*, 429 F.3d 935, 939 (10th Cir. 2005); 4 *Newberg on Class Actions* § 8:23. Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."

Here, Plaintiffs propose a robust Notice Plan that more than satisfies the aforementioned requirements as well as the mandates of due process. Specifically, Plaintiffs propose individual notice by first-class mail. This mailing will be sent to a list compiled by the Notice Administrator. The Notice Administrator will compile this list by obtaining the names and addresses of U.S. corn producers who received crop subsidies in any year 2013-2017 from the FSA, and will supplement this list with any additional names and addresses contained in specialty mailing lists for U.S. corn producers previously purchased and utilized in sending

notice to various Class Members regarding the original class certification orders in the various litigation.  In addition, the Notice Administrator has purchased mailing lists for Ethanol and Grain facilities in the United States.  *See* Ex. A, Ex. 5 to SA; Brown Decl. at ¶¶ 19-20.  Again, as previously discussed, prior to mailing, all mailing addresses will be checked against the NCOA database maintained by the Postal Service, best available efforts will be made to obtain current and accurate addresses for all Class members and duplications and excluded individuals and entities will be removed.  Ex. A, Ex. 5 to SA.

Direct mail notice will be augmented by publication notice in various farm- or corn-trade journals and social media outlets read or accessed by Class members, as well as dissemination of the publication notice through corn-trade organizations.  *Id.*  The Claims Administrator also will post the notices and related documents on the dedicated settlement website.  *Id.*; *see also* Section IV.B.1, *supra* (discussing proposed notice campaign).

The proposed Long Form Notice, *see* Ex. A, Ex. 3 to SA (proposed Long-Form Notice), follows the question-and-answer format recommended by the Federal Judicial Center. It describes:

- the allegations and pertinent procedural history of this class action (question 2);
- the Class definition (questions 5-8);
- the terms of the proposed settlement, and the proposed method of allocation and distribution, (questions 10-13);
- how to submit an objection thereto (question 27);
- the process for opting out of the Settlement (question 20);
- the anticipated process for submitting a claim (question 16);
- the scope of the release and binding effect of the settlement (question 18);
- the prospective petition for attorneys' fees, incentive/case contribution awards to the representative Plaintiffs, reimbursement of litigation expenses, and instructions on to how to submit an objection thereto (question 26, 27);
- details about the fairness hearing (questions 28-30); and
- information on how Class members may obtain additional information, including a copy of the settlement agreement and other pertinent documents (question 32).

The contents of the proposed Notice, and the proposed method of its dissemination, comport with Federal Rules of Civil Procedure 23(c)(2)(B), 23(e), and 23(h), as well as due process. *See generally Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175-77 (1974) (due process is satisfied by mailed notice to all Class members who reasonably can be identified).

Accordingly, the Court should approve the form and plan of dissemination of Class Notice concerning the proposed Settlement. The Court should also appoint BrownGreer as Notice Administrator and Claims Administrator for this Settlement. BrownGreer is highly experienced in implementing both notice plans that satisfy the requirements of due process and a claims administration plan that is user-friendly, streamlined and will provide Class Members, Settlement Class Counsel and the Court with the necessary support. Indeed, it has prior experience administering the Bayer LLRICE GMO settlement. *See* Brown Decl. at ¶ 9.

### D. THE COURT SHOULD APPOINT SPECIAL MASTERS TO OVERSEE THE SETTLEMENT

The Settlement Agreement contemplates the appointment of Ms. Reisman and Judge Stack as Special Masters to oversee various aspects of the Settlement. *See* Ex. A, SA § 2.63. Pursuant to the Settlement Agreement, the Special Masters will have oversight into some aspects of the Claims Process as well as overseeing certain disputes that may arise in the implementation of the Settlement. *See*, *e.g.*, *id.* at §§ 3.7.3.1-3.7.3.3, 3.9.1-3.9.2, 9.18.3.

The appointment of a Special Master to oversee complex settlements is not unusual. *E.g.*, *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 508 (W.D. La. 2017) ("This Court has kept in close communication with the Special Master and continued to monitor, guide, and oversee the progress of this matter, and is convinced that due, in large part, to the continuing administration, oversight, and management by the Special Master, PSC leadership and defense settlement counsel, all working closely with BrownGreer, that the settlement process has been a

model of efficiency."); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *3 (E.D. La. July 27, 2015) ("The Court held a preliminary fairness and settlement class certification hearing on August 14, 2014. On August 22, 2014, the Court appointed Richard C. Stanley as Special Master, in accordance with Rule 53 of the Federal Rules of Civil Procedure, to assist in implementing any subsequent settlements."); *Active Prods. Corp. v. A.H. Choitz & Co.*, 163 F.R.D. 274, 283 (N.D. Ind. 1995) ("Recently, many courts have expressly appointed special masters to achieve settlements in complex litigation."); *see also* Fed. R. Civ. P. 53(a)(1)(C) (allowing courts to appoint masters for "posttrial matters"); David F. Herr, *Annotated Manual for Complex Litigation, Fourth* § 21.661, at 442 (rev. ed. 2016) ("Judges often appoint a claims administrator or special master and describe the duties assigned in the order approving the settlement agreement.").

Indeed, such appointments promote judicial efficiency because they relieve the Court from being bogged down by the administration of the settlement. Especially in a case such as this, where there are likely to be tens of thousands of claims, which may result in the need to address issues relating to whether claims were timely and properly filed, whether the information on a claim form is sufficient, and whether putative opt-outs are valid, among other things. These types of disputes can be handled more efficiently by Special Masters without the need for Court involvement.

In this case, Ms. Reisman and Judge Stack have been intimately involved in the Settlement process from the beginning. They are well versed in the terms of the Settlement Agreement, have a good working relationship with all the Parties and are the logical individuals to appoint to this role. As such, the Parties request appointment of Ellen K. Reisman and the Honorable Daniel Stack as Special Masters to oversee the duties of the Special Masters as

specified in the Settlement Agreement.

**E.    THE COURT SHOULD ADOPT THE PROPOSED SCHEDULE FOR FINAL APPROVAL PROCEEDINGS**

Finally, as part of their request for preliminary approval of the Settlement, Plaintiffs request that the Court adopt the proposed schedule for the Rule 23(e) Final Approval Proceedings, as set forth in section 4.6 of the Settlement Agreement:

| ACTION | TIMING |
|---|---|
| First Mailing of Class Notice | 10 days after issuance of the Preliminary Approval Order |
| First Installment of Gross Settlement Proceeds Paid into Escrow | No later than 30 days after execution of the Settlement Agreement |
| Opt-Out Deadline | 90 days after First Mailing of Class Notice |
| Opt-Out List | 30 days after the Opt-Out Deadline |
| Notice Completion Date | 150 days after First Mailing of Class Notice |
| Claims Deadline | 150 days after First Mailing of Class Notice |
| Syngenta Walk Away Deadline | 30 days after receipt of Opt-Out List, unless otherwise extended |
| Motion for Final Approval Deadline | 14 days after Syngenta Walk Away Deadline |
| Fee and Expense Application Deadline | 30 days before Objection Filing Deadline |

| ACTION | TIMING |
|---|---|
| Objection Filing Deadline | 90 days after First Mailing of Class Notice |
| Objection Response Deadline | 30 days after Objection Filing Deadline |
| Second Installment of Gross Settlement Proceeds Paid into Escrow Account | On or before March 31, 2018 |
| Final Installment of Gross Settlement Proceeds Paid into Escrow Account | The later of April 1, 2019 or within 30 days after entry of the Final Approval Order |

**CONCLUSION**

For the foregoing reasons, the Court should grant preliminary approval to the Settlement, including approval of the method of allocation and distribution; provisional certification of the Settlement Class and Subclasses, and appointment of Settlement Class Counsel, Subclass Counsel, and Class and Subclass Representatives; approval of the Notice Plan, the Long Form Notice, Publication Notice, and Claim Forms; appointment of the Notice Administrator and Claims Administrator; authorization to disseminate notice to Class members; appointment of Special Masters Ellen K. Reisman and the Honorable Daniel Stack to oversee the settlement; and adoption of a schedule for the final approval process.  A proposed order is being submitted herewith.

Dated: March 12, 2018

Respectfully Submitted,

**STUEVE SIEGEL HANSON LLP**

By: */s/ Patrick J. Stueve*
Patrick J. Stueve, KS Bar #13847
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:     (816) 714-7100
Facsimile:      (816) 714-7101
stueve@stuevesiegel.com

*Co-Lead, Litigation Class and Liaison Counsel for Plaintiffs and Proposed Settlement Class Counsel and Subclass Counsel for the Non-Viptera/Duracade Purchaser Subclass (Subclass 1)*

**SEEGER WEISS LLP**
Christopher A. Seeger
55 Challenger Road
Ridgefield Park, NJ  07660
Telephone:     (212) 584-0700
cseeger@seegerweiss.com

*Member of Plaintiffs' Settlement Negotiation Committee and Proposed Settlement Class Counsel and Subclass Counsel for the Non-Viptera/Duracade Purchaser Subclass (Subclass 1)*

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson
120 S. 6th St., Minneapolis, MN 55402
Telephone:     (612) 333-8844
Facsimile:      (612) 339-6622
dgustafson@gustafsongluek.com

*Minnesota Co-Lead Litigation Class Counsel, Member of Plaintiffs' Settlement Negotiation Committee and Proposed*

***Settlement Class Counsel and Subclass***
***Counsel for the Non-Viptera/Duracade***
***Purchaser Subclass (Subclass 1)***

**GRAY, RITTER & GRAHAM, P.C.**
Don M. Downing, MO Bar #30405
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone:   (314) 200-4737
Facsimile:   (314) 241-4140
ddowning@grgpc.com

**HARE WYNN NEWELL & NEWTON**
Scott A. Powell, #ASB-7523-L60S
2025 3rd Ave. North, Suite 800
Birmingham, Alabama 35203
Telephone:   (205) 328-5330
Facsimile:   (205) 324-2165
scott@hwnn.com
bvines@hwn.com

**GRAY REED & McGRAW, P.C.**
William B. Chaney, TX Bar #04108500
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
wchainey@grayreed.com

***Co-Lead and Litigation Class Counsel***

**SHAMBERG JOHNSON AND BERGMAN**
Lynn R. Johnson
2600 Grand Blvd.
Suite 500
Kansas City, Missouri 64108
Telephone:   (816) 474-0004
Facsimile:   (816) 474-0003
ljohnson@sjblaw.com

***Proposed Subclass Counsel for the***
***Viptera/Duracade Purchaser Subclass***
***(Subclass 2)***

**WEXLER WALLACE LLP**
Kenneth A. Wexler
55 W. Monroe Street
Suite 3300
Chicago, IL 60603
Telephone:     (816) 589-6270
Facsimile:     (312) 346-2222
kaw@wexlerwallace.com

***Proposed Subclass Counsel***
***for the Grain Handling***
***Facility Subclass (Subclass 3)***


**CARELLA, BYRNE, CECCHI, OLSTEIN,**
**BRODY & AGNELLO, P.C.**
James E. Cecchi
5 Becker Farm Rd.
Roseland, NJ 07068
Telephone:     (973) 994-1700
Facsimile:     (973) 994-1744
JCecchi@carellabyrne.com

***Proposed Subclass Counsel***
***for the Ethanol Production***
***Facility Subclass (Subclass 4)***

## <u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, on March 12, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

<u>/s/  Patrick J. Stueve                               </u>
Plaintiffs' Co-Lead, Liaison, and Class Counsel for Plaintiffs