## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| *IN RE SYNGENTA AG MIR 162 CORN LITIGATION*<br><br>THIS DOCUMENT RELATES TO:<br><br>All Actions | Master File No. 2:14-MD-02591-JWL-JPO<br><br>MDL No. 2591 |

## DECLARATION OF ORRAN L. BROWN, SR.
## IN SUPPORT OF NOTICE PLAN

I, ORRAN L. BROWN, SR., hereby declare and state as follows:

### I.   INTRODUCTION

**1.** *Personal Information.* My name is Orran L. Brown, Sr. I am the Chairman and a founding partner of BrownGreer PLC, located at 250 Rocketts Way, Richmond, Virginia 23231.

**2.** *The Capacity and Basis of this Declaration.* I am over the age of 21. The matters set forth in this Declaration are based upon my personal knowledge and information received from the parties in this proceeding (the "Parties"). The opinions presented and recommendations made in this Declaration rest on my training and experience.

**3.** *The Purpose of this Declaration.* I submit this Declaration to describe my experience, the Notice Plan being developed for the proposed class action settlement of this litigation, and why my professional opinion is that the Notice Plan will be effective and will constitute the best notice that is practicable under the circumstances to the members of the class involved in this settlement, pursuant to Fed. R. Civ. P. 23(c)(2)(B).

## II.    BACKGROUND AND EXPERIENCE

4.    *Summary of My Personal Experience.*  I have worked in the mass claims area, including class actions, for over 25 years.  I have extensive experience as a lawyer handling class action proceedings, settlements and notices; as a claims administrator designing and implementing class action settlements, notice plans and notices to claimants and counsel; as a notice administrator; as a trustee or special master involved in multiple claim proceedings; and as an educator on class actions and other complex litigation.  My personal biography is attached to this Declaration as Exhibit 1.

5.    *General Description of BrownGreer.*  BrownGreer has specialized in notice administration and settlement administration since my partner, Lynn Greer, and I founded the firm in 2002.  We are experts in the legal and administrative aspects of the design, approval, and implementation of notice plans, settlement programs and the design, staffing and operation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of multiple claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicles.  We have played major roles in many of the largest and most complex multiple claim proceedings and multiple claim settlement programs in history, serving as administrators, special masters, trustees, or settlement counsel.  The BrownGreer summary attached as Exhibit 2 to this Declaration provides detail on our firm.

6.    *Summary of Experience with Notices and Notice Programs.*  BrownGreer has performed crucial administration or review roles in more than 70 major programs involving the disposition of over $33 billion in payments to qualifying claimants.  In the course of the implementation of claims programs, BrownGreer has designed, written and issued over 12

540581

million notices to claimants and counsel on the outcome of the review of their claims. My work as a lawyer and claims administrator regularly involves drafting the text of notices to known and unknown claimants or members of a class or settlement group, designing the appearance of such notices to make them concise, clear and understandable, and designing and implementing the method of distributing such notices in the best practicable manner to the persons or entities affected by them. In its capacity as a notice administrator, BrownGreer has sent more than 30 million direct notices by mail and email and has designed and implemented print and internet publication notice campaigns achieving hundreds of millions of exposures. We have extensive experience in all aspects of notice and settlement design and implementation, including:

(a)   On countless occasions, I have drafted and overseen the implementation of specific campaigns to certain groups of claimants before an existing claims facility to accelerate the disposition of stalled claims, to alert claimants to information and materials needed to complete their claims to be reviewed for eligibility determinations, and to advise claimants of the results of processing steps on their claims.

(b)   I have designed, and we have programmed, tested, hosted and maintained, many settlement websites to provide information on programs and containing complex functionality permitting claimants and their counsel to submit claims materials, receive notices on claim outcomes, take action on claims, and request materials.

(c)   We have designed, staffed, trained and operated call center systems and automated call systems for claimants and counsel to hear information on settlement programs, request information on notices and programs, or speak with specialists in the programs.

(d)   I have advised and participated in the implementation of notice programs to known and unknown potential claimants or class members, assessed the reasonableness and sufficiency of such notice programs, from both practical and legal perspectives, and worked with marketing consultants to place public notice in written and broadcast media.

(e)   I regularly advise companies and claims administrators and draft individual group notices to conform to applicable legal requirements and to make the text and instructions provided in such notices comprehensible and as simple as possible.

**7.**   ***Highlights of Major Notice Plan Projects.***  Here are some of our more extensive projects regarding notice programs:

540581

(a)   **Notice of Final Dalkon Shield Claim Filing Deadline:**  I drafted the notices and designed the entire notice campaign issued by the Dalkon Shield Claimants Trust to provide public notice of the final deadline for the submission of any claim relating to the Dalkon Shield device to the claims facility.  This campaign included a publication in mid-April 1994, in sixty-eight newspapers in the United States and internationally, of a quarter-page notice explaining the final claims deadline and the steps necessary to submit a claim before the deadline.  The supervisory court found this notice to be sufficient to advise potential claimants, whose identities could not be determined through due diligence, of the deadline and the opportunity to receive compensation through the claims resolution process.  *See In re A.H. Robins Co. (Smith v. Dalkon Shield Claimants Trust)*, 197 B.R 495 (E.D. Va.1995); *In re A.H. Robins Co. (Allen v. Dalkon Shield Claimants Trust)*, 197 B.R 501 (E.D. Va. 1995); *In re A.H. Robins Co. (Warren v. Dalkon Shield Claimants Trust)*, 197 B.R 503 (E.D. Va. 1995); *In re A.H. Robins Co. (Rothbard v. Dalkon Shield Claimants Trust)*, 197 B.R 509 (E.D. Va. 1996); *In re A.H. Robins Co. (Bennett v. Dalkon Shield Claimants Trust)*, 204 B.R 194 (E.D. Va. 1996).

(b)   **Initial Notice of Diet Drug Settlement:**  I participated in the implementation of the notice campaign to provide notice of the preliminary approval of the national class action settlement of the diet drug litigation in 2000.  This campaign included a television commercial broadcast 106 times over a period of five weeks on network television and 781 times, for six consecutive weeks, on various cable networks.  It also included a summary notice that appeared repeatedly in several magazines between January and March 2000, and as a one-third page black and white advertisement in four national newspapers, 77 local newspapers, three newspapers distributed throughout the United States territories and four newspapers targeted to the Hispanic market.  This summary notice was also published in a variety of publications targeted to health care providers and pharmacists.  The notice was mailed to all pharmacists in the United States, physicians who were likely to have prescribed the diet drug to patients, and to a mailing list of known diet drug users.  The actual notice was an extensive packet of materials that included an Official Court Notice, a simpler Guide to Class Members, and claim forms that were all mailed to over 1,175,750 known class members.  This notice campaign was approved by the supervisory court as sufficient in *Brown v. American Home Products Corporation, (In re Diet Drugs Products Liability Litigation)*, MDL No.1203, 2000 WL 1222042 (E.D. Pa. 2000).

(c)   **Notice of Final Judicial Approval of the Diet Drug Settlement:**  As required by the Settlement Agreement in the diet drug litigation, I, along with Class Counsel and other parties, drafted the Official Court Notice mailed in February 2002 to over 830,500 persons on the official notice list, of the final judicial approval of the settlement, the claims filing and medical diagnosis deadline dates affected by the date of final approval, the terms of the Settlement Agreement and benefits available, the steps required to seek benefits or opt out of the settlement, and the consequences of failing to act by the deadlines.

**(d)**   **Notice of Nextel Communications Settlement:**  In January of 2004, I served as an expert witness in the class action field and advisor to the court on the adequacy of notification procedures in a large consumer class action involving alleged improper monthly billing by Nextel Communications.  The notice campaign included a combination of print publication and direct mail notice and reached nearly five million class members.

**(e)**   **Notice of Seventh Amendment to the Diet Drug Settlement:**  In June 2004 through September 2004, I, Class Counsel, and other counsel drafted and designed the Official Court Notice of the Seventh Amendment to the Settlement Agreement, which required new notice to all known Diet Drug class members.  This notice described the terms of the Seventh Amendment, explained what benefits were available to class members under the agreement and provided direction to class members intending to object to or opt out of the new agreement, and consisted of both a detailed notice and a concise summary notice.  I testified regarding the Seventh Amendment and the notice plan during the fairness hearing on the Seventh Amendment before the United States District Court for the Eastern District of Pennsylvania on January 19, 2005.  The United States District Court for the Eastern District of Pennsylvania approved this notice plan as compliant with due process and Rule 23 in PTO 3880 - Preliminarily Approving the Seventh Amendment to the Nationwide Class Action Settlement Agreement with American Home Products Corporation, Approving the Form of Notice, and Scheduling a Hearing Regarding the Amendment (Document No. 104343), (August 26, 2004).  BrownGreer mailed these notices from September – November 2004 to over 525,000 class members in the Trust's claims database and handled all aspects of returned and re-issued mail.  The United States District Court for the Eastern District of Pennsylvania approved the Seventh Amendment in PTO 4567 (Document No. 105062) (March 15, 2005).

**(f)**   **Notice of Telephone Consumer Protection Act Class Action Settlement.**  In July 2014, my firm and I were appointed by the United States District Court for the Northern District of Illinois to serve as the Notice and Claims Administrator for the $75,455,098.74 nationwide settlement program for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*.  We advised the parties on the notice plan for that action, and I submitted a Declaration in support of the Motion for Preliminary Approval regarding the settlement.  BrownGreer implemented the notice campaign to provide notice of the class action settlement to users of approximately 21,200,000 unique cell phone numbers.  This campaign primarily occurred in August 2014 through September 2014 and included individual emails, direct mailing of postcards, internet banner notice, and paid search terms.  To inform the internet notice campaign, BrownGreer developed a comprehensive target audience profile for the class and designed a program tailored to that profile.  BrownGreer sent over 16,500,000 notices, and the banner notice campaign enjoyed over 19,000,000 impressions throughout the display period.  BrownGreer successfully reached over 96% of the known Settlement Class and nearly 92% of the estimated total Settlement Class.  The supervisory court approved the notice campaign on February 12, 2015 in *In re Capital*

*One Telephone Consumer Protection Act Litigation*, MDL No.2416, 12 C 10064 (N.D. Ill. 2015).

**(g)** **Notice of Court Ordered Victim Compensation Program.** On August 19, 2016, my firm and I were appointed by the United States District Court for the District of Arizona in the Court's Order Re Victim Compensation (*Melendres v. Arpaio*, Case No 2:06-cv-02513-GMS (D. Ariz)) to serve as the Third-Party Administrator managing a mass Notice and Claims Processing Plan. The Maricopa County Board of Supervisors created a fund of $500,000 to compensate individuals who claimed that their constitutional rights were violated as a result of detention by the Maricopa County Sheriff's Office. For that matter, we designed a multi-faceted notice plan in Spanish and English that includes (1) letters mailed directly to known potential class members; (2) outreach to local and international community organizations and government consulate offices; (3) print publication notice in relevant periodicals; (4) radio advertisements on regional stations; (5) a dedicated settlement website; (6) internet banner ads; (7) paid search terms; (8) Facebook ads; and (9) a national press release.

**(h)** **Notice of Nationwide Consumer Product Settlement.** In September 2017, my firm and I were appointed by the United States District Court for the Eastern District of Washington to serve as the Notice and Claims Administrator for a $3,800,000 nationwide class settlement related to allegedly defective instant hot water filters sold and installed throughout the United States. For that matter, we designed a multi-faceted notice plan that includes (1) letters mailed directly to known potential class members; (2) postcards mailed to businesses that may have sold, installed, or serviced the subject product; (3) print publication notice in a national consumer magazine, a national newspaper, a national newspaper supplement, and a national trade magazine; (4) a dedicated settlement website; (5) internet banner ads; (6) paid search terms; (7) Facebook ads; and (8) a national press release. On September 8, 2017, the supervisory court approved the notice campaign in *Desio v. Emerson Electric Co. d/b/a InSinkErator*, No. 2:15-cv-00346-SJM (E.D. Wash. 2017).

   **8.**    ***Other Relevant Notice Experience.***  In addition to the notice plan projects highlighted in Paragraph 7, BrownGreer has administered, served as experts, and/or otherwise consulted with settled parties on many other notice programs approved as sufficient by the overseeing court, such as the programs implemented in these cases:

   (1)    *Acosta v. Tyson Foods, Inc.*, No. 8:08-cv-86 (D. Neb.) (direct mail notice);

   (2)    *Bessey v. Packerland Plainwell, Inc.*, No. 4:06-cv-0095 (W.D. Mich.) (direct mail notice);

   (3)    *Beecroft v. Altisource Business Solutions Pvt. Ltd.*, No. 0:15-cv-02184 (D. Minn.) (direct mail notice; social media ads);

(4)     *Churchill v. Farmland Foods, Inc.*, No. 4:06-cv-4023 (C.D. Ill.) (direct mail notice);

(5)     *Clark v. Grp. Hosp. & Med. Servs., Inc.*, No. 3:10-CIV-00333-BEN-BLM (S.D. Cal.) (direct mail notice).

(6)     *Cohen v. Foothill/E. Transp. Corridor Agency, et al.*, No. SACV 15-01698 (C.D. Cal.) (direct mail and email notice).

(7)     *Cohen v. Warner Chilcott Pub. Ltd. Co.*, No. 1:06-cv-00401-CKK (D.D.C) (national print publications, internet banner ads, and paid internet search);

(8)     *Collins v. Sanderson Farms, Inc.*, No. 2:06-cv-02946 (E.D. La.) (direct mail notice);

(9)     *Conerly v. Marshall Durbin Food Corp.*, No. 2:06-cv-205 (N.D. Ala.) (direct mail notice);

(10)    *Contreras v. PM Beef Holdings, LLC*, No. 07-CV-3087 (D. Minn.) (direct mail notice);

(11)    *Cook v. Columbia Freightliner, LLC*, No. 10-CP-02-1987 (Aiken County S.C. Jud. Dist.) (direct mail notice);

(12)    *Flores v. Zorbalas*, No. 27-CB-16-14225 (Hennepin County District Court, Fourth Judicial District of Minnesota) (direct mail notice);

(13)    *Ene v. Maxim Healthcare Servs., Inc.*, No. 4:09-cv-02453 (S.D. Tex.) (direct mail notice);

(14)    *Ferguson v. Food Lion, LLC*, No. 12-C-861 (Cir. Ct., Berkeley Cnty., W. Va.) (regional print publications and direct mail notice).

(15)    *Gales v. Capital One, N.A.*, No. 8:13-cv-01624 (D. Md.) (direct mail notice);

(16)    *Gomez v. Tyson Foods, Inc.*, No. 08-021 (D. Neb.) (direct mail notice);

(17)    *Graham v. Capital One Bank (USA), N.A.*, 8:13-cv-00743 (C.D. Cal.) (direct mail notice);

(18)    *Gray, Ritter & Graham P.C. v. Goldmann Phipps PLLC*, No. 4:13-cv-00206-CDP (E.D. Mo.) (direct mail notice)

(19)    *Hall v. Capital One Auto Fin., Inc.*, No. 1:08-cv-01181 (N.D. Ohio) (direct mail notice);

(20)    *Hankins v. Carmax Inc.*, No. 03-C-07-005893 CN (Baltimore County Md. Cir. Ct.) (direct mail notice);

(21) *Herron v. Carmax Auto Superstores, Inc.*, No. 2006-CP-02-1230 (Aiken County S.C. Jud. Dist.) (direct mail notice);

(22) *In Re Children's Ibuprofen Oral Suspension Antitrust Litig.-Indirect Purchaser Action*, No. 1:04-mc-0535-ESH (D.D.C.) (national print publications, internet banner ads, and paid internet search);

(23) *In Re Moyer Packing Co.*, P. & S. Docket No. D-07-0053 (U.S. Dep't Agric.) (direct mail notice);

(24) *In Re Oxycontin Litig.*, No. 02-CP-18-1756 (S.C. Eq., Dorchester Cnty., S.C.) (regional print publications and direct mail notice);

(25) *Morales v. Greater Omaha Packing Co. Inc.*, No. 8:08-cv-0161 (D. Neb.) (direct mail notice);

(26) *Morgan v. Richmond Sch. of Health & Tech.*, No. 3:12-cv-00373-JAG (E.D. Va.) (regional print publications and direct mail notice);

(27) *Nader v. Capital One Bank (U.S.A.), N.A.*, No. 2:12-cv-01265-DSF-RZ (C.D. Cal.) (national print publication and direct mail and email notice);

(28) *Polanco v. Moyer Packing Co.*, No. C.P., 1852 (Philadelphia County Pa.) (direct mail notice);

(29) *Samuel v. EquiCredit Corp.*, No. 00-cs-6196 (E.D. Pa.) (direct mail notice);

(30) *Santiago v. GMAC Mortg. Grp.*, Inc., No. 784574 (E.D. Pa.) (direct mail notice);

(31) *Spinelli v. Capital One Bank (USA)*, No. 8:08-cv-132 (M.D. Fla.) (direct mail notice);

(32) *Stout v. JELD-WEN, Inc.*, No. 1:08-cv-0652 (N.D. Ohio) (national and regional print publications, internet banner ads, paid internet search, and direct mail notice);

(33) *United States v. Capital One, N.A.*, No. 1:12-cv-828 (E.D. Va.) (direct mail notice);

(34) *United States v. Chevy Chase Bank, F.S.B.*, No. 1:13-cv-1214 (E.D. Va.) (direct mail notice);

(35) *Watts v. Capital One Auto Finance, Inc.*, No. CCB-07-03477 (D. Md.) (direct mail notice); and

(36) *Wilder v. Triad Fin. Corp.*, No. 3:03-cv-863 (E.D. Va.) (direct mail notice).

540581

9.     ***Directly Relevant Program Administration Experience.***  BrownGreer also has experience administering programs similar to this proposed settlement.  In 2011, we were appointed as the Claims Administrator in *In re Genetically Modified Rice Litigation*, MDL No. 1811 (E.D. Mo), a voluntary settlement program concerning farmers and landlords allegedly affected by long grain rice crops that had been contaminated by the presence of genetically modified rice produced by Bayer CropScience, Inc.  In that matter, we oversaw and administered the claims review process and analyzed information from Farm Service Agency 578 forms to calculate payments based on percent interest.  We stored claimant information in a secure and confidential database and distributed $750 million.  That program is substantially like this proposed settlement, making us uniquely positioned to serve the class and the court in this matter.

### III.     THE GOALS OF A SUCCESSFUL NOTICE PLAN

10.     ***How the Notice is to be Delivered to the Class.***  As advised in the Manual for Complex Litigation, "[n]otice is a critical part of class action practice," for it "provides the structural assurance of fairness that permits representative parties to bind absent class members." *See Manual for Complex Litigation*, § 21.31 (4th ed. 2010).  The proposed settlement in this proceeding involves a common issues class under Fed. R. Civ. P 23(b)(3).  For any matter certified as a Rule 23(b)(3) class, Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  For the settlement of such a class, Rule 23(e)(1) requires the court to "direct notice in a reasonable manner to all class members who would be bound by the proposal."  The notice of an action certified as a class for purposes of settlement should adhere to the higher "best notice practicable" standard and thereby will satisfy both these provisions.  The

delivery methods selected for the notice must fulfill the essential requisites of due process of alerting affected parties to the pendency of the resolution and affording them the opportunity to be heard.  "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).   Rule 23 and due process mandate individual, direct notice to known and reasonably knowable class members.  "[E]ach class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action."  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176-77 (1974). Where certain class members' names and addresses cannot be determined with reasonable efforts, notice may be made by publication and is considered to be a "customary substitute."  *See Mullane*, 339 U.S. at 317.  While notice by publication has traditionally been disseminated via print publications, "in this age of electronic communications, newspaper notice alone is not always an adequate alternative to individual notice.  The World Wide Web is an increasingly important method of communication, and, of particular pertinence here, an increasingly important substitute for newspapers."  *Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 786 (7th Cir. 2004) (internal citations omitted).   As the Court explained in *Mullane*, "process which is a mere gesture is not due process.  The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."  *Id.* at 315.  The *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010)* issued by the

Federal Judicial Center includes this as one of its four "Major Checkpoints" when examining a notice plan:

> ***Will notice effectively reach the class?***  The percentage of a class that will be exposed to a notice based on a proposed notice plan can always be calculated by experts.  A high percentage (e.g., between 70-95%) can often be reached by a notice campaign.
>
> A notice plan thus must analyze the nature of the class and determine the delivery mechanisms best calculated to provide direct notice to known class members and publication notice to those whose identities and/or contact information cannot be reasonably ascertained.

11.    ***The Content of the Notice.***  Rule 23(c)(2)(B) requires that the notice of a Rule 23(b)(3) class action "must clearly and concisely state in plain, easily understood language" these seven messages:

> (1) the nature of the action;
>
> (2) the definition of the class certified;
>
> (3) the class claims, issues, or defenses;
>
> (4) that a class member may enter an appearance through an attorney if the member so desires;
>
> (5) that the court will exclude from the class any member who requests exclusion;
>
> (6) the time and manner for requesting exclusion; and
>
> (7) the binding effect of a class judgment on members under Rule 23(c)(3).

According to the Court in *Mullane:*

> The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance . . . .  But if, with due regard for the practicalities and peculiarities of the case, these conditions are reasonably met, the constitutional requirements are satisfied.

339 U.S. at 314-15.  "The notice should describe the action and the plaintiffs' rights in it."  *See*

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  Two of the four Major Checkpoints

11

in the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* address the need to make the notices themselves both noticeable and understandable:

> ***Will the notices come to the attention of the class?***  Notices should be designed using page-layout techniques (e.g., headlines) to command class members' attention when the notices arrive in the mail or appear on the Internet or in printed media.

> ***Are the notices informative and easy to understand?***  Notices should carry all of the information required by Rule 23 and should be written in clear, concise, easily understood language.

A notice plan must ensure that each notice sent to a class member individually or by publication conveys in clear, non-legalistic words and a reader-friendly format the information that the class member needs to make an informed decision about whether to accept, opt out, or object to the proposed settlement, how to effect any such decision, the deadlines by which to act, and the consequences of taking or not taking action.

12.     ***Timing of the Notice.***  The notice must be transmitted on dates that allow potential class members sufficient time to receive the notice, realize a need to react to it, and take the actions necessary to, if they so choose, participate in the settlement, be excluded from it, or object to it.  The assessment and significance of these criteria vary depending upon the nature of the claims involved in the settlement, the sophistication of potential class members, the information available on known class members, and the complexity of the actions required to seek benefits under the settlement.

## IV.     CLASS MEMBER RESOURCES

13.     ***Settlement Website.***  We will establish a dedicated settlement website (the "Settlement Website") available at www.CornSeedSettlement.com containing (1) class information, (2) important settlement documents, such as the Settlement Agreement,

preliminary approval submissions, notice materials, Claim Forms, Preliminary Approval Order, and Final Approval Order, (3) relevant pleadings, (4) a list of Frequency Asked Questions, (4) important settlement deadlines, and (5) a claim submission function.  All notice materials will refer to the Settlement Website.  This Settlement Website will be accessible to all users of the internet, on any type of internet-capable device.

14.     ***P.O. Box.***  We established a dedicated P.O. Box for the program to serve as the return address on all program mailings and to serve also as a resource for Settlement Class Members wishing to submit hard copy claim forms, written questions, or other mailed materials.  The address is:

> Corn Settlement Claims Administrator
> P.O. Box 26226
> Richmond, VA 23260

15.     ***Toll-Free Telephone Number.***  We reserved a dedicated toll-free telephone number, 1-833-567-CORN (1-833-567-2676), to serve as an additional Settlement Class member resource in this program.  We will provide a live agent call center during the claims period to support the Settlement Class, so persons may talk with someone to get information about the settlement.

## V.     THE SETTLEMENT CLASS

16.     ***The Settlement Class Members***.  The Parties' Settlement Agreement defines the proposed Settlement Class as "Any Person in the United States that during the Class Period owned any Interest in Corn in the United States priced for sale during the Class Period <u>and</u> falls into one of the four sub-classes set forth in Section 1.2." (Agreement § 1.1).  The Class Period includes September 15, 2013 through the date of the Preliminary Approval Order, and the four sub-classes are as follows:

> (a) ***Producers***:  Subclasses 1 and 2 are comprised of "Producers" in the United States that during the Class Period, owned an Interest in Corn priced for

13

sale during the Class Period.  Subclass 1 excludes Producers that purchased Agrisure Viptera and/or Agrisure Duracade Corn Seed and produced Corn grown from those seeds, while Subclass 2 includes those Producers.  A "Producer" includes "any owner, operator, landlord, waterlord, tenant, or sharecropper who shares the risk of producing Corn and who is entitled to share in the Corn crop available for marketing during the Class Period."  A landlord who receives a variable rent payable based on a share of the crop or proceeds from the sale of Corn is a Corn Producer.  A landlord who receives only a fixed cash amount for renting the land that does not vary with the size of, or pricing for, the crop is not a Corn Producer.  (*Id.* § 2.34, 2.5).

**(b)** ***Grain Handling Facilities***:  Subclass 3 consists of Grain Handling Facilities in the United States that during the Class Period, owned an Interest in U.S. Corn priced for sale during the Class Period.  A "Grain Handling Facility" includes grain elevators, grain distributors, grain transports, or other U.S. entities that during the Class Period, purchased Corn and then either priced Corn for sale or transported, stored, or otherwise handled Corn priced for sale during the Class Period.  (*Id.* § 2.31).

**(c)** ***Ethanol Production Facilities***:  Subclass 4 includes U.S. Ethanol Production Facilities that during the Class Period, owned any Interest in corn in the United States priced for sale during the Class Period.   An "Ethanol Production Facility" is defined as an ethanol plant, biorefinery, or other entity in the United States that during the Class Period, produced or purchased Dried Distillers Grains ("DDGs") in the United States and priced those DDGs for sale.  (*Id.* § 2.21).

The Settlement Agreement excludes the following from the Settlement Class:

(a) The Court and its officers, employees, appointees, and relatives;

(b) Syngenta and its affiliates, subsidiaries, officers, directors, employees, contractors, agents, and representatives;

(c) All plaintiffs' counsel in the MDL Actions or the Related Actions;

(d) Government entities;

(e) Those who opt out of the Settlement Class; and

(f) The Excluded Exporters, including Archer Daniels Midland Company, Bunge North America, Inc., Cargill, Incorporated, Cargill, International SA, Louis Dreyfus Company, BV, Louis Dreyfus Company, LLC, Louis Dreyfus Company Grains Merchandising, LLC, Gavilon Grain, LLC, Trans Coastal Supply Company, Inc., Agribase International Inc., or the Delong Co. Inc., and related entities/affiliates.

(*Id.* § 1.3, 2.22)

14

## VI.   DIRECT NOTICE

**17.   *Direct Notice Generally*.**  The first goal of this Notice Plan is to provide direct notice to all Settlement Class Members who can be identified through reasonable effort.  We will mail the long-form Notice substantially in the form of Exhibit 3 to every Class Member for whom we have a name and address.  We will attempt to verify and update all addresses against the United States Postal Service's ("USPS") National Change of Address ("NCOA")[1] database prior to mailing.  In addition, we will certify the addresses through the Coding Accuracy Support System ("CASS")[2] to ensure the quality of the zip code and verify the accuracy of the address through Delivery Point Validation ("DPV")[3].  If a Notice is returned by the USPS as undeliverable but with a forwarding address, we will promptly re-mail the Notice to the updated address provided by the USPS.  If the returned Notice does not identify any updated address from the USPS, we will submit the Class Member's mailing information to the LexisNexis compendium of domestic addresses for updated address information, if available.  In addition, we will update addresses based on requests received from Class Members.

**18.   *Corn Producers*.**  The Farm Service Agency ("FSA") provided us with a compact disc ("CD") that contained the names, mailing address, and farming address for 610,054 "corn producers" with unique identification numbers.  These corn producers are individuals and businesses who/that reported and received a crop subsidy related to a share interest in corn crop to the U.S. Department of Agriculture sometime from 2013 through 2017.  Based on guidance

---

[1] The NCOA database contains records of all permanent change of address submissions received by the USPS from individuals and businesses. The Settlement Potential Claimant list is submitted against the database, and a Potential Claimant's address is automatically updated with the new address from USPS data based on a comparison with the Potential Claimant's name and last known address.

[2] CASS is a certification process to standardize the address format and ensure the accuracy of ZIP and ZIP + 4 codes. The Class Member list is submitted, and the ZIP and ZIP + 4 codes are compared and updated based on the ZIP and ZIP + 4 codes in the USPS data.

[3] DPV confirms addresses against known addresses in the USPS system to verify accuracy and to confirm that mail is deliverable to a particular address. The addresses are compared against valid addresses in the USPS's Address Management System and DPV verifies the accuracy of addresses and reports the deficiencies or errors in incorrect addresses.

540581

from the Parties and publicly available information, we understand that the FSA list should comprise approximately 95% of corn Producers at issue in this settlement, with the only corn Producers not represented being the very limited few who do not file FSA forms or never received a subsidy payment.  We estimate that we will be able to reach more than 90% of these corn Producers directly.

19.     ***Grain Handling Facilities***.  Neither the Parties nor the FSA can provide a list of Grain Handling Facilities; accordingly, we purchased a curated mailing list to use for contacting these Class Members.[4]  We selected grain elevators, grain wholesalers, and grain transporters for this list based on Standard Industrial Classification ("SIC") and North American Industry Classification System ("NAICS") codes[5].  The list we purchased includes 1,569 unique entity name and address combinations after removing the Excluded Exporters. Based on guidance from the Parties and publicly available information, we understand that this list should comprise nearly 100% Grain Handling Facilities at issue in this settlement.[6] We estimate that we will be able to reach 99% of these Grain Handling Facilities with individual and direct notice.

20.     ***Ethanol Production Facilities***.  Similarly, because neither the Parties nor the FSA maintain a list of Ethanol Production Facilities, we purchased a curated mailing list to use for contacting this Subclass.  We selected ethanol manufacturers based on the SIC and NAICS

---

[4] Redi-Data, Inc. ("R-D"),is a company that curates and sells mailing lists across many industries, including those described here.

[5] NAICS is the standard used by federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy.  The Office of Management and Budget adopted NAICS in 1997 to replace the SIC system, though SIC continues to be used by such agencies as the U.S. Securities and Exchange Commission.

[6] The curated list includes active Grain Handling Facilities.  To the extent that a Grain Handling Facility operated and closed during the Class Period, that entity may not appear in the list.  For the purposes of this Declaration, in the absence of information from the Parties or otherwise indicating this is not a complete list, we have assumed that it is complete in calculating direct reach.

16

codes, which yielded a list of 183 unique business entities after we eliminated the Excluded

Exporters.  Based on guidance from the Parties and publicly available information, we

understand that this list includes nearly 100% Ethanol Production Facilities at issue in this

settlement.[7]  We estimate that we will be able to reach 99% of these Ethanol Production

Facilities directly.

## VII.   SUPPLEMENTAL NOTICE

21.   ***Purpose of Supplemental Notice***.   Given the available Class Member contact

information and the estimated Settlement Class size, we expect we will be able to reach over

90% of all Class Members through direct notice, which is much more of the class than often can

be reached directly in class settlements.  The Class Members we cannot contact by mail are those

for whom mailing addresses are unavailable, or those whose mailed notices are returned to us by

the Postal Service as undeliverable.  We will use a carefully planned supplemental notice

campaign to target those Class Members.  This supplemental notice will also reach Class

Members already notified by direct mail.  By reaching these Class Members a second time, the

publication notice will serve alternative goals of strengthening Class Member awareness of the

Settlement and engaging those Class Members to become more likely to participate in the

Settlement Process.

22.   ***Developing a Supplemental Notice Plan***.   Supplemental notice in the class

settlement context refers to the practice of exposing potential members of a Settlement Class

whom you cannot contact directly to a class settlement notice by strategically placing the

---

[7] The curated list includes active Ethanol Production Facilities.  To the extent that an Ethanol Production Facility operated and closed during the Class Period, that entity may not appear in the list.  For the purposes of this Declaration, in the absence of information from the Parties or otherwise indicating this is not a complete list, we have assumed that it is complete in calculating direct reach.

540581

notice in places where the Settlement Class Members will have the opportunity to see and read, or hear, and react to the notice.  A supplemental notice campaign is effectively an advertising campaign for the proposed class settlement.  A supplemental notice strategy, therefore, must consider how members of the proposed Settlement Class consume media and locate information so that paid notice placements target the right people and do so effectively.[8]

23.    *Industry Tools and Resources*.  There are several syndicated research data sources and tools available to inform any marketing or notice campaign.  To develop the paid media portion of the proposed Notice Plan in this case, we used resources offered by Nielsen[9] and comScore, Inc.[10], which are accepted and commonly employed by experts in the marketing field.  Collectively, we refer to these resources as the "Notice Resources."

24.    *Corn Producers*.  Because the corn Producers comprise over 99% of the Settlement Class, the primary focus of the supplemental notice campaign will be these Class Members.

---

[8] To ensure that the notice plan draws upon the latest and most sophisticated market research and penetration techniques used in the advertising industry, we consulted with media experts at the Consumer Attorney Marketing Group ("CAMG").  CAMG, established in 2010, is a direct response, legal marketing agency that exclusively develops and executes marketing campaigns aimed at reaching consumers with potential legal claims, with a particular focus on the class action and mass action areas.  Traditional "mass marketing" or "branding" reminds customers and prospects about a brand regularly over an extended period so that consumers have the brand at the top of their consciousness when they go to make a purchasing decision.  Direct response marketing, on the other hand, emphasizes performance metrics and is designed to evoke an immediate response and compel the audience to take some specific action, such as calling a number for more information or being directed to a web page.  CAMG specializes in tailoring campaigns to very intentional target audiences and adapting to campaign performance to maximize efficiency and effectiveness.

[9] Nielsen's *Scarborough USA+* is an industry standard research tool that serves multiple media platforms, including Print, Radio, Broadcast TV, Cable TV, and Out of Home and is accredited by the Media Rating Council, an organization that establishes standards for media industry measurement services to guarantee valid and dependable research procedures.

[10] comScore is a leading provider of digital audience measurement using its Unified Digital Measurement methodology, which accounts for all site visitors and helps website publishers understand the size and quality of their audience.

**(a)** *Print Publication.*  We will place a copy of the Print Publication Notice substantially in the forms illustrated in Exhibit 4 to this Declaration in the following:

| Print Publications | | |
|---|---|---|
| | **Publication** | **Description** | **Circulation** |
| 1. | The Progressive Farmer | A national monthly publication that is a trusted source for breaking agriculture news, markets and weather forecasts with focuses on land ownership, farm operations and lifestyle issues. | 500,000 |
| 2. | Small Farmer's Journal | A quarterly journal featuring information about Livestock, Crops, Barns, Farming Systems, Equipment, Recipes, Kids pages, Marketing, Poetry, Stories, and Political Updates. | 7,000 |
| 3. | Iowa Farmer Today | A weekly newspaper style publication targeting subscribers in Iowa that focuses on local, national, and global topics related to markets and crops as well as farming news and classified ads. | 58,878 |
| 4. | Illinois Farmer Today | A weekly newspaper style publication targeting subscribers in Illinois that focuses on local, national, and global topics related to markets and crops as well as farming news and classified ads. | 24,456 |
| 5. | Missouri Farmer Today | A weekly newspaper style publication targeting subscribers in Missouri that focuses on local, national, and global topics related to markets and crops as well as farming news and classified ads. | 15,109 |
| 6. | Nebraska Farmer | An agricultural publication targeting subscribers in Nebraska that focuses on agribusiness, crop and livestock production, and farm technology. | 28,591 |
| 7. | The Farmer | An agricultural publication targeting subscribers in Minnesota that focuses on agribusiness, crop and livestock production, farm management, and conservation. | 30,841 |

The above combination of publications offers both high national circulation and relevant regional coverage.  The Notice Resources estimate these placements combined will generate more than 660,000 notice exposures.

**(b)** *Radio.*  For two weeks following the initial mailing of the direct letter notice and two weeks immediately following the mailing of the reminder postcards, described in Section VIII of this Declaration, we will run 30-second radio ads using both syndicated and regional radio platforms.  We will run 30 spots across select nationwide syndicated radio programs and a total of 526 spots on a network of 526 regional radio stations across the fourteen states with the highest population of corn producers.  We will strategically select stations that Scarborough USA+ 2017 suggests are most effective for this settlement, such as news and sports programs, talk radio, weather stations, and informational

19

channels.  For the initial two weeks, we will use the script substantially in the form of Exhibit 5 to inform potential Class Members about the settlement. After the opt out deadline, we will use the script substantially in the form of Exhibit 6 to remind potential Class Members about the program and encourage claimant participation.  In total, these ads will produce 556 spots, or opportunities for Class Members to hear the notice.

(c) *Facebook Ads.*  Facebook is the highest-read social network on the Internet, with 1.4 billion daily active users on average as of December 2017.[11]  We will display ads substantially in the forms illustrated in Exhibit 7 to this Declaration, directed to users of Facebook with an interest in farming.  The Notice Plan aims to achieve approximately 4 million Facebook ad exposures.

(d) *Press Release.*  We will issue a joint press release substantially in the form of Exhibit 8 to this Declaration through Cision/PR Newswire, a leading provider of multimedia platforms and distribution.  The press release will explain the core aspects of the proposed settlement and provides the address for the Settlement Website, as well as the toll-free number.  We expect that the press release will be picked-up by hundreds of media outlets with a combined potential audience of tens of millions of people.

(e) *Fliers to FSA Offices and Trade Organizations.*  To build additional reach and encourage class participation, we will send a notice flier substantially in the form of Exhibit 9 to this Declaration to various states' corn growers' associations, the National Corn Growers Association, the National Grain and Feed Association, and the FSA for their consideration to distribute to their members, insert into newsletters, or post at local offices.

25. *Grain Handling Facilities.*  We expect to reach nearly 100% of the Grain Handling Facility Subclass through direct notice, and therefore, supplemental notice is likely not necessary to satisfy due process for this Subclass.  By targeting corn Producers through the means described above, collateral industries in the agricultural community will nevertheless have an opportunity to see and hear, and respond, to the notice.  We will also use supplemental notice platforms that specifically target Grain Handling Facilities to encourage their participation in the Settlement Process.

(a) *Print Publication.*  We will run the publication notice in *Feed & Grain Magazine*, a national magazine that focuses on businesses in the commercial

---

[11] https://newsroom.fb.com/company-info/

540581

feed, grain, and allied processing industry, as well as safety and policy related topics. This publication distributes 15,700 copies per issue.

(b) *Fliers to Trade Organizations.* Because grain handlers may be members of the National Grain and Feed Association, notices distributed by that organization to corn Producers will likely reach members of this Subclass as well. We will also email a copy of the notice flier to the U.S. Grains Counsel, which features news related to the grain industry prominently on its website.

26. *Ethanol Production Facilities.* As with the Grain Handling Facility group, we will reach nearly 100% of the Ethanol Production Facility Subclass through direct mail while also providing the Subclass members with an opportunity to see or hear the notice through supplemental means.

(a) *Print Publication.* We will publish the notice illustrated in Exhibit 4 in *Ethanol Producer Magazine.* This publication provides global news and commentary regarding the ethanol industry featuring plant optimization, research, science, technology, equipment, environmental health and safety, compliance, marketing, policy and industry events. It has a circulation of 5,000 copies per issue, and because of its highly specific subject matter and relatively wide circulation, is likely to be seen by members of the Ethanol Production Facility group.

(b) *Fliers to Trade Organizations.* We will send a notice flier to various ethanol production trade agencies, such as the Renewable Fuels Association and American Coalition for Ethanol. These organizations highlight ethanol industry related news on their websites and have opportunities to distribute the notice to its members during conferences and webinars.

27. *Supplemental Notice Summary.* We estimate that the combined supplemental notice elements of print publication, radio, social media, a national press release, and outreach to trade organizations will provide over 5 million opportunities for Class Members to see or hear and respond to a paid media placement or notice flier.

## VIII.   POSTCARD REMINDER

28. *Short-Form Postcard Reminder.* Even after reaching over 90% of the class directly and exposing much of the class to the notice using paid media placement and community

21

540581

outreach, there will be Class Members who will not have filed a claim and may need to be reminded and encouraged to do so. After the opt out deadline, we will mail postcard reminders substantially in the form of Exhibit 10 to this Declaration to any Class Members for which we have a facially valid mailing address who have not filed a claim. We will use the updated list of Class Members' mailing addresses we developed from the initial direct notice mailing, which will include mailing addresses for corn Producers, Grain Handling Facilities, and Ethanol Production Facilities. If we were unsuccessful in sending the initial Notice to a mailing address because the notice was returned as undeliverable without a forwarding address and LexisNexis did not identify an updated address, we will remove that address from the postcard reminder mailing list. We will attempt to verify the addresses in the postcard reminder mailing list against the USPS's NCOA database, the CASS, and through DPV to confirm whether the USPS obtained additional address information between the original mailing and the reminder mailing and to achieve discounted postage. If a Class Member's address is updated based on these verification processes, the updated address will be used for mailing the postcard reminder. If there are no updates to a Class Member's address, we will use the most up-to-date address list from the first mailing to mail summary postcards reminding Class Members about the Settlement and their legal rights under the Settlement Agreement. As with the initial direct Notices, if a postcard reminder is returned by the USPS as undeliverable but with a forwarding address, we will re-mail the postcard to the updated address provided by the USPS. If the USPS returns a postcard reminder without a forwarding address, we will again submit the Class Member's mailing information to the LexisNexis compendium of domestic addresses for updated address information, if available. Finally, we will update addresses based on requests received from Class Members.

29.    *Notice Contents.* Rule 23(c)(2)(B) requires that notices present settlement information to class members "clearly and concisely" and "in plain, easily understood language." All the notice materials present information about the Settlement in plain language and are designed to be understood easily by Settlement Class Members. The notice

540581

language and design follow the principles embodied in the FJC Checklist, attached as Exhibit 11 to this Declaration.  The notices include prominent headlines in bold text, and contain comprehensive information in simple, plain language about the settlement to encourage Settlement Class Members' understanding.  Where possible, the notices also include plain language explanations of (1) the nature of the action; (2) the class definition; (3) the claims, issues, and defenses; (4) the right to hire an attorney; (5) the right to be excluded; (6) the procedure for being excluded; and (7) the binding effect of a judgment as required by Rule 23(c)(2)(B).  In short, the notices themselves comport with Rule 23 and due process and effectively deliver notice to the Settlement Class.

## IX.   <u>CONCLUSION</u>

30.   ***The Notice Plan is the Best Notice Practicable Under the Circumstances.***
The Notice Plan provides (1) direct, individual notice by mail to potential Settlement Class Members to the extent reasonably possible and (2) the opportunity to view or hear and respond to the notice in print, radio, and other strategic paid media placements.  The notice materials are clear, concise, informative, and effective, and each directs Settlement Class Members to a suite of support services (the Settlement Website, toll-free call center, and P.O. Box).  The proposed Notice Plan satisfies due process and Rule 23's requirement of the best notice practicable under the circumstances, including giving individual notice to all Settlement Class Members who can be identified with reasonable effort.  The Notice Plan is at least consistent with other effective settlement notice plans and, indeed, includes a supplemental courtesy reminder campaign providing further support to the Settlement Class. With an estimated reach exceeding 90% for corn Producers, Grain Handling Facilities, and Ethanol Production Facilities, the Notice Plan provides the same or better reach that courts have approved in other similar class matters.  The Notice Plan is also generally consistent with the aims of the FJC Checklist.

540581

I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.  Executed on this 9th day of March, 2018.

_____

Orran L. Brown

540581