# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE SYNGENTA AG MIR162 CORN LITIGATION | Master File No. 2:14-MD-02591-JWL-JPO |
| THIS DOCUMENT RELATES TO ALL CASES **EXCEPT**: | MDL No. 2591 |
| *Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG, et al.,* No. 16-2788-JWL-JPO | |
| *Trans Coastal Supply Company, Inc. v. Syngenta AG, et al.,* No. 2:14-cv-02637-JWL-JPO | |
| *The Delong Co., Inc. v. Syngenta AG, et al.,* No. 2:17-cv-02614-JWL-JPO | |
| *Agribase International Inc. v. Syngenta AG, et al.,* No. 2:15-cv-02279-JWL-JPO | |

## MEMORANDUM IN SUPPORT OF KANSAS MDL CO-LEAD COUNSEL AND SETTLEMENT CLASS COUNSEL CHRISTOPHER SEEGER'S PETITION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES/BELLWETHER PLAINTIFFS AND ALLOCATION OF ATTORNEYS' FEE AWARD

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... v

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 4

I.  KANSAS COMMON BENEFIT GROUP UNDERTOOK SUBSTANTIAL EFFORT PROSECUTING CLASS MEMBERS' CLAIMS AGAINST SYNGENTA ................... 4

    A.  The Court Appointed Co-Lead Counsel to Lead the Litigation. ............................ 5

    B.  Co-Lead Counsel Organized and Coordinated a Team of Lawyers to Conduct Discovery in the MDL. ....................................................................................... 8

        1.  Co-Lead Counsel Led Offensive Discovery Against Syngenta. ................. 9

        2.  Co-Lead Counsel Led Third-Party Discovery. ........................................ 11

        3.  Co-Lead Counsel Coordinated Non-Producer Bellwether Discovery in the Kansas MDL with Kansas Common Benefit Attorneys. .......................... 13

        4.  Co-Lead Counsel Assembled and Managed a Team to Conduct Defensive Producer Discovery in the Kansas MDL. ................................................. 13

    C.  The Kansas Common Benefit Group Prevailed on Syngenta's Third-Party Complaint.......................................................................................................... 17

    D.  Co-Lead Counsel Litigated Key Legal Issues in the Case.................................... 18

    E.  Co-Lead Counsel Led Expert Discovery on the Key Experts. ............................ 21

    F.  Co-Lead Counsel Responded to and Filed Summary Judgment. ......................... 23

    G.  Co-Lead Counsel Led Trial Preparations and Briefing for the Kansas trial......... 24

    H.  Co-Lead Counsel Tried the Kansas Class Action................................................. 26

    I.  Co-Lead Counsel Prepared for Four More MDL Trials in 2018. ......................... 27

II.  CO-LEAD COUNSEL COORDINATED WITH OTHER ACTIONS AND HAVE ENTERED INTO A FEE-SHARING AGREEMENT WITH OTHER LEAD COUNSEL. .................................................................................................. 28

    A.  The Court Entered a Coordination Order Requiring the Sharing of Discovery with Related Actions............................................................................................ 28

    B.  Other Actions were filed in Minnesota, Illinois and Elsewhere. ......................... 29

        1.  The Minnesota Leadership Actions. ........................................................ 29

        2.  The Illinois Leadership Actions............................................................... 31

    C.  Lead Counsel's Fee-Sharing Agreements............................................................ 32

III.  SETTLEMENT WAS THE PRODUCT OF THE WORK DONE BY LEADERSHIP IN KANSAS, MINNESOTA AND ILLINOIS. .................................................................. 33

IV.   PROSECUTION OF THESE CASES REQUIRED AN ENORMOUS AND RISKY
      INVESTMENT OF LABOR AND RESOURCES...........................................................35

      A.   The Litigation Was Risky and Success Was Far From Certain............................35

      B.   Kansas Common Benefit Firms Invested Significant Labor and Expenses. ........37

V.    TWO DISTINGUISHED EXPERTS ON ATTORNEYS' FEES SUPPORT THE
      REQUESTS. ...................................................................................................................39

      A.   Professor Klonoff Opines that Fees, Costs and Service Awards are Reasonable
           under the Facts of this Case and in Comparison to Awards in Similarly Sized
           Settlements..........................................................................................................39

      B.   Retired Magistrate Judge Richard Ralston Opines that the Billing Rates Used to
           Calculate the Lodestar are Reasonable. ..............................................................42

ARGUMENT ...........................................................................................................................43

I.    THE FEE REQUEST IS FAIR AND REASONABLE UNDER GOVERNING
      PRINCIPLES AND BASED ON THE FACTS OF THE CASE. ...................................43

      A.   The Fee Request is Reasonable as a Percentage of the Fund ...............................43

      B.   The *Johnson* Factors Justify the Fee Request because this was a Hugely Complex
           Case Involving Significant Time and Labor where Counsel Incurred Great Risk
           and Obtained a Record-Setting Settlement. .........................................................45

           1.   The difficult factual and legal issues in this case justify the Fee Request. 46

                a)   The litigation involved a unique and complex structure...............47

                b)   The litigation involved a novel fact pattern. .................................48

                c)   The legal issues were complex and their outcome uncertain........52

           2.   Plaintiffs were well-represented by a team of attorneys with substantial
                experience in prosecuting high-stakes, complex litigation.......................56

           3.   Counsel exercised a high-degree of skill in navigating the complex legal
                and factual issues that permeated the MDL. .............................................57

           4.   The massive amount of time and labor that counsel expended supports the
                Fee Request. ............................................................................................63

           5.   The demands of this litigation necessary imposed time limitations and
                precluded counsel from other employment................................................63

           6.   The contingent nature of the fee and the risk undertaken by counsel
                justifies the Fee Request. .......................................................................66

           7.   The relief involved, totaling $1.51 billion, supports the Fee Request. .....69

           8.   The fee request is consistent with a customary fee...................................72

           9.   Awards in similar cases justify the Fee Request.......................................74

      C.   A Lodestar Cross-Check Confirms Reasonableness of the Requested Fee..........78

iii

II.  THE EXPENSE REQUEST FOR THE KANSAS COMMON BENEFIT GROUP SHOULD BE GRANTED. ............................................................................. 85

III.  KANSAS COMMON BENEFIT ATTORNEYS SHOULD BE ALLOCATED 50% OF THE ONE-THIRD FEE AWARD. .................................................... 87

   A.  The MDL Allocation to the Federal Kansas Common Benefit Group is Easily Fair and Equitable under the *Johnson* Factors. .......................... 88

   B.  The Court Should Award Subclass Counsel Attorneys' Fees and Expenses from the Remaining 20% .............................................................. 94

IV.  SERVICE AWARDS FOR CLASS REPRESENTATIVE AND BELLWETHER PLAINTIFFS ARE WELL DESERVED. ........................................................ 94

   A.  Category 1 Plaintiffs Should Each Be Awarded $5,000. ....................................... 97

   B.  Category 2 Plaintiffs Should Each Be Awarded $15,000. .................................... 98

   C.  The Kansas Trial Representatives Should Each be Awarded $100,000. ............ 102

   D.  Subclass Representatives Should Each Be Awarded $2,500. ............................ 104

CONCLUSION ............................................................................................................. 106

# TABLE OF AUTHORITIES

**Cases**

*Accounting Outsourcing, L.L.C. v. Verizon Wireless Pers. Comms., L.P.*,
No. CIV.A. 03-CV-161, 2007 WL 7087615 (M.D. La. Aug. 2, 2007) ............................98, 100

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ........................................................................... *passim*

*Anderson v. Merit Energy Co.*,
No. CIV.07CV00916LTBBNB, 2009 WL 3378526 (D. Colo. Oct. 20, 2009) ..................70, 73

*Asare v. Change Group of New York, Inc.*,
No. 12 Civ. 3371(CM), 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) ....................................95

*Barbosa v. Nat'l Beef Packing Co., LLC*,
No. CIV.A. 12-2311-KHV, 2015 WL 4920292 (D. Kan. Aug. 18, 2015) ...............................74

*Barrera v. Nat'l Crane Corp.*,
No. SA-10-CV-0196 NN, 2012 WL 242828 (W.D. Tex. Jan. 25, 2012) ..................................68

*Been v. O.K. Indus., Inc.*,
CIV-02-285-RAW, 2011 WL 4478766 (Aug. 16, 2011) .................................................. *passim*

*Bennett v. Sprint Nextel Corp.*,
Case No. 2:09-cv-02122-EFM-GEB, ECF No. 301 (D. Kan. Aug. 12, 2015) .......................101

*Blum v. Stenson*,
465 U.S. 886 (1984) ...............................................................................................................43

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ...............................................................................................................43

*Bratcher v. Bray–Doyle Ind. Sch. Dist. No. 42*,
8 F.3d 722 (10th Cir. 1993) ....................................................................................................82

*Bredbenner v. Liberty Travel, Inc.*,
No. CIV.A. 09-1248 MF, 2011 WL 1344745 (D.N.J. Apr. 8, 2011) .......................................67

*Brown v. Phillips Petroleum Co.*,
838 F.2d 451 (10th Cir. 1988) ...........................................................................44, 45, 66, 69

*Bussie v. Allmerica Financial Corp.*,
No. 97-40204-NMG, 1999 WL 342042 (D. Mass. May 19, 1999) ..........................................44

*Case v. Unified Sch. Dist. No. 233, Johnson County, Kan.*,
157 F.3d 1243 (10th Cir. 1998) ..............................................................................................80

*Castro v. Sanofi Pasteur Inc.*,
No. CV117178JMVMAH, 2017 WL 4776626 (D.N.J. Oct. 23, 2017)............................73, 103

*Chieftan Royalty Co. v. Enervest Energy Instit. Fund XIII-A, L.P.*,
888 F.3d 455 (10th Cir. 2017) ..............................................................................................103

*Chambers v. Whirlpool Corp.*,
214 F. Supp. 3d 877 (C.D. Cal. 2016) ....................................................................................82

v

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
  No. 1:04-CV-3066-JEC, 2008 WL 11319972 (N.D. Ga. Mar. 4, 2008) ...............................103

*CompSource Oklahoma v. BNY Mellon, N.A.*,
  No. CIV 08-469-KEW, 2012 WL 6864701 (E.D. Okl. Oct. 25, 2012) ...................................78

*Cook v. Niedert,*
  142 F.3d 1004 (7th Cir. 1998) ...................................................................................................95

*Cullen v. Whitman Med. Corp.,*
  197 F.R.D. 136 (E.D. Pa. 2000)..................................................................................................96

*Deloach v. Philip Morris Companies*,
  No. 1:00CV01235, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003)..........................................85

*deMunecas v. Bold Food, LLC*,
  No. 09 CIV. 00440 DAB, 2010 WL 3322580 (S.D.N.Y. Aug. 23, 2010)..............................98

*Dornberger v. Metropolitan Life Ins. Co.,*
  203 F.R.D. 118 (S.D.N.Y. 2001)................................................................................................95

*Elliott v. Rolling Frito-Lay Sales, LP*,
  No. SACV 11-01730 DOC, 2014 WL 2761316 (C.D. Cal. June 12, 2014)............................73

*Fairway Med. Ctr., L.L.C. v. McGowan Enterprises, Inc.*,
  No. CV 16-3782, 2018 WL 1479222 (E.D. La. Mar. 27, 2018)................................................73

*Family Med. Pharmacy, LLC v. Trxade Group, Inc.*,
  No. CV 15-0590-KD-B, 2017 WL 1042079 (S.D. Ala. Mar. 17, 2017) ..................................67

*Flournoy v. Honeywell Int'l, Inc.*,
  No. Civ. A.205-184, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007)............................................72

*Fox v. Vice,*
  563 U.S. 826 (2011)....................................................................................................................79

*Garcia v. Gordon Trucking, Inc.*,
  No. 1:10-CV-0324 AWI SKO, 2012 WL 5364575 (E.D. Cal. Oct. 31, 2012)........................73

*George v. Duke Energy Ret. Cash Balance Plan,*
  No. 8:06-CV-00373-JMC, 2011 WL 13218031 (D.S.C. May 16, 2011) ................................46

*Gevaerts v. TD Bank,*
  No. 1:14-CV-20744-RLR, 2015 WL 6751061 (S.D. Fla. Nov. 5, 2015) ...............62, 64, 66, 73

*Glover v. Standard Fed. Bank*,
  283 F.3d 953 (8th Cir. 2002) .....................................................................................................67

*Godshall v. Franklin Mint Co.,*
  No. 01-CV-6539, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)..................................................95

*Gokare v. Fed. Express Corp.*,
  No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094887 (W.D. Tenn. Nov. 22, 2013)........44, 46, 73

*Goldberger v. Integrated Res., Inc.,*
  209 F.3d 43 (2d Cir. 2000)..........................................................................................................67

*Gottlieb v. Barry,*
  43 F.3d 474 (10th Cir. 1994) ........................................................................................43, 44, 45

*Gray v. Talking Phone Book*,
  No. 8:08-CV-01833-GRA, 2012 WL 12978113 (D.S.C. Aug. 13, 2012) .................................98

*Gudenkauf v. Stauffer Communications, Inc.*,
  158 F.3d 1074 (10th Cir. 1998) ...................................................................................................45

*Harris v. Marhoefer*,
  24 F.3d 16 (9th Cir. 1994) ...........................................................................................................85

*Huyer v. Wells Fargo & Co.*,
  314 F.R.D. 621 (S.D. Iowa 2016) ................................................................................................74

*In re Auto. Parts Antitrust Litig.*,
  No. 2:12-CV-00203, 2017 WL 3525415 (E.D. Mich. July 10, 2017) ..........................................77

*In re Bank of Am. Wage & Hour Employment Litig.*,
  No. 10-MD-2138-JWL, 2013 WL 6670602 (D. Kan. Dec. 18, 2013)..........................................83

*In re Catfish Antitrust Litig.*,
  939 F. Supp. 493 (N.D. Miss. 1996).............................................................................................46

*In re Charter Commc'ns, Inc., Sec. Litig.*,
  No. 4:02-CV-1186 CAS, 2005 WL 4045741 (E.D. Mo. June 30, 2005) ............................81, 85

*In re: Checking Account Overdraft Litig.*,
  No. 1:09-MD-02036-JLK, 2014 WL 12557836 (S.D. Fla. Apr. 1, 2014)..........................95, 98

*In re: Checking Account Overdraft Litig.*,
  No. 1:09-MD-02836-JLK, 2014 WL 11370115 (S.D. Fla. Jan. 6, 2014)...............59, 66, 68, 78

*In re: Checking Account Overdraft Litig.*,
  No. 1:09-MD-02036-JLK, 2013 WL 11319392 (S.D. Fla. Aug. 5, 2013) ............................101

*In re: Checking Account Overdraft Litig.*,
  830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...........................................................................73, 77, 78

*In re Copley Pharm., Inc., Albuterol Products Liab. Litig.*,
  50 F. Supp. 2d 1141 (D. Wyo. 1999)......................................................................................92, 93

*In re Credit Default Swaps Antitrust Litig.*,
  No. 1:13-md-02476-DLC, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ...............................85

*In re Diet Drugs*,
  582 F.3d 524 (3d Cir. 2009)..........................................................................................................79

*In re Domestic Air Transp. Antitrust Litig.*,
  148 F.R.D. 297 (N.D. Ga. 1993)..............................................................................................92, 96

*In re Dun & Bradstreet Credit Services Customer Litig.*,
  130 F.R.D. 366 (S.D. Ohio 1990) .................................................................................................96

*In re Enron Corp.*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ..........................................................................................85

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*,
  251 F. Supp. 3d 1225 (N.D. Ind. 2017) ........................................................................74, 76, 77

*In re Genetically Modified Rice Litig.*,
  764 F.3d 864 (8th Cir. 2014) ........................................................................................................79

*In re Genetically Modified Rice Litig.*,
No. 4:06MD1811 CDP, 2012 WL 6085141 (E.D. Mo. Dec. 6, 2012) .....................................83

*In re High-Tech Employee Antitrust Litig.*,
No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)................................103

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)................................................................................75, 77

*In re Initial Pub. Offering Sec. Litig.*,
No. 21 MC 92 SAS, 2011 WL 2732563 (S.D.N.Y. July 8, 2011)..........................................93

*In re Lease Oil Antitrust Litig.*,
186 F.R.D. 403 (S.D. Tex. 1999)...........................................................................................96

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 644 (E.D. Pa. 2003) ...................................................................................58

*In re Linerboard Antitrust Litig.*,
No. CIV.A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ..................................*passim*

*In re Linkedin User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)...........................................................................................98

*In re Lorazepam & Clorazepate Antitrust Litig.*,
205 F.R.D. 369 (D.D.C. 2002)...............................................................................................95

*In re: Motor Fuel Temperature Sales Practices Litig.*,
07-MD-1840-KHV, 2016 WL 4445438 (D. Kan. Aug. 24, 2016) .....................................46, 53

*In re Neurontin Antitrust Litig.*,
No. Civ. A. No. 02-1830, ECF No. 114 (D.N.J. Aug. 6, 2014).............................................103

*In re NuvaRing Prods. Liab. Litig.*,
No. 4:08 MDL 1964 RWS, 2014 WL 7271959 (E.D. Mo. Dec. 18, 2014).................43, 78, 79

*In re Ocean Power Techs., Inc.*, 3:14-CV-3799,
2016 WL 6778218 (D.N.J. Nov. 15, 2016) ....................................................................56, 66

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ...............................................................................................97

*In re Packaged Ice Antitrust Litig.*,
No. 08-MDL-01952, 2012 WL 5493613 (E.D. Mich. Nov. 13, 2012).....................................73

*In re Phenylpropanolamine (PPA) Products Liab. Litig.*,
460 F.3d 1217 (9th Cir. 2006) ..............................................................................................58

*In re Plastic Tableware Antitrust Litig.*,
No. 94-CV-3564, 1995 WL 723175 (E.D. Pa. Dec.4, 1995)...................................................96

*In re Polyurethane Foam Antitrust Litig.*,
168 F. Supp. 3d 985 (N.D. Ohio 2016)................................................................................101

*In re Qwest Communications Int'l, Inc. Sec. Litig.*,
625 F. Supp. 2d 1143 (D. Colo. 2009)...................................................................................67

*In re Remeron Direct Purchaser Antitrust Litig.*,
No. CIV.03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005)..........................................72

*In re Residential Doors Antitrust Litig.*,
No. 94–3744, 1998 WL 151804 (E.D. Pa. Apr. 2, 1998) ........................................96

*In re Rite Aid Corp. Sec. Litig.*,
362 F. Supp. 2d 587 (E.D. Pa. 2005) ...................................................................85

*In re Rite Aid Corp. Securities Litig.*,
396 F.3d 294 (3d Cir. 2005)...........................................................................77, 78

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ...................80

*In re Southeastern Milk Antitrust Litig.*,
No. 07-cv-1000, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) ..........................44

*In re Sunbeam Sec. Litig.*,
176 F. Supp. 2d 1323 (S.D. Fla. 2001) ...............................................................68

*In re Superior Beverage/Glass Container Consol. Pretrial,*
133 F.R.D. 119 (N.D. Ill. 1990)...........................................................................67

*In re Syngenta AG MIR 162 Corn Litig.*,
131 F. Supp. 3d 1177 (D. Kan. 2015) .................................................................55

*In re Syngenta Mass Tort Actions,*
272 F. Supp. 3d 1074 (S.D. Ill. 2017)...................................................32, 34, 36

*In re Synthroid Marketing Litig.*,
264 F.3d 712 (7th Cir. 2001) ........................................................................72, 76

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices
& Prods. Liab. Litig.*, No. 810ML02151JVSFMOX, 2013 WL 12327929
(C.D. Cal. July 24, 2013)........................................................................57, 67, 68

*In re U.S. Bancorp Litig.*,
291 F.3d 1035 (8th Cir. 2002) ............................................................................74

*In re United Telecommc'ns Sec. Litig.*,
No. 90-2251-0, 1994 WL 326007 (D. Kan. June 1, 1994) ...................................74

*In re Urethane Antitrust Litig.*,
No. 04-1616-JWL, 2008 WL 696244 (D. Kan. Mar. 13, 2008) ............................96

*In re: Urethane Antitrust Litig.*,
No. 04-1616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) ..................... *passim*

*In re Urethane Antitrust Litig.*
No. 04-1616-JWL, ECF No. 3251 (D. Kan. June 1, 2016) ..................................103

*In re Vioxx Prod. Liab. Litig.*,
No. 11-1546, 2013 WL 5295707 (E.D. La. Sept. 18, 2013)..................................79

*In re Vitamin Cases,*
No. 301803, 2004 WL 5137597 (Cal. Super. Ct. Apr. 12, 2004)..........................93

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) ..............................................................................68

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ............................................................67, 78, 84, 85

*In re Zurn Pex Plumbing Products Liab. Litig.*,
   No. 08-MDL-1958 ADM/AJB, 2013 WL 716460 (D. Minn. Feb. 27, 2013) .........................83

*Ingram v. Coca-Cola Co.*,
   200 F.R.D. 685 (N.D.Ga. 2001) .....................................................................................95

*Ivax Corp. v. Aztec Peroxides, LLC*,
   No. 1:02CV00593, ECF No. 78 (D.D.C. Aug. 24, 2005) .................................................103

*Jackson v. Wells Fargo Bank*, N.A.,
   136 F. Supp. 3d 687 (W.D. Pa. 2015) ..............................................................................79

*Jenkins v. Trustmark Nat'l Bank*,
   300 F.R.D. 291 (S.D. Miss. 2014) .............................................................................57, 67

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) .....................................................................................45, 46

*Johnston v. Comerica Mortg. Corp.*,
   83 F.3d 241 (8th Cir. 1996) ...........................................................................................80

*Kanawi v. Bechtel Corp.*,
   No. C 06-05566 CRB, 2011 WL 782244 (N.D. Cal. Mar. 1, 2011) .....................................68

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) .............................................................................46

*Knight v. Red Door Salons, Inc.*,
   No. 08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ............................................58

*Koehler v. Freightquote.com, Inc.*,
   No. 12-2505-DDC-GLR, 2016 WL 3743098 (D. Kan. July 13, 2016) ............................70, 74

*Kolinek v. Walgreen Co.*,
   311 F.R.D. 483 (N.D. Ill. 2015) .....................................................................................73

*Larey v. Allstate Prop. & Cas. Ins. Co.*,
   No. 4:14-CV-4008, 2018 WL 811103 (W.D. Ark. Feb. 9, 2018) .........................................98

*Law v. Nat'l Collegiate Athletic Ass'n*,
   4 F. Appx. 749 (10th Cir. 2001) .....................................................................................45

*Lewis v. Wal-Mart Stores, Inc.*,
   No. 02-CV-0944, 2006 WL 3505851 (N.D. Okla. Dec. 4, 2006) .........................................74

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) .................................................................................................55

*Longden v. Sunderman*,
   979 F.2d 1095 (5th Cir. 1992) .......................................................................................93

*Lucas v. Kmart Corp.*,
   No. CIV.A. 99-01923, 2006 WL 2729260 (D. Colo. July 27, 2006) ...............................67, 81

*Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*,
   No. 09-CV-01543-REB-KMT, 2010 WL 5387559 (D. Colo. Dec. 22, 2010) .............44, 70, 73

*Lunsford v. Woodforest Nat'l Bank*,
  No. 1:12-CV-103-CAP, 2014 WL 12740375 (N.D. Ga. May 19, 2014)................46, 56, 58, 68

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
  No. 07-CV-1078, ECF No. 713 (E.D. Pa. July 14, 2014).......................................103

*Manuel v. Wells Fargo Bank, Nat'l Ass'n*,
  No. 3:14CV238(DJN), 2016 WL 1070819 (E.D. Va. Mar. 15, 2016) ...................101

*McDaniels v. Westlake Services, LLC*, No. CIV.A. ELH-11-1837,
  2014 WL 556288 (D. Md. Feb. 7, 2014) ...........................................................98

*McDonough v. Toys R Us, Inc.*,
  80 F. Supp. 3d 626 (E.D. Pa. 2015) .................................................................83

*McNeely v. Nat'l Mobile Health Care, LLC*,
  No. 07-933, 2008 WL 4816510 (W.D. Okla. Oct. 27, 2008) .............................69

*Meijer, Inc. v. 3M*,
  CIV.A. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) ..........................101

*Nichols v. SmithKline Beecham Corp.*,
  No. CIV.A.00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) .....................73, 77

*Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...........................................................68

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ........................................................................78

*Pinto v. Princess Cruise Lines, Ltd.*,
  513 F. Supp. 2d 1334 (S.D. Fla. 2007) ............................................................67

*Ramos v. Lamm*,
  713 F.2d 546 (10th Cir. 1983) ........................................................................81

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
  663 F. Supp. 1360 (D. Kan. 1987)...................................................................81

*Risch v. Natoli Eng'g Co., LLC*,
  No. 4:11CV1621 AGF, 2012 WL 4357953 (E.D. Mo. Sept. 24, 2012) ...............98

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997)...................................................................85

*Roeser v. Best Buy Co.*,
  No. CIV. 13-1968 JRT/HB, 2015 WL 4094052 (D. Minn. July 7, 2015) .............83

*Rosenbaum v. MacAllister*,
  64 F.3d 1439 (10th Cir. 1995) ........................................................................44

*Ruiz v. XPO Last Mile, Inc.*,
  5-CV-2125 JLS (KSC), 2017 WL 6513962 (S.D. Cal. Dec. 20, 2017).................73

*Sample v. Monsanto Co.*,
  283 F. Supp. 2d 1088 (E.D. Mo. 2003)............................................................54

*Sewell v. Bovis Lend Lease, Inc.*,
  No. 09 CIV. 6548 RLE, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012) .................85

*Sharyland Water Supply Corp. v. City of Alton*,
354 S.W.3d 407 (Tex. 2011)........................................................................53

*Shaw v. Interthinx, Inc.*,
No. 13-CV-01229-REB-NYW, 2015 WL 1867861 (D. Colo. Apr. 22, 2015)..............44, 67, 73

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
91 F. Supp. 2d 942 (E.D. Tex. 2000)........................................................101

*Spicer v. Chi. Bd. Options Exchange, Inc.*,
844 F. Supp. 1226 (N.D. Ill. 1993) ...............................................101, 102, 103

*Steiner v. Am. Broad. Co., Inc.*,
248 F. Appx. 780 (9th Cir. 2007)................................................................85

*Sussman v. Patterson*,
108 F.3d 1206 (10th Cir. 1997) .................................................................80

*Syngenta Mass Tort Actions*,
No. 3:16-CV-00255-DRH, 2017 WL 2117728 (S.D. Ill. May 15, 2017)................................32

*Tenuto v. Transworld Sys.*,
No. CIV. A. 99–4228, 2002 WL 188569 (E.D. Pa. Jan.31, 2002) ...........................95

*The Erica P. John Fund, Inc. v. Halliburton Company*,
No. 3:02-cv-1152-M, ECF No. 844 (N.D. Tex. Apr. 25, 2018) .......................73, 103

*Thompson v. Qwest Corp.*,
No. 17-CV-1745-WJM-KMT, 2018 WL 2183988 (D. Colo. May 11, 2018) ........................98

*Titanium Dioxide Antitrust Litig.*,
No, 10-CV-00318 RDB, 2013 WL 6577029 (D. Md. Dec. 13, 2013) ...................................103

*Turner v. Murphy Oil USA, Inc.*,
472 F. Supp. 2d 830 (E.D. La. 2007).................................................67, 79, 93

*Tuten v. United Airlines, Inc.*,
41 F. Supp. 3d 1003 (D. Colo. 2014)......................................................95, 101

*Tyson Foods, Inc. v Bouaphakeo*,
136 S. Ct. 1036 (2016)...........................................................................54

*UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*,
352 F. App'x 232 (10th Cir. 2009) ..............................................................95

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) ....................................................................78

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
9 F.3d 849 (10th Cir. 1993) ......................................................................45

*Velez v. Novartis Pharm. Corp.*,
No. 04 CIV 09194 CM, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)...................................103

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.*,
623 F.3d 82 (2d Cir. 2010)........................................................................93

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ..............................................................77, 85

*Williams v. Sprint/United Mgmt. Co.*,
    No. 03-2200-JWL, 2007 WL 2694029 (D. Kan. Sept. 11, 2007)..............................74

*Yarrington v. Solvay Pharmaceuticals, Inc.*,
    697 F. Supp. 2d 1057 (D. Minn. 2010)........................................................... *passim*

## **Statutes**

7 U.S.C. § 87g(a) ...........................................................................................55

28 U.S.C. § 1292(b) ........................................................................................71

28 U.S.C. § 1407.............................................................................................81

## **Other Authorities**

4 *Newberg on Class Actions* (4th ed. 2010)..............................................43, 84

5 *Newberg on Class Action*s (5th ed. 2015)...................................46, 74, 94

Dan B. Dobbs, *An Introduction to Non-Statutory Economic Loss Claims*,
    48 Ariz. L. Rev. 713 (2006)........................................................................53

Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,*
    1 J. Empirical Legal Stud. 27 (2004) .........................................................72

Jim Wren, *Applying the Economic Loss Rule in Texas*,
    64 Baylor L. Rev. 204 (2012) ....................................................................53

Manual for Complex Litigation 4th ................................................43, 70, 93

*Report of Third Circuit Task Force: Selection of Class Counsel*,
    208 F.R.D. 340 (2002) ...............................................................................43

## INTRODUCTION

The Settlement Agreement with Syngenta, if approved, will create a common fund of $1.51 billion to compensate Class Members for the claims asserted in this multi-district litigation ("MDL") and in the related actions filed in Minnesota, Illinois, and other state courts across the country. Pursuant to the Settlement Agreement and this Court's inherent authority under the common-fund doctrine and Rule 23(h), Patrick Stueve, Don Downing, William Chaney, and Scott Powell ("Co-Lead Counsel") for the Kansas MDL and Settlement Class Counsel Christopher Seeger ("Seeger") respectfully submit this Petition for Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards to Class Representatives/Bellwether Plaintiffs and Allocation of Attorneys' Fee Award ("Fee Application").

First, they request that the Court award one-third of the $1.51 billion settlement fund to be set aside for attorneys' fees ("Fee Request") and, to reimburse Co-Lead Counsel and other MDL firms ("Kansas Common Benefit Group") $6,695,350.05 in costs and expenses incurred performing common-benefit work ("Expense Request"). The Fee and Expense Requests are eminently justifiable under the facts and circumstances of this unusual case and application of the *Johnson* factors. The result achieved here is a non-reversionary $1.51 billion settlement — record-setting for agricultural litigation – and more than double the settlement reached with Bayer in what was previously the largest agricultural trade-disruption settlement resulting from the release of a new genetically modified ("GM") trait. This result was not obtained easily, but only after the sustained effort of counsel, including certification of a nationwide and nine state-law litigation classes in two jurisdictions, the start of three jury trials, and one completed, class trial resulting in a $217.7 million jury verdict.

1

As detailed more fully herein, the factual and legal complexity of these claims, and the unique nature of this MDL and the prosecution of claims in Minnesota and Illinois, required extensive investment of labor and advancement of substantial costs by counsel.  The work performed advancing the claims of Class Members – on a fully contingent basis – carried significant risk, and many counsel performing that work, including Co-Lead Counsel, forwent other opportunities and dedicated themselves to these cases full-time for much or all of the past four years.  Only because of those efforts were they able to: review more than 2.5 million pages of documents; take or defend nearly 200 depositions (many multi-day depositions); subpoena 18 third party witnesses; produce more than eight expert reports; cross-examine 11 defense experts (some more than once); file 36 substantive motions with supporting legal memoranda; and respond to 19 substantive motions dealing with complex and sophisticated legal arguments — many without controlling precedent on the facts presented here — on issues such as state-law duty, economic-loss doctrine, proximate causation, intervening causation, federal preemption, *Noerr-Pennington*, due process, and the application of foreign law under World Trade Organization ("WTO") treaties, among others.

Furthermore, counsel performed their work while racing toward trial so as not to delay the prosecution of Class Members' claims, completing the depositions of Syngenta's 32 witnesses over 57 days in four continents and nearly 106 depositions, of plaintiffs and third parties across the U.S. within 12 months of the start of full fact discovery in the MDL.  They faced uncertain recovery, squaring off against Syngenta's top-flight and well-funded defense counsel armed with an extensive factual record and potentially credible arguments that: the trade disruption was the result of Chinese politics; damages were uncertain and speculative; and any tort duty to delay or restrict the sale of Syngenta's seed, legal in the United States, was

unfounded and unprecedented. Given these risks, the result achieved through counsel's perseverance and investment speaks for itself, justifying the Fee and Expense Request made herein.

Second, Co-Lead Counsel and Settlement Class Counsel Seeger and Stueve request that the Court issue an order allocating the Fee Request among the many lawyers who contributed to the settlement in the following manner:

- 50% of the Fee Request should be awarded to the Co-Lead Counsel to allocate among the 44 law firms, including the four Co-Lead law firms and Mr. Seeger's firm, who performed and reported common-benefit work in the Kansas MDL ("Kansas Common Benefit Group") pursuant to the Court's Common Benefit Order, in light of the fact that the Kansas Common Benefit Group, *inter alia,* took the lead in fact and expert discovery, obtained key legal rulings first in the case, obtained class certification of a nationwide and eight state-law litigation classes, invested over $6.6 million of their own money, led the plaintiffs' settlement negotiation committee, and obtained the only jury verdict – for $217.7 million – in the litigation;

- 12.5% of the Fee Request should be awarded to Minnesota Lead Counsel to allocate among all the law firms who performed and reported common-benefit work in the Minnesota litigation pursuant to the Minnesota Court's Common Benefit Order, for the reasons stated in their separate application for allocation of the Fee Request;

- 17.5% of the Fee Request should be awarded to Illinois Lead Counsel to allocate among themselves and their referral, affiliated, and related counsel for the reasons stated in their separate application for allocation of the Fee Request; and

- 20% of the Fee Request, if the one-third aggregate request is awarded, should be reserved by the Court to award $388,005 in attorneys' fees to Subclass Counsel and to any other counsel who makes a timely and valid request for fees that the Court deems appropriate under common-benefit doctrine principles.

This allocation is supported by Co-Lead Counsel and Seeger and in separate requests to be filed by Daniel Gustafson and Bill Sieben ("Minnesota Lead Counsel"), and Clayton A. Clark ("Illinois Lead Counsel"). Co-Lead Counsel and Seeger reserve the right to amend this request as to the allocation of the 20% upon review of any other applications submitted to this Court.

Third, Co-Lead Counsel and Seeger request that the Court approve service awards from the common fund to subclass representatives and to certain class representatives and bellwether plaintiffs who responded to written discovery (beyond the Plaintiff Fact Sheet), were deposed, and/or testified and represented the Kansas litigation class at trial.  These requests are made in varying amounts set forth below according to the plaintiffs' relative contribution, and are fully justified by the facts and law.

This Memorandum is supported by the cited and attached evidence, including: declarations from all four Co-Lead Counsel as Exhibits 1 (Patrick J. Stueve), 2 (Scott Powell), 3 (Don M. Downing), 4 (William Chaney), and lawyers at each of the Kansas Common Benefit Firms (Ex. 7, 10-47); the expert declarations of retired Magistrate Judge Richard Ralston (Ex. 5) and Professor Robert Klonoff (Ex. 6) whose opinions support the reasonableness of these requests; and the Kansas Common Benefit Firm time records, which the undersigned are prepared to submit *in camera* at the Court's  request.

## **FACTUAL BACKGROUND**

## I.    **KANSAS   COMMON   BENEFIT   GROUP   UNDERTOOK   SUBSTANTIAL EFFORT PROSECUTING CLASS MEMBERS' CLAIMS AGAINST SYNGENTA**

From  the  development  of  the  factual  record – which  required  nearly  two  hundred depositions across four continents coordinated with different types of plaintiffs in venues across the country – to the analysis of complex legal issues including duty, causation and the economic-loss doctrine in 22 different states, this was an enormously challenging case to prosecute.  Co-Lead Counsel, working in conjunction with an Executive Committee and others in the Kansas Common  Benefit  Group,[1]  took  the  lead  on  nearly  every  aspect  of  this  prosecution,  from

---

[1]  As used throughout this brief, "Co-Lead Counsel" includes the work performed by the four appointed Co-Lead Counsel and the attorneys and staff at their law firms.  The "Kansas Common Benefit Group" or "Kansas Common Benefit Attorney" refers to those lawyers and staff at other firms who

coordinating discovery to taking the lead in preparing for and examining fact witnesses during depositions, producing and defending the experts relied upon by Plaintiffs at trial, to actually trying the Kansas class case through to the jury's award of $217.7 million. Following the Kansas trial and months of settlement negotiations, the parties agreed on a $1.51 billion settlement.

The enormous work, expense and risk undertaken in achieving this settlement – as the Court has observed – are detailed in declarations submitted herewith. Exs. 1-7, 10-47. A summary is set out below.

### A.     The Court Appointed Co-Lead Counsel to Lead the Litigation.

Prior to the formation of the MDL, counsel recognized the need to assemble a high-quality and dedicated team of professionals, with a proven track record of taking risky claims the distance. To this end, Don Downing, Scott Powell, and William Chaney investigated, researched and filed two of the early, initial complaints against Syngenta, following their proven success trying multiple bellwether cases in *In re Genetically Modified Rice Litigation*, which they ultimately settled on behalf of producers for $750 million. They filed a complaint, *Five Star Farms*, in the District of Kansas, for which they joined forces with Patrick Stueve, a Kansas City attorney with similar, national experience prosecuting high-stakes litigation. *See Five Star Farms, et al. v. Syngenta AG et al.*, No. 2:14-cv-02571 (D. Kan.) (filed 11/11/14). The second complaint, *Wilson Farm*, was filed in the Eastern District of Missouri. *Wilson Farm Inc., et al. v. Syngenta AG et al.*, No. 4:14-cv-01908 (E.D. Mo.) (filed 11/11/14). Both complaints were filed on November 11, 2014 and amended on December 18, 2014. Following amendment, the *Wilson Farms* complaint asserted claims on behalf of farmers in 13 states (Alabama, Arkansas, Illinois,

---

performed work at the express direction and approval of Co-Lead Counsel in the performance of discrete tasks that advanced the common benefit of MDL plaintiffs and Class Members, pursuant to the Order Establishing Protocols for Common Benefit Work and Expenses and Establishing the Common Benefit Fee and Expense Fund ("CBO"). ECF No. 936. The identities of the Kansas Common Benefit Group are in the Declaration of Patrick J. Stueve ("Stueve Decl.") attached as Exhibit 1 in paragraph 644.

Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Tennessee, and Wisconsin) and the *Five Star Farms* complaint asserted claims on behalf of farmers in 6 states (Kansas, Colorado, Nebraska, North Dakota, South Dakota, and Oklahoma).   These complaints were the template used in drafting the Master Complaints, filed on March 13, 2015, which included early work with the agricultural economists describing the price impact of lost Chinese demand for corn on U.S. farmers.  *See* Ex. 3 (Downing Decl. ¶¶ 4, 8-21); Ex. 4 (Chaney Decl. ¶¶ 168-73); Ex. 2 (Powell Decl. ¶ 84).

Together, in response to the Court's solicitations for leadership, these four lawyers assembled a team of law firms, representing the diverse interests of the current Class Members. Ex. 3 (Downing Decl. ¶¶ 8-21).  That team included Downing, Chaney, Powell, and Stueve as "Co-Lead Counsel," along with the resources of their firms, as well as an Executive Committee (the "EC") consisting of Jayne Conroy, Christopher Ellis, David Graham, Richard Paul III, Robert Shelquist, John Ursu, Stephen Weiss, Tom Cartmell, Scott Poynter and Tom Bender.[2] The Court described the EC as "a set of lawyers whose own skills, demographics and client bases complement and add value to the leadership structure."   ECF No. 67 at 4.   They represented plaintiffs who were corn and milo producers, non-producers, farmers large and small, and sophisticated corporations.  *Id.*  And the Court agreed with Co-Lead Counsel that this team was the "best way to proceed," and for which the Court predicted would "bode[] well for the expeditious handling of this litigation."  *Id.* at 2.  The Court charged Co-Lead Counsel to, *inter alia*, "organize and supervise the efforts of plaintiffs' counsel in a manner to ensure that the pretrial and trial preparation for the plaintiffs is conducted effectively, efficiently, expeditiously,

---

[2] Tom Cartmell subsequently withdrew from leadership on June 29, 2015.  ECF No. 891.  Mr. Graham also withdrew, but only in 2018 following his client's settlement with Syngenta.  ECF No. 3498.

and economically" and "to encourage full cooperation and efficiency among all plaintiffs' counsel." *Id.* at 6-9. That order was issued on January 22, 2015.

On July 27, 2015, the Court entered the CBO, where it defined "Common Benefit Work" as "services performed for the benefit of all producer and/or all non-producer plaintiffs ... specifically authorized by [Co-]Lead Counsel." ECF No. 936 at 7. Such work included but was not limited to "investigation, discovery (whether documents, interrogatories, depositions or otherwise), coding or other analytical work relating to documents or evidence, research, motions and responses to motions, exhibits, bellwether trials and transcripts, [and] all other work performed under the direction of [Co-]Lead Counsel for the benefit of all producer and/or all non-producer plaintiffs, and orders on substantive matters involving Common Benefit Work." *Id.* at 7-8. The Court's order provided that client solicitation and other similar tasks were *not* to be considered Common Benefit Work. *Id.* at 8.

In June 2015, efficiency guidelines were circulated to all Kansas Common Benefit firms. During the 29 months of litigation, Co-Lead Counsel engaged the EC and the other lawyers in the Kansas Common Benefit Group to assist them in: conducting discovery, obtaining class certification, and securing the $217.7 million jury verdict. The $1.51 billion settlement followed. Time spent on work covered by the CBO, and a description of that work, was reported to Stueve during the course of the MDL. After the case settled, each firm was asked to re-review their time for compliance with the CBO and resubmit it. Downing, Chaney, and Powell then reviewed all time entries for compliance and reasonableness. Ex. 1 (Stueve Decl. ¶ 621-42); Ex. 2 (Powell Decl. ¶ 217); Ex. 3 (Downing Decl. ¶ 84); Ex. 4 (Chaney Decl. ¶ 315).

Pursuant to the CBO, for everyone who remains in the Class, attorney's fees are to be determined and awarded from the overall recovery made available by the settlement, pursuant to

the Court's approval and orders.  *See* ECF No. 936 at 20 ("In the event that there is a class settlement, recovery or judgment in favor of the class, no assessment pursuant to this Section will be made, either for attorneys' fees or for expenses, individually from any class member or his/her/its individual attorney as to the portion of any class recovery distributed to that individual class member if the class member remains in the class (i.e., does not opt-out of the class). Instead, all fees and expenses for that class member will come out of the overall class recovery funds provided by defendants, as approved by the Court, or otherwise Ordered by the Court.").

### B.  Co-Lead Counsel Organized and Coordinated a Team of Lawyers to Conduct Discovery in the MDL.

Co-Lead Counsel organized and coordinated the MDL efficiently and expeditiously.  Ex. 1 (Stueve Decl. ¶ 621-29).  The nature of the MDL required extensive organization and effort because it included claims of producers, non-producers, individuals, and putative class members. *Id.* at ¶ 292.  Following Rule 12(b)(6) motion practice (discussed *infra*), the Court established a discovery schedule that included five non-producer plaintiffs, 48 individual producer plaintiffs ("bellwether plaintiffs"), six producer plaintiffs who purchased Agrisure Viptera and/or Duracade, and the putative nationwide and eight state-law class actions, which consisted of a further 21 putative class-representative producer plaintiffs.  ECF No. 1098 at 6; ECF No. 1495 at 1-2. Syngenta and Co-Lead Counsel each selected half of the bellwether plaintiffs.  To ensure that the best plaintiffs were selected, Co-Lead Counsel and others assigned from the Kansas Common Benefit Group analyzed the relevant state laws, interviewed potential plaintiffs, and vetted each and every one.  Ex. 1 (Stueve Decl. ¶¶ 233-34); Ex. 2 (Powell Decl. ¶¶ 96-99); Ex. 4 (Chaney Decl. ¶¶ 192-94); Ex. 43 (Bender Decl. ¶ 6); Ex. 30 (Paul Decl. ¶ 6(d)).  In total, after some withdrawals, the plaintiffs covered by Scheduling Order No. 2 consisted of 69 producer plaintiffs.  Ex. 2 (Powell Decl. ¶ 99).  On November 19, 2015, full discovery commenced on the

claims covered by Scheduling Order No. 2 with the first trial, scheduled for June 2017, nineteen months later.  ECF No. 1098 at 14; Ex. 1 (Stueve Decl. ¶ 243).

**1.     Co-Lead Counsel Led Offensive Discovery Against Syngenta.**

Co-Lead Counsel and attorneys in their firms led the offensive discovery against Syngenta, engaging others in the Kansas Common Benefit Group in discrete tasks such as legal research, drafting of legal briefs, document review, and, in a few instances, the taking of depositions.  They drafted and issued to Syngenta 267 document requests and 71 interrogatories.  Ex. 1 (Stueve Decl. ¶¶ 247-48); Ex. 2 (Powell Decl. ¶ 158).  They spent significant time identifying custodians from whom documents would be collected, negotiating search protocols with Syngenta, and establishing a joint document depository available to all coordinating plaintiffs' counsel ("MDL Document Database").  More than 1.5 million pages of responsive documents were obtained from Syngenta and stored in the MDL Document Database.  Ex. 1 (Stueve Decl. ¶¶ 251-53).  Co-Lead Counsel managed an extensive document review, selecting document reviewers from Kansas Common Benefit Group firms and emphasizing attorneys with long-term availability to commit to the project.  They prepared a document-review protocol, and trained and conducted initial review sets on site in Kansas City, Missouri, supervised by a team from Co-Lead Counsel's firms.  Co-Lead Counsel tracked performance utilizing software in the MDL Document Database, routing review sets to the most efficient and effective reviewers.  Ex. 1 (Stueve Decl. ¶¶ 259-74); Ex. 2 (Powell Decl. ¶¶ 160-63); Ex. 4 (Chaney Decl. ¶¶ 199-201).

Review results were housed in the MDL Document Database and made available to coordinating counsel for all plaintiff types across the country.  The database contained an issue code for each relevant document, "hot doc" flags, and reviewer comments.  Once the production was narrowed to several thousand pages of potential "hot docs," senior members of Co-Lead Counsel's firms responsible for deposition preparation, summary-judgment briefing, and trial

preparation then catalogued and narrowed those documents further.  Ex. 1 (Stueve Decl. ¶ 263); Ex. 2 (Powell Decl. ¶¶ 160-63).  The project resulted in: a list of "key events"; "factual bases of certain anticipated defenses"; "a factual timeline"; and an identification of "topics for questioning at depositions."  Ex. 2 (Powell Decl. ¶ 163).  It permitted Co-Lead Counsel to assemble "all of Syngenta's internal discussions about the status and problems with [its Chinese] applications and compare them with Syngenta's public statements regarding when Chinese approval was expected."  Ex. 1 (Stueve Decl. ¶ 418).  The coded database represented an extensive knowledge base from which deposition and trial documents could be selected.  Little was more important to the overall merits of Plaintiffs' claims than obtaining this documentary evidence.  Ex. 1 (Stueve Decl. ¶ 262).

Co-Lead Counsel also supervised the inquiry into Syngenta's privilege log.  Ex. 1 (Stueve Decl. ¶¶ 256-58).  Following meet-and-confer efforts, they filed a motion to compel, which was granted in part.  ECF No. 3109; ECF No. 3238.

Co-Lead Counsel prepared a list of 126 Rule 30(b)(6) deposition topics for Syngenta. Ex. 2 (Powell Decl. ¶ 158(a)).  These depositions began in January 2016 – just a few months after Plaintiffs were granted leave to serve non-targeted written discovery – and individual depositions followed immediately thereafter.  Ex. 1 (Stueve Decl. ¶¶ 239, 266).  Co-Lead Counsel and only one other lawyer from the Kansas Common Benefit Group deposed all 32 Syngenta witnesses – 19 of those deposition lasted two or more days.  *Id.* at ¶ 405.  Plaintiffs played 18 of these depositions in their case-in-chief during the Kansas trial.  *Id.* at ¶ 420.

These depositions were critical in establishing, *inter alia*, Syngenta's knowledge regarding the risk to downstream stakeholders of commercializing its GM traits ahead of Chinese approval; its awareness of Chinese actual and expected corn imports from the U.S.; the facts,

timeline and statements made by Syngenta to Chinese regulatory authorities about its applications for import approval of its GM traits; how and whether China's regulatory system was processing other GM traits; and, rebuttal to its other defenses. *Id.* at ¶¶ 407-17; Ex. 2 (Powell Decl. ¶¶ 164-68); Ex. 4 (Chaney Decl. ¶¶ 241-42); Ex. 3 (Downing Decl. ¶¶ 32-35).

Among counsel for Plaintiffs in the various jurisdictions, Co-Lead Counsel took the lead in preparing and questioning Syngenta's witnesses. This required extensive preparation and travel in the United States, Hong Kong, Great Britain, and Australia. Depositions were treated as trial depositions given the inability to ensure that any witness would be within the Court's subpoena power at the time of trial. Many of these depositions were submitted as evidence in both the Kansas and Minnesota trials. Ex. 1 (Stueve Decl. ¶¶ 407-17, 577). Normally, prior to the deposition, Co-Lead Counsel would share their outline and exhibits with Plaintiffs' counsel in other jurisdictions. Ex. 2 (Powell Decl. ¶¶ 164-68); Ex. 4 (Chaney Decl. ¶¶ 164, 226, 241-42, 282); Ex. 3 (Downing Decl. ¶¶ 32-35); Ex. 30 (Paul Decl. ¶ 6(b)).

### 2. Co-Lead Counsel Led Third-Party Discovery.

Co-Lead Counsel prepared and served five subpoenas on third parties: Louis Dreyfus Commodities LLC; Bunge North America, Inc.; Gavilon Grain, LLC, CHS, Inc.; the American Soybean Association; and, CropLife America. Ex. 1 (Stueve Decl. ¶ 421). Both Co-Lead Counsel and Syngenta separately subpoenaed another five third parties: North American Export Grain Association, Inc.; National Grain and Feed Association; American Seed Trade Association; Biotechnology Innovation Organization; and U.S. Grains Council. *Id.* at ¶ 424; Ex. 2 (Powell Decl. ¶ 159); Ex. 4 (Chaney Decl. ¶ 198). Syngenta additionally subpoenaed another eight third parties, including the National Corn Growers Association. Ex. 1 (Stueve Decl. ¶ 425). Co-Lead Counsel engaged in extensive meet-and-confer efforts regarding these

subpoenas, resulting in the production and ultimate review of more than 170,000 pages of additional documents. *Id.* at ¶¶ 426-27.

Nine of these third parties were deposed. *Id.* at ¶ 428. Counsel for Plaintiffs asked questions at six depositions and, in all but two instances, Kansas Common Benefit Attorneys led the questioning for Plaintiffs. *Id.* at ¶ 429. Several of these third parties included trade groups for the biotechnology industry, and Syngenta played video clips from the depositions of Matthew O'Mara, Nathan Fields, Gary Martin and Thomas Sleight. *Id.* at ¶ 431.

Syngenta also took extensive discovery of non-parties Cargill and ADM in the Louisiana litigation, where it cross noticed over 40 depositions with the MDL and Minnesota. Ex. 1 (Stueve Decl. ¶ 433); Ex. 2 (Powell Decl. ¶ 168). Co-Lead Counsel participated in all 40 depositions, which occurred in numerous U.S. cities, Hong Kong, and London, spanning 72 deposition days. Ex. 1 (Stueve Decl. ¶ 431); Ex. 2 (Powell Decl. ¶ 167) (requiring multiple overseas trips). These depositions required extensive review of Cargill and ADM documents and preparation. Ex. 1 (Stueve Decl. ¶ 436); Ex. 2 (Powell Decl. ¶ 168); Ex. 4 (Chaney Decl. ¶¶ 199, 247-73). They covered both offensive and defensive issues in the litigation – both of which were critically important. As a defensive matter, Syngenta vociferously argued that these non-parties were at fault for the Chinese rejections (ECF No 2947 at 96-111; ECF No. 3344 at 59-64), that their actions constituted a defense to proximate cause (ECF No. 2861 at 86-99), and that their conduct was relevant to foreseeability and the extent to which Syngenta complied with the standard of care (ECF No. 3141 at 1-5; ECF No. 3163 at 65). Syngenta played eight of these 42 depositions at the Kansas trial. Ex. 1 (Stueve Decl. ¶ 438). As an offensive matter, Plaintiffs developed key evidence related to the relevant standard of care and the Chinese regulatory process through these witnesses, including Cargill's Dr. Randy Giroux who testified at the

Kansas and Minnesota trials as an expert for the Plaintiffs.  Ex. 1 (Stueve Decl. ¶¶ 434-35, 437).

Plaintiffs also played the deposition of Anthony Reed in their case-in-chief during the Kansas

trial.  *Id.* at ¶ 438.

In total, Kansas Common Benefit Group participated in 49 third-party depositions,

requiring an extensive investment of time and resources.  Ex. 1 (Stueve Decl. ¶¶ 428-33); Ex. 2

(Powell Decl. ¶ 169); Ex. 3 (Downing Decl. ¶ 33); Ex. 4 (Chaney Decl. ¶¶ 247-73).

### 3.    Co-Lead Counsel Coordinated Non-Producer Bellwether Discovery in the Kansas MDL with Kansas Common Benefit Attorneys.

Two of the 4 non-producer bellwether plaintiffs' claims, Trans Coastal and Rail Transfer,

also proceeded through full fact discovery under Scheduling Order No. 2.[3]  Ex. 45 (Robinovitch

Decl. ¶ 20); Ex. 35 (Conroy Decl. ¶ 9).   Unlike producer plaintiffs, these plaintiffs were

required to serve complete Rule 26 initial disclosures.  Ex. 4 (Chaney Decl. ¶ 221).   Over the

course of the litigation, they each responded to three sets of requests for production, two sets of

interrogatories, and requests for admission.  *Id.* at ¶¶ 222-24.   Co-Lead Counsel drafted

potential objections and worked with each plaintiff's counsel in preparing and serving

substantive responses.  *Id.* The Kansas Common Benefit Group defended nine depositions over

17 days in multiple cities for the non-producer bellwether plaintiffs.  *Id.* at ¶¶ 230-40.

### 4.    Co-Lead Counsel Assembled and Managed a Team to Conduct Defensive Producer Discovery in the Kansas MDL.

There are presently 4,049 plaintiffs in the MDL.  Ex. 1 (Stueve Decl. ¶ 144).   Only

putative class representatives and bellwether plaintiffs were required to participate in written

discovery, and all bellwether producer class representatives and producer plaintiffs completed

fact discovery.  Ex. 2 (Powell Decl. ¶ 106).   There were 89 such plaintiffs who fell into these

---

[3] Two bellwethers completed some discovery before dismissing their claims.  Ex. 4 (Chaney Decl. at 57 n.2).

categories.  *See id.*  Putative class representatives named in one of the master producer complaints, but not covered by Scheduling Order No. 2, responded to 27 document requests.  *Id.* The remaining 69 producer plaintiffs completed discovery under Scheduling Order No. 2.  *Id.*  In total, each of them responded to 97 requests for documents, 56 interrogatories, and 98 requests for admission; these requests sought extensive information about the plaintiff's farming operations over long periods of time.  *See id.* at ¶¶ 106, 117-32; Ex. 1 (Stueve Decl. ¶¶ 280-81). This work required to respond to this discovery was necessarily extensive: between 2015-17 the Kansas Common Benefit Group produced approximately 350 *volumes* of written discovery, including: 400,000 pages of documents; approximately two-hundred sets of original and amended interrogatory responses, representing over 10,000 interrogatory responses; and two-hundred sets of original and amended responses to Syngenta's request for admissions.  Ex. 2 (Powell Decl. ¶ 102).

This discovery occurred prior to class certification, so these bellwether plaintiffs represented potentially important test cases for Plaintiffs' claims against Syngenta, and this discovery was defensive evidence that Syngenta would rely upon in opposing class certification. Further, if certification had been denied, these cases would be the test ground for summary-judgment, *Daubert* issues*,* trial, and appeal of Plaintiffs' claims in the MDL.  It was appropriate for and necessary for Co-Lead Counsel to manage this discovery. Ex. 1 (Stueve Decl. ¶ 279).

To this end, Co-Lead Counsel worked with several EC firms and individual counsel in the Kansas Common Benefit Group to comply with these discovery obligations.  Ex. 2 (Powell Decl. ¶¶ 100, 130-31).   Co-Lead Counsel prepared model responses to various requests, reviewed documents for privilege, coordinated production, and handled service.  *Id.* at ¶¶ 100, 129, 117-32.  Kansas Common Benefit Group firms spend extensive time and effort preparing

substantive answers, collecting documents, and working with Plaintiffs to answer this discovery.[4] Not a single plaintiff covered by Scheduling Order No. 2 was dismissed for non-compliance with their discovery obligations.  *Id.* at ¶ 114.  The degree of individualized attention and effort given by the Kansas Common Benefit Group to this discovery is reflected in the varying size and length of each plaintiff's responses.  Some plaintiffs produced tens of thousands of pages of documents, others less than a hundred; and, interrogatory responses ranged from 20 to 33 pages long.  *Id.* at ¶ 157.

Moreover, the 69 producers – of varying farm sizes – utilized different levels of technology and storage systems.  Thus, there was no single method used to identify and collect responsive documents.  Often, a member of the discovery team had to physically drive to the farm (often in a remote, rural location), conduct a records search, copy responsive information (either electronically or manually), and catalogue the information for production.  Ex. 1 (Stueve Decl. ¶¶ 299-300).  In other instances, responses required seeking information from third parties, such as where the Kansas Common Benefit Group contacted or went to third-party locations to collect documents (such as a crop insurance agent, grain elevator or seed dealer) with the plaintiff's authorization.  Ex. 2 (Powell Decl. ¶¶ 123, 131).  In producing the documents, Co-Lead Counsel assembled, labeled, uploaded, and prepared load files for all productions in compliance with the Court's ESI protocol.  *Id.* at ¶ 103.

The Kansas Common Benefit Group also engaged in affirmative discovery with the Plaintiffs.  Syngenta produced over 100,000 stewardship agreements, showing the names of all

---

[4] *See* Ex. 10 (Donarski Decl. ¶ 7); Ex. 13 (J. Bell Decl. ¶ 5); Ex. 44 (W. Bell Decl. ¶¶ 4-5);  Ex. 43 (Bender Decl. ¶¶ 6-33); Ex. 15 (Ellis Decl. ¶¶ 6-7); Ex. 16 (Preston Decl. ¶ 6); Ex. 18 (Emerson Decl. ¶¶ 7-8); Ex. 21 (Crompton Decl. ¶¶ 4-5); Ex. 40 (Kerlick Decl. ¶¶ 12-13); Ex. 24 (Shelquist Decl. ¶ 8); Ex. 25 (Lundberg Decl. ¶¶ 6-7); Ex. 26 (Flax Decl. ¶¶ 5-6); Ex. 28 (Wedgworth Decl. ¶ 19); Ex. 29 (Lytle Decl. ¶ 5); Ex. 30 (Paul Decl. ¶¶ 6-7); Ex. 31 (Poynter Decl. ¶ 6); Ex. 34 (Schirger Decl. ¶ 7); Ex. 7 (Weiss Decl. ¶¶ 5, 36-48); Ex. 37 (Soper Decl. ¶ 6); Ex. 38 (Bukovac Decl. ¶¶ 7-8); Ex. 39 (Thrash Decl. ¶¶ 5-6).

farmers and/or entities that purchased seeds containing the Agrisure Viptera or Duracade seed traits. Because the farmers' names were typically hand written, these records were manually reviewed and the names had to be typed into a searchable database, a very time-consuming process, in order to confirm that Syngenta would not argue any of the bellwether plaintiffs purchased or planted Viptera or Duracade seed. Ex. 1 (Stueve Decl. ¶¶ 271-73).

All of these plaintiffs were deposed. There were over 70 depositions because, in some instances, more than one person was produced from each plaintiff. A team of only 11 lawyers was assembled to prepare and produce most of the plaintiffs for their deposition. Ex. 2 (Powell Decl. ¶ 133). An EC firm, Walters Bender, coordinated scheduling and deposition preparation. Ex. 43 (Bender Decl. ¶ 6). The client was prepared ahead of time, typically in person, *id.*, using an extensive deposition outline prepared by the EC in consultation with Co-Lead Counsel. *Id.*; Ex. 1 (Stueve Decl. ¶ 294). Ahead of each deposition, this team ensured the producer plaintiffs' document production was complete. Ex. 2 (Powell Decl. ¶ 134). This small team completed all depositions, oftentimes in rural and remote locations, for over 70 witnesses in the six months between December 2015 and May 2016. *Id.* at ¶ 133; Ex. 1 (Stueve Decl. ¶ 295).

Work continued even after the depositions were completed. From May 2016 to December 2016, the Kansas Common Benefit Group conducted numerous meet-and-confer activities with Syngenta. Ex. 2 (Powell Decl. ¶¶ 143-45). These efforts were precipitated by a letter from Syngenta's counsel containing 88-pages (single-spaced) of purported deficiencies in the plaintiffs' discovery answers. *Id*. at ¶ 143. The Kansas Common Benefit Group engaged in substantial effort reviewing these assertions, collecting and supplementing responses, and responding in a set letters totaling 150 (single-spaced) pages. *Id.* This prompted a 94-page (single spaced) reply by Syngenta's counsel. *Id.* at ¶ 144. An attorney from one of Co-Lead

Counsel and the Walters Bender firm then conducted a lengthy meet-and-confer with Syngenta's lawyers on the purported deficiencies, which lead to both further supplementation and another round of lengthy letters. *Id.* As a result of these efforts, the disputes were all resolved without Court intervention. *Id.* at ¶ 145.

### C. The Kansas Common Benefit Group Prevailed on Syngenta's Third-Party Complaint.

Throughout the course of the litigation, Syngenta asserted multiple defenses to shift responsibility for Plaintiffs' injuries on other parties. *See* Ex. 1 (Stueve Decl. ¶¶ 222-28). In late 2015, in answering the Non-Producer Plaintiffs' Second Amended Complaint, Syngenta filed not only an answer and affirmative defenses, but counterclaims as well. ECF No. 1224. Its counterclaims sought indemnification and contribution for any recovery by Plaintiffs against Syngenta. ECF No. 1224 at 106-09. On December 3, 2015, Syngenta filed its Third-Party Complaint against Cargill and ADM, with causes of action also seeking contribution and indemnity. ECF No. 1259. Had Syngenta been successful in maintaining these claims, all of the trials would have taken significant additional time and would have been far more complicated, with higher risk that a jury could find someone other than Syngenta responsible. Ex. 1 (Stueve Decl. ¶ 225).

On January 19, 2016, Co-Lead Counsel with Kansas Common Benefit Group counsel filed a motion to dismiss the counterclaims and third-party claims and memorandum in support. ECF Nos. 1434, 1435. Syngenta opposed the motion, ECF No. 1661, and a reply was filed on March 25, 2016. ECF No. 1766. On April 4, 2016, the Court granted the joint motion to dismiss Syngenta's counterclaims and third-party complaints. ECF No. 1803. This victory ensured that there would not be third parties sitting at trial that Syngenta could blame for the harm to Plaintiffs. Ex. 1 (Stueve Decl. ¶ 225). It also resulted in the defeat of Syngenta's similar claims

against non-producer Plaintiffs and Class Members.  Syngenta would later seek to permit the jury to assign fault to non-party ADM, Cargill, other exporters of corn, and even China, and also avoid liability based on superseding cause.  Again, Plaintiffs' counsel defeated those efforts.  *See infra*, Section I.E.

> ### D.  Co-Lead Counsel Litigated Key Legal Issues in the Case.

Co-Lead Counsel and the Kansas Common Benefit Group's raised or responded to a number of key and difficult legal and factual issues via briefing and pleadings throughout the case.  They prepared and filed precise and carefully pled Producer Plaintiffs' Class Action Master and Non-Producer Plaintiffs' Class Action Master Complaints (ECF Nos. 296, 297), both of which included specific economic allegations supporting the alleged harm.  These initial Master Complaints contained over 274 paragraphs of allegations, a nationwide count for relief under the Lanham Act, and over 70 additional causes of action.  These Master Complaints were supplemented following review of Syngenta's initial document production in response to Scheduling Order No. 1, adding another 100 paragraphs of factual allegations.  ECF Nos. 450, 451.  Additional amendments were made over the course of the MDL.  ECF Nos. 1064, 1377.

Legal briefs in the case – drafted almost exclusively by Co-Lead Counsel with frequent collaboration from EC firm Seeger Weiss – were also complex and extensive.  A watershed brief, presented and briefed first in the Kansas MDL, was Plaintiffs' response to Syngenta's Motion to Dismiss the Master Complaints pursuant to Rule 12(b)(6).  ECF No. 927; Ex. 1 (Stueve Decl. ¶¶ 203-16); Ex. 2 (Powell Decl. ¶¶ 93-95); Ex. 4 (Chaney Decl. ¶¶ 188-90); Ex. 3 (Downing Decl. ¶ 27).  Syngenta's June 19, 2015 memorandum in support of its motion to dismiss was 128 pages with appendices.  ECF No. 857.  Plaintiffs' response was 207 pages with appendices.  ECF No. 927.  This Court's memorandum and order was itself 120 pages.  ECF No.

1016.  But, that was only one such brief, there were other significant briefs with comprehensive arguments and multiple legal analyses, such as:

- Early in the litigation, Syngenta removed hundreds of cases originally filed in state courts on the basis of the Federal Common Law of Foreign Relations.  After full briefing before this Court, these cases were remanded back to state court.  ECF No. 395.  This ruling – and the briefing filed by Co-Lead Counsel – thus paved the way for the separate lawsuits in Minnesota and Illinois state court.  But for the ruling, all Syngenta cases would have been prosecuted in federal court.

- Syngenta's memorandum in support of its motion for summary judgment in the Kansas class case contained 41 pages of facts, 71 pages of argument, and 323 exhibits.  ECF No. 2861.  Plaintiffs' opposition contained 79 pages responding to Syngenta's statement of facts, ECF No. 2940-1 (Appx. A), a 117-page statement of additional facts (587 separate paragraphs), ECF No. 2940 (¶¶ 1-587), 100 pages of argument, ECF No. 2940 at 2-100, and 415 exhibits.

- Plaintiffs' own motion for partial summary judgment contained 22 pages of facts, 36 pages of argument, and 64 exhibits.  ECF Nos. 2859 & 2859-1-64.  Plaintiffs' reply was 112 pages, with 30 additional exhibits.  ECF Nos. 2994 & 2994-2-31.

- Syngenta's memorandum in support of its post-trial motion under Rules 50(b) and 59 was sixty-nine pages long.  ECF No. 3344.  Plaintiffs' opposition was 82 pages long.  ECF Nos. 3392.

*See* Ex. 1 (Stueve Decl. ¶¶ 499-509, 570-72); Ex. 2 (Powell Decl. ¶¶ 180-82, 203); Ex. 3 (Downing Decl. ¶¶ 4(b), 49-50); Ex. 4 (Chaney Decl. ¶¶ 178-81, 279-80, 301); Ex. 7 (Weiss Decl. ¶ 15); Ex. 20 (Ursu Decl. ¶ 6).

Co-Lead Counsel and Seeger Weiss also prepared the extensive motion for class certification of the litigation classes in the MDL, including the development of two agricultural economists and their expert reports.  Ex. 1 (Stueve Decl. ¶¶ 441-48); Ex. 3 (Downing Decl. ¶ 40).  The motion, memorandum and supporting exhibits themselves were voluminous.  *See* ECF Nos. 2156-57.  In response, Syngenta filed nearly 1,000 pages of argument and exhibits attacking the ascertainability of the class and, similar to the successful arguments in the *Rice* litigation, alleging individualized issues pertaining to claims and damages, both of which were alleged to

defeat commonality and predominance.  *See* ECF No. 2335.  Plaintiffs' reply brief and exhibits totaled nearly 1,900 pages.  ECF No. 2436.

Co-Lead Counsel produced both of their agricultural economists for deposition, and deposed three defense experts designated by Syngenta when it opposed certification.  Ex. 1 (Stueve Decl. ¶¶ 449-51); Ex. 3 (Downing Decl. ¶ 40).  The Court held a two-day class certification hearing in which Drs. Babcock and Carter testified live and were cross-examined by Syngenta.  Ex. 1 (Stueve Decl. ¶ 458).  Significant time was devoted to preparing for this hearing, including a dry run with Minnesota Lead Counsel the day before the hearing.  Ex. 3 (Downing Decl. ¶ 40).  On September 26, 2016, the Court granted the motion and certified the nationwide and eight state classes, which was the first class certification decision in any of the related cases. Ex. 1 (Stueve Decl. ¶¶ 459-61).

On September 26, 2016, the Court granted the motion for certification of the litigation classes.  ECF No. 2547.  On October 11, 2016, Syngenta filed a Rule 23(f) Petition for Permission to Appeal Class Certification Order.  *In re Syngenta AG MIR162 Corn Litigation*, Case No. 16-607 (10th Cir. Oct. 11, 2016).  If granted, this Petition likely would have delayed the June 2017 Kansas trial and put at substantial risk the chance of trying Plaintiffs' claims as class actions.  Ex. 1 (Stueve Decl. ¶¶ 493-98).  Co-Lead Counsel and Seeger Weiss prepared and filed an opposition brief.  On December 7, 2016, the Tenth Circuit denied the Rule 23(f) Petition because the "district court's rulings in the order granting class certification are well-researched and reasoned, and, if any rulings are in error, those errors can be addressed on appeal, if necessary."  *In re Syngenta AG MIR162 Corn Litigation,* Case No. 16-607, at 3 (10th Cir. Dec. 7, 2016).

In addition to Plaintiffs' initial motion for class certification and the other titanic briefings described above, and excluding the *many* unopposed, procedural, or administrative motions that were filed in the MDL, Co-Lead Counsel filed approximately thirty-six other substantive motions. *See* ECF Nos. 283, 365, 848, 854, 945, 1213, 1214, 1289, 1435, 1580, 1642, 2237, 2364, 2428, 2598, 2617, 2856, 2868, 2871, 2872, 2877, 2880, 2882, 2884, 2886, 2903, 2912, 3081, 3101, 3109, 3128, 3175, 3297, 3341, 3431, and 3506.[5]  And they responded to approximately nineteen substantive motions filed by Syngenta or others.  *See* ECF Nos. 1091, 1557, 1615, 1810, 1825, 2090, 2239, 2476, 2949, 2952, 2954, 2456, 2957, 2958, 2960, 2961, 2983, 3029, 3267.  In addition, the Court held, and Co-Lead Counsel attended, approximately seventeen hearings or status conferences over the course of the MDL.  *See* ECF Nos. 77, 286, 333, 340, 1087, 1335, 1526, 1546, 2661, 2768, 3085, 3118, 3289, 3347, 3394, 3399, 3513.  The Court itself issued at least 17 Memoranda and Orders, containing substantive analysis of disputed legal issues, during the litigation phase of this case.  ECF Nos. 403, 935, 1016, 1679, 1803, 2047, 2426, 2492, 2502, 2547, 2556, 2703, 3051, 3134, 3319, 3426, 3437.

The legal work represented a significant investment of time and resources by the Kansas Common Benefit Group, and it paved the way for settlement.

**E.    Co-Lead Counsel Led Expert Discovery on the Key Experts.**

Before even filing a complaint, Co-Lead Counsel consulted with agricultural economists to understand and investigate the extent of the damages.  Ex. 3 (Downing Decl. ¶¶ 8, 11). Pursuant to Rule 26, Co-Lead Counsel disclosed nine experts in the MDL.  These included Dr. Bruce Babcock, Dr. Colin Carter, Dr. Randy Giroux, Dr. Joe Keaschall, Kevin Latner, and Dr.

---

[5] Although citations are not referenced here, all such motions filed by Plaintiffs were typically accompanied by a Memorandum of Law and a Reply brief.  In rare instances, a Sur-reply brief and/or Notices of Supplemental Authority were also prepared and filed.

Dirk Maier.[6]   These six experts provided opinion testimony on a broad range of topics, including: agricultural economics, the U.S. commodity system, the standard of care, the efficacy of Syngenta's seeds, and the Chinese regulatory system.  Co-Lead and EC Counsel retained and prepared all nine of the experts.  Ex. 1 (Stueve Decl. ¶¶ 466-69); Ex. 2 (Powell Decl. ¶¶ 169-75); Ex. 30 (Paul Decl. ¶ 6(f)).  Many months were spent discussing opinions and facts, reviewing drafts, and preparing for and defending the experts at their depositions.  Ex. 3 (Downing Decl. ¶¶ 6, 11, 28, 38, 43, 47, 53, 62, 67); Ex. 1 (Stueve Decl. ¶¶ 469); Ex. 2 (Powell Decl. ¶¶ 173); Ex. 30 (Paul Decl. ¶ 6(f)).   Syngenta moved to strike all of the experts under *Daubert*.  Ex. 1 (Stueve Decl. ¶ 511).  Co-Lead Counsel researched, prepared, and filed responses to each motion.  Ex. 2 (Powell Decl. ¶ 174); Ex. 1 (Stueve Decl. ¶ 509); Ex. 3 (Downing Decl. ¶ 51).  They defeated nearly all of Syngenta's arguments.  *See* ECF Nos. 2863 (Dr. Dirk Maier), 2866 (Dr. Joe Keaschall), 2870 (Kevin Latner), 2876 (Dr. Randal Giroux), 2888 (Dr. Bruce Babcock) and 2892 (Dr. Colin Carter).  Ultimately, Drs. Carter, Babcock, Keaschall, and Giroux testified at the Kansas trial, and did testify or were expected to testify in the Minnesota trial.  Ex. 1 (Stueve Decl. ¶ 469).

Syngenta disclosed twelve experts, covering subjects including the USDA process for approving new GM products; the U.S. commodity system; routes of transgenic contamination; industry standards for commercialization of new GM crops; China's regulatory system and purported political manipulation of this system; Chinese law on sale, shipping and import/export of foreign agricultural products containing GM traits; and damages.  Ex. 1 (Stueve Decl. ¶¶ 475-76).   Co-Lead Counsel led defensive expert discovery for ten of these experts, including:

---

[6] Plaintiffs also originally designated Bernard Black and David Teece, experts retained and prepared by Minnesota counsel, but both experts were later voluntarily withdrawn in the MDL.  ECF No. 2988.  Co-Lead Counsel additionally designated Eric C. Frye to provide individual economic analyses of specific plaintiffs, but the parties agreed to delay that designation after the classes were certified.

deposing each expert and preparing and filing *Daubert* motions against each expert.[7]   Ex. 1 (Stueve Decl. ¶ 508); Ex. 2 (Powell Decl. ¶ 174); Ex. 3 (Downing Decl. ¶ 51); Ex. 4 (Chaney Decl. ¶ 277).   Moreover, Co-Lead Counsel employed two pieces of strategy that significantly narrowed the scope of expert testimony Syngenta could present at trial.   First, Co-Lead Counsel subpoenaed Syngenta's only standard-of-care expert, J. Thomas Carrato who authored the BIO Policy, seeking documents responsive to his expert analysis, and challenged his previous employer's attempts to shield these documents based on privilege and confidentiality objections. After several rounds of legal briefing and favorable orders issued by the Court, Syngenta ultimately withdrew Mr. Carrato as an expert witness, leaving Syngenta without a standard-of-care expert for at least the Kansas, Minnesota, Arkansas, Missouri, Illinois, Iowa, Nebraska, South Dakota, and Ohio trials.   Ex. 1 (Stueve Decl. ¶¶ 476-90).   Second, Co-Lead Counsel prepared and filed a successful *Daubert* brief striking Dr. Goodwin's alternative damages model, which left Syngenta without an alternative damages computation for these trials.   *Id.* at ¶ 515; ECF No. 3134 at 29.

Finally, work was conducted in preparing expert reports and opinions for non-producer bellwether plaintiffs.   Ex. 4 (Chaney Decl. ¶ 278); Ex. 45 (Robinovitch Decl. ¶ 22).

### F.    Co-Lead Counsel Responded to and Filed Summary Judgment.

On February 6, 2017, Syngenta filed a summary judgment motion seeking dismissal of "all claims asserted by the Nationwide Lanham Act Class and Kansas State Class."   ECF No. 2860 at 2.   Syngenta's memorandum was 121 pages, including 137 paragraphs of purportedly undisputed materials facts, and attaching 323 exhibits totaling more than 2,900 pages.   ECF No. 2861.   Opposition to this summary judgment motion was enormously complicated.   Co-Lead

---

[7] As rebuttal experts to Black and Teece, Page and Daines were withdrawn by Syngenta when Plaintiffs withdrew Black and Teece.  ECF No. 2971.

Counsel's firms drafted responses to all of Syngenta's 137 fact assertions, and with assistance from Kansas Common Benefit Group, drafted 587 statements of additional facts that canvassed the totality of the discovery in this litigation, including excerpts from depositions taken across the world, as well as documents produced by Syngenta and third parties throughout the course of the litigation.  Ex. 1 (Stueve Decl. ¶¶ 499-509); Ex. 2 (Powell Decl. ¶¶ 180-82); Ex. 3 (Downing Decl. ¶¶ 54-55); Ex. 4 (Chaney Decl. ¶¶ 279-80).  The brief and supporting exhibits total more than 9,000 pages.  ECF Nos. 2940-46.

Co-Lead Counsel also drafted and filed a motion for partial summary judgment, seeking dismissal of significant affirmative defenses, including assumption of risk, comparative fault, mitigation, intervening and superseding cause and purported business and economic justification. *See* ECF Nos. 2858, 2859.  The memorandum and supporting exhibits totaled more than 1,900 pages and asserted 123 statements of undisputed facts.  ECF No. 2859.  In addition to responding to Syngenta's legal arguments, Plaintiffs' reply brief responded to Syngenta's 208 statements of additional material fact.  ECF No. 2994; Ex. 1 (Stueve Decl. ¶¶ 499-509); Ex. 2 (Powell Decl. ¶¶ 180-82); Ex. 4 (Chaney Decl. ¶¶ 279-80); Ex. 3 (Downing Decl. ¶¶ 54-55).

These motions were granted in part and denied in part.  ECF No. 3051.  Among other things, and importantly, the Court narrowed the affirmative defenses Syngenta could raise at trial, refusing Syngenta's bid to assess fault of producers, ADM, Cargill, and China, and from asserting that the supposed "illegal" acts of the exporters were a superseding cause.  *Id.*; Ex. 1 (Stueve Decl. ¶ 508); Ex. 3 (Downing Decl. ¶¶ 54-55).

### G.    Co-Lead Counsel Led Trial Preparations and Briefing for the Kansas trial.

Because Syngenta repeatedly stated that it would not settle this litigation in advance of trial, Co-Lead Counsel prepared for trial from the very beginning of the litigation.  Ex. 1 (Stueve Decl. ¶ 522-23).  To prepare for trial, they worked with trial consultants in helping to shape the

24

themes and demonstrative exhibits for trial, including conducting a focus group and a mock trial. *Id.* at ¶¶ 524-35.  The fulsome feedback received from these efforts greatly assisted in refining trial arguments and demonstratives and identifying areas of concern that could be proactively addressed before trial.  *Id.* at ¶ 532.

Syngenta's employees were outside of the subpoena power of the Court, so a substantial portion of Plaintiffs' evidence was pre-recorded deposition video testimony.  Ex. 1 (Stueve Decl. ¶ 554).  Pursuant to the Court's Trial Order, the Parties were required to exchange depositions designations on May 5, 2017; to make counter-designations and objections by May 10; and to make objections and counter-counter-designations by May 15.  ECF No. 2984.  There were nearly 200 depositions; it took enormous work to select the testimony for trial.  Ex. 1 (Stueve Decl. ¶¶ 554-55); Ex. 2 (Powell Decl. ¶ 185); Ex. 6 (Klonoff Decl. ¶ 79).  After an extensive, multi-stage review of the depositions, Co-Lead Counsel designated testimony from 43 witnesses for the Kansas trial.  ECF No. 3345-1; Ex. 4 (Chaney Decl. ¶ 282).  Syngenta designated testimony from 51 witnesses.  ECF No. 3338-1.  Co-Lead Counsel and the Kansas Common Benefit Group prepared and served objections and counter designations to the testimony of all 51 witnesses within five days.  Ex. 1 (Stueve Decl. ¶ 554).  Five days after that, they served objections and counter to Syngenta's counter designations.  *Id*.

In the weeks leading up to the trial, Co-Lead Counsel fully briefed *in limine* motions, negotiated stipulated jury instructions and fully briefed disputed instructions.  ECF Nos. 3204, 3205, 3239, 3278, 3280, 3283, 3284, 3285; Ex. 1 (Stueve Decl. ¶¶ 536-45); Ex. 3 (Downing Decl. ¶¶ 4(b), 56-57, 59, 62).  In connection with the latter, Syngenta argued for the first time, a little more than a week before the start of trial, that international law applied to issues in this litigation and the Court should instruct on the WTO's Sanitary and Phytosanitary Measures

Agreement (the "SPS Agreement").  *See* ECF No. 3205.  Responding to this proposed jury instruction required significant legal analysis of international law and its relationship to this litigation at a time in which Co-Lead Counsel and their firms were otherwise focused on preparing to start trial.  The Court ultimately gave Jury Instruction No. 17. Ex. 1 (Stueve Decl. ¶ 543).  Co-Lead Counsel presented oral argument at the jury conference during the Kansas trial. ECF No. 3309 at 2227.

### H.      Co-Lead Counsel Tried the Kansas Class Action.

The Kansas class trial was the first Syngenta corn case to be tried to a verdict in any court.  The Kansas class trial began on June 5, 2017, and lasted until June 23, 2017, when the jury returned its verdict awarding the Kansas class $217.7 million, the entire compensatory damages amount requested by Plaintiffs. Ex. 1 (Stueve Decl. ¶¶ 546-67).

Co-Lead Counsel tried all aspects of the Kansas lawsuit.  They put on every fact and expert witness for Plaintiffs and cross-examined all of Syngenta's witnesses.  Preparation was extensive.  *Id.*  Syngenta identified 12 persons as potential live witness on its pre-trial witness list and 58 potential depositions to be offered into evidence.  ECF No. 3131.  Plaintiffs identified 21 potential live witnesses.  ECF No. 3076.  Co-Lead Counsel prepared for the examination of many, if not all, of these witnesses in anticipation that they might be called at trial. Ex. 1 (Stueve Decl. ¶¶ 547, 558). Ultimately, Co-Lead Counsel put seven live witnesses on the stand and offered 22 video clips into evidence in their case-in-chief and numerous counter-designated video clips in Syngenta's case.  *Id.* at ¶ 556; *see* ECF Nos. 3240-3261, 3287-88, 3293-94.

Syngenta brought in nationally recognized counsel from Kirkland & Ellis to try the Kansas case.  Ex. 1 (Stueve Decl. ¶¶ 518-21).  Syngenta's trial team involved at least eight partners from Kirkland offices across the country, with additional help from Kirkland associates and staff and jury consultants, and at least two partners from Berkowitz Oliver in Kansas City.

26

*Id.*   Counsel worked late into the evening and early morning each night preparing for the presentation of evidence, negotiating deposition cuts, meeting and conferring, and preparing for and raising legal arguments with the Court.  *Id.* at ¶¶ 555; Ex. 4 (Chaney Decl. ¶¶ 289-91); Ex. 2 (Powell Decl. ¶¶ 194-202); Ex. 3 (Downing Decl. ¶¶ 56-57).  At the close of Plaintiffs' case-in-chief on June 14, 2017, Syngenta filed a Rule 50(a) Motion for Judgment as a Matter of Law.  ECF No. 3265.  Four hours later, Co-Lead Counsel filed a 16-page opposition.  The next morning, the Court ruled on this motion orally, largely denying the motion.  Ex. 1 (Stueve Decl. ¶ 558).

Syngenta ultimately put on five live witnesses at trial, each one cross-examined by Co-Lead Counsel, and played video clips from the depositions of 15 witnesses.  *Id.* at ¶ 559-61.

After deliberating from Thursday afternoon, June 22, 2017, until Friday morning, the jury returned a verdict finding that Plaintiffs proved, by a preponderance of the evidence, the requisite elements of negligence and Syngenta failed to prove its defense that China was a superseding cause.  ECF No. 3304.  The jury's award was the tenth largest jury verdict in the United States in 2017.  Ex. 1 (Stueve Decl. ¶¶ 567-68).

On July 21, 2017, Syngenta filed a Rule 50(b) motion for judgment as a matter of law and alternatively Rule 59 motion for a new trial and/or remittitur.  ECF No. 3343.  Co-Lead Counsel drafted the opposition, filed on August 21, 2017.  ECF No. 3392.  Before this motion was ruled upon, the parties reached a global class settlement.  Ex. 1 (Stueve Decl. ¶¶ 570-72).

## I.     Co-Lead Counsel Prepared for Four More MDL Trials in 2018.

After the Kansas trial, the Parties disagreed on the order and course of the trials of the remaining seven certified classes.  Co-Lead Counsel moved to consolidate the trials of multiple classes together.  ECF No. 3082.  Syngenta opposed and wanted all of the class claims severed and cases remanded to judges unfamiliar with the litigation.  Following a status conference, the

Court ordered supplemental briefing.  ECF Nos. 3314, 3317.  The Court adopted Plaintiffs'
argument that Syngenta waived personal jurisdiction in Kansas for these Plaintiffs, and grouped
the class cases for a set of consolidated trials.  ECF No. 3319.  The next such trial would include
the Arkansas and Missouri classes.  *Id.*  Co-Lead Counsel prepared and participated in the
pretrial conference for that trial.  Ex. 1 (Stueve Decl. ¶¶ 573-78).

On September 15, 2017, Co-Lead Counsel filed a motion to certify the remaining
producer claims pled in the Master Complaint as class actions.  ECF No. 3431.

## II.     CO-LEAD COUNSEL COORDINATED WITH OTHER ACTIONS AND HAVE ENTERED INTO A FEE-SHARING AGREEMENT WITH OTHER LEAD COUNSEL.

### A.     The Court Entered a Coordination Order Requiring the Sharing of Discovery with Related Actions.

The JPML issued its order consolidating the federal cases on December 22, 2014.  ECF
No. 1.  On May 5, 2015, the Court rejected Syngenta's argument that the doctrine of foreign
relations provided federal jurisdiction, ECF No. 395, and on May 22, 2015, the Minnesota
Supreme Court consolidated all state-court cases in a single venue.  As a result, on October 21,
2015, and in conjunction with Scheduling Order No. 2, the Court entered a Coordination Order
that required coordination among counsel between this MDL and Related Actions, which were
defined as those "already . . . pending in Minnesota . . . Louisiana . . . and additional actions
[that] may be filed in the future."  ECF No. 1099 at 1.

One purpose of that order was to "minimize undue duplication of discovery and undue
burden on courts, parties, and non-parties in responding to discovery requests, save substantial
expense by the parties and non-parties, and produce substantial savings in judicial resources."
*Id.* at 2.  To that end, the order provided that Co-Lead Counsel: create the MDL Document
Database (*id.* at 5) and take the "lead" for discovery scheduling (*id.* at 4).  Pursuant to applicable

orders in the MDL, Co-Lead Counsel was then required to share discovery taken in the MDL with plaintiffs in the Related Actions, although plaintiffs could obtain additional discovery if "such discovery had not been obtained in the MDL." *Id.* at 7.  To be a Related Action, the order provided that it could be adopted by courts overseeing cases in other jurisdictions. *See* Ex. 1 (Stueve Decl. ¶¶ 177-82).

### B.    Other Actions were filed in Minnesota, Illinois and Elsewhere.

#### 1.    The Minnesota Leadership Actions.

On May 22, 2015, the Minnesota Supreme Court transferred a number of lawsuits filed by producers and non-producers in Minnesota to a single judge in in the Fourth Judicial District of Minnesota ("Minnesota Court"). *In re: Syngenta Litigation*, No. 27-CV-15-3785, Dist. Court, County of Hennepin, Fourth Judicial District, Mem. Order (Minn. Tr. Ct. Apr. 7, 2016) ("*In re Syngenta Minn. Litig.*"), previously filed as ECF No. 3392-1 at 8.  On August 5, 2015, the Minnesota Court appointed lead counsel ("Minnesota Lead Counsel").  ECF No. 1273-3. Following this order Minnesota Lead Counsel proposed orders similar to many of the administrative orders issued in the MDL, including: the Notice to Conform, Protective Order, ESI Protocol, and Preservation Order.[8]  On October 2, 2015, Minnesota Lead Counsel filed master complaints similar to the MDL complaints containing specific and extensive factual allegations and causes of action.  Ex. 51 (Minnesota Class Action Master Complaint for Producers and Non-Producers, *In re Syngenta Minn. Litig.* (Oct. 2, 2015)) & Ex. 52 (Master Complaint for Producers and Non-Producers (Non-Class), *In re Syngenta Minn. Litig.* (Oct. 2,

---

[8]  *Compare* ECF No. 287 (MDL Order Relating to Consolidated Pleadings) *with* Ex.  53 (Proposed Notice to Conform, *In re Syngenta Minn. Litig.* (Oct. 23, 2015)); *compare* ECF No. 294 (MDL Protective Order) *with* ECF No. 3392-1 (Stipulated Protective Order *In re Syngenta Minn. Litigation*, (Minn. Tr. Ct. Sept. 25, 2015) (Sipkins, J.)); *compare* ECF No. 369 (April 21, 2015 MDL Preservation Order) *with* Ex. 54 (Preservation Order, *In re Syngenta Minn. Litig.*, (Oct. 30, 2015)); *compare* ECF No. 327 (Mar. 31, 2015 MDL ESI Protocol) *with* Ex. 55 (ESI Protocol, *In re Syngenta Minn. Litig.*, (September 25, 2015)).

2015)).  On November 11, 2015 and December 22, 2015, the Minnesota Court adopted its own Scheduling Order No. 2 and a bellwether discovery plan that included 40 bellwether discovery plaintiffs in addition to the putative Minnesota class representatives.  Ex. 56 (Scheduling Order No. 2, *In re Syngenta Minn. Litig.* (Nov. 4, 2015)) & Ex. 57 (Order Regarding Bellwether Selection, *In re Syngenta Minn. Litig.* (Dec. 22, 2015)).

On November 9, 2015, Syngenta moved to dismiss the Minnesota complaints based on many of the same grounds raised and rejected by this Court, including duty and the economic-loss doctrine.  Ex. 58 (Mem. in Law in Supp. of Mot. Dismiss, *In re Syngenta Minn. Litig.* (Nov. 9, 2015)).  On December 1, 2015, Minnesota Lead Counsel filed a 105-page opposition brief. Ex. 59 (MN Pls.' Mem. of Law in Opp. to Mot. to Dismiss, *In re Syngenta Minn. Litig.* (Dec. 1, 2015)).  The Minnesota Court largely denied the motion, issuing a 55-page decision that followed, in most material aspects, this Court's September 11, 2015 Memorandum and Order.  *In re Syngenta Minn. Litig.*, (Apr. 7, 2016), previously filed as ECF No. 3392-1.

On November 4, 2015, the Minnesota Court entered the MDL Coordination Order.  ECF No. 1273-1.  As such, Minnesota Lead Counsel was provided access to the MDL Document Database, depositions, exhibits, and jury-consultant analysis.[9]  *See id.*; Ex. 1 (Stueve Decl. ¶ 183).  They also sent lawyers to and participated in the Syngenta and third-party depositions described above, and faced most, if not all, of the same defenses that Co-Lead Counsel faced in the MDL: Syngenta opposed class certification, sought to file third-party complaints against ADM and Cargill, argued preemption, sought summary judgment, and challenged the plaintiffs' expert witnesses.  In most regards, following briefing by Minnesota Lead Counsel, the Minnesota Court adopted rulings consistent with those issued by this Court and described above.

---

[9] Any Minnesota document reviewers would have submitted time under the Minnesota CBO, and their work should be included in the brief seeking attorneys' fees submitted by Minnesota Lead Counsel

*See* Ex. 60 (Order Regarding Summary Judgment Motions, *In re Syngenta Minn. Litig.* (Apr. 11, 2017)); Ex. 61-38 (Orders Regarding Syngenta's Experts); Ex. 69 (Order Granting Class Certification, *In re Syngenta Minn. Litig.* (Nov. 3, 2016)); Ex. 70 (Order Denying Syngenta's Mot. to File Third-Party Complaint, *In re Syngenta Minn. Litig.* (Sept. 6, 2016)).

Trial of the first Minnesota bellwether plaintiff started on April 26, 2017, but a mistrial was declared because of a jury issue before opening statements.  ECF No. 3507-11 at ¶ 16.  On September 11, 2017, the Minnesota class jury began and proceeded through Plaintiffs' case-in-chief before it was announced that the parties had executed a settlement term sheet.  *Id.*

Minnesota Lead Counsel are filing a separate motion in support of their fee application that includes greater detail about their side of the litigation.

### 2.        The Illinois Leadership Actions.

The Illinois Supreme Court consolidated hundreds of producer claims filed in Illinois state court against Syngenta before the Circuit Court of the First Judicial Circuit, Williamson County ("Illinois State Court").  *Dereadt, et al. v. Syngenta Seeds, Inc., et al.*, No. 120-209 (Ill. S. Ct.); *Browning v. Syngenta Seeds, Inc. et al*., No. 15-L-157 (Ill. Cir. Ct.).  The Illinois State Court appointed Clayton Clark and Martin J. Phipps as lead counsel in the Illinois State Court cases ("Illinois Lead Counsel").   Additionally, Illinois Lead Counsel represented producer plaintiffs with cases pending in the United States District Court for the Southern District of Illinois in the action styled *Tweet et al. v. Syngenta AG et al.*, No. 3:16-cv-00255-DRH ("Illinois Federal Court").

Following this Court's Memorandum and Order largely denying Syngenta's motion to dismiss in the MDL and the Minnesota Court's similar order, Syngenta nonetheless filed motions to dismiss in both the Illinois state- and federal-court actions.  On May 15, 2017, the Illinois Federal Court issued an extensive order with rulings substantially similar to this Court's orders.

*In re Syngenta Mass Tort Actions*, No. 3:16-CV-00255-DRH, 2017 WL 2117728, at *1 (S.D. Ill. May 15, 2017).[10]  On August 18, 2017, the Illinois State Court issued an order largely denying Syngenta's motion to dismiss "[i]n accord with [the] decisions" of this Court, the Minnesota Court, and the Illinois Federal Court.  *Browning,* Order (Aug. 21, 2017), previously filed as ECF No. 3392-2.

Illinois Lead Counsel also filed a series of cases on behalf of ethanol plants in state courts around the country, including in Ohio, Michigan, Nebraska, Indiana, and Iowa.  Syngenta moved to dismiss those claims.  In all but one case, the motions were denied.

Illinois Lead Counsel are filing a separate motion in support of their fee application that includes greater detail about their side of the litigation.

### C.    Lead Counsel's Fee-Sharing Agreements.

After extensive negotiations between attorneys from the various litigations, the Court-appointed Special Master made a mediator's proposal on an allocation of attorneys' fees between attorneys in the MDL, Minnesota and Illinois.  Ex. 1 (Stueve Decl. ¶ 611).  Following that proposal Co-Lead Counsel, Minnesota Lead Counsel, and Illinois Lead Counsel executed a Fee-Sharing Agreement on or about February 23, 2018.  Ex. 8 ("Fee-Sharing Agreement").  Pursuant to this Agreement, the parties agreed to request that the Court allocate its Fee Award as follows:

- 50% to Co-Lead Counsel for disbursement to the 44 firms in the Kansas Common Benefit Group, *i.e.,* firms who performed authorized work in the Kansas MDL consistent with the Kansas MDL Court's orders ("MDL Allocation"), to be distributed by Co-Lead Counsel;

- 12.5% to Minnesota Lead Counsel for disbursement to all common-benefit law firms ("Minnesota Common Benefit Group") who performed work in the

---

[10] In addition to the *Tweet* case*,* the Illinois Federal Court presided over another set of cases consolidated as *Poletti et al. v. Syngenta AG et al.,* No. 3:15-cv-01221-DHR.  The MDL Coordination Order was entered in that case.  ECF No. 1514.  On April 3, 2017, the Illinois Federal Court denied in large part Syngenta's motion to dismiss in that case.  *In re Syngenta Mass Tort Actions*, 272 F. Supp. 3d 1074 (S.D. Ill. 2017).

> Minnesota MDL consistent with the Minnesota MDL Court's orders ("MN Allocation"), to be distributed by Minnesota Lead Counsel; and

- 17.5% to Illinois Lead Counsel for disbursement to the law firms of Clayton A. Clark ("Clark"), Peter J. Flowers, and Martin J. Phipps, as well as their referring counsel, co-counsel, and/or joint venture partners ("IL Allocation"), to be distributed by Clark.

In the Fee-Sharing Agreement, the parties also provided that the remaining 20% of the Fee Award be allocated by the Court, in consultation and agreement with the Minnesota Court and the Illinois Federal Court, taking into consideration the recommendation by the Special Masters. Ex. 8 (Fee-Sharing Agreement at 2).

Co-Lead Counsel additionally entered into an agreement with Settlement Class Counsel Christopher Seeger and his law firm Seeger Weiss LLP on or about February 22, 2018 for the allocation of attorneys' fees and expenses to the Seeger Weiss law firm from any sum awarded to counsel in the MDL, providing that: no less than ten percent of the MDL Allocation be allocated to Seeger Weiss for their contributions to the case; and, that Seeger Weiss receive the same multiplier on their lodestar, if any, as Co-Lead Counsel. Ex. 9; Ex. 1 (Stueve Decl. ¶ 615). Thus, Seeger's efforts leading the Plaintiffs' Settlement Negotiation Committee, discussed *infra*, as well as his firm's contributions to the case as an EC member, will be compensated out of the MDL Allocation awarded by the Court.

## III. SETTLEMENT WAS THE PRODUCT OF THE WORK DONE BY LEADERSHIP IN KANSAS, MINNESOTA AND ILLINOIS.

From the start of the MDL through the verdict in the Kansas trial, Syngenta was clear that it did not intend to settle this litigation before trial. Ex. 1 (Stueve Decl. ¶ 522). On August 9, 2017, the Court entered an order forming a Plaintiffs' Settlement Negotiation Committee ("Negotiating Committee") to negotiate with Syngenta. ECF No. 3366. The Negotiating Committee included Christopher A. Seeger (representing the Kansas MDL), Mikal Watts

33

(representing Minnesota individual cases), Clayton A. Clark (representing Illinois state cases), and Daniel E. Gustafson (representing the Minnesota class). *Id.* at 3. It was overseen under the auspices of the previously appointed Special Master Ellen K. Reisman, along with retired Judge Dan Stack, and under the supervision of the Illinois Federal Court. *Id.* at 2. Seeger led the committee on behalf of the Plaintiffs. After months of negotiations, Syngenta agreed to pay $1.51 billion. In the three months following the Kansas verdict, the Special Master convened numerous in-person meetings across the country and multiple telephonic meetings between Syngenta's counsel and the Negotiating Committee. Seeger invested hundreds of hours spearheading these negotiations on behalf of the Plaintiffs. Ex. 7 (Weiss Decl. ¶ 13). Given the "parallel litigations," the negotiations were "complex, spirited [and] multidimensional." *Id.* As the Special Master reported at the December 19, 2017 status conference, the term sheet required "months of hard negotiations" and was only reached after the Minnesota class trial had begun. ECF No. 3485 at 5:1-2. Co-Lead Counsel actively participated in negotiations through communications and strategy decisions with Seeger. Ex. 1 (Stueve Decl. ¶ 594).

On October 9, 2017, the parties filed a Joint Motion to Stay pending the execution of the settlement agreement. ECF No. 3452. After the committee announced that it had executed a term sheet with Syngenta, dated September 25, 2017, negotiations continued and were expanded to include Patrick J. Stueve from the MDL Co-Lead Counsel. As the Special Master told the Court, the process of "taking it from a term sheet to final settlement agreement [was also] a difficult one." ECF No. 3485 at 6:5-8. The Special Master convened numerous additional in-person and telephonic meetings. Ex. 1 (Stueve Decl. ¶¶ 595-97). Co-Lead Counsel[11] and

---

[11] Moreover, in order to simplify the settlement distribution process, Co-Lead Counsel reached out to the United States Department of Agriculture's Farm Service Agency (the "FSA") after the Kansas verdict to discuss with the FSA the possibility of allowing a settlement administrator to have access to the data reported by farmers to the FSA on 578 forms. *Id.* at ¶ 598. In December 2017, Co-Lead Counsel

Seeger's firm spent substantial time and effort negotiating and finalizing the Settlement Agreement, a process that itself took another five months, culminating in a Settlement Agreement signed by Syngenta, Co-Lead Counsel, Subclass Counsel, and all members of the Negotiating Committee. *Id.* at ¶¶ 596-602; Ex 7 (Weiss Decl. ¶¶ 5, 10, 13).

On March 12, 2018, Settlement Class Counsel filed a motion and supporting memorandum seeking preliminary approval of the $1.51 billion settlement. ECF Nos. 3506-07. Attached as Exhibit A to that memorandum was the fully-executed Settlement Agreement. ECF No. 3507-2. The motion drew objections from the Toups/Coffman Plaintiffs and joinders in those objections by the Hossley-Embry Plaintiffs. ECF Nos. 3519, 3512. On April 5, 2018, the Court conducted a preliminary approval hearing. ECF No. 3529. On April 10, 2018, the Court granted preliminary approval of the settlement. ECF No. 3532. By May 11, 2018, the settlement administrator had mailed notice to potential class members. Ex. 1 (Stueve Decl. ¶ 610).

## IV. PROSECUTION OF THESE CASES REQUIRED AN ENORMOUS AND RISKY INVESTMENT OF LABOR AND RESOURCES.

### A. The Litigation Was Risky and Success Was Far From Certain.

This was an enormously challenging lawsuit to prosecute, filled with specialized and complicated fact discovery and numerous complex legal issues. Ex. 1 (Stueve Decl. ¶¶ 579-88). From a discovery perspective, there was no way to subpoena documents from China. This made it difficult to combat Syngenta's claims that China's denial of Syngenta's import approval applications and ultimate rejection of U.S. corn were all for political reasons. *Id.* at ¶ 580. Syngenta produced many documents in Chinese and multiple witnesses required translators, which further complicated discovery. *Id.* at ¶ 581.

---

secured the commitment from the FSA to supply this information electronically, which was ultimately a key part of the claims process. Ex. 4 (Chaney Decl. ¶ 304). As a result, very few producers will have to submit any documentary evidence to seek their share of the settlement.

Additionally, there were substantial legal risks, particularly with regard to establishing the duty Syngenta owed to Plaintiffs and overcoming Syngenta's causation and economic-loss doctrine arguments. *Id.* at ¶ 585. The risk that this litigation could be dismissed because of a legal ruling is underscored by the June 28, 2017 Judgement Entry entered by the Court of Common Pleas of Seneca County, Ohio in *Fostoria Ethanol, LLC v. Syngenta Seeds, Inc.,* No. 15 CV 0323. *Id.* at ¶ 586. In that Order, the Ohio Court granted Syngenta's motion to dismiss in its entirety, finding that Syngenta did not owe a duty to plaintiffs for their alleged financial losses. The Court stated in relevant part: "There has been no case from any court in Ohio presented to this Court to show that Syngenta's duty should extend to economic harm caused by the intended use of its products, and this court declines to invent such a duty." *Id.* (quoting Order).

The risk continued to trial, where it was quite possible that either the Kansas jury or subsequent juries would find China was a superseding cause of the injuries to Plaintiffs. This risk increased when the Court gave Jury Instruction No. 17, explaining to the jury that China's actions may be relevant to the superseding cause analysis. ECF No. 3302 at 18-19.

Despite these risks, Co-Lead Counsel and the Kansas Common Benefit Group funded the prosecution of the litigation without any guarantee that the more than $6.6 million in expenses would be repaid or that the nearly 150,000 hours of labor expended would be compensated. Ex. 1 (Stueve Decl. ¶ 592). No money was contributed by a non-party or from non-lawyer funders. *Id.* at ¶ 649.

In total, the Kansas Common Benefit Group advanced $6,695350.05 in common-benefit expenses for such costs critical to the prosecution of this litigation, such as: more than $380,000 in deposition-related expenses; nearly $300,000 in ESI-related expenses for the MDL Document Database; approximately $300,000 in payment of the Kansas MDL share of the invoices from

the Special Masters; over $300,000 in expenses related to subpoenas, including the service of these subpoenas and the reasonable expenses related to the production of documents from these subpoenaed third parties; more than $1.5 million reflecting the Kansas MDL share of expert-related expenses; and more than $460,000 in expenses related to the class certification notice. *Id.* at ¶¶ 645, 647-53.[12]  A full summary of expenses by category is contained *infra* at Section II.

### B.   Kansas Common Benefit Firms Invested Significant Labor and Expenses.

Co-Lead Counsel and the Kansas Common Benefit Group invested over 142,823 hours of labor in this case on a full contingency basis. *Id.* at ¶¶ 643-64.  This reflects the work of 44 of the 49 firms in the Kansas Common Benefit Group.[13]  *Id.*  Approximately sixty-eight percent of all common-benefit time was performed by Co-Lead Counsel.  When the next highest-hour firm – Seeger Weiss – is included, that figure increases to 75% of the overall time. *Id.* at ¶ 644.

Since the entry of the CBO, Kansas Common Benefit Group firms have been required to submit their time and expenses to Co-Lead Counsel in an Excel spreadsheet on a monthly basis following protocols designed by Co-Lead Counsel.  ECF No. 936.  Throughout the litigation, these submissions were reviewed carefully and problems with the submissions were addressed with submitting law firms throughout the litigation. *Id.* at ¶ 630.

After the settlement was announced and beginning in February 2018, all law firms in the Kansas Common Benefit Group that submitted common-benefit time and expenses in the Kansas MDL were emailed a comprehensive Excel spreadsheet containing that time and those expenses

---

[12] Some costs were shared with Lead Counsel in Minnesota.  This Expense Request includes only the share of costs incurred by Kansas Common Benefit Attorneys in the MDL.  Minnesota Lead Counsel will seek reimbursement for their portion of any shared costs separately.  In addition, counsel in the *Poletti* case (Heninger Garrison Davis, LLC) made contributions to the litigation fund.  This Expense Request includes that firm's expenses, but not any common-benefit work because they did not submit any.  It is anticipated that they may file their own request.

[13] Five firms in the Kansas Common Benefit Group reported no common-benefit work, but made contributions to the litigation fund that were used to fund common-benefit expenses in the MDL and seek reimbursement of those contributions. *Id.* at ¶ 644.

submitted by that firm. *Id.* at ¶¶ 631-32. Counsel were asked to re-review this Excel spreadsheet to re-confirm that all entries were in compliance with the CBO, including ensuring that these submissions did *not* include time spent on individual clients who were not bellwether or class representative plaintiffs, marketing activities, secretarial work, or time spent on Plaintiff Fact Sheets not related to bellwether plaintiffs or class representatives. Co-Lead Counsel drafted and circulated a memorandum containing these guidelines for the re-review and emailed individualized issues to common-benefit firms based upon their submissions to date. All Kansas Common Benefit Group firms were instructed to exercise billing discretion on the previously-submitted entries. *Id.* at ¶¶ 632-35.

All Kansas Common Benefit Group firms were required to – and did – execute a declaration attesting to the time and expenses submitted. Ex. 1 (Stueve Decl. ¶¶ 666, 672); Ex. 2 (Powell Decl. ¶¶ 214-20); Ex. 3 (Downing Decl. ¶ 77); Ex. 4 (Chaney Decl. ¶ 318); Ex. 10 (Donarski Decl. ¶¶ 12, 15); Ex. 11 (Basser Decl. ¶¶ 11, 15); Ex. 12 (Plant Decl. ¶¶ 22, 25); Ex. 13 (J. Bell Decl. ¶¶ 11, 14); Ex. 44 (W. Bell Decl. ¶ 11); Ex. 43 (Bender Decl. ¶¶ 38, 42); Ex. 14 (Brady Decl. ¶¶ 12, 15); Ex.15 (Ellis Decl. ¶¶ 13, 17); Ex. 16 (Preston Decl. ¶¶ 12, 16); Ex. 22 (Brooks Decl. ¶¶ 10, 13); Ex. 17 (Pinyan Decl. ¶¶ 14, 17); Ex. 48 (Cecchi Decl. ¶¶ 25, 28); Ex. 18 (Emerson Decl. ¶¶ 13, 18); Ex. 19 (Maier Decl. ¶¶ 14, 18); Ex. 20 (Ursu Decl. ¶¶ 13, 17); Ex. 21 (Crompton Decl. ¶¶ 8, 13); Ex. 40 (Kerlick Decl. ¶ 19); Ex. 24 (Shelquist Decl. ¶¶ 14, 18); Ex. 25 (Lundberg Decl. ¶ 13); Ex. 26 (Flax Decl. ¶¶ 12, 15); Ex. 27 (McCluer Decl. ¶ 12); Ex. 28 (Wedgworth Decl. ¶¶ 25, 28); Ex. 33 (Miller Decl. ¶ 12); Ex. 29 (Lytle Decl. ¶¶ 11, 14); Ex. 30 (Paul Decl. ¶¶ 13, 17); Ex. 31 (Poynter Decl. ¶¶ 12, 15); Ex. 32 (Roth Decl. ¶¶ 12, 16); Ex. 34 (Schirger Decl. ¶¶ 15, 17); Ex. 7 (Weiss Decl. ¶¶ 52, 56); Ex. 35 (Conroy Decl. ¶¶ 16, 19); Ex. 37 (Soper Decl. ¶¶ 8, 11); Ex. 38 (Bukovak Decl. ¶¶ 13, 16); Ex. 39 (Thrash Decl.

¶¶ 12, 16); Ex. 41 (Wagner Decl. ¶¶ 31, 34); Ex. 42 (Waller Decl. for WJW ¶ 12); Ex. 36

(Waller Decl. for Sneed Lang ¶¶ 14, 18); Ex. 45 (Robinovitch Decl. ¶¶ 30, 34); Ex. 46 (Toups

Decl. ¶¶ 6, 10-11, 13); Ex. 47 (Coffman Decl. ¶¶ 8, 12).

After these multiple rounds of review, Co-Lead Counsel computed the aggregate number

of common-benefit hours: in sum, 142,823 hours of labor have been invested by the Kansas

Common Benefit Group in this litigation, resulting in an aggregate lodestar of $81,725,060.90.

Ex. 1 (Stueve Decl. ¶ 644).  This results in a blended rate of $572 across all timekeepers.[14]  *Id.* at

¶ 646.

## V.   TWO DISTINGUISHED EXPERTS ON ATTORNEYS' FEES SUPPORT THE REQUESTS.

### A.   Professor Klonoff Opines that Fees, Costs and Service Awards are Reasonable under the Facts of this Case and in Comparison to Awards in Similarly Sized Settlements.

Professor Richard Klonoff is the current Jordan D. Shnitzer Professor of Law at Lewis &

Clark Law School, an endowed, tenured position.  Ex. 6 (Klonoff Decl. ¶ 2).  Professor Klonoff

graduated from Yale Law School and clerked for the Honorable John R. Brown on the United

States Court of Appeals for the Fifth Circuit before serving as an Assistant to the Solicitor

General.  *Id.*  He worked for over 12 years at Jones Day before entering academia.  *Id.*  He has

taught class actions, complex litigation, civil procedure, federal courts, and federal appellate

procedure.  *Id.*  In 2011, the Chief Justice of the United States appointed him to the Judicial

Conference Advisory Committee on the Rules of Civil Procedure.  He served two, three-year

terms, where he worked on proposed amendments to Rule 23.  *Id.* at ¶ 4.  He served for five

---

[14] Importantly, Co-Lead Counsel excluded nearly $8 million of their own time and over $500,000 of out-of-pocket expenses because they did not meet the definition of common-benefit work or expenses in the CBO, including substantial hours expended on their many individual clients, representing approximately 22,700 hours.  Ex. 1 (Stueve Decl. ¶ 664); Ex. 2 (Powell Decl. ¶ 214); Ex. 3 (Downing Decl. ¶ 78); Ex. 4 (Chaney Decl. ¶ 313).

years as a reporter for the ALI's *Principles of the Law of Aggregate Litigation*, in which he was the principal author of the chapter addressing class-action settlements and attorneys' fees. *Id.* at ¶ 5. Numerous courts have relied and cited his testimony and opinions in approving class settlements and attorneys' fees. *Id.* at ¶ 11 (collecting cases).

Here, Professor Klonoff conducted an extensive review of the record, including Kansas Common Benefit Attorneys' time records, and provides a 67-page report containing numerous opinions and sub-opinions. In summary, he concludes as follows. First, the Fee Request is reasonable under the compelling circumstances of this case and is supported by awards made in other large settlements, finding that even in such cases, "there is nothing unusual about awards in the range requested here," even in cases that – unlike this one – did *not* go to trial. *Id.* at ¶ 95.

Second, a lodestar cross check is unnecessary in awarding a percentage-of-the-recovery and "can lead to the very harmful consequences that the percentage method is designed to avoid." *Id.* at ¶ 102. Even so, if such a crosscheck were conducted here, it "would only confirm the reasonableness of the fees requested by MDL class counsel."[15] *Id.* at ¶ 103. The time records reveal "no red flags suggesting that the work of the MDL plaintiffs' firms was inefficient or that there was needless duplication." *Id.* at ¶ 106. "[T]he MDL leadership took great efforts to minimize duplication of tasks," including *inter alia* circulating "guidelines [that] directed firms to minimize the number of timekeepers," "assign[ing] tasks to the same attorneys and staff members to avoid extra time getting others up to speed," and using "small groups of attorneys [to focus] on discovery in particular subject areas to promote efficiency, while a core group of attorneys consistently worked on legal research and briefing." *Id.* at ¶ 107. Further, the billing rates used by the "various MDL law firms submitting lodestar hours," *id.* at ¶ 109, are:

---

[15] At the time he prepared his report, Minnesota and Illinois Lead Counsel had not completed the review of their time, so that information was unavailable to Professor Klonoff. *Id.* at ¶ 103.

consistent with "rates for prominent plaintiffs' complex litigation firms," *id.* at ¶ 110; justified by the "even higher rates [approved in other] complicated, multi-jurisdictional" cases, *id.* at ¶¶ 111, 115; comparable to "prominent defense firms," *id.* at ¶ 112; and, "especially instructive," lower than the rates published by and revealed in public filings for Kirkland & Ellis, *id* at ¶ 113.  The blended rate of $572 per hour is lower than "blended rates in other major MDL cases," even though "none of those cases went to trial (where hours billed by senior lawyers would be expected to increase)."  *Id.* at ¶ 116.  The resulting multiplier of 3.079 applied to the $251.67 million sought by Kansas Common Benefit Attorneys is "not uncommon, especially for a complicated, challenging case such as this one" *id.* at ¶ 123, and justified by, among other things, the fact that counsel "took on a challenging, risky case with extremely complex legal and factual issues, prosecuted it skillfully over the course of several years without assistance form any official investigation, obtained class certification despite Syngenta's opposition, conducted a complete trial that resulted in an impressive $217.7 million jury verdict, and obtained a superb $1.51 billion settlement for the class." *id.* at ¶ 126.  It is actually lower than multipliers applied in many other so-called "mega-fund" settlements, none of which required a trial or jury verdict.  *Id.* at ¶ 124.

Third, the $6,695,350.05 million in "costs sought by class counsel are eminently reasonable," as they "paid those enormous costs without any assurance that the case would ultimately succeed."  *Id.* at ¶ 133.  Those costs are, based on his experience, well within the "norm for major class actions," and reflect "standard (and expected) expenses for a case like this," representing "only .44 percent of the settlement fund."  *Id.* at ¶ 134.

Finally, the proposed service awards are reasonable given: the actions taken by those plaintiffs to protect the interests of the class; the benefits conferred on the class by their efforts;

the time and effort undertaken; and, the "huge risk that" despite their investments in the case, "causing them at times to put their farming operations on hold," that "they (and the class) might end up recovering nothing." *Id*. at ¶¶ 135-143.

**B.** **Retired Magistrate Judge Richard Ralston Opines that the Billing Rates Used to Calculate the Lodestar are Reasonable.**

Richard H. Ralston is an attorney, mediator, and arbitrator who has practiced in the Kansas City region "for approximately 50 years," with "substantial experience litigating cases on behalf of both plaintiffs and defendants." Ex. 5 (Ralston Decl. ¶ 2). He served as a United States Magistrate Judge for 12 years in the Western District of Missouri, and since then has been involved "as a settlement judge or mediator in more than 4,000 cases." *Id*. He "regularly serve[s] as an expert witness addressing issues such as the reasonableness of settlements and, in particular, assessing the reasonableness of attorneys' fees for class counsel when those fees are determined through application of the percentage of the common fund methodology." *Id*. at ¶ 16. He sets forth a number of opinions and sub-opinions, analyzing market rates in complex MDL and class litigation and other materials: "[b]ased on [his] approximately 50 years of professional experience working in this area of the law both in Kansas City and around the country, the hourly rates charged by common benefit counsel and utilized to calculate the lodestar in this case are reasonable and fair," and that "these rates do not account for the risk undertaken by counsel in accepting these cases on a contingent-fee basis." *Id*. at ¶ 22.

## ARGUMENT

### I.   THE FEE REQUEST IS FAIR AND REASONABLE UNDER GOVERNING PRINCIPLES AND BASED ON THE FACTS OF THE CASE.

It has long been recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (same). The common-fund doctrine "prevent[s]. . .inequity" by proportionately spreading payment among those who benefit from the labor of others. *Boeing,* 444 U.S. at 478. "The common benefit doctrine has been approved and implemented in dozens, if not hundreds, of multidistrict litigations . . . ." *In re NuvaRing Prods. Liab. Litig.*, No. 4:08 MDL 1964 RWS, 2014 WL 7271959, at *2 (E.D. Mo. Dec. 18, 2014).

#### A.   The Fee Request is Reasonable as a Percentage of the Fund

The dominant method of determining attorneys' fees in common-fund cases is awarding a percentage of the fund.  *See* 4 Newberg on Class Actions §14:6 (4th ed. 2010) ("in recent years, a majority of the Circuit courts have approved the percentage-of-the-fund method.") (citing cases); Manual for Complex Litigation, Fourth, § 14.121 ("[T]he vast majority of courts . . . use the percentage-fee method in common-fund cases."); *Report of Third Circuit Task Force: Selection of Class Counsel*, 208 F.R.D. 340, 355 (2002) ("A percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel…").  The Supreme Court itself has expressly stated that "under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n.16 (1984).

"The Tenth Circuit has expressed a preference for the percentage-of-the-fund method of awarding attorney fees in common fund cases." *In re: Urethane Antitrust Litig.*, No. 04-1616-

JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) (citing *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995)); *Gottlieb,* 43 F.3d at 483.  This approach is favored because, among other things, it best aligns the interests of the class and its counsel and appropriately approximates the market by basing a fee on what private counsel ordinarily would charge in contingency-fee matters.  Ex. 6 (Klonoff Decl. ¶¶ 49-50); *accord Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *5 (D. Colo. Apr. 22, 2015) ("The Tenth Circuit favors the common fund approach, as opposed to the lodestar method, because a percentage of the common fund 'is less subjective than the lodestar plus multiplier approach,' matches the marketplace most closely, and is the better suited approach when class counsel were retained on a contingent fee basis") (quoting *Lucken Family Ltd. P'ship, LLLP v. Ultra Res., Inc.*, No. 09-CV-01543-REB-KMT, 2010 WL 5387559, at *2 (D. Colo. Dec. 22, 2010) (quoting *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 484 (10th Cir. 1988))).[16]

Here, Co-Lead and Settlement Class Counsel request one-third of the settlement fund, equal to approximately $503.3 million, be allocated to numerous counsel for plaintiffs in the manner described *infra*, Section III.  This amount, as a percentage of the fund, is consistent with the Tenth Circuit's requirements that any fee be reasonable under analysis of applicable factors.

---

[16] *See also, e.g., Gokare v. Fed. Express Corp.*, No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094887, at *3 (W.D. Tenn. Nov. 22, 2013) ("the percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation . . . By contrast, the lodestar method . . . is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation' and 'creates inherent incentive to prolong the litigation." (internal quotations and citations omitted); *In re Southeastern Milk Antitrust Litig.*, No. 07-cv-1000, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) ("percentage-of-the-fund method. . .clearly appears to have become the preferred method in common fund cases" and properly "reflects the results achieved by class counsel"); *Bussie v. Allmerica Financial Corp.*, No. 97-40204-NMG, 1999 WL 342042, at *2 (D. Mass. May 19, 1999) ("the [percentage] method of calculating fees more appropriately aligns the interests of the class with the interests of class counsel – the larger the value of the settlement, the larger the value of the fee award.") (internal quotation and citation omitted).

**B.**     **The *Johnson* Factors Justify the Fee Request because this was a Hugely Complex Case Involving Significant Time and Labor where Counsel Incurred Great Risk and Obtained a Record-Setting Settlement.**

Under both the percentage and lodestar approach, reasonableness is determined by consideration of the now well-known factors originally articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and approved in the Tenth Circuit:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee-this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases

*Brown*, 838 F.2d at 454-55 (quoting *Johnson*, 488 F.2d at 717-19); *see also Gottlieb*, 43 F.3d at 482 (*Johnson* factors "for statutory fee cases apply equally to percentage fee awards in common fund cases.").  Not every factor will apply in every case; the court has discretion regarding which factors it considers and the relative weight given to each.  *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993) ("rarely are all of the *Johnson* factors applicable; this is particularly so in a common fund situation"); *Law v. Nat'l Collegiate Athletic Ass'n*, 4 F. Appx. 749, 752 (10th Cir. 2001) ("We have never held that a district court abuses its discretion by failing to specifically address each *Johnson* factor.") (quoting *Gudenkauf v. Stauffer Communications, Inc.,* 158 F.3d 1074, 1083 (10th Cir. 1998)); *see also, e.g., Yarrington v. Solvay Pharmaceuticals, Inc.*, 697 F. Supp. 2d 1057, 1062 (D. Minn. 2010) ("not all of the

individual factors will apply in every case, affording the Court wide discretion in the weight to assign each factor.").[17]   The award requested here is well supported by all applicable factors.

> ### 1.   The difficult factual and legal issues in this case justify the fee request.

"Courts emphasize the risk undertaken by counsel" in awarding fees, concluding that "complex cases justify higher fees, and simple cases lower fees."  *Been v. O.K. Indus., Inc.*, CIV-02-285-RAW, 2011 WL 4478766, at *7 (Aug. 16, 2011), *report and recommendation adopted*, CIV-02-285-RAW, 2011 WL 4475291 (Sept. 26, 2011).  And cases involving issues of first impression – which "present greater uncertainty and require extra time and effort – can warrant higher fee awards to compensate the attorneys who accept them."  *Id.* (citing *Johnson,* 488 F.2d at 718 ("Cases of first impression generally require more time and effort on the attorney's part . . . [Counsel] should be appropriately compensated for accepting the challenge.").[18]

As the Court well knows from steering this MDL from stem to stern, the claims in the MDL, in Minnesota, in Illinois, and in the state ethanol cases were full of complex factual and

---

[17]   For example, one of the factors, relationship with the client, "has little relevance in the class setting given that the 'client' is the class."  5 Newberg on Class Actions § 15:77 n.15 (5th ed. 2015). Consequently, courts rarely consider it in that context.  *See e.g.*, *In re: Motor Fuel Temperature Sales Practices Litig.*, 07-MD-1840-KHV, 2016 WL 4445438, at *9 (D. Kan. Aug. 24, 2016) (class action: nature and length of the professional relationship with the client did not apply); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 503 (N.D. Miss. 1996) (class action: "This factor has no application in this court's analysis.").

[18]   *See also, e.g., Lunsford v. Woodforest Nat'l Bank*, No. 1:12-CV-103-CAP, 2014 WL 12740375, at *13 (N.D. Ga. May 19, 2014) ("The novelty and difficulty of the issues involved created significant risk for Class Counsel. The risks were not merely one, but several."); *Gokare*, 2013 WL 12094887, at *7 ("an award of 30.9% of the common fund is more than justified when comparing the significant results achieved to the difficulty of the case."); *George v. Duke Energy Ret. Cash Balance Plan*, No. 8:06-CV-00373-JMC, 2011 WL 13218031, at *5 (D.S.C. May 16, 2011) ("Clearly, this litigation involved complex issues and, in some instances, issues of first impression"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 677 (N.D. Tex. 2010) ("complexity of the issues also favors an increase in the benchmark percentage"); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1206 (S.D. Fla. 2006) ("The second *Johnson* factor recognizes that attorneys should be appropriately compensated for accepting novel and difficult cases. . .The legal difficulty of this case was further compounded by the application of state law to numerous issues").

legal issues.  More often than not, Syngenta argued that the claims asserted and arguments raised by Plaintiffs were novel and the issues presented lacked direct or controlling precedent (or were defeated by such precedent).  In the MDL, it fell to Co-Lead Counsel to extensively research and persuasively argue otherwise to the Court and the jury.  Ultimately, the collective work of the leadership attorneys in the various jurisdictions was highly successful, bringing to port both favorable legal rulings, a favorable jury verdict and resulting in a $1.51 billion nationwide settlement.

### a)      The litigation involved a unique and complex structure.

As a starting point, the unique structure of this litigation, including its multi-jurisdiction spanning nature, created unusual organizational complications.  From inception, it involved: hundreds of individual cases as well as putative class actions; discrete, and sometimes disparate, types of plaintiffs, including corn producers and corn buyers; and, multi-jurisdictional litigation that despite the MDL mechanism were impossible to consolidate together because of statutory limitations.  Despite these challenges, leadership counsel organized in their respective jurisdictions, and sometimes between themselves, for the mutual benefit of the Class.  Moreover, this MDL and the Minnesota cases were highly unusual in that they instituted a dual and simultaneous track for individual-bellwether and class cases, involving all of the initially filed plaintiff types.  Early proposed orders and Master Complaints permitted the Court to resolve legal issues in all of the cases efficiently.  Ex. 1 (Stueve Decl. ¶¶ 156-202).  Further, formal, Court-approved coordination orders were proposed and followed by counsel.  And, despite sometimes differences of opinion on strategy among the lawyers for plaintiffs in these cases working toward the common goal, these differences did not impede the substantive prosecution of Plaintiffs' claims on the merits.  This is best evidenced by the amount of work that was conducted, in this complex case, in relatively short order: the Court shepherded this case to a

class-wide jury verdict within 29 months from the appointment of MDL leadership. *Compare* Order Concerning Appt. of Leadership, ECF No. 67 *with* Verdict Form, ECF No. 3304. Similarly, the Minnesota Court cases, although initially delayed by Syngenta's removal, were able to proceed swiftly because of this Court's timely order on federal jurisdiction and the groundwork laid in the federal MDL. *See supra* Section I.D. Thus, the first Minnesota trial started in April 2017, less than two years after consolidation, and the second – class – trial started in September 2017.

**b)      The litigation involved a novel fact pattern.**

This was not a case with a simple fact pattern. Indeed, the facts are more complex than even the "ordinary" complex case, like a typical securities-fraud class claim. Rather, the claims in this MDL required an understanding of the development and commercialization of genetically modified ("GM") agricultural seeds, industry standards for that commercialization, the process for USDA deregulation prior to domestic commercialization, China's process for import (and cultivation) approval of GM agricultural products, international policies relating to such processes, and the commingled commodity system in the United States. Leadership counsel were required to become experts in national rules on exportation and international rules on importation of new GM corn. This required expertise beyond just learning these rules – themselves sometimes opaque and subject to interpretation – and required detailed consideration of public policy. A centerpiece of Syngenta's arguments, both legal and factual, was that the United States utilizes a science-based approach to GM seed approvals, and that permitting a recovery here would allow China a "veto over which GM traits can and cannot appear in U.S. corn." ECF 857 at 69. Plaintiffs had to counter that argument both with facts and policy, and did so successfully as evidenced by the many courts' rulings on Syngenta's initial motion to dismiss and the Kansas jury verdict.

Moreover, a central factual attack levied by Syngenta was that the Chinese regulatory process for approval of MIR162 and Event 5307 had been politicized in a trade battle between China and the United States.[19]   According to Syngenta, China was the culpable party in the *de facto* trade embargo, and Plaintiffs were required to rebut this defense even though they could not compel discovery from that foreign state.   Consequently, Plaintiffs had to build their case on a painstaking review and use of Syngenta's own internal communications with and about the Chinese regulatory authorities.[20]   Relatedly, Plaintiffs' damages case was built on the allegation that, but for the *de facto* trade embargo, Chinese importers would have continued to buy and would have increased their purchases of U.S. corn.   Owing to the structure of China, however, these importers were either government buyers of corn or private buyers who Plaintiffs – once again – could not compel to provide discovery.   Plaintiffs, therefore, depended heavily on expert forecasts of the corn market, which required extensive and complex economic models that had to withstand legal scrutiny and be communicated intelligently and understandably to the jury.

In addition to the complex policy and economic issues relating to GM products and market risk from asynchronous approvals, this was no simple negligence case. There was substantial dispute over the proper standard of care, with difficult policy concepts interwoven therein.   Counsel in the leadership groups had to become experts in relevant industry policies and

---

[19] Syngenta's expert Philip A. Shull provided a 67-page report expounding on the Chinese approval system, stretching back to food shortages in the 1950s, China's food security policy and how that policy purportedly affects its regulatory system.  He additionally opined that China's rejection of U.S. corn due to the presence of MIR162 was pretextual, China was not a "key market" for U.S. corn, China's agricultural trade policies are contrary to WTO rules, China misuses its regulatory process to erect trade barriers, and that China should not be given control over advances in U.S. corn seed technology.  Ex. 1 (Stueve Decl. ¶ 491).

[20] Plaintiffs' attorneys were required to delve into the complicated realm of China's regulatory process generally, as well as the timing and scientific data required, submitted, and not submitted, by Syngenta.  *See* ECF No. 2940 at ¶¶ 36-42, 249-343 & Ex. 27 (Latner Rpt.).

standards adopted by biotech companies in the United States to avoid trade disruptions.[21]  These policies were alternatively favorable and unfavorable to Plaintiffs' claims, depending on their interpretation and the facts surrounding how they were actually implemented by Syngenta and other biotech developers.  Plaintiffs could not fall back on prior cases to develop their theories about the standard of care.  Syngenta repeatedly argued that this was the first instance where a seed manufacturer was being held responsible for a trade disruption caused by a GM trait that had been fully deregulated in the United States.  Applying the standard of care to that factual circumstance required painstaking legal analysis, careful consideration and skill.  Counsel had to become experts in both industry policies and their implementation by biotech companies, necessitating wide-ranging third-party discovery with trade organizations that were often hostile the Plaintiffs' claims, as well as the policy implications of that standard – issues that were argued and presented to both the Court and jury.

In addition to the standard of care, counsel in the leadership groups had to become experts in the United States commodity system for the domestic and international corn trade.  A complicating aspect of the claims – unique from other types of negligence cases – was the

---

[21] The parties both pointed to policies adopted by the Biotechnology Industry Organization ("BIO"), a trade organization of biotechnology developers, in which the risk of trade disruption stemming from asynchronous approvals is recognized.  Plaintiffs alleged that under this policy, a developer should not introduce new GM products without import approval from key export markets.  *See* ECF No. 450 at ¶¶ 98-102; ECF No. 1377 at ¶¶ 107-111. From a legal/policy perspective, Syngenta argued that "[e]mbarking on the course Plaintiffs have charted would . . . embroil the judiciary in an ongoing flood of policy choices. Courts would have to decide for each and every significant export crop (1) how to define 'key' export markets that should be given Plaintiffs' proposed veto over new biotechnology in the U.S.; (2) how to determine which governments have 'functioning regulatory systems' such that they are worthy of being granted that veto power by American courts; and (3) whether changes in a country's circumstances have caused it to lose (or gain) status as a 'key' market or a 'functioning regulatory system' . . . Courts simply do not have the experience or expertise to construct and micromanage such a parallel regulatory system governing the introduction of biotechnology products. That is a role for the political branches."  ECF No. 857 at 69-70; *see also* ECF No. 3344 at 42-43.  From a factual perspective, both sides had their own interpretations of the BIO policy. Ex. 1 (Stueve Decl. ¶¶ 583-84).

process by which the MIR162 and Event 5307 traits reached shipments of U.S. corn to China.[22] This required a full understanding of, and factual development regarding, how GM seeds are planted and grown, harvested, and sold, as well as how corn is commingled and shipped to foreign buyers.  Again, these subjects were not just factual, but were intertwined with policies underlying the commodity system (for example, economies of scale and efficiencies of transport).  It also required counsel to research and acquire an understanding of foreign laws related to such shipments.[23]  And it required an understanding of the feasibility of segregating and channeling GM crops,[24] as well as the highly technical science of genetic modification and the various means of contamination (*e.g.*, cross-pollination).  These were not factual issues that had been fully developed in other cases, substantially increasing the complexity and difficulty of addressing them.

Issues of segregation were complicated further by Syngenta's third-party complaint against non-producers including exporters like Cargill and ADM.  ECF No. 1225.  Although these complaints were resolved on legal grounds, many of Syngenta's allegations that these non-producers knowingly shipped corn containing MIR162 and Event 5307 remained in the case, and were asserted aggressively by Syngenta, which blamed exporters just as it blamed China.  *See* ECF No. 3163 at 65.

Not surprisingly, the case required numerous experts.  Syngenta designated at least 12 experts who had to be deposed, cross examined, and rebutted (some more than once).  *See supra* Sections I.E & II.B.1.  Likewise, in the MDL and Minnesota actions, six experts for the Plaintiffs

---

[22] *See, e.g.*, ECF No. 2859 at ¶¶ 26-41; ECF No. 2940 at ¶¶ 97-106.

[23] Syngenta argued that exporters violated Chinese law in various respects when they shipped corn containing, *see* ECF No. 2859 Ex. 11 (Zhang Rpt.), requiring Plaintiffs to delve into that subject. *See* ECF No. 2940 at 59-70.

[24] *See, e.g.*, ECF 2940 ¶¶ 163-233.

were prepared and produced for trial and deposition, sometimes more than once.  *Id.*  Their opinions involved highly specialized subject matters.  *Id.*

Finally, certification of the litigation classes in the MDL and Minnesota turned, in part, on a central question of disputed fact:  Syngenta disputed whether class members could prove the fact and amount of damages by showing the price impact on the Chicago Board of Trade ("CBOT") futures price for corn and cited to this dispute as a basis for requiring an evidentiary hearing for the class certification motion.  *See* ECF No. 2419 at 3.  Prior to this case, no other court had accepted this assertion.  The issue was argued in the *Genetically Modified Rice* litigation, where the district court found that CBOT rice price could *not* be used to support class certification in that case.  Here, in addition to advancing new legal arguments, counsel developed a different factual record from which this Court, and ultimately the Kansas jury, found that impact and damages could be shown on a class-wide basis.  The development of this record necessarily involved application of facts to legal precedent that was hugely important to the prosecution of the Plaintiffs' claims.  *See* Ex. 1 (Stueve Decl. ¶¶ 448-61).

c)      <strong>The legal issues were complex and their outcome uncertain.</strong>

The legal issues were at least as extensive, complex and hard-fought as these novel and important factual issues.  They often involved issues for which there was no controlling precedent under the facts of this case.  Syngenta's able lawyers left no stone unturned in pressing its defenses beginning with extensive arguments for dismissal some five months after appointment of lead counsel in the MDL.  *See supra* Section I.D.  Even after this Court rejected most of Syngenta's arguments, Syngenta pressed its defenses in multiple venues, including Minnesota, Illinois, and the state courts handling ethanol claims.  *See supra* Section II.B.

Work on the initial motion to dismiss was a watershed moment.  In that first motion and continuing throughout the litigation, Syngenta urged many defenses, including three

"fundamental doctrines cutting across tort law," which Syngenta argued broadly foreclosed Plaintiffs' claims: duty, causation, and the economic-loss doctrine.   ECF No. 857 at 29-31. These issues alone are not only dispositive but daunting, and involved the law of 22 states.   ECF No. 927 at 97-118.   *See Allapattah Servs., Inc.,* 454 F. Supp. 2d at 1206 ("The legal difficulty of this case was further compounded by the application of state law to numerous issues"); *In re: Motor Fuel Temperature Sales Practices Litig.*, 2016 WL 4445438, at *8 ("Plaintiffs asserted class claims which involved the law of 29 jurisdictions and complex liability and class certification issues. At every juncture, defendants raised procedural, jurisdictional, constitutional and substantive arguments and defenses").   Syngenta's arguments on duty and causation were sophisticated, policy-driven and made even more complex because of numerous contextual sub-issues.[25]   The economic-loss doctrine is one of the most complicated topics in modern tort law due to the doctrine's multiple variants and differing rationales, untangling it was a substantial effort and prevailing on it was a significant victory.[26]

Syngenta contended many were issues of first impression, due either to a dearth of precedent or application of existing law to the particular facts of this case.   Among other things, Syngenta urged that Plaintiffs' theories of liability were "unprecedented," that prior cases addressing unapproved GM traits (*In re StarLink Corn Prods Liab. Litig.* and *In re Genetically*

---

[25] For example, duty and causation involved not only already-complicated policy issues, *see* ECF No. 857 at 48-55, but arguments including who should have the burden of implementing safeguards when a new GM product is introduced, application of the BIO policy, and matters of foreign relations.   *Id.* at 55-58; ECF No. 3292 at 14-23; ECF No. 3344 at 39-46.

[26] *See* Jim Wren, *Applying the Economic Loss Rule in Texas*, 64 Baylor L. Rev. 204, 205 (2012) ("courts often reference 'the economic loss rule' as if there were one unitary rule applicable to tort actions generally. The over-simplification misleads."); *id.* at 207  ("any reference to a single "economic loss rule" is a "misnomer") (quoting *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011));  Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts (2d ed.) ("Dobbs on Torts") at § 607 ("the implication of references to 'the' economic loss rule that there is but a single overarching economic loss rule is misleading. Several discrete rules dominate the decisions, not a single rule."); Dan B. Dobbs, *An Introduction to Non-Statutory Economic Loss Claims*, 48 Ariz. L. Rev. 713, 714 (2006) ("The contractual versions of the [ELD] are different" than the "stranger" version).

*Modified Rice Litig.*) were distinguishable, and that the only prior analogous cases held that claims were barred by the absence of duty or economic-loss doctrine. *See* ECF No. 857 at 31 (citing *Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088, 1093 (E.D. Mo. 2003); *Hoffman v. Monsanto Canada*, 2005 SKQB 225, 2005 SK.C. LEXIS 330 (Can. Sask. Q.B. May 11, 2005)). Syngenta also argued that it would be unprecedented to hold it accountable for "actions of grain exporters and other market participants that are wholly beyond Syngenta's control," ECF No. 857 at 28, that any duty "to reorganize the entire industry framework for growing and distributing corn. . .would also squarely undermine the policy behind the U.S. regulatory framework" and that "[n]o court has ever purported to create a parallel regulatory regime for determining which GM traits can and cannot be sold freely after federal approval and this Court should not be the first." *Id.* at 30. Counsel were required to respond to these arguments, often in briefs of significant length, which often cited a host of case law and other authority. They prevailed against these arguments, obtaining favorable rulings in multiple jurisdictions.

Class certification also involved cutting-edge legal issues. This Court was one of the first to apply the predominance teachings of *Tyson Foods, Inc. v Bouaphakeo,* 136 S. Ct. 1036 (2016). *See* ECF No. 2436 at 45-49. It also involved an issue that Syngenta alleged was one of first impression in this Circuit: whether to adopt a supposed heightened ascertainability requirement under Rule 23. *See* Syngenta's Rule 23(f) Petition at 20, *In re Syngenta AG MIR162 Corn Litigation*, Case No. 16-607 (10th Cir. Oct. 11, 2016). Plaintiffs' prevailed on these issues as well in both the MDL and Minnesota, and obtained denial of Syngenta's requests for interlocutory appeals in both jurisdictions.

Other complex issues included:

- Whether the high court of each state would apply its version, or adopt the "stranger" version, of the economic-loss doctrine to the circumstances here. *See*

ECF No. 857 at 73-83; ECF No. 927 at 97-134; *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1195 n.10 (D. Kan. 2015) (noting Court's task as "predicting what particular states' courts would do" in terms of economic-loss doctrine application under the circumstances presented).

- Whether a defendant can be compelled to consent to general jurisdiction by registering to do business in the state, and then subsequently whether such registration is an unconstitutional condition. *See* Mem. & Order, ECF No. 1679; Mem. & Order, ECF No. 2047.

- Standing, causation, and whether statements alleged are actionable under the Lanham Act. *See* ECF No. 857 at 99-106; ECF No. 927 at 160-171; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

- Express and implied preemption under the Grain Standards Act ("GSA"), 7 U.S.C. § 87g(a), where the preemption clause of the hundred-years-old statute had *never* before been interpreted by a court.[27]

- Syngenta's arguments that China violated international law in violation of World Trade Organization ("WTO") treaties with the United States. *See* ECF No. 2869-2 (Shull Rpt. at 30-32); ECF No. 3188-1; ECF 3205 at 19-22; Order, ECF No. 3239 (requesting supplemental briefing on proposed instruction Nos. 19 and 19A regarding international law); ECF Nos. 3278, 3280.

- Whether fault could be assessed to a foreign state, like China, entailing issues pertaining to various treaties asserted by Syngenta, *see* ECF No. 3344 at 78-81, the act-of-state doctrine, and whether a foreign government has a legal duty to farmers in this country. *See* ECF 3051 at 38-42.

These are just some of the myriad and difficult issues faced by Plaintiffs in this case. All were exceedingly complicated and none had ready answers.[28]

---

[27]   Issues relating to GSA preemption, first raised by exporters, carried through to jury instructions as well as summary judgment disputes between Syngenta and producers. *See* ECF No. 1803; ECF No. 3108 at 17-18; ECF No. 2426 at 23-25; ECF No. 2859 at 30-32; ECF No. 3051 at 34-36.

[28]   There were many other legal issues in this case made complex by the ability of Syngenta's legal team to craft sophisticated arguments. These included, for example: (1) the standard by which the Court should consider the opinions of plaintiffs' experts at class certification and meaty issues pertaining to class-wide damages, ECF No. 2547 at 14-24; (2) Syngenta's due process arguments against class certification and aggregate damages, ECF No. 2335 at 6, 31, 76, ECF No. 3292 at 29-31, ECF No. 3344 at 82-84; (3) Syngenta's effort to assign fault to Plaintiffs and exporters, *see* ECF Nos. 1270, 2947, 3344 at 75-77; (4) Syngenta's arguments on intervening/superseding case, ECF Nos. 2980 at 78-100, 3344 at 55; (5) the *Noerr-Pennington* doctrine, ECF No. 2862 at 100; and, (6) Syngenta's due process and policy arguments against punitive damages, ECF No. 2862 at 113-120.

All of these factors are relevant to the Fee Request in at least three ways: *first*, the issues presented in this case (procedural, factual, and legal) required counsel with the commensurate skill (administrative, strategic, and legal) to counter the multifaceted defense lodged by Syngenta; *second*, the case justifies the significant number of hours and lawyers of varying skill sets engaged by lead counsel in the MDL, Minnesota, and Illinois cases; and *third*, the outcome of this case was far from certain, requiring counsel to undertake significant risk in investing their time and money into a case that, without herculean effort, could have turned out very differently.

### 2. Plaintiffs were well-represented by a team of attorneys with substantial experience in prosecuting high-stakes, complex litigation.

This case both demanded – and received – an experienced team of attorneys to meet the challenges from Syngenta's well-funded and well-qualified opposing counsel.[29]   Syngenta's legal team was comprised of highly experienced litigators from Kirkland & Ellis with exceptional reputations; tellingly, however, Syngenta engaged even more high-profile lawyers at key, critical points in the case to respond to Plaintiffs' prosecution.  For example, although it was already utilizing recognized Supreme Court advocate Patrick Philbin, Syngenta hired and supplemented its team to include Paul Clement when it petitioned the Tenth Circuit for review of the class-certification order.  And, to try the Kansas and Minnesota cases, it brought on Leslie Smith and Mike Brock, the latter of whom has been described as "one of the country's most prominent trial lawyers in bet-the-company litigation."  Ex. 6 (Klonoff Decl. ¶ 68).

To meet this formidable challenge, Plaintiffs assembled a team of lawyers capable of meeting their opponents head-to-head, including subject-matter experts to assist with the many

---

[29] *See, e.g.*, *Lunsford*, 2014 WL 12740375, at *13 ("In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel."); *In re Ocean Power Techs., Inc.*, 3:14-CV-3799, 2016 WL 6778218, at *28 (D.N.J. Nov. 15, 2016) (the "quality and vigor of opposing counsel is also important in evaluating the services rendered by Plaintiff's Counsel."); *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1207 ("Further adding to the difficulty of the case was the quality of Plaintiffs' legal adversaries.").

complex factual and legal questions presented in the case.  The experience and reputation of Kansas Common Benefit Attorneys alone are extensively documented in the attached declarations. Although not intended to be comprehensive, some highlights include:

- subject-matter experts, such as the lawyers who prosecuted, tried and/or handled critical appeals on all of the *Genetically Modified Rice* bellwether cases and the prior *Starlink* corn contamination case,  Ex. 3 (Downing Decl. ¶¶ 5-7); Ex. 2 (Powell Decl. ¶¶ 12, 23); Ex. 4 (Chaney Decl. ¶¶ 19-20, 24); Ex. 7 (Weiss Decl. ¶ 3, 8, 14);[30]

- numerous lawyers with extensive experience in high-stakes litigation, including class actions, backed up by biographies of successful verdicts and settlements, *see e.g,* Ex. 1 (Stueve Decl. ¶¶ 20-21, 32-36, 40-42, 56-63); Ex. 2 (Powell Decl. ¶¶ 13-17, 24, 28, 33); Ex. 3 (Downing Decl. ¶ 4); Ex. 4 (Chaney Decl. ¶¶ 19-20, 23-25, 107); Ex. 7 (Weiss Decl. ¶¶ 7, 9, 12, 17-18); Ex. 24 (Shelquist Decl. ¶ 5(b)); Ex. 30 (Paul Decl. ¶ 5(a)-(c)); Ex. 35 (Conroy Decl. ¶ 6); Ex. 38 (Bukovac Decl. ¶ 3); Ex. 43 (Bender Decl. ¶ 5(a)); and,

- at least thirty-eight former federal circuit- or district-court law clerks or state-court law clerks,  Ex. 1 (Stueve Decl. ¶¶ 12, 29, 50, 73, 95, 98, 100, 108, 109); Ex. 2 (Powell Decl. ¶¶ 40, 44, 51); Ex. 3 (Downing Decl. ¶ 4); Ex. 4 (Chaney Decl. ¶¶ 11, 84, 94, 96); Ex. 7 (Weiss Decl. ¶ 18); Ex. 43 (Bender Decl. ¶ 5); Ex. 24 (Shelquist Decl. ¶ 5(a, g, h, i)); Ex. 20 (Ursu Decl. ¶ 5); Ex. 30 (Paul Decl. ¶ 5); Ex. 12 (Plant Decl. ¶ 10); Ex. 13 (Bell Decl.); Ex. 17 (Pinyan Decl. ¶¶ 5, 6); Ex. 18 (Emerson Decl. ¶ 6); Ex. 27 (McCluer Decl. ¶ 4);  Ex. 39 (Thrash Decl. ¶ 4).

These attorneys applied their experience in successfully navigating the numerous difficult and complex issues from the inception of this litigation to the $217 million jury verdict to the $1.51 billion settlement.

### 3.   Counsel exercised a high-degree of skill in navigating the complex legal and factual issues that permeated the MDL.

As courts have noted, the successful handling of class and other complex multi-party actions itself requires expertise and a special set of skills.[31]  The MDL device adds its own level

---

[30] *See In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *4 ("Litigation of this case required great skill in a highly specialized field (third factor), against highly skilled opposing counsel. . ."); *Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 308 (S.D. Miss. 2014) ("Litigation of this Action required counsel trained in class-action law and procedure as well as the specialized issues presented here.  Class Counsel possess these attributes, and their participation added immense value. . .").

[31] *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, No. 810ML02151JVSFMOX, 2013 WL 12327929, at *31 (C.D. Cal. July 24, 2013) ("Courts

of complexity, particularly for counsel in leadership positions who serve the court in addition to the interests of many thousands of plaintiffs and are required to navigate the complications that coordination between diverse sets of lawyers entails.[32]   And this case involved not just a single MDL, but multiple consolidated cases in several state and federal jurisdictions.

The skills of counsel were on full display in these proceedings.  The prosecution of this litigation was not assisted by a government investigation (for example, it was not a product case involving recall or precipitated by a DOJ antitrust investigation).   Instead, lead counsel investigated, developed, prosecuted, and succeeded in the litigation entirely by their own considerable efforts, often without a road map and relying on their own experience and best judgment.  *See In re: Urethane Antitrust Litig*., 2016 WL 4060156, at *4 ("Counsel achieved this verdict and judgment without the benefit of a government investigation or prosecution of members of the alleged antitrust conspiracy."); Ex. 6 (Klonoff Decl. ¶¶ 70-71) ("class counsel had no assistance of any kind from the government" and "bore the entire burden of investigating and proving Syngenta's alleged improper conduct").   If anything, as the Kansas trial showed, counsel's efforts were impeded by governmental authorities: Syngenta relied on U.S. trade representative reports to point the finger at China's trade policies; cited to U.S. deregulation of Agrisure Viptera and Duracade as a legal defense to the imposition of duty; and even used a former USDA trade representative, Mr. Shull, as a trial expert.  Ex. 6 (Klonoff Decl. ¶ 71).

---

have recognized that the 'prosecution and management of a complex national class action requires unique legal skills and abilities.'") (quoting *Knight v. Red Door Salons, Inc*., No. 08-01520 SC, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009)); *Lunsford*, 2014 WL 12740375, at *11 ("the dimensions [of successfully and ethically prosecuting large class action suits] are awesome.") (citation omitted).

[32] Multidistrict litigation "is a special breed of complex litigation."  *In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 460 F.3d 1217, 1232 (9th Cir. 2006).   "For it all to work, multidistrict litigation assumes cooperation by counsel and macro-, rather than micro-, judicial management because otherwise, it would be an impossible task for a single district judge to accomplish." *Id*.  Appointment of leadership counsel is a necessary tool "provid[ing] order and structure to multidistrict proceedings."  *In re Linerboard Antitrust Litig*., 292 F. Supp. 2d 644, 667 (E.D. Pa. 2003).

Independent investigation and development of the facts was a complicated, arduous business given the number and difficulty of subject matters to cover, the number of documents, witnesses and experts involved, the number of representative plaintiffs who provided discovery and depositions, as well as the ever-present zealousness of opposing counsel. From the outset, the level of investigation and legal analysis is reflected in the Master Complaints filed and amended, containing a detailed account of facts and economic injury, as well as multiple claims made nationally and for 22 state classes of producers in the country's highest corn-producing states. *See supra* Section I.D & II.B.

The marshalling of all salient facts as the case progressed is further testament to the skill and dedication of counsel, who: analyzed over 2.5 million pages of documents; deposed over 81 witnesses, domestically and abroad; prepared and defended over 70 witnesses; and deposed or defended 18 experts. *See, supra*, Section I; Ex. 1 (Stueve Decl. ¶¶ 252, 295, 405, 428, 433). The skill of Plaintiffs' counsel also is evidenced by consistent success on major legal issues, which include those affecting plaintiffs globally (including class certification, Syngenta's motion to dismiss, and efforts to obtain interlocutory appeal thereon) and those pertaining to the Kansas and Minnesota trials (including summary judgment,[33] motions *in limine*, *Daubert* or *Frye-Mack* motions, and pre- and post-verdict motions for judgment in the Kansas case), which not only affected that trials, but stood as precursors to future argument and rulings. These were challenging issues to research, brief and successfully argue to the Court. *See In re: Checking Account Overdraft Litig.*, No. 1:09-M D-02836-JLK, 2014 WL 11370115, at *16 (S.D. Fla. Jan.

---

[33] Among counsel's significant victories, the Court granted summary judgment for plaintiffs with respect to certain applications of Syngenta's defenses of superseding cause, assumption of risk, mitigation, business and economic justification, antitrust preemption, and comparative fault. Ex. 1 (Stueve Decl. ¶ 508).

6, 2014) ("based on the novel and very complex issues confronted by Class Counsel in this case . . . an extraordinary group of lawyers was required to prosecute this case.").

Moreover, even as Syngenta demonstrated its perseverance by pressing arguments it lost in the MDL, Minnesota and Illinois Lead Counsel successfully demonstrated their skill in maintain those favorable rulings.

In addition to the unusually complicated factual and legal landscape, another aspect of this case that sets it apart from many other class and MDL actions is that the parties went to trial. *See Allapattah Servs., Inc.,* 454 F. Supp. 2d at 1210 ("Few class actions ever reach trial."); *see also id.* at 1193 ("The most apparent feature distinguishing this class action from virtually every other class action in the reported federal decisions is obviously that it did not settle before trial."); Ex. 6 (Klonoff Decl. at ¶ 69) ("Because relatively few class actions go to trial, courts reviewing attorneys' fee requests justifiably give significant weigh to the fact—when present— that a contested trial occurred.") (citing cases).

The Kansas trial (affecting more than 7,000 Kansas producers) began on June 5, 2017 and lasted three weeks.  The second Minnesota trial (affecting more than 22,000 Minnesota producers) began in September 2007 and lasted two weeks before it was stopped for settlement. Although Syngenta brought on additional, high-profile lawyers to try the case, Plaintiffs' counsel met that challenge with the skilled trial team assembled by Co-Lead Counsel in the first instance. Their success was made evident by their preparation, presentation, and ultimate success.  *See Allapattah Servs., Inc.,* 454 F. Supp. 2d at 1208 ("skill may manifest itself through arduous preparation and efficient organization, particularly if the case goes to trial. . .an attorney who has a sharp command of trial practice and a sound understanding of the substantive law, governing

the case. . .should be compensated at a higher rate of pay than one who has to educate himself just to gain a general working knowledge of trial practice and law.").

Plaintiffs' trial team culled and organized the most significant documents from the millions of pages produced in discovery. Objection and argument over admissibility of documents was extensive, as were evidentiary issues via motions *in limine*. Ex. 1 (Stueve Decl. ¶¶ 536-45, 557); *see also* ECF Nos. 3098, 3101, 3108, 3143. Testimony at trial was presented live and by video deposition. Syngenta's well-prepared witnesses uniformly and assiduously avoided any concession on any topic. Plaintiffs' counsel analyzed thousands of pages of deposition testimony for cogent passages that were useable at trial and presented their story in a way both understandable and persuasive to a jury. *See* Section I.H. Due to the factual context, much of the evidence was topically complex, requiring extra effort and skill to distill, simplify, and present to lay jurors, and the injuries here were financial. *See In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *4 ("The subject matter was complex and not easily digestible by a lay jury, and there were no personal injuries to heighten sympathy."). Damages evidence alone involved high-level economic concepts that needed to be presented in an understandable way. Battle over instructions was intense, involving weeks of meet-and-confer sessions, many rounds of briefing, ECF Nos. 3204, 3205, 3239, 3278, 3280, 3283, 3284, 3285, and oral argument.

Through the efforts of their attorneys, Plaintiffs overcame all obstacles and prevailed, as the $217 million verdict confirms. ECF No. 3304. That verdict had tremendous importance not just to the Kansas class but to the litigation overall. It was the first verdict secured against Syngenta, serving as a bellwether outcome that awarded 100% of the compensatory damages requested, Ex. 1 (Stueve Decl. ¶ 567)**,** a clear message to Syngenta of the risk it faced going forward. *See* Ex. 6 (Klonoff Decl. ¶ 68) ("Realistically, I have no doubt that had plaintiffs lost

the trial, their ability to negotiate a settlement anywhere near the magnitude of $1.51 billion would have vanished.").   Such a rare class trial and victory weighs strongly in favor of the requested fee.  *See Gevaerts v. TD Bank*, No. 1:14-CV-20744-RLR, 2015 WL 6751061, at *12 (S.D. Fla. Nov. 5, 2015) ("In the private marketplace, counsel of exceptional skill commands a significant premium.  So too should it here.").   Moreover, Syngenta did not simply capitulate following the verdict.  By putting on much of the Plaintiffs' case in chief before the term sheet was signed, Minnesota Lead Counsel demonstrated that they were prepared to go the distance as well.  And Co-Lead Counsel demonstrated that they were prepared to try four class trials in 2018, showing Syngenta the risk it faced if it refused settlement.

Again, this was not a typical class action that resolved during pre-trial discovery.  This case required counsel capable of: coordinating among multiple jurisdictions, deciding on and implementing a long-term strategy; planning for multiple cross-jurisdictional jury trials; preparing for potential appeals with case-wide impact; developing a versatile discovery record that could be used by different types of plaintiffs (producer and non-producer) in different types of cases (class and individual) in disparate jurisdictions (federal and state); and designing a nationwide settlement to fairly distribute the $1.51 billion non-reversionary fund agreed to by Syngenta.  Further, it required not just counsel who could develop a pre-trial record, but counsel who were capable of using that record in trial of a class action against one of the largest law firms in the world with one of the most respected trial teams in the country.  Ex. 1 (Stueve Decl. ¶¶ 517-21).   The pre-trial record, the jury's verdict in the Kansas class trial, and the record-breaking $1.51 billion agricultural settlement reached during the middle of the Minnesota class trial are the best evidence of the skills employed by counsel in obtaining this settlement.  *See generally* Ex. 1 (Stueve Decl.); Ex. 2 (Powell Decl.); Ex. 6 (Klonoff Decl.).

**4. The massive amount of time and labor that counsel expended supports the fee request.**

The case was litigated vigorously at all stages in multiple fora over nearly four years, requiring sustained and intensive efforts by lead counsel and those engaged to assist their efforts. This is not a case that settled early or easily. It followed hard-won certification of litigation classes both here and in Minnesota along with orders in both jurisdictions denying interlocutory appeal, rulings on a lengthy motion to dismiss, extensive argument from both sides on summary judgment, fights over admissibility of documents, lay and expert testimony, the start of two class trials, one class-wide jury verdict, and pre- and post-verdict briefing. *See supra* Sections I-II. Furthermore, settlement required the extensive involvement of both the Court-appointed Special Master and the Honorable Daniel Stack (retired), a special discovery master in Illinois, as well as repeated hearings with and involvement from the courts. As discussed throughout, sustained pressure across multiple jurisdictions and a full-damages jury verdict were necessary to achieve this result.

The work necessary to achieve this result, discussed extensively in the attached declarations, is summarized in the Statement of Facts. Further recitation of efforts in the Minnesota Court and the Illinois Courts are included in Minnesota and Illinois Lead Counsel's separate filings. The Court should have no trouble, on this record and based on its own first-hand experience, concluding that the fee request is supported by the time and labor involved in achieving this ground-breaking settlement.

**5. The demands of this litigation necessary imposed time limitations and precluded counsel from other employment.**

From the earliest status conferences, Syngenta was in this case "for the long haul" with the intention that it was going to "take the case to trial" if it was not dismissed on the pleadings. ECF No. 127 at 81:20-24. Leadership counsel showed they were up to the task. The pace of this

case was aggressive and sustained, with few breaks and little down time.  The demands of this case necessarily required full-time commitment from the Co-Lead Counsel in the MDL for virtually the entire course of the MDL, and from many of the lawyers at their firms, as well as similar or significant commitments from many of the supporting law firms.

The initial scheduling order provided MDL leadership with a little over one month to file their consolidated amended master complaints for producers and non-producers that would govern the claims in the MDL, which were 170 and 90 pages long (ECF Nos. 296-97). Scheduling Order No. 1, ECF No. 123.  On October 21, 2015, after ruling on Syngenta's motion to dismiss, the Court entered Scheduling Order No. 2 (ECF No. 1098), which started full fact discovery and scheduled the first trial for June 2017 – a deadline that Plaintiffs met through the sustained labor and commitment of counsel.  *See* Section I.

Within seven months, Plaintiffs completed most of fact discovery, including depositions of all 74 producers and all but one of the 32 Syngenta depositions.  *See* Ex. 1 (Stueve Decl. ¶¶ 294, 405).  While reviewing the 1.5 million pages of documents produced by Syngenta, these 32 Syngenta witnesses were deposed over 57 days in 4 continents.  *Id.*  Although some of the 49 third-party depositions extended past the initial deadline, all but two were completed prior to October 2016 – within 12 months from the start of discovery.  Ex. 1 (Stueve Decl. ¶¶ 428, 433).

By March 2017 (within 17 months), Plaintiffs had obtained class certification, successfully opposed interlocutory review of that order, conducted their pretrial conference, and completed extensive summary-judgment briefing. Twenty months and two days after the start of fact discovery, Plaintiffs in the MDL had obtained a $217.7 million jury verdict on behalf of a certified Kansas class, ECF No. 3304, completed pre- and post-verdict briefing and immediately began preparing for the next class trial, *see* Pretrial Order (AR and MO classes), ECF No. 3368.

During this period, counsel filed and responded to over 55 substantive motions and countless other administrative, unopposed and procedural requests.  *See, supra*, Section IIE.  In the end, it took a sustained effort over approximately two years – and one full and two partial trials – before the parties moved to stay the cases pending execution of the Settlement Agreement.  ECF No. 3452.  It is difficult to point to other MDLs of similar size that accomplished so much in such a relatively short timeframe, evidence of the degree of commitment required by counsel.

As detailed in the accompanying application of Minnesota Lead Counsel, they followed a similar schedule.  *See also* Section II.B.1 (citing Scheduling Order No. 2).  Their first bellwether trial was set and prepared for April 2017.  Although it resulted in a mistrial before the presentation of evidence due to a juror issue, they were required to proceed through the same discovery process and schedule as the federal MDL.  Moreover, the second trial, the Minnesota class trial, began shortly after the conclusion of the Kansas trial, and counsel in both the MDL and in Minnesota were prepared to continue trying cases when the litigation settled.

Given these facts, it is unsurprising that this kind of workload precluded many attorneys from accepting other engagements.[34]  It would have been impossible to meet the demands of this case if this litigation was not the first and top priority of the lawyers leading it.  *See* Ex. 6

---

[34] For example: according to Patrick Stueve, "I had a full docket of cases that I had to delegate to other partners because of the time commitment of this case. This was necessary to complete the extensive amounts of discovery in the time frame allotted and to prepare the Kansas case for trial.  For extensive periods throughout the litigation, Ms. Schwartz and Mr. Wilders also worked almost exclusively on this case during that time frame.  Without a doubt, the needs of this case precluded us, and our firm, from accepting other assignments." Ex. 1 (Stueve Decl. ¶ 670) ("During the time I was working on this case, I spent little, if any, time evaluating and developing new cases, which is something I have historically spent substantial amounts of time on.  The needs of this case, and the desire to prosecute these claims effectively on behalf of the Plaintiffs, required that I, and my firm, put this case first, above and beyond other business opportunities.  It is not an exaggeration to say that this required that level of commitment and sacrifice.").  According to Don Downing, "Before and throughout this entire time period, the resources of my firm's entire commercial litigation/class action/mass tort practice were so fully devoted to this litigation that I was required to instruct those responsible for new client screening and intake to advise all new potential clients that our group was not taking new matters.  We had to decline several significant matters due to our commitment to this litigation." Ex. 3 (Downing Decl. ¶ 24).

(Klonoff Decl. ¶ 79) ("As a result of this case, the lead firms representing plaintiffs were clearly hampered in their ability to take on significant other work.  The demands of this case were enormous by any measure.  At least five lawyers have billed more than 5,000 hours on the case; at least 12 lawyers have billed more than 3,000 hours; and at least 20 lawyers and paralegals have billed more than 2,000 hours.").  This also weighs in favor of the requested fee.  *See, e.g.*, *Brown*, 838 F.2d at 455 (substantial work on the litigation "precluded or reduced their opportunity for other employment"); *Allapattah Servs., Inc.,* 454 F. Supp. 2d at 1209 ("Taking on this resource-sapping, risk-based venture also precluded Class Counsel from accepting other contingent matters during the period of representation.").

### 6.     The contingent nature of the fee and the risk undertaken by counsel justifies the fee request.

Relatedly, the more an attorney invests in a single case, the riskier the bet they place on the outcome of that litigation.  Here, counsel expended their labor, forwent other employment, and advanced millions of dollars of their own money, on behalf of the Class Members to prosecute highly complex and risky claims over an extended time period – all on a contingency fee basis with no guarantee of any payment whatsoever.  In so doing, they "assumed a significant risk of non-payment or underpayment.  Numerous cases recognize such a risk as an important factor in determining a fee award." *Gevaerts*, 2015 WL 6751061, at *13; *see In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *4 (recognizing that when liability is less than certain, a case presents "a great deal of risk, as counsel was required to advance all expenses and attorney time to litigate a hard-fought case against highly experienced opposing counsel hired by a defendant with ample resources").[35]  The risk of no recovery, and no payment, factors into

---

[35] *See also, e.g.*, *In re: Checking Account Overdraft Litig.*, 2014 WL 11370115, at *17 (same);  *In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at *28 ("Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award

undesirability, and is considered in light of, among other things, the risk of obtaining class certification and establishing liability.[36]

"Fees that are contingent on success present definite risks.  Payment, if any, is deferred, and there is always a risk, often a substantial risk, that there may be no payment . . . [R]isk demands a premium. And, as a general rule, the greater the uncertainty of payment the greater the premium should be."  *Been*, 2011 WL 4478766, at *8 (quoting *In re Superior Beverage/Glass Container Consol. Pretrial,* 133 F.R.D. 119, 127 (N.D. Ill. 1990)).[37]  The risk of no recovery only increases with the difficulty of the case.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig*., 2013 WL 12327929, at

---

of attorneys' fees."); *Jenkins*, 300 F.R.D. at 309 ("in '[r]ecognizing the contingent risk of nonpayment in [class action] cases, courts have found that class counsel ought to be compensated . . . for risk of loss or nonpayment assumed by carrying through with the case.'") (quoting *Turner v. Murphy Oil USA, Inc.,* 472 F. Supp. 2d 830, 859–60 (E.D. La. 2007)); *Pinto v. Princess Cruise Lines, Ltd*., 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) ("A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the wholly contingent outlay of out-of-pocket sums by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high.  Cases recognize that attorneys' risk is perhaps the foremost factor in determining an appropriate fee award.") (internal quotations omitted) (quoting *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 54 (2d Cir. 2000) and citing cases); *Yarrington*, 697 F. Supp. 2d at 1062 ("Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees.") (quoting *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005) (quotations omitted); *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1215 (finding that contingency risk factor weighs "heavily in favor of" granting the requested fee).

[36] *Bredbenner v. Liberty Travel, Inc*., No. CIV.A. 09-1248 MF, 2011 WL 1344745, at *20 (D.N.J. Apr. 8, 2011); *see also, e.g., Family Med. Pharmacy, LLC v. Trxade Group, Inc.*, No. CV 15-0590-KD-B, 2017 WL 1042079, at *12 (S.D. Ala. Mar. 17, 2017) (analyzing the "undesirability" factor and stating that the complexity and risk of class actions "may render this class action litigation as undesirable. Accordingly, this factor weighs in favor of awarding the requested attorney's fee."); *Shaw,* 2015 WL 1867861, at *7 ("in light of the risk of nonpayment of the costs advanced by Class Counsel and the time they invested in this case, this [undesirability] factor supports the requested fee award."); *In re Qwest Communications Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1152-53 (D. Colo. 2009) (risk of non-recovery of time and advanced costs as relevant to "undesirability" factor "carries significant weight and weighs in favor of a substantial fee award"); *Lucas v. Kmart Corp*., No. CIV.A. 99-01923, 2006 WL 2729260, at *7 (D. Colo. July 27, 2006) ("Given the risk of no recovery and the unsettled legal issues described above, this was not a desirable case to take.").

[37] There are ample examples of situations in which attorneys in complex litigation "have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig*., 364 F. Supp. 2d at 994 (citing *Glover v. Standard Fed. Bank*, 283 F.3d 953 (8th Cir. 2002) (reversing class certification)).

67

*30 ("Another significant factor to be considered in determining attorney fees is the risk that counsel took of 'not recovering at all, particularly [in] a case involving complicated legal issues.'") (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046-47 (N.D. Cal. 2008)).

"It is an established practice to reward attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all." *Kanawi v. Bechtel Corp.*, No. C 06-05566 CRB, 2011 WL 782244, at *2 (N.D. Cal. Mar. 1, 2011) (citing *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994)). "Such a practice encourages the legal profession to assume such a risk and promotes competent representation for plaintiffs who could not otherwise hire an attorney." *Id.*[38]

Here, in just the Kansas MDL, attorneys invested over $81 million of lodestar, unadjusted for risk, representing over 142,823 hours of common-benefit work. By themselves, Co-Lead Counsel's firms invested $59 million in lodestar, betting on their own skill, and the skill of the

---

[38] *See also Been*, 2011 WL 4478766, at *9 ("Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success."); *In re: Checking Account Overdraft Litig.*, 2014 WL 11370115, at *17 (risk embodied by "contingency fee arrangement often justifies an increase in the award of attorney's fees.") (quoting *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1335 (S.D. Fla. 2001)); *see also id.* ("Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee here."); *Lunsford*, 2014 WL 12740375, at *11 ("Adequate compensation promotes the availability of counsel for aggrieved persons."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 2013 WL 12327929, at *32 ("It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for contingency cases . . . This ensures competent representation for plaintiffs who may not otherwise be able to afford it." (internal quotations and citation omitted); *Barrera v. Nat'l Crane Corp.*, No. SA-10-CV-0196 NN, 2012 WL 242828, at *4 (W.D. Tex. Jan. 25, 2012) ("The legal profession accepts contingent fees that exceed the market value of the services if rendered on a non-contingent basis as a legitimate way of assuring competent representation for plaintiffs who cannot afford to pay on an hourly basis regardless of whether they win or lose"); *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1217 ("Class Counsel has risked millions of dollars in un-reimbursed attorneys' time and additional millions in out-of-pocket costs. Unless that risk is compensated with a commensurate reward, few firms, no matter how large or well financed, will have any incentive to represent the small stake holders in class actions against corporate America, no matter how worthy the cause or wrongful the defendant's conduct.").

rest of the Kansas Common Benefit Group.  Lead Counsel in Minnesota (over $41 million in lodestar reported under the Minnesota Court's CBO) and Illinois are also expected to report large investments in their separate filings.  Moreover, it was not just the labor that counsel invested, but the advancement of expenses.  The Kansas Common Benefit Group alone advanced over $6.6 million in expenses, the recovery of which was also contingent on a commensurate success. Ex. 1 (Stueve Decl. ¶ 645).  Minnesota Lead Counsel doubtless has significant costs under that Court's CBO.  As recounted above, these attorneys faced – and overcame – numerous difficult, novel and complex defenses, including the always-uncertain risk of an adverse jury finding. Liability (and consequent payment) was more than uncertain.  This risk permeated every substantive aspect of the case: the motion to dismiss, class certification, dispositive motions and trial.  Lead Counsel and those working on their behalf necessarily undertook tremendous risk – and succeeded on behalf of the Class – and should be compensated for doing so.

### 7.   The relief involved, totaling $1.51 billion, supports the Fee Request.

The next factor "recognizes that a fee award should reflect the relief obtained." *Allapattah Servs., Inc.,* 454 F. Supp. 2d at 1204.  This perhaps is the most important factor, particularly when "the recovery was highly contingent and. . .the efforts of counsel were instrumental in realizing recovery. . ." *In re: Urethane Antitrust Litig*., 2016 WL 4060156, at *4 (quoting *Brown*, 838 F.2d at 456).[39]  "Factors indicating 'exceptional success' include success achieved under unusually difficult or risky circumstances and the size of plaintiffs' recovery." *Allapattah Servs., Inc.,* 454 F. Supp. 2d at 1204-05.  The difficulty and risk here, as well as counsel's skill and effort, make the settlement amount all the more remarkable.

_____

[39] *See also McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-933, 2008 WL 4816510, at *15-16 n.9 (W.D. Okla. Oct. 27, 2008) (counsel's "willingness to prosecute this matter on a contingent basis. . .ordinarily shifts the analytical focus away from hours spent. . .to the ultimate result. . .obtained").

In common fund cases, the size of the fund itself reflects "the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded."  Manual For Complex Litigation 4th § 14:121 (2004) (internal quotation marks and citation omitted); *see also Lucken Family Ltd. P'ship, LLLP*, 2010 WL 5387559, at *3 ("Numerous courts have recognized that in evaluating the various *Johnson* factors, the greatest weight should be given to the monetary results achieved for the benefits of the class.") (quoting *Anderson v. Merit Energy Co.*, No. CIV.07CV00916LTBBNB, 2009 WL 3378526, at *4 (D. Colo. Oct. 20, 2009)).  The result obtained here amply supports the requested fee.  The settlement is from the outset advantageous as it avoids future uncertainties and provides cash recovery.  *See Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2016 WL 3743098, at *7 (D. Kan. July 13, 2016) (settlement "avoids the uncertainty and rigors of trial and produces a favorable result for plaintiffs. This factor favors approval of the fee award.").

Moreover, the fee is proportionate to the amount of money that Class Members' will recieve.  Syngenta will pay $1.51 billion, with no possibility of reversion, under a claims process that, for most, requires submitting no documentary proof.  This is the largest GM crop settlement in history.  It reflects a significant portion of the damages alleged by the Class, and is "one of the largest class settlements of any kind." Ex. 6 (Klonoff Decl. ¶ 85).  It was not achieved easily, but through sustained victories and extensive effort.

Finally, the results are incredible in light of two additional factors.  First, Plaintiffs' victories all hung on the edge of potential appellate review.  Syngenta had a strong belief in the merits of its arguments, as demonstrated by the fact that, in its own words, "Syngenta has sought appellate review at every available opportunity for almost two years."  ECF No. 3391 at 9.  And, indeed, it pressed its arguments in every jurisdiction and sought such review at every available

turn.  It asked the Court to certify its September 11, 2015 order on the motion to dismiss under 28 U.S.C. § 1292(b).  ECF No. 1081.  It petitioned both the Tenth Circuit and the Minnesota Court of Appeals for review of the orders granting class certification.  *See In re Syngenta AG MIR162 Corn Litigation,* Case No. 16-607 (10th Cir. Oct. 11, 2016).  And it argued vigorously that the Kansas judgment was final and would be subject to immediate appeal following resolution of its post-trial motions even though that judgment did not dispose of all the claims in the Producer Plaintiffs' Third Amended Class Action Master Complaint.  *See* ECF No. 3391 at 1-2.  No doubt – as it argued – Syngenta's post-verdict motion gave a preview of the arguments it would raise on appeal, including key legal issues such as duty, causation, and the economic-loss doctrine as well as challenges to Plaintiffs' damages models, non-party fault and cause, and certification.  ECF No. 3344.  Syngenta previously argued that an appellate success on any one of these issues should apply in the cases of all Class Members, *see* ECF No. 3391 at 9-11, and would undoubtedly have pressed that argument if it prevailed on appeal, in which case every Class Member could have recovered nothing, further demonstrating tremendous results.

Second, the benefits of the litigation extend beyond the pure monetary value of the settlement to Class Members – whose businesses continue to have an interest in preserving the exportability of corn or other crops.  The rulings and outcomes in this litigation have provided the Class Members with precedent – in numerous jurisdictions.  This precedent – and the trial outcome – supports the existence of a GM seed manufacturer's legal duty to act with reasonable care in the timing, manner and scope of commercializing new GM seeds.  *See* ECF No. 3392 at iii (collecting cases in the several jurisdictions recognizing said duty).  This may deter other GM seed manufacturers from commercialization decisions that cause future trade disruptions.  *See* ECF No. 3392 at Ex. 5 (presentation of former general counsel for Monsanto recognizing that

71

the "deterrent effect of potential [tort] liability is also [a] strong motivation for increased stewardship" of new GM traits).  In addition, non-producer Class Members can point to the Kansas and Illinois rulings interpreting the Grain Standards Act as not requiring them to disrupt their businesses to segregate and channel commodity grains.  *See* Mem. & Order, ECF No. 1803. Finally, this litigation presents a road map for Class Members who may need to seek class certification of similar claims in the future.  Thus, beyond the settlement amount of which Class Counsel seek a percentage, the litigation as a whole will doubtlessly provide future benefits to the Class as they continue to operate their farming businesses.

### 8.   The fee request is consistent with a customary fee.

A useful measure of reasonableness is the customary fee that a lawyer and client would agree to in private litigation.  *See In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1211 ("the more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases."); Ex. 6 (Klonoff Decl. ¶ 81).

In a contingent case, one-third of any recovery is par or lower than a standard fee arrangement.[40]   In this litigation, thousands of producers have executed fee agreements with counsel clients providing for 40% or more of the recovery.  Ex. 1 (Stueve Decl. ¶ 659); Ex. 3

---

[40] *See, e.g.*, Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27 (2004), at 35 ("Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases."); *Flournoy v. Honeywell Int'l, Inc.*, No. Civ. A. 205-184, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("The most common contingent fee is one third of the recovery. Forty percent fee contracts are common for complex and difficult litigation"); *In re Remeron Direct Purchaser Antitrust Litig.*, No. CIV.03-0085 FSH, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation.") (citing cases).

(Downing Decl.) ¶¶ 71-73 (noting that the vast majority of fee contracts in both rice and corn MDL's require payment of 40% to the attorney, while others require payment of one-third); Ex. 6 (Klonoff Decl. ¶ 81).  As this Court recognized in the *Urethane* case, "a one-third fee is customary in contingent-fee cases, and indeed that figure is often higher for complex cases or cases that proceed to trial."  *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *5. This observation is sound and well supported.  "Other courts have similarly recognized that '[t]he percentages awarded in common fund cases typically range from 20 to 50 percent of the common fund created[,]' . . . and that fees within this range are 'presumptively reasonable.'" *Shaw*, 2015 WL 1867861, at *6 (citations omitted).[41]  The Court may also consider what the

---

[41] *See also, e.g.*, *Castro v. Sanofi Pasteur Inc.*, No. CV117178JMVMAH, 2017 WL 4776626, at *9 (D.N.J. Oct. 23, 2017) ("fee awards generally range from 19% to 45% of the settlement fund."); *Elliott v. Rolling Frito-Lay Sales, LP*, No. SACV 11-01730 DOC, 2014 WL 2761316, at *9 (C.D. Cal. June 12, 2014) ("thirty percent is commensurate with traditional contingency recovery in an individual suit."); *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2012 WL 5493613, at *8 (E.D. Mich. Nov. 13, 2012) ("the requested award of close to 30% appears to be a fairly well-accepted ratio in cases of this type and generally in complex class actions."); *In re: Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355-56 n.35 (S.D. Fla. 2011) (30% award "falls at the low end of the average in the private marketplace" in which attorney and client often agree to 33-40% of recovery); *Lucken Family Ltd. P'ship*, 2010 WL 5387559, at *6 ("The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class."); *Anderson*, 2009 WL 3378526, at *3 ("The customary fee to class counsel in a common fund settlement is approximately one-third of the economic benefit bestowed on the class."); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *22 (E.D. Pa. Apr. 22, 2005) ("fee awards of approximately 30% of the common fund [are] not unusual."); *The Erica P. John Fund, Inc. v. Halliburton Company*, No. 3:02-cv-1152-M, ECF No. 844 at 19 & n. 8 (Mem. Op. and Order) (N.D. Tex. Apr. 25, 2018) ("Numerous courts in this Circuit have awarded fees in the 30% to 36% range") (citing cases), attached as Ex. 74; *id.* at 25 (approving one-third of settlement fund); *Fairway Med. Ctr., L.L.C. v. McGowan Enterprises, Inc.*, No. CV 16-3782, 2018 WL 1479222, at *2 (E.D. La. Mar. 27, 2018) (finding that "the appropriate benchmark in this case is one-third") (citing cases); *Ruiz v. XPO Last Mile, Inc.*, 5-CV-2125 JLS (KSC), 2017 WL 6513962, at *7 (S.D. Cal. Dec. 20, 2017) (awarding 35% of settlement fund); *Gevaerts*, 2015 WL 6751061, at *10 ("Numerous recent decisions within this Circuit have awarded attorneys' fees up to and in excess of thirty percent") (citing cases); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 502–03 (N.D. Ill. 2015) (awarding 36% of settlement fund); *Gokare*, 2013 WL 12094887, at *4 ("The requested attorneys' fees award of 30.9% from the common fund is appropriate; the percentage requested is similar to or lower than percentage-of-the-fund awards approved in numerous other common fund cases in this Circuit.") (citing cases); *Garcia v. Gordon Trucking, Inc.*, No. 1:10-CV-0324 AWI SKO, 2012 WL 5364575, at *8 (E.D. Cal. Oct. 31, 2012) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value"); *Yarrington*, 697 F. Supp. 2d at 1061 (in the Eighth Circuit, courts "have frequently awarded attorney fees between twenty-five and thirty-six percent

73

named plaintiffs agreed to pay. *See In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 251 F. Supp. 3d 1225, 1240 (N.D. Ind. 2017) ("it seems appropriate to consider as well that many of the named plaintiffs agreed at the outset to pay the attorney 33 percent of any recovery, and some agreed to pay as much as 40 percent, without limitation as to how much the recovery might be.").   In this unique case, thousands of producers were willing to pay lawyers at least 40% of their total recovery, so one-third is clearly reasonable for the work described herein.

### 9.    Awards in similar cases justify the fee request.

A one-third fee falls within the range of percentage fee awards approved by this Court and others in this Circuit,[42] and by courts across the country, including in large cases with high risks and exceptional recovery.  Such an award is fully supported by the *Johnson* factors.

Objections sometimes are made that the percentage should go down in so-called "mega fund" cases in sliding scale inverse to the size of the recovery.  That argument, however, has many flaws as recognized by experts, commentators, and courts alike.  *See, e.g.*, Ex. 6 (Klonoff Decl. ¶¶ 96-100; Rubenstein, 5 *Newberg on Class Actions* § 15.80 (5th ed. 2015) (criticizing megafund "sliding scale" approach as "lack[ing] rigor," as being inappropriate in "high fund

---

of a common fund in class actions.") (quoting *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir. 2002)); *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 629 (S.D. Iowa 2016) (finding fee award of one-third of settlement fund "to be in line with other awards in the Eighth Circuit; it is also reasonable and fair given the circumstances of this case.").

[42] *See In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *8 (awarding one-third fee from $835,000,000 settlement fund)*; see also Koehler*, 2016 WL 3743098, at *7 (one-third award falls within "the customary percentage of the fund approved by this Court") (quoting *Barbosa v. Nat'l Beef Packing Co., LLC*, No. CIV.A. 12-2311-KHV, 2015 WL 4920292, at *11 (D. Kan. Aug. 18, 2015)); *Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (awarding 35% of $57 million common fund) (Lungstrum, J.); *Lewis v. Wal-Mart Stores, Inc.*, No. 02-CV-0944, 2006 WL 3505851, at *1 (N.D. Okla. Dec. 4, 2006) (awarding one-third of  settlement fund and noting that a "one-third [fee] is relatively standard [even] in lawsuits that settle before trial"); *In re United Telecommc'ns Sec. Litig.*, No. 90-2251-0, 1994 WL 326007, at *3-4 (D. Kan. June 1, 1994) (awarding 33.3% of settlement fund).

cases [that] involve significant risks," and for "creat[ing] perverse incentives" for class counsel); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at * 5-7 (rejecting sliding-scale approach as unwarranted, creating perverse incentives, and failing to account for risk).

*First*, every case, whether "mega-fund" or not, is unique and should be treated as such. Whether a fee is reasonable should not be answered by rote application of arbitrary rules or a vague sense that the fee is too high, but by assessment of the complexity, risks, skill, work, and result in the case at hand.  *See, e.g.*, *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 196-97 (E.D. Pa. 2000) ("The court will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent. . .It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage.").  As this Court recognized, the Tenth Circuit has suggested no "sliding-scale" principle, but rather, that "the fee percentage must be determined on a case-by-case basis, based on a weighing of the applicable *Johnson* factors."  *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *5.

*Second*, the notion of downward adjustment when success is large is "antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained." *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1213 (awarding 31.33% fee from $1.06 billion settlement).

*Third*, such a downward adjustment makes no economic sense:  "By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding

scale approach creates the perverse incentive for the Class Counsel to settle too early for too little." *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *6 (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. at 197); *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1213 (same); Ex. 6 (Klonoff Decl. at ¶ 100). As aptly observed by the Seventh Circuit, "[p]rivate parties would never contract for such an arrangement." *In re Synthroid Mktg. Litig.*, 264 F.3d at 718. To the contrary, sophisticated clients "often take the opposite approach, increasing fees as the size of the award grows to create incentive to pursue even the most difficult dollars." *In re FedEx Ground Package Sys., Inc., Empl. Practs. Litig.*, 251 F. Supp. 3d at 1240. It makes no sense to *dis*incentivize counsel from maximizing the Class's recovery.

*Fourth*, a justification sometimes expressed for a sliding-scale fee award is that the "mega-fund" victory affords lawyers an undeserved windfall. *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *6. That most certainly *is not* true where the litigation has been complex, the battles difficult and long, and the result achieved through skill, perseverance and an outlay of millions in out-of-pocket costs. The lodestar cross check, *infra*, further confirms that the requested fee here is no "windfall," easily falling within the range of multipliers that Courts have approved in other mega-fund cases. In these circumstances, the fee is not unreasonably large in proportion to the result but, to the contrary, appropriately reflective of the risks undertaken and the success achieved. *See id.* at *5-7; *see also id.* at *4 (counsel's "enormous success in a highly contingent case favors an award of a substantial percentage of the Dow settlement fund to the counsel who achieved that success for the class members. It also makes no sense to penalize counsel for hard-won success."); *In re Linerboard Antitrust Litig.*, No. CIV.A. 98-5055, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) ("One might argue that a fee award of 30 percent of settlements in excess of $200 is excessive given the absolute figure, approximately $60 million,

that such an award produces. The Court rejects that thinking in this case because the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success.").  Here, it must also be noted that this litigation was not prosecuted as a single class action with a small set of attorneys, nor even in a single jurisdiction MDL, but rather as a multi-jurisdictional action with varying degrees of coordination and disparate lead counsel, requiring the efforts of a large number of law firms, all of whom will share in the fee award.  If not unprecedented in its procedural characteristics, this litigation is highly distinctive in its sprawling complexity.

Many courts analyzing the "sliding scale" approach have rejected it outright.[43]  And it is in no way unusual to award one-third or more in cases with large recoveries.  Rather, "there are numerous mega-fund cases with percentage awards comparable to those sought here."; Ex. 6 (Klonoff Decl. ¶ 93) (collecting cases); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *6 ("Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher."); *In re: Checking Account Overdraft*

---

[43]  *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 2:12-CV-00203, 2017 WL 3525415, at *2 (E.D. Mich. July 10, 2017) ("[T]here is no requirement that the Court necessarily apply a declining fee percentage based on the absolute dollar amount of any of the settlements at issue. The Court notes that other federal courts have also rejected the so-called 'mega fund' adjustment to fee awards based solely on the size of a settlement. Instead, consideration must be given to, among other things, the stage of the litigation when a settlement has been achieved and the labor and expense that were required to be incurred in order to achieve the settlement."); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 251 F. Supp. 3d at 1239 ("our court of appeals hasn't recognized the megafund as a separate concept when determining the reasonableness of a common fund fee request."); *In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund. Put simply, the declining percentage concept does not trump the fact-intensive *Prudential/Gunter* analysis."); *Nichols*, 2005 WL 950616, at *21 ("The Court finds that reducing the percentage of recovery awarded as a fee in this case to a mean fee percentage derived from other cases without consideration of the *Gunter* factors . . . would require the Court to utilize an impermissibly formulaic approach."); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *16-17 (rejecting "sliding scale" approach); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. at 196-97 (rejecting "declining percentage method"); *Allapattah*, 454 F. Supp. 2d at 1212-13 (rejecting sliding-scale approach as "arbitrary"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043-50, 1047 (9th Cir. 2002) (rejecting "increase-decrease rule").

*Litig.*, 830 F. Supp. 2d at 1367 (awarding 30% fee from $410 million fund, noting that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements") (citing cases awarding one-third or more from recoveries ranging from $356 million to $1.075 billion); *id.* at 1366 n.38 ("National Economic Research Associates, an economic consulting firm that has conducted a survey of fee awards in class actions, found that '[r]egardless of the case size, fees average approximately 32 percent of the settlement.'") (quoting Denise N. Martin, *et al.*, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996)).

### C.      A Lodestar Cross-Check Confirms Reasonableness of the Requested Fee.

Courts may, but are not required to, use the lodestar method to cross-check the fairness of a percentage award. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999) (lodestar approach is "sometimes warranted to double-check the result of the 'percentage of the fund method"); *CompSource Oklahoma v. BNY Mellon, N.A.*, No. CIV 08-469-KEW, 2012 WL 6864701, at *8 (E.D. Okl. Oct. 25, 2012) ("A majority of circuits recognize that trial courts have the discretion to award fees based solely on a percentage of the fund approach and are not required to conduct a lodestar analysis in common fund class actions.") (citing *Union Asset Mgmt. Holding A.G. v. Dell, Inc.,* 669 F.3d 632, 644 (5th Cir. 2012)); *In re: Checking Account Overdraft Litig.*, 2014 WL 11370115, at *15 ("In view of the excellent results obtained here, the Court deems it unnecessary to scrutinize Class Counsel's lodestar.").

Here, the Fee Request is fully supported under the percentage approach and the Court need not engage in a multiplier analysis. *See* Ex. 6 (Klonoff Decl. ¶ 102). If the Court chooses to do so, however, that analysis only confirms reasonableness.

Where performed, a lodestar cross-check "need entail neither mathematical precision nor bean counting." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d at

999; *In re NuvaRing Prods. Liab. Litig.*, 2014 WL 7271959, at *4 (same) (quoting *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d at 306). Even when fees are sought from the defendant under fee-shifting statutes, "trial courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838, (2011). The goal is "not to achieve auditing perfection." *Id.* Trial courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.* This is especially true when the lodestar is used as a cross-check. *See, e.g., Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 719 (W.D. Pa. 2015) ("the lodestar method is applied quite differently in common fund cases. While the lodestar method generally is the primary analysis in statutory fee-shifting cases, in common fund cases it serves only to cross-check the reasonableness of the results of a percentage-of-recovery method."); *Turner*, 472 F. Supp. 2d at 867 ("In recognition of the noted disadvantages of the lodestar method as the principle means for determining attorneys' fees, such as the taxing of judicial resources by examining every time entry and billing rate for each attorney, a lodestar analysis which is rough and more abbreviated is appropriate for a cross check"). The court may, for example, rely on summaries and declarations of counsel as to hours expended as well as blended rates.[44]

---

[44] Class Counsel stands ready to provide billing records for this Court's review *in camera* upon the Court's request, but it is acceptable and common for the court to rely on affidavits and summaries in performing a lodestar cross-check, especially in large, prolonged cases like this one. *See, e.g., In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871 (8th Cir. 2014) (district court "was permitted to rely on the summaries and affidavits presented to the court by Lead Counsel and other common benefit attorneys," which is within its discretion "especially [in large cases] . . . of prodigious proportions like this"); *In re NuvaRing Products Liab. Litig.*, 2014 WL 7271959, at *4 ("a court performing a lodestar cross check need not scrutinize each time entry; reliance on representation by class counsel as to total hours may be sufficient. Furthermore, the lodestar cross-check can be simplified by use of a blended hourly rate.") (quoting *Turner*, 472 F. Supp. 2d at 867); *In re Vioxx Prod. Liab. Litig.*, No. 11-1546, 2013 WL 5295707, at *3 (E.D. La. Sept. 18, 2013) ("[T]he lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method."); *In re Diet Drugs*, 582 F.3d 524, 539 (3d Cir. 2009) (rejecting objection that court should have considered individual billing records, explaining that "we have held that courts need not always engage in that time-consuming process . . . In large cases, especially one of prodigious

The attached declarations provide the factual support for the time undertaken and expenses incurred by the Kansas Common Benefit Group.[45]

The declarations, and time records offered for *in camera* review, provide detailed descriptions of the work performed and the number of hours expended by timekeepers (partners, associates, and paraprofessionals) in rendering service to the settlement classes in this case, and attest to the reasonableness of that expenditure. *See, e.g.,* Ex. 1 (Stueve Decl. ¶¶ 133-610); Ex. 2 (Powell Decl. ¶¶ 82-218); Ex. 3 (Downing Decl. ¶¶ 8-84); Ex. 4 (Chaney Decl. ¶¶ 163-319); Exs. 7, 10-47. Co-Lead Counsel have taken the further step of reviewing time records to, among other things, ensure that time submitted was in compliance with the CBO, ensure consistency of billing practices and remove unnecessary duplicative time. *See supra* Sections III.B, IV**.**

To calculate this lodestar, the hours expended were multiplied by a reasonable hourly rate "to produce a fee amount which can be adjusted, up or down, to reflect the individualized characteristics of a given action." *Johnston v. Comerica Mortg. Corp*., 83 F.3d 241, 244 (8th Cir. 1996). In assessing reasonableness of rates, it is appropriate to consider market evidence of rates for comparable firms and lawyers in comparable cases within the area in which the court

---

proportions like this, reliance on summaries is certainly within the discretion of the district court."); *Jackson*, 136 F. Supp. 3d at 716 ("Class counsel has produced timekeeping summaries and details demonstrating that a total of 1579.9 hours have been expended"); *In re Schering-Plough Corp. Enhance Sec. Litig*., No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *33 (D.N.J. Oct. 1, 2013) (a lodestar cross-check is "not a full-blown lodestar inquiry" . . . Accordingly, the district court may rely on summaries submitted by counsel and need not review billing records.") (internal quotations and citations omitted); *In re Linerboard Antitrust Litig*., 2004 WL 1221350, at *1, 15 (relying on affidavits containing time and expense summaries; "The Court emphasizes that this is only a cross-check and not a full lodestar analysis.") (citing *DiGiacomo v. Plains All American Pipeline*, Civ. No. H-99-4137, at 23 (S.D. Tex. 2001) (court "will not conduct a detailed analysis of charged hours and hourly rates" because to do so "would undermine the utility of the percentage method").

[45] Upon request by the Court, Counsel are prepared to submit more detailed records accounting for the time and efforts devoted to this litigation. Given that the litigation by certain non-producer plaintiffs continues, that this settlement is not finally approved, and that time entries contain privileged communication and mental impressions of counsel, any such submission should be made *in camera* to avoid providing Syngenta with insight into these plaintiffs' litigation strategy.

sits. *Sussman v. Patterson*, 108 F.3d 1206, 1211 (10th Cir. 1997); *Case v. Unified Sch. Dist. No. 233, Johnson County, Kan.*, 157 F.3d 1243, 1255-56 (10th Cir. 1998) (court should determine what the market commands in analogous litigation, considering evidence of "what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time.") (quoting *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983)).[46]  The performance, experience and skill of counsel should be taken into account, as well as the contingencies and complexities of the case at hand.  Moreover, Plaintiffs' counsel should "be as well paid as their adversaries who did not work on a contingency basis." *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-CV-1186 CAS, 2005 WL 4045741, at *17 (E.D. Mo. June 30, 2005); *see also In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (finding that the "amounts at issue justified use of the best counsel charging the highest rates (just as Dow used similarly high-priced counsel in the litigation).").[47]  In addition, use of current fee rates in

---

[46] This is not to say that a court cannot or should not consider rates outside the forum, particularly where the litigation is complex and specialized. *See Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1453–54 (D. Kan. 1987) ("Where local rates are too low for the litigation at issue, the relevant community may be said to be comprised of that group of attorneys specializing in the relevant law and in complex litigation . . . If a high[er] priced, out of town attorney renders services which local attorney could do as well, and there is no other reason to have them performed by the former, then the judge, in his discretion, might allow only an hourly rate which local attorneys would have charged for the same service. On the other hand, there are undoubtedly services which a local attorney may not be willing or able to perform. The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally. . ."); *Lucas*, 2006 WL 2729260, at *4 ("Hourly rates must reflect the prevailing market rates in the relevant community. Because of the significant resources and skill required, as well the risks entailed, to litigate large-scale actions on behalf of a class, very few attorneys handle such cases. Thus the relevant community. . .likely consists of attorneys who litigate nationwide, complex class actions.").  It may be observed that MDLs do not share the homogenous aspect of class actions filed in a particular state, but rather, are a collection of cases transferred to a single forum under 28 U.S.C. § 1407 and that both plaintiffs and attorneys rendering services are from many areas across the nation, justifying consideration of national rates.

[47] Reported early-2016 hourly rates for partners at Kirkland & Ellis, Syngenta's law firm in this case, are $875-$1,445. Sara Randazzo and Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour*, WALL STREET JOURNAL (Feb. 9, 2016) (available at https://www.wsj.com/articles/legal-fees-reach-new-pinnacle-1-500-an-hour-1454960708).  More recently, Kirkland's website states that in 2017, partners were billing between $930 to $1,745 per hour, Of Counsel at rates ranging from $555 to $1,745

calculating the lodestar is appropriate.  *See id.* at *7 n.7 ("Because of the long delay in receiving payment for past work, the Court concludes that use of current billing rates is appropriate in conducting this lodestar cross-check.").[48]

Here, 142,823.5 common-benefit hours were expended by the Kansas Common Benefit Group alone, reflecting $81,725,060.90 in lodestar, resulting in a blended rate of $572.  These hours only include time spent on common-benefit work permitted by the CBO, including the time spent prosecuting the claims of the bellwether plaintiffs and litigation classes and other time as described generally above, more specifically in the supporting declarations, and in detail in counsel's time records.  Moreover, any lodestar is inherently understated because Co-Lead and Settlement Class Counsel will likely spent at least 500-1,000 hours seeking final approval, defending the Settlement from objections, and supervising claims administration and distribution of the proceeds, Ex. 1 (Stueve Decl. ¶ 668), which could be potentially higher if there are appeals.  These hours include the work of 44 law firms, and, even though many or all of those firms incurred such time, it does not include time spent: advertising, soliciting, or retaining clients; communicating status updates to individual, non-bellwether, non-representative plaintiffs; or assisting plaintiffs in completing and responding to their PFS obligations for non-bellwether, non-representative plaintiffs.  *Id.* at ¶ 644.  As recited above, Co-Lead Counsel alone excluded nearly $8 million of their own lodestar spent on non-common benefit tasks, most

---

per hour, and associates at between $555 and $1,015 per hour. Firm News, Press Mention (Sept. 29, 2017) (available at https://www.kirkland.com/sitecontent.cfm?contentID=230&itemId=13055).

[48] *See also, e.g., Chambers v. Whirlpool Corp.,* 214 F. Supp. 3d 877, 900 (C.D. Cal. 2016) ("District courts have the discretion to compensate plaintiff's attorneys for a delay in payment by. . .applying the attorneys' current rates to all hours billed during the course of the litigation[.]") (citation omitted); *Been,* 2011 WL 4478766, at *9 (applying current hourly rates "is properly part of a reasonable attorneys' fee because 'compensation received several years after the services were rendered. . .is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings."); *Bratcher v. Bray–Doyle Ind. Sch. Dist. No. 42,* 8 F.3d 722, 726 (10th Cir. 1993) (delay in payment may be remedied by applying current hourly rates).

prominently providing services to their individual clients. *See supra* n. 14. Furthermore, the lodestar itself has been subject to review: *first*, by the submitting firm who were obligated to confirm that its time complied with the CBO; and *second*, by Co-Lead Counsel who again re-reviewed all submitted time and expenses. *See supra* Section III.C.

The blended rate of $572 an hour, as well as the rates submitted, is par or below counterparts in private litigation,[49] and in line with rates approved within, as well as outside, this forum in other complex cases. *See* Ex. 6 (Klonoff Decl. ¶¶ 13, 109-19); Ex. 5 (Ralston Decl. ¶¶ 23-61).[50] It demonstrates that counsel used both reasonable rates in determining the lodestar and appropriately delegated tasks. The multiplier on the Kansas Common Benefit Attorneys' requested Fee Allocation of $251.67 million is 3.079, which is "not uncommon, especially for a complicated, challenging case such as this one." Ex. 6 (Klonoff Decl. ¶ 123). "Here, a

---

[49] Attorneys of the caliber of those in this case often have billing rates exceeding $1,000 per hour. *See* Vanessa O'Connell, *Big Law's $1,000-Plus and Hour Club*, WALL STREET JOURNAL, (Feb. 23, 2011) (available at http://www.wsj.com/articles/ SB10001424052748704071304576160362028728234); Sara Randazzo and Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour,* WALL STREET JOURNAL (Feb. 9, 2016) (available at https://www.wsj.com/articles/legal-fees-reach-new-pinnacle-1-500-an-hour-1454960708). The rates are reasonable even if only the locale of the litigation is considered. Ex. 5 (Ralston Decl. ¶ 61); Ex. 6 (Klonoff Decl. ¶ 110).

[50] In the *Urethane* case, using 2016 rates, the blended rate of the unadjusted lodestar was approximately $518/ hour. *In re: Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) ("According to billing records provided *in camera* to the Court, counsel expended over 193,000 hours in this litigation, which, at current rates, yields a total lodestar amount of approximately $100 million."). As the Court observed, "the amounts at issue justified use of the best counsel charging the highest rates." *In re: Urethane Antitrust Litig.,* 2016 WL 4060156, at *7. That is no less true here. The rate here is very reasonable as illustrated by decisions approving comparable or higher rates in cases of similar or less complexity even several years ago. *See, e.g., In re Bank of Am. Wage & Hour Employment Litig.,* No. 10-MD-2138-JWL, 2013 WL 6670602, at *3 (D. Kan. Dec. 18, 2013) (Lungstrum, J.) (finding blended hourly rate of $488 in FSLA case reasonable); *Roeser v. Best Buy Co.*, No. CIV. 13-1968 JRT/HB, 2015 WL 4094052, at *12 (D. Minn. July 7, 2015) (finding rates of $775 and $880 reasonable accounting "the high-quality work performed by counsel, and the typically higher compensation rates approved for class counsel, in approving these hourly rates."); *In re Genetically Modified Rice Litig.*, No. 4:06MD1811 CDP, 2012 WL 6085141 (E.D. Mo. Dec. 6, 2012), *aff'd*, 764 F.3d 864 (8th Cir. 2014) (approving hourly rates ranging from $375-$865 for partners and $175-$450 for associates as fair and reasonable); *In re Zurn Pex Plumbing Products Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716460, at *5 (D. Minn. Feb. 27, 2013) (collecting cases approving rates of $500-$800 per hour); *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 657 (E.D. Pa. 2015) (finding rates ranging from $315 to $800 reasonable).

multiplier of 3.079 [for Kansas Common Benefit Attorneys] is well justified under the case law because class counsel took on a challenging, risky case with extremely complex legal and factual issues, prosecuted it skillfully over the course of several years without assistance from any official investigation, obtained class certification despite Syngenta's opposition, conducted a complete trial that resulted in an impressive $217.7 million jury verdict, and obtained a superb $1.51 billion settlement for the class." *Id.* at ¶ 125.

In addition, Minnesota Lead Counsel reports that their filing will describe over $41 million in lodestar performing additional work pursuant to the Minnesota Court's CBO. Collectively, then, the combined common-benefit lodestar of these two jurisdictions alone is over $122.7 million. That does not include: any of the time spent by Illinois Lead Counsel in Illinois or the state ethanol cases; nor, any other fee applications that the Court may consider. Thus, while the multiplier for the entire one-third fee is presently only slightly higher than four (4.1), it will undoubtedly be lower than that in the final analysis. In any event, that multiplier itself is reasonable. *See id.* at ¶ 124 (table showing 14 cases where multiplier, in $100 million+ settlements, was greater than 4.16, *none of which went to trial*).

Importantly, a "multiplier need not fall within any pre-defined range, so long as the court's analysis justifies the award, such as when the multiplier is in line with multipliers used in other cases." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d at 999. Either multiplier here is well within the range of those applied in comparable cases. *See* Newberg on Class Actions § 14:6 (4th ed. & Supp. June 2008) ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied. A large common fund award may warrant an even larger multiple."); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (noting that even were the Court to reduce the lodestar, increasing the

multiplier to 4 or 5, that multiplier "would fall within the range of multipliers accepted by a number courts in megafund cases").[51]   The multiplier here is well within typical range, is supported by applicable factors, and is reasonable.   The lodestar cross-check confirms that the amount requested should be approved.

## II.   THE EXPENSE REQUEST FOR THE KANSAS COMMON BENEFIT GROUP SHOULD BE GRANTED.

"Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement."   *Yarrington*, 697 F. Supp. 2d at 1067 (quotations omitted).   The appropriate analysis is whether the particular costs are the type typically billed by attorneys to paying clients in the marketplace.   *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (allowing recovery of "out-of-pocket expenses that 'would normally be charged to a fee paying client'").

Co-Lead Counsel, on behalf of the Kansas Common Benefit Group, seeks reimbursement of costs and expenses reported under the CBO totaling $6,695,350.05.   Each firm has been required to submit a declaration attesting to the accuracy and reasonableness of these expenses.

---

[51]   *See, e.g.,  In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d at 999 (collecting cases and approving 4.7 multiplier as reasonable); *In re Rite Aid Corp. Sec. Litig.,* 362 F. Supp. 2d 587 (E.D. Pa. 2005) (approving award representing multiplier of 6.96); *Sewell v. Bovis Lend Lease, Inc.*, No. 09 CIV. 6548 RLE, 2012 WL 1320124, at *13 (S.D.N.Y. Apr. 16, 2012); ("Courts commonly award lodestar multipliers between two and six"); *Steiner v. Am. Broad. Co., Inc.,* 248 F. Appx. 780, 783 (9th Cir. 2007) (6.85 multiplier "falls well within the range of multipliers that courts have allowed."); *Roberts v. Texaco, Inc*., 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5). The range of multipliers in "mega-fund" cases is similar.  *See, e.g., Vizcaino*, 290 F.3d at 1050-51 & n.6 (approving 3.65 multiplier from $96.9 million settlement fund, and noting standard 1-4 multiplier range); *In re Credit Default Swaps Antitrust Litig.,* No. 1:13-md-02476-DLC, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) ($253.8 million fee and multiplier "just over 6" multiplier); *In re Enron Corp.*, 586 F. Supp. 2d 732, 799-803 (S.D. Tex. 2008) (5.2 multiplier and $688 million fee award; collecting cases); *In re Charter Commc'ns, Inc., Sec. Litig.,* 2005 WL 4045741, at *18 (settlement fund of $146,250,000; approving multiplier of 5.61, which "falls within the range of multipliers found reasonable for cross-check purposes by courts in other similar actions, and is fully justified here given the effort required, the hurdles faced and overcome, and the results achieved."); *Deloach v. Philip Morris Companies*, No. 1:00CV01235, 2003 WL 23094907, at *1 (M.D.N.C. Dec. 19, 2003) (>$1 billion fund;  4.45 multiplier).

*See supra* Section III.C.  Each expense was categorized pursuant to the categories outlined in the

CBO.  Here is a summary of the expenses by category:

| Expense Category | Total Expenses |
|---|---|
| Federal Express / Local Courier | $25,713.95 |
| Postage Charges | $1,807.54 |
| Facsimile Charges | $48.00 |
| Long Distance Calls | $31,359.11 |
| In-House Photocopying | $99,144.89 |
| Outside Photocopying | $187,185.79 |
| Hotels | $559,548.83 |
| Meals | $148,438.47 |
| Mileage | $28,793.07 |
| Air Travel | $387,787.08 |
| Deposition Costs | $62,319.31 |
| Lexis/Westlaw/Bloomberg | $555,248.82 |
| Witness and Expert Expenses | $423,794.32 |
| Court Fees | $7,629.22 |
| Service of Process Fees | $9,485.11 |
| Hearing and Trial Transcripts | $180.90 |
| Ground Transportation | $94,272.26 |
| Miscellaneous | $169,395.38 |
| Litigation Fund Assessment | $3,800,000.00[52] |
| Litigation Class Certification Notice | $103,195.00 |
| **TOTAL** | **$6,592,152.05** |

Ex. 1 (Stueve Decl. ¶ 643).  These are the type of expenses routinely charged to hourly clients,

are appropriately documented, and were necessary and reasonable to prosecute the litigation.

The full requested amount should be reimbursed.  *See* Ex. 6 (Klonoff ¶¶ 132-34).

In addition, for the same reasons, Subclass Counsel should be reimbursed their modest

expenses in the following amounts as detailed in their supporting declarations.  Ex. 48 (Chechi

---

[52]  Litigation fund assessments were levied by Co-Lead Counsel throughout the litigation to firms in the Kansas Common Benefit Group, and these funds were used by Co-Lead Counsel to pay for additional costs not included in the above table: the non-travel related costs of depositions ($382,022.20); ESI expenses, including the costs of the MDL Document Database ($294,591.27); the MDL's share of the Special Master expenses ($299,807.06); court transcripts ($17,382.25); experts ($1,546,672.02); translation services ($46,997.61); subpoena costs pursuant to Rule 45 ($306,391.11); trial consultants ($306,039.11); trial expenses ($188,298.88); additional litigation class notice charges ($363,042.46); FSA information for settlement ($48,412.34); and bank charges for the litigation fund ($342.82).  Ex. 1 (Stueve Decl. ¶ 652).

Decl. ¶¶ 27-28) ($15,046.20, which is almost exclusively related to expert costs); Ex. 49 (Wexler

Decl. ¶ 20) ($5,621.16); Ex. 50 (Johnson Decl. ¶ 11) ($4,910.16).

## III.   KANSAS COMMON BENEFIT ATTORNEYS SHOULD BE ALLOCATED 50% OF THE ONE-THIRD FEE AWARD.

Lead Counsel in Kansas, Minnesota,[53] and Illinois[54] have agreed to submit to the Court a

proposed allocation among their various groups (50/12.5/17%) that reserves up to 20% of the

total fee – approximately $100.7 million – for other potential fee claimants.  This Fee-Sharing

Agreement, discussed *supra* Section II.C, was reached following extensive mediations with the

Court-appointed Special Master.   Pursuant to that agreement, Co-Lead Counsel and Seeger

requests 50% of the $503.3 million to disburse consistent with the Court's orders to the Kansas

Common Benefit Group (approx. $251.67 million)[55]  *See infra* at Section III.A.  With respect to

the 20% unallocated by the Fee-Sharing Agreement, Co-Lead Counsel and Seeger propose that

this amount be distributed as follows: *first,* Subclass Counsel for the Viptera/Duracade

Purchaser, Grain Elevator, and Ethanol Subclasses be compensated from this percentage based

on their lodestar of $256,670, with a 1.5 multiplier for their efforts representing the subclasses

during settlement negotiations, for a total fee of $388,055; *second,* the remainder of $100.7

---

[53]   Attorneys in the Minnesota MDL Group include: Daniel E. Gustafson (Gustafson Gluek PLLC); Lewis A. Remele, Jr. (Bassford Remele); William R. Sieben (Schwebel Goetz & Sieben, P.A.); Richard M. Paul, III (Paul McInnes LLP and Paul LLP); Will Kemp (Kemp, Jones & Coulthard, LLP); Tyler Hudson (Wagstaff & Cartmell, LLP); Robert K. Shelquist (Lockridge Grindal Nauen); Paul Byrd (Paul Byrd Law firm PLLC); and Referring Counsel.

[54]  Attorneys in the Clark Group ("Illinois Group") include: Clayton A. Clark (Clark, Love & Hutson, GP); Peter J. Flowers (Meyers & Flowers) and Martin J. Phipps (Phipps Anderson Deacon LLP), as well as Referring Counsel, co-counsel and / or joint venture partners.

[55]  Attorneys in the Federal Kansas Common Benefit Group include the 44 law firms who performed and reported common-benefit work at the direction and with the approval of Co-Lead Counsel in the MDL and are listed in the Declaration of Patrick J. Stueve at ¶ 644.  If a law firm performed common-benefit work in both Minnesota and the MDL, it is the intent and agreement of the Fee-Sharing Agreement that work be reported once and that work performed in the MDL at the direction of Co-Lead Counsel be paid from the MDL Allocation and that work performed in Minnesota at the direction of Minnesota Lead Counsel be paid from the MN Allocation.

million amount be used to make any other fee awards that the Court deems appropriate consistent with governing principles upon a timely submission by other counsel under the Settlement Agreement and the Court's scheduling order; and, *third*, that any portion not awarded to other counsel be re-distributed in accordance with the *Johnson* factors.

Furthermore, the undersigned requests that the Court implement the following procedure with respect to allocation of the Fee and Expense Award, consistent with the Fee-Sharing Agreement (Ex. 8 at n.3-4): *first,* that Co-Lead Counsel be assigned and authorized to allocate the MDL Allocation among the Federal Kansas Common Benefit Group with proposed deadlines for any objections; *second*, that Daniel E. Gustafson and Lew Remele be assigned and authorized to allocate the MN Allocation among the Minnesota Common Benefit Group; and, *third* that Clayton A. Clark be assigned and authorized to allocate the IL Allocation among the Illinois Group.  Their roles steering the litigation in their respective jurisdictions uniquely qualify them make these determinations in a fair and equitable manner.

### A. The MDL Allocation to the Federal Kansas Common Benefit Group is Easily Fair and Equitable under the *Johnson* Factors.

Awarding the 50% MDL Allocation to the 44 firms in the Kansas Common Benefit Group is easily equitable under the facts here.  First, as between Minnesota and Illinois Lead Counsel, it reflects an arms-length agreement reached through the efforts of the Special Master and Judge Stack.  Thus, the agreement should be afforded and given weight by the Court.  Ex. 1 (Stueve Decl. ¶¶ 611-13); Ex. 6 (Klonoff Decl. ¶¶ 129-31).  Second, as between the 44 firms in the Kansas Common Benefit Group – including Co-Lead Counsel and Seeger – and *any* other attorneys who file a fee application, the MDL Allocation reflects the fact that the MDL attorneys took the lead, plowed the ground on most aspects of the litigation, led the settlement negotiation

committee, and obtained the $217.7 million jury verdict.  This work, and the results achieved because of it, represents at least half the benefits conferred on the Class.

Furthermore, if the Court awards one-third of the $1.51 billion, as requested, the MDL Allocation would be only 16.67% of the settlement fund.  That percentage is well below other awards in comparable cases, and is more than supported by all the *Johnson* factors as detailed herein.  *Supra* Section II.B.8; *see* Ex. 6 (Klonoff Decl. ¶ 94).  From an allocation standpoint, lawyers in the federal MDL performed a substantial share of services, and created the benefits, on behalf of the Class.

Out of the gate, the MDL lawyers went first.  They supported remand of state-court cases under the doctrine of foreign relations, paving the way for the state litigation.  *See supra* Section I.D.  By May and August 2015 – when the first related actions (in Minnesota) were consolidated and leadership appointed, respectively, the Kansas Common Benefit Group had: negotiated a procedure for consolidated pleadings and Notices to Conform (ECF No. 287); obtained and reviewed initial discovery in the form of *Bunge* litigation documents, regulatory filings, and stewardship agreements (ECF No. 123); filed initial and amended Master Complaints (ECF Nos. 296, 297, 450, 451); negotiated with Syngenta and received Court entry of an ESI protocol (ECF No. 327), preservation order (ECF No. 369), and protective order (ECF No. 294); submitted discovery disputes over the scope of Syngenta's discovery to putative class representatives (ECF No. 945); and, perhaps most importantly, prepared and filed their lengthy and largely successful opposition to Syngenta's motion to dismiss (ECF No. 927).  Thus, the Kansas Common Benefits Group's work, which took several months to accomplish, was available to everyone in the related jurisdictions, allowing them to catch up, avoid duplication, and accelerate their discovery schedule to match the MDL.

Co-Lead Counsel and the Kansas Common Benefit Group continued to press forward by developing the cases for trial, including *inter alia*: (1) establishing the initial bellwether process; (2) propounding initial sets of written discovery to Syngenta; (3) negotiating search terms with Syngenta for the production of documents; (4) setting up the shared MDL Document Depository; (5) organizing, administering and conducting the 2.5 million-page document review; (6) subpoenaing and negotiating with the third-party witnesses; (7) taking the lead in scheduling and in questioning all 32 Syngenta witnesses, including those critical to the case and those played in the Kansas and Minnesota trials; (8) taking a leading role in the deposition of the Cargill, ADM and other third-party witnesses; (9) locating and developing the experts used to obtain class certification; (10) briefing class certification, which they shared with Minnesota; (11) locating and developing the experts designated and/or used at both the Kansas and Minnesota class trials; (12) deposing and developing cross-examination of Syngenta's experts; (13) preparing and sharing the motions to strike Syngenta's experts and the oppositions to Syngenta's motions to strike Plaintiffs' experts; (14) successfully obtaining an order compelling production of documents that led to the withdrawal of Syngenta's standard-of-care expert; and, (15) trying the first and only case to a verdict, resulting in the $217.7 million Kansas judgment, reflecting full compensatory damages. *See supra* Section I. Co-Lead Counsel also provided assistance to Lead Counsel in Minnesota with the Minnesota class trial, including preparing the damages experts to testify. *See* Ex. 3 (Downing Decl. ¶ 64); Ex. 1 (Stueve Decl. ¶¶ 575-77).

Reflective of the amount of time expended in the MDL, the MDL also involved a larger bellwether pool than other jurisdictions, including 69 producer plaintiffs, and it involved eight certified classes. *See supra* Section II, III.B. Prosecution of these cases placed immense and immediate settlement pressure on Syngenta due to: counsel's successful efforts in obtaining class

certification, the successful result in the Kansas trial, and Syngenta's potential exposure in further 2018 trials, for which Co-Lead Counsel was already preparing for. *See* Ex. 1 (Stueve Decl. ¶ 578); Ex. 2 (Powell Decl. ¶¶ 205-07); Ex. 3 (Downing Decl. ¶ 68); Ex. 4 (Chaney Decl. ¶ 302). Following on the heels of the June 2017 Kansas class trial, the Court originally set four additional class trials, comprised of seven additional state classes, to begin on January 22, 2018, April 4, 2018, May 14, 2018 and October 8, 2018. ECF No. 3319. Thus, Syngenta faced, in the MDL and against counsel with a proven trial result, multiple class trials with substantial exposure in 2018. Moreover, Co-Lead Counsel filed a motion to certify the remaining 13 state-law classes, covering the vast majority of corn produced in the U.S., to ensure that Syngenta, if it continued forward with litigation, would face class trials through 2019 and beyond. *See, supra,* Section I.I. In measuring responsibility for "results achieved," *e.g.,* the $1.5 billion settlement, both past results and ongoing pressure in the MDL speak for themselves.

Co-Lead Counsel and the Kansas Common Benefit Group were also the first to brief the key legal issues in the case, identifying the precedent and making the arguments that would prove persuasive throughout the litigation. This included responding to Syngenta's Rule 12(b)(6) motion to dismiss and presenting oral argument on that motion. ECF No. 927. They obtained the initial orders on most or all of the key rulings, including the motion to dismiss, class certification, and summary judgment. *See supra* Section I.D, I.F. This Court's rulings were often cited to approvingly by the other judges. *Id.* at Section II.B.

Pursuant to the Coordination Order and agreements between the Kansas attorneys and Minnesota attorneys, the Kansas Common Benefit Group's work product was made available to attorneys in the Minnesota jurisdiction. This included the MDL Document Database and, often, drafts of briefs and papers, including the motion and reply in support of class certification, the

motion for partial summary judgment, and the *Daubert* motions against Syngenta's experts. And, the work done with the following experts, including their reports, were shared: Dr. Colin Carter; Dr. Bruce Babcock; Dr. Randall Giroux; Dr. Joe Keaschall; Mr. Kevin Latner; and, Dr. Dirk Maier.  *See* Ex. 1 (Stueve Decl. ¶¶ 448, 455, 467)

One of the four Co-Leads, or in rare instances a lawyer from their firm or another EC firm, took the lead in questioning Syngenta witnesses at their deposition.  *See supra* Section I.B.1.  Normally, the Co-Lead taking the deposition would share their deposition outline with the other plaintiffs' attorneys in advance of the deposition, to the extent they wished to question the witness, to avoid non-duplicative questions.  Ex. 3 (Downing Decl. ¶ 33).  Experts in the MDL were made available to Minnesota plaintiffs pursuant to an expert sharing agreement.  *Id*. at ¶ 45.

In addition, it was counsel in the Kansas MDL group who secured the first and only jury verdict against Syngenta.  It was by their efforts that Syngenta's risk before a jury was brought home.  *See, e.g.*, *In re Copley Pharm., Inc., Albuterol Products Liab. Litig.*, 50 F. Supp. 2d 1141, 1153 (D. Wyo. 1999) ("the Court must remember that this case, unlike other MDL cases, settled only after it went to trial and the Court has accorded great weight to trial counsel for this effort.").  A 16.667% aggregate fee to this group, which led the litigation, is well supported by all relevant *Johnson* factors.

Co-Lead Counsel also request that they be assigned the task of allocating the total award to the Kansas Common Benefit Group.  "Ideally, allocation is a private matter to be handled among class counsel."  *In re Copley Pharm., Inc., Albuterol Products Liab. Litig.,* 50 F. Supp. 2d 1141, 1148 (D. Wyo. 1999) (quoting *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 357 (N.D. Ga. 1993)).  It is sensible to adopt such a procedure as, among other things, "[l]ead [c]ounsel, like the Court as the presiding jurist, [is] in a unique position to weigh the

contributions to the litigation." *Id.* at 1149.[56]  It is common practice that lead counsel undertake

such allocation. *See, e.g.*, Manual for Complex Litigation 4th §14.221 ("Lead counsel can be

made responsible for overseeing [multiple fee submissions]"); *In re: Urethane Antitrust Litig.*,

No. 04-1616-JWL, 2008 WL 696244, at *2 (D. Kan. Mar. 13, 2008) (Lungstrum, J.) (co-lead

counsel to allocate fee award).[57]

Co-Lead Counsel have been directly involved in the litigation since its inception, have

personally conducted, assigned, and overseen all work within the group, and have intimate

familiarity therewith.  Thus, it is the most efficient means to proceed that once the Fee Award is

entered, Co-Lead Counsel undertake the allocation.  Co-Lead Counsel request leave to do so, and

will, as directed in *Urethane*, allocate the award "in a manner that, in Co-Lead Counsel's good-

faith judgment, reflects each plaintiffs' counsel's contribution to the institution, prosecution and

resolution of the litigation against Defendants."  *In re: Urethane Antitrust Litig.*, 2008 WL

696244, at *2.  Co-Lead Counsel further propose that any objections to the allocation, along with

the reasons therefore, be filed with the Court not later than ten (10) days after the firm receives

---

[56] *See also Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82 (2d Cir. 2010) ("Since lead counsel is typically well-positioned to weigh the relative merit of other counsel's contributions, it is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation"); *In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 SAS, 2011 WL 2732563, at *7–8 (S.D.N.Y. July 8, 2011) ("Lead counsel is best positioned to gauge the relative contributions of each firm because, by assuming nearly every task litigation could require . . . the EC is intimately aware of the distribution of responsibility and work that ultimately led to final approval of the settlement."); *In re Vitamin Cases*, No. 301803, 2004 WL 5137597, at *8 (Cal. Super. Ct. Apr. 12, 2004) ("Federal courts nationwide have recognized that lead counsel are generally better suited than the trial court to decide the weight and merit of the relative contributions made by those performing common benefit work-particularly in cases such as this litigation where many attorneys performed thousands of hours of widely varying professional services outside the direct observation of the Court and under the overall supervision of lead counsel.") (citing cases).

[57] *Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir. 1992) ("The district court acted well within its discretion in awarding an aggregate sum to the Susman Attorneys that was based on their collective efforts, leaving apportionment of that sum up to the Susman Attorneys themselves"); *Turner*, 472 F. Supp. 2d at 869-70 ("The Court will leave the apportionment of this award up to the PSC attorneys themselves.").

written notice of the allocation, with Co-Lead Counsel's response due no later than fourteen (14) days thereafter, with a hearing should the Court deem it necessary.

### B.   The Court Should Award Subclass Counsel Attorneys' Fees and Expenses from the Remaining 20%.

If the Court follows this proposal and the Fee-Sharing Agreement, 20% of the Fee Request remains.  As an initial matter, Subclass Counsel has performed work representing the interests of the subclass members in negotiating the allocation of amounts in the Settlement Agreement.  Their fee request should be paid from this remaining 20%.  The amounts requested are: $209,520 to Carella Byrne; $95,835 to Wexler Wallace; and, $82,650 to Shamberg Johnson, which reflects a modest multiplier of 1.5 of their lodestar representing the subclasses.  Their efforts are detailed in their declarations, attached hereto as Exhibits 48-50.  Moreover, $388,005 reflects a small portion of the $72 million they negotiated for their subclasses.  *See* ECF No. 3507-2 at 25-26.

The undersigned understand that the Special Master may make a recommendation as to allocation of the remainder of the 20%, and others have or will request fees pursuant to their own applications.  If the Court determines that some or all of a global award is not appropriately awarded to applicants under common-benefit principles, then respectfully, Co-Lead Counsel recommend that such amount be awarded, as appropriate, to lawyers whose services were of demonstrable class benefit (including those in the Kansas MDL Group) based on application of the *Johnson* factors. Co-Lead Counsel reserve the right to modify their recommendations upon review of the other fee applications.

## IV.   SERVICE AWARDS FOR CLASS REPRESENTATIVE AND BELLWETHER PLAINTIFFS ARE WELL DESERVED.

"At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class." 5 *Newberg on Class Actions* § 17:1 (5th ed.

2015).  Serving in a representative capacity is a burdensome task and, without plaintiffs willing to undertake that task, the entire class would receive nothing.  Service awards thus "aim to compensate class representatives for their service to the class and simultaneously serve to incentivize them to perform this function."  *Id.* at § 17:3.[58]

When considering the appropriateness of a service award, the Court may consider: (1) the actions the representative took to protect the interests of the class; (2) the degree to which the class benefitted from those actions; and (3) the amount of time and effort the representative expended in pursuing the litigation.  *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1010 (D. Colo. 2014).  "Incentive awards serve an important function, particularly where the named plaintiffs participated actively in the litigation."  *Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1218.[59]

---

[58] *See also UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*, 352 F. App'x 232, 235 (10th Cir. 2009) ("a class representative may be entitled to an award for. . .additional effort and expertise provided for the benefit of the class."); *In re: Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2014 WL 12557836, at *9–10 (S.D. Fla. Apr. 1, 2014) ("[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action . . . Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives.") (internal quotations and citation omitted); *Asare v. Change Group of New York, Inc.*, No. 12 Civ. 3371(CM), 2013 WL 6144764, at *14 (S.D.N.Y. Nov. 18, 2013) ("Courts acknowledge that class representatives play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny."); *Yarrington*, 697 F. Supp. 2d at 1068 (service awards "promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits.").

[59] *See also id.* at 1218 ("[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D.Ga. 2001)) (citing *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ($25,000 to named plaintiff); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) ("Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class. . .In fact, [c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation") (internal quotations and citation omitted); *Godshall v. Franklin Mint Co.*, No. 01-CV-6539, 2004 WL 2745890, at *6 (E.D. Pa. Dec. 1, 2004) ($20,000 to each named plaintiff); *In re Linerboard Antitrust Litig.*, CIV.A. 98-5055, 2004 WL 1221350, at *18-19 (E.D. Pa. June 2, 2004) ($25,000 for each of the five class representatives); *Tenuto v. Transworld Sys.*, No. CIV. A. 99–4228, 2002 WL 188569, at *4-5 (E.D. Pa. Jan.31, 2002) (award of $2,000); *Dornberger v. Metropolitan Life*

Here, there are four categories of plaintiffs (all class representatives and/or bellwether plaintiffs) for whom awards are warranted for their time, effort and service: (1) those who participated in written discovery beyond plaintiff fact sheets; (2) those who participated in more extensive written discovery and also were deposed; (3) those who participated in this more extensive written discovery, were deposed, and also testified at trial; and, (4) subclass representatives who assisted in negotiating subclass caps.   In recognition of these levels of service, Settlement Class Counsel request $5,000 for each plaintiff or plaintiff group in the first category; $15,000 for each plaintiff or plaintiff group in the second category; and $100,000 for the trial plaintiffs in the third category.[60]   *See In re Dun & Bradstreet Credit Services Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) ("a differentiation among class representatives based upon the role each played may be proper in given circumstances.").   Subclass counsel additionally requests $2,500 to each subclass representative.   Appendix A contains a chart, by category and citation to supporting evidence, for each such plaintiff.

All these plaintiffs were named in complaints filed against Syngenta.   Some were among the earliest filed.[61]   Some became class representatives named in the master complaint and some

---

*Ins. Co.,* 203 F.R.D. 118, 124-125 (S.D.N.Y. 2001) (award of $10,000 for lead plaintiff and $1,500 for eight sub-class representatives); *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136, 145 (E.D. Pa. 2000) ("courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."); *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 449 (S.D. Tex. 1999) (granting awards of between $1,000 and $10,000); *In re Residential Doors Antitrust Litig.,* No. 94–3744, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) ($10,000 to each of the four class representatives); *In re Plastic Tableware Antitrust Litig.,* No. 94-CV-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec.4, 1995) (award of $3,000); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 357 (N.D.Ga. 1993) (award of $2,000 to plaintiffs who produced documents and $5,000 to plaintiffs that were also deposed).

[60] Plaintiffs who farm under common ownership/management and/or whose participation was handled primarily by one representative are treated as a single plaintiff group for purposes of the service award request.

[61]   *See Hadden Farms Inc. v. Syngenta Corporation et al.,* No. 3:14-cv-03302 (C.D. Ill.) (filed 10/03/14); *Cronin, Inc., et al. v. Syngenta Corporation et al.,* No. 5:14-cv-04084   (N.D. Iowa) (filed 10/03/14); *Claas, et al. v. Syngenta Corporation et al.,* No. 2:14-cv-04267 (W.D. Mo) (filed 10/03/14);

agreed to be bellwether plaintiffs representing the class of plaintiffs from their home state at trial. All have made themselves available regularly for any necessary communications with counsel, participated substantially in the litigation and contributed to its success.

### A.    Category 1 Plaintiffs Should Each Be Awarded $5,000.

The first category of plaintiffs went beyond the effort of responding to a plaintiff fact sheet; each was required to work with an attorney to respond to, locate, and produce documents responsive to at least Syngenta's First Request for Production.  These plaintiffs were putative class representatives outside of the eight bellwether states subject to Scheduling Order No. 2, and who moved for class certification on September 15, 2017.  *See* ECF Nos. 1098, 3432.  Syngenta served requests on these plaintiffs on August 17, 2015, ECF No. 955 (Notice of Service), which contained 27 categories of requested documents.  *See* Ex. 1 (Stueve Decl. ¶ 281).  The requests came during harvest season, when many farmers were already working 15-20 hour days in the field, and sought extensive documents respecting numerous details of each plaintiff's farming operation over a significant time period.  *Id.* at ¶¶ 281, 283, citing Req. Nos. 1-8, 10-14. Included were requests for sensitive financial information.  *Id.* at ¶ 282, citing Req. No. 24.  As to these, as well as other document requests, farmers not only had to search their own records, but often were required to obtain documents held by third parties (for example, sales contracts and settlement sheets reflecting sales of corn and other crops, seed purchase documents, crop

---

*Volnek Farms, Inc. v. Syngenta Corporation, et al.*, No. 8:14-cv-00305 (D. Neb.) (filed 10/03/14); *Graham v. Syngenta AG et al.*, No. 4:14-cv-00428 (S.D. Iowa) (filed 10/27/14); *Hamilton v. Syngenta Corporation et al.*, No. 8:14-cv-00345 (D. Neb.) (filed 11/03/14); *Five Star Farms, et al. v. Syngenta AG et al.*, No. 2:14-cv-02571 (D. Kan) (filed 11/11/14); *Wilson Farm Inc., et al. v. Syngenta AG et al.*, No. 4:14-cv-01908 (E.D. Mo.) (filed 11/11/14); *Gilbert Jones & Sons Farm LLC v. Syngenta Corporation et al.*, No. 14-cv-14384 (E.D. Mich.) (filed 11/14/14).

insurance records, FSA records, and accounting records).  Ex. 2 (Powell Decl. ¶¶ 123, 131).  The

requested award is at or below what courts typically approve.[62]

### B.      Category 2 Plaintiffs Should Each Be Awarded $15,000.

The second category is comprised of the class representative and bellwether plaintiffs

subject to Scheduling Order No. 2.  They completed fact discovery by: providing extensive

written responses to three sets of interrogatories, answering 98 requests for admission, producing

documents to two sets of requests for production, and being deposed.  *See* Ex. 2 (Powell Decl. ¶¶

136-45) (detailing these discovery efforts).

In Syngenta's Second Request for Production directed to these plaintiffs, Syngenta

sought 70 categories of documents, many again seeking extensive information over multi-year

time periods.  *See, e.g.* Ex. 1 (Stueve Decl. ¶ 284), citing Req. No. 8, 9, 10, 11, 29.  Again, these

requests sought detailed information pertaining to plaintiff's farming operations, as well as

information pertaining to categories of argument Syngenta had and/or planned to make.  *See,*

*e.g.*, *id.* at ¶ 286, citing Req. Nos. 62, 63, 64.  Again, the Requests sought sensitive financial

---

[62]    *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) ($5,000 award to each class representative "was relatively small, well within the usual norms of "modest compensation" paid to class representatives for services performed in the class action"); *Thompson v. Qwest Corp.*, No. 17-CV-1745-WJM-KMT, 2018 WL 2183988, at *3 (D. Colo. May 11, 2018) (awarding $5,000 and noting it to be "on the lower end of awards deemed reasonable."); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 592 (N.D. Cal. 2015) (awarding $5,000 as "presumptively reasonable" in district although no written discovery was served on class representative, she did not need to respond to any discovery, she was not deposed, and she did not attend any court hearing or settlement conference); *McDaniels v. Westlake Services, LLC*, No. CIV.A. ELH-11-1837, 2014 WL 556288, at *12 (D. Md. Feb. 7, 2014) ($5,000 incentive award approved as "both reasonable and within the range approved by this and other courts"); *Larey v. Allstate Prop. & Cas. Ins. Co.*, No. 4:14-CV-4008, 2018 WL 811103, at *5 (W.D. Ark. Feb. 9, 2018) ($5,000 service award to each class representative); *deMunecas v. Bold Food, LLC*, No. 09 CIV. 00440 DAB, 2010 WL 3322580, at *10 (S.D.N.Y. Aug. 23, 2010) (same); *Gray v. Talking Phone Book*, No. 8:08-CV-01833-GRA, 2012 WL 12978113, at *11 (D.S.C. Aug. 13, 2012) (same); *Risch v. Natoli Eng'g Co., LLC*, No. 4:11CV1621 AGF, 2012 WL 4357953, at *3 (E.D. Mo. Sept. 24, 2012) (same); *In re Checking Acct. Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2014 WL 12557836, at *10 (S.D. Fla. Apr. 1, 2014) (same); *Accounting Outsourcing, L.L.C. v. Verizon Wireless Pers. Comms., L.P.*, No. CIV.A. 03-CV-161, 2007 WL 7087615, at *3 (M.D. La. Aug. 2, 2007) (same).

information.  *See* Ex. 1 (Stueve Decl. ¶ 285), citing Req. Nos. 9-10.  Again, these plaintiffs

expended significant effort collecting documents, many times requiring communications and/or

travel to third parties.  *See* Ex. 2 (Powell Decl. ¶¶ 121, 123-24, 131); Ex. 1 (Stueve Decl. ¶¶ 300-

01, 312-13, 325-26, 337-38, 349-50, 358-59, 367-68, 377-78, 386-87, 395-96).  Documents from

these plaintiffs were used in combatting Syngenta's arguments against class certification.  *See*

ECF No. 2436 at 2, 30-41 & Appx. C, D, E.[63]

They also responded to three sets of interrogatories. Ex. 1 (Stueve Decl. ¶¶ 280, 287,

289).  The first set from Syngenta Corporation sought 15 categories of information, primarily

directed to the factual basis for various allegations in the complaint and arguments Syngenta had

and/or planned to make.  *Id.* at ¶ 287.  The set from Syngenta Crop Protection contained 20

categories, all seeking detailed information (including financial and insurance information) about

the plaintiff's farming operations.[64]  And the set from Syngenta AG sought 21 categories of

---

[63] In opposing Syngenta's arguments about ascertainability/feasibility of identifying class members, Producer Plaintiffs were able to point to not only documents produced by particular plaintiffs, but the quantity of discovery from plaintiffs overall. *See id.* at 39-40 ("Syngenta goes into great detail about what certain records do or do not show or what records have or have not been produced, but its silence about what *has* been produced is deafening. . .Syngenta has had the benefit of an extraordinary amount of discovery from putative class members.  In all that evidence, Syngenta did not point to even one MDL producer without proof to establish class membership.").

[64] This requested information included: (1) storage capacity and volume of corn stored from 2013 to present; (2) corn sales made from storage (by volume, storage location, corn variety,  and price received) from 2013 to present; (3) any revenue protection crop insurance;  (4) other risk-based insurance from 2010 to present as to corn crops or farming operations generally (including level of such insurance, claims filed and paid and dates thereof); (5) any government subsidy programs or revenue protection enrollment; (6) all government payments received from 2010-2014; (7) all Commodity Credit Corporation marketing assistance loans and Loan Deficiency Payments received since 2010; (8) acres set aside from 2010 to present and any payments received for those acres; (9) listing of all corn and/or grain sorghum acreage by farm/tract/field number in which the plaintiff either has a landlord interest or was a tenant from 2013 to present (including the names of the tenants or the entities under which they farm, the names of the landlords from which you rent land, and the details of the specific compensation agreement with any tenants and/or landlords); (10) description of ownership structure of plaintiff's business entity; (11) description of ownership interests in any other operation; (12) any financial interest in businesses that manufacture/sell ethanol, sweeteners or other corn by-products; (13) description of any interest in marketing, ethanol, or other cooperative related to plaintiff's corn farming operations (including all income and patronage dividends received from such membership, and all sales of corn made through the

information.[65]   Answers to interrogatories were served by April 2016; Syngenta three times demanded additional information, which was provided in supplemental responses over the next several months.   In responding to these interrogatories, plaintiffs collectively provided 1,857 pages of objections and responsive information.  Ex. 2 (Powell Decl. ¶ 157).

In its First Requests for Admission, Syngenta propounded 98 such requests.   Ex. 1 (Stueve Decl. ¶ 290).   The Interrogatories from Syngenta Corporation requested that for any request not unqualifiedly admitted, the plaintiff state the factual basis for denial or qualified admission.  *See id.* at ¶ 290.   As with the document requests and interrogatories, response to these requests for admission entailed considerable effort.  Ex. 2 (Powell Decl. ¶¶ 137-38, 157). In addition, these plaintiffs also provided deposition testimony. On average, they spent many hours in responding to discovery, preparing for and providing that testimony.  Ex. 1 (Stueve Decl. ¶¶ 315, 328, 340, 352, 361, 370, 380, 389, 399); Ex. 2 (Powell Decl. ¶¶ 148-56); Ex. 3 (Downing Decl. ¶¶ 88-90); Ex. 4 (Chaney Decl. ¶¶ 213-20).   Many of the depositions were used in briefing issues relating to class certification and summary judgment.[66]

---

cooperative, from 2010 to present); (14) all loans secured by corn crops from 2010 to present (including terms, lender, and date on which loan was paid off); (15) all GM crops grown by the plaintiff from 2010 to present (by year and variety); (16) any derivatives or other financial instruments, such as options or futures, purchased or sold to hedge the price risk associated with corn (describing if the plaintiff was long or short corn in that time period and if so by how much); (17) specific nature of any livestock operations (including type and cost of feed) from 2013 to present.  Ex. 1 (Stueve Decl. ¶ 288 n.7).

[65] These interrogatories sought information pertaining to, for example: (1) information pertaining to damages; (2) accounting/bookkeeping process on all farming operations (including any software utilized and reports generated); (3) cultivation costs and yield per acre from 2011 to present; (4) information pertaining to any planting/sale of Viptera or Duracade; information on the process for pricing plaintiff's corn; (5) annual price per bushel from 2010 to present;  (6) each contract for the sale of corn (including contract type, specific pricing, corn variety, buyer, and delivery terms); (7) corn sales to food processing facilities, exporters and/or ethanol plants; (8) segregation and/or channeling efforts; and (9) pricing information. Ex. 1 (Stueve Decl. ¶ 289).

[66] *See* ECF No. 2436 at 77-78 n.67-68, 80; ECF No. 2859 at 51-52.  Had the litigation continued, it is certain that Syngenta and Producer Plaintiffs would have made similar use of such evidence in summary judgment or other motions pertaining to other state classes.   Moreover, testimony and documents from these Plaintiffs were relied upon to refute several of Syngenta's defenses to class

All these plaintiffs agreed to serve in the important role as bellwether plaintiff for individual trials or as class representatives in the class trials. That willingness to serve, the contribution made to the pool of information used generally for the benefit of all plaintiffs, as well as the significant commitment of time and effort invested in service to their respective classes, warrants an elevated service award. *See, e.g., In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18-19 (awarding $25,000 for each of five class representatives: "Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly. The five class representatives performed considerable work advancing the litigation . . . provided verified answers to interrogatories and produced documents . . . Each of them also expended time in preparing for depositions and gave testimony at depositions."); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 999-1000 (N.D. Ohio 2016) (awarding $10,000 to each of thirteen class representatives as "well within an appropriate range"); *Manuel v. Wells Fargo Bank, Nat'l Ass'n,* No. 3:14CV238(DJN), 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016) (awarding $10,000 to class representative who "took an active role by participating in discovery and testifying in a deposition.").[67]

---

certification: including commonality of pricing (ECF No. 2164 at Appendix B); ascertainability (ECF No. 2436 at 35 & Appendix D & E).

[67] *See also Bennett v. Sprint Nextel Corp.*, Case No. 2:09-cv-02122-EFM-GEB (D. Kan. Aug. 12, 2015), ECF No. 301, at 3 (awarding $13,927.69, $14,647.50 and $14,345.25, respectively, to three class representatives); *In re: Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2013 WL 11319392, at *12 (S.D. Fla. Aug. 5, 2013) (awarding $10,000 to each of five class representatives); *Tuten*, 41 F. Supp. 3d at 1010 (awarding $15,000 to class representative); *Meijer, Inc. v. 3M*, CIV.A. 04-5871, 2006 WL 2382718, at *25 (E.D. Pa. Aug. 14, 2006) (awarding $25,000 to class representative, noting that award is "similar to the awards approved in comparable complex class actions") (collecting cases); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) (awarding $25,000 to each of two named plaintiffs); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving awards ranging from $5,000 to $100,000; awarding $10,000 to each named plaintiff).

### C.      The Kansas Trial Representatives Should Each be Awarded $100,000.

The third category of plaintiffs not only completed the same discovery as the Category 2 Plaintiffs but also traveled to, attended, and testified at trial.  *See* Ex. 1 (Stueve Decl. ¶ 305)**.** Their contribution was, therefore, extraordinary.

These four plaintiffs collectively produced 31,186 pages of documents; 111 pages of interrogatory objections and information; and 99 pages of responses to requests for admission. Ex. 2 (Powell Decl. ¶ 157). The contribution of these plaintiffs cannot be overstated.  Each became a public face for all plaintiffs injured by Syngenta's conduct.  In addition to the discovery obligations of Category 2 plaintiffs, they spent several hours each preparing for their testimony at trial.  Ex. 1 (Stueve Decl. ¶¶ 309-45; Ex. 43 (Bender Decl. ¶ 20); *see also* Ex. 2 (Powell Decl. ¶ 199); Ex. 4 (Chaney Decl. ¶ 293). They travelled and stayed more than 300 miles, and in one instance over 800 miles, from their farms to Kansas City, Kansas to represent the Kansas class and give the jury a face to the Plaintiffs' claims.  Ex. 1 (Stueve Decl. ¶¶ 305-07); Ex. 43 (Bender Decl. ¶ 20(c)).  This work took these farmers away from their family and farms for as much as 120 hours – all in service of the Class Members' claims – and this is in addition to their other discovery-related obligations.  *See* Ex. 43 (Bender Decl. ¶ 20(c)); Ex. 1 (Stueve Decl. ¶¶ 318, 330, 342).  They provided invaluable testimony – testimony obviously persuasive to the Kansas jury – at trial; and, this testimony took each of them away from the day-to-day running of their farms for several weeks, Ex. 1 (Stueve Decl. ¶¶ 305-07), while they were still planting corn seed and harvesting the wheat crop – duties that had to be fulfilled by other laborers on their farms and without their direct supervision, *id.* at ¶¶ 316, 330.  Mr. Kendrick attended every single day of the Kansas trial, *id.* at ¶¶ 316; Ex. 43 (Bender Decl. ¶ 20(c)), while the other three plaintiffs attended nearly all or significant portions of the trial, Ex. 1 (Stueve

Decl. ¶¶ 330, 342).  Three of them continue to consult with counsel regarding the settlement, fulfilling their duties as settlement class representatives.  *Id.* at ¶¶ 320, 332, 344.

Furthermore, as the Court found in granting class certification, "the amounts at stake per farm are small enough that separate suits may be impracticable for many class members."  ECF No. 2547 at 28.  In attending and testifying at trial, these Category 3 Plaintiffs selflessly fulfilled their role as class representatives.  Each was invaluable in securing the $217 million jury award in the Kansas trial, which was the singular most important benefit toward settlement in the litigation.  Collectively, their service awards of $400,000 represent only .026% of the remarkable benefit that their efforts have made available.  It is small price for the remaining class members to pay (less than 3/100 of a cent on every dollar) for the service provided by these plaintiffs.[68] The amount requested compensates these individuals not only for their effort but their vast contribution to the outcome in this case, and again, is in line with other awards for similar or lesser service.[69]  All these plaintiffs expended substantial time and effort in representing the

_____

[68] The Tenth Circuit has stated that strictly basing incentive awards on a percentage of the recovery is disfavored "if not altogether forbidden."  *Chieftain Royalty Co. v. Enervest Instit. Fund XIII-A, L.P.*, 888 F.3d 455, 468-69 (10th Cir. 2017) (interpreting Oklahoma law, but relying on federal cases and quoting *Newberg* 17:16).  Nonetheless, use of "a percentage calculation. . . to 'check a flat award for excessiveness" is not prohibited.  *Id.*  Here, the award requested for the trial plaintiffs is plainly not excessive, and justified by the "work they performed" and benefits conferred.  *Id.* at 468

[69] *See, e.g., Erica P. John Fund, Inc. v. Halliburton Company, et al.*, No. 3:02-cv-1152-M, ECF No. 844 at 29 (N.D. Texas Apr. 25, 2018) (awarding $100,000 to class representative); *Castro v. Sanofi Pasteur Inc.,* CV117178JMVMAH, 2017 WL 4776626, at *10 (D.N.J. Oct. 23, 2017) (awarding $100,000 to each of three class representatives); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (granting requested incentive payments); *In re: Urethane Antitrust Litig.*, ECF No. 3251 at 12 (D. Kan. June 1, 2016) (requesting awards of $150,000 each to two representatives and $200,000 for third representative); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *17-18 (N.D. Cal. Sept. 2, 2015) (awarding $100,000-$140,000 to each of five class representatives); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, No. 07-CV-1078, ECF No. 713 at 2, 8 (E.D. Pa. July 14, 2014) (awarding $150,000 to one class representative and $75,000 to two other class representatives), attached as Ex. 71; *In re Neurontin Antitrust Litig.*, No. Civ. A. No. 02-1830, ECF No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) (awarding $100,000 to each class representative), attached as Ex. 72; *In re Titanium Dioxide Antitrust Litig.*, No, 10-CV-00318 RDB, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding $125,000 to one class representative and $25,000 to each of two class representatives); *Been,* 2011 WL 4478766, at *12 (awarding $100,000 to each of 5 class representatives); *Velez v. Novartis*

Classes, took action that protected and advanced the interests of all class members, and deserve to be compensated for their involvement. The amounts requested are within ranges awarded in this Circuit and around the country for similar efforts.

### D. Subclass Representatives Should Each Be Awarded $2,500.

Finally, the undersigned and Subclass Counsel request that the appointed class representatives of the of Subclasses 2-4 – the Viptera/Duracade purchaser, Grain Handling Facility, and Ethanol Production Facility subclasses each be awarded $2,500. As the authorities cited above demonstrate, $2,500 is a modest service award. Although these representatives were not deposed, they importantly assisted Subclass Counsel in evaluating the strengths and weaknesses, and concomitantly, the value of the Subclass members' claims. Their efforts are detailed more extensively in the declarations of Subclass Counsel. *See* Ex. 48 (Cecchi Decl. ¶ 19); Ex. 49 (Wexler Decl. ¶ 13); Ex. 50 (Johnson Decl. ¶ 14). These awards should be approved.

### CONCLUSION

For the foregoing reasons, MDL Co-Lead Counsel and Settlement Class Counsel Christopher Seeger request that the Court grant this motion and (1) award one-third of the $1.51 billion settlement fund as attorneys' fees; (2) allocate 50% of that amount to MDL Co-Lead Counsel for distribution to the Kansas Common Benefit Group, 12.5% to the Minnesota Common Benefit Group, and 17.5% to the Illinois Group; (3) approve $388,005 in attorneys' fees to Subclass Counsel from the remaining 20% and set aside the remainder until all other fee applications have been considered; (4) approve $6,695,350.05 in reimbursement of costs and expenses to MDL Co-Lead Counsel for distribution to the Kansas Common Benefit Group; (5)

---

*Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) (awarding $125,000 to named plaintiffs); *Columbus Drywall & Insulation, Inc. v. Masco Corp*., No. 1:04-CV-3066-JEC, 2008 WL 11319972, at *3 (N.D. Ga. Mar. 4, 2008) (awarding $100,000 to each class representative); *Ivax Corp. v. Aztec Peroxides, LLC*, No. 1:02CV00593, ECF No. 78 at 2 (D.D.C. Aug. 24, 2005) (awarding $100,000 to each of two class representatives), attached as Ex. 73.

authorize MDL Co-Lead Counsel to distribute the MDL Allocation to the Kansas Common Benefit Group and set a deadline for any objections to that allocation of 10 days after notice of the allocation is made with a 14-day response period thereto; and, (6) approve the service awards requested in Appendix A.

Dated: July 10, 2018

Respectfully Submitted,

/s/  Patrick J. Stueve
**STUEVE SIEGEL HANSON LLP**
Patrick J. Stueve, KS Bar #13847
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:     (816) 714-7100
Facsimile:      (816) 714-7101
stueve@stuevesiegel.com

**CO-LEAD, CLASS, LIAISON AND SETTLEMENT
CLASS COUNSEL FOR PLAINTIFFS**

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, NJ  07660
Telephone:     (212) 584-0700
Facsimile:      (212) 584-0799
cseeger@seegerweiss.com

**MEMBER OF PLAINTIFFS' SETTLEMENT NEGOTIATION
COMMITTEE AND SETTLEMENT CLASS COUNSEL**

Don M. Downing
**GRAY, RITTER & GRAHAM, P.C.**
701 Market Street, Suite 800
St. Louis, MO 63101
Telephone: (314) 241-5620
ddowning@grgpc.com

**CO-LEAD AND CLASS COUNSEL FOR PLAINTIFFS**

William B. Chaney
**GRAY REED & MCGRAW, LLP**

1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
wchaney@grayreed.com

**CO-LEAD AND CLASS COUNSEL FOR PLAINTIFFS**


Scott Powell
**HARE WYNN NEWELL & NEWTON**
2025 3rd Ave. North, Suite 800
Birmingham, AL 35203
Telephone: (205) 328-5330
scott@hwnn.com

**CO-LEAD AND CLASS COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on July 10, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

<u>/s/ Patrick J. Stueve</u>
Plaintiffs' Co-Lead, Liaison, Class and Settlement
Class Counsel for Plaintiffs

107