# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| IN RE SYNGENTA AG MIR162 CORN LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CASES EXCEPT:<br><br>*Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG, et al., No. 16-2788-JWL-JPO*<br><br>*Trans Coastal Supply Company, Inc. v. Syngenta AG, et al., No. 2:14-cv-02637-JWL-JPO*<br><br>*The Delong Co., Inc. v. Syngenta AG, et al., No. 2:17-cv-02614-JWL-JPO*<br><br>*Agribase International Inc. v. Syngenta AG, et al., No. 2:15-cv-02279-JWL-JPO* | Master File No. 2:14-MD-02591-JWL-JPO<br><br>MDL No. 2591 |

**DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENTS**

**TABLE OF CONTENTS**

I.   INTRODUCTION                                                                              1

II.  QUALIFICATIONS                                                                            1

III. MATERIALS RELIED UPON                                                                     7

IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT                                              8

V.   SUMMARY OF OPINIONS                                                                       15

VI.  DETAILED DISCUSSION OF OPINIONS                                                           16

    A.  The Attorneys' Fees Requested by Class Counsel Are Reasonable               17

      1.  This Court Should Use the Percentage-of-the-Fund Method                 17

      2.  The 33⅓ Percent Requested Here Is Reasonable                            19

        a.  The Percentage Requested Is Justified Under the *Johnson* Factors Based on the Compelling Circumstances in This Case                    19

          i.   Time and Labor Required                                           21

          ii.  Novelty and Difficulty of the Questions                          22

          iii. Skill Requisite to Perform the Legal Service Properly            30

          iv.  Preclusion of Other Employment Due to Acceptance of the Case     33

          v.   Customary Fee                                                    33

          vi.  Any Prearranged Fee                                              35

          vii. Time Limitations Imposed by the Client or the Circumstances      35

          viii. Amount Involved and Results Obtained                            36

          ix.  Experience, Reputation, and Ability of Attorneys                 36

          x.   Undesirability of the Case                                       37

          xi.  Nature and Length of Professional Relationship With the Client    37

          xii. Awards in Similar Cases                                          37

        b.  The Percentage Requested Is Supported by Awards in Other Class Actions, Including So-Called Mega-Fund Cases                          38

      3.  There Is No Need for a Lodestar Cross Check                             46

      4.  In Any Event, a Lodestar Analysis Supports the Fees Requested           47

        a.  The Hours Spent by MDL Class Counsel Are Reasonable                 48

        b.  The Billing Rates Proposed by MDL Class Counsel Are Reasonable      49

        c.  Additional Expected Hours Should Be Included                        54

        d.  The Multiplier Is Well Justified Based on Tenth Circuit Precedent   54

e.   The Multiplier Is Well Justified in Comparison With Other Mega-Fund
Cases                                                                                        57

f.   The Multiplier Is Supported by the Relevant *Johnson* Factors            59

5.   Conclusion on Attorneys' Fees                                                       59

B.   The Proposed Allocation of Attorneys' Fees Is Reasonable                    60

C.   The Out-of-Pocket Costs Sought by Class Counsel Are Reasonable         61

D.   The Proposed Incentive Payments for the Class Representatives Are Reasonable   62

VII.   CONCLUSION                                                                          67


APPENDIX A:   Curriculum Vitae                                                         69

APPENDIX B:   Materials Reviewed                                                       83

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I. INTRODUCTION

1. I have been asked by class counsel to opine on the reasonableness of: (1) the requested attorneys' fees; (2) the proposed allocation of attorneys' fees; (3) the requested out-of-pocket costs; and (4) the proposed incentive payments to certain MDL class representatives and bellwether plaintiffs. I am offering my opinions for the Court's consideration based on my background and experience. I recognize, of course, that my role is limited and that this Court will make the ultimate decision.

## II. QUALIFICATIONS

2. I have served as an expert in numerous class action cases, including several recent high-profile class settlements. I am currently the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School and have held that position since June 1, 2014. This is an endowed, tenured position at the rank of full professor. From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time. Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC). That appointment was an endowed, tenured position at the rank of full professor. Prior to my academic post at UMKC, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office. For most of that time, I was an equity partner at the firm. (I continued to work at Jones Day while I was employed at UMKC; my status with the firm during that period changed from partner to of counsel.) While working at Jones Day (before joining the UMKC faculty), I also served for many years as an adjunct professor of law at Georgetown University Law Center. Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States. Immediately after graduating from law school, I served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit. I received my law degree from Yale Law School.

3. In my various academic positions, I have taught (among other subjects) complex litigation, class actions, civil procedure, federal courts, and federal appellate procedure.

4. In September 2011, the Chief Justice of the United States appointed me to serve a three-year term as the academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure ("Advisory Committee"). The Advisory Committee considers and recommends amendments to the Federal Rules of Civil Procedure. Only one civil procedure professor in the United States is selected by the Chief Justice to serve in that role during any three-year term. In May 2014, the Chief Justice reappointed me to serve a second three-year term on the Advisory Committee. I completed that service in May 2017. (The maximum period of service on the Advisory Committee is six years.) I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Advisory Committee on proposed amendments to the federal class action rule, Federal Rule of Civil Procedure 23. Those proposed amendments are currently making their way through the rules adoption process and are on track to become effective on December 1, 2018.[1]

5. I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation*. I was the principal author of Chapter 3, which addresses class action settlements and attorneys' fees. The ALI project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published by the American Law Institute in May 2010. It has been frequently cited by courts and commentators.[2]

---

[1] *See* Pending Rules and Forms Amendments, U.S. COURTS, http://www.uscourts.gov/rules-policies/pending-rules-and-forms-amendments (last visited July 7, 2018).

[2] *See, e.g.*, *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *Keepseagle v. Perdue*, 856 F.3d 1039, 1069–70 (D.C. Cir. 2017) (Brown, J., dissenting); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 744, 749 (9th Cir. 2017); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n. 5 (9th Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1702 (2017); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 nn.14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n.2 (9th Cir. 2011); *Cabiness v. Educ. Fin. Solutions, LLC*, No. 16-cv-01109-JST, 2018 WL 3108991, at *8 n.4 (N.D. Cal. June 25, 2018); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011); Richard Marcus, *Revolution v. Evolution in Class Action Reform*, 96 N.C. L. REV. 903, 927–28, 933 n.161, (2018); Sergio J. Campos, *Mass Torts and Due Process*, 65 VAND. L. REV. 1059, 1063 (2012); Tanya J. Monestier, *Transnational Class Actions and the Illusory Search for Res Judicata*, 86 TUL. L. REV. 1, 66 (2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. CAL. L. REV. 97, 111 (2014); Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right to Sue*, 115 COLUM. L. REV. 599, 649–50 (2015).

6.   I have more than 30 years of experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court, and numerous oral arguments in other federal and state appellate courts throughout the country, including oral arguments in eight federal circuits. As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.

7.   I have lectured and taught on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, Germany, India, Israel, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[3]

8.   I co-authored the first casebook devoted specifically to class actions, and I am now the sole author of that book:  *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017).   I am also the sole author of the Nutshell on class actions: Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017). These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[4]   In addition, I have authored or co-authored numerous scholarly articles on class actions and other topics.[5]   I also serve on the advisory board of Class Action Litigation Report, a Bloomberg/BNA publication.

---

[3] Examples of those courses and speaking engagements are contained in my attached curriculum vitae (Appendix A).

[4] *See, e.g., Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 468 (1st Cir. 2013) (citing *Nutshell*); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) (citing *Nutshell*); *Adams v. United Services Automobile Ass'n*, No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (citing *Nutshell*), *rev'd on other grounds*, 863 F.3d 1069 (8th Cir. 2017); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 286 n.27, 291 n.65, 316 n.206 (2018) (citing casebook and *Nutshell*); Jaime Dodge, *Privatizing Mass Settlement*, 90 NOTRE DAME L. REV. 335, 337 n.12 (2014) (citing casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making*, 44 LOY. U. CHI. L.J. 445, 449 n. 17 (2012) (citing *Nutshell*); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 151 n.5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation*, 27 HARV. ENVTL. L. REV. 519, 521 n.10 (2003) (citing *Nutshell*).

[5] For example, my 2013 article, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729 (2013), has been widely cited. *See, e.g., In re National Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014); *Dickens v. GC Services Limited Partnership*, 220 F. Supp. 3d 1312, 1324 (M.D. Fla. 2016), *vacated on other grounds*, 706 F. App'x 529 (11th Cir. 2017); *In re Kosmos Energy Ltd. Sec. Litig.*, No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n.20 (N.D. Tex. Mar. 19, 2014); David C. Miller, *Abuse of Discretion and the Sliding Scale of Difference: Restoring the Balance of Power Between Circuit Courts and District Courts for Rule 23 Class*

9.   In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.   I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

10.   I have testified as an expert in numerous class action cases and in other cases raising civil procedure issues.   Between 2011 and the present, I testified in the following cases:

- *Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC (N.D. Cal.) (submitted expert declaration on class certification, settlement fairness, attorneys' fees, costs, and incentive payments in unauthorized accounts litigation, dated 1/19/18; submitted supplemental declaration on 5/21/18);

- *Lynch v. Lynch*, No. F.D. 14-6239-006 (Pa. Ct. Comm. Pl., Allegheny Cnty.) (submitted expert declaration on the nature of class action law practice in the context of a divorce proceeding involving a class action attorney) (dated 9/05/17);

- *In re Chinese-Manufactured Drywall Litigation*, MDL No. 2047 (E.D. La.) (submitted expert declaration on attorneys' fees issues) (dated 5/04/17);

---

*Certification Decisions in Oil and Gas Royalty Litigation*, 103 IOWA L. REV. 1811 *passim* (2018); Libby Jelinek, *The Applicability of the Federal Rules of Evidence at Class Certification*, 65 UCLA L. REV. 280, 297 n.101 (2018); Andrew D. Bradt & D. Theodore Rave, *Aggregation on Defendants' Terms:* Bristol-Myers Squibb *and the Federalization of Mass Tort Litigation*, 59 B.C. L. REV. 1251, 1261 n.39, 1266 n.78, 1286 n.196 (2018); Joseph A. Seiner, *Tailoring Class Actions to the On-Demand Economy*, 78 OHIO ST. L.J. 21, 25 n.14, 32 n.54 (2017); Brian T. Fitzpatrick, *Justice Scalia and Class Actions: A Loving Critique*, 92 NOTRE DAME L. REV. 1977, 1979 (2017); Deborah R. Hensler, *From Sea to Shining Sea: How and Why Class Actions Are Spreading Globally*, 65 KAN. L. REV. 965, 965 n.2 (2017); Richard Marcus, *Bending in the Breeze: American Class Actions in the Twenty-First Century*, 65 DEPAUL L. REV. 497, 497 & n.2 (2016); Maureen Carroll, *Class Action Myopia*, 65 DUKE L.J. 843, 846 n.8, 876–78 & nn.181, 183 & 190–93, 881 nn.211 & 213, 883 n.225 (2016); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 GEO. MASON L. REV. 695, 698 n.29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 110 n.2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV. 651, 654 n.6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n.17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 WASH. U. L. REV. 951, 956 n.20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 EMORY L.J. 293, 294 n.7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 403 n.14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n.80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 FORDHAM L. REV. 2769, 2775 n. 38 (2013); Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 314 n.105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n.5 (2013); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n.82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n.17, 589 n.154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n.4.

4

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements) (dated 4/28/17);

- *State of Louisiana & Vermilion Parish School Board v. Louisiana Land and Exploration Co., et al.,* No. 82162 (15th Judicial Court, Parish of Vermilion) (submitted expert declaration on attorneys' fees issues) (dated 3/9/17);

- *Thacker v. Farmers Insurance Exchange*, Case No. 2006CV342 (Dist. Ct. Boulder County, Colo.) (submitted expert declaration on class certification issues) (dated 1/24/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 2.0-liter settlement) (dated 9/30/16);

- *In the Matter of Gosselin Group*, No. 15/3925/B (Antwerp Court of First Instance, Belgium) (submitted expert declaration discussing the role of U.S. federal appellate courts in the factfinding process) (dated 9/27/16);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification, settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement) (dated 8/5/16);

- *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Limited*, No. 46065-09-14 (Central District Court, Israel) (submitted expert declaration on Sept. 3, 2015, on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of Cal., Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments to class representatives) (dated 12/30/14);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness) (dated 11/12/14);

- *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness on 2/13/13; submitted supplemental expert declaration on 2/19/13; and testified in court on 2/20/13);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("Deepwater Horizon") (submitted expert declarations on class certification, fairness, and attorneys' fees for the economic and property damages settlement (Doc. No. 7104-3) and

class certification, fairness, and attorneys' fees for the personal injuries settlement (Doc. No. 7111-4) (both dated 08/13/12), and submitted supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic), (Doc. No. 7728-2) (medical) (both dated 10/22/12));

- *Robichaux v. State of Louisiana, et. al.* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted written report on attorneys' fees on February 20, 2012, gave deposition testimony on March 7, 2012, and testified in court on April 11, 2012); and

- *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert declarations on the fairness of a proposed class action settlement (Doc. No. 163-3) and on attorneys' fees and incentive payments (Doc. 164-1) (both dated 03/08/11), and testified in court on March 10, 2011).

11.  Courts reviewing class settlements and attorneys' fees issues have relied extensively on my testimony.  For example, in the *Wells Fargo Unauthorized Accounts* litigation, Judge Chhabria cited my testimony in ordering that objectors to the class settlement post an appeal bond.[6]  In the *Volkswagen Clean Diesel* litigation, Judge Charles Breyer repeatedly cited and quoted my two Declarations in his three opinions—relating to the 2.0-liter VW class settlement, the 3.0-liter VW class settlement, and the class settlement with VW's co-defendant, Bosch.[7]  In the *Deepwater Horizon* case, Judge Carl Barbier cited and quoted my Declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his two opinions analyzing class certification and fairness.[8]  In a later order in that MDL, Judge Barbier repeatedly cited my Declaration (which I filed in connection with a class settlement involving Transocean and Halliburton).[9]  In the *AT&T Mobility* litigation, Judge Amy St. Eve (now a Judge on the Seventh

---

[6] *See Jabbari v. Wells Fargo & Co.*, No. 15-cv-02159-VC, slip op. at 14 (N.D. Cal. June 14, 2018) (Dkt. No. 271), *available at* https://www.courthousenews.com/wp-content/uploads/2018/06/Wells-Fargo-settlement.pdf.

[7] *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *appeal filed*, No. 16-17185 (9th Cir. Nov. 29, 2016); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3230) (filed 05/17/17), at 18.

[8] *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[9] *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. 22252) (E.D. La. 02/15/17); *available at* http://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017OrderAndReasons%28HESI%26TOsettlement%29.pdf (last visited July 7, 2018).

Circuit) cited and quoted my Declarations more than 20 times in approving a class settlement and awarding attorneys' fees.[10]   And in *Skold v. Intel Corp.*, Judge Peter Kirwan cited my Declaration in approving a class settlement and awarding attorneys' fees.[11]

12.   Along with my expertise and experience in the areas of class certification and settlement fairness, I have done extensive work in the area of attorneys' fees.  In addition to my expert witness work, I have litigated attorneys' fees issues in private practice, have worked on such issues in my role as Associate Reporter for the ALI *Aggregate Litigation* project, and have addressed attorneys' fees issues in my academic writings.[12]   In those various tasks, I have developed expertise in attorneys' fees concepts, such as percentage of the fund and the lodestar.

13.   I have extensive knowledge of typical hourly rates for attorneys and paralegals in class action litigation.  I have served as counsel and as an expert in class action cases throughout the United States, and have gained knowledge of hourly rates during that work. I have also gained familiarity with hourly rates of legal personnel through my work as a scholar.

14.   I am being compensated at the rate of $785 per hour.  My fee is not contingent on the substance of my opinions.

15.   Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Appendix A.

## III. MATERIALS RELIED UPON

16.   In addition to reviewing cases and materials in other class actions, I reviewed numerous documents in the instant case.  *See* Appendix B (listing those documents).

---

[10] *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

[11] *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7, *available at* http://lawzilla.com/blog/janet-skold-et-al-vs-intel-corporation/.

[12] *See, e.g.*, ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION: CASES AND MATERIALS 632–49 (West 4th ed. 2017) (overview of attorneys' fees issues); ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 351–56 (West 5th ed. 2017) (similar); Robert H. Klonoff & Mark Herrmann, *The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements*, 80 TULANE L. REV. 1695 (2006) (discussing attorneys' fees issues in the settlement context); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §§ 3.08, 3.13 (Am. Law Inst. 2010) (addressing attorneys' fees in class actions and other aggregate litigation).

## IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT

17.  This Court is thoroughly familiar with the background of this litigation.  Thus, I focus only on those facts that bear on my opinions in this matter.  The factual statements in this Declaration are based on the case-specific materials I have reviewed, which are listed in Appendix B.

18.  The instant litigation commenced in the fall of 2014, with numerous lawsuits filed against Syngenta[13] in federal and state court resulting from Syngenta's decision to commercialize two genetically modified organisms (GMO) corn seeds (containing the new traits MIR162 and Event 5307), with trade names Viptera and Duracade.  According to plaintiffs, Syngenta's commercialization of Viptera caused corn containing MIR162 to become commingled with the rest of the U.S. corn supply, and, as a result, China ceased importation of corn from the U.S. for a period of time.  Because of Syngenta's actions, the price of corn fell, harming corn producers and various non-producers (grain elevators and ethanol production facilities).

19.  In December 2014, the Judicial Panel on Multidistrict Litigation (JPML) consolidated the pending federal cases in this Court.  On January 22, 2015, this Court entered an order appointing Co-Lead Counsel, the Executive Committee, Interim Class Counsel, and Liaison Counsel.  That order also defined the authority, duties, and responsibilities of counsel appointed to leadership positions in the federal multidistrict litigation (MDL).

20.  In March 2015, the MDL plaintiffs filed two consolidated master complaints (one on behalf of producers, the other on behalf of non-producers).

21.  In May 2015, the MDL plaintiffs filed two amended master complaints.  Syngenta moved to dismiss both complaints, arguing, *inter alia*, that it owed no legal duty to prevent commingling of corn grown by third parties from its GMO corn seed and plaintiffs could not establish proximate cause; that various claims were barred by the economic loss doctrine; and that the various causes of action were barred for a variety of other reasons.  In a 120-page opinion, this Court granted in part and denied in part the motion dismiss (dismissing various counts but leaving intact claims under the Lanham Act (15 U.S.C. §§ 1051 et seq.), claims of

---

[13] "Syngenta" is used herein as shorthand for the various Syngenta entities and companies named in this litigation. These are: Syngenta AG; Syngenta Crop Protection AG; Syngenta Corp.; Syngenta Crop Protection, LLC; Syngenta Seeds, Inc. (now known as Syngenta Seeds, LLC); and Syngenta Biotechnology, Inc. (now merged with Syngenta Crop Protection, LLC, as the remaining entity).

negligence and tortious interference, and various consumer protection claims).  The Court denied Syngenta's request for interlocutory appeal under 28 U.S.C. § 1292(b).

22.  On July 27, 2015, this Court entered an order establishing protocols for common benefit work and expenses.  The order also established the common benefit fee and expense funds.  As the Court described it, the order "provides for the fair and equitable sharing among plaintiffs' counsel of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all producer and/or all non-producer plaintiffs in this complex litigation." Order Establishing Protocols for Common Benefit Work & Expenses & Establishing the Common Benefit Fee & Expense Funds (Dkt. No. 936) (hereinafter "Common Benefit Order"). The Common Benefit Order further stated that, in the event of a class settlement:

> [N]o assessment pursuant to this Section will be made, either for attorneys' fees or for expenses, individually from any class member or his/her/its individual attorney as to the portion of any class recovery distributed to that individual class member if the class member remains in the class (*i.e.*, does not opt-out of the class). Instead, all fees and expenses for that class member will come out of the overall class recovery funds provided by defendants, as approved by the Court, or as otherwise Ordered by the Court.

*Id.* at 20.

23.  Approximately six months after the JPML consolidated the federal cases in this Court, the Minnesota Supreme Court entered an order consolidating the cases filed in Minnesota state court in a single venue in Hennepin County, Minnesota.  Consolidated master complaints were filed in the Minnesota action.

24. On October 21, 2015, at the request of the MDL parties, this Court entered a Coordination Order, encouraging the parties to coordinate discovery against Syngenta.  The following month, numerous producer plaintiffs filed suit in Illinois state court.  Syngenta removed those cases to federal court.  The Illinois federal court held that, because those cases were a mass action under the Class Action Fairness Act, they could not be transferred to this Court.  Numerous additional cases were filed in Illinois state court in January 2016 and were consolidated before a single judge.  Subsequently, thousands of additional individual cases were filed in Illinois state court, and numerous class actions were filed in state courts in Indiana, Iowa, Michigan, Nebraska, and Ohio, many of which were removed by Syngenta and transferred to the

MDL.  Additionally, in December 2015, class actions were filed by ethanol production facilities in several state courts, including Ohio and Indiana.  Syngenta did not remove those cases.

25.  In addition to attacking the MDL complaints, Syngenta also moved to dismiss the Minnesota complaint.  In a 55-page opinion, the Minnesota court largely denied the motion, citing with approval to this Court's order on Syngenta's motions to dismiss in the MDL.  The judges in the Illinois state and federal cases rejected similar challenges by Syngenta.  Syngenta was successful, however, in securing dismissal of all of the Ohio claims by one ethanol production facility.

26.  On October 21, 2015, this Court lifted the general stay of discovery, opening the door to full discovery against Syngenta and third parties, and full discovery from the producer and non-producer bellwether plaintiffs and the class representatives from the bellwether states.  Among other discovery, MDL plaintiffs obtained more than 2.3 million pages of documents, which were placed in a document depository.  All of the MDL bellwether plaintiffs (both representatives and non-representative individuals) were deposed and produced written discovery.  Similar discovery occurred in the Minnesota case.  MDL plaintiffs retained two agricultural economists as experts, both of whom were deposed twice and were additionally utilized in the Minnesota action.  MDL plaintiffs also prepared for and took over 30 depositions of current and former Syngenta employees, many of which proved critical at trial given that these individuals were outside the subpoena power of the Court.  Plaintiffs and Syngenta also sought discovery from a number of non-parties, and deposed representatives of the National Corn Growers Association, the National Grain and Feed Association, the American Seed Trade Association, the United States Grains Council, the North American Export Grain Association, and the Biotechnology Innovation Organization.  Syngenta also cross-noticed the depositions of at least 40 individuals deposed in coordinated actions involving ADM and Cargill.  And both sides prepared for and conducted several lengthy depositions of many of the more than 16 experts disclosed by plaintiffs and Syngenta.

27.  On June 15, 2016, the MDL plaintiffs moved for class certification of a nationwide class (and eight state-law classes).  Plaintiffs' submission included 114 pages of briefing and more than 1500 pages of evidence.  Syngenta's opposition briefing totaled 127 pages, with more than 800 pages of evidence (including reports of three economists, whom plaintiffs deposed).

Plaintiffs' reply totaled 104 pages, along with 1800 additional pages of evidence. Plaintiffs' motion was also opposed by the Phipps/Clark plaintiffs, who argued that plaintiffs' expert damages models were unreliable and failed to establish classwide damages. *See id.* ¶ 350. This Court conducted a two-day hearing on September 13–14, 2016, consisting of both evidentiary presentations (attended by the Minnesota judge) and oral argument. Also on June 15, 2016, Minnesota plaintiffs moved for class certification, using the same economists that plaintiffs in the MDL used. The Minnesota court heard argument on September 16, 2016.

28. On September 26, 2016, this Court granted class certification, and the Minnesota court granted class certification on November 13, 2016. On December 7, 2016, the Tenth Circuit denied Syngenta's request for Rule 23(f) interlocutory review of this Court's class certification order, and on January 10, 2017, the Minnesota Court of Appeals denied interlocutory review of the Minnesota trial court's class certification order.

29. Bellwether trial dates were set in the MDL and in Minnesota, and the parties engaged in further expert discovery. The MDL plaintiffs produced six experts. Syngenta produced 12 experts in the MDL.

30. In February 2017, both sides moved for summary judgment in both the MDL and Minnesota cases. Plaintiffs moved for summary judgment as to various defenses raised by Syngenta. Syngenta moved for summary judgment as to plaintiffs' Lanham Act claims, negligence claims, claims based on Syngenta's sale of Duracade, and punitive damages claims. Both motions were granted in part and denied in part. On April 5, 2017, this Court granted summary judgment for plaintiffs with respect to certain applications of Syngenta's defenses of intervening cause, assumption of risk, mitigation, business and economic justification, antitrust preemption, and comparative fault. The Court granted summary judgment for Syngenta as to all of plaintiffs' claims under the Lanham Act, as well as all claims of negligence based on alleged misrepresentation, voluntary undertaking, failure to warn, and duty to recall. The court otherwise denied both motions. The Minnesota court entered its summary judgment order on April 11, 2017.

31. The Minnesota bellwether case, which was intended to try the claims of a single bellwether producer plaintiff, commenced trial in April 2017. On April 26, 2017, a mistrial was declared in that case because of a jury issue before opening statements began.

32.  On June 5, 2017, the Kansas bellwether class action (involving more than 7,000 Kansas corn growers) went to trial in the MDL.  Plaintiffs' trial team included the four co-lead attorneys appointed by the Court and attorneys and staff from their law firms.  Syngenta's trial team included at least seven Kirkland & Ellis partners, with assistance from a number of associates and support staff, and at least two partners from Berkowitz Oliver.  On June 23, 2017, a jury returned a verdict of $217.7 million for the Kansas class, the full amount of compensatory damages requested by plaintiffs.[14]

33.  Settlement discussions had begun even prior to the MDL trial, and this Court had appointed a special master, Ellen K. Reisman, to assist in settlement discussions.  Syngenta made clear, however, that it had no intention of settling the litigation prior to trial.  After the June 23, 2017 jury verdict in the MDL, this Court appointed a plaintiffs' negotiation committee.  The committee included an attorney from one of the firms on the MDL plaintiffs' executive committee (Christopher Seeger), class counsel in Minnesota, and counsel representing thousands of individual producer and non-producer plaintiffs.  Subsequently, the Court requested that the special discovery master in the Illinois state and federal cases (the Honorable Daniel J. Stack, retired) participate in the settlement discussions.

34.  Although a class trial began in Minnesota state court in September 2017, the trial was halted when the negotiating committee announced the execution of a settlement term sheet.  The term sheet provided for a settlement of up to $1.51 billion.  Settlement discussions continued after the execution of the term sheet, and separate counsel participated in the negotiations to determine the relief for each of the four subclasses (discussed below).

35.  The settlement, as ultimately embodied in the settlement agreement, provides for Syngenta to pay the $1.51 billion in three installments between March 2018 and April 2019.  The settlement provides that, upon final approval, none of the $1.51 billion will revert to Syngenta. The settlement class consists of four subclasses:  (1) a producer subclass that did not purchase and/or produce Viptera or Duracade, (2) a producer subclass that did purchase and/or produce Viptera or Duracade, (3) a grain handling facility subclass, and (4) an ethanol production facility subclass.  The settlement did not include the large corn exporters such as Cargill, ADM, Bunge,

---

[14] According to the National Law Journal, this represents the 10th-largest verdict in 2017.  *See Top 100 Verdicts 2017: Chart*, THE NATIONAL LAW JOURNAL (Apr. 30, 2018), https://www.law.com/nationallawjournal/2018/04/30/top-100-verdicts-2017-chart/?slreturn=20180530185632.

or Louis Dreyfus, several of whom had filed separate lawsuits against Syngenta.  The class period is defined as starting on September 15, 2013, and ending as of the date of preliminary approval of the settlement.  Under the settlement, class members release their economic claims against Syngenta relating to the conduct at issue but do not release claims for bodily harm.

36.  Under the settlement, the costs of settlement administration, attorneys' fees, and class counsel's out-of-pocket costs will first be deducted from the total fund.  Specific dollar amounts are allocated to three of the subclasses, with the remainder of funds being used to pay members of the remaining subclass.[15]  The agreement sets forth a detailed compensation formula that considers, among other things, the number of corn acres reported on a producer's USDA Form FSA 578 as well as acres not reported to USDA but for which data is available.  Weighted averages are set forth for each of five marketing years beginning with 2013–2014.  Allocation methodologies are also provided for non-producer grain handling facilities and ethanol production facilities.  As part of the preliminary approval process, the parties proposed a multi-faceted notice program, including direct mail and publication notice (print and digital).  Regarding attorneys' fees, costs, and incentive payments to class representatives and other plaintiffs, the agreement does not reflect any position by Syngenta with respect to such awards.  Any disputes arising from the fact that many individual plaintiffs have separate contingency fee agreements with individual attorneys will be resolved by the Court.

37.  On February 23, 2018, MDL co-lead counsel, Minnesota lead counsel, and certain other plaintiffs' counsel entered into a fee-sharing agreement, which provides that any attorneys' fees awarded by the Court will be distributed among the various common benefit law firms as follows:  (1) 50 percent will be allocated to Kansas MDL Co-Lead Counsel (Stueve Siegel Hanson; Gray, Ritter & Graham; Gray Reed & McGraw; and Hare Wynn Newell & Newton) to allocate "among all firms that provided common benefit work in the Kansas MDL consistent with the Kansas MDL Court's orders"; (2) 12.5 percent will be allocated to Minnesota counsel Gustafson Gluek to allocate to "all firms that provided common benefit work in the Minnesota MDL consistent with the Minnesota MDL Court's orders"; (3) 17.5 percent will be allocated to

---

[15] In particular, a maximum of $22.6 million is allocated to producers who purchased and planted Viptera or Duracade; a maximum of $29.9 million is allocated to the grain handling facilities; a maximum of $19.5 million is allocated to the ethanol production facilities; and the remainder is allocated to producers who did not plant Viptera or Duracade corn.

Illinois counsel Clark, Love & Hutson, who "shall petition the Honorable David R. Herndon of the United States District Court for the Southern District of Illinois concerning the allocation of fees among the members of [its] group"; and (4) the remaining 20 percent "will be allocated by the MDL Court, in consultation and agreement with the Minnesota Court and Judge Herndon of the United States District Court for the Southern District of Illinois, taking into consideration the recommendation by the Special Masters."  Fee Sharing Agreement at 1–2.[16]

38.  On March 12, 2018, the parties moved for preliminary approval of the settlement.  A group of plaintiffs (Toups/Coffman) opposed the settlement at the preliminary approval stage for a number of reasons, including an objection as to the anticipated amount of attorneys' fees that might be sought.  *See* Toups/Coffman Pls.' Response in Opposition to Class Pls.' Mot. for Preliminary Approval at 3–18 (Dkt. No. 3514) (hereinafter "Toups/Coffman Obj.").   The objection stated that class counsel intended to seek attorneys' fees of 33⅓ percent and challenged such fees as being "exorbitant."  *Id*. at 14.  The objection argued that fees at that level were well above the average fees awarded in mega-fund cases, and particularly for funds of $1 billion or more.

39.  On April 10, 2018, this Court entered an order preliminarily approving the settlement.  In its order, the Court set a deadline of July 10, 2018, for the filing of attorneys' fees and expense applications (including applications for incentive payments to class representatives).  The Court additionally rejected the objections raised by Toups/Coffman.  Motions for final approval of the settlement are due October 17, 2018, and the final approval hearing is set for November 15, 2018.

40.  MDL co-lead counsel now seek approval of (1) attorneys' fees of one-third (33⅓ percent) of the $1.51 billion settlement fund; (2) the proposed allocation of those fees pursuant to the February 23, 2018 agreement among common benefit counsel; (3) out-of-pocket costs for the MDL plaintiffs of $6,695,350.05; and (4) incentive payments to certain MDL class representatives and bellwether plaintiffs of $5,000 (for 20 bellwether and class representative plaintiffs who participated in written discovery beyond plaintiff fact sheets but were not deposed); $15,000 (for 65 bellwether and class representative plaintiffs who participated in written discovery and were deposed); and $100,000 (for four class representatives who

---

[16] It is my understanding that the Fee Sharing Agreement will be filed with the Court on July 10, 2018.

participated in written discovery, were deposed, and participated in the Kansas class trial on behalf of Kansas corn farmers).

## V. SUMMARY OF OPINIONS

41. The Syngenta litigation has been extremely challenging and hard-fought, with extraordinary lawyers on both sides. Syngenta made clear that it would not settle prior to trial. Thus, the MDL plaintiffs had to litigate class certification and conduct a classwide bellwether trial. Class counsel succeeded in obtaining class certification and eventually won the bellwether trial, recovering the entire $217.7 million that they sought in compensatory damages. Only after that trial verdict did Syngenta agree to a record-setting $1.51 billion settlement.[17] Prior to litigating class certification and proceeding to trial, class counsel conducted extensive and wide-ranging fact and expert discovery, and litigated myriad dispositive legal questions.

42. **Reasonableness of Fees.** The first issue is whether the fees sought (33⅓ percent) are reasonable. In my view, they are. Under the percentage-of-the-fund method, a 33⅓ percentage is justified by the so-called *Johnson* factors: Enormous time and expertise were required to litigate the claims, which raised extremely difficult factual, legal, and expert issues. Class counsel displayed exceptional skill and were largely precluded from taking on other significant matters. Despite extraordinary pressures placed on class counsel, they were victorious at every critical juncture—dispositive motions, class certification, and the bellwether trial—and ultimately reached an historic settlement. Class counsel came to the case with impressive experience and national reputations, and took a great risk by investing enormous time and money in such a challenging case. The fact that thousands of individual plaintiffs agreed to 40 percent contingency arrangements confirms the reasonableness of the requested fee. All of these factors support the request for 33⅓ percent, an award that is supported by numerous cases awarding comparable percentages.

43. I do not believe that a lodestar cross check is necessary or appropriate. In any event, I have done a lodestar cross check for the MDL common benefit counsel and believe that the pertinent figures (142,823.50 total hours, a blended rate of $572.21, and a total lodestar of

---

[17] The settlement is more than twice what Bayer agreed to pay rice farmers in the most recent lawsuit involving the loss of an export market due to the release of unapproved genetically modified traits. *See Bayer Settles With Farmers Over Modified Rice Seeds*, N.Y. TIMES (July 1, 2011), https://www.nytimes.com/2011/07/02/business/02rice.html.

$81,725,060.90—resulting in a multiplier of 3.079 to reach the fees requested by MDL counsel) fully justify the 33⅓ percent sought under the percentage method.

44.   **Allocation of Fees.**  Class counsel recommend that the Court divide the fee by awarding 50 percent to MDL common benefit counsel, 12.5 percent to common benefit counsel in the Minnesota litigation, and 17.5 percent to leadership counsel in the Illinois litigation, with the remaining 20 percent to be allocated in the Court's discretion.  This approach makes perfect sense to me:  It was determined through arms-length bargaining under the auspices of the special masters, and I see nothing to suggest that it is unfair to any segment of plaintiffs' attorneys involved in this litigation.[18]

45.   **Out-of-Pocket Costs.** In my view, the out-of-pocket costs sought by counsel are eminently reasonable.  Totaling $6,695,350.05, which is only 0.44 percent of the settlement, they consist of essential costs, such as fees and costs for expert witnesses, costs of class certification notice, deposition expenses, etc.  These are the types of costs commonly reimbursed by paying clients.

46.   **Incentive Payments.** Incentive payments are sought for certain MDL class representatives and bellwether plaintiffs.   Those who produced written discovery beyond responding to plaintiff fact sheets would receive $5,000; those who, in addition, sat for depositions would receive $15,000; and those who also attended the Kansas class bellwether trial would receive $100,000.  As I explain, these awards are supported by the case law, given the significant time investments involved, the tangible risks to the plaintiffs' livelihoods (including time spent away from their farms), coupled with the substantial risk that at the end of the day, they—like class counsel—would recover nothing.

## VI.  DETAILED DISCUSSION OF OPINIONS

47.   In the remaining sections of this Declaration, I explain in detail my opinions on the reasonableness of (1) the proposed attorneys' fees, (2) the proposed allocation of attorneys' fees, (3) the out-of-pocket costs requested by the MDL plaintiffs, and (4) the proposed incentive payments to certain MDL class representatives and bellwether plaintiffs.

---

[18] I may offer further opinions on this issue after I review all of the fee and expense applications filed on July 10, 2018.

# ATTORNEYS' FEES

## A. The Attorneys' Fees Requested by Class Counsel Are Reasonable

48.   Class counsel are seeking, as attorneys' fees, 33⅓ percent of the $1.51 billion settlement fund (approximately $503 million).    In this section of the Declaration, I analyze the reasonableness of that request.

### 1.  This Court Should Use the Percentage-of-the-Fund Method

49.   As an initial matter, this Court must decide whether to use the percentage-of-the-fund method (the percentage method) or the lodestar method.   Courts in the Tenth Circuit have discretion in common fund cases to choose either the percentage method or the lodestar method.[19]   Both in the Tenth Circuit and nationwide, however, courts have a strong preference for the percentage method.[20]    This preference for the percentage method—which I

---

[19] *See, e.g., Gottlieb v. Barry*, 43 F.3d 474, 483, 487–88 (10th Cir. 1994) (noting that "either method is permissible in common fund cases," but holding that the district court abused its discretion in applying the lodestar method contrary to the special master's recommendation; special master had recommended that the percentage method be applied because:  "(1) it most closely matches the methodology actually employed in the marketplace; (2) because it matches the market, it provide[s] incentive for counsel to pursue actions such as this on behalf of large groups of investors; (3) it is less subjective than the lodestar plus multiplier approach; (4) it gives primary consideration to the results obtained by counsel; (5) because class counsel was initially retained on a contingent fee basis, a percentage fee most closely approximates the original agreement between client and counsel; (6) a fee expert retained by class counsel opined that percentage fee awards are customary and reasonable in cases like this one; and (7) because of the large number of law firms seeking compensation in this case, a lodestar approach could result in overcharging the class" (citations and internal quotation marks omitted; alteration in original)).

[20] *See, e.g., Gottlieb*, 43 F.3d at 487–88 (noting "preference for the percentage of the fund method"); *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995) (to the same effect); *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) (Lungstrum, J.) ("The Tenth Circuit has expressed a preference for the percentage-of-the-fund method of awarding attorney fees in common fund cases." (citations omitted)); *CompSource Okla. v. BNY Mellon, N.A.*, No. CIV 08-469-KEW, 2012 WL 6864701, at *8 (N.D. Okla. Oct. 25, 2012) (to the same effect); *In re Univ. Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2011 WL 1808038, at *2 (D. Kan. May 12, 2011) (to the same effect); *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at *4 (E.D. Okla. Aug. 16, 2011) (to the same effect); *Millsap v. McDonnell Douglas Corp.*, No. 94-CV-633-H(M), 2003 WL 21277124, at *6 (N.D. Okla. May 28, 2003) (to the same effect); *In re Southeastern Milk Antitrust Litig.*, No. 07-cv-1000, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) (noting that the "percentage-of-the-fund method clearly appears to have become the preferred method in common fund cases"); *Jones v. Dominion Resources Services, Inc.*, 601 F. Supp. 2d 756, 758 (S.D. W. Va. 2009) ("The percentage method has overwhelmingly become the preferred method for calculating attorneys' fees in common fund cases."); Manual for Complex Litigation (Fourth) § 14.121 (2004) (noting that the "vast majority" of courts apply the percentage method); Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. Rev. 937, 963 (2017) (noting that the lodestar method "was used in only 6.29 [percent] of cases during the 2009–2013 period"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 832–33 (2010) (noting that district courts "employed the lodestar method in only 12 percent of settlements" from 2006–2007); Theodore Eisenberg & Geoffry Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248, 267 (2010) (lodestar method was used in only 9.6 percent of settlements from 2003–2008); Am. Law

wholeheartedly support—stems primarily from the fact that the percentage method "aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers."[21]  By contrast, the lodestar method gives class counsel an incentive to work more hours than are necessary and to avoid early settlement.[22]  As one district court in the Tenth Circuit emphasized, "[t]he lodestar method encourages attorneys to bill as many hours as possible, preferably to the firm's most expensive attorneys, and discourages early settlement, even on terms favorable to plaintiffs, because the attorneys will earn more the longer a litigation lasts."[23]  Another court observed that, "[w]hile the lodestar approach incentivizes attorneys to work more hours, without regard to the quality of the output or the class's needs, the percentage

---

INST., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.13(b) (2010) (noting that the "percentage-of-the-fund approach is the method [that should be] utilized in most common fund cases"); *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 246–49 (1985) (concluding that courts should generally use the percentage method in common fund cases).

[21] *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1241 (D.N.M. 2016).  *Accord, e.g.*, *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (noting that the percentage method "provides a powerful incentive for the efficient prosecution and early resolution of litigation"); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993) ("It matters little to the class how much the attorney spends in time or money to reach a successful result."); *Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *5 (D. Colo. Apr. 22, 2015) ("The Tenth Circuit favors the common fund approach, as opposed to the lodestar method, because a percentage of the common fund is less subjective than the lodestar plus multiplier approach, matches the marketplace most closely, and is the better suited approach when class counsel were retained on a contingent fee basis . . . ." (citation omitted)); *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (emphasizing that the percentage method "aligns the interests of counsel and the class by allowing class counsel to directly benefit from increasing the size of the class fund"); *see also* NAT'L ASS'N OF CONSUMER ADVOCATES, STANDARDS AND GUIDELINES FOR LITIGATING AND SETTLING CONSUMER CLASS ACTIONS 27 (3d ed. 2014) (noting that the percentage method is preferable from consumers' perspective because it "keeps class counsel's financial interest closely aligned with that of the class itself" and "approximates the 'free market' negotiated fees obtained in traditional contingency litigation").

[22] *See, e.g.*, *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 418 (2d Cir. 2010) ("The lodestar method . . . creates an incentive for attorneys to bill as many hours as possible, to do unnecessary work, and for these reasons also can create a disincentive to early settlement.  Under certain conditions, moreover, lodestar awards can create the near opposite incentive, encouraging attorneys to settle before trial even when it is not in their clients' best interest."); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.5 (9th Cir. 2002) ("[I]t is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary . . . , [and] the lodestar method does not reward early settlement."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("[T]he lodestar approach creates [an] incentive to run up the billable hours."); *Swedish Hosp. Corp*, 1 F.3d at 1268–69 ("[U]sing the lodestar approach . . . attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive attorneys [and] . . . there is a strong incentive against early settlement since attorneys will earn more the longer a litigation lasts."); *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, slip op. at 18 (N.D. Cal. Mar. 18, 2013) ("[T]he lodestar method's limitations lie in its creating a possible incentive for counsel to expend more hours than is necessary on a litigation or to delay settlement."); REPORT OF THE FEDERAL COURTS STUDY COMMITTEE 104 (Fed. Judicial Ctr. Apr. 2, 1990), *available at* https://www.fjc.gov/sites/default/files/2012/RepFCSC.pdf (noting that the lodestar method gives class counsel "incentives to run up hours unnecessarily").

[23] *In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407, 1411 (D. Wyo. 1998).

approach instead rewards counsel for success and penalizes it for failure."[24]   Moreover, the lodestar method has been heavily criticized by courts and commentators as "difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result."[25]

50.   Here, the policies favoring the percentage method are directly applicable.  Class counsel took on a difficult case and did everything possible (including obtaining class certification and winning a Kansas class bellwether trial) to achieve the maximum possible settlement.  In any event, although there is no need for the Court to undertake the time-consuming effort of a lodestar cross check, the fee award sought by MDL class counsel here is fully supported by a lodestar cross check, which I conducted for the MDL common benefit counsel (*see* ¶¶ 103–127).

### 2.  The 33⅓ Percent Requested Here Is Reasonable

51.   As noted, class counsel seek attorneys' fees of 33⅓ percent of the $1.51 billion settlement fund.  As I discuss below, it is my opinion that this percentage is reasonable.

### a.  The Percentage Requested Is Justified Under the *Johnson* Factors Based on the Compelling Circumstances in This Case.

52.   The determination of the reasonableness of fees must depend on the precise facts and circumstances of the particular case.  Courts in the Tenth Circuit have long recognized that attorneys' fees awards must be "decided on the totality of the circumstances of the case and the uniqueness of the litigation."[26]   For a very difficult and risky case, a high award is justified,

---

[24] *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 762 (S.D. Ohio 2007).

[25] *Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1108 (D.N.M. 1999).  *Accord, e.g.*, *Swedish Hosp. Corp.*, 1 F.3d at 1269–70 ("The lodestar method makes considerable demands upon judicial resources since it can be exceptionally difficult for a court to review attorney billing information over the life of a complex litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable. . . . A related weakness in the lodestar approach is that it often results in substantial delay in distribution of the common fund to the class. . . ."); REPORT OF THE FEDERAL COURTS STUDY COMMITTEE 104 (Fed. Judicial Ctr. Apr. 2, 1990), *available at* https://www.fjc.gov/sites/default/files/2012/RepFCSC.pdf (noting that the lodestar method may "unduly burden judges").

[26] *In re King Resources Co. Sec. Litig.*, 420 F. Supp. 610, 640 (D. Colo. 1976).  *Accord, e.g.*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001) ("[A] district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case."); *Urethane*, 2016 WL 4060156, at *5 (noting, in rejecting objectors' contention that percentage fee awards should necessarily be lower in mega-fund cases, that "the fee percentage must be determined on a case-by-case basis . . . based on the unique circumstances of the case."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1359 (S.D. Fla. 2011) ("There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case.")

while a lower award would be appropriate where such concerns are not present.[27]

53.  In the Tenth Circuit, the facts and circumstances are assessed by looking at 12 specific factors.  These so-called *Johnson* factors, originally set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*,[28] are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[29]

The *Johnson* factors are considered "in totality," and no one factor is dispositive.[30]  Moreover, courts in the Tenth Circuit have recognized that "[t]he weight to be given to each of the *Johnson* factors varies from case to case, and each factor is not always applicable in every case."[31]  Moreover, "[i]n a common fund case, the greatest weight should be given to the monetary results achieved for the benefit of the class."[32]

---

[27] *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d 201, 221 (3d Cir. 2001) (noting that plaintiffs' had "a simple case in terms of liability" in rejecting the district court's fee award as excessive); *Urethane*, 2016 WL 4060156, at *4 (noting that "the case presented a great deal of risk" to class counsel in awarding attorneys' fees of 33⅓ percent of $835 million fund); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT), slip op. at 5 (D. Conn. Dec. 9, 2014) (Dkt. No. 521) (noting that "Class Counsel undertook numerous and significant risks" in awarding attorneys' fees of 33⅓ percent of $297 million fund); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013) (noting that "[t]here were significant risks involved in this litigation" and that "the case did not lend itself to easy proof of liability or damages" in awarding attorneys' fees of 33 percent); *Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at *6 (E.D. Okla. Aug. 16, 2011) (emphasizing that the case had been "prosecuted to judgment and through two appeals" in awarding attorneys' fees of 42 percent); *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 148 (E.D. Pa. 2000) (noting that "[v]irtually nothing about this case was simplistic" in awarding attorneys' fees of 33⅓ percent); *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1259 (C.D. Cal. 1997) (noting that "[t]he facts of [the] case weighed heavily in the Class' favor from the start" in awarding attorneys' fees of 10 percent).

[28] 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).

[29] *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454–55 (10th Cir. 1988).

[30] *In re Copley Pharm., Inc. Albuterol Prods. Liab. Litig.*, 50 F. Supp. 2d 1141, 1156 (D. Wyo. 1999).

[31] *Lucken Family Ltd. P'ship, LLLP v. Ultra Resources, Inc.*, No. 09-cv-01543-REB-KMT, 2010 WL 5387559, at *3 (D. Colo. Dec. 22, 2010).

[32] *Id.* at *3.  *See also Urethane*, 2016 WL 4060156, at *4 ("[T]he amount involved and the results obtained . . . may be given greater weight when, as in this case, the trial judge determines that the recovery was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class." (citation and internal quotation marks omitted)).

54.  In my opinion, the *Johnson* factors, taken as a whole, support the reasonableness of the 33⅓ percent fee award requested in this case.  I address each factor separately below.

### i.  Time and Labor Required

55.  This case has required (and will continue to require) a significant investment of time by class counsel.  As set forth more fully below (*see* ¶¶ 105, 119), to date, MDL class counsel have devoted 142,823.50 hours to the case, and expect to devote at least 500–1,000 hours in the future to implement the settlement.

### ii.  Novelty and Difficulty of the Questions

56.  Class counsel faced numerous difficulties and challenges.  They include the following:

57.  **Difficult Legal Claims.**  There were a number of exceptionally difficult legal issues in this case, particularly in light of the unique underlying facts of the litigation.  Syngenta argued that the alleged tort law duty underlying the complaint was "novel" because it required Syngenta "not to sell Viptera at all in the U.S. [after being approved to do so] absent Chinese approval— thereby effectively giving China a veto over the sale of U.S.-approved biotechnology *in the U.S.*"[33]  Syngenta's legal challenges resulted in hundreds of pages of briefing and numerous orders of the Court.  Syngenta raised challenges to the entire array of claims asserted by plaintiffs, including claims under the Lanham Act; state law claims of negligence, nuisance, negligent misrepresentation, tortious interference, and misrepresentation; and claims under state consumer protection acts.  In addition to contending that various elements of the claims could not be satisfied, Syngenta raised additional overarching legal and policy issues, including:  whether the Lanham Act should apply to the facts here, which are not the typical trademark/trade dress claims; the interpretation and application of the principles of proximate and superseding cause, where the decision to reject U.S. corn was made by a foreign state; application of the economic loss doctrine to tort claims for financial injury; and application of the Grain Standards Act (7 U.S.C. §§ 71 et seq.) and federal preemption.  Syngenta also contested the availability of punitive damages.  Syngenta succeeded on some of its arguments (such as successfully obtaining summary judgment on plaintiffs' Lanham Act claims, as well as all of plaintiffs' claims of negligence based on alleged misrepresentation, voluntary undertaking, failure to warn, and duty

---

[33] Rule 23(f) Petition for Permission to Appeal Class Certification Order at 4–5 (10th Cir.) (filed Oct. 11, 2016) (emphasis in original).

to recall (*see* ¶ 30)).   But even where Syngenta was not successful, its arguments offered potentially dispositive grounds for appeal (both in the Tenth Circuit and in the U.S. Supreme Court).[34]

58.  Substantial attorneys' fees are justified when the legal issues are particularly complex. Indeed, this Court in the *Urethane Antitrust* litigation relied heavily on the fact that it "was an extremely difficult and complex case . . .with significant disputed issues arising at [various stages of the litigation]."[35]   In awarding attorneys' fees of 33⅓ percent, the Court emphasized that "[l]iability on these claims was far from certain, and thus the case presented a great deal of risk" to class counsel.[36]   Similarly, in *Cullen v. Whitman Medical Corp.*, the court noted, in awarding attorneys' fees of 33⅓ percent, that "[v]irtually nothing about this case was simplistic . . . [and that] both the legal theories and litigation process were complex."[37]

59.  **Difficult Factual Issues.**  There were a number of exceptionally difficult factual issues embedded in plaintiffs' claims and Syngenta's defenses.  Those claims and defenses required not only proof of Syngenta's conduct and China's reasons for rejecting the U.S. corn, but also proof of the conduct of numerous third parties involved in the transportation and trade of U.S. corn, including grain handlers, trade associations, and foreign buyers.  Plaintiffs' bone of contention— that Syngenta should have taken steps to limit the launch of its seeds until it had obtained China's approval—necessarily required proof that those steps would have prevented the trade

---

[34] The difficulty of the legal issues is also confirmed by the fact that in Ohio, the court dismissed an ethanol production facility's entire lawsuit against Syngenta, accepting Syngenta's argument that the company had no duty to prevent the economic harm alleged by plaintiffs.  *See Fostoria Ethanol v. Syngenta Seeds, Inc.*, No. 15-cv-00323, slip op. at 7 (C.P. Seneca Cnty., Ohio June 28, 2017).  Such prior success by the defendant has been relied upon by courts in awarding fees.  *See, e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *7 (E.D. Pa. Apr. 5, 2018) ("Class Counsel was actually fighting *against* prior cases in which the NFL Parties had successfully utilized defenses to obtain pretrial dismissals.  This litigation required Class Counsel to reinvent the Plaintiffs' position by conducting new research, developing experts, and briefing issues without the benefit of previous successful lawsuits." (emphasis in original)).  In addition, Syngenta cited and relied on earlier cases that had rejected similar claims against seed manufacturers.  *See* Syngenta's Mem. of Law in Support of Mot. to Dismiss Producer & Non-Producer Pls.' Amended Class Action Master Complaints at 31 (Dkt. No. 857) (citing *Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088, 1093 (E.D. Mo. 2003); *Hoffman v. Monsanto Canada*, 2005 SKQB 225, 2005 S.K.C. LEXIS 330 (Can. Sask. Q.B. May 11, 2005)).

[35] *Urethane*, 2016 WL 4060156, at *5.

[36] *Id.* at *4.

[37] 197 F.R.D. 136, 148 (E.D. Pa. 2000).  *Accord, e.g.*, *Buettgen v. Harless*, No. 3:09-cv-00791-K, 2013 WL 12303194, at *2 (N.D. Tex. Nov. 13, 2013) (emphasizing in awarding attorneys' fees that the case involved "particularly complex issues of law" and "numerous rounds of complicated briefing"); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 445 (S.D. Tex. 1999) (relying on the existence of "difficult questions" of law in awarding "an above-average recovery").

disruption.  Also, Syngenta argued that China's reasons for rejection of U.S. corn were put in issue under plaintiffs' theory of the case, even though plaintiffs could not, in any way, compel direct evidence from a foreign state.

60.  At bottom, Syngenta raised substantial arguments pointing to the difficulties in proving the nexus between its actions and plaintiffs' injuries.  As it argued:

> Plaintiffs' convoluted theory of causation winds its way through a host of actions taken by others *after* Syngenta relinquished control of its Viptera seed, including farmers who planted the seed (allowing cross-pollination); grain elevators that bought and mixed corn without distinguishing for Viptera (and then shipped it to China knowing that it likely contained Viptera); and Chinese officials who conveniently invoked Viptera as the reason for turning away U.S. corn after the price of corn had dropped over 30% (thus giving Chinese buyers a way out of expensive contracts).  And the last step in the chain turns on Plaintiffs' speculation that China's actions lowered the price of U.S. corn.[38]

61.  Class counsel's task in combating Syngenta's arguments was made more challenging by their inability to subpoena documents from China.  Without access to that critical information, it became difficult for class counsel to explain China's actions and to refute Syngenta's arguments that China acted for purely political reasons rather than because of the presence of Viptera in corn shipments.

62.  The existence of difficult factual issues can warrant substantial fees.  For example, in awarding attorneys' fees of more than 30 percent in *Allapattah Services, Inc. v. Exxon Corp.*, the district court emphasized that "[t]he factual and legal framework out of which this case arose made it an extraordinarily difficult case."[39]  Similarly, in the *Heritage Bond Litigation*, the court noted that "the case was factually complex" and reasoned that "[t]he complexity of this case justifies the requested fees [of 33⅓ percent]. . . .[T]his case cannot be considered a garden variety securities class action."[40]

63.  **Difficult Expert Issues.** Substantial briefing (and analysis by this Court) was

---

[38] Def.'s Mem. of Law in Support of Mot. to Dismiss at 2 (Dkt. No. 857) (emphasis in original).

[39] 454 F. Supp. 2d 1185, 1206 (S.D. Fla. 2006).

[40] *In re Heritage Bond Litig.*, No. 02-ML-01475-DT, 2005 WL 1594403, at *20–21 (C.D. Cal. June 10, 2005). *Accord, e.g., Cullen*, 197 F.R.D. at 148 (relying on factual complexity and voluminous discovery in awarding fees); *Eashoo v. Iovate Health Sciences U.S.A., Inc.*, No. 15-cv-01726-BRO (PJWx), 2016 WL 6205785, at *10 (C.D. Cal. Apr. 5, 2016) (similar); *Schwartz v. TXU Corp.*, No. 3:02-cv-02243-K, 2005 WL 3148350, at *29 (N.D. Tex. Nov. 8, 2005) (similar).

necessitated by Syngenta's argument that plaintiffs' various experts did not satisfy the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[41]  Especially challenging issues arose because of the effort of plaintiffs' experts to address classwide injury by (1) focusing on the price of corn on the Chicago Board of Trade (CBOT) and then (2) opining that price changes on the CBOT caused uniform changes nationwide to all local corn prices.  Plaintiffs had to establish via expert testimony a counterfactual economic world where Syngenta did not commercialize—or limited the commercialization of—Viptera and Duracade until the company received Chinese approval. This required experts who could reliably predict what Chinese demand for U.S. corn would have been in this counterfactual world and what impact that demand would have had on U.S. corn prices.  To prevail in the Kansas class jury trial, plaintiffs also had to develop an economic model that applied to the entire class, including persuading the Court and the jury that changes in the CBOT price would be reflected in changes to all local prices paid to producers in the class. Moreover, plaintiffs had to establish what the standard of care should be for GMO manufacturers in commercializing new traits that have not obtained export approvals in all key export markets. I am advised that plaintiffs developed expert testimony through one of the third-party grain handlers in the case, and navigated the use of that expert at trial in the face of potentially difficult cross-examination on bias, based on his employment with a plaintiff who was suing Syngenta. In addition, class counsel successfully obtained orders compelling the production of documents from Syngenta's standard-of-care expert, ultimately resulting in that expert's withdrawal as an expert in this litigation.

64.  The existence of hotly contested *Daubert* issues can warrant substantial fees.   For example, the court in the *Flonase Antitrust Litigation*, in awarding 33⅓ percent of the settlement fund as attorneys' fees, relied upon the fact that class counsel had litigated a number of hotly contested *Daubert* challenges.[42]   Similarly, in *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, the court cited "multiple *Daubert* challenges" in awarding attorneys' fees of 33⅓ percent.[43]

---

[41] 509 U.S. 579 (1993).

[42] *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013).

[43] No. 1:04-cv-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012).  *Accord, e.g.*, *Kleen Prods. LLC v. Int'l Paper Co.*, No. 1:10-cv-05711, 2017 WL 5247928, at *5 (N.D. Ill. Oct. 17, 2017) (relying on "substantial motion practice, including . . . motions to exclude expert testimony under *Daubert*" in awarding fees); *Cook v. Rockwell Int'l Corp.*, No. 90-cv-00181-JLK, 2017 WL 5076498, at *3 (D. Colo. Apr. 28, 2017) (relying on multiple

65. **Hotly Contested Class Certification Issues.** Although I ultimately agree with this Court's decision to certify a class, given the overarching common issues, there is no question that class counsel took a serious risk that class certification would be denied. In the case that arguably was the most similar to this one, *In re Genetically Modified Rice Litigation*, the court denied class certification.[44] Syngenta relied extensively on that case in opposing class certification. *See* Syngenta's Opposition to Producer Pls.' Mot. for Class Certification at 5–6, 29, 75, 83, 111–12, 115–16, 124 (Dkt. No. 2335). Syngenta also made numerous other forceful arguments in vigorously contesting class certification, including: that the class was not ascertainable because individualized inquiries were required regarding each producer; that individualized inquiries were required to determine whether specific class members were injured (thus defeating commonality and predominance); that individualized inquiries were required to resolve Syngenta's affirmative defenses (including failure to mitigate damages); that a class action was not the superior mechanism; and that an issues class under Rule 23(c)(4) would not be efficient or consistent with the Seventh Amendment. Syngenta also attacked plaintiffs' experts in opposing class certification, arguing that the Court must resolve any disputes between the class's experts and Syngenta's experts, instead of just ruling that, under *Daubert*, the class's experts offered admissible testimony. The briefing and evidentiary submissions on class certification were extensive (*see* ¶ 27), and Syngenta's arguments were supported by substantial authority.

66. Although Syngenta did not prevail in opposing class certification, and it was unsuccessful in seeking Rule 23(f) interlocutory review, it nonetheless raised substantial arguments for appealing the class certification ruling after final judgment. At the same time, class counsel's success in obtaining certification undoubtedly placed substantial settlement pressure on Syngenta, thereby contributing to the $1.51 billion settlement.[45] After the $217.7 million judgment in the Kansas class bellwether trial, Syngenta faced even greater damages in

---

*Daubert* motions in awarding fees); *Buettgen*, 2013 WL 12303194, at *2 (relying on contentious *Daubert* motions in awarding fees); *Allapattah*, 454 F. Supp. 2d at 1193, 1232 (noting "week-long *Daubert* evidentiary hearing" in awarding fees).

[44] 251 F.R.D. 392, 398 (E.D. Mo. 2008).

[45] *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 475 (2013) (noting the "[s]ettlement pressure exerted by class certification"); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 629 (8th Cir. 2011) (noting that "many defendants face substantial settlement pressures as a result of class certification" (citation omitted)).

the forthcoming Minnesota, Arkansas, Missouri, Illinois, Iowa, Ohio, Nebraska, and Missouri trials.  Thus, by the time Syngenta might have received an appellate ruling on class certification (or any of several other dispositive issues) from the Tenth Circuit, it potentially would have incurred multiple jury verdicts as large as (or larger than) the Kansas verdict.  Thus, class counsel's efforts in obtaining class certification in the face of numerous hotly contested issues were immensely beneficial to the class.

67.  A number of courts have relied on the fact that class counsel litigated difficult class certification issues in justifying a substantial percentage fee award.   The district court in *Montague v. Dixie National Life Insurance*, for example, reasoned that the fact that the case "was hotly contested both on the merits of the claims *and on the issue of class certification . . .* provide[d] support for a 33 percent fee award."[46]  Similarly, in awarding attorneys' fees of 33⅓ percent of the $586 million settlement fund in the *Initial Public Offering Securities Litigation*, the court emphasized that "class counsel briefed and argued three hotly contested class certification motions."[47]

68.  **Contested Trial.**  One of the most compelling justifications for the award sought here is the fact that MDL class counsel conducted a full trial on the merits.[48]  That trial, involving a Kansas class of more than 7,000 Kansas growers, resulted in a verdict of $217.7 million in compensatory damages—100 percent of the compensatory relief requested by plaintiffs.  Syngenta vigorously disputed plaintiffs' claims at trial and brought in a distinguished and experienced trial team of seven Kirkland & Ellis partners, including Mike Brock—one of the country's most prominent trial lawyers in bet-the-company litigation—and additional attorneys and staff.  Realistically, I have no doubt that had plaintiffs lost the trial, their ability to negotiate a settlement anywhere near the magnitude of $1.51 billion would have vanished.  The fact that MDL class counsel achieved a major verdict against such formidable opposition helped pave the way for the substantial global settlement.

---

[46] No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D.S.C. Aug. 17, 2011) (emphasis added).

[47] *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 508 (S.D.N.Y. 2009).  *Accord, e.g.*, *In re Schering-Plough Corp. Enhance Sec. Litig.*, Nos. 08-397 & 08-2177 (DMC) (JAD), 2013 WL 5505744, at *26 (D.N.J. Oct. 1, 2013) (relying on contested class certification and "unusual class certification issues" in awarding fees); *Cullen*, 197 F.R.D. at 148 (relying on contested class certification motions in awarding fees); *Heritage Bond*, 2005 WL 1594403, at *20 (similar).

[48] Notably, class counsel also conducted portions of two bellwether trials in Minnesota.  *See* ¶¶ 31, 34.

69.  Because relatively few class actions go to trial,[49] courts reviewing attorneys' fee requests justifiably give significant weight to the fact—when present—that a contested trial occurred.  For example, in its order awarding attorneys' fees in the *Deepwater Horizon Litigation*, the court noted that class counsel "did something that rarely happens in class actions: they actually went to trial."[50]  The court emphasized that the "massive two-phase trial effort" weighed in favor of the fees requested by class counsel.[51]  Similarly, in *Allapattah*, the district court emphasized that the settlement was reached only after class counsel succeeded at trial, noting that "[c]lass counsel . . . faced a potential catastrophic risk in the event the case was lost at trial."[52]  And in *Urethane*, this Court relied heavily in its fee award on the impressive jury verdict obtained by class counsel.[53]  The Court emphasized that "the case was not settled pretrial" but rather was litigated before a jury, resulting in a verdict of over $400 million—an "incredible success on the merits."[54]

70.  **Absence of Government Litigation.**  In some instances, private counsel are aided by the existence of parallel government litigation.  Such government litigation—which may involve

---

[49] *See, e.g.*, *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013) (noting that it is "the rare case in which a class action not dismissed pretrial goes to trial rather than being settled"); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1299 (11th Cir. 1999) ("Rarely do class action litigations proceed to trial."); Robert H. Klonoff, *Class Actions in the Year 2026: A Prognosis*, 65 EMORY L.J. 1569, 1642 (2016) (indicating that "settlement is still the norm").

[50] *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974, at *18 (E.D. La. Oct. 25, 2016).

[51] *Id.*

[52] 454 F. Supp. 2d 1185, 1203 (S.D. Fla. 2006).

[53] *Urethane*, 2016 WL 4060156, at *4–7.

[54] *Id.* at *4.  *Accord, e.g.*, *Brady v. Air Line Pilots Ass'n*, 627 F. App'x 142, 144–45 (3d Cir. 2015) (emphasizing that "Class Counsel conducted a five-week liability trial that resulted in a jury verdict in favor of the class" in upholding district court's 30 percent attorneys' fee award); *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-cv-02147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) (awarding attorneys' fees of 33⅓ of $145 million fund based in large part on favorable jury verdict secured by class counsel, and noting:  "[S]ecurities class actions rarely proceed to trial . . . [and] there was a great risk that this case would not result in a favorable verdict after trial."); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 768 F. Supp. 912, 931–32 (D.P.R. 1991) (relying on multi-phase trial in setting aside total attorneys' fees of $68 million out of $220 million fund, or 30.9 percent), *rev'd on other grounds*, 56 F.3d 295 (1st Cir. 1995).  Indeed, courts give substantial weight in awarding fees to the fact that a case was *close* to going to trial.  *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, Nos. 11-cv-8405(CM), 14-cv-8714(CM), 2015 WL 10847814, at *12–13 (S.D.N.Y. Sept. 9, 2015) (noting, in awarding 33⅓ percent of cash settlement fund, that "the litigation was hard-fought" and a settlement was reached "on the eve of trial" and after an "all-day mock trial"); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 99, 104, 106 (E.D. Pa. 2013) (noting that class counsel "had completed significant preparation for trial" in awarding attorneys' fees of 33⅓ percent); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-cv-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012) (emphasizing that "[t]he case settled only within 48 hours of trial" in awarding attorneys' fees of 33⅓ percent).  *A fortiori*, a completed, successful trial is a strong circumstance justifying large fees.

both criminal actions and civil enforcement—can provide valuable resources and can help uncover underlying wrongdoing.  Thus, some courts have noted the heavy involvement of the government in setting awards below what class counsel requested.  For example, in reducing class counsel's fee request in the *AOL Time Warner Securities Litigation*, the court noted that class counsel "benefited to a degree from work performed by others," including "[p]arallel government investigations."[55]  Similarly, in explaining its fee award of only 10 percent in *In re Quantum Health Resources, Inc.*, the court emphasized that "[t]he facts of [the] case weighed heavily in the Class' favor from the start, largely because the material allegations of the complaint were supported by the unequivocal results of public investigations conducted by [California state agencies]."[56]  Conversely, courts have also noted the *absence* of government involvement in approving substantial fee requests.  For example, in *In re Gulf Oil/Cities Services Tender Offer Litigation*, the court emphasized that the case was "not [one] where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  [Class counsel] did all the work on their own."[57]  As this Court noted in *Urethane*, the fact that "[class] [c]ounsel had to build this case on their own, *without the help of a government investigation or prosecution*," weighed in favor of the requested 33⅓ percent fee award.[58]

71.  Here, class counsel had no assistance of any kind from the government.  They bore the entire burden of investigating and proving Syngenta's alleged improper conduct.  Indeed, statements and actions by the U.S. government were used *against* class counsel:  Syngenta sought to use U.S. government deregulation as a defense in this case, cited to U.S. government reports on China to support its argument that China's biotechnology approval process was

---

[55] *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02-cv-05575 (SWK), 2006 WL 3057232, at *17 (S.D.N.Y. Oct. 25, 2006).

[56] 962 F. Supp. 1254, 1259 (C.D. Cal. 1997).

[57] 142 F.R.D. 588, 597 (S.D.N.Y. 1992).

[58] *Urethane*, 2016 WL 4060156, at *6 (emphasis added).  *Accord, e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *7 (E.D. Pa. Apr. 5, 2018) ("This was not a case where government prosecutions laid the groundwork for private litigation.  This case required a pioneering effort by Class Counsel." (citation, internal quotation marks, and brackets omitted)); *Standard Iron Works v. ArcelorMittal*, No. 08-cv-05214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (noting, in awarding attorneys' fees of 33 percent, that "Class Counsel initiated and developed this case with no assistance from any prior government investigation or prosecution"); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 748–49 (E.D. Pa. 2013) (relying on absence of government investigation); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) (similar).

politically driven, and hired a former U.S. trade official as one of its experts.

72. **No Public Admission of Liability.** In some instances, class counsel benefit from the fact that the defendant has publicly admitted wrongdoing. Such admissions no doubt make it easier for class counsel to prosecute the claims and negotiate a settlement. For example, in *Quantum Health*, the court emphasized the "significant public admissions by Quantum" in concluding that class counsel did not face "any significant risk" and awarding attorneys' fees of 10 percent of the common fund.[59] Here, Syngenta vigorously contested liability prior to settlement, and it still admits no wrongdoing even today despite its agreement to pay $1.51 billion. Indeed, Syngenta even argued at trial that its actions *benefited* farmers, rather than harming them.

73. **No Public Relations Reason to Settle.** In some cases, widespread adverse publicity creates a public relations nightmare for a defendant, thus increasing the need for such a defendant to settle on terms favorable to plaintiffs. Examples include the *Deepwater Horizon Litigation*, where British Petroleum faced "a torrent of criticism" in the wake of the oil spill disaster;[60] the *Volkswagen Clean Diesel Litigation*, where Volkswagen's admission of fraud shook consumer confidence and resulted in "something like a tsunami" of bad press;[61] and the *NFL Concussion Litigation*, where commentators noted that "regular updates from a courtroom had the potential to be a PR nightmare for the NFL, especially because of the possibility of unflattering documents coming to light."[62] Here, there were no similar pressures that compelled Syngenta to seek an early resolution. To the contrary, as noted (¶ 33), the company showed no

---

[59] 962 F. Supp. at 1259. *See also, e.g.*, *In re Schering-Plough Corp. Enhance Sec. Litig.*, Nos. 08-397 & 08-2177 (DMC) (JAD), 2013 WL 5505744, at *43 (D.N.J. Oct. 1, 2013) (noting that the litigation "was no easy task for [class counsel] because no Defendant ever admitted wrongdoing"). Additionally, even if the defendant has not publicly admitted wrongdoing, courts have focused on the relative ease of establishing liability in awarding fees below those requested by class counsel. For example, the Third Circuit, in rejecting the district court's fee award in *In re Cendant Corp. Litigation*, emphasized that plaintiffs had "a simple case in terms of liability." 264 F.3d 201, 221 (3d Cir. 2001).

[60] Leon Kaye, *Five Years After Deepwater Horizon, Can BP Repair Its Reputation?*, SUSTAINABLE BRANDS (Feb. 19, 2015), http://www.sustainablebrands.com/news_and_views/marketing_comms/leon_kaye/five_years_after_deepwater_horizon_can_bp_repair_its_reputa.

[61] Danny Hakim, *VW's Crisis Strategy: Forward, Reverse, U-Turn*, N.Y. TIMES (Feb. 26, 2016), https://www.nytimes.com/2016/02/28/business/international/vws-crisis-strategy-forward-reverse-u-turn.html.

[62] Dan Diamond, *NFL Pays $765 Million to Settle Concussion Case, Still Wins*, FORBES (Aug. 29, 2013), https://www.forbes.com/sites/dandiamond/2013/08/29/nfl-pays-765-million-to-settle-concussion-case-still-wins/#67a1d1317e62.

interest in settlement until after its defeat in the Kansas bellwether trial.

74.  In sum, class counsel faced numerous difficult circumstances that justify a fee award of 33⅓ percent.  This Court's observations in *Urethane* are equally applicable here:

> [Class] counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, . . . and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything . . . .[63]

### iii.  Skill Requisite to Perform the Legal Service Properly

75.  A high level of skill was necessary to litigate and settle these cases.  As noted above (*see* ¶¶ 56–74), this case involved a number of difficult legal and factual challenges.  The plaintiffs' team needed to be at the top of their game in trial skills, legal research and analysis, class certification, knowledge of the national and international commodity system, knowledge of markets for corn (as well as the rules and regulations governing importation and exportation of genetically modified corn), and the development of technical expert testimony.

76.  Thus, it is not surprising that the team representing the class included some of the country's most accomplished class action plaintiff lawyers.  Team members have received recognition as the "The Best Lawyers in America,"[64] "Super Lawyers,"[65] and "Rising Stars."[66]

---

[63] *Urethane*, 2016 WL 4060156, at *6.

[64] The Best Lawyers in America are selected based on a peer-review process "designed to capture, as accurately as possible, the consensus opinion of leading lawyers about the professional abilities of their colleagues within the same geographical area and legal practice area." *Methodology Process*, BEST LAWYERS, https://www.bestlawyers.com/methodology (last visited July 7, 2018). Attorneys on plaintiffs' team who have been named to The Best Lawyers in America include (among others) Patrick Stueve, Norman Siegel, Steve Six, and Rachel Schwartz of Stueve Siegel Hanson, *see Attorneys*, STUEVE SIEGEL HANSON, http://www.stuevesiegel.com/ssh/about-us/attorneys.html (last visited July 7, 2018); Don Downing, Gretchen Garrison, and Jason Sapp of Gray, Ritter & Graham, *see Attorneys*, GRAY, RITTER & GRAHAM, P.C., https://www.grgpc.com/attorneys/ (last visited July 7, 2018); and Scott Powell of Hare Wynn Newell & Newton, *see Scott A. Powell*, HARE WYNN NEWELL & NEWTON, https://www.hwnn.com/our-people/scott-a-powell/ (last visited July 7, 2018).

[65] Super Lawyers are selected each year based on an extensive research and peer-evaluation process. They represent the top five percent of attorneys in each state and practice area. *See Selection Process Detail*, SUPER LAWYERS, https://www.superlawyers.com/about/selection_process_detail.html (last visited July 7, 2018). Attorneys on plaintiffs' team who have been selected as Super Lawyers include (among others) Patrick Stueve, Norman Siegel, Steve Six, and Rachel Schwartz of Stueve Siegel Hanson, *see Attorneys*, STUEVE SIEGEL HANSON, http://www.stuevesiegel.com/ssh/about-us/attorneys.html (last visited July 7, 2018); Don Downing and Gretchen Garrison of Gray, Ritter & Graham, *see Attorneys*, GRAY, RITTER & GRAHAM, P.C.,

Many have held prominent leadership roles in other major class actions and MDL cases.[67]  These are, in short, some of the country's premier complex litigation attorneys.

77.  An important factor in evaluating a proposed fee award is the quality of opposing counsel.   For example, in awarding attorneys' fees of 33⅓ percent in *Dartell v. Tibet Pharmaceuticals, Inc.*, the court noted that "the quality and vigor of opposing counsel is relevant when evaluating the quality of services rendered by [class counsel]. . . . The performance and quality of defense counsel . . . favors a finding that [class counsel] prosecuted this case with skill and efficiency."[68]  Similarly, in awarding attorneys' fees of 33⅓ percent of the $510 million fund in the *Initial Public Offering Securities Litigation*, the court noted that class counsel "were pitted against . . . prominent national defense firms," emphasizing that the favorable settlement

---

https://www.grgpc.com/attorneys/ (last visited July 7, 2018); and Dan Gustafson and Karla Gluek of Gustafson Gluek, *see Our People*, GUSTAFSON GLUEK PLLC, http://gustafsongluek.com/our-people/ (last visited July 7, 2018).

[66] Attorneys under 40 years of age or in practice for ten years or less are eligible to be designated Rising Stars if they have not been designated Super Lawyers.  The Rising Stars selection process is similarly based on independent research and a peer-evaluation process. Only 2.5 percent of eligible lawyers are designated Rising Stars.  *See The Rising Stars Selection Process*, SUPER LAWYERS, https://www.superlawyers.com/about/ selection_process_detail.html (last visited July 7, 2018).  Attorneys on plaintiffs' team who have been selected as Rising Stars include (among others) Jason Sapp of Gray, Ritter & Graham (selected for five consecutive years), *see Jason D. Sapp*, GRAY, RITTER & GRAHAM, P.C., https://www.grgpc.com/attorneys/jason-d-sapp/ (last visited July 7, 2018); and Drew York of Gray Reed & McGraw (selected 11 consecutive times as of 2018), *see Drew York*, GRAY REED & MCGRAW, http://www.grayreed.com/Our-People/Andrew-K-York (last visited July 7, 2018).

[67] For example, Clayton Clark of Clark, Love & Hutson has been appointed as national co-lead counsel in the pending *Pelvic Repair System* products liability MDL, served as plaintiffs' liaison counsel in the *Phen-Fen* and *Paxil* cases, and was appointed to the executive committee in the *Pradaxa* litigation.  *See Clayton A. Clark*, CLARK, LOVE & HUTSON, http://www.triallawfirm.com/Firm-Overview/Clayton-A-Clark.shtml (last visited July 7, 2018). Christopher Seeger of Seeger Weiss was appointed to the plaintiffs' steering committee in the *Volkswagen Clean Diesel Litigation*, served as co-lead counsel in the *NFL Concussion*, *Vioxx*, and *Testosterone Replacement Therapy Products* cases, and was appointed chair of the plaintiffs' trial committee in the *Chinese Drywall Litigation*.  *See Christopher A. Seeger*, SEEGER WEISS LLP, https://www.seegerweiss.com/attorneys/partners/christopher-a-seeger (last visited July 7, 2018).  Stephen Weiss of Seeger Weiss was appointed to the plaintiffs' executive committee in the *Polyurethane Foam* antitrust MDL, was appointed to the plaintiffs' steering committee in the *Initial Public Offering Securities Litigation*, and served as co-lead counsel in the *Vytorin/Zetia* and *StarLink Corn* MDLs.  *See Stephen A. Weiss*, SEEGER WEISS LLP, https://www.seegerweiss.com/attorneys/partners/stephen-a-weiss/ (last visited July 7, 2018).  Scott Powell of Hare Wynn Newell & Newton holds a seat on the plaintiffs' steering committee in the ongoing *Biomet M2a Magnum Hip Implant* litigation, and served as co-lead counsel in *Genetically Modified Rice*.  Don Downing of Gray, Ritter & Graham was recently appointed lead plaintiffs' counsel and chair of the plaintiffs' executive committee in the *Monsanto Dicamba Herbicide* MDL, and also served as co-lead counsel in *Genetically Modified Rice*.  Patrick Stueve of Stueve Siegel Hanson served as co-lead counsel in the *Lincoln National Life Insurance Litigation*, and as lead counsel in *Berry v. Volkswagen of America, Inc*.  *See Patrick Stueve*, STUEVE SIEGEL HANSON, http://www.stuevesiegel.com/attorney/Stueve (last visited July 7, 2018).  And Norman Siegel of Stueve Siegel Hanson has served as lead counsel in the *SFPP Right-of-Way Claims Litigation*, the *Home Depot Data Breach Litigation*, and the *Target Data Breach MDL*.  *See Norman E. Siegel*, STUEVE SIEGEL HANSON, http://www.stuevesiegel.com/attorney/Siegel (last visited July 7, 2018).  Numerous other examples could be cited.

[68] No. 14-cv-03620, 2017 WL 2815073, at *9–10 (D.N.J. June 29, 2017) (citations and internal quotation marks omitted).

achieved "against such formidable opponents [was] an impressive feat."[69]   Numerous other courts have applied similar reasoning.[70]

78.   Not surprisingly, Syngenta retained some of the top defense lawyers in the country, including (as noted) Mike Brock and others from Kirkland & Ellis.   There can be no serious doubt that Kirkland & Ellis is a prestigious and formidable national law firm.   Indeed, Kirkland generally—and Brock in particular—have received widespread recognition.[71]   Berkowitz Oliver, the Kansas City-based defense firm representing Syngenta, likewise has a stellar national reputation.[72]   The fact that class counsel achieved such an impressive settlement against these top-flight defense attorneys is a testament to class counsel's skill.

---

[69] *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 510 (S.D.N.Y. 2009).

[70] *See, e.g.*, *Allapattah*, 454 F. Supp. 2d at 1207 ("Further adding to the difficulty of the case was the quality of Plaintiffs' legal adversaries.   Exxon hired some of the most able lawyers and experts in America and spared no expense in doing so."); *Billitteri v. Sec. Am., Inc.*, Nos. 3:09-cv-01568-F & 3:10-cv-01833-F, 2011 WL 3585983, at *7 (N.D. Tex. Aug. 4, 2011) ("Because of the extremely effective work of opposing counsel . . . the skill required here . . . certainly justifies the contemplated [fee] award."); *In re OSB Antitrust Litig.*, No. 06-cv-00826 (D. Pa. Dec. 9, 2008) (Dkt. No. 947) (noting, in awarding attorneys' fees of 33⅓ percent, that "counsel for Defendants—dozens of extremely distinguished lawyers from across the country—skillfully and vigorously opposed [class counsel]"); *Schwartz v. TXU Corp.*, No. 3:02-cv-2243-K, 2005 WL 3148350, at *29–30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys.   The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation."); *Walco Investments, Inc. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) ("Given the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude [than class counsel] could have achieved similar results"); *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1377 (C.D. Cal. 1977) ("[P]laintiff's attorneys in this class action have been up against established and skilled defense lawyers, and should be compensated accordingly."); *Arenson v. Bd. of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974) (emphasizing, in awarding attorneys' fees to class counsel, that "attorneys for the defendants represent the cream of the antitrust bar in the United States").

[71] *See, e.g.*, *Mike Brock, P.C. - Partner*, KIRKLAND & ELLIS LLP, https://www.kirkland.com/sitecontent.cfm? contentId=220&itemid=11248&section=1 (last visited July 7, 2018) (listing numerous accolades and awards received by Mike Brock and the Kirkland & Ellis firm, including, *e.g.*, awards for top trial lawyer(s), top litigation firm, and The Best Lawyers in America").   Brock led the trial team representing British Petroleum in the *Deepwater Horizon Litigation*, represented Merck Pharmaceuticals in the *Vioxx* and *Fosamax* cases, and has received prominent recognition as a leading trial lawyer in bet-the-company litigation.   *See* Andrew Westney, *Trial Ace: Kikland's Robert C. 'Mike' Brock*, LAW360 (Aug. 27, 2015), https://www.law360.com/articles/696061/trial-ace-kirkland-s-robert-c-mike-brock.

[72]   Berkowitz Oliver counts among its clients BMW of North America, Ford Motor Company, H&R Block, Hyundai Motors America, Mazda Motors of America, and Morgan Stanley Smith Barney.   *See About Us*, BERKOWITZ OLIVER, http://www.berkowitzoliver.com/about-us/ (last visited July 7, 2018).   Lead attorney Thomas Schult has been named to the Best Lawyers in America in numerous categories, has been repeatedly selected as a Super Lawyer, and has tried numerous major cases.   *See Thomas P. Schult*, BERKOWITZ OLIVER, http://www.berkowitzoliver.com/people/thomas-schult/ (last visited July 7, 2018).

### iv.  Preclusion of Other Employment Due to Acceptance of the Case

79.  As a result of this case, the lead firms representing plaintiffs were clearly hampered in their ability to take on significant other work.  The demands of this case were enormous by any measure.  At least five lawyers have billed more than 5,000 hours on the case; at least 12 lawyers have billed more than 3,000 hours; and at least 20 lawyers and paralegals have billed more than 2,000 hours.  More than 180 depositions were taken on both sides, including depositions of current and former Syngenta employees, plaintiffs, and third parties in the United States, Great Britain, Hong Kong, and Australia, and depositions of numerous experts.  Millions of pages of documents and electronic records were prepared, exchanged, and reviewed during discovery, including voluminous interrogatories and tens of thousands of Chinese regulatory documents, many of which required translation. Co-lead counsel Patrick Stueve, Scott Powell, Don Downing, and William Chaney detail in their voluminous declarations the massive discovery efforts undertaken by plaintiffs.[73]

80.  This case has been a huge resource drain on the various plaintiffs' law firms involved, and has significantly impeded the ability of those firms to take on other work.  For example, Patrick Stueve notes that "Stueve Siegel Hanson's attorneys and staff collectively spent more time on this MDL than the firm has ever spent on a single case in the history of the firm."  Stueve Decl. ¶ 669.  Stueve himself "worked almost exclusively on this case for the past several years," and thus "spent little, if any, time evaluating and developing new cases."  *Id*. ¶ 670.  Ultimately, he notes that he and his firm "put this case first, above and beyond other business opportunities."  *Id*.  Given the major challenges in this case (*see* ¶¶ 56–74), I have no doubt that such commitment and singular focus were reasonable and necessary, and were the reasons why plaintiffs achieved such an impressive settlement.

### v.  Customary Fee

81.  In individual contingency-fee contracts, the attorneys' fees percentage is typically 33⅓

---

[73] *See* Decl. of Patrick J. Stueve ¶¶ 237–492 (filed contemporaneously) (hereinafter "Stueve Decl."); Decl. of Scott Powell ¶¶ 100–177 (filed contemporaneously) (hereinafter "Powell Decl."); Decl. of Don Downing ¶¶ 25–26, 29–35, 37–40, 43, 45–48, 51, 86–90 (filed contemporaneously) (hereinafter "Downing Decl."); Decl. of William Chaney ¶¶ 196–278 (filed contemporaneously) (hereinafter "Chaney Decl.").

percent, although the percentage can go much higher if, for example, the case goes to trial.[74]
Here, I understand that there were potentially *thousands* of contingent fee contracts *at the 40 percent level even pre-trial*, a level that is well above the typical 33⅓ percent.[75]  In assessing reasonable fees, numerous courts have cited the actual amount of individual fee agreements.  As the Seventh Circuit has explained:

> When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys.  The court must base the award on relevant market rates and the *ex ante* risk of nonpayment.  To determine the market for attorney's fees, the court should look to actual fee contracts that were privately negotiated for similar litigation . . . .[76]

Similarly, the court in *Allapattah* noted that, "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."[77]  Here, the market rate (the rate negotiated by individual plaintiffs and counsel) was clearly well above 33⅓ percent.  The fact that so many individual plaintiffs agreed to a 40

---

[74] *See, e.g.*, *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (noting that the "usual range for contingent fees is between 33 and 50 percent"); *Urethane*, 2016 WL 4060156, at *5 (noting that "a one-third fee is customary in contingent-fee cases, and indeed that figure is often higher for complex cases or cases that proceed to trial"); *Sanchez v. Roka Akor Chicago LLC*, No. 14-cv-04645, 2017 WL 1425837, at *6 (N.D. Ill. Apr. 20, 2017) (collecting cases noting that the usual contingent fee percentage is between 33⅓ percent and 50 percent); Ted Schneyer, *Legal-Process Constraints on the Regulation of Lawyers' Contingent Fee Contracts*, 47 DEPAUL L. REV. 371, 381, 409 (1998) (noting that "standard contingent fees . . . [are] one-third of any recovery" and that fees "may vary with the stage at which the matter is resolved (*e.g.*, one-third of the recovery if the case settles before trial; forty percent thereafter)"); Eric Helland et al., *Contingent Fee Litigation in New York City*, 70 VAND. L. REV. 1971, 1971 (2017) (study finding that, in New York, contingent fees "are almost always one-third"); Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267, 286 (1998) (survey of Wisconsin attorneys revealed that "a contingency fee of 33% was by far the most common," but the "range for those cases involving a suit but not a trial was 20% to 43%[, and] [f]or those going to trial, the range was from 25% to as high as 50%").

[75] *See, e.g.*, *Montague v. Dixie Nat'l Life Ins. Co.*, No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D.S.C. Aug. 17, 2011) ("A 33% fee award from the common fund in this case is consistent with what is routinely privately negotiated in contingency fee litigation."); Eisenberg & Miller, *supra* note 20, at 35 ("Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases."); Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267, 284–86 (1998) (noting that 33⅓ percent "is the standard contingency fee figure" and finding, in a study of Wisconsin attorneys, that "a contingency fee of 33% was by far the most common, accounting for 92% of those cases").

[76] *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011).

[77] 454 F. Supp. 2d at 1211.  *Accord, e.g.*, *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94, 268 (S.D.N.Y. 1992) (noting that "what should govern [fee] awards is . . . what the market pays in similar cases").

percent contingency fee speaks volumes regarding the difficulty of the litigation and the fairness of a fee request of 33⅓ percent.

### vi.  Any Prearranged Fee

82.  As noted (*see* ¶ 81), thousands of individual farmers entered into private contingency fee contracts of 40 percent.

### vii.  Time Limitations Imposed by the Client or the Circumstances

83.  Serious time limitations were imposed in this case.  This Court held both sides' feet to the fire, resolving the complicated class certification issues, pressing forward on case management and discovery, setting tight deadlines, and moving forward with a Kansas class trial.  Similar pressures were imposed in the Minnesota litigation, including the adjudication of class certification and the commencement (on two occasions) of bellwether trials.  The intense time pressures are demonstrated by the accelerated discovery and class certification schedules, which (based on my many years of experience as a litigating partner at Jones Day) were extremely unusual.  Prior to its ruling on Syngenta's motion to dismiss, the Court permitted only "highly targeted discovery."  Thus, full discovery did not commence until October 21, 2015.  Plaintiffs completed virtually all of their discovery in seven months, and the Court's decision on class certification—which was preceded by extensive briefing, evidentiary submissions, and a hearing—was rendered within 11 months of the start of full discovery.  Moreover, within about 20 months of the start of full discovery, the parties had completed the Kansas class trial and plaintiffs had obtained the $217.7 million verdict.  And a term sheet to settle the cases for $1.51 billion was announced within only 33 months of the commencement of the MDL and 23 months after the start of full discovery.  These figures suggest that class counsel were under extreme pressure to work essentially non-stop to conduct the rigorous investigation, discovery, briefing, class certification work, and trial preparation necessary to achieve success for the class.

84.  Courts have emphasized similar litigation pressures in awarding attorneys' fees.  For example, in *Johnson*, the court noted that "priority work that delays the lawyer's other legal work is entitled to some premium."[78]  And in *Allapattah*, the court cited the "frantic pace" of the

---

[78] *Johnson*, 488 F.2d at 718.

litigation in "giv[ing] significant weight to this factor in setting the [fee] percentage."[79]

### viii.  Amount Involved and Results Obtained

85.   As noted, courts in the Tenth Circuit have widely recognized that, "in evaluating the various *Johnson* factors, the greatest weight should be given to the monetary results achieved for the benefit of the class."[80]   Here, class counsel successfully negotiated a settlement worth approximately $1.51 billion, twice as large as the *Genetically Modified Rice* settlement.   I understand that this may well be the largest agricultural settlement in history,[81] and indeed, it is one of the largest class settlements of any kind.[82]   Settlements or verdicts in excess of a billion dollars are exceedingly rare.[83]   This is the polar opposite of a case in which class members end up with little of value, such as a settlement involving worthless coupons.[84]   Here, class members will receive substantial compensation for their losses.   In my opinion, this is a superb result, especially given the difficulties noted in ¶¶ 56–74.   The fact that class counsel achieved this strong result weighs strongly in favor of the requested 33⅓ percent fee.

### ix.  Experience, Reputation, and Ability of Attorneys

86.   As noted in ¶¶ 75–78, class counsel are highly skilled and experienced class action

---

[79] 454 F. Supp. 2d at 1215.  *Accord, e.g.*, *In re OSB Antitrust Litig.*, No. 06-cv-00826, slip op. at 5 (D. Pa. Dec. 9, 2008) (Dkt. No. 947); *Lucas v. Kmart Corp.*, No. 99-cv-01923, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006).

[80] *Anderson v. Merit Energy Co.*, Nos. 07-cv-00916-LTB-BNB, 07-cv-01025-REB-MJW, 2009 WL 3378526, at *4 (D. Colo. Oct. 20, 2009).

[81] *See, e.g.*, *Syngenta Settles in Largest Ag Litigation in U.S. History*, AGDAILY (Mar. 13, 2018), https://www.agdaily.com/news/syngenta-largest-ag-litigation-u-s/ (noting that the settlement "is believed to be the largest agricultural litigation settlement in U.S. history"); *$1.51 Billion Believed to Be Largest Agricultural Litigation Settlement in U.S. History*, HIGH PLAINS/MIDWEST AG JOURNAL (Mar. 14, 2018), http://www.hpj.com/crops/billion-believed-to-be-largest-agricultural-litigation-settlement-in-us/article_6f21e1b4-2790-11e8-a7e5-6f5f4a94c8a3.html (same).

[82] *See, e.g.*, SECURITIES CLASS ACTION SERVICES, THE TOP 100 U.S. CLASS ACTION SETTLEMENTS OF ALL TIME AS OF 31 DECEMBER 2017 at 6–17 (2018), *available at* https://www.issgovernance.com/library/the-top-100-u-s-settlements-of-all-time-as-of-december-2017/ (listing only seven securities class action settlements over $1.51 billion since the passage of the Private Securities Litigation Reform Act of 1995); *List of Largest Pharmaceutical Settlements*, WIKIPEDIA, https://en.wikipedia.org/wiki/List_of_largest_pharmaceutical_settlements (last visited July 7, 2018) (listing only three pharmaceutical settlements over $1.51 billion in U.S. history).

[83] *See, e.g.*, Fitzpatrick, *supra* note 20, at 826 (study found seven settlements over $1 billion in 2006 and only one such settlement in 2007); SECURITIES CLASS ACTION SERVICES, *supra* note 82, at 6–17 (finding only 13 securities settlements over $1 billion since 1995).

[84] *See, e.g.*, *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-cv-3066-JEC, 2012 WL 12540344, at *3 (N.D. Ga. Oct. 26, 2012) (noting, in awarding attorneys' fees of 33⅓ percent, that "unlike some class settlements, the recovery here consists entirely of cash, rather than coupons or discounts on future purchases from the defendants").

attorneys, whose prior representations included many important class action and MDL cases. And they were litigating against one of the country's most prestigious and formidable law firms, Kirkland & Ellis.

### x.  Undesirability of the Case

87.  Although a number of attorneys sought leadership opportunities in the MDL and/or filed individual cases, any lawyer considering involvement on the plaintiffs' side had to understand that the litigation involved a huge commitment of time and resources, with an outcome that was anything but certain.  Plaintiffs were facing exceedingly difficult legal, factual, and expert issues. *See* ¶¶ 56–64.  And they were litigating against a defendant—and team of defense attorneys— who were willing (and financially able) to devote any and all necessary resources to achieving success.  Moreover, as fiduciaries, class counsel could not simply cut their losses and quit when the case became too challenging and expensive.[85]  Indeed, the challenges of this litigation explain why numerous plaintiffs' lawyers were able to negotiate 40 percent individual contingency fee agreements, a figure well above the typical 33⅓ percentage.  *See* ¶ 81.

### xi.  Nature and Length of Professional Relationship With the Client

88.  Because of their prior work on behalf of farmers in the *Genetically Modified Rice* litigation, three of the four MDL co-lead attorneys had pre-existing professional relationships with a small number of class members.  *See* Powell Decl. ¶ 12.  For the vast majority of class members, however, there was no such prior relationship.  Courts have generally given little weight to this factor, noting that "[t]he meaning of this factor . . . and its effect on the calculation of a reasonable fee has always been unclear."[86]  As a result, courts typically state that this particular *Johnson* factor is irrelevant or immaterial.  Here, to the extent that this factor is relevant at all, it is largely neutral.

### xii.  Awards in Similar Cases

89.  Fee awards in other cases involving significant challenges confirm the reasonableness of

---

[85] *See, e.g.*, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (noting the "fiduciary duty owed [to] the class" by class counsel); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys . . . also owe the entire class a fiduciary duty once the class complaint is filed.").

[86] *Bruner v. Spring/United Mgmt. Co.*, No. 07-cv-02164-KHV, 2009 WL 2058762, at *9 (D. Kan. July 14, 2009).

the fees sought here.  As I explain in detail below, the percentage requested here (33⅓ percent) is in line with percentages awarded in numerous other class actions.  *See* ¶ 94 (Table 1), and ¶¶ 91–101.

* * *

90.  As the above discussion reflects, analysis of the *Johnson* factors demonstrates the reasonableness of the fees sought here.  The case imposed enormous demands on class counsel, and it entailed a significant risk that counsel would invest massive hours and substantial funds, only to recovery nothing.  The multi-jurisdictional and complex nature of the litigation, the extensive work required of class counsel under severe time pressure, the favorable class certification ruling and bellwether jury verdict, and the compelling $1.51 billion settlement support the requested fee of 33⅓ percent.  This is anything but a garden-variety case, and in my opinion, the fee award should reflect that reality.

### b.  The Percentage Requested Is Supported by Awards in Other Class Actions, Including So-Called Mega-Fund Cases

91.  In this section, I explain why, in my opinion, an award of 33⅓ percent is in line with awards in other complicated class actions that resulted in impressive settlements.

92.  I am fully aware that a fee of 33⅓ percent is above the average and median fee awards in class actions.[87]  I also recognize that, in general, fee awards (as a percentage) tend to decline as the amount of the settlement increases, with the lowest percentage awards appearing in so-called mega-fund settlements (*i.e.*, those above $100 million).[88]  Nonetheless, it should be obvious that

---

[87] *See, e.g.*, Eisenberg, Miller & Germano, *supra* note 20, at 947, 951 (finding average of 27 percent and median of 29 percent for 2009–2013 period); Fitzpatrick, *supra* note 20, at 811, 833 (finding, for 2006–2007 period, average and median of about 25 percent); Eisenberg & Miller, *supra* note 20, at 259 (finding, in 1993–2008 study, average fees of 24 percent and median fees of 25 percent); THOMAS E. WILLGING, LAURAL L. HOOPER & ROBERT J. NIEMIC, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 151 (Fed. Judicial Ctr. 1996), *available at* http://www.uscourts.gov/sites/default/files/rule23_1.pdf (1996 study of four federal districts found that average and median awards ranged from 26 to 31 percent).

[88] *See, e.g.*, Fitzpatrick, *supra* note 20, at 811 (noting that fee percentages are "inversely associated with the size of the settlement" and finding that, in cases involving settlements between $1 billion and $6.6 billion during 2006–2007, average and median awards were 13.7 percent and 9.5 percent, respectively); Eisenberg, Miller & Germano, *supra* note 20, at 947–48 (describing "scaling effect" where, "as [the] recovery amount increases, the ratio of the size of the attorneys' fee relative to the size of the recovery (*i.e.*, the fee percentage) tends to decrease" and finding that average and median fees for settlements greater than $100 million varied from "a low of 16.6% in 2009 to a high of 25.5% in 2011").

a median means that half of the awards are *above* that amount and half are below.  And in the case of an average, the figure is also comprised of awards *above* that amount as well as awards below it.[89]

93.  It is thus not surprising that there are numerous mega-fund cases with percentage awards comparable to those sought here.  As would be expected, those awards are based on a careful analysis of the specific facts and challenges of a given case.  For example, in *In re Vitamins Antitrust Litigation*,[90] *Standard Iron Works v. ArcelorMittal*,[91] and *In re Flonase Antitrust Litigation*,[92] the courts awarded, respectively, 34.06 percent, 33 percent, and 33⅓ percent as attorneys' fees because of the complex issues involved, the quality of class counsel's work, and the results obtained.  Importantly, the courts approved those awards even though none of the cases actually went to trial.  The litigation challenges in the instant case were substantially greater, since class counsel had to tackle a full bellwether trial (and two partial bellwether trials).

94.  The above cases are just three examples.  In the table below, I have collected more than 40 mega-fund cases that involved fee awards of 30 percent or greater.

### TABLE 1: Fee Awards of 30 Percent or More in Mega-Fund Class Actions

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *Lobo Exploration Co. v. BP Am. Prod.*, No. CJ-1997-72 (Oka. Dist. Ct., Beaver Cnty. Dec. 8, 2005) | $150 million | 40 percent | No |
| *Simmons v. Anadarko Petroleum Corp.*, No. CJ-2004-57 (Okla. Dist. Ct., Caddo Cnty., Dec. 23, 2008) | $155 million | 40 percent | No |
| *Lauriello v. Caremark RX LLC*, No. 01-cv-2003-006630.00 (Ala. Cir. Ct., Jefferson Cnty. Aug. 15, 2016) | $310 million | 40 percent | No |

---

[89] Indeed, in one study, more than one-third of all fee awards were 30 percent or higher.  *See* Fitzpatrick, *supra* note 20, at 834.

[90] No. MISC 99-197(TFH), 2001 WL 34312839, at *11–13 (D.D.C. July 16, 2001).

[91] No. 08-cv-05214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014).

[92] 951 F. Supp. 2d 739, 747–49 (E.D. Pa. 2013).

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) | $185 million | 40 percent | No |
| *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) | $127 million | 36 percent | No[93] |
| *In re Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) | $100 million | 35.5 percent | No |
| *Haddock v. Nationwide Life Ins. Co.*, No. 3:01-cv-01552-SRU (D. Conn. Apr. 9, 2015) (Dkt. No. 601) | $140 million | 35 percent | No |
| *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 million | 34.06 percent | No |
| *DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, 2003 WL 25683496 (M.D.N.C. Dec. 19, 2003) | $212 million | 33.33 percent | No |
| *In re Tricor Direct Purchaser Antitrust Litig.*, 1:05-cv-00340-SLR (D. Del. Apr. 23, 2009) (Dkt. No. 543) | $250 million | 33.33 percent | No |
| *In re Neurontin Antitrust Litig.*, No. 2:02-cv-01830 (D.N.J. July 6, 2014) (Dkt. No. 114) | $190 million | 33.33 percent | No |
| *In re Titanium Dioxide Antitrust Litig.*, No. 1:10-cv-00318 (D. Md. Dec. 13, 2013) (Dkt. No. 555) | $163.5 million | 33.33 percent | No |
| *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT) (D. Conn. Dec. 9, 2014) (Dkt. No. 521) | $297 million | 33.33 percent | No |
| *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan. July 29, 2016) (Dkt. No. 3276) | $835 million | 33.33 percent | Yes |
| *In re Relafen Antitrust Litig.*, No. 01-cv-12239-WGY (D. Mass. Apr. 9, 2004) (Dkt. No. 297) (direct purchaser litigation) | $175 million | 33.33 percent | No |
| *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150 million | 33.33 percent | No |
| *City of Greenville v. Syngenta Crop Prot.*, No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 million | 33.33 percent | No |

---

[93] A trial was conducted in the parallel government enforcement action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq., but the private class action based on plaintiffs' tort claims was settled prior to trial.

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *In re OSB Antitrust Litig.*, No. 06-cv-00826 (D. Pa. Dec. 9, 2008) (Dkt. No. 947) | $120.7 million | 33.33 percent | No |
| *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-cv-02147-PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) | $145 million | 33.33 percent | Yes |
| *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK (S.D.N.Y. Apr. Nov. 18, 2003) (Dkt. No. 171) | $220 million | 33.30 percent | No |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | $510 million | 33.30 percent | No |
| *Standard Iron Works v. ArcelorMittal*, No. 08-cv-05214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014) | $164 million | 33 percent | No |
| *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass. Feb. 2, 2015) (Dkt. No. 1095) | $590.5 million | 33 percent | No |
| *San Allen, Inc. v. Buehrer*, No. CV-07-644950 (C.P., Cuyahoga Cnty., Ohio Nov. 25, 2014) | $420 million | 32.7 percent | Yes |
| *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL-1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) | $105.7 million | 32.7 percent | No |
| *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1.06 billion | 31.33 percent | Yes |
| *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 million | 30.9 percent | Yes |
| *Weatherford Roofing Co. v. Employers Nat'l Ins. Co.*, No. 91-05637 (116th Tex. Dist. Ct., Dallas Cnty. Dec. 1, 1995) | $140 million | 30 percent | Yes |
| *In re (Bank of America) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) | $410 million | 30 percent | No |
| *Tennille v. Western Union Co.,* No. 09-cv-00938-JLK-KMT, 2014 WL 5394624 (D. Colo. Oct. 15, 2014) | $180 million | 30 percent | No |
| *In re Linerboard Antitrust Litig.*, No. 98-cv-05055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) | $202.5 million | 30 percent | No |
| *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) | $185 million | 30 percent | Yes |

| Case | Recovery | Fee Award | Trial? |
|---|---|---|---|
| *In re (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036 (S.D. Fla. Dec. 19, 2012) (Dkt. No. 3134) | $162 million | 30 percent | No |
| *In re (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036 (S.D. Fla. Mar. 12, 2013) (Dkt. No. 3331) | $137.5 million | 30 percent | No |
| *In re Informix Corp. Sec. Litig.*, No. 97-cv-01289-CRB (N.D. Cal. Nov. 23, 1999) (Dkt. No. 471) | $132.2 million | 30 percent | No |
| *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94-civ-2373 (MBM), 94-civ-2546 (BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 million | 30 percent | No |
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) | $111 million | 30 percent | No |
| *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632 (N.D. Tex. Apr. 9, 2010), *as modified* (June 14, 2010) | $110 million | 30 percent | No |
| *In re Prison Realty Sec. Litig.*, No. 3:99-cv-00458 (M.D. Tenn. Feb. 9, 2001) (Dkt. No. 108) | $104 million | 30 percent | No |

95.  These cases show that, even in mega-fund cases, there is nothing unusual about awards in the range requested here.  If any case justifies an award of 33⅓ percent, it is this one, which involved difficult factual, legal, and expert issues, a contested class certification, a trial on the merits, formidable opposing counsel, and a significant risk of no recovery.

96.  At bottom, it is erroneous to focus solely on averages and medians.  The Toups/Coffman objection, for example, is fatally deficient because it fails to conduct any nuanced, fact-specific analysis of the 33⅓ percent fee request in light of the particular circumstances of this case, including the litigation's difficult legal and factual challenges, the precise work performed by class counsel, and the fact that class counsel prevailed after a hard-fought bellwether trial.

97.  Moreover, given that mega-fund class actions are relatively less common than those with smaller recoveries, average and median fee percentages for those cases are subject to greater

variation.[94]   Notably, a number of mega-fund settlements have been securities class actions, where average and median fee awards tend to be lower than the overall averages and medians.[95] A reason for lower fees in securities cases, presumably, is that the crucial issue of class certification—a major source of dispute here (*see* ¶¶ 65–66)—is generally less challenging in securities cases.[96]   Moreover, in some mega-fund securities settlements, courts have pointed to the lack of complex legal and factual challenges and the relative ease of achieving settlement in awarding lesser attorneys' fees.[97]

98. In my opinion, the important point is that attorneys' fee awards should bear a relationship to the degree of risk involved.[98]   Indeed, courts often expressly point to the degree of risk assumed by class counsel in approving larger fee awards.   As one court noted in awarding attorneys' fees of 33 percent, "Courts recognize that the risk of receiving no recovery is a major factor in awarding attorneys' fees . . . .   [T]he riskier the case, the greater the justification for a substantial fee award."[99]   Another court suggested that "[a]ttorneys' risk is perhaps the foremost factor in determining an appropriate fee award."[100]   Indeed, a number of the *Johnson* factors

---

[94] *See, e.g.*, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974, at *16 (E.D. La. Oct. 25, 2016) (noting that in mega-fund cases "there are fewer percentage awards to serve as a benchmark; consequently, there is some variability in the percentages awarded in these cases"); Fitzpatrick, *supra* note 20, at 839 (noting that recoveries in the $1 billion to $6.6 billion range were subject to the largest standard deviation among fee awards).

[95] *See* Fitzpatrick, *supra* note 20, at 834.

[96] *See, e.g.*, *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.*, No. 3:05-MD-527 RLM, 2017 WL 1735541, at *5 (N.D. Ind. Apr. 28, 2017) (noting, in awarding attorneys fees of 30 percent and distinguishing lower fee awards in comparable securities cases, that "securities cases . . . differ . . . in many ways, not least of which that class certification in securities cases is nearly automatic under today's laws"); *see also* Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729, 824 (2013) (noting that because "securities fraud suits . . . tend to involve overarching issues that impact all class members and seek damages that can be easily calculated," they "are commonly certified").

[97] In *In re Cendant Corp. PRIDES Litigation*, for example, the Third Circuit noted that the "case was neither legally nor factually complex and did not require significant motion practice or discovery by [class counsel], and the entire duration of the case from the filing of the Amended Complaint to the submission of a Settlement Agreement to the District Court was only four months."   *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742–43 (3d Cir. 2001).

[98] *See, e.g.*, Eisenberg & Miller, *supra* note 20, at 27, 38 ("[f]ees are . . . correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees. . . . That fees are adjusted for risk is widely accepted in the literature.").   In their more recent study, Professors Eisenberg, Miller, and Germano found that "the association between risk and fee percentage continues in the 2009–2013 data."   Eisenberg, Miller & Germano, *supra* note 20, at 958

[99] *Montague v. Dixie Nat'l Life Ins. Co.*, No. 3:09-00687-JFA, 2011 WL 3626541, at *3 (D.S.C. Aug. 17, 2011).

focus specifically on the risks imposed by the litigation.  *See* ¶¶ 52–90.

99.  An emphasis on risk is especially relevant in mega-fund cases, where class counsel often invest thousands of attorney hours and millions of dollars in expenses.  For example, in awarding attorneys' fees of 33⅓ percent in *Heekin v. Anthem, Inc.*, the court noted that class counsel "had a great deal at stake . . . with the burden of advancing litigation costs of over $6 million" despite "the risk presented by [the] case."[101]

100.  It should also be emphasized that the very concept that fees as a percentage should decline as the size of the fund increases has been roundly criticized by courts.  In *Urethane*, for example, this Court expressly rejected objectors' reliance on statistical studies in arguing—much like the Toups/Coffman objectors here—that fee awards should necessarily decrease with the size of the fund.  To the contrary, in awarding attorneys' fees of 33⅓ percent in *Urethane*, this Court stated:

> [Objector] repeatedly cites the "principle" in the Tenth Circuit that fee award percentages decrease as settlement funds increase. . . . *[T]here is no such Tenth Circuit principle*. . . . This Court appreciates that some courts have awarded lower percentages to avoid granting an excessive windfall to counsel under the unique circumstances of those cases. On the other hand, *the Court agrees with those courts who have noted that such a diminishing scale can fail to provide the proper incentive for counsel*. . . . [I]n the present case, . . . class counsel achieved extraordinary success in a very long litigation.  Thus, use of a declining-scale approach is not appropriate here, and the Court will award fees based on the unique circumstances of the case.[102]

Likewise, the Third Circuit has noted that the "position [that fees should decrease with the size of the fund] has been criticized by respected courts and commentators, who contend that such a

---

[100] *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, at *14 (S.D. Fla. Jan. 31, 2008).  *Accord, e.g.*, *In re Ocean Power Technologies, Inc.*, No. 3:14-cv-03799, 2016 WL 6778218, at *28 (D.N.J. Nov. 15, 2016) ("Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees."); *Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 309 (S.D. Miss. 2014) (noting that "courts have found that class counsel ought to be compensated . . . for risk of loss or nonpayment assumed by carrying through with the case").

[101] No. 1:05-CV-01908-TWP, 2012 WL 5878032, at *3–4 (S.D. Ind. Nov. 20, 2012).  *Accord, e.g.*, *In re Tyco Int'l Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 260 (D.N.H. 2007) (noting that the case "involved a greater risk of non-recovery than other multibillion-dollar securities class action settlements" and emphasizing that, "[h]ad [class counsel] lost at summary judgment or fallen short of establishing liability at trial, they would have lost the tens of millions of dollars in expenses and all of the attorney time that they collectively invested in th[e] case").

[102] *Urethane*, 2016 WL 4060156, at *5–6 (emphasis added).

fee scale often gives counsel an incentive to settle cases too early and too cheaply."[103]   In the *Rite Aid Securities Litigation*, the Third Circuit made clear that "there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund."[104]   In the court's view, "the declining percentage concept does not trump the fact-intensive [attorneys' fees] analysis."[105]   And in *Allapattah*, the court emphasized that a declining percentage reduction:

> is antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for the Class Counsel to settle too early for too little.[106]

Echoing the same analysis, the court in *In re Ikon Office Solutions, Inc. Securities Litigation* noted:

> Such an approach . . . fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is great risk of no recovery. Nor does it give significant weight to the fact that large attorneys' fees serve to motivate capable counsel to undertake these actions.[107]

Other courts have made the same points.[108]   In my opinion, these courts have correctly criticized

---

[103] *In re Cendant Corp. Litig.*, 264 F3d 201, 284 n.55 (3d Cir. 2001).

[104] *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005), *as amended* (Feb. 25, 2005).

[105] *Id.*

[106] 454 F. Supp. 2d at 1213.

[107] 194 F.R.D. 166, 197 (E.D. Pa. 2000).

[108] *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 2:12-cv-00203, 2017 WL 3525415, at *2 (E.D. Mich. July 10, 2017) ("[T]here is no requirement that the Court necessarily apply a declining fee percentage based on the absolute dollar amount of [the settlement]. . . . [O]ther federal courts have also rejected the so-called 'mega fund' adjustment to fee awards based solely on the size of a settlement.  Instead, consideration must be given to, among other things, the stage of the litigation when a settlement has been achieved and the labor and expense that were required . . . to achieve the settlement."); *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974, at *16 (E.D. La. Oct. 25, 2016) ('[C]ourts have rejected a blanket rule that would automatically cap the fee percentage at a low figure when the class recovery is quite high."); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (rejecting "[o]bjectors argu[ment] that the fact of a large settlement justifies a reduction in the percent fee awarded" because "[s]uch an approach . . . fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery"); *Nichols v. SmithKline Beecham Corp.*, No. 00-cv-06222, 2005 WL 950616, at *21 (E.D. Pa. Apr. 22, 2005) (noting that "reducing the percentage of recovery awarded as a fee in this case to a mean fee percentage derived from other cases . . . [would be] an impermissibly formulaic approach"); *In re Linerboard Antitrust Litig.*, No. 98-cv-05055, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (rejecting "sliding

the notion that fee percentages should necessarily decline with the size of the fund.[109]

101.  In short, the requested fee of 33⅓ percent of a $1.51 billion judgment fits comfortably within the case law, given the facts and circumstances of this case.

### 3.  There Is No Need for a Lodestar Cross Check

102.  The next issue is whether the fees requested by class counsel should be tested using a "lodestar cross check"—*i.e.*, a procedure that courts sometimes use to verify the reasonableness of the fees sought based on sheer percentages.[110]  This Court is certainly not *required* to conduct a lodestar cross check.[111]   Indeed, a lodestar cross check can lead to the very harmful consequences that the percentage method is designed to avoid.  As one court has noted, "[t]he lodestar analysis, even when used as a cross check to determine a reasonable percentage award, has the effect of rewarding attorneys for the same undesirable activities that the percentage method was designed to discourage, namely 'incentiviz[ing] [class counsel] to multiply filings and drag along proceedings to increase their lodestar.'"[112]  (*See* ¶¶ 49–50.)  It is not surprising, therefore, that even when approving relatively high percentage fee awards, courts in the Tenth

scale approach" as "economically unsound" and reasoning that "the highly favorable settlement was attributable to [class counsel's] skill and it is inappropriate to penalize them for their success").

[109] Likewise, numerous scholars agree that fee percentages should not necessarily be lower in mega-fund cases. *See, e.g.*, John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 697 (1986); Declaration of Professor Geoffrey P. Miller at 11, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2318-3) (filed Jan. 24, 2018), *available at* https://www.autoairbagsettlement.com/Content/ Documents/Exhibit%20C%20to%20Response%20to%20Objections%20HN.pdf; Declaration of Professor Lucian A. Bebchuk at 11, *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (filed Nov. 13, 2007), *available at* http://www.enronfraud.com/pdf/Bebchuk_Decl_with_Appendix_A.pdf; Declaration of Brian T. Fitzpatrick at 14 & n.4, *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-2509-LHK (N.D. Cal.) (filed May 8, 2015), *available at* http://www.hightechemployeelawsuit.com/media/303927/15-5-8__1079__fitzpatrick_decl__motion_for_attorney_ fees.pdf; Declaration of Brian T. Fitzpatrick on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 7, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3269-1) (filed July 15, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Reply_Mem_iso_Attys_Fees_etc_Exhibits_ for_website.pdf.  Although the Toups/Coffman objection relies almost entirely on Professor Fitzpatrick, that scholar in fact refutes the entire premise of the objection.

[110] *See In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02356-PAB-KLM, 2014 WL 4670886, at *4 & n.4 (D. Colo. Sept. 18, 2014) (describing role of lodestar cross check as a means to confirm the reasonableness of a percentage fee award, and noting that the "cross-check calculation need entail neither mathematical precision nor bean counting" (citation omitted)).

[111] *See, e.g.*, *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1241 (D.N.M. 2016) ("The Tenth Circuit has made it clear that district courts need not calculate a lodestar when applying the percentage method." (citing *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994))).

[112] *Jewell*, 167 F. Supp. 3d at 1242 (citation omitted).

Circuit have often declined to apply a lodestar cross check.[113]  Many other jurisdictions follow a similar approach.[114]  Indeed, in awarding attorneys' fees of 30 percent in the $410 million *Bank of America Checking Account Overdraft Litigation* without conducting a lodestar cross check, the court emphasized that "[t]he lodestar approach should not be imposed through the back door via a cross-check."[115]

### 4.  In Any Event, a Lodestar Analysis Supports the Fees Requested

103.  Even if the Court were to conduct a lodestar cross check, such an analysis, in my opinion, would only confirm the reasonableness of the fees requested by MDL class counsel.  (I have only been given data for MDL counsel and thus am not in a position to opine on the lodestar with respect to Illinois and Minnesota counsel.)

104.  In the Tenth Circuit, a lodestar cross check involves "determining the lodestar amount—*i.e.*, the number of hours [class] counsel reasonably expended multiplied by a reasonable [hourly rate]—and then multiplying the lodestar amount by a subjective 'multiplier'

---

[113] *See, e.g.*, *Fankhouser v. XTO Energy, Inc.*, 2012 WL 4867715, at *3 (W.D. Okla. Oct. 12, 2012) (awarding 36 percent fee without lodestar cross check); *Hill v. Marathon Oil Co.*, No. 5:08-cv-00037, slip op. at 5–6 (W.D. Okla. Oct. 3, 2012), *available at* https://ecf.okwd.uscourts.gov/doc1/14912670884 (awarding 33⅓ percent fee without lodestar cross check); *CompSource Okla. v. BNY Mellon, N.A.*, No. CIV 08-469-KEW, 2012 WL 6864701, at *8 (N.D. Okla. Oct. 25, 2012) (awarding 25 percent fee  without lodestar cross check); *Droegemueller v. Petroleum Dev. Corp.*, 2009 WL 961539, at *4 (D. Colo. Apr. 7, 2009) (awarding 33⅓ percent fee without lodestar cross check); *Lewis v. Wal-Mart Stores, Inc.*, 2006 WL 3505851, at *2 (N.D. Okla. Dec. 4, 2006) (awarding 33⅓ percent fee without lodestar cross check); *Millsap v. McDonnell Douglas Corp.*, No. 94-CV-633-H(M), 2003 WL 21277124, at *9 (N.D. Okla. May 28, 2003) (awarding 25 percent fee without lodestar cross check).

[114] *See, e.g.*, *Swedish Hosp. v. Shalala*, 1 F.3d 1261, 1266–70 (D.C. Cir. 1993) (lodestar analysis not required); *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-11280-DJC, slip op at 7 (D. Mass. Nov. 8, 2017) (noting that lodestar cross check is discretionary in the First Circuit); *CompSource Okla. v. BNY Mellon, N.A.*, No. CIV 08-469-KEW, 2012 WL 6864701, at *8 (N.D. Okla. Oct. 25, 2012) ("[A] majority of circuits recognize that trial courts have the discretion to award fees based solely on a percentage of the fund approach and are not required to conduct a lodestar analysis in common fund class actions."); *Smith v. Krispy Kreme Doughnut Corp*., No. 1:05CV00187, 2007 WL 119157, at *3 (M.D.N.C. Jan. 10, 2007) (noting that "[i]t is not necessary for the Court to conduct a lodestar analysis" in the Fourth Circuit); *Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 688 (Cal. 2016) (noting that courts "retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee").

[115] *In re Bank of Am. Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1362 (S.D. Fla. 2011).  Likewise, numerous scholars have argued that courts should not use a lodestar cross check when applying the percentage method.  *See, e.g.*, Declaration of Brian T. Fitzpatrick at 6–7, *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-2509-LHK (N.D. Cal.) (filed May 8, 2015), *available at* http://www.hightechemployeelawsuit.com/media/303927/15-5-8__1079__fitzpatrick_decl__motion_for_attorney_fees.pdf; Morris Ratner, Civil Procedure: Class Action Fee and Cost Awards 30–32 The Judge's Book: Vol. 1, Article 9 (2017); Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1813–14 (2000).

to compensate for the risk of [the] litigation."[116]   I focus on these calculations below.

### a. The Hours Spent By MDL Class Counsel Are Reasonable

105.  I have been provided with copies of all time entries from all common benefit counsel in the Kansas MDL.  In total, common benefit counsel in the Kansas MDL have spent 142,823.50 hours prosecuting this litigation to date.

106. I should note that I see no red flags suggesting that the work of the MDL plaintiffs' firms was inefficient or that there was needless duplication.  Attorneys at the MDL plaintiffs' common benefit law firms targeted specific tasks:  overseeing overall strategy and case management; performing legal research; drafting briefs and memoranda; reviewing, analyzing, and coding documents; focusing on particular kinds of depositions (*e.g.*, producer depositions and expert depositions); drafting discovery responses; drafting pleadings; and trial preparation. Moreover, the paralegals assigned to the case focused on traditional paralegal tasks, such as preparation of potential exhibits for depositions; document management; assisting with filing of court documents; and performing basic research.  I have seen nothing to suggest that the case was overstaffed, that there was needless duplication of effort, or that attorneys or paralegals were focusing on unnecessary tasks.

107. Indeed, the MDL leadership took great efforts to minimize duplication of tasks.  Co-lead counsel created and circulated billing guidelines to the various common benefit law firms. Among other things, those guidelines directed the firms to minimize the number of individual timekeepers at each firm, directed the firms to assign the same attorneys and staff members to related tasks to avoid extra time getting others up to speed, and provided that time spent generally reviewing filings and other materials not directly related to work assigned by co-lead counsel would not be billable as common benefit time.  *See* Stueve Decl. ¶¶ 621–629. Moreover, small groups of attorneys focused on discovery in particular subject areas to promote efficiency, while a core group of attorneys consistently worked on legal research and briefing

---

[116] *Been v. O.K. Indus.*, Inc., No. CIV-02-285-RAW, 2011 WL 4478766, at *10 (E.D. Okla. Aug. 16, 2011). *Accord, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10-ml-02151-JVS (FMOx), 2013 WL 12327929, at *34 (C.D. Cal. July 24, 2013) (multiplier awarded based on "all the circumstances of [the] litigation, particularly the risks"); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 680 (N.D. Tex. 2010), *as modified* (June 14, 2010) (noting that a multiplier was "warranted due to the risks entailed in this litigation"); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1271 (D. Kan. 2006) (finding multiplier resulting from lodestar cross check "[e]minently reasonable based on the risks associated with counsel taking on this case").

throughout the litigation. *See id.* ¶¶ 625–626. Even document reviewers were kept consistent, with priority given to "those document reviewers who were able to devote substantial amounts of time over multiple months." *Id.* ¶ 627. Stueve Siegel Hanson collected and reviewed monthly time records from all of the common benefit firms, and then combined, reviewed, and corrected the cumulative records. After this initial review, each firm involved was asked to review its time for consistency with the Common Benefit Order and the above-mentioned billing guidelines provided by co-lead counsel, which resulted in meaningful cuts. Co-lead counsel then performed a final review of all time entries, which again resulted in a meaningful reduction in the overall lodestar. *See id.* ¶¶ 630–641.

108. I understand that additional time was logged by Minnesota counsel and by members of the Clark, Love & Hutson group in the Illinois action. I further understand that those attorneys are submitting their hours to the Court separately.

### b. The Billing Rates Proposed by MDL Class Counsel Are Reasonable

109. The designated hourly rates for the various MDL law firms submitting lodestar hours[117] range from $175 to $985 for partners; $170 to $775 for associates; $495 to $825 for of counsel; $150 to $325 for law clerks; and $63.75 to $305 for paralegals. To gauge the reasonableness of class counsel's rates, courts in the Tenth Circuit begin by referring to "the prevailing market rates in the relevant community"—defined as "the area in which the litigation occurs."[118]

110. Courts have approved rates for prominent plaintiffs' complex litigation firms that are comparable to those designated by the plaintiffs' firms in this case. Examples include Motley Rice (hourly rates as high as $975 approved in litigation in this District three years ago),[119] and

---

[117] Those firms are: Anderson, Bottrell, Sanden & Thompson; Barrack, Rodos & Bacine; Battle & Winn; Batts, Batts & Bell; Bohrer Brady; Bolen Robinson & Ellis; Brady Preston Brown; Brooks Pierce; Coffman Law Firm; Emerson Poynter; Emerson Scott; English, Lucas, Prist & Owsley; Gray Reed & McGraw; Gray, Ritter & Graham; Greene Espel; Hare Wynn Newell & Newton; Holland Law Firm; Jake W. Brooks Attorney at Law; Kruml Law Office; Lockridge Grindal Nauen; Lundberg Law Firm; Martin, Browne, Hull & Harper; McCulley McCluer; Miller Schirger; Paul LLP; Saeed & Little; Schirger, Kirk, McDougall & Winzeler; Seeger Weiss; Simmons Hanly Conroy; Sneed Lang; Soper Leddin Law Firm; Stinson Leonard Street; Stueve Siegel Hanson; Wadler Perches Hudl Kerlick; Wagner Reese; Walters Bender Strohbehn & Vaughan; Weller, Green, Toups & Terrell; Westerfield Janoush & Bell; and Zimmerman Reed. These firms are referred to collectively as "plaintiffs' firms."

[118] *Garcia v. Tyson Foods, Inc.*, No. 06-cv-02198-JTM, 2012 WL 5985561, at *3 (D. Kan. Nov. 29, 2012) (citations and internal quotation marks omitted).

[119] *See, e.g.*, Decl. of James M. Hughes at Ex. A, *Bennett v. Sprint Nextel Corp.*, No. 2:09-cv-02122-EFM (D. Kan.) (filed May 8, 2015), *available at* https://ecf.ksd.uscourts.gov/doc1/07914018030.

litigation involving both Bolen Robinson & Ellis and the Holland Law Firm (hourly rates up to $897 approved in 2017 in the Western District of Missouri, where the court noted that such rates "are not dissimilar to those hourly rates charged in the Kansas City area").[120]  Stueve Siegel Hanson has an impressive record of having substantial rates approved, both in the Kansas City area and elsewhere, with several judicial opinions in 2018 approving rates as high as $865 for partners and $525 for associates.[121]

111.  Indeed, even higher rates than those requested here would be justified given the complicated, multi-jurisdictional nature of this case.[122]  For example, in *Volkswagen*, class counsel's hourly rates were as high as $1,600 for partners and $790 for associates.[123]  And in *Nitsch v. DreamWorks Animation SKG, Inc.*, billing rates for partners were as high as $1,200 per hour.[124]  Here, all of the proposed rates are below $1,000 per hour, despite the prominence and

---

[120] *Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 222 (W.D. Mo. 2017).  It is also notable, as Retired Judge Ralston points out in his declaration (at ¶ 51), that this Court's order appointing Ellen K. Reisman as special master designated her rate at $950 per hour.

[121] *See, e.g.*, *Hapka v. Carecentrix, Inc.*, No. 2:16-cv-02372-KGG, slip op. at 3 (D. Kan. Feb. 15, 2018), *available at* https://ecf.ksd.uscourts.gov/doc1/07914925572 (citing Pls.' Mem. in Support of Mot. for an Award of Attorneys' Fees, Expenses, & Costs to Class Counsel & a Class Representative Service Award at 13–20 (filed Dec. 8, 2017)); *Criddell v. Premier Healthcare Services, LLC*, No. 16-cv-05842-R-KS (C.D. Cal. Jan. 16, 2018) (Dkt. No. 64) (approving hourly partner rate of $825 and hourly associate rate of $395); *Spangler v. Nat'l Coll. of Tech. Instruction*, No. 14-cv-03005-DMS (RBB), 2018 WL 846930, at *2 (S.D. Cal. Jan. 5, 2018) (approving Stueve Siegel Hanson's 2016 rates of $795 to $825 per hour for partners and $315 to $525 per hour for associates); *see also* Decl. of Richard H. Ralston ¶ 56 (filed contemporaneously) (hereinafter "Ralston Decl.") (discussing additional examples from 2010–2017).

[122] *See, e.g.*, *Jeffboat LLC v. Office of Workers' Comp. Programs*, 553 F.3d 487, 490 (7th Cir. 2009) (noting that the "national market" is relevant to complex cases where the attorneys involved are "highly specialized"); *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (noting that the relevant market may be expanded where "special skills" are required by the litigation); *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir. 1987) (approving "the use of national hourly rates in exceptional multiparty cases of national scope"); *Urethane*, 2016 WL 4060156, at *7 ("[T]he amounts at issue justified use of the best counsel charging the highest rates (just as [the defendant] used similarly high-priced counsel in the litigation)."); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 660 (E.D. La. 2010) ("[T]he attorneys come from states across the country.  Thus a more national rate is the appropriate pole star to guide the Court."); *Lucas v. Kmart Corp.*, No. 99-cv-01923, 2006 WL 2729260, at *4 (D. Colo. July 27, 2006) ("Hourly rates must reflect the prevailing market rates in the relevant community.  Because of the significant resources and skill required, as well the risks entailed, to litigate large-scale actions on behalf of a class, very few attorneys handle such cases.  Thus the relevant community . . . likely consists of attorneys who litigate nationwide, complex class actions.").

[123] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017).

[124] No. 14-CV-04062-LHK, 2017 WL 2423161, at *9 (N.D. Cal. June 5, 2017).  *See also, e.g.*, *In re Cathode Ray Tube (Crt) Antitrust Litig.*, MDL 1917, No. 3:07-cv-5944 JST, 2016 WL 721680, at *43 (N.D. Cal. Jan. 28, 2016) (finding $875/hr for lead counsel "reasonable and responsible" for purposes of lodestar cross check in antitrust class settlement); *In re Amgen Sec. Litig.*, No. CV 7-2536 PSG, 2016 U.S. Dist. LEXIS 148577, at *27 (C.D. Cal. Oct. 25, 2016) (approving "a billing rate ranging from $750 to $985 per hour for partners, $500 to $800 per hour for 'of

---

50

vast experience of the attorneys involved (*see* ¶ 76).

112.   The rates proposed by the MDL plaintiffs' firms here are also extremely reasonable when compared to rates for prominent defense firms.   For instance, a 2016 American Bar Association report (relying on public filings in Chapter 11 bankruptcy cases) noted billing rates as high as $1,475 at Proskauer Rose; $1,450 at Ropes & Gray; and $1,425 at both Akin Gump Strauss Hauer & Feld and Skadden Arps Slate Meagher & Flom.[125]   Similarly, a 2015 fee application of Gibson Dunn revealed rates for partners in a bankruptcy case as high as $1,475.[126] Indeed, according to some sources (discussing rates in 2014 and 2015), some prominent partners at top law firms have billed rates as high as $2,000 per hour.[127]   For associates, a 2011 study found rates at DLA Piper as high as $730; at Kay Scholer, rates as high as $705; and at Winston

---

counsels'/senior counsel, and $300 to $725 per hour for other attorneys"); *Abbott v. Lockheed Martin Corp.*, No. 06-cv-701-MJR-DGW, 2015 WL 4398475, at *3 (S.D. Ill. July 17, 2015) (awarding fees of $974/hr for attorneys with at least 25 years of experience; $826/hr for attorneys with 15–24 years in ERISA class settlement); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-2509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015) (billing rates for partners as high as $975/hr); *Cheesemore v. Alliance Holdings, Inc.*, No. 09-cv-413-wmc, 2014 WL 4415919, at *6 (W.D. Wis. Sept. 5, 2014) (approving rate of $895/hr for highest level partners in ERISA class settlement); *In re Heartland Payment Systems, Inc.*, 851 F. Supp. 2d 1040, 1087–88 (S.D. Tex. 2012) (noting hourly rates as high as $825/hr; court found the hourly rates were "within the 'prevailing market rates for lawyers with comparable experience and expertise' in complex class-action litigation and thus are reasonable.") (citation omitted); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 10-ml-02151 NS, 2013 WL 12327929, at *33 n.15 (C.D. Cal. July 24, 2013) (approving rates up to $950 per hour).   Rates for paralegals in other major class actions have ranged from $150 to $490 per hour.   *See, e.g.*, *In re Volkswagen*, 2017 WL 1047834, at *5 ($150 to $490 per hour); Co-Lead Class Counsel's Pet. for An Award of Atty's Fees at Add. 1, Ex. C, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 12-MD-2323 (AB) (E.D. Pa.) (filed Feb. 13, 2017) ($215 to $325 per hour); *Astiana v. Kashi Co.*, No. 11-cv-01967-H (BGS), slip op. at 6 (S.D. Cal. Sept. 2, 2014) (Dkt. No. 241) ($245 to $315 per hour).

[125] *See* Martha Neil, *Top Partner Billing Rates at BigLaw Firms Approach $1,500 Per Hour*, ABA JOURNAL (Feb. 8, 2016), http://www.abajournal.com/news/article/top_partner_billing_rates_at_biglaw_firms_nudge_1500_per_hour.

[126] *See* Final Application of Gibson, Dunn & Crutcher LLP as General Bankruptcy and Restructuring Co-Counsel for Debtors and Debtors-in-Possession for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Final Period Mar. 12, 2015–Nov. 19, 2015 at 4, *In re SRC Liquidation, LLC*, No. 15-10541-BLS (Bankr. D. Del.) (Dkt. No. 1404) (filed Dec. 15, 2015).

[127] *See, e.g.*, Aebra Coe, *What Do the Highest-Paid Lawyers Make an Hour?*, Law360 (May 11, 2016), https://www.law360.com/legalindustry/articles/794929/what-do-the-highest-paid-lawyers-make-an-hour- (noting that research conducted by the BTI Consulting Group revealed that rates "reached $2,000 per hour" in 2016, up from the previous high of $1,600 per hour in 2015); Kathryn Rubino, *$2,000 An Hour Lawyers: That's One Way to Fund Salary Increases*, ABOVE THE LAW (June 13, 2016), https://abovethelaw.com/2016/06/2000-an-hour-lawyers-thats-one-way-to-fund-salary-increases/ (similar); *see also* Karen Sloan, *$1,000 Per Hour Isn't Rare Anymore*, NAT'L L.J. (Jan. 13, 2014), https://www.law.com/nationallawjournal/almID/1202637587261/NLJ-Billing-Survey%3A-%241%2C000-Per-Hour-Isn%27t-Rare-Anymore/ (noting that "four-figure hourly rates for in-demand partners at the most prestigious firms don't raise eyebrows—and a few top earners are closing in on $2,000 an hour").

& Strawn, rates as high as $600.[128]  Of course, today's rates for partners and associates would presumably be even higher.[129]

113.   It is especially instructive, in gauging billing rates for class counsel, to look at rates for the firm actually representing the defendant in the litigation.[130]  Here, partners at Syngenta's law firm, Kirkland & Ellis, bill at substantially higher rates than plaintiffs' counsel here are proposing.  For instance, Kirkland's own web site reveals that the firm's partners bill at rates as high as $1,745 per hour, with associates billing out as high as $1,015 per hour.[131]  Other sources confirm similarly high rates for Kirkland lawyers.[132]

114.   The rates designated by the MDL plaintiffs' common benefit lawyers in the instant case are comparable to (or below) the above-described billing rates.  For example, the billing rates designated by those lawyers are well below Kirkland's billing rates, with no attorney from any of the plaintiffs' common benefit firms proposing rates for partners anywhere close to $1,745 per hour, or for associates anywhere close to $1,015 per hour.  Indeed, at Kirkland, some *associates* bill out at more than the rates proposed by even the most senior and prominent partners in the instant case, such as Christopher Seeger and Patrick Stueve.

115.   Importantly, in other cases, the MDL plaintiffs' law firms involved here have been

---

[128] *See A Nationwide Sampling of Law Firm Billing Rates*, NAT'L L.J. (Dec. 19, 2011), *available at* http://tpmlaw.com/global_pictures/NationalLawJournal2011.PDF.

[129] *See* Hugh A. Simons, *Why Elite Law Should Raise Rates*, THE AM. LAWYER (Feb. 26, 2018), https://www.law.com/americanlawyer/2018/02/26/why-elite-law-should-raise-rates/ (noting that attorneys' hourly billing rates "rose by 33 percent from 2007 to 2017" and that rates continue to increase, "with standard rates rising at 3 percent [per year]").

[130] *See, e.g., Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case." (citation omitted)); *Ruiz v. Estelle*, 553 F. Supp. 567, 589 (S.D. Tex. 1982) ("In an action for which no adequate parallel can be found, the best example of a fee paid for similar work is that paid by opposing counsel in the same action."); *cf. I.W. v. School Dist. of Philadelphia*, No. 14-3141, 2016 WL 147148, at *13 (E.D. Pa. Jan. 13, 2016) ("Evidence of the hours expended by the non-prevailing party on the same task is relevant to the determination of whether the hours requested by the prevailing party are reasonable." (citations omitted)); *Mitroff v. Xomox Corp.*, 631 F. Supp. 25, 28 (S.D. Ohio 1985) ("Pertinent to any consideration of a reasonable amount of time expended in the prosecution of a law suit is the amount of time expended by the defendant in defending that law suit.").

[131] *See Kirkland, Kutak Rocke Unite Again in Toys 'R' Us Bankruptcy*, KIRKLAND & ELLIS LLP (Sept. 29, 2017), https://www.kirkland.com/sitecontent.cfm?contentID=230&itemId=13055.

[132] *See, e.g.*, Ryan Lovelace, *Hourly Rate Gap Widens as Top Billers Leave Others Behind*, NAT'L L.J. (May 17, 2018), https://www.law.com/nationallawjournal/2018/05/17/hourly-rate-gap-widens-as-top-billers-leave-others-behind/ (noting hourly rates for Kirkland partners as high as $1,745); Sara Randazzo & Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour*, WALL ST. J. (Feb. 9, 2016), https://www.wsj.com/articles/legal-fees-reach-new-pinnacle-1-500-an-hour-1454960708 (2016 article noting hourly rates for Kirkland partners ranging from $875 to $1,445).

awarded hourly rates comparable to those requested.  For example, as noted (¶ 110), rates as high as $865 per hour have been approved for attorneys at Stueve Siegel Hanson in prior litigation in this District.  In the *NFL Concussion* case, the court approved hourly billing rates for partners ranging from $750 to $985, including $985 per hour for Christopher Seeger of Seeger Weiss (settlement class counsel in this case).[133]

116.  The blended rate for the MDL plaintiffs' common benefit firms in this case is $572.21. That rate is consistent with or below blended rates in other major MDL cases.  For example, in *NFL Concussion*, the court approved a blended rate of $861.28 per hour for Seeger Weiss specifically, and a blended rate of $623.05 per hour for all common benefit counsel.[134]  In *Hightower v. JPMorgan Chase Bank, N.A.*, the court approved a blended rate of $575 per hour.[135]  And Lieff Cabraser Heimann & Bernstein designated a blended rate of $529 per hour in the *Volkswagen Clean Diesel Litigation*.[136]  Notably, none of those cases went to trial (where hours billed by senior lawyers would be expected to increase).

117. In any event, in my opinion, it is not useful to compare the blended rate here with the rates in other cases, especially those in which the tasks performed were very different.  Here, much of the work was, by its very nature, high-level and thus not suitable for a paralegal or low-level attorney.  For example, the firm could not assign paralegals or recent law school graduates to try the bellwether cases, conduct high-level settlement negotiations, interview and work with experts, or evaluate, brief, and argue the complicated issues of law.  It should not be surprising, therefore, that four of the top five billers (all with more than 5,000 hours) are partners, and that among the top ten billers, all but two are partners.  Given the nature of the tasks that make up

---

[133] *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, slip op. at 20-21 (E.D. Pa. May 24, 2018) (Dkt. No. No. 10019) (approving full lodestar for Seeger Weiss based on submitted rates); Co-Lead Class Counsel's Pet. for An Award of Atty's Fees at Ex. 2, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa.) (filed Feb. 13, 2017) (Dkt. No. 7151) (identifying Seeger Weiss's submitted and approved hourly rates, including rates for partners ranging from $750 to $985, rates for of counsel ranging from $775 to $795 per hour, rates for associates of $600 per hour, and rates for professional staff ranging from $215 to $290 per hour).

[134] *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, slip op. at 20-21 (E.D. Pa. May 24, 2018) (Dkt. No. No. 10019) (approving lodestar for Seeger Weiss); *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *9 (E.D. Pa. Apr. 5, 2018) (approving blended rate of $623.05 per hour for all common benefit counsel).

[135] No. 11-cv-01802-PSG, 2015 WL 12644569, at *11 (C.D. Cal. Feb. 3, 2015) (preliminary approval); 2015 WL 9664959, at *1 (Aug. 4, 2015) (final approval).

[136] *See In re Volkswagen*, 2017 WL 1047834, at *5.

many of the hours spent by class counsel, the blended rate here is very reasonable.  Simply comparing that number to other cases—in which the mix of tasks performed may be very different—is not an especially probative exercise.[137]

### c.  Additional Expected Hours Should Be Included

118.   When calculating the lodestar, courts routinely take into account hours that class counsel reasonably anticipate spending on the matter after final approval (*e.g.*, hours to be spent on claims administration issues).[138]

119.  I am advised by MDL class counsel that they have spent 142,823.50 hours on the case to date, and expect to spend at least 500–1,000 hours in the future due to the size of the class and the complexity of the settlement administration process.  Because the claims deadline is not until October 12, 2018, MDL class counsel will continue working with the claims administrator and answer questions from class members for three additional months.  Additional work will also include drafting the final approval papers and preparing for and attending the final approval hearing.   As discussed in ¶¶ 105–107, the figure for time spent thus far on this complicated case—with a full and two partial bellwether trials, contested class certification, and extensive dispositive and *Daubert* motions—strikes me as entirely reasonable, as does the figure representing hours likely to be expended by the firm going forward.

### d.  The Multiplier Is Well Justified Based on Tenth Circuit Precedent

120.  Based on the number of hours expended and the hourly rates proposed, class counsel's lodestar would be $81,725,060.90.  MDL class counsel are requesting 50 percent of the total 33⅓ percent attorneys' fees requested, or approximately $251.6 million, pursuant to the above-noted

---

[137] *See also, e.g.*, *Young v. Polo Retail, LLC*, No. 02-cv-4546-VRW, 2007 WL 951821, at *7 (N.D. Cal. Mar. 28, 2007) ("[T]he central role of settlement negotiations in this litigation—and the central role of senior attorneys in those negotiations—suggest that typical blended hourly rates . . . are inappropriate here.").

[138] *See, e.g.*, *Tennille v. Western Union Co.*, No. 09-cv-00938-MSK-KMT, 2013 WL 6920449, at *3 (D. Colo. Dec. 31, 2013) (instructing plaintiffs to include in their lodestar calculation "an estimate of the future hours that will be necessary to carry the case to completion under the Settlement Agreement"); *Reyes v. Bakery & Confectionery Union*, 281 F. Supp. 3d 833, 853, 856–57 (N.D. Cal. 2017) (including estimated hours for "future work" related to, *inter alia*, "managing class members' claims"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), slip op at 8 (N.D. Cal. Mar. 17, 2017) (granting fee request reserving "an additional 21,000 hours to (1) guide the hundreds of thousands of Class Members through [claims period]; (2) assist in the implementation and supervision of the Settlement . . . ; and (3) defend and protect the settlement on appeal, among other things" (citation and internal quotation marks omitted)); *AT&T Mobility*, slip op at 16–17 (citing the "considerable ongoing efforts" required of class counsel to implement the settlement as a "factor [that] supports a generous reward").

fee-sharing agreement.  *See* ¶ 37.  (I opine separately on that proposed allocation in ¶¶ 129–131.) That calculates to a multiplier of 3.079 for MDL class counsel, not counting hours going forward.[139]  Counting 750 hours going forward as well (based on class counsel's estimate of 500–1,000 additional hours), the multiplier would be 3.06.  In my view, either multiplier is justified here.

121.  As a threshold matter, I believe that MDL class counsel are clearly entitled to a multiplier.  Courts in the Tenth Circuit generally apply a multiplier to the lodestar "to compensate for the risk of [the] litigation."[140]  In analyzing the multiplier, the ultimate standard is "reasonableness," and courts often look to those *Johnson* factors that are not already subsumed within the lodestar calculation (excluding, for example, "the time and labor involved," because class counsel's hours and rates are already accounted for by the lodestar).[141]

122.  In this case, there is no question that MDL class counsel reasonably expected to be awarded a multiplier (assuming that the Court were to apply the lodestar method).  Counsel took on a case that, as explained in ¶¶ 56–74, entailed enormous risk and challenges.  It would be illogical and unfair to rely solely on normal billing rates, without enhancement, in a situation where there was a high likelihood that class counsel would recover nothing.  Class counsel's designated hourly rates do not reflect that risk.  As noted, those rates are in line with (or below) those awarded to plaintiffs' firms (before factoring in a multiplier) in other major class actions. *See* ¶¶ 109–111, 116.  And they are comparable to—or below—what prominent defense firms charge (*see* ¶¶ 112–114), even though such defense firms are paid those rates regardless of whether they win or lose.[142]  As the court emphasized in the *Toyota Unintended Acceleration* case, a multiplier is awarded based on "all the circumstances of [the] litigation, particularly the

---

[139] This figure is based on a lodestar (excluding future time, *see* ¶¶ 118–119) of $81,725,060.90.  A multiplier of 3.079 is thus required to reach MDL class counsel's requested fee of $251.6 million.

[140] *Been*, 2011 WL 4478766, at *10.

[141] *See, e.g.*, *In re Miniscribe Corp.*, 309 F.3d 1234, 1243 (10th Cir. 2002) (applying "*Johnson* criteria for determining the multiplier . . . to be applied to the lodestar amount"); *Koehler v. Freightquote.com, Inc.*, No. 12-2505-DDC-GLR, 2016 WL 3743098, at *6–9 (D. Kan. July 13, 2016) (approving class counsel's requested multiplier where "the other *Johnson* factors demonstrate[d] the reasonableness of the fee").

[142] *See also, e.g.*, *Lowery v. City of Albuquerque*, No. CIV 09-0457 JB/WDS, 2013 WL 1010384, at *44 (D.N.M. Feb. 27, 2013) (noting that class counsel "had to take considerable risks so its hourly rate should be more"); note 116, *supra* (cases noting multiplier's role in compensating plaintiffs' attorneys for risk of little or no recovery).

risks."[143]

123. Multipliers in the 3.079 range are not uncommon, especially for a complicated, challenging case such as this one.  In the Tenth Circuit, "[a] multiplier of four or less is commonly accepted as reasonable."[144]  And courts in the Tenth Circuit and elsewhere have approved similar or greater multipliers in numerous other major cases.  For example, in *Urethane*, this Court stated that a multiplier of "4 or 5 would fall within the range of multipliers accepted by a number of courts in megafund cases."[145]  Another court within the Tenth Circuit noted that "[t]ypical multipliers range from one to four depending on the facts, with many courts awarding multipliers larger than four on case-specific grounds."[146]  Likewise, in *Steiner v. American Broadcasting Co., Inc.*, the Ninth Circuit upheld a multiplier of 6.85, and emphasized that it "f[ell] well within the range of multipliers that courts have allowed."[147]  Another court noted that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."[148]  And the court in *In re Charter Communications*

---

[143] *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10-ml-02151-JVS (FMOx), 2013 WL 12327929, at *34 (C.D. Cal. July 24, 2013).  *Accord, e.g., Tennille v. Western Union Co.*, No. 09-cv-00938-MSK-KMT, 2013 WL 6920449, at *3 (D. Colo. Dec. 31, 2013) ("A multiplier is then added to [the] lodestar amount to account for risk."); *Vaszlavik v. Storage Corp.*, No. 95-B-02525, 2000 WL 1268824, at *1 (D. Colo. Mar. 9, 2000) (lodestar multiplier is necessary to "compensate for risk").

[144] *Been*, 2011 WL 4478766, at *11.  *Accord, e.g., In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (noting that numerous other courts "have approved attorney fees based on the percentage method that resulted in lodestar multipliers in excess of four" and citing cases); *Vaszlavik*, 2000 WL 1268824, at *3 ("Courts in common fund cases regularly award multipliers of two to three times the lodestar or more to compensate for risk and to reflect the quality of the work performed.").

[145] *Urethane*, 2016 WL 4060156, at *7.

[146] *Cook v. Rockwell Int'l Corp.*, No. 90-cv-00181-JLK, 2017 WL 5076498, at *4 (D. Colo. Apr. 28, 2017).

[147] 248 F. App'x 780, 783 (9th Cir. 2007).

[148] *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013).  *See also, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6, app. (9th Cir. 2002) (collecting cases applying multipliers ranging as high as 19.6); *In re Credit Default Swaps Antitrust Litig.*, No. 1:13-md-02476, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (multiplier of 6.2); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (multiplier of 5.2); *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1123–25 (C.D. Cal. 2008) (multiplier of 5.2); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (multiplier of 6); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589–90 (E.D. Pa. 2005) (multiplier of 6.96); *Stop & Shop Supermarket Co. v. Smith-Kline Beecham Corp.*, No. Civ. A. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (multiplier of 15.6); *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK, slip op. at 8 (S.D.N.Y. Apr. 18, 2003) (Dkt. No. 171) (multiplier of 8.46); *Newman v. Carabiner International, Inc.*, No. 1:99-cv-02271, slip op. at 11 (S.D.N.Y. Oct. 25, 2001) (Dkt. No. 31) (multiplier of 7.7); *In re 3COM Corp. Sec. Litig.*, No. C-97-21083, slip op. at 12 (N.D. Cal. Mar. 9, 2001) (multiplier of 6.67); *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 335 (Bankr. D. Md. 2000) (multiplier of 19.6); *Perera v. Chiron Corp.*, No. 95-20725-SW (N.D. Cal. 1999), *cited in* ELIZABETH J. CABRASER, CALIFORNIA CLASS ACTIONS AND COORDINATED PROCEEDINGS § 15.05 (2d ed. 2017) (multiplier of 9.14).

*Securities Litigation* noted, in awarding a multiplier of 5.61, that the multiplier was "fully justified here given the effort required, the hurdles faced and overcome, and the results achieved."[149]

  **e.  The Multiplier Is Well Justified in Comparison With Other Mega-Fund Cases**

124. Multipliers much higher than 3.079 have been approved in other mega-fund cases. Such cases include, among others:

**TABLE 2: Multipliers Over 3.079 in Mega-Fund Class Actions**

| Case | Recovery | Multiplier | Trial? |
|---|---|---|---|
| *Stop & Shop Supermarket Co. v. Smith-Kline Beecham Corp.*, No. 03-cv-04578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) | $100 million | 15.6 | No |
| *Lobo Exploration Co. v. BP Am. Prod.*, No. CJ-1997-72 (Oka. Dist. Ct., Beaver Cnty. Dec. 8, 2005) | $150 million | 8.7 | No |
| *In re Buspirone Antitrust Litig.*, No. 1:01-md-01413-JGK (S.D.N.Y. Apr. 18, 2003) (Dkt. No. 171) | $220 million | 8.46 | No |
| *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) | $126.6 million | 6.96 | No |
| *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003), *aff'd*, 404 F.3d 173 (3d Cir. 2005) | $3.18 billion | 6.87 | No |
| *In re 3COM Corp. Sec. Litig.*, No. C-97-21083 (N.D. Cal. Mar. 9, 2001) | $259 million | 6.67 | No |
| *In re Credit Default Swaps Antitrust Litig.*, No. 1:13-md-02476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) | $1.86 billion | 6.2 | No |
| *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) | $600 million | 6 | No |
| *In re Charter Commc'ns, Inc. Sec. Litig.*, No. 4:02-cv-01186-CAS, 2005 WL 4045741 (E.D. Mo. June 30, 2005) | $146.2 million | 5.6 | No |
| *Roberts v. Texaco*, 979 F. Supp. 185 (S.D.N.Y. 1997) | $115 million | 5.5 | No |

---

[149] No. 4:02-cv-01186-CAS, 2005 WL 4045741, at *18 (E.D. Mo. June 30, 2005).

| Case | Recovery | Multiplier | Trial? |
|---|---|---|---|
| *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) | $7.22 billion | 5.21 | No |
| *DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, 2003 WL 25683496 (M.D.N.C. Dec. 19, 2003) | $212 million | 4.45 | No |
| *Simmons v. Anadarko Petroleum Corp.*, No. CJ-2004-57 (Okla. Dist. Ct., Caddo Cnty., Dec. 23, 2008) | $155 million | 4.2 | No |
| *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $3.42 billion | 4.03 | No |
| *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.07 billion | 3.97 | No |
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02-cv-05575(SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | $2.65 billion | 3.69 | No |
| *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom.*, *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96 (2d Cir. 2005) | $3.38 billion | 3.5 | No |
| *Bussie v. Allamerica Fin. Corp.*, No. 97-cv-040204, 1999 WL 342042 (D. Mass. May 19, 1999) | $108 million | 3.3 | No |

125.  As the court noted in the *Enron Litigation*: "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."[150]  It can be "adjusted to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved . . . ."[151]  In *Enron*, class counsel faced complex legal and factual issues, obtained class certification over vigorous opposition, took on numerous rounds of briefing and motion practice, contributed to (rather than relying entirely on) a parallel government investigation, and ultimately obtained a record-setting settlement.  The court held that "the extraordinary recovery under extremely challenging circumstances . . . justifies . . . application of a significant [5.21] multiplier."[152]  Similarly, in the *Rite Aid Securities Litigation*,

---

[150] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008).

[151] *Id.*

[152] *Id.* at 797.

the court cited the "undeniably unique" facts, the complexity of the legal issues, the lack of reliance "on the fruits of any official investigation," class counsel's skillful representation, and the impressive "nine-figure settlement" in support of a multiplier of 6.96.[153]   Importantly, in neither *Enron* nor *Rite Aid* was there a trial on the merits, unlike the instant case.

126.   Here, a multiplier of 3.079 for MDL class counsel is well justified under the case law because class counsel took on a challenging, risky case with extremely complex legal and factual issues, prosecuted it skillfully over the course of several years without assistance from any official investigation, obtained class certification despite Syngenta's opposition, conducted a complete trial that resulted in an impressive $217.7 million jury verdict, and obtained a superb $1.51 billion settlement for the class.

### f.   The Multiplier Is Supported by the Relevant *Johnson* Factors

127.   The reasonableness of the 3.079 multiplier is further confirmed by those *Johnson* factors that are not already subsumed by the lodestar calculation.   In particular, this is an unusually complicated case, with difficult legal and factual issues, and it involved a contested class certification, a successful bellwether trial, and contentious dispositive and *Daubert* motions.   MDL class counsel took on substantial risks, were precluded to a significant extent from doing other work, and achieved an enormous $1.51 billion settlement, even though the case was not a desirable one at the outset.   *See* ¶¶ 52–90.

### 5.  Conclusion on Attorneys' Fees

128.   The attorneys' fees sought (33⅓ percent) are well justified based on the percentage method, and the 50 percent of those fees sought by MDL class counsel remain fully justified even if this Court were to analyze the fees under a lodestar cross check.

---

[153] *See In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005).

## ALLOCATION OF FEES[154]

**B. The Proposed Allocation of Attorneys' Fees Is Reasonable**

129.  As explained above (¶ 37), on February 23, 2018, class counsel entered into a fee-sharing agreement.  Specifically, co-lead counsel in the federal MDL, co-class counsel in the Minnesota cases, and appointed lead counsel in the Illinois state cases agreed on an allocation among their various groups, after mediations with the Court-appointed special master.  Under the agreement, those attorneys propose that the Court divide the fee award as follows:  50 percent to co-lead counsel in the federal MDL and the attorneys who performed and reported common benefit work in the federal MDL; 12.5 percent to attorneys who performed common benefit work in the Minnesota MDL; and 17.5 percent to appointed counsel in the Illinois state-court cases. Under the agreement, the remaining 20 percent of the requested fee would be distributed as the Court deems appropriate.

130.  I understand that class counsel are now recommending that the Court allocate the common benefit portion pursuant to the February 23, 2018 agreement (50/12.5/17.5 percent).  As to the remaining 20 percent, class counsel urge that that portion be allocated:  (1) to subclass counsel for the Viptera purchaser, grain elevator, and ethanol production subclasses for their efforts representing those subclasses during settlement negotiations and for any service awards sought by subclass counsel for the subclass representatives; (2) to other counsel who make timely fee requests as the Court deems appropriate; and (3) if funds remain, to lawyers whose services were of demonstrable class benefit (including those in the Kansas MDL group) as the Court deems appropriate in accordance with the *Johnson* factors.

131.  The February 2018 agreement was negotiated under the auspices of the special masters, and the allocations were the result of arms-length negotiations between the federal MDL common benefit group, the Minnesota common benefit group, and the Illinois common benefit group.  Given the arms-length bargaining and the involvement of the special masters, I have no basis to second-guess the 50/12.5/17.5 allocation among common benefit counsel.   MDL common benefit counsel did much of the heavy lifting in developing and investigating the case, and took the lead on discovery, class certification, briefing key legal issues, and trying the

---

[154] I offer no opinions in connection with a putative class action lawsuit filed against the Watts Guerra law firm, *Kellogg v. Watts Guerra et al.*, No. 0:18-cv-01082-DWF-BRT (D. Minn. filed Apr. 24, 2018).

Kansas case. Also, it makes perfect sense for common benefit counsel to defer to the Court on allocations to subclass counsel and other attorneys from the remaining 20 percent. Finally, it makes good sense for the Court to divide among common benefit counsel any of the 20 percent that is left over, and the *Johnson* factors can be used to determine precisely how to divide those funds.

## OUT-OF-POCKET COSTS

### C. The Out-of-Pocket Costs Sought by Class Counsel Are Reasonable

132. MDL class counsel seek out-of-pocket costs in the amount of $$6,695,350.05. It is well settled in the Tenth Circuit and nationwide that "an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred."[155]

133. In my opinion, the costs sought by class counsel are eminently reasonable. Those costs represent only 0.44 percent of the settlement fund. They include: expert-related expenses (more than $1.5 million), class certification notice (more than $460,000), deposition-related expenses (more than $380,000), payments to the special masters (close to $300,000), ESI expenses (close to $300,000), as well as substantial outlays for travel, research, fax and mailing charges, court costs, etc. Notably, as previously discussed, class counsel paid those enormous costs without any assurance that the case would ultimately succeed.

134. Based on my experience, costs of that magnitude are well within (indeed, below) the norm for major class actions. For example, in the *Enron* case, costs were 0.50 percent;[156] in *Visa Antitrust*, costs were 0.55 percent;[157] in the *Tyco Securities Litigation*, costs were 0.87 percent,[158]

---

[155] *Lucas v. Kmart Corp.*, No. 99-cv-01923-JLK-CBS, 2006 WL 2729260, at *9 (D. Colo. July 27, 2006). *Accord, e.g., Been v. O.K. Indus., Inc.*, No. CIV-02-285-RAW, 2011 WL 4478766, at *3 (E.D. Okla. Aug. 16, 2011) ("Attorneys who recover a common fund for a class are entitled to . . . reasonable . . . costs and expenses from the fund."); *Wakefield v. Wells Fargo & Co.*, No. 3:13-CV-05053-LB, 2015 WL 3430240, at *6 (N.D. Cal. May 28, 2015) ("Class counsel are entitled to reimbursement of reasonable out-of-pocket expenses."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 534–35 (E.D. Mich. 2003) ("Under the common fund doctrine, class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document productions, consulting with experts and consultants, travel and other litigation-related expenses.").

[156] *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (approximately $39 million in costs compared to $7.2 billion settlement).

[157] *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ($18.7 million in costs compared to $3.4 billion settlement).

in *Dahl v. Bain Capital Partners, LLC*, costs were 2.03 percent,[159] and in the *U.S. Foodservice Pricing Litigation*, costs were 2.7 percent.[160]  Moreover, the costs are for standard (and expected) expenses for a case like this, and thus do not raise any concerns.

## INCENTIVE PAYMENTS

### D. The Proposed Incentive Payments for the Class Representatives Are Reasonable

135.  The Kansas class representatives, and certain other class representatives and bellwether plaintiffs here, invested significant time and effort on behalf of the class.  For most, their work on this case took them away from their families and from their day-to-day responsibilities of running their family-owned farms.  Those who attended the three-week Kansas class trial had to travel to Kansas City, far from their homes and farms, and some spent the full three weeks at trial.  They had to prepare to testify, and ultimately provided persuasive testimony that helped win a major verdict for the class.  All of those plaintiffs who attended the Kansas class trial were also deposed, and many had to travel to prepare for and attend their sometimes lengthy depositions.  A number of plaintiffs who did not attend the Kansas class trial nonetheless had to travel to prepare for and attend depositions.  And all of the plaintiffs who were deposed also responded to lengthy written discovery—including at least six sets of interrogatories propounded by Syngenta and nearly 100 requests for admissions—and produced numerous documents detailing their farming operations in response to Syngenta's requests for production.  Other plaintiffs were not deposed, but spent significant time responding to voluminous requests for production beyond plaintiff fact sheets.  In addition to searching and reviewing their own files to respond to Syngenta's discovery requests, many plaintiffs in each category had to put in additional effort to obtain documents from third parties.

136. Class counsel seek incentive payments for those class representatives and bellwether plaintiffs, to be structured as follows:  (1) $100,000 for each plaintiff who attended the Kansas

---

[158] *See In re Tyco Int'l Ltd. Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) ($28.9 million in costs compared to $3.3 billion settlement).

[159] *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388 (D. Mass. Feb. 2, 2015) (Dkt. No. 1095) ($12 million in costs compared to $590.5 million settlement).

[160] *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT), slip op. at 7 (D. Conn. Dec. 9, 2014) (Dkt. No. 521) ($8.08 million in costs compared to $297 million settlement).  Professors Eisenberg and Miller found that mean and median costs awarded in all class settlements between 2003 and 2008 were 2.7 percent and 1.7 percent, respectively.  *See* Eisenberg & Miller, *supra* note 20, at 274.

class trial; (2) $15,000 for each plaintiff who was deposed but did not attend the Kansas class trial; and (3) $5,000 for each plaintiff who responded to written discovery but was not deposed and did not attend the Kansas class trial.  The first category encompasses four plaintiffs; the second encompasses 65 plaintiffs; and the third encompasses 20 plaintiffs.[161]  Thus, the proposed incentive payments total $1.475 million, or 0.1 percent of the $1.51 billion common fund.  In my view, these requests are reasonable based on the facts and circumstances presented here.

137.  In the Tenth Circuit and elsewhere, incentive payments serve as compensation to class representatives "for personal risk incurred by the [class representative] or additional effort and expertise provided for the benefit of the class."[162]  Courts often look to "the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial."[163]  Moreover, courts frequently evaluate incentive payments "in comparison to the total recovery on behalf of the class."[164]

138.  Courts have approved substantial incentive payments where the class representatives undertook particularly demanding work on behalf of the class.  The payments sought here are substantial but not unprecedented.  Thus, courts have awarded $100,000 or more in a number of cases, such as where the representatives participated in trials or otherwise performed major roles.  For instance, in *Urethane*, this Court awarded incentive payments as high as $150,000 to $200,000 out of a fund of $835 million.[165]  In *Boynton v. Headwaters, Inc.*, the court approved incentive payments of $100,000 out of a fund of $16 million, noting the "diligence" of the class representatives and the "significant financial sacrifices" they made in playing such active, time-

---

[161] The plaintiffs in each category are identified in the Memorandum in Support of Kansas MDL Co-Lead Counsel and Settlement Class Counsel Christopher Seeger's Petition for Award of Attorneys' Fees, Reimbursement of Expenses, Service Awards to Class Representatives/Bellwether Plaintiffs and Allocation of Attorneys' Fee Award (filed contemporaneously).

[162] *UFCW Local 880–Retail Food Emp'rs Joint Pension Fund v. Newmont Mining Corp.*, 352 F. App'x 232, 235–36 (10th Cir. 2009).  *Accord, e.g., Hadix v. Johnson*, 322 F.3d 895, 898 (6th Cir. 2003) (noting that "incentive awards are efficacious ways of . . . rewarding individual efforts taken on behalf of the class," noting that "[n]umerous courts have authorized incentive awards," and citing cases approving incentive awards); *Lane v. Page*, 862 F. Supp. 2d 1182, 1234 (D.N.M. 2012) (noting that incentive payments serve "to compensate a class representative for risks they take and work they perform on behalf of the class").

[163] *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 257 (E.D. Pa. 2011).

[164] *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 565 F. Supp. 2d 49, 57 (D.D.C. 2008).

[165] *See In re Urethane Antitrust Litig.*, No. 04-md-01616-JWL, slip op. at 2 (D. Kan. July 29, 2016) (Dkt. No. 3276).

consuming roles.[166]  Other examples are *In re High-Tech Employee Antitrust Litigation,*[167] *In re Titanium Dioxide Antitrust Litigation,*[168] *Ivax Corp. v. Aztec Peroxides, LLC,*[169] *In re Neurontin Antitrust Litigation,*[170] *Marchbanks Truck Services v. Comdata Network, Inc.,*[171] *Been v. O.K. Industries, Inc.,*[172] *Columbus Drywall & Insulation, Inc. v. Masco Corp,*[173] *Velez v. Novartis Pharmaceutical Corp.,*[174] and the *NFL Concussion Litigation.*[175]  And of course, myriad cases have awarded payments of less than $100,000.[176]

139.  In evaluating the reasonableness of proposed incentive payments, courts in the Tenth Circuit consider a number of factors:

> (1) the actions the class representative took to protect the interests of the class; (2) the level of benefit that the class received from the class representative's actions; and (3) the quantity of time and effort the class representative spent in pursuing the litigation.[177]

---

[166] No. 10:2-cv-01111-JPM-EGB, 2012 WL 12546853, at *3 (W.D. Tenn. Mar. 27, 2012).

[167] No. 11-cv-02509-LHK, 2015 WL 5158730, at *17–18 (N.D. Cal. Sept. 2, 2015) ($100,000–$140,000 incentive payments out of $16 million settlement fund).

[168] No. 10-cv-00318(RDB), 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) ($125,000 incentive payment out of $163.5 million fund).

[169] No. 1:02-cv-00593, slip op. at 2 (D.D.C. Aug. 24, 2005) (Dkt. No. 78) ($100,000 incentive payments out of $21 million fund).

[170] No. 02-cv-01830, slip op. ¶ 31 (D.N.J. Aug. 6, 2014) (Dkt. No. 114) ($100,000 incentive payments out of $190 million fund).

[171] No. 07-cv-01078, slip op. at 2, 8 (E.D. Pa. July 14, 2014) (Dkt. No. 713) ($150,000 and $75,000 incentive payments out of $130 million fund).

[172] No. CIV-02-285-RAW, 2011 WL 4478766, at *12 (E.D. Okla. Aug. 16, 2011) ($100,000 incentive payments out of $15.6 million fund).

[173] No. 1:04-cv-03066-JEC, 2008 WL 11319972, at *3 (N.D. Ga. Mar. 4, 2008) ($100,000 incentive payments out of $37.25 million fund).

[174] No. 04-cv-09194-CM, 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) ($125,000 incentive payments out of $152.5 million fund).

[175] *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, at *10–11 (E.D. Pa. Apr. 5, 2018) ($100,000 incentive payments out of $1 billion fund).

[176] *See, e.g., In re Online DVD Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (permitting $5,000 incentive payments); *Thompson v. Qwest Corp.*, No. 17-cv-01745-WJM, 2018 WL 2183988, at *3 (D. Colo. May 11, 2018) (same); *Waldbuesser v. Northrop Grumman Corp.*, No. 06-cv-06213-AB (JCX), 2017 WL 9614818, at *6–8 (C.D. Cal. Oct. 24, 2017) ($25,000 incentive payments out of $16.75 million fund); *see also, e.g., In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1041–42 (N.D. Ill. 2011) (awarding $5,000 incentive payments despite noting that "the parties undertook no formal discovery" and thus "the class representatives' roles were largely prospective").

[177] *Nieberding v. Barrette Outdoor Living, Inc.*, 129 F. Supp. 3d 1236, 1251 (D. Kan. 2015).

Courts also consider the personal risk assumed by the class representative.[178]  I assess each of these factors below:

140.  **Actions to Protect the Interests of the Class.**  Here, the class representatives and other bellwether plaintiffs ensured that common benefit counsel could properly litigate the case. Without their cooperation, common benefit counsel could not have complied with their discovery obligations or satisfied plaintiffs' burden of proof in the bellwether trial.  All of the plaintiffs for whom incentive payments are sought responded to written discovery and produced documents.  Some of those plaintiffs also prepared for and sat for depositions.  And a subgroup of the latter group actually attended and participated in all or most of the three week trial.  *See* Stueve Decl. ¶ 305.  All of these actions were designed to ensure that plaintiffs satisfied their discovery obligations and succeeded at trial.

141.  **Benefit to the Class.**  The benefit to the class is obvious:  the class representatives and other bellwether plaintiffs did important heavy lifting that enabled class counsel to win the Kansas class bellwether trial, secure a jury verdict of $217.7 million, and thereby parlay that verdict into a $1.51 billion settlement.  As the court noted in *In re Linerboard Antitrust Litigation*:  "Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly."[179]

142.  **Time and Effort.**  The declarations contemporaneously filed by counsel detail the substantial time and effort put into the case by each plaintiff for whom an incentive payment is sought.  *See, e.g.*, Stueve Decl. ¶¶ 279–401.

143.  **Risk.**  The class representatives and bellwether plaintiffs took a huge risk that, despite all the hours they put into the case, causing them at times to put their farming operations on hold, they (and the class) might end up recovering nothing.  And, of course, had the case not gone well for the class, there would be no chance that these plaintiffs would be eligible for incentive

---

[178] *See, e.g., In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 293 (D. Kan. 2010) (noting that incentive awards are justified "to compensate [class representatives] for personal risk incurred"); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL-1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) (noting, in awarding incentive payments of $30,000 each, that "[t]he Class Representatives not only conferred benefits on all of the Class Members, but also risked jeopardizing their existing relationships with their suppliers of automotive refinishing paint products"); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299–300 (N.D. Cal. 1995) (noting that, in evaluating the reasonableness of incentive payments, courts consider "the risk to the class representative in commencing suit, both financial and otherwise").

[179] No. 98-cv-05055, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004).

payments. Moreover, the Kansas class representatives took on unique risk because of the timing of the Kansas class trial. The June 2017 trial occurred during the final weeks of the Kansas corn planting season (and for some, the wheat harvest season), a critical time for farmers to be on their farms. *See* Stueve Decl. ¶ 305. The Kansas class representatives' willingness to travel to Kansas City for up to three weeks during planting season put their families' livelihoods at risk, and represents a much different situation than a company merely sending a designated corporate representative to sit at trial.

144. Two examples that illustrate the hardships borne by the Kansas class representatives who attended the trial are David Polifka and Daniel Grafel. Polifka, a corn and wheat farmer in Quinter, Kansas, completed a fact sheet for class counsel, responded to numerous interrogatories propounded by Syngenta, and produced over 6,000 pages of documents detailing his farming operations. He attended a deposition 50 miles from his home, spent nearly three full weeks in Kansas City at the trial, and provided live testimony on day eight of the trial. During corn planting and wheat harvest season, Polifka would normally have been putting in long days on his family farm—as well as providing equipment for and assisting his two sons with their farms— but abandoned those duties for the benefit of the class. Grafel, a corn and wheat farmer in Oberlin, Kansas, also completed a fact sheet for class counsel and responded to numerous interrogatories propounded by Syngenta. In total, he produced over 22,000 pages of documents detailing his farming operations. He was deposed locally, but traveled to Kansas city for nearly three weeks for the trial, and was the first live witness at trial. Like Polifka, Grafel would normally have been working long days during the corn planting and wheat harvest season—the busiest time of the year for his family farm. His efforts on behalf of the class and absence during that critical time placed "significant stress" on his farming operation. Stueve Decl. ¶¶ 309–333.

145. Finally, none of the questionable circumstances that have caused courts to reject or overturn incentive payments in other cases exist here. In *Radcliffe v. Experian Information Solutions Inc.*, for example, the Ninth Circuit overturned a class settlement on the ground that the settlement agreement provided for incentive awards *only* if the class representatives supported the settlement, creating a "patent divergence of interests between the named representatives and the class."[180] By contrast, the incentive payments in this case are not conditioned on support for

---

[180] 715 F.3d 1157, 1161 (9th Cir. 2013).

the settlement.   Additionally, this is not a case where the unnamed class members receive nothing.[181]   Indeed, the proposed incentive payments represent only a tiny fraction (0.1 percent) of the total recovery.   Here, the class will receive significant monetary compensation for their losses.   Thus, the entire class directly benefited from the class representatives' investment of time in the case.

## VII.  CONCLUSION

146.  It is my opinion that the attorneys' fees requested, proposed fee allocation, expenses claimed, and proposed incentive payments are reasonable.

---

[181] Even in a case where the settlement went entirely to a *cy pres* entity and attorneys' fees, the Ninth Circuit affirmed incentive payments.  *See Lane v. Facebook, Inc.*, 696 F.3d 811, 817 (9th Cir. 2012).

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

_____

Robert H. Klonoff

July 10, 2018

APPENDIX A

CURRICULUM VITAE

**ROBERT H. KLONOFF**
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel:  503-768-6601 (Office)
E-Mail:  klonoff@lclark.edu

Date of Birth:   March 15, 1955
Place of Birth:  Portland, Oregon

**EDUCATION:**

J.D., Yale University, 1979

A.B., University of California, Berkeley, 1976, Majored in Political Science/Economics (Highest Honors)

**WORK EXPERIENCE:**

**Current Position:**

Jordan D. Schnitzer Professor of Law, Lewis & Clark Law School (since 2014)

**Prior Positions:**

Dean of the Law School, Lewis & Clark Law School (2007-2014)

Douglas Stripp/Missouri Endowed Professor of Law, University of Missouri-Kansas City School of Law (2003-2007)

Jones Day, Washington, D.C. (Partner, 1991-July 2003; Of Counsel, 1989-1991, 2003- 2007)

Adjunct Professor of Law, Georgetown University Law Center (class action law and practice) (1999-2003)

Visiting Professor of Law, University of San Diego School of Law (1988-1989)

Assistant to the Solicitor General of the United States (1986-1988)

Assistant United States Attorney (Criminal Division, District of Columbia) (1983-1986)

Associate, Arnold & Porter, Washington, D.C. (1980-1983)

Law Clerk to the Honorable John R. Brown, Chief Judge, United States Court of Appeals for the Fifth Circuit (1979-1980)

Summer Associate, Baker & Botts, Houston, and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (1978)

Summer Associate, Sidley & Austin, Washington, D.C. (1977)

## SPECIAL HONORS AND ACHIEVEMENTS:

Member, 2011-2017, United States Judicial Conference Advisory Committee on Civil Rules (appointed by Chief Justice John G. Roberts, Jr., in 2011 as the sole voting member from the law school academy; reappointed May 2014 for a second three-year term)

Elected Member, International Association of Procedural Law

Selected in November 2013 for the J. William Fulbright Specialist Roster

Recipient, Oregon Consular Corps Award for Individual Achievement in International Outreach, Portland, Oregon (May 2013)

Associate Reporter, American Law Institute's *Principles of the Law of Aggregate Litigation* (class action project; drafts presented at several annual meetings; final version approved by full ALI in May 2009 annual meeting and published in May 2010)

Fellow, American Academy of Appellate Lawyers

Fellow, American Bar Foundation

Academic Fellow, Pound Institute

Elected Member, American Law Institute

Recipient, 2007 Award for Outstanding UMKC Law Professor (based on vote of 3d year class)

2007 UMKC Law School Commencement Speaker (based on vote of 3d year class)

Recipient, 2006 UMKC Law School Elmer Pierson Teaching Award for Most Outstanding Teacher in the Law School (selected by the Dean)

Recipient, 2005 President's Award for Outstanding Service from the UMKC Law School Foundation

Reporter, 2005 National Conference on Appellate Justice (co-sponsored by the Federal Judicial Center, National Center for State Courts, and other organizations)

Co-Recipient, District of Columbia Bar's Frederick B. Abramson Award for Superior Service to the Community (June 1998)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant to the Solicitor General of the United States (1986, 1987)

Attorney General's Special Achievement Award for Outstanding Work as an Assistant United States Attorney (1984, 1985)

The Benjamin N. Cardozo Prize for Best Moot Court Brief for Academic Year 1978-1979, Yale Law School

Semi-Finalist, Moot Court Oral Argument, Yale Law School (Fall, 1978)

Phi Beta Kappa

U.C. Berkeley's Most Outstanding Political Science Student (1976)

The Edward Kraft Award for Outstanding Work as a Freshman Student, U.C. Berkeley (1974)

## **MEMBERSHIPS**:

U.S. Supreme Court Bar

Various Federal Circuit and District Courts

District of Columbia Bar

Missouri State Bar

Oregon State Bar

Multnomah County Bar

American Law Institute

American Bar Association

American Bar Association Committee on Class Actions & Derivative Suits (Section of Litigation)

**PUBLICATIONS:**

    **Books:**

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017)

        Castanias & Klonoff, *Federal Appellate Practice in a Nutshell* (West  2d ed. 2017)

        Klonoff, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017) (with teacher's manual)

        Klonoff, *Introduction to the Study of U.S. Law:  Cases and Materials* (West 2016)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 4th ed.) (2012)

        Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 3d ed.) (2012) (with teacher's manual)

        Klonoff (associate reporter), *Principles of the Law of Aggregate Litigation*, American Law Institute Publications (2010) (along with Samuel Issacharoff, reporter, and associate reporters Richard Nagareda and Charles Silver)

        Castanias & Klonoff, *Federal Appellate Practice and Procedure in a Nutshell* (Thomson West) (2008)

        Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (NITA 3d ed.) (2007)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 3d ed.) (2007)

        Klonoff, Bilich & Malveaux, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (Thomson West 2d ed.) (2006) (with teacher's manual)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (Thomson West 2d ed.) (2004)

        Klonoff & Colby, *Winning Jury Trials:  Trial Tactics and Sponsorship Strategies* (Lexis Nexis 2d ed.) (2002)

        Klonoff & Bilich, *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West Group 2000)

        Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West Group 1999)

Klonoff & Colby, *Sponsorship Strategy:  Evidentiary Tactics for Winning Jury Trials* (Michie Co. 1990)

**Articles and Book Chapters:**

*Application of the New Discovery Rules in Class Actions: Much Ado About Nothing,* 6 Vanderbilt L. Rev. ___ (forthcoming, 2018)

*Class Actions in the U.S. and Israel: A Comparative Approach*, 19 Theoretical Inquiries in the Law 151 (2018) (co-author)

*Class Actions Part II: A Respite from the Decline*, 92 N.Y.U. L. Rev. 971 (2017)

*The Remedy For Election Fraud Is A New Election,* Law 360 (July 20, 2017) (www.law360.com/whitecollar/articles/946569/the-remedy-for-election-fraud-is-a-new-election)

*Class Actions in the Year 2025: A Prognosis*, 65 Emory L.J. 1569 (2016)

*Why Most Nations Do Not Have U.S.-Style Class Actions*, 16 BNA Class Action Litigation Report, Vol. 16, No. 10, at 586 (May 22, 2015) (selected for presentation at the May 2015 World Congress of the International Association of Procedural Law, Istanbul, Turkey)

*Federal Rules Symposium:  A Tribute to Judge Mark R. Kravitz -- Introduction to the Symposium*, 18 Lewis & Clark L. Rev. 583 (2014) (co-author)

*Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):  Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014)

*The Decline of Class Actions,* 90 Wash. U. (St. Louis) L. Rev. 729 (2013)

*Reflections on the Future of Class Actions,* 44 Loy. U. Chi. L.J. 533 (2013)

*Richard Nagareda: In Memorium,* 80 U. Cin. L. Rev. 289 (2012)

*Introduction and Memories of a Law Clerk,* 47 Houston L. Rev. 529, 573 (2010)

*ALI's Aggregate Litigation Project Has Global Impact,* 33 ALI Reporter 7 (Fall 2010)

Book Review, *In the Public Interest,* 39 Env. Law 1225 (2009)

*The Public Value of Settlement,* 78 Fordham L. Rev. 1177 (2009)(co-author)

*Making Class Actions Work:  The Untapped Potential of the Internet,* 69 U. Pitt. L. Rev. 727 (co-author)(2008), adapted and published in 13  J. Internet Law 1 (2009)

*The Class Action Fairness Act:  An Ill-Conceived Approach to Class Settlements*, 80 Tul. L. Rev. 1695 (co-author) (2006)

*The Twentieth Anniversary of* Phillips Petroleum v. Shutts, *Introduction to the Symposium*, 74 UMKC L. Rev. 433 (2006)

*The Adoption of a Class Action Rule:  Some Issues for Mississippi to Consider*, 24 Miss. C. L. Rev. 261 (2005)

*Antitrust Class Actions:  Chaos in the Courts*, 11 Stan. J. L. Bus. & Fin. 1 (2005), reprinted in Litigation Conspiracy:  An Analysis of Competition Class Actions (Stephen G.A. Pitel ed. Irwin Law 2006), and 3 Canadian Class Action Review 137 (2006)

*The Judiciary's Flawed Application of Rule 23's "Adequacy of Representation" Requirement*, 2004 Mich. St. L. Rev. 671 (2004)

*Class Action Rules — Are They Driven by Substance?*, 1 Class Action Litigation Report 504 (Nov. 10, 2000) (co-author)

*Response to May 2000 Article on Sponsorship Strategy*, 63 Tex. B.J. 754 (Sept. 2000) (co-author)

*A Look at Interlocutory Appeals of Class Certification Decisions Under Rule 23(f)*, 1 Class Action Litigation Report 69 (May 12, 2000) (co-author)

*The Mass Tort Class Action Gamble*, 7 Metro. Corp. Counsel 1, 8 (Aug. 8, 1999) (co-author)

"Legal Approaches to Sex Discrimination" (co-author), in H. Landrine & E. Klonoff, *Discrimination Against Women:  Prevalence, Consequences, Remedies* (Sage Pub. 1997)

*Sponsorship Strategy:  A Reply to Floyd Abrams and Professor Saks*, 52 Md. L. Rev. 458 (1993) (co-author)

*A Trial Lawyer's Roadmap for Handling Bad Facts:  The Role of Credibility*, 16 Trial Diplomacy Journal 139 (July/Aug. 1993) (co-author)

*Opening Statement*, 17 Litigation 1 (ABA Spring 1991) (co-author)

Contributing Editor, *Criminal Practice Institute Trial Manual*, Young Lawyers Section, Bar Ass'n of D.C. (1986)

*The Congressman as Mediator Between Citizens and Government Agencies:  Problems and Prospects*, 15 Harv. J. Legis. 701 (1979)

*A Dialogue on the Unauthorized Practice of Law*, 25 Villanova L. Rev. 6 (1979) (co-author)

*The Problems of Nursing Homes:  Connecticut's Non Response*, 31 Admin. L. Rev. 1 (1979)

## SIGNIFICANT LEGAL EXPERIENCE:

Argued eight cases before the U.S. Supreme Court

Authored dozens of U.S. Supreme Court filings (certiorari petitions, certiorari oppositions, merits briefs, reply briefs)

Briefed and argued numerous cases before various U.S. circuit and district courts and state trial and appellate courts

Tried dozens of cases (primarily jury trials)

Handled more than 100 class action cases as counsel

Served as an expert witness in numerous federal and state class action cases, including the British Petroleum Deepwater Horizon oil spill case, the National Football League Concussion case, and the Volkswagen "Clean Diesel" case

Worked extensively with testifying and consulting experts on class action issues, including economists, securities experts, medical and scientific experts, and leading academics

Presented more than 100 cases to the grand jury while serving as an Assistant U.S. Attorney

Handled hundreds of sentencing hearings, preliminary hearings, and probation revocation hearings

## SIGNIFICANT TEACHING AND SPEAKING ENGAGEMENTS

Speaker on Class Actions, Freie University Faculty of Law, Berlin, Germany (June 26, 2018)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (April 2018) (taught course on Introduction to United States Law)

Co-Chair, Moderator, and Panelist, Posner on Class Actions, Columbia Law School, New York, New York (March 2, 2018)

Panelist on Civil Discovery, Vanderbilt University School of Law, Nashville, Tennessee (October 13, 2017)

Panelist on the Civil Rules Committee Process, University of Arizona College of Law, Tucson, Arizona (October 7, 2017)

Visiting Professor of Law, University of Bologna School of Law, Ravenna, Italy (July 2017) (faculty member for environmental law program; lectured on environmental class actions)

Visiting Professor of Law, University of Trento School of Jurisprudence, Trento, Italy (May 2017) (taught course on Introduction to U.S. Law)

Panelist on Class Actions, Beard Group, Class Action Money and Ethics Conference, New York, New York (May 1, 2017)

Visiting Professor of Law, Tel Aviv University, Tel Aviv, Israel (January 2017) (taught course on class actions)

Panelist on Class Actions, Tel Aviv University, Fifty Years of Class Actions – A Global Perspective (January 4, 2017)

Panelist on Class Actions, New York University Law School Conference on Rule 23@50, New York, New York (December 2, 2016)

Panelist on Class Actions, Appellate Judges Education Institute, Philadelphia, Pennsylvania (November 11, 2016)

Speaker on Class Actions, National Legal Aid Defender Association National Farmworker Conference, Indianapolis, Indiana (November 10, 2016)

Panelist on Class Actions, American Bar Association Class Action Institute, Las Vegas, Nevada (October 20, 2016)

Panelist, Duke University Law School Conference on Class Action Settlements, San Diego, California (October 6, 2016)

Fulbright Scholar, Hong Kong University School of Law (August- September 2016) (taught course on class actions and delivered campus-wide lecture on criminal procedure)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (June 2016) (taught course on Introduction to United States Law)

Speaker on Class Actions, University of Zagreb Law School, Zagreb, Croatia (May 11, 2016)

Panelist on Civil Litigation, Association of American Law Schools Annual Meeting, New York, New York (January 8, 2016)

Visiting Professor of Law, Bahçeşehir University School of Law, Istanbul, Turkey (December 2015) (taught Introduction to United States Law)

Invited Participant, Conference on Civil Justice (Pound Institute) Emory University Law School, Atlanta, Georgia (October 15, 2015)

Invited Participant, Conference on Class Actions, Duke Law School, Arlington, Virginia (July 23-24, 2015)

Invited Participant, Conference on Class Actions, Defense Research Institute, Washington, D.C. (July 23-24, 2015)

Invited Participant, Civil Procedure Workshop, Seattle University Law School, Seattle, Washington (July 17, 2015)

Panelist on Class Actions, Annual Meeting, American Association for Justice, Montreal, Canada (July 12, 2015)

Speaker on Class Actions, International Association of Procedural Law, Istanbul, Turkey (May 28, 2015)

Panelist, Subcommittee on Class Actions of U.S. Judicial Conference Advisory Committee on Civil Rules, American Law Institute Annual Meeting, Washington, D.C. (May 17, 2015)

Moderator, Ethical Issues in Class Actions and Non-Class Aggregate Litigation, American Law Institute Annual Meeting, Washington, D.C., (May 17, 2015)

Visiting Professor of Law, University of Trento, Trento, Italy (March 2015) (taught U.S. Class Actions)

Speaker on Class Actions, European University Institute, Fiesole, Italy (February 23, 2015)

Visiting Professor of Law, University of Notre Dame, Fremantle Australia (January 2015) (taught course on U.S. Civil Rights and Civil Liberties)

Visiting Professor of Law, Universidad Sergio Arboleda, Bogota and Santa Marta, Colombia (December 2014) (taught course on Introduction to United States Law)

Visiting Professor of Law, National Taiwan University, Taipei, Taiwan (November 2014) (taught course on Introduction to United States Law)

Panelist, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 23, 2014)

Visiting Professor of Law, East China University of Political Science and Law, Shanghai, China (October 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Herzen State Pedagogical University of Russia, St. Petersburg, Russia (September 2014) (taught U.S. Class Actions)

Visiting Professor of Law, Royal University of Law and Economics, Phnom Penh, Cambodia (July 2014) (taught Introduction to United States Law)

Speaker on U.S. Legal Education, Universidad Sergio Arboleda School of Law, Bogota, Colombia (June 3 and 5, 2014)

Speaker on Class Actions, Superintendencia de Industria y Comercio, Bogota, Colombia (June 3, 2014)

Speaker on Class Actions and the Fukushima Nuclear Accident, Waseda University School of Law, Tokyo, Japan (January 24, 2014)

Speaker on Class Actions, Osaka Bar Association, Osaka, Japan (January 23, 2014)

Speaker on Class Actions, East China University of Political Science and Law, Shanghai, China (January 15, 2014)

Speaker on Class Actions, AmCham Shanghai, Shanghai, China (January 14, 2014)

Speaker on Development of Animal Law in the Legal Academy, 2013 Animal Law Conference, Stanford Law School, Palo Alto, California (November 25, 2013)

Speaker on U.S. Law and Legal Education, Royal University of Law and Economics, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Law and Legal Education, Paññāsāstra University of Cambodia, Phnom Penh, Cambodia (October 1, 2013)

Speaker on U.S. Legal Education, International Association of Law Schools International Deans' Forum, National University of Singapore Law School, Singapore (September 26, 2013)

Speaker on Class Actions, Japan Federation of Bar Associations, Tokyo, Japan (September 19, 2013)

Speaker on Class Actions, Waseda University School of Law, Tokyo, Japan (September 19, 2013)

Speaker on Ethics of Aggregate Settlements, American Association for Justice Annual Meeting, San Francisco, California (July 22, 2013)

Speaker on the British Petroleum Class Action Settlement, International Water Law Conference, National Law University of Delhi, Delhi, India (May 31, 2013)

Speaker on U.S. Supreme Court Confirmation Process, Jewish Federation of Greater Portland's Food for Thought Festival, Portland, Oregon  (April 21, 2013)

Speaker on Class Actions, Class Action Symposium, George Washington University Law School, Washington, D.C. (March 8, 2013)

Speaker on Class Actions, Impact Fund Class Action Conference, Oakland, California (March 1, 2013)

Speaker on Class Actions, Hong Kong University Department of Law (November 15, 2012)

Speaker on Class Actions, Fudan University Law School (Shanghai, China) (November 13, 2012)

Keynote Speaker, National Consumer Law Center Symposium, Seattle, Washington (October 28, 2012)

Speaker, American Bar Association, National Institute on Class Actions, Chicago, Illinois (October 25, 2012)

Speaker, Conference on Class Actions, Washington University St. Louis School of Law and the Institute for Law and Economic Policy (April 27, 2012)

Speaker, Conference on Class Actions, Loyola Chicago School of Law (April 13, 2012)

Panelist on leadership and world peace with Former South African President F.W. De Klerk, University of Portland (February 29, 2012)

Panelist on class actions before the Standing Committee on Rules of Practice and Procedure, Phoenix, Arizona (January 5, 2012)

Speaker on Class Actions Lawsuits in the U.S., University of the Philippines, College of Law, Quezon City, Philippines (August 2011)

Speaker on Environmental Class Actions, Kangwon University Law School, Chuncheon, South Korea (August 2011)

Speaker on Class Actions, Federal Judicial Center Conference on Class Actions, Duke University School of Law (May 20, 2011)

Speaker, Conference on Aggregate Litigation, University of Cincinnati College of Law (April 1, 2011)

Speaker on Class Actions, Seoul National University School of Law (May 18, 2010)

Keynote Speaker (addressing US Supreme Court confirmation process), Alaska Bar Annual Meeting (April 28, 2010)

Speaker, Conference on the Future of Animal Law, Harvard Law School (April 11, 2010)

Speaker, Conference on Aggregate Litigation: Critical Perspectives, George Washington University Law School (Mar. 12, 2010)

Speaker, U.S. Supreme Court Confirmation Process, Multnomah County Bar Association and City Club of Portland, (Sept. 30, 2009)

Speaker on Class Actions, American Legal Institutions, and American Legal Education at National Law Schools of India in Bangalore, Hyderabad, Calcutta,  Jodhpur, and Delhi (August 2009)

Speaker, China/U.S. Conference on Tort and Class Action Law, Renmin University of China School of Law, Beijing, China (July 11-12, 2009)

Speaker on Class Actions, Southeastern Association of Law Schools annual meeting, Palm Beach, Florida (August 1, 2008)

Speaker on Class Actions, National Foundation for Judicial Excellence (meeting of 150 state appellate court judges), Chicago, Illinois (July 12, 2008)

Speaker on Class Actions, Practising Law Institute, New York, NY (July 10, 2008)

Speaker at Conference on Class Actions in Europe and North America, sponsored by New York University School of Law, the American Law Institute, and the European University Institute, Florence, Italy (June 13, 2008)

Speaker on Class Actions at the American Bar Association Tort and Insurance Section Meeting, Washington, D.C. (Oct. 26, 2007)

Speaker on Antitrust Class Actions at the American Bar Association's Annual Antitrust Meeting, Washington D.C. (April 18, 2007)

Chair, Organizer, and Moderator of Class Action Symposium at UMKC School of Law (April 7, 2006) (other speakers (26 in all) included, *e.g.*, Professors Arthur Miller, Edward Cooper, Sam Issacharoff, Geoffrey Miller, and Linda Mullenix, as well as several prominent federal judges and practicing lawyers)

Speaker on Class Actions, Missouri CLE (Nov. 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 29, 2005)

Speaker on Class Actions, Kansas CLE (June 23, 2005)

Speaker on Class Actions at Bureau of National Affairs Seminar on the Class Action Fairness Act of 2005 (June 17, 2005)

Visiting Lecturer on Class Actions, Peking University (May 30-June 3, 2005)

Speaker on Oral Argument, American Bar Association 2005 Section of Litigation Annual Conference (April 22, 2005) (part of panel including Second Circuit Chief Judge Walker and several others)

Speaker on Class Actions, Federal Trade Commission/Organization for Economic Co-operation and Development, Workshop on Consumer Dispute Resolution and Redress in the Global Marketplace (April 19, 2005)

Speaker at Antitrust Class Action Symposium, University of Western Ontario College of Law (April 1, 2005)

Speaker at Class Action Symposium, Mississippi College of Law (February 18, 2005)

Speaker on Class Actions, Practising Law Institute (July 30, 2004)

Visiting Lecturer on Class Actions, Peking University (June 2004)

Visiting Lecturer on Class Actions, Tsinghua University (June 2004)

Speaker at Class Action Symposium, Michigan State University (April 16-17, 2004)

Speaker on U.S. Supreme Court advocacy, David Prager Advanced Appellate Institute (Kansas City Metropolitan Bar Association) (Feb. 27, 2004)

Speaker on Class Actions, Institute of Continuing Legal Education in Georgia (Oct. 24, 2003)

Speaker on Class Actions, Practising Law Institute (July 31, 2003)

Speaker on Class Actions, Practising Law Institute (Aug. 5, 2002)

Speaker on Class Actions, Practising Law Institute (Aug. 16, 2001)

Speaker on many occasions throughout the country on "Sponsorship Strategy"  (1990-present)  and advocacy before the U.S. Supreme Court (1988-present)

## OTHER LEGAL ACTIVITIES:

Member of American Bar Association Group Evaluating Qualifications of Merrick Garland to serve on the U.S. Supreme Court

Advisory Board Consulting Editor, *Class Action Litigation Report* (BNA)

Advisory Board, The Flawless Foundation (an organization that serves troubled children)

Member, Board of Directors, Citizens' Crime Commission (Portland, Oregon) (2007-2011)

Served on numerous UMKC School of Law committees, including Programs (Chair), Promotion and Tenure, Appointments, and Smith Chair Appointment

Chair of pro bono program for all 27 offices of Jones Day (2000-2004); also previously Chair of Washington office pro bono program (1992-2003)

Member, Board of Directors, Bread for the City (a D.C. public interest organization providing medical, legal, and social services) (2001-2003)

Master, Edward Coke Appellate Practice Inn of Court in Washington, D.C. (other participants include Ted Olson, Seth Waxman, Ken Starr, Walter Dellinger, and several sitting appellate judges) (2001-2003)

Member, Board of Directors, Washington Lawyers' Committee for Civil Rights and Urban Affairs (2000-2003); Advisory Board Member (2003-present)

Member, D.C. Court of Appeals Committee on Unauthorized Practice of Law (1997-2000)

Handled and supervised numerous pro bono matters (*e.g.*, death penalty and other criminal defense, civil rights, veterans' rights)

Played a major role in establishing a walk-in free legal clinic in Washington, D.C.'s Shaw neighborhood

**VOLUNTEER WORK:**

Numerous guest speaker appearances at public schools and retirement homes; volunteer at local soup kitchen; volunteer judge for Classroom Law Project.

# APPENDIX B

## MATERIALS REVIEWED

In addition to the documents and information identified in my Declaration, below are additional materials considered in forming the opinions expressed above:

- **Court Filings (including accompanying exhibits and/or addendums) in *In re Syngenta AG MIR162 Corn Litigation*, Case No. 14-2591 (D. Kan.):**

  - Order Concerning Appointment of Counsel (Dkt. No. 67).

  - Syngenta's Motion to Dismiss Producer and Non-Producer Plaintiffs' Amended Class Action Master Complaints (Dkt. No. 856).

  - Syngenta's Memorandum of Law in Support of Motion to Dismiss Producer and Non-Producer Plaintiffs' Amended Class Action Master Complaints (Dkt. No. 857).

  - Plaintiffs' Memorandum in Opposition to Syngenta's Motion to Dismiss Producer and Non-Producer Plaintiffs' Amended Class Action Master Complaints (Dkt. No. 927).

  - Syngenta's Motion to Dismiss Milo Producer Plaintiffs' Master Complaint (Dkt. No. 929).

  - Order Establishing Protocols for Common Benefit Work and Expenses and Establishing the Common Benefit Fee and Expense Funds (Dkt. No. 936).

  - Syngenta's Reply in Support of Motion to Dismiss Producer and Non-Producer Plaintiffs' Amended Class Action Master Complaints (Dkt. No. 950).

  - Plaintiffs' Sur-Reply to Syngenta's Motion to Dismiss Producer and Non-Producer Plaintiffs' Amended Class Action Master Complaints and Motion to Dismiss Milo Producer Plaintiffs' Master Complaint (Dkt. No. 960).

  - Syngenta's Sur-Sur-Reply in Support of Motions to Dismiss Producer and Non-Producer Plaintiffs' Amended Class Action Master Complaints and Milo Producer Plaintiffs' Master Complaint  (Dkt. No. 963).

  - Memorandum and Order (Dkt. No. 1016) (on Syngenta's Motion to Dismiss).

  - Memorandum and Order (Dkt. No. 1679) (on Syngenta's Motion to Dismiss).

  - Memorandum and Order (Dkt. No. 1803) (on Joint Motion to Dismiss Syngenta's Counterclaims and Third-Party Complaint).

  - Producer Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. No. 2164).

  - Syngenta's Opposition to Producer Plaintiffs' Motion for Class Certification (Dkt. No. 2335).

- The Phipps/Clark Plaintiffs' Memorandum in Opposition to Producer Plaintiffs' Motion for Class Certification (Dkt. No. 2348).

- Memorandum and Order (Dkt. No. 2426) (on Syngenta's Motion for Judgment on the Pleadings).

- Producer Plaintiffs' Reply in Support of Motion for Class Certification (Dkt. No. 2436).

- Memorandum and Order (Dkt. No. 2547) (on Plaintiffs' Motion for Class Certification).

- Memorandum in Support of Motion for Partial Summary Judgment on Syngenta's Affirmative Defenses of Assumption of Risk, Comparative Fault, Mitigation, Intervening/Superseding Cause, and "Business and Economic Justification" (Dkt. No. 2859).

- Corrected Memorandum in Support of Syngenta's Motion for Summary Judgment on Nationwide Lanham Act Class Claims and Kansas State Class Claims (Dkt. Nos. 2861–2862).

- Plaintiffs' Memorandum in Opposition to Syngenta's Motion for Summary Judgment (Dkt. No. 2940).

- Syngenta's Opposition to Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 2947).

- Plaintiffs' Reply in Support of Motion for Partial Summary Judgment on Syngenta's Affirmative Defenses of Assumption of Risk, Comparative Fault, Mitigation, Intervening/Superseding Cause, and "Business and Economic Justification" (Dkt. No. 2994).

- Syngenta's Reply in Support of Motion for Summary Judgment on Nationwide Lanham Act Class Claims and Kansas State Class Claims (Dkt. No. 2996).

- Syngenta's Letter Notice of Supplemental Authority (Dkt. No. 3026).

- Memorandum and Order (Dkt. No. 3051) (on both parties' Motions for Summary Judgment).

- Memorandum and Order (Dkt. No. 3134) (on both parties' *Daubert* Motions).

- Producer Plaintiffs' Memorandum in Support of Second-Phase Motion for Certification of Additional State Classes (Dkt. No. 3436).

- Producer and Non-Producer Plaintiffs' Consolidated Fourth Amended Class Action Master Complaint (Dkt. No. 3505).

- Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Settlement, Provisional Certification of Settlement Class and Subclasses, Appointment of Settlement Class Counsel, Subclass Counsel, and Class Representatives, Approval to Disseminate the Class Notice, Appointment of the Notice Administrators and Claims Administrator and Special Masters, and Adoption of a Schedule for the Final Approval Process (Dkt. No. 3507).

- Toups/Coffman Plaintiffs' Response in Opposition to Class Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement Agreement (Dkt. No. 3514).

- Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Preliminary Approval of Settlement, Provisional Certification of Settlement Class and Subclasses, and Other Relief (Dkt. No. 3526).

- Order Preliminarily Approving the Settlement Between Class Plaintiffs and the Syngenta Defendants, Provisionally Certifying the Settlement Class, Appointing Settlement Class Counsel, Subclass Counsel, and Class Representatives, Approving the Notice Plan and Authorizing Dissemination of Notice, Appointing the Notice Administrator and Claims Administrator and Special Masters, and Setting a Schedule for the Final Approval Process (Dkt. No. 3532).

- Syngenta's Rule 23(f) Petition for Permission to Appeal Class Certification Order (10th Cir.) (filed Oct. 11, 2016).

- Plaintiff's Response to Rule 23(f) Petition to Appeal Class Certification Order (10th Cir.) (filed Oct. 21, 2016).

- Plaintiffs–Respondents' Answer in Opposition to Defendants–Petitioners' Petition to Appeal (10th Cir.) (filed Oct. 21, 2016).

- Petitioners' Motion for Leave to File Reply (10th Cir.) (filed Oct. 28, 2016).

- Order (on Rule 23(f) Petition) (10th Cir.) (entered Dec. 7, 2016).

- **Additional Documents:**

  - Fee-Sharing Agreement.

  - Time and Expenses Spreadsheet (detailing all expense entries, all time entries, timekeeper information and billing rates, and lodestar figures for MDL class counsel).

  - Declaration of Patrick Stueve (filed contemporaneously).

  - Declaration of Scott Powell (filed contemporaneously).

  - Declaration of Don Downing (filed contemporaneously).

  - Declaration of William Chaney (filed contemporaneously).

  - Declaration of Richard Ralston (filed contemporaneously).

  - Memorandum in Support of Kansas MDL Co-Lead Counsel and Settlement Class Counsel Christopher Seeger's Petition for Award of Attorneys' Fees, Reimbursement of Expenses, Service Awards to Class Representatives/ Bellwether Plaintiffs, and Allocation of Attorneys' Fee Award (filed contemporaneously).

  - Complaint for Declaratory and Injunctive Relief and Damages in *Kellogg, et al v. Watts Guerra*, No. 0:18-cv-01082-DWF-BRT (D. Min.).

  - Petition for Discretionary Review of the District Court's Order Granting Class Certification (Minn. Ct. App.) (filed Dec. 2, 2016).

- Opposition to Petition for Discretionary Review of the District Court's Order Granting Class Certification (Minn. Ct. App.) (filed Dec. 9, 2016).

- Reply in Support of Petition for Discretionary Review of the District Court's Order Granting Class Certification (Minn. Ct. App.) (filed Dec. 14, 2016).

- Order (on Petition for Discretionary Review) (Minn. Ct. App.) (entered Jan. 10, 2017).

- Legal Representation Agreement, Syngenta Seed Litigation (Phipps Anderson Deacon LLP and Morascysk & Polochak), via link to:  http://mopolaw.com/wp-content/uploads/2016/04/Legal-Representation-Agreement-Syngenta-Corn.pdf.

- Conmy Feste Law Firm Syngenta Corn Litigation Webpages, via link to:  https://www.conmylaw.com/Commercial-Litigation/Syngenta-Corn-Litigation.shtml.

- Contract to Hire Attorneys (Weller, Green, Toups & Terrell, LLP and The Coffman Law Firm), via link to:  https://corncasesettlement.com/docs/Corn-Contract-to-Hire-Attorneys-Rev-August-2016.pdf.