# EXHIBIT 78

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| IN RE SYNGENTA AG MIR162 CORN LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CASES EXCEPT:<br><br>*Louis Dreyfus Company Grains Merchandising LLC v. Syngenta AG, et al., No. 16-2788-JWL-JPO*<br><br>*Trans Coastal Supply Company, Inc. v. Syngenta AG, et al., No. 2:14-cv-02637-JWL-JPO*<br><br>*The Delong Co., Inc. v. Syngenta AG, et al., No. 2:17-cv-02614-JWL-JPO*<br><br>*Agribase International Inc. v. Syngenta AG, et al., No. 2:15-cv-02279-JWL-JPO* | Master File No. 2:14-MD-02591-JWL-JPO<br><br>MDL No. 2591 |

**SUPPLEMENTAL DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO ATTORNEYS' FEES**

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I. INTRODUCTION

1. On July 10, 2018, I submitted a declaration relating to attorneys' fees, costs, and incentive payments. *See* Decl. of Prof. Robert H. Klonoff Relating to Attorneys' Fees, Costs, & Incentive Payments (Dkt. No. 3587-6) (hereinafter "Klonoff Decl."). In that declaration, I examined (1) class counsel's request for attorneys' fees; (2) their proposed allocation of attorneys' fees; (3) their requested out-of-pocket costs; and (4) their proposed incentive payments to certain MDL class representatives and bellwether plaintiffs. I explained in detail why, in my opinion, class counsel's requests were reasonable.

2. Also on July 10, 2018, numerous other attorneys submitted their own fee requests. In some instances, those requests were accompanied by expert declarations. I have been asked by class counsel to opine on certain of those July 10 submissions. In particular, I have been asked to opine on:

> (1) the application of the Watts Guerra law firm for attorneys' fees and costs (*see* Fee & Expense Appl. by Watts Guerra LLP (Dkt. No. 3580) (hereinafter "Watts Fee Appl.")), along with other applications raising similar issues, giving special attention to two expert declarations accompanying the Watts application (one submitted by five experts, the other submitted by two experts); and

> (2) various attorneys' fees submissions (*e.g.*, the Bassford Remele submission, *see* Bassford Remele, P.A.'s Mot. Regarding Allocation of Attorneys' Fees (Dkt. No. 3565) (hereinafter "Bassford Mot.")) arguing that the Court should defer any decision on attorneys' fees until after the claims period has closed.

As with my original declaration, I am offering my opinions for the Court's consideration based on my background and experience. I recognize, of course, that my role is limited and that this Court will make the ultimate decision.

## II. QUALIFICATIONS

3. My qualifications are set forth in my original declaration. *See* Klonoff Decl. ¶¶ 2–15 & App. A.

## III.  MATERIALS RELIED UPON

4.  In addition to the materials listed in my original declaration (*see id.* ¶ 16 & App. B), I have relied upon:

- Fee and Expense Application By Watts Guerra LLP (with all accompanying exhibits, including the expert declarations referenced above) (Dkt. No. 3580);

- Memorandum in Support of the Fee & Expense Application by Watts Guerra LLP (Dkt. No. 3611);

- Memorandum In Support of Toups/Coffman Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Expenses (Dkt. No. 3567);

- Bassford Remele, P.A.'s Memorandum of Law Regarding Allocation of Attorneys' Fees (Dkt. No. 3568);

- Paul Byrd Law Firm, PLLC's Brief in Support of Petition for an Award of Attorneys' Fees and Reimbursement of Costs and Expenses (Dkt. No. 3586);

- Order Establishing Protocols for Common Benefit Work and Expenses and Establishing the Common Benefit Fee and Expense Funds (Dkt. No. 936);

- August 3, 2018 Supplemental Attorneys' Fees Filings from All Jurisdictions;

- Amended and Restated Joint Prosecution Agreement;

- Notices of Corrections to Previously Filed Documents;

- First Addendum to Joint Prosecution Agreement;

- Long-Form Class Settlement Notice;

- Toups/Coffman Exclusions Consolidated Spreadsheet;

- Class Certification Exclusions from Watts Guerra (Appendix A);

- The Court's Microsoft Excel Spreadsheet for the Categorization Supplement; and

- Consolidated Response of Kansas MDL Co-Lead Counsel and Settlement Class Counsel Christopher Seeger to the Various Petitions for Attorneys' Fees (filed contemporaneously).

I have also reviewed additional case law and court filings in other class action cases.

## IV.  SUMMARY

5.  **Watts's and Other Attorneys' Fee Applications.**  In justifying their fee applications, Watts, its experts, and certain other attorneys rely on legally erroneous arguments and fail to address critical factual allegations.

6. First, various fee applications address the issue of whether this Court has authority to review contingency fee contracts.  As I explain in Section V, this Court need not decide the issue.  In any event, the arguments by Watts, its experts, and certain other attorneys that this Court lacks such authority are contrary to settled law.

7. Second, Watts, its experts, and certain other attorneys rely heavily on numerous contingency fee contracts entered into between the attorneys and individual farmers and grain elevators, asserting that the farmers and grain elevators were fully and accurately advised of their rights.   Again, as I explain in Section V, this Court need not examine the circumstances surrounding the formation of those contracts, because the individual contracts are not relevant to the Court's award and allocation of attorneys' fees.   But, in any event, some of the fee applications fail to address factual allegations that, if true, bear on the circumstances surrounding the formation of the contracts.

8. Third, Watts and its experts argue that class members who hired their own lawyers should pay no more than class members who did not.  There is no legal authority for that position, and it is contrary to the class notice in this case and to class notices in literally thousands of other cases.

9. Fourth, Watts and its experts overstate Watts's role in obtaining Syngenta's agreement to settle the litigation for $1.51 billion.  Their argument that the mere filing of individual lawsuits put great pressure on Syngenta is both legally and factually flawed.  In my opinion, Syngenta came to the bargaining table mainly as a result of this Court's class certification ruling and class counsel's successful classwide trial verdict before this Court.

10. Fifth, Watts and its experts propose an unreasonably low award for common benefit counsel (other than Watts) and erroneously call that proposal lavish.

11. Sixth, Watts and its experts claim that the Joint Prosecution Agreement (JPA) is binding on class counsel in the context of a class settlement.   But class counsel offer substantial arguments to the contrary, including language in this Court's Common Benefit Order (CBO).

12. **Relevance of Final Claims Data.**  Contrary to the submissions of Bassford Remele and various other attorneys, it is my opinion that this Court should decide the attorneys' fees issues now, and should not wait until April 2019 or later for final claims data.  This is a non-

reversionary settlement, so the Court knows the full amount of the fund, and thus can set proper fee awards now.

13. **Options for Awarding Fees.**  Like this case, there are other cases involving a class settlement as well as individual contingency fee contracts.  For example, in the *Volkswagen "Clean Diesel"* case,[1] the court set common benefit fees and left contract counsel to decide whether to pursue their individual contingency fee contracts separately in an appropriate forum.  Utilizing the *Volkswagen* approach, the Court could apply the well-recognized *Johnson* factors[2] in evaluating attorneys' claims for fees based on common benefit work.

## V.  DISCUSSION

### A.  Analysis of Various Fee Submissions

#### 1.  Introduction

14.  A number of attorneys who filed fee applications on July 10, 2018, base their fee claims on contingency fee contracts.  For example, in its July 10, 2018 submission (the "Watts fee application"), the Watts Guerra law firm ("Watts") requests attorneys' fees from the common fund calculated as follows:  (1) it would reduce its contingency fees in its contracts with individual plaintiffs from 40 percent (the contract rate) to 33⅓ percent; (2) from that percentage, it would subtract a common benefit assessment of 9.17 percent of its fees; (3) based on (1) and (2), it would receive 24.16 percent of the gross benefits to its clients; and (4) in addition, it would be reimbursed for its common benefit expenses.  All of the claimed fees would come from the common fund.

15.  Filed in support of the Watts fee application are two joint expert declarations.  The first was authored by Professors Arthur Miller, Geoffrey Miller, Charles Silver, Brian Fitzpatrick, and Alexandra Lahav.  *See* Report of Professors Arthur R. Miller, Geoffrey P. Miller, Charles Silver, Brian T. Fitzpatrick, & Alexandra Lahav on Issues of Economics, Procedure, & Policy in Support of the Fee & Expense Appl. by Watts Guerra LLP (Dkt. No. 3580-2) (hereinafter "Miller et al. Decl.").  The second was authored by Professor Silver and Professor Andrew Kull.

---

[1] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB (N.D. Cal.).

[2] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); *see* Klonoff Decl. ¶¶ 52–89.

*See* Report of Professors Andrew Kull and Charles Silver on Issues of Restitution and Unjust Enrichment in Support of the Fee & Expense Appl. by Watts Guerra LLP (Dkt. No. 3580-3) (hereinafter "Kull/Silver Decl."). Both the Miller et al. declaration and the Kull/Silver declaration support the Watts request in its entirety. *See* Miller et al. Decl. at 36 (describing the proposal as "a generous one" and noting that "we support Watts Guerra's fee application"); Kull/Silver Decl. at 17 ("[W]e support Watts Guerra's fee application.").

### 2. Analysis

#### a. Although It Is Unnecessary in this Case, This Court Has Authority to Review the Reasonableness of Watts's and Other Attorneys' Contingency Fee Contracts

16. As I explain in detail throughout this Declaration, this Court need not undertake a review of the reasonableness of the individual contingency fee agreements. Rather, the Court can award common benefit fees by utilizing the *Johnson* factors.[3] Attorneys who wish to enforce their fee contracts could attempt to do so, and the clients would be able to assert all relevant defenses. Nonetheless, the various fee submissions raise the question whether the Court has the authority to cap contingency fees. For example, Bassford Remele argues that the Court *should* cap such fees.[4] By contrast, Watts (joined by its experts) and Toups/Coffman argue that no such authority exists.[5] Accordingly, I address these issues herein. Although I am comprehensive in response to these arguments (which are the centerpiece of the presentation of Watts's experts), the length of my analysis does not change my view that the Court need not undertake a review of the reasonableness of the individual fee agreements for the reasons discussed herein.

17. As noted, Watts and its experts (among others) maintain that contingency fee contracts are sacrosanct and that this Court lacks any authority to examine the reasonableness of the fees,

---

[3] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); *see* Klonoff Decl. ¶¶ 52–89.

[4] *See* Bassford Remele, P.A.'s Mem. of Law Regarding Allocation of Attorneys' Fees at 30–33 (Dkt. No. 3568) (hereinafter "Bassford Mem.") (arguing that "this Court should follow the *NFL* framework [for capping contingency fees]").

[5] *See* Watts Mem. at 34 ("[N]either Rule 23 nor inherent powers authorizes judges to override private fee agreements . . . ."); Mem. in Support of Toups/Coffman Pls.' Counsel's Mot. For an Award of Attorneys' Fees & Expenses at 6–7 (Dkt. No. 3567) (hereinafter "Toups Mem.") ("The Court . . . must fashion an attorneys' fee and expense payment mechanism that honors the contingent fee contracts between [Toups and its clients].").

even where, as here, Watts seeks to be paid its contractual fees out of the common fund.[6] According to Watts, "neither Rule 23 nor inherent powers authorizes judges to override private fee agreements—nor should they." Watts Mem. at 34. The Miller et al. declaration likewise submits that "some judges have *claimed* to possess the inherent authority to cut lawyers' fees" but that "*we are doubtful any such authority exists in this case*." Miller et al. Decl. at 16 (emphases added).[7]

18. In my opinion, Watts, its experts, and various other attorneys are incorrect in asserting that the Court lacks authority to review the reasonableness of contingency fee contracts,

---

[6] Watts and its experts rely heavily on the contention that the Watts firm (along with 332 associated law firms) entered into binding and enforceable contingency fee contracts with more than 57,000 farmers and grain elevators in the Minnesota consolidated proceeding. *See* Watts Fee Appl. at 2; Miller et al. Decl. at 5. According to Watts and its experts, these farmers and grain elevators knowingly and voluntarily agreed to 40 percent contingency fees. *See* Mem. in Support of Fee & Expense Appl. by Watts Guerra LLP at 5–6 (Dkt. No. 3611) (hereinafter "Watts Mem."); Miller et al. Decl. at 5. Rather than enforcing these individual fee agreements with its clients, Watts seeks its contractual fees from the common fund in an amount that "should reflect as nearly as possible" the 40 percent contractual rate. Watts Mem. at 32.

It is my understanding that MDL class counsel take no position on whether contract counsel can ultimately seek to enforce their individual fee agreements. Instead, the allocation proposed by MDL class counsel does not rely on individual fee agreements at all, but on the application of the *Johnson* factors. As I explained in my original declaration, MDL class counsel propose that the Court should follow the Fee-Sharing Agreement and compensate subclass counsel and other counsel who have performed common benefit work (as those concepts are defined in the Common Benefit Order) from the remaining 20 percent of the fee award, or in some instances from the categories comprising the other 80 percent. For instance, some or all of Watts's common benefit fees could come from the 12.5 percent Minnesota allocation proposed by the Fee-Sharing Agreement as well as from the residual 20 percent. *See* Klonoff Decl. ¶ 130. Under MDL class counsel's proposal, there is no need to address individual contingency fee agreements.

[7] I should note that some of Watts's experts have in the past expressed criticism of MDL judges who rely on the "quasi-class action" concept to review contingency fee contracts in non-class MDLs. *See, e.g.*, Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VAND. L. REV. 107 (2010) (criticizing, *inter alia*, MDL courts' practice of "cut[ting] non-lead lawyers' [contractual] fees"); Charles Silver & Lynn A. Baker, *Fiduciaries and Fees: Preliminary Thoughts*, 79 FORDHAM L. REV. 1833, 1854 & n.92 (2011) (arguing, in criticizing the court's "quasi-class action" approach and contingency fee cap in the *Vioxx* MDL, that "Judge Fallon invented a new power and put ordinary procedural arrangements to uses for which they are not suited"). Importantly, Silver and Miller have repeatedly emphasized that their arguments are not applicable to Rule 23 class actions. *See, e.g.*, Silver & Miller, *supra*, at 113–14 ("The MDLs we discuss are *not* class actions. . . . Class action procedures may not be necessary or appropriate in MDLs." (emphasis in original)); *id*. at 142–143 ("Judges have missed the fact that MDLs differ from class actions in respects that often render class action procedures inappropriate."); *id*. at 124 ("[C]laimants can opt out of class actions but not MDLs."); Affidavit of Geoffrey P. Miller ¶ 16, *In re Vioxx Prods. Liab. Litig.*, No. 2:05-md-01657-EEF-DEK (E.D. La.) (Dkt. No. 18133-2) (filed Mar. 31, 2009) (testifying against fee caps on individual contingency fee contracts but emphasizing that *Vioxx* was not a class action: "[T]hese cases are neither class actions nor shareholder derivative suits."). Here, however, these experts fail to recognize that the class action context of the instant case differs markedly from the non-class MDL context.

(All cited declarations and unpublished orders are available on PACER under the docket numbers provided. Internet citations have also been provided where available.)

particularly given that such attorneys seek those fees from the common fund.  Numerous cases have made clear that courts have inherent authority to regulate attorneys practicing before them. Thus, the Tenth Circuit has noted:  "[C]ontingent fee arrangements are . . . subject to the courts' supervision."[8]  Similarly, the Eighth Circuit has emphasized:  "The court has the power and the responsibility to monitor contingency fee agreements for reasonableness."[9]  Numerous other courts have made the same point.[10]

19.  Moreover, a court's authority to scrutinize contingency fee agreements is especially available in a class action, given the court's role as a fiduciary for *all* class members.[11]  Under Federal Rule of Civil Procedure 23(h), in the case of a certified class, "the court may award reasonable attorneys' fees . . . ."[12]

---

[8] *Cooper v. Singer*, 719 F.2d 1496, 1505 (10th Cir. 1983), *abrogated on other grounds by Venegas v. Mitchell*, 495 U.S. 82 (1990).

[9] *Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1277 (8th Cir. 1980).

[10] *See, e.g.*, *United States v. Overseas Shipholding Grp., Inc.*, 625 F.3d 1, 1 (1st Cir. 2010) ("Both this court and other courts of appeals have held that this supervisory authority encompasses the power to assess the fairness of attorney fee agreements, including contingent fee arrangements."); *In re Finney*, 130 F. App'x 527, 530 (3d Cir. 2005) ("[A] District Court must be alert to a fee agreement that would unjustifiably enrich an attorney through oppression or overreaching."); *In re Goldstein*, 430 F.3d 106, 110 (2d Cir. 2005) ("[C]ourts have the right to inquire into fee arrangements . . . to protect the client from excessive fees." (citation and internal quotation marks omitted)); *In re A.H. Robins Co., Inc.*, 86 F.3d 364, 373 (4th Cir. 1996) ("[F]ederal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount. . . ."); *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982) ("Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee . . . ." (citations omitted)); *Hoffert v. General Motors Corp.*, 656 F.2d 161, 165 (5th Cir. 1981) ("[T]he court must scrutinize the reasonableness of the contingent attorneys' fee contract which affects the net recovery of the plaintiff."); *In re Michaelson*, 511 F.2d 882, 888 (9th Cir. 1975) ("The courts have inherent power to regulate the bar . . . [including] the right to inquire into fee arrangements . . . to protect the client from excessive fees."); *McGill v. City of Ottowa*, 773 F. Supp. 1473, 1474 (D. Kan. 1991) ("[F]ederal courts have inherent jurisdiction to supervise the bar and to examine confirmance with the reasonable standard of the Code of Ethics." (citations omitted)).

[11] *See, e.g.*, *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010) ("[T]he District Court evaluates the [settlement] agreement as a fiduciary for absent class members."); Alan Wright & Arthur R. Miller, 7A Federal Practice & Procedure § 1765 (3d ed. 2002) (treatise co-authored by Watts's expert noting that "the judge in a class action . . . sits to protect the interests of the unnamed class members"); *id.* § 1797 ("In considering the settlement of a class action, the district court acts as a fiduciary who must serve as the guardian of the rights of the absent class members . . . .").

[12] Watts's experts argue that Rule 23, by its terms, does not authorize courts to review contingency fee agreements (and that if it did, the Rule would violate the Rules Enabling Act).  *See* Miller et al. Decl. at 21-22.  In fact, however, the courts that have chosen to review contingency fee contracts have typically relied on their inherent authority to supervise the reasonableness of fees.  That authority exists in both the class and non-class contexts. Rule 23, however, provides additional context in a class action if a court were to elect to review a fee agreement:  In awarding fees and determining how such fees should be allocated to class members, a court must consider not only class counsel but also counsel who represent individual class members.

20. Not surprisingly, a number of courts, in both the class action and non-class MDL contexts, have held that they have authority to review the reasonableness and enforceability of contingency fee agreements.[13]  These cases cannot be dismissed as outliers.[14]

21. Scholars and respected academic organizations concur with this overwhelming body of law.  Yet, as discussed below, Watts, its experts, and certain others take issue with this settled law.  Watts's experts focus at length on this issue, but their arguments are legally flawed.

22. In their report, Miller et al. repeatedly cite the Restatement (Third) of the Law Governing Lawyers as support for their view that courts cannot review contingency fee contracts.  *See* Miller et al. Decl. at 12, 13, 16.  Yet, the Restatement directly refutes their position.  It notes that "courts scrutinize contingent fees with care in determining whether they are reasonable," and it gives the following illustration:

> Client seeks Lawyer's help in collecting life-insurance benefits under a $15,000 policy on Client's spouse and agrees to pay a one-third contingent fee.  There is

---

[13] *See, e.g., In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1658808, at *2 (E.D. Pa. Apr. 5, 2018) (capping contractual fees at 22 percent and noting that "a court has the authority to impose a fee cap derived from both the power of a court presiding over an MDL or class action and the ability of a court to review individual fee awards"); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex. on Apr. 20, 2010*, No. 2:10-md-02179-CJB-JCW, 2012 WL 2236737 (E.D. La. June 15, 2012) (capping contractual fees at 25 percent and noting that the court has "authority to regulate individual attorneys' fees," particularly because "the instant Settlements are structured and preliminarily certified as class action settlements"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, No. 05-md-01708-DWF-AJB, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) (applying a 20 percent fee cap and noting that "this Court has the inherent right and responsibility to supervise the members of its bar in both individual and mass actions, including the right to review contingency fee contracts for fairness." (citations and internal quotation marks omitted)); *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008) (applying a 32 percent fee cap and noting that "[i]n addition to this Court's equitable authority over the global settlement, the Court also has the inherent authority and concomitant duty to exercise ethical supervision over the parties."); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (applying a variable 20–35 percent fee cap and noting the need in a non-class MDL "to ensure fair treatment to all parties and counsel regarding fees and expenses"); *In re Joint E. & S. Dists. Asbestos Litig.*, 878 F. Supp. 473, 558 (E.D.N.Y. & S.D.N.Y. 1995) ("Courts reviewing fees pursuant to Rule 23, general equitable powers, or authority to control officers of the court, may override private, contractual fee agreements made by the attorneys representing the parties in the class action or related individual actions."); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 524–25 (D. Nev. 1987) (capping attorneys' fees at 33⅓ percent in non-class MDL and noting that "[t]he court has the right and the duty to establish equitable fees for *all* of the attorneys" (emphasis added)).

[14] The Miller et al. declaration includes a chart listing nineteen MDL settlements over $1 billion, and notes that, out of those nineteen cases, "*only three* judges imposed a cap overriding the fees that the plaintiffs and their lawyers had agreed to."  Miller et al. Decl. at 16–18 (Table 1) (emphasis in original).  That figure, however, is misleading.  The issue was not even raised in most of the cases.  Indeed, in many class actions, especially those involving small individual claims, few class members choose to sign up separate counsel, so the issue of the reasonableness of individual contingency fee contracts does not even arise.  Where the issue was squarely raised, as in *NFL*, *Deepwater Horizon*, and *Vioxx*, the court either applied a cap or, as in the *Volkswagen "Clean Diesel"* case, it informed individual attorneys that they had to pursue their contracts in separate actions rather than claiming a portion of the common fund.

> no reasonable ground to contest that the benefits are due, the claim has not been contested by the insurer, and when Lawyer presents it the insurer pays without dispute.   The $5,000 fee provided by the client–lawyer contract is not reasonable.[15]

Moreover, the Restatement specifically notes that "a contingent fee can also be unreasonable either because the percentage rate is excessive or the base against which the percentage is applied is excessive or otherwise unreasonable."[16]   Thus, according to the Restatement, a contingency fee "will be unreasonable if it is an inappropriate measure of the lawyer's work and risk and the benefit the client derived from the lawyer's services."[17]   Numerous courts have relied on the Restatement in regulating contingency fee agreements.[18]

23. A number of prominent scholars have also recognized the authority of courts to scrutinize the reasonableness of contingency fee agreements.   For example, Professor Morris Ratner has stated:

> There is no question that trial courts have long claimed inherent authority to supervise members of the bar, and specifically to supervise attorneys' fees for reasonableness.   *Contingency fee contracts are treated differently than the contracts of laypersons, and even of other professionals, because lawyers are subject to special controls, including the disciplinary powers of courts and the ethical prescriptions formulated by bar associations.*   Courts' power to supervise attorneys' fees for reasonableness is traditionally located in the courts' power to "regulate the practice of law."   This authority is so widely recognized that many of the attorneys subjected to fee caps in *Vioxx, Guidant,* and *Zyprexa* did not even bother to challenge its existence.[19]

Similarly, in his testimony in the *NFL Concussion* case as a court-appointed expert, Professor William Rubenstein emphasized that:

---

[15] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35 cmt. c (2000).

[16] *Id.* § 35 cmt. d.

[17] *Id.*

[18] *See, e.g., Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 83–84 (D.D.C. 2008) (citing the Restatement in assessing reasonableness of contingency fee agreement); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 290 F. Supp. 2d 840, 851 (N.D. Ohio 2003) (citing the Restatement in voiding certain contingency fee agreements between class members and their individual attorneys); *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 571, 574 (Colo. App. 2010) (citing the Restatement in finding contingency fee "unreasonable and excessive").

[19] Morris A. Ratner, *Achieving Procedural Goals Through Indirection:  The Use of Ethics Doctrine to Justify Contingency Fee Caps in MDL Aggregate Settlements*, 26 GEO. J. LEGAL ETHICS 59, 75–76 (2013) (emphasis added; citations omitted).

> [T]here is no doubt that this Court possesses the authority to assess the *reasonableness of each class member's contingent fee contract with his individually retained attorney.*  That is so because the Court has the inherent authority to regulate attorneys appearing before it, and any attorney representing a player making a claim in this class action settlement is effectively appearing before this Court.[20]

24.  Similarly, Watts's own expert, Professor Brian Fitzpatrick, has previously written that "even apart from Rule 23, federal courts have long believed that they have the 'inherent power' to regulate the contingency fees of the lawyers who practice before them."[21]  Relying on that authority, Fitzpatrick has argued that federal courts have authority to reject contingency fee caps imposed by state law and can award *higher* fees.[22]  It is impossible to square Fitzpatrick's prior argument—that courts have inherent authority to override state law contingency fee caps—with his argument here that courts lack *any* inherent authority to review contingency fee agreements.

25.  Implicitly recognizing that their position conflicts with settled law, Watts's experts purport to carve out special rules for Texas and Minnesota, citing one case from Texas and two from Minnesota.  *See* Miller et al. Decl. at 18 (stating that "Texas has rejected the inherent judicial power to reduce lawyers' fees" and that "Minnesota judges . . . have only used the inherent power to *raise* lawyers' fees . . . ." (emphasis in original)).[23]  But the authorities they cite stand for no such absolute rule.

26.  In *In re Polybutylene Plumbing Litigation*,[24] the sole Texas case that Watts and its experts cite, the court discussed a "general rule" favoring the enforcement of privately negotiated fee agreements,[25] not an *absolute* rule.  The court cited a number of "*exceptions* to the general rule," including "pleading and proof of barratry, fraud, breach of fiduciary duty, incapacity,

---

[20] Expert Report of Professor William B. Rubenstein ¶ 17, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa.) (Dkt. No. 9526) (filed Dec. 11, 2017) (emphasis added; citations omitted).  *Accord, e.g.*, PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 14:43 (2018) (noting that the role of the court in class actions includes "[s]upervising the fees which individual counsel get at least by ensuring the fees are reasonable, as applied by the applicable canons of ethics").

[21] Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043, 2078 (2010) (hereinafter "Fitzpatrick, *Class Action Lawyers*") (citing cases).

[22] *See id.* at 2077–78.

[23] Texas law is invoked because Watts's fee agreements are all purportedly governed by Texas law (based on forum selection clauses).

[24] 23 S.W.3d 428 (Tex. App. 2000).

[25] *Id.* at 436.

illegality, *class action, [and] the applicability of the 'common fund doctrine.'*"[26]   Indeed, the court focused extensively on distinguishing class actions:

> [T]his is not a class action lawsuit . . . .   In this case, every plaintiff had an individual attorney fee contract with [the law firm involved], and each plaintiff had to approve the settlement in order for it to apply to that plaintiff.  There is no large group of unnamed members whose interests are represented by a named plaintiff; rather, the plaintiffs here have all filed lawsuits in their own names. . . .[27]

Because the instant case involves a class action with the vast majority of plaintiffs represented only by class counsel, *Polybutylene Plumbing*—by its own terms—does not apply here.  Additionally, because this case involves a common fund, another exception identified by the *Polybutylene Plumbing* court applies here.  Finally, as discussed in ¶¶ 32–40, the *Polybutylene Plumbing* court's exceptions for fraud, illegality, and breach of fiduciary duty might also apply, given the allegations in a class action lawsuit filed against Watts.

27.  The Minnesota cases cited by Watts's experts likewise do not support their argument.  Those cases expressly recognize that courts may intervene "when an attorney has taken advantage of a client's circumstances to exact an unreasonable or unconscionable proportion of the client's claim . . . ."[28]   As discussed in ¶¶ 32–40, such grounds for intervention may be relevant here.  I am particularly puzzled by Miller et al.'s reliance on *Irwin v. Surdyk's Liquor*,[29] in which the court premised its holding overturning statutory requirements for attorneys' fees in workers' compensation cases precisely on the authority of courts to review fees for reasonableness:

> We have carefully preserved over the years the concept that the judiciary retains final control over attorneys. . . .   Legislation that prohibits this court from deviating from the precise statutory amount of awardable attorney fees impinges on *the judiciary's inherent power to oversee attorneys and attorney fees* by depriving this court of a final, independent review of attorney fees.[30]

28.  Moreover, the underlying premise of Watts and its experts—that state law governs a federal court's review of the reasonableness of contingency fee agreements—is questionable.

---

[26] *Id.* at 437, 439 (emphases added).

[27] *Id.* at 437.

[28] *Holt v. Swenson*, 252 Minn. 510, 514, 90 N.W.2d 724, 727–28 (1958).

[29] 599 N.W.2d 132 (Minn. 1999).

[30] *Id.* at 140–42 (emphasis added).

The Third Circuit has noted that, even in diversity cases, because "the examination of a contingent fee arrangement's reasonableness . . . implicates our responsibility to supervise the members of our Bar," courts "must apply federal law."[31]  The argument for applying federal law when a federal court invokes its inherent authority makes a good deal of sense.  As one of Watts's own experts has previously written:

> In light of the fact that the Supreme Court has ruled that [an] . . . 'inherent power' to sanction attorneys for misconduct overrides state law to the contrary, it would not be surprising if federal courts concluded that Rule 23 and the courts' inherent power to regulate the compensation of class counsel trump [state law regarding contingent fee contracts] . . . .[32]

29.  Under applicable federal law, federal courts clearly have authority to supervise contingency fee agreements if they choose.  In *Cooper v. Singer*, for example, the Tenth Circuit noted:  "[C]ourts retain supervisory power over the attorney–client relationship.  Fees are central to that relationship, and *contingent fee arrangements are therefore subject to the courts' supervision*."[33]  Other courts are in accord.[34]

30.  To be sure, a court's use of inherent authority to scrutinize contingency fee agreements must be undertaken with care.  But I do not agree with Watts, its experts, and certain other attorneys that a court can *never* examine the reasonableness of contingency fee agreements.

---

[31] *In re Finney*, 130 F. App'x 527, 531 n.5 (3d Cir. 2005).  *Accord, e.g.*, *Mitzel v. Westinghouse Elec. Corp.*, 72 F.3d 414, 417 (3d Cir. 1995) (noting that "contingency fee agreements in diversity cases are to be treated as matters of procedure governed by federal law"); *see also* 5 NEWBERG ON CLASS ACTIONS § 15.2 (5th ed. 2018) ("[I]t is not unusual for federal courts to apply federal fees law and/or federal calculation methods in common fund cases, even those arising under state law. . . . [T]here is a fair argument that the federal court's equity powers authorize use of federal law.").

[32] Fitzpatrick, *Class Action Lawyers*, *supra* note 21, at 2078 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51–55 (1991)).  Given this analysis, it is surprising that Watts's experts assume, with no analysis, that state law is controlling.

[33] 719 F.2d 1496, 1505 (10th Cir. 1983) (emphasis added), *abrogated on other grounds by Venegas v. Mitchell*, 495 U.S. 82 (1990).

[34] *See, e.g.*, *Krause v. Rhodes*, 640 F.2d 214, 218 (6th Cir. 1981) ("A federal district judge has broad equity power to supervise the collection of attorneys' fees under contingent fee contracts."); *Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1277 (8th Cir. 1980) (invoking federal courts' "supervisory power over the bar by examining contingency agreements between attorney and client"); *Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3d Cir. 1973) ("The district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established."); *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir. 1970) (upholding district court's reduction of contractual contingency fees and noting that "the right to contract for a contingent fee has never been thought to be unrestrained"); *Estate of Mohamed v. Daimler Trucks N. Am., LLC*, No. 16-cv-00651-WMC, 2018 WL 522345, at *1–2 (W.D. Wis. Jan. 23, 2018) (recognizing inherent authority to examine contingency fee agreements and noting that courts "must consider all the circumstances of the case to determine whether the contingency fee amount is a just and reasonable figure" (citation and internal quotation marks omitted)).

Under that view, a court could not—for example—refuse to enforce a fee agreement that is based on fraud or misrepresentation or one that awards 99 percent of any recovery to the attorney. That view, in my opinion, cannot be correct.

31. Again, despite the depth of my analysis above, it is my view that this Court need not decide if it has the authority to review contingency fee agreements (and need not actually review the agreements in this case). But the claims by others that it lacks this authority are incorrect.

### b.  Allegations in the *Kellogg v. Watts* Class Action Lawsuit

32. Any court that were to review the reasonableness of the individual contingency fee agreements would be tasked with looking into the facts and circumstances surrounding those agreements.

33. Although not necessary here, if such a review were undertaken of the individual fee agreements, a court would need to consider certain factual allegations against Watts and associated law firms involving their contingency fee contracts at issue here. *See Class Action Complaint for Declaratory & Injunctive Relief & Damages, Kellogg v. Watts Guerra, LLP*, No. 0:18-cv-01082-DWF-BRT (D. Minn.) (filed Apr. 24, 2018) (Dkt. No. 1) (hereinafter "*Kellogg* Compl.").[35]  The *Kellogg* class action lawsuit, which seeks damages and equitable relief, was filed in federal court in Minnesota against Watts and associated law firms on April 24, 2018.[36] The class is defined as "all corn growers who signed attorney retainer contracts with Watts Guerra, LLP and its joint venture partners, for representation in claims, suits or other matters arising out of and resulting from economic damages sustained from the use of Syngenta GMO products or those products' adverse effect on the U.S. corn market."[37]  In other words, the class includes the farmers and grain elevators who signed 40 percent contingency fee agreements with Watts.

---

[35] I understand that MDL class counsel take no position on the merits of the allegations in *Kellogg*. Again, MDL class counsel's proposed allocation relies on the Fee-Sharing Agreement and the *Johnson* factors, not on whether individual contingency fee agreements exist or are enforceable.

[36] Hereinafter I refer to this group of defendants collectively as "Watts."

[37] *Kellogg* Compl. ¶ 30.

34. According to the *Kellogg* complaint, Watts falsely told class members that "*only those who sign up (with [Watts]) are eligible to pursue claims.*"[38]   At various town hall meetings and other settings, Watts allegedly told class members that, in a class action, "*lawyers will get all the money* and the *farmers may get a gift certificate.*"[39]   After the appointment of the special master in the MDL, Watts allegedly wrote in a news update:   "Since settlement discussions are underway, it is important for any [farmers] who want to participate in the settlement, to sign up (with Watts Guerra, LLP) as soon as possible, so they don't get left out."[40]   According to the complaint, class members were never told about the scope of the MDL class actions.[41]   The complaint further alleges that Watts "falsely represented to corn growers through direct mail and advertisements and town hall meetings that if they did not sign with [Watts], the growers would lose their right to file a claim."[42]

35. If these allegations in the *Kellogg* complaint are true—and many of them purport to be documented[43]—they directly bear on whether Watts has any legitimate basis to rely upon the 40

---

[38] *Id.* ¶ 8 (emphasis in original); *see also id.* ¶ 81 (citing statement placed on LostCornIncome.com website and otherwise disseminated by Watts after putative class actions had been consolidated in the federal MDL in Kansas that, "if farmers don't file a suit, which costs them nothing, they will most likely *not be included in any eventual settlement*" (emphasis in original)).

[39] *Id.* ¶ 9 (emphasis in original); *see also id.* ¶ 71 ("Farmers were dishonestly told in a barrage of advertisements and community meetings that a '*mass tort . . . individual suit*' is better than a class action." (emphasis in original)); *id.* ¶ 77 (alleging that Watts deceptively touted its "'*mass tort . . . individual suit*' scheme as superior to class actions where 'lawyers get all the money' and corn growers only get a gift certificate and discounts for seed corn"); *id.* ¶ 80 (citing Watts's statement in farm publication Agweek and on LostCornIncome.com that "class action suits can end in getting a 'free bag of seed or some [sale] credit,' while a mass tort can provide 'better recovery for the farmers'" (alteration in original)); *id.* ¶ 88 (citing Watts's statement on 3DollarCorn.com website that "Class Action cases are often settled without the knowledge of the clients under terms that seem to work best for the lawyers who bill the case by the hour.  Many of these settlements result in clients being offered coupons or pre-paid debit cards").

[40] *Id.* ¶ 146.

[41] *See id.* ¶ 11 ("Farmers were never told that they were putative class members in class actions filed in federal district courts in different states and consolidated [into the Kansas MDL].  Farmers were never told that the class actions consolidated in the MDL in Kansas brought claims on behalf of corn growers across the United States. Farmers were never informed that in a class action, the presiding judge is a fiduciary for the class members, and obligated to invite and consider objections from class members and award a reasonable attorney fee as a percentage of the common fund of monetary damages for the class."); *id.* ¶ 15 ("[Watts] never advised farmers of the class action proceedings in federal and state court covering the Farmers and their claims.  [Watts] never advised Farmers of the merits of those proceedings and what is in the best interest of the Farmers.").

[42] *Id.* ¶ 76.

[43] The complaint cites to direct quotes from town hall meetings, including quotes that appeared in the press.  For example, Mikal Watts was quoted in Iowa's Storm Lake Pilot Tribune as telling an assembled group of Iowa corn growers that they needed to sign up with his group quickly, and that in a class action, "*lawyers get all the money* and the *farmers may get a gift certificate.*"  *Id.* ¶ 82 (emphasis in original).  A number of statements by Watts attorneys

14

percent contingency fee agreements.  If the allegations are true, then the farmers only signed the agreements because they were falsely told by Watts that they otherwise could not recover (or could recover at most worthless gift certificates).  Also, if the allegations are true, then class members were not informed that, in the class action, they could recover without having to pay their own attorneys if the class action was successfully litigated or settled.

36.  I do not know if the allegations in the *Kellogg* complaint are true.  And, as explained throughout this Declaration, the Court need not examine the reasonableness of individual fee contracts.  But just as I am not in a position to determine the truth of the allegations in *Kellogg*, Watts's experts are also presumably not in a position to make factual findings in connection with the *Kellogg* complaint.  Yet, without even mentioning the *Kellogg* complaint or referencing any other evidence, the Miller et al. declaration asserts that at the town meetings the Watts firm "informed [farmers] of their rights."  Miller et al. Decl. at 20; *see also id.* at 14 (stating that farmers were "educated at town halls" but not describing what they were told); *id.* at 8 (stating that "[t]hese fee contracts were entered into by competent, *informed* adults" (emphasis added)).  The Miller et al. declaration further asserts, without citing evidence, that Watts "offered [the clients] a combination of quality and price . . . that was deemed reasonable by almost 58,000 clients."  *Id*. at 11–12.  If the allegations in *Kellogg* are true, however, then those thousands of individuals signed up not as a result of an informed business decision but only because of fraud and/or material misrepresentations by Watts.  Importantly, Miller et al. acknowledge:  "When deciding whether contingent fees are reasonable, the Restatement . . . advises judges to ask whether 'the lawyer afford[ed] the client a free and informed choice."  *Id*. at 14 (citation omitted).  Yet, once again citing no evidence, Watts's experts conclude:  "*Here, the answer is plainly yes*."  *Id*. (emphasis added).  But how can these experts conclude that the Watts clients were properly and accurately advised without analyzing the allegations of the *Kellogg* complaint?

37.  In short, Miller et al. rely heavily on the 57,000+ contingency fee contracts in supporting Watts's fee request.  In doing so, they repeatedly opine that the contracts were based on truthful and complete information being given to the clients.  But if they are wrong, and the allegations in

---

appeared on the websites LostCornIncome.com and 3DollarCorn.com, and in trade publications such as Agweek (a publication focusing on farmers in Minnesota, North Dakota, South Dakota, and Montana).  *See id*. ¶¶ 80–88.

*Kellogg* are correct, then the lynchpin of Watts's entire fee application—the need to enforce thousands of legitimate fee agreements—collapses.

38.  Similarly, Kull/Silver concede that their entire analysis involves a fact-based inquiry. They note that "a contract is unenforceable [if] it was induced by fraud," and that if fraud exists, the contract's "price term will not be accepted as the measure of the benefit conferred on the defendant by the fraudulent party."  Kull/Silver Decl. at 14.  Yet, like the Miller et al. declaration, the Kull/Silver declaration fails even to mention the *Kellogg* complaint, let alone grapple with its allegations.

39.  Either Miller et al. and Kull/Silver were unaware of the *Kellogg* complaint, or they knew about it but simply chose not to address it.[44]  Either way, their conclusions are unreliable because the experts failed to consider the pertinent facts.[45]

---

[44] I cannot determine from their declarations if Watts's experts reviewed the *Kellogg* complaint.  Although Fed. R. Civ. P. 26(a)(2)(B) requires an expert to specify "the facts or data considered by the [expert] in forming" his or her opinions, neither expert report proffered by Watts contains a listing of documents that the experts reviewed and relied upon.  That omission here is puzzling, since Watts's experts routinely list the specific documents they considered when they submit attorneys' fees declarations.  *See, e.g.*, Report of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 3–4, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3251-1) (filed June 1, 2016), *available at* http://polyetherpolyol settlement.com/docs/Ex%20A%20-%20Silver%20Report.pdf (listing numerous items reviewed); Decl. of Brian T. Fitzpatrick on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 3, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3269-1) (filed July 15, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Reply_Mem_iso_Attys_Fees_etc_Exhibits_for_website.pdf. (same); Decl. of Brian T. Fitzpatrick at 3, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex. on Apr. 20, 2010*, No. 2:10-md-02179-CJB-JCW (E.D. La.) (filed Aug. 21, 2016) (Dkt. No. 21098-3) (same); Decl. of Professor Geoffrey P. Miller at 3, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2318-3) (filed Jan. 24, 2018), *available at* https://www.autoairbagsettlement.com/Content/Documents/Exhibit%20C%20to%20Response%20to%20Objections%20HN.pdf (same); Decl. of Professor Geoffrey P. Miller at 3, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 1:13-cv-07789-LGS (S.D.N.Y.) (Dkt. No. 939-39) (filed Jan. 12, 2018) (same); Report of Professor Charles Silver on Attorneys' Fees at 5–6, *Silverman v. Motorola, Inc.*, No. 1:07-cv-04507 (N.D. Ill.) (Dkt. No. 457) (filed Mar. 19, 2012) (same).

By contrast, I am *certain* that Watts itself was aware of the *Kellogg* complaint, since Watts was served with the complaint on May 7, 2018, more than two months before filing its fee application.  *See* Affidavit of Service, *Kellogg v. Watts Guerra, LLP*, No. 0:18-cv-01082-DWF-BRT (D. Minn.) (filed May 31, 2018) (Dkt. No. 53-3).  Moreover, Watts retained counsel in *Kellogg* and moved for an extension of time to answer the complaint on May 21, 2018. *See* Notice of Joinder in Mot. to Extend Time to Answer, *Kellogg v. Watts Guerra, LLP*, NO. 0:18-cv-01082-DWF-BRT (D. Minn.) (filed May 21, 2018) (Dkt. No. 32).  Thus, I can only assume that Watts made a deliberate strategic decision to avoid referencing factual allegations that contradict its fee application.  That it would fail to acknowledge such a highly relevant court filing only confirms why courts must have authority to scrutinize the circumstances surrounding contingency fee agreements.

[45] *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, No. 12-02591-JWL, 2016 WL 7373857, at *13 (D. Kan. Dec. 20, 2016) (Lungstrum, J.) (excluding expert testimony where the expert "lacked access to the information required" for the analysis at issue); *Fanning v. Sitton Motor Lines, Inc.*, No. 08-cv-02464-CM-DJW, 2010 WL 4261476, at *7–8 (D. Kan. Mar. 10, 2010) (Lungstrum, J.) (ruling in a wrongful death case that an expert's

40.  In short, Watts's experts assert the validity of the Watts fee agreements but they ignore highly relevant factual allegations.  More fundamentally, the Watts fee application is flawed because Watts knowingly failed to grapple with crucial evidence (the *Kellogg* complaint) bearing directly on Watts's claimed entitlement to fees.  *See* ¶ 39 n.44.

### c.  Watts and Its Experts Err in Arguing that All Class Members Should Pay the Same Percentage of Fees Regardless of Whether They Retained Counsel

41.  In its fee request, Watts faced a dilemma:  its clients agreed to pay 40 percent of their recoveries to Watts, but those same class members will also have their recoveries reduced by attorneys' fees paid from the settlement fund to common benefit counsel.  Watts, of course, does not want to lose the value of its fee contracts, but at the same time, the firm and its experts presumably recognize that imposing 40 percent contracts *and* common benefit fees on those class members who signed separate contracts would likely be unreasonable.  The solution that Watts and its experts propose is to make *all* class members equally responsible for the Watts contingency fee contracts, whether they signed a contract or not.

42.  Thus, the Miller et al. declaration takes the position that "[a]bsent class members who never hired attorneys should not be rewarded for sitting on their hands," and that "[t]hey should not fare better than active claimants who participated in the litigation against Syngenta and gave it added impetus by hiring attorneys to whom they promised to pay fees."  Miller et al. Decl. at 28.  According to Miller et al., "[b]ecause the farmers are all being treated alike in the settlement, they will all obtain the same benefits from the litigation *and should all bear the same liability for fees and expenses in restitution.*"  *Id*. at 24–25 (emphasis added).  In my opinion, that view is legally unsupportable and fundamentally unfair to the hundreds of thousands of class members in this case who did not enter into contracts with Watts or any other attorney.

43.  The only authority that Watts's experts cite for their position is the 137-year-old case of *Trustees v. Greenough*,[46] which is not at all on point.  The Supreme Court in *Greenough* held

---

"conclusion [was] not 'based upon sufficient facts or data' . . . [and] did not adequately account for plausible alternative explanations for the decedent's untimely death" (citation omitted)); *see also, e.g., Cook ex rel. Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[A] trial court may exclude expert testimony that is imprecise and unspecific, or whose factual basis is not adequately explained." (citations and internal quotation marks omitted)); *United States v. Thaller*, No. 12-cv-22445, 2016 WL 6441548, at * 12 (S.D. Fla. Nov. 1, 2016) (excluding expert testimony "[b]ecause Plaintiff ha[d] not shown that [the expert] ha[d] an adequate factual basis for his opinions").

[46] 105 U.S. 527 (1881).

that a trust beneficiary who undertook litigation on his own to preserve a trust fund for the benefit of himself and others could be awarded allowances from the fund for attorneys' fees and costs. In subsequent decisions, the Supreme Court has explained that *Greenough* simply stands for the proposition that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[47] The case says nothing about foisting individual contingency fee contracts on class members who never entered into such contracts.

44. The reason Miller et al. cannot cite a single case on point is that their argument runs counter to a well-settled principle of class actions—that *a class member who hires his or her own attorney is responsible for that attorney's fees.* The class notice in this very case makes clear to class members that, "[i]f you want to be represented by your own lawyer, you may hire one *at your own expense.*"[48] Later, the notice again emphasizes to class members that, "*[i]f you choose to hire your own lawyer, you will be responsible for that lawyer's fees and expenses.*"[49] The notice in this case is not an outlier. The principle that class members who hire their own lawyers must individually bear that cost is reflected in literally thousands of class notices in class action cases.[50] The countless judges who approved such notices would be astounded to learn that,

---

[47] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

[48] Long-Form Notice at 17, *In re Syngenta MIR162 Corn Litig.*, No. 14-md-02591-JWL-JPO (D. Kan.) (Dkt. No. 3507-5), *available at* https://www.cornseedsettlement.com/Docs/Long%20Form%20Notice.pdf (emphasis added) (hereinafter "Long-Form Notice").

[49] *Id.*

[50] As just a small sample, *see, e.g.*, Long-Form Notice at 6, *In re Motor Fuel Temperature Sales Practices Litig.*, No. 2:07-md-01840-KHV (D. Kan.), *available at* http://ksd.uscourts.gov/wp-content/uploads/2015/11/mdl-1840-2012.03.01-Court-Approved-Long-Form-with-blanks-filled-in.pdf ("If you want to be represented by your own lawyer, you may hire one at your own expense. . . . If you want your own lawyer, you will have to pay that lawyer."); Long-Form Notice at 26, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB (N.D. Cal.) (Dkt. No. 1685-3), *available at* https://www.vwcourtsettlement.com/wp-content/uploads/documents/PSC/Approved%20Exhibit%203%20-%20Long%20Form%20Notice.pdf ("If you want to be represented by your own lawyer, you may hire one at your own expense."); Long-Form Notice at 7, *McDonough v. Toys "R" Us, Inc.*, No. 2:06-cv-00242-AB (E.D. Pa.), *available at* http://www.babyproducts antitrustsettlement.com/documents/notice.pdf ("You do not need to hire your own lawyer . . . . But, if you want your own lawyer, you may hire one at your own expense."); Long-Form Notice at 7, *Rubin v. MF Global, Ltd.*, No. 08-cv-02233-VM (S.D.N.Y.), *available at* http://www.classactionlitigation.com/MF%20Global%20Notice.pdf ("If you want to be represented by your own lawyer, you may hire one at your own expense."); Long-Form Notice at 7, *In re Samsung DLP Television Class Action Litig.*, No. 07-cv-02141-GEB-MCA (D.N.J.), *available at* https://www.samsung.com/us/dlptvsettlement/Class%20Action%20Settlement%20Notice.pdf ("If you want to be represented by your own lawyer, you may hire one at your own expense, but it is not necessary."); Long-Form Notice at 5, *Tripp v. Berman & Rabin, P.A.*, No. 14-cv-02646-DDC-GEB (D. Kan.), *available at* https://keoghlaw.com/wp-content/uploads/2018/01/Long-Form-Notice-About-the-Settlement.pdf ("[Y]ou can, at your own expense, talk to your own lawyer."); Revised Long-Form Notice at 19, *Jabbari v. Wells Fargo & Co.*, No.

according to Miller et al., class members who hire their own attorneys do *not* bear a significant cost in doing so but instead can force all other class members to pay an equal share.  This is not—and never has been—the law.  As one district court stated:  "If individual class members wish[] to have the services of individual counsel in addition to class counsel, they should bear the expense themselves."[51]

45.  Indeed, in my more than 30 years of practice, teaching, and research in the field of class actions, I have never seen the type of notice that Miller et al. envision:  *i.e.*, "If you choose to hire your own lawyer, you will only have to pay a tiny fraction of the cost; the other class members will pay the rest, even though they did not sign any contract."  Not surprisingly, Watts's experts do not cite a single case where a court has adopted such an approach.

46.  The approach of Miller et al. would allow individual plaintiffs to impose the cost of their contingency agreements on individuals who justifiably relied on the class action notice and chose not to retain their own attorneys.  Many class members in this very case might have chosen to hire their own attorneys had they known that they would bear only a tiny fraction of the cost, with the lion's share being imposed on the rest of the class.  Because the class notice told class members that they must pay to hire their own individual lawyer, it would be incredibly unfair for this Court to now hold that the notice was wrong and that *all* class members must now pay the fees on behalf of those class members who signed 40 percent contingency fee agreements with Watts.  Although Watts and its experts profess to invoke the sanctity of contracts,[52] their approach imposes severe obligations on class members who never signed contingency fee contracts.  Freedom of contract also means freedom *not* to enter into a contract.[53]

---

3:15-cv-02159-VC (N.D. Cal.) (Dkt. No. 162-7), *available at* https://www.cand.uscourts.gov/filelibrary/3132/Settlement-Agreement-Ex-B2.pdf ("If you want to be represented by your own lawyer, you may hire one at your own expense."); Long-Form Notice at 14, *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, No. 1:05-md-01720-JG-JO (E.D.N.Y.), *available at* https://www.paymentcardsettlement.com/Content/Documents/Settlement%20Long%20Form%20Notice.pdf ("You do not have to hire your own lawyer.  But you can if you want to, at your own cost.").

[51] *In re Auction Houses Antitrust Litig.*, No. 00-cv-00648, 2001 WL 210697, at *4 (S.D.N.Y. Feb. 26, 2001).

[52] *See, e.g.*, Watts Mem. at 31 (arguing that its "contractual rights are critical to the decisions the Courts must now make"); Miller et al. Decl. at 2 (arguing that the Court should "[r]espect the allocation of rights and responsibilities that informed and sophisticated parties freely agreed to ex ante and resist the temptation to rewrite those agreements . . . ."); Kull/Silver Decl. at 5 (emphasizing importance of "valid contractual arrangements").

[53] *See, e.g.*, R.J.P. KOTTENHAGEN, FROM FREEDOM OF CONTRACT TO FORCING PARTIES TO AGREEMENT 2 (2005), *available at* https://repub.eur.nl/pub/14270/from%20freedom%20of%20contract.pdf ("In the western world,

47. I must also take serious issue with Watts and its experts when they refer to the class members in this case who did not sign on with Watts as "free-riders" (Watts Mem. at 36), and as individuals who "sat on their hands" (Miller et al. Decl. at 24–25).  These derogatory terms misperceive the entire point of a class action, and the use of such terms is extremely unfair to class members who did not sign contingency fee contracts.  As noted, the notice approved by this Court told class members that "you do not need to hire your own lawyer,"[54] and the long-form notice specifically urged caution in hiring an individual attorney.[55]  By *not* hiring separate counsel, those class members helped to ensure the efficiency of the litigation; they were doing exactly what they were supposed to do to make the class action device work properly.  The position of Watts and its experts—that class members who wish to act with integrity (and avoid becoming "free riders") should hire their own attorneys—would destroy the efficiencies of a class action.  Class actions would be routinely accompanied by thousands of duplicative individual lawsuits, with the lawyers who file such cases comforted with the assurance that their fees will be paid by the entire class, even if all or virtually all of the work is done by class counsel.  The whole purpose of a class action would be thwarted.  As one of Watts's experts has noted elsewhere, attorneys' fees should "not become a windfall to attorneys at the expense of the class."[56]  And as another of Watts's experts has explained, the class action device originated precisely to avoid the waste and inefficiency of "adjudicat[ing] the controversy in piecemeal fashion . . . [and] trying the common questions repetitively in separate actions . . . ."[57]

---

freedom of contract is one of the axioms of contract law.  This means that parties are free to enter or *not to enter* into agreements." (emphasis added)).

[54] Notice of Class Action Lawsuit ¶ 18 (Dkt. No. 2703-1).

[55] *See* Long-Form Notice at 17 ("You may receive letters or calls from lawyers seeking to represent you in this case. You have the right to consult an attorney for advice about whether to stay in the Settlement Class and accept the settlement.  You should be cautious, however, about advice from attorneys recommending that you exclude yourself from the Settlement Class so that they can represent you in an individual lawsuit against Syngenta, because these attorneys have a financial motive in having you hire them.").

[56] Alexandra Lahav, *Fundamental Principles for Class Action Governance*, 37 IND. L. REV. 65, 94 (2003).

[57] WRIGHT & MILLER, *supra* note 11, § 1751; *see also id*. § 1754 (objectives of the class action device include "the elimination of repetitious litigation and possibly inconsistent adjudications involving common questions, related events, or requests for similar relief").

48.  Likewise, the Supreme Court has made clear that a major purpose of tolling the statute of limitations under *American Pipe & Construction Co. v. Utah*[58] is to avoid having class members hire their own lawyers to pursue individual lawsuits:

> A putative class member who fears that class certification may be denied would have every incentive to file a separate action prior to the expiration of his own period of limitations. *The result would be a needless multiplicity of actions— precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of* American Pipe *were designed to avoid.*[59]

In *American Pipe* itself, the Court explained that the filing of multiple individual lawsuits "is simply inconsistent with Rule 23 . . . . *A federal class action is no longer an 'invitation to joinder' but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.*"[60]

49.  Consider the *Volkswagen "Clean Diesel"* case, for example.  It would have made no sense for class members to hire thousands of individual lawyers to litigate the identical issues. The vast majority of *Volkswagen* class members wisely chose not to do so, thereby avoiding needless duplication.  To call the class members in *Volkswagen* who chose not to hire their own attorneys "free riders" (or accuse them of "sitting on their hands") is to misperceive the benefits of aggregation:  the resolution of approximately a half a million claims without unnecessarily increasing fees and expenses through the involvement of thousands of individual lawyers.  By the same token, class members in the instant case were not "free riders."  They were simply allowing the case to proceed efficiently through the vehicle of a class action, relying on class counsel to do the heavy lifting.  And their instincts were confirmed by the fact that Watts has now advised its own clients to make claims under the class settlement and not to litigate individually.  *See* ¶ 64.

50.  Importantly, as discussed more fully in ¶ 70, to the extent that Watts's work on behalf of individual clients aided class counsel in securing the settlement, Watts is entitled to petition this

---

[58] 414 U.S. 538 (1974).

[59] *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350–51 (1983) (emphasis added).

[60] 414 U.S. at 550 (emphasis added).  *Accord, e.g.*, *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1802 (2018) ("Economy of litigation favors delaying individual claims until after a class-certification denial." (citation and internal quotation marks omitted)).

Court for a share of common benefit fees.  Thus, attorneys' fees for any work performed by Watts that benefited the class as a whole *will* come from the common fund.

### d.  Watts and Its Experts Overstate the Firm's Role in Achieving the Historic Settlement

51. In my opinion, Watts and its experts overstate Watts's role in Syngenta's decision to settle.  Watts repeatedly touts the pressure placed on Syngenta by its individual cases.  *See, e.g.*, Watts Mem. at 8 ("Mr. Watts and his colleagues knew that active proceedings and the threat of juries in multiple jurisdictions would increase the litigation pressure on Syngenta."); *id.* at 16 (citing "litigation pressure of tens of thousands of individual claims").  Watts's experts embrace the claim that Watts played a critical role in the instant litigation.  *See* Miller et al. Decl. at 1 ("[L]eadership lawyers with lots of signed clients bring leverage to multi-district litigation that relatively client-less lawyers do not.").  The Miller et al. declaration contends that, by signing up so many individual plaintiffs, the firm communicated to Syngenta that plaintiffs would continue to litigate regardless of the Court's ruling on class certification.  *See id.* at 5 ("By . . . bringing suit on behalf of more than 57,000 farmers . . ., Watts Guerra eliminated any hope Syngenta had of fending off liability by defeating class certification.").  It also argues that Watts helped secure a ruling that punitive damages could be awarded in the Minnesota case.  And it contends that Watts played a significant role in the two partial Minnesota trials.  In the end, however, Miller et al. provide no evidentiary support for their assertions that Watts's contributions were "indispensable" and that, "[b]ut for Watts Guerra's work, including the pressure imposed on Syngenta by its docket and the threat of punitive damages, it is unlikely that there would be a $1.51 billion settlement on the table today."  *Id.* at 5, 7; *see also id.* at 9 (arguing that Watts's individual lawsuits "benefited other claimants by increasing the pressure on Syngenta to settle").

52. Courts have recognized that not all efforts by counsel are of equal value in achieving a successful resolution of a class action or non-class MDL litigation.  As Judge Fallon explained in the *Vioxx* MDL:

> In a case of this kind, not all types of work are created equal.  Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of

the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition.  This, of course, is not the only type of work that such a case requires.  Documents must be reviewed, categorized, and analyzed; e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored.  This work, while necessary and often time consuming does not deserve equal treatment when allotting fees.  In short, there is a hierarchy of value for work that tends to have a greater impact on the litigation and generates more 'common benefit.'  Such work deserves greater compensation. [61]

In *Vioxx*, Judge Fallon prepared a chart listing "each category of work performed by [each fee applicant], and the total time logged in performing that task."   Judge Fallon explained that "[e]ach category was assigned a number, *with categories such as participating in trials, participating in settlement negotiation, taking depositions, writing briefs, and committee leadership having a larger number*.  A total of these numbers generally revealed the individuals who performed the most significant work in resolving the litigation."[62]

53.  Here, there can be no serious question that class counsel performed the bulk of the work in the key areas identified by Judge Fallon.  In particular, class counsel conducted virtually all offensive and third-party discovery; conducted defensive discovery in the MDL; prepared and filed master complaints; briefed and argued key legal issues raised in dispositive motions; briefed and argued class certification in the MDL; led expert discovery; prepared for—and tried—the Kansas class trial (which resulted in a $217.7 million verdict); and took the lead in settlement negotiations.  *See* Klonoff Decl. ¶¶ 18–30, 131.  After reviewing Watts's July 10, 2018 briefing, it is still my opinion that the lion's share of the work that led to the settlement was performed by Kansas class counsel.

54.  As noted, according to Watts and its experts, a crucial contribution by Watts was the increased pressure on Syngenta to settle by filing lawsuits for individual plaintiffs, all of whom were already putative class members in the nationwide and state classes asserted in the MDL.  *See* ¶ 51.  But neither Watts nor its experts explain why the filing of Watts's individual cases put

---

[61] *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 772–73 (E.D. La. 2011) (citation, internal quotation marks, and paragraph break omitted).

[62] Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 388–89 (2014) (emphasis added).

critical pressure on Syngenta.  In my opinion, those lawsuits did not lead to the settlement; they may in fact have been counterproductive.[63]

55.  Not surprisingly, Watts and its experts cite no authority for their counterintuitive argument that the mere filing of individual suits is common benefit work.  To the contrary, Judge Breyer in *Volkswagen* squarely rejected that argument when it was made by contract counsel in that case:

> [T]he filings alone did not materially drive settlement negotiations with Volkswagen.  *See In re Cendant*, 404 F.3d [173], 191, 196, 204 [(3d Cir. 2005)] (explaining that non-class counsel should not normally be compensated for "fil[ing] complaints and otherwise prosecut[ing] the early stages of litigation," which is best viewed as "entrepreneurial effort," rather than as work that benefits the class).[64]

56.  Judge Breyer is plainly correct.  Volkswagen was not afraid of individual trials involving a single automobile.  It was afraid of a classwide judgment involving about 500,000 vehicles.

57.  The argument that Watts's filings here caused Syngenta to settle is weak for several reasons.

58.  First, it is telling that the presence of those individual cases did not bring Syngenta to the table before class counsel's victory in the Kansas class trial.  Syngenta itself made clear that it would not settle before going through a trial.  *See* Klonoff Decl. ¶¶ 33, 73.  In my view, it was the pressure of class certification and class counsel's trial victory in Kansas (and the fear of

---

[63] Some attorneys go even further than Watts and rely on *unfiled* cases as purportedly putting pressure on Syngenta.  For instance, the Toups/Coffman application seeks fees for work done on behalf of more than 9,400 clients, even though those lawyers filed fewer than 1,500 cases (and then dismissed almost 500 of those) in the MDL.  I understand that they also filed suit for 7,238 plaintiffs in Williamson County, Illinois, but that leaves cases for approximately 1,000 plaintiffs unfiled.  *See* Toups Mem. at 2; Consolidated Response of Kansas MDL Co-Lead Counsel & Settlement Class Counsel Christopher Seeger to the Various Petitions for Attorneys' Fees at 31–32 (filed contemporaneously) (hereinafter "Co-Lead Response").  Many of the reasons (discussed herein) why Watts's *filed* cases did not pose major pressure on Syngenta to settle apply *a fortiori* to unfiled cases.

[64] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1474312, at *4 (N.D. Cal. Apr. 24, 2017) (fourth and fifth alterations in original).  The Tenth Circuit's opinion in *Gottlieb v. Barry*, 43 F.3d 474, 489 (10th Cir. 1994), distinguished by the court in *Volkswagen*, is not to the contrary.  There, the court determined that it was illogical to assume that lawyers who prosecuted cases for 16 months "should be wholly uncompensated."  *Id*.  As I note (*see* ¶¶ 50, 70–71), Watts should indeed be compensated for work that directly benefited the class.  My point is simply that Watts and its experts err in arguing that the mere filing of individual suits was a crucial pressure point that convinced Syngenta to settle.

massive additional classwide verdicts) that brought Syngenta to the table.[65]   Indeed, by Watts's own admission, Syngenta did not make its first settlement offer until August 10, 2017—just weeks after the June 23, 2017 Kansas trial verdict.   *See* Decl. of Mikal C. Watts in Support of the Fee & Expense Application by Watts Guerra LLP ¶ 264 (Dkt. No. 3580-5) (hereinafter "Watts Decl.").[66]

59.  Second, Miller et al.'s contention that the individual lawsuits put Syngenta on notice that the litigation would continue even without a class action (*see* Miller et al. Decl. at 5) became moot after common benefit counsel successfully achieved class certification in this Court in September 2016 and convinced the Tenth Circuit to deny Rule 23(f) review.   The cases were also not a serious threat even before class certification.   Watts never would have (or could have) taken these cases to trial one by one, a point it later admitted.  *See* ¶ 64.

60.  Third, the thousands of individual lawsuits may have actually been *harmful* to plaintiffs' cause.  I understand that average losses in the instant case are only about $34,491.69 per farmer. *See* Co-Lead Response at 34 (citing Pls.' Mot. to Certify Class at 97–98 (Dkt. No. 2164), which discusses that average loss).   The individual lawsuits were thus negative-value suits, meaning that the cost to Watts of bringing individual cases would greatly exceed the potential benefits.[67] Syngenta, by contrast, could logically decide to spend far more to defend an individual case than

---

[65] I understand that, until the parties jointly filed a motion to stay proceedings pending execution of the settlement agreement (Dkt. No. 3452), four additional trials—composed of seven certified classes—were in the MDL trial queue for 2018 alone.  *See* Co-Lead Response at 8.  That compressed trial schedule most likely would have occurred before Syngenta was able to secure Tenth Circuit (or Supreme Court) rulings in connection with the $217.7 million Kansas verdict.

[66] Although Watts's experts try to minimize the central role of the Kansas class trial verdict in achieving the settlement, one of its experts has testified in another case that even the *threat* of winning at trial is *the* crucial pressure point in aggregate litigation:  "The point that the prospect of winning at trial is what gives plaintiffs' attorneys bargaining leverage in settlement negotiations is as true in aggregate proceedings as in single plaintiff cases."  Decl. of Charles Silver at 5, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 1:14-md-02543-JMF (S.D.N.Y.) (filed Feb. 5, 2016) (Dkt. No. 2243-2).  (Nowhere does Silver's testimony suggest that the mere filing of individual cases results in "bargaining leverage" in achieving a settlement.)  *A fortiori*, a classwide *verdict* in an actual trial provides substantial pressure to settle, and that was the case here.

[67] *See, e.g.*, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 295 F.R.D. 112, 144 (E.D. La. 2013) (explaining that negative-value claims are those whose "monetary value does not warrant individual prosecution due to discovery and expert witness expense and other costs" (citations and internal quotation marks omitted)).  Indeed, in the instant case, this Court noted in certifying the class that "the litigation of individual suits would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. . . . [T]he amounts at stake per farm are small enough that separate suits may be impracticable for many class members."  Mem. & Order at 27–28 (Dkt. No. 2547) (citation and internal quotation marks omitted).

the case is worth in order to crush the plaintiffs and their attorneys.[68]  As two commentators have explained, "*the separate action process is structured so that the defendant always can exploit its natural incentive to outspend the individual plaintiff in litigating the common questions to gain the upper hand in any solo action*."[69]  By contrast, "[in] a class action, both sides have equivalent aggregate investment incentives, and hence there is no structural bias against either party."[70]

61.  Watts's filing of large numbers of individual cases was also counterproductive because it increased the risk that class certification would be denied.  Numerous individual lawsuits can lead to inconsistencies, management difficulties, and needless duplication of effort.  As one of Watts's experts has explained, "[i]f the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be joined, which is seldom feasible, a Rule 23 proceeding only will result in one more action."[71]  As a related matter, numerous individual lawsuits can aid the defendant in arguing that a class action is not the superior method of adjudicating the controversy.  As Professor Edward Sherman has noted, "[i]nsofar as existing individual suits indicate that the class members have adequate, non-class remedies available, multiple suits may actually offer a salutary vehicle for avoiding the cumbersomeness of a class action."[72]

62.  These are not just theoretical concerns.  At class certification, Syngenta made a significant point out of the fact that numerous individual cases had been filed, noting that "*thousands* of plaintiffs have voted with their feet by filing individual actions to avoid being part of a class action in the MDL and instead filing in Minnesota and elsewhere."  Syngenta's Opposition to Producer Pls.' Mot. for Class Certification at 110 (Dkt. No. 2335) (hereinafter

---

[68] The fact that Watts signed up many individuals does not change the analysis, since those individuals represent a small percentage of the class.  Indeed, I understand that in total, individual plaintiffs constituted only 18 percent of the total corn bushels involved, with those represented by class counsel constituting 82 percent of the corn bushels. *See* Co-Lead Response at 32–33.

[69] David Rosenberg & Kathryn E. Spier, *Incentives to Invest in Litigation and the Superiority of the Class Action*, 6 J. LEGAL ANALYSIS 305, 306–07, 328 (2014) (emphasis added).

[70] *Id*. at 306.  Indeed, those authors note that increasing the number of individual plaintiff lawsuits actually *harms* plaintiffs:  "[A]s the number of plaintiffs suing separately increases, so does the intensity of the structural bias against them."  *Id*. at 328.

[71] Wright & Miller, *supra* note 11, § 1780 (footnote omitted).

[72] Edward F. Sherman, *Class Actions and Duplicative Litigation*, 62 IND. L.J. 507, 511 (1987).

"Opp. to Class Cert.") (emphasis in original).   According to Syngenta, the individual filings showed that "many farmers believe they have a vital interest in controlling the prosecution of their own separate actions."  *Id*.  Importantly, Syngenta relied on *In re Genetically Modified Rice Litigation*,[73] the prior putative class action with the greatest similarity, noting that in that case "the *GM Rice* court pointed to the fact [in denying class certification] that 'hundreds of plaintiffs have shown interest in prosecuting their claims' separately."  Opp. to Class Cert. at 110 (quoting *Genetically Modified Rice*, 251 F.R.D. 392, 400 (E.D. Mo. 2008).  Syngenta also argued that the filing of individual suits undercut class counsel's arguments that "that these are 'negative value' cases that individuals do not have the economic incentive to pursue."  Opp. to Class Cert. at 112.  Syngenta cited and quoted *Bustillos v. Board of County Commissioners of Hidalgo County*,[74] which stated that "the extent to which proposed class members have already filed individual claims" is "probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification."  Opp. to Class Cert. at 112 (quoting *Bustillos*, 310 F.R.D. at 655–56).  And in its Rule 23(f) petition, Syngenta noted that "*tens of thousands* of suits remain to be resolved individually," arguing that "[the] extraordinary number of suits remaining for individual resolution necessarily defeats a finding that a class action would be superior."  Rule 23(f) Pet. for Permission to Appeal Class Certification Order at 11–12, *In re Syngenta AG MIR162 Corn Litig.*, No. 16-607 (10th Cir.) (filed Oct. 11, 2016) (hereinafter "Syngenta Rule 23(f) Pet.").  In that filing, Syngenta criticized this Court's "specula[tion] that individual plaintiffs would not really want control over their own actions when it got closer to trial" (*id*. at 12), and it concluded:  "[T]ens of thousands of individual suits conclusively show that these are not negative value claims."  *Id*. at 13.  In short, Watts served up—on a silver platter—arguments for Syngenta to use in opposing class certification.  The fact that class counsel was eventually able to persuade this Court to certify a class does not undercut the fact that Watts's strategy of filing individual lawsuits was not helpful to the cause of class certification.

63.  In sum, as I have explained above, Watts and its experts nowhere acknowledge the adverse strategic consequences of flooding the courts with thousands of individual lawsuits.

---

[73] No. 4:06-md-01811-CDP (E.D. Mo.)

[74] 310 F.R.D. 631 (D.N.M. 2015).

64.  In my opinion, perhaps the best proof that Watts's individual cases did not pose a threat to Syngenta is Watts's own conduct after a settlement was reached.  If Watts's individual cases truly put pressure on Syngenta, Watts would *not* have advised its clients to join in the class settlement.  Instead, Watts would have used its supposed power and leverage to negotiate a *better* deal for its clients than the class members received in the class settlement.  As it turned out, however, Watts advised its clients to join the class settlement.[75]  Mikal Watts himself candidly acknowledged in his declaration in support of the Watts fee application that the individual lawsuits did not provide a practical, timely solution:  "*[G]etting [the individual farmers] to trial would take many decades, long after the remaining life expectancy of most farmers had passed.*"  Watts Decl. ¶ 300 (emphasis added).  Mikal Watts's concession is fatal to Watts's argument that the existence of these individual cases put serious pressure on Syngenta.[76]  Surely Syngenta's experienced counsel understood—even prior to Mikal Watts's concession— that Watts was bluffing when it threatened to try these thousands of cases one at a time.

65.  My opinion—that Watts's filing of individual lawsuits did not put significant pressure on Syngenta—is not based just on my academic background.  Most importantly, it is confirmed by my extensive experience representing large corporate defendants as a Jones Day partner in more than 100 class actions.  My worry as a class action defense lawyer was always about class certification—and especially about an adverse verdict in a classwide trial.  Except for cases involving massive individual damages (such as mass tort personal injury cases, which are normally not suitable for class certification), I felt little or no pressure by the filing of numerous individual lawsuits, since I knew my client could always out-litigate (and outspend) plaintiffs one trial at a time.[77]  In short, as Watts's own expert and numerous courts have previously noted,

---

[75] The same phenomenon occurred in *Volkswagen* and *NFL*; in both cases, the vast majority of individual plaintiffs ended up participating in the class settlements.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *16 (N.D. Cal. Oct. 25, 2016) (noting approximately 0.7 percent opt-out rate in approving 2.0-liter settlement and explaining that "the number of opt outs continues to decrease as Class Members revoke their requests for exclusion"); *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 369–70 (E.D. Pa. 2015) (noting approximately 1 percent opt-out rate in approving settlement).

[76] Watts also acknowledged that he saved his firm and associated counsel more than $100 million in administrative fees as a result of the participation by Watts's clients in the class settlement.  Watts Decl. ¶ 321.  This is further proof that individual trials would have been cost-prohibitive for Watts.

[77] The only exception is that, occasionally even after the denial of class certification, a string of decisive and large plaintiff victories in bellwether trials might convince a defendant to reach a global settlement.  That occurred, for example, in *Genetically Modified Rice*.  In that case, which involved individual damages ranging into the millions of

it is the certification of a class action, and not the filing of individual lawsuits, that typically causes defendants to settle a class action lawsuit.[78]

66.   Watts and its experts also rely heavily on Watts's preparation of plaintiff fact sheets in support of Watts's fee application.   *See* Watts Mem. at 15–16; Miller et al. Decl. at 6.   Similar arguments are made by other contract counsel seeking fees.   *See, e.g.*, Paul Byrd Law Firm, PLLC's Brief in Support of Pet. for an Award of Attorneys' Fees & Reimbursement of Costs & Expenses at 3 (Dkt. No. 3586) ("The amount of effort and skill and time it took to successfully complete the Plaintiff Fact Sheets deserves recognition . . . .").   But that work cannot reasonably be characterized as common benefit work.   Such work may have helped the individual clients, but the argument that the class as a whole was helped is, in my view, specious.   Taken to its logical conclusion, the argument of Watts and its experts is that anything that helps the individuals by definition helps the class.   Such an argument, if accepted, would destroy the whole distinction between common benefit work and work that only helps individual plaintiffs.

---

dollars, after class certification was denied, plaintiffs won five separate bellwether trials (and settled two more cases during trial), with jury verdicts as high as $11.8 million in compensatory damages and $125 million in punitive damages.   Following those verdicts, the defendant agreed to a global settlement worth $750 million.   *See Genetically Modified Rice*, No. 4:06-md-01811-CDP, 2012 WL 6085153, at *8 (E.D. Mo. Nov. 2, 2012) (describing background of litigation); David Bario, *Bayer Loses Biggest* Genetically Modified Rice *Verdict Yet: $136.8 Million in Arkansas State Court Trial Against Riceland Cooperative*, THE AM. LAWYER (Mar. 22, 2011), https://www.law.com/americanlawyer/almID/1202487422350/ (discussing jury verdicts and noting that "Bayer and its lawyers . . . are now 0-for-7 in trials").   There, the impressive trial verdicts—not the mere filing of multiple cases—presumably convinced the defendant to settle.   Here, by the same token, Syngenta did not agree to settle merely because of multiple individual cases, but did so only after the Kansas class verdict.   And here, unlike in *Genetically Modified Rice*, Watts cannot claim that it achieved a victory in *any* Minnesota trials, let alone multi-million dollar verdicts in five bellwether trials.   The most Watts can do is praise Mikal Watts's cross examinations in one aborted Minnesota trial.   *See* ¶ 68 n.82.   Moreover, unlike *Genetically Modified Rice*, as Watts itself has conceded (*see* ¶ 64), the individual damages in this case are not large enough to support the threat of major verdicts in individual litigation.

[78]   Arthur R. Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem"*, 92 HARV. L. REV. 664, 679 n.63 (1979) (one of Watts's experts noting that, "[o]nce the case is certified as a class action, the size of the potential liability takes on a frightening dimension"); *see also, e.g.*, *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016) (noting that "class certification is often the defining moment in class actions" (citation and internal quotation marks omitted)); DONNA M. NAGY ET AL., SECURITIES LITIGATION AND ENFORCEMENT 429 (3d ed. 2011) ("The court's decision on certification carries enormous significance for all concerned.   If certification is denied, most (and possibly all) members of the might-have-been class will lose the opportunity to recover because they lack the resources to sue individually.   On the other hand, a grant of certification may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." (citations and internal quotation marks omitted)).   *See also* Report of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 19, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3251-1) (filed June 1, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Ex%20A%20-%20Silver%20Report.pdf ("The belief that plaintiffs' attorneys can collect buckets of dollars just by *filing* class actions isn't true." (emphasis added)).

As one of Watts's experts has noted elsewhere, "common benefit work, by definition, serves the interests of *all* plaintiffs."[79]    Indeed, as with the filing of individual cases in the first place, the completion of individual fact sheets in the instant case gave Syngenta arguments for *opposing* class certification.  *See, e.g.*, Syngenta Rule 23(f) Pet. at 16 & n.7 (arguing that "even a limited sample" of fact sheets confirmed the need for "individualized fact finding," thus making a class action inappropriate).[80]

67.  Watts and its experts also make a big point of the fact that Watts's clients have thus far filed claim forms at a much higher rate than the class as a whole.  *See* Watts Mem. at 23 (noting that "as of July 2, 2018, ***more than half*** of the completed claims received by the Claims Administrator . . . are from class members identifying themselves as Watts Guerra clients" (italics and boldface in original)); Miller et al. Decl. at 6 (citing same statistic).  Watts and its experts assume that this statistic somehow shows that a benefit has been conferred on the class as a whole (although they do not explain why that is so).  In my view, however, the filing of a claim form typically does not confer a benefit on the class as a whole.  Certainly, the filing of claim forms here cannot be said to have exerted pressure on Syngenta—which had already agreed to the settlement and which will receive a release binding on all class members who do not opt out, regardless of whether any particular class member submits a claim form.  If Watts's statistic is accurate, it might provide an argument that Watts's clients should pay Watts a separate sum under their contracts for the special attention they received, but it does not justify the award of common benefit fees.

68.  Additionally, although Watts's experts ignore the importance of the $217.7 million Kansas verdict, they assert (as does Watts itself) that Watts "*establish[ed]* that [punitive] damages should be awarded by the jury in the Minnesota Class trial . . . ."  Miller et al. Decl. at 5 (emphasis added); *see also* Watts Mem. at 53.[81]  But they have no valid basis for claiming that a

---

[79] Decl. of Geoffrey Parsons Miller ¶ 10, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 1:14-md-02543-JMF (S.D.N.Y.) (filed Feb. 1, 2016) (Dkt. No. 2200-1) (emphasis added).

[80] Filling out plaintiff fact sheets has been recognized as a relatively minor contribution.  *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, No. 05-md-01708-DWF-AJB, 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008) ("Other counsel . . . did substantially less work, with some doing no more than filing a Complaint and a Plaintiff Fact Sheet, or work requiring even less skill.").

[81] The fact that Watts's experts essentially ignore the pivotal role of the Kansas trial verdict cannot be squared with their approach in other cases.  *See, e.g.*, Report of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 24–25, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL

victory for plaintiffs (let alone a judgment with a punitive damages award) was a certainty.[82] Indeed, at the time the settlement term sheet was agreed upon, the Minnesota trial was not even close to being completed (Minnesota counsel had yet to put their damages experts on the stand), so it is difficult to understand how Watts and its experts can be so confident as to how the trial would have come out had the case gone to verdict.

69. Finally, to the extent that Watts seeks fees for redoing work that was already done by class counsel, or for keeping its clients abreast of developments, that work should not, in my view, justify a common benefit award.  As the Court set forth in its July 27, 2015 Order Establishing Protocols for Common Benefit Work and Expenses and Establishing the Common Benefit Fee and Expense Funds (Dkt. No. 936), "'Common Benefit Work' means services performed for the benefit of *all* producer and/or *all* non-producer plaintiffs . . . and specifically authorized by Lead Counsel."  *Id.* at 7 (emphases added).  As the Third Circuit has noted, it "cannot see how the monitoring [of class proceedings, keeping clients informed, and advising clients regarding the class settlement] itself benefits the class as a whole, as opposed to the attorney's individual client.[83]  Similarly, as one district court reasoned:  "[T]here is [no] reason for the class as a whole to compensate large numbers of lawyers for individual class members for keeping abreast of the case on behalf of their individual clients, keeping their individual clients informed, or duplicating the efforts of lead counsel."[84]

---

(D. Kan.) (Dkt. No. 3251-1) (filed June 1, 2016), *available at* http://polyetherpolyolsettlement.com/docs/ Ex%20A%20-%20Silver%20Report.pdf ("Winning a large class action lawsuit takes more than being right.  It takes enormous resources and exceptional lawyering, and even then the lawyers face serious risk. . . . The difficulty of winning an enormous class action is hard to overstate.").

[82] Watts and Miller et al. claim that Mikal Watts's cross examination of Syngenta senior executives at the Minnesota class trial was a watershed event leading to settlement.  Watts boasted that the cross examination was so devastating that it was "abundantly clear to all that a punitive damages finding was likely."  Watts Mem. at 53; *see also id.* at 2 (claiming that Mikal Watts "savaged Syngenta executives on cross examination," thus "ma[king] punitive damages all but inevitable").  According to Watts, that cross examination "forced Syngenta finally to accept that it faced not just hundreds of millions of dollars in compensatory damages but a likely multi-*billion* dollar judgment," and "[t]hen, in an instant, it was over."  *Id.* (emphasis added); *see also* Miller et al. Decl. at 7 (noting their "understand[ing]" that Mikal Watts's cross examination "made it clear that a punitive damages finding was quite possible, even likely").  In my experience, nothing is inevitable in the world of jury trials, especially an award of punitive damages.  Indeed, MDL class counsel note that, after the Watts cross examinations, plaintiffs reduced their settlement demand by far more than the amount by which Syngenta increased its offer.  *See* Co-Lead Response at 10.  In short, the notion that Mikal Watts's cross examination at the never-completed Minnesota trial was the *sine qua non* leading to the $1.51 billion settlement is hard to take seriously.

[83] *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 201 (3d Cir. 2005).

[84] *In re Auction Houses Antitrust Litig.*, No. 00-cv-00648, 2001 WL 210697, at *4 (S.D.N.Y. Feb. 26, 2001). *Accord, e.g., In re Heritage Bond Litig.*, No. 02-ml-01475-DT-RCX, 2005 WL 1594389, at *18 (C.D. Cal. 2005)

70.  In any event, as noted (¶ 50), the fact that Watts is not entitled to compensation merely for filing large numbers of cases does not mean that Watts must go away empty handed.  To the extent that Watts can show that its work was truly common benefit work—that it actually benefited the class as a whole—it may seek compensation from the settlement fund for that work under the Court's procedures.  Indeed, some of the work described by Watts strikes me as potentially suitable for some common benefit fees, including:  conducting bellwether discovery, working on class certification in Minnesota, participating in the aborted Minnesota trials, briefing issues regarding admissibility of expert testimony, and participating in settlement talks.  *See* Watts Mem. at 5–23.

71.  In sum, while Watts may be entitled to some fees for common benefit work, any work that "benefited only an individual client and not the common fund does not trigger a fee entitlement."[85]

72.  To the extent that contract counsel wish to enforce their contracts, as opposed to seeking reasonable fees from the common fund for work that benefited the class, that "is a matter of contract law, subject to the codes of professional conduct, and such disputes should be resolved in the appropriate forum."[86]  Indeed, Watts concedes that it has that remedy; it notes that unless

---

("[A]ttorneys who confer no benefit on the class and simply serve the interests of an individual plaintiff are not entitled to be compensated from the common fund."); *In re Honeywell Int'l, Inc. Sec. Litig.*, No. 2:00-cv-03605-DRD-SDW, slip op. at 3 (D.N.J. Oct. 14, 2004) (Dkt. No. 261) (When attorneys confer a benefit on the class they are entitled to an award of attorneys' fees.  Conversely, attorneys who confer no benefit on the class and simply serve the interests of an individual plaintiff are not entitled to be compensated from the common fund." (citations omitted)).

[85]  5 Newberg on Class Actions § 15:59 (5th ed. 2018) (citations omitted).  *Accord, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1474312, at *3 (N.D. Cal. Apr. 24, 2017) ("In 'common fund' cases, a court may award non-class counsel a reasonable attorney's fee only if counsel's work conferred a benefit on the *class*, as opposed to on an individual client." (emphasis in original) (citing *Gottlieb v. Barry*, 43 F.3d 474, 489 (10th Cir. 1994))).  I would also note that there is tension between the Miller et al. declaration and the Kull/Silver declaration on this point.  The former "approach[es] the Watts Guerra fee application from a contractual perspective" (Miller et al. Decl. at 7), namely, relying on the sanctity of the 57,000+ individual fee contracts as the key to awarding fees to Watts.  By contrast, the Kull/Silver declaration recognizes that in the "'horizontal' common fund allocation" among lawyers, the focus is on the "contribut[ions] (*in the form of common benefit work*) . . . ." Kull/Silver Decl. at 4 (emphasis added).

[86]  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1474312, at *5 (N.D. Cal. Apr. 24, 2017).  The case of *In re Chinese-Manufactured Drywall Products Liability Litigation*, No. 09-cv-02047 (E.D. La. Jan. 31, 2018) (Dkt. No. 21168), cited by Watts (*see* Watts Mem. at 37), is distinguishable.  In that case, the settlement included funds that were specifically designated for fees for both class counsel and contract counsel.  *See Chinese-Manufactured Drywall*, Dkt. No. 21168 at 4 (defendant agreed to pay a separate amount "for attorneys' fees, which include[d] both the fees for contract counsel and those for common benefit counsel").  By contrast, Syngenta did not designate a portion of its settlement to pay contract counsel for non-common benefit work.

this Court allows contract counsel to be paid out of the common fund, there will be "immense pressure on all retained counsel to resort to attorney liens." Watts Mem. at 58.

73.  Finally, I would note that, unlike some personal injury cases involving difficult, plaintiff-specific issues of injury, causation, and damages, the issues here did not require the services of individual attorneys in addition to common benefit counsel.  That reality should be taken into consideration by this Court in awarding fees.  Notably, the claim form in the proposed class settlement is very simple, requiring only the most basic information for a farmer to secure recovery.[87]  In most instances, the class member does not even need to attach documentation.[88]  Thus, contract counsel cannot credibly argue that they were essential to enable their clients to fill out claim forms.

### e.  Watts's Experts Err in Characterizing Watts's Proposed Treatment of MDL Class Counsel as Generous

74.  The Miller et al. declaration submits that, "[u]nder the Watts Guerra proposal . . . the other common benefit lawyers in this case will be compensated *lavishly*."  Miller et al. Decl. at 33–34 (emphasis added).  They calculate that, under Watts's proposal:

> [I]f the Courts award *one-third* of the settlement for attorney fees and expenses, and absent class members (*i.e.*, the 500,000 class members who did not retain lawyers) file claims by which they collect *one-half* of the remaining settlement funds, the other common benefit lawyers will receive $319 million.  As a percentage of the total settlement, $319 million would be 21.25%.  *This sum is nearly without precedent*.  By contrast, the lawyers in the Watts Guerra Group will not fare nearly as well . . . .

*Id*. at 34 (emphases in original).

75.  Miller et al.'s contention that a 21.25 percent common benefit award to lawyers other than Watts is "nearly without precedent" is both legally erroneous and contrary to several of these experts' own declarations in other cases.  Miller et al. claim that, based on their research, "the highest previous take for common benefit counsel was 29.4% and the second highest was only 14.4%."  Miller et al. Decl. at 34.  This assertion is wrong on many levels.  To begin with,

---

[87] *See* Long-Form Notice at 13 ("You can submit an electronic Claim Form in just a few quick and easy steps on the settlement website.").

[88] *See id*. at 14 ("You do not need to obtain copies of your FSA 578 Report to make a claim.  After you submit a Claim Form consenting to disclosure of the FSA data to the Claims Administrator to use for processing your claim . . . this information will be provided directly by the FSA.").

Miller et al. offer a chart of common benefit awards in several $1 billion+ settlements, but omit *Allapattah Services, Inc. v. Exxon Corp.*,[89] a case involving a $1.06 billion fund in which the court awarded 31⅓ percent in fees.  *See* Klonoff Decl. ¶ 94 (Table 1).  This omission is difficult to understand, since Watts's own expert submitted a declaration in that case endorsing class counsel's *33⅓ percent* fee request.[90]  I would also note that, by arbitrarily setting the line at $1 billion, Miller et al. avoided including *In re Urethane Antitrust Litigation*, in which this Court awarded attorneys' fees to common benefit counsel of 33⅓ percent of the $835 million fund just two years ago.[91]  Moreover, I showed in my original declaration that in many other mega-fund cases (involving funds of more than $100 million), courts have awarded more than 30 percent in fees.  *See* Klonoff Decl. ¶ 94 (Table 1).  Those cases should be precedent *a fortiori* for Watts's experts, who have argued repeatedly and forcefully that fees should *increase* as a percentage matter as the common fund increases.[92]  In other words, consistent with their own writings, their

---

[89] 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[90] *See* Expert Report of Professor Charles Silver Concerning Attorneys' Fees & Expenses, *Allapattah Services, Inc. v. Exxon Corp.*, No. 1:91-cv-00986-ASG (S.D. Fla.) (Dkt. No. 2638) (filed Feb. 16, 2006) ("In my opinion, the request for [33⅓ percent] fees and expenses is reasonable . . . .").

[91] *See In re Urethane Antitrust Litig.*, No. 04-md-01616-JWL, slip op. (D. Kan. July 29, 2016) (Dkt. No. 3276) (Lungstrum, J.) (awarding attorneys' fees); *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL, 2016 WL 4060156 (D. Kan. July 29, 2016) (Lungstrum, J.) (addressing objections to attorneys' fees petition).

[92] For example, Professor Fitzpatrick has testified that "it is better *not* to lower fee percentages because the settlement is large," since "doing so does little more than misalign the incentives of class counsel to fight for the largest settlement, and, indeed, may incentivize some class counsel to settle cases earlier for smaller sums."  Decl. of Brian T. Fitzpatrick at 14 & n.4, *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-2509-LHK (N.D. Cal.) (Dkt. No. 1079) (filed May 8, 2015), *available at* http://www.hightechemployeelawsuit.com/media/303927/15-5-8__1079__fitzpatrick_decl__motion_for_attorney_fees.pdf (emphasis added).  Fitzpatrick presented a similar argument in *Urethane*, providing the following illustration to support his position:

> [S]uppose class counsel could settle a case for $500 million and receive a 33% fee award or settle a case for $800 million but receive a 20% fee award. Class counsel would rather settle such a case for $500 million (and a $165 million fee award) than $800 million (and a $160 million fee award). That is the very definition of perverse incentives.

Decl. of Brian T. Fitzpatrick on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 7, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3269-1), *available at* http://polyetherpolyolsettlement.com/docs/Reply_Mem_iso_Attys_Fees_etc_Exhibits_for_website.pdf. Similarly, Professor Silver has argued that "[a]lthough it sometimes is suggested that fee percentages should decline as recoveries increase, that isn't so." Report of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 29, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3251-1) (filed June 1, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Ex%20A%20-%20Silver%20Report.pdf. *Accord, e.g.*, Expert Report of Professor Charles Silver at 4, *In re (Bank of Am.) Checking Acct. Overdraft Litig.*, No. 1:09-md-02036-JLK (S.D. Fla.) (Dkt. No. 1885-12) (filed Sept. 16, 2011) ("Private parties would never contract for [the mega-fund rule that fee percentages should decline as recoveries increase] because doing so would punish success." (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (internal quotation marks omitted)) Numerous other examples could be cited.  *See, e.g.*, Decl. of Professor Charles Silver on

34

chart should have included settlements far below $1 billion. As Professor Fitzpatrick noted in *Urethane*, "settlement size, by itself, is not a good reason to reduce fee percentages."[93]

76. I would also note that Professors Geoffrey Miller, Fitzpatrick, and Silver[94] have repeatedly endorsed attorneys' fees for class counsel (without reference to contract attorneys) of 30 percent or more. Among numerous examples, Professor Fitzpatrick submitted a declaration to this Court arguing in favor of a 33⅓ percent fee award for class counsel in *Urethane*.[95] Similarly, Professor Geoffrey Miller testified in support of class counsel's request for attorneys' fees of 30 percent in the *J.C. Penney* securities case,[96] and he explicitly recognized only months ago in his declaration in the *Takata Airbag Litigation* that "[f]ees of 30% or higher are observed even in 'mega' cases [when class counsel] generate excellent results under conditions of elevated risk."[97] Likewise, Professor Silver testified in support of class counsel's 33 percent fee request in the $590 million *Dahl v. Bain Capital Partners LLC* settlement,[98] and in support of class counsel's 40 percent fee request in *Cook v. Rockwell International Corp.*[99] Numerous other

the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees, *Cook v. Rockwell Int'l Corp.*, No. 1:90-cv-00181-JLK (D. Colo.) (Dkt. No. 2435-13) (filed Jan. 12, 2017) (praising "the attitude Judge Lungstrum displayed in *Urethane*" because "he rejected the [mega-fund rule that percentages should decline as recoveries increase]").

[93] *See* Decl. of Brian T. Fitzpatrick on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 6, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3269-1) (filed July 15, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Reply_Mem_iso_Attys_Fees_etc_Exhibits_for_website.pdf (also noting that "many courts have [so] recognized").

[94] I can find no prior declarations on point by Professors Arthur Miller, Lahav, or Kull.

[95] *See* Decl. of Brian T. Fitzpatrick on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3269-1) (filed July 15, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Reply_Mem_iso_Attys_Fees_etc_Exhibits_for_website.pdf.

[96] *See* Decl. of Professor Geoffrey P. Miller, *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-00736-RWS-KNM (E.D. Tex.) (Dkt. No. 166-15/4891) (filed Oct. 25, 2017), available at http://www.jcpenneysecuritieslitigation.com/media/1122471/declaration_of_prof._geoffrey_p._miller__re_dkt._166_.pdf.

[97] Decl. of Professor Geoffrey P. Miller at 11, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2318-3) (filed Jan. 24, 2018), *available at* https://www.autoairbagsettlement.com/Content/Documents/Exhibit%20C%20to%20Response%20to%20Objections%20HN.pdf.

[98] *See* Report of Professor Charles Silver on the Reasonableness of Lead Counsel's Request for Payment of Attorneys' Fees & Expenses, *Dahl v. Bain Capital Partners LLC*, No. 1:07-cv-12388-WGY (D. Mass.) (Dkt. No. 1059) (filed Nov. 13, 2014).

[99] *See* Decl. of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees, *Cook v. Rockwell Int'l Corp.*, No. 1:90-cv-00181-JLK (D. Colo.) (Dkt. No. 2435-13) (filed Jan. 12, 2017).

examples can be cited for each of these experts.[100]   The declarations of these experts in other

cases highlight, with myriad statistics and charts, many awards *to class counsel alone* of more

than 30 percent, even in so called mega-fund cases.  As Watts's expert, Professor Fitzpatrick, put

it in discussing fee awards to class counsel, "courts *often* award fees equal to one-third of class

action settlements."[101]

77.   Moreover, in none of these cases do Fitzpatrick, Silver, or Miller argue that the fees from

the common fund must be shared with contract counsel who signed clients to individual

contingency fee contracts but did not benefit the class.[102]   In none of them do these experts argue

that class members who did not hire lawyers are "free riders" or must pay their share of the fees

---

[100] *See, e.g.*, Decl. of Brian T. Fitzpatrick, *In re (PNC Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036-JLK (S.D. Fla.) (filed Mar. 22, 2013) (endorsing class counsel's 30 percent attorneys' fees request); Decl. of Bryan T. Fitzpatrick, *Chaudhri v. Osram Sylvania, Inc.*, No. 2:11-cv-05504-MCA (D.N.J.) (Dkt. No. 88-4) (filed Jan. 9, 2015) (endorsing class counsel's 33⅓ percent fee request); Decl. of Brian T. Fitzpatrick, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2033-3) (filed Sept. 8, 2017) (endorsing class counsel's 30 percent fee request); Decl. of Geoffrey P. Miller at 24, *Chieftain Royalty Co. v. QEP Energy Co.*, No. 6:11-cv-00212-KEW (W.D. Okla.) (filed Apr. 26, 2013), *available at* http://www.chieftain-qep.com/Portals/0/Documents/06%20Declaration%20of%20Geoffrey%20P.%20Miller%20in%20Support%20of%20Stipulation%20and%20Agreememt%20of%20Settlement,%20Application%20for%20Attorneys%27%20Fees%20and%20Notice%20of%20Proposed%20Settlement.pdf (endorsing class counsel's 40 percent fee request, citing numerous fee awards within the Tenth Circuit over 36 percent); Decl. of Geoffrey P. Miller, *Chieftain Royalty Co. v. XTO Energy Inc.*, No. 6:11-cv-00029-KEW (E.D. Okla.) (Dkt. No. 206) (filed Feb. 23, 2018) (endorsing class counsel's 40 percent fee request); Expert Report of Professor Charles Silver, *In re (Bank of Am.) Checking Acct. Overdraft Litig.*, No. 1:09-md-02036-JLK (S.D. Fla.) (Dkt. No. 1885-12) (filed Sept. 16, 2011) (endorsing class counsel's 30 percent fee request).

[101] Decl. of Brian T. Fitzpatrick on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 4, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3269-1) (filed July 15, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Reply_Mem_iso_Attys_Fees_etc_Exhibits_for_website.pdf.

[102] Professor Fitzpatrick, for example, submitted attorneys' fees declarations in *NFL Concussion*, *Volkswagen "Clean Diesel,"* and *BP Deepwater Horizon*.   In all three cases, the issue of how to treat contract counsel was prominent and contentious, and Fitzpatrick's failure to say anything about those lawyers in supporting fees for class counsel is telling.  For instance, Fitzpatrick nowhere suggested that a portion of the attorneys' fees in those cases should go to contract counsel.   To the contrary, Fitzpatrick assumed that the award would go solely to class counsel (and other common benefit counsel).   *See* Decl. of Brian T. Fitzpatrick at 2, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa.) (Dkt. No. 8447-2) (filed Oct. 10, 2017) (discussing, without mentioning individual contingency fee agreements, "how to allocate fees among multiple firms that have worked on behalf of *[the] class*" (emphasis added)); Decl. of Brian T. Fitzpatrick in Support of Pls.' Mot. for Attorneys' Fees & Costs at 17–18, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB (Dkt. No. 2175-2) (filed Nov. 8, 2016) (acknowledging some individual contingency fee agreements but endorsing attorneys' fees only for common benefit counsel); Decl. of Brian T. Fitzpatrick at 7, 9–34, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex. on Apr. 20, 2010*, No. 2:10-md-02179-CJB-JCW (E.D. La.) (filed Aug. 21, 2016) (Dkt. No. 21098-3) (discussing percentage and lodestar methods for calculating fees to "class counsel" alone).   And in other cases in which Silver, Geoffrey Miller, and Fitzpatrick urged fees of 30 percent or more to class counsel, it was clear that numerous individual lawsuits had been filed.  *See, e.g.*, Transfer Order at 2, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (J.P.M.L. Feb. 6, 2015) (Dkt. No. 1) (noting that "constituent and tag-along actions are pending across the country in more than two dozen districts").

for those class members who chose to hire their own attorneys.  In none of them do the experts argue that class members who hired their own lawyers should pay no more in fees than class members who did not.[103]  In none of them do the experts argue that contract lawyers should be paid out of a common fund for *non*-common benefit work.  In short, the expert declarations submitted by Miller et al. and Kull/Silver here are significant departures from these experts' prior submissions to courts in numerous other cases.

### f.  The Arguments of Watts and Its Experts Regarding the Joint Prosecution Agreement Are Meritless

78. Watts and its experts contend that this Court need not fret over the allocation of attorneys' fees because the lawyers themselves worked out all of the details in the Participation Agreements and Minnesota Joint Prosecution Agreements ("JPA").  Miller et al. note, for example, that the JPA is "a valid contract, binding on its signatories," and that this Court specifically approved and incorporated the JPA in its own Order Establishing Protocols for Common Benefit Work and Expenses and Establishing the Common Benefit Fee and Expense Funds (Dkt. No. 936) ("CBO").  Miller et al. Decl. at 27.  Similarly, Kull/Silver assert that "[t]he

---

[103] Importantly, in each of these cases (as discussed in ¶ 44), the class notice clearly specified that each class member must independently pay for an individual lawyer if he or she chooses to retain one.  *See* Long-Form Notice at 5, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.), *available at* http://polyetherpolyol settlement.com/docs/notice.pdf ("Plaintiffs' Counsel represent you and other members of the Class. . . . If you want to be represented by your own lawyer, you may hire one at your own expense. . . .  You do not need to hire your own lawyer . . . .  If you hire your own lawyer, you will have to pay for that lawyer at your own expense."); Long-Form Notice at 13–14, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.), *available at* https://www.autoairbagsettlement.com/Content/Documents/Honda/Honda%20Notice.pdf ("The Court has appointed lawyers to represent you and other Class Members. . . . If you want to be represented by another lawyer, you may hire one to appear in Court for you at your own expense."); Long-Form Notice at 10, *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-00736-RWS-KNM (E.D. Tex.), *available at* http://www.jcpenneysecuritieslitigation.com/media/ 1021126/v3_jys_notice_072717_final.pdf ("If you are a Class Member . . . [y]our interests will be represented by Lead Counsel.  If you choose, you may enter an appearance individually or through your own counsel at your own expense."); Long-Form Notice at 3, *In re (Bank of Am.) Checking Acct. Overdraft Litig.*, No. 1:09-md-02036-JLK (S.D. Fla.) (Dkt. No. 3338-1), available at https://ecf.flsd.uscourts.gov/doc1/051111962641 ("If you elect to hire your own lawyer, you will be responsible to pay your lawyer's fees and costs."); Long-Form Notice at 8, *Dahl v. Bain Capital Partners LLC*, No. 1:07-cv-12388-WGY (D. Mass.) (Dkt. No. 1044-1) ("If you want to be represented by your own lawyer, you may hire one at your own expense."); Long-Form Notice at 18, *Cook v. Rockwell Int'l Corp.*, No. 1:90-cv-00181-JLK (D. Colo.) (Dkt. No. 2407-3) ("[Y]ou do not need to hire your own lawyer . . . .  You may, however, hire a lawyer at your own expense . . . ."); Long-Form Notice at 6, *Chaudhri v. Osram Sylvania, Inc.*, No. 2:11-cv-05504-MCA (D.N.J.), *available at* https://autolightclaims.com/Portals/0/Documents/4113_LiteBrite_ LF%20Notice_WEB_v2.pdf ("If you want to be represented by your own lawyer, you may hire one at your own expense."); Long-Form Notice at 7, *In re (PNC Bank) Checking Account Overdraft Litig.*, No. 1:09-md-02036-JLK (S.D. Fla.) (Dkt. No. 2008-6) ("If you want to be represented by your own lawyer in this case, you may hire one at your own expense."); Long-Form Notice at 7, *Chieftain Royalty Co. v. XTO Energy Inc.*, No. 6:11-cv-00029-KEW (E.D. Okla.) (Dkt. No. 197) ("If you retain separate counsel, you will be responsible for his or her fees and expenses out of your own pocket.").

JPA, by its terms and as adopted by the Courts' common benefit orders, … fixed a contract price" for the work of the attorneys in this case.  Kull/Silver Decl. at 7.

79.  Watts itself is certainly free to expound on its interpretation of the JPA and the Court's orders, but I am surprised that its experts feel qualified to opine *as experts* on the construction, validity, and applicability of the JPA or the correct interpretation of the Court's procedural orders in this litigation.  I do not purport to offer an "expert" opinion on the meaning of the JPA and CBO.  The various attorneys seeking fees have briefed (and will continue to brief) the meaning of those items.  I would note, however, that Watts's experts, in embracing Watts's interpretations, have failed to grapple with substantial arguments to the contrary.  They simply assume, without analysis, that the JPA would continue to apply in the context of a class action settlement, and that this Court intended for the JPA to continue to apply in that context.[104]

### i.  Class Counsel's Arguments Rebutting Watts and Its Experts Based on the CBO

80.  The Kansas MDL lawyers make substantial arguments that the CBO and JPA do not apply to class settlements.  *See* Mem. in Support of Kansas MDL Co-Lead Counsel & Settlement Class Counsel Seeger's Pet. for Award of Attorneys' Fees, Reimbursement of Expenses, & Service Awards to Class Representatives/Bellwether Plaintiffs & Allocation of Attorneys' Fee Award at 7–8 (Dkt. No. 3587) (hereinafter "7/10/18 Co-Lead Fee Mem."); Decl. of Patrick J. Stueve ¶ 617 (Dkt. No. 3587-1) (hereinafter "Stueve Decl."); Co-Lead Response at 6, 13–17, 59–78.  As they note (*see* Co-Lead Response at 60–62), Section IV.B3 of the CBO provides that defendants shall hold back and set aside (for the common benefit fee fund and common benefit expense fund) certain percentages of any settlement or judgment as "assessment[s]."  CBO at 20–21.  Those assessments, which varied from 5.5 percent to 13 percent, governed recoveries in cases filed in the Kansas MDL, cases of attorneys who signed the Participation Agreement, and cases filed in Minnesota state court by attorneys who were parties to the JPA.  Critically,

---

[104] Miller et al. cite Professor John Coffee for the proposition that fee-splitting contracts among lawyers should be viewed by a court with "benign neglect."  Miller et al. Decl. at 26 (quoting John C. Coffee, *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. Chi. L. Rev. 877, 903 (1987))  Those experts, however, have cited Professor Coffee out of context.  Coffee was discussing the circumstance in which attorneys "[s]eek[] to renege on their agreement."  *Id.* at 902.  Nowhere does Coffee argue that a court should treat a contract with "benign neglect" when, as here, some of the parties to the contract argue that it was not intended to apply to the circumstance at issue.  Here, class counsel argue that the JPA was not intended to apply to a class settlement.

however, class counsel point to language in the CBO—not seriously analyzed by Watts or its experts—that, in their view, demonstrates that the assessments referenced in the CBO do not apply to attorneys' fees or expenses sought or awarded in a class action settlement. *See* 7/10/18 Co-Lead Fee Mem. at 7–8; Stueve Decl. ¶ 617; Co-Lead Response at 13–17, 59–78. Specifically, they point to the following language:

> *In the event that there is a class settlement, recovery or judgment in favor of the class, no assessment pursuant to this Section will be made, either for attorneys' fees or for expenses*, individually from any class member or his/her/its individual attorney as to the portion of any class recovery distributed to that individual class member if the class member remains in the class (*i.e.*, does not opt-out of the class).[105]

81. Thus, class counsel have put forth an argument, bolstered by the text of the CBO, to support their view that the CBO does not apply in the class settlement context. Even assuming that Watts's experts are qualified to offer "expert" testimony on the interpretation of the CBO or the parties' intentions in executing the JPA, it is not credible for them to essentially ignore this potentially dispositive language.

### ii. Class Counsel's Arguments Rebutting Watts and Its Experts Based on the Negotiation of the JPA

82. Watts and its experts rely on various provisions of the JPA that address common benefit assessments. *See, e.g.*, Watts Mem. at 40–41; Miller et al. Decl. at 31–32. Class counsel argue, however, that the JPA does not limit attorneys' fees that Kansas common benefit counsel can recover from a fund created by a class settlement (even one that includes clients of JPA signatories). They further argue that the JPA does not dictate the allocation of fees between class counsel and contract counsel in the event of a class settlement. And they note that Watts and its experts offer no argument that the term "assessment" can be validly construed to include class settlements (as opposed to individual recoveries). Class counsel also explain that the JPA was negotiated in the context of the original proposed (and filed) CBO (which included the class settlement exemption discussed above). *See* Co-Lead Response at 13–17, 59–78.

83. Again, I am not in a position to opine as an expert on the correct construction of the JPA, and it is not clear why Watts's experts believe that they are qualified to do so. In any case,

---

[105] CBO at 20 (emphasis added).

Watts's experts have given their interpretation of the JPA without addressing the substantial arguments that can be raised to the contrary.  Especially given the fact that Watts's experts do not identify what evidence they reviewed in rendering their opinions (*see* ¶ 39 & n.44), their interpretation of the JPA (and their implicit rejection of the language of the CBO discussed above) should be given no weight.

### iii. Watts and Its Experts Err in Arguing that Even If the JPA Does Not Apply, Its Allocation of Fees Should Govern Under Principles of Restitution

84.  Kull/Silver implicitly recognize that Watts and Miller et al. are on shaky ground in relying on the JPA as a binding contract in the context of a class settlement.  Thus, they argue that, even if the JPA is *not* binding for a class settlement, its allocation principles should nonetheless govern as a matter of restitution because the agreement is a hard fought, arms-length determination of what the various lawyers believed were fair allocations.  *See* Kull/Silver Decl. at 13-16.  But if, as Kansas MDL counsel argue, the allocations under the JPA were never intended to apply to a class settlement, then it makes no sense to use the JPA as a restitutionary proxy for what should be done in the class settlement. Class counsel note that, had the parties understood that the JPA *would* apply to a class settlement, the terms that were negotiated would have been very different.  *See* Co-Lead Response at 60–62.  Indeed, Kansas MDL counsel maintain that it is precisely because they knew that the JPA would not apply to a class action that they were willing to agree to the JPA's terms.  *See id.*  It is fundamental that if an unenforceable contract is to be used as the basis for restitution, the contract must involve the same subject matter and issues.[106]  Thus, a contract that was never intended to apply to a class settlement

---

[106] Kull/Silver cite section 31 of the Restatement (Third) of Restitution and Unjust Enrichment for the proposition that "[i]f the parties have specified a price for a performance that has no definitive market value . . . the value to the recipient of claimant's performance may be properly determined, for restitution purposes, by what the recipient has offered to pay."  Kull/Silver Decl. at 15.  Of critical importance, however, that same section goes on to caution that "*[t]here is no claim under this section for a performance for which the [recipient] did not—at least implicitly—agree to pay . . . .*"  RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 31 cmt. d (2011) (emphasis added).  Thus, if it is true that class counsel here did not agree to the JPA's allocation scheme in the context of a class action, then the Restatement and case law authorities cited by Kull/Silver are inapposite.

None of the cases cited by Kull/Silver (*see* Kull/Silver Decl. at 5 & n.5) suggests that an unenforceable contract can be used as a restitutionary proxy for the parties' intent in circumstances not contemplated by the unenforceable contract at issue.  For example, in *Oxborough v. St. Martin*, 169 Minn. 72, 210 N.W. 854 (1926), an oral contingency fee agreement between attorney and client was unenforceable under the Statute of Frauds, but it addressed the same services actually rendered by the attorney that were the subject of the claim of restitution.  As the court stated: "[W]hen there has been an understanding . . . as to the value of the services by consenting to give a certain amount therefor, that fact ought . . . to be received in evidence as an admission against the client as to what

cannot serve as a proxy for what the parties deemed a fair allocation of fees in a class settlement. In short, unless they can show that class counsel intended the JPA to apply to a class settlement, Watts and its experts cannot rely on the JPA as the basis for how the Court should rule on the fee dispute here.

### B. Various Attorneys Err in Arguing for Deferral of Fee Determinations Until Final Claims Data Is Available

85. A number of the July 10, 2018 submissions contend that this Court should defer any ruling on attorneys' fees until all claims data is available. As Bassford Remele argue: "[W]e believe that an equitable fee allocation can occur only after the claim period has closed and the respective courts have the raw claims data available to determine which clients have participated in the settlement." Bassford Mem. at 6. Significantly, these submissions cite no relevant authority for the proposition that in a case like the present one—which does not involve a reversionary settlement—a court should delay awarding fees until all claims data is submitted.

86. Class counsel advise me that claims data will not be finalized until, at the earliest, April 2019. Indeed, they tell me that the date could be much later than that. I assume those facts to be correct for purposes of my opinion. Under those circumstances, holding back a ruling on fees would, in my view, be unfair to class counsel, who have invested substantial time and resources on this case since 2014 with no recovery of attorneys' fees or expenses. In my view, there must be a major reason in order to justify postponing a ruling on fees for many more months. I see none here.

87. It is critical to note that this is a non-reversionary settlement. Regardless of which particular class members submit claims, no amount of the $1.51 billion settlement will revert to Syngenta. The entire amount will go to class members (after the award of attorneys' fees and expenses). Thus, the Court has everything it needs to render a fee award. As I testified in my original declaration (*see* Klonoff Decl. ¶¶ 49–90), fees should be awarded based on the percentage basis (and with an analysis of the *Johnson* factors). There is no possibility that the amount of the fund will decrease.

---

value he placed on the services." *Id*. at 75, 855. Likewise, in *Pelletier v. Johnson*, 188 Ariz. 478, 937 P.2d 668 (Ct. App. 1996), a contract for the sale of vinyl siding was held unenforceable due to the seller's noncompliance with statutory notice requirements. The contract was used as a basis for restitution, however, because it set forth an agreed price for precisely the vinyl siding purchased. These unremarkable cases do not provide any support for using the JPA as a basis for restitution in a situation beyond the scope of the parties' agreement.

88. A reversionary settlement (which is not involved here) would create a different situation, and might justify postponement of a fee award until the claims rate is determined. Consider, for example, a $1 billion fund with a reversionary clause. If class members claim only $100 million of the fund, it would not make sense to award fees based on a percentage of $1 billion. For example, an award of 40 percent of the $1 billion ($400 million) would result in a fee award four times the amount actually received by the class. That is why courts dealing with reversionary clauses sometimes express a preference for holding off on awarding fees until the claims data is available. As one court noted in the context of a reversionary class settlement:

> The Court's primary concern . . . is whether a fee award of $1,583,333.33—a full one-third of the $4,750,000 common fund—is commensurate to the benefits actually bestowed on class members in this case. [O]nly 39% of the 4,018 class members have filed Claim Forms and are eligible to receive settlement checks. The Court finds this response rate to be unimpressive, particularly where each class member is eligible to receive a fairly substantial amount of money. As a result of the low claim rate, Class Counsel stands to collect 33 and 1/3% of a $4,750,000 common fund, whereas only 26% of the fund will end up in class members' pockets, and *39% of the fund will revert to Defendants*. Arguably, the fee award in this case is closer to a 50/50 split between Class Counsel and the class members, rather than the one-third requested by counsel.[107]

This problem does not exist here. The Court can award fees with the knowledge that the fund will definitely be $1.51 billion and that, under no circumstances, will any of that fund revert to Syngenta.

89. Notably, nothing in Rule 23 supports a broad practice of deferring attorneys' fees pending final claims data. Indeed, during the Civil Rules Advisory Committee's recent (and exhaustive) consideration of proposed amendments to Rule 23, the issue of claims rate data came up specifically, but the Committee did not go forward with any change to Rule 23 that would

---

[107] *Roberts v. TJX Companies, Inc.*, No. 13-cv-13142-ADB, 2016 WL 8677312, at *10–13 (D. Mass. Sept. 30, 2016) (emphasis added). *Accord, e.g.*, *Valdez v. Neil Jones Food Co.*, No. 1:13-cv-00519-AWI-SAB, 2015 WL 11109826, at *1–2 (E.D. Cal. Dec. 3, 2015) (expressing concern "that the attorney fee request in this claims-made settlement is based on the maximum settlement amount" and noting "concern[s] about the potential reversion"); *see also* Robert H. Klonoff & Mark Herrmann, *The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements*, 80 TUL. L. REV. 1695, 1698–1705, 1713 (2006) (expressing concern about calculating attorneys' fees where value to class members of the settlement is unknown, and noting that "both coupon settlements and reversionary settlements raise the question of how to determine the true value of the benefit to the class when calculating fees").

require deferral of the award of attorneys' fees until all claims data was received.[108]   The only mention of the issue in the proposed amendments (presently due to go into effect on December 1, 2018) is the following remark in the Committee Notes:[109]   "In some cases, it will be important to relate the amount of an award of attorney's fees to the expected benefits to the class.   One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results."[110]   That brief comment does not support the deferral of an attorneys' fee award here.   In my personal opinion, the reference to "[i]n some cases" means that there needs to be a strong reason to defer, such as the existence of a provision that all unclaimed funds will revert to the defendant.[111]

### C.   Some Options for the Court in Addressing Common Benefit and Contract Attorney Claims for Fees

90.   As I have argued, the approach of Watts and certain others for awarding fees is not persuasive.   First, it makes no sense to provide compensation out of the common fund for time spent that benefited only individual clients and not the class as a whole.   The class was told in the class notice (consistent with class notices in thousands of other cases) that anyone hiring his or her own lawyer would have to pay for that lawyer's services.   It would be very unfair to now pay such lawyers out of the common fund for non-common benefit work (and thus require all class members to contribute out of their shares of the fund).

91.   It is important to reiterate that attorneys with individual contracts who also performed common benefit work (as Watts and many others claim to have done) can submit their common benefit time and urge the Court to award common benefit fees for that work.   Here, if the Court

---

[108]   I was a member of the Civil Rules Committee during that period, and was also a member of the Class Action Subcommittee that focused specifically on Rule 23.

[109]   *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011) (refusing to give weight to Committee Notes).

[110]   TRANSMITTAL OF PROPOSED AMENDMENT TO THE FEDERAL RULES OF CIVIL PROCEDURE 21–22 (Oct. 4, 2017), *available at* http://www.uscourts.gov/sites/default/files/2018-04-26-congressional_package_final_posted_to_the_website_0.pdf; *see also* Pending Rules & Forms Amendments, UNITED STATES COURTS, http://www.uscourts.gov/rules-policies/pending-rules-and-forms-amendments (last visited Aug. 12, 2018).

[111]   Indeed, even a modest claims data proposal offered to the Committee from a non-member did not move forward.   *See* Letter from Brian Wolfman et al. to Richard Marcus, Associate Reporter to the Advisory Comm. on Civil Rules (Mar. 17, 2015), *available at* http://src.bna.com/cqs.   That proposal would *not* have required deferral of a fee award until all claims data was gathered; rather, it merely would have required a report, at the end of the claims process, regarding how the funds were distributed.   The fact that even that modest proposal was not adopted further refutes the argument by Bassford Remele and others that this Court should postpone the awarding of fees until all claims data has been finalized.

adopts the allocation proposed by MDL class counsel (*see* Klonoff Decl. ¶¶ 129–131), Watts will be eligible for common benefit fees from both the 12.5 percent of total fees allocated to common benefit counsel in the Minnesota litigation and the 20 percent to be allocated among common benefit counsel in the Court's discretion.  Moreover, an award of common benefit fees here (to class counsel and other attorneys who justify common benefit time) does not foreclose attorneys with contingency fee contracts from attempting to enforce their contracts as a matter of contract law (subject to all defenses).

92.  In most class actions, disputes between common benefit counsel and contract counsel do not arise.  In my experience, many class actions involve few individual fee agreements, usually because the small amounts at stake do not justify contracts with large numbers of individual class members.  In other class actions, attorneys with individual fee contracts simply choose not to enforce them, or the plaintiffs simply pay the fees per the contract.  At the other end of the spectrum are cases in which a class is not suitable but an MDL proceeding is still justified.  That is the situation in many mass tort cases, and was true (for example) in *Vioxx*[112] and *Zyprexa*.[113] In such cases, every plaintiff is represented by counsel pursuant to a fee agreement.

93.  This case is a hybrid; it is a class action, but there are also thousands of individual contracts.  It is not unique, however.  There are other cases that have involved both class actions and numerous individual contracts, and those cases provide potential guidance to this Court in deciding how to allocate fees.

94.  For example, the Court may wish to consider the approach of Judge Breyer in the *Volkswagen* case.[114]   There, Judge Breyer awarded common benefit fees based on benefits conferred on the class as a whole,[115] and left individual attorneys free to seek fees directly from their clients as "a matter of contract law, subject to the codes of professional conduct."[116]  Under

---

[112] *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008).

[113] *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y. 2006).

[114] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB (N.D. Cal.).

[115] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017).

[116] *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1474312, at *5 (N.D. Cal. Apr. 24, 2017).  *See id.* at *1 n.1 (noting that 244 motions were filed by individual attorneys who were not compensated by the settlement fund).

that model, all contract lawyers here—including Watts—could seek fees from the common fund for any and all time that they can justify as common benefit time.  At the same time, individual contract counsel would have to decide whether, in addition to recovering whatever common benefit fees they can prove, they want to sue to enforce their contracts against their clients.  Such actions would not be part of this MDL but, as Judge Breyer noted in *Volkswagen*, would "be resolved in the appropriate forum."[117]  In that forum, the clients would have the opportunity to assert all available defenses.

95.  In the *NFL Concussion* case,[118] Judge Brody took a different approach.  There, in a settled class action involving retired NFL players alleging injuries from concussions, the court determined—applying criteria similar to the *Johnson* factors—that class counsel should receive 11 percent.[119]  In that case, the settlement occurred very early, with no formal discovery, no briefing or ruling on class certification, and no class trial.[120]  In analyzing whether—and at what amount—to cap contract attorneys' fees, the court found that separately represented class members should not have to pay more than, in total, 33 percent in fees.[121]  Thus, the court capped contract attorneys' fees at 22 percent.[122]  Professor Bill Rubenstein, the court-appointed expert upon whom Judge Brody relied, noted that, "given the relatively streamlined nature of the litigation, the clients' total fee payments should be far less than, in some instances, 60+% of their recoveries."[123]  Contract attorneys in *NFL*, as in *Volkswagen*, could not recover individual

---

[117] *Id.*

[118] *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa.).

[119] *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648 (E.D. Pa. Apr. 5, 2018).

[120] *See id.* at *5 ("This settlement was secured without formal discovery, with limited litigation of motions, and with no bellwether trials.").  As I previously noted (*see* Klonoff Decl. ¶¶ 51–101), the instant case warrants fees of 33⅓ percent because the circumstances are very different than those in *NFL*.

[121] *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1658808, at *3 (E.D. Pa. Apr. 5, 2018).

[122] *See id.*

[123] Expert Report of Professor William B. Rubenstein ¶ 28, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa.) (Dkt. No. 9526) (filed Dec. 11, 2017); *see also* Rely of Professor William B. Rubenstein to Responses to Expert Report ¶ 6, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa.) (Dkt. No. 9571) (filed Jan. 19, 2018) (supplemental report recommending 22 percent cap on individual contingency fee agreements).  Similarly, in *Deepwater Horizon*, the court capped individual contingency fees at 25 percent, citing Judge Fallon's reasoning in *Vioxx* and noting that contract attorneys "reaped a great benefit from the [class action] structure" and the "tremendous economies of scale for the lawyers who would otherwise be responsible for preparing thousands of individual cases for trial").  *In re Oil Spill by the Oil*

contractual fees from the common fund, but were required to take the matter up with their individual clients and sue separately in an appropriate forum if they sought to enforce their contracts. The difference is that in *NFL*, the fees that contract counsel could seek were capped.

96. In my view, the *Volkswagen* model is preferable in this case, as it avoids the need for the Court to undertake the difficult task of setting a reasonable fee cap.

97. Ultimately, consistent with MDL class counsel's proposed allocation, this Court can determine Watts's entitlement to common benefit fees from the common fund by simply applying the established *Johnson* factors to all of the attorneys' time.[124] Significantly, Watts's own experts have on numerous occasions applied and embraced the *Johnson* factors (or similar factors from other circuits).[125] Indeed, Watts itself cites the *Johnson* factors with approval numerous times in its brief (*see* Watts Mem. at 29, 30, 31, 58), and concedes that "[i]n the class context, the Tenth Circuit judges the reasonableness of attorney fees against the familiar [*Johnson*] factors." *Id*. at 29. Yet, inexplicably, Watts and its experts abandon the *Johnson* factors with respect to Watts's own fees and urge a complicated formula—derived without any case law precedent. No doubt Watts has created an exception for itself because it understands that, under the *Johnson* factors, it would not fare nearly as well as it would under its "for this case only" formula. But Watts cannot legitimately abandon the universally endorsed *Johnson* factors merely because those factors do not yield an award as high as Watts would like.

---

*Rig "Deepwater Horizon" in the Gulf of Mex. on Apr. 20, 2010*, No. 2:10-md-02179-CJB-JCW, 2012 WL 2236737, at *1–2 (E.D. La. June 15, 2012).

[124] Those factors are identified and explained in detail in my original declaration. *See* Klonoff Decl. ¶¶ 52–90; *see also, e.g., In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1150 (D. Wyo. 1999) ("[T]he *Johnson* factors . . . provide a useful framework for assessing the quality and quantity of counsel's work." (citation and internal quotation marks omitted)).

[125] *See, e.g.*, Report of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees at 6–34, *In re Urethane Antitrust Litig.*, No. 2:04-md-01616-JWL (D. Kan.) (Dkt. No. 3251-1) (filed June 1, 2016), *available at* http://polyetherpolyolsettlement.com/docs/Ex%20A%20-%20Silver%20Report.pdf (28-page analysis of fee request under the *Johnson* factors, noting that those factors are the appropriate test because they "identify features of representations that are likely to affect market rates"); Decl. of Geoffrey P. Miller at 31–42, *Chieftain Royalty Co. v. XTO Energy Inc.*, No. 6:11-cv-00029-KEW (E.D. Okla.) (Dkt. No. 206) (filed Feb. 23, 2018) (extensive analysis endorsing class counsel's 40 percent fee request under the *Johnson* factors); Decl. of Brian T. Fitzpatrick at 10–32, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex. on Apr. 20, 2010*, No. 2:10-md-02179-CJB-JCW (E.D. La.) (filed Aug. 21, 2016) (Dkt. No. 21098-3) (applying *Johnson* factors); Decl. of Brian T. Fitzpatrick at 9–19, *In re Takata Airbag Prods. Liab. Litig.*, No. 1:15-md-02599-FAM (S.D. Fla.) (Dkt. No. 2033-3) (filed Sept. 8, 2017) (applying Eleventh Circuit's *Camden I* factors and noting overlap with *Johnson* factors).

46

## VI.  CONCLUSION

98.  For the reasons stated above, Watts, its experts, and various other attorneys offer legally and factually flawed arguments supporting their fee applications.

99.  This Court should decide the attorneys' fees issues now, and should not wait until all claims data is in.

100.  In awarding fees, the Court should apply the *Johnson* factors to determine Watts's and other attorneys' entitlement to fees from the common fund.

\* \* \*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

_____

Robert H. Klonoff

August 17, 2018