# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: SYNGENTA AG MIR 162 CORN LITIGATION, )<br><br>This Document Relates to All Cases <u>Except</u>: )<br><br>*Louis Dreyfus Co. Grains Merchandising LLC v. Syngenta AG, et al.*, No. 16-2788 )<br><br>*Trans Coastal Supply Co., Inc. v. Syngenta AG, et al.*, No. 14-2637 )<br><br>*The Delong Co., Inc. v. Syngenta AG, et al.*, No. 17-2614 )<br><br>*Agribase Int'l Inc. v. Syngenta AG, et al.*, No. 15-2279 ) | MDL No. 2591<br><br>Case No. 14-md-2591-JWL |

## <u>MEMORANDUM AND ORDER</u>

In this multi-district litigation (MDL), the Court provisionally certified a settlement class and preliminarily approved a settlement agreement resolving claims against Syngenta[1] (Doc. # 3532).  Plaintiffs now seek final settlement approval pursuant to Fed. R. Civ. P. 23(e).  On November 15, 2018, the Court conducted a final settlement hearing (of which the settlement class received due notice), at which the Court also heard argument concerning the total amount of attorney fees that should be awarded from the settlement fund.  For the reasons set forth below and on the record of the hearing, the Court **grants**

---

[1] The Court refers to defendants in this MDL collectively as "Syngenta".

the motion for final approval (Doc. # 3776), and it will issue a separate order setting forth the granted relief as requested by plaintiffs. The Court also awards total attorney fees in the amount of one third of the settlement fund, or $503,333,333.33, and it therefore **grants** the petition for attorney fees filed by MDL co-lead counsel and settlement class counsel (Doc. # 3585) to that extent.[2] The Court approves the withdrawal of two objections (Doc. # 3684, withdrawal requested in Doc. # 3774; Doc. # 3673, withdrawal requested in Doc. # 3782), and it **overrules** all other objections to the settlement or to the total fee award (Doc. ## 3545, 3667, 3669, 3671, 3672, 3680, 3681, 3682). Finally, the Court **grants as unopposed** the special master's pending motion for mediation expenses (Doc. # 3564).

I. <u>**Background**</u>

Beginning in 2014, corn farmers and others in the corn industry filed thousands of similar suits against Syngenta in various jurisdictions, including class actions. The suits generally related to Syngenta's commercialization of genetically-modified corn seed products, Viptera and Duracade, which contained the trait MIR 162, without approval of that trait by China, an export market. The plaintiffs alleged that Syngenta's commercialization of its products caused the genetically-modified corn to be commingled throughout the corn supply in the United States; that China rejected imports of all corn from the United States because of the presence of MIR 162; that such rejection caused corn prices to drop in the United States; and that corn farmers and others in the industry were

---

[2] The petition remains pending with respect to the allocation of the total fee award.

harmed by that market effect. In December 2014, this MDL was created, and it encompasses hundreds of suits brought by corn producers and non-producers. The Court appointed co-lead plaintiffs' counsel, who filed master consolidated class action producer and non-producer complaints in March 2015.

On May 5, 2015, the Court ruled that Syngenta had improperly removed cases to federal court on the basis of the federal common law of foreign relations, *see In re Syngenta AG MIR 162 Corn Litig.*, 2015 WL 2092435 (D. Kan. May 5, 2015) (Lungstrum, J.), and thus many cases were remanded to state court. On September 11, 2015, the Court granted in part and denied in part Syngenta's motions to dismiss. *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177 (D. Kan. 2015) (Lunstrum, J.). Most significantly, the Court rejected Syngenta's arguments based on a lack of duty and the economic loss doctrine, and plaintiffs' negligence, tortious interference, Lanham Act, and state consumer protection act claims survived at least in part. *See id.* The Court also dismissed counterclaims and third-party claims asserted by Syngenta against certain grain handlers. *See In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 1312519 (D. Kan. Apr. 4, 2016) (Lungstrum, J.).

The parties engaged in substantial discovery, which was coordinated across multiple jurisdictions pursuant to orders issued by this Court and courts in Minnesota and Illinois. Millions of pages of documents were reviewed, hundreds of depositions were taken in multiple countries around the world, and numerous experts were retained and deposed. In September 2016, after an evidentiary hearing, the Court certified a nationwide class of corn producers to assert plaintiffs' Lanham Act claims and eight state-wide classes of producers

to assert state-law common-law tort and statutory claims. *See In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 5371856 (D. Kan. Sept. 26, 2016) (Lungstrum, J.). The Court subsequently granted summary judgment to Syngenta on the Lanham Act claims, *see In re Syngenta AG MIR 162 Corn Litig.*, 249 F. Supp. 3d 1224 (D. Kan. 2017) (Lungstrum, J.), but the Kansas class claims proceeded to trial. After the Court ruled on the parties' *Daubert* motions, *see In re Syngenta AG MIR 162 Corn Litig.*, 2017 WL 1738014 (D. Kan. May 4, 2017) (Lungstrum, J.), the Kansas claims were tried to a jury over three weeks in June 2017, and the jury returned a verdict in favor of the Kansas class in the amount of $217,700,000. Trials were then scheduled for the claims asserted by the other certified state-wide classes.

Thousands of similar suits against Syngenta were also filed in state court in Minnesota, and in May 2015 those suits were consolidated before a single judge, who appointed lead plaintiffs' counsel. In April 2016, the Minnesota court denied in large part Syngenta's motion to dismiss. The trial of one bellwether plaintiff's individual claims resulted in a mistrial in April 2017, and that plaintiff subsequently settled with Syngenta. The Minnesota class action trial began in September 2017, but that trial was never completed, as the parties reached the instant settlement. Similar claims were also litigated against Syngenta in state and federal courts in Illinois. Various ethanol plants also filed suits against Syngenta in five other states.

In March 2016, this Court and several others with related cases appointed a special master for purposes of settlement. In August 2017, the Court appointed a Plaintiffs' Settlement Negotiation Committee ("PNC") to work towards a settlement with Syngenta.

In appointing the members of the PNC, the Court sought to "balance[] the goals of representing the interests of different groups of producer plaintiffs while maintaining a workably sized group to conduct settlement negotiations." On September 25, 2017, the PNC executed a term sheet with Syngenta providing for a total settlement amount of $1.51 billion. Over the next several months, with the help of the special master and with oversight by the various courts, the PNC negotiated with Syngenta the terms of a final settlement agreement ("the Agreement"), which the parties executed on February 26, 2018.

The Agreement's terms include the following: In exchange for releases of claims based on the sale and marketing of Viptera and Duracade, Syngenta will pay a total of $1.51 billion, with two initial deposits totaling $400 million and the remainder deposited within 30 days after final court approval. Syngenta has no right of reversion of any of that amount. The Agreement is contingent on certification of a nationwide settlement class, divided into four subclasses generally consisting of corn producers who did not purchase Viptera or Duracade; corn producers who did purchase one of those products; grain handling facilities (except for certain excluded exporters); and ethanol producers. The Agreement sets out the allocation of the settlement fund among the members of the four subclasses; a claims procedure; an opt-out procedure; and a notice plan.

After execution of the Agreement and with leave of the Court, plaintiffs filed a fourth amended master class action complaint. By that complaint, plaintiffs seek certification of the same nationwide class and subclasses, asserting class claims based on the federal Lanham Act and certain Minnesota statutes.

On April 10, 2018, the Court granted plaintiffs' motion for preliminary approval of the Agreement. *See In re Syngenta AG MIR 162 Corn Litig.*, 2018 WL 1726345 (D. Kan. Apr. 10, 2018) (Lungstrum, J.). Specifically, the Court preliminarily approved the settlement; provisionally certified the settlement class and subclasses as set forth in the fourth amended complaint; appointed representative plaintiffs for the subclasses; appointed class counsel; approved the claims procedure, opt-out procedure, and notice plan; appointed the notice and claims administrator; appointed special masters to oversee the settlement and claims procedures; and imposed particular deadlines and set the hearing on final approval of the settlement.

## II.     Final Approval of Settlement

### A.     *Satisfaction of Requirements for Approval*

Under Rule 23, a class action settlement may be approved by the Court only upon a finding that it is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2).

> In deciding whether to approve a class settlement, a district court considers whether (1) the settlement was fairly and honestly negotiated, (2) serious legal and factual questions placed the litigation's outcome in doubt, (3) the immediate recovery was more valuable than the mere possibility of a more favorable outcome after further litigation, and (4) the parties believed the settlement was fair and reasonable.

*See Tennille v. Western Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015) (internal quotation and citation omitted). The Court finds that each of the four factors cited by the Tenth Circuit is satisfied here and that this settlement is indeed fair, reasonable, and adequate.

First, the Court finds that the settlement was fairly and honestly negotiated. The Agreement was reached by the parties only after a long period of negotiation over months and years. The settlement negotiation was overseen by special masters appointed by the Court, who confirmed that the parties negotiated at arm's length. There is no evidence of collusion in the negotiation of the settlement.[3] In addition, any potential conflicts among plaintiff's counsel was addressed by the Court's appointment of the PNC, which included attorneys representing different types of plaintiffs. During the negotiations, the different subclasses of plaintiffs were represented by different counsel to ensure proper representation of all plaintiffs with respect to the allocation of the settlement fund. Finally, the merits of plaintiffs' claims were thoroughly vetted through litigation that was hotly contested, in multiple jurisdictions, over a long period of time, by experienced and expert counsel with significant resources. As outlined above, that litigation included substantial and far-ranging discovery; briefing and argument of multiple dispositive and other substantive motions; preparation for multiple trials; and one multi-week class action trial in this Court. This is not a situation in which the parties proceeded quickly to settlement without serious litigation of the claims on their merits, such that there might be reason to

_____

[3] In preliminarily approving the settlement, the Court rejected the argument by some plaintiffs who had brought individual suits that they were disadvantaged because the two-tiered settlement structure envisioned by the term sheet was not retained in the ultimate Agreement. *See* 2018 WL 1726345, at *6. Those plaintiffs did not show, however, that those changes resulted from any collusion among plaintiffs' counsel. Moreover, in one objection to the final settlement, the objectors speculated about the possibility that a secret deal among plaintiffs' attorneys caused the change from the term sheet, but those objectors conceded that they could show no such deal. The substance of that objection is discussed below.

suspect that the settlement was not fairly negotiated. Indeed, the protracted negotiation process and the vigor with which the parties litigated the merits of the claims provide additional assurance that this agreement was fairly and honestly negotiated.

Second, the Court finds that serious legal and factual questions placed the litigation's outcome in doubt. Based on the evidence presented at the Kansas class trial, it is this Court's opinion that the litigation presents very close questions of fact. Although the jury at that trial found in favor of plaintiffs and awarded damages, it rejected the claim for punitive damages, and a reasonable jury could certainly have declined to award any damages whatsoever based on that evidence. Moreover, that trial involved only corn producer plaintiffs who did not use Viptera or Duracade; other plaintiffs' claims would have been subject to additional defenses, and thus the factual merits of those claims remain untested and in doubt. In particular, plaintiffs who used Syngenta's products would face contractual defenses, including the contractual economic loss doctrine. In addition, although this Court and others rejected Syngenta's argument for dismissal at the pleadings stage based on a lack of legal duty, the question was novel (no court had addressed the issue with respect to a trait approved in this country), the courts' rulings in plaintiffs' favor would be subject to challenge on appeal, and at least one trial court did dismiss claims against Syngenta on that basis. Similarly, other rulings by the Court on close legal issues (for instance, with respect to causation, damages, and the admissibility of expert testimony) would be vulnerable to attack on appeal.

Third, the Court finds that immediate recovery of the settlement amount---even after an award of one-third of the settlement fund for attorney fees---would be more valuable

than the mere possibility of a more favorable outcome after further litigation. The amount of the settlement ($1.51 billion) is very large in an absolute sense, and it represents a significant percentage of the actual nationwide damages alleged by the MDL plaintiffs' experts.[4] No objector has taken issue with the total amount to be paid by Syngenta in the settlement. As set forth above, despite the Kansas class verdict, the factual and legal issues remain hotly disputed and in doubt, and thus other plaintiffs face a significant risk of little or no recovery in future trials. Therefore, the immediate recovery of such a substantial sum is more valuable than the mere possibility of a more favorable outcome after protracted and expensive litigation over many years in the future.

Fourth, very experienced and expert counsel for all parties believe the settlement to be fair. In addition, 52 percent of class members have submitted claims, and although the settlement class members exceed 650,000 in number, only 17 members have timely and properly exercised their right to opt out of the settlement (without revocation of the opt-out), and only nine objections by 15 members were submitted (without withdrawal of the objection). The fact that the class members have reacted so overwhelmingly in favor of the settlement further supports a finding that the settlement is fair and reasonable and adequate.

Finally, as set forth in detail below, the Court finds that the objections filed in opposition to the settlement lack merit. The Court further finds that notice to the class after

---

[4] For instance, the jury awarded the Kansas class of non-purchaser producers $217,700,000, based on the experts' testimony, and plaintiffs' counsel have estimated Kansas corn production at roughly ten percent of the total U.S. production.

preliminary approval, which was extensive, repeated, and given in varied forms (including direct mailing), was more than adequate. As it did in granting its preliminary approval, the Court finds that the Agreement's opt-out procedures were reasonable and sufficient. The Court further finds that the claims procedure, which allowed for the submission of claims online based on records provided by the federal government, was reasonable and facilitated the submission of claims by the greatest number of class members, as evidenced by the very high number of claims received. The Court is also satisfied that the administrator has used and will continue to use reasonable efforts to allow members to cure deficiencies with their claims.

Accordingly, for all these reasons, the Court finds that this settlement effected by the parties' Agreement is fair, reasonable, and adequate, and it therefore approves the settlement pursuant to Fed. R. Civ. P. 23(e).

B.    *Objections*

The Court overrules all of the timely and properly submitted objections to aspects of the settlement. The Court addresses the objections more specifically as follows:

1.    LORANCE PROPERTIES LLC

In this very short objection (Doc. # 3545), the class member states that it does not like "any part of" the settlement, including the fee and service award requests; that the settlement will increase the cost of doing business; and that all parties should examine their motives. The objection, however, does not include any explanation why any aspect of the settlement or fee request is unfair or unreasonable, or why the settlement will have an adverse economic effect. Accordingly, the Court overrules this objection.

## 2.    JAMI HAYHURST / DALE BROOKOVER

a.    Attorney George Cochran submitted an objection (Doc. # 3667) on behalf of his clients, class members Jami Hayhurst and Dale Brookover.  Plaintiffs have shown that Mr. Cochran is a serial objector to class action settlements, with a history of attempting to extract payment for the withdrawal of objections.  In their reply brief (submitted by Mr. Cochran as counsel), these objectors argue that Mr. Cochran's history is irrelevant to whether their objections have merit.  The fact that the objections are asserted by a serial or "professional" objector, however, may be relevant in determining the weight to accord the objection, as an objection carries more credibility if asserted to benefit the class and not merely to enrich the objector or her attorney.  The credibility of this objection is further undermined by the following facts revealed in depositions of Mr. Brookover and Ms. Hayhurst:  Mr. Cochran proposed to the objectors the non-attorney-fee-related bases for the objection; the objectors were motivated to act by Mr. Cochran's promise to seek $5,000 service awards for them if the objection was deemed to have merit; Mr. Brookover did not even read the entire objection before he signed it; Mr. Brookover testified that he did not in fact object to any aspect of the settlement other than the attorney fee request;[5] and the interest of Ms. Hayhurst (Mr. Brookover's daughter) in the settlement is miniscule, as she held only a half-interest in 10 acres during one year.  Nevertheless, in order to ensure the most exacting review of the settlement, the Court will address the merits of this objection.

---

[5] In a post-deposition declaration, Mr. Brookover states that he was confused during the deposition and that he does object to the other aspects of the settlement.  The Court gives no weight, however, to that sham declaration, which contradicts Mr. Brookover's clear deposition testimony.

b.     These objectors argue that the settlement improperly fails to distinguish between class and individual plaintiffs, and they request that the settlement be reformed to exclude individual plaintiffs. They argue that the settlement's abandonment of the original settlement term sheet's two-tiered approach raises red flags concerning the possible existence of secret side deals regarding fees. The Court overrules this objection. As the objectors concede, there is no evidence to support the existence of any such secret deal, and there is no basis to conclude that the size of the attorney fee request was affected by the decision to adopt a one-tier approach. Nor have the objectors shown that a two-tier approach (which would increase administrative costs) would benefit class plaintiffs, particularly in light of Syngenta's insistence during negotiations that it would not pay more than $1.51 billion and that it would settle only for a release of both individual and class claims. As the Court concluded in granting preliminary approval, the Agreement's equal treatment of all settlement class members, whether or not they filed individual suits, is reasonable. *See* 2018 WL 1726345, at *6 (rejecting similar objection).

c.     These objectors argue that the settlement is deficient because settling counsel did not engage in a choice-of-law analysis to distinguish stronger claims from weaker ones, with the result that all class members are treated equally, regardless of the state in which they reside. The objectors argue in their reply brief that Ohio statutory claims are stronger than claims under other states' law because Syngenta's conduct is a per se violation in Ohio and victims do not pay attorney fees if they win.

The Court overrules this objection. In its preliminary approval order, the Court rejected this same argument for a choice-of-law analysis, *see id.* at *5-6, and the objectors

have not shown how the Court erred in that analysis. As the Court stated previously, the key for certification of a settlement class is ensuring the satisfaction of the requirements of Rule 23, and as discussed below, those requirements have been met here. The Court also rejects any argument that the Agreement is fatally unfair because it does not allow for a greater recovery for Ohio residents; no argument based on Ohio statutory law is included in the objection itself, and the objectors have not shown in their reply that Ohio farmers have better claims, as there is no analysis of Ohio law or any citation to the operative statute or to authority. Moreover, as plaintiffs note in response to the objection, the original Ohio class action claims did not include claims based on any Ohio statute, and any such claim would overlap with the Lanham Act claim asserted by the nationwide settlement class at any rate.[6]

d. These objectors also argue that a Lanham Act class cannot be certified because this Court granted summary judgment in favor of Syngenta on those claims. As the Court explained in its preliminary approval order, however, plaintiffs would be entitled to appeal the Court's summary judgment ruling, and the relative merits of a particular claim are not relevant to the class certification issue. *See id.* at *6 (citing authority). Thus, the Court overrules this objection.

e. These objectors complain that the claims procedure calls for the administrator to use data from the federal government for those class members who reported acreage information to the government on Form 578s, while those members who

---

[6] The objectors did not respond to these arguments in their reply brief.

did not report may simply estimate five years of data. They further argue that getting the acreage from the government instead of allowing the claimants to provide it will delay distribution and increase costs, and that the non-reporters may more easily over-report or commit fraud. The Court overrules this objection. First, the government has already provided the data, at no cost. Second, in arguing that reporters might under-report because reports are due early in the process, the objectors fail to appreciate that there is a later reporting each year as well, based on actual acreage. Third, in each case, the claimant farmer must declare, under oath or penalty of perjury, the proper figures, and there is no basis to assume that non-reporters will over-report more often than reporters did in submitting data to the government. The use of the government data has greatly streamlined the process, which likely contributed to the very high claim rate, and it is eminently reasonable to allow for the use of data that has already been reported by 99 percent of claimants.

f.     These objectors also object to the amount of attorney fees requested. For the reasons set forth below in the Court's discussion of the fee award, the Court overrules this objection.

### 3.     SIMON RADEMACHER / CHRISTOPHER ROBERTS

a.     Objectors Simon Rademacher and Christopher Roberts were represented at one time in this litigation by the Bandas law firm, and plaintiffs have shown that Mr. Bandas and his firm have been serial objectors. Thus, the Court accords this objection (Doc. # 3669) somewhat less weight, although it will address the merits of the objection.

b. Messrs. Rademacher and Roberts object on the basis of their argument that the settlement and class notices did not give them sufficient information concerning their likely recovery. The Court overrules this objection. As this Court has previously explained, the settlement allocation formula need not specify the exact amount that each settlement class member may expect to recover, and notice is sufficient if the allocation formula is provided to the class members. *See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1262 (D. Kan. 2006) (Lungstrum, J.) (citing authority). As plaintiffs note, the number and size of the claims cannot be known until after the opt-out deadline, and therefore a member's recovery cannot be calculated beforehand. In this case, class members were given notice of the gross settlement proceeds ($1.51 billion), the formulas by which each claimant's recovery would be determined, and the request by plaintiffs' counsel for an award of one-third of the settlement fund for attorney fees. Moreover, class members had their own production data and access to public data concerning county and national yields. Thus, class members had the ability to apply the formulas to estimate a range of recovery based on assumptions concerning the total claims submitted (and the Court's attorney fee award). These objectors have not shown that more was required. This is not a case in which no allocation method was described to the class members.

c. The objectors object to the Agreement's failure to provide for unclaimed funds that they argue will result from uncashed checks. The Court overrules this objection. The Court is satisfied that the administrator will make reasonable efforts to distribute all funds to claimants, and there is no reason to expect that class members who submitted claims will not then cash their recovery checks. Whatever minimal amount that remains

after those efforts can be addressed at a later date if necessary.  *See, e.g.*, *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (argument concerning residual funds would not become ripe unless the entire settlement fund was not distributed to class members); *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 904 (8th Cir. 1999) (district court acted prematurely in ordering the creation of a *cy pres* fund before it was known whether such funds would exist); *In re Petrobras Sec. Litig.*, 2018 WL 4521211, at *5 (S.D.N.Y. Sept. 21, 2018) (noting the absence of controlling authority requiring identification of a *cy pres* recipient prior to approval of the settlement).  The objectors have not cited authority requiring the settlement to include something more at this time.  They have cited cases in which *cy pres* provisions were rejected, but in each case, there was an actual *cy pres* provision, and the beneficiary was unknown or insufficiently related; in this case, however, the entire settlement fund is intended to be distributed, and no *cy pres* distribution is contemplated.  The objectors also cite *In re Thornburg Mortgage, Inc. Securities Litigation*, 912 F. Supp. 2d 1178 (D.N.M. 2012), in which the court declined to approve a class action settlement because it did not address residual funds.  *See id.* at 1246-47.  That case was decided on its particular facts, however, including a concern about minimal recoveries and the fact that the attorneys expected $5,000 to $10,000 in uncashed checks.  *See id*.  In contrast, the Court is convinced in this case that the distribution of the settlement funds to class members has already been maximized under the terms of the Agreement, and therefore there is no basis to reject the settlement as unfair.

d.     These objectors also object to the amount of attorney fees requested.  For the reasons set forth below in the Court's discussion of the fee award, the Court overrules this objection.

### 4.     WALKER / EGLER BROS. / W. LEE EGLER FARMS

a.     The objection filed by class members F. Ronalds Walker, Egler Brothers, Inc. and W. Lee Egler Farms, Inc. (Doc. # 3671) raises various issues relating to certification of the settlement class.  The Court overrules the objection.  First, as discussed above, the Court may certify a nationwide class asserting Lanham Act and Minnesota statutory claims despite its prior rulings regarding such claims.  Moreover, because the relative merits of the claims are not material to the issue of certification, the objectors' argument that users of Syngenta's products could not prevail on such claims does not prevent inclusion of such farmers within the settlement class.  Second, the Court rejects the objectors' argument against certification based on Rule 23's predominance requirement; as the Court ruled previously in certifying various classes, common questions of law and fact abound and predominate over individual issues.  Third, the Court rejects the argument that members of the previously asserted and certified state law classes are not adequately represented.  Objectors appear to argue in that regard that those state-law claims are superior and stronger in comparison to the nationwide Lanham Act class claim, as evidenced by the verdict in the Kansas class trial.  As plaintiffs point out, however, the nationwide class encompasses the previous state classes, and the objectors have not explained how any class member with stronger claims is being disadvantaged because of the inclusion of anyone with weaker claims.  In addition, these objectors are not from

Kansas and thus have no standing to argue that Kansas class members are being disadvantaged; indeed, no Kansas settlement class member has objected to the settlement on this basis. Fourth, the objectors note that the operative dates for membership in the settlement class do not coincide exactly with the dates for the previously-certified state classes, but they have not made any argument to explain why the use of those dates is unreasonable or improper. The dates for the settlement class are not without basis, as the class period covers the duration of the economic effect as alleged by plaintiffs.

b.    These objectors also object to the amount of attorney fees requested. For the reasons set forth below in the Court's discussion of the fee award, the Court overrules this objection.

## 5.    ROBERT OTTO / LINDA OTTO

a.    In their objection (Doc. # 3672, Exh. A), Robert and Linda Otto argue that their classification within subclass II (corn producers who used Viptera or Duracade) is not fair. The Ottos planted both Viptera and Duracade prior to Chinese approval, but they argue that they acted properly in attempting to segregate that corn from other corn. They speculate that subclass II members would not have used those products for 100 percent of their corn, and they argue that because 75 percent of their corn did not come from Viptera or Duracade, only 25 percent of their recovery should be subjected to the subclass II formula. The Court overrules this objection. Class members who used Syngenta's products have weaker claims because of unique defenses that Syngenta could assert, including contractual limitations and the economic loss doctrine (as more fully discussed in the following section concerning the Krause objection). Therefore, the Agreement

reasonably provides for a lesser recovery for such class members. Subclass II had separate counsel representing the interests of those members, and the Court finds that the allocation negotiated by the parties among the subclasses is fair, adequate, and reasonable. The Court further notes that members of subclass II were free to opt out of the settlement if they believed that their particular circumstances made their own claims relatively strong.

b. These objectors also object to the claim procedure's use of county average yields. They argue that they have always exceeded such averages because of their use of good seed and good practices, and that their actual yield should be used in determining their recovery. The Court overrules this objection. The use of the county averages greatly aids the claims process: eliminating the need to determine and verify actual yields makes the process far more streamlined, which results in more claims, faster payouts, and lower administrative costs. The Court finds that the use of county average yields is a fair and reasonable method of allocating the settlement fund among a class with over 650,000 members.

## 6. KRAUSE AG, LLC

The objection by class member Krause AG, LLC (Doc. # 3672, Exh. B) raises a single issue. The objector argues that it planted Viptera and Duracade only after those products were approved in China, and that it is therefore unfair for the objector to receive a substantially-reduced recovery within subclass II. The Court overrules this objection.

Although this objector's claim against Syngenta would seem to be stronger on its face than the claims of producers who used Viptera and Duracade prior to Chinese approval, in fact the objector would still face great obstacles in attempting to prevail in

litigation against Syngenta. In particular, Viptera and Duracade users typically signed a contract with Syngenta that contained a prohibition against any future tort recovery from Syngenta and a one-way attorney fee provision favoring Syngenta. These provisions greatly increase the risk and potential cost of pursuing a claim by a subclass II member, regardless of when the member signed the contract with Syngenta. Moreover, purchasers of the seed from Syngenta must also overcome the defense of the economic loss doctrine. Finally, in contrast to members of subclass I (producers who did not use Viptera or Duracade), subclass II members have no successful trial result on which to rely in negotiating for a larger settlement recovery. The presence of these hurdles persuaded plaintiffs' counsel not to include Viptera and Duracade users within the previously-asserted classes, and these obstacles also informed negotiations concerning the allocation conducted by the separate counsel for the subclasses. Thus, regardless of when a class member used Syngenta's products, that member's claim against Syngenta is far weaker than claims by subclass I members, and the different treatment of such a claim is therefore fair and reasonable.

The allocation of settlement funds need only have a reasonable basis, which may involve the relative strength and values of different categories of claims. *See In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *2 (D. Kan. July 29, 2016) (Lungstrum, J.) (quoting *In re Sprint ERISA Litig.*, 443 F. Supp. 2d at 1262). There is no requirement that funds be allocated according to the particular strength of each class member's claim. In this case, the reduced recovery allocated to subclass II members is reasonable, based on the relative weakness of those members' claims.

### 7.     JAMES BARBER LIVING TRUST / HARRY BARBER

This objection (Doc. # 3680) raises the same issue raised in the Krause objection, and the Court therefore overrules the objection for the same reasons set forth above.

### 8.     TAURUS HOLDINGS, LLC

This objection (Doc. # 3681) relates only to the amount of attorney fees requested. For the reasons set forth below in the Court's discussion of the fee award, the Court overrules this objection.

### 9.     EUROPEAN RURAL HERITAGE INSTITUTE

This objection (Doc. # 3682) relates only to the amount of attorney fees requested. For the reasons set forth below in the Court's discussion of the fee award, the Court overrules this objection.[7]

### 10.     WITHDRAWN OBJECTIONS

Two class members submitted and subsequently withdrew objections. Sharon Brunet objected to the amount of attorney fees requested (Doc. # 3684), but she subsequently filed a motion to withdraw "with prejudice" that objection and her prior notice of intent to appear at the final approval hearing (Doc. # 3774). The reason for the withdrawal is unknown, and at the hearing plaintiffs' counsel confirmed that Ms. Brunet was not given any consideration for that withdrawal. Moreover, the objection is cumulative of other objections. Accordingly, the Court approves the withdrawal of the objection.

---

[7] The Court is aware of two objections that were not filed as required. One such objection did not include a specific complaint about any particular aspect of the settlement. The other, if it had been properly submitted, would be overruled for the same reasons cited with respect to the Krause and Barber objections.

Rail Transfer, Inc. objected based on the possibility that, because it was a transporter that did not buy and sell corn, its claim would be rejected (Doc. # 3673).  Subsequently, without providing an explanation, Rail Transfer withdrew the objection.  At the hearing, plaintiffs' counsel confirmed that the parties intended that Rail Transfer be included in the settlement and that its claim would therefore be accepted.  Counsel further confirmed that no consideration was paid for the withdrawal of the objection.  Accordingly, the Court approves the withdrawal of this objection.[8]

### C.  *Certification of the Settlement Class*

In its order preliminarily approving the settlement, the Court provisionally certified the settlement class and subclasses as set forth in plaintiffs' fourth amended class action complaint.  *See* 2018 WL 1726345, at *3.  The Court now confirms the certification of the class and subclasses.

In order for such classes to be certified, the usual requirements of Rule 23 must be met, except that trial management issues need not be considered.  *See Nieberding v. Barrette Outdoor Living, Inc.*, 2015 WL 164798, at *2 (D. Kan. Apr. 14, 2015) (citing authorities).  Although generally the requirements of the rule (including avoiding overbroad class definitions) must be given "undiluted, even heightened" attention in the settlement context, such heightened scrutiny is unnecessary if a class had already been certified before settlement.  *See id.* at *2-3 (citing authorities).  In this case, the Court

---

[8] Effective December 1, 2018, Rule 23(e) does not require court approval for the withdrawal of an objection.  These objections were withdrawn prior to that date, however, when Rule 23(e)(5) did require such approval.  Accordingly, the Court explicitly approves the withdrawal of these objections.

previously certified a nationwide Lanham Act class and statewide classes asserting negligence and other state-law claims. The proposed settlement classes go beyond those previously-certified classes, but the proposed classes are not overbroad, as each subclass group has asserted related claims against Syngenta.

The Court again concludes that the requirements of Rule 23 are satisfied here for a nationwide settlement class and each of the proposed subclasses (producers who did not purchase Viptera or Duracade, producers who did, grain handlers, ethanol producers). The class members are numerous---corn producers number in the hundreds of thousands, and claims have been submitted by over 1,800 grain handlers and 350 ethanol producers. The same common questions of fact and law identified by the Court in its previous certification order may be found here as well, and the proposed plaintiff representatives are typical and adequate. As confirmed by the trial of the Kansas class claims, the common questions predominate, and class treatment is superior to individual treatment (especially in this settlement context). Finally, as discussed above, the objections relating to class certification lack merit. Accordingly, the Court grants the motion for certification, the terms of which will be set forth in the Court's separate order concerning final approval and the other relief requested by plaintiffs.

### D.    *Other Relief Requested*

By their motion for final settlement approval, plaintiffs also request that the Court reaffirm its preliminary appointments of class representatives, settlement class counsel, claims administrator, and special masters to oversee the claims process. No party or class member has objected to or opposed any of those requests. In particular, the claims

administrator is sufficiently experienced and has already demonstrated its ability to handle the claims process. The Court therefore grants the requests for these appointments, as more fully set forth in the Court's separate order.

### III.     <u>Award of Attorney Fees from Settlement Fund</u>

MDL co-lead counsel and settlement class counsel request that the Court award one-third of the gross settlement amount as attorney fees. For the reasons set forth on the record of the final approval hearing and as more fully set forth below, the Court agrees that an award in that amount is appropriate under the unique circumstances of this case. Accordingly, the Court awards attorney fees from the settlement fund in the amount of $503,333,333.33.

First, the Court has authority to award attorney fees and expenses from the settlement fund in this case. Rule 23 provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law." *See* Fed. R. Civ. P. 23(h).[9] The Agreement here expressly contemplates an award of attorney fees and expenses to counsel who performed work for the benefit of the settlement class members. Fees are also authorized under the common fund doctrine. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself

---

[9] The rule further provides that in ruling on a motion for attorney fees, the court "must find the facts and state its legal conclusions under Rule 52(a)." *See* Fed. R. Civ. P. 23(h)(3). Accordingly, this section of the order constitutes the Court's findings and conclusions pursuant to Fed. R. Civ. P. 52(a).

or his client is entitled to a reasonable attorney's fee from the fund as a whole."); *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (quoting *Boeing*); *see generally* Federal Judicial Center, *Manual for Complex Litigation* §§ 14.21, 20.312 (4th ed. 2004). The Tenth Circuit has expressed a preference for the percentage-of-the-fund method of awarding attorney fees in common fund cases. *See Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995) (citing *Gottlieb*, 43 F.3d at 483). In addition, although common benefit orders, contemplating fees awarded from a common fund, were entered in this MDL and in the Minnesota state-court litigation, the settlement was accomplished at least in part because of work by plaintiffs' attorneys that was not necessarily covered by those orders; accordingly, pursuant to Rule 23(h) and the common-fund doctrine, the Court awards a percentage of the fund sufficient to permit reasonable attorney fees for all work that contributed to the class settlement.[10]

The Tenth Circuit has indicated that a court making a percentage fee award in a common fund case should apply the so-called *Johnson* factors, which are as follows:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee . . .; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

---

[10] Such an approach was used in the recent *NFL* case, which also involved a hybrid settlement of class and individually-asserted claims. *See In re National Football League Players' Concussion Injury Litig. (NFL)*, 2018 WL 1635648 (E.D. Pa. Apr. 5, 2018) (appeals pending); *NFL*, 2018 WL 1658808 (E.D. Pa. Apr. 5, 2018) (appeals pending).

*See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988) (citing *Johnson v. Georgia Hwy. Expr., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)); *see also Gottlieb*, 43 F.3d at 483 (court utilizing the percentage-of-the-fund approach must consider the *Johnson* factors). The Tenth Circuit has recognized, however, that "rarely are all of the Johnson factors applicable; this is particularly so in a common fund situation." *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993) (quoting *Brown*, 838 F.2d at 456). Moreover, "[i]n percentage-of-the-fund cases, courts often engage in a 'cross-check' of the fee award against the lodestar figure accounting for counsel's hours and hourly rates." *See Urethane*, 2016 WL 4060156, at *7 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305-06 (3d Cir. 2005)); *see also Manual for Complex Litig.* § 14.121.

The Court finds that application of the *Johnson* factors overwhelmingly supports the request for fees in the amount of one-third of the settlement fund. Only the eleventh factor (the nature and length of the client relationship) does not weigh in favor of plaintiffs' counsel. The Court finds that all of the other factors support a substantial award.

The Court notes at the outset that counsel have supported their request with an expert declaration from Professor Robert Klonoff. The Court agrees with Professor Klonoff that the facts and circumstances of this case, considered in light of the *Johnson* factors, distinguish this case from other common fund cases with large settlements and warrant a substantial fee award. The Court further notes that very few class members (or their attorneys) objected to an award of one-third of the fund.

First, this litigation required very extensive time and labor by plaintiffs' attorneys (*Johnson* factor 1). The fee applications submitted by various plaintiffs' counsel show a total of more than 1.2 million hours spent on the litigation. This number is not surprising given the breadth and scope of the litigation. As noted above, thousands of suits were filed against Syngenta, in multiple jurisdictions, resulting in the creation of a federal MDL and a similar consolidation in state court in Minnesota. That breadth contributed greatly to the ultimate settlement, as Syngenta was forced to defend different types of suits (class actions and individual suits), involving a variety of federal and state-law claims, brought by different types of plaintiffs, in a number of different courts.

In addition, the actual litigation of the claims required a great amount of work, from the time the cases were filed to the ultimate settlement. Counsel had to investigate and develop novel factual and legal theories (more on that below), and massive efforts were undertaken in discovery, which included reviewing millions of pages of documents and taking hundreds of depositions here and abroad. This case included numerous experts on both sides, requiring plaintiffs' counsel to oversee production of principal and rebuttal expert reports, take and defend expert depositions, and brief and argue *Daubert* motions prior to trial. Motion practice was extensive, including with respect to the Court's jurisdiction, substantial motions to dismiss, class certification, discovery disputes, motions for summary judgment, and motions in limine. The parties prepared for and completed a three-week trial, and two other trials were started. Moroever, this litigation was extremely hard-fought, as Syngenta, represented by experienced and well-funded top-shelf counsel, (quite properly) raised every defense and contested every issue throughout. The burden

for plaintiffs' counsel was increased by the fact that class certification was not assured (it was denied in the similar *Rice* case) and by the close questions of fact and law raised by the claims. The Court further notes that, unlike some other class actions, this case did not involve a government investigation or prosecution of the defendant, and thus plaintiffs' counsel were forced to undertake all of the necessary investigation and discovery. In addition, this Court and the other courts did not allow for an overly protracted period of litigation; rather, they insisted on keeping these cases moving at a good pace, which required counsel to perform their work subject to significant time limitations (factor 7).

Although the work was quite extensive (with a massive number of hours expended), it was nevertheless performed efficiently on the whole. Suits were effectively consolidated by the filing of master complaints, the courts issued coordination orders and worked together, and plaintiffs' counsel coordinated their discovery efforts in the various jurisdictions. That efficiency is evidenced by the fact that the litigation proceeded to three trials in a relatively short period of time, given the amount of discovery and motion practice.

In short, this was not a case that settled before significant work was performed litigating the claims. Indeed, the fact that a trial was completed distinguishes this case from most cases involving large settlements. As one attorney put it with respect to the reasonableness of the settlement, the "tires were kicked" to an extraordinary degree in testing the merits of plaintiffs' claims. Plaintiffs' counsel necessarily and reasonably expended a huge amount of time and labor in litigating these cases to a very successful conclusion, and that fact weighs heavily in support of a substantial fee award.

Moreover, as noted above, this case involved very novel and difficult questions of law and fact (factor 2). Plaintiffs' task was daunting, as they brought what was essentially the first GMO case involving a product that had been approved for sale in the United States and that posed no known health risk. As Syngenta repeatedly reminded the courts, imposition of liability in such circumstances was therefore unprecedented. Difficult issues fully contested by the parties include federal court jurisdiction, the existence of a legal duty, applicability of the economic loss doctrine, the ability to recover the damages sought, liability under the Lanham Act, preemption by federal statutes, the ability to compare fault, violations of international law, and punitive damages. Litigaton of the case demanded expertise in a variety of areas, including genetically-modified organisms (GMO), the domestic corn market, governmental deregulation, and Chinese government policies and practices. Syngenta raised defenses that implicated international politics and economics. This was not a simple or straightforward negligence case. In addition, plaintiffs could not necessarily count on class certification, which had been denied in a similar case involving rice.

The complex and difficult nature of the litigation, which spanned across multiple jurisdictions and which involved multiple types of plaintiffs and claims, required a great deal of skill from plaintiffs' counsel (factor 3), including because they were opposed by excellent attorneys retained by Syngenta. That high standard was met in this case, as the Court finds that the most prominent and productive plaintiffs' counsel in this litigation were very experienced, had very good reputations, were excellent attorneys, and performed excellent work (factor 9). In appointing lead counsel, the various courts made sure that

plaintiffs would have the very best representation. Lead counsel had very good experience in large-scale and class-action and MDL cases, including in the similar *Rice* and *Starlink* cases. In this Court's view, the work performed by plaintiffs' counsel was consistently excellent, as evidenced at least in part by plaintiffs' significant victories with respect to dispositive motion practice, class certification, and trial. Moreover, plaintiffs' counsel have confirmed that the demands of this litigation, especially for lead counsel in the various courts, precluded other employment for these attorneys (factor 4).

The Court finds that a one-third fee is customary in contingent-fee cases (factor 5), or is even on the low side, as that figure is often higher in complex cases or cases that proceed to trial. *See Urethane*, 2016 WL 4060156, at *5. Indeed, counsel have indicated that many plaintiffs in this case agreed to contingent-fee arrangements that allowed for fees of at least 40 percent of any recovery (factor 6).

The Court finds that its award is further supported by the amount at stake in this litigation (billions of dollars alleged in damages) and the excellent results obtained for plaintiffs by their counsel (factor 8). As noted above with respect to the Court's finding that the settlement is reasonable, the $1.51 billion settlement amount is very impressive---it is one of the largest known settlements in any kind of case---and represents a significant percentage of the actual damages alleged by plaintiffs. The class members' reaction to the settlement has been overwhelmingly positive, with few opt-outs and objections (and no objection to the settlement amount). That result is especially impressive in light of the many difficulties faced by plaintiffs in succeeding on these claims, which made the case less than desirable (factor 10). As previously noted, there was no parallel government

proceeding against the defendant on which plaintiffs could rely for investigation, discovery, or simple reassurance in the merits of the claims. The litigation of this case required that plaintiffs' counsel risk huge expenditures on a contingent basis, with a substantial risk of no recovery in light of the doubtful nature of the claims and the difficulties that could arise in collecting any judgment from a foreign defendant.

Finally, the Court finds that its award of one-third of the settlement fund is supported by a consideration of awards in similar cases (factor 12). The few objectors to the fee request (including one group of plaintiffs' counsel) have focused almost entirely on this factor, as they argue that percentage fee awards tend to be lower in so-called "megafund" cases involving very large settlements. Indeed, as those objectors note, there are a number of megafund cases involving fee awards under 20 percent, although in many such cases, the court did not reject a higher request but rather accepted the low one. Of course, those cases were decided on their particular facts, as this case must be decided by application of the *Johnson* factors to its particular circumstances. It is true that economies of scale may mean that a large percentage would result in an unacceptable windfall in some cases, but the Court does not agree that megafund cases should necessarily be subject to a diminishing scale by which the award percentage falls as the settlement amount grows. As the Court has noted previously, use of such a scale fails to provide the proper incentive for counsel and is fundamentally at odds with the percentage-of-the-fund approach favored by the Tenth Circuit. The Court agrees with the following reasoning by another court:

> While such an approach may have validity when there is a large settlement short of a full trial, I conclude that the rationale has no reasonable application in this unique case for the reasons I have already discussed. Likewise, the

court in *In re Ikon Office Solutions, Inc. Sec. Litig.* . . . rejected this "declining percentage" method:

> Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give significant weight to the fact that large attorneys' fees serve to motivate capable counsel to undertake these actions.
>
> While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit . . ., the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.

*See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1212-13 (S.D. Fla. 2006)

(quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000))

(other citations and internal quotations omitted).[11]

A number of courts have awarded similar fees in megafund cases. *See Urethane*, 2016 WL 4060156, at *6. Professor Klonoff's declaration contains a list of over 40 megafund cases (with settlements of $100 million or more) involving fee awards of 30 percent or greater, the great majority of which were settled before any trial. An award at the top end of the range of percentage awards is warranted by the particular circumstances

---

[11] Additional cases containing criticism of this approach are cited in Professor Klonoff's declaration. In addition, although many objectors rely on a study by Professor Brian Fitzpatrick to show that most megafund cases involve an award of a lower percentage of fees, Professor Fitzpatrick stated in a declaration in the *Deepwater Horizon* case (which the Toups/Coffman attorneys submitted in support of their "megafund" objection to a one-third award) that he (like many courts and commentators) "do[es] not endorse this bigger-settlement-smaller-fee approach because it creates bad incentives for class counsel."

of this litigation, including the following: the case involved seriously disputed questions of law and fact, and recovery was therefore in doubt; there was no parallel government proceeding against the defendant; litigation was extensive and exhaustive, over many years, and included a trial and a plaintiffs' verdict; and a great recovery was achieved for plaintiffs. A one-third fee is within the range of awards for cases with similar success, *see id.* at *8 (awarding one-third of settlement fund as attorney fees), and this factor therefore supports the Court's award in this case.

Finally, the reasonableness of a one-third award is confirmed by a cross-check of the relevant lodestar amount. Because this award is intended to account for all contingent fee recoveries from payments to class members from the settlement fund, the Court considers all fee applications submitted by plaintiffs' attorneys, and not merely the applications by lead counsel or by counsel performing work under common benefit orders, in calculating the applicable lodestar amount. In addition, the Court finds that the hourly rates used by counsel (averaging under $500 per hour, with lower amounts for contract attorney and non-attorneys) and the number of hours expended to be generally reasonable, considering the scope and complexity of this litigation. The total lodestar amount is approximately $357 million, which yields a multiplier of only 1.4 on an award of $503 million. That multiplier is extremely modest in light of the great risk undertaken in pursuing these claims on a contingent-fee basis. Even if the Court were to discount by 50 percent all time other than common-benefit work by Kansas and Minnesota lead counsel (which discount the Court does not believe appropriate), the multiplier would remain below 2. For further perspective, even if the Court considered only common-benefit work by

33

Kansas and Minnesota lead counsel---despite the obvious contribution to the settlement effected by other work---the multiplier would be less than 3.[12]  Such multipliers are well within the range accepted by other courts, even in cases without trials.  *See id.* at *7; *Newburg on Class Actions* § 14:6 (4th ed. & Supp. 2008).[13]

For all of these reasons, the Court finds that the *Johnson* factors support an award of attorney fees in this case in the amount of one-third of the settlement fund, or $503,333,333.33, and it hereby awards fees in that amount.  The special master's report and recommendation of November 21, 2018 (Doc. # 3816), issued pursuant to Fed. R. Civ. P. 23(h)(4), addresses the allocation of that amount among plaintiffs' attorneys (as well as the requests for expenses and service awards).  Objections to the report and recommendation have been filed, and the Court will conduct a hearing on those issues on December 17, 2018.


### IV.    Special Master's Motion for Mediation Expenses

The special master's pending motion for an award of deferred expenses incurred in mediation, in the amount of $205,720.10, is unopposed, and the Court concludes that such an award is reasonable and appropriate.  The Court therefore grants the motion.

---

[12] Thus, even if one were to assume that some hours for non-common-benefit-order work (which was not subject to the same rigorous controls) have been padded (for instance, by the inclusion of time spent seeking clients or submitting claims), as some of the objectors suspect, the multiplier would remain within an acceptable range.

[13] Professor Klonoff's declaration cites a number of megafund cases involving multipliers above 3.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiffs' motion for final settlement approval and other relief (Doc. # 3776) is hereby **granted**, and the Court will issue a separate order setting forth the granted relief as requested by plaintiffs. Moreover, the Court approves the withdrawal of two objections (Doc. # 3684, withdrawal requested in Doc. # 3774; Doc. # 3673, withdrawal requested in Doc. # 3782), and it **overrules** all other objections to the settlement or to the total fee award (Doc. ## 3545, 3667, 3669, 3671, 3672, 3680, 3681, 3682).

IT IS FURTHER ORDERED BY THE COURT THAT total attorney fees are awarded in the amount of one third of the settlement fund, or $503,333,333.33, and the petition for attorney fees filed by MDL co-lead counsel and settlement class counsel (Doc. # 3585) is **granted** to that extent (and otherwise remains pending).

IT IS FURTHER ORDERED THAT the special master's pending motion for mediation expenses (Doc. # 3564) is **granted as unopposed**, and the special master is awarded $205,720.10 from the settlement fund.

IT IS SO ORDERED.

Dated this 7th day of December, 2018, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge